# 1:21-cv-10038-LAK

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

In re DITECH HOLDING CORPORATION, *et al.*

FINANCE OF AMERICA REVERSE LLC, Appellant,

v.

MORTGAGE WINDDOWN LLC, AS PLAN ADMINISTRATOR, Appellee.

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (GARRITY JR., J.)

IN RE DITECH HOLDING CORPORATION, *ET AL.,* CASE NO. 19-10412 (JOINTLY ADMINISTERED)

===================================================================

### OPENING BRIEF OF APPELLANT
### <u>FINANCE OF AMERICA REVERSE LLC</u>

Peter S. Partee, Sr.
Robert A. Rich
**HUNTON ANDREWS KURTH LLP**
200 Park Avenue
New York, New York 10166
(212) 309-1000
ppartee@huntonak.com
rrich2@huntonak.com

*Counsel for Appellant Finance of America Reverse LLC*

Dated: January 18, 2022

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 7.1 and Federal Rule of Bankruptcy Procedure 8012, Appellant Finance of America Reverse LLC states as follows:

1.　　Appellant Finance of America Reverse LLC is wholly owned by Finance of America Holdings LLC, which is wholly owned by Finance of America Funding LLC, which is wholly owned by Finance of America Equity Capital LLC.

2.　　Finance of America Companies Inc., a publicly-traded company, owns more than 10% of Finance of America Equity Capital LLC, and certain funds managed by publicly-traded Blackstone Group L.P. indirectly own more than 10% of Finance of America Equity Capital LLC.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Finance of America Reverse LLC respectfully requests oral argument.  This appeal raises important issues of bankruptcy law with respect to administrative obligations that a debtor incurs in the operation of its business as a debtor in possession.  Resolution of these issues is likely to impact the extent to which contract counterparties are willing to cooperate with a debtor's efforts to rehabilitate, which is the goal of Chapter 11.  This appeal also raises issues with respect to contract interpretation under New York law, with far reaching implications both in and outside the bankruptcy world.  Oral argument should assist the Court to resolve these issues.

# <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................................1

JURISDICTIONAL STATEMENT ................................................................................................4

STATEMENT OF ISSUES PRESENTED.......................................................................................4

STATEMENT OF THE CASE.........................................................................................................4

    I.     Factual and Procedural Background. .........................................................................4

          A.  The Bankruptcy Case ...................................................................................4

          B.  The Subservicing Agreements .....................................................................5

          C.  The FoA Administrative Claim ....................................................................7

          D.  The Plan Administrator's Objection, FoA's Response and the
              Sufficiency Hearing .....................................................................................7

    II.    The Decision Below.................................................................................................9

STANDARD OF REVIEW ...........................................................................................................10

ARGUMENT .................................................................................................................................11

    I.     The Bankruptcy Court Erred In Denying Adminstrative Priority
        For Damages Resulting From RMS' Post-Petition Breach of the
        Subservicing Agreements .......................................................................................11

          A.  Statutory Framework ..................................................................................11

          B.  Claims For Breach Of Executory Contracts During the Period Prior to
              Assumption or Rejection Qualify for Administrative Expense Priority
              Where They Result From the Parties' Post-Petition Performance...................13

          C.  The FoA Administrative Claim Asserts Damages Resulting From
              the Parties' Post-Petition Performance. .....................................................21

    II.    The Bankruptcy Court Erred In Holding That The Post-Petition
        Extension Agreements Do Not Consitute New, Post-Petition Contracts ............23

    III.   The Other Issues Raised By The Plan Administrator Below, But
        Not Reached By The Bankruptcy Court, Lack Merit and Should
        Be Decided In FoA's Favor ...................................................................................27

          A.  The Post-Petition Extension Agreements Do Not Require Bankruptcy
              Court Approval Before Giving Rise to Administrative Expense Priority .......28

          B.  The FoA Administrative Claim Is Not Capped At The Amount
              of Post-Petition Subservicing Fees Paid to RMS............................................32

CONCLUSION..............................................................................................................................35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Adelphia Bus. Solutions, Inc.*,
  296 B.R. 656 (Bankr. S.D.N.Y. 2003) ..............................................................13, 21

*Ala. Surface Mining Comm'n v. N.P. Mining Co. (In re N.P. Mining Co.)*,
  963 F.2d 1449 (11th Cir. 1992) ...................................................................33

*In re Ames Dept. Stores, Inc.*,
  306 B.R. 43 (Bankr. S.D.N.Y. 2004) ...................................................................16

*In re AppliedTheory Corp.*,
  312 B.R. 225 (Bankr. S.D.N.Y. 2004)..............................................................34, 35

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)..........................................................................10

*Bacolitsas v. 86th & 3rd Owner, LLC*,
  702 F.3d 673 (2d Cir. 2012).........................................................................27

*Bethlehem Steel Corp. v. BP Energy Co. (In re Bethlehem Steel Corp.)*,
  291 B.R. 260 (Bankr. S.D.N.Y. 2003)..............................................................14, 34

*Booking v. Gen. Star Mgmt. Co.*,
  254 F.3d 414 (2d Cir. 2001)..........................................................................27

*In re Bradlees Stores, Inc.*,
  Case No. 02-0896, 2003 WL 76990 (S.D.N.Y. Jan. 9, 2003), *aff'd* 78 F. Appx.
  166 (2d Cir. 2003)....................................................................................21

*In re Bush Industries, Inc.*,
  Case No. 05-cv-119S, 2006 WL 8455682 (W.D.N.Y. Mar. 29, 2006) ............................25, 26

*Cappelli v. State Farm Mut. Auto. Ins. Co.*,
  686 N.Y.S.2d 494 (App. Div. 2d Dept. 1999) ......................................................24

*In re Chateaugay Corp.*,
  944 F.2d 997 (2d. Cir. 1991).................................................................18, 19, 20

*Conway Hosp., Inc. v. Lehman Bros. Holdings Inc.*,
  531 B.R. 339 (S.D.N.Y. 2015)........................................................................20

*In re Country Club Ests. at Aventura Maint. Ass'n, Inc.*,
  227 B.R. 565 (Bankr. S.D. Fla. 1998) ..............................................................26, 27

*In re Crystal Apparel, Inc.*,
 220 B.R. 816 (Bankr. S.D.N.Y. 1998) ................................................................33, 34

*Cumberland Farms, Inc. v. Fla. Dept. of Envtl. Prot.*,
 116 F.3d 16 (1st Cir. 1997) ..............................................................................................33

*Delta Air Lines, Inc. v. Bombardier, Inc.*,
 Case No. 20-cv-3025-GHW, 2021 WL 1163702 (S.D.N.Y. Mar. 25, 2021),
 *aff'd*, Case No. 21-1028, 2021 WL 5492938 (2d Cir. Nov. 23, 2021) ....................24

*Dime Sav. Bank of New York, FSB v. Montague St. Realty Assoc.*,
 90 N.Y.2d 539, 686 N.E.2d 1340 (N.Y. 1997) ........................................................26

*In re Ditech Holding Corp.*,
 Case No. 19-10412, 2020 WL 7052883 (Bankr. S.D.N.Y. Nov. 30, 2020) ............20

*Eagle Ins. Co. v. Bankvest Capital Corp. (In re Bankvest Capital Corp.)*,
 360 F.3d 291 (1st Cir. 2004) ............................................................................................6

*Eastern Air Lines, Inc. v. Ins. Co. of Pa. (In re Ionosphere Clubs, Inc.)*,
 85 F.3d 992 (2d Cir. 1996) ............................................................................................12

*Elliott v. Gen. Motors LLC (In re Motors Liquidation Co.)*,
 829 F.3d 135 (2d Cir. 2016) ..........................................................................................18

*In re Enron Corp.*,
 279 B.R. 79 (Bankr. S.D.N.Y. 2002) ......................................................................11, 16

*In re Enron Corp.*,
 Case No. 01-16034, 2003 WL 1562202 (Bankr. S.D.N.Y. Mar. 21, 2003) ..........29, 30, 31, 32

*Goldberg v. Hilsen (In re Hilsen)*,
 119 B.R. 435 (S.D.N.Y. 1990) ......................................................................................27

*Greek Orthodox Archdiocese of N. & S. Am. v. Abrams*,
 162 Misc. 2d 850, 618 N.Y.S.2d 504 (N.Y. Sup. Ct. 1994) ..............................24, 25

*Hersch v. Dewitt Stern Group, Inc.*,
 Case No. 0601675/2005, 2005 WL 6003389 (N.Y. Sup. Ct. Sep. 21, 2005) ..........27

*Hodgson v. Preferred Acc. Ins. Co.*,
 165 N.Y.S. 293 (N.Y. Sup. Ct. 1917) ..........................................................................27

*In re ID Liquidation One, LLC*,
 503 B.R. 392 (Bankr. D. Del. 2013) ......................................................................14, 34

*In re Jartran, Inc.*,
 732 F.2d 584 (7th Cir. 1984) ..........................................................................................13

*Johns Manville Corp.*,
  552 B.R. 221 (Bankr. S.D.N.Y. 2016) ................................................................................18

*Karpen v. Ali*,
  46 Misc. 3d 1228(A), 9 N.Y.S.3d 593 (N.Y. Sup. Ct. 2015) ................................................24

*In re Manville Forest Prod. Corp.*,
  209 F.3d 125 (2d Cir. 2000)........................................................................................18, 20

*Mason v. Official Comm. of Unsecured Creditors (In re FBI Distribution Corp.)*,
  330 F.3d 36 (1st Cir. 2003)................................................................................................21

*Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*,
  114 F.3d 379 (2d Cir. 1997)........................................................................................28, 30

*Mission Prod. Holdings, Inc. v. Tempnology, LLC*,
  139 S. Ct. 1652 (2019)......................................................................................................12

*Moore v. Metro. Life Ins. Co.*,
  346 N.Y.S.2d 298 (N.Y. Sup. Ct. 1972) ............................................................................27

*Morillo v. Wells Fargo Bank, N.A.*,
  Case No. 19-CV-08183 (PMH), 2020 WL 2539068 (S.D.N.Y. May 19, 2020) ...................29

*In re Motors Liquidation Co.*,
  598 B.R. 744 (Bankr. S.D.N.Y. 2019) ................................................................................19

*N.L.R.B. v. Bildisco & Bildisco*,
  465 U.S. 513, 104 S. Ct. 1188 (1984)....................................................................14, 32, 34

*Matter of New York State Elec. & Gas Corp. v. Pub. Serv. Commn.*,
  281 N.Y.S. 384 (App. Div. 3d Dept. 1935) ........................................................................24

*Nostas Assocs. v. Costich (In re Klein Sleep Products, Inc.)*,
  78 F.3d 18 (2d Cir. 1996) ............................................................................................15, 33

*Ogle v. Fid. & Deposit Co. of Md.*,
  586 F.3d 143 (2d Cir. 2009)......................................................................................18. 19, 20

*In re Palace Quality Servs. Indus., Inc.*,
  283 B.R. 868 (Bankr. E.D. Mich. 2002) ............................................................................33

*In re Patient Educ. Media, Inc.*,
  221 B.R. 97 (Bankr. S.D.N.Y. 1998)..................................................................................14

*Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*,
  266 B.R. 575 (S.D.N.Y. 2000)..........................................................................................21

iv

*Reading Co. v. Brown*,
391 U.S. 471 (1968)...............................................................................................11, 33

*In re REFCO, Inc.*,
Case No. 07-4784 (DLC), 2008 WL 140956 (S.D.N.Y. Jan. 14, 2008), *aff'd in part, appeal dismissed in part sub nom. In re Refco Inc.*,
331 F. Appx. 12 (2d Cir. 2009)..............................................................................32, 33

*Rescap Liquidating Tr. v. PHH Mortg. Corp. (In re Residential Cap., LLC)*,
558 B.R. 77 (S.D.N.Y. 2016)..........................................................................................20

*SP Special Opportunities, LLC v. LightSquared, Inc. (In re LightSquared, Inc.)*,
539 B.R. 232 (S.D.N.Y. 2015).......................................................................................10

*Spunt v. Charlesbank Laundry, Inc. (In re Charlesbank Laundry, Inc.)*,
755 F.2d 200 (1st Cir. 1985).........................................................................................33

*In re Sturgis Iron & Metal Co.*,
420 B.R. 716 (Bankr. W.D. Mich. 2009)......................................................................33

*Texaco Inc. v. Bd. Of Commissioners for the LaFourche Basin Levee Dist. (In re Texaco Inc.)*,
254 B.R. 536 (Bankr. S.D.N.Y. 2000)...............................................15, 19, 22, 23

*Trustees of the Amalgamated Ins. Fund v. McFarlin's, Inc.*,
789 F.2d 98 (2d Cir. 1986).........................................................11, 13, 16, 22

*In re UAL Corp.*,
293 B.R. 183 (Bankr. N.D. Ill. 2003) ...........................................................................12

*United States Aviation Underwriters, Inc. v. Preservatrice-Fonciere Compagnies D'Assurance*,
Case No. 83-cv-3935 (GLG), 1986 WL 3779 (S.D.N.Y. Mar. 21, 1986), *aff'd sub nom. U.S. Aviation v. Preservatrice-Fonciere*, 801 F.2d 391 (2d Cir. 1986) ...........................................................................................................26

*United States v. Uccio*,
940 F.2d 753 (2d Cir. 1991)...........................................................................................29

*In re Vertis Holdings, Inc.*,
Case No. 10-16170, 2011 WL 6739518 (Bankr. S.D.N.Y. Dec. 21, 2011)...........................12

*In re Yonkers Hamilton Sanitarium Inc.*,
22 B.R. 427 (Bankr. S.D.N.Y. 1982)............................................................................15

*Zelin v. Unishops, Inc. (In re Unishops, Inc.)*,
553 F.2d 305 (2d Cir. 1977)...........................................................................................15

**Unpublished Orders**

*Aralex Pharmaceuticals US Inc.*,
    Case No. 18-12425 (Bankr. S.D.N.Y. Aug. 27, 2018) ............................................17

*In re Ditech Holding Corporation*,
    Case No. 21-10221-LAK (S.D.N.Y. Dec. 8, 2021)................................................8, 23

*Eastman Kodak Company*,
    Case No. 12-10202 (Bankr S.D.N.Y. Jan. 31, 2012)..........................................17

*In re Mortgage Lenders Network USA, Inc.*,
    Case No. 07-10146 (Bankr. D. Del. Mar. 19, 2007) .........................................29, 30

*Sound Shore Medical Center of Westchester*,
    Case No. 13-22840 (Bankr. S.D.N.Y. Jul. 30, 2013)............................................17

**Statutes**

11 U.S.C. § 101(5) .................................................................................................18, 19

11 U.S.C. § 363(b) .................................................................................................27, 28

11 U.S.C. § 363(c) .................................................................................................27, 28

11 U.S.C. § 365(a) .......................................................................................................12

11 U.S.C. § 365(d) .......................................................................................................12

11 U.S.C. § 365(g) .........................................................................................12, 17, 18

11 U.S.C. § 502(g) .................................................................................................12, 17

11 U.S.C. § 503(b) ................................................................................................ *passim*

11 U.S.C. § 1101(1) ......................................................................................................5

11 U.S.C. § 1107(a) ...................................................................................................5, 11

11 U.S.C. § 1108 ...........................................................................................................5

28 U.S.C. § 157(b) ........................................................................................................4

28 U.S.C. § 158(a) ........................................................................................................4

28 U.S.C. § 1334(b) ......................................................................................................4

28 U.S.C. § 1408............................................................................................................4

28 U.S.C. § 2106..........................................................................................................10

**Rules**

Fed. R. Civ. P. 12(b)(6)......................................................................................9, 10, 31

**Legislative History**

H.R. Rep. No. 95-595 (1977)...........................................................................................17

S. Rep. No. 95-989 (1978)..............................................................................................17

## INTRODUCTION AND SUMMARY OF ARGUMENT[1]

Congress created the Bankruptcy Code's administrative expense priority scheme with the overarching rationale that allowing a debtor to continue operating its business in the ordinary course during the Chapter 11 rehabilitation process, as opposed to requiring the immediate cessation and liquidation of that business, redounds directly to the benefit of the debtor's pre-petition creditors.   In fairness to counterparties that facilitate a debtor's continued operations during the Chapter 11 process, and to encourage counterparties to continue dealing with Chapter 11 debtors – a critical requirement for preserving Chapter 11 debtors' going concern value – the Bankruptcy Code affords "administrative priority" to claims that arise from the debtor's post-bankruptcy conduct of business.   Because payment of such administrative priority claims in full is a condition of confirming a Chapter 11 plan and exiting the Chapter 11 process, such administrative priority claims almost always are paid in full.   In this way, counterparties suffer no prejudice by continuing to deal with a Chapter 11 debtor.

In this case, RMS' business consisted of servicing and subservicing reverse mortgage loans, including a portfolio of reverse mortgage loans for Appellant, FoA, as the owner and/or named servicer.   RMS continued operating through its Chapter 11 process, collecting millions of dollars in subservicing fees from FoA among other servicing counterparties, which facilitated the preservation of RMS' business until its Chapter 11 case successfully concluded with confirmation of a Plan and consummation of a going concern asset sale.   Unfortunately for FoA, RMS' failure to properly subservice FoA's reverse mortgage loan portfolio during the Chapter 11 case resulted in substantial damages incurred by FoA for which RMS is responsible under the terms of the

---

[1] Capitalized terms used but not defined in this Introduction and in the Statement of Issues Presented shall have the meanings ascribed to such terms below.

parties' subservicing contracts.  FoA timely filed a proof of claim in RMS' bankruptcy case asserting these damages claims and seeking administrative expense priority.

This appeal follows a decision by the Bankruptcy Court denying administrative expense priority to FoA's claims.[2]  Although those claims relate exclusively to RMS' subservicing errors and other breaches committed during Chapter 11 case, i.e. post-petition, the Bankruptcy Court held that FoA's claims are deemed to arise prior to the Chapter 11 case, i.e. pre-petition, solely because they are based on subservicing contracts entered pre-petition.  In doing so, the Bankruptcy Court adopted a new rule that turns the Bankruptcy Code's carefully crafted administrative expense priority scheme on its head: that all claims sounding in contract are deemed to arise at the time the contract was entered, regardless of when the breach occurred.  The consequence of the Bankruptcy Court's ruling is that all claims for breach of a pre-petition contract against a Chapter 11 debtor constitute pre-petition claims, *even if the breach of contract occurred post-petition*.  Unless reversed on appeal, therefore, FoA's claims for post-petition breach of contract will not be afforded administrative expense priority, but rather, will be treated as pre-petition claims and likely paid only pennies on the dollar.

The Bankruptcy Court erred in denying administrative expense priority to FoA's claims solely because they are based on pre-petition contracts.  Claims resulting from the parties' post-petition performance arise post-petition, and are afforded administrative expense priority, even if those claims are based on a pre-petition contract.  If claims based on pre-petition contracts never gave rise to administrative expense liability, then a debtor in bankruptcy would be free to demand performance by a counterparty while refusing to provide any consideration in return, leaving the counterparty with a mere pre-petition claim.  The resulting asymmetry runs directly contrary to

---

[2] Only the priority, and not the amount, of FoA's claims is at issue in this appeal.

Congress' intent in enacting the administrative expense priority scheme designed to reward counterparties that continue to deal with Chapter 11 debtors during the rehabilitation process.

The Bankruptcy Court also erred in holding that all of the subservicing agreements at issue constitute pre-petition contracts.  The vast majority of FoA's claims are based on *post-petition* agreements with RMS, meaning that claims based on those agreements arise post-petition even under the Bankruptcy Court's flawed reasoning as to when a contract claim arises.  The pre-petition subservicing contracts between RMS and FoA expired by their terms within the first two months of the Chapter 11 case.  During the course of the Chapter 11 case, the parties entered into a series of extension agreements to allow for RMS to continue subservicing until consummation of its asset sale.  Those extension agreements constitute new contracts under applicable state law, formed when they were entered into by the parties.  The Bankruptcy Court's holding that they do not constitute new contracts is based on a flawed interpretation of New York contract law.

Finally, given these rulings, the Bankruptcy Court expressly declined to address two arguments raised by the appellee below: (i) that even if the post-petition extension agreements were new contracts under applicable state law, RMS' entry into those agreements constitutes a transaction outside of the ordinary course of RMS' business, which required Bankruptcy Court approval before it could give rise to administrative expense priority; and (ii) the portion of FoA's claims entitled to priority should be limited to no more than the total amount of subservicing fees that FoA paid to RMS during the course of the Chapter 11 case.  Appellee raised each of these arguments for the first time in its reply brief, and therefore FoA did not have the opportunity to brief them with the Bankruptcy Court below.  However, it is clear from the record that these arguments lack merit, and so FoA respectfully submits that the Court can and should exercise its discretion to rule against the appellee on these issues.

## JURISDICTIONAL STATEMENT

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 157(b) and 1334(b), and venue was proper under 28 U.S.C. § 1408.  After the bankruptcy court entered the *Memorandum Decision and Order Sustaining The Fifty-Second Omnibus Objection to proofs of Claim (Misclassified Claims)* on October 21, 2021, which is a final order, Appellant, FoA, appealed that order on November 3, 2021.  [B.D.I. 3754, A-1147-1182].[3]  Thus, this Court has jurisdiction under 28 U.S.C. § 158(a)(1).

## STATEMENT OF ISSUES PRESENTED

1.      Whether the bankruptcy court erred in holding that FoA's claims for damages resulting from the Debtor's post-petition, pre-rejection breach of the subservicing agreements are not entitled to administrative expense priority.

2.      Whether the bankruptcy court erred in holding that subservicing extension agreements between FoA and the Debtor entered post-petition do not constitute new contracts under applicable state law.

3.      Whether this Court should consider and overrule the additional arguments raised by the appellee in its reply brief below, but not reached by the bankruptcy court.

## STATEMENT OF THE CASE

**I.      Factual and Procedural Background**

**A.      The Bankruptcy Case**

On February 11, 2019 (the "Petition Date"), Reverse Mortgage Solutions, Inc. ("RMS" or the "Debtor") and certain of its affiliates (collectively, with RMS, the "Debtors") filed voluntary

---

[3] References to docket items in the bankruptcy court case below are cited as "B.D.I."  References to the Appendix are cited as "A-___".

petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), commencing their jointly administered bankruptcy cases (collectively, the "Bankruptcy Case") [A-3, A-697, A-715].  The Debtors thereafter remained in possession and control of their business and assets as debtors in possession[4] pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  [A-3].  On September 26, 2019, the Bankruptcy Court entered an order [B.D.I. 1404, A-474-584] (the "Confirmation Order") confirming the Debtors' Third Amended Joint Chapter 11 Plan [B.D.I. 1404-1, A-585-666] (the "Plan").  [A-4].  The effective date of the Plan occurred on September 30, 2019 (the "Plan Effective Date").  [A-4, A-668].

Appellant Finance of America Reverse LLC ("FoA") is a creditor in the Bankruptcy Case and counterparty to a number of subservicing agreements with RMS, as described below.  [A-4, A-715-18].   Appellee Mortgage Winddown LLC, as Plan Administrator (the "Plan Administrator"), is a fiduciary appointed pursuant to the Plan that is charged with the duty of winding down, dissolving and liquidating the Debtors' estates after the Plan Effective Date.  [A-4, A-601 (Plan §1.130), A-605-06 (Plan §§ 1.184, 1.186),  A-688].

**B.**     **The Subservicing Agreements**

Prior to the Petition Date (i.e., February 11, 2019), FoA and RMS entered into the following agreements pursuant to which RMS subserviced certain reverse mortgage loans for FoA as the owner and/or named servicer, in exchange for subservicing fees and other consideration:

- Reverse Mortgage Subservicing Agreement, dated as of December 12, 2017, by and between RMS and FoA (the "Dec 2017 Agreement");

---

[4] Under section 1101(1) of the Bankruptcy Code, "debtor in possession" means a debtor that operates its business during a Chapter 11 case, as opposed to a trustee.  11 U.S.C. § 1101(1).

- Reverse Mortgage Subservicing Agreement, dated as of October 4, 2018, by and between RMS and FoA (the "Oct 2018 Agreement")[5]; and

- Reverse Mortgage Subservicing Agreement, dated as of March 18, 2011, by and between RMS and FoA (f/k/a Urban Financial Group, Inc.) (the "Mar 2011 Agreement"; together with related pre-petition extension agreements,[6] the Dec 2017 Agreement, and the Oct 2018 Agreement, the "Prepetition Subservicing Agreements").

[A-4-5, A-715].  After the Petition Date, FoA and RMS, as debtor in possession,[7] entered into a series of four (4) Extension Agreements (collectively, the "Post-Petition Extension Agreements," together with the Prepetition Subservicing Agreements, the "Subservicing Agreements") extending the term of the Mar 2011 Agreement ultimately through September 30, 2019 (the Plan Effective Date).  [A-5, A-716].  RMS continued to subservice the covered reverse mortgage loans, and FoA continued to pay RMS subservicing fees, from April 1, 2019 through the Plan Effective Date (i.e., September 30, 2019) in accordance with the Post-Petition Extension Agreements.  [A-6, A-716].  The final Post-Petition Extension Agreement expired on the Plan Effective Date.[8]

---

[5] The Dec 2017 and Oct 2018 Agreements each have one month terms subject to FoA's monthly renewal option, which FoA exercised through February 2019 and through September 2019 under the respective agreements.  RMS continued to subservice the covered reverse mortgage loans, and FoA continued to pay RMS subservicing fees, through the pre- and post-petition periods covered by the Dec 2017 and Oct 2018 Agreements in accordance with those agreements.  [A-7 n.12, A-715].

[6] The term of the Mar 2011 Agreement, inclusive of automatic renewals, ran through March 18, 2018.  FoA and RMS then entered into a series of seven (7) pre-petition Extension Agreements (collectively, the "Prepetition Extension Agreements" pursuant to which the parties agreed to extend the term of the Mar 2011 Agreement through the identified extension period, but otherwise on the same terms and conditions stated in the Mar 2011 Agreement.  The final Prepetition Extension Agreement, dated January 30, 2019, provided a subservicing term through March 31, 2019. RMS continued to subservice the covered reverse mortgage loans, and FoA continued to pay RMS subservicing fees, through March 31, 2019 in accordance with the Prepetition Subservicing Agreements.  [A-5, A-716].

[7] References to RMS or the Debtor in the context of the time period following the Petition Date shall refer to RMS as a debtor in possession.  Courts often use the term "debtor" to mean "debtor in possession" when the context requires for brevity and convenience.  *See, e.g., Eagle Ins. Co. v. Bankvest Capital Corp. (In re Bankvest Capital Corp.),* 360 F.3d 291, 295 n.8 (1st Cir. 2004).

[8] The Plan Administrator states that the Subservicing Agreements were deemed rejected on the Plan Effective Date. [A-864].  Whether those agreements were rejected, or simply expired, is not relevant to this appeal.  The parties agree that none of the Subservicing Agreements were assumed by RMS.

### C.    The FoA Administrative Claim

The Confirmation Order set a deadline for each person or entity asserting an Administrative Expense Claim (as defined in the Plan) to file a proof of such administrative claim on or before November 11, 2019.[9]  [A-487, A-698].   On November 11, 2019, FoA timely filed its proof of Administrative Expense Claim (Claim No. 60182) [A-1206-17] (the "FoA Administrative Claim") [A-8], through which it seeks allowance of an administrative expense priority claim, pursuant to section 503(b)(1)(A) of the Bankruptcy Code, in the amount of approximately $14 million[10] for damages resulting from RMS' subservicing errors and other material breaches of the Subservicing Agreements during the period after the Petition Date but prior to the Plan Effective Date, i.e. during the post-petition period when RMS had not yet assumed or rejected any of the Subservicing Agreements.  [A-8, A-715].[11]

### D.    The Plan Administrator's Objection, FoA's Response and the Sufficiency Hearing.

On April 17, 2020, the Plan Administrator filed an omnibus objection [B.D.I. 2186, A-689-709] (the "Objection") to certain administrative claims, including the FoA Administrative Claim.[12]

---

[9] The Confirmation Order set an Administrative Expense Claim deadline of thirty-five (35) days from the date of service of the notice of entry of the Confirmation Order – November 11, 2019.  There is one instance in the decision below where the Bankruptcy Court appears to have mistakenly identified October 31, 2019 as the deadline for filing Administrative Claims.  See [A-4].  The actual deadline as set forth in the Debtors' notice of entry of the Confirmation Order was November 11, 2019 [A-668], as both parties recognize.  See Plan Administrator's Omnibus Objection ¶ 7. [A-698].  Later in the decision, the Bankruptcy Court makes clear that the FoA Administrative Claim was timely filed. [A-7] ("FoA timely filed the FoA Administrative Expense Claim").

[10] The FoA Administrative Claim initially was filed in the amount of $375,832.07 plus amounts to be determined. FoA subsequently quantified its damages in the approximate amount of $14 million plus other amounts to be determined.  [A-8, A-717-18].

[11] Earlier in the Bankruptcy Case, FoA had filed a separate proof of claim (Claim No. 21347) for damages resulting from RMS' breach of the Subservicing Agreements during the period prior to the Petition Date.  [A-1183-1205].  That proof of claim is not at issue in this appeal.

[12] The Objection also addressed claims filed by Liberty Home Equity Solutions, Inc. ("Liberty").  Liberty filed its own response to the Objection [B.D.I. 2314] and notice of appeal [B.D.I. 3756] of the Bankruptcy Court's decision,

Through the Objection, the Plan Administrator sought to reclassify the FoA Administrative Claim as a General Unsecured Claim (as defined in the Plan) solely on the grounds that the FoA Administrative Claim asserts damages under executory contracts of the Debtor that ultimately were rejected rather than assumed.  [A-704].

On May 8, 2020, FoA filed and served its response to the Objection [B.D.I 2315, A-710-724].  Through that response, FoA explained that a debtor's obligations under a pre-petition contract, which result from the parties' performance during the post-petition, pre-rejection period, can give rise to administrative expense priority claims, even if the debtor ultimately rejects that contract.  [A-721-23].  FoA further explained that, even if that were not the case, most of FoA's claims arise under the Post-Petition Extension Agreements, which under applicable state law constitute new contracts formed when they were executed post-petition by FoA and RMS, rather than pre-petition contracts as alleged in the Objection.  [A-719-21].

On December 11, 2020, the Plan Administrative filed its reply in support of the Objection [B.D.I. 3076, A-858-896].  Through the reply, the Plan Administrator argued that claims for breach of executory contracts of the Debtor cannot qualify for administrative expense priority.  [A-876-80].  The Plan Administrator also argued that the Post-Petition Extension Agreements, even though executed post-petition by RMS and FoA, do not constitute contracts under applicable state law, and therefore all of FoA's claims arise under executory contracts of the Debtor.  [A-868-73].  The Plan Administrator argued, in the alternative, that: (i) RMS' entry into the Post-Petition Extension Agreements constitutes a transaction outside of the ordinary course of RMS' business, which required Bankruptcy Court approval before it could give rise to administrative expense priority

---

which addressed both Liberty's and FoA's claims.  Liberty's appeal has been voluntarily dismissed and therefore is no longer at issue.  *See In re Ditech Holding Corporation,* Case No. 21-10221-LAK (S.D.N.Y. Dec. 8, 2021).

[A-873-76]; and (ii) even if the FoA Administrative Claim is entitled to administrative expense priority, the amount of the priority claim should be capped at the total amount of subservicing fees received by RMS from FoA during the course of the Bankruptcy Case.  *See* [A-882-86] (the "Alternative Arguments").

On January 28, 2021, the Bankruptcy Court held a telephonic "Sufficiency Hearing"[13] with respect to the Objection.  *See* [B.D.I. 3206, A-1061-146] (hearing transcript).  The legal standard of review applied by the Bankruptcy Court at the Sufficiency Hearing is equivalent to the standard applied by a court upon a motion to dismiss for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)").  [A-9, A-674 ¶ 3(iv)(a)]. No discovery is permitted until the Bankruptcy Court holds a Sufficiency Hearing and determines that the claimant states a claim.  [A-674 ¶ 3(v)].

## II.   **The Decision Below**

On October 21, 2021, the Bankruptcy Court entered its memorandum decision and order [B.D.I. 3741, A-1-26] (the "Memorandum Decision") which sustained the Objection and denied administrative expense priority to the FoA Administrative Claim.  The Bankruptcy Court held that claims resulting from a debtor in possession's breach of an un-assumed executory contract of the debtor cannot give rise to administrative expense liability, because such claims are at most contingent claims deemed to arise pre-petition.  [A-22, A-26].

---

[13]  The Bankruptcy Court entered an order [B.D.I. 1632, A-670-86] (the "Claims Procedures Order") establishing that an objection to a properly filed administrative claim gives rise to a "Contested Claim" that will be resolved at a "Claim Hearing."  [A-9, A-673 ¶ 3(iv)].  Pursuant to the Claims Procedures Order, the Plan Administrator had the option of scheduling the Claim Hearing as either a "Merits Hearing" or a "Sufficiency Hearing."  [A-9, A-674 ¶ 3(iv)(a), (b)]. A "Merits Hearing" is an evidentiary hearing on the merits of a Contested Claim.  [A-9, A-674 ¶ 3(iv)(b)].  A "Sufficiency Hearing," which is what preceded the Bankruptcy Court's decision below, is a non-evidentiary hearing to address whether a Contested Claim states a claim for relief.

The Bankruptcy Court also held that all of the Subservicing Agreements are executory contracts of the Debtor, and therefore none of FoA's claims are entitled to administrative expense priority. [A-19-20, 26].  The Bankruptcy Court acknowledged that if the Post-Petition Extension Agreements are considered "contracts" under applicable state law, then those Post-Petition Extension Agreements are not executory contracts "of the debtor," but rather contracts with RMS, as debtor in possession. [A-15] (citing cases).  However, the Bankruptcy Court agreed with the Plan Administrator that the Post-Petition Extension Agreements do not constitute new contracts separate from the Subservicing Agreements under applicable state law.  [A-26].

In light of these holdings, the Bankruptcy Court expressly declined to reach the Plan Administrator's Alternative Arguments, which were rendered moot except to the extent the Bankruptcy Court's decision may be reversed or remanded in this appeal.

## STANDARD OF REVIEW

In reviewing a bankruptcy court's decision, this Court may "affirm, modify, vacate, set aside or reverse" the decision below, and "may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances." 28 U.S.C. § 2106; *See, e.g., SP Special Opportunities, LLC v. LightSquared, Inc. (In re LightSquared, Inc.)*, 539 B.R. 232, 240 (S.D.N.Y. 2015).  In reviewing a bankruptcy court order, this Court reviews conclusions of law de novo, mixed questions of law and fact de novo, and factual findings for clear error.  *LightSquared*, 539 B.R. at 240.

In the case below, the Bankruptcy Court was tasked with applying a Rule 12(b)(6) standard by assuming the truth of all material facts alleged by FoA, and drawing all reasonably inferences in FoA's favor.  [A-12] (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007)).

## ARGUMENT

I.  **The Bankruptcy Court Erred In Denying Administrative Priority For Damages Resulting From RMS' Post-Petition Breach of the Subservicing Agreements.**

A.   **Statutory Framework**

1.   Administrative Expenses Under 11 U.S.C. § 503(b)(1)(A)

Section 503(b)(1)(A) of the Bankruptcy Code provides administrative expense priority for the "actual, necessary costs and expenses of preserving the estate …"  11 U.S.C. § 503(b)(1)(A). Costs and expenses of "preserving the estate" include actual and necessary costs and expenses incurred in the operation of a debtor's business during a bankruptcy case with a "view to rehabilitating it."  *Reading Co. v. Brown*, 391 U.S. 471, 475 (1968).  Congress' rationale for affording administrative priority to such claims is that "the operation of the business by a debtor in possession benefits pre-petition creditors; therefore, any claims that result from that operation are entitled to payment prior to payment to creditors for whose benefit the continued operating of the business was allowed."  *In re Enron Corp.*, 279 B.R. 79, 85 (Bankr. S.D.N.Y. 2002) (citation and internal quotation marks omitted); *see also Trustees of the Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir. 1986) ("Congress reasoned that unless the debts incurred by the debtor in possession could be given priority over the debts which forced the estate into bankruptcy in the first place, persons would not do business with the debtor in possession, which would inhibit rehabilitation of the business and thus harm the creditors.") (citation omitted).

2.   Treatment of Executory Contracts Under 11 U.S.C. § 365

Pursuant to section 365 of the Bankruptcy Code, a trustee or debtor-in-possession[14] has the option to "assume or reject any executory contract … of the debtor … at any time before

---

[14] Section 365 of the Bankruptcy Code speaks only of "the trustee," but in a Chapter 11 case the debtor in possession enjoys all the rights and powers of the trustee.  11 U.S.C. § 1107(a).

confirmation of a plan …"  11 U.S.C. § 365(a), (d)(2).  Although the Bankruptcy Code does not define the term "executory contract," the Second Circuit has defined it as a contract "on which performance remains due to some extent on both sides."  *Eastern Air Lines, Inc. v. Ins. Co. of Pa. (In re Ionosphere Clubs, Inc.)*, 85 F.3d 992, 998-99 (2d Cir. 1996) (citation omitted).

At any point in time during a bankruptcy case, an executory contract will be either (1) assumed, (2) rejected, or (3) awaiting decision by the debtor in possession as to whether to assume or reject.  Assumption represents a decision by the debtor in possession to fully accept the benefits and burdens of the contract at issue, such that the contract will continue to be enforceable on a post-bankruptcy basis.  *See In re UAL Corp.*, 293 B.R. 183 (Bankr. N.D. Ill. 2003).  Rejection operates as a deemed breach of the contract by the debtor immediately before the petition date, such that any damages resulting from that breach are rendered pre-petition claims against the bankruptcy estate.  *See* 11 U.S.C. §§ 365(g)(1), 502(g)(1).

A breach of contract caused by rejection does not operate as termination or rescission of the contract, nor does it otherwise affect the counterparty's rights thereunder.  *See Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1661 (2019) ("Rejection of a contract—any contract—in bankruptcy operates not as a rescission but as a breach."); *In re Vertis Holdings, Inc.*, Case No. 10-16170, 2011 WL 6739518, at *3 (Bankr. S.D.N.Y. Dec. 21, 2011) ("[R]ejection constitutes a breach, but 'do[es] not affect the parties' substantive rights under the contract or lease, such as the amount owing or a measure of damages for breach ...'") (quoting 3 Collier on Bankruptcy ¶ 365.10[1] (2011)).

**B.**    **Claims For Breach of Executory Contracts During the Period Prior to Assumption or Rejection Qualify for Administrative Expense Priority Where They Result From The Parties' Post-Petition Performance.**

Contrary to the Bankruptcy Court's decision below, not all claims "based on un-assumed prepetition contracts are contingent prepetition claims that arise upon the execution of a contract" and therefore cannot qualify for administrative expense priority [A-22]. Claims based on executory contracts of the debtor that relate to performance during the post-petition period[15] arise post-petition, and absolutely may be afforded administrative expense priority as "actual, necessary costs and expenses of preserving the estate" even if the contract ultimately is rejected or otherwise not assumed. 11 U.S.C. § 503(b)(1)(A).

For a claim to be considered an actual, necessary cost or expense of preserving the estate, it must "arise[] out of a transaction between the creditor and the … debtor in possession" and the "consideration supporting the claimant's right to payment" must be supplied to and beneficial to the debtor in possession. *Amalgamated Ins. Fund*, 789 F.2d at 101. As a corollary to the requirement that the claim "arise out of a transaction with the debtor in possession," in the context of executory contracts, courts have held that the debtor in possession must have "induced" the contract counterparty's post-petition performance. *In re Adelphia Bus. Solutions, Inc.*, 296 B.R. 656, 664 (Bankr. S.D.N.Y. 2003). The "inducement" requirement deals with a situation where a non-debtor counterparty continues to provide performance under an executory contract post-petition pending its assumption or rejection, but the debtor in possession has not sought the counterparty's performance or accepted it. *Id.* (citing *In re Jartran, Inc.*, 732 F.2d 584 (7th Cir. 1984)). For example, if a debtor orders goods pre-petition, and then following a bankruptcy filing

---

[15] The FoA Administrative Claim asserts claims that relate solely to RMS' *post-petition* subservicing failures. *See* FoA Administrative Claim ¶ 7 [A-1211] ("FoA holds administrative claims against RMS for amounts arising from RMS' post-petition failure to perform and other post-petition material breaches of the Subservicing Agreements…").

the debtor in possession refuses to accept delivery, then the non-debtor counterparty to that transaction may not be afforded an administrative expense claim.  On the other hand, if the debtor in possession, "knowingly and willingly" accepts delivery of the goods, it has accepted the obligation of paying for them as a necessary cost of preserving the estate under section 503(b)(1)(A) of the Bankruptcy Code.  *See*, *e.g.*, *In re Patient Educ. Media, Inc.*, 221 B.R. 97, 102 (Bankr. S.D.N.Y. 1998) (finding that debtor in possession "knowingly and willingly" used the non-debtor's property during the pre-rejection period to preserve and maximize the assets of the estate, thus giving rise to administrative expense liability).

The United States Supreme Court recognized that the debtor in possession is obligated to pay claims arising under an executory contract during the period prior to assumption or rejection as actual, necessary expenses of the estate, i.e. as administrative claims, where the debtor in possession knowingly and willingly elects to continue receiving the benefits of that contract:

> If the debtor-in-possession elects to continue to receive benefits from the other party to an executory contract ***pending a decision to reject or assume the contract***, the debtor-in-possession is obligated to pay for the reasonable value of those services …

*N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 531, 104 S. Ct. 1188 (1984) ("*Bildisco*") (emphasis added).

Under the *Bildisco* standard, it is presumed that the contract terms represent reasonable value.  *See Bethlehem Steel Corp. v. BP Energy Co. (In re Bethlehem Steel Corp.)*, 291 B.R. 260, 264 (Bankr. S.D.N.Y. 2003) ("There is an initial assumption that, where a contract exists, the contractual rate is the reasonable value of the goods or services provided to the estate" which can be overcome only if the objecting party provides "convincing evidence to the contrary"); *see also In re ID Liquidation One, LLC,* 503 B.R. 392, 399 (Bankr. D. Del. 2013) ("Under the *Bildisco*

'reasonable value of services' standard, there is a presumption that the contract terms and rate represent the reasonable value of the services or goods provided under the contract.").[16]

As a result, if the debtor in possession accepts performance under an executory contract while operating its business post-petition, as RMS did here by continuing to subservice FoA's reverse mortgage loans and accepting related subservicing fees, courts hold that the debtor in possession will be deemed to have accepted the burdens of that contract as "actual, necessary costs and expenses of preserving the estate" whether or not the contract ultimately is assumed.  11 U.S.C. § 503(b)(1)(A); *see Nostas Assocs. v. Costich (In re Klein Sleep Products, Inc.)*, 78 F.3d 18, 27 (2d Cir. 1996) ("[A]dministrative priority [is] available *either* if the trustee assumed an executory contract or if the estate received demonstrable benefits under the contract.") (citation omitted, emphasis in original); *Zelin v. Unishops, Inc. (In re Unishops, Inc.)*, 553 F.2d 305, 308 (2d Cir. 1977) ("It is settled law that a claim arising under an executory contract is entitled to priority if the trustee or debtor in possession elects to assume the contract **_or_** if he receives benefits under it.") (emphasis added); *Texaco Inc. v. Bd. Of Commissioners for the LaFourche Basin Levee Dist. (In re Texaco Inc.)* ("*Texaco*"), 254 B.R. 536, 556 (Bankr. S.D.N.Y. 2000) ("As long as the debtor continues to receive benefits under such contract it must also bear the burdens or obligations imposed under the contract."); *In re Yonkers Hamilton Sanitarium Inc.*, 22 B.R. 427, 435 (Bankr. S.D.N.Y. 1982) (same).[17]

---

[16] A further discussion of "reasonable value" is set forth in Section III.B *infra*, to address arguments raised by the Plan Administrator below but not reached by the Bankruptcy Court.

[17] The Bankruptcy Court distinguishes this line of cases solely on the basis that they pre-date what the Bankruptcy Court interprets as the Second Circuit's "clear" directive that claims based on un-assumed pre-petition contracts are contingent pre-petition claims not entitled to administrative expense priority.  [A-24].  As explained below, none of the cases cited by the Bankruptcy Court direct that all claims for post-petition breach of an un-assumed executory contract are deemed to arise pre-petition.

The Bankruptcy Court's holding to the contrary, if permitted to stand, would lead to inequitable and irrational results. A debtor in possession would be incentivized to demand performance from executory contract counterparties pending assumption or rejection, but not provide any consideration in return, leaving those counterparties with only general pre-petition claims having the same priority as claims filed by general pre-petition trade creditors who may have done nothing to assist the debtor in possession in the post-petition operation of the debtor's business. This represents the diametric opposite result from what Congress intended in affording claims resulting from the post-petition operation of the debtor's business priority over claims held by pre-petition creditors "for whose benefit the continued operating of the business was allowed." *Enron Corp*, 279 B.R. at 85. Counterparties would be disincentivized to cooperate with the debtor in possession, which would "inhibit rehabilitation of the business and thus harm the creditors," again contrary to Congress' intent in enacting the priority scheme set forth in section 503(b)(1)(A) of the Bankruptcy Code. *Amalgamated Ins.*, 789 F.2d at 101.

Further, if claims arising under executory contracts prior to assumption or rejection never are afforded administrative expense priority, a debtor in possession would have no incentive to reject an executory contract before the end of the bankruptcy case. In reality, debtors in possession regularly seek to reject executory contracts early in a bankruptcy case so as to avoid incurring unnecessary administrative expense obligations. *See In re Ames Dept. Stores, Inc*., 306 B.R. 43, 51-52 (Bankr. S.D.N.Y. 2004) ("The ability to reject provides the trustee or debtor-in-possession with the means to relieve the estate of the duty to perform on burdensome obligations at the expense of all of the estate's other creditors, and to avoid the incurrence of additional administrative expenses which lack a corresponding benefit to the estate."). In fact, debtors in

possession often seek, and are granted, retroactive or "*nunc pro tunc*" rejection so as to minimize accrual of administrative expenses during the pre-rejection period.[18]

Finally, the Bankruptcy Court's adopted new rule would render sections 365(g)(1) and 502(g)(1) of the Bankruptcy Code unnecessary. Those statutes provide that rejection is deemed a pre-petition breach such that resulting claims[19] are rendered pre-petition claims. 11 U.S.C. §§ 365(g)(1) ("[R]ejection of an executory contract … constitutes a breach of such contract … immediately before the date of the filing of the petition."); 502(g)(1) ("A claim arising from the rejection … of an executory contract … shall be allowed … the same as if such claim had arisen before the date of the filing of the petition."). The legislative history to section 365(g)(1) of the Bankruptcy Code makes clear that the purpose of those provisions is to ensure that claims stemming from rejection are treated as general pre-petition claims. S. Rep. No. 95-989, p. 60 (1978) ("The purpose [of section 365(g)] is to treat rejection claims as prepetition claims"); H.R. Rep. No. 95-595, p. 354 (1977) ("Subsection (g) gives entities injured by the rejection of an executory contract … a prepetition claim for any resulting damages, and requires that the injured entity be treated as a prepetition creditor with respect to that claim."). If every breach of a pre-petition contract gave rise only to pre-petition claims, there would be no need for a breach caused by a (post-petition) rejection to be a deemed a breach occurring "immediately before the date of

---

[18] *See, e.g., In re Aralex Pharmaceuticals US Inc.*, Case No. 18-12425 (Bankr. S.D.N.Y. Aug. 27, 2018), Motion (ECF No. 61, ¶ 20) (seeking rejection *nunc pro tunc* to avoid "unnecessary administrative expenses."), Order (ECF No. 102); *In re Sound Shore Medical Center of Westchester,* Case No. 13-22840 (Bankr. S.D.N.Y. Jul. 30, 2013), Motion (ECF No. 215, ¶ 17) ("The Debtors believe that expedited rejection of the Executory Contracts is necessary due to the dire financing condition of the Debtors and the need to reduce unnecessary administrative claims against their estates."), Order (ECF No. 525); *In re Eastman Kodak Company*, Case No. 12-10202 (Bankr S.D.N.Y. Jan. 31, 2012), Motion (ECF No. 172, ¶ 13) ("Without a retroactive date of rejection, the Debtors will be potentially forced to incur unnecessary administrative charges for an agreement that likely does not provide a benefit to the Debtors and their estates in excess of the costs associated therewith."), Order (ECF No. 372). Copies of these unpublished motions and orders have been included in the appendix for the Court's convenience. [A-1218-82].

[19] FoA did not assert claims resulting from any rejection of the Subservicing Agreements.

the filing of the petition" in order to treat resulting claims the same as claims held by pre-petition creditors.  11 U.S.C. § 365(g)(1).

Although the Bankruptcy Court, in the Memorandum Decision, initially holds that claims under pre-petition contracts never give rise to administrative expense priority [A-22], the Bankruptcy Court then appears to recognize, correctly, that claims for post-petition breach are considered contingent pre-petition claims **only** where such claims have been contemplated by the parties pre-petition.  [A-23] (citing *Ogle v. Fid. & Deposit Co. of Md.*, 586 F.3d 143 (2d Cir. 2009) ("*Ogle*"); *In re Manville Forest Prod. Corp.*, 209 F.3d 125 (2d Cir. 2000) ("*Manville*") and *In re Chateaugay Corp.*, 944 F.2d 997 (2d. Cir. 1991) ("Chateaugay"), among others.

Claims are "contemplated" by the parties pre-petition only if the parties' pre-petition conduct gives rise to liability.  *See In re Johns Manville Corp.*, 552 B.R. 221, 233 (Bankr. S.D.N.Y. 2016) ([T]he fair contemplation test "asks whether the relationship has resulted in prepetition conduct that could, in the fair contemplation of the parties," give rise to claim under non-bankruptcy law.).  The Bankruptcy Code defines "claim" broadly in section 101(5) of the Bankruptcy Code to include all rights to payment, including without limitation rights to payment that are contingent as of the bankruptcy filing.  11 U.S.C. § 101(5); *see also Ogle*, 586 F.3d at 146; *Manville*, 209 F.3d at 128; *Chateaugay*, 944 F.2d at 1002.  However, even a right to payment that is contingent as of the petition date must contain all the elements necessary to give rise to a legal obligation to be within the contemplation of the parties, meaning it must "result from pre-petition conduct fairly giving rise to that contingent claim."  *Chateaugay*, 944 F.2d at 1005; *see also Elliott v. Gen. Motors LLC (In re Motors Liquidation Co.)*, 829 F.3d 135, 156 (2d Cir. 2016) (holding that if a claim is contingent on future events, the claim must "result from pre-petition conduct fairly giving rise to that contingent claim" if it is to be deemed to arise pre-petition) (quoting

*Chateaugay*, 944 F.2d at 1005)*; In re Motors Liquidation Co*., 598 B.R. 744, 755 (Bankr. S.D.N.Y. 2019) ("[A]n individual has a § 101(5) claim against a debtor" when "the basis for liability is the debtor's prepetition conduct") (citation omitted).

Conversely, contract claims based on the parties' post-petition performance are deemed to arise at the time that post-petition performance is rendered.  For example, in *Texaco*, the Bankruptcy Court granted summary judgment in favor of lessors under executory oil and gas leases who asserted claims for the debtor's failure to comply with its contractual and statutory "prudent operator" obligations during the period following confirmation of the debtor's chapter 11 plan. *Texaco*, 254 B.R. at 558.  The debtor argued that any such claims arose prior to confirmation of the debtor's chapter 11 plan, because the parties entered the leases at issue, and constructed the canals to gain access to the oil wells, pre-confirmation. *Texaco* 254 B.R. at 558*.*  The Bankruptcy Court held that it is "utterly unrealistic" to say that a dispute as to the debtor's post-confirmation compliance with "prudent operator" obligations, which no one claimed were supposed to have been performed prior to confirmation, are "claims" which arose prior to confirmation as defined under section 101(5) of the Bankruptcy Code. *Id.* at 559.  The Bankruptcy Court found therefore that it is "not surprising that no court ever held that future claims for possible future breaches of contract constitute 'claims' under section 101(5) of the Bankruptcy Code …". *Id.*[20]

None of the cases relied on by the Bankruptcy Court involve claims resulting from the parties' post-petition performance.  In *Ogle*, the Second Circuit held that post-petition attorneys' fees owed to the claimant pursuant to a pre-petition indemnity agreement were allowable as part

---

[20] In *Texaco,* the debtor also argued that it could not have incurred any "prudent operator" liability under the leases at issue because those leases had not been assumed during the bankruptcy case.  254 B.R. at 556.  The Bankruptcy Court held that whether or not the agreements had been assumed "does not matter in the context of this controversy." *Id.* at 558.  Because the debtor continued to derive all of the economic benefits under the agreements, it retained all of its burdens, i.e. the clean-up, restoration and remediation obligations. *Id.*

of the claimant's general unsecured claim.  586 F.3d at 145.  The claimant did not allege it provided any post-petition performance under the indemnity agreement, nor did it seek administrative claim priority.  *Id.*  In *Manville*, the claimant sought claims under a pre-petition indemnification agreement pursuant to which the debtor agreed to indemnify the claimant upon the happening of future events.  209 F.3d at 129.  The claimant did not allege it had any ongoing post-petition performance owed to the debtor.  In *Rescap Liquidating Tr. v. PHH Mortg. Corp. (In re Residential Cap., LLC)*, the claimant sought post-petition attorneys' fees accrued in connection with a pre-petition agreement for the sale of mortgage loans to the debtor.  558 B.R. 77, 79 (S.D.N.Y. 2016). There was no "ongoing attempt to do business" under the contracts post-petition, such that there was any post-petition performance that could give rise to an administrative claim.  *Id.* at 86, n.7. Finally, in *Conway Hosp., Inc. v. Lehman Bros. Holdings Inc*., the claimant asserted a claim for termination damages after having terminated a pre-petition contract with the debtor shortly after the bankruptcy filing, and did not allege to have provided any post-petition performance.[21]  531 B.R. 339, 343 (S.D.N.Y. 2015).[22]

These cases are factually inapposite to the situation here, which involves executory contracts[23] with ongoing post-petition performance by the debtor (RMS) and the claimant (FoA). That post-petition performance gives rise to a right to payment independent from rights to payment

---

[21] The Bankruptcy Court also cited *Chateaugay*, which involved alleged CERCLA liability rather than contract claims. 944 F.2d at 1004.

[22] The Bankruptcy Court properly followed this line of cases when enjoining Gautam and Panthobi Sharma from prosecuting their claims against the Debtors for breach of a pre-petition mortgage, because those claims were deemed to arise at the time the mortgage was executed.  *See* [A-23 n. 20] (discussing the *Sharma* decision); *In re Ditech Holding Corp*., Case No. 19-10412, 2020 WL 7052883, at *6 (Bankr. S.D.N.Y. Nov. 30, 2020) [A-837-57] ("*Sharma*").  The mortgage at issue in *Sharma* was not an executory contract with ongoing performance obligations that could give rise to post-petition rights to payment that had not already accrued pre-petition.

[23] Although the cases cited by the Bankruptcy Court do not include a discussion regarding executoriness, there is no indication in those cases that the agreements at issue were executory contracts.

that already accrued pre-petition.  *See Mason v. Official Comm. of Unsecured Creditors (In re FBI Distribution Corp.)*, 330 F.3d 36, 48 (1st Cir. 2003) ("Under a nonexecutory contract, in which the nondebtor owes no future performance, the nondebtor provides no consideration 'after the commencement of the case,' and thus is not entitled to priority.").

In the other cases relied upon by the Bankruptcy Court, the debtor expressly *declined* to accept post-petition performance by the claimant by *cancelling* the purchase orders at issue.  *See In re Bradlees Stores, Inc.*, Case No. 02-0896, 2003 WL 76990, at *3 (S.D.N.Y. Jan. 9, 2003) ("No merchandise was ever accepted by the debtors post-petition and used for the benefit of the debtors' estates … [claimants], therefore, are unable to demonstrate that they conferred any actual, post-petition benefit upon the debtors."), *aff'd* 78 F. Appx. 166 (2d Cir. 2003)[24]; *Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 580-82 (S.D.N.Y. 2000).  As explained above, where a debtor in possession does not accept performance, it has not "induced" a transaction with the non-debtor counterparty sufficient to establish an administrative claim.  *Adelphia*, 296 B.R. at 664.

### C.    The FoA Administrative Claim Asserts Damages Resulting From The Parties' Post-Petition Performance.

Through the FoA Administrative Claim, FoA asserts claims for damages that result directly from RMS' *post-petition* subservicing failures, i.e. RMS' post-petition failure to perform under the Subservicing Agreements.  *See* FoA Administrative Claim ¶ 7 [A-1211] ("FoA holds administrative claims against RMS for amounts arising from RMS' post-petition failure to perform

---

[24] The Second Circuit's decision in *Bradlees Stores* is a non-precedential summary order, which affirms for "substantially" the reasons stated below with no further analysis. 78 F. Appx. 166; *see also* 2d Cir. R. 32.1.1(a) ("Rulings by summary order do not have precedential effect").  The Bankruptcy Court adopted a misquote of the *Bradlees Stores* case from the Plan Administrator's reply brief, which incorrectly attributes to the Second Circuit what was stated only by the district court.  *See* [A-22, A-878]; *see Bradlees Stores*, 2003 WL 76990, at *3 (S.D.N.Y. Jan. 9, 2003) (holding that "the Second Circuit recognizes that contract-based bankruptcy claims are deemed to arise at the time the contract is executed, and therefore a post-petition breach of a pre-petition contract gives rise solely to a pre-petition claim").

and other post-petition material breaches of the Subservicing Agreements…").  RMS expressly accepted and induced FoA's payment of subservicing fees, which represents the "consideration supporting [FoA's] right to payment," during the post-petition period prior to rejection or expiration of the Subservicing Agreements.  *Amalgamated Ins.*, 789 F.2d at 101.  That inducement is evidenced not only by RMS having accepted subservicing fees post-petition, but by RMS continuing to subservice FoA's mortgage loan portfolio post-petition, and entering into the Post-Petition Extension Agreements expressly requiring the parties' to continue performing post-petition.  [A-7 n.12, A-715].

Just as in *Texaco* with respect to claims for the debtor's failure to comply with "prudent operator" obligations, it would be "utterly unrealistic" to hold that FoA's claims for RMS' failure to comply with its post-petition subservicing obligations arose pre-petition.  254 B.R. at 559.  Each of the Prepetition Subservicing Agreements by their terms expired before or shortly after the Petition Date, but were extended by post-petition agreements entered into by FoA and RMS.  [A-5-7, A-715-16].  Under the Bankruptcy Court's flawed reasoning, FoA's claims against RMS for failure to properly subservice its reverse mortgage loan portfolio during the post-petition period arose not only prior to that post-petition period, but also prior to the parties' agreement that RMS would subservice the reverse mortgage loan portfolio during that period.  Certainly FoA's claims against RMS for failing to comply with its obligations could not have arisen before RMS had even incurred those obligations.

In sum, the FoA Administrative Claim asserts damages resulting from the parties' post-petition performance under the Subservicing Agreements.  RMS, as debtor in possession, elected to continue subservicing FoA's reverse mortgage loan portfolio post-petition, thereby inducing FoA's payment of post-petition subservicing fees for the benefit of the estate.  Having elected to

continue receiving the benefits of the Subservicing Agreements, RMS, as debtor in possession, also must "bear the burdens or obligations imposed" under the Subservicing Agreements as actual, necessary costs and expenses of preserving the estate entitled to priority under section 503(b)(1)(A) of the Bankruptcy Code. *Texaco* 254 B.R. at 556.

## II.   The Bankruptcy Court Erred In Holding That The Post-Petition Extension Agreements Do Not Constitute New, Post-Petition Contracts.

The Bankruptcy Court also erred in holding that the Post-Petition Extension Agreements are not "contracts" under New York law.[25]  [A-19-20].  If the Post-Petition Extension Agreements are contracts under New York law, then any claims for breach of those agreements would constitute post-petition claims even under the Bankruptcy Court's flawed reasoning that all breach of contract claims arise at the time of contract formation.[26]

The Bankruptcy Court's holding is premised on a misinterpretation of New York law with respect to extensions and other contract modifications.  The purpose of the Post-Petition Extension Agreements was to memorialize the parties' post-petition agreement for RMS to continue subservicing FoA's reverse mortgage loan portfolio, on the same terms as in the original Subservicing Agreement, for an extended duration.  RMS and FoA could have accomplished that purpose through (1) an agreement that provides for an amendment or modification to the original Subservicing Agreement by extending the subservicing term set forth therein (a "modification"),

---

[25] New York law is the governing law under all of the FoA's Subservicing Agreements, and therefore is the relevant state law in this appeal.  [A-17, A-720 n.5].  The Bankruptcy Court also considered Delaware law, which is the governing law under  similar extension agreements entered between RMS and Liberty Home Equity Solutions, Inc. Liberty Homes Equity Solutions, Inc.'s appeal of the Bankruptcy Court's decision has been voluntarily dismissed, and so Delaware law is no longer at issue.  *See In re Ditech Holding Corporation,* Case No. 21-10221-LAK (S.D.N.Y. Dec. 8, 2021).

[26] The vast majority of FoA's claims arise under the Post-Petition Extension Agreements.  Each of the Prepetition Subservicing Agreements by their terms expired no later than March 31, 2019, which is less than two months after the Petition Date.  [A-5-7, A-715-16].  Accordingly, FoA's claims from at least April 1, 2019 through the Plan Effective Date (September 30, 2019) arise under the Post-Petition Extension Agreements.

or (2) an agreement that provides for RMS to subservice FoA's reverse mortgage loan portfolio, on the same terms as the original Subservicing Agreement, beginning when the original Subservicing Agreement terminates, but does not modify the original Subservicing Agreement (a "succeeding agreement").

Whether the Post-Petition Extension Agreements constitute modifications or succeeding agreements is not perfectly clear on their face,[27] but whether they are modifications or succeeding agreements is of no consequence here, where the issue is whether those Post-Petition Extension Agreements are "contracts" under New York law formed post-petition.  Under New York law, a modification is a *type* of new contract, distinct from the original contract, just as much as a succeeding agreement.  *See Matter of New York State Elec. & Gas Corp. v. Pub. Serv. Commn.*, 281 N.Y.S. 384, 389 (App. Div. 3d Dept. 1935) ("Of course, an amendment or extension of a contract would be of necessity a new contract.").  The difference is that, unlike with a succeeding agreement, a modification replaces or supplants the original agreement with the contract as modified.  *See Cappelli v. State Farm Mut. Auto. Ins. Co.,* 686 N.Y.S.2d 494 (App. Div. 2d Dept. 1999) ("The modification of a contract results in the ***creation of a new agreement*** between the parties which pro tanto supplants the affected provisions of the original agreement while leaving the balance of the agreement intact.") (emphasis added); *see also Delta Air Lines, Inc. v. Bombardier, Inc.*, Case No. 20-cv-3025-GHW, 2021 WL 1163702, at *11 (S.D.N.Y. Mar. 25, 2021) (same), *aff'd*, Case No. 21-1028, 2021 WL 5492938 (2d Cir. Nov. 23, 2021); *Karpen v. Ali*, 46 Misc. 3d 1228(A), 9 N.Y.S.3d 593 (N.Y. Sup. Ct. 2015) (same); *Greek Orthodox Archdiocese*

---

[27] On the one hand, the Post-Petition Extension Agreements provide for an "extension" of the subservicing term set forth in the original Subservicing Agreement, which suggests they are modifications.  On the other hand, the Post-Petition Extension Agreements provide that they shall not be construed "as a modification or release of any of the obligations owing by RMS to [FoA] …," and that the original agreement had "expired," which suggests they are succeeding agreements.  [A-19, A-895].

*of N. & S. Am. v. Abrams,* 162 Misc. 2d 850, 856, 618 N.Y.S.2d 504, 507 (N.Y. Sup. Ct. 1994) (same).  Thus, whether or not they are modifications, the Post-Petition Extension Agreements represent new contracts under applicable law formed as of the date those Post-Petition Extension Agreements were executed.

This does not mean there are not instances where the characterization of a contract as a "modification," as opposed to a succeeding agreement or any other type of contract, is not critical. It can be, as it was in the case of *In re Bush Industries, Inc.*, Case No. 05-cv-119S, 2006 WL 8455682 (W.D.N.Y. Mar. 29, 2006) ("<u>Bush</u>"), upon which the Bankruptcy Court heavily relies but misinterprets [A-18-19].  In that case, whether the contract at issue "modified" the original agreement was relevant to whether the parties had provided the mutual assent necessary to form an enforceable contract. *Id.* at *4.  The parties had entered into a consulting agreement (the "<u>1997 Agreement</u>") which specified that it could be modified by a writing signed by the party against whom enforcement of the modification is sought.  *Id.* at *4.  Years later, the parties were negotiating a proposed agreement that reduced the amount of guaranteed payments to the consultant. *Id.* at *1.  The consultant signed that proposed agreement (the "<u>2003 Agreement</u>"), however the other parties did not countersign the 2003 Agreement at that time.  The consultant later purported to "revoke" the unilaterally-signed 2003 Agreement which he claimed was merely an offer to enter into a new contract and which had not yet been accepted through countersignature. *Id.* at *2, *4.  When the counterparties (one, a debtor in bankruptcy)[28] sought to enforce the terms set forth in the 2003 Agreement, the issue as to whether the 2003 Agreement was an enforceable contract turned on whether it constituted a "modification," assent to which required only the

---

[28] Coincidentally, the dispute arose in the context of the debtor's objection to the consultant's motion for allowance of an administrative expense claim.

consultant's signature, or a "new agreement," for which mutual assent is required and may never have been provided, rendering it unenforceable.  *Id.* at \*4.  The bankruptcy court held that the 2003 Agreement was a modification and thus enforceable, and the district court affirmed on appeal.  *Id.* at \*3, \*4.  The district court did not suggest that the 2003 Agreement, being a modification, was not a "contract" formed on the date it was executed.  Just the opposite is true.  The district court held that the 2003 Agreement *was* an enforceable contract formed when it was signed.  *Id.* at \*4. ("***Having found that Hain entered an enforceable contract when he executed the October 2003 Agreement***, this Court also finds Hain's assertion that he revoked the October 2003 Agreement to be without merit.") (emphasis added).

Just as the 2003 Agreement in *Bush* is a contract formed when it was signed, RMS and FoA formed the Post-Petition Extension Agreements when those agreements were signed post-petition.  Unlike in *Bush*, whether or not the Post-Petition Extension Agreements are considered to be modifications of the original Subservicing Agreements simply is not an issue.

The other cases cited by the Bankruptcy Court involve automatic renewal provisions or options to renew, which are not applicable here.[29]  Where a contract contains an option to renew, the requisite mutual assent to the renewal period was formed at the time of the original agreement, and therefore the renewal constitutes a continuation of the original agreement rather than a new contract.  *See Dime Sav. Bank of New York, FSB v. Montague St. Realty Assoc.*, 90 N.Y.2d 539, 543, 686 N.E.2d 1340, 1342 (N.Y. 1997).  The same is true where a contract calls for automatic renewal, at least in cases where the parties do no not have the mutual right to terminate via a notice

---

[29] *See* [A-20] (citing *United States Aviation Underwriters, Inc. v. Preservatrice-Fonciere Compagnies D'Assurance*, Case No. 83-cv-3935 (GLG), 1986 WL 3779, at \*2 (S.D.N.Y. Mar. 21, 1986), *aff'd sub nom. U.S. Aviation v. Preservatrice-Fonciere*, 801 F.2d 391 (2d Cir. 1986); *In re Country Club Ests. at Aventura Maint. Ass'n, Inc*., 227 B.R. 565, 567–68 (Bankr. S.D. Fla. 1998)).

of nonrenewal.[30]  Here the Mar 2011 Agreement was extended via the parties' mutual assent at the time the Post-Petition Extension Agreements were entered, as evidenced by the parties' execution of those Post-Petition Extension Agreements, not by an automatic renewal or renewal option. [A-5, A-716].

### III.    The Other Issues Raised By The Plan Administrator Below, But Not Reached By The Bankruptcy Court, Lack Merit and Should Be Decided In FoA's Favor.

"A district court sitting in a bankruptcy appeal has the power to consider any issue presented by the record on appeal."  *Goldberg v. Hilsen (In re Hilsen)*, 119 B.R. 435, 439 (S.D.N.Y. 1990); *see also Booking v. Gen. Star Mgmt. Co.*, 254 F.3d 414, 418-19 (2d Cir. 2001) (finding that an appellate court has "broad discretion" to "consider issues that were raised, briefed, and argued in the [trial court], but were not reached there.").  It is appropriate to consider an issue on appeal that was not decided below when the issue is a pure question of law and consideration of the issue would promote judicial economy.  *Bacolitsas v. 86th & 3rd Owner, LLC*, 702 F.3d 673, 681 (2d Cir. 2012).

The Plan Administrator raised two issues below that the Bankruptcy Court expressly declined to address:

(1)    whether the Post-Petition Extension Agreements represent transactions outside of the ordinary course of RMS' business such that they require approval under section 363(b) of the Bankruptcy Code before giving rise to administrative expense liability.  [A-873-76]; and

---

[30] Under New York law, even an automatic renewal will be deemed a new contract where each party has the right to terminate by notice.  *See Hersch v. Dewitt Stern Group, Inc.,* Case No. 0601675/2005, 2005 WL 6003389 (N.Y. Sup. Ct. Sep. 21, 2005) ("Even were this court to find that the cause of action accrued when the inadequate insurance coverage was procured, the operative date would have been May 2004 when the insurance was renewed and not 1992 when the original policy was first procured because each renewal is really a "new" contract"); *Moore v. Metro. Life Ins. Co.*, 346 N.Y.S.2d 298, 299 (N.Y. Sup. Ct. 1972) ("Where an insurer has the absolute right to terminate a policy on its anniversary date each renewal of the policy is deemed the issuance of a new policy.") (citations omitted); *Hodgson v. Preferred Acc. Ins. Co.*, 165 N.Y.S. 293, 295 (N.Y. Sup. Ct. 1917) ("When the policy ended by its terms neither side was obliged to renew it and it could not be renewed or continued without the consent of both parties. That is, a new contract had to be made.").  Courts in other jurisdictions have found automatic renewals do not constitute new contracts even if each party has the right to terminate.  *See, e.g., Country Club*, 227 B.R. at 567 (holding the same without specifying the applicable governing law).

(2) whether the FoA Administrative Claim, if allowed, should be capped at the amount of subservicing fees RMS received from FoA during the Bankruptcy Case. [A-882-86].

*See* [A-26] ("The [Bankruptcy] Court need not, and does not, address those arguments.").

The Plan Administrator raised each of these arguments for the first time in its reply brief and therefore FoA did not have the opportunity to brief them with the Bankruptcy Court. However, it is clear from the record that these arguments lack merit, and so FoA respectfully submits the Court can and should exercise its discretion to find against the Plan Administrator on these issues.[31]

### A. The Post-Petition Extension Agreements Do Not Require Bankruptcy Court Approval Before Giving Rise to Administrative Expense Priority.

1. RMS' Entry Into The Post-Petition Extensions Agreements Represents An Ordinary Course Transaction That Does Not Require Court Approval Under Section 363(b) of the Bankruptcy Code.

Section 363 of the Bankruptcy Code, which governs a debtor in possession's use of property, distinguishes between a debtor in possession's actions on the basis of whether such actions are within the ordinary course of business. If so, section 363(c) of the Bankruptcy Code provides that no notice to creditors is required. If not, section 363(b) of the Bankruptcy Code provides that the debtor in possession may "after notice and a hearing" use, sell or lease, other than in the ordinary course of business, property of the estate. *See* 11 U.S.C. § 363(b), (c).

"Section 363 is designed to strike [a] balance, allowing a business to continue its daily operations without excessive court or creditor oversight and protecting secured creditors and others from dissipation of the estate's assets." *Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997). Consistent with commercial reality, the Bankruptcy Code "takes

---

[31] FoA reserves the right to raise additional arguments with the Bankruptcy Court on remand should it become necessary.

cognizance of the fact that if a debtor had to seek court approval to pay for every expense incurred during the normal course of its affairs, the debtor would be in court more than in business." *In re Enron Corp.*, Case No. 01-16034, 2003 WL 1562202, at *16 (Bankr. S.D.N.Y. Mar. 21, 2003).

Here, it is law of the case that the Post-Petition Extension Agreements represent ordinary course transactions. *See United States v. Uccio*, 940 F.2d 753, 758 (2d Cir. 1991) (Pursuant to law of the case doctrine, "when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages of the same case."). On motion by the Debtors [B.D.I. 10, A-1283-1355] (the "363(c) Motion"), the Bankruptcy Court previously entered an order [B.D.I. 229, A-1356-79] (the "363(c) Order")[32] confirming that RMS was authorized to continue to honor its "Servicing Obligations" (as defined in the Motion) as being in the ordinary course of business pursuant to section 363(c) of the Bankruptcy Code. *See* 363(c) Order ¶ 2(b) [A-1358] ("The Debtors are authorized, but not directed, to continue in the ordinary course of business … [to] honor the Servicing Obligations …"). The term "Servicing Obligations" is defined to include the type of obligations imposed on RMS under the Subservicing Agreements.[33] The Plan Administrator attempts to split hairs by distinguishing RMS' *entry* into the Post-Petition Extension Agreements from *honoring* the obligations set forth therein. [A-875]. However, even in the 363(c) Motion, the Debtors expressly recognize that entry into subservicing agreements is an ordinary course transaction for debtors in the mortgage lending and servicing business. *See, e.g.,* 363(c) Motion ¶ 76 [A-1321-22] (citing *In re Mortgage Lenders Network USA, Inc.*, Case No. 07-10146

---

[32] The Court may consider the 363(c) Motion and 363(c) Order even though not designated in the record on appeal. *See Morillo v. Wells Fargo Bank, N.A.*, Case No. 19-CV-08183 (PMH), 2020 WL 2539068, at *1 n.2 (S.D.N.Y. May 19, 2020) ("The Court may take judicial notice of the bankruptcy docket, and documents on the docket not included in Appellant's designation of the record on appeal."). Copies of the 363(c) Motion and the 363(c) Order have been included in the Appendix for the Court's convenience.

[33] *Compare* Motion ¶¶ 28, 31 [A-1296] (defining "Servicing Obligations") *with* FoA Administrative Claim ¶ 5(i) [A-1209-10] (listing RMS' duties under the Subservicing Agreements).

(Bankr. D. Del. Mar. 19, 2007) [Docket No. 304] (authorizing debtors to, among other things …

"incur new servicing obligations in the ordinary course of business")).

Even if it were not law of the case, the undisputed facts make clear that entry into a Post-Petition Extension Agreement constitutes an "ordinary course" transaction of RMS.  While the Bankruptcy Code does not define the term "ordinary," courts find that a transaction is in the ordinary course when it satisfies a two part test:  (1) the "vertical test", and (2) the "horizontal test." *Enron Corp*., 2003 WL 1562202, at *17.  The horizontal test involves a comparative analysis of the debtor's business to other similar businesses and requires considering whether such other businesses would engage in the proposed transaction as ordinary business.  *Id.*  The vertical test requires that a bankruptcy court consider whether the transaction imposes economic risks consistent with a hypothetical creditor's expectations measured from the time that the creditor chose to contract with this particular debtor.  *Id.* (citing *In re Lavigne*, 114 F.3d at 385).  "The focus is on the debtor's pre-petition business practices as compared to the debtor's post-petition conduct, in an effort to discern any significant variance in the debtor's activity."  *Id.*

With respect to the horizontal test, the record is clear that RMS' primary business is servicing and subservicing reverse mortgage loans.  *See* 363(c) Motion ¶ 1 [A-1286] (RMS "primarily focuses on servicing and subservicing reverse mortgage loans …"); First Day Declaration, [A-45] (same); Disclosure Statement, [A-213] ("RMS services loans for the Company's reverse mortgage portfolio and subservices loan portfolios on behalf of third-party credit owners of reverse loans").  RMS' sworn bankruptcy schedules identify dozens of servicing and subservicing agreements as of the Petition Date.  [B.D.I. 308, A-1543-47, A-1552-54]. Certainly any company in the servicing and subserving business will enter servicing and subservicing agreements in the ordinary course.

With respect to the vertical test, the Post-Petition Extension Agreements provide that RMS shall subservice FoA's mortgage loan portfolio for an additional period, but that the extension otherwise "shall be on the same terms and conditions as stated in the original [Subservicing] Agreement."  [A-895].  There was no "significant variance" in the "debtor's prepetition business practices as compared to the post-petition conduct" so as to take the transaction outside of the ordinary course.  *Enron Corp.*, 2003 WL 1562202, at *17.  There was no variance at all.

Accordingly, entry into the Post-Petition Extension Agreements represents an ordinary course transaction for which, pursuant to section 363(c) of the Bankruptcy Code, no notice to creditors or Bankruptcy Court approval is required.

> 2.   The Bankruptcy Court Could Not Have Sustained The Plan Administrator's Section 363(c) Argument In The Context Of A <u>Sufficiency Hearing</u>.

The Plan Administrator's argument that the Post-Petition Extension Agreements are outside of the ordinary course of business is premised on the magnitude of the obligations incurred by RMS pursuant to those agreements compared to RMS' overall business [A-875].  This argument necessarily raises factual issues beyond the scope of a Sufficiency Hearing, which is the context in which the Bankruptcy Court considered the FoA Administrative Claim.  *See* [A-9, A-674 ¶ 3(iv)(a)] (Sufficiency Hearing is equivalent to the standard applied by a court upon a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6)), [A-674 ¶ 3(v)] (No discovery is permitted until the Bankruptcy Court holds a Sufficiency Hearing and determines that the claimant states a claim that could be allowed).  Accordingly, the Plan Administrator's argument represents a defense to allowance of the FoA Administrative Claim that could not be sustained by the Bankruptcy Court at this stage of the Contested Matter.

3.     Even If Entry Into The Post-Petition Extension Agreements Is Found To Be Outside Of The Ordinary Course Of Business, FoA Still Is Entitled To <u>Administrative Expense Priority</u>.

"Absent notice and an opportunity for a hearing, non-ordinary course of business transactions are void." *Enron Corp.,* 2003 WL 1562202, at *16.  Even if the Post-Petition Extension Agreements are deemed void, FoA provided post-petition consideration to RMS in the form of subservicing fees, and is entitled to the reasonable value of those fees as an administrative expense claim. *Bildisco*, 465 U.S. at 531.  Accordingly, FoA still would hold an administrative expense claim for the value of its performance, which the Bankruptcy Court may assess by looking to the Prepetition Subservicing Agreements.

**B.     FoA's Administrative Priority Claim Is Not Capped At The <u>Amount of Post-Petition Subservicing Fees Paid to RMS</u>.**

The Plan Administrator argued below that, even if FoA's contractual damages claims are deemed to arise post-petition, FoA's administrative priority claim still would be limited to no more than the amount of subservicing fees paid by FoA to RMS during the Bankruptcy Case.  [A-882-885] ("FoA asserts approximately $14.4 million as an administrative expense, which is approximately $10 million above what it paid the Debtors in postpetition fees.").  The argument is premised on the idea that RMS' bankruptcy estate received a "benefit" of no more than the amount of fees received, and therefore only that amount can be considered an "actual, necessary" expense of preserving the estate under section 503(b)(1)(A) of the Bankruptcy Code.  [A-882].

The "benefit" requirement is not an additional element of establishing administrative priority under section 503(b)(1)(A) of the Bankruptcy Code, but rather courts have used it "as a way of testing whether a particular expense was 'necessary' to preserve the estate." *In re REFCO, Inc.*, Case No. 07-4784 (DLC), 2008 WL 140956, at *6 n.11 (S.D.N.Y. Jan. 14, 2008), *aff'd in part, appeal dismissed in part sub nom. In re Refco Inc.*, 331 F. Appx. 12 (2d Cir. 2009).  "The

underlying reasoning is that an expense incurred in exchange for something that is not beneficial to the estate cannot be considered an expense necessary for preserving the estate." *Id.*[34]

The problem with the Plan Administrator's argument is that it wrongfully suggests that whether the Debtor "benefitted" by incurring post-petition subservicing obligations to FoA should be viewed in hindsight. Whether a contract is "beneficial," such that any claims arising thereunder will be afforded administrative expense priority, is determined at the time the estate incurs the obligation giving rise to the expense. *See Klein Sleep*, 78 F.3d at 26 (noting if that were not the case, "any post-bankruptcy contract, entered into for the benefit of a bankrupt's estate, would cease to be entitled to priority the moment the deal turned sour.").[35]

RMS clearly benefited by being able to continue its subservicing business post-petition in accordance with the Subservicing Agreements. RMS would not have been able to earn revenue otherwise. *See* [A-45] (RMS "primarily focuses on servicing and subservicing reverse mortgage loans …"). All transactions entered by the debtor in possession in the ordinary course of operating the debtor's business satisfy the "benefit" requirement. *See In re Crystal Apparel, Inc.*, 220 B.R.

---

[34] There are exceptions to the so-called "benefit" requirement. The United States Supreme Court held that, consistent with the "rule of fairness," post-petition tort claims are afforded administrative priority as necessary costs incident to the post-petition operation of the debtor's business, notwithstanding that there is no direct benefit to the estate. *Reading*, 391 U.S. at 479. Courts have applied the reasoning in *Reading* to except from the "benefit" requirement other instances where the debtor in possession's operation of the business causes injury. *See, e.g., Cumberland Farms, Inc. v. Fla. Dept. of Envtl. Prot.*, 116 F.3d 16, 20 (1st Cir. 1997) (fines and penalties incurred for post-petition failure to comply with environmental regulations entitled to administrative priority); *Spunt v. Charlesbank Laundry, Inc. (In re Charlesbank Laundry, Inc.)*, 755 F.2d 200, 202 (1st Cir. 1985) (compensatory fines for a debtor in possession's post-petition injunction violations entitled to administrative expense priority); *Ala. Surface Mining Comm'n v. N.P. Mining Co. (In re N.P. Mining Co.)*, 963 F.2d 1449, 1461 (11th Cir. 1992) (penalties assessed for mining violations sustained in connection with the debtor in possession's operation entitled to administrative priority). While arguably the *Reading* rationale requires that the FoA Administrative Claim, which asserts damages resulting from RMS' post-petition subservicing failures, enjoy administrative priority even absent a benefit to the Debtor's estate, it is not necessary to apply that rationale for the reasons set forth herein.

[35] Courts in at least two jurisdictions have held that there is no "benefit" requirement at all in the context of claims arising under executory contracts and unexpired leases. *See In re Palace Quality Servs. Indus., Inc.*, 283 B.R. 868, 885-905 (Bankr. E.D. Mich. 2002) (reasoning that under section 541(a) of the Bankruptcy Code, the estate holds whatever rights the debtor held in the executory contract or unexpired lease, and no more); *In re Sturgis Iron & Metal Co.*, 420 B.R. 716, 750-54 (Bankr. W.D. Mich. 2009) (same).

816, 830 (Bankr. S.D.N.Y. 1998) ("Transactions in the ordinary course of business of the debtor in possession create expenses of administration."). RMS' decision to continue subservicing on the terms set forth in the Subservicing Agreement continues an ordinary course of business transaction for all the reasons explained in Section II, *supra*. Even if these were not ordinary course transactions, there is a strong presumption that the terms of the Subservicing Agreements represent reasonable consideration for RMS' right to continue subservicing FoA's reverse mortgage loan portfolio on a post-petition basis, and thus entry into those agreements satisfies the benefit requirement. *Bethlehem Steel Corp.*, 291 B.R. at 264 ("There is an initial assumption that, where a contract exists, the contractual rate is the reasonable value of the goods or services provided to the estate" which can be overcome only if the objecting party provides "convincing evidence to the contrary"); *see also ID Liquidation One,* 503 B.R. at 399 ("Under the *Bildisco* 'reasonable value of services' standard, there is a presumption that the contract terms and rate represent the reasonable value of the services or goods provided under the contract."). The Plan Administrator has not even alleged otherwise.

The Bankruptcy Court's decision in *In re AppliedTheory Corp.*, on which the Plan Administrator heavily relies [A-883-84], suggests no different result. 312 B.R. 225 (Bankr. S.D.N.Y. 2004). In that case, the Bankruptcy Court denied administrative priority to claims filed by certain of the debtor's executives based on a "golden parachute" provision in their pre-petition employment contracts. The golden parachute was triggered by the executives' voluntary departure following a change of control of the debtor. *Id.* at 237. The Bankruptcy Court found that the "reasonable value" of the executives' post-petition performance was reflected by the salary, bonuses and other fringe benefits set forth in their employment contracts. *Id.* at 240-41. The golden parachute was triggered only when they stopped working for the debtor. *Id.* The

34

Bankruptcy Court found therefore that claims based on the golden parachute had no "nexus" to the executives' post-petition performance and were, in substance, a form of liquidated damages intended to compensate the executives for the period after which they were no longer performing. *Id.* at 241. Unlike in *AppliedTheory*, the FoA Administrative Claim seeks damages arising only in connection with RMS' failure to properly subservice its mortgage loan portfolio during the post-petition period when FoA was paying for those services. FoA has not sought any damages resulting from RMS' purported rejection of the Subservicing Agreements, or otherwise in connection with RMS' decision to discontinue subservicing.

Accordingly, the entire amount of the FoA Administrative Claim, once allowed, should be afforded administrative expense priority.

## CONCLUSION

For the foregoing reasons, FoA respectfully requests that the Court (i) reverse the Memorandum Decision, (ii) hold that FoA's Administrative Claim shall be afforded administrative expense priority in the Bankruptcy Case, and (iii) grant such other and further relief in favor of FoA that the Court deems just or proper.

Dated:   January 18, 2022
　　　　 New York, New York

　　　　　　　　　　　　　 */s/ Robert A. Rich*
　　　　　　　　　　　　　 Peter S. Partee, Sr.
　　　　　　　　　　　　　 Robert A. Rich
　　　　　　　　　　　　　 **HUNTON ANDREWS KURTH LLP**
　　　　　　　　　　　　　 200 Park Avenue
　　　　　　　　　　　　　 New York, New York 10166
　　　　　　　　　　　　　 (212) 309-1000
　　　　　　　　　　　　　 ppartee@huntonak.com
　　　　　　　　　　　　　 rrich2@huntonak.com

　　　　　　　　　　　　　 *Counsel for Appellant Finance of America Reverse LLC*

# CERTIFICATE OF COMPLIANCE

Based on the word counting device used in my computer program, I hereby certify that:

1.     This brief complies with the word limit requirement set forth in Fed. R. Bankr. P. 8015(a)(7)(B)(i) and Local Civil Rule 7.1(c) because it contains less than 13,000 words, excluding the parts of the brief exempted by Fed. R. Bankr. P. 8015(g).

2.     This brief complies with the page limitation set forth in the Court's Individual Rules of Practice, dated April 18, 2020, because it does not exceed 35 pages in length, double-spaced, which is the page limitation applicable to memoranda of law on motions.[36]

Dated:     January 18, 2022
            New York, New York

                        /s/ Robert A. Rich
                        Robert A. Rich

---

[36] This brief has been prepared using 12-point Times New Roman typestyle, rather than the 14-point typestyle set forth in Fed. R. Bankr. P. 8015(a)(5)(A), because the 35-page limit for memoranda of law, made applicable to bankruptcy appeal briefs per the Court's Individual Rules of Practice, allows for use of 12-point type or larger. *See* Local Civ. R. 11.1(b)(1).