# 1:21-cv-10038-LAK

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

In re DITECH HOLDING CORPORATION, *et al.*

FINANCE OF AMERICA REVERSE LLC, Appellant,

v.

MORTGAGE WINDDOWN LLC, AS PLAN ADMINISTRATOR, Appellee.

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (GARRITY JR., J.)

IN RE DITECH HOLDING CORPORATION, *ET AL.,* CASE NO. 19-10412 (JOINTLY ADMINISTERED)

===============================================================

## APPELLANT FINANCE OF AMERICA REVERSE LLC'S
## APPENDIX VOLUME I OF II (1-724)

===============================================================

Peter S. Partee, Sr.
Robert A. Rich
**HUNTON ANDREWS KURTH LLP**
200 Park Avenue
New York, New York 10166
(212) 309-1000
ppartee@huntonak.com
rrich2@huntonak.com

*Counsel for Appellant Finance of America Reverse LLC*

Dated: January 18, 2022

# TABLE OF CONTENTS[1]

| Document Title | Date of Filing | Bankr. Dkt. No. | App. Page |
|---|---|---|---|
| Memorandum Decision and Order signed on 10/21/2021 Sustaining Fifty-Second Omnibus Objection to Proofs of Claim (Misclassified Claims) with respect to Claims of Liberty Home Equity Solutions, Inc. and Finance of America Reverse LLC | October 21, 2021 | 3741 | 1 |
| Declaration of Gerald A. Lombardo Pursuant to Rule 1007-2 of Local Bankruptcy Rules for Southern District of New York | February 11, 2019 | 2 | 27 |
| Order Establishing Deadline for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof | February 22, 2019 | 90 | 168 |
| Order Further Extending General Bar Date for Filing Proofs of Claim for Consumer Borrowers Nunc Pro Tunc | May 2, 2019 | 496 | 191 |
| Amended Disclosure Statement for Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors | May 10, 2019 | 543 | 195 |
| Order Confirming Third Amended Chapter 11 Plan | September 26, 2019 | 1404 | 474 |

---

[1] Certain items in the record relate solely to the appeal filed by Liberty Home Equity Solutions, Inc. (Case No. 21-10221-LAK), which has been dismissed. With the exception of those items, Appellant has included the entire record of appeal in this appendix because (i) the record is not overly voluminous, (ii) most of the items are relevant to Appellant's opening brief, and (iii) the Court's individual rules require that Appellant provide the Court with a courtesy copy of the record on appeal.

| Document Title | Date of Filing | Bankr. Dkt. No. | App. Page |
|---|---|---|---|
| Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and its Affiliated Debtors | September 26, 2019 | 1404-1[2] | 585 |
| Notice of (I) Entry of Order Confirming Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors, (II) Occurrence of Effective Date, and (III) Final Deadline for Filing Administrative Expense Claims | September 30, 2019 | 1449 | 667 |
| Order Approving (I) Claims Objection Procedures and (II) Claim Hearing Procedures | November 19, 2019 | 1632 | 670 |
| Notice of Appointment of Successor Plan Administrator | December 3, 2019 | 1653 | 687 |
| Fifty-Second Omnibus Objection to Proofs of Claim (Misclassified Claims) | April 17, 2020 | 2186 | 689 |
| Finance of America Reverse LLC's Response to Fifty-Second Omnibus Objection to Proofs of Claim (Misclassified Claims) | May 8, 2020 | 2315 | 710 |
| Transcript of Hearing Held on 10-29-2020 | November 2, 2020 | 2940 | 725 |
| Memorandum Decision and Order Granting Plan Administrator's Sixth Omnibus Motion to Enforce the Plan Injunction and Confirmation Order as It Relates to Gautam and Panthobi Sharma | November 11, 2020 | 3034 | 837 |

---

[2] The *Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and its Affiliated Debtors* also was filed on September 22, 2019 at Bankruptcy Court Docket No. 1326.

| Document Title | Date of Filing | Bankr. Dkt. No. | App. Page |
|---|---|---|---|
| Reply of Plan Administrator of Support of Fifty-Second Omnibus Objection with Respect to Claims of Finance of America Reverse LLC (Claim Nos. 21347 and 60182) and Liberty Home Equity Solutions, Inc. (Claim No. 60214) | December 11, 2020 | 3076 | 858 |
| Transcript of Hearing Held on 12-17-2020 | December 18, 2020 | 3116 | 897 |
| Transcript of Hearing Held on 1-28-2021 | February 1, 2021 | 3206 | 1061 |
| Notice of Appeal of Finance of America Reverse LLC | November 3, 2021 | 3754 | 1147 |
| Finance of America Reverse LLC Claim No. 21347 | April 25, 2019 | Claim No. 21347 | 1183 |
| Finance of America Reverse LLC Claim No. 60182 | November 11, 2019 | Claim No. 60182 | 1206 |
| *In re Aralex Pharmaceuticals US Inc.*, Case No. 18-12425 (Bankr. S.D.N.Y. Aug. 27, 2018), Debtors' Omnibus Motion #1 For Order: (A) Authorizing Rejection Of Certain Executory Contracts *Nunc Pro Tunc* To The Petition Date; (B) Authorizing Rejection of Certain Unexpired Leases Effective As Of August 31, 2018; and (C) Granting Related Relief [ECF No. 61] | N/A | N/A | 1218 |
| *In re Aralex Pharmaceuticals US Inc.*, Case No. 18-12425 (Bankr. S.D.N.Y. Sept. 14, 2018), Omnibus Order #1: (A) Authorizing Rejection Of Certain Executory Contracts *Nunc Pro Tunc* To The Petition Date; (B) Authorizing Rejection of Certain Unexpired Leases Effective As Of August 31, 2018; and (C) Granting Related Relief [ECF No. 102] | N/A | N/A | 1240 |

| Document Title | Date of Filing | Bankr. Dkt. No. | App. Page |
|---|---|---|---|
| *In re Sound Shore Medical Center of Westchester,* Case No. 13-22840 (Bankr. S.D.N.Y. Jul. 30, 2013), Debtors' Motion For An Order Pursuant To Section 365 Of The Bankruptcy Code Authorizing Debtors To Reject Certain Executory Contracts, *Nunc Pro Tunc*, To The Date Of Termination Or The Filing Date Of This Motion, Whichever Is Earlier [ECF No. 215] | N/A | N/A | 1245 |
| *In re Sound Shore Medical Center of Westchester,* Case No. 13-22840 (Bankr. S.D.N.Y. Jan. 6, 2014), Order Pursuant To 11 U.S.C. § 365 Approving Rejection Of Executory Contracts [ECF No. 525] | N/A | N/A | 1257 |
| *In re Eastman Kodak Company*, Case No. 12-10202 (Bankr S.D.N.Y. Jan. 31, 2012), Debtors' Motion For An Order Authorizing Rejection Of Certain Executory Contract *Nunc Pro Tunc* to January 31, 2012 [ECF No. 172] | N/A | N/A | 1259 |
| *In re Eastman Kodak Company*, Case No. 12-10202 (Bankr S.D.N.Y. Feb. 15, 2012), Order Authorizing Rejection of Certain Executory Contract Nunc Pro Tunc to January 31, 2012 [ECF No. 372] | N/A | N/A | 1278 |
| Motion of the Debtors for Interim and Final Orders (I) Authorizing Debtors to Continue Honoring Reverse Issuer and Servicer Obligations in the Ordinary Course and Granting Related Relief, (II) Modifying Automatic Stay on a Limited Basis to Facilitate Debtors' Ongoing Operations, and (III) Scheduling a Final Hearing | February 11, 2019 | 10 | 1283 |

| Document Title | Date of Filing | Bankr. Dkt. No. | App. Page |
|---|---|---|---|
| Final Order (I) Authorizing Debtors to Continue Honoring Reverse Issuer and Servicer Obligations in the Ordinary Course and Granting Related Relief and (II) Modifying Automatic Stay on a Limited Basis to Facilitate Debtors' Ongoing Operations | March 21, 2019 | 229 | 1356 |
| Schedules of Assets and Liabilities for Reverse Mortgage Solutions, Inc. | March 28, 2019 | 308 | 1380 |

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

NOT FOR PUBLICATION

------------------------------------------------------- x

In re:

Ditech Holding Corporation, *et al.*,

Debtors.[1]

: Case No. 19-10412 (JLG)
: Chapter 11
:
: (Jointly Administered)

------------------------------------------------------- x

**MEMORANDUM DECISION AND ORDER SUSTAINING THE FIFTY-SECOND OMNIBUS OBJECTION TO PROOFS OF CLAIM (MISCLASSIFIED CLAIMS) WITH RESPECT TO CLAIMS OF LIBERTY HOME EQUITY SOLUTIONS, INC. AND FINANCE OF AMERICA REVERSE LLC**

**A P P E A R A N C E S :**

WEIL, GOTSHAL & MANGES LLP
*Attorneys for the Plan Administrator*
767 Fifth Avenue
New York, New York 10153
By:   Ray C. Schrock, P.C.
      Richard W. Slack, Esq.
      Sunny Singh, Esq.

HUNTON ANDREWS KURTH LLP
*Attorneys for Liberty Home Equity Solutions, Inc. and Finance of America Reverse LLC*
200 Park Avenue
New York, New York 10166
By:   Peter S. Partee, Sr., Esq.
      Robert A. Rich, Esq.

---

[1]   The confirmation of the Debtors' Third Amended Plan (as defined below) created the Wind Down Estates. The Wind Down Estates, along with the last four digits of their federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Wind Down Estates' principal offices are located at 2600 South Shore Blvd., Suite 300, League City, TX 77573. References to "ECF No. __" herein are to documents filed in the electronic docket in these jointly administered cases under Case No. 19-10412 (the "Chapter 11 Cases").

**HON. JAMES L. GARRITY, JR.**
**U.S. BANKRUPTCY JUDGE**

## Introduction[2]

Liberty Home Equity Solutions, Inc. ("LHES") and Finance of America Reverse LLC ("FoA") filed administrative expense claims against Reverse Mortgage Solutions, Inc. ("RMS") in these Chapter 11 Cases in the sums of $4,145,648.48 and approximately $14 million, respectively (collectively, the "Subservicing Administrative Expense Claims").[3] In its Fifty-Second Omnibus Claim Objection (the "Objection"),[4] the Plan Administrator, on behalf of the Wind Down Estates, seeks to reclassify those claims as General Unsecured Claims. LHES and FoA each responded in opposition to the Objection, and in support of their claims (collectively, the "Responses").[5] The Plan Administrator filed a single reply to the Responses (the "Reply").[6] Pursuant to the Claims Procedures Order,[7] the Court conducted a Sufficiency Hearing on the Subservicing Administrative Expense Claims, at which time counsel for the Plan Administrator and counsel for LHES and FoA were heard by the Court. The legal standard of review at a

---

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Objection or the Third Amended Plan, as applicable.

[3]   *See* Proof of Claim No. 60214 ("LHES Administrative Expense Claim"); Proof of Claim No. 60182 (asserting an administrative claim of $375,832.07) (together, the "FoA Administrative Expense Claim").

[4]   *See Fifty-Second Omnibus Objection to Proofs of Claim (Misclassified Claims)* [ECF No. 2186].

[5]   *See Finance of America Reverse LLC's Response to Fifty-Second Omnibus Objection to Proofs of Claim (Misclassified Claims)* [ECF No. 2315] (the "FoA Response");*Liberty Home Equity Solutions Inc.'s Response to Fifty-Second Omnibus Objection to Proofs of Claim (Misclassified Claims* [ECF No. 2314] (the "LHES Response"). LHES and FoA are represented by the same counsel and make essentially identical arguments in their respective Responses to the Objection. Moreover, as noted below, the Plan Administrator filed a single reply to the Responses. The Court will consider the Objection to the LHES and FoA claims together.

[6]   *See Reply of Plan Administrator in Support of Fifty-Second Omnibus Objection with Respect to Claims of Finance of America Reverse LLC (Claim Nos. 21347 and 60182) and Liberty Home Equity Solutions, Inc. (Claim No. 60214)* [ECF No. 3076].

[7]   *See Order Approving (I) Claim Objection Procedures and (II) Claim Hearing Procedures* [ECF No. 1632] (the "Claims Procedures Order").

Sufficiency Hearing is equivalent to the standard applied to a motion to dismiss a complaint for failure to state a claim upon which relief may be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule 12(b)(6)").[8]

For the reasons stated herein, the Court finds that LHES and FoA have not met their burden of demonstrating plausible grounds for according their claims administrative expense priority under the Bankruptcy Code. Accordingly, as a matter of law, the Court sustains the Objection and reclassifies the LHES Administrative Expense Claim and the FoA Administrative Expense Claim as General Unsecured Claims.

## Jurisdiction

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 1334(a) and 157(a) and the *Amended Standing Order of Reference* dated January 31, 2012 (Preska, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Background

**The Chapter 11 Cases**

On February 11, 2019 (the "Petition Date"), Ditech Holding Corporation (f/k/a Walter Investment Management Corp.) and certain of its affiliates ("Debtors") filed petitions for relief under chapter 11 of the Bankruptcy Code in this Court. Thereafter, the Debtors remained in possession and control of their business and assets as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On February 22, 2019, the Court entered an order fixing April 1, 2019 at 5:00 p.m. (prevailing Eastern Time) as the deadline for each person or entity, not including governmental units (as defined in section 101(27) of the Bankruptcy Code)

---

[8]    *See* Claims Procedures Order ¶ 3(iv)(a). Rule 12(b)(6) is incorporated herein by Rule 7012 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

to file a proof of claim in the Debtors' Chapter 11 Cases (the "General Bar Date").[9] The Court

extended the General Bar Date for consumer borrowers, twice, and ultimately to June 3, 2019 at

5:00 p.m. (prevailing Eastern Time).[10]

On September 26, 2019, the Debtors confirmed their Third Amended Plan, and on

September 30, 2019, that plan became effective (the "Effective Date").[11] In the Confirmation

Order, the Court set the deadline for the filing of administrative expense claims as October 31,

2019. The Plan Administrator is a fiduciary appointed under the Third Amended Plan who is

charged with the duty of winding down, dissolving and liquidating the Wind Down Estates. *See*

Third Amended Plan, ¶¶ 1.130, 1.184, 1.186. Among other things, the Third Amended Plan

authorizes the Plan Administrator, on behalf of each of the Wind Down Estates, to object to

Administrative Expense Claims. *See id.*, ¶ 7.1.

**The Subservicing Agreements**

As of the Petition Date, RMS was party to certain reverse mortgage subservicing

agreements with LHES and FoA. Pursuant to those agreements, RMS subserviced reverse

mortgage loans for LHES and FoA, as the owner and/or the named servicer of those loans, in

exchange for subservicing fees and other consideration. LHES Response ¶ 5; FoA Response ¶ 5.

The relevant agreements (collectively, the "Subservicing Agreements") are as follows:

---

[9]    *See Order Establishing Deadline for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* [ECF No. 90].

[10]    *See Order Further Extending General Bar Date for Filing Proofs of Claim for Consumer Borrowers Nunc Pro Tunc* [ECF No. 496].

[11]    *See Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and its Affiliated Debtors* [ECF No. 1326] (the "Third Amended Plan"); *Order Confirming Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and its Affiliated Debtors* [ECF No. 1404] (the "Confirmation Order"); *Notice of (I) Entry of Order Confirming Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and its Affiliated Debtors, (II) Occurrence of Effective Date, and (III) Final Deadline for Filing Administrative Expense Claims* [ECF No. 1449].

LHES

> Reverse Mortgage Subservicing Agreement, dated as of November 17, 2008 (the "LHES November 2008 Agreement").

FoA

> Reverse Mortgage Subservicing Agreement, dated as of March 18, 2011 (the "FoA March 2011 Agreement");

> Reverse Mortgage Subservicing Agreement, dated as of December 12, 2017 (the "FoA December 2017 Agreement"); and

> Reverse Mortgage Subservicing Agreement, dated as of October 4, 2018 (the "FoA October 2018 Agreement").

By their terms, the LHES November 2008 Agreement and the FoA March 2011 Agreement were scheduled to expire in November 2013 and March 2018, respectively. Prior to the Petition Date (i.e., February 11, 2019), pursuant to a series of agreements (collectively, the "Prepetition Extension Agreements"), the parties extended the expiration dates of both agreements – without altering the other terms and conditions of the agreements. LHES Response ¶¶ 6-7; FoA Response ¶¶ 6-8.  As of the Petition Date, those agreements were in effect, and pursuant to the Prepetition Extension Agreements, their termination dates had been extended to March 31, 2019. LHES Response ¶ 6; FoA Response ¶ 7. Post-petition, under those agreements, RMS subserviced the covered reverse mortgage loans, and LHES/FoA paid RMS subservicing fees post-petition, through March 31, 2019.  LHES Response ¶¶ 6-7; FoA Response ¶¶ 7-8. Thereafter, RMS entered into a series of agreements with LHES and FoA, respectively (collectively, the "Post-Petition Extension Agreements") pursuant to which the parties extended the expiration dates of the LHES November 2008 Agreement and the FoA March 2011 Agreement ultimately through September 30, 2019, again, without altering the other terms and conditions of the agreements. LHES Response ¶ 7; FoA Response ¶ 8.

Pursuant to the Post-Petition Extension Agreements, RMS continued to subservice the covered reverse mortgage loans, and LHES/FoA continued to pay RMS subservicing fees, from April 1, 2019 through September 30, 2019. LHES Response ¶ 7; FoA Response ¶ 8. Separately, the FoA December 2017 Agreement and the FoA October 2018 Agreement (collectively with the FoA March 11 Agreement, the "FoA Subservicing Agreements") each have a one-month term subject to FoA's monthly renewal option. FoA exercised its renewal option under both agreements, prepetition and post-petition through February 2019 and September 2019, respectively, but otherwise on the same terms and conditions stated in the agreements. FoA Response ¶ 6. RMS subserviced the reverse mortgage loans, and FoA paid RMS a subservicing fee, through the prepetition and post-petition periods covered by those agreements, in accordance with the terms of those agreements. *Id.*

To summarize, prior to the Petition Date, the Debtors entered into eight (8) Prepetition Extension Agreements with FoA and seven (7) Prepetition Extension Agreements with LHES. The Debtors also entered into four (4) Post-Petition Extension Agreements with FoA and two (2) Post-Petition Extension Agreements with LHES. LHES Response ¶¶ 5-7;  FoA Response ¶¶ 7-8. None of those agreements (collectively, the "Extension Agreements") altered the terms of the Subservicing Agreements in any way except by extending the termination date of each such agreement.[12]

---

[12]    The Court more fully describes the LHES November 2008 Agreement and the FoA March 2011 Agreement below.

LHES

    The initial term of the LHES November 2008 Agreement was three years and it automatically renewed for an additional two years through November 17, 2013. LHES Response ¶ 6. In 2013, LHES and RMS entered into one or more agreements pursuant to which they extended the term of the LHES November 2008 Agreement through March 31, 2019, but otherwise on the same terms and conditions stated in the agreement (the "LHES Prepetition Extension Agreements"). *Id.* Thus,

Under the Third Amended Plan, the Debtors sold their reverse mortgage business to the Reverse Buyer. The Debtors consummated the sale on September 30, 2019. The Subservicing Agreements expired on or before the Effective Date, and RMS did not assign any of those agreements to the Reverse Buyer. The Third Amended Plan provides for the assumption of all executory contracts listed by the Debtors on an assumption notice or on the Assumption Schedule. All other executory contracts of the Debtors are deemed rejected as of the Effective Date unless such executory contracts previously expired or terminated pursuant to its own terms

---

as of the Petition Date, RMS and LHES were party to the LHES November 2008 Agreement, as extended through March 31, 2019.

After the Petition Date, RMS subserviced the reverse mortgage loans, and LHES paid RMS subservicing fees, through March 31, 2019, in accordance with the terms of the LHES November 2008 Agreement, as extended by the LHES Prepetition Extension Agreements. Thereafter, LHES and RMS entered into two agreements further extending the term of the LHES November 2008 Agreement through June 30, 2019 and September 30, 2019, respectively (the "LHES Post-Petition Extension Agreements"). Thus, post-petition, RMS subserviced the reverse mortgage loans, and LHES paid RMS a subservicing fee, from April 1, 2019 through September 30, 2019, in accordance with the terms of the LHES November 2008 Agreement, as extended by the LHES Post-Petition Extension Agreements.

FoA

The initial term of the FoA March 2011 Agreement was five years and it automatically renewed for an additional two years through March 18, 2018. FoA Response ¶ 5. In 2018, FoA and RMS entered into the first of seven prepetition agreements pursuant to which the parties ultimately extended the term of the FoA March 2011 Agreement through March 31, 2019, on the same terms and conditions stated in the FoA March 2011 Agreement (the "FoA Prepetition Extension Agreements"). *Id.* ¶ 7. RMS subserviced the covered reverse mortgage loans, and FoA paid RMS subservicing fees, through March 31, 2019 in accordance with the FoA Prepetition Extension Agreements. *Id.* After the Petition Date, FoA and RMS entered into four agreements that collectively further extended the term of the FoA March 2011 Agreement through September 30, 2019 (the "FoA Post-Petition Extension Agreements"). The FoA Post-Petition Extension Agreements are dated as of March 29, 2019, April 15, 2019, June 30, 2019, and August 16, 2019, respectively. RMS subserviced the covered reverse mortgage loans, and FoA paid RMS a subservicing fee, from April 1, 2019 through September 30, 2019 in accordance with the terms of the FoA March 2011 Agreement, as extended by the FoA Post-Petition Extension Agreements. *Id.* ¶ 8.

The FoA December 2017 Agreement and the FoA October 2018 Agreement each have one-month terms subject to FoA's monthly renewal option. FoA exercised its monthly renewal option through February 2019 and through September 2019 under the respective agreements, but otherwise on the same terms and conditions stated in the agreements. *Id.* ¶ 6. RMS subserviced the reverse mortgage loans, and FoA paid RMS a subservicing fee, through the pre- and post- petition periods covered by the FoA December 2017 Agreement and FoA October 18, 2019 Agreement, in accordance with the terms of those agreements.

or by agreement of the parties. *See* Third Amended Plan, ¶ 8.1. The Debtors did not assume the

Subservicing Agreements under the Third Amended Plan, or otherwise.

**The LHES and FoA Claims**

<u>LHES Administrative Expense Claim</u>

On November 11, 2019, LHES timely filed the LHES Administrative Expense Claim in

the amount of $4,145,648.48, plus other amounts to be determined, for damages resulting from

RMS' alleged post-petition subservicing errors and other material alleged post-petition breaches

of the LHES November 2008 Agreement. LHES Administrative Expense Claim at 2; LHES

Response ¶ 10. LHES does not claim any damages resulting from any purported rejection of that

agreement, or for any breach of the agreement that may have occurred after the Effective Date.

LHES Response ¶ 10.

<u>FoA Claim Administrative Expense Claim</u>

On November 11, 2019, FoA timely filed the FoA Administrative Expense Claim in the

amount of $375,832.07, plus other amounts to be determined, for damages resulting from RMS'

alleged post-petition subservicing errors and other alleged material post-petition breaches of the

FoA Subservicing Agreements. FoA Response ¶ 12.[13] FoA has since quantified its realized and

unrealized losses resulting from RMS' alleged post-petition subservicing errors and other alleged

material post-petition breaches in the approximate amount of $14 million, plus other amounts to

be determined. *Id.* FoA does not claim any damages resulting from any purported rejection of the

---

[13]    On April 25, 2019, FoA timely filed Proof of Claim No. 21347 ("Claim No. 21347") in the Chapter 11 Cases in
the amount of $54,085,624, plus other amounts to be determined, as a general unsecured claim and an undetermined
amount as an administrative expense claim under section 507(a)(2), for damages resulting from RMS' alleged
subservicing errors and other alleged material breaches of the FoA Subservicing Agreements. In that claim, FoA
expressly reserved the right to assert administrative expense priority claims at the appropriate time for any damages
resulting from RMS' subservicing errors and other material breaches of the FoA Subservicing Agreements occurring
after the Petition Date. FoA acknowledges that the $54,085,624 amount is based on alleged prepetition breaches of
the FoA Subservicing Agreements. That claim is not at issue herein.

agreements, or for any breaches of the agreements that may have occurred after the Effective Date.

**The Claims Procedures Order**

On November 19, 2019, the Court entered the Claims Procedures Order. Under that order, the Plan Administrator is authorized to file Omnibus Objections seeking reduction, reclassification, or disallowance of claims on the grounds set forth in Bankruptcy Rule 3007(d) and additional grounds set forth in the Claims Procedures Order. *See* Claims Procedures Order ¶ 2(i)(a)-(h). A properly filed and served response to an objection gives rise to a "Contested Claim" that will be resolved at a Claim Hearing. *Id.* ¶ 3(iv). The Plan Administrator has the option of scheduling the Claim Hearing as either a "Merits Hearing" or a "Sufficiency Hearing." *Id.* ¶ 3(iv)(a), (b). A "Merits Hearing" is an evidentiary hearing on the merits of a Contested Claim. A "Sufficiency Hearing" is a non-evidentiary hearing to address whether the Contested Claim states a claim for relief against the Debtors. The legal standard of review that will be applied by the Court at a Sufficiency Hearing is equivalent to the standard applied by the Court upon a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6). *Id.* ¶ 3(iv)(a).

**The Objection**

In the Objection, the Plan Administrator seeks to reclassify the Subservicing Administrative Expense Claims to General Unsecured Claims. As support for the Objection, the Plan Administrator contends that it has examined each of those claims, the documents submitted in support of the claims and the Debtors' books and records and has determined that the claims are improperly classified as administrative expense claims. Objection ¶ 13. It says that is so

because they are damage claims arising from the rejection of prepetition contracts in these

Chapter 11 Cases and, as such, are properly classified as general unsecured claims. *Id.*

### Applicable Legal Standards

Section 503(b) of the Bankruptcy Code provides that "[a]fter notice and a hearing,

there shall be allowed, administrative expenses. . . including the actual, necessary costs and

expenses of preserving the estate. . ." 11 U.S.C. § 503(b). This administrative expense priority is

based on the premise that the operation of the business during the bankruptcy case benefits

prepetition creditors; therefore, any claims that result from that operation are entitled to payment

prior to payment to "creditors for whose benefit the continued operation of the business was

allowed." LHES Response ¶ 13; FoA Response ¶ 15 (citing *Cramer v. Mammoth Mart, Inc. (In

re Mammoth Mart, Inc.)*, 536 F.2d 950, 954 (1st Cir. 1976)). Agreements entered into by the

debtor-in-possession and supported by consideration beneficial to the debtor-in-possession, are

actual and necessary to preserve the estate, and therefore a claim for damages arising from a

debtor-in-possession's breach of a post-petition agreement gives rise to an administrative

expense claim for the full amount of the damages provided for in the contract. *See Nostas

Assocs. v. Costich (In re Klein Sleep Products, Inc.)*, 78 F.3d 18, 26 (2d Cir. 1996)

("[P]ostpetition claims ... arising, for example, . . . from contracts entered into by the trustee or

debtor-in-possession are entitled to administrative expense priority."); *GATX Leasing Corp. v.

Airlift Int'l, Inc. (In re Airlift Int'l, Inc.)*, 761 F.2d 1503, 1509 (11th Cir. 1985) (holding that

breach of post-petition contract gives rise to an administrative expense claim under section

503(b)). A claimant that asserts a priority claim bears the burden of establishing its entitlement to

priority. *See, e.g.*, *Supplee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.)*, 479 F.3d 167,

172 (2d Cir. 2007) ("The burden of proving entitlement to priority payment . . . rests with the

party requesting it."); *In re Drexel Burnham Lambert Grp. Inc.*, 134 B.R. 482, 489 (Bankr.

S.D.N.Y. 1991) ("The burden of establishing entitlement to priority rests with the claimant and

should only be granted under extraordinary circumstances") (citation omitted).

In filing the Objection, the Plan Administrator initiated a contested matter. *See* Fed.

R. Bankr. P. 3007 advisory committee's note ("[t]he contested matter initiated by an objection to

a claim is governed by Rule 9014. . ."). *See also In re Tender Loving Care Health Servs., Inc.*,

562 F.3d 158, 162 (2d Cir. 2009) (stating that "when a debtor files an objection to a claim, the

objection has initiated a contested matter"). Bankruptcy Rule 9014 governs contested matters.

The rule does not explicitly provide for the application of Bankruptcy Rule 7012. However,

Bankruptcy Rule 9014 provides that a bankruptcy court "may at any stage in a particular matter

direct that one or more of the other Rules in Part VII shall apply." Fed. R. Bankr. P. 9014. The

Court did so here. Under the Claims Procedures Order, the legal standard of review the Court

applies at a Sufficiency Hearing is equivalent to the standard applied by the Court under Rule

12(b)(6) on a motion to dismiss for failure to state a claim upon which relief could be granted.

*See* Claims Procedures Order ¶ 3(iv)(a). *See also In re 20/20 Sport, Inc.*, 200 B.R. 972, 978

(Bankr. S.D.N.Y. 1996) ("In bankruptcy cases, courts have traditionally analogized a creditor's

claim to a civil complaint [and] a trustee's objection to an answer. . . ").

In applying Rule 12(b)(6) to the Subservicing Administrative Expense Claims, the Court

assesses the sufficiency of the facts alleged in support of the claims in light of the pleading

requirements under Rule 8(a) of the Federal Rules of Civil Procedure.[14]  Rule 8(a)(2) states that a

claim for relief must contain "a short and plain statement of the claim showing that the pleader is

entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). To meet that standard, the claims "must contain

---

[14]    Rule 8 is made applicable herein pursuant to Bankruptcy Rule 7008.

sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."

*Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) ("*Iqbal*") (citations omitted); *accord Bell Atlantic*

*Corp. v. Twombly,* 550 U.S. 544, 570 (2007) ("*Twombly*"). "A claim has facial plausibility when

the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *accord Twombly*, 550

U.S. at 570. To satisfy Rule 12(b)(6), the "pleadings must create the possibility of a right to relief

that is more than speculative." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183

(2d Cir. 2008) (citation omitted). In considering whether that standard is met for a particular

claim, the court must assume the truth of all material facts alleged in support of the claim and

draw all reasonable inferences in the claimant's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund,*

*Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). However, the court "need not accord 'legal conclusions,

deductions or opinions that are couched as factual allegations . . . a presumption of

truthfulness.'" *Hunt v. Enzo Biochem, Inc.*, 530 F.Supp.2d 580, 591 (S.D.N.Y. 2008) (quoting *In*

*re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007)). In short, "[i]n ruling on a motion

pursuant to Fed. R. Civ. P. 12(b)(6), the duty of a court is merely to assess the legal feasibility of

the complaint, not to assay the weight of the evidence which might be offered in support

thereof." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2d Cir. 2010) (citation and

internal quotation marks omitted).[15]

---

[15]    In support of the Objection, the Plan Administrator provides representative samples of Prepetition and Post-Petition Extension Agreements. *See* Reply Exs. A-1, A-2, B-1 and B-2. Because the Subservicing Agreements and the Prepetition and Post-Petition Extension Agreements are referenced by LHES and FoA in the Responses and serve as the bases for their claims, the Court may consider those documents in resolving the Objection. *See, e.g., Bd. of Trs. of Ft. Lauderdale v. Mechel OAO*, 811 F. Supp. 2d 853, 865 (S.D.N.Y. 2011), *aff'd sub nom. Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012) (Court may consider "(1) documents attached to or incorporated by reference in the complaint, (2) documents integral to and relied upon in the complaint, even if not attached or incorporated by reference, (3) public disclosure documents required by law to be, and that have been, filed with the SEC, and (4) facts of which judicial notice properly may be taken."); *Flake v. Alper Holdings USA, Inc.* (*In re Alper Holdings USA, Inc.), 398 B.R. 736, 748 (S.D.N.Y. 2008) ("The documents attached to the proofs of claim should be

### Discussion

LHES and FoA maintain that the Subservicing Agreements are not the operative

documents for calculating their claims. They contend that under state law, each Extension

Agreement is a new subservicing agreement among RMS and LHES or FoA. LHES Response ¶¶

15-16; FoA Response ¶¶ 17-18.  The LHES and FoA Administrative Expense Claims consist of

(i) subservicing damage claims arising under the Post-Petition Extension Agreements, and (ii)

subservicing damage claims arising under the Prepetition Extension Agreements during the post-

petition period of February 11, 2019 through March 31, 2019. LHES and FoA contend that the

Post-Petition Extension Agreements are not executory contracts, and that the Prepetition

Extension Agreements expired by their terms post-petition prior to the Effective Date. They

assert that the Court should overrule the Objection because they are not seeking damages under

rejected executory contracts and, as a matter of law, their claims are entitled to administrative

priority status under section 503(b) of the Bankruptcy Code.

The Plan Administrator disputes those contentions. The Court considers those matters

below.

**Whether the Damage Claims Arising Under
the Post-Petition Extension Agreements are
Entitled to Administrative Expense Priority**

The Post-Petition Extension Agreements are "on the same terms and conditions as stated

in the original [Subservicing] Agreement[s]," except that each agreement extends the expiration

---

treated, for purposes of a motion to disallow claims, like documents that are attached to or relied upon in a complaint are treated on a Rule 12(b)(6) motion to dismiss") (citation omitted).

date of the original agreement. *See* Reply, Exs. A-1;[16] B-1.[17] LHES and FoA assert that under

applicable state law, by reason of the modifications to the termination dates under the

Subservicing Agreements, the Post-Petition Extension Agreements are new, post-petition

contracts between RMS, as debtor-in-possession, and FoA and LHES, respectively, that

supersede and replace the Subservicing Agreements and that RMS was authorized to execute in

---

[16]    The final Post-Petition Extension Agreement between LHES and RMS states, in part, as follows:

> WHEREAS, the Reverse Mortgage Subservicing Agreement ("Agreement") between the parties dated November 17, 2008 expired on November 17, 2013, and the parties subsequently agreed to extend the agreement through June 30, 2019.

> WHEREAS, to allow the parties further time to negotiate and execute a new Reverse Mortgage Subservicing Agreement, the parties now desire to extend the Agreement through September 30, 2019.

> NOW THEREFORE, the parties agree that the Agreement shall be extended through September 30, 2019. Except as provided herein, this extension shall be on the same terms and conditions as stated in the original Agreement. This Extension Agreement shall be binding upon and inure to the benefit of the parties, their successors, and subsidiaries.

Reply, Ex. A-2.

[17]    The August 16, 2019 Post-Petition Extension Agreement between FoA and RMS states, as follows:

> WHEREAS, the Reverse Mortgage Subservicing Agreement ("Agreement") between the parties dated March 18, 2011 expired on March 18, 2018, and the parties subsequently agreed to extend the Agreement for an additional term commencing upon the expiration date of March 18, 2018 and expiring on May 11, 2018; and the parties further agreed to extend the Agreement for further subsequent extensions commencing upon the expiration dates of May 11, 2018, June 30, 2018, August 30, 2018, October 31, 2018, November 30, 2018, December 31, 2018, January 30, 2019, March 31, 2019, April 15, 2019, June 30, 2019, and August 31, 2019, respectively.

> WHEREAS, to allow the parties further time to negotiate and execute an Amended and Restated Reverse Mortgage Subservicing Agreement, the parties now desire to extend the Agreement through September 30, 2019.

> Except as provided herein, this extension shall be on the same terms and conditions as stated in the original Agreement.

> Each of RMS and [FoA] have entered into this Extension Agreement solely to temporarily extend the term of the Agreement and do not intend this Extension Agreement or the transactions contemplated hereby to be, and this Extension Agreement and the transactions contemplated hereby shall not be construed to be or operate as, a novation, modification, or release of any of the obligations owing by RMS to FAR or in connection with the Agreement, all of which are hereby expressly preserved in their entirety.

Reply, Ex. B-2.

the ordinary course of its business pursuant to section 363(c) of the Bankruptcy Code. LHES

Response ¶¶ 15-16 and 16 n.5; LHES Response ¶¶ 17-18 and 18 n.5. They also contend that the

Post-Petition Extension Agreements are supported by consideration beneficial to RMS, including

in the form of subservicing fee rights, and that RMS continued to subservice mortgage loans

covered by the Post-Petition Extension Agreements and to accept its subservicing fee through the

end of the term of each Post-Petition Extension Agreement. LHES Response ¶¶ 6, 20; FoA

Response ¶ 18, 22. Accordingly, LHES and FoA contend that their timely filed administrative

expense claims for damages resulting from RMS' alleged subservicing errors and other alleged

material breaches of the Post-Petition Extension Agreements are entitled to administrative

expense priority. LHES Response ¶ 18; FoA Response ¶ 20. In making this argument they assert

that the Plan Administrator mistakenly contends that they are claiming damages under a rejected

contract. LHES Response ¶ 17; FoA Response ¶ 19 (citing Objection, Ex. A). They correctly

note that contracts entered post-petition are not subject to assumption or rejection because they

are not executory contracts "of the debtor." 11 U.S.C. § 365(a). *See In re Leslie Fay Companies,*

*Inc.*, 168 B.R. 294, 300 (Bankr. S.D.N.Y. 1994) ("[C]ontracts … entered into postpetition are not

subject to rejection under section 365."); *In re Airport Executive Center, Ltd.*, 138 B.R. 628, 629

(Bankr. M.D. Fla. 1992) ("[Section 365(a)] applies to leases which exist prepetition, and not

those which are entered into post-petition"); *In re IML Freight, Inc.,* 37 B.R. 556, 559 (Bankr. D.

Utah 1984) ("The post-petition agreements entered into between the Trustee for the estate and

the Unions were not executory contracts of the debtor and therefore are not subject to Section

365 of the Code.").

To create an enforceable contract the parties must agree to the material terms of the

bargain and intend to be bound by their agreement. *Tractebel Energy Mktg., Inc. v. AEP Power*

*Mktg., Inc.,* 487 F.3d 89, 98 (2d Cir. 2007) (holding that where "the parties have agreed on

all material terms of the contract and clearly manifested their intent to be bound by those terms. .

. the contract will be enforced."); *Slatt v. Slatt*, 64 N.Y.2d 966, 967 (1985) ("Where the intention

of the parties is clearly and unambiguously set forth, effect must be given to the intent as

indicated by the language used"); *Kasowitz, Benson, Torres & Friedman, LLP v. Reade,* 98

A.D.3d 403, 404 (2012), *aff'd,* 20 N.Y.3d 1082 (2013) ("To establish the existence of an

enforceable agreement, a plaintiff must establish an offer, acceptance of the offer, consideration,

mutual assent, and an intent to be bound") (citation omitted). "In determining the intent of the

parties, the court has a duty to ascertain the intent as manifested in the language of the

agreement. If the terms of the agreement are clear from the face of the document, the intent of

the parties is found in the document." *In re Chateaugay Corp.*, 116 B.R. 887, 902–03 (Bankr.

S.D.N.Y. 1990) (citations omitted). But "'where the language used is susceptible to differing

interpretations, each of which may be said to be as reasonable as another,' then the interpretation

of the contract becomes a question of fact ... and extrinsic evidence of the parties' intent properly

is admissible." *Bourne v. Walt Disney Co.,* 68 F.3d 621, 629 (2d Cir. 1995) (citations

omitted); *see also Ruttenberg v. Davidge Data Sys. Corp.*, 215 A.D.2d 191, 192 (1st Dep't 1995)

("Where a contract is straightforward and unambiguous, its interpretation presents a question of

law for the court to be made without resort to extrinsic evidence").

Here, the Plan Administrator contends that the Court can determine, as a matter of law,

that the Extension Agreements are not new subservicing agreements because it is clear on the

face of each such agreement that the purpose of the agreement merely was to extend the

termination date of the subject Servicing Agreement, while post-petition, the parties negotiated the terms of a new agreement. Reply ¶ 35. The Plan Administrator maintains that the plain language of the Extension Agreements is clear and unambiguous that in executing those agreements, either before or after the Petition Date, the parties did not intend to enter into new subservicing agreements and in executing the Extension Agreements, they did not do so. Reply ¶ 40.

The LHES and FoA Post-Petition Extension Agreements are governed by Delaware and New York law, respectively. Under Delaware law, "[a] new contract. . . does not destroy the obligation of the former agreement, except as it is inconsistent therewith, unless it is shown that the parties intended the new contract to supersede the old contract entirely." *Lee Builders v. Wells,* 92 A.2d 710, 715 (Del.Ch.1952), *rev'd on other grounds,* 99 A.2d 620 (Del.1953). "Whether the parties to a contract intended a new contract to supersede an old one, whether partially or entirely, depends on their intent." *Haft v. Dart Grp. Corp.,* 841 F. Supp. 549, 568 (D. Del. 1993) (internal citations omitted). The intent of the parties "must be ascertained from the language of the contract." *Id.* at 564; *see also Citadel Holding Corp. v. Roven*, 603 A.2d 818, 822 (Del. 1992) ("It is an elementary canon of contract construction that the intent of the parties must be ascertained from the language of the contract. Only when there are ambiguities may a court look to collateral circumstances."). Likewise, New York law is clear that "the objective of contract interpretation is to give effect to the *expressed* intentions of the parties, '[t]he best evidence of what parties to a written agreement intend is what they say in their writing,'. . . 'Thus, a written agreement that is complete, clear and unambiguous on its face must be [interpreted] according to the plain meaning of its terms,' 'without the aid of extrinsic evidence.'" *Law Debenture Tr. Co. of New York v. Maverick Tube Corp.,* 595 F.3d 458, 467–68

(2d Cir. 2010) (internal citations omitted).  *See, e.g., Network Publishing Corp. v. Shapiro,* 895

F.2d 97, 99 (2d Cir.1990) ("[w]e must consider the words [of a contract] themselves for they are

always the most important evidence of the parties' intention" (internal quotation marks

omitted)); *Bailey v. Fish & Neave,* 8 N.Y.3d 523, 528 (2007)("[w]here the language is clear,

unequivocal and unambiguous, the contract is to be interpreted by its own language").

The case of *In re Bush Indus., Inc*., No. 05-CV-119S, 2006 WL 8455682 (W.D.N.Y.

Mar. 29, 2006) is instructive in construing the Extension Agreements at issue herein. There, the

claimant ("Hain") was party to a prepetition consulting agreement (the "Consulting Agreement")

with the debtor ("Bush") and the debtor's wholly owned subsidiary ("Color Works"). *Id.* at *1.

Prepetition, Hain executed an agreement to reduce his guaranteed payments under the Consulting

Agreement. *Id.* Five months after Bush filed for bankruptcy, Hain notified Bush that the

agreement was null and void because Bush and Color Works had not executed the agreement. *Id.*

at *2. Nonetheless, Hain accepted the payments called for under the new agreement and filed an

administrative expense claim equal to the difference between the amounts that he was paid under

the new agreement and the amounts he would have been paid under the Consulting Agreement.

*Id.* Hain argued that the agreement reducing the amount of guaranteed payment was a new

contract that was unenforceable because it did not contain the signatures of each party to the

agreement. *See id*. The bankruptcy court disagreed, finding that the agreement was a

modification rather than a new contract due to a clause allowing modification by an instrument

"signed by the party against whom enforcement of any such amendment, supplement or

modification is sought." *Id*.  Thus, the agreement was a modification that became effective when

signed by the claimant. *See id*. On appeal, the district court ruled that the bankruptcy court

correctly relied only on the unambiguous documents presented and resolved the issue as a matter

of law. *See id*. at *4. In analyzing the question of modification, the district court found, in

substance, that an agreement that restates contract provisions with no substantive changes,

involves the same relationship among the same parties, contains clauses that state the parties'

desire to amend and restate prior agreements, and merely adjusts the term of the agreement or the

compensation, does not constitute a new contract. *See id* at *5. Furthermore, the district court

found where underlying agreements permit amendment, supplementation, or modification in

whole or in part, subsequent agreements will be considered modifications rather than new

agreements. *See id*.

Applying the settled rules of contract construction to the Post-Petition Extension

Agreements, and the teachings of *Bush,* the Court finds, as a matter of law, that in executing the

Extension Agreements, RMS was not entering into new agreements with LHES or FoA, and that

those agreements do not supersede and replace the Subservicing Agreements. The plain,

unambiguous language of the Post-Petition Extension Agreements is clear that they are not

"new" post-petition agreements among RMS, as debtor in possession and LHES or FoA. Both

agreements speak only of "extending" the original agreements "on the same terms and conditions

as stated in the original [Subservicing] Agreement[s]." *Supra* n.16, 17.[18] Moreover, the parties

tacitly acknowledge that the Extension Agreements are not new agreements among the parties

because they agreed to extend the termination dates of the agreements "to allow the parties

further time to negotiate and execute a new Reverse Mortgage Subservicing Agreement." *Supra*

n.16, 17. Further, the FoA Post-Petition Extension Agreement provides that it "shall not be

construed to be or operate as, a novation, modification, or release of any of the obligations owing

---

[18]   The Prepetition Extension Agreements contain similar language. *See* Reply, Ex. A-1 (LHES Prepetition
Extension Agreement) ("This extension shall be on all other terms and conditions as stated in the original
Agreement."); *Id*., Ex. B-1 (FoA Prepetition Extension Agreement) ("Except as provided herein, this extension shall
be on the same terms and conditions as stated in the original Agreement.").

by RMS to [FoA] or in connection with the [FoA November 2011] Agreement, all of which are hereby expressly preserved in their entirety." *Supra* n.17.[19] Finally, the extensions fail to address, at all, the rights and obligations under the subservicing relationship that constitute breach, notification of breach, indemnity, dispute resolution, or the treatment of claims arising under the agreement. Thus, like the agreement at issue in *Bush,* the Post-Petition Extension Agreements merely (i) restate the provisions of the applicable Subservicing Agreement with no substantive changes, (ii) involve the same relationship among the same parties, and (iii) state the parties' intention to extend terms of the subject Subservicing Agreements. Accordingly, those agreements do not constitute new contracts. *See United States Aviation Underwriters, Inc. v. Preservatrice-Fonciere Compagnies D'Assurance*, No. 83 CIV. 3935 (GLG), 1986 WL 3779, at *2 (S.D.N.Y. Mar. 21, 1986) (noting that renewal of the contract was viewed "as an extension of the original [contract], not a new contract"), *aff'd sub nom. U.S. Aviation v. Preservatrice-Fonciere*, 801 F.2d 391 (2d Cir. 1986); *In re Country Club Ests. at Aventura Maint. Ass'n, Inc.*, 227 B.R. 565, 567–68 (Bankr. S.D. Fla. 1998) (noting that the automatically renewed service agreement on the same terms of the original agreement was not a new post-petition contract, "but rather a mere continuation of [the] parties' executory, prepetition agreement.").

---

[19]   The non-inclusion of such language in the two LHES Post-petition Extension Agreements does not undermine this analysis. The Plan Administrator asserts that the failure to include that language in the LHES documents is a consequence of the parties' routine practice of using prior extensions in their business relationship, not their intent to exclude the provisions from nearly identical contracts. *See* Reply ¶ 37 n.4 (citing *Nycal Corp. v. Inoco PLC*, 166 F.3d 1201 (2d Cir. 1998) ("any differences in the wording used in the three contemporaneous settlement agreements can only be reasonably viewed as a consequence of the different relationships and dealings between the respective companies and not as an indication of a different intent with respect to the Nycal-Inoco release.") (internal quotations omitted). The Court credits that contention.

**20**

**Whether the Damage Claims Resulting From RMS'**
**Post-Petition Breach of the Subservicing Agreements**
**are Entitled to Administrative Expense Priority**

LHES and FoA contend that their damage claims resulting from RMS' post-petition

breach of the Subservicing Agreements, as extended by the Prepetition Extension Agreements

are entitled to administrative expense priority under section 507(a)(2) of the Bankruptcy Code.

They maintain that is so because a debtor's post-petition obligations under a prepetition contract

that has not yet been assumed or rejected will give rise to administrative expense claims where

the debtor-in possession continues to perform under such contract and receive the benefits

thereunder. LHES Response ¶ 19; FoA Response ¶ 21. They assert that RMS elected to continue

subservicing reverse mortgage loans under the LHES and FoA Prepetition Extension

Agreements on a post-petition basis and accepted the post-petition subservicing fees paid in

exchange for its performance under those contracts through March 31, 2019.  Accordingly,

LHES and FoA maintain their respective timely filed administrative expense claims for damages

resulting from RMS' post-petition subservicing errors and other material post-petition breaches

of the Prepetition Extension Agreements are entitled to administrative expense priority. LHES

Response ¶ 20; FoA Response ¶ 22.

The Bankruptcy Code determines when claims arise. *See, e.g., Pearl-Phil GMT (Far*

*East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 581 (S.D.N.Y. 2000) ("[I]t is well settled that the

Bankruptcy Code governs *when* a claim arises."). Section 101(5) of the Bankruptcy Code defines

"claim" to include any

> [R]ight to payment, whether or not such right is reduced to judgment, liquidated,
> unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal,
> equitable, secured, or unsecured; . . .

11 U.S.C. § 101(5)(A). That term "is sufficiently broad to encompass any possible right to payment." *Mazzeo v. United States (In re Mazzeo),* 131 F.3d 295, 302 (2d Cir. 1997). *See also United States v. LTV Corp. (In re Chateaugay Corp.),* 944 F.2d 997, 1003 (2d Cir. 1991) (noting that as defined, the term "claim" "contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case.") (quoting H.R. Rep. No. 95-595 at 300 (1978), reprinted in U.S. Code Cong. & Admin. News 5787, 5963, 6266). For these purposes, "[a] 'contingent' claim . . . refers 'to obligations that will become due upon the happening of a future event that was within the actual or presumed contemplation of the parties at the time the original relationship between the parties was created.'" *Ogle v. Fid. & Deposit Co. of Md.,* 586 F.3d 143, 146 (2d Cir.2009) (quoting *In re Manville Forest Prods. Corp.,* 209 F.3d 125, 128–29 (2d Cir. 2000)); *see also In re St. Vincent's Catholic Med. Ctrs.,* 440 B.R. 587, 602 (Bankr.S.D.N.Y.2010).

Claims based on un-assumed prepetition contracts are contingent prepetition claims that arise upon the execution of the contract. S*ee Ogle v. Fid. & Deposit Co. of Maryland,* 586 F.3d at 147 ("an unsecured claim for post-petition fees, authorized by a valid pre-petition contract," is a contingent claim "deemed to have arisen pre-petition.") (citing *In re SNTL Corp.,* 571 F.3d 826, 844 (9th Cir. 2009)); *Rescap Liquidating Tr. v. PHH Mortg. Corp. (In re Residential Cap., LLC),* 558 B.R. 77, 86 (S.D.N.Y. 2016) ("The appellees' claims for attorney's fees accrued at the time the Contracts were executed even though they remained contingent until the Trust allegedly breached the Contracts"); *Conway Hosp., Inc. v. Lehman Bros. Holdings Inc.,* 531 B.R. 339, 343 (S.D.N.Y. 2015) ("The relationship between Conway and LBSF therefore was created upon the signing of the…Agreement. The fact that the Lehman bankruptcy—the relevant contingency— materialized post-petition does not transmogrify the claim into a post-petition claim, but merely

means that the contingent claim moved closer to becoming liquidated"). *See also In re Bradlees Stores, Inc.*, No. 02 CIV. 0896 (WHP), 2003 WL 76990, at *3 (S.D.N.Y. Jan. 9, 2003), *aff'd*, 78 F. App'x 166 (2d Cir. 2003) (holding that "the Second Circuit recognizes that contract-based bankruptcy claims are deemed to arise at the time the contract is executed, and therefore a post-petition breach of a pre-petition contract gives rise solely to a pre-petition claim"); *Pearl-Phil GMT (Far E.) Ltd. v. Caldor Corp.*, 266 B.R. at 582 (finding that the "Bankruptcy Court's conclusion is supported by the clear weight of case law in this Circuit which recognizes that contract-based bankruptcy claims arise at the time the contract is executed. For example, courts consistently hold that a post-petition breach of a pre-petition contract gives rise only to a pre-petition claim").[20]

Where parties contemplate the possibility of future breach in their contracts, such breaches are treated as contingent prepetition claims rather than post-petition claims. *See In re Residential Cap., LLC*, 558 B.R. at 85-87; *see also In re Manville Forest Prod. Corp.*, 209 F.3d 125, 129 (2d Cir. 2000) (claims for indemnity arose prepetition where "the terms of the indemnification agreements were so broad as to encompass all types of future liability"); *In re*

---

[20]    The Court held as much in these Chapter 11 Cases in granting the Debtors' motion to enforce the Plan Injunction contained in the Third Amended Plan to enjoin Gautam and Panthobi Sharma (the "Sharmas") from prosecuting counterclaims seeking monetary relief against the Debtors in Illinois state court. *See Memorandum Decision and Order Granting Plan Administrator's Sixth Omnibus Motion to Enforce the Plan Injunction and Confirmation Order as it Relates to Gautam and Panthobi Sharma* [ECF No. 3034] (Nov. 30, 2020). The Sharmas were parties to a prepetition mortgage and note that had been assigned to Ditech. After confirmation of the Third Amended Plan, Ditech brought a foreclosure action based on the mortgage. The Sharmas asserted counterclaims in that action seeking monetary relief, principally attorneys' fees and costs, alleging under both contract and Illinois statutory law that Ditech failed to give proper notice of the foreclosure and therefore the foreclosure was invalid. *Id.* at 7-8. It was undisputed that the Sharmas asserted counterclaims for monetary relief against Ditech, and that those counterclaims for monetary relief would be covered by the Plan Injunction if the claims arose prior to the Effective Date of the Plan. *Id.* The sole issue before the Court was when those claims arose. Relying on the precedent cited above, the Court found that the counterclaims were subject to the injunction, reasoning, in part, that "[c]ontract claims arise upon execution of the agreement…It is settled that prepetition contract based claims for attorney's fees are deemed to arise upon execution of the contract." *Id.* at 13 (citations omitted).

*Chateaugay Corp.*, 944 F.2d at 1004 ("In the context of contract claims, the Code's inclusion of

'unmatured' and 'contingent' claims is usually said to refer to obligations that will become due

upon the happening of a future event that was 'within the actual or presumed contemplation of

the parties at the time the original relationship between the parties was created.'") (internal

citations omitted). The Subservicing Agreements contemplate the possibility of servicing errors

and establish procedures for dealing with errors, including through indemnity provisions.  The

risk of subservicing errors in the post-petition period was within the fair contemplation of the

parties, and the fact that the Debtors received compensation for their services does not transform

the claims into administrative expense claims. Rather, under Second Circuit case law, the claims

are contingent prepetition claims, which are not afforded administrative expense priority under

section 503(b)(1)(A) of the Bankruptcy Code.[21]

The Subservicing Agreements were executory contracts under which the Debtors

provided servicing in exchange for fees from LHES and FoA. Executory contracts for services,

like all executory contracts, are subject to assumption or rejection. *See, e.g., In re Hawker

Beechcraft, Inc.*, 486 B.R. 264, 279 (Bankr. S.D.N.Y. 2013) (Support-plus agreements under

which purchasers had reporting obligations in return for continuing support from debtor were

---

[21]    In support of their contention that their claims arose post-petition under the Servicing Agreements, as extended
by the Prepetition Extension Agreements, FoA and LHES rely on: *Zelin v. Unishops, Inc. (In re Unishops, Inc.)*, 553
F.2d 305, 308 (2d Cir. 1977) ("It is settled law that a claim arising under an executory contract is entitled to priority
if the trustee or debtor in possession elects to assume the contract *or* if he receives benefits under it.") (emphasis
added); *In re Enron Corp.,* 279 B.R. 79, 87 (Bankr. S.D.N.Y. 2002) ("With respect to an executory contract, the
focus is on whether the debtor used the nondebtor's property in the ordinary course of its business, and continued to
receive and accept the nondebtor's performance."); *Texaco Inc. v. Bd. Of Commissioners for the LaFourche Basin
Levee Dist. (In re Texaco Inc.)*, 254 B.R. 536, 556 (Bankr. S.D.N.Y. 2000) ("As long as the debtor continues to
receive benefits under such contract it must also bear the burdens or obligations imposed under the contract."); *In re
Yonkers Hamilton Sanitarium Inc.*, 22 B.R. 427, 435 (Bankr. S.D.N.Y. 1982) (same); *In re Shoppers Paradise, Inc.*,
8 B.R. 271, 279 (Bankr. S.D.N.Y. 1980) ("Even where court approval was not obtained the debtor-in-possession
may be deemed to have adopted the contract or lease where it received benefits and when the issue presented is
whether or not such benefits should be entitled to an administration expense claim."). *See* LHES Response ¶ 19;
FoA Response ¶ 21. FoA and LHES misplace their reliance on those cases. All of them pre-date the Second
Circuit's clear direction that claims based upon un-assumed prepetition contracts are contingent prepetition claims
that arise upon the execution of the contract. Thus, in that regard, they have no precedential value.

executory contracts subject to rejection). Where a debtor-in-possession exercises its right to

reject an executory contract either prior to plan confirmation or under a confirmed plan, the

rejection is treated as occurring "immediately before the date of the filing of the petition." 11

U.S.C. § 365(g)(1). "The Bankruptcy Code… specifically provides that such claim against the

estate is treated as a pre-petition claim, thereby affording it general unsecured status." *In re Old

Carco LLC*, 424 B.R. 633, 639 (Bankr. S.D.N.Y. 2010) (internal citation omitted).

The Third Amended Plan provided that all executory contracts not otherwise assumed

would be rejected. *See* Third Amended Plan, ¶ 8.1(a). The Debtors did not assume the

Subservicing Agreements. *See* LHES Response ¶ 9; FoA Response ¶ 11. LHES and FoA note

that the terms of the LHES November 2008 Agreement and FoA Subservicing Agreements (as

extended by the Prepetition Extension Agreements) expired at the end of March 2019, well

before the Effective Date. They assert that those agreements never were assumed or rejected

under the terms of the Third Amended Plan. LHES and FoA do not assert claims resulting from

any failure by RMS to perform after the Effective Date, which they say is the earliest date the

Prepetition Subservicing Agreements could have been rejected under the Third Amended Plan.

Thus, they contend they are not asserting rejection damages claims that would be deemed to have

occurred prepetition under section 365(g) of the Bankruptcy Code. LHES Response ¶ 22; FoA

Response ¶ 24. The Court finds no merit to that contention. "The effect of rejection is that the

*estate* does not become obligated on the contract…Thus, rejection is the equivalent of electing

not to assume a contract." *In re Old Carco LLC*, 424 B.R. at 639; *see also In re A.C.E. Elevator

Co.,* 347 B.R. 473, 483–84 (Bankr. S.D.N.Y. 2006) (finding when debtor did not reject an

agreement post-petition and allowed the agreement to expire by its terms, employees' claim for

delinquent contributions was not entitled to administrative priority). Even though the Debtors

were unable to reject the Prepetition and Post-Petition Extension Agreements because they

expired prior to the Effective Date, the Claims still arise under the Subservicing Agreements and

the Debtors did not assume those agreements. Accordingly, the Claims are, at most, contingent

prepetition general unsecured claims regardless of whether the Subservicing Agreements and/or

the Prepetition and Post-Petition Extension Agreements were deemed rejected or expired on their

terms.

## **Conclusion**

Based on the foregoing, the Court sustains the Debtors' Objection to the LHES and FoA

Administrative Expense Claims[22] and reclassifies them as General Unsecured Claims.[23]

IT IS SO ORDERED.

Dated:  New York, New York
       October 21, 2021

/s/ *James L. Garrity, Jr.*
Hon. James L. Garrity, Jr.
U.S. Bankruptcy Judge

---

[22]  To be clear, to the extent that FoA is asserting administrative expense claims in Claim No. 21347, those claims are reclassified as General Unsecured Claims.

[23]  In support of the Objection, the Plan Administrator also asserted that (i) even if the Court found that the Post-Petition Extension Agreements are in fact post-petition contracts (i) LHES and FoA would not be entitled to collect on an administrative priority basis because the parties did not obtain Court approval of the extensions (*see* Reply ¶¶ 41-49); and (ii) the claims would be limited to the reasonable value conferred upon the estates. *Id*. ¶¶ 61-71. The Court need not, and does not, address those arguments.

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Sunny Singh

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------X
                           :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **DITECH HOLDING CORPORATION**, *et al.*, | : | **Case No. 19-[_____] (___)** |
| | : | |
| Debtors.[1] | : | **(Joint Administration Pending)** |
| | : | |

------------------------------------------------------------X

### DECLARATION OF GERALD A. LOMBARDO PURSUANT TO RULE 1007-2 OF LOCAL BANKRUPTCY RULES FOR SOUTHERN DISTRICT OF NEW YORK

I, Gerald A. Lombardo, make this declaration under 28 U.S.C. §1746.

1.    I am the Chief Financial Officer of Ditech Holding Corporation ("**DHCP**") and its affiliated debtors in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"). I have served in this role since February 2018, having previously served in other financial leadership positions at other companies with over 25 years of experience.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Ditech Holding Corporation (0486), DF Insurance Agency LLC (6918), Ditech Financial LLC (5868), Green Tree Credit LLC (5864), Green Tree Credit Solutions LLC (1565), Green Tree Insurance Agency of Nevada, Inc. (7331), Green Tree Investment Holdings III LLC (1008), Green Tree Servicing Corp. (3552), Marix Servicing LLC (6101), Mortgage Asset Systems, LLC (8148), REO Management Solutions, LLC (7787), Reverse Mortgage Solutions, Inc. (2274), Walter Management Holding Company LLC (9818), and Walter Reverse Acquisition LLC (8837). The Debtors' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

2.       On the date hereof (the "**Commencement Date**"), the Debtors

commenced with this court (the "**Bankruptcy Court**") voluntary cases under chapter 11 of title

11 of the United States Code (the "**Bankruptcy Code**").  I am knowledgeable and familiar with

the Debtors' day-to-day operations, business and financial affairs, books and records, and the

circumstances leading to the commencement of these chapter 11 cases.

3.       I submit this Declaration pursuant to Rule 1007-2 of the Local Bankruptcy

Rules for the Southern District of New York (the "**Local Rules**") to assist the Bankruptcy Court

and parties in interest in understanding the events and circumstances that led to the

commencement of these chapter 11 cases and in support of the motions and applications that the

Debtors have filed with the Bankruptcy Court, including the "first-day pleadings" (the "**First-

Day Pleadings**").[2]  I am authorized to submit this Declaration on behalf of the Debtors.  Except

as otherwise indicated herein, the facts set forth in this declaration (this "**Declaration**") are based

upon my personal knowledge, my review of relevant documents, information provided to me the

Company, or advisors to the Debtors, or my opinion based upon my experience, knowledge, and

information concerning the Company and the mortgage originating and servicing industry.  If

called upon to testify, I would testify competently to the facts set forth in this Declaration.

4.       The Debtors have requested a variety of relief in the First-Day Pleadings

to minimize the adverse effects of the commencement of these chapter 11 cases.  I am familiar

with the contents of each First-Day Pleading, and I believe the relief sought therein is necessary

to permit the Debtors an effective transition into and out of chapter 11.  I further believe that the

relief requested in the First-Day Pleadings will preserve the value of the Debtors' estates.

---

[2]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the
respective First Day Pleadings.

5.      This Declaration is organized in six (6) sections:

- Section I is an Overview of these Chapter 11 Cases;

- Section II describes the Debtors' business, both in terms of their history, as well as their current operations;

- Section III summarizes the Company's organizational and capital structure;

- Section IV describes the circumstances that led to the commencement of the chapter 11 cases;

- Section V provides a summary of the First-Day Pleadings, the factual bases for the relief requested therein and other information related to these chapter 11 cases;

- Section VI identifies the attached schedules of information required by Local Rule 1007-2.

## I.
## OVERVIEW OF THESE CHAPTER 11 CASES

6.      The Debtors, together with their non-Debtor subsidiaries (collectively, the "**Company**"), operate as an independent servicer and originator of mortgage loans and servicer of reverse mortgage loans.  For more than 50 years, the Company has offered a wide array of loans across the credit spectrum for its own portfolio and for GSEs (as defined below), government agencies, third-party securitization trusts, and other credit owners.  The Company originates and purchases residential loans through consumer, correspondent and wholesale lending channels that are predominantly sold to GSEs and government entities.  The Company also operates two complimentary businesses: (i) asset receivables management and (ii) real estate owned property management and disposition.

7.      In recent years, the Debtors' business has been impacted by significant operational challenges and industry trends that have severely constrained its liquidity and ability to implement much needed operational initiatives.  In an effort to address the burden of its overleveraged capital structure—a remnant of its historical acquisitions—the Company

3

consummated a fully consensual prepackaged chapter 11 plan on February 8, 2018.  Given the significant liquidity and operational headwinds facing the Company in 2019, it became clear to the Company's new senior management team that additional relief was needed.

8.    Beginning in June 2018, the Company began its formal review of strategic alternatives, including a potential merger or sale of all or substantially all of the assets of the Company.  As explained in more detail in Section IV of this Declaration, the Company was not able to consummate an out-of-court transaction with a third party purchaser.  Accordingly, facing increased uncertainty in 2019, and an anticipated end-of-first-quarter going-concern qualification from its auditors, the Company turned its focus toward planning for an in-court recapitalization transaction that would maximize value for its creditors and preserve the enterprise as a going concern.  To that end, in December 2018, the Company began in earnest negotiating with groups of holders of its corporate debt on the terms and implementation of an acceptable recapitalization structure, culminating in a restructuring support agreement (the "**Restructuring Support Agreement**") with the Ad Hoc Group of Term Lenders (as defined below)—the Company's senior creditors—holding, in the aggregate, approximately $736.6 million of Term Loans (as defined below).  A copy of the Restructuring Support Agreement is attached hereto as Annex II.

## A.    Restructuring Support Agreement

9.    By virtue of the Restructuring Support Agreement, the Company has commenced these chapter 11 cases with a clear path to a confirmable chapter 11 plan of reorganization and a viable recapitalization—in which, among other things, over $800 million in funded debt would be extinguished, leaving a significantly deleveraged reorganized Company wholly owned by the Term Lenders, with $400 of term loan debt and an appropriately sized exit working capital facility or consummation of another liquidity enhancing transaction

4

(the "**Reorganization Transaction**").    As a toggle to the Reorganization Transaction, the Restructuring Support Agreement also provides for the continuation of the Company's Prepetition Marketing Process (as defined below) whereby any and all bids for the Company or its assets will be evaluated as a precursor to confirmation of any chapter 11 plan of reorganization (the "**Marketing Process**").

10.    Specifically, the Marketing Process will provide a public and comprehensive forum in which the Debtors seek bids or proposals for three (3) potential transactions that, if representing higher or better value, will either be incorporated into a Reorganization Transaction or pursued as an alternative to the Reorganization Transaction in consultation with and subject to the rights of the Term Loan Ad Hoc Group under the Restructuring Support Agreement and the DIP Lenders under the DIP Warehouse Facility Agreements, including:

- "**Sale Transaction**" meaning, a sale of substantially all of the Company's assets," in each case, as provided in the Restructuring Support Agreement; and

- "**Asset Sale Transaction**" meaning, the sale of a portion of the Company's assets other than a Sale Transaction consummated after the Commencement Date but prior to the Effective Date; provided such sale shall only be conducted with the consent of the Requisite Term Lenders.

- "**Master Servicing Transaction**" meaning, as part of a Reorganization Transaction to the extent the terms thereof are acceptable to the Requisite Term Lenders, entry by the Company into an agreement or agreements with an approved subservicer or subservicers (the "**New Subservicer**") whereby, following the Effective Date, all or substantially all of the Company's mortgage servicing rights are subserviced by the New Subservicer;

11.    Although the Debtors will pursue the Marketing process in earnest, the Reorganization Transaction will serve as a backstop and provide the Company the optionality to enter into such other transactions that can either augment the Reorganization Transaction (such as the Master Servicing Transaction) or, if representing higher or better value, replace the

WEIL:\96914025\1\41703.0010

Reorganization Transaction (such as the Sale Transaction).  Further, if during the Marketing Process the Debtors receive separate bids for certain of their assets that represent higher or better value for the estate, the Debtors can elect to proceed with such Asset Sale Transaction in conjunction with either a Reorganization Transaction or a Sale Transaction (as applicable).  *See Figure* below.



12.    Accordingly, upon completion of the Marketing Process, not only will the Reorganization Transaction be fully market tested, the Debtors will also be in the best position to compare their options against the Reorganization Transaction before proceeding to confirmation of their chapter 11 plan of reorganization.

13.    In recognition of the Term Lenders' position as the Debtors' fulcrum creditors, under the Restructuring Support Agreement, within five (5) business days following the earlier of (a) the conclusion of the Company's post-Commencement Date marketing and sale process and (b) 95 days after the Commencement Date (the earliest such date, the "**Election Date**"), holders of at least $66^{2/3}$% in aggregate principal amount outstanding of the Term Loans (the "**Electing Term Lenders**") may deliver a notice (the "**Election Notice**") to the Company stating that the Electing Term Lenders wish to consummate a transaction (the "**Elected Transaction**"), being a: (i) Reorganization Transaction, or (ii) Master Servicing Transaction (as

6

part of a Reorganization Transaction), or (iii) Sale Transaction, and, if applicable, (iv) in connection and together with an election of (i), (ii), or (iii), including any Asset Sale Transaction(s).  If the Debtors do not proceed with the Elected Transaction, the Consenting Term Lenders can terminate the Restructuring Support Agreement.

14.    The Restructuring Support Agreement presently contemplates the following treatment for certain key classes of creditors under the Reorganization Transaction:

- Term Loan Claims. On the effective date, the holders of Term Loan Claims will receive their pro rata share of new term loans under the Amended and Restated Credit Facility Agreement in the aggregate principal amount of $400 million, and 100% of the New Common Stock;

- Second Lien Notes Claims. On the effective date, the holders of Second Lien Notes Claims will not receive any distribution;

- Go-Forward Trade Claims. On the effective date, holders of all Go-Forward Trade Claims (i.e., trade creditors identified by the Company (with the consent of the Requisite Term Lenders) as being integral to and necessary for the ongoing operations of New Ditech) will receive a distribution in Cash in an amount equaling a certain percentage of their Claim, subject to an aggregate cap; and

- Existing Equity Interests. On the effective date, holders of Existing Equity Interests will have their claims extinguished.

15.    If the Debtors proceed to confirmation of a Sale Transaction, the Debtors will distribute proceeds of such transaction in accordance with the priority scheme under the Bankruptcy Code.

## B.    DIP Financing and Cash Collateral

16.    To address the working capital needs of the Debtors and support the transactions contemplated by the Restructuring Support Agreement, the Debtors have secured commitments for, and will seek the authority to enter into, DIP Warehouse Facility Agreements, which will enable the Debtors to enter into the DIP Warehouse Facility Agreements that will

provide the Debtors up to $1.9 billion in available financing to refinance their existing warehouse and servicer advance facilities (the "**DIP Warehouse Financing**").

17.     The DIP Warehouse Facilities will provide the Debtors the flexibility to use the commitment amount in the manner that best suits their capital needs.  Specifically, during the chapter 11 cases, (i) up to $650 million will be available to fund Ditech Financial's (as defined below) origination business, (ii) up to $1.0 billion will be available to RMS (as defined below), and (iii) up to $250 million will be available to finance the advance receivables related to Ditech Financial's servicing activities.   In addition, the lenders under the DIP Facilities (as defined below) have agreed to provide Ditech Financial up to $1.9 billion in notional trading capacity required by Ditech Financial to hedge its interest rate exposure with respect to the loans in Ditech Financial's origination pipeline, as well as those loans that will be subject to repurchase obligations with the DIP Warehouse Facilities lenders prior to being securitized.

18.     The entry into the DIP Warehouse Facilities will be subject to certain conditions precedent, including: (i) the applicable Debtors' continued status as an approved issuer and servicer with the GSEs or Ginnie Mae (as defined below), as applicable; (ii) no material disruption of claim payments on FHA insured loans; and (iii) the entry by the Bankruptcy Court of an interim DIP Order approving the DIP Warehouse Financing (the "**DIP Financing**").

19.     In addition, the Debtors will seek authorization to use consensually the cash collateral of the Prepetition Term Lenders for the duration of the Chapter 11 Cases.   In exchange, the Debtors will seek to provide the Prepetition Term Lenders, with the consent of the Prepetition Administrative Agent, acting at the direction of the Required Term Lenders:

(a)     <u>Adequate Protection Lien</u>. Prepetition Administrative Agent will receive replacement security interests and lien on all prepetition collateral of the

8

Term Loans subject only to the negotiated carve-out, other permitted liens and otherwise subject to the DIP Facilities;

(b)     507(b) Claim.   The Prepetition Administrative Agent will receive an administrative expense claim pursuant to section 507(b) of the Bankruptcy Code, subject to a negotiated carve-out and the priorities set out in the DIP Facilities;

(c)     Adequate Protection Payments. The Debtors will make prompt payments on account of the reasonable fees and expenses incurred by the First Lien Ad Hoc Group and the Prepetition Administrative Agent;

(d)     Financial Reporting. The Debtors will, until the Effective Date, continue to provide First Lien Ad Hoc Group and the Prepetition Administrative Agent, and their advisors, financial and other reporting on a monthly basis is a form and substance reasonably acceptable to them.

20.     The Company's ability to continue as a going concern, and thereby maximize value for stakeholders, is currently constrained by its highly-leveraged position and assorted amortization and interest payments.   Upon the commencement of these chapter 11 cases, the Company will be in default under its warehouse facilities.   It is critical for the Company to have access to a continued flow of liquidity during these chapter 11 cases so that the Company can continue operating its business in the ordinary course.   Without access to the DIP Facilities, the Company will be unable to fund the day-to-day operations of its business, including:  (a) originating or purchasing new mortgage loans, (b) repurchasing reverse mortgage loans from Ginnie Mae-guaranteed securitizations, (c) providing servicing advances pursuant to the Company's mortgage servicing agreements, (d) repaying amounts outstanding under the Prepetition Repo Facilities, (e) funding operational expenses of the Company, including required property maintenance and foreclosure activities, and (f) paying customary fees and closing costs in connection with the DIP Facilities.

WEIL:\96914025\1\41703.0010

C.       **Proposed Timeline**

21.      The Debtors believe that accomplishing a speedy and efficient resolution

of the chapter 11 cases is essential to maximizing the value of the Company.  As experience has

shown, it is extremely challenging to reorganize a mortgage originator and servicer in chapter 11,

especially over a prolonged basis.  Under the terms of the DIP Financing and the Restructuring

Support Agreement, the Debtors are obligated to meet certain milestones.  Specifically, the

Restructuring Support Agreement and the DIP Financing may be terminated if, among other

things, the Debtors fail to satisfy the following milestones:

| Event | RSA Milestone |
|---|---|
| File the Plan, Disclosure Statement, and Bidding Procedures Motion | February 26, 2019 |
| Entry of orders approving Disclosure Statement and Bid Procedures | April 2, 2019 |
| Commence Auction (if necessary) | May 17, 2019 |
| Commence Confirmation Hearing | June 6, 2019 |
| Effective Date | June 16, 2019 |

WEIL:\96914025\1\41703.0010

**D.      GSE, Ginnie Mae, and Regulator Communications**

22.      The ongoing support of the GSEs, Ginnie Mae, and the Company's regulators is critical to its ability to continue to operate as a going concern.  Accordingly, throughout its strategic alternatives review process and in the lead up to these chapter 11 cases, the Company has maintained a constant and open line of communication with the GSEs, Ginnie Mae, and its regulators, seeking their feedback and position on key aspects of the Restructuring Support Agreement and the relief sought in the First Day Pleadings; both reflect the input of those parties, which the Debtors believe is critical to their ability to operate in the ordinary course of business during these chapter 11 cases and to effect any chapter 11 plan of reorganization contemplated by the Restructuring Support Agreement.

## II.
## OVERVIEW OF THE COMPANY'S OPERATIONS

23.      The Debtors' business was established in 1958 and operated as a captive financing business of Walter Energy, Inc. ("**Walter Energy**"), originating and purchasing residential loans and then servicing those loans to maturity.  In 1997, DHCP's predecessor, Walter Investment Management Corporation ("**WIMC**"), was incorporated in Maryland.  In April 2009, WIMC spun off from Walter Energy, merged with Hanover Capital Mortgage Holdings, Inc., qualified as a real estate investment trust, and began to operate as an independent, publicly traded company.  After the spin-off, WIMC acquired Marix Servicing LLC, a high-touch specialty mortgage servicer, in 2010 and GTCS Holdings LLC ("**Green Tree**"), a leading independent mortgage loan servicer providing high-touch servicing of GSE, government agency, and third-party mortgage loans in 2011.  As a result of the Green Tree acquisition, the Company no longer qualified as a real estate investment trust.  WIMC subsequently acquired Reverse Mortgage Solutions, Inc. ("**RMS**"), which resulted in the addition of 330 employees and four

11

offices in three states.  WIMC commenced a chapter 11 case in the United States Bankruptcy Court for the Southern District of New York on November 30, 2017 and emerged from chapter 11 on February 9, 2018 as Ditech Holding Corporation.

24.    The Company's businesses are comprised of three primary segments: (i) forward mortgage originations; (ii) forward mortgage servicing; and (iii) reverse mortgage servicing.

## A.    Forward Mortgage Origination Business (Ditech Financial)

25.    As more fully explained in the Ditech OCB Motion (as defined below) and incorporated fully by reference herein, the Company originates forward mortgage loans exclusively through Ditech Financial LLC ("**Ditech Financial**").  Beginning in 2016, the Company combined the consumer retention and consumer direct call centers to pursue a more streamlined consumer lending process.  In January 2016, the Company exited activities associated with the consumer retail channel, which originated mortgage loans through loan officers.  Virtually all of the loans that Ditech Financial originates are conventional conforming loans eligible for securitization by government-sponsored enterprises, such as Fannie Mae and Freddie Mac,[3] or guarantees by government agencies, such as Ginnie Mae mortgage-backed securities ("**MBS**").[4]  Ditech Financial sells substantially all of the mortgage loans it originates

---

[3]    As used herein, "**Fannie Mae**" means the Federal National Mortgage Association, and "Freddie Mac" means the Federal Home Loan Mortgage Corporation.  Fannie Mae and Freddie Mac are government-sponsored enterprises (each a "**GSE**" and collectively the "**GSEs**") chartered by Congress that buy and securitize mortgage loans originated by mortgage lenders, enabling the lenders quick access to liquidity fueled by the market demand for residential mortgage backed securities.

[4]    As used herein, "**Ginnie Mae**" means the Government National Mortgage Association.  Ginnie Mae is a federal corporation within the Department of Housing and Urban Development ("**HUD**"), a federal agency, that guarantees investors the timely payment of principal and interest on MBS backed by federally insured or guaranteed loans, primarily loans insured by the Federal Housing Administration ("**FHA**") or guaranteed by the Department of Veterans Affairs ("**VA**") or the Department of Agriculture ("**USDA**").

WEIL:\96914025\1\41703.0010

into Fannie Mae- and Freddie Mac-sponsored securitizations or into mortgage pools insured by

Ginnie Mae.

      26.    Ditech Financial originates or acquires mortgage loans through the

following channels:

    (a)    *Consumer Lending*:  Contacts and solicits (i) consumers within its existing servicing portfolio, and (ii) referrals and leads generated through direct mail, internet, telephone, and general advertising campaigns.

    (b)    *Correspondent Lending*:  purchases mortgage loans from a network of lenders in the marketplace; and

    (c)    *Wholesale Lending*:  originates mortgage loans identified through a network of approved brokers.  Ditech Financial reentered this origination segment in the third quarter of 2016 and is looking to expand this method of origination.

      27.    In 2018, Ditech Financial originated or purchased over $12.6 billion in

mortgage loans.  Of these loans approximately 30% were originated through the direct consumer

outreach channel, approximately 6% were originated through the wholesale lending channel, and

approximately 64% were purchased in the correspondent lending channel.  Based on the unpaid

principal balance ("**UPB**") of the loans originated by Ditech Financial during this time period,

approximately 30% were guaranteed by Fannie Mae, approximately 13% were eligible for

securitization by Freddie Mac, and approximately 57% were guaranteed by Ginnie Mae.  To the

extent that Ditech Financial identifies a loan ineligible for GSE securitizations and/or Ginnie

Mae guarantees during its retail origination process, it may elect to close and fund such loan as

long as it lines up a private buyer for such loan at the pre-closing stage of the process.  Such

loans constitute a relatively small percentage of all loans originated by Ditech Financial.

      28.    The Company's consumer originations operations offer a range of home

purchase and refinance mortgage loan options, including fixed and adjustable rate conventional

conforming, Ginnie Mae, FHA, VA, USDA and jumbo products. A conventional conforming loan is a mortgage loan that conforms to GSE guidelines, which include, but are not limited to, limits on loan amount, loan-to-value ratios, debt-to-income ratios, and minimum credit scores. The mortgage loans the Company funds are generally eligible for sale to GSEs or insured by government agencies.

29.     The Company underwrites the mortgage loans it originates generally to secondary market standards, including the standards set by Fannie Mae, Freddie Mac, Ginnie Mae, the FHA, the USDA, the VA, and jumbo loan investor programs. Loans are reviewed by the Company's underwriters in an attempt to ensure each mortgage loan is documented according to, and its terms comply with, the applicable secondary market standard. The Company's underwriters determine loan eligibility based on specific loan product requirements, such as loan-to-value, FICO, or maximum loan amount. Third-party diligence tools are utilized by the Company's underwriters to validate data supplied by the potential borrower and to uncover potential discrepancies. The Company conducts audits on its underwriters to confirm proper adherence to its internal guidelines and polices, which audits are in addition to the Company's standard quality control review. These audits are designed to provide an additional layer of internal review in an attempt to further mitigate quality defects and repurchase risk in the originations process.

30.     Within the Company correspondent lending channel, the Company generally purchases the same types of loans that the Company originates in its consumer originations channel, although the mix varies among these channels. Correspondent lenders with which the Company does business agree to comply with the Company's client guide, which sets forth the terms and conditions for selling loans to the Company and generally governs the

14

business relationship.  The Company monitors and attempts to mitigate counterparty risk related to loans that the Company acquires through its correspondent lending channel by conducting quality control reviews of correspondent lenders, reviewing compliance by correspondent lenders with applicable underwriting standards and the Company's client guide, and evaluating the credit worthiness of correspondent lenders on a periodic basis.  In 2018, the Company correspondent lending channel purchased loans from 452 lenders in the marketplace, of which 38 were associated with approximately half of the Company's purchases.

31.    Within its wholesale lending channel, the Company originates loans through mortgage brokers.  Loans sourced by mortgage brokers are underwritten and funded by the Company and generally close in the Company's name.  Through the wholesale channel, the Company generally originates the same types of loans that the Company originates in its consumer originations channel, although the mix varies among these channels.  The Company underwrites and processes all loan applications submitted by the mortgage brokers in a manner consistent with that described above for the consumer originations channel.  Mortgage brokers with whom the Company does business agree to comply with its client guide, which sets forth the terms and conditions for brokering loans to the Company and generally governs the business relationship.  The Company monitors and attempts to mitigate counterparty risk related to loans that the Company originates through its wholesale lending channel by conducting quality control reviews of mortgage brokers, reviewing compliance by brokers with applicable underwriting standards and the Company's client guide, and evaluating the credit worthiness of brokers on a periodic basis.

32.    The Company's capital markets group is responsible for pricing loans and managing the interest rate risk through the time a loan is sold to third parties and managing the

risk (which the Company calls the "pull-through risk") that loans the Company has locked will not be closed and funded in an attempt to maximize loan sale profitability through the Company's various originations channels. The capital markets group uses models and hedging analysis in an attempt to maximize profitability while minimizing the risks inherent in the originations business.

33.    The Company's originations segment revenue, which is primarily net gains on sales of loans, is impacted by interest rates and the volume of loans locked and sold. The margins earned by the Company's originations segment are impacted by its cost to originate the loans including underwriting, fulfillment and lead costs.

34.    As a Fannie Mae- and Freddie Mac-approved seller/servicer of mortgages, Ditech Financial is a party to certain agreements with each GSE, which agreements generally incorporates the applicable GSE selling and servicing guidelines (such agreements, together with the addenda and amendments thereto, respectively, the "**Fannie Sales Agreements**" and "**Freddie Sales Agreements**," and collectively, the "**GSE Sales Agreements**"). In general, when Ditech Financial originates a mortgage loan it funds the loan utilizing borrowings under master repurchase agreements ("**MRAs**"), pledges the loan as security for such borrowings, subsequently sells the loans into a GSE-sponsored securitization, and uses the proceeds for the sale of the mortgage backed securities to repay the borrowings under the MRAs.

35.    As a Ginnie Mae issuer, Ditech Financial pools and securitizes certain mortgage loans conforming to the requirements of the Ginnie Mae Mortgage-Backed Securities Guide and all special announcements, agreements, and other written communications made by Ginnie Mae to Ditech Financial (collectively, the "**Ginnie Agreements**," and together with the GSE Agreements, the "**GA Agreements**"). The Ginnie Agreements employ a custodial account

16

**42**

mechanism whereby the issuer, such as Ditech Financial, forwards to an eligible document custodian approved by Ginnie Mae all of the loan documentation. After the pool of mortgages is approved by a Ginnie Mae pool processing agent, it directs Ditech Financial to issue MBS to third-party investors. In connection with the approval process, Ditech Financial remits guarantee fees and base servicing fees to Ginnie Mae.

36. The Ginnie Agreements provide for continuing recourse obligations on Ginnie Mae-approved issuers, such as Ditech Financial. Specifically, upon the discovery of a defective loan within four months after the mortgage origination date, the issuer is required either to cure the defect or purchase the loan from the mortgage pool at the outstanding principal balance.

37. For the year ended December 31, 2018, Ditech Financial sold mortgage loans of $12.4 billion in UPB, consisting of approximately (i) $5.4 billion in Fannie Mae/Freddie Mac conventional conforming loans, (ii) $7.0 billion of Ginnie Mae loans, and (iii) $28.3 billion of jumbo and other loans. On average, Ditech Financial sells or securitizes loans funded through warehouse borrowings in approximately 20 days from the date of origination. As of December 31, 2018, the total UPB of the warehoused loans held by Ditech Financial and awaiting securitization was approximately $746.2 million.

**B. Forward Mortgage Servicing Business**

38. As more fully explained in the Ditech OCB Motion and are incorporated fully by reference herein, Ditech Financial performs loan servicing of mortgage loans that fall into two categories: (i) mortgage loans for which Ditech Financial owns the mortgage servicing rights (“**MSRs**”), and (ii) subservicing for third party owners of MSRs. With respect to mortgage loans for which Ditech Financial owns the MSRs, Ditech Financial performs mortgage

17

servicing primarily in accordance with Fannie Mae, Freddie Mac, and Ginnie Mae servicing guidelines, as applicable. Ditech Financial typically originates the mortgage loans associated with such MSRs and sells them into securitization trusts owned by Fannie Mae or Freddie Mac or into mortgage pools insured by Ginnie Mae. The servicing segment also operates complementary businesses including a collections agency that performs collections of post charge-off deficiency balances for third parties and the Company. The subservicing contracts pursuant to which the Company is retained to subservice mortgage loans generally provide that the customer, the owner of the subserviced MSR, can terminate the Company as subservicer with or without cause. Each such subservicing contract has unique terms establishing the fees that the Company will be paid for the Company's work under the contract or upon the termination of the contract, if any. The standards of performance the Company is required to meet in servicing the relevant mortgage loans and the profitability of the subservicing activity may vary among different contracts.

39.     As of December 31, 2018, Ditech Financial serviced approximately 1.4 million residential loans with UPB of $176.1 billion. Of those, Ditech Financial was the subservicer for 0.7 million accounts with an unpaid principal loan balance of $104.3 billion. These subserviced accounts represented approximately 58% of its total servicing portfolio based on unpaid principal loan balance at that date. Ditech Financial's largest subservicing customer, New Residential Mortgage LLC ("**NRM**"), represented approximately 78% of its total subservicing portfolio and 48% of its total servicing portfolio based on unpaid principal loan balance on December 31, 2018. The Company's next largest subservicing customer represented approximately 17% of its total subservicing portfolio based on unpaid principal loan balance on December 31, 2018.

18

## C.    Reverse Mortgage Servicing Business

40.    As more fully explained in the RMS OCB Motion (as defined below), RMS, a debtor in these chapter 11 cases, primarily focuses on servicing and subservicing reverse mortgage loans, the majority of which are home equity conversion mortgages ("**HECMs**") that are insured by FHA.  A HECM is a loan that allows homeowners to borrow money against the equity value of their homes.  Unlike traditional home equity loans, HECMs are non-recourse loans without a fixed term with balances increasing over time as interest and other fees are added to the borrowers' total obligations.

41.    A reverse mortgage borrower typically is not required to remit monthly mortgage payments.  Instead, the borrower receives cash in monthly installments, a lump sum or a line of credit up to a principal limit, which limit is calculated based on, among other things, the age of the borrower, the appraised value of the borrower's home, and the loan interest rate. HECM loan borrowers must be age 62 or over and typically rely on the proceeds of such loan to fund their living expenses.  Indeed, the average age of borrowers under the HECM loans in RMS's portfolio is approximately seventy-five (75) years of age.  The loans generally become due and payable when one of the following events of default occur:  (i) the death of the borrower, (ii) the borrower no longer utilizes the home as his or her principal residence, (iii) title to the property is transferred to a non-borrower, (iv) the borrower fails to meet other requirements of the loans, (*e.g.*, paying property taxes, insurance, and homeowner's association fees), or (v) the end of a deferral period for an eligible non-borrowing spouse.

42.    Reverse mortgage loan servicing accounts for approximately 13% of the Debtors' revenue.[5]  RMS performs servicing for mortgage loans that fall into two categories:

---

[5]    Although RMS exited the reverse mortgage origination business in early 2017, RMS continues to have ongoing

(i) mortgage loans that RMS owns or owns the mortgage servicing rights and (ii) mortgage loans for which RMS performs servicing and subservicing for third-party owners of loans.

43.     RMS sold virtually all of the loans that it originated to securitizations guaranteed by Ginnie Mae.   RMS now serves as an issuer of MBS in connection with such securitizations in accordance with the Ginnie Mae Agreements.[6]   RMS periodically issues securitizations to finance subsequent borrower draws and other amounts.

44.     As of December 31, 2018, RMS serviced or subserviced approximately 88,000 loans with an unpaid principal balance of $17.1 billion.

### III.
### ORGANIZATIONAL AND CAPITAL STRUCTURE

**A.      Organizational Structure**

45.     DHCP owns, directly or indirectly, 100% of the ownership interest in each of the Debtors and their non-debtor affiliates.   The organizational chart, attached hereto as Exhibit A, illustrates the Debtors' organizational structure, as of the date hereof.

---

obligations in connection with mortgage loans that it originated, such as funding subsequent borrower draws.

[6]   As used herein, the "**Ginnie Mae Agreements**" means, collectively, the Ginnie Mae securitization guide (the "**Ginnie Mae Guide**") and those certain Master Servicing Agreements, dated as of March 6, 2014 (together with all Guarantee Agreements, MBS prospectus documents, cross default agreements, escrow agreements, Tri-Party agreement, corporate guaranty, acknowledgement agreement, supplements, addendums, amendments, and related agreements, the "**Ginnie Mae Servicing Agreements**").

**B.**    **Leadership**

46.    The following table sets forth the names of the members of the DHCP's

current board of directors:

| Name | Director Since | Position |
|------|---------------|----------|
| Thomas F. Marano | February 2018 | CEO, President and Chairman of the Board |
| David S. Ascher | February 2018 | Director |
| George M. Awad | June 2016 | Director |
| Seth L. Bartlett | February 2018 | Lead Independent Director |
| Daniel G. Beltzman | December 2015 | Director |
| John R. Brecker | February 2018 | Director |
| Neal P. Goldman | January 2017 | Director |
| Thomas G. Miglis | February 2018 | Director |
| Samuel T. Ramsey | February 2018 | Director |

47.    The following table sets forth the names of the DHCP's current executive

officers:

| Name | Position |
|------|----------|
| Thomas F. Marano | CEO and President |
| Gerald A. Lombardo | Chief Financial Officer |
| John J. Haas | General Counsel, Chief Legal Officer and Secretary |
| Alfred W. Young, Jr. | Chief Risk and Compliance Officer |
| Elizabeth F. Monahan | Chief Human Resources Officer |
| Jeffrey P. Baker | President of Reverse Mortgage Solutions, Inc. |

**C.**    **Existing Capital Structure**

48.    <u>Prepetition Credit Agreement</u>.    As of the Commencement Date, the

Debtors have outstanding first lien secured debt obligations in the aggregate principal amount of

approximately $961.4 million, which amount consists of secured term loan borrowings

(the "**Term Loans**") under the Second Amended and Restated Credit Agreement (as amended by

21

that certain Amendment No. 1 to Second Amended and Restated Credit Agreement, dated as of

March 29, 2018) among DHCP, each of the other loan parties named therein, Credit Suisse AG,

Cayman Islands Branch, as administrative agent and collateral agent, and other lenders party

thereto, dated as of February 9, 2018 (the "**Prepetition Credit Agreement**"), plus interest, fees

and other expenses arising thereunder. The Prepetition Credit Agreement is secured by a lien on

substantially all the assets of the Debtors.

49.     Prepetition Second Lien Notes Indenture. As of the Commencement Date,

the Debtors have outstanding second lien note obligations consisting of $253.9 million plus

accrued and unpaid interest in aggregate outstanding principal of 9.0% Second Lien Senior

Subordinated PIK Toggle Notes Due 2024 issued pursuant to that certain Second Lien Notes

Indenture by and between DHCP (f/k/a WIMC), certain other debtors as guarantors, and

Wilmington Savings Fund Society, FSB, a national banking association, as trustee and collateral

agent, dated as of February 9, 2018 (the "**Second Lien Notes Indenture**"). The Second Lien

Notes Indenture is secured on a second-lien basis on substantially all of the assets of the Debtors.

50.     Intercreditor Agreement. The Prepetition Credit Agreement and Second

Lien Notes Indenture is subject to that certain First Lien/Second Lien Intercreditor Agreement

dated as of February 9, 2018 among Credit Suisse AG, Cayman Islands Branch, as Senior

Collateral Agent for the Senior Secured Parties and Wilmington Savings Fund Society, FSB, as

Junior Collateral Agent for the Junior Secured Parties (the "**Intercreditor Agreement**").

Pursuant to the Intercreditor Agreement, holders of Second Lien Notes are subject to a 180 day

standstill before they are entitled to commence any enforcement, among other things, action

against the shared collateral. Further, the Intercreditor Agreement includes a "Cooperation"

provision whereby each junior representative, on behalf of itself and each junior secured party

WEIL:\96914025\1\41703.0010

agrees that, unless and until discharge of the senior obligations has occurred, it will not commence, or join with any person in commencing any enforcement, collection, execution, levy or foreclosure action or proceeding with respect to any lien held by it or otherwise in respect of the junior obligations. *See* §3.02, Intercreditor Agreement.

51.    <u>Warehouse Facilities and Financing Arrangements</u>.  The Debtors are also party to the following agreements with respect to the following warehouse facilities:

A.    *Mortgage Loan Warehouse Facility*:

- Amended and Restated Master Repurchase Agreement, dated as of November 18, 2016, between Credit Suisse First Boston Mortgage Capital LLC, as administrative agent, Credit Suisse AG, as committed buyer, Alpine Securitization Ltd, as a buyer, Barclays Bank PLC, as a buyer and other Buyers from time to time, and Ditech Financial LLC, as seller, with a committed capacity level of $1 billion, subject to a combined maximum capacity level of $1.9 billion.

B.    *Reverse Mortgage Facilities*:

- Second Amended and Restated Master Repurchase Agreement, dated as of November 30, 2017 and effective as of December 5, 2018, between Credit Suisse First Boston Mortgage Capital LLC, as administrative agent, Credit Suisse AG, as committed buyer, Alpine Securitization Ltd, as a buyer, Barclays Bank PLC, as a committed buyer and other Buyers from time to time, and Reverse Mortgage Solutions, Inc., as a seller, RMS REO CS, LLC, and RMS REO BRC, LLC, with a committed capacity level of $800 million, subject to a combined maximum capacity level of $1.9 billion; and

- Master Repurchase Agreement, dated April 23, 2018 (as may be amended, restated, supplemented, or otherwise modified), between Barclays Bank PLC, as purchase and agent and Reverse Mortgage Solutions, Inc., as seller, with a committed capacity level of $412 million.[7]

C.    *Mortgage Loan Servicing Facilities*:

- Ditech PLS Advance Trust II Advance Receivables Backed Notes, Issuable in Series  issued pursuant to that certain Indenture between Ditech PLS Advance

---

[7]    $200 million of the stated amount matures in February 2019, and $212 million matures in April 2019.

WEIL:\96914025\1\41703.0010

Trust II, as issuer, Wells Fargo Bank N.A, as indenture trustee, calculation agent, paying agent and securities intermediary, Ditech Financial, as servicer and administrator, and Credit Suisse First Boston Mortgage Capital LLC, as administrative agent, dated as of February 9, 2018 and effective as of February 12, 2018, with a committed capacity level of $85 million, subject to a combined maximum capacity level of $1.9 billion (the "**DPAT II Facility**");

- Ditech Agency Advance Trust Advance Receivables Backed Notes, Issuable in Series issued pursuant to that certain Indenture between Ditech Agency Advance Trust, as issuer, Wells Fargo Bank N.A, as indenture trustee, calculation agent, paying agent and securities intermediary, Ditech Financial, as servicer and administrator, and Credit Suisse First Boston Mortgage Capital LLC, as administrative agent, dated as of February 9, 2018 and effective as of February 12, 2018, with a committed capacity level of $465 million, subject to a combined maximum capacity level of $1.9 billion (the "**DAAT Facility**"); and

- Participation Interest Sale and Contribution Agreement, dated as of October 1, 2018, by and among RMS and a non-debtor subsidiary, and the related Note Purchase Agreement of even date therewith, between such subsidiary and National Founders LP (the "**National Founders Facility**").

52.     <u>General Unsecured Claims</u>.    In the ordinary course of business, the Debtors incur trade credit and varying terms, but generally pursuant to medium- to long-term contracts.  As of the Commencement date, the Debtors estimate that there is approximately $85 million in general unsecured claims, excluding lease rejection claims.

53.     <u>Equity Ownership</u>.    The Company is a public company that files annual reports with, and furnishes other information to, the SEC.  As of December 31, 2018, 90 million shares of DHCP $0.01 par value common stock had been authorized with 5,328,417 shares of common stock issued and outstanding.  As of December 31, 2018, there were 87 record holders of the common stock.  As of December 31, 2018, 91,408 shares of mandatorily convertible preferred stock were issued and outstanding.  The common stock was delisted on the New York Stock Exchange on December 1, 2018.

24

**50**

# IV.
## CIRCUMSTANCES LEADING TO THE CHAPTER 11 CASES

### A.    Background and Prior Restructuring

54.    On November 30, 2017, Walter Investment Management Corp. ("**WIMC**"), the Company's parent company, commenced a prepackaged chapter 11 case (*In re Walter Investment Management Corp.*, 17-13446 (JLG) (Bankr. S.D.N.Y. Nov. 30, 2017) (the "**WIMC Chapter 11 Case**") with this Court to address its overleveraged capital structure. In less than two months, WIMC confirmed its plan of reorganization eliminating more than $800 million in funded debt. On February 9, 2018, WIMC emerged from the WIMC Chapter 11 Case as Ditech Holding Corporation, and a final decree was entered closing the WIMC Chapter 11 Case on August 14, 2018. The goal of the WIMC Chapter 11 Case was to deleverage the capital structure sufficiently to enable the reorganized debtor to implement its business plan. As set out herein, due to circumstances, largely out of the control of the Debtors, the Company has faced significant hardships and must again address its capital structure through these Chapter 11 Cases.

### B.    Events Leading to the Commencement of These Chapter 11 Cases

55.    Notwithstanding the Company's efforts to implement its business plan, which included further cost reductions, operational enhancements and streamlining of its business, following emergence from the WIMC Chapter 11 Case, the Company continued to face liquidity and performance challenges that were more persistent and widespread than anticipated. Coupled with the industry and market factors, these performance challenges have resulted in less liquidity, making the implementation of key operational enhancements more difficult—resulting in their postponement.

56.    In addition, a number of industry factors have caused Ditech increased uncertainty with respect to its future performance, including the projected decrease in total

originations, and for reverse mortgages, the impact of changes in HUD regulations, among other things.  The increase in interest rates has also negatively impacted mortgage originators and servicers generally—the Debtors are no exception.  As interest rates have risen, less borrowers are refinancing loans in a higher interest rate environment, resulting in lower origination volume for the Company.

57.    The Company's liquidity has also suffered from a burdensome interest and amortization obligations on its corporate debt and tightening of rates from its lending counterparties.  In the normal course of business, the Company utilizes its mortgage loan servicing advance facilities and master repurchase agreements to finance, on a short-term basis, mortgage loan related servicing advances, the repurchase of HECMs out of Ginnie Mae securitization pools, and funding of newly originated mortgage loans.  These facilities are typically subject to annual renewal requirements and typically contain provisions that, in certain circumstances, prevent the Company from utilizing unused capacity under the facility and/or accelerate the repayment of amounts under the facility.

58.    The Company's ability to fund its business operations is a significant factor that affects its liquidity and ability to operate and grow.  The Company is dependent on the ability to secure these types of arrangements on acceptable terms and to renew, replace or resize existing financing facilities as they expire.  Continued growth in Ginnie Buyouts activity will require the Company to continue to seek additional financing for Ginnie Buyouts or to otherwise sell or securitize Ginnie Mae buyout assets.

59.    The Company has taken a number of measures to address forecasted reductions in liquidity and compliance with its various facilities, including entry into

26

**52**

amendments under its Prepetition Credit Agreement, the DAAT Facility, the DPAT II Facility, and each of Ditech Financial's and RMS's master repurchase agreements.

60.     The Company has entered into new agreements or transactions to generate additional liquidity.  In April 2018, the Company entered into an additional master repurchase agreement that provides up to $212 million in total capacity, and a minimum of $200 million in committed capacity to fund the repurchase of certain HECMs and real estate owned from Ginnie Mae securitization pools for a period of one year.  In June 2018, pursuant to the National Founders Facility, the Company sold a pool of defaulted reverse Ginnie Buyouts owned by the Company and financed under an existing master repurchase agreement for a sales price of $241.3 million.  The proceeds from the sale were used to repay the related amount financed under the master repurchase agreement and to fund additional Ginnie Buyouts.  The Company continues to service these loans on behalf of the purchaser under a servicing agreement.  In addition, in June 2018, the Company agreed to sell to New Penn Financial additional MSRs relating to mortgage loans having an aggregate unpaid principal balance of approximately $4.7 billion, and received approximately $56.7 million in cash proceeds.  The proceeds from the sale were used primarily to make mandatory principal payments under the Prepetition Credit Agreement.

61.     Notwithstanding these liquidity initiatives, the Company still faced scheduled amortization payments of approximately $110 million in 2019.  Accordingly, the Company was at a significant risk of receiving a going-concern qualification from its auditors, which would have triggered a domino effect of defaults and terminations throughout its corporate debt and working capital facilities.  Instead, the Company has sought to forge a different path with the cooperation of the Term Loan Ad Hoc Group and its major stakeholders—a path that will lead either to a significantly deleveraged and recapitalized

27

Company through a Reorganization Transaction or, if it provides higher or better return to creditors, a Sale Transaction; consistent with the goals of the Company's strategic alternatives review process discussed below.

## C.   The Prepetition Marketing Process and Negotiations with Stakeholders

62.   In June 2018, the Company initiated a process to evaluate strategic alternatives to enhance value and re-engaged Houlihan Lokey Capital, Inc. ("**Houlihan**") and Weil, Gotshal & Manges LLP ("**Weil**") to assist in such process.   Subsequently, in October 2018, the Company engaged AlixPartners, LLP to assist and advise in its contingency planning process, acknowledging at that time, that it may ultimately become necessary to implement a transaction through an in-court process.

63.   The Company's efforts were overseen by the Board of Directors of DHCP and a Special Committee of the board of directors (the "**Special Committee**"), which is composed of DHCP's five (5) independent directors.   The Special Committee, with the assistance of Houlihan and Weil, evaluated a range of potential strategic alternatives, including (i) a sale of the entire Company; (ii) a sale of certain assets and business platforms; (iii) a merger; or (iv) continuing as a standalone entity.   The Board of Directors of DHCP ultimately delegated decision-making authority over the marketing and sale process (the "**Prepetition Marketing Process**") to the Special Committee.

64.   The Company undertook an extensive marketing effort, including soliciting interest from thirty-three (33) potentially interested parties including strategic and financial buyers with the financial and operational wherewithal to complete a transaction.   The Company formally engaged with multiple potential bidders, executing ten (10) confidentiality

28

**54**

agreements and providing a Confidential Information Memorandum, financial projections and data room access to such potential bidders.

65.     The deadline for interested parties to submit initial bids was July 17, 2018. The Company received four (4) indications of interest ("**IOIs**").    Following extensive discussions with the Special Committee and its legal and financial advisors, the Company selected three (3) bidders to proceed to a second round of negotiations and diligence, including onsite management presentations during the last week of July 2018.  Following the management presentations, the Company and its advisors continued to facilitate due diligence with the remaining bidders in advance of the second round of IOIs.  The Company received three (3) second round IOIs on or about August 21, 2018, two (2) of which were bids for the sale of certain servicing and reverse assets with subservicing retained by the Company (the "**Alternative Bids**") and one (1) of which was a bid for substantially all of the Company's net assets as a going concern (the "**All-Company Bid**").  Over the course of September and October 2018, the Company and its advisors engaged in extensive discussions with the final three bidders.

66.     In October 2018, it became clear that (i) the Alternative Bids would require additional capital and liquidity to fund the restructured business plan and (ii) the proposed valuation levels of the All-Company Bid would not exceed the outstanding amount of the Company's Second Lien Notes.  As a result, the Company decided to engage with an ad hoc group of second lien noteholders (the "**Second Lien Ad Hoc Group**") to explore the Company's strategic alternatives and solicit input with respect to the All-Company Bid and the Alternative Bids.  On October 8, 2018, the Second Lien Ad Hoc Group signed a confidentiality agreement and began engaging with the Company to evaluate the sale alternatives and develop a competing

potential recapitalization transaction.  The Company continued to have periodic discussions with the Second Lien Ad Hoc Group as it analyzed the sale options and various recapitalization scenarios.  In November 2018, the Second Lien Ad Hoc Group retained Centerview Partners ("**Centerview**") and Milbank, Tweed, Hadley & McCloy LLP ("**Milbank**") to assist with its analysis of the potential strategic alternatives and to assist in preparing a recapitalization transaction proposal supported by the Second Lien Ad Hoc Group.

67.     The Company's financial and legal advisors engaged with the Second Lien Ad Hoc Group's advisors to develop potential viable alternatives to an All-Company Bid. Among other things, the Second Lien Ad Hoc Group proposed equitizing a portion of the Second Lien Notes and obtaining amortization relief from the Term Lenders under the Prepetition Credit Agreement (the "**Second Lien Proposal**").

68.     In December 2018, the Company engaged in parallel discussions with an ad hoc group of prepetition secured term loan lenders (the "**Term Loan Ad Hoc Group**") to discuss the Prepetition Marketing Process and the Second Lien Proposal.  The Term Loan Ad Hoc Group retained FTI Consulting ("**FTI**") and Kirkland & Ellis LLP ("**Kirkland**") as its advisors.  The Debtors and their advisors held in-person meetings in December 2018 with each of the Term Loan Ad Hoc Group and the Second Lien Ad Hoc Group and their respective advisors to discuss strategic alternatives, including analyzing the All-Company Bid.

69.     Despite extensive negotiations with the bidder who submitted the All-Company Bid, such bidder ultimately rescinded the All-Company Bid in late December 2018, immediately after the Company had utilized the grace period with respect to its Second Lien Notes (explained in more detail below).  Following such rescission, the Company re-engaged a previous bidder in connection with a potential bid for substantially all of the Company's assets.

After several weeks of negotiations with such bidder, the Company ultimately decided not to pursue the sale transaction.

70.     In early January 2019, the Term Loan Ad Hoc Group submitted a proposal for a recapitalization transaction, pursuant to which a portion of the Prepetition Term Loan would be equitized and incremental liquidity would be provided through, among other things, a new revolving credit facility and a reduction in scheduled amortization payments.  Shortly thereafter, the Second Lien Ad Hoc Group submitted a revised Second Lien Proposal.  Over the course of several weeks, the Company, with the assistance of its financial and legal advisors, engaged in extensive discussions with the Term Loan Ad Hoc Group and the Second Lien Ad Hoc Group regarding the competing recapitalization transactions proposed by such parties.  Following extensive diligence and numerous meetings with the Company's management and advisors, the advisors to the Term Loan Ad Hoc Group provided the Company with a proposal for the recapitalization of the Company.  As precondition to seeking the approval of the Board for such terms, the Company agreed with the Term Loan Ad Hoc Group to share the proposal with certain of the Company's key counterparties, including NRM.

**D.     NRM Termination Notice**

71.     Notwithstanding the Debtors' good faith efforts to cooperate with NRM throughout its strategic review process, NRM repeatedly threatened to issue a termination notice under its Subservicing Agreement with the Company, dated August 8, 2016 (as amended) (the "**Subservicing Agreement**") while simultaneously participating as a bidder in the Company's sale process.  Ultimately, on January 17, 2019—the morning after the Company shared with NRM a recapitalization proposal from the Term Loan Ad Hoc Group—NRM issued a notice purporting to terminate ("**Termination Notice**") the Subservicing Agreement.  The

Debtors have disputed NRM's basis for termination and intend to explore all legal remedies against NRM in connection with the timing and issuance of the Termination Notice. The Debtors are, however, cooperating with NRM to transition the servicing of the loans under the Subservicing Agreement.

**E.      Employee Programs**

72.      Immediately following receipt of the Termination Notice, the Debtors learned that their employees were being contacted by competitors who were offering material hiring incentives to the Debtors' employees. Further, Fannie Mae advised the Company that it was concerned about possible increased employee attrition given the upcoming planned chapter 11 cases. In response, the Company immediately implemented a rank and file employee retention program to ward-off employee attrition and reward its existing employees for their loyalty and service during the transformative chapter 11 cases.

73.      The importance of the Debtors' employees cannot be overstated, particularly in the servicing segment of their business. Without employees to maintain standards of servicing, the Debtors may default on their obligations to the GSEs, Ginnie, regulators, and under the terms of the DIP Warehouse Financing, National Founders Facility, and the Restructuring Support Agreement.

74.      Furthermore, even before the rank and file employee retention program, the Company took steps to vitiate employee attrition throughout its organization. Among other things, this has included its 2018 Key Employee Retention Program and its Transaction Incentive Bonus. The Company made payments to eligible employees, including certain insiders, under each program, including, on February 8, 2019, payments under the Transaction Incentive Bonus, recognizing the milestone of signing the Restructuring Support Agreement. Importantly, these

32

payments are subject to claw-back, should an employee voluntarily terminate their employment before consummation of the transactions contemplated by the Restructuring Support Agreement. Additional details regarding the employee programs are contained in the Wages Motion.

**F.      Utilization of Grace Period, Forbearance, and Expiration of Certain Warehouse Facilities**

75.      On December 17, 2018, the Company elected not to make the approximately $9 million cash interest payment (the "**Interest Payment**") due and payable on December 17, 2018 with respect to the Company's outstanding Second Lien Notes and entered the 30-day grace period.  Although the Company had sufficient liquidity to make the Interest Payment, the Company elected not to make the payment as discussions were still ongoing with various stakeholders regarding the Company's strategic alternatives. The Company's failure to make the Interest Payment within thirty days after it was due and payable would constitute an "event of default" under the Indenture. An event of default under the Indenture also constitutes an "event of default" under the Prepetition Credit Agreement and certain of the Company's Warehouse Facility Agreements, among others.

76.      On January 16, 2019, the Company and, as applicable, certain of its subsidiaries, entered into forbearance agreements (each a "**Forbearance Agreement**" and collectively the "**Forbearance Agreements**") with (i) certain holders of greater than 75% of the aggregate principal amount of the outstanding Second Lien Notes (the "**Notes Forbearing Parties**"), (ii) certain lenders holding greater than 50% of the sum of (a) the Term Loans outstanding, (b) letter of credit exposure and (c) unused commitments under the Prepetition Credit Agreement at such time and the administrative agent and collateral agent under the Prepetition Credit Agreement (collectively, the "**Credit Agreement Forbearing Parties**") and

33

(iii) the requisite buyers and variable funding noteholders, as applicable, under the Warehouse Facility Agreements (collectively, the "**Warehouse Lenders Forbearing Parties**").

77.     Pursuant to the Forbearance Agreements, subject to certain terms and conditions, the Notes Forbearing Parties, Credit Agreement Forbearing Parties and Warehouse Lenders Forbearing Parties agreed to temporarily forbear from the exercise of any rights or remedies they may have in respect of the aforementioned events of default or other defaults or events of default arising out of or in connection therewith.

78.     The deadline of the Forbearance Agreements was tied to the maturity date of certain of the Company's repurchase loan agreements with the Warehouse Lenders Forbearing Parties.  Without a viable recapitalization of the Company in hand, the Warehouse Lenders Forbearing Parties were not in a position to commit to a significant extension of their facilities with the Company.  As noted above, these facilities are critical to the Company's ordinary course of business operations.  Accordingly, the Company focused instead on obtaining the DIP Financing to take out such obligations, and will, during the Marketing Process, continue to seek commitments for postpetition facilities.

79.     Before the termination of the Forbearance Agreements on February 8, 2019, the Company entered into new forbearance agreements with the Credit Agreement Forbearing Parties and the Warehouse Lenders Forbearing Parties (the "**Forbearance Extension**").  The Forbearance Extension was scheduled to terminate on February 11, 2019.

## V.
## <u>FIRST-DAY PLEADINGS</u>

80.     The Debtors have filed their First-Day Pleadings contemporaneously herewith to facilitate a smooth transition into these chapter 11 cases and minimize disruption to

WEIL:\96914025\1\41703.0010

the Debtors' business operations. I am familiar with the contents of each First-Day Pleadings and believe that the relief sought in each First-Day Pleading is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value, constitutes a critical element connection with the Debtors' chapter 11 strategy and best serves the Debtors' estates and creditors' interests. The facts set forth in each First-Day Pleading are incorporated herein by reference. Capitalized terms used, but not otherwise defined in this section, shall have the meanings ascribed to such terms in the relevant First-Day Pleading.

## A.      Administrative Motions

### i.      Motion of Debtors for Entry of Order Directing Joint Administration of Related Chapter 11 Cases (the "Joint Admin Motion")

81.      The Debtors request entry of an order directing joint administration of these chapter 11 cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and that the Bankruptcy Court maintain one file and one docket for all of the chapter 11 cases under the lead case, Ditech Holding Corporation.

82.      Joint administration of the chapter 11 cases will provide significant administrative efficiencies without harming the substantive rights of any party in interest. Many of the motions, hearings and orders that will be filed in the chapter 11 cases almost certainly will affect each of the Debtors. The entry of an order directing joint administration of the chapter 11 cases will reduce fees and costs by avoiding duplicative filings, objections, notices, and hearings, and will allow all parties in interest to monitor the chapter 11 cases with greater ease and efficiency. The relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their businesses in chapter 11 with the least disruption.

ii.     **Motion of Debtors for Entry of Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs (the "Schedules and SOFAS Motion")**

83.     The Debtors request entry of an order granting additional time to file their schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "**Schedules**"). As a consequence of the size and complexity of the Debtors' business operations, the number of creditors likely to be involved in these chapter 11 cases, and the numerous critical operational matters that the Debtors' management and employees must address, a 45-day extension (without prejudice to further extensions) is necessary and appropriate.

84.     To prepare the Schedules, the Debtors must compile information from books, records, and other documents relating to, among other things, accounts payable and receivable, real estate and capital leases, employee wages and benefits, intercompany transactions, and contracts in connection with their loan origination and servicing operations. Collecting the necessary information to prepare the Schedules requires an enormous expenditure of time and effort on the part of the Debtors, their employees, and their professionals. While the Debtors, with the assistance of their professional advisors, are mobilizing their employees to work diligently and expeditiously on preparing the Schedules, the Debtors' resources are strained. I believe an extension of the time to file the Schedules will ultimately maximize the value of the Debtors' estates for the benefit of their creditors and all other parties in interest.

iii.    **Motion of Debtors for Entry of an Order (I) Authorizing Debtors to (A) File a Consolidated List of Creditors and (B) File a Consolidated List of Debtors' 40 Largest Unsecured Claims, (II) Authorizing Debtors to Redact Certain Personal Identification Information for Individual Creditors and Interest Holders, (III) Approving Form and Manner of Notifying Creditors of Commencement of These Chapter**

36

**11 Cases; and (IV) Approving Publication Notice to Borrowers (the "Creditor Matrix Motion")**

85.     The Debtors request entry of an order (i) authorizing the Debtors to (a) file a consolidated list of creditors in lieu of submitting separate mailing matrices for each individual Debtor (the "**Creditor Matrix**") and (b) file a consolidated list of the Debtors' forty (40) largest unsecured claims; (ii) authorizing the Debtors to redact certain personal identification information for individual creditors and interest holders; (iii) approving the form and manner of notifying creditors of commencement of these chapter 11 cases , and (iv) authorizing the Debtors to provide publication notice to the individual borrowers whose loans are serviced by the Debtors (the "**Borrowers**").

86.     Permitting the Debtors to maintain one single consolidated list of creditors in lieu of filing a separate creditor matrix for each Debtor entity is warranted under the circumstances of these chapter 11 cases.  Specifically, maintaining a single consolidated Creditor Matrix will benefit the Debtors and their estates by allowing the Debtors to more efficiently provide required notices to parties in interest and reduce the potential for duplicate mailings.

87.     Cause exists to authorize the Debtors to redact address information of individual creditors and interest holders—many of whom are the Debtors' employees—and interest holders from the creditor list because such information is sensitive and could be used to perpetrate identity theft.  It is also unnecessary to disclose.  The Debtors propose to provide, under seal, an unredacted version of the Creditor Matrix to the Bankruptcy Court, the United States Trustee, and any official committee of unsecured creditors appointed in the Chapter 11 Cases, upon request.

88.     Providing publication notice to the Borrowers is appropriate in these chapter 11 cases.  The Debtors currently service over 1.4 million mortgages.  Copying and

mailing multiple notices and otherwise serving documents filed with the Bankruptcy Court on all Borrowers is impracticable, will costs millions of dollars, and will impose an extraordinary administrative burden on the Debtors and their estates.    Authorizing publication notice to Borrowers will substantially reduce administrative burdens, and moreover, no parties in interest will be prejudiced by the relief requested in the motion as it only applies to the claims of Borrowers.    In the event any Borrower has filed a notice of appearance or a proof of claim in these chapter 11 cases, the Debtors will provide such party with notice as required under Bankruptcy Rule 2002.

### iv.    Motion of Debtors for Entry of Order Implementing Certain Notice and Case Management Procedures

89.    The Debtors request entry of an order approving and implementing the notice, case management, and administrative procedures therein (collectively,  the "**Case Management Procedures**").

90.    Given the size and scope of these cases, the Case Management Procedures will facilitate service of notices, motions, applications, declarations, objections, responses, memoranda, briefs, supporting documents, and other papers filed in these chapter 11 cases that will be less burdensome and costly than serving such documents on every potentially interested party.  This, in turn, will maximize the efficiency and orderly administration of these chapter 11 cases, while at the same time ensuring that appropriate notice is provided.

### B.    Operational Motions Requesting Immediate Relief

### i.    Motion of Debtors Requesting Authority to (I) Continue Using Existing Cash Management System, Bank Accounts, and Business Forms, (II) Implement Changes to the Cash Management System in the Ordinary Course of Business, (III) Continue Intercompany Transactions, (IV) Provide Administrative Expense Priority for Postpetition Intercompany Claims, (V) Extend Time to Comply with,

> **or Seek Wavier of, 11 U.S.C. § 345(b), and (VI) Granting Related Relief (the "Cash Management Motion")**

91.    The Debtors request authority to (i) continue their existing cash management system, including the continued maintenance of their existing bank accounts and business forms; (ii) implement changes to their cash management system in the ordinary course of business, including opening new or closing existing bank accounts; (iii) continue to perform under and honor intercompany transactions in the ordinary course of business, in their business judgment and at their sole discretion; (vi) provide administrative expense priority for postpetition intercompany claims; and (v) extend the time to comply with section 345(b) of the Bankruptcy Code by forty-five (45) days (or such later time as may be agreed to by the U.S. Trustee (as defined herein) or as approved by the Court) or seek a waiver thereof.

92.    The Cash Management System is comprised of 1,196 bank accounts (collectively, the "**Bank Accounts**") maintained at various financial institutions (the "**Banks**"),[8] of which (i) 24 are operating accounts, (ii) 1,171 are custodial accounts maintained in the name of a Debtor whereby such Debtor merely holds the account (and the funds in it) in trust or as custodian for a third party, and (iii) 1 account that holds restricted cash[9] (such as principal and interest payments that serve as collateral for the Warehouse Lenders (as defined in the motion)). The majority of the Bank Accounts are in the name of Ditech Financial and RMS.  1,194 of the Bank Accounts are located at Banks designated as authorized depositories by the Office of the

---

[8]    The Debtors' Banks include:  Bank of America, N.A. ("**Bank of America**"), Bank of New York Mellon Corporation ("**BNY Mellon**"), Citibank, N.A. ("**Citibank**"), EverBank, N.A. ("**Everbank**"), Texas Capital Bank, N.A. ("**Texas Capital Bank**"), U.S. Bank, N.A. ("**U.S. Bank**"), and Wells Fargo Bank, N.A. ("**Wells Fargo**").

[9]    Ditech Financial maintains the restricted account at U.S. Bank.  Such account holds principal and interest payments that are remitted from a borrower to Ditech Financial before the underlying loan that Ditech Financial originated has been sold.  Once the underlying loan is sold by Ditech Financial, such principal and interest payments are transferred to the Ditech Origination Account (as defined herein).

United States Trustee for Region 2 (the "**U.S. Trustee**") pursuant to the U.S. Trustee's Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees (the "**UST Guidelines**"), with the remaining 2 Bank Accounts located at EverBank, which is not designated as an authorized depository under the UST Guidelines.

93.    The Cash Management System is an ordinary course, customary, and essential business system which allows for the flow of cash between Bank Accounts and between Company affiliates as required or needed, in accordance with the Company's cash management practices.   Most of the Company's obligations are paid by Ditech Financial from the Ditech Servicing Account (as defined in the Cash Management Motion).   When Ditech Financial makes disbursements on behalf of its affiliates, such disbursements are tracked electronically in the Company's accounting system and are concurrently recorded on the applicable entity's balance sheet and income statement.   The accounting system requires that all general ledger entries be balanced at the legal entity level, and therefore, when the accounting system enters an intercompany receivable on an entity's balance sheet, it also automatically creates a corresponding intercompany payable on the applicable affiliate's balance sheet.

94.    The Debtors receive and collect cash, wires, and pre-authorized drafts through various entry points in the Cash Management System, including lockboxes (where they receive borrower payments), custodial accounts (where they receive borrower payments, advances, and reimbursement funds from Fannie Mae, Freddie Mac, Ginnie Mae, and HUD), and clearing accounts (where they receive payments and sale proceeds from servicers and buyers). The Debtors primarily receive operating cash through the collection of fees and other amounts related to servicing mortgage loans on behalf of third parties and from the sale of originated loans.

95.     The Debtors further request that the Court authorize the financial institutions at which the Debtors maintain various bank accounts to (i) continue to maintain, service, and administer the Debtors' bank accounts; (ii) debit the bank accounts in the ordinary course of business on account of (a) electronic transfers (including wire transfers, book transfers, and automated clearinghouse transfers) or checks drawn on the bank accounts, provided that any payments drawn, issued or made prior to the Commencement Date shall not be honored by the Banks absent receipt of direction from the Debtors and entry of a separate order of the Court authorizing such prepetition payment or (b) undisputed service charges owed to the Banks for maintenance of the Debtors' cash management system, if any.

> **ii.     Debtors' Motion for Interim and Final Orders (A) Authorizing Debtors to Enter Into Repurchase Agreement Facilities, Servicer Advance Facilities and Related Documents; (B) Authorizing Debtors to Sell Mortgage Loans and Servicer Advance Receivables in the Ordinary Course of Business; (C) Granting Back-Up Liens and Superpriority Administrative Expense Claims; (D) Authorizing Use of Cash Collateral and Granting Adequate Protection; (E) Modifying the Automatic Stay; (F) Scheduling a Final Hearing; and (G) Granting Related Relief (the "DIP Motion")**

96.     The relief sought in the DIP Motion will enable the Debtors' two main operating entities, Ditech Financial and RMS, as applicable, (a) to obtain up to $1.9 billion in warehouse financing under three master repurchase agreements and two advance facilities and (b) to obtain access to $1.9 billion in hedging capacity under certain master securities forward transaction agreements and related netting agreement (collectively, the "**DIP Facilities**").  The DIP Facilities will ensure that the Company's financing needs will continue to be met and access to such financing will not be abruptly interrupted.

97.     In addition, in exchange for certain agreed upon adequate protection (the "**1L/2L Adequate Protection**") to the Debtors' prepetition First Lien Term Loan Lenders

(distinct from the lenders providing the DIP Facilities (the "**DIP Lenders**")) and to the Debtors' prepetition Second Lien Noteholders, the Debtors' request authorization to use the Prepetition 1L/2L Collateral, including Cash Collateral.  Such authorization will allow the Company to continue to have access to its cash management system and to incur intercompany obligations in the ordinary course of business during the pendency of these cases.

98.    The Debtors, through their investment banker, Houlihan, ran a marketing process for their debtor in possession financing.  The Debtors negotiated the DIP Facilities and the 1L/2L Adequate Protection with the DIP Lenders and the First Lien Term Loan Lenders, respectively, in good faith and at arm's length, and believe that the terms of the DIP Facilities and 1L/2L Adequate Protection are competitive and the best that could be obtained under the circumstances.  Further the DIP Facilities have been market tested and represent the best of three offers received by the Company.  For these reasons, and as more fully explained in the DIP Motion, I believe the relief requested is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in these chapter 11 cases.

a.    **It is in the Best Interests of the Debtors' Estates to Continue Financing Arrangements Entitled to the "Safe Harbor" Protections of the Bankruptcy Code**

99.    Ditech Financial and RMS finance their mortgage origination operations via certain master repurchase agreements pursuant to which they sell to buyer counterparties various mortgage obligations that Ditech Financial and RMS originate or purchase from others, and pursuant to which they are obligated to repurchase such mortgage obligations in the future (the "**Prepetition Repo Facilities**," and the counterparties thereunder, the "**Prepetition Repo Facility Parties**").  The Debtors propose to continue such financing activities pursuant to new and/or amended and restated master repurchase agreements entered into pursuant to the Interim

42

Order that are substantially similar to the Prepetition Repo Facilities (the "**DIP Repo Facilities**;"
the counterparties under the DIP Repo Facilities, the "**DIP Repo Facility Parties**").

100.    Ditech Financial also hedges certain of its financing operations via certain
master securities forward transaction agreements with Barclays Capital Inc. and Nomura
Securities International Inc. (the "**Prepetition MSFTA Counterparties**") pursuant to which it
buys and sells mortgage-backed and other securities for future delivery (the "**Prepetition
MSFTAs**").  The Debtors propose to continue such hedging activities post-petition under the
same agreements (the "**DIP MSFTAs**") with the same parties or any other applicable
counterparties (the "**DIP MSFTA Counterparties**").

101.    In addition, certain Debtors entered into a margin, setoff and netting
agreement to allow the Debtors and counterparties to the Prepetition Repo Facilities and the
Prepetition MSFTAs (the "**Prepetition Netting Counterparties**") to net, setoff and margin their
obligations to one another (the "**Prepetition Netting Agreement**"). The Debtors propose to
enter into a substantially similar agreement post-petition with Barclays Capital Inc. and Nomura
Securities International Inc. (the "**DIP Netting Counterparties**") that will afford the parties the
same obligations and protections as under the Prepetition Netting Agreement (the "**DIP Netting
Agreement**").

102.    In my experience, it is customary in the mortgage origination and servicer
industry to enter into financing arrangements such as the DIP Repo Facilities, the DIP MSFTAs
and the DIP Netting Agreement.  Such arrangements afford mortgage originators, servicers and
borrowers more advantageous borrowing rates and terms as compared to other potential
financing structures (such as secured lending facilities).  It is also industry custom to structure
such arrangements so that they qualify as "repurchase agreements," "securities contracts,"

43

"forward agreements," "swap agreements," and "master netting agreements" and/or "master netting agreements" entitled to the protections of the so-called "safe harbor" provisions of the Bankruptcy Code.  The Debtors' financing sources and counterparties are not willing to provide the Debtors with the liquidity and financial support necessary for the Debtors to reorganize if the safe harbor protections are not assured.

103.   I believe that it is in the best interests of the Debtors' estates that the Debtors enter into the DIP Repo Facilities, the MSFTAs and the Netting Agreement and that each agreement qualify for the safe harbor protections afforded under the Bankruptcy Code. Indeed, I believe that the failure to obtain safe harbor protections for such agreements would be detrimental to the Debtors' business.  It is my understanding that each agreement was carefully structured to satisfy the applicable statutory criteria. Therefore, I believe that this Court should grant the relief requested in the DIP Motion and find that the DIP Repo Facilities, the DIP MSFTAs and the DIP Netting Agreement each qualify for the Bankruptcy Code's safe harbor protections.

### b. The DIP Servicer Advance Facilities Constitute "Bankruptcy Remote" Financing Structures

104.   Ditech Financial in its capacity as mortgage servicer provides advances to various trusts that hold mortgages that secure mortgage-backed securities (the "**Servicer Advances**"). Ditech Financial obtains additional liquidity for its operations by selling its rights to receive reimbursements of the Servicer Advances (the "**Servicer Advance Receivables**") to two "bankruptcy-remote" securitization vehicles, Ditech Agency Advance Depositor LLC and Ditech PLS Advance Depositor LLC (together, the "**Depositors**"), which subsequently transfer such rights to two non-debtor special purpose vehicles, Ditech Agency Advance Trust and Ditech PLS Advance Trust II (together, the "**Non-Debtor SPVs**"), which in turn issue variable funding notes

44

backed by such Servicer Advance Receivables (the "**Servicer Advance Facility VFNs**") to Barclays and others.

105.   The Debtors propose to enter into substantially similar agreements post-petition that will allow them to sell Servicer Advance Receivables generated post-petition to the Depositors, which will subsequently transfer such Servicer Advance Receivables to the Non-Debtor SPVs, which will in turn issue Servicer Advance Facility VFNs to Barclays and others backed by such Servicer Advance Receivables.  Such post-petition arrangements will also repay and refinance in whole the Servicer Advance Facility VFNs.

106.   In my experience, it is customary in the mortgage origination and servicer industry to structure such arrangements so that the sales of servicer advances constitute so-called "true sales," and not mere secured financings, and to structure the depositors and special purpose vehicle issuers so that their affairs are kept separate from the sellers and hence, will not be substantively consolidated into the estate of the seller if it becomes a debtor under the Bankruptcy Code.  This structure is critical to lenders, who rely on it in extending credit so that in the event of a default, they will be able to easily exercise their remedies.

### c. Sales of DIP Servicer Advance Receivables Constitute "True Sales" and Not Secured Financings

107.   Based on my knowledge of the Debtors' business and industry custom, I believe it is in the best interests of the Debtors' and their estates that the transfers under the Receivables Sale Agreements be construed as "true sales."  The Debtors' counterparties rely on the fact that the transfer of Servicer Advance Receivables are in fact true sales and not secured financings.  If this were not so, I believe that the Debtors' counterparties and indirect financing sources may not provide critical liquidity on favorable terms and the Debtors' ability to fund its Servicer Advances could be severely impaired.  I also believe that structuring servicer advance

financing arrangements as true sales is customary in the mortgage servicer industry as well as in

other businesses that generate significant receivables.  Therefore, I believe that this Court should

grant the relief requested in the DIP Motion and find that the transfers of Servicer Advance

Receivables constitute "true sales" and not secured financings.

### d. There Is No Basis for the Substantive Consolidation of the Depositors Or the Non-Debtor SPV's Into the Debtors' Bankruptcy Estates

108.    I am familiar with the special purpose vehicles and other entities that

participate in structuring the Servicer Advance facilities.  In particular, it is my understanding

that each Non-Debtor SPV Issuer is (and has been since its formation) a special purpose trust,

while each Depositor is (and has been since its formation) a special purpose limited liability

company.[10]  I also understand that the activities of each Non-Debtor SPV Issuer and Depositor

have been (and Ditech Financial will cause them to continue to be) limited to activities relating

to the purchase and sale of Servicer Advance receivables, the issuance of Servicer Advance

VFNs, and the administration of the respective entity's assets.  I understand from counsel that the

organization documents of each entity contain representations, covenants, and agreements

relating to the separateness of each entity's operations from those of any other entity, including

requirements that each Non-Debtor SPV Issuer be managed by an owner trustee and that each

Depositor have at least one independent manager.[11]  To the best of my knowledge, the corporate

separateness covenants have been observed in all respects prior to the Petition Date, and Ditech

Financial will continue, and will cause the Depositors and Non-Debtor SPVs to continue, to

observe them during these Chapter 11 Cases.

---

[10]   Ditech Financial owns 100% of the equity interests in the Depositors.  Each Depositor owns 100% of the equity interest in its respective Non-Debtor SPV.

[11]   *See, e.g.,* Sections 2.4, 2.6, and 2.7 and Article VI of each Trust Agreement and Sections 9(b)iii. and 10 of each LLCA.

46

72

109.    In addition, I believe that each entity's assets have not been and will not be commingled with those of any direct, indirect, or ultimate parent or affiliate and that each entity has kept and will continue to keep correct and complete separate records, bank accounts, and books of account.  I also understand that each entity has taken since its creation and will take during these Chapter 11 Cases all reasonable steps to maintain its respective identity as a separate legal entity and to make it manifest to third parties that it is an entity with assets and liabilities distinct from any other entities, and that each entity has provided, and will continue to provide, for its own operating expenses and liabilities from its own funds, and has and will not guarantee or hold itself out to third parties as liable for the debts of any other entity.

110.    I believe that the Debtors' counterparties rely on the fact that the Non-Debtor SPVs and the Depositors will not be substantively consolidated into Ditech Financial's estate.   As with the other aspects of the Servicer Advance facilities, features of corporate separateness are deliberately structured and carefully observed.  I understand that the Debtors' counterparties and indirect financing sources would not fund the Servicer Advance facilities if they believed that there was any risk of consolidation.  Indeed, reliance on corporate separateness is customary in the mortgage servicer industry as well as in other businesses that finance receivables.  Therefore, I believe that this Court should grant the relief requested in the DIP Motion and find that there is no basis for any of the Depositors or the Non-Debtor SPVs to be substantively consolidated into the bankruptcy estate of Ditech Financial.

### e.  Sale of REO Assets to the DIP REO Subsidiary Constitutes a "True Sale" and Not a Secured Financing

111.    As further set forth in the DIP Motion, RMS proposes to repurchase all assets sold pursuant to the terms of the Prepetition Reverse Repo Facilities, to terminate the Prepetition Reverse Repo Facilities and any related program documents, and to sell all such

assets pursuant to the terms of the DIP Reverse Repo Facility, thereby repurchasing and repaying the Prepetition Reverse Repo Facilities with proceeds from the sale of such assets under the DIP Reverse Repo Facility Documents.  In furtherance thereof, it is contemplated that (1) RMS will cause (x) its non-debtor subsidiaries RMS REO CS, LLC and RMS REO BRC, LLC (together, the "**CS REO Subsidiaries**") to transfer all of their REO Property (as defined in the Prepetition Exit Reverse Repo Master Purchase Agreement) (collectively, the "**CS REO Assets**") to RMS and (y) RMS REO BRC II, LLC (the "**DIP REO Subsidiary**") to transfer all of its prepetition assets (the "**Prepetition DIP REO Assets**" and, together with the CS REO Assets, the "**REO Assets**") to RMS and (2) immediately following such transfer, RMS will transfer all such CS REO Assets and Prepetition DIP REO Assets to the DIP REO Subsidiary.

112.    I understand that such transfers will entail the transfer of all right, title and interest in the REO Assets on an absolute and non-recourse basis, and full risk of loss with respect to the REO Assets will pass to the DIP REO Subsidiary.  I also understand that RMS will have no right to receive any proceeds allocable to the REO Assets, and will not guarantee or otherwise pay to the DIP REO Subsidiary a specified yield (or adjust the purchase price post-sale).  Therefore, I believe that this Court should grant the relief requested in the DIP Motion and find that the sales of REO Assets to the DIP REO Subsidiary constitute "true sales" and not secured financings.

**iii.    Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to Continue Origination and Servicing of Forward Mortgage Loans in Ordinary Course and Granting Related Relief, (II) Modifying Automatic Stay on a Limited Basis to Facilitate Debtors' Ongoing Operations, and (III) Scheduling a Final Hearing ("Ditech OCB Motion")**

113.    The Debtors request entry of an order authorizing, but not directing, the Debtors to continue in the ordinary course of business:  (a) to originate and purchase mortgage

48

loans; (b) to sell and securitize loans, including by performing under certain agreements with Fannie Mae, Freddie Mac, Ginnie Mae, and private parties; (c) to service and subservice loans pursuant to terms and conditions set forth in certain agreements with Fannie Mae, Freddie Mac, Ginnie Mae, other applicable federal agencies, and private parties; (d) to make servicing advances; (e) to pay prepetition amounts owed to critical vendors on the terms and conditions described herein; (f) to fulfill compliance and regulatory obligations; and (g) to provide assurances of future performance to Fannie Mae, Freddie Mac, and Ginnie Mae and comply therewith.  Each of the activities for which the Debtors seek Court authority to continue are consistent with both the Debtors' prepetition conduct and with customary practices in the forward mortgage loan origination and servicing industry.

114.    Selling and servicing Agency Loans accounts for a significant portion of the Debtors' revenue.  Accordingly, maintaining eligibility to sell, securitize, and service Agency Loans is a vital component of the Debtors' business and essential to a successful reorganization. Indeed, the failure to comply with the terms and conditions set forth in the applicable Agency Agreements may result in the applicable agency terminating the GSE Agreements and revoking the Debtors' selling and servicing authorizations.  In the case of Ginnie Securitized Loans, for example, Ditech Financial could be placed in a default subject to the terms and conditions of that certain Cross-Default Agreement, dated as of July 17, 2015 (the "**Cross-Default Agreement**"), pursuant to which the interests of both Ditech Financial and RMS in the applicable underlying forward and reverse mortgage portfolios could be extinguished without compensation or any rights of reimbursement; and a default subject to the terms and conditions of the Ginnie Mae Agreements.  Without the ability to access the liquid agency sale and servicing markets, the Debtors will be unable to operate their businesses.  It is therefore imperative that the Debtors be

WEIL:\96914025\1\41703.0010

permitted to continue to perform under the Agency Agreements, which will allow them to operate their business in the ordinary course without interruption so as to preserve the value maximizing transactions contemplated by the Restructuring Support Agreement.  Further, if the relief requested is not granted, the Debtors will be unable to secure debtor in possession financing and to administer these chapter 11 cases.  Approval of the Ditech OCB Motion and the ability to comply with and remain an approved servicer, originator, and issuer with the GSEs and Ginnie Mae, as applicable, are conditions to the DIP Financing.

### a.  Critical Vendors

115.    In connection with their general corprorate activities, as well as their origination and servicing businesses, Ditech utilizes the services of numerous third-party vendors, service providers, and professionals that are critical to operations (collectively, "**Critical Ditech Vendors**"), who perform a variety of critical functions for the Debtors.

116.    Employing these specialized vendors is more cost-effective than performing such activities in-house; indeed, replacing certain of these vendors would not only be difficult and disruptive, but also cost-prohibitive.  The Debtors have developed long-standing relationships with their Critical Ditech Vendors, which has enabled them to negotiate favorable pricing, credit terms, and priority scheduling.  Any failure to timely honor the Debtors' prepetition obligations to the Critical Ditech Vendors could jeopardize these relationships, and any interruption of their services for even a short period of time would impair the Debtors' operations and the value of the enterprise.

117.    Through the Ditech OCB Motion and the RMS OCB Motion, the Debtors request authority, but not direction, to continue to employ and pay the prepetition obligations of, in the Debtors' sole discretion, the Critical RMS Vendors and the Critical Ditech Vendors (as defined in the Ditech OCB Motion) (collectively, the "**Critical Vendors**").  The Debtors seek to

pay (a) up to <u>approximately $35 million</u> of such prepetition amounts to Critical Vendors during the first thirty (30) days of these chapter 11 cases, of which the Debtors expect <u>approximately $30.6 million</u> will either be prefunded or reimbursed to the Debtors and (b) up to <u>approximately $40 million</u> of such prepetition amounts to Critical Vendors on a final basis. Without the requested relief, the Critical Vendors may refuse to continue providing services to Ditech postpetition or may impose unfavorable trade terms, such as cash in advance requirements, security deposits, and/or restrictive trade credit.

### b.  Limited Relief from the Automatic Stay

118.   In its capacity as servicer, Ditech is currently party to approximately 16,400 judicial and non-judicial foreclosure proceedings and approximately 350 evictions. In such proceedings it is not uncommon for borrowers and tenants to raise claims, defenses and related counter-claims against RMS to preserve their respective interests in underlying property as owner or tenant. I am advised that such claims, cross-claims, third-party claims, and counter-claims, whether asserted by borrowers in foreclosure actions or by tenants in eviction actions and whether commenced prior to, on, or after the Commencement Date, are or may become subject to the automatic stay pursuant to section 362(a) of the Bankruptcy Code. Requiring each of these parties to obtain stay relief in order to assert such counter-claims would likely add an unnecessary degree of complexity, costs, and delay to both the foreclosure process described herein and the administration of these chapter 11 cases.

119.   In addition, certain of the borrowers on loans serviced or subserviced by the Debtors have sought, or may seek during the pendency of these cases, bankruptcy protection under chapters 7, 11, 12, or 13 of the Bankruptcy Code (such borrowers, the "**Bankrupt Borrowers**"). In connection with such cases, from time to time, the Debtors file, or direct their counsel or agents to file, documents required by the Bankruptcy Code and Bankruptcy Rules,

including proofs of claims, notices of payment change, notices of postpetition fees, responses to notices of final cures, motions to lift the automatic stay, and related amendments and appeals. Given the importance of allowing Bankrupt Borrowers to timely prosecute their bankruptcy cases, as well as the unnecessary degree of complexity and costs that would accrue against the Debtors' estates by requiring Bankrupt Borrowers, trustees duly appointed under the Bankruptcy Code in a Bankrupt Borrower's bankruptcy case, or the United States Trustees assigned to oversee such cases, to obtain stay relief with respect to routine actions in the prosecution of such Bankrupt Borrower's bankruptcy case, I believe that limited relief from the automatic stay is merited.

120.    Finally, the Debtors are often a party to actions involving the amount, validity, and/or priority of liens with respect to properties subject to mortgages owned or serviced by the Debtors (such actions, "**Title Disputes**").  Prosecuting such disputes allows the Debtors to clear title to the underlying property and thereby protect its rights and remedies with respect thereto.  Thus, for similar reasons of judicial economy and estate resources discussed above, the Debtors request that the Court enter a standing order modifying the automatic stay to allow Interested Parties to assert a defense, including the appeals of such, in Title Disputes.

### c.  Assurances of Future Performance

121.    Fannie Mae, Freddie Mac, and Ginnie Mae have each requested, and the Debtors have agreed, subject to Court approval, to provide certain assurances regarding the Debtors' ability to originate, sell, service, and securitize the Fannie Mae Loans, Freddie Mac Loans, and Ginnie Securitized Loans, respectively, during the course of these chapter 11 cases. The form of these assurances was negotiated at arms' length and with the assistance of independent counsel, and the Debtors believe they are fair and reasonable.  In addition, the

WEIL:\96914025\1\41703.0010

Debtors' debtor in possession financing is conditioned upon the Debtors' continued operations in the ordinary course. Thus, it is essential that the Debtors be authorized to provide such assurances to Fannie Mae, Freddie Mac, and Ginnie Mae, respectively. The Debtors have every intention of maintaining their origination, servicing, and with respect to Ginnie Securitized Loans, securitization-related, operations in accordance with the standards and requirements set forth in the Agency Agreements.

> **iv.** **Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to Continue Honoring Reverse Issuer and Servicing Obligations in the Ordinary Course and Granting Related Relief, (II) Modifying Automatic Stay on a Limited Basis to Facilitate Debtors' Ongoing Operations, and (III) Scheduling a Final Hearing (the "RMS OCB Motion")**

122. The Debtors request entry of an order authorizing, but not directing, the Debtors to continue in the ordinary course of business, among other things: (a) (i) honor and fund the Ginnie Mae Buyout Obligations, (ii) continue their activities, (iii) honor the Ginnie Mae Agreements; and (iv) remit the Ginnie Mae Commitment Fee, the Ginnie Mae Guaranty Fee, amounts due from Borrower Paydown (each as defined below), and certain administrative fees arising from RMS's securitization activities; (b) (i) honor the Servicing Obligations, including by continuing to perform under the Fannie Mae Agreements and honor their obligations under the MECA, (ii) honor and pay the Curtailment Obligations, (iii) collect and securitize the Servicing Fees, and (iv) remit the Servicer Advances (each as defined below); (c) continue submitting assignment or reimbursement claims to FHA; (d) pay prepetition and postpetition claims of the Critical Servicing Vendors in the aggregate amount; (e) continue honoring their indemnification obligations to FHA in connection with defective loans; (f) fulfill compliance and regulatory obligations; and (g) provide assurances of future performance to Ginnie Mae and Fannie Mae.

The Debtors also request that the Court enter a standing order modifying the automatic stay in connection with foreclosure and eviction proceedings.

123.    RMS performs mortgage servicing primarily in accordance with the FHA servicing guidelines (the "**FHA Servicing Guidelines**"), which impose numerous obligations on qualified servicers such as RMS.  Similar to the FHA Servicing Guidelines, the Ginnie Mae Agreements impose substantial obligations on qualified issuers of MBS such as RMS.  Any disruptions to RMS's ability to perform under and comply with the FHA Servicing Guidelines and the Ginnie Mae Guide in the ordinary course—whether as an issuer of Ginnie Mae guaranteed securitizations or as a servicer—could lead to a catastrophic loss of value for the Debtors' estates, major disruption in the reverse mortgage securitization market, and a temporary loss of income for thousands of reverse mortgage borrowers, most of whom are senior citizens relying on such loan payments for essential living and medical expenses.  Furthermore, if RMS fails to comply with the FHA Servicing Guidelines, it could face the possible termination of its servicing rights without compensation, which include the right to receive reimbursements from FHA.  Such termination could result in the loss of future servicing fees, cause the loss of reimbursement of servicing advances by FHA to RMS of approximately $68 million, and create substantial harm to the Debtors' estates.  Similarly, a failure to comply with the Ginnie Mae Guide may result in a default subject to the terms and conditions of the Cross-Default Agreement, pursuant to which the interests of both RMS and Ditech in the applicable underlying reverse and forward mortgage portfolios could be extinguished without compensation or any rights of reimbursement; and a default subject to the terms and conditions of Ginnie Mae Servicing Agreements.

54

**80**

124.     As a servicer and subservicer of Fannie Mae owned loans (collectively, the "**Fannie Mae Loans**"),[12] RMS must comply with the Fannie Mae Mortgage Selling and Servicing Contract, which includes that certain Servicing Guide: Fannie Mae Single Family and that certain Fannie Mae Reverse Mortgage Loan Servicing Manual (collectively, the "**Fannie Mae Servicing Guides**"), and RMS's obligations thereunder are secured pursuant to that certain Pledge and Security Agreement dated as of December 19, 2014 (the "**Fannie Mae Pledge Agreement**" and together with the Fannie Mae Mortgage Selling and Servicing Contract and the Fannie Mae Servicing Guides, together with all supplements, addendums, amendments, and related agreements, the "**Fannie Mae Agreements**").   The Fannie Mae Agreements generally provide that Fannie Mae can terminate servicers either at will or for cause, among other reasons. Accordingly, if RMS does not honor its servicing or subservicing obligations with respect to the Fannie Mae loans, Fannie Mae may take the position that it has the right to unilaterally terminate RMS's servicing and/or subservicing rights, which could result in the loss of a significant portion of the Debtors' revenue.

125.     Further, if the relief requested in the RMS OCB Motion is not granted, the Debtors will not be able to secure debtor in possession financing and administer these chapter 11 cases.  Approval of RMS OCB Motion and the ability to comply with and remain an approved servicer and subservicer with Ginnie Mae and Fannie Mae are conditions to the debtor in possession financing.

126.     It is imperative that the Debtors be permitted to continue to operate their business in the ordinary course of business without interruption.  If the relief requested in the

---

[12]   In addition to servicing and subservicing Fannie Mae Loans, RMS also acts as the REO property manager for HECMs guaranteed by Fannie Mae and held in the Mortgage Equity Conversion Asset Trust 2011-1 (the "**MECA**") and is responsible for, among other things, disposition of the related REO properties and remitting the sale proceeds (the "**MECA REO Sale Proceeds**") to the servicer under the MECA.

WEIL:\96914025\1\41703.0010

RMS OCB Motion is not granted, the Debtors' ability to administer their chapter 11 cases would

be jeopardized.  The Debtors believe that the relief requested will preserve the value-maximizing

reorganization transaction contemplated by the Restructuring Support Agreement.  Furthermore,

each of the activities for which the Debtors seek authorization to continue are consistent with

both the Debtors' prepetition conduct and with customary practices in the reverse mortgage loan

servicing industry.

### a.  Critical Vendors

127.    In connection with its servicing activities, RMS utilizes the services of

numerous third-party vendors, service providers, and professionals that are critical to operations

(collectively, "**Critical RMS Vendors**"), who perform a variety of critical functions for the

Debtors.

128.    Employing these specialized vendors is more cost-effective than

performing such activities in-house; indeed, replacing certain of these vendors would not only be

difficult and disruptive, but cost-prohibitive as well.  The Debtors has developed long-standing

relationships with these vendors, which has enabled RMS to negotiate favorable pricing, credit

terms, and priority scheduling.  Any failure to timely honor RMS's prepetition obligations to the

Critical Vendors could jeopardize these relationships, and any interruption of their services for

even a short period of time would impair RMS's business operations and the value of these

businesses.

129.    Through the RMS OCB Motion and the Ditech OCB Motion, the Debtors

request authority, but not direction, to continue to employ and pay the prepetition obligations of,

in the Debtors' sole discretion, the Critical RMS Vendors and the Critical Ditech Vendors (as

defined in the Ditech OCB Motion) (collectively, the "**Critical Vendors**").  The Debtors seek to

pay (a) up to <u>approximately $35 million</u> of such prepetition amounts to Critical Vendors during

the first thirty (30) days of these chapter 11 cases, of which the Debtors expect <u>approximately</u> <u>$30.6 million</u> will either be prefunded or reimbursed to the Debtors and (b) up to <u>approximately</u> <u>$40 million</u> of such prepetition amounts to Critical Vendors on a final basis.

### b.  Limited Relief from the Automatic Stay

130.    RMS is currently party to approximately 6,000 judicial and non-judicial foreclosure proceedings and more than 600 eviction proceedings.  In such proceedings it is not uncommon for borrowers and tenants to raise claims, defenses and related counter-claims against RMS to preserve their respective interests in underlying property as owner or tenant.  I am advised that such claims, cross-claims, third-party claims, and counter-claims, whether asserted by borrowers in foreclosure actions or by tenants in eviction actions and whether commenced prior to, on, or after the Commencement Date, are or may become subject to the automatic stay pursuant to section 362(a) of the Bankruptcy Code.  Requiring each of these parties to obtain stay relief in order to assert such counter-claims would likely add an unnecessary degree of complexity, costs, and delay to both the foreclosure process described herein and the administration of these chapter 11 cases.

131.    In addition, certain of the borrowers on loans serviced or subserviced by the Debtors have sought, or may seek during the pendency of these cases, bankruptcy protection under chapters 7, 11, 12, or 13 of the Bankruptcy Code (such borrowers, the "**Bankrupt Borrowers**").  In connection with such cases, from time to time, the Debtors file, or direct their counsel or agents to file, documents required by the Bankruptcy Code and Bankruptcy Rules, including proofs of claims, notices of payment change, notices of postpetition fees, responses to notices of final cures, motions to lift the automatic stay, and related amendments and appeals.  Given the importance of allowing Bankrupt Borrowers to timely prosecute their bankruptcy cases, as well as the unnecessary degree of complexity and costs that would accrue against the

Debtors' estates by requiring Bankrupt Borrowers, trustees duly appointed under the Bankruptcy Code in a Bankrupt Borrower's bankruptcy case, or the United States Trustees assigned to oversee such cases, to obtain stay relief with respect to routine actions in the prosecution of such Bankrupt Borrower's bankruptcy case, I believe that limited relief from the automatic stay is merited.

132.     Finally, the Debtors are often a party to actions involving the amount, validity, and/or priority of liens with respect to properties subject to mortgages owned or serviced by the Debtors (such actions, "**Title Disputes**").  Prosecuting such disputes allows the Debtors to clear title to the underlying property and thereby protect its rights and remedies with respect thereto.  Thus, for similar reasons of judicial economy and estate resources discussed above, the Debtors request that the Court enter a standing order modifying the automatic stay to allow Interested Parties to assert a defense, including the appeals of such, in Title Disputes.

### c.  Assurances of Future Performance

133.     Ginnie Mae and Fannie Mae each requested, and the Debtors have agreed, subject to Court approval to provide certain assurances regarding RMS's ability to continue, among other things, honoring its obligations in accordance with the Ginnie Mae Guide and service the Fannie Mae Loans, respectively, during the pendency of these chapter 11 cases.  The form of these assurances was negotiated at arms' length and with the assistance of independent counsel, and the Debtors believe they are fair and reasonable.  In addition, the Debtors' access to the DIP Facility is conditioned upon the Debtors' continued operations in the ordinary course.  Thus, it is essential that the Debtors be authorized to provide such assurances to Ginnie Mae and Fannie Mae, respectively.  The Debtors have every intention of maintaining their servicing and subservicing, and with respect to Ginnie Mae securitized loans, securitization-related operations

in accordance with the standards and requirements set forth in the Ginnie Mae Agreements and

Fannie Mae Agreements, as applicable.

> **v.    Motion of Debtors for (I) Authority to (A) Pay Employee Obligations and (B) Continue Employee Benefit Programs, and (II) Related Relief (the "Wages Motion")**

134.    The Debtors request the entry of interim and final orders authorizing, but

not directing, the Debtors to pay and honor certain prepetition claims and obligations, continue

programs and maintain funding, in the exercise of their discretion, relating to, among other

things: (i) Unpaid Compensation; (ii) Payroll Taxes; (iii) Deductions; (iv) Supplemental

Workforce Agencies; (v) Reimbursable Expenses; (vi) Employee Benefit Programs; (vii) the

Non-Insider Severance Program; (viii) the 401(k) Savings Plan; and (ix) Compensation

Programs, solely with respect to non-insider Employees.

135.    The relief requested includes compensation for the Debtors' full-time,

part-time, and temporary employees, and independent contractors and consultants that provide

services related to various aspects of the Debtors' operations and are vital to the Debtors'

businesses. As of the date hereof, certain prepetition obligations to such employees and

supplemental workers may be due and owing.

136.    As of the Commencement Date, the Debtors employ approximately 2,900

full-time employees, 10 part-time employees, and 15 temporary employees.  The majority of the

Debtors' workforce relies on the Debtors' compensation, benefits and reimbursement of

expenses to satisfy daily living expenses.  The workforce will be exposed to significant financial

difficulties if the Debtors are not permitted to honor obligations for unpaid compensation,

benefits and reimbursable expenses.  Moreover, if the Debtors are unable to satisfy such

obligations, morale and loyalty will be jeopardized at a time when support is critical.  In the

WEIL:\96914025\1\41703.0010

absence of such payments, the workforce may seek alternative employment opportunities, including with the Debtors' competitors, hindering the Debtors' ability to meet its customer obligations and, likely, diminishing stakeholder confidence in the Debtors' ability to successfully carry out their chapter 11 strategy. Loss of valuable employees would have a devastating impact on the sustainability of the Debtors' businesses and would jeopardize the success of the Debtors' chapter 11 strategy.

### vi. Motion of Debtors for Authority to Pay Certain Prepetition Taxes and Fees (the "Taxes and Fees Motion")

137.   The Debtors request authorization to pay taxes, assessments, fees, and other charges (collectively, the "**Taxes and Fees**"), in the ordinary course of business, including any such Taxes and Fees subsequently determined, upon audit or otherwise, to be owed, and whether accrued or arose before or after the Commencement Date.

138.   In the ordinary course of operating their business, the Debtors collect, withhold, and incur an assortment of Taxes and Fees that they remit periodically to various federal, state, and local taxing, licensing, regulatory, and other governmental authorities (collectively, the "**Authorities**"). The Taxes and Fees generally fall into the following categories, each of which is discussed in more detail in the Motion: (i) sales and use taxes, (ii) franchise and income taxes, (iii) property taxes, (iv) other taxes, and (v) fees. The Debtors seek to pay certain prepetition Taxes and Fees in order to, among other things, forestall Authorities from taking actions that might interfere with the administration of this Chapter 11 Case, which may include bringing personal liability actions against directors, officers, and other key employees (whose full-time attention to the Debtors' Chapter 11 Cases is required to avoid business disruptions and maximize recoveries to the Debtors' creditors), asserting liens on the Debtors' property or assessing penalties and/or significant interest on past-due taxes. In

addition, the non-payment of such Taxes and Fees may give rise to priority claims pursuant to section 507(a)(8) of the Bankruptcy Code.  Accordingly, I believe that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest, and will enable the Debtors to continue to operate their businesses.

### vii.    Motion of Debtors for an Order Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Claims Against and Equity Interests in the Debtors (the "NOL Motion")

139.    Pursuant to sections 105(a) and 362 of title 11 of the Bankruptcy Code, the Debtors request authority to establish procedures (the "**Procedures**") to protect the potential value of the Debtors' consolidated net operating loss carryforwards ("**NOLs**") and other tax attributes, including the so-called "net unrealized built-in losses" (collectively, the "**Tax Attributes**").

140.    The Debtors estimate that, as of January 1, 2019, they had incurred, for U.S. federal income tax purposes, a consolidated NOL in excess of $40 million and, as of the Commencement Date, they have a substantial "net unrealized built-in loss" for U.S. federal income tax purposes (in significant part attributable to the tax basis of their assets).  The Debtors' estimates of the amounts of these tax attributes is subject to variability, depending (among other things) on elections that the Debtors may make, available under applicable tax law, in respect of the Debtors' restructuring completed in 2018; these elections would be made with the Debtors' 2018 tax return, expected to be filed in October 2019, but, regardless of which tax elections are or are not made, the Debtors would continue to have significant tax attributes during the pendency of these chapter 11 cases, and may emerge from these cases with significant tax attributes as well.

61

141.    Title 26 of the United States Code (the "**Tax Code**") generally permits corporations to carry forward their tax attributes to reduce future taxable income. Accordingly, the Tax Attributes are available to offset any income realized through the taxable year that includes the effective date of a chapter 11 plan, and potentially thereafter. Accordingly, I believe the Tax Attributes could translate into future tax savings over time and any such savings could enhance the Debtor's cash position for the benefit of all parties in interest and contribute to the Debtor's efforts toward a successful reorganization.

142.    The Debtors' ability to use its Tax Attributes to offset future income or tax liability is subject to certain statutory limitations. Specifically, sections 382 and 383 of the Tax Code limit a corporation's use of its NOLs and certain other tax attributes to offset future income or tax after the corporation experiences an ownership change. These limitations also apply to the use of losses recognized after the change in ownership to the extent the losses were "built-in" prior to the change in ownership ("**Built-In Losses**"). For purposes of section 382 of the Tax Code, a change of ownership occurs when the percentage of a loss company's equity held by one or more "5% shareholders" (as such term is defined in section 382 of the Tax Code) increases by more than 50 percentage points over the lowest percentage of stock owned by such shareholder(s) at any time during the relevant statutory testing period (usually three years). A section 382 change of ownership prior to the effective date of a chapter 11 plan would effectively eliminate or substantially curtail the Debtors' ability to use the Tax Attributes, thereby resulting in a significant loss of value.

143.    The limitations imposed by section 382 in the context of an ownership change pursuant to a confirmed plan of reorganization are significantly more relaxed than those applicable outside chapter 11. *See* 26 U.S.C. §§ 382(l)(5), (6). Under section 382(l)(5) of the

WEIL:\96914025\1\41703.0010

Tax Code, a corporation is not subject to the annual limitation ordinarily imposed by section 382 with respect to an ownership change resulting from consummation of a plan of reorganization, provided that the debtor's pre-change shareholders (i.e., persons or entities who owned the debtor's stock immediately before the relevant ownership change) and/or Qualified Creditors (as defined in the NOL Motion) emerge from the reorganization owning at least 50% of the total value and voting power of the debtor's stock immediately after the ownership change.  26 U.S.C. § 382(1)(5)(A) (the "**382 (l)(5) Safe Harbor**").

144.    The proposed procedures are necessary to preserve the Debtors' ability to use the Tax Attributes, which are valuable assets of the Debtors' estates, while providing latitude for trading in volumes of DHCP Stock (as defined in the NOL Motion) below specified levels.  The Debtors' ability to meet the requirements of the tax law to preserve the Tax Attributes may be seriously jeopardized unless procedures are established to ensure that trading in DHCP Stock is closely monitored, and, where necessary, precluded, and made subject to Court approval.  The trading in DHCP Stock, even by/among larger stockholders, may not, at this time, pose a serious risk to the Tax Attributes so long as such transfers are monitored and do not exceed certain levels, and thus the restrictions and procedures set forth in the Motion preserve the Debtor's ability to waive in writing, in appropriate circumstances, any and all restrictions, stays, and notification procedures contained in the Motion.

145.    It is in the best interests of the Debtors, the Debtors' estates, its creditors, and its stakeholders to restrict stock and claims trading that could result in a change of ownership under section 382 of the Tax Code before the effective date of a plan of reorganization.  If such a change of ownership occurs during the pendency of the chapter 11 cases, the section 382 limitation on subsequent use of the Tax Attributes would be based on the value of the Debtors,

and I believe the valuation for determining the annual amount of useable NOLs and Built-In Losses would be very low.

146.    In addition, the 382(l)(5) Safe Harbor described above may create significant incremental benefit to the Debtors following emergence from bankruptcy. Among other things, the Debtors' "net unrealized built-in losses," calculated as of the effective date of the plan of reorganization, would not be subject to the annual limitation when realized in a post-change period. Consequently, the Debtors currently contemplate that, assuming they will be eligible therefore, they will avail themselves of the 382(l)(5) Safe Harbor. The requested relief has been narrowly tailored to permit trading of claims in amounts expected to be below the de minimis rule, thus preserving Debtors' ability to avail itself of the 382(l)(5) Safe Harbor while allowing free trading of claims that would not jeopardize Debtors' ability to do so.

147.    Although there can be no assurance that the 382(1)(5) Safe Harbor ultimately will be available to the Debtors, it is important that the Debtors preserve the ability to take advantage of that safe harbor. Because the determination of whether a creditor is "qualified" depends on whether such creditor has held its Claim until the effective date of the plan of reorganization, transfers of Claims by creditors before such date pose a threat to the Debtors' ability to satisfy the requirements of the safe harbor. Likewise, because transfers of DHCP Stock by or into the hands of 5% shareholders before the effective date of the plan of reorganization could trigger a section 382 ownership change that would impose a severe annual limitation on the Debtors' use of the Tax Attributes (even if the Debtors later satisfied the requirements of the 382(1)(5) Safe Harbor in connection with a second ownership change resulting from the plan) such pre-plan transfers pose a threat to the post-reorganization value of the Tax Attributes. I believe the requested relief will ensure that the Debtors have maximum

64

flexibility to implement a plan that meets the requirements of the 382(1)(5) Safe Harbor and thus preserves the Tax Attributes to the fullest extent.

> viii.    **Motion of Debtors for (I) Authorization to (A) Continue to Maintain Their Insurance Policies and Programs and Surety Bond Program and (B) Honor All Obligations with Respect Thereto and (II) Modification of the Automatic Stay with Respect to the Workers' Compensation Program. (the "Insurance Motion")**

148.    The Debtors request (i) authority, but not direction, to (a) maintain and renew, in their sole discretion, the Insurance Policies and Programs (including the Workers' Compensation Program) and the Surety Bond Program (each as defined in the motion), (b) continue honoring their Insurance and Surety Obligations (each as defined herein), including posting any collateral in connection therewith, on a postpetition basis in the ordinary course of business, and (c) pay accrued and outstanding prepetition amounts due in connection with the Surety Obligations; and (ii) modification of the automatic stay to the extent necessary to permit the Debtors' employees to proceed with any claims they may have under the Workers' Compensation Program.

149.    Postpetition, the Debtors' insurance policies and workers' compensation programs will be essential to the preservation of the value of the Debtors' business, properties and assets, and, in certain instances, are required by law.  If any of the Debtors' insurance policies are terminated or lapse, the Debtors would be exposed to substantial liability to the detriment of all parties in interest and could be in violation of law.  State law may prohibit the Debtors from operating without certain insurance.  Additionally, given that the Debtors' insurance carriers and insurance broker are intimately familiar with the Debtors' insurance policies, even the temporary loss of their services would be detrimental to the Debtors'

WEIL:\96914025\1\41703.0010

estates. Accordingly, authorization to continue to honor all insurance-related obligations is critical to the continued operation of the Debtors' business.

150. With respect to the Surety Bond Program, to continue their business operations during these chapter 11 cases, the Debtors must be able to provide financial assurances to various third parties, including municipalities, state and federal governmental units, and public agencies. This requires the Debtors to maintain their existing Surety Bond Program, including the payment of the Surety Premiums as and when they come due, providing the Sureties with collateral, and renewing or potentially acquiring additional bonding capacity as needed in the ordinary course of the Debtors' business. A failure to maintain the Surety Bond Program may result in violations of applicable law, which could be disruptive to the Debtors' operations. Obtaining authority to honor obligations arising in connection with the Surety Bond Program is essential to preserving the Debtors' business and the value of the Debtors' estates for all parties in interest.

### ix. Application of Debtors Requesting Authority to Retain and Employ Epiq as Claims and Noticing Agent *Nunc Pro Tunc* to the Commencement Date (the "Epiq Retention Motion")

151. The Debtors request authority to appoint Epiq Corporate Restructuring, LLC ("**Epiq**") as claims and noticing agent ("**Claims and Noticing Agent**") in accordance with the terms and conditions specified in the Engagement Agreement by and between the Debtors and Epiq (the "**Engagement Agreement**"), effective as of the Commencement Date. Epiq's duties will include assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim, filed in the Debtors' chapter 11 cases.

66

152.    I believe the Debtors' selection of Epiq to serve as its Claims and Noticing Agent has satisfied the Bankruptcy Court's Protocol for the Employment of Claims and Noticing Agents Under 28 U.S.C. § 156(c).  Specifically, the Debtors have solicited and reviewed engagement proposals from at least two other Court-approved claims and noticing agents to ensure selection through a competitive process.  I believe that Epiq's rates are competitive and reasonable given Epiq's quality of services and expertise.  The terms of Epiq's retention are set forth in the Engagement Agreement attached to, and filed contemporaneously therewith, the Claims and Noticing Agent Retention Application.  Appointing Epiq as the Debtors' Claims and Noticing Agent will maximize the efficiency of the distribution of notices and the processing of claims, as well as relieve the Office of the Clerk of the Bankruptcy Court of the administrative burden of processing an overwhelming number of claims.

## VI.
## Information Required by Local Rule 1007

153.    In accordance with Local Rule 1007-2, the schedules attached hereto provide certain information related to the Debtors.

154.    Pursuant to Local Rule 1007-2(a)(3), **Schedule 1** hereto lists the names and addresses of the members of, and attorneys for, any official committee organized prior to the Commencement Date and a brief description of the circumstances surrounding the formation of the committee and the date of its formation.

155.    Pursuant to Local Rule 1007-2(a)(4), **Schedule 2** hereto lists the holders of the Debtors' forty (40) largest unsecured claims on a consolidated basis, excluding claims of insiders.

156.    Pursuant to Local Rule 1007-2(a)(5), **Schedule 3** hereto lists the holders of the five (5) largest secured claims against the Debtors on a consolidated basis.

157.     Pursuant to Local Rule 1007-2(a)(6), **Schedule 4** hereto provides a summary of the (unaudited) consolidated assets and liabilities for the Debtors and their non-Debtor affiliates.

158.     Pursuant to Local Rule 1007-2(a)(7), **Schedule 5** hereto provides the following information: the number and classes of shares of stock, debentures, and other securities of the Debtors that are publicly held and the number of record holders thereof; and the number and classes of shares of stock, debentures, and other securities of the Debtors that are held by the Debtors' directors and officers, and the amounts so held.

159.     Pursuant to Local Rule 1007-2(a)(8), **Schedule 6** hereto provides a list of all of the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity, giving the name, address, and telephone number of each such entity and the location of the court in which any proceeding relating thereto is pending.

160.     Pursuant to Local Rule 1007-2(a)(9), **Schedule 7** hereto provides a list of the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses.

161.     Pursuant to Local Rule 1007-2(a)(10), **Schedule 8** hereto provides the location of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

162.     Pursuant to Local Rule 1007-2(a)(11), **Schedule 9** hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the

Debtors or their property where a judgment against the Debtors or a seizure of their property may be imminent.

163.    Pursuant to Local Rule 1007-2(a)(12), **Schedule 10** hereto provides a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

164.    Pursuant to Local Rule 1007-2(b)(1)-(2)(A), **Schedule 11** hereto provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors, stockholders, and partners) and the estimated amount to be paid to officers, stockholders, directors, members of any partnerships, and financial and business consultants retained by the Debtors for the thirty (30) day period following the filing of the Debtors' chapter 11 cases as the Debtors intend to continue to operate their businesses.

165.    Pursuant to Local Rule 1007-2(b)(3), **Schedule 12** hereto provides, for the thirty (30) day period following the filing of the chapter 11 cases, a list of estimated cash receipts and disbursements, net cash gain or loss, obligations, and receivables expected to accrue that remain unpaid, other than professional fees.

## Conclusion

166.    This declaration illustrates the factors that have precipitated the commencement of the chapter 11 cases and the critical need for the Debtors to implement the Transaction.

[Execution Page Follows]

WEIL:\96914025\1\41703.0010

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed this 11th day of February, 2019

/s/ Gerald A. Lombardo
Gerald A. Lombardo
Chief Financial Officer
Ditech Holding Corporation

**96**

**Exhibit A**

**Corporate Organizational Chart**



Ditech Holding Corporation
Mid-State Capital, LLC
Walter Reverse Acquisition LLC
Hanover SPC-A, Inc.
Green Tree Credit Solutions LLC
Marix Servicing LLC
WIMC Real Estate Investment LLC
Reverse Mortgage Solutions, Inc.
Green Tree Insurance Agency of Nevada, Inc.
Walter Management Holding Company LLC
DF Insurance Agency LLC
Green Tree Investment Holdings III LLC
Mortgage Asset Systems, LLC
REO Management Solutions, LLC
RMS REO BRC, LLC
RMS REO CS, LLC
RMS REO BRC II, LLC
RMS 2018-09, LLC
Green Tree Credit LLC
Green Tree Servicing Corp.
(non-economic member of Ditech Financial LLC)
Ditech Financial LLC
Green Tree Advance Receivables III LLC
Ditech Agency Advance Depositor LLC
Ditech PLS Advance Depositor LLC

**Exhibit B**

**Restructuring Support Agreement**

EXECUTION VERSION

# RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, and including any exhibits or schedules hereto, this "***Agreement***"), dated as of February 8, 2019, is entered into by and between:

(i)  Ditech Holding Corporation and its direct and indirect subsidiaries (the "***Company***"); and

(ii)  each undersigned entity, in each such entity's respective capacity as lender under, or as nominee, investment adviser, sub-adviser, or investment manager, as applicable, to certain funds, accounts, and other entities (including subsidiaries and affiliates of such funds, accounts, and entities) that is a lender (in its respective capacity as such, each, a "***Term Lender***," and, collectively, the "***Term Lenders***" and, together with their respective successors and permitted assigns and any subsequent Term Lender that becomes party hereto in accordance with the terms hereof, each, a "***Consenting Term Lender***," and, collectively, the "***Consenting Term Lenders***") party to that certain Second Amended and Restated Credit Agreement, dated as of February 9, 2018 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "***Credit Agreement***," and the term loan facility thereunder, the "***Term Loan Facility***"), by and among the Company, as the borrower, Credit Suisse AG, Cayman Islands Branch (formerly Credit Suisse AG), as administrative agent (together with any successor administrative agent, in each case, in such capacity, the "***Administrative Agent***"), the other term lenders party thereto and the other lenders party thereto.

The Company, each Consenting Term Lender, and any subsequent Person that becomes a party hereto in accordance with the terms hereof are referred to herein as the "***Parties***" and individually as a "***Party***."

**WHEREAS**, the Parties have agreed to the Restructuring consistent with the terms and subject to the conditions set forth herein, including in the Term Sheet, which are the product of arm's-length, good faith discussions between the Parties and their respective professionals;

**WHEREAS**, as of the date hereof, the Consenting Term Lenders in the aggregate hold, or act as the nominee, investment adviser, sub-adviser, or investment manager to entities that hold, as of the date hereof, more than $66^{2/3}\%$ of the aggregate outstanding principal amount of the Loans and Commitments (each as defined in the Credit Agreement);

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment in respect of the matters discussed in the Term Sheet and hereunder.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

## 1.    Certain Definitions.

Capitalized terms used but not defined herein shall have the meaning ascribed to them in the restructuring term sheet attached hereto as **Exhibit A** (together with all schedules, exhibits, and annexes attached thereto, and as may be modified in accordance with Section 9 hereof, the "**Term Sheet**"), or as the context otherwise requires.

As used in this Agreement, the following terms have the following meanings:

(a)    "**Alternative Transaction**" means any plan, dissolution, winding up, liquidation, sale or disposition, reorganization, merger or restructuring of the Company or its assets other than the Restructuring, as set forth herein, including in the Term Sheet;

(b)    "**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended from time to time.

(c)    "**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157, pursuant to 28 U.S.C. § 151, the United States District Court for the Southern District of New York.

(d)    "**Bidding Procedures Motion**" means a motion filed by the Debtors with the Bankruptcy Court for entry of a Bidding Procedures Order.

(e)    "**Bidding Procedures Order**" means any order (1) approving Bidding Procedures, and (2) setting dates for the submission of bids and the auction (if any), and (3) granting related relief.

(f)    "**Commencement Date**" means the date that Debtors commence the Chapter 11 Cases.

(g)    "**Confirmation Order**" means an order of the Bankruptcy Court confirming the Plan.

(h)    "**Definitive Documents**" means the documents (including any related orders, agreements, instruments, schedules or exhibits) that are contemplated by the Term Sheet and that are otherwise necessary or desirable to implement, or otherwise relate to the Restructuring and the Restructuring Transactions, including:  (A) the Plan; (B) the Bidding Procedures; (C) the Bidding Procedures Motion; (D) the Bidding Procedures Order; (E) each of the documents comprising the Plan Supplement; (F) the Disclosure Statement; (G) any motion seeking the approval of the adequacy of the Disclosure Statement and solicitation of the Plan; (H) the Confirmation Order; (I) the motion for use of cash collateral and to incur postpetition financing and any credit agreement with

2

respect thereto (the "***Financing Motion***"); (J) any Financing Orders, and (K) any asset purchase agreement for the Sale Transaction or an Asset Sale Transaction. Each of the Definitive Documents shall contain terms and conditions consistent in all material respects with this Agreement and the Term Sheet, and, except to the extent such Definitive Documents must be acceptable to the Requisite Term Lenders in accordance with the Term Sheet, shall otherwise be reasonably acceptable in all material respects to the Required Parties, including with respect to any modifications, amendments, or supplements to such Definitive Documents at any time during the Support Period; provided, that the terms of the Plan and Confirmation Order with respect to the treatment of the Term Loans and the treatment of any matters with respect to the Credit Agreement or any economic interest of the Term Lenders, and the Financing Motion and the Financing Orders shall be acceptable in all material respects to the Requisite Term Lenders.

(i)       "***Effective Date***" means the date on which the Plan is consummated.

(j)       "***Financing Orders***" means any orders authorizing Debtors to continue to access cash collateral and incur any postpetition financing on an interim basis or final basis consistent with the Term Sheet.

(k)       "***Outside Commencement Date***" means February 15, 2019.

(l)       "***Person***" means any "person" as defined in section 101(41) of the Bankruptcy Code, including, without limitation, any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof or other entity.

(m)       "***Plan Supplement***" means the plan supplement to the Plan, comprising the following documents, as applicable:  (A) the Amended and Restated Credit Facility Agreement, (B) new organizational documents, (C) the Exit Working Capital Facility documentation, (D) the Management Incentive Plan, (E) shareholders agreement, (F) a schedule of executory contracts and unexpired leases to be assumed and an associated notice of cure amount, (G) a schedule of retained causes of action, (H) any other documents the Company and the Requisite Term Lenders agree shall comprise the Plan Supplement.

(n)       "***Required Lenders***" means the "Required Lenders" as defined in the Credit Agreement.

(o)       "***Required Parties***" means each of (A) the Company and (B) the Requisite Term Lenders.

(p)       "***Requisite Term Lenders***" means, as of the date of determination, Consenting Term Lenders holding at least a majority in aggregate principal amount outstanding of the Term Loans held by the Consenting Term Lenders as of such date.

(q)  "***Restructuring Transactions***" means all acts, events, and transactions contemplated by, required for, and taken to implement the Restructuring, the Definitive Documents, the Plan Supplement, this Agreement, and the Elected Transaction (as defined below), each in the singular and collectively, as applicable.

(r)  "***SEC***" means the Securities & Exchange Commission.

(s)  "***Securities Act***" means the Securities Act of 1933, as amended.

(t)  "***Support Effective Date***" means the date on which the counterpart signature pages to this Agreement shall have been executed and delivered by the Company and Consenting Term Lenders (A) holding at least $66^{2/3}$% in aggregate principal amount outstanding of the Term Loans and (B) representing the Required Lenders.

(u)  "***Support Period***" means the period commencing on the Support Effective Date and ending on the earlier of the (A) date on which this Agreement is terminated in accordance with Section 5 hereof and (B) the Effective Date.

## 2.  Term Sheet and Plan.

The Term Sheet is expressly incorporated herein by reference and made part of this Agreement as if fully set forth herein.  The Term Sheet, including the schedules, annexes and exhibits thereto, sets forth certain material terms and conditions of the Restructuring. Notwithstanding anything else in this Agreement to the contrary, in the event of any inconsistency between this Agreement and the Term Sheet, the Term Sheet shall control.

## 3.  Agreements of the Consenting Term Lenders.

(a)  Agreement to Support.  During the Support Period, subject to the terms and conditions hereof, each of the Consenting Term Lenders agrees, severally and not jointly, that it shall:

(i)  use its commercially reasonable efforts to support the Restructuring and the Restructuring Transactions, and to act in good faith and take any and all reasonable actions necessary to consummate the Restructuring and the Restructuring Transactions, in a manner consistent with this Agreement;

(ii)  refrain from initiating (or directing or encouraging the Administrative Agent or any other party to initiate) any actions, including legal proceedings, that are inconsistent with, or that would delay, prevent, frustrate or impede the approval, confirmation or consummation, as applicable, of the Restructuring or Restructuring Transactions;

(iii)  timely vote (pursuant to the Plan) or cause to be voted all of its Claims (including on account of the Second Lien Notes, or any securities, owned or controlled by such Consenting Term Lender) to accept the Plan by delivering its duly executed and completed ballot or ballots, as applicable, accepting the Plan on a timely

4

basis following commencement of the solicitation of acceptances of the Plan in accordance with sections 1125 and 1126 of the Bankruptcy Code;

(iv)    negotiate in good faith with the Company the forms of the Definitive Documents (to the extent such Consenting Term Lender is a party thereto) and subject to the consent thresholds specified herein execute the Definitive Documents;

(v)    not change or withdraw its votes to accept the Plan (or cause or direct such vote to be changed or withdrawn); provided, however, that such vote shall, without any further action by the applicable Consenting Term Lender, be deemed automatically revoked (and, upon such revocation, deemed void *ab initio*) by the applicable Consenting Term Lender at any time following the expiration of the Support Period with respect to such Consenting Term Lender;

(vi)    not directly or indirectly, through any Person, take any action that would reasonably be expected to prevent, interfere with, delay or impede the consummation of the Restructuring or Restructuring Transactions, including the approval of any Bidding Procedures Motion, the entry of any Bidding Procedures Order, the approval of the Disclosure Statement, or the solicitation of votes on, and confirmation of, the Plan;

(vii)    use its commercially reasonable efforts to support and take all actions as are reasonably necessary and appropriate for such Consenting Term Lender to obtain any and all required regulatory and/or third-party approvals for such Consenting Term Lender to consummate the Restructuring Transactions; and

(viii)    support and take all reasonable actions necessary or reasonably requested by the Company to confirm such Consenting Term Lender's support for the Bankruptcy Court's approval of the Bidding Procedures Motion, the entry of any Bidding Procedures Order, the approval of the Plan and Disclosure Statement, the solicitation of votes on the Plan by the Company, and the confirmation and consummation of the Plan and the Restructuring Transactions.

(b)    Transfers.

(i)    Each Consenting Term Lender agrees that, for the duration of the Support Period, such Consenting Term Lender shall not sell, transfer, loan, issue, participate, pledge, hypothecate, assign or otherwise dispose of (other than ordinary course pledges and/or swaps) (each, a "*Transfer*"), directly or indirectly, in whole or in part, any of its Claims, including any beneficial ownership in any such Claims,[1] or any option thereon or any right or interest therein, unless the transferee thereof either (A) is a Consenting Term Lender (with respect to a transfer by a Consenting Term Lender) or (B) prior to such Transfer, agrees in writing for the benefit of the Parties to become a

---

[1] As used herein, the term "*beneficial ownership*" means the direct or indirect economic ownership of, and/or the power, whether by contract or otherwise, to direct the exercise of the voting rights and the disposition of, any Claims subject to this Agreement or the right to acquire such Claims.

Consenting Term Lender and to be bound by all of the terms of this Agreement applicable to Consenting Term Lenders (including with respect to any and all Claims it already may hold against or in the Company prior to such Transfer) by executing a joinder agreement, a form of which is attached hereto as **Exhibit B** (a "*Joinder Agreement*"), and delivering an executed copy thereof within two (2) business days of such execution, to (1) Weil, Gotshal and Manges LLP ("*Weil*"), as counsel to the Company, (2) Kirkland & Ellis LLP, as counsel to an ad hoc group of Consenting Term Lenders ("*Kirkland*"), and (3) Davis Polk & Wardwell LLP ("*Davis Polk*"), as counsel to the Administrative Agent, in which event (x) the transferee shall be deemed to be a Consenting Term Lender hereunder to the extent of such transferred Claims and (y) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred Claims (such transfer, a "*Permitted Transfer*" and such party to such Permitted Transfer, a "*Permitted Transferee*").  Each Consenting Term Lender agrees that any Transfer of any Claim that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and the Company and each other Consenting Term Lender shall have the right to enforce the voiding of such Transfer.

(ii)     Notwithstanding anything to the contrary herein, (A) a Qualified Marketmaker[2] that acquires any Claims subject to this Agreement held by a Consenting Term Lender with the purpose and intent of acting as a Qualified Marketmaker for such Claims, shall not be required to become a party to this Agreement as a Consenting Term Lender, if (x) such Qualified Marketmaker transfers such Claims (by purchase, sale, assignment, or other similar means) within the earlier of ten (10) business days of its acquisition and the plan voting deadline to a Permitted Transferee and the transfer otherwise is a Permitted Transfer and (y) such Consenting Term Lender shall be solely responsible for the Qualified Marketmaker's failure to comply with this Section 3(b) and (B) to the extent any Party is acting solely in its capacity as a Qualified Marketmaker, it may Transfer any ownership interests in the Claims that it acquires from a holder of Claims that is not a Consenting Term Lender to a transferee that is not a Consenting Term Lender at the time of such Transfer without the requirement that the transferee be or become a signatory to this Agreement or execute a Joinder Agreement.

(iii)     This Section 3(b) shall not impose any obligation on the Company to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Term Lender to Transfer any Claims.  Notwithstanding anything to the contrary herein, to the extent the Company and another Party have entered into a separate agreement with respect to the issuance of a "cleansing letter" or other public disclosure of information, the terms of such confidentiality agreement shall continue to apply and remain in full force and effect according to its terms.

---

[2] As used herein, the term "*Qualified Marketmaker*" means an entity that (a) holds itself out to the public, the syndicated loan market, and/or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers claims against, and/or equity interests in, the Company, including Term Loans, or enter with customers into long and short positions in claims against the Company), in its capacity as a dealer or market maker in such claims and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including term, loans, and/or debt or equity securities).

6

(c)     <u>Additional Claims</u>.   This Agreement shall in no way be construed to preclude the Consenting Term Lenders from acquiring additional Claims; <u>provided</u> that, to the extent any Consenting Term Lender (i) acquires additional Claims, (ii) holds or acquires any other claims against the Company entitled to vote on the Plan or (iii) holds or acquires any equity interests in the Company entitled to vote on the Plan, then, in each case, each such Consenting Term Lender shall promptly notify Weil, Kirkland and Davis Polk, and each such Consenting Term Lender agrees that all such Claims shall be subject to this Agreement, and agrees that, for the duration of the Support Period and subject to the terms of this Agreement, it shall vote in favor of the Plan (or cause to be voted) any such additional Claims and/or equity interests entitled to vote on the Plan (to the extent still held by it on or on its behalf at the time of such vote), in a manner consistent with <u>Section 3(a)</u> hereof.  For the avoidance of any doubt, any obligation to vote for the Plan or any other plan of reorganization shall be subject to sections 1125 and 1126 of the Bankruptcy Code.

(d)     <u>Preservation of Rights</u>.   Notwithstanding the foregoing, nothing in this Agreement, and neither a vote to accept the Plan by any Consenting Term Lender, nor the acceptance of the Plan by any Consenting Term Lender, shall:  (i) be construed to limit consent and approval rights provided in this Agreement, the Term Sheet, and the Definitive Documentation; (ii) be construed to prohibit any Consenting Term Lender from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement, or exercising rights or remedies specifically reserved herein; (iii) be construed to prohibit any Consenting Term Lender from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and are not for the purpose of (or could not reasonably be expected to) hindering, delaying, or preventing the consummation of the Restructuring Transactions; (iv) impair or waive the rights of any Consenting Term Lender to assert or raise any objection expressly permitted under this Agreement in connection with any hearing in the Bankruptcy Court, including, without limitation, any hearing on confirmation of the Plan; or (v) subject to <u>Section 3(f)</u>, limit the ability of any Consenting Term Lender to assert any rights, claims, and/or defenses under the Credit Agreement, the Security Agreement (as defined in the Credit Agreement), and any related documents or agreements (including, without limitation, the right of any Consenting Term Lender to assert that any potential action of the Company or any Credit Party (as defined in the Credit Agreement) that is inconsistent with, or any potential omission of the Company or any Credit Party (as defined in the Credit Agreement) to take any action required, by the Credit Agreement and/or that a potential Default or Event of Default has occurred under the Credit Agreement).

(e)     <u>Negative Covenants</u>.   The Consenting Term Lenders agree that, for the duration of the Support Period, each Consenting Term Lender shall not take any action inconsistent with, or omit to take any action required by the Credit Agreement, except to the extent that any such action or inaction is expressly contemplated or permitted by this Agreement, the Plan, or any of the other Definitive Documents.

7

4.        **Agreements of the Company.**

(a)        <u>Covenants</u>.  The Company agrees that, for the duration of the Support Period, the Company shall:

(i)        (A) support and use commercially reasonable efforts to consummate and complete the Restructuring, the Restructuring Transactions, and all transactions contemplated under this Agreement (including, without limitation, those described in the Term Sheet and once filed, any Bidding Procedures Motion, and the Plan) including, without limitation, (1) take any and all reasonably necessary actions in furtherance of the Restructuring, the Restructuring Transactions, and the transactions contemplated under this Agreement, including, without limitation, as set forth in the Term Sheet and, once filed, any Bidding Procedures Motion and the Plan, (2) commence the Chapter 11 Cases on or before the Outside Commencement Date and complete and file, within the timeframes contemplated herein, the Plan, the Disclosure Statement, and the other Definitive Documents, and (3) use commercially reasonable efforts to obtain orders of the Bankruptcy Court approving any Bidding Procedures Motion, and the Disclosure Statement and confirming the Plan within the timeframes contemplated by this Agreement; (B) use commercially reasonable efforts to obtain any and all required regulatory approvals for the Restructuring Transactions embodied in the Definitive Documents, including the Plan; and (C) not take any action that is inconsistent with, or to alter, delay, impede, or interfere with, approval of any Bidding Procedures Order, or the Disclosure Statement, confirmation of the Plan, or consummation of the Plan and the Restructuring Transactions, in the case of each of clauses (A) through (C) to the extent consistent with, upon the advice of counsel, the fiduciary duties of the boards of directors of the Company;

(ii)        not commence an avoidance action or other legal proceeding that challenges the validity, enforceability, or priority of the Term Loans or obligations under the Credit Agreement;

(iii)        if the Company receives an unsolicited bona fide proposal or expression of interest in undertaking an Alternative Transaction that the boards of directors, members, or managers (as applicable) of the Company, determine in their good-faith judgment provides a higher or better economic recovery to the Company's stakeholders than that set forth in this Agreement and such Alternative Transaction is from a proponent that the boards of directors, members, or managers (as applicable) of the Company has reasonably determined is capable of timely consummating such Alternative Transaction, the Company will within 48 hours of the receipt of such proposal or expression of interest, notify Kirkland and Davis Polk of the receipt thereof, with such notice to include the material terms thereof, including the identity of the Person or group of Persons involved;

(iv)        provide draft copies of all material motions or applications and other documents (including all "first day" and "second day" motions and orders, any Bidding Procedures Motion, any Bidding Procedures Order, the Plan, the Disclosure Statement, the ballots and other solicitation materials in respect of the Plan, and the

Confirmation Order) the Debtors intend to file with the Bankruptcy Court to Kirkland and to Davis Polk, if reasonably practical, at least three (3) business days prior to the date when the Company intends to file any such pleading or other document (provided that if delivery of such motions, orders or materials (other than any Bidding Procedures Motion, the Plan, the Disclosure Statement, the Confirmation Order or an adequate protection order) at least three (3) business days in advance is not reasonably practicable, such motion, order or material shall be delivered as soon as reasonably practicable prior to filing) and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court;

(v)    file such "first day" motions and pleadings reasonably determined by the Debtors, in form and substance reasonably acceptable to the Requisite Term Lenders, to be necessary, and to seek interim and final (to the extent necessary) orders, in form and substance reasonably acceptable to the Debtors and the Requisite Term Lenders, from the Bankruptcy Court approving the relief requested in such "first day" motions;

(vi)    subject to appropriate confidentiality arrangements, provide to the Consenting Term Lenders' professionals, upon reasonable advance notice to the Company:  (A) reasonable access (without any material disruption to the conduct of the Company's business) during normal business hours to the Company's books, records, and facilities; (B) reasonable access to the respective management and advisors of the Company for the purposes of evaluating the Company's finances and operations and participating in the planning process with respect to the Restructuring or Restructuring Transactions; (C) prompt access to any information provided to any existing or prospective financing sources (including lenders under any debtor-in-possession and/or exit financing); and (D) prompt and reasonable responses to all reasonable diligence requests;

(vii)    use their commercially reasonable efforts to support and take all actions as are reasonably necessary and appropriate to obtain any and all required regulatory and/or third-party approvals to consummate the Restructuring;

(viii)    promptly pay all prepetition and postpetition reasonable and documented fees and expenses of (x) Kirkland, FTI Consulting Inc. ("*FTI*"), and one firm acting as local counsel for the Requisite Term Lenders, if required, in each case in accordance with the terms of their respective engagement letters with the Company and (y) the Administrative Agent, Davis Polk, and one firm acting as local counsel for the Administrative Agent, if required, in each case, in accordance with the Credit Agreement and the Term Sheet;

(ix)    not, nor encourage any other person or entity to, take any action which would, or would reasonably be expected to, breach or be inconsistent with this Agreement or delay, impede, appeal, or take any other negative action, directly or indirectly, to interfere with the acceptance, confirmation, or consummation of the Plan or implementation of the Restructuring;

9

(x)      subject to applicable laws, use commercially reasonable efforts to, consistent with the pursuit and consummation of the Restructuring and the Restructuring Transactions, preserve intact in all material respects the current business operations of the Company (other than as consistent with applicable fiduciary duties), keep available the services of its current officers and material employees (in each case, other than voluntary resignations, terminations for cause, or terminations consistent with applicable fiduciary duties) and preserve in all material respects its relationships with customers, sales representatives, suppliers, distributors, and others, including the warehouse lenders, in each case, having material business dealings with the Company (other than terminations for cause or consistent with applicable fiduciary duties);

(xi)      provide prompt written notice to the Requisite Term Lenders between the date hereof and the Effective Date of (A) receipt of any written notice from any third party alleging that the consent of such party is or may be required in connection with the Restructuring Transactions, (B) receipt of any written notice from any governmental body in connection with this Agreement or the Restructuring Transactions, and (C) receipt of any written notice of any proceeding commenced, or, to the actual knowledge of the Company, threatened against the Company, relating to or involving or otherwise affecting in any material respect the Restructuring Transactions; and

(xii)      unless otherwise agreed by the Company and the applicable firm, on the date that is at least one (1) calendar day prior to the Commencement Date, pay to (A) Kirkland, (B) one firm acting as local counsel for the Requisite Term Lenders, if any, (C) FTI, (D) the Administrative Agent, (E) Davis Polk and (F) one firm acting as local counsel for the Administrative Agent, if any, in each case (x) all reasonable and documented fees and expenses accrued but unpaid as of such date, whether or not such fees and expenses are then due, outstanding, or otherwise payable in connection with this matter and (y) fund or replenish, as the case may be, any retainers reasonably requested by Kirkland or FTI, in each case in accordance with the terms of their respective engagement letters with the Company.

(b)      <u>Automatic Stay</u>.  The Company acknowledges and agrees and shall not dispute that after the commencement of the Chapter 11 Cases, the giving of notice of termination by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Company hereby waives, to the greatest extent possible, the applicability of the automatic stay to the giving of such notice); <u>provided</u> that nothing herein shall prejudice any Party's rights to argue that the giving of notice of default or termination was not proper under the terms of this Agreement.

(c)      <u>Negative Covenants</u>.  The Company agrees that, for the duration of the Support Period, the Company shall not take any action inconsistent with, or omit to take any action required by the Credit Agreement, except to the extent that any such action or inaction is expressly contemplated or permitted by this Agreement, the Term Sheet, the Plan or any of the other Definitive Documents.

5. **Termination of Agreement.**

(a)    This Agreement shall terminate upon the receipt of written notice to the other Parties, delivered in accordance with Section 19 hereof, from (x) the Requisite Term Lenders at any time after and during the continuance of any Lender Termination Event or (y) the Company at any time after and during the continuance of any Company Termination Event, as applicable.

(b)    A "***Lender Termination Event***" shall mean any of the following:

(i)    the breach by the Company of (a) any covenant contained in this Agreement or (b) any other obligations of the Company set forth in this Agreement, in each case, in any material respect and, in either respect, such breach remains uncured for a period of five (5) business days following the Company's receipt of written notice pursuant to Sections 5(a) and 19 hereof (as applicable);

(ii)    any representation or warranty in this Agreement made by the Company shall have been untrue in any material respect when made or shall have become untrue in any material respect, and such breach remains uncured for a period of five (5) business days following the Company's receipt of notice pursuant to Sections 5(a) and 19 hereof (as applicable);

(iii)    the Definitive Documents and any amendments, modifications, or supplements thereto filed by the Company include terms that are materially inconsistent with the Term Sheet and are not otherwise acceptable to the Requisite Term Lenders, and such event remains unremedied for a period of three (3) business days following the Company's receipt of notice pursuant to Sections 5(a) and 19 hereto (as applicable);

(iv)    a Definitive Document alters the treatment of the Term Lenders specified in the Term Sheet without complying with Section 9 hereof and the Requisite Term Lenders have not otherwise consented to such Definitive Document;

(v)    solely in the context of a Reorganization Transaction, the failure of the Company to secure commitments to fund the Exit Working Capital Facility prior to the Confirmation Hearing on terms acceptable to the Company and to holders of at least $66^{2/3}$% in aggregate principal amount outstanding of the Term Loans;

(vi)    the Company, after delivery of an Election Notice (as defined below), fails to pursue consummation of the Elected Transaction or pursues consummation of a transaction other than the Elected Transaction;

(vii)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and either (A) such ruling, judgment or order has been issued at the request of or with the acquiescence of the Company, or (B) in all other circumstances, such ruling, judgment or order has not been not stayed, reversed or vacated within fifteen (15) calendar days after such issuance;

11

(viii)    the Support Effective Date shall not have occurred on or before the Commencement Date;

(ix)    the Commencement Date shall not have occurred on or before the Outside Commencement Date;

(x)    the Debtors shall not have complied with Milestones set out in the Term Sheet;

(xi)    the Bankruptcy Court enters an order that is not stayed (A) directing the appointment of an examiner with expanded powers or a trustee in the Chapter 11 Cases, (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing the Chapter 11 Cases, (D) denying confirmation of the Plan, the effect of which would render the Plan incapable of consummation on the terms set forth herein or (E) granting relief that is inconsistent with this Agreement or the Plan in any materially adverse respect to the Consenting Term Lenders, in each case;

(xii)    the Confirmation Order is reversed or vacated by a Final Order;

(xiii)    any court of competent jurisdiction has entered a final, non-appealable judgment or order declaring this Agreement to be unenforceable;

(xiv)    if either (A) the Company (or any person or entity on behalf of the Company or its bankruptcy estate with proper standing) files a motion, application or adversary proceeding (or supports or fails to timely object to such a filing) (1) challenging the validity, enforceability, perfection or priority of, or seeking invalidation, avoidance, disallowance, recharacterization or subordination of, the obligations or Claims under the Credit Agreement or (2) challenging the seniority of the obligations or Claims under the Credit Agreement over any obligations or Claims under the Second Lien Notes Indenture or (B) the Bankruptcy Court (or any court with jurisdiction over the Chapter 11 Cases) enters an order providing relief against the interests of the Term Lenders with respect to any of the foregoing causes of action or proceedings, including, but not limited to, invalidating, avoiding, disallowing, recharacterizing, subordinating, or limiting the enforceability of any of the obligations or Claims arising under or related to the Credit Agreement;

(xv)    the terms and conditions of the debtor-in-possession financing (including, but not limited to, any Definitive Documents memorializing such facility) are not acceptable to the Requisite Term Lenders in all material respects;

(xvi)    the debtor-in-possession financing contemplated by the Term Sheet is not approved by the Bankruptcy Court or terminated;

(xvii)    the Company (unless the Company is acting at the direction or instruction or with the consent of the Requisite Term Lenders, including any of their respective employees, agents, or representatives) files or seeks approval of, or supports (or fails to timely object to) another party in filing or seeking approval of an Alternative Transaction;

12

(xviii)  the commencement of an involuntary bankruptcy case against the Company under the Bankruptcy Code, if such involuntary case is not dismissed within sixty (60) calendar days after the filing thereof, or if a court order grants the relief sought in such involuntary case;

(xix)    if the Company (A) withdraws the Plan, (B) publicly announces its intention not to support the Restructuring or the Plan, (C) files a motion with the Bankruptcy Court seeking the approval of an Alternative Transaction or (D) agrees to pursue (including, for the avoidance of doubt, as may be evidenced by a term sheet, letter of intent, or similar document) or publicly announces its intent to pursue an Alternative Transaction;

(xx)     the Bankruptcy Court enters an order modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization (including the Plan); or

(xxi)    if the Company or any other Credit Party (as defined in the Credit Agreement) makes, or causes to be made, any payment of principal or interest on any indebtedness constituting Second Lien Notes.

(c)    A "*Company Termination Event*" shall mean any of the following:

(i)      the breach in any material respect by one or more of the Consenting Term Lenders, of any of the undertakings, representations, warranties, or covenants of the Consenting Term Lenders set forth herein in any material respect which remains uncured for a period of five (5) business days after the receipt of written notice of such breach pursuant to Sections 5(a) and 19 hereof (as applicable), but only if the non-breaching Consenting Term Lenders own less than $66^{2/3}$% of the Claims;

(ii)     the board of directors, members, or managers (as applicable) of the Company reasonably determines in good faith based upon the advice of outside counsel that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law; provided, that the Company shall provide notice of such determination to Kirkland and Davis Polk via email within one (1) business day after the date thereof;

(iii)    the Company shall not have obtained votes accepting the Plan from holders of the Term Loans sufficient to satisfy the conditions for acceptance set forth in section 1126(c) of the Bankruptcy Code on or before the voting deadline set forth in the solicitation materials distributed in connection with the Plan;

(iv)     the Support Effective Date shall not have occurred on or before the Commencement Date;

(v)      if the Effective Date shall not have occurred on or before 125 days following the Commencement Date;

13

(vi)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and such ruling, judgment or order has not been not stayed, reversed or vacated within fifteen (15) calendar days after such issuance; or

(vii)    solely in the context of a Reorganization Transaction, the failure of the Company to secure commitments to fund the Exit Working Capital Facility prior to the Confirmation Hearing on terms acceptable to the Company and to holders of at least $66^{2/3}$% in aggregate principal amount outstanding of the Term Loans;

(d)    <u>Mutual Termination</u>.    This Agreement may be terminated by mutual agreement of the Company and the Requisite Term Lenders upon the receipt of written notice delivered in accordance with <u>Section 19</u> hereof.

(e)    <u>Automatic Termination</u>.    This Agreement shall terminate automatically, without any further action required by any Party, upon the occurrence of the Effective Date.

(f)    <u>Effect of Termination</u>.    Upon the termination of this Agreement in accordance with this <u>Section 5</u> (other than pursuant to <u>Section 5(e)</u>) if the Restructuring has not been consummated, and except as provided in <u>Section 13</u> hereof, this Agreement shall forthwith become void and of no further force or effect and each Party shall, except as provided otherwise in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law, the Credit Agreement and any ancillary documents or agreements thereto; <u>provided</u>, <u>however</u>, that in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.    Upon any such termination of this Agreement, each vote or any consents given by any Consenting Term Lender prior to such termination shall be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement, in each case, without further confirmation or other action by such Consenting Term Lender.    If this Agreement has been terminated as to any Consenting Term Lender in accordance with this <u>Section 5</u> (other than pursuant to <u>Section 5(e)</u>) at a time when permission of the Bankruptcy Court shall be required for a Consenting Term Lender to change or withdraw (or cause to change or withdraw) its vote to accept the Plan, the Company shall support and not oppose any attempt by such Consenting Term Lender to change or withdraw (or cause to change or withdraw) such vote at such time, subject to all remedies available to the Company at law, equity, or otherwise, including those remedies set forth in <u>Section 12</u> hereof.    The Consenting Term Lender shall have no liability to the Company or to each other in respect of any termination of this Agreement in accordance with the terms of this <u>Section 5</u> and <u>Section 19</u> hereof.

14

(g)    If the Restructuring has not been consummated prior to the date of termination of this Agreement, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights and the Parties expressly reserve any and all of their respective rights.    Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

### 6.    Definitive Documents; Good Faith Cooperation; Further Assurances.

Subject to the terms and conditions described herein, during the Support Period, each Party, severally and not jointly, hereby covenants and agrees to reasonably cooperate with each other in good faith in connection with, and shall exercise commercially reasonable efforts with respect to the pursuit, approval, implementation, and consummation of the Plan and the Restructuring, as well as the negotiation, drafting, execution (to the extent such Party is a party thereto), and delivery of the Definitive Documents.    Furthermore, subject to the terms and conditions hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, including making and filing any required regulatory filings and voting any claims against or securities of the Company in favor of the Restructuring, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement; provided that no Consenting Term Lender shall be required to incur any material cost, expense, or liability in connection therewith.

### 7.    Representations and Warranties.

(a)    Each Party, severally and not jointly, represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof (or, with respect to a Consenting Term Lender that becomes a party hereto after the date hereof, as of the date such Consenting Term Lender becomes a party hereto):

(i)    such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder, and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(ii)    the execution, delivery and performance by such Party of this Agreement does not and will not (A) violate any material provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries or (B) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party;

15

(iii)    the execution, delivery and performance by such Party of this Agreement does not and will not require any material registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state or governmental authority or regulatory body, except such filings as may be necessary and/or required by the SEC; and

(iv)    this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(b)    Each Consenting Term Lender severally (and not jointly), represents and warrants to the Company that, as of the date hereof (or as of the date such Consenting Term Lender becomes a party hereto), such Consenting Term Lender (i) is the beneficial owner of the aggregate principal amount of Term Loans set forth below its name on the signature page hereof (or below its name on the signature page of a Joinder Agreement for any Consenting Term Lender that becomes a party hereto after the date hereof) and does not beneficially own any other Term Loans and/or (ii) has, with respect to the beneficial owners of such Term Loans, (A) sole investment or voting discretion with respect to such Term Loans, (B) full power and authority to vote on and consent to matters concerning such Term Loans or to exchange, assign and transfer such Term Loans and (C) full power and authority to bind or act on the behalf of, such beneficial owners.

(c)    Each Consenting Term Lender severally (and not jointly) makes the representations and warranties set forth in this Section 7, in each case, to the other Parties.

## 8.    Disclosure; Publicity.

(a)    Subject to the provisions set forth in Section 8(b) hereof, the Company shall disseminate publication on Form 8-K or a press release disclosing the existence of this Agreement and the terms hereof (including any schedules and exhibits thereto that are filed with the Bankruptcy Court on the Commencement Date) with such redactions as may be reasonably requested by Kirkland to maintain the confidentiality of the items identified in Section 8(b) hereof, except as otherwise required by law.  In the event that the Company fails to make the foregoing disclosures in compliance with the terms specified herein, any such Consenting Term Lender may publicly disclose the foregoing, including, without limitation, this Agreement and all of its exhibits and schedules (subject to the redactions called for by Section 8 hereof), and the Company hereby waives any claims against the Consenting Term Lenders arising as a result of such disclosure by a Consenting Term Lender in compliance with this Agreement.

(b)    The Company shall submit drafts to Kirkland of any press releases, public documents and any and all filings with the SEC that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement, or any

16

other matter relating to the Term Loans, at least one (1) business day prior to making any such disclosure, and any such press releases, public documents, and other SEC filings shall be reasonably acceptable in all material respects to the Requisite Term Lenders. Except as required by applicable law or otherwise permitted under the terms of any other agreement between the Company and any Consenting Term Lender, no Party or its advisors shall disclose to any person (including, for the avoidance of doubt, any other Consenting Term Lender), other than advisors to the Company, the principal amount of the Term Loans held by the Consenting Term Lender, without such Consenting Term Lender's prior written consent; provided, however, that (i) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall, to the extent permitted by law, afford the relevant Consenting Term Lender a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure (the expense of which, if any, shall be borne by the relevant Consenting Term Lender) and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate outstanding principal amount of the Term Loans held by all the Consenting Term Lenders collectively.

## 9.   **Amendments and Waivers; Term Lender Election.**

(a)     This Agreement, including any exhibits or schedules hereto, may not be waived, modified, amended or supplemented except with the written consent of the Company and the Requisite Term Lenders; provided, however, that any waiver, modification, amendment or supplement to this Section 9 shall require the written consent of all of the Parties; provided, further, that any modification, amendment or change to the definition of Requisite Term Lenders shall require the written consent of each Consenting Term Lender; provided, further, that any change, modification or amendment to this Agreement, the Term Sheet, or the Plan that treats or affects any Consenting Term Lender in a manner that is disproportionately adverse, on an economic or non-economic basis, to the manner in which any of the other Consenting Term Lenders are treated (after taking into account each of the Consenting Term Lender's respective holdings and interests in the Company and the recoveries contemplated by the Term Sheet (as in effect on the date hereof)) shall require the written consent of such Consenting Term Lender; provided, further, that if any change, modification or amendment to this Agreement, the Term Sheet or the Plan does not materially, adversely affect the rights of a Consenting Term Lender, the consent of such Consenting Term Lender shall not be required.  In the event that an adversely affected Consenting Term Lender ("***Non-Consenting Term Lender***") does not consent to a waiver, change, modification or amendment to this Agreement requiring the consent of each Consenting Term Lender, but such waiver, change, modification or amendment receives the consent of Consenting Term Lenders owning at least $66^{2/3}\%$ of the aggregate outstanding principal amount of the Term Loans, this Agreement shall be deemed to have been terminated only as to such Non-Consenting Term Lender, but this Agreement shall continue in full force and effect in respect to all other Consenting Term Lenders who have so consented, in a way consistent with (or otherwise reasonably acceptable to the Requisite Term Lenders) this Agreement and the Term Sheet as waived, changed, modified, or amended, as applicable.

17

(b)       Unless extended by the Company, within five (5) business days following the earlier of (a) the conclusion of the Company's post-Commencement Date marketing and sale process and (b) 95 days after the Commencement Date (the earliest such date, the "***Election Date***"), holders of at least 66⅔% in aggregate principal amount outstanding of the Term Loans (the "Electing Term Lenders") shall deliver a notice (the "***Election Notice***") to the Company stating that the Electing Term Lenders wish to consummate a transaction (the "***Elected Transaction***"), being a: (i) Reorganization Transaction, or (ii) Master Servicing Transaction (as part of a Reorganization Transaction), or (iii) Sale Transaction, and, if applicable, (iv) in connection and together with an election of (i), (ii), or (iii), any Asset Sale Transaction(s); <u>provided</u> that inclusion of any such Asset Sale Transaction(s) is not incompatible with the successful consummation of the elected transaction in (i), (ii), or (iii).

10.       **Effectiveness.**

This Agreement shall become effective and binding on the Parties on the Support Effective Date, and not before such date; <u>provided</u> that signature pages executed by Consenting Term Lenders shall be delivered to (a) the other Consenting Term Lenders in a redacted form that removes such Consenting Term Lenders' holdings of the Term Loans or any other Claims against or interests in the Company and any schedules to such Consenting Term Lenders' holdings (if applicable) and (b) the Company, Weil and Kirkland in an unredacted form (and to be kept confidential by the Company, Weil and Kirkland).

11.       **Governing Law; Jurisdiction; Waiver of Jury Trial.**

(a)       This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York, without giving effect to the conflict of laws principles thereof.

(b)       Each of the Parties irrevocably agrees that any legal action, suit or proceeding arising out of or relating to this Agreement brought by any party or its successors or assigns shall be brought and determined in any federal or state court in the State of New York, and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement or the Restructuring.  Each of the Parties agrees not to commence any proceeding relating hereto or thereto except in the courts described above in New York, other than proceedings in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any such court in New York as described herein.  Each of the Parties further agrees that notice as provided herein shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient. Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any proceeding arising out of or relating to this Agreement or the Restructuring, (i) any claim that it is not personally subject to the jurisdiction of the courts in New York as described herein for any reason, (ii) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of

18

notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (iii) that (A) the proceeding in any such court is brought in an inconvenient forum, (B) the venue of such proceeding is improper or (C) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.  Notwithstanding the foregoing, during the pendency of the Chapter 11 Cases, all proceedings contemplated by this <u>Section 11(b)</u> shall be brought in the Bankruptcy Court.

(c)    EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

## 12.    Specific Performance/Remedies.

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder.

## 13.    Survival.

Notwithstanding the termination of this Agreement pursuant to <u>Section 5</u> hereof, the agreements and obligations of the Parties in this <u>Section 13</u>, and <u>Sections 4(b)</u>, <u>5(f)</u>, <u>8</u>, <u>10</u>, <u>11</u>, <u>12</u>, <u>14</u>, <u>15</u>, <u>16</u>, <u>17</u>, <u>18</u>, <u>19</u>, and <u>20</u> hereof (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect in accordance with the terms hereof; <u>provided</u>, <u>however</u>, that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

## 14.    Headings.

The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

## 15.    Successors and Assigns; Severability; Several Obligations.

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives;

provided, however, that nothing contained in this Section 15 shall be deemed to permit Transfers of the Term Loans or claims arising under the Term Loans other than in accordance with the express terms of this Agreement. If any provision of this Agreement, or the application of any such provision to any Person or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible. The agreements, representations and obligations of the Parties are, in all respects, ratable and several and neither joint nor joint and several.

### 16.    No Third-Party Beneficiaries.

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties (and their respective successors, permitted assigns, heirs, executors, administrators and representatives) and no other Person shall be a third-party beneficiary hereof.

### 17.    Prior Negotiations; Entire Agreement.

This Agreement, including the exhibits and schedules hereto (including the Term Sheet) constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof and thereof, except that the Parties acknowledge that any confidentiality agreements (if any) heretofore executed between the Company and each Consenting Term Lender shall continue in full force and effect.

### 18.    Counterparts.

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement may be delivered by facsimile or by electronic mail in portable document format (pdf), which shall be deemed to be an original for the purposes of this paragraph.

### 19.    Notices.

All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, facsimile, courier or by registered or certified mail (return receipt requested) to the following addresses and facsimile numbers:

(1)    If to the Company or Debtors, to:

Ditech Holding Corporation
3000 Bayport Drive, Suite 985
Tampa, FL 33607
Attn:  John Haas, General Counsel, Chief Legal Officer and Secretary

Email:  JHaas@ditech.com

With a copy to (which shall not constitute notice):

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attn:  Ray C. Schrock, P.C.
Email:  Ray.Schrock@weil.com
Attn:  Sunny Singh, Esq.
Email:  Sunny.Singh@weil.com
Attn: Alexander Welch, Esq.
Email: Alexander.Welch@weil.com

(2)    If to a Consenting Term Lender, or a transferee thereof, to the addresses or
facsimile numbers set forth below following the Consenting Term
Lender's signature (or as directed by any transferee thereof), as the case
may be, with copies to:

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Il 606545
Attn:  Patrick J Nash Jr., P.C.
Email:  Patrick.Nash@kirkland.com
Attn:  John Luze
Email:  John.Luze@kirkland.com

(3)    If to the Administrative Agent:

Credit Suisse AG
11 Madison Avenue,
New York, NY 10010
Attn:  Megan Kane
Email:  Megan.Kane@credit-suisse.com
Attn:  Peter Winstanley
Email:  Peter.Winstanley@credit-suisse.com

With a copy to (which shall not constitute notice):

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Attn: Brian M. Resnick
Email:  Brian.Resnick@davispolk.com
Attn: Michelle McGreal
Email:  Michelle.Mcgreal@davispolk.com

Any notice given by delivery, mail or courier shall be effective when received. Any notice given by facsimile or electronic mail shall be effective upon oral, machine or electronic mail (as applicable) confirmation of transmission.

### 20.    Reservation of Rights; No Admission.

(a)    Nothing contained herein shall:  (i) limit (A) the ability of any Party to consult with other Parties or (B) the rights of any Party under any applicable bankruptcy, insolvency, foreclosure, or similar proceeding, including the right to appear as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, in each case, so long as such consultation or appearance is consistent with such Party's obligations hereunder, or under the terms of the Plan; (ii) limit the ability of any Consenting Term Lender to sell or enter into any transactions in connection with the Second Lien Notes owned or controlled by such Consenting Term Lender, or any other claims against or interests in the Company, subject to the terms of <u>Section 3(b)</u> hereof; (iii) limit the rights of any Consenting Term Lender under the Credit Agreement or any agreements executed in connection with the Credit Agreement; or (iv) constitute a waiver or amendment of any provision of the Credit Agreement or any agreements executed in connection with the Credit Agreement.

(b)    Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of each of the Parties to protect and preserve its rights, remedies, and interests, including its claims against any of the other Parties (or their respective affiliates or subsidiaries) or its full participation in any bankruptcy case filed by the Company or any of its affiliates and subsidiaries.  This Agreement, the Term Sheet and the Plan are part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties.  Pursuant to Rule 408 of the Federal Rule of Evidence, any applicable state rules of evidence, and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.  This Agreement shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever.  Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

### 21.    Relationship Among Consenting Term Lenders.

It is understood and agreed that no Consenting Term Lender has any duty of trust or confidence in any kind or form with any other Consenting Term Lender, and, except as expressly provided in this Agreement, there are no commitments among or between them.  In this regard, it is understood and agreed that any Consenting Term Lender may trade in the Second Lien Notes or other debt of the Company without the consent of the Company or any other Consenting Term Lender, subject to applicable securities laws, the terms of this Agreement, and any confidentiality agreement entered into with the Company; <u>provided</u> that no Consenting Term Lender shall have any responsibility for any such trading to any other person or entity by virtue of this Agreement.  No prior history, pattern, or practice of sharing

22

confidences among or between the Consenting Term Lender shall in any way affect or negate this understanding and agreement.

### 22.    No Solicitation; Representation by Counsel; Adequate Information.

(a)    This Agreement is not and shall not be deemed to be a solicitation for votes in favor of the Plan in the Chapter 11 Cases by the Term Lenders or a solicitation to tender or exchange any of the Term Loans.  The acceptances of the Consenting Term Lenders with respect to the Plan will not be solicited until such Consenting Term Lender has received the Disclosure Statement and related ballots and solicitation materials, each as approved or ratified by the Bankruptcy Court.

(b)    Each Party acknowledges that it has had an opportunity to receive information from the Company and that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

(c)    Although none of the Parties intends that this Agreement should constitute, and they each believe it does not constitute, a solicitation or acceptance of a chapter 11 plan of reorganization or an offering of securities, each Consenting Term Lender acknowledges, agrees and represents to the other Parties that it (i) is a "qualified institutional buyer" as such term is defined in Rule 144A of the Securities Act or a non-US person participating in the offering outside the United States in reliance on Regulation S under the Securities Act, (ii) is an accredited investor (as such term is defined in Rule 501(a) of Regulation D promulgated under the Securities Act), (iii) understands that the securities to be acquired by it (if any) pursuant to the Restructuring have not been registered under the Securities Act and that such securities are, to the extent not acquired pursuant to section 1145 of the Bankruptcy Code, being offered and sold pursuant to an exemption from registration contained in the Securities Act, based in part upon such Consenting Term Lender's representations contained in this Agreement and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available and (iv) has such knowledge and experience in financial and business matters that such Consenting Term Lender is capable of evaluating the merits and risks of the securities to be acquired by it (if any) pursuant to Restructuring and understands and is able to bear any economic risks with such investment.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

WEIL:\96911452\1\41703.0010

**EXHIBIT A**

**RESTRUCTURING TERM SHEET**

DITECH HOLDING CORPORATION
RESTRUCTURING TERM SHEET

This Term Sheet is attached as **Exhibit A** to the restructuring support agreement dated February 8, 2019 (as amended and restated), by and among holders (the "***Consenting Term Lenders***") of outstanding Term Loans (as defined in the Credit Agreement (defined below)) and Ditech Holding Corporation (the "***RSA***"). Capitalized terms used in this Term Sheet not defined shall have the meaning ascribed to them in **Annex A**.

This Term Sheet is not an offer or a solicitation with respect to any securities of the Company, nor is it a solicitation of acceptances of a plan of reorganization as contemplated by sections 1125 and/or 1126 of the Bankruptcy Code. Any such offer or solicitation shall comply with all applicable securities laws and/or provisions of the Bankruptcy Code.

This Term Sheet is a settlement proposal in furtherance of settlement discussions. Accordingly, this Term Sheet is protected by rule 408 of the Federal Rules of Evidence and any other applicable statutes or doctrines protecting the use or disclosure of confidential settlement discussions.

This Term Sheet is for discussion purposes only and does not purport to summarize all of the terms, conditions, representations, warranties, and other provisions with respect to the transactions described herein, which transactions will be subject to the completion of definitive documents incorporating the terms set forth herein and the closing of any transaction shall be subject to the terms and conditions set forth in such definitive documents. No binding obligations will be created by this Term Sheet unless and until binding definitive documents are executed and delivered by all applicable parties.

| Introduction | |
|---|---|
| **Overview** | This Term Sheet summarizes the terms of a restructuring (the "***Restructuring***") of the Company to be effectuated pursuant to the Plan. |
| **The Company** | Ditech Holding Corporation ("***Ditech***") and its subsidiaries that will be debtors and debtors in possession (the "***Debtors***" or collectively, the "***Company***"). |
| **Claims and Interests to be Restructured** | First Lien Senior Secured Term Loan Claims: Claims on account of term loans ("***Term Loan Claims***") under that certain Second Amended and Restated Credit Agreement, dated as of February 9, 2018 (and as amended by that certain Amendment No. 1 to Second Amended and Restated Credit Agreement, dated as of March 29, 2018) (the "***Credit Agreement***"), among Ditech, the lenders party thereto (each, a "***Term Lender***"), and Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent for the Term Lenders (the "***Administrative Agent***"). Term Loan Claims shall be allowed in the outstanding principal amount of $961,355,635.34, plus any amounts owing on account of call protections contained in the Credit Agreement, plus all accrued interest, costs, fees, and expenses under the Credit Agreement.

Second Lien Notes Claims: Claims on account of the 9.0% Second Lien Senior Subordinated PIK Toggle Notes due 2024 (the "***Second Lien Notes***"), |

| Introduction | |
|---|---|
| | issued by Ditech pursuant to the Indenture dated as of the Effective Date (as amended, restated, supplemented or otherwise modified from time to time), under which the Second Lien Notes were issued, among Ditech, as issuer, certain of the subsidiary guarantors party thereto, as guarantors, and Wilmington Savings Fund Society, FSB, as trustee and collateral agent (the "***Second Lien Notes Trustee***").
<br><br>General Unsecured Claims: Consisting of any Claim against the Company (other than any Intercompany Claims or Go-Forward Trade Claims (as defined below) as of the Commencement Date that is neither secured by collateral nor entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court including any deficiency claim under section 506(a) of the Bankruptcy Code (collectively, the "***General Unsecured Claims***").
<br><br>Go-Forward Trade Claims: Consisting of any Claim against the Company (other than any Intercompany Claims or General Unsecured Claims) as of the Commencement Date that is neither secured by collateral nor entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court identified by the Company (with the consent of the Requisite Term Lenders) as being integral to and necessary for the ongoing operations of New Ditech (the "***Go-Forward Trade Claims***").
<br><br>Existing Equity Interests: Consisting of any common stock, preferred stock, warrants, or other ownership interest of or in Ditech pursuant to the Ditech Certificate of Incorporation or otherwise that are issued and outstanding as of the Commencement Date (the "***Existing Equity Interests***"). |
| **Transaction Overview** | |
| **Implementation** | The Company will commence the Chapter 11 Cases and implement the Restructuring pursuant to the Plan as provided in the RSA.  The transactions in this Term Sheet may be effectuated pursuant to the Plan as (a) a standalone reorganization and/or credit bid of Allowed Term Loan Claims by the Term Lenders; or (b) a sale to a third party. |
| **DIP Financing** | The Company will execute certain new refinancing agreements to be entered into by Ditech Financial LLC and Reverse Mortgage Solutions Inc., as borrowers (the "***DIP Warehouse Facility***"), which shall provide for the refinancing of existing warehouse, repurchase, and advance facilities of Ditech Financial LLC and Reverse Mortgage Solutions Inc., including the Existing Warehouse and Repurchase Facilities; *provided* that, the terms and conditions of the DIP Warehouse Facility (including, but not limited to, any Definitive Documents memorializing the DIP Warehouse Facility) shall be acceptable to the Requisite Term Lenders in all material respects; *provided further*, that, exit financing refinancing the DIP Warehouse Facility shall be raised following the Commencement Date but prior to the Effective Date (if necessary). |
| **Exit Working Capital Facility** | On the Effective Date, the Company, subject to the consent of the Requisite Term Lenders, shall enter into a new-money revolver or delayed-draw term loan facility in an amount equal to $150 million (the "***Exit Working Capital*** |

2

**125**

| Introduction | |
|---|---|
| | _Facility_"), or such lesser amount as is acceptable to the Company and the Requisite Term Lenders; _provided_, that, $30 million of the Exit Working Capital Facility may be reserved for a letter of credit sub-facility or synthetic letter of credit sub-facility (or shall have a reserve for any separately incurred letter of credit facility not to exceed $30 million). The terms of the Exit Working Capital Facility shall be otherwise in form and substance acceptable to the Requisite Term Lenders and the Company; provided, that, the Exit Working Capital Facility shall be co-terminus with the Amended and Restated Term Loan Facility. <br><br> The Exit Working Capital Facility will be funded by: (i) some or all of the Term Lenders providing a revolving credit facility or similar financing, subject to ongoing diligence and acceptable documentation; (ii) third party senior financing; (iii) asset sales, or (iv) some combination of the foregoing (i), (ii) and (iii), each of (i)-(iv) on customary terms and otherwise acceptable to the Company and Requisite Term Lenders; _provided_ that with respect to any third party senior financing, the Consenting Term Lenders shall have the option to fund any such financing on substantially the same terms in place of any third party financing source. |
| **Use of Cash Collateral** | The Company will be authorized to use cash collateral (as defined in section 363(a) of the Bankruptcy Code) of the Term Lenders with the consent of the Administrative Agent, acting at the direction of the Requisite Term Lenders, subject to the following terms and conditions and such other terms and conditions that are mutually acceptable to the Company and the Requisite Term Lenders; <u>provided</u> that notwithstanding anything to the contrary herein, the following shall be subject in all respects to the terms of the orders approving the DIP Warehouse Facility: <br><br> • <u>Adequate Protection Lien</u>. The Administrative Agent (on behalf of itself and the Term Lenders) shall receive a replacement security interest in and lien on (the "**Term Loan AP Liens**") all assets and property of the Debtors, whether arising prepetition or postpetition of any nature whatsoever, which liens and security interests shall be subordinate only to (i) Permitted Liens (as defined in the Credit Agreement) to the extent any such Permitted Liens are senior in priority under applicable non-bankruptcy law to the liens securing the Obligations under the Credit Agreement and (ii) the liens granted under the DIP Warehouse Facility (the "**DIP Liens**") and (iii)  a customary professional fee "carve-out" in an amount to be agreed upon by the Company and the Requisite Term Lenders (the "_**Carve Out**_"). The Term Loan AP Liens shall not be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtor's estate under section 551 of the Bankruptcy Code or (ii) subordinated to or made pari passu with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise, except as expressly provided in the Financing Orders. |

WEIL:\96911480\1\41703.0010

| Introduction |
|---|
| <ul><li>**507(b) Claim.** The Administrative Agent (on behalf of itself and the Term Lenders) shall receive an administrative expense claim pursuant to Bankruptcy Code section 507(b) with priority over all other administrative expenses, subject to the Carve Out and adequate protection granted on account of the DIP Warehouse Facility.</li><li>**Adequate Protection Payments**. The Debtors' prompt payment of, whether incurred prior to or following the Commencement Date, all reasonable fees and expenses of the Administrative Agent (in accordance with the Credit Agreement), including but not limited to Kirkland and FTI, as provided herein; *provided*, that, subject to the terms of the Intercreditor Agreement, the right of any party in interest (other than, so long as the RSA is in effect, the Company) to file a complaint with the Bankruptcy Court to recharacterize any such payments as payments against principal on the ground that the Allowed Term Loans are under-collateralized is reserved, subject to the rights of the Administrative Agent and Term Lenders to oppose such complaint and raise any and all defenses thereto.</li><li>**Financial Reporting.** Until the Effective Date, the Debtors shall continue to provide the Administrative Agent, Kirkland, and FTI with financial and other reporting in compliance with the Prepetition Documents and any reporting described in the Financing Orders, including monthly financial reporting in form and substance reasonably acceptable to the Requisite Term Lenders.</li></ul> The Company will be authorized to use any collateral, including cash collateral (as defined in section 363(a) of the Bankruptcy Code), of the holders of Second Lien Notes, and the Second Lien Notes Trustee (on behalf of itself and the holders of Second Lien Notes) shall receive a replacement security interest in and lien on all assets and property of the Debtors, whether arising prepetition or postpetition of any nature whatsoever, which liens and security interests shall be subordinate to (i) the DIP Liens; (ii) the Term Lenders AP Liens; (iii) the prepetition liens of the Term Lenders; (iv) permitted liens under the indenture governing the Second Lien Notes to the extent any such liens are senior in priority under applicable non-bankruptcy law to the liens securing the Second Lien Notes and (v) the Carve Out.  The second lien adequate protection liens shall not be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtor's estate under section 551 of the Bankruptcy Code or (ii) subordinated to or made pari passu with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise, except as expressly provided in the Financing Orders. Neither the Second Lien Notes Trustee nor holders of Second Lien Notes shall receive any other form of adequate protection. |
| **Amended and Restated Credit Facility Agreement** — On the Effective Date, New Ditech and the Term Lenders will enter into or shall be deemed to have entered into, pursuant to the Plan, the Third Amended and Restated Credit Facility Agreement, included as an exhibit to the Plan Supplement in form and substance consistent with this Term Sheet and otherwise acceptable to the Requisite Term Lenders and the Company (the |

WEIL:\96911480\1\41703.0010

| Introduction |
|---|

| | *"**Amended and Restated Credit Facility Agreement**"*).<br><br>The Amended and Restated Credit Facility Agreement shall provide for new term loans (the "***New Term Loans***"), which New Term Loans shall provide for the following material terms:<br><br>• Principal Amount:  $400,000,000<br><br>• Maturity Date:  5 Years post-Effective Date.<br><br>• Interest Rate:  LIBOR + 6.0% cash interest per annum, plus 2.0% PIK interest per annum.<br><br>• Amortization:<br> o  2019: None<br> o  2020: [TBD]<br> o  2021: [TBD]<br><br>• Call Protection: callable at 103%, 102%, 101% for the first, second, and third years, respectively, following the Effective Date.<br><br>• Covenants:  no less favorable to the Term Lenders than as provided for in the Credit Agreement or as otherwise acceptable to the Requisite Term Lenders and Company, and to include the following:<br><br> o  Minimum Tangible Net Worth: [TBD]<br><br> o  Asset Coverage Tests: [TBD]<br><br> o  Monthly MSR Detailed Information: [TBD]<br><br> o  All covenant levels and thresholds to be otherwise acceptable to the Requisite Term Lenders and the Company.<br><br>• Cash Sweep:  [TBD]<br><br>• Closing Conditions: customary closing conditions (including, but not limited to, customary legal opinions from borrower's counsel (including local counsel)) and otherwise as acceptable to the Requisite Term Lenders and the Company.<br><br>The Amended and Restated Credit Facility Agreement shall provide for other financial covenants, other covenants, representations, warranties, and Events of Default (taken as a whole) no less favorable to the Term Lenders than as provided for in the Credit Agreement or as otherwise acceptable to the Requisite Term Lenders and Company. |
| **New Common Stock** | On the Effective Date, New Ditech will issue new common stock of the Company (the "**New Common Stock**"), and which will be in a form and manner acceptable to the Requisite Term Lenders. |
| **No Substantive Consolidation** | The Plan will be implemented without any substantive consolidation. |

WEIL:\96911480\1\41703.0010

| Introduction | |
|---|---|
| **Marketing Process** | "**Reorganization Transaction**" means, collectively, (a) the issuance of the New Common Stock; (b) the entry into the New Term Loans; (c) the entry into the Exit Working Capital Facility; (d) the execution of any new organizational documents; (e) the vesting of the Company's assets in New Ditech pursuant to the Plan; (f) the consummation of any transactions with respect to the foregoing, as determined by the Requisite Term Lenders in their reasonable discretion in accordance with the RSA; and (g) if applicable and only if the terms there of are acceptable to the Requisite Term Lenders, a Master Servicing Transaction. |
| | "**Master Servicing Transaction**" means, as part of a Reorganization Transaction to the extent the terms thereof are acceptable to the Requisite Term Lenders, entry by the Company into an agreement or agreements with an approved subservicer or subservicers (the "**New Subservicer**") whereby, following the Effective Date, all or substantially all of the Company's mortgage servicing rights are subserviced by the New Subservicer. The Debtors shall conduct request for proposal process for the Master Servicing Transaction in accordance with the Bid Procedures. |
| | "*Sale Transaction*" means the sale of substantially all of the Company's assets, as contemplated by one or more Successful Bids, in each case, as provided in the RSA. |
| | "*Successful Bid*" means one or more bids to purchase all or substantially all of the Company's assets that the Company determines, in an exercise of its business judgment: (a) provides sufficient cash consideration to satisfy the following Claims in full in cash in accordance with the priorities set forth in the plan: (i) Allowed Other Secured Claims (except to the extent the applicable purchase agreement provides for a different method of rendering such Claims unimpaired); (ii) Allowed Administrative Claims; (iii) Allowed Professional Fee Claims; (iv) Allowed Priority Tax Claims (unless paid in another manner permitted by section 1129(a)(9)(c) of the Bankruptcy Code); (v) Allowed Other Priority Claims; (vi) pays in full in cash the prepetition warehouse facilities and the DIP Warehouse Facility Claims; and (vii) Allowed Term Loan Claims (or such lesser amount as is acceptable to the Requisite Term Lenders in their sole and absolute discretion); (b) provides consideration that the Company and the Requisite Term Lenders determine is sufficient to pay or reserve for payments pursuant to and in accordance with the Plan, including consideration sufficient to wind down the estates following the closing of the Sale Transaction; and (c) includes such other terms and conditions as the Company and the Requisite Term Lenders may reasonably require. |
| | "*Asset Sale Transaction*" means the sale of a portion of the Company's assets other than a Sale Transaction consummated on or as soon as is reasonably practicable after the Effective Date; provided such sale shall only be conducted with the consent of the Requisite Term Lenders.  Net proceeds of any Asset Sale Transaction shall be "*Asset Sale Proceeds*." |
| | Following the Commencement Date, the Company shall oversee and manage the sale process and solicit bids for a potential Sale Transaction, Master Servicing Transaction, and if applicable, an Asset Sale Transaction, in good- |

WEIL:\96911480\1\41703.0010

| Introduction | |
|---|---|
| | faith consultation with the Requisite Term Lenders. The sale and plan solicitation process shall generally be conducted in accordance with the procedures and timeline set forth on in the Bidding Procedures and the order approving the Disclosure Statement, subject to approval of the Bankruptcy Court. The Requisite Term Lenders and their advisors shall have the right to review all information, diligence, and materials provided by the investment banker retained by the Company to any bidder or prospective bidder with respect to the sale and to consult with such investment banker with respect to any potential Sale Transaction, Asset Sale Transaction, or Master Servicing Transaction. The Company and the advisors for the Requisite Term Lenders shall consult in good faith regarding the sale process, including any diligence and other information requested by the Requisite Term Lenders and their advisors with respect thereto. |
| | The Company shall solicit bids on any and all bases, including soliciting bids that do not pay Allowed Term Loans in full. The Company shall only consummate the Sale Transaction on the Effective Date, if the Company receives a bid with respect to a possible Sale Transaction that would satisfy all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, and Term Loan Claims (or such lesser amount as is acceptable to the Requisite Term Lenders in their sole and absolute discretion) in full in Cash and would satisfy the DIP Warehouse Facility in full in Cash. |
| **Milestones** | The Consenting Term Lenders' support for the Restructuring shall be subject to the timely satisfaction of the following milestones (the "***Milestones***"), which may be extended with the prior written consent of the Requisite Term Lenders: |
| | • File the Plan, Disclosure Statement, and a motion seeking Bankruptcy Court approval of the Bidding Procedures: not later than 15 days after the Commencement Date; |
| | • Entry of Orders approving the Disclosure Statement and Bidding Procedures: not later than 50 days after the Commencement Date; |
| | • Deadline to commence the Auction: not later than 95 days after the Commencement Date; |
| | • Deadline to commence the Confirmation Hearing: not later than 115 days after the Commencement Date; and |
| | • Deadline for Effective Date under the Plan to Occur; not later than 125 days from the Commencement Date. |
| **Treatment of Claims and Interests** | |
| **Class** | **Treatment** |
| **DIP Warehouse** | **Unimpaired; Non-Voting.** The DIP Warehouse Facility Claim shall be paid |

| Introduction |
|---|
| **Facility Claims**     in full in Cash on the Effective Date. |
| **Other Priority Claims, Priority Tax Claims, Other Secured Claims**     **Unimpaired; Non-Voting.** All Priority Tax Claims, other priority Claims, and other secured Claims, other than those Claims otherwise referenced herein, will be unimpaired under the Plan and/or paid in full in the ordinary course of business. |
| **Term Loan Claims**     **Impaired; Voting.** Term Loan Claims shall be allowed in the outstanding principal amount of $961,355,635.34, plus all accrued interest, costs, fees, and expenses under the Credit Agreement.<br><br>a) **If the Company consummates the Reorganization Transaction, including a Master Servicing Transaction (if applicable)**, on the Effective Date, the holders of Term Loan Claims will receive their pro rata share of (i) New Term Loans under the Amended and Restated Credit Facility Agreement; (ii) 100% of the New Common Stock; *provided* that the New Common Stock will be subject to dilution by the Management Incentive Plan, and (iii) if applicable, Asset Sale Proceeds; or<br><br>b) **If the Company consummates the Sale Transaction**, on the Effective Date, the holders of Term Loan Claims will receive their pro rata share of Cash in an amount equal to all Allowed Term Loan Claims, and if applicable, Asset Sale Proceeds. |
| **Second Lien Notes Claims**     **Impaired; Non-Voting.**<br><br>a) **If the Company consummates the Reorganization Transaction, including a Master Servicing Transaction (if applicable)**, the holders of such Claims will not receive any distribution; or<br><br>b) **If the Company consummates the Sale Transaction**, on the Effective Date the holders of Second Lien Notes will receive their pro rata share of Cash in an amount equal to the Cash proceeds as such holders are entitled to under applicable nonbankruptcy law (subject to the Intercreditor Agreement) after the Term Loan Claims are paid in full in Cash, plus the payment in full in Cash of other accrued administrative and priority costs. |
| **General Unsecured Creditors**     **Impaired; Non-Voting.** Holders of all General Unsecured Claims shall not be entitled to any recovery under the Plan; provided, that, in a Sale Transaction, holders of General Unsecured Claims will receive their pro rata share of Cash in an amount equal to the Cash proceeds as such holders are entitled to receive after the Term Loan Claims and Second Lien Notes Claims are paid in full in Cash, plus the payment in full in Cash of other accrued administrative and priority costs. |
| **Go-Forward Trade Claims**     **Impaired; Non-Voting.**<br><br>a) **If the Company consummates the Reorganization Transaction, including a Master Servicing Transaction (if applicable)**, holders of |

WEIL:\96911480\1\41703.0010

| Introduction | |
|---|---|
| | all Go-Forward Trade Claims shall receive a distribution in Cash in an amount equaling not less than [●]% of their Claim, subject to an aggregate cap of $[●], after which any further payments on account of Go-Forward Trade Claims will be subject to the consent of the Requisite Term Lenders; or<br><br>b) **If the Company consummates the Sale Transaction**, holders of Go-Forward Trade Claims shall receive the same treatment as General Unsecured Creditors. |
| **Intercompany Claims** | **Impaired or Unimpaired; Non-Voting.**  Intercompany Claims shall be canceled, reinstated, or receive such other treatment that is acceptable to the Company and the Requisite Term Lenders in their respective reasonable discretion. |
| **Intercompany Interests** | **Impaired or Unimpaired; Non-Voting.** Intercompany Interests shall be canceled, reinstated, or receive such other treatment that is acceptable to the Company and the Requisite Term Lenders in their respective reasonable discretion. |
| **Subordinated Security Claims** | **Impaired; Deemed to Reject.**  Any Claim or Interest subject to subordination pursuant to section 510 of the Bankruptcy Code shall be cancelled and deemed to reject the Plan, and the holders of any such Claims or Interests will not receive any recovery with respect thereto under the Plan. |
| **Existing Equity Interests** | **Impaired; Deemed to Reject.**  Holders of Existing Equity Interests issued and outstanding as of the Effective Date will not receive any recovery on account of their Existing Equity Interests under the Plan and such Existing Equity Interests shall be cancelled and deemed to reject the Plan. |

| Other Key Terms | |
|---|---|
| **Term** | **Description** |
| **Management Incentive Plan** | Following the Effective Date, New Ditech will enter into a post-Restructuring management incentive plan ("***Management Incentive Plan***"), under which up to 10% of the New Common Stock (after taking into account the shares to be issued under the Management Incentive Plan) will be reserved for issuance as awards under the Management Incentive Plan.  If the Company pursues a Reorganization Transaction, the Company shall file a term sheet with proposed terms of the Management Incentive Plan, including initial allocations, no later than the Plan Supplement filing date. |
| **Private Company** | New Ditech will be privately held and shall not be subject to any United States Securities and Exchange Commission reporting obligations. |
| **Government Entities Contracts** | All contracts with government entities such as Ginnie Mae, FNMA, and FHLMC will be assumed or honored as part of the Company's first day relief. |

WEIL:\96911480\1\41703.0010

| Introduction | |
|---|---|
| **Intercreditor Agreement** | The Intercreditor Agreement shall remain in full force and effect and shall be fully enforceable according to its terms. |
| **Credit Bidding** | Upon the direction of the Term Lenders, the Administrative Agent or its designee shall have the right to credit bid all or any portion of the Term Loan Claims in accordance with section 363(k) of the Bankruptcy Code in connection with any transaction, including a Sale Transaction or the Reorganization Transaction, if structured as a sale transaction. |
| **Executory Contracts** | Unless the Company is pursuing a Sale Transaction, subject to the prior written consent of the Requisite Term Lenders, all executory contracts and unexpired leases, other than those expressly identified by the Company for assumption, will be deemed rejected. |
| **Employee Compensation and Benefit Plans** | To be discussed. |
| **Board of Directors of New Ditech** | Upon the Effective Date, the Board of New Ditech will consist of five (5) members, four (4) of whom shall be nominated by the Requisite Term Lenders and one (1) of whom shall be the chief executive officer of New Ditech, Thomas F. Marano. |
| | Corporate governance for New Ditech, including charters, bylaws, operating agreements, or other organization documents, as applicable, shall be consistent with this Term Sheet and section 1123(a)(6) of the Bankruptcy Code (as applicable) and documentation therefor shall be otherwise acceptable to the Requisite Term Lenders. |
| **Charter; Bylaws** | The charter, bylaws, limited liability company agreements and other organizational documents of New Ditech and each of its subsidiaries will be amended or amended and restated by New Ditech consistent with section 1123(a)(6) of the Bankruptcy Code, if applicable, and otherwise in accordance with the Plan, and the RSA. |
| **Cancellation of Notes, Interest, Instruments, Certificates and other Documents** | Except as provided herein and in connection with the Credit Agreement, on the Effective Date, all notes, instruments, certificates evidencing debt to, or Interests in, the Company, including, without limitation, the Second Lien Notes and Existing Equity Interests, will be cancelled and obligations of the Company thereunder will be discharged.  In addition, on the Effective Date, any registration rights or similar agreements with respect to Existing Equity Interests will also be cancelled and any obligations of the Company thereunder will be discharged. |
| **Vesting of Assets** | On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all assets of the Company's Estate will vest in New Ditech free and clear of all claims, liens, encumbrances, charges and other interests, except as otherwise provided in the Plan. |

WEIL:\96911480\1\41703.0010

| Introduction | |
|---|---|
| **Compromise and Settlement** | The Plan will contain provisions for the compromise and settlement of Claims stating that, except as provided herein, the allowance, classification and treatment of Allowed Claims and Interests and their respective distributions take into account and conform to the relative priority and rights of such Claims and Interests in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise. |
| **Released Parties** | "***Released Parties***" means, collectively:  (a) the Consenting Term Lenders; (b) the Administrative Agent; (c) such other entities as agreed between the Company and the Requisite Term Lenders; and (d) with respect to each of the Company, New Ditech, and each of the foregoing entities in clauses (a) through (c), such entities' predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, and all of their respective current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such persons' respective heirs, executors, estates, servants and nominees. |
| **Releases** | To the extent the Restructuring is consummated, the Plan will provide for releases with language substantially to the effect of the following:<br><br>Releases by the Company:  As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Definitive Documents, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties to facilitate the reorganization of the Company and the implementation of the Restructuring, and except as otherwise provided in the Plan or in the confirmation order for the Plan, the Released Parties will be deemed forever released and discharged, to the maximum extent permitted by law, by the Company, New Ditech, and Estate and all affiliates or subsidiaries managed or controlled thereby, from any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, remedies, losses, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Company, or New Ditech (as the case may be), or the Estate, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Company, or New Ditech (as the case may be), or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or interest or other person, based on or relating to, or in any manner arising prior to the Effective Date from, in whole or in part, the Company, the chapter 11 cases, the purchase, sale, or rescission of the purchase or sale of any security of the Company, the subject matter of, or the transactions or events giving rise to, any Claim or interest that is treated in the Plan, the business or contractual arrangements between any of the Company and any Released Party, the Restructuring, the restructuring of any Claim or interest before or during the Chapter 11 Cases, the Disclosure Statement, the RSA, and the Plan |

11

**134**

| | |
|---|---|
| **Introduction** | |
| | and related agreements, instruments, and other documents (including the Definitive Documents), and the negotiation, formulation, or preparation thereof, the solicitation of votes with respect to the Plan, or any other act or omission, other than claims or causes of action arising out of or related to any act or omission of a Released Party that constitutes fraud or willful misconduct, as determined by a Final Order. |
| | <u>Releases by holders of Impaired Claims</u>: As of the Effective Date, except (i) for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remain in effect or become effective after the Effective Date or (ii) as otherwise expressly provided in the Plan or in confirmation order for the Plan, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever, released, and discharged by |
| | (1)      the holders of Impaired Claims who voted to accept the Plan; |
| | (2)      the parties to the RSA, in accordance with and subject to the terms of the RSA; and |
| | (3)      with respect to any entity in the foregoing clauses (1) and (2), such Entity's (a) predecessors, successors and assigns, (b) any subsidiaries, affiliates, managed accounts or funds, managed or controlled by such entity and (c) all persons entitled to assert claims through or on behalf of such entities with respect to the matters for which the releasing entities are providing releases, |
| | in each case, from any and all Claims, interests or Causes of Action whatsoever, including any derivative Claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on, relating to, or arising prior to the Effective Date from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or New Ditech, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Plan (including the Plan Supplement), the RSA, the Definitive Documents, or any related agreements, instruments, or other documents, the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; *provided* that nothing in this the Plan shall be construed to release the Released Parties from willful misconduct or intentional fraud as determined by a Final Order. |

WEIL:\96911480\1\41703.0010

| Introduction | |
|---|---|
| **Injunction** | The Plan will provide for an injunction solely with respect to any Claim or Interest extinguished, discharged, or released pursuant to the Plan, with language substantially to the effect of the following:
(a)    Upon entry of the confirmation order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim extinguished, discharged, or released pursuant to the Plan.
(b)    Except as expressly provided in the Plan, the confirmation order, or a separate order of the Bankruptcy Court or as agreed to by the Debtors and a holder of a Claim against or Interest in the Debtors, all Entities who have held, hold, or may hold Claims against or Interests in the Debtors (whether proof of such Claims or Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action that will be or are extinguished, discharged, or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Released Parties or the property of any of the Released Parties, (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Released Parties or the property of any of the Released Parties, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Released Parties or the property of any of the Released Parties, (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Released Parties or the property of any of the Released Parties, except as contemplated or Allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.
(c)    By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest extinguished, discharged, or released pursuant to the Plan will be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth in the Plan.
(d)    The injunctions in the Plan shall extend to any successors of the Debtors and New Ditech and their respective property and interests in property. |
| **Exculpation** | The Plan will provide that "***Exculpated Parties***" will have the same meaning as Released Parties. |

WEIL:\96911480\1\41703.0010

| Introduction | |
|---|---|
| | The Plan will contain exculpation provisions with language substantially to the effect of the following: |
| | To the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any claim in connection with or arising out of the administration of the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Company; the negotiation and pursuit of the Disclosure Statement, the RSA, the Restructuring Transactions, the Plan, or the solicitation of votes for, or confirmation of, the Plan; the funding or consummation of the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; the issuance of securities under or in connection with the Plan; or the transactions in furtherance of any of the foregoing; except for fraud or willful misconduct, as determined by a Final Order. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability. |
| **Tax Treatment** | The Restructuring contemplated by this Term Sheet shall be structured, with the reasonable consent of the RSA Parties, (1) to preserve favorable tax attributes of the Company to the extent practicable and (2) in a tax efficient manner for the Consenting Term Lenders and the Company. |
| **Conditions to Effectiveness** | The Plan will be subject to usual and customary conditions to confirmation and effectiveness (as applicable), as well as such other conditions that are reasonably satisfactory to the Company and the Requisite Term Lenders including the following: |
| | 1. the Definitive Documents will contain terms and conditions consistent in all respects with this Term Sheet and the RSA and will otherwise be satisfactory or reasonably satisfactory in form and substance to the Requisite Term Lenders and the Company to the extent set forth in the RSA or this Term Sheet; |
| | 2. the Bankruptcy Court will have entered the confirmation order for the Plan, and such confirmation order will not have been reversed, stayed or modified; |
| | 3. the RSA will not have been terminated, and will be in full force and effect; |
| | 4. all Restructuring Expenses will have been paid in full in Cash; |
| | 5. the conditions to closing of the Amended and Rested Credit Facility Agreement and Exit Working Capital Facility shall have been satisfied; and |
| | 6. all governmental and third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by this Term Sheet will have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable |

WEIL:\96911480\1\41703.0010

| Introduction | |
|---|---|
| | waiting periods will have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions. |
| | The conditions to effectiveness may be waived in writing by the Company together with the Requisite Term Lenders. |
| **Securities Exemptions** | The issuance and distribution under the Plan of the New Common Stock, if applicable, to the Term Lenders will be exempt from registration under the Securities Act or other applicable securities laws without further act or action by any Person pursuant to section 1145(a) of the Bankruptcy Code and/or any other applicable exemptions. |
| **Fees and Expenses** | The Company shall pay or reimburse all reasonable and documented fees and out-of-pocket expenses (regardless of whether such fees and expenses were incurred before or after the Commencement Date) of Kirkland & Ellis LLP and FTI Consulting, in connection with the subject matter of this Term Sheet and the Restructuring pursuant to the economic terms of their respective engagement letters. The Company will also pay the fees and expenses of the Administrative Agent (including its counsel) in the manner set forth in, and to the extent required by, the Credit Agreement. |
| **Retention of Jurisdiction** | The Plan will provide for a broad retention of jurisdiction by the Bankruptcy Court for (a) resolution of claims, (b) allowance of compensation and expenses for pre-Effective Date services, (c) resolution of motions, adversary proceedings or other contested matters, (d) entering such orders as necessary to implement or consummate the Plan and any related documents or agreements and (e) other purposes. |
| **Resolution of Disputed Claims** | The Plan will provide customary procedures for the resolution of disputed Claims, including the ability (but not requirement) to establish a claims bar date pursuant to an order of the Bankruptcy Court. Once resolved, the claimants will receive distributions, if any, in accordance with the provisions of the Plan and the classification of their Allowed Claim. |
| **Definitive Documents** | This Term Sheet is indicative, and any final agreement will be subject to the Definitive Documents. The Definitive Documents will contain terms, conditions, representations, warranties, and covenants, each customary for the transactions described herein consistent with the terms of this Term Sheet, and in accordance with the RSA. |
| **Other Terms** | Acceptable to the RSA Parties in accordance with the RSA. |

**ANNEX A**

**Certain Defined Terms**

16

**139**

| **Defined Terms** |
|---|
| "***Administrative Expense Claim***" | Means any right to payment constituting a cost or expense of administration incurred during the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Commencement Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Fee Claims; (c) Restructuring Expenses; and (d) any Claim under the DIP Warehouse Facility, against a Debtor. |
| "***Allowed***" | Means, with reference to any Claim or Interest, a Claim or Interest (a) arising on or before the Effective Date as to which (i) no objection to allowance or priority, and no request for estimation or other challenge, including, without limitation, pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed and not withdrawn within the applicable period fixed by the Plan or applicable law, or (ii) any objection has been determined in favor of the holder of the Claim or Interest by a Final Order, (b) that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtors or New Ditech, (c) as to which the liability of the Debtors or New Ditech, as applicable, and the amount thereof are determined by a Final Order of a court of competent jurisdiction, or (d) expressly allowed hereunder; provided, however, that notwithstanding the foregoing, (x) unless expressly waived by the Plan, the Allowed amount of Claims or Interests shall be subject to and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable, and (y) New Ditech shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan. |
| "***Bankruptcy Code***" | Has the same meaning as in the RSA. |
| "***Bankruptcy Court***" | Has the same meaning as in the RSA. |
| "***Bidding Procedures***" | Means the procedures governing the auction and sale process relating to any potential Sale Transaction, Asset Sale Transaction, or Master Servicing Transaction, as approved by the Bankruptcy Court and as may be amended from time to time in accordance with their terms and otherwise as acceptable to the Company and the Requisite Term Lenders. |
| "***Cash***" | Means legal tender of the United States of America. |
| "***Cause of Action***" | Means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, lien, indemnity, guaranty, suit, obligation, liability, loss, debt, damage, judgment, account, defense, remedies, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or |

17

140

| **Defined Terms** |
|---|

|  | unsecured, assertable directly or derivatively, whether arising before, on, or after the Commencement Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including, without limitation, under any state or federal securities laws). Causes of Action also includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim. |
|---|---|
| *"Chapter 11 Cases"* | Means the cases under chapter 11 of the Bankruptcy Code to be commenced by the Company by no later than the Outside Commencement Date, in the Bankruptcy Court and styled *In re Ditech Holding Corp.*; *provided*, that, to the extent that any other subsidiary or affiliate of the Company commences a case under chapter 11 of the Bankruptcy Code, the Company will seek to have such case jointly administered on a procedural basis with the Company's chapter 11 cases, and any reference to the Chapter 11 Cases shall be deemed to include such other cases (if any) filed by the Company's subsidiaries and affiliates. |
| *"Claim"* | A "claim," as defined in section 101(5) of the Bankruptcy Code, as against any Debtor. |
| *"Class"* | Any group of Claims or Interests classified by the Plan pursuant to section 1122(a)(1) of the Bankruptcy Code. |
| *"Confirmation Hearing"* | A hearing at which the Bankruptcy Court will confirm the Plan, as applicable. |
| *"Definitive Documents"* | Shall have the same meaning as in the RSA, as applicable. |
| *"Disclosure Statement"* | The disclosure statement filed by the Debtors in support of the Plan. |
| *"Effective Date"* | Shall have the same meaning as in the RSA. |
| *"Estate(s)"* | Individually or collectively, the estate or estates of a Debtor created under section 541 of the Bankruptcy Code. |
| *"Existing Warehouse and Repurchase Facilities"* | Means, each of and collectively, the (i) Second Amended and Restated Master Repurchase Agreement, dated as of November 30, 2017, by and among Reverse Mortgage Solutions, Inc., as seller, the seller parties party thereto, Credit Suisse First Boston Mortgage Capital LLC, as administrative agent, and the buyers party thereto, (ii) Amended and Restated Master Repurchase Agreement, dated November 18, 2016, by and among Ditech Financial LLC, as seller, Credit Suisse First Boston Mortgage Capital LLC, as administrative agent, and the buyers party |

| **Defined Terms** |
|---|
| | thereto, (iii) Master Repurchase Agreement, dated as of April 23, 2018, between Reverse Mortgage Solutions, Inc. as seller and Barclays Bank PLC, as purchaser and agent, (iv) Participation Interest Sale and Contribution Agreement, dated as of October 1, 2018, by and among Reverse Mortgage Solutions, Inc. and one of its subsidiaries, and the related Note Purchase Agreement of even date therewith, between such subsidiary and National Founders LP, (v) the Indenture and the supplement thereto, each dated as of February 9, 2018, among Ditech Agency Advance Trust, Wells Fargo, as indenture agent, calculation agent, paying agent and securities intermediary, Ditech Financial LLC, as servicer and administrator, and Credit Suisse, as administrative agent and (vi) the Indenture and the supplement thereto, each dated as of February 9, 2018, among Ditech DPAT II Advance Trust II, Wells Fargo, as indenture trustee, calculation agent, paying agent and securities intermediary, Ditech Financial LLC, as servicer and administrator, and Credit Suisse, as administrative agent (in each case, as amended, restated, amended and restated, supplemented or otherwise modified from time to time). |
| *"Fee Claim"* | Means a Claim for professional services rendered or costs incurred on or after the Commencement Date through the Effective Date by professional persons retained by the Debtors by an order of the Bankruptcy Court pursuant to sections 327, 328, 329, 330, 331, or 503(b) of the Bankruptcy Code in the Chapter 11 Case. |
| *"Final Order"* | Means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument, or rehearing shall have expired; provided, however, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment. |
| *"Impaired"* | Means, with respect to a Claim, Interest, or Class of Claims or Interests, "impaired" within the meaning of sections 1123(a)(4) and 1124 of the |

WEIL:\96911480\1\41703.0010

| **Defined Terms** |
|---|

| | Bankruptcy Code. |
|---|---|
| **"Intercompany Claim"** | Any Claim against any of the Company's entities held by another of the Company's entities. |
| **"Intercompany Interest"** | An Interest in any of the Company's direct or indirect subsidiaries held by another of the Company's entities or an Interest in the Company held by an affiliate of the Company (other than any Preferred Stock or Existing Equity Interest in Holdings). |
| **"Intercreditor Agreement"** | Shall have the same meaning as ascribed to it in the Credit Agreement. |
| **"Interests"** | Means any equity security (as defined in section 101(16) of the Bankruptcy Code) of a Debtor, including all shares, common stock, preferred stock, or other instrument evidencing any fixed or contingent ownership interest in any Debtor, whether or not transferable, and any option, warrant, or other right, contractual or otherwise, to acquire any such interest in the Debtors, whether fully vested or vesting in the future, including, without limitation, equity or equity-based incentives, grants, or other instruments issued, granted or promised to be granted to current or former employees, directors, officers, or contractors of the Debtors, to acquire any such interests in the Debtors that existed immediately before the Effective Date. |
| **"New Ditech"** | Means, on or after the Effective Date, Ditech and each of the other Debtors, as reorganized, pursuant to and under the Plan or any successor thereto, and/or one or more acquiring entities, in each case, after giving effect to the Reorganization Transaction, whether structured as a debt-for-equity exchange or credit bid and asset sale transaction. |
| **"Other Secured Claim"** | Means a Secured Claim, other than an Administrative Expense Claim, a Claim in connection with the DIP Warehouse Facility, a Priority Tax Claim, or a Term Loan Claim. |
| **"Commencement Date"** | Has the same meaning as in the RSA. |
| **"Plan Supplement"** | Has the same meaning as in the RSA. |
| **"Priority Non-Tax Claim"** | Means any Claim other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code. |
| **"Priority Tax Claim"** | Means any Secured Claim or unsecured Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code. |
| **"Reinstate", "Reinstated", or** | Means leaving a Claim Unimpaired under the Plan. |

| Defined Terms | |
|---|---|
| *"Reinstatement""* | |
| *"Rejecting Class"* | Means a Class that does not vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code. |
| *"Requisite Term Lenders"* | Has the same meaning as in the RSA. |
| *"Restructuring Expenses"* | Means, with respect to, (a) the Requisite Term Lenders, the reasonable and documented fees, costs, and expenses of (i) Kirkland & Ellis LLP, (ii) one law firm acting as local counsel (if any), and (iii) FTI Consulting Inc.; (b) the Administrative Agent, to the extent provided under the Credit Agreement, pursuant to the economic terms of their respective engagement letters with the Company or, in the case of the Administrative Agent, the Credit Agreement. |
| *"Restructuring Transactions"* | Has the same meaning as in the RSA. |
| *"RSA Parties"* | Means the Consenting Term Lenders (as defined in the RSA). |
| *"Unimpaired"* | Means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code. |

## **EXHIBIT B**

## **FORM OF JOINDER AGREEMENT FOR CONSENTING TERM LENDERS**

This Joinder Agreement to the Restructuring Support Agreement, dated as of [●] (as amended, supplemented or otherwise modified from time to time, the "***Agreement***"), by and among Ditech Holding Corporation, and the holders of the Term Loans (together with their respective successors and permitted assigns, the "***Consenting Term Lenders***" and each, a "***Consenting Term Lender***") is executed and delivered by _____ (the "***Joining Party***") as of _____ __, 2019.  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1.    Agreement to be Bound.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as **Annex I** (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions hereof).  The Joining Party shall hereafter be deemed to be a "Consenting Term Lender" and a "Party" for all purposes under the Agreement and with respect to any and all Claims held by such Joining Party.

2.    Representations and Warranties.  With respect to the aggregate principal amount of Term Loans set forth below its name on the signature page hereto, the Joining Party hereby makes the representations and warranties of the Consenting Term Lenders set forth in Section 7 of the Agreement to each other Party to the Agreement.

3.    Governing Law.  This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflict of laws provisions which would require the application of the law of any other jurisdiction.

[Signature Page Follows]

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**CONSENTING TERM LENDER**

By:_____

Name:

Title:

Notice Address:

_____

_____

_____

Fax: _____

Attention:

Email:    _____

_____

Acknowledged:

**DITECH HOLDING CORPORATION**
on its own behalf and on behalf of its direct
and indirect subsidiaries

By:_____

Name:
Title:

SIGNATURE PAGE TO JOINDER AGREEMENT

**Schedule 1**

**Committees**

Pursuant to Local Bankruptcy Rule 1007-2(a)(3), prior to the Commencement Date, the Debtors are aware of the following ad hoc groups that were formed to engage with the Debtors in an effort to participate in the Debtors' ongoing restructuring efforts.

| Committee Description | Committee Representative |
|---|---|
| Ad hoc group of holders of the 2018 Term Loan under the Second Amended and Restated Credit Agreement | Kirkland & Ellis LLP, 300 North LaSalle, Chicago, IL 60654 (Attn: Patrick J. Nash and Gregory F. Pesce) |
| Ad hoc group of holders of the 9.0% Second Lien Senior Subordinated PIK Toggle Notes due 2024 | Milbank, Tweed, Hadley & McCloy LLP, 2029 Century Park East, Los Angeles, CA 90067 (Attn: Gregory A. Bray and Melanie K. Mansfield) |

### Schedule 2

### Consolidated List of 40 Largest Unsecured Claims (Excluding Insiders)[1]

Pursuant to Local Rule 1007-2(a)(4), the following is a list of creditors holding, as of February 9, 2019, the forty (40) largest, unsecured claims against the Debtors, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim — If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | ISGN Solutions Inc. Attn.: E. Rock Primas 2330 Commerce Park Drive, NE, Suite 2 Palm Bay, Florida 32905 | Attn.: E. Rock Primas Phone: (609) 932-4712 Email: rock.primas@isgnsolutions.com | Trade Debt | | | | $1,531,484.00 |
| 2 | Black Knight Tech Solutions Attn.: Darlene Ledet 601 Riverside Avenue Jacksonville, FL 32204 | Attn.: Darlene Ledet Phone: (904) 854-3153 Email: darlene.ledet@bkfs.com | Trade Debt | | | | $1,458,204.00 |
| 3 | Servicelink Attn.: Joe Greve 9600 Reserve Run Brecksville, Ohio 15108 | Attn.: Joe Greve Phone: (216) 374-1888 Email: joe.greve@svclnk.com | Trade Debt | | | | $1,222,945.00 |
| 4 | Corelogic Tax Services LLC Attn.: Tom Blauvelt 4 First American Way Santa Ana, California 92707 | Attn.: Tom Blauvelt Phone: (512) 977-3716 Email: tblauvelt@corelogic.com | Trade Debt | | | | $1,155,282.00 |
| 5 | Safeguard Properties Mgmt. LLC Attn.: Gregory Sharp 7887 Safeguard Cir. Valley View, Ohio 44125 | Attn.: Gregory Sharp Phone: (216) 739-2900 Email: gregory.sharp@safeguardproperties.com | Trade Debt | | | | $1,150,138.00 |
| 6 | Tata Consultancy Services Ltd. Attn.: Prashant Panghal 379 Thornall Street Edison, New Jersey 08837 | Attn.: Prashant Panghal Phone: (732) 986-6921 Email: prashant1.p@tcs.com | Trade Debt | | | | $1,135,384.00 |
| 7 | Cognizant Technology Solutions Attn.: Janine Lj Durham 2512 Dunlap Avenue Phoenix, Arizona 32905 | Attn.: Janine Lj Durham Phone: (602) 315-0481 Email: janine.durham@cognizant.com | Trade Debt | | | | $1,023,481.00 |
| 8 | Corelogic Information Solutions Attn.: Tom Blauvelt 4 First American Way Santa Ana, California 92707 | Attn.: Tom Blauvelt Phone: (512) 977-3716 Email: tblauvelt@corelogic.com | Trade Debt | | | | $800,585.00 |
| 9 | Black Knight Financial Services Attn.: Darlene Ledet 601 Riverside Avenue Jacksonville, Florida 32204 | Attn.: Darlene Ledet Phone: (904) 854-3153 Email: darlene.ledet@bkfs.com | Trade Debt | | | | $586,915.00 |

---

[1]    The information herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.  All claims are subject to customary offsets, rebates, discounts, reconciliations, credits, and adjustments, which are not reflected on this Schedule.

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 10 | Verizon Business<br>Attn.: Lona Gruebele<br>22001 Loudoun County Pkwy<br>Ashburn, Virgina 20147 | Attn.: Lona Gruebele<br>Phone: (612) 805-1034<br>Email: lona.j.gruebele@verizon.com | Trade Debt | | | | $555,663.00 |
| 11 | Nationwide Title Clearing Inc.<br>Attn.: Debbie Lastoria<br>2100 Alt 19 North<br>Palm Harbor, Florida 34683 | Attn.: Debbie Lastoria<br>Phone: (727) 771-4000<br>Email: debbie_lastoria@nwtc.com | Trade Debt | | | | $554,418.00 |
| 12 | NCP Solutions LLC<br>Attn.: Tom Hart<br>5200 East Lake Boulevard<br>Birmingham, Alabama 35217 | Attn.: Tom Hart<br>Phone: (205) 421-7254<br>Email: thart@ncpsolutions.com | Trade Debt | | | | $492,500.00 |
| 13 | Pegasystems Inc.<br>Attn.: Kirk Faustman<br>One Rogers Street<br>Cambridge, Massachusetts 02142 | Attn.: Kirk Faustman<br>Phone: (617) 777-3229<br>Email: kirk.faustman@pega.com | Trade Debt | | | | $480,180.00 |
| 14 | Padgett Law Group<br>Attn.: Timothy D. Padgett<br>6267 Old Water Oak Road, Suite 203<br>Tallahassee, Florida 32312 | Attn.: Timothy D. Padgett<br>Phone: (850) 422-2520<br>Email: accounting@padgettlaw.net | Professional Services | | | | $471,337.00 |
| 15 | McCalla Raymer Leibert Pierce LLC<br>Attn.: Michael Allgood<br>1544 Old Alabama Road<br>Roswell, Georgia 30076 | Attn.: Michael Allgood<br>Phone: (770) 643-7202<br>Email: michael.allgood@mccalla.com | Trade Debt | | | | $462,992.00 |
| 16 | RAS Crane LLC<br>Attn.: John Crane<br>10700 Abbott's Bridge Road; Suite 170<br>Duluth, Georgia 30097 | Attn.: John Crane<br>Phone: (972) 757-1486<br>Email: jcrane@rascrane.com | Professional Services | | | | $446,268.00 |
| 17 | Locke Lord LLP<br>Attn.: Lori Barton<br>2200 Ross Avenue, Suite 2800<br>Dallas, Texas 75201 | Attn.: Lori Barton<br>Phone: (214) 740-8000<br>Email: lori.barton@lockelord.com | Professional Services | | | | $443,666.00 |
| 18 | Ellie Mae Inc.<br>Attn.: John Coppa<br>4420 Rosewood Drive, Suite 500<br>Pleasanton, CA 94588 | Attn.: John Coppa<br>Phone: (925) 227-2060<br>Email: john.coppa@elliemae.com | Professional Services | | | | $347,728.00 |
| 19 | Quattro Direct LLC<br>Attn.: Dan Lawler<br>200 Berwyn Park, Suite 310<br>Berwyn, Pennsylvania 19312 | Attn.: Dan Lawler<br>Phone: (610) 993-0070<br>Email: dlawler@quattrodirect.com | Trade Debt | | | | $342,006.00 |
| 20 | KML Law Group PC<br>Attn.: Lisa Lee<br>701 Market Street, Suite 5000<br>Philadelphia, Pennsylvania 19106 | Attn.: Lisa Lee<br>Phone: (215) 627-1322<br>Email: llee@kmllawgroup.com | Professional Services | | | | $332,535.00 |
| 21 | Phelan Hallinan LLP<br>Attn.: Jay Jones<br>1617 JFK Blvd., Suite 1400<br>Philadelphia, Pennsylvania 19103-1814 | Attn.: Jay Jones<br>Phone: (215) 563-7000<br>Email: jay.jones@phelanhallinan.com | Professional Services | | | | $305,245.00 |
| 22 | Insight Direct/ Datalink<br>Attn.: Michael Schmidt<br>6820 South Harl Avenue<br>Tempe, Arizona 85283 | Attn.: Michael Schmidt<br>Phone: (651) 260-4017<br>Email: Michael.schmidt@insight.com | Trade Debt | | | | $300,279.00 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 23 | TCS America Attn.: Prashant Panghal 379 Thornall Street Edison, New Jersey 08837 | Attn.: Prashant Panghal Phone: (732) 986-6921 Email: prashant1.p@tcs.com | Trade Debt | | | | $297,383.00 |
| 24 | Robertson Anschutz & Schneid PL Attn.: Eric L. Bronfeld 6409 Congress Avenue, Suite 100 Boca Raton, Florida 33487 | Attn.: Eric L. Bronfeld Phone: (561) 241-6901 Email: arcollections@rasflaw.com | Professional Services | | | | $290,502.00 |
| 25 | American Bankers Insurance Attn.: Michelle Griffith 11222 Quail Roost Drive Miami, Florida 33157 | Attn.: Michelle Griffith Phone: (305) 253-2244 Email: michelle.griffith@assurant.com | Trade Debt | | | | $285,213.00 |
| 26 | Indecomm Holdings Inc. Attn.: Teddi Horan 205 Regency Executive Park Drive, Suite 500 Charlotte, North Carolina 28217 | Attn.: Teddi Horan Phone: (215) 962-7212 Email: teddi.horan@indecomm.net | Trade Debt | | | | $284,830.00 |
| 27 | Wells Fargo Bank N.A Attn.: Holly Monday 420 Montgomery Street San Francisco, California 94104 | Attn.: Holly Monday Phone: (703) 865-7740 Email: holly.monday@wellsfargo.com | Trade Debt | | | | $271,624.00 |
| 28 | Newcourse Communications Inc. Attn.: Valerie Griffin 5010 Linbar Dr., Ste. 100 Nashville, Tennessee 37211 | Attn.: Valerie Griffin Phone: (615) 921-6656 Email: valerie.giffin@newcoursecc.com | Trade Debt | | | | $270,000.00 |
| 29 | Xome Valuation Services Attn.: Allen Illgen 444 East Washington Street Indianapolis, Indiana 46204 | Attn.: Allen Illgen Phone: (612) 207-4012 Email: allen.illgen@assurant.com | Trade Debt | | | | $249,474.00 |
| 30 | Rean Cloud LLC Attn.: Rupa Vasireddy 2201 Cooperative Way #250 Herndon, Virginia 20171 | Attn.: Rupa Vasireddy Phone: (844) 377-7326 Email: rupa@reancloud.com | Trade Debt | | | | $240,667.00 |
| 31 | US Real Estate Services Inc. Attn.: Becca Nottberg 25520 Commerce Centre Drive; 1st Floor Lake Forest, California 92630 | Attn.: Becca Nottberg Phone: (949) 206-5353 Email: becca.nottberg@res.net | Trade Debt | | | | $233,284.00 |
| 32 | Operational Excellence Attn.: Tony Galluzzo 19712 MacArthur Blvd., Suite 110 Irvine, California 92612 | Attn.: Tony Galluzzo Phone: (949) 988-7229 Email: tgalluzzo@ca-usa.com | Trade Debt | | | | $231,378.00 |
| 33 | US Bank Trust NA Att.: Kirk Larson 300 East Delaware; 8th Floor Wilmington, Delaware 19809 | Attn.: Kirk Larson Phone: (651) 466-5666 Email: kirk.larson1@usbank.com | Trade Debt | | | | $230,809.00 |
| 34 | Wolfe & Wyman LLP Attn.: Stuart B. Wolfe 11811 N. Tatum, Suite 3031 Phoenix, Arizona 85028-1621 | Attn.: Stuart B. Wolfe Phone: (602) 953-0100 Email: sbwolfe@wolfewyman.com | Professional Services | | | | $228,398.00 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 35 | Five Brothers Mortgage Servs Attn.: Dawn Whiteaker 12220 E. 13 Mile Road; Suite 100 Warren, Missouri  48093 | Attn.: Dawn Whiteaker Phone: (586) 354-2017 Email: dawnrw@fiveonline.com | Trade Debt | | | | $224,947.00 |
| 36 | Servicelink Default Title & Closing Attn.: Joe Greve 1355 Cherrington Parkway Moon Township, Pennsylvania  15108 | Attn.: Joe Greve Phone: (216) 374-1888 Email: joe.greve@svclnk.com | Trade Debt | | | | $218,298.00 |
| 37 | Level 3 Communications LLC Attn.: Timothy McGraw 600 W. Chicago Avnue, Suite 325 Chicago, Illinois  60654 | Attn.: Timothy McGraw Phone: (612) 392-7364 Email: timothy.mcgraw@level3.com | Trade Debt | | | | $209,330.00 |
| 38 | Xome Field Services LLC Attn.: Allen Illgen 444 East Washington Street Indianapolis, Indiana  46204 | Attn.: Allen Illgen Phone: (612) 207-4012 Email: allen.illgen@assurant.com | Trade Debt | | | | $206,077.00 |
| 39 | RAS Boriskin LLC Attn.: Sara Borskin 900 Merchants Concourse Westbury, New York  11590 | Attn.: Sara Boriskin Phone: (516) 280-7675 Email: sboriskin@rasboriskin.com | Trade Debt | | | | $202,336.00 |
| 40 | ISGN Corporation Attn.: E. Rock Primas 2330 Commerce Park Drive, NE, Suite 2 Palm Bay, Florida  32905 | Attn.: E. Rock Primas Phone: (609) 932-4712 Email: rock.primas@isgnsolutions.com | Trade Debt | | | | $200,850.00 |

**Schedule 3**

**Consolidated List of the Holders of 5 Largest Secured Claims**

Pursuant to Local Bankruptcy Rule 1007-2(a)(5), the following is a list of creditors holding the five largest non-contingent, secured claims against the Debtors, on a consolidated basis, as of the Commencement Date.

| # | Creditor | Contact, Mailing Address & Telephone Number | Nature of Claim | Amount of Claim[1] | Collateral Description | Estimated Value of Collateral[2] | Contingent, Unliquidated, or Disputed |
|---|----------|---------------------------------------------|-----------------|--------------------|------------------------|----------------------------------|----------------------------------------|
| 1 | Credit Suisse AG, Cayman Islands Branch | Megan E Kane Credit Suisse Services (USA) LLC One Madison Avenue New York, NY 10010 +1 (212) 325-1690 | Term Loan | $961,355,635.37 | Secured by substantially all of the Debtors' assets | Unknown | |
| 2 | Credit Suisse First Boston Mortgage Capital LLC | Margaret D Dellafera Credit Suisse Securities (USA) LLC 11 Madison Ave New York, NY 10010 +1 (212) 325-6471 | Mortgage Loan Warehouse Facility | $471,129,677.00 | Purchase Mortgage Loans | $495,933,033.00 | |
| 3 | Credit Suisse First Boston Mortgage Capital LLC | Margaret D Dellafera Credit Suisse Securities (USA) LLC 11 Madison Ave New York, NY 10010 +1 (212) 325-6471 | Reverse Mortgage Warehouse Facility | $414,895,327.00 | HECMs and real estate owned | $519,869,881.00 | |
| 4 | Barclays Bank PLC | Ellen Kiernan Barclays Bank PLC – Mortgage Finance 745 Seventh Avenue, 4th Floor New York, NY 10019 +1 (212) 412-7990 | Reverse Mortgage Warehouse Facility | $340,846,274.00 | HECMs and real estate owned | $445,811,205.00 | |

---

[1]    Outstanding balances as of February 1, 2019.

[2]    Reflects the face amount of the collateral pledged as of February 1, 2019.

| 5 | Wilmington Savings Fund Society, FSB | Geoffrey J Lewis Wilmington Savings and Fund Society 500 Delaware Ave Wilmington, DE 19801 +1 (302) 573-3218 | Second Lien Notes | $253,895,875.00 | Secured by substantially all of the Debtors' assets | Unknown | |

## Schedule 4

Pursuant to Local Bankruptcy Rule 1007-2(a)(6), the following are estimates of the Debtors' total assets and liabilities on a consolidated basis, as consolidated with their affiliated non-Debtors as of September 30, 2018.

**DITECH HOLDING CORPORATION AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**
**(in thousands, except share and per share data)**

| | September 30, 2018 (unaudited) |
|---|---|
| **ASSETS** | |
| Cash and cash equivalents | $ 187,197 |
| Restricted cash and cash equivalents | 86,774 |
| Residential loans at amortized cost, net (includes $920 and $6,347 in allowance for loan losses at September 30, 2018 and December 31, 2017, respectively) | 389,756 |
| Residential loans at fair value | 10,017,770 |
| Receivables, net (includes $2,457 and $5,608 at fair value at September 30, 2018 and December 31, 2017, respectively) | 101,417 |
| Servicer and protective advances, net (includes $25,372 and $164,225 in allowance for uncollectible advances at September 30, 2018 and December 31, 2017, respectively) | 467,694 |
| Servicing rights, net (includes $658,122 and $714,774 at fair value at September 30, 2018 and December 31, 2017, respectively) | 710,728 |
| Goodwill | — |
| Intangible assets, net | 32,351 |
| Premises and equipment, net | 70,504 |
| Deferred tax assets, net | 560 |
| Other assets (includes $19,201 and $29,394 at fair value at September 30, 2018 and December 31, 2017, respectively) | 270,256 |
| Total assets | $ 12,335,007 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | |
| Payables and accrued liabilities (includes $1,441 and $1,282 at fair value at September 30, 2018 and December 31, 2017, respectively) | $ 864,947 |
| Servicer payables | 128,320 |
| Servicing advance liabilities | 226,591 |
| Warehouse borrowings | 1,549,694 |
| Corporate debt | 1,202,998 |
| Mortgage-backed debt (includes $496,124 and $348,682 at fair value at September 30, 2018 and December 31, 2017, respectively) | 496,124 |
| HMBS related obligations at fair value | 7,810,508 |
| Deferred tax liabilities, net | 643 |
| Total liabilities not subject to compromise | 12,279,825 |
| Liabilities subject to compromise | — |
| Total liabilities | 12,279,825 |
| Commitments and contingencies (Note 23) | |
| Stockholders' equity (deficit): | |
| Preferred stock, $0.01 par value per share (Successor and Predecessor): | |
| Authorized - 10,000,000 shares, including 100,000 shares of mandatorily convertible preferred stock (Successor) and 10,000,000 shares (Predecessor) | |
| Issued and outstanding - 94,421 shares at September 30, 2018 (Successor) and 0 shares at December 31, 2017 (Predecessor) (liquidation preference $98,724 at September 30, 2018) | 1 |
| Common stock, $0.01 par value per share (Successor and Predecessor): | |
| Authorized - 90,000,000 shares (Successor and Predecessor) | |
| Issued and outstanding - 4,982,002 shares at September 30, 2018 (Successor) and 37,373,616 shares at December 31, 2017 (Predecessor) | 50 |
| Additional paid-in capital | 186,345 |
| Accumulated deficit | (131,256) |
| Accumulated other comprehensive income | 42 |
| Total stockholders' equity (deficit) | 55,182 |
| Total liabilities and stockholders' equity (deficit) | $ 12,335,007 |

## Schedule 5

### Publicly Held Securities

Pursuant to Local Bankruptcy Rule 1007-2(a)(7), the following lists the number and classes of shares of stock, debentures, and other securities of the Debtors that are publicly held ("Securities") and the number of holders thereof.  The Securities held by the Debtors' directors and officers are listed separately.

### Ditech Holding Corporation Common and Preferred Stock

| Type of Security | Approximate Number of Shares | Approximate Number of Record Holders[1] | As of |
|---|---|---|---|
| Common stock, $0.01 par value per share | 5,328,417 | 87 | December 31, 2018 |
| Preferred stock, $0.01 par value per share | 91,408 | 1 | December 31, 2018 |

### Ditech Holding Corporation Common and Preferred Stock Held by the Debtors' Non-Employee Directors

| Name of Director | Approximate Number of Shares | As of |
|---|---|---|
| David S. Ascher | 18,872 share of common stock | February 6, 2019 |
| George M. Awad | 42,972 share of common stock | February 6, 2019 |
| Seth L. Bartlett | 18,872 share of common stock | February 6, 2019 |
| Daniel G. Beltzman | 38,620 share of common stock | February 6, 2019 |
| John R. Brecker | N/A | |
| Neal P. Goldman | 5,746 share of common stock | February 6, 2019 |
| Thomas G. Miglis | 31,454 share of common stock | February 6, 2019 |
| Samuel T. Ramsey | N/A | |

### Ditech Holding Corporation Common and Preferred Stock Held by the Debtors' Executive Officers

| Name of Executive Officer | Approximate Number of Shares | As of |
|---|---|---|
| Thomas F. Marano | N/A | |
| Gerald A. Lombardo | N/A | |
| John J. Haas | 205 shares of common stock | February 6, 2019 |
| Alfred W. Young, Jr. | N/A | |
| Elizabeth F. Monahan | N/A | |
| Jeffrey P. Baker | N/A | |
| Kimberly A. Perez | 2,361 shares of common stock | February 6, 2019 |

---

[1]    The approximate number of record holders listed does not reflect the number of beneficial holders.  The information is provided to the best of the Debtors' knowledge and belief as of the Commencement Date.

**Ditech Holding Corporation 9.0% Second Lien Notes**

| Type of Security | Outstanding Balance | Approximate Number of Beneficial Holders[2] | As of |
|---|---|---|---|
| 9.0% Second Lien Senior Subordinated PIK Toggle Notes due 2024 | $253,895,875.00 | Undetermined | February 1, 2019 |

---

[2]    The Debtors are unable to approximate the number of beneficial holders of their public notes as only information regarding the registered holder is available.

## Schedule 6

**Debtors' Property Held by Third Parties**

Pursuant to Local Bankruptcy Rule 1007-2(a)(8) the following lists the Debtors' property that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity.

> In the ordinary course of business, on any given day, property of the Debtors (including security deposits or other collateral with counterparties to certain commercial relationships) is likely to be in the possession of various third parties, including, but not limited to, custodians, mortgagees, secured creditors, governmental sponsored entities, or agents, where the Debtors' ownership interest is not affected.  Because of the constant movement of this property, identification of all of their addresses, telephone numbers, and the location of any court proceeding affecting the property would be impractical.

## Schedule 7

### Listing of Leased and Owned Properties

Pursuant to Local Bankruptcy Rule 1007-2(a)(9), the following lists the property or premises owned, leased, or held under other arrangement from which the Debtors operates their business.

### Owned Property

None

### Leased Property

| Current Tenant/Subtenant Entity | Guarantor | Address | City | State | Postal Code |
|---|---|---|---|---|---|
| Ditech Financial LLC | | 1240 1st Street North, Suite 204 | Alabaster | AL | 35007 |
| Ditech Financial LLC | | 256 Honeysuckle Rd, Suite 22 | Dothan | AL | 36305 |
| Ditech Financial LLC | | 3322 Memorial Pkwy SW, Suite 203 | Huntsville | AL | 35801 |
| Ditech Financial LLC | | 2820 Fairlane Dr, Building A, Suite 14 | Montgomery | AL | 36116 |
| Ditech Financial LLC | | 1123 S University Ave, Suite 235 | Little Rock | AR | 72204 |
| Ditech Financial LLC | | 2100 East Elliot Rd | Tempe | AZ | 85284 |
| Ditech Financial LLC | | 5214 SW 91 Way, Suite 130 | Gainesville | FL | 32608 |
| Ditech Financial LLC | | 301 W Bay St | Jacksonville | FL | 32202 |
| Reverse Mortgage Solutions, Inc. | | 4800 Riverside Dr, Suites 102, 103, and 104 | Palm Beach Gardens | FL | 33410 |
| Ditech Financial LLC | | 3250 W Navy Blvd, Suites 202 and 208 | Pensacola | FL | 32505 |
| Ditech Holding Corporation | | 3000 Bayport Dr, Suites 880 and 985 | Tampa | FL | 33607 |

| | | | | | |
|---|---|---|---|---|---|
| Ditech Financial LLC | | 733 Bishop St, Suite 152 | Honolulu | HI | 96813 |
| Ditech Financial LLC | GTCS LLC | 345 St Peter Street, 5th Floor | Saint Paul | MN | 55102 |
| Ditech Financial LLC | | 180 East 5th St, Floors 4, 5, 9, and 11 | Saint Paul | MN | 55101 |
| Ditech Financial LLC | | 11885 Lackland Road, Suite 312 | Maryland Heights | MO | 63146 |
| Ditech Financial LLC | | 402 Wilkins Wise Road, Suite 4 | Columbus | MS | 39705 |
| Ditech Financial LLC | | 303-C West Park Ave | Greenwood | MS | 38930 |
| Ditech Financial LLC | | 2010 Oak Grove Rd, Suite 1 | Hattiesburg | MS | 39402 |
| Ditech Financial LLC | | 612 Delaware Ave, Suite 28 | McComb | MS | 39648 |
| Ditech Financial LLC | | 877 Northpark Dr, Building 4, Suite 200 | Ridgeland | MS | 39157 |
| Ditech Financial LLC | | 915 Ferncliff Cove, Suite 2A | Southaven | MS | 38671 |
| Ditech Financial LLC | | 9205 West Russell Blvd, Suite 240, Office 228 | Las Vegas | NV | 89148 |
| Ditech Financial LLC | | 4867 S Sheridan Rd, Suite 704 | Tulsa | OK | 74145 |
| Ditech Holding Corporation | | 1100 Virginia Drive, Suite 100 | Fort Washington | PA | 19034 |
| Ditech Financial LLC | | 2137 Hoffmeyer Rd, Suite A | Florence | SC | 29501 |
| Ditech Financial LLC | | 1710 Sunset Blvd, Suite A | West Columbia | SC | 29169 |
| Ditech Financial LLC | Ditech Holding Corporation | 1400 Turbine Drive, Suites 100, 150, and 200 | Rapid City | SD | 57703 |
| Ditech Financial LLC | | 4704 & 4708 Mercantile Drive | Fort Worth | TX | 76137 |

| Ditech Financial LLC | | 652 N Sam Houston Pkwy E, Suite 180 | Houston | TX | 77060 |
| Reverse Mortgage Solutions, Inc. | | 14405 Walters Rd, Suite 110, Floors 2, 3, 4, and 5 | Houston | TX | 77014 |
| Ditech Financial LLC | | 500 Grapevine Hwy, Suite 450 | Hurst | TX | 76054 |
| Ditech Financial LLC | | 1555 Walnut Hill Lane, Suite 100 and 200 | Irving | TX | 75038 |
| Ditech Financial LLC | | 911 North Bishop St, Suite C-204 | Texarkana | TX | 75501 |

## Schedule 8

Pursuant to Local Bankruptcy Rule 1007-2(a)(10), the following lists the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

### Location of Debtors' Substantial Assets

As of September 30, 2018, the Debtors had assets of approximately $12.335 billion, as provided in Schedule 4, with substantial assets located across the country.

### Books and Records

The Debtors' books and records are located at the Ditech Holding Corporation headquarters at 1100 Virginia Drive, Suite 100, Fort Washington, PA, 19034 as well as in Saint Paul, MN, Tampa, FL, Houston, TX and their various operational centers throughout the United States.

### Debtors' Assets Outside the United States

The Debtors do not have significant assets located outside of the territorial limits of the United States.

**Schedule 9**

**Summary of Legal Actions Against the Debtors**

Pursuant to Local Bankruptcy Rule 1007-2(a)(11), to the best of the Debtors' knowledge, belief, and understanding, there are no actions or proceedings pending or threatened against the Debtors or their property, as of the Commencement Date, where a judgment against the Debtors or a seizure of their property may be imminent.

## Schedule 10

### Senior Management

Pursuant to Local Rule 1007-2(a)(12), the following provides the names of the individuals who comprise the Debtors' existing senior management, a description of their tenure with the Debtors and certain of their non-Debtor affiliates, and a brief summary of their relevant responsibilities and experience.

| Name & Position | Responsibilities & Experience |
|---|---|
| Thomas F. Marano – Chief Executive Officer and President | Thomas F. Marano has served as a director and Chairman of the Board since February 2018, and was appointed to the Chief Executive Officer and President role in April 2018. From 2014 until 2017, Mr. Marano served as Chief Executive Officer of Intrawest Resorts Holdings, Inc. strategically leading the company to grow until its acquisition in 2017. Prior to Intrawest Resorts, Mr. Marano was the Managing Member of OldePike Associates LLC, a mortgage consulting business from 2013 to 2014. From 2009 until 2013, Mr. Marano served in numerous capacities for GMAC, Inc./Ally Financial, Inc., focusing on mortgage lending. His involvement in GMAC, Inc./Ally Financial, Inc. includes serving as Chief Executive Officer of Mortgage Operations, Chief Capital Markets Officer, and Chief Executive Officer and Chairman of GMAC ResCap, Inc. From 2008 until 2009, Mr. Marano served as a Managing Director at Cerberus Capital Management, LLC where he consolidated commercial and residential mortgage trading operations and helped establish a mortgage fund. Until 2008, Mr. Marano worked at Bear Stearns & Co. Inc. for 25 years as a trader and as the U.S. and Global Head of Mortgage-Backed and Asset-Backed Securities. Mr. Marano holds a bachelor's degree from Columbia College. |
| Gerald A. Lombardo – Chief Financial Officer | Gerald A. Lombardo joined the Company and began serving as Chief Financial Officer in February 2018. Prior to joining the Company, Mr. Lombardo served as a Managing Director & Treasurer of the Consumer and Community Bank at JPMorgan Chase & Co. from 2013 to 2017 where he managed and had responsibilities for all treasury-related functions for each of the firm's five consumer businesses including mortgage, auto finance, card, consumer banking and business banking. Prior to serving in a senior leadership position with JPMorgan Chase & Co., Mr. Lombardo served as the Global Head of Funding & Liquidity for Ally Financial from 2009 to 2012, where he assisted in the transformation of the firm's global treasury organization. Prior to that, Mr. Lombardo held a financial executive role at Cerberus Capital Management, where he supported portfolio companies in the transformation of their business planning, forecasting and liquidity |

| | functions. Mr. Lombardo also held senior finance roles including Senior Managing Director of FTI Consulting and Chief Financial Officer of Refco. Mr. Lombardo is a Certified Public Accountant and received his Bachelor of Business Administration in Accounting from Pace University. |
|---|---|
| John J. Haas – General Counsel, Chief Legal Officer and Secretary | John J. Haas has served as General Counsel, Chief Legal Officer and Secretary since April 12, 2017. Mr. Haas joined the Company in June 2014 as Assistant General Counsel. Mr. Haas has over 15 years of experience, including both as a corporate and securities attorney and as an investment banker. Before joining the Company, Mr. Haas most recently was Of Counsel at Foley & Lardner LLP from 2013 to 2014 and Executive Director at UBS Investment Bank from 2010 to 2013. Prior to this, Mr. Haas worked as a Director at Merrill Lynch and as an Associate at Skadden, Arps, Slate, Meagher & Flom LLP. Mr. Haas holds a Bachelor of Arts degree from the University of Florida and a Juris Doctorate from New York University School of Law. |
| Alfred W. Young, Jr. – Chief Risk and Compliance Officer | Alfred W. Young, Jr. has served as the Chief Risk and Compliance Officer since October 2016. From 2015 until joining the Company, Mr. Young served as Director of Risk Analytics at the Office of Comptroller of the Currency (the "OCC"), an independent bureau of the U.S. Department of the Treasury charged with regulating and supervising U.S. national banks and federal savings associations. In this role, Mr. Young was responsible for various risk-related supervisory functions and analyses, identifying risks to the national banking system and measuring the effectiveness of certain risk supervisory efforts, among other things. From 2008 to 2015, Mr. Young served as Consumer Credit Examination Lead at the OCC, where he was responsible for large and complex bank supervision and directed a multi-year review of the mortgage servicing activities of a global consumer bank. Mr. Young has a deep background in risk governance and federal regulatory experience, with particular experience in credit risk management, portfolio management, loan servicing, portfolio and bank acquisitions, modeling and analytics. In addition to his regulatory experience, from 1993 to 2008 Mr. Young held various compliance- and risk-related roles at midsize and large national banks. Mr. Young holds a Master of Business Administration from the University of Cincinnati and a Bachelor of Science in Business Administration from Fitchburg State University. |
| Elizabeth F. Monahan – Chief Human Resources Officer | Elizabeth F. Monahan has served as the Company's Chief Human Resources Officer since November 2016. From 2015 until joining the Company, Ms. Monahan served as the Leader of Human Resources of Assero Services, LLC, a national field service company providing property preservation, maintenance and other residential property services to financial institutions. In this |

| | |
|---|---|
| | capacity, Ms. Monahan was responsible for creating the human resources and related administrative functions, including management development and labor safety programs. Ms. Monahan served as Vice President and Global Head of Human Resources at Quintiq, a software company providing supply chain planning and optimization software solutions, from 2013 to 2015, and Senior Vice President and Director of Human Resources for Homeward Residential Inc. from 2011 to 2013. Prior to this, Ms. Monahan held various human resources leadership positions with CorpTalk, De Lage Landen and GMAC Residential Finance Group. During her time at GMAC Residential Finance Group, Ms. Monahan served as the senior human resources leader on acquisition teams for a number of acquisitions, including that of ditech.com. Ms. Monahan holds a Masters of Counseling Psychology from Rider University and a Bachelor of Science from Penn State University. |
| Jeffrey P. Baker – President of Reverse Mortgage Solutions, Inc. | Jeffrey P. Baker has served as President of Reverse Mortgage Solutions, Inc., a subsidiary of the Company, since October 2016 and has served in various other capacities since 2016, including as the Interim Chief Executive Officer and President and as the Chief Operations Officer. Mr. Baker came to the Company with more than 18 years of experience as a senior executive and board member of both public and private companies. Prior to joining the Company, Mr. Baker was the co-founder and Chief Executive Officer of Mayday Capital Advisors, LLC, a restructuring firm. From 2011 to 2015, Mr. Baker served as the Turnaround and Restructuring Practice Leader for Wipfli LLP, a business consulting, accounting and professional services firm. Mr. Baker received his Bachelors of Business Administration from Texas A&M University and completed the Executive Program, M&A at Kellogg Graduate School of Management. |

<u>**Schedule 11**</u>

**Payroll**

Pursuant to Local Bankruptcy Rule 1007-2(b)(1), the following provides the estimated amount of bi-weekly payroll to the Debtors' employees (not including officers, directors and stockholders).

| Estimated amount of bi-weekly payroll to Employees (Not Including Officers, Directors and Stockholders) | ($9.4M) |
|---|---|

Pursuant to Local Bankruptcy Rule 1007-2(b)(2)(A) and (C), the following provides the estimated amount to be paid to officers, stockholders, directors and financial and business consultants retained by the Debtors for the 30-day period following the filing of the chapter 11 petitions.

| Payments to Officers, Stockholders and Directors | ($2.3M) |
|---|---|
| Payments to Financial and Business Consultants | $0.0M |

## Schedule 12

**Cash Receipts and Disbursements, Net Cash Gain or Loss, Unpaid Obligations and Receivables**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the filing of the chapter 11 petition, the estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| | |
|---|---|
| **Cash Receipts** | $96.0M |
| **Cash Disbursements** | ($80.0M) |
| **Net Cash Gain / (Loss)** | $16.0M |
| **Unpaid Obligations** | ($35.9M) |
| **Unpaid Receivables** | $21.7M |

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
                                                    :
In re                                               :    **Chapter 11**
                                                    :
**DITECH HOLDING CORPORATION, *et al.*,**           :    **Case No. 19-10412 (JLG)**
                                                    :
           Debtors.[1]                              :    **(Jointly Administered)**
                                                    :    **Related Docket No. 5**
-----------------------------------------------------------------X

### ORDER ESTABLISHING DEADLINE FOR FILING PROOFS OF CLAIM
### AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF

Upon the application of Ditech Holding Corporation and its debtor affiliates, as debtors

and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"),

for an order, pursuant to Federal Rule of Bankruptcy Procedure (the "**Bankruptcy Rules**") fixing

deadlines and establishing procedures for filing proofs of claim and approving the form and

manner of service thereof; and it appearing that the relief requested is in the best interests of the

Debtors, their estates, and creditors and that adequate notice has been given and that no further

notice is necessary; and after due deliberation and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.         Except as otherwise provided herein, pursuant to section 502(b)(9) of title 11 of the

United States Code (the "**Bankruptcy Code**"), Bankruptcy Rules 2002 and 3003(c)(3), Rule 3003-

1 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"), and

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech
Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree
Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree
Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management
Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company LLC
(9818); and Walter Reverse Acquisition LLC (8837).  The Debtors' principal offices are located at 1100 Virginia
Drive, Suite 100, Fort Washington, Pennsylvania 19034.

**168**

the United States Bankruptcy Court for the Southern District of New York's Procedural Guidelines for Filing Requests for Orders to Set the Last Date for Filing Proofs of Claim, updated as of December 1, 2015 (the "**Guidelines**"), all persons and entities, (including, without limitation, individuals, partnerships, corporations, joint ventures, trusts and governmental units) that assert a claim, as defined in Section 101(5) of the Bankruptcy Code, against the Debtors which arose on or prior to the filing of the Chapter 11 petitions on February 11, 2019 (the "**Commencement Date**"), including claims asserted under section 503(b)(9) of the Bankruptcy Code, shall file a proof of such claim in writing or electronically in accordance with the procedures below so that it is received on or before **April 1, 2019** (the "**General Bar Date**").

2.      Notwithstanding any other provision hereof, proofs of claim filed by governmental units (as defined in section 101(27) of the Bankruptcy Code) must be filed on or before August 12, 2019 (the date that is one hundred eighty (180) days after the date of the order for relief **as calculated in accordance with Bankruptcy Rule 9006 (a)(i) [JLG]**(the "**Governmental Bar Date**").

3.      Notwithstanding any other provision hereof, claimants must file proofs of claim with respect to amendments or supplements to the Debtors' schedules of assets and liabilities (the "**Schedules**") on or before the later of (i) the General Bar Date or the Governmental Bar Date, as applicable and (ii) 5:00 p.m. (Prevailing Eastern Time) on the date that is thirty (30) days from the date on which the Debtors provide notice of previously unfiled Schedules (as defined herein) or an amendment or supplement to the Schedules (the "**Amended Schedules Bar Date**").

4.      Notwithstanding any other provision hereof, any person or entity that holds a claim that arises from the rejection of an executory contract or unexpired lease must file a proof of claim

**169**

based on such rejection on or before the later of (i) the General Bar Date or the Governmental Bar

Date, as applicable, and (ii) 5:00pm (Prevailing Eastern Time) on the date that is thirty (30) days

after entry of the order authorizing such rejection (the "**Rejection Damages Bar Date**", and

together with the General Bar Date, the Governmental Bar Date, and the Amended Schedules Bar

Date, the "**Bar Dates**").  For the avoidance of doubt, a counterparty to an executory contract or

unexpired lease is permitted to file a single proof of claim on account of its claims arising under

the applicable contract or lease agreement (including claims for prepetition defaults and rejection

damages) by the Rejection Damages Bar Date.

5.     The (i) proposed notice of the Bar Dates, substantially in the form annexed hereto

as **<u>Exhibit 1</u>** (the "**Bar Date Notice**") and (ii) model proof of claim form (the "**Claim Form**"),

substantially in the form annexed hereto as **<u>Exhibit 2</u>**, are approved.

6.     The following procedures for the filing of proofs of claim (the "**Procedures**") shall

apply:

(a)     Proofs of claim must conform substantially to the Claim Form or Official

Bankruptcy Form No. 410 (the "**Official Form**");[2]

(b)     Proofs of Claim must be filed either: (i) electronically through Epiq's Proof

of Claim website for these cases at http://dm.epiq11.com/Ditech by

following instructions for filing proofs of claim electronically; (ii) by

mailing the original proof of claim either by U.S. Postal Service mail or

overnight delivery to Epiq's Claims Processing Centers for the Debtors at

---

[2]     The Official Form can be found at www.uscourts.gov/forms/bankruptcy-forms, the official website for the
United States Bankruptcy Courts.  The Claim Form can be found at http://http://dm.epiq11.com/Ditech, the
website established by Epiq for the Debtors' chapter 11 cases.

(x) P.O. Box 4421, Beaverton, OR 97076 or (y) 10300 SW Allen Blvd.,

Beaverton, OR 97005; or (iii) by delivering the original Proof of Claim by

hand to (x) the United States Bankruptcy Court for the Southern District of

New York at One Bowling Green, New York, NY 10004-1408 or (y) Epiq's

Claims Processing Center for the Debtors at 10300 SW Allen Blvd.,

Beaverton, OR 97005 or (z) 777 Third Avenue, 12th Floor, New York, NY

10017;

(c)     Proofs of claim will be deemed filed only when <u>received</u> by the Clerk of the

Bankruptcy Court or by Epiq on or before the applicable Bar Date;

(d)     Proofs of claim must (i) be signed; (ii) include supporting documentation

(if voluminous, attach a summary) or an explanation as to why

documentation is not available; (iii) be in the English language; and, (iv) be

denominated in United States currency;

(e)     Proofs of claim must specify by name and case number the Debtor against

which the claim is filed.  If the holder asserts a claim against more than one

Debtor or has claims against different Debtors, a separate proof of claim

form must be filed with respect to each Debtor.  If the holder files a proof

of claim without identifying a Debtor, such proof of claim will be deemed

as filed only against Ditech Holding Corporation; and

(f)     Proofs of claim sent by facsimile, telecopy, or electronic mail transmission

**<u>will not</u>** be accepted.

7.      The following persons or entities need not file a proof of claim on or prior to the

Bar Dates:

    (a)    Any claim as to which the holder has already filed a proof of claim against the Debtors in the above-captioned case in a form substantially similar to the Claim Form or the Official Form and otherwise in compliance with these Procedures;

    (b)    Any claim that is listed on the Schedules filed by the Debtors, provided that (i) the claim is <u>not</u> scheduled as "disputed", "contingent" or "unliquidated"; <u>and</u> (ii) the claimant does not disagree with the amount, nature and priority of the claim as set forth in the Schedules;  <u>and</u> (iii) the claimant does not dispute that the claim is an obligation of the specific Debtor against which the claim is listed in the Schedules;

    (c)    Any claim that heretofore has been allowed by Order of this Court;

    (d)    Any claim that has been paid in full by any of the Debtors;

    (e)    Any claim for which different specific deadlines have previously been fixed by this Court;

    (f)    Any claim by a Debtor against another Debtor;

    (g)    Any claim that asserts an equity security interest in the Debtors, which interest is based exclusively upon the ownership of common or preferred units, membership interests, partnership interests, or warrants, options, or rights to purchase, sell, or subscribe to such a security or interest; <u>provided</u> that if any holder asserts such a claim (as opposed to an ownership interest)

against the Debtors (including a claim relating to an equity interest or the purchase or sale of such equity interest), a proof of claim must be filed on or before the applicable Bar Date pursuant to the Procedures;

(h)    Any claim allowable under sections 503(b) and 507(a)(2) of the Bankruptcy Code as an expense of administration (other than a claim arising under section 503(b)(9) of the Bankruptcy Code);

(i)    Any claim limited exclusively to the repayment of principal, interest, fees, expenses, and any other amounts owing under any agreements governing any notes, bonds, debentures, or other debt securities (collectively, the "**Debt Securities**") (x) issued by any of the Debtors, (y) secured by assets of any of the Debtors or agreements with respect to such assets, or (z) secured by assets leased to any of the Debtors (a "**Debt Claim**") pursuant to an indenture or credit agreement, as applicable (together, the "**Debt Instruments**") if the relevant indenture trustee, administrative agent, registrar, paying agent, loan or collateral agent, or any other entity serving in a similar capacity however designated (each, a "**Debt Agent**") under the applicable Debt Instrument files a single proof of claim in the Debtors' lead chapter 11 case *In re Ditech Holding Corporation* (Case No. 19-10412) (JLG), on or before the applicable Bar Date, against all Debtors under the applicable Debt Instrument on account of all Debt Claims; <u>provided</u> that any holder of a Debt Claim wishing to assert a claim arising out of or relating to a Debt Instrument, other than a Debt Claim, must file a proof of claim with respect to such claim on or before the applicable Bar Date, unless

another exception identified herein applies; <u>provided</u>, further, that in lieu of attaching voluminous documentation, including documentation for compliance with Bankruptcy Rule 3001(d), the Debt Agent under the Debt Instrument may include a summary of the operative documents with respect to the Debt Claims; or

(j)    Any claim held by the Prepetition Repo Facilities Parties, the Prepetition 1L/2L parties or any other person or entity that is not required to file a proof of claim pursuant to a final order approving *Debtors' Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 507, 546, 548, 555, 559, and 561 (A) Authorizing Debtors to Enter into Repurchase Agreement Facilities, Servicer Advance Facilities and Related Documents; (B) Authorizing Debtors to Sell Mortgage Loans and Servicer Advance Receivables in the Ordinary Course of Business; (C) Granting Back-Up Liens and Superpriority Administrative Expense Claims; (D) Authorizing Use of Cash Collateral and Granting Adequate Protection; (E) Modifying the Automatic Stay; (F) Scheduling a Final Hearing; and (G) Granting Related Relief*, as may be amended or superseded from time to time (the "**Final DIP Order**"), arising from or relating to relating to any of the Prepetition Repo Facilities Parties or the Prepetition 1L/2L Documents, as applicable (each of the foregoing as defined in the Final DIP Order).

7.    Claims arising under section 503(b)(9) of the Bankruptcy Code must be filed by the deadlines set forth in this Order.

**174**

8.      Nothing in this Order shall prejudice the right of the Debtors or any other party in interest to dispute or assert offsets or defenses to any claim reflected in the Schedules.

9.      Pursuant to Bankruptcy Rule 3003(c)(2), all holders of claims that fail to comply with this Order by timely filing a proof of claim in appropriate form shall ~~(i) be forever barred, estopped, and enjoined from asserting such claims against the Debtors, their property, or their estates (or submitting a proof of claim with respect thereto) and (ii) not be treated as a creditor with respect to such claim for the purposes of voting and distribution with respect to any chapter 11 plan or plans of reorganization that may be filed in this cases.~~**not be treated as a creditor with respect to such claim for the purposes of voting and distribution.[JLG]**

10.     The Debtors shall cause to be mailed (i) the Claim Form and (ii) the Bar Date Notice which shall be deemed adequate and sufficient if served by first-class mail at least thirty-five (35) days prior to the applicable Bar Date upon:

(a)     The United States Trustee;

(b)     counsel to each official committee;

(c)     **all persons or entities that have filed claims;[JLG]**

~~(d)~~     all ~~known~~ creditors and other known holders of potential claims **as of the date of this order; including all persons listed in the schedules as holding claims** ~~against any of the Debtors' estates;~~**[JLG]**

(e)     all counterparties to the Debtors' executory contracts and unexpired leases at the addresses stated therein or as updated pursuant to a request by the counterparty or by returned mail from the post office with a forwarding

address;

(f)     all parties to pending litigation against the Debtors (as of the date of the entry of the Proposed Order);

(g)     all parties who have requested notice pursuant to Bankruptcy Rule 2002 (as of the date of the entry ~~of the Proposed~~ **this** Order);

(h)     the Internal Revenue Services for the district in which the case is pending and, if required by Bankruptcy Rule 2002(j), the Securities and Exchange Commission and any other required governmental units (a list of such agencies is available from the Office of the Clerk of the Court); and

(i)     such additional persons and entities as deemed appropriate by the Debtors.

11.     Each Debt Agent, other than the DIP Credit Parties, the Prepetition Repo Facilities Parties, and the Prepetition 1L/2L Parties (each as defined in the Final DIP Order) shall provide to Epiq a list of names and addresses of the record holders of the respective Debt Security for which it serves as Debt Agent within five (5) business days after service of this Order on the Debt Agent.

12.     Pursuant to Bankruptcy Rule 2002(l) and the Guidelines, the Debtors shall publish the Bar Date Notice, once in the national editions of *The New York Times* and *USA Today* at least twenty-eight (28) days prior to the General Bar Date, which publication is hereby approved and shall be deemed good, adequate and sufficient publication notice of the Bar Dates and the Procedures for filing proofs of claim in these chapter 11 cases.

13.     Any person or entity who desires to rely on the Schedules will have the responsibility for determining that the claim is accurately listed in the Schedules.

**176**

14.    The Debtors and Epiq are authorized and empowered to take such steps and perform such acts as may be necessary to implement and effectuate the terms of this Order.

15.    Entry of this Order is without prejudice to the right of the Debtors to seek a further order of this Court fixing a date by which holders of claims or interests not subject to the Bar Dates established herein must file such proofs of claim or interest or be barred from doing so.

Dated: February 21, 2019
    New York, New York

               /s/ *James L. Garrity, Jr.*
               HONORABLE JAMES L. GARRITY, JR.
               UNITED STATES BANKRUPTCY JUDGE

177

**Exhibit 1**

**Bar Date Notice**

**178**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------X
                                                    :
In re                                               :        **Chapter 11**
                                                    :
**DITECH HOLDING CORPORATION**, *et al.*,           :        **Case No. 19-10412 (JLG)**
                                                    :
                      Debtors.[1]                   :        **(Jointly Administered)**
                                                    :        **Related Docket No. 5**
---------------------------------------------------------------X

## NOTICE OF DEADLINES
## REQUIRING FILING OF PROOFS OF CLAIM

The United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") has entered an order (the "**Bar Date Order**") establishing **April 1, 2019 at 5:00 p.m. (Prevailing Eastern Time)** as the last date and time for each person or entity (excluding "governmental units," as defined in section 101(27) of the Bankruptcy Code) to file a proof of claim (such deadline, the "**General Bar Date**") against any of the debtors listed below (collectively, the "**Debtors**").

The General Bar Date and the procedures set forth below for filing proofs of claim apply to all claims against the Debtors that arose before **February 11, 2019** (the "**Commencement Date**"), the date on which the Debtors commenced cases under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), including claims arising under section 503(b)(9) of the Bankruptcy Code, and excluding claims held by those listed in Section 4 below that are specifically excluded from the Bar Date filing requirement. "Governmental Units" (as defined in section 101(27) of the Bankruptcy Code) have until **August 10, 2019 at 5:00 p.m. (Prevailing Eastern Time)**, the date that is one-hundred and eighty (180) days after the order for relief **as calculated in accordance with Bankruptcy Rule 9006(a)(i)**(the "**Governmental Bar Date**"), to file proofs of claim against the Debtors.

Counterparties to the Debtors' executory contracts and unexpired leases have until the later of (i) the General Bar Date and (ii) thirty (30) days after entry of the order authorizing the rejection of such contract or lease (the "**Rejection Damages Bar Date**"), to file proofs of claim for rejection damages against the Debtors.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Debtors' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

With respect to amendments or supplements to the Debtors' schedules of assets and liabilities (the "**Schedules**"), claimants have until the later of (i) the General Bar Date or the Governmental Bar Date, as applicable and (ii) 5:00 p.m. (**Prevailing Eastern Time**) on the date that is thirty (30) days from the date on which the Debtors provide notice of previously unfiled Schedules (as defined herein) or an amendment or supplement to the Schedules (the "**Amended Schedules Bar Date**"), and together with the General Bar Date, the Governmental Bar Date, and the Rejection Damages Bar Date, the "**Bar Dates**"), to file proofs of claim against the Debtors.

The Bar Date Order, the Bar Dates, and the procedures set forth below for filing proofs of claim apply to claims against any of the Debtors, as listed in the following table:

| NAME OF DEBTOR AND LAST FOUR DIGITS OF FEDERAL TAX IDENTIFICATION NUMBER | CASE NUMBER |
|---|---|
| DF Insurance Agency, LLC (6918) | 19-10413 (JLG) |
| Ditech Financial LLC (5868) | 19-10414 (JLG) |
| Ditech Holding Corporation (0486) | 19-10412 (JLG) |
| Green Tree Credit LLC (5864) | 19-10411 (JLG) |
| Green Tree Credit Solutions LLC (1565) | 19-10415 (JLG) |
| Green Tree Insurance Agency of Nevada, Inc. (7331) | 19-10416 (JLG) |
| Green Tree Investment Holdings III LLC (1008) | 19-10417 (JLG) |
| Green Tree Servicing Corp. (3552) | 19-10418 (JLG) |
| Marix Servicing LLC (6101) | 19-10419 (JLG) |
| Mortgage Asset Systems, LLC (8148) | 19-10420 (JLG) |
| REO Management Solutions, LLC (7787) | 19-10421 (JLG) |
| Reverse Mortgage Solutions, Inc. (2274) | 19-10422 (JLG) |
| Walter Management Holding Company LLC (9818) | 19-10423 (JLG) |
| Walter Reverse Acquisition LLC (8837) | 19-10424 (JLG) |
| **OTHER NAMES USED BY THE DEBTORS IN THE LAST 8 YEARS** | |
| DTF Insurance Agency LLC | Specialty Servicing Solutions |
| DTFS Insurance Agency LLC | Green Tree Licensing LLC |
| Green Tree Servicing LLC | |
| RMS Asset Management Solutions, LLC | |
| REO Management Solutions, LLC | |
| RMS Asset Management Solutions, LLC | |
| Residential Asset Management Solutions, LLC | |
| Residential Asset Management Solutions | |
| RMS Reverse Mortgage Solutions, Inc. | |
| RMS Reverse Mortgage Solutions | |
| Security One Lending | |
| Security 1 Lending | |

## 1.    WHO MUST FILE A PROOF OF CLAIM

You **MUST** file a proof of claim to vote on a chapter 11 plan filed by the Debtors or to share in distributions from the Debtors' bankruptcy estates if you have a claim that arose before the Commencement Date, and it is not one of the types of claims described in Section 4 below.  Claims based on acts or omissions of the Debtors that occurred before the Commencement Date must be filed on or before the Bar Dates, even if such claims are not now fixed, liquidated or certain or did not mature or become fixed, liquidated or certain before the Commencement Date.

180

Under section 101(5) of the Bankruptcy Code and as used in this notice, the word "claim" means a right to (a) payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

## 2.   WHAT TO FILE

Your filed proof of claim must conform substantially to Official Form 410 (the "**Official Form**").  The Debtors are enclosing a case-specific proof of claim form for use in these cases (the "**Claim Form**").  If your claim is listed on the schedules of assets and liabilities filed by the Debtors (collectively, the "**Schedules**"), the proof of claim form also sets forth the amount of your claim as listed on the Schedules, the specific Debtor against which the claim is scheduled, and whether the claim is scheduled as "disputed," "contingent," or "unliquidated."  You will receive a different proof of claim form for each claim listed in your name on the Schedules.  You may utilize the proof of claim form(s) provided by the Debtors to file your claim.  Additional proof of claim forms and instructions may be obtained at (a) the website established by the Debtors' Court-approved claims and noticing agent, Epiq Corporate Restructuring, LLC, located at http://dm.epiq11.com/Ditech or (b) the Bankruptcy Court's website located at www.uscourts.gov/forms/bankruptcy-forms.

All proof of claim forms must be **signed** by the claimant or, if the claimant is not an individual, by an authorized agent of the claimant.  It must be written in English and be denominated in United States currency (using the exchange rate, if applicable, as of the Commencement Date).  You also should attach to your completed proof of claim any documents on which the claim is based (if voluminous, attach a summary) or explanation as to why the documents are not available.

Your proof of claim form must **not** contain complete social security numbers or taxpayer identification numbers (only the last four (4) digits), a complete birth date (only the year), the name of a minor (only the minor's initials), or a financial account number (only the last four (4) digits of such account number).

IF YOU ARE ASSERTING A CLAIM AGAINST MORE THAN ONE DEBTOR OR HAVE CLAIMS AGAINST DIFFERENT DEBTORS, SEPARATE PROOFS OF CLAIM MUST BE FILED AGAINST EACH SUCH DEBTOR AND YOU MUST IDENTIFY ON YOUR PROOF OF CLAIM THE SPECIFIC DEBTOR AGAINST WHICH YOUR CLAIM IS ASSERTED AND THE CASE NUMBER OF THAT DEBTOR'S BANKRUPTCY CASE.  IF YOU FILE A PROOF OF CLAIM WITHOUT IDENTIFYING A DEBTOR, SUCH PROOF OF CLAIM WILL BE DEEMED AS FILED ONLY AGAINST DITECH HOLDING CORPORATION.  A LIST OF THE NAMES OF THE DEBTORS AND THEIR CASE NUMBERS IS SET FORTH ABOVE.

3.    **WHEN AND WHERE TO FILE**

All proofs of claim must be filed so as to be received on or before **April 1, 2019 at 5:00 p.m. (Prevailing Eastern Time)** (for all persons except Governmental Units) or **August 12, 2019 at 5:00 p.m. (Prevailing Eastern Time)** (for all Governmental Units) as follows:

IF BY U.S. POSTAL SERVICE MAIL OR OVERNIGHT DELIVERY:

Ditech Holding Corporation, Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
P.O. Box 4421
Beaverton, OR 97076-4421

Ditech Holding Corporation, Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
10300 SW Allen Blvd.
Beaverton, OR 97005

IF DELIVERED BY HAND:

Ditech Holding Corporation, Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
777 Third Avenue
12th Floor
New York, NY 10017

Ditech Holding Corporation, Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
10300 SW Allen Blvd.
Beaverton, OR 97005

United States Bankruptcy Court
for the Southern District of New York
One Bowling Green
New York, NY 1004-1408

IF ELECTRONICALLY:

The website established by Epiq, using the interface available on such website located at http:// http://dm.epiq11.com/Ditech (the "**Electronic Filing System**") and following the instructions provided.

Proofs of claim will be deemed filed only when **actually received** at the addresses listed above or via the Electronic Filing System on or before the applicable Bar Date. Proofs of claim may not be delivered by facsimile, telecopy, or electronic mail transmission.

4

**182**

4.    **WHO NEED <u>NOT</u> FILE A PROOF OF CLAIM**

The following persons or entities need **<u>not</u>** file a proof of claim on or prior to the applicable Bar Date:

(a) any claim that has already been asserted in a proof of claim against the Debtors in the above-captioned case in a form substantially similar to the Claim Form or the Official Form and otherwise in compliance with the procedures set forth in this notice;

(b) any claim that is listed on the Schedules filed by the Debtors, provided that (i) the claim is <u>not</u> scheduled as "disputed", "contingent" or "unliquidated"; <u>and</u> (ii) the claimant does not disagree with the amount, nature and priority of the claim as set forth in the Schedules; <u>and</u> (iii) the claimant does not dispute that the claim is an obligation of the specific Debtor against which the claim is listed in the Schedules;

(c) any claim that heretofore has been allowed by Order of the Court;

(d) any claim that has been paid in full by any of the Debtors;

(e) any claim for which a different deadline has previously been fixed by the Court;

(f) any claim by a Debtor against another Debtor;

(g) any claim that asserts an equity security interest in the Debtors, which interest is based exclusively upon the ownership of common or preferred units, membership interests, partnership interests, or warrants, options, or rights to purchase, sell, or subscribe to such a security or interest; <u>provided</u> that if any holder asserts such a claim (as opposed to an ownership interest) against the Debtors (including a claim relating to an equity interest or the purchase or sale of such equity interest), a proof of claim must be filed on or before the applicable Bar Date pursuant to the procedures set forth in this notice;

(h) any claim allowable under sections 503(b) and 507(a)(2) of the Bankruptcy Code as an expense of the administration (other than a claim arising under section 503(b)(9) of the Bankruptcy Code);

(i) any claim limited exclusively to the repayment of principal, interest, fees, expenses, and any other amounts owing under any agreements governing any notes, bonds, debentures, or other debt securities (collectively, the "**Debt Securities**") (x) issued by any of the Debtors, (y) secured by assets of any of the Debtors or agreements with respect to such assets, or (z) secured by assets leased to any of the Debtors (a "**Debt Claim**") pursuant to an indenture or credit agreement, as applicable (together, the "**Debt Instruments**") if the relevant indenture trustee, administrative agent, registrar, paying agent, loan or

**183**

collateral agent, or any other entity serving in a similar capacity however designated (each, a "**Debt Agent**") under the applicable Debt Instrument files a single proof of claim in the Debtors' lead chapter 11 case *Ditech Holding Corporation* (Case No. 19-10412 (JLG), on or before the applicable Bar Date, against all Debtors under the applicable Debt Instrument on account of all Debt Claims; <u>provided</u> that any holder of a Debt Claim wishing to assert a claim arising out of or relating to a Debt Instrument, other than a Debt Claim, must file a proof of claim with respect to such claim on or before the applicable Bar Date, unless another exception identified herein applies; or

(j) Any claim held by the Prepetition Repo Facilities Parties, the Prepetition 1L/2L Parties or any other person or entity that is not required to file a proof of claim pursuant to a final order approving the *Debtors' Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 507, 546, 548, 555, 559, and 561 (A) Authorizing Debtors to Enter into Repurchase Agreement Facilities, Servicer Advance Facilities and Related Documents; (B) Authorizing Debtors to Sell Mortgage Loans and Servicer Advance Receivables in the Ordinary Course of Business; (C) Granting Back-Up Liens and Superpriority Administrative Expense Claims; (D) Authorizing Use of Cash Collateral and Granting Adequate Protection; (E) Modifying the Automatic Stay; (F) Scheduling a Final Hearing; and (G) Granting Related Relief*, as may be amended or superseded from time to time (the "**Final DIP Order**"), arising from or relating to any of the Prepetition Repo Facilities Parties or the Prepetition 1L/2L Documents, as applicable (each of the foregoing as defined in the Final DIP Order).

This notice may be sent to many persons that have had some relationship with or have done business with the Debtors but may not have an unpaid claim against the Debtors. The fact that you have received this notice does not mean that you have a claim or that the Debtors or the Bankruptcy Court believe that you have a claim against the Debtors.

## 5.     EXECUTORY CONTRACTS AND UNEXPIRED LEASES

If you hold a claim arising out of the rejection of an executory contract or unexpired lease, you must file a proof of claim on or before the Rejection Damages Bar Date. For the avoidance of doubt, a party to an executory contract or unexpired lease that asserts a claim on account of unpaid amounts accrued and outstanding as of the Commencement Date pursuant to such executory contract or unexpired lease is permitted to file a single proof of claim for such amounts and rejection damages on or before the Rejection Damages Bar Date.

## 6.     CONSEQUENCES OF FAILURE TO FILE A PROOF OF CLAIM BY THE BAR DATE

ANY HOLDER OF A CLAIM THAT IS NOT EXEMPTED FROM THE REQUIREMENTS OF THE BAR DATE ORDER, AS SET FORTH IN SECTION 4 ABOVE, AND THAT FAILS TO TIMELY FILE A PROOF OF CLAIM IN THE APPROPRIATE FORM

SHALL **NOT** BE TREATED AS A CREDITOR WITH RESPECT TO SUCH CLAIM FOR THE PURPOSES OF VOTING ON ANY PLAN OF REORGANIZATION FILED IN THESE CASES AND PARTICIPATING IN ANY DISTRIBUTION IN THE DEBTORS' CASES ON ACCOUNT OF SUCH CLAIM.

## 7.     THE DEBTORS' SCHEDULES AND ACCESS THERETO

You may be listed as a holder of a claim against one or more of the Debtors in the Debtors' Schedules. To determine if and how you are listed on the Schedules, please refer to the descriptions set forth on the enclosed proof of claim form(s) regarding the nature, amount, and status of your claim(s). If you received postpetition payments from the Debtors (as authorized by the Bankruptcy Court) on account of your claim(s), the enclosed proof of claim form(s) should reflect the net amount of your claim(s). If the Debtors believe that you hold claims against more than one Debtor, you will receive multiple proof of claim forms, each of which will reflect the nature and amount of your claim against one Debtor, as listed in the Schedules.

IF YOU RELY ON THE DEBTORS' SCHEDULES OR THE ENCLOSED PROOF OF CLAIM FORM(S), IT IS YOUR RESPONSIBILITY TO DETERMINE THAT THE CLAIM ACCURATELY IS LISTED ON THE SCHEDULES.

As set forth above, if you agree with the nature, amount, and status of your claim as listed in the Debtors' Schedules, and if you do not dispute that your claim only is against the Debtor specified by the Debtors, and if your claim is not described as "disputed," "contingent," or "unliquidated," you need **not** file a proof of claim. Otherwise, or if you decide to file a proof of claim, you must do so before the applicable Bar Date, in accordance with the procedures set forth in this notice.

Copies of the Debtors' Schedules are available for inspection on the Bankruptcy Court's electronic docket for the Debtors' chapter 11 cases, which is posted on (a) the website established by Epiq for the Debtors' cases at http://dm.epiq11.com/Ditech and (b) on the Court's website at http://www.nysb.uscourts.gov. A login and password to the Bankruptcy Court's Public Access to Electronic Records ("**PACER**") are required to access this information on the Court's website and can be obtained through the PACER Service Center at http://www.pacer.gov. Copies of the Schedules also may be examined between the hours of 9:00 a.m. and 4:30 p.m., Monday through Friday at the Office of the Clerk of the Bankruptcy Court, located at One Bowling Green, New York, NY 10004-140**8**. Copies of the Debtors' Schedules also may be obtained by request to Epiq:

<div align="center">

Ditech Holding Corporation, Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
777 Third Avenue, 12th Floor
New York, NY 10017
Toll Free: (866)-486-4809
E-mail: ProjectPhoenix@epiqglobal.com

</div>

**A holder of a possible claim against the Debtors should consult an attorney regarding any matters not covered by this notice, such as whether the holder should file a proof of claim.**

Dated: _____, 2019                    **BY ORDER OF THE COURT**
New York, New York

**<u>Exhibit 2</u>**

**Claim Form**

**United States Bankruptcy Court for the Southern District of New York**
Ditech Holding Corporation Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
P.O. Box 4421
Beaverton, OR 97076-4421

**Name of Debtor:**
**Case Number:**

For Court Use Only

# Proof of Claim (Official Form 410)

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. With the exception of claims under 503(b)(9), do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503. **Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) **that you received.**

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**
Name of the current creditor (the person or entity to be paid for this claim): _____

Other names the creditor used with the debtor: _____

**2. Has this claim been acquired from someone else?** ☐ No ☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?** Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

_____
Name

_____
Number    Street

_____
City                State            ZIP Code

Country (if International): _____

Contact phone: _____

Contact email: _____

**Where should payments to the creditor be sent?**
(if different)

_____
Name

_____
Number    Street

_____
City                State            ZIP Code

Country (if International): _____

Contact phone: _____

Contact email: _____

**4. Does this claim amend one already filed?**

☐ No

☐ Yes. Claim number on court claims register (if known) _____

Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☐ No

☐ Yes. Who made the earlier filing?

_____

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☐ No

☐ Yes.
Last 4 digits of the debtor's account or any number you use to identify the debtor:

____ ____ ____ ____

**7. How much is the claim?**

$_____.

**Does this amount include interest or other charges?**

☐ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c). Limit disclosing information that is entitled to privacy, such as health care information.

_____

_____

**188**

**9. Is all or part of the claim secured?**

☐ No

☐ Yes.   The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate.  If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other.  Describe: _____

_____

_____

**Basis for perfection:** _____

_____

Attach redacted copies of documents, if any, that show evidence of perfection of security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**                            $_____

**Amount of the claim that is secured:**    $_____

**Amount of the claim that is unsecured:** $_____
(The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any
default as of the date of the petition:**  $_____

**Annual Interest Rate** (when case was filed)      _____%

☐ Fixed   ☐ Variable

---

*(continued top right column)*

☐ No

☐ Yes.  **Amount necessary to cure
any default as of the date of petition.**

$_____

**12. Is all or part of the claim entitled to priority
under 11 U.S.C. § 507(a)?**

☐ No

☐ Yes.  *Check one:*

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).

☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).

☐ Other.  Specify subsection of 11 U.S.C. § 507 (a)(___) that applies.

* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

---

*(top far-right column)*

☐ No

☐ Yes.  Identify the property:

_____

_____

A claim may be partly priority and partly nonpriority.  For example, in some categories, the law limits the amount entitled to priority.

**Amount entitled to priority**

$_____

$_____

$_____

$_____

$_____

$_____

---

**13.  Does this claim qualify as an Administrative Expense under 11 U.S.C. § 503(b)(9)?**

☐ No

☐ Yes.  **Amount that qualifies as an Administrative Expense under 11 U.S.C. § 503(b)(9):** $_____

---

| **Part 3:** | **Sign Below** |
| --- | --- |

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent.  Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other co-debtor.  Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   _____        _____
                                  MM / DD / YYYY           Signature

**Print the name of the person who is completing and signing this claim:**

Name   _____
              First name            Middle name            Last name

Title   _____

Company   _____
                  Identify the corporate servicer as the company if the authorized agent is a servicer.

Address   _____
                  Number          Street

_____
City                                        State          ZIP Code

Contact Phone   _____        Email   _____

**189**

# Instructions for Proof of Claim

United States Bankruptcy Court

These instructions and definitions generally explain the law. In certain circumstances, such as bankruptcy cases that debtors do not file voluntarily, exceptions to these general rules may apply. You should consider obtaining the advice of an attorney, especially if you are unfamiliar with the bankruptcy process and privacy regulations.

A person who files a fraudulent claim could be fined up to $500,000 imprisoned for up to 5 years, or both.  18 U.S.C. §§ 152, 157 and 3571

## How to fill out this form

- **Fill in all of the information about the claim as of the date the case was filed.**
- **Fill in the caption at the top of the form.** The full list of debtors is provided under the overview section on the Claims Agent's website: http://dm.epiq11.com/Ditech.
- **If the claim has been acquired from someone else, then state the identity of the last party** who owned the claim or was the holder of the claim and who transferred it to you before the initial claim was filed.
- **Attach any supporting documents to this form.** Attach redacted copies of any documents that show that the debt exists, a lien secures the debt, or both. (See the definition of redaction below.) Also attach redacted copies of any documents that show perfection of any security interest or any assignments or transfers of the debt.  In addition to the documents, a summary may be added.  Federal Rule of Bankruptcy Procedure (called "Bankruptcy Rule") 3001(c) and (d).
- **Do not attach original documents because attachments may be destroyed after scanning.**
- **If the claim is based on delivering health care goods or services, do not disclose confidential health care information.  Leave out or redact confidential information both in the claim and in the attached documents.**
- A *Proof of Claim* form and any attached documents must show **only the last 4 digits of any social security number, individual's tax identification number, or financial account number, and only the year of any person's date of birth.**  See Bankruptcy Rule 9037.
- **For a minor child, fill in only the child's initials and the full name and address of the child's parent or guardian.**  For example, write *A.B., a minor child (John Doe, parent, 123 Main St, City, State).*  See Bankruptcy Rule 9037.

## Confirmation that the claim has been filed

To receive confirmation that the claim has been filed, either enclose a stamped self-addressed envelope and a copy of this form or you may access the Claims Agent's website (http://dm.epiq11.com/Ditech) to view your filed form under "Claims."

## Where to Send Proof of Claim Form

**First-Class Mail:**

Ditech Holding Corporation Claims Processing Center
c/o Epiq Corporate Restructuring, LLC
PO Box 4421
Beaverton, OR 97076-4421

**Hand Delivery or Overnight Mail:**

Ditech Holding Corporation Claims Processing Center
c/o Epiq Corporate Restructuring, LLC
10300 SW Allen Blvd.
Beaverton, OR 97005

## Understand the terms used in this form

**Administrative expense**: Generally, an expense that arises after a bankruptcy case is filed in connection with operating, liquidating, or distributing the bankruptcy estate.  11 U.S.C. § 503.

**Claim**: A creditor's right to receive payment for a debt that the debtor owed on the date the debtor filed for bankruptcy.  11 U.S.C. §101 (5).  A claim may be secured or unsecured.

**Creditor**: A person, corporation, or other entity to whom a debtor owes a debt that was incurred on or before the date the debtor filed for bankruptcy.  11 U.S.C. §101 (10).

**Debtor**: A person, corporation, or other entity who is in bankruptcy. Use the debtor's name and case number as shown in the bankruptcy notice you received. 11 U.S.C. § 101 (13).

**Evidence of perfection**: Evidence of perfection of a security interest may include documents showing that a security interest has been filed or recorded, such as a mortgage, lien, certificate of title, or financing statement.

**Information that is entitled to privacy**: A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, an individual's tax identification number, or a financial account number, only the initials of a minor's name, and only the year of any person's date of birth. If a claim is based on delivering health care goods or services, limit the disclosure of the goods or services to avoid embarrassment or disclosure of confidential health care information. You may later be required to give more information if the trustee or someone else in interest objects to the claim.

**Priority claim**: A claim within a category of unsecured claims that is entitled to priority under 11 U.S.C. §507(a). These claims are paid from the available money or property in a bankruptcy case before other unsecured claims are paid. Common priority unsecured claims include alimony, child support, taxes, and certain unpaid wages.

**Proof of claim**: A form that shows the amount of debt the debtor owed to a creditor on the date of the bankruptcy filing. The form must be filed in the district where the case is pending.

**Redaction of information**: Masking, editing out, or deleting certain information to protect privacy. Filers must redact or leave out information entitled to **privacy** on the *Proof of Claim* form and any attached documents.

**Secured claim under 11 U.S.C. §506(a)**: A claim backed by a lien on particular property of the debtor. A claim is secured to the extent that a creditor has the right to be paid from the property before other creditors are paid. The amount of a secured claim usually cannot be more than the value of the particular property on which the creditor has a lien. Any amount owed to a creditor that is more than the value of the property normally may be an unsecured claim. But exceptions exist; for example, see 11 U.S.C. § 1322(b) and the final sentence of 1325(a).

Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment may be a lien.

**Setoff**: Occurs when a creditor pays itself with money belonging to the debtor that it is holding, or by canceling a debt it owes to the debtor.

**Uniform claim identifier**: An optional 24-character identifier that some creditors use to facilitate electronic payment.

**Unsecured claim**: A claim that does not meet the requirements of a secured claim.  A claim may be unsecured in part to the extent that the amount of the claim is more than the value of the property on which a creditor has a lien.

## Offers to purchase a claim

Certain entities purchase claims for an amount that is less than the face value of the claims. These entities may contact creditors offering to purchase their claims. Some written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court, the bankruptcy trustee, or the debtor. A creditor has no obligation to sell its claim. However, if a creditor decides to sell its claim, any transfer of that claim is subject to Bankruptcy Rule 3001(e), any provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.) that apply, and any orders of the bankruptcy court that apply.

**190**

Do not file these instructions with your form.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
                                 :

In re                             :        **Chapter 11**

                                 :

**DITECH HOLDING CORPORATION**, *et al.*,   :        **Case No. 19-10412 (JLG)**

                                 :

                Debtors.[1]        :        **(Jointly Administered)**

                                 :        **Related Docket No. 468**

-------------------------------------------------------------X

### ORDER FURTHER EXTENDING GENERAL BAR DATE FOR
### FILING PROOFS OF CLAIM FOR CONSUMER BORROWERS *NUNC PRO TUNC*

Upon the *Application of Debtors for Entry of Order Further Extending General Bar Date for Filing Proofs of Claim for Consumer Borrowers Nunc Pro Tunc* filed on April 25, 2019 (the "**Application**") of Ditech Holding Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**") to extend the General Bar Date to June 3, 2019 at 5:00 p.m. (Prevailing Eastern Time) for consumer borrowers;[2]

**IT IS HEREBY ORDERED THAT:**

1.      The General Bar Date shall be extended to **June 3, 2019 at 5:00 p.m.** (Prevailing Eastern Time) (the "**Extended Bar Date**") solely for consumer borrowers.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Debtors' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

[2]    Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Application.

2.      Individual borrowers whose loans are presently serviced by the Debtors or whose loans were serviced by the Debtors at any time prior to the Commencement Date shall be permitted to file a consolidated proof of claim against all Debtors.

3.      Except as expressly set forth herein, the *Order Establishing Deadline for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* [ECF No. 90] and *Order Extending General Bar Date* [ECF No. 272] shall remain in full force and effect.

4.      Entry of this Order is without prejudice to the rights of the Debtors to seek a further order of this Court extending the date by which holders of claims must file proofs of claims against the Debtor.

Dated: April 30, 2019
        New York, New York

            /s/ *James L. Garrity, Jr.*
        THE HONORABLE JAMES L. GARRITY, JR.
        UNITED STATES BANKRUPTCY JUDGE

## **Exhibit 1**

**Extended Bar Date Notice**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------X

| | | |
|---|---|---|
| In re | : | **Chapter 11** |
| | : | |
| **DITECH HOLDING CORPORATION,** *et al.,* | : | **Case No. 19-10412 (JLG)** |
| | : | |
| **Debtors.**[1] | : | **(Jointly Administered)** |

--------------------------------------------------------------X

## NOTICE OF EXTENDED DEADLINE FOR CONSUMER BORROWERS TO FILE PROOFS OF CLAIM

The United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") has entered an order establishing **June 3, 2019 at 5:00 p.m. (Prevailing Eastern Time)** as the last date and time for consumer borrowers to file a proof of claim (such deadline, the "**Extended Bar Date**") against any of the debtors listed below (collectively, the "**Debtors**"). You can access a proof of claim form on (a) the website established by the Debtors' Court-approved claims and noticing agent, Epiq Corporate Restructuring, LLC ("**Epiq**") at http://dm.epiq11.com/Ditech or (b) the Bankruptcy Court's website located at www.uscourts.gov/forms/bankruptcy-forms. All proof of claim forms must be **signed** by the claimant or, if the claimant is not an individual, by an authorized agent of the claimant. It must be written in English and be denominated in United States currency (using the exchange rate, if applicable, as of February 11, 2019). You also should attach to your completed proof of claim any documents on which the claim is based (if voluminous, attach a summary) or explanation as to why the documents are not available. Your proof of claim form must <u>not</u> contain complete social security numbers or taxpayer identification numbers (only the last four (4) digits), a complete birth date (only the year), the name of a minor (only the minor's initials), or a financial account number (only the last four (4) digits of such account number).

Copies of the Debtors' schedules of assets and liabilities (collectively, the "**Schedules**") are available for inspection on the Bankruptcy Court's electronic docket for the Debtors' chapter 11 cases, which is posted on (a) the website established by Epiq for the Debtors' cases at http://dm.epiq11.com/Ditech and (b) on the Court's website at http://www.nysb.uscourts.gov. A login and password to the Bankruptcy Court's Public Access to Electronic Records ("**PACER**") are required to access this information on the Court's website and can be obtained through the PACER Service Center at http://www.pacer.gov. Copies of the Schedules also may be examined between the hours of 9:00 a.m. and 4:30 p.m., Monday through Friday at the Office of the Clerk of the Bankruptcy Court, located at One Bowling Green, New York, NY 10004-1408. Copies of the Debtors' Schedules also may be obtained by request to Epiq: Ditech Holding Corporation, Claims Processing Center, c/o Epiq Bankruptcy Solutions, LLC 777 Third Avenue, 12th Floor, New York, NY 10017 (Toll Free: (866)-486-4809) (E-mail: ditechinfo@epiqglobal.com).

**If you are a consumer borrower, you received this notice because your loan may be serviced by Ditech Financial LLC, Reverse Mortgage Solutions, Inc. or any of their affiliates. Receipt of this notice does not mean that the Debtors believe that you have claims against them. The decision to file or not to file a claim must be made by each individual that receives the notice. If you need help in deciding whether or not you have a claim, or how to complete the form you should contact an attorney. If you decide to file a proof of claim, you may file one proof of claim against all Debtors. The Debtors' bankruptcy has no impact on your obligation to repay your loan, but it could limit your right to sue Ditech Financial LLC or any of its affiliates, if you believe that the servicing of your loan by Ditech Financial LLC or any of its affiliates has violated the law. If you have any questions, please call the Debtors' restructuring hotline at 1-866-486-4809 (U.S. Toll- Free) or 1-503-597-7698 (International). The Bankruptcy Court cannot provide you with legal advice. Do not contact the Bankruptcy Court for assistance or advice as to how to complete the proof of claim form, your rights as a creditor, or the amount of your claim.**

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Debtors' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------ X
                                        :

In re                               :          **Chapter 11**

                                         :

**DITECH HOLDING CORPORATION**, *et al.*,   :      **Case No. 19-10412 (JLG)**

                                         :

                     Debtors.[1]     :          **(Jointly Administered)**

                                         :

------------------------------------------------------------------ X

## AMENDED DISCLOSURE STATEMENT FOR
## AMENDED JOINT CHAPTER 11 PLAN OF DITECH
## HOLDING CORPORATION AND ITS AFFILIATED DEBTORS

**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock, P.C.
Sunny Singh, Esq.
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Counsel for Debtors*
*and Debtors in Possession*

Dated:    May 9, 2019
            New York, New York

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837).  The Debtors' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

**A SOLICITATION OF VOTES IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF THE JOINT CHAPTER 11 PLAN OF DITECH HOLDING CORPORATION AND ITS AFFILIATED DEBTORS.**

---

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 4:00 P.M., PREVAILING EASTERN TIME, ON JUNE 10, 2019, UNLESS EXTENDED BY THE DEBTORS.**

**THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS MAY VOTE ON THE PLAN IS MAY 8, 2019 (THE "<u>VOTING RECORD DATE</u>").**

---

**RECOMMENDATION BY THE DEBTORS AND CREDITORS' COMMITTEE**

**The Board of Directors of Ditech Holding Corporation and the board of directors, managers or members, as applicable, of each of its affiliated Debtors have unanimously approved the transactions contemplated by the Plan (as defined herein) and recommend that all creditors whose votes are being solicited submit ballots to accept the Plan. Holders of approximately 80.38% of the Term Loan Claims (as defined herein) have already agreed to vote in favor of the Plan. The Creditors' Committee also recommends that all creditors whose votes are being solicited submit ballots to accept the Plan.**

---

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE VOTING ON THE PLAN.

THE ISSUANCE AND DISTRIBUTION UNDER THE PLAN OF NEW COMMON STOCK (AS DEFINED HEREIN) WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND ANY OTHER APPLICABLE SECURITIES LAWS PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE. THESE SECURITIES MAY BE RESOLD WITHOUT REGISTRATION UNDER THE SECURITIES ACT OR OTHER FEDERAL SECURITIES LAWS PURSUANT TO THE EXEMPTION PROVIDED BY SECTION 4(a)(1) OF THE SECURITIES ACT, UNLESS THE HOLDER IS AN "UNDERWRITER" WITH RESPECT TO SUCH SECURITIES, AS THAT TERM IS DEFINED IN SECTION 1145(b)(1) OF THE BANKRUPTCY CODE. IN ADDITION, SUCH SECTION 1145 EXEMPT SECURITIES GENERALLY MAY BE RESOLD WITHOUT REGISTRATION UNDER STATE SECURITIES LAWS PURSUANT TO VARIOUS EXEMPTIONS PROVIDED BY THE RESPECTIVE LAWS OF THE SEVERAL STATES. THE AVAILABILITY OF THE EXEMPTION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR ANY OTHER APPLICABLE SECURITIES LAWS SHALL NOT BE A CONDITION TO THE OCCURRENCE OF THE EFFECTIVE DATE (AS DEFINED IN THE PLAN).

THE NEW COMMON STOCK TO BE ISSUED ON THE EFFECTIVE DATE HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY SUCH AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE, PROJECTED FINANCIAL INFORMATION, AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS. CERTAIN OF THESE FORWARD-LOOKING STATEMENTS CAN BE IDENTIFIED BY THE USE OF WORDS SUCH AS "BELIEVES," "EXPECTS," "PROJECTS," "INTENDS," "PLANS," "ESTIMATES," "ASSUMES," "MAY," "SHOULD," "WILL," "SEEKS," "ANTICIPATES," "OPPORTUNITY," "PRO FORMA," "PROJECTIONS," OR OTHER SIMILAR EXPRESSIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN AND IN DITECH HOLDING CORPORATION'S FILINGS WITH THE SEC.

READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS, INCLUDING THOSE IDENTIFIED IN SECTION IX OF THIS DISCLOSURE STATEMENT. IMPORTANT ASSUMPTIONS AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THOSE EXPECTED ALSO INCLUDE, BUT ARE NOT LIMITED TO, THOSE FACTORS, RISKS, AND UNCERTAINTIES DESCRIBED IN MORE

DETAIL UNDER THE HEADING "RISK FACTORS" AND ELSEWHERE IN THE ANNUAL AND QUARTERLY REPORTS OF DITECH HOLDING CORPORATION, INCLUDING AMENDMENTS THERETO, AND ITS OTHER FILINGS WITH THE SEC.  DUE TO THESE UNCERTAINTIES, READERS CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT.  THE DEBTORS ARE UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIM ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT (AS DEFINED BELOW).

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE FINANCIAL PROJECTIONS OR THE LIQUIDATION ANALYSIS ATTACHED HERETO AS EXHIBITS D AND E, RESPECTIVELY.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.  THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR IN CONNECTION WITH CONFIRMATION OF THE PLAN.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.

ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO, AND ARE A PART OF, THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

**198**

WEIL:\97031080\1\41703.0011

# TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................................................... 6

II.     OVERVIEW OF COMPANY'S OPERATIONS.................................................... 16
        A.      Debtors' Business........................................................................................ 16
        B.      Debtors' Organizational Structure............................................................... 24
        C.      Directors and Officers ................................................................................ 24
        D.      Regulation of Company's Business.............................................................. 24
        E.      Debtors' Existing Capital Structure............................................................. 26

III.    KEY EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASES ............. 29
        A.      Background and Prior Restructuring ........................................................... 29
        B.      Events Leading to Commencement of these Chapter 11 Cases .................... 29
        C.      Prepetition Marketing Process and Negotiations with Stakeholders............. 30
        D.      Utilization of Grace Period, Forbearance, and Expiration of Certain Warehouse
                Facilities.................................................................................................... 32

IV.     OVERVIEW OF THE CHAPTER 11 CASES ..................................................... 33
        A.      Commencement of Chapter 11 Cases and First-Day Motions ..................... 33
        B.      Procedural Motions and Retention of Professionals..................................... 36
        C.      KEIP Motion.............................................................................................. 36
        D.      Lease Rejection Motion .............................................................................. 36
        E.      Bar Date ..................................................................................................... 37
        F.      Appointment of the Creditors' Committee .................................................. 37
        G.      Appointment of the Consumer Creditors' Committee.................................. 37
        H.      Statements and Schedules, and Rule 2015.3 Financial Reports.................... 38
        I.      Litigation Matters....................................................................................... 39
        J.      Marketing Process and Bidding Procedures ................................................ 40
        K.      U.S. Trustee's Objections to Plan ............................................................... 41
        L.      Plan Settlement Negotiations and the Global Plan Settlement...................... 42

V.      SUMMARY OF PLAN ........................................................................................... 44
        A.      Administrative Expenses and Priority Claims ............................................. 44
        B.      Classification of Claims and Interests ......................................................... 46
        C.      Treatment of Claims and Interests............................................................... 47
        D.      Means for Implementation.......................................................................... 53
        E.      Distributions............................................................................................... 68
        F.      Procedures for Disputed Claims.................................................................. 73

| | G. | Executory Contracts and Unexpired Leases | 75 |
|---|---|---|---|
| | H. | Conditions Precedent to Confirmation of Plan and Effective Date | 79 |
| | I. | Effect of Confirmation of Plan | 81 |
| | J. | Retention of Jurisdiction | 86 |
| | K. | Miscellaneous Provisions | 88 |
| **VI.** | | **VALUATION ANALYSIS** | **92** |
| **VII.** | | **TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES LAWS** | **93** |
| **VIII.** | | **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF PLAN** | **94** |
| | A. | Consequences to the Debtors | 95 |
| | B. | Consequences to Holders of Term Loan Claims | 98 |
| | C. | Disposition of New Common Stock | 102 |
| | D. | Ownership and Disposition of the New Term Loan | 102 |
| | E. | Information Reporting and Backup Withholding | 104 |
| **IX.** | | **CERTAIN RISK FACTORS TO BE CONSIDERED** | **107** |
| | A. | Certain Bankruptcy Law Considerations | 107 |
| | B. | Additional Factors Affecting Value of Reorganized Debtors | 109 |
| | C. | Risks Relating to Debtors' Business and Financial Condition | 109 |
| | D. | Factors Relating to Securities to be Issued Under Plan, Generally | 114 |
| | E. | Risk Related to Obtaining Exit Financing | 115 |
| | F. | Risks Related to Investment in New Common Stock | 115 |
| | G. | Additional Factors | 116 |
| **X.** | | **VOTING PROCEDURES AND REQUIREMENTS** | **117** |
| | A. | Voting Deadline | 117 |
| | B. | Voting Procedures | 118 |
| | C. | Parties Entitled to Vote | 118 |
| **XI.** | | **CONFIRMATION OF PLAN** | **120** |
| | A. | Confirmation Hearing | 120 |
| | B. | Objections to Confirmation | 121 |
| | C. | Requirements for Confirmation of Plan | 123 |
| **XII.** | | **ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN** | **126** |
| | A. | Alternative Plan of Reorganization | 127 |
| | B. | Sale Under Section 363 of Bankruptcy Code | 127 |

WEIL:\97031080\1\41703.0011

**200**

C.    Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law ............................ 127

**XIII.    CONCLUSION AND RECOMMENDATION** .................................................................... **128**

EXHIBIT A:    Joint Plan of Reorganization

EXHIBIT A-1    Borrower Non-Discharged Claims

EXHIBIT B:    Restructuring Support Agreement

EXHIBIT C:    Organizational Structure Chart

EXHIBIT D:    Financial Information and Projections

EXHIBIT E:    Liquidation Analysis[2]

---

[2]    The Debtors have sought authority from the Bankruptcy Court to file the Liquidation Analysis with the Plan Supplement to protect the integrity of their sale process.  Copies of the Liquidation Analysis will be available on the Voting Agent's website with the Plan Supplement upon its filing.

# I.
# INTRODUCTION

Ditech Holding Corporation (f/k/a Walter Investment Management Corp., "**DHCP**") and its affiliated debtors (collectively, the "**Debtors**" and together with their non-debtor affiliates, the "**Company**") submit this amended disclosure statement (as amended, modified, or supplemented, the "**Disclosure Statement**") pursuant to Section 1125 of the Bankruptcy Code in connection with the solicitation of votes with respect to the Amended *Joint Chapter 11 Plan of Ditech Holding Corporation and its Affiliated Debtors*, dated May 9, 2019 (as amended, modified, or supplemented, the "**Plan**") .[3] The Plan is annexed hereto as Exhibit A and is incorporated herein by reference. The Debtors commenced their chapter 11 cases (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on February 11, 2019 (the "**Commencement Date**").

The purpose of this Disclosure Statement, including the exhibits annexed hereto, is to provide information of a kind, and in sufficient detail, to enable creditors of the Debtors that are entitled to vote on the Plan to make an informed decision on whether to vote to accept or reject the Plan. This Disclosure Statement contains summaries of the Plan, certain statutory provisions, events contemplated in the Chapter 11 Cases, and certain documents related to the Plan.

DHCP is the ultimate parent of twenty-six (26) direct and indirect subsidiaries and trust companies, thirteen (13) of which are Debtors in these Chapter 11 Cases. The Company is an independent servicer and originator of forward mortgage loans and a servicer of reverse mortgage loans. The Company is an integrated enterprise with primary day-to-day operations carried out at the subsidiary level and corporate and similar functions carried out at the DHCP level. In particular, Ditech Financial LLC ("**Ditech Financial**") primarily carries out the Company's forward mortgage origination and servicing operations and Reverse Mortgage Solutions, Inc. ("**RMS**") primarily carries out the Company's reverse mortgage servicing operations.

The Company services a wide array of loans across the credit spectrum for its own portfolio and for the GSEs (as defined below), government entities, third-party securitization trusts, and other credit owners. The Company originates and purchases residential loans through the consumer, correspondent and wholesale lending channels that are predominantly sold to GSEs and government entities. The Company also operates two complimentary businesses: (i) asset receivables management and (ii) real estate owned property management and disposition.

Beginning in May 2018, the Company began its formal review of strategic alternatives, including a potential merger or sale of all or substantially all of the assets of the Company. As explained in more detail below, the Company was not able to consummate an out-of-court transaction with a third party purchaser. Accordingly, facing increased uncertainty in 2019, and an anticipated going-concern qualification from its auditors, the Company turned its focus toward planning for an in-court recapitalization transaction that would maximize value for creditors and preserve the enterprise as a going concern. To that end, in December 2018, the Company began in earnest negotiating with groups of holders of its corporate debt on the terms and implementation of an acceptable recapitalization structure, culminating in a restructuring support agreement (the "**Restructuring Support Agreement**") with the Term Loan Ad Hoc Group (as defined below)—the Company's senior creditors—holding, in the aggregate, approximately $722.8 million

---

[3]     Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Plan. To the extent any inconsistencies exist between this Disclosure Statement and the Plan, the Plan shall govern.

of Prepetition Term Loans (as defined below).  A copy of the Restructuring Support Agreement is attached hereto as Exhibit B.[4]

By virtue of the Restructuring Support Agreement, the Company commenced the Chapter 11 Cases with a clear path to a confirmable chapter 11 plan of reorganization and a viable recapitalization—in which, among other things, over $800 million in funded debt would be extinguished, leaving a significantly deleveraged reorganized Company, wholly owned by the holders of the Prepetition Term Loans, with $400 million of new term loan debt, and an appropriately sized exit working capital facility or consummation of another liquidity enhancing transaction (the "**Reorganization Transaction**").  As a toggle to the Reorganization Transaction, the Restructuring Support Agreement also provides for the continuation of the Company's prepetition review of strategic alternatives whereby any and all bids for the Company or its assets will be evaluated as a precursor to confirmation of any chapter 11 plan of reorganization (the "**Marketing Process**").

Specifically, the Marketing Process will provide a public and comprehensive forum in which the Debtors seek bids or proposals for two (2) potential transactions that, if representing higher or better value, will either be incorporated into a Reorganization Transaction or pursued as an alternative to the Reorganization Transaction in consultation with and subject to the rights of the Term Loan Ad Hoc Group under the Restructuring Support Agreement and the DIP Lenders under the DIP Facilities (as defined below).  The two types of transactions for which bids will be solicited are:

- "**Sale Transaction**" meaning, a sale of substantially all of the Company's assets as provided in the Restructuring Support Agreement;

- "**Asset Sale Transaction**" meaning, the sale of a portion of the Company's assets other than a Sale Transaction consummated on or as soon as is reasonably practicable after the Effective Date; provided such sale shall only be conducted with the consent of the Requisite Term Lenders (as defined in the Plan); and

Although the Debtors will pursue the Marketing Process in earnest, the Reorganization Transaction will serve as a backstop and provide the Company the optionality to enter into such other transactions that can either augment the Reorganization Transaction (such as an Asset Sale Transaction) or, if representing higher or better value, replace the Reorganization Transaction (such as the Sale Transaction).  Further, if during the Marketing Process the Debtors receive separate bids for certain of their assets that represent higher or better value for the estate, the Debtors can elect to proceed with such Asset Sale Transaction in conjunction with either a Reorganization Transaction or a Sale Transaction, as applicable.

In recognition of the Prepetition Term Loan holders' position as the Debtors' fulcrum creditors, under the Restructuring Support Agreement, within five (5) business days following the earlier of (a) the conclusion of the Company's Marketing Process and (b) 95 days after the Commencement Date (the earliest such date, the "**Election Date**"), holders of at least $66^{2/3}$% in aggregate principal amount outstanding of the Prepetition Term Loans (the "**Electing Term Lenders**") may deliver a notice (the "**Election Notice**") to the Company stating that the Electing Term Lenders wish to consummate a transaction (the "**Elected Transaction**"), as follows:  (i) a Reorganization Transaction or (ii) a Sale Transaction, and, if applicable, (iv) in connection and together with an election of (i) or (ii), any Asset Sale Transaction(s); provided that inclusion of any such Asset Sale Transaction(s) is not incompatible with the successful consummation of the elected

---

[4]    The signature pages for the Consenting Term Lenders have been removed from Exhibit B.

transaction in (i) or (ii).[5]  If the Debtors do not proceed with the Elected Transaction, the Consenting Term Lenders can terminate the Restructuring Support Agreement.

As part of the restructuring contemplated by the Restructuring Support Agreement, the Company refinanced all of its prepetition warehouse and advance facilities by entering into the DIP Facilities, guaranteed by DHCP, which provide up to $1.9 billion in liquidity to Ditech Financial and RMS to support their operations and these Chapter 11 Cases.  The DIP Facilities will be paid or refinanced in full in cash under any Elected Transaction or combination of Elected Transactions.

The Restructuring Support Agreement contemplates the following treatment for certain key classes of creditors under the Reorganization Transaction[6]:

- Term Loan Claims. On the Effective Date, the holders of Term Loan Claims will receive their pro rata share of new term loans (the "**New Term Loan**") under the Amended and Restated Credit Facility Agreement in the aggregate principal amount of $400 million and 100% of the New Common Stock.

- Second Lien Notes Claims. On the Effective Date, the holders of Second Lien Notes Claims will not receive any distribution.

- General Unsecured Claims.  On the Effective Date, the holders of General Unsecured Claims will not receive any distribution.

- Parent Equity Interests. On the Effective Date, Parent Equity Interests will be extinguished.

- All Priority Non-Tax Claims, Other Secured Claims, Intercompany Claims, and Intercompany Interests are Unimpaired under the Plan.

- Following the Effective Date, Reorganized DHCP will adopt a post-restructuring management incentive plan (the "**Management Incentive Plan**"), under which up to 10% of the New Common Stock (after taking into account the shares to be issued under the Management Incentive Plan) will be reserved for issuance as awards under the Management Incentive Plan.  The Management Incentive Plan will be included in the Plan Supplement.

Following feedback from the Office of the United States Trustee for Region 2 (the "**U.S. Trustee**") and consultation with the Term Loan Ad Hoc Group, the Plan has been modified to provide that certain borrower claims (as described below) will not be discharged in a Reorganization Transaction.

The Reorganization Transaction is expected to leave the Company's businesses intact and its balance sheet delevered.  It is also expected to enhance the Company's long-term growth prospects and to allow the Company's management team to increase its focus on operational performance and value creation.  In a sale scenario, the Plan contemplates that the asset sale proceeds remaining after the payment of administrative and priority claims will be distributed in accordance with the priority scheme of the Plan.

---

[5]    Although the Restructuring Support Agreement and Election Notice contemplate a master servicing transaction, the Debtors and the Consenting Term Lenders have determined that a master servicing transaction will no longer be pursued.

[6]    The Debtors have determined, in consultation with the Consenting Term Lenders, to remove separate classification and treatment of "Go-Forward Trade Claims."  Such claims will be addressed in the assumption/rejection process.

8

The Plan also incorporates a Global Plan Settlement (as defined herein) resolving all issues and objections that have been, or could be, asserted by the Creditors' Committee with respect to, among other things, (i) confirmation of the *Amended Joint Chapter 11 Plan of Reorganization of Ditech Holding Corporation and Its Debtor Affiliates*, dated as of April 26, 2019 (ECF No. 469) (the "**April 26, 2019 Plan**");[7] (ii) the releases and exculpations contemplated by the Plan; (iii) prospective lien challenges, claims, or causes of action that might be brought by or on behalf of the Debtors' Estates; and (iv) the Restructuring Support Agreement.  As described more fully below and set forth in the Plan, the Global Plan Settlement contemplates a distribution to holders of Allowed Second Lien Claims and General Unsecured Claims, as a carve out of Term Loan collateral, as follows:

- The holders of General Unsecured Claims shall be paid pursuant to a general unsecured claim recovery trust whereby the Debtors and the estates shall transfer assets to the trust free and clear of all liens, charges, claims, encumbrances, and interests for the benefits of the holders of Allowed General Unsecured Claims.

- Second Lien Noteholders shall be paid pursuant to a second lien recovery cash pool free and clear of all liens, charges, claims, encumbrances, and interests for the benefits of the Second Lien Noteholders.

The Global Plan Settlement results from vigorous, arm's-length negotiation among the Debtors, the Term Loan Ad Hoc Group and the Creditors' Committee, with the assistance of their advisors.  As a result of the modifications to the Plan implemented through the Plan, the Creditors' Committee supports confirmation of the Plan.

Accomplishing a speedy and efficient resolution of the Chapter 11 Cases is essential to maximizing the value of the Company.  Under the Restructuring Support Agreement and pursuant to the terms of the DIP Documents, the Debtors are obligated to meet certain milestones.  Specifically, the Restructuring Support Agreement and the DIP Facilities may be terminated if, among other things, the Debtors fail to satisfy the following milestones:

| Milestone | Deadline |
|---|---|
| File the Plan, Disclosure Statement, and Bidding Procedures Motion | March 5, 2019 |
| Entry of OCB Orders | March 21, 2019 |
| Entry of order approving Bidding Procedures | April 17, 2019 |
| Entry of Final DIP Order and Cash Management Order | April 19, 2019 |
| Entry of order approving Disclosure Statement | May 10, 2019 |
| Commence Auction (if necessary) | June 11, 2019 |
| Commence Sale and Confirmation Hearing | June 25, 2019 |
| Occurrence of Effective Date | July 9, 2019 |

---

[7]    For the avoidance of doubt, the Plan supersedes and replaces the April 26, 2019 Plan in its entirety.

WEIL:\97031080\1\41703.0011

> **THE DEBTORS AND CREDITORS' COMMITTEE SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN. THE DEBTORS AND CREDITORS' COMMITTEE BELIEVE THAT THE PLAN PROVIDES THE HIGHEST AND BEST RECOVERY FOR ALL STAKEHOLDERS.**

**WHO IS ENTITLED TO VOTE**: Under the Bankruptcy Code, only holders of claims or interests in "impaired" Classes are entitled to vote on the Plan (unless, for reasons discussed in more detail below, such holders are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code). Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" unless (i) the Plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the Plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

Holders of Claims in Class 3 (Term Loan Claims) are the only Class being solicited under, and the only Class entitled to vote on, the Plan.

**THE PLAN PROVIDES THAT THE HOLDERS OF CLAIMS IN CLASS 3 WHO VOTE TO ACCEPT THE PLAN, OR WHO ABSTAIN FROM VOTING OR VOTE TO REJECT THE PLAN BUT DO NOT OPT-OUT OF THE RELEASES CONTAINED IN SECTION 10.6(b) OF THE PLAN, ARE DEEMED TO HAVE GRANTED THE RELEASES CONTAINED IN SECTION 10.6(b) OF THE PLAN.**

The following table summarizes (i) the treatment of Claims and Interests that are classified under the Plan, (ii) which Classes are impaired by the Plan, (iii) which Class is entitled to vote on the Plan, and (iv) the estimated recoveries for holders of Claims and Interests in the Reorganization Transaction. The table is qualified in its entirety by reference to the full text of the Plan. For a more detailed summary of the terms and provisions of the Plan, see Article V—Summary of Plan below. The Plan constitutes a separate plan for each Debtor. Each class of Claims and Interests only address claims against or interest in a particular Debtor. A discussion of the amount of Claims in each Class is set forth in Article II.E.1 hereof.

WEIL:\97031080\1\41703.0011

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Approx. Recovery in Reorganization[8] |
|---|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Except to the extent that a holder of an Allowed Priority Non-Tax Claim against the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction of such Allowed Priority Non-Tax Claim, at the sole option of the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable:  (i) each such holder shall receive payment in Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is reasonably practicable; (ii) such holder's Allowed Priority Non-Tax Claim shall be Reinstated; or (iii) such holder shall receive such other treatment so as to render such holder's Allowed Priority Non-Tax Claim Unimpaired. | Unimpaired | No (Presumed to accept) | 100% |
| 2 | Other Secured Claims | Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim will receive, on account of such Allowed Claim, at the sole option of the Debtors, Reorganized Debtors, or the Plan Administrator, as applicable:  (i) Cash in an amount equal to the Allowed amount of such Claim; (ii) Reinstatement of such holder's Allowed Other Secured Claim; (iii) such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired; or (iv) return of the applicable collateral in satisfaction of the Allowed amount of such Other Secured Claim.

Upon the Effective Date and solely with respect to the Reorganization Transaction, the National Founders Facility shall be Reinstated and shall either be paid in full in Cash on account of the National Founders Facility Claim or receive such other treatment as agreed to among the Debtors and National Founders. | Unimpaired | No (Presumed to accept) | 100% |
| 3 | Term Loan Claims[9] | Except to the extent that a holder of an Allowed Term Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed Term Loan Claim, each such holder thereof shall receive: | Impaired | Yes | <100% |

---

[8]    Approximate recovery in a Sale Transaction will be determined by the sale proceeds.

[9]    As discussed in further detail below, the Debtors are presently engaged in the Marketing Process.  To ensure that the integrity of the Marketing Process is preserved and value is maximized, the expected recoveries for Term Loan Claims is not, at this time, being disclosed herein by the Debtors.  The Debtors will file, no later than the date that the Plan Supplement is filed, the expected recoveries to creditors under the Plan and will serve notice thereof on holders of Claims in the Voting Class as promptly as practicable upon filing.

WEIL:\97031080\1\41703.0011

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Approx. Recovery in Reorganization[8] |
|---|---|---|---|---|---|
| | | (i)      If the Sale Transaction occurs, on the Effective Date, such holder's Pro Rata share of Net Cash Proceeds until all Allowed Term Loan Claims are satisfied in full in cash.  On the Effective Date, the Prepetition Credit Agreement shall be deemed cancelled (except as set forth in Section 5.12 of the Plan). <br><br> (ii)      If the Reorganization Transaction occurs, on the Effective Date, such holder's Pro Rata share of (a) term loans under the Amended and Restated Credit Facility Agreement; (b) 100% of the New Common Stock; provided, that the New Common Stock shall be subject to dilution by the Management Incentive Plan; and (c) if applicable, the Asset Sale Proceeds.  On the Effective Date, the Prepetition Credit Agreement shall be deemed cancelled (except as set forth in Section 5.12 of the Plan) and replaced by the Amended and Restated Credit Facility Agreement, without the need for any holder of a Term Loan Claim that does not vote for the Plan or votes to reject the Plan executing the Amended and Restated Credit Facility Agreement, and each Lien, mortgage and security interest that secures the obligations arising under the Prepetition Credit Agreement as of the Commencement Date shall be reaffirmed, ratified and deemed granted by the Reorganized Debtors to secure all obligations of the Reorganized Debtors arising under the Amended and Restated Credit Facility Agreement. <br><br> In each case, any Term Loan Deficiency Claims shall be deemed waived; provided, that holders of Allowed Term Loan Claims shall be entitled to receive a Pro Rata share of fifty percent (50%) of the proceeds from the GUC Recovery Trust Causes of Action in accordance with the GUC Recovery Trust Agreement. | | | |
| 4 | Second Lien Notes Claims | The Second Lien Notes Claims are Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $253,895,875.  Except to the extent that a holder of an Allowed Second Lien Notes Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed Second Lien Notes Claim, each such holder thereof shall receive: <br><br> (i)      If the Sale Transaction occurs, such holder's (x) Pro Rata share of the Second Lien Recovery Cash Pool; (y) Pro Rata share as between Allowed Claims in Class 4 and Class 5 of the Contributed Sale Proceeds; and (z) Pro Rata share of the Net Cash Proceeds as such holders are entitled to under applicable nonbankruptcy law after the Term Loan Claims are satisfied in full in Cash, until all Allowed Second Lien Notes Claims are satisfied in full; provided, that distributions on account of (x) and (y) of this Section 4.4(b)(i) shall | Impaired | No (Deemed to reject) | <1% |

12

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Approx. Recovery in Reorganization[8] |
|---|---|---|---|---|---|
| | | be subject to the approval and consummation of the Global Settlement.<br><br>(ii)　If the Reorganization Transaction occurs, such holder's Pro Rata share of the Second Lien Recovery Cash Pool; provided, that such distribution shall be subject to the approval and consummation of the Global Settlement.<br><br>(iii)　If either the Sale Transaction or the Reorganization Transaction occurs, on the Effective Date, the Second Lien Notes shall be deemed cancelled (except as set forth in Section 5.12 hereof) without further action by or order of the Bankruptcy Court. | | | |
| 5 | General Unsecured Claims | Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed General Unsecured Claim, each such holder thereof shall receive:<br><br>(i)　If the Sale Transaction occurs, such holder's Pro Rata share of (y) the GUC Recovery Trust Assets; and (z) the Net Cash Proceeds (until all Allowed General Unsecured Claims are satisfied in full) after the Term Loan Claims and Second Lien Notes Claims are satisfied in full in Cash; provided, that distributions on account of (y) of this Section 4.5(b)(i) shall be subject to the approval and consummation of the Global Settlement.<br><br>(ii)　If the Reorganization Transaction occurs, such holder's Pro Rata share of the GUC Recovery Trust Assets; provided, that such distribution shall be subject to the approval and consummation of the Global Settlement. | Impaired | No (Deemed to reject) | 13-15%[10] |
| 6 | Borrower Non-Discharged Claims[11] | Except to the extent that a holder of an Allowed Borrower Non-Discharged Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed Borrower Non-Discharged Claim, each such holder thereof shall receive:<br><br>(i)　If the Sale Transaction occurs, the same treatment as Allowed General Unsecured Claims in accordance with Section 4.5(b) hereof, unless such Borrower Non-Discharged Claim is assumed by a purchaser as an assumed liability.　For the avoidance of doubt, holders of Allowed Borrower Non-Discharged Claims and holders of Allowed | Reorganization Transaction (Unimpaired)<br><br>Sale Transaction (Impaired) | Reorganization Transaction No (Presumed to accept)<br><br>Sale Transaction No (Deemed to reject) | Reorganization Transaction 100%<br><br>Sale Transaction >100% |

---

[10]　Based on the Debtors' estimates of the Allowed Prepetition General Unsecured Claims.　This number is subject to change based on the proofs of claim filed in these chapter 11 cases and administered pursuant to the Plan and any other changes or developments in these chapter 11 cases.

[11]　The definition and description of Borrower Non-Discharge Claims is set out in Exhibit A-1 to this Disclosure Statement.

13

**209**

WEIL:\97031080\1\41703.0011

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Approx. Recovery in Reorganization[8] |
|---|---|---|---|---|---|
| | | General Unsecured Claims shall receive distributions from the GUC Recovery Trust Assets on a Pro Rata basis.<br><br>(ii)    If the Reorganization Transaction occurs, on or after the Effective Date, as a carve out from the Term Lenders' collateral (or the proceeds or value thereof), holders of Allowed Borrower Non-Discharged Claims shall be treated in the ordinary course of business as if the Chapter 11 Cases had not been commenced, subject to all defenses or disputes the Debtors and Reorganized Debtors may assert as to the validity or amount of such Claims, including as provided in Section 10.9 of the Plan. | | | |
| 7 | Intercompany Claims | On or after the Effective Date, all Intercompany Claims will be adjusted, continued, settled, reinstated, discharged, or eliminated as determined by the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, and the Requisite Term Lenders, in their respective reasonable discretion; provided, that if the Sale Transaction occurs, holders of Intercompany Claims shall not receive Cash on account of such Intercompany Claims. | Unimpaired | No (Presumed to accept) | N/A |
| 8 | Intercompany Interests | On or after the Effective Date, all Intercompany Interests shall be cancelled, reinstated, or receive such other treatment as determined by the Debtors or Reorganized Debtors, as applicable, and the Requisite Term Lenders, in their respective reasonable discretion; provided, that if the Sale Transaction occurs, holders of Intercompany Interests shall not receive Cash on account of such Intercompany Interests. | Unimpaired | No (Presumed to accept) | N/A |
| 9 | Parent Equity Interests | Except to the extent that a holder of Parent Equity Interests agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for Parent Equity Interests, each such holder thereof shall receive:<br><br>(i)    If the Sale Transaction occurs, (A) on the Effective Date, all Parent Equity Interests shall be cancelled and one share of Ditech common stock (the "**Single Share**") shall be issued to the Plan Administrator to hold in trust as custodian for the benefit of the former holders of Ditech common stock and preferred stock consistent with their former relative priority and economic entitlements. The Single Share shall be recorded on the books and records maintained by the Plan Administrator. To the extent not previously filed, on or promptly after the Effective Date, a Form 15 for the purpose of terminating the registration of Ditech's common stock and suspending Ditech's reporting obligations, as applicable, shall be filed with the Securities and Exchange Commission to the extent permitted by applicable law; (B) each former holder of a Parent Equity Interest (through their interest in the Single Share, as applicable) | Impaired | No (Deemed to reject) | 0% |

WEIL:\97031080\1\41703.0011

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Approx. Recovery in Reorganization[8] |
|---|---|---|---|---|---|
| | | shall neither receive nor retain any property of the Estate or direct interest in property of the Estate on account of such Parent Equity Interests; *provided*, that in the event that all Allowed Claims have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each former holder of a Parent Equity Interest may receive its share of any remaining assets of Ditech consistent with such holder's rights of payment existing immediately prior to the Commencement Date. Unless otherwise determined by the Plan Administrator, on the date that Ditech's Chapter 11 Case is closed in accordance with Section 5.16 of the Plan, the Single Share issued on the Effective Date shall be deemed cancelled and of no further force and effect provided that such cancellation does not adversely impact the Debtors' Estates; (C) the continuing rights of former holders of Parent Equity Interests (including through their interest in Single Share or otherwise) shall be nontransferable except (i) by operation of law or (ii) for administrative transfers where the ultimate beneficiary has not changed, subject to the Plan Administrator's consent. (ii)      If the Reorganization Transaction occurs, on the Effective Date, all Parent Equity Interests shall be deemed cancelled without further action by or order of the Bankruptcy Court, and shall be of no further force and effect, whether surrendered for cancellation or otherwise. | | | |
| 10 | Subordinated Securities Claims | Holders of Subordinated Securities Claims shall not receive or retain any property under the Plan on account of such Subordinated Securities Claims. On the Effective Date, all Subordinated Securities Claims shall be deemed cancelled without further action by or order of the Bankruptcy Court, and shall be of no further force and effect, whether surrendered for cancellation or otherwise. | Impaired | No (Deemed to reject) | 0% |

**PLEASE TAKE NOTICE THAT ALL HOLDERS OF GENERAL UNSECURED CLAIMS, INCLUDING BORROWERS OF LOANS AND/OR MORTGAGORS OF MORTGAGES SERVICED BY THE DEBTORS, THAT HOLD PREPETITION CLAIMS AGAINST ONE OR MORE OF THE DEBTORS WILL BE SUBJECT TO THE BAR DATE ORDER.  IF YOU HOLD SUCH A CLAIM AND DO NOT FILE A PROOF OF CLAIM BY THE GENERAL BAR DATE IN ACCORDANCE WITH THE BAR DATE ORDER, YOUR CLAIM MAY BE DISCHARGED AND YOU MAY NOT BE ENTITLED TO A RECOVERY, IF ANY, ON SUCH CLAIM PURSUANT TO THE PLAN.**

**WHERE TO FIND ADDITIONAL INFORMATION**:  DHCP files annual reports and quarterly reports with, and furnishes other information to, the SEC.  Copies of any document filed with the SEC may be obtained by visiting the SEC website at http://www.sec.gov and performing a search under the "Company Filings" link.  Each of the following filings is incorporated as if fully set forth herein and is part of the Disclosure Statement:

WEIL:\97031080\1\41703.0011

- Annual Report on Form 10-K for the fiscal year ended December 31, 2018 filed with the SEC on April 16, 2019;

- Quarterly Report on Form 10-Q for the quarter ended March 31, 2018 filed with the SEC on June 6, 2018;

- Quarterly Report on Form 10-Q for the quarter ended June 30, 2018 filed with the SEC on August 9, 2018;

- Quarterly Report on Form 10-Q for the quarter ended September 30, 2018 filed with the SEC on November 14, 2018; and

- Current Reports on Form 8-K filed with the SEC on October 4, 2018; November 6, 2018; December 7, 2018; January 17, 2019; January 24, 2019; February 11, 2019; February 21, 2019; March 6, 2019; March 26, 2019; April 3, 2019; and April 17, 2019 (other than information furnished pursuant to Item 2.02 or 7.01 and any related exhibits of any Form 8-K, unless expressly stated otherwise therein).

**Any statement contained in a document incorporated or deemed to be incorporated herein by reference, or contained in this Disclosure Statement, shall be deemed to be modified or superseded for purposes of this Disclosure Statement to the extent that a statement contained herein or in any other subsequently dated or filed document which also is or is deemed to be incorporated by reference herein modifies or supersedes such statement.**

**You should carefully read the entire Disclosure Statement and the documents incorporated by reference herein. Financial data included herein as of December 31, 2018 remains subject to the customary review procedures associated with the completion of the Company's public reporting requirements.**

## II.
## OVERVIEW OF COMPANY'S OPERATIONS

### A.    Debtors' Business

#### 1)    Business Operations

The Debtors' business was established in 1958 and operated as a captive financing business of Walter Industries, Inc. (now known as Walter Energy, Inc., "**Walter Energy**") purchasing residential mortgage loans and consumer credit obligations and then securitizing and servicing those to maturity. In 1997, DHCP's predecessor, Hanover Capital Mortgage Holdings, Inc., a qualified real estate investment trust, was incorporated in Maryland. In April 2009, Walter Investment Management LLC spun off from Walter Energy, merged into Hanover Capital Mortgage Holdings, Inc., changed the newly merged entity's name to Walter Investment Management Corp. ("**WIMC**"), and began operating as an independent, publicly traded company. After the spin-off, WIMC acquired Marix Servicing LLC, a high-touch specialty mortgage servicer, in 2010 and acquired GTCS Holdings LLC ("**Green Tree**") in 2011, a leading independent mortgage loan servicer that provided high-touch servicing of GSE, government agency, and third-party mortgage loans. WIMC subsequently acquired RMS, which resulted in the addition of 330 employees and four offices in three states. As a result of the Green Tree acquisition, WIMC no longer qualified as a real estate investment trust. As discussed more fully in Article III hereof, WIMC commenced

16

**212**

a chapter 11 case in the United States Bankruptcy Court for the Southern District of New York on November 30, 2017 and emerged from chapter 11 on February 9, 2018 as Ditech Holding Corporation.

The Company's businesses are comprised of three primary segments: (i) forward mortgage originations; (ii) forward mortgage servicing; and (iii) reverse mortgage servicing. Following an extensive review and diligence process, the Company and its advisors determined that certain non-debtor affiliates should not be included as Debtors in these Chapter 11 Cases because they were either bankruptcy remote entities, inactive, and/or not obligated on the Company's funded debt. A description of each of the Debtors and non-Debtor affiliates and their primary functions is listed below:

| Debtor/Non-Debtor Affiliate | Services Provided |
| --- | --- |
| **Debtors** | |
| Ditech Holding Corporation | Parent holding company for other Debtors and non-Debtor affiliates. |
| Ditech Financial LLC[12] | As described in further detail below, Ditech Financial originates and purchases residential mortgage loans that are predominantly sold to GSEs and government agencies. Ditech Financial also services a wide array of loans across the credit spectrum for its own portfolios as well as for GSEs, government agencies, third party securitization trusts, and other credit owners. |
| Reverse Mortgage Solutions, Inc. | As described in further detail below, RMS services loans for the Company's reverse mortgage portfolio and subservices loan portfolios on behalf of third-party credit owners of reverse loans. Its subsidiaries also provide real estate owned property asset management services, securitizations, and technology services. |
| REO Management Solutions, LLC | A subsidiary of RMS that performs real estate owned property management services. |
| Mortgage Asset Systems, LLC | Provides technology services for REO Management Solutions, LLC. |
| DF Insurance Agency LLC | A licensed insurance agency that performs marketing services for a third-party insurance business with respect to voluntary insurance policies and receives premium-based commissions for its services. |

---

[12]    As discussed further herein, the Company's payroll processor, Ceridian drafts the required funds for payroll and payroll taxes from the Ditech Financial LLC Citibank account ending in #5011. Intercompany accounting entries are created to record the expense and liabilities on the appropriate entity's books.

| Green Tree Credit LLC | An inactive entity that was formed on May 20, 2003 and is the surviving entity of a merger with Conseco Finance Credit Corp. |
| Green Tree Credit Solutions LLC | An intermediate holding company and subsidiary of Ditech Holding Corporation. |
| Green Tree Insurance Agency of Nevada, Inc. | An inactive entity that is an insurance agency and subsidiary of Green Tree Credit Solutions LLC. |
| Green Tree Investment Holdings III LLC | An inactive entity and subsidiary of Green Tree Credit Solutions LLC. |
| Green Tree Servicing Corp. | The managing member of Ditech Financial LLC. |
| Marix Servicing LLC | A subsidiary of Ditech Holding Corporation. |
| Walter Management Holding Company LLC | An intermediate holding company and member of Ditech Financial LLC, a licensed origination and servicing company, and Green Tree Credit LLC, an inactive company. |
| Walter Reverse Acquisition LLC | An intermediate holding company of Reverse Mortgage Solutions, Inc. |
| **Non-Debtor Affiliates** | |
| Ditech Agency Advance Depositor LLC | A special purpose vehicle that holds rights to receive reimbursement of prior and future protective and P&I advances regarding Fannie Mae loans under a trust. |
| Ditech Agency Advance Trust | A statutory trust that was formed to fund Fannie Mae (GSE) advances. |
| Ditech PLS Advance Depositor LLC | A special purpose vehicle that holds rights to receive reimbursement of prior and future protective and P&I advances under certain PLS securitizations. |
| Ditech PLS Advance Trust II | A statutory trust that was formed to fund PLS (non-GSE) advances. |
| Green Tree Advance Receivables III LLC | A special purpose vehicle that holds rights to receive reimbursement of prior and future protective and P&I advances regarding Fannie Mae and Freddie Mac loans. |
| Hanover SPC-A, Inc. | An inactive entity that holds interests of Hanover securitizations. |

18

WEIL:\97031080\1\41703.0011

| Mid-State, Capital, LLC | A bankruptcy remote entity. |
| RMS REO BRC, LLC | Holds OREO property acquired in foreclosures. |
| RMS REO BRC II, LLC | Holds OREO property acquired in foreclosures. |
| RMS REO CS, LLC | Holds OREO property acquired in foreclosures. |
| RMS 2018-09, LLC | A special purpose vehicle that handles financing of HECM loans. |
| WIMC Real Estate Investment LLC | An inactive entity. |

a.  Forward Mortgage Origination Business (Ditech Financial)

The Company originates forward mortgage loans and consumer credit transactions exclusively through Ditech Financial. Virtually all of the loans that Ditech Financial originates are loans eligible for securitization by government-sponsored enterprises, such as Fannie Mae and Freddie Mac,[13] or federally insured or guaranteed and eligible for Ginnie Mae securitization as mortgage-backed securities ("**MBS**").[14] Ditech Financial sells substantially all of the mortgage loans it originates into Fannie Mae- and Freddie Mac-sponsored securitizations or into mortgage pools insured by Ginnie Mae.

Ditech Financial originates or acquires mortgage loans through the following channels:

a.  Consumer Lending:  contacts and solicits (i) consumers within its existing servicing portfolio, and (ii) referrals and leads generated through direct mail, internet, telephone, and general advertising campaigns;

b.  Correspondent Lending:  purchases closed mortgage loans from a network of lenders in the marketplace; and

c.  Wholesale Lending:  originates mortgage loans identified through a network of approved brokers.

In 2018, Ditech Financial originated or purchased over $12.6 billion in mortgage loans. Of these loans approximately 30% were originated through the consumer lending channel, approximately 6% were originated through the wholesale lending channel, and approximately 64% were purchased in the correspondent lending channel. Based on the unpaid principal balance ("**UPB**") of the loans originated by

---

[13]  As used herein, "**Fannie Mae**" means the Federal National Mortgage Association, and "**Freddie Mac**" means the Federal Home Loan Mortgage Corporation. Fannie Mae and Freddie Mac are government-sponsored enterprises (each a "**GSE**" and collectively the "**GSEs**") chartered by Congress that buy and securitize mortgage loans originated by mortgage lenders, enabling the lenders quick access to liquidity fueled by the market demand for residential mortgage backed securities.

[14]  As used herein, "**Ginnie Mae**" means the Government National Mortgage Association. Ginnie Mae is a federal corporation within the U.S. Department of Housing and Urban Development ("**HUD**"), a federal agency, that guarantees investors the timely payment of principal and interest on MBS backed by federally insured or guaranteed loans, primarily loans insured by the Federal Housing Administration ("**FHA**") or guaranteed by the Department of Veterans Affairs ("**VA**") or the Department of Agriculture ("**USDA**").

WEIL:\97031080\1\41703.0011

Ditech Financial during this time period, approximately 30% were eligible for securitization by Fannie Mae, approximately 13% were eligible for securitization by Freddie Mac, and approximately 57% were eligible for private securitization guaranteed by Ginnie Mae.  To the extent that Ditech Financial identifies a loan ineligible for GSE securitization and/or securitization and Ginnie Mae guarantee during its origination process, it may elect to close and fund such loan as long as it lines up a private buyer for such loan at the pre-closing stage of the process.  Such loans constitute a relatively small percentage of all loans originated by Ditech Financial.

Ditech Financial's consumer originations operations offer a range of home purchase and refinance mortgage options, including fixed and adjustable rate conforming, Ginnie Mae, FHA, VA, USDA, retail installment financing, and jumbo products.  A conforming loan is a mortgage loan that conforms to GSE guidelines, which include, but are not limited to, limits on loan amount, loan-to-value ratios, debt-to-income ratios, and minimum credit scores.  The mortgage loans that Ditech Financial funds are generally eligible for sale to GSEs or insured by government agencies.

Ditech Financial underwrites the mortgage loans it originates generally to secondary market standards, including the standards set by Fannie Mae, Freddie Mac, Ginnie Mae, the FHA, the USDA, the VA, and jumbo loan investor programs.  Loans are reviewed by Ditech Financial's underwriters in an attempt to ensure each mortgage loan is documented according to, and its terms comply with, the applicable secondary market standard.  Ditech Financial's underwriters determine loan eligibility based on specific loan product requirements, such as loan-to-value, FICO, or maximum loan amount.  Third-party diligence tools are utilized by Ditech Financial's underwriters to validate data supplied by the potential borrower and to uncover potential discrepancies.  Ditech Financial conducts audits on its underwriters to confirm proper adherence to its internal guidelines and polices, which audits are in addition to Ditech Financial's standard quality control review. These audits are designed to provide an additional layer of internal review in an attempt to further mitigate quality defects and repurchase risk in the originations process.

Within its correspondent lending channel, Ditech Financial generally purchases the same types of loans that it originates in its consumer originations channel, although the mix varies among these channels. Correspondent lenders with which Ditech Financial does business agree to comply with Ditech Financial's client guide, which sets forth the terms and conditions for selling loans to Ditech Financial and generally governs the business relationship.  Ditech Financial monitors and attempts to mitigate counterparty risk related to loans that Ditech Financial acquires through its correspondent lending channel by conducting quality control reviews of correspondent lenders, reviewing compliance by correspondent lenders with applicable underwriting standards and Ditech Financial's client guide, and evaluating the credit worthiness of correspondent lenders on a periodic basis.  In 2018, the Company correspondent lending channel purchased loans from 452 lenders in the marketplace, of which 38 were associated with approximately half of Ditech Financial's purchases.

Within its wholesale lending channel, Ditech Financial originates loans through mortgage brokers.  Loans sourced by mortgage brokers are underwritten and funded by Ditech Financial and generally close in Ditech Financial's name.  Through the wholesale channel, Ditech Financial generally originates the same types of loans that it originates in its consumer originations channel, although the mix varies among these channels. Ditech Financial underwrites and processes all loan applications submitted by the mortgage brokers in a manner consistent with that described above for the consumer originations channel.  Mortgage brokers with whom Ditech Financial does business agree to comply with its client guide, which sets forth the terms and conditions for brokering loans to Ditech Financial and generally governs the business relationship.  Ditech Financial monitors and attempts to mitigate counterparty risk related to loans that Ditech Financial originates through its wholesale lending channel by conducting quality control reviews of mortgage brokers, reviewing compliance by brokers with applicable underwriting standards and Ditech Financial's client guide, and evaluating the credit worthiness of brokers on a periodic basis.

Ditech Financial's capital markets group is responsible for pricing loans and managing the interest rate risk through the time a loan is sold to third parties and managing the risk (which Ditech Financial calls the "pull-through risk") that loans Ditech Financial has locked will not be closed and funded in an attempt to maximize loan sale profitability through Ditech Financial's various originations channels.  The capital markets group uses models and hedging analysis in an attempt to maximize profitability while minimizing the risks inherent in the originations business.

Ditech Financial's originations segment revenue, which is primarily net gains on sales of loans, is impacted by interest rates and the volume of loans locked and sold.  The margins earned by Ditech Financial's originations segment are impacted by its cost to originate the loans including underwriting, fulfillment and lead costs.

As a Fannie Mae- and Freddie Mac-approved seller/servicer of mortgages, Ditech Financial is a party to certain agreements with each GSE, which agreements generally incorporate the applicable GSE selling and servicing guidelines (such agreements, together with the addenda and amendments thereto, respectively, the "**Fannie Sales Agreements**" and "**Freddie Sales Agreements**," and collectively, the "**GSE Sales Agreements**").  In general, when Ditech Financial originates a mortgage loan it funds the loan utilizing borrowings under a master repurchase agreement ("**MRA**"), pledges the loan as security for such borrowings, subsequently sells the loans into a GSE-sponsored securitization, and uses the proceeds from the sale of the mortgage backed securities to repay the borrowings under the MRA.

As a Ginnie Mae issuer, Ditech Financial pools and securitizes certain mortgage loans conforming to the requirements of the Ginnie Mae Mortgage-Backed Securities Guide and all special announcements, agreements, and other written communications made by Ginnie Mae to Ditech Financial (collectively, the "**Ginnie Agreements**").  The Ginnie Agreements employ a custodial account mechanism whereby the issuer, such as Ditech Financial, forwards to an eligible document custodian approved by Ginnie Mae all of the loan documentation.  After the pool of mortgages is approved by a Ginnie Mae pool processing agent, it directs Ditech Financial to issue MBS to third-party investors.  In connection with the approval process, Ditech Financial remits guarantee fees and base servicing fees to Ginnie Mae.

The Ginnie Agreements provide for continuing recourse obligations on Ginnie Mae-approved issuers, such as Ditech Financial.  Specifically, upon the discovery of a defective loan within four months after the mortgage origination date, the issuer is required either to cure the defect or purchase the loan from the mortgage pool at the outstanding principal balance (such loans, the "**Ginnie Buyouts**").

For the year ended December 31, 2018, Ditech Financial sold mortgage loans of $12.4 billion in UPB, consisting of approximately (i) $5.4 billion in Fannie Mae/Freddie Mac conventional conforming loans, (ii) $7.0 billion of Ginnie Mae loans, and (iii) $28.3 million of jumbo and other loans.  On average, Ditech Financial sells or securitizes loans funded through warehouse borrowings in approximately 20 days from the date of origination.  As of December 31, 2018, the total UPB of the warehoused loans held by Ditech Financial and awaiting securitization was approximately $746.2 million.

b.  Forward Mortgage Servicing Business

Ditech Financial, a debtor in these Chapter 11 Cases, performs loan servicing of mortgage loans that fall into two categories:  (i) mortgage loans for which Ditech Financial owns the mortgage service rights ("**MSRs**"), and (ii) subservicing for third party owners of MSRs.  With respect to mortgage loans for which Ditech Financial owns the MSRs, Ditech Financial performs mortgage servicing primarily in accordance with Fannie Mae, Freddie Mac, and Ginnie Mae servicing guidelines, as applicable.  Ditech Financial typically originates the mortgage loans associated with such MSRs and sells them into securitization trusts owned by Fannie Mae or Freddie Mac or into mortgage pools insured by Ginnie Mae.  The servicing

21

segment also operates complementary businesses including a collections agency that performs collections of post charge-off deficiency balances for third parties and Ditech Financial. The subservicing contracts pursuant to which Ditech Financial is retained to subservice mortgage loans generally provide that the customer, the owner of the subserviced MSR, can terminate Ditech Financial as subservicer with or without cause. Each such subservicing contract has unique terms establishing the fees that Ditech Financial will be paid for Ditech Financial's work under the contract or upon the termination of the contract, if any. The standards of performance that Ditech Financial is required to meet in servicing the relevant mortgage loans and the profitability of the subservicing activity may vary among different contracts.

As of December 31, 2018, Ditech Financial serviced approximately 1.4 million residential loans with UPB of $170.1 billion. Of those, Ditech Financial was the subservicer for 0.7 million accounts with an unpaid principal loan balance of $104.3 billion. These subserviced accounts represented approximately 58% of its total servicing portfolio based on unpaid principal loan balance at that date. Ditech Financial's largest subservicing customer, New Residential Mortgage LLC ("**NRM**"), represented approximately 78% of its total subservicing portfolio and 48% of its total servicing portfolio based on unpaid principal loan balance on December 31, 2018. The Company's next largest subservicing customer represented approximately 17% of its total subservicing portfolio based on unpaid principal loan balance on December 31, 2018. For additional information about the Debtors relationship with NRM, see Article III.C below.

c. Reverse Mortgage Servicing Business

RMS, a debtor in these Chapter 11 Cases, primarily focuses on servicing and subservicing reverse mortgage loans, also known as a home equity conversion mortgage ("**HECM**"). A HECM is a type of loan that allows homeowners aged sixty-two (62) or older to borrow money against the equity value of their homes. Unlike traditional home equity loans, HECMs are non-recourse loans without a fixed term and the balance increases over time as interest and other fees, such as servicing-related advances, are added to the borrower's total obligations. HECMs are insured by the FHA.

A borrower under a HECM does not make monthly mortgage payments—rather, the borrower receives cash in monthly installments or a lump sum up to a principal limit, which limit is calculated based on, among other things, the age of the borrower, the appraisal value of the borrower's home, and the loan interest rate. Generally, a borrower is obligated to repay the HECM when the borrower no longer uses the home as his or her principal residence, upon the death of the borrower, if title to the property is transferred, or if the borrower fails to meet certain requirements of the loan (*e.g.*, paying property taxes, insurance, or homeowners association fees) or otherwise defaults under the loan.

RMS began originating HECMs in 2010 and exited the origination business effective as of January 2017. Although RMS does not have any reverse loans remaining in its originations pipeline, RMS has remaining origination-related obligations in connection with the mortgage loans it previously originated, which obligations consist primarily of funding and securitizing subsequent borrower draws on such loans. In addition, RMS performs loan servicing for mortgage loans that fall into two categories: (i) mortgage loans originated by RMS, for which RMS acts as a servicer, and (ii) mortgage loans owned by third parties, for which RMS acts as a subservicer. Reverse mortgage servicing accounts for approximately thirteen percent 13% of the Debtors' revenues. RMS performs mortgage servicing in accordance with HUD servicing guidelines[15] and performs securitization activities in accordance with Ginnie Mae guidelines. RMS also provides management and disposition services in connection with real

---

[15]    The U.S. Department of Housing and Urban Development servicing guidelines (the "**HUD Guide**") is available at https://www.hud.gov/programoffices/housing/sfh/hecm. The Ginnie Mae Mortgage-Backed Securities Guide (the "**Ginnie Mae Guide**") is available at https://www.ginniemae.gov.

estate owned property ("**REO Property**") of the Debtors or third-party reverse mortgage servicers or investors.

RMS is an issuer of Ginnie Mae-guaranteed HECM Mortgage Backed Securities ("**HMBS**") and virtually all loans RMS originated were sold into HMBS. Under the HMBS program, RMS is required to repurchase loans from the securitization when the loans reach 98% of the maximum claim amount (which is established at origination to reflect the value of the property subject to federal limits). Performing repurchased loans are conveyed to HUD, and a payment is received from HUD typically within a short time of repurchase. Nonperforming loans are either cured or liquidated through foreclosure and subsequent sale of REO Property. RMS typically files a claim with HUD for reimbursement of costs associated with nonperforming loans shortly after such sales occur, or, in any event, no later than approximately six months after foreclosing and obtaining marketable title on the property.

As of December 31, 2018, RMS serviced or subserviced approximately 88,000 loans with an unpaid principal balance of $17.1 billion.

   2)    *Employees*

As of the Commencement Date, the Debtors employed approximately 2,900 full-time employees, ten (10) part-time employees, and fifteen (15) temporary employees who perform a variety of critical functions, including administrative, legal, accounting, finance, and management-related tasks. In addition, the Debtors rely on services from a supplemental workforce comprised of approximately 1,300 independent contractors and consultants that provide services related to the Debtors' operations. Specifically, the supplemental workforce provides consulting services with respect to financial services, information technology, claims management, and other shared services.

   3)    *Competition*

The Company competes with a number of institutions in the mortgage banking market for both the servicing and originations businesses as well as in the reverse mortgage and complementary businesses. In the servicing area, the Company competes with other servicers to acquire MSR and for the right to subservice mortgages for others. Competitive factors in the servicing business include: a servicer's scale of operations and financial strength; a servicer's access to capital to fund acquisitions of MSR; a servicer's ability to meet contractual and regulatory obligations and to achieve favorable performance (*e.g.*, in default management) relative to other servicers; a servicer's ability to provide a favorable experience for the borrower; a servicer's ability to recapture borrowers as they refinance; and a servicer's cost to service or subservice. In the mortgage originations area, the Company competes to refinance or provide new mortgage loans to borrowers whose mortgages are in the Company's existing servicing portfolio. In this area, the price and variety of the Company's mortgage products are important factors of competition, as is the reputation of the Company's servicing business and the quality of the experience the borrower may have had with the Company's servicing business. Since mid-2015, the Company's forward loan origination and servicing businesses have operated under a single "Ditech" brand. The Company also competes, principally on the basis of price and process efficiency, to acquire mortgages from correspondent lenders. In the future, the Company will also increasingly compete on the basis of brand awareness.

Across the Company's servicing and originations businesses, technology is an important competitive factor. In particular, the Company believes it will be increasingly important to enable servicing and originations customers to access the Company's services through its website and mobile devices.

23

**219**

B. **Debtors' Organizational Structure**.

DHCP owns, directly or indirectly, 100% of the ownership interest in each of the Debtors and their non-debtor affiliates. The organizational chart, attached hereto as Exhibit C, illustrates the Debtors' organizational structure, as of the date hereof.

C. **Directors and Officers**.

The following table sets forth the names of the members of DHCP's current Board of Directors:

| Name | Director Since | Position |
| --- | --- | --- |
| Thomas F. Marano | February 2018 | CEO, President & Chairman of the Board |
| David S Ascher | February 2018 | Director |
| George M. Awad | June 2016 | Director |
| Seth L. Bartlett | February 2018 | Lead Independent Director |
| Daniel G. Beltzman | December 2015 | Director |
| John R. Brecker | February 2018 | Director |
| Neal P. Goldman | January 2017 | Director |
| Thomas G. Miglis | February 2018 | Director |
| Samuel T. Ramsey | February 2018 | Director |

The following table sets forth the names of DHCP's current executive officers:

| Name | Position |
| --- | --- |
| Thomas F. Marano | CEO and President |
| Gerald A. Lombardo | Chief Financial Officer |
| John J. Haas | General Counsel, Chief Legal Officer and Secretary |
| Alfred W. Young, Jr. | Chief Risk and Compliance Officer |
| Elizabeth F. Monahan | Chief Human Resources Officer |
| Jeffrey P. Baker | President of Reverse Mortgage Solutions, Inc. |

The composition of the board of directors of the reorganized DHCP will be disclosed prior to the entry of the order confirming the Plan in accordance with section 1129(a)(5) of the Bankruptcy Code.

D. **Regulation of Company's Business**

The Company's operations are conducted in the United States and are subject to extensive regulation by federal, state and local authorities, including the Consumer Financial Protection Bureau ("**CFPB**"), HUD, VA, the SEC and various state agencies that license, audit and conduct examinations of the Company's mortgage servicing and mortgage originations businesses. The Company is also subject to a variety of regulatory and contractual obligations imposed by credit owners, investors, insurers, and guarantors of the mortgages the Company originates and services, including, but not limited to, Fannie Mae, Freddie Mac, Ginnie Mae, FHFA, USDA, VA, and the FHA. Furthermore, the industry has been under scrutiny by federal and state regulators over the past several years, and the Company expects this scrutiny to continue. Laws, rules, regulations, and practices that have been in place for many years may be changed, and new laws, rules, regulations, and administrative guidance have been, and may continue to be, introduced in order to address real and perceived problems in the industry's history. The Company expects to incur ongoing operational, legal, and system costs in order to comply with these rules and regulations.

For example, the Company is required to comply with federal consumer protection and other laws, including, but not limited to:

- The Gramm-Leach-Bliley Act and Regulation P, which require initial and periodic communication with consumers on privacy matters and the maintenance of privacy matters and the maintenance of privacy regarding certain consumer data in the Debtor's possession.

- The Fair Debt Collection Practices Act, which regulates the timing and content of communications on debt collections.

- The Truth in Lending Act, including Home Ownership and Equity Protection Act and Regulation Z, which regulate mortgage loan origination activities, require certain disclosures be made to mortgagors regarding terms of mortgage financing, regulate certain high-cost mortgages, mandate home ownership counseling for mortgage applicants and regulate certain mortgage servicing activities.

- The Fair Credit Reporting Act, as amended by the Fair and Accurate Credit Transactions Act, and Regulation V, which collectively regulate the use and reporting of information related to the credit history of consumers.

- The Equal Credit Opportunity Act and Regulation B, which prohibit discrimination on the basis of age, race, and certain other characteristics in the extension of credit and require certain disclosures to applicants for credit.

- The Homeowners Protection Act, which requires the cancellation of mortgage insurance once certain equity levels are reached.

- The Home Mortgage Disclosure Act and Regulation C, which require reporting of certain public loan data.

- The Fair Housing Act and its implementing regulations, which prohibit discrimination in housing on the basis of race, sex, national origin, and certain other characteristics.

- The Service members Civil Relief Act, as amended, which provides certain legal protections and relief to members of the military.

- The Real Estate Settlement Procedures Act and Regulation X, which govern certain mortgage loan origination activities and practices and related disclosures and the actions of servicers related to various items, including escrow accounts, servicing transfers, lender-placed insurance, loss mitigation, error resolution, and other customer communications.

- Regulation AB under the Securities Act, which requires registration, reporting, and disclosure for mortgage-backed securities.

- Certain provisions of the Dodd-Frank Wall Street Reform and Consumer Protection Act, which among other things, created the CFPB and prohibits unfair, deceptive or abusive acts or practices.

- The Federal Trade Commission Act, the FTC Credit Practices Rules, and the FTC Telemarketing Sales Rule, which prohibit unfair and certain related practices.

- The Telephone Consumer Protection Act, which restricts telephone solicitations and automatic telephone equipment.

- Regulation N, which prohibits certain unfair and deceptive acts and practices related to mortgage advertising.

- The Bankruptcy Code and bankruptcy injunctions and stays, which can restrict collection of debts.

- The Secure and Fair Enforcement for Mortgage Licensing Act.

- Various federal flood insurance laws that require the lender and servicer to provide notice and ensure appropriate flood insurance is maintained when required.

### E.    Debtors' Existing Capital Structure

#### 1.    Prepetition Indebtedness

The following description is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.

#### (a)    Prepetition Credit Agreement

As of the Commencement Date, the Debtors have outstanding first lien secured debt obligations in the aggregate principal amount of approximately $961.4 million, which amount consists of secured term loan borrowings (the "**Prepetition Term Loans**") under the Second Amended and Restated Credit Agreement (as amended by that certain Amendment No. 1 to Second Amended and Restated Credit Agreement, dated as of March 29, 2018) among DHCP, each of the other loan parties named therein, Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent, and other lenders party thereto, dated as of February 9, 2018 (the "**Prepetition Credit Agreement**"), plus interest, fees and other expenses arising thereunder.  The Prepetition Credit Agreement is secured by a lien on substantially all the assets of the Debtors.

#### (b)    Prepetition Second Lien Notes Indenture

As of the Commencement Date, the Debtors have outstanding second lien note obligations consisting of $253.9 million plus accrued and unpaid interest in aggregate outstanding principal of 9.0% Second Lien Senior Subordinated PIK Toggle Notes due 2024 issued pursuant to that certain Second Lien Notes Indenture by and between DHCP (f/k/a WIMC), certain other debtors as guarantors, and Wilmington Savings Fund Society, FSB, a national banking association, as trustee and collateral agent, dated as of February 9, 2018 (the "**Second Lien Notes Indenture**").  The Second Lien Notes Indenture is secured on a second-lien basis on substantially all the assets of the Debtors.

(c)    Prepetition Warehouse Facilities

As of the Commencement Date, the Debtors were party to the following agreements with respect to the following facilities:[16]

A.    *Mortgage Loan Warehouse Facility:*

- Amended and Restated Master Repurchase Agreement, dated as of November 18, 2016, between Credit Suisse First Boston Mortgage Capital LLC, as administrative agent, Credit Suisse AG, as committed buyer, Alpine Securitization Ltd, as a buyer, Barclays Bank PLC, as a buyer and other Buyers from time to time, and Ditech Financial LLC, as seller, with a committed capacity level of $1 billion (the "**Prepetition Forward MRA**"), subject to a combined maximum capacity level of $1.9 billion together with the Prepetition Reverse MRA, DPAT II Facility, and DAAT Facility (each as defined below).

B.    *Reverse Mortgage Facilities:*

- Second Amended and Restated Master Repurchase Agreement, dated as of November 30, 2017 and effective as of December 5, 2018, between Credit Suisse First Boston Mortgage Capital LLC, as administrative agent, Credit Suisse AG, as committed buyer, Alpine Securitization Ltd, as a buyer, Barclays Bank PLC, as a committed buyer and other Buyers from time to time, and Reverse Mortgage Solutions, Inc., as a seller, RMS REO CS, LLC, and RMS REO BRC, LLC, with a committed capacity level of $800 million (the "**Prepetition Reverse MRA**"), subject to a combined maximum capacity level of $1.9 billion together with the Prepetition Forward MRA, DPAT II Facility, and DAAT Facility; and

- Master Repurchase Agreement, dated April 23, 2018 (as may be amended, restated, supplemented, or otherwise modified), between Barclays Bank PLC, as purchaser and agent and Reverse Mortgage Solutions, Inc., as seller, with a committed capacity level of $412 million.

- Participation Interest Sale and Contribution Agreement, dated as of October 1, 2018, by and among RMS and a non-debtor subsidiary, and the related Note Purchase Agreement of even date therewith, between such subsidiary and National Founders LP (together with its affiliates, "**National Founders**" and, such facility, the "**National Founders Facility**").

C.    *Mortgage Loan Servicing Facilities:*

- Ditech PLS Advance Trust II Advance Receivables Backed Notes, Issuable in Series (the "**DPAT II Notes**") issued pursuant to that certain Indenture between Ditech PLS Advance Trust II ("**DPAT II**"), as issuer, Wells Fargo Bank N.A, as indenture trustee, calculation agent, paying agent and securities intermediary, Ditech Financial, as servicer and administrator, and Credit Suisse First Boston Mortgage Capital LLC, as administrative agent, dated as of February 9, 2018 and effective as of February 12, 2018, with a committed capacity level of $85 million (the "**DPAT II Facility**"), subject to a combined maximum capacity level of $1.9 billion together with the Prepetition Forward MRA, Prepetition Reverse MRA, and DAAT Facility; and

---

[16]    As of the Commencement Date, the Debtors were also party to the Prepetition MSFTAs and the Prepetition Netting Agreement (each as defined in the DIP Orders).

- Ditech Agency Advance Trust Advance Receivables Backed Notes, Issuable in Series (the "**DAAT Notes**") issued pursuant to that certain Indenture between Ditech Agency Advance Trust ("**DAAT**"), as issuer, Wells Fargo Bank N.A, as indenture trustee, calculation agent, paying agent and securities intermediary, Ditech Financial, as servicer and administrator, and Credit Suisse First Boston Mortgage Capital LLC, as administrative agent, dated as of February 9, 2018 and effective as of February 12, 2018, with a committed capacity level of $465 million (the "**DAAT Facility**"), subject to a combined maximum capacity level of $1.9 billion together with the Prepetition Forward MRA, Prepetition Reverse MRA, and DPAT II Facility.

(d)   General Unsecured Claims

General Unsecured Claims consist of any Claims against the Debtors (other than any Intercompany Claims) existing as of the Commencement Date that are neither secured by collateral nor entitled to priority under the Bankruptcy Code (or any order of the Bankruptcy Court).

**2.   Equity Ownership**

DHCP is a public company that files annual reports with, and furnishes other information to, the SEC.  As of December 31, 2018, 90 million shares of DHCP $0.01 par value common stock had been authorized with 5,328,417 shares of common stock issued and outstanding.  As of December 31, 2018, there were 87 record holders of DCHP's common stock.  As of December 31, 2018, 91,408 shares of mandatorily convertible preferred stock were issued and outstanding.  DHCP's common stock was delisted from the New York Stock Exchange on December 1, 2018 and currently trades over-the-counter.

**3.   Unencumbered Assets**

Substantially all of the Debtors' assets are subject to the secured of the Debtors' prepetition secured lenders and the DIP Lenders, with limited carve-outs for *de minimis* assets and value.  The Creditors' Committee alleged that there may be significant unencumbered assets of the Debtors or their non-Debtor affiliates which may inure to the benefit of the General Unsecured Claims in these chapter 11 cases.  The Debtors do not agree with the Creditors' Committee's position.  The Debtors anticipate that once the Marketing Process and Liquidation Analysis are finalized, the outcome of that analysis and process will demonstrate that there remains no expected recovery for General Unsecured Claims on account of unencumbered assets.

Following review of their purported unencumbered assets, the Debtors believe that certain claims of the Creditors' Committee with respect to unencumbered assets are speculative and, even if successful, any such value would nevertheless be exhausted following (i) its application to the costs of these chapter 11 cases and administrative expenses, and/or (ii) upon accounting for the currently contemplated Restructuring Transactions and the anticipated General Unsecured Claims against each Debtor on a Debtor-by-Debtor basis.

For example, in any Restructuring Transaction a significant portion of General Unsecured Claims are expected to be satisfied as either assumed liabilities or assumed contracts, rendering them Unimpaired. Additionally, current estimates suggest that the Term Loan Claims will have a significant deficiency claim (the "**Term Loan Deficiency Claim**") in any Restructuring Transaction.  The Term Loan Deficiency Claim may be asserted against each of the Debtors for the full amount of the Term Loan Deficiency Claim; whereas, the entirety of the Second Lien Notes Claim is payment and lien subordinated to the Term Loan Deficiency Claim.  Accordingly, when accounting on a Debtor-by-Debtor basis, unencumbered value, if any, is expected to inure almost entirely to the benefit of the Term Loan Deficiency Claim on the Debtors. These issues have been resolved by the Global Settlement.

28

### 4.    Intercompany Claims

The Debtors have evaluated and determined that there will likely be no recovery to General Unsecured Claims, except as provided by the Global Settlement, and thus, there will likely be no recovery to Intercompany Claims in a sale scenario.  Pursuant to the Plan, in a Reorganization Transaction, the Intercompany Claims will likely be either reinstated for administrative purposes or cancelled so long as such cancellation does not have an adverse effect on the Debtors but not paid.

### III.
### KEY EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASES

### A.    Background and Prior Restructuring

In the beginning of the third quarter of 2016, the Company engaged Houlihan Lokey Capital, Inc. as investment banker ("**Houlihan**") and Weil, Gotshal & Manges LLP as legal counsel ("**Weil**") and, on November 30, 2017, WIMC commenced a prepackaged chapter 11 case (*In re Walter Investment Management Corp.*, 17-13446 (JLG) (Bankr. S.D.N.Y. Nov. 30, 2017)) (the "**WIMC Chapter 11 Case**") with the Bankruptcy Court to address its overleveraged capital structure.  The plan of reorganization in the WIMC Chapter 11 Case had the overwhelming support of its creditors.  In less than two months, WIMC confirmed its plan of reorganization, eliminating more than $800 million in funded debt.  On February 9, 2018, WIMC emerged from the WIMC Chapter 11 Case as Ditech Holding Corporation, and a final decree was entered closing the WIMC Chapter 11 Case on August 14, 2018.  The goal of the WIMC Chapter 11 Case was to deleverage the capital structure sufficiently to enable the reorganized debtor to implement its business plan.  As set out below, due to circumstances largely out of the control of the Debtors, the Company has faced significant hardships and must again address its capital structure through these Chapter 11 Cases.

### B.    Events Leading to Commencement of these Chapter 11 Cases

In recent years, the Debtors' business has been impacted by significant operational challenges and industry trends that have severely constrained its liquidity and ability to implement much needed operational initiatives.  In an effort to address the burden of its overleveraged capital structure—a remnant of its historical acquisitions—the Company consummated a fully consensual prepackaged chapter 11 plan on February 8, 2018.  Given the significant liquidity and operational headwinds facing the Company in 2019, it became clear to the Company's new senior management team that additional relief was needed.

Notwithstanding the Company's efforts to implement its business plan, which included further cost reductions, operational enhancements and streamlining of its business, following emergence from the WIMC Chapter 11 Case, the Company continued to face liquidity and performance challenges that were more persistent and widespread than anticipated.  Coupled with the industry and market factors, these performance challenges have resulted in less liquidity than projected, making the implementation of key operational enhancements more difficult, and in certain cases, resulting in their postponement.

In addition, a number of industry factors have caused the Company increased uncertainty with respect to its future performance, including the projected decrease in total originations, and for reverse mortgages, the impact of changes in HUD regulations, among other things.  The increase in interest rates has also negatively impacted mortgage originators and servicers generally—the Debtors are no exception.  As interest rates have risen, fewer borrowers are refinancing loans in a higher interest rate environment, resulting in lower origination volume for the Company.

The Company's liquidity has also suffered from burdensome interest and amortization obligations on its corporate debt and tightening of rates from its lending counterparties.  In the normal course of business, the

29

**225**

Company utilizes its mortgage loan servicing advance facilities and master repurchase agreements to finance, on a short-term basis, mortgage loan related servicing advances, the repurchase of HECMs out of Ginnie Mae securitization pools, and funding of newly originated mortgage loans. These facilities are typically subject to annual renewal requirements and typically contain provisions that, in certain circumstances, prevent the Company from utilizing unused capacity under the facility and/or accelerate the repayment of amounts under the facility.

The Company's ability to fund its business operations is a significant factor that affects its liquidity and ability to operate and grow. The Company is dependent on the ability to secure these types of arrangements on acceptable terms and to renew, replace or resize existing financing facilities as they expire. Continued growth in Ginnie Buyouts activity have required the Company to continue to seek additional financing for Ginnie Buyouts or to otherwise sell or securitize Ginnie Mae buyout assets, and the Company entered into a number of transactions relating to these types of assets during the past year.

The Company has taken a number of measures to address forecasted reductions in liquidity and compliance with its various facilities, including entry into amendments under its Prepetition Credit Agreement, the DAAT Facility, the DPAT II Facility, and each of Ditech Financial's and RMS's master repurchase agreements.

The Company has entered into new agreements or transactions to generate additional liquidity. In April 2018, the Company entered into an additional master repurchase agreement that, as of December 31, 2018, provides up to $412 million in total capacity, and a minimum of $400 million in committed capacity to fund the repurchase of certain HECMs and real estate owned from Ginnie Mae securitization pools for a period of one year. In June 2018, the Company sold a pool of defaulted reverse Ginnie Buyouts owned by the Company and financed under an existing master repurchase agreement for a sales price of $241.3 million. The proceeds from the sale were used to repay the related amount financed under the master repurchase agreement and to fund additional Ginnie Buyouts. The Company continues to service these loans on behalf of the purchaser under a servicing agreement. In June 2018, the Company agreed to sell to New Penn Financial additional MSRs relating to mortgage loans having an aggregate unpaid principal balance of approximately $4.7 billion, and received approximately $56.7 million in cash proceeds. The proceeds from the sale were used primarily to make mandatory principal payments under the Prepetition Credit Agreement. In addition, in October 2018, pursuant to the National Founders Facility, the Company executed a transaction that provided $230 million of additional secured financing for certain HECMs and owned real estate.

Notwithstanding these liquidity initiatives, the Company still faced scheduled amortization payments of approximately $110 million in 2019. Accordingly, the Company was at significant risk of receiving a going-concern qualification from its auditors, which would have triggered a domino effect of defaults and terminations throughout its corporate debt and working capital facilities. Instead, the Company has sought to forge a different path with the cooperation of the Term Loan Ad Hoc Group and its major stakeholders— a path that will lead either to a significantly deleveraged and recapitalized Company through a Reorganization Transaction or, if it provides higher or better return to creditors, one of the three types of transactions as contemplated by the Restructuring Support Agreement, consistent with the goals of the Company's strategic alternatives review process discussed below.

### C.    Prepetition Marketing Process and Negotiations with Stakeholders

In May 2018, the Company initiated a process to evaluate strategic alternatives to enhance stockholder value and re-engaged Houlihan and Weil to assist in such process. Subsequently, in October 2018, the Company engaged AlixPartners, LLP to assist and advise in its contingency planning process,

acknowledging at that time that it may ultimately become necessary to implement a transaction through an in-court process.

The Company's efforts were overseen by the Board of Directors of DHCP and a Special Committee of the Board (the "**Special Committee**"), which is composed of four (4) DHCP independent directors.  The Special Committee, with the assistance of Houlihan and Weil, evaluated a range of potential strategic alternatives, including (i) a sale of the entire Company; (ii) a sale of certain assets and business platforms; (iii) a merger; or (iv) continuing as a standalone entity.

The Company undertook an extensive marketing effort (the "**Prepetition Marketing Process**"), including soliciting interest from thirty-three (33) potentially interested parties including strategic and financial buyers with the financial and operational wherewithal to complete a transaction.  The Company formally engaged with multiple potential bidders, executing ten (10) confidentiality agreements and providing a Confidential Information Memorandum, financial projections and data room access to such potential bidders.

The deadline for interested parties to submit initial bids was July 17, 2018.  The Company received four (4) indications of interest ("**IOIs**").  Following extensive discussions with the Board, the Special Committee and its legal and financial advisors, the Company selected three (3) bidders to proceed to a second round of negotiations and diligence, including onsite management presentations during the last week of July 2018.  Following the management presentations, the Company and its advisors continued to facilitate due diligence with the remaining bidders in advance of the second round of IOIs.  The Company received three (3) second round IOIs on or about August 21, 2018, two (2) of which were bids for the sale of certain servicing and reverse assets with subservicing retained by the Company (the "**Alternative Bids**") and one (1) of which was a bid for substantially all of the Company's net assets as a going concern (the "**All-Company Bid**").  Over the course of September and October 2018, the Company and its advisors engaged in extensive discussions with the final three bidders.

In October 2018, it became clear that (i) the Alternative Bids would require additional capital and liquidity to fund the restructured business plan and (ii) the proposed valuation levels of the All-Company Bid would not exceed the outstanding amount of the Company's Second Lien Notes.  As a result, the Company decided to engage with an ad hoc group of second lien noteholders (the "**Second Lien Ad Hoc Group**") to explore the Company's strategic alternatives and solicit input with respect to the All-Company Bid and the Alternative Bids.  On October 8, 2018, the Second Lien Ad Hoc Group signed a confidentiality agreement and began engaging with the Company to evaluate the sale alternatives and develop a competing potential recapitalization transaction.  The Company continued to have periodic discussions with the Second Lien Ad Hoc Group as it analyzed the sale options and various recapitalization scenarios.  In November 2018, the Second Lien Ad Hoc Group retained Centerview Partners ("**Centerview**") and Milbank, Tweed, Hadley & McCloy LLP ("**Milbank**") to assist with its analysis of the potential strategic alternatives and to assist in preparing a recapitalization transaction proposal supported by the Second Lien Ad Hoc Group.

The Company's financial and legal advisors engaged with the Second Lien Ad Hoc Group's advisors to develop potential viable alternatives to an All-Company Bid.  Among other things, the Second Lien Ad Hoc Group proposed equitizing a portion of the Second Lien Notes and obtaining amortization relief from the Term Lenders under the Prepetition Credit Agreement (the "**Second Lien Proposal**").

In December 2018, the Company engaged in parallel discussions with an ad hoc group of prepetition secured term loan lenders (the "**Term Loan Ad Hoc Group**") to discuss the Prepetition Marketing Process and the Second Lien Proposal.  The Term Loan Ad Hoc Group retained FTI Consulting ("**FTI**") and Kirkland & Ellis LLP ("**Kirkland**") as its advisors.  The Debtors and their advisors held in-person meetings

in December 2018 with each of the Term Loan Ad Hoc Group and the Second Lien Ad Hoc Group and their respective advisors to discuss strategic alternatives, including analyzing the All-Company Bid.

Despite extensive negotiations with the bidder who submitted the All-Company Bid, such bidder ultimately rescinded the All-Company Bid in late December 2018, immediately after the Company had utilized the grace period with respect to its Second Lien Notes (explained in more detail below). Following such rescission, the Company re-engaged a previous bidder in connection with a potential bid for substantially all of the Company's assets. After several weeks of negotiations with such bidder, and after consultation with the Term Loan Ad Hoc Group and its advisors, the Company ultimately decided not to pursue the sale transaction.

In early January 2019, the Term Loan Ad Hoc Group submitted a proposal for a recapitalization transaction, pursuant to which a portion of the Prepetition Term Loan would be equitized and incremental liquidity would be provided through, among other things, a new revolving credit facility and a reduction in scheduled amortization payments. Shortly thereafter, the Second Lien Ad Hoc Group submitted a revised Second Lien Proposal. Over the course of several weeks, the Company, with the assistance of its financial and legal advisors, engaged in extensive discussions with the Term Loan Ad Hoc Group and the Second Lien Ad Hoc Group regarding the competing recapitalization transactions proposed by such parties. Following extensive diligence and numerous meetings with the Company's management and advisors, the advisors to the Term Loan Ad Hoc Group provided the Company with a proposal for the recapitalization of the Company. As a precondition to seeking the approval of the Board for such terms, the Company agreed with the Term Loan Ad Hoc Group to share the proposal with certain of the Company's key counterparties, including NRM.

Notwithstanding the Debtors' good faith efforts to cooperate with NRM throughout the Company's strategic alternatives review process, NRM asserted that it had the right to issue a termination notice based on the occurrence of certain alleged termination events under its Subservicing Agreement with the Company, dated August 8, 2016 (as amended) (the "**Subservicing Agreement**") while simultaneously participating as a bidder in the Company's sale process. Ultimately, on January 17, 2019—the morning after the Company shared with NRM a recapitalization proposal from the Term Loan Ad Hoc Group—NRM issued a notice purporting to terminate the Subservicing Agreement and directing the Company to remit certain transfer fees and costs to NRM in accordance with the terms of the Subservicing Agreement ("**Termination Notice**"). On January 23 and 29, 2019, NRM sent additional letters to the Company which purported to confirm the Termination Notice and to identify certain additional termination events. The Debtors have disputed NRM's basis for termination and intend to explore all legal remedies against NRM in connection with the timing and issuance of the Termination Notice. The Debtors are, however, cooperating with NRM to transition the servicing of the loans under the Subservicing Agreement. NRM asserts that the Termination Notice was properly issued, based on the occurrence of certain alleged termination events and was effective to terminate the Subservicing Agreement. The Debtors, NRM and its parent company, New Residential Investment Corp., have each reserved all rights and remedies with respect to the Subservicing Agreement and the purported termination thereof.

### D.        Utilization of Grace Period, Forbearance, and Expiration of Certain Warehouse Facilities

On December 17, 2018, the Company elected not to make the approximately $9 million cash interest payment (the "**Interest Payment**") due and payable on December 17, 2018 with respect to the Company's outstanding Second Lien Notes and entered the 30-day grace period. Although the Company had sufficient liquidity to make the Interest Payment, the Company elected not to make the payment as discussions were still ongoing with various stakeholders regarding the Company's strategic alternatives. The Company's failure to make the Interest Payment within thirty days after it was due and payable constitutes an "event

of default" under the Second Lien Notes Indenture.  As active discussions were still ongoing, the Board determined that the Company would not make the Interest Payment prior to the expiration of the grace period, even though it had sufficient liquidity to do so, resulting in an event of default under the Second Lien Notes Indenture.  An event of default under the Indenture also constitutes an "event of default" under the Prepetition Credit Agreement and certain of the Company's warehouse facility agreements (the "**Warehouse Facility Agreements**"), among others.

On January 16, 2019, the Company and, as applicable, certain of its subsidiaries, entered into forbearance agreements (each a "**Forbearance Agreement**" and collectively the "**Forbearance Agreements**") with (i) certain holders of greater than 75% of the aggregate principal amount of the outstanding Second Lien Notes (the "**Notes Forbearing Parties**"), (ii) certain lenders holding greater than 50% of the sum of (a) the Term Loans outstanding, (b) letter of credit exposure, and (c) unused commitments under the Prepetition Credit Agreement at such time and the administrative agent and collateral agent under the Prepetition Credit Agreement (collectively, the "**Credit Agreement Forbearing Parties**"), and (iii) the requisite buyers and variable funding noteholders, as applicable, under the Warehouse Facility Agreements (collectively, the "**Warehouse Lenders Forbearing Parties**").

Pursuant to the Forbearance Agreements, subject to certain terms and conditions, the Notes Forbearing Parties, Credit Agreement Forbearing Parties and Warehouse Lenders Forbearing Parties agreed to temporarily forbear from the exercise of any rights or remedies they may have in respect of the aforementioned events of default or other defaults or events of default arising out of or in connection therewith.

The deadline of the Forbearance Agreements was tied to the maturity date of certain of the Company's repurchase loan agreements with the Warehouse Lenders Forbearing Parties.  Without a viable recapitalization of the Company in hand, the Warehouse Lenders Forbearing Parties were not in a position to commit to a significant extension of their facilities with the Company.  As noted above, these facilities are critical to the Company's ordinary course of business operations.  Accordingly, the Company focused instead on obtaining the DIP Facilities to refinance such obligations, and will, during the Marketing Process, continue to seek commitments for post-emergence facilities.

Before the termination of the Forbearance Agreements on February 8, 2019, the Company entered into new forbearance agreements with the Credit Agreement Forbearing Parties and the Warehouse Lenders Forbearing Parties (the "**Forbearance Extension**").  The Forbearance Extension was scheduled to terminate on February 11, 2019.

## IV.
## OVERVIEW OF THE CHAPTER 11 CASES

### A.    Commencement of Chapter 11 Cases and First-Day Motions

On February 11, 2019, the Debtors commenced the Chapter 11 Cases.  The Debtors continue to manage their estates as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  To that end, the Debtors filed various motions seeking relief from the Bankruptcy Court to promote a seamless transition between the Debtors' prepetition and postpetition business operations, facilitate a smooth restructuring through the Chapter 11 Cases, and minimize any disruptions to the Debtors' operations (the "**First Day Motions**").  At the second day hearing held on March 14, 2019, the Bankruptcy Court granted substantially all of the relief requested in the First Day Motions on a final basis and entered various final orders authorizing the Debtors to, among other things:

- Continue paying employee wages and benefits (ECF No. 207);

- Continue insurance programs and the workers' compensation program, the processing of workers' compensation claims, and continue the Debtors' surety bond program (ECF No. 205);

- Continue to pay all taxes, fees, and similar charges and assessments, whether arising prepetition or postpetition, to the appropriate taxing, regulatory, or other governmental authority in the ordinary course (ECF No. 230);

- Establish procedures for utility companies to request adequate assurance of payment and to prohibit utility companies from altering or discontinuing services (ECF No. 128); and

- Continue to conduct their forward and reverse mortgage businesses in the ordinary course, as discussed in more detail below in Section 2 (ECF Nos. 224 and 229).

The Debtors' request to continue to use their cash management system, bank accounts, and business forms and to obtain debtor-in-possession financing have been approved on a final basis (ECF No. 478). The Debtors' motion to continue to use their cash collateral has been approved on an interim basis (ECF No. 53), and in accordance with the Global Settlement, the Creditors' Committee objections to entry of a final order for use of cash collateral will be resolved.

### 1.    DIP Facilities and Cash Collateral

(a)    DIP Facilities:

To address the working capital needs of the Debtors and support the transactions contemplated by the Restructuring Support Agreement, the Debtors filed a motion (the "**DIP Motion**") (ECF No. 26) to enter into the DIP Facilities, which provide the Debtors' two primary operating entities, Ditech Financial and RMS, as applicable, (a) up to $1.9 billion in warehouse financing under three master repurchase agreements and two advance facilities and (b) access to $1.9 billion in hedging capacity under certain master securities forward transaction agreements and related netting agreement (collectively, the "**DIP Facilities**"). The DIP Facilities will ensure that the Company's financing needs will continue to be met and access to such financing will not be abruptly interrupted. The interim order granting the relief requested in the DIP Motion can be found at ECF No. 53 ("**Interim DIP Order**"), and the final order granting the relief request in the DIP Motion with respect to the DIP Facilities can be found at ECF No. 422 (the "**Final DIP Order**").

The DIP Facilities provide the Debtors with the flexibility to use the commitment amount in the manner that best suits their capital needs. Specifically, during the Chapter 11 Cases, (i) up to $650 million will be available to fund Ditech Financial's origination business, (ii) up to $1.0 billion will be available to RMS, and (iii) up to $250 million will be available to finance the advance receivables related to Ditech Financial's servicing activities. In addition, the lenders under the DIP Facilities will provide Ditech Financial up to $1.9 billion in trading capacity to hedge its interest rate exposure with respect to the loans in its origination pipeline, as well as those loans that will be subject to repurchase obligations with the DIP Facilities lenders prior to being securitized.

(b)    Cash Collateral

In addition, the Debtors are authorized, on an interim basis, to consensually use the cash collateral of the Prepetition Term Lenders for the duration of the Chapter 11 Cases. In exchange, the Debtors are providing the Prepetition Term Lenders, with the consent of the Prepetition Administrative Agent, acting at the direction of the Required Term Lenders with the following:

WEIL:\97031080\1\41703.0011

Adequate Protection Lien. The Prepetition Administrative Agent (on behalf of itself and the Prepetition Term Lenders) shall receive a replacement security interest in and lien on the same property of the Debtors on which the Prepetition Administrative Agent has a perfected, first-priority security interest and lien prior to the Commencement Date pursuant to the Prepetition Credit Agreement and related security documents, whether arising prepetition or postpetition of any nature whatsoever, which liens and security interests shall be subordinate only to Permitted Liens (as defined in the Prepetition Credit Agreement) to the extent any such Permitted Liens are senior in priority under applicable non-bankruptcy law to the liens securing the obligations under the Prepetition Credit Agreement, and a customary professional fee "carve-out" in an amount to be agreed upon by the Company and the Requisite Term Lenders (the "**Carve Out**").  The adequate protection liens shall not be (i) subject, or junior to, any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise, except as expressly provided in the interim and final orders (collectively, the "**DIP Orders**").

507(b) Claim. The Prepetition Administrative Agent (on behalf of itself and the Prepetition Term Lenders) shall receive an administrative expense claim pursuant to Bankruptcy Code section 507(b), subject to the Carve Out and the priorities set out in the DIP Facilities.

Adequate Protection Payments. The Debtors' prompt payment of, whether incurred prior to or following the Commencement Date, all reasonable fees and expenses of the Prepetition Administrative Agent (in accordance with the Prepetition Credit Agreement, including, without limitation, the reasonable fees, costs, and expenses of Davis Polk & Wardwell LLP, as counsel to the Prepetition Administrative Agent) and the Term Loan Ad Hoc Group.

Financial Reporting. The Debtors will, until the Effective Date, continue to provide the Term Loan Ad Hoc Group and the Prepetition Administrative Agent, and their advisors, financial and other reporting on a monthly basis in a form and substance reasonably acceptable to them.

(c)     National Founders Facility

The Debtors are also providing, among other things, the following adequate protection to National Founders, the Debtors' existing lender under the National Founder Facility, including:

- Reimbursement of reasonable and documented fees and expenses of National Founders;

- Covenant by RMS to perform under the existing servicing agreement, and stipulation and agreement by Debtors that any Claim for actual damages arising from RMS's failure to perform or otherwise breach the existing servicing agreement shall constitute superpriority Administrative Expense Claims against RMS, subject to subordination as expressly provided in the DIP Orders; and

- Superpriority administrative claim against RMS for all draws on advance account funds, which Claims shall be subordinated in priority and payment to the DIP Lender's superpriority Claims.

In exchange for the adequate protection provided to National Founders, the Debtors received assurances for the continuation of the National Founders Facility and the continued use of National Founders' cash collateral for the duration of these Chapter 11 Cases, as well as assurances that National Founders will not declare an event of default or servicer termination event as a result of the commencement of the Chapter 11 Cases or the insolvency of RMS.

WEIL:\97031080\1\41703.0011

### 2.    Operations in the Ordinary Course for Ditech Financial and RMS

To avoid any disruption to their business operations, the Debtors have obtained final relief to continue to conduct their forward and reverse mortgage businesses in the ordinary course (the "**Final OCB Orders**") (ECF Nos. 224 and 229). As discussed above, RMS no longer originates reverse mortgage loans, but it has remaining origination-related obligations in connection with the mortgage loans it previously originated, which obligations consist primarily of funding and securitizing subsequent borrower draws on such loans. The Debtors will also continue to comply with their obligations to Fannie Mae, Freddie Mac, and Ginnie Mae, and to continue their securitization activities and servicing businesses in the ordinary course to avoid disruption and uncertainty in the market. As part of this relief, the Debtors have agreed to provide Fannie Mae, Freddie Mac, and Ginnie Mae certain undertakings for assurance of performance of the obligations ("**Operating Undertakings**") and to seek Bankruptcy Court approval of the Operating Undertakings.[17]

### B.    Procedural Motions and Retention of Professionals

The Debtors have also filed several other motions that are common to chapter 11 proceedings of similar size and complexity as the Chapter 11 Cases, including applications to retain various professionals to assist the Debtors in the Chapter 11 Cases. The Bankruptcy Court granted substantially all of the relief requested in such motions and entered various orders with respect to such relief.

### C.    KEIP Motion

On April 18, 2019, the Court approved a motion (the "**KEIP Motion**") seeking authority to implement a key employee incentive program as modified (the "**Proposed KEIP**") (ECF No. 228) by letter to the Bankruptcy Court (ECF No. 417). Under the Proposed KEIP, thirty-one (31) of the Debtors' key employees (collectively, the "**KEIP Participants**"), who are largely responsible for the continuity of the Debtors' day-to-day operations, will be eligible to collectively receive up to $2.5 million. In the event of a Sale (as defined in the KEIP Motion), KEIP Participants will remain eligible to receive the first $2.5 million of any award granted under the Proposed KEIP subject to meeting certain performance metrics. In addition, under the Proposed KEIP, a subset of KEIP Participants (twelve (12) key employees) will be entitled to an incremental award tied directly to the recoveries for the Term Lenders in recognition of their integral role and ability to drive value in the Marketing Process.

### D.    Lease Rejection Motion

On February 11, 2019, the Debtors filed with the Bankruptcy Court a motion (ECF No. 6) seeking authority to (i) reject certain unexpired leases of nonresidential real property and related subleases in (a) St. Paul, Minnesota; Houston, Texas; and Maryland Heights, Missouri as of the Commencement Date and (b) Fort Worth, Texas; Irving, Texas; and Palm Beach Gardens, Florida as of February 28, 2019; and (ii) abandon certain property in connection therewith. The Bankruptcy Court granted this motion at the second day hearing held on March 14, 2019 (ECF No. 204).

On March 28, 2019, the Debtors filed with the Bankruptcy Court a motion (ECF No. 320) seeking authority to (i) reject a certain unexpired lease of nonresidential real property in Rapid City, South Dakota as of April 5, 2019 and (ii) abandon certain property in connection therewith. The Bankruptcy Court granted this motion at the hearing held on April 11, 2019 (ECF No. 481).

---

[17] Ginnie Mae sent a Notice of Violation on February 8, 2019 and stated that it would forbear from taking any action for 125 days through June 13, 2019. On April 10, 2019, Ginnie Mae extended the forbearance period by thirty (30) days through July 13, 2019.

### E.    Bar Date

On February 22, 2019, the Bankruptcy Court entered an order, which, among other things, (i) established April 1, 2019, at 5:00 p.m., prevailing Eastern Time, as the deadline for all non-governmental units (as defined in section 101(27) of the Bankruptcy Code) to file proofs of claim in the Chapter 11 Cases (the "**General Bar Date**"); (ii) established August 10, 2019, at 5:00 p.m., prevailing Eastern Time, as the deadline for all governmental units (as defined in section 101(27) of the Bankruptcy Code) to file proofs of claim in the Chapter 11 Cases (the "**Governmental Bar Date**"); (iii) established the later of (a) the General Bar Date or the Governmental Bar Date, as applicable, and (b) 5:00 p.m., prevailing Eastern Time, on the date that is thirty (30) days from the date on which the Debtors provide notice of a previously unfiled Schedule or an amendment or supplement to the Schedule as the deadline by which persons or entities affected by such filing, amendment, or supplement must file proofs of claim in the Chapter 11 Cases; and (iv) established the later of (y) the General Bar Date or the Governmental Bar Date, as applicable, and (z) 5:00 p.m., prevailing Eastern Time, on the date that is thirty (30) days following the service of an order approving rejection of any executory contract or unexpired lease of the Debtors as the deadline by which persons or entities asserting claims resulting from such rejection must file proofs of claim in the Chapter 11 Cases.

On March 27, 2019, the Bankruptcy Court entered an order which extended the General Bar Date to April 25, 2019, at 5:00 p.m., prevailing Eastern Time (ECF No. 272).

On May 2, 2019, the Bankruptcy Court entered an order further extending the General Bar Date to June 3, 2019 at 5:00 p.m., prevailing Eastern Time for consumer borrowers (i.e., individual borrowers whose home mortgage loans (including reverse mortgages) are or were originated, serviced, or owned by one or more of the Debtors) (ECF No. 496).

### F.    Appointment of the Creditors' Committee

On February 27, 2019, the Official Committee of Unsecured Creditors (the "**Creditors' Committee**") was appointed by the U.S. Trustee pursuant to section 1102 of the Bankruptcy Code to represent the interests of unsecured creditors in the Chapter 11 Cases (ECF No. 127).

The members of the Creditors' Committee are Safeguard Properties Management, LLC, Wilmington Savings Fund Society, FSB, Lee Kamimura, ISGN Solutions, Inc., Black Knight Financial Technology Solutions, LLC, Cognizant Technology Solutions, and Deutsche Bank National Trust Company as RMBS Trustee.

The Creditors' Committee retained Pachulski Stang Ziehl & Jones LLP and Rich Michaelson Magaliff, LLP as its attorneys and Goldin Associates, LLC as its financial advisor. On April 22, 2019, the U.S. Trustee appointed two additional members to the Creditors' Committee: Stephen Kulzyck and Sarah White and Jose Martinez. Subsequently, these two (2) individuals were removed from the Creditors' Committee.

### G.    Appointment of the Consumer Creditors' Committee

On May 2, 2019, the Official Committee of Consumer Creditors (the "**Consumer Creditors' Committee**") was appointed by the U.S. Trustee pursuant to section 1102(a) of the Bankruptcy Code to represent the interests of consumer creditors in the Chapter 11 Cases (ECF No. 498). The Creditors' Committee did not oppose the appointment of the Consumer Creditors' Committee in these Chapter 11 Cases.

The members of the Consumer Creditors' Committee are Stephen Kulzyck, Jose Martinez, LeRon Harris, Melinda Hopkins, and D.C. Randall. Four of the five members are represented by counsel for non-profit

legal services organizations or legal aid entities. On May 6, 2019, the Consumer Creditors' Committee retained Quinn Emanuel Urquhart & Sullivan, LLP as its attorneys.

On May 8, 2019, the Debtors filed the *Motion of Debtors for Entry of an Order (I) Disbanding the Official Committee of Consumer Creditors Appointed by the U.S. Trustee or, Alternatively, (II) Limiting the Scope of such Committee and Capping the Fees and Expenses which may be Incurred by such Committee* (ECF No. 522). The motion will be heard by the Bankruptcy Court on May 14, 2019 at 3:00 p.m. prevailing Eastern Time.

<h4>H.    <u>Consumer Creditors' Committee's Position With Regard to Treatment of Consumer Borrowers' Claims in the Sale Process and Under the Plan</u></h4>

The Consumer Creditors' Committee has requested that the Debtors include the following language in this Disclosure Statement; however, its inclusion should not be construed as, nor is it, an endorsement by the Debtors of the position of the Consumer Creditors' Committee.

Upon retaining counsel, the Consumer Creditors' Committee immediately engaged in discussions with the Debtors regarding its concerns about the treatment of consumer creditors under the Plan and the consumer-related disclosures in the Disclosure Statement. The Consumer Creditors' Committee represents the interests of all consumer creditors in these cases who have claims against the Debtors. Such claims include affirmative claims for violation of state and federal laws, claims on account of misstated and inflated accounts, and other claims in connection with their mortgages in which the Debtors hold an interest (including ownership, servicing interests, or otherwise) and may be subject to the sale contemplated by the Plan. The Consumer Creditors' Committee's position is that the proposed Plan cannot be confirmed unless claims held by consumer borrowers in connection with their mortgages (both against any of the Debtors and any non-debtor third parties) are fully preserved, and may be brought against any purchaser of the Debtors' assets associated with such claims.

Specifically, the Consumer Creditors' Committee agrees with the U.S. Trustee's position that section 363(o) of the Bankruptcy Code prohibits a free and clear sale of any interests associated with the consumer creditor claims, that such a sale cannot be effectuated without preserving the consumer creditors' claims and defenses, and that any purchaser of assets must be subject to such claims and defenses. And even notwithstanding the application of section 363(o), the Consumer Creditors' Committee maintains that any reorganization transaction or sale (whether through a Plan or otherwise) cannot ratify the validity, authenticity, or accuracy of any borrower account records, and any Plan must preserve consumer creditors' rights to challenge misstated amounts under their accounts. Under section 541 of the Bankruptcy Code, for example, the Debtors cannot include in any sale, under the Plan or otherwise, assets that are not property of the estate. Insofar as a sale under the Plan purports to include amounts due that are inappropriately misstated or inflated and to which the Debtors do not have a legal or equitable interest, such a sale should be denied by this Court.

The Consumer Creditors' Committee also submits that notwithstanding any proposed free and clear sale, discharge, or release granted under the Plan, the Plan cannot discharge any setoff claims or recoupment rights or other defenses of the consumer creditors and cannot effectuate any sale free and clear of such setoff rights or recoupment rights or other defenses. Such rights include the right to commence litigation, or to file counterclaims or cross-claims, on account of claims asserting statutory and/or common law claims contesting the status of their account, application of payments, escrow accounting (including disbursements), or disputing any fees, charges, expenses, corporate advances of any nature, and seeking compensation for all damages and attorneys' fees that would otherwise be recoverable.

Moreover, the Consumer Creditors' Committee questions the legal basis for certain Final OCB Orders entered in these chapter 11 cases that appear to suggest that the automatic stay applies to any rights of recoupment of any of the consumer borrowers (including, purportedly, counterclaims or cross-claims that arise under the same transaction as the amounts owed by the consumer borrower to the Debtors).  In the Consumer Creditors' Committee's view, these orders, through their vague and restrictive language and improper application of the automatic stay to recoupment rights (which include, among other things, the right to file a counterclaim for affirmative relief or to recover legal fees that arise from defending a foreclosure action or correcting a misstated and inflated account) have caused significant confusion among the Consumer Creditors' Committee's constituents.  As such, the Consumer Creditors' Committee is considering a motion for reconsideration of the Final OCB Orders to ensure that the automatic stay applies only to the extent appropriate under the Bankruptcy Code.  The Debtors will oppose any such motion.

Finally, the Consumer Committee is concerned that notice to consumer borrowers in these cases has been inadequate and, as such, consumer borrowers' claims cannot be discharged under any Plan under established Second Circuit law.  In addition to the above concerns, the Consumer Creditors' Committee reserves its rights to object to the Plan on any other basis, including any purported release of any consumer creditor claims or defenses against any non-debtors parties, including any purchaser of any of the Debtors' assets.

The Consumer Creditors' Committee intends to participate constructively in these chapter 11 proceedings to protect these consumer creditor rights, and hopes to have the Debtors' cooperation, including honoring the Consumer Creditors' Committee's rights to the same information as the Creditors' Committee and other parties in interest with regard to the sale of the Debtors' assets.  Access to this information is vital for the Consumer Creditors' Committee to appropriately evaluate the effect of any sale on consumer rights and to potentially resolve issues related to any such sale with the Debtors.

## I.    Statements and Schedules, and Rule 2015.3 Financial Reports

On March 27, 2019, the Debtors each filed their schedules of assets and liabilities and statements of financial affairs (collectively, the "**Schedules**") (ECF Nos. 286–313).  The Schedules and Statements, as amended will be incorporated into the Disclosure Statement by reference.  The Debtors intend to file a Rule 2015.3 financial report by May 9, 2019.

## J.    Litigation Matters

In the ordinary course of business, the Debtors are defendants in, or parties to, pending and threatened legal actions and proceedings, including actions brought on behalf of various classes of claimants.  Many of these actions and proceedings are based on alleged violations of consumer protection laws governing the Company's servicing and origination activities, and in certain instances, claims for substantial monetary damages are asserted against the Company.  The Company is also subject to regulatory and governmental examinations, information requests and subpoenas, inquiries, investigations, and threatened legal actions and proceedings.  In connection with formal and informal inquiries, the Company receives numerous requests in connection with various aspects of the Company's activities.

### 1.    Courtney Elkin, *et al.* vs. Walter Investment Management Corp., *et al.*

A federal securities fraud complaint was filed against the Company, George M. Awad, Denmar J. Dixon, Anthony N. Renzi, and Gary L. Tillett on March 16, 2017.  The case, captioned *Courtney Elkin, et al. vs. Walter Investment Management Corp., et al.*, Case No. 2:17-cv-02025-JCJ, is pending in the Eastern District of Pennsylvania.  An amended complaint was filed on September 15, 2017 by the court-appointed lead plaintiff, and the amended complaint sought monetary damages and asserted claims under Section

39

10(b) and 20(a) of the Securities Exchange Act of 1934 during a class period alleged to begin on August 9, 2016 and conclude on August 1, 2017. From December 1, 2017 to February 9, 2018, the action was stayed pursuant to section 362 of the Bankruptcy Code, and on July 13, 2018, the parties entered into a formal settlement agreement to settle the action for $2.95 million, subject to notice to the alleged class and court approval. On December 18, 2018, the court approved the settlement on a final basis. The settlement was paid by the Company's directors' and officers' insurance carrier.

### 2.    **Michael E. Vacek, Jr.,** *et al.* **vs. George M. Awad,** *et al.*

A stockholder derivative suit was filed against current and former members of the Board on June 22, 2017. The case, captioned *Michael E. Vacek, Jr., et al. vs. George M. Awad, et al.*, Case No. 2:17-cv-02820-JCJ, is pending in the Eastern District of Pennsylvania. An amended complaint was filed on September 13, 2017, which sought monetary damages for the Company and equitable relief and asserted a claim for breach of fiduciary duty arising out of: (i) a material weakness in the Company's internal controls over financial reporting related to operation processes associated with Ditech Financial's default servicing activities; (ii) an accounting error that caused an overstatement of the value of the Company's deferred tax assets; and (iii) subpoenas seeking documents relating to RMS's origination and underwriting of reverse mortgages and loans. On October 17, 2018, the parties entered into a formal settlement agreement to settle the action based on the Company's adoption of certain corporate governance measures. On December 3, 2018, the court issued an order preliminarily approving the proposed settlement, and on February 1, 2019, the court approved the proposed settlement on a final basis. The Company's directors' and officers' insurance carrier has agreed to pay $257,500 in attorneys' fees to plaintiff's counsel. The implementation of corporate governance measures has been stayed by the automatic stay under section 362 of the Bankruptcy Code.

### 3.    **Other Litigation**

As mentioned above, in the ordinary course of business, the Company is involved in numerous pending and threatened legal actions and proceedings, as well as in routine proceedings such as foreclosures, evictions, title disputes, collection actions, and borrower bankruptcy cases. All actions and claims interposed against the Debtors in such actions are stayed pursuant to section 362 of the Bankruptcy Code during the pendency of the Chapter 11 Cases, subject to the limited stay relief granted under the Final OCB Orders.

The Debtors are involved in over one hundred (100) actions ("**Third Party Actions**") in which they owe indemnification and/or defense obligations to non-Debtor third parties including without limitation (a) private investors and securitization trustees; (b) Fannie Mae; (c) Freddie Mac; and (d) Mortgage Electronic Registration System, Inc. (collectively, "**Indemnified Parties**"). The Third Party Actions fall into a number of categories, including commercial litigation and claims, cross-claims, third-party claims, and counterclaims by various parties for monetary damages against the Debtors and/or Indemnified Parties.

### K.    **Marketing Process and Bidding Procedures**

In support of the Debtors' Marketing Process, the Debtors and their advisors have developed bidding and auction procedures for the marketing and sale of their assets in these Chapter 11 Cases in an orderly and value maximizing manner (the "**Bidding Procedures**"). Under the Bidding Procedures, parties may submit bids for the purchase and sale of any and all of the Debtors' assets in accordance with the terms of the Bidding Procedures. The Bidding Procedures are designed to promote a competitive and expedient bidding process, and are intended to generate the greatest level of interest in the Debtors' assets. The Bidding Procedures are intended to provide the Debtors with flexibility to solicit proposals, negotiate transactions, provide stalking horse protections (if necessary and appropriate), hold an auction (if necessary and appropriate) and consummate a Sale Transactions for the highest and best value, all while protecting the due process rights of all interested parties and ensuring that there is a full and fair opportunity to review

and consider proposed transactions.    The Bidding Procedures are filed at ECF No. 147.    Below are the proposed dates related to the Bidding Procedures.

| Key Event | Proposed Date |
|---|---|
| Deadline to Submit Non-Binding Indications of Interest | No later than May 6, 2019 at 4:00 p.m. (ET) |
| Deadline to Submit Bids | May 28, 2019 at 4:00 p.m. (ET) |
| Deadline for Debtors to Notify Bidders of Status as Qualified Bidders | May 29, 2019 at 4:00 p.m. (ET) |
| Auction, if necessary, to be conducted at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 | May 30/May 31 2019 at 10:00 a.m. (ET) |
| Deadline to File Notice of (a) Successful Bid and Back-Up Bid and (b) Identity of Successful Bidder and Back-Up Bidder | June 3, 2019 at 4:00 p.m. (ET) |
| Deadline to File Objections to Sale Transaction or Asset Sale Transaction | June 10, 2019 at 4:00 p.m. (ET) |
| Sale Hearing | June 20, 2019 |

### L.    U.S. Trustee's Objections to Disclosure Statement

On April 5, 2019, the U.S. Trustee filed an objection to the disclosure statement (ECF No. 348).  With regards to section 363(o) claims, the U.S. Trustee requested that the Plan explicitly provide that, in the event of a sale of the Debtors' assets under section 363 of the Bankruptcy Code, the successor in interest to the Debtors must be liable for consumer claims.  The U.S. Trustee further stated that to the extent the Debtor reorganizes without a sale, analogous language should be incorporated into the Plan.  (ECF No. 348, ¶ 40).  The Debtors disagree with the U.S. Trustee's position concerning section 363(o) of the Bankruptcy Code.  The Debtors' position is that section 363(o) does not apply to asset sales under the Plan.

With regard to releases, the U.S. Trustee argued that the scope of the Plan's release provisions are not adequately explained and stated.  "This Disclosure Statement needs a simple, clear, plan-English explanation of how the Plan's release, discharge, and injunction provisions will affect claims, particularly consumer claims.  To the extent claims may be unaffected by the discharge and ride through the bankruptcy, this needs to be explained.  Any explanation should be appropriately tailored to a creditor body that may not understand legal jargon."  (ECF No. 348, ¶ 42-44).

The third party releases provided in the Plan are consensual in nature.  As a result, consumer borrowers are unaffected by and not subject to the releases in section 10.6 of the Plan.  Additionally, the Plan has been amended to include a new class of Borrower Non-Discharged Claims that addresses the discharge of certain consumer claims.  A simplified description of the types of borrower claims in this class can be found in Schedule A to the Plan.

As reflected therein, the claims identified on Schedule 1 will not be discharged in a Reorganization Transaction.  In a sale transaction, the Debtors are not requesting a discharge.  However, any recovery to

41

consumer borrowers (just like all creditors) will be dictated by the amount of proceeds received from the sale, which will be distributed in accordance with the priority scheme under the Bankruptcy Code and the Global Settlement. In addition, potential buyers may choose to assume certain liabilities which will be identified in an asset purchase agreement. The Debtors have prepared a notice tailored to consumer borrowers that will provide such parties with relevant information about the confirmation hearing and the Plan, including its release and discharge provisions. The notice also provides instructions to access the webpage created by Epiq designed specifically for consumer borrowers. The notice includes a plain-English explanation of Borrower Non-Discharged Claims. A copy of the proposed notice is annexed to the revised proposed *Order (I) Approving Disclosure Statement and Notice of Disclosure Statement Hearing, (II) Establishing Solicitation and Voting Procedures, (III) Scheduling Sale and Confirmation Hearing, (IV) Approving Sale and Confirmation Objection Procedures and Notice of Sale and Confirmation Hearing, and (V) Granting Related Relief.*

### M.    Plan Settlement Negotiations and the Global Plan Settlement

The Debtors filed their initial chapter 11 plan on March 5, 2019 (ECF No. 145) (the "**Initial Plan**"), filed an amended plan of reorganization on March 28, 2019 (ECF No. 314) (the "**Amended Plan**") and subsequently filed the April 26, 2019 Plan on April 26, 2019, each with the support of the Term Loan Ad Hoc Group. The Creditors' Committee raised a number of formal and informal objections and issues with respect to the Initial Plan and the Debtors' restructuring, including:

- Value attributable to the Debtors' unencumbered assets and the proposed treatment of unsecured creditors and the Initial Plan and the Amended Plan;

- The treatment of intercompany claims and interests; and

- The releases and exculpations contemplated by the Initial Plan and the Amended Plan.

The Debtors, the Creditors' Committee, and the Term Loan Ad Hoc Group, with the assistance of their advisors, engaged in vigorous, arm's-length negotiations to resolve all their respective issues on a consensual basis.

These negotiations were successful, and the modifications to the Initial Plan described herein resolve each of those issues and objections of the Creditors' Committee (collectively, the "**Global Plan Settlement**"). In particular, the Global Plan Settlement significantly improves recoveries for General Unsecured Claims under the Plan, compared to the Initial Plan. These improved recoveries are being carved out of the collateral securing Term Loan Claims by agreement of the Term Loan Ad Hoc Group. Given the Debtors' valuation, recoveries of this size to general unsecured creditors would be impossible absent the Global Plan Settlement. In particular, the modified General Unsecured Claim recoveries provided on account of the Global Plan Settlement include:

- On the Effective Date, and solely for purposes of distributions from the GUC Recovery Trust: (i) all GUC Recovery Trust Assets (and all proceeds thereof) and all liabilities of each of the Debtors shall be deemed merged or treated as though they were merged into and with the assets and liabilities of each other; (ii) all guaranties of the Debtors of the obligations of any other Debtor shall be deemed eliminated and extinguished so that any General Unsecured Claim against any Debtor and any guarantee thereof executed by any Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors; (iii) each and every General Unsecured Claim filed or to be filed in any of the Chapter 11 Cases shall be treated filed against the consolidated Debtors and shall be treated as one General Unsecured Claim against and obligation of the consolidated Debtors; and (iv) for purposes of determining the availability of

the right of set off under section 553 of the Bankruptcy Code, the Debtors shall be treated as one entity so that, subject to the other provisions of section 553 of the Bankruptcy Code, debts due to any of the Debtors may be set off against the debts of any of the other Debtors. Such substantive consolidation shall not (other than for purposes relating to the Plan) affect the legal and corporate structures of the Reorganized Debtors. Moreover, such substantive consolidation shall not affect any subordination provisions set forth in any agreement relating to any General Unsecured Claim or the ability of the GUC Trustee to seek to have any General Unsecured Claim subordinated in accordance with any contractual rights or equitable principles.

- On the Effective Date, the GUC Recovery Trust shall be established in accordance with Section 5.19 of the Plan and shall be governed and administered in accordance with the GUC Recovery Trust Agreement.

- On the Effective Date, the Debtors and the Estates shall transfer to (i) the GUC Recovery Trust the GUC Recovery Trust Assets and (ii) the Prepetition Second Lien Notes Trustee, the Second Lien Recovery Cash Pool and the portion of the Contributed Sale Proceeds payable on account of the Second Lien Notes Claims, in each case, free and clear of all Liens, charges, Claims, encumbrances, and interests for the benefit of the holders of Allowed General Unsecured Claims and the Second Lien Noteholders. In accordance with Section 1141 of the Bankruptcy Code, all of the GUC Recovery Trust Assets, as well as the rights and powers of the Debtors' Estates applicable to the GUC Recovery Trust Assets, shall vest in the GUC Recovery Trust, for the benefit of the holders of Allowed General Unsecured Claims.

- The GUC Recovery Trust shall determine whether to enforce, settle, release, or compromise the GUC Recovery Trust Causes of Action (or decline to do any of the foregoing). The Reorganized Debtors and the Plan Administrator, as applicable, shall not be subject to any claims or counterclaims with respect to the GUC Recovery Trust Causes of Action, or otherwise.

- On the Effective Date, the Debtors and the Estates shall transfer to the Prepetition Second Lien Notes Trustee and MBS Trustee, as applicable, the applicable Remaining IT Fees, without any further notice to or action, order, or approval of the Bankruptcy Court. Nothing in this Section 5.2 shall in any way affect or diminish the rights of the Prepetition Second Lien Notes Trustee to exercise any charging lien against distributions to holders of Second Lien Notes Claims with respect to any unpaid fees or expenses.

- On the Effective Date, the Contributed Sale Proceeds shall be transferred to the GUC Recovery Trust and the Prepetition Second Lien Notes Trustee to be distributed in accordance with the Plan.

- The holders of Allowed Term Loan Claims shall be entitled to receive fifty percent (50%) of the net proceeds from the GUC Recovery Trust Causes of Action in accordance with the GUC Recovery Trust Agreement and shall be deemed to have otherwise waived any Term Loan Deficiency Claim, solely for purposes of distribution pursuant to and in accordance with Section 4.5(b).

- The Creditors' Committee's previous objections to the Creditors' Committee Budget are resolved based on the definition of Creditors' Committee Budget under the Plan.

- On the Effective Date, all Claims or Causes of Action against (a) the Debtors' landlords under leases of nonresidential real property and (b) third party vendors providing services or goods to the Debtors in the ordinary course of business arising under chapter 5 of the Bankruptcy Code, including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates,

WEIL:\97031080\1\41703.0011

whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever, released.

- On the Effective Date, the Creditors' Committee's objection to the Disclosure Statement Motion shall be deemed resolved and withdrawn with prejudice. The Creditors' Committee shall not prosecute such objection or any other objection to the Disclosure Statement, Plan, or any Sale Transaction (provided that the terms of the Bidding Procedures are complied with).

- On the Effective Date, (a) the Challenge Period (as defined in the DIP Order) shall be deemed expired with respect to the Creditors' Committee; (b) the stipulations set forth in Sections H, I, and J of the DIP Order shall be final; and (c) the releases in paragraph 48(c) of the DIP Order shall be final.

- As a condition precedent to consummation of the Global Settlement, the Creditors' Committee shall not object to or take any other action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay, or impede the confirmation and consummation of the Plan or approval of the Global Settlement.

## V.
## SUMMARY OF PLAN

This section of the Disclosure Statement summarizes the Plan, a copy of which is annexed hereto as Exhibit A.

### A.    Administrative Expenses and Priority Claims

#### 1.    Treatment of Administrative Expense Claims

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, each holder of an Allowed Administrative Expense Claim (other than a Fee Claim, a DIP Claim, or a Restructuring Expense) shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Administrative Expense Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; provided, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any course of dealing or agreements governing, instruments evidencing, or other documents relating to such transactions.

#### 2.    Treatment of Fee Claims

(a)    All Entities seeking an award by the Bankruptcy Court of Fee Claims shall file and serve on counsel to the Debtors, the U.S. Trustee, and counsel to the Requisite Term Lenders, on or before the date that is forty-five (45) days after the Effective Date, their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred from the Commencement Date through the Effective Date. Objections to any Fee Claims must be filed and served on counsel to the Debtors, counsel to the Requisite Term Lenders, and the requesting party no later than twenty-one (21)

calendar days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the Debtors or the Reorganized Debtors, as applicable, and the party requesting compensation of a Fee Claim).

(b)    Allowed Fee Claims shall be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court (i) on the date upon which an order relating to any such Allowed Fee Claim is entered or as soon as reasonably practicable thereafter; or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable.  Notwithstanding the foregoing, any Fee Claims that are authorized to be paid pursuant to any administrative orders entered by the Bankruptcy Court may be paid at the times and in the amounts authorized pursuant to such orders.

(c)    On or about the Effective Date, holders of Fee Claims shall provide a reasonable estimate of unpaid Fee Claims incurred in rendering services before the Effective Date to the Debtors or the Creditors' Committee, as applicable, and the Debtors or Reorganized Debtors, as applicable, shall separately escrow such estimated amounts for the benefit of the holders of the Fee Claims until the fee applications related thereto are resolved by Final Order or agreement of the parties.  If a holder of a Fee Claim does not provide an estimate, the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, may estimate the unpaid and unbilled reasonable and necessary fees and out-of-pocket expenses of such holder of a Fee Claim.  When all such Allowed Fee Claims have been paid in full, any remaining amount in such escrow shall promptly be released from such escrow and revert to, and ownership thereof shall vest in, the Reorganized Debtors or Plan Administrator, as applicable, without any further action or order of the Bankruptcy Court.

(d)    The Reorganized Debtors or the Plan Administrator, as applicable, are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

### 3.    Treatment of Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction of such Allowed Priority Tax Claim, at the sole option of the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable, (a) Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date; (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; and (iii) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due; provided, that the Debtors reserve the right to prepay all or a portion of any such amounts at any time under this option without penalty or premium; or (b) equal annual Cash payments in an aggregate amount equal to the amount of such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years from and after the Commencement Date.

### 4.    Treatment of DIP Claims

On the Effective Date, in full and final satisfaction of the Allowed DIP Claims, the commitments of the DIP Credit Parties under the DIP Documents shall be terminated and DIP Claims shall be (a) paid in full in Cash upon the consummation of the Sale Transaction if the Sale Transaction occurs or (b) refinanced in full in Cash by the Exit Warehouse Facilities if the Reorganization Transaction occurs.  The Debtors' and their respective Affiliates' contingent or unliquidated expense reimbursement and indemnity obligations

under the DIP Documents, to the extent not paid in full in Cash on the Effective Date or otherwise satisfied by the Debtors and their respective Affiliates in a manner reasonably acceptable to the DIP Agent, shall survive the Effective Date and shall not be released or discharged pursuant to the Plan or Confirmation Order, notwithstanding any provision thereof to the contrary.

### 5. Restructuring Expenses

During the period commencing on the Commencement Date through the Effective Date, the Debtors will promptly pay in full in Cash any Restructuring Expenses in accordance with the terms of the RSA. Without limiting the foregoing, to the extent that any Restructuring Expenses remain unpaid as of the Business Day prior to the Effective Date, on the Effective Date, the Reorganized Debtors or Plan Administrator, as applicable, shall pay in full in Cash any outstanding Restructuring Expenses that are invoiced without the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases, and without any requirement for further notice or Bankruptcy Court review or approval.  For the avoidance of doubt, any Restructuring Expenses invoiced after the Effective Date shall be paid promptly, but no later than ten (10) business days of receiving an invoice.

### B. Classification of Claims and Interests

### 1. Classification in General

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; provided, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Allowed Claim or Allowed Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

### 2. Grouping of Debtors for Convenience Only

The Plan groups the Debtors together solely for the purpose of describing treatment of Claims and Interests under this Plan and confirmation of this Plan. Although this Plan applies to all of the Debtors, the Plan constitutes fourteen (14) distinct chapter 11 plans, one for each Debtor.  Each Class of Claims will be deemed to contain sub-classes for each of the Debtors, to the extent applicable for voting and distribution purposes.  To the extent there are no Allowed Claims or Interests with respect to a particular Debtor, such Class is deemed to be omitted with respect to such Debtor.  Except as otherwise provided herein, to the extent a holder has a Claim that may be asserted against more than one Debtor, the vote of such holder in connection with such Claims shall be counted as a vote of such Claim against each Debtor against which such holder has a Claim.  The grouping of the Debtors in this manner shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal Entities, or cause the transfer of any Assets, and, except as otherwise provided by or permitted under this Plan, all Debtors shall continue to exist as separate legal Entities.

### 3. Summary of Classification

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan; (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; and (c) deemed to accept or reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified.

WEIL:\97031080\1\41703.0011

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Priority Non-Tax Claims | Unimpaired | No (Presumed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| 3 | Term Loan Claims | Impaired | Yes |
| 4 | Second Lien Notes Claims | Impaired | No (Deemed to reject) |
| 5 | General Unsecured Claims | Impaired | No (Deemed to reject) |
| 6 | Borrower Non-Discharged Claims | Reorganization Transaction (Unimpaired)<br><br>Sale Transaction (Impaired) | Reorganization Transaction (Presumed to Accept)<br><br>Sale Transaction (Deemed to Reject) |
| 7 | Intercompany Claims | Unimpaired | No (Presumed to accept) |
| 8 | Intercompany Interests | Unimpaired | No (Presumed to accept) |
| 9 | Parent Equity Interests | Impaired | No (Deemed to reject) |
| 10 | Subordinated Securities Claims | Impaired | No (Deemed to reject) |

### 4.    Special Provision Governing Unimpaired Claims

Nothing under the Plan shall affect the rights of the Debtors or the Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### 5.    Elimination of Vacant Classes

Any Class of Claims against or Interests in the Debtors that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

### C.    Treatment of Claims and Interests

### 1.    Priority Non-Tax Claims (Class 1)

(a)    *Classification*:  Class 1 consists of Priority Non-Tax Claims.

(b)    *Treatment*:  Except to the extent that a holder of an Allowed Priority Non-Tax Claim against the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction of such Allowed Priority Non-Tax Claim, at the sole option of the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable:  (i) each such holder shall receive payment in Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is reasonably practicable; (ii) such holder's Allowed Priority Non-Tax Claim shall be Reinstated; or (iii) such holder shall receive such other treatment so as to render such holder's Allowed Priority Non-Tax Claim Unimpaired.

(c)    *Voting*:  Class 1 is Unimpaired, and holders of Priority Non-Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Priority Non-Tax Claims.

### 2.    Other Secured Claims (Class 2)

(a)    *Classification*:  Class 2 consists of the Other Secured Claims.  To the extent that Other Secured Claims are secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 2 for purposes of voting to accept or reject the Plan and receiving distributions under the Plan.

(b)    *Treatment*:

(i)    Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim will receive, on account of such Allowed Claim, at the sole option of the Debtors, Reorganized Debtors or the Plan Administrator, as applicable:  (i) Cash in an amount equal to the Allowed amount of such Claim; (ii) Reinstatement of such holder's Allowed Other Secured Claim; (iii) such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired; or (iv) return of the applicable collateral in satisfaction of the Allowed amount of such Other Secured Claim.

(ii)    Upon the Effective Date and solely with respect to the Reorganization Transaction, the National Founders Facility shall be Reinstated and shall either be paid in full in Cash on account of the National Founders Facility Claim or receive such other treatment as agreed to among the Debtors and National Founders.

(c)    *Voting*:  Class 2 is Unimpaired, and holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Other Secured Claims.

### 3.    Term Loan Claims (Class 3)

(a)    *Classification*:  Class 3 consists of Term Loan Claims.

(b)    *Allowance*:  The Term Loan Claims are Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $961,355,635.34, plus amounts owing (if any) on account of call protections contained in the Prepetition Credit Agreement, plus all accrued but unpaid interest, costs, fees, and expenses then outstanding under the Prepetition Credit Agreement.  The Prepetition Administrative Agent and the Term Lenders shall not be required to file proofs of Claim on account of any Term Loan Claims.

(c)    *Treatment*:  Except to the extent that a holder of an Allowed Term Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed Term Loan Claim, each such holder thereof shall receive:

(i)    **If the Sale Transaction occurs**, on the Effective Date, such holder's Pro Rata share of Net Cash Proceeds until all Allowed Term Loan Claims are satisfied in full in cash. On the Effective Date, the Prepetition Credit Agreement shall be deemed cancelled (except as set forth in Section 5.12 of the Plan).

(ii)    **If the Reorganization Transaction occurs**, on the Effective Date, such holder's Pro Rata share of (a) term loans under the Amended and Restated Credit Facility Agreement; (b) 100% of the New Common Stock; provided, that the New Common Stock shall be subject to dilution by the Management Incentive Plan; and (c) if applicable, the Asset Sale Proceeds. On the Effective Date, the Prepetition Credit Agreement shall be deemed cancelled (except as set forth in Section 5.12 of the Plan) and replaced by the Amended and Restated Credit Facility Agreement, without the need for any holder of a Term Loan Claim that does not vote for the Plan or votes to reject the Plan executing the Amended and Restated Credit Facility Agreement, and each Lien, mortgage and security interest that secures the obligations arising under the Prepetition Credit Agreement as of the Commencement Date shall be reaffirmed, ratified and deemed granted by the Reorganized Debtors to secure all obligations of the Reorganized Debtors arising under the Amended and Restated Credit Facility Agreement.

In each case, holders of Allowed Term Loan Claims shall also be entitled to receive their Pro Rata share of a fifty percent (50%) undivided interest in GUC Recovery Trust Causes of Action and the proceeds thereof in accordance with the GUC Recovery Trust Agreement.

(d)    *Voting*: Class 3 is Impaired, and holders of Term Loan Claims in Class 3 are entitled to vote to accept or reject the Plan.

**4.    Second Lien Notes Claims (Class 4).**

(a)    *Classification*: Class 4 consists of Second Lien Notes Claims.

(b)    *Treatment*: The Second Lien Notes Claims are Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $253,895,875. Except to the extent that a holder of an Allowed Second Lien Notes Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed Second Lien Notes Claim, each such holder thereof shall receive:

(i)    **If the Sale Transaction occurs**, such holder's (x) Pro Rata share of the Second Lien Recovery Cash Pool; (y) Pro Rata share as between Allowed Claims in Class 4 and Class 5 of the Contributed Sale Proceeds; and (z) Pro Rata share of the Net Cash Proceeds as such holders are entitled to under applicable nonbankruptcy law after the Term Loan Claims are satisfied in full in Cash, until all Allowed Second Lien Notes Claims are satisfied in full; provided, that distributions on account of (x) and (y) of this Section 4.4(b)(i) shall be subject to the approval and consummation of the Global Settlement.

(ii)    **If the Reorganization Transaction occurs**, such holder's Pro Rata share of the Second Lien Recovery Cash Pool; provided, that such distribution shall be subject to the approval and consummation of the Global Settlement.

(iii)    **If either the Sale Transaction or the Reorganization Transaction occurs**, on the Effective Date, the Second Lien Notes shall be deemed cancelled (except as set forth in Section 5.12 hereof) without further action by or order of the Bankruptcy Court.

49

(c)     *Voting*:  Class 4 is Impaired, and holders of Second Lien Notes Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Second Lien Notes Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Second Lien Notes Claims.

### 5.     General Unsecured Claims (Class 5)

(a)     *Classification*:  Class 5 consists of General Unsecured Claims.

(b)     *Treatment*:  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed General Unsecured Claim, each such holder thereof shall receive:

(i)     **If the Sale Transaction occurs**, such holder's Pro Rata share of (y) the GUC Recovery Trust Assets; and (z) the Net Cash Proceeds (until all Allowed General Unsecured Claims are satisfied in full) after the Term Loan Claims and Second Lien Notes Claims are satisfied in full in Cash; provided, that distributions on account of (y) of this Section 4.5(b)(i) shall be subject to the approval and consummation of the Global Settlement.

(ii)     **If the Reorganization Transaction occurs**, such holder's Pro Rata share of the GUC Recovery Trust Assets; provided, that such distribution shall be subject to the approval and consummation of the Global Settlement.

For the avoidance of doubt, a holder of a Term Loan Deficiency Claim and a holder of a deficiency Claim on account of a Second Lien Notes Claim shall not receive distributions in accordance with this Section 4.5(b) and such claims are waived solely for purposes of distribution pursuant to and in accordance with this Section 4.5(b).

(c)     *Voting*:  Class 5 is Impaired, and holders of General Unsecured Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of General Unsecured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such General Unsecured Claims.

### 6.     Borrower Non-Discharged Claims (Class 6)

(a)     *Classification*:  Class 7 consists of Borrower Non-Discharged Claims.

(b)     *Treatment*:  Except to the extent that a holder of an Allowed Borrower Non-Discharged Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed Borrower Non-Discharged Claim, each such holder thereof shall receive:

(i)     **If the Sale Transaction occurs**, the same treatment as Allowed General Unsecured Claims in accordance with Section 4.5(b) hereof, unless such Borrower Non-Discharged Claim is assumed by a purchaser as an assumed liability.  For the avoidance of doubt, holders of Allowed Borrower Non-Discharged Claims and holders of Allowed General Unsecured Claims shall receive distributions from the GUC Recovery Trust Assets on a Pro Rata basis.

WEIL:\97031080\1\41703.0011

(ii)    **If the Reorganization Transaction occurs**, on or after the Effective Date, as a carve out from the Term Lenders' collateral (or the proceeds or value thereof), holders of Allowed Borrower Non-Discharged Claims shall be treated in the ordinary course of business as if the Chapter 11 Cases had not been commenced, subject to all defenses or disputes the Debtors and Reorganized Debtors may assert as to the validity or amount of such Claims, including as provided in Section 10.9 of the Plan.

(c)    *Voting*:

(i)    **If the Sale Transaction occurs**, Class 6 is Impaired, and holders of Borrower Non-Discharged Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

(ii)    **If the Reorganization Transaction occurs**, Class 6 is Unimpaired, and holders of Borrower Non-Discharged Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

Therefore, holders of Borrower Non-Discharged Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Borrower Non-Discharged Claims.

7.    **Intercompany Claims (Class 7)**

(a)    *Classification*:  Class 7 consists of Intercompany Claims.

(b)    *Treatment*:  On or after the Effective Date, all Intercompany Claims will be adjusted, continued, settled, reinstated, discharged, or eliminated as determined by the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, and the Requisite Term Lenders, in their respective reasonable discretion; provided, that if the Sale Transaction occurs, holders of Intercompany Claims shall not receive Cash on account of such Intercompany Claims.

(c)    *Voting*:  Class 7 is Unimpaired, and holders of Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Intercompany Claims.

8.    **Intercompany Interests (Class 8)**

(a)    *Classification*:  Class 8 consists of Intercompany Interests.

(b)    *Treatment*:  On or after the Effective Date, all Intercompany Interests shall be cancelled, reinstated, or receive such other treatment as determined by the Debtors or Reorganized Debtors, as applicable, and the Requisite Term Lenders, in their respective reasonable discretion; provided, that if the Sale Transaction occurs, holders of Intercompany Interests shall not receive Cash on account of such Intercompany Interests.

(c)    *Voting*:  Class 8 is Unimpaired, and holders of Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Intercompany Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Intercompany Interests.

9.      **Parent Equity Interests (Class 9)**

(a)      *Classification*:  Class 9 consists of Parent Equity Interests.

(b)      *Treatment*:  Except to the extent that a holder of an Parent Equity Interests agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for Parent Equity Interests, each such holder thereof shall receive:

(i)      **If the Sale Transaction occurs**, (A) on the Effective Date, all Parent Equity Interests shall be cancelled and one share of Ditech common stock (the "***Single Share***") shall be issued to the Plan Administrator to hold in trust as custodian for the benefit of the former holders of Ditech common stock and preferred stock consistent with their former relative priority and economic entitlements.  The Single Share shall be recorded on the books and records maintained by the Plan Administrator.  To the extent not previously filed, on or promptly after the Effective Date, a Form 15 for the purpose of terminating the registration of Ditech's common stock and suspending Ditech's reporting obligations, as applicable, shall be filed with the Securities and Exchange Commission to the extent permitted by applicable law; (B) each former holder of a Parent Equity Interest (through their interest in the Single Share, as applicable) shall neither receive nor retain any property of the Estate or direct interest in property of the Estate on account of such Parent Equity Interests; *provided*, that in the event that all Allowed Claims have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each former holder of a Parent Equity Interest may receive its share of any remaining assets of Ditech consistent with such holder's rights of payment existing immediately prior to the Commencement Date. Unless otherwise determined by the Plan Administrator, on the date that Ditech's Chapter 11 Case is closed in accordance with Section 5.16 of the Plan, the Single Share issued on the Effective Date shall be deemed cancelled and of no further force and effect provided that such cancellation does not adversely impact the Debtors' Estates; (C) the continuing rights of former holders of Parent Equity Interests (including through their interest in Single Share or otherwise) shall be nontransferable except (i) by operation of law or (ii) for administrative transfers where the ultimate beneficiary has not changed, subject to the Plan Administrator's consent.

(ii)      **If the Reorganization Transaction occurs**, on the Effective Date, all Parent Equity Interests shall be deemed cancelled without further action by or order of the Bankruptcy Court, and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

(c)      *Voting*: Class 9 is Impaired, and holders of Parent Equity Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of Parent Equity Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Parent Equity Interests.

10.      **Subordinated Securities Claims (Class 10)**

(a)      *Classification*: Class 10 consists of Subordinated Securities Claims.

(b)      *Treatment*:  Holders of Subordinated Securities Claims shall not receive or retain any property under the Plan on account of such Subordinated Securities Claims.  On the Effective Date, all Subordinated Securities Claims shall be deemed cancelled without further action by or order of the

WEIL:\97031080\1\41703.0011

Bankruptcy Court, and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

(c)  *Voting*:  Class 10 is Impaired, and the holders of Subordinated Securities Claims are conclusively deemed to have rejected the Plan.  Therefore, holders of Subordinated Securities Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders of Subordinated Securities Claims will not be solicited.

## D.    **Means for Implementation**

### 1.    **No Substantive Consolidation**

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor. The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan.

### 2.    **Compromise and Settlement of Claims, Interests, and Controversies**

(a)    Pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan and the Global Settlement shall constitute a good faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a creditor or an Interest holder may have with respect to any Claim or Interest or any distribution to be made on account of an Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable, and reasonable.

(b)    The treatment provided for hereunder to Allowed Second Lien Notes Claims and Allowed General Unsecured Claims incorporates and reflects a proposed compromise and settlement by and among the Debtors, the Creditors' Committee, the Second Lien Noteholders, and the Consenting Term Lenders (the "**Global Settlement**").  The following constitutes the provisions and conditions of the Global Settlement:

(i)    On the Effective Date, and solely for purposes of distributions from the GUC Recovery Trust:  (i) all GUC Recovery Trust Assets (and all proceeds thereof) and all liabilities of each of the Debtors shall be deemed merged or treated as though they were merged into and with the assets and liabilities of each other; (ii) all guaranties of the Debtors of the obligations of any other Debtor shall be deemed eliminated and extinguished so that any General Unsecured Claim against any Debtor and any guarantee thereof executed by any Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors; (iii) each and every General Unsecured Claim filed or to be filed in any of the Chapter 11 Cases shall be treated filed against the consolidated Debtors and shall be treated as one General Unsecured Claim against and obligation of the consolidated Debtors; and (iv) for purposes of determining the availability of the right of set off under section 553 of the Bankruptcy Code, the Debtors shall be treated as one entity so that, subject to the other provisions of section 553 of the Bankruptcy Code, debts due to any of the Debtors may be set off against the debts of any of the other Debtors.  Such substantive consolidation shall not (other than for purposes relating to the Plan) affect the legal and corporate structures of the Reorganized Debtors.

53

Moreover, such substantive consolidation shall not affect any subordination provisions set forth in any agreement relating to any General Unsecured Claim or the ability of the GUC Trustee to seek to have any General Unsecured Claim subordinated in accordance with any contractual rights or equitable principles.

(ii)     On the Effective Date, the GUC Recovery Trust shall be established in accordance with Section 5.19 of the Plan and shall be governed and administered in accordance with the GUC Recovery Trust Agreement.

(iii)     On the Effective Date, the Debtors and the Estates shall transfer to (i) the GUC Recovery Trust the GUC Recovery Trust Assets and (ii) the Prepetition Second Lien Notes Trustee, the Second Lien Recovery Cash Pool and the portion of the Contributed Sale Proceeds payable on account of the Second Lien Notes Claims, in each case, free and clear of all Liens, charges, Claims, encumbrances, and interests for the benefit of the holders of Allowed General Unsecured Claims and the Second Lien Noteholders.   In accordance with Section 1141 of the Bankruptcy Code, all of the GUC Recovery Trust Assets, as well as the rights and powers of the Debtors' Estates applicable to the GUC Recovery Trust Assets, shall vest in the GUC Recovery Trust, for the benefit of the holders of Allowed General Unsecured Claims.

(iv)     The GUC Recovery Trust shall determine whether to enforce, settle, release, or compromise the GUC Recovery Trust Causes of Action (or decline to do any of the foregoing).  The Reorganized Debtors and the Plan Administrator, as applicable, shall not be subject to any claims or counterclaims with respect to the GUC Recovery Trust Causes of Action, or otherwise.

(v)     On the Effective Date, the Debtors and the Estates shall transfer to the Prepetition Second Lien Notes Trustee and MBS Trustee, as applicable, the applicable Remaining IT Fees, without any further notice to or action, order, or approval of the Bankruptcy Court.  Nothing in this Section 5.2 shall in any way affect or diminish the rights of the Prepetition Second Lien Notes Trustee to exercise any charging lien against distributions to holders of Second Lien Notes Claims with respect to any unpaid fees or expenses.

(vi)     On the Effective Date, the Contributed Sale Proceeds shall be transferred to the GUC Recovery Trust and the Prepetition Second Lien Notes Trustee to be distributed in accordance with the Plan.

(vii)     The holders of Allowed Term Loan Claims shall be entitled to receive fifty percent (50%) of the net proceeds from the GUC Recovery Trust Causes of Action in accordance with the GUC Recovery Trust Agreement and shall be deemed to have otherwise waived any Term Loan Deficiency Claim, solely for purposes of distribution pursuant to and in accordance with Section 4.5(b).

(viii)     The Creditors' Committee's previous objections to the Creditors' Committee Budget are resolved based on the definition of Creditors' Committee Budget under the Plan.

(ix)     On the Effective Date, all Claims or Causes of Action against (a) the Debtors' landlords under leases of nonresidential real property and (b) third party vendors providing services or goods to the Debtors in the ordinary course of business arising under

WEIL:\97031080\1\41703.0011

chapter 5 of the Bankruptcy Code, including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever, released.

(x)    On the Effective Date, the Creditors' Committee's objection to the Disclosure Statement Motion shall be deemed resolved and withdrawn with prejudice. The Creditors' Committee shall not prosecute such objection or any other objection to the Disclosure Statement, Plan, or any Sale Transaction (provided that the terms of the Bidding Procedures are complied with).

(xi)    On the Effective Date, (a) the Challenge Period (as defined in the DIP Order) shall be deemed expired with respect to the Creditors' Committee; (b) the stipulations set forth in Sections H, I, and J of the DIP Order shall be final; and (c) the releases in paragraph 48(c) of the DIP Order shall be final.

(xii)    As a condition precedent to consummation of the Global Settlement, the Creditors' Committee shall not object to or take any other action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay, or impede the confirmation and consummation of the Plan or approval of the Global Settlement.

**3.    Marketing Process**

Following the Commencement Date, the Debtors shall oversee and manage the sale process relating to any potential Sale Transaction, and, if applicable, an Asset Sale Transaction, in good-faith consultation with the Requisite Term Lenders the DIP Agent, the Creditors' Committee, Freddie Mac, Fannie Mae, and Ginnie Mae. The Requisite Term Lenders, the DIP Agent, the Creditors' Committee, Freddie Mac, Fannie Mae, and Ginnie Mae and their respective advisors shall have the right to review all information, diligence, and materials provided by the Debtors to any bidder or prospective bidder, subject to confidentiality, with respect to the sale and to consult with the Debtors with respect to any potential Sale Transaction, or Asset Sale Transaction. The Debtors, the Requisite Term Lenders, the DIP Agent, the Creditors' Committee, Freddie Mac, Fannie Mae, and Ginnie Mae shall consult in good faith regarding the sale process, including any diligence and other information requested by the Requisite Term Lenders. The Debtors shall solicit bids on any and all bases, including soliciting bids that do not satisfy the Term Loan Claims in full.

**4.    Election Notice.**

Unless extended by the Debtors, within five (5) business days following the earlier of (a) the conclusion of the Debtors' marketing and sale process and (b) ninety-five (95) calendar days after the Commencement Date (the earliest such date, the "***Election Date***"), holders of at least $66^{2/3}\%$ in aggregate principal amount outstanding under the Prepetition Credit Agreement (the "***Electing Term Lenders***") shall deliver a notice (the "***Election Notice***") to the Debtors stating that the Electing Term Lenders wish to consummate a transaction (the "***Elected Transaction***"), being a: (i) Reorganization Transaction or (ii) Sale Transaction, and, if applicable, (iii) in connection and together with an election of (i) or (ii), any Asset Sale Transaction(s); provided, that inclusion of any such Asset Sale Transaction(s) is not incompatible with the successful consummation of the Elected Transaction in (i) or (ii).

### 5.  Sources of Consideration for Plan Distributions

(a)  ***Sale Transaction***.  The Debtors shall fund distributions and satisfy applicable Allowed Claims and Allowed Interests under the Plan with respect to the Sale Transaction using Cash on hand, the Sale Transaction Proceeds, and, if applicable, the Asset Sale Proceeds, in each case, as a carve out from the Term Lenders' collateral (or the proceeds or value thereof).

(b)  ***Reorganization Transaction***.  The Debtors shall fund distributions and satisfy applicable Allowed Claims and Allowed Interests under the Plan with respect to the Reorganization Transaction with Cash on hand, the Amended and Restated Credit Facility, Exit Working Capital Facility, the Exit Warehouse Facilities, New Common Stock, and, if applicable, the Asset Sale Proceeds.

### 6.  Sale Transaction

(a)  *Closing of Sale Transaction (If Any)*

On the Effective Date, the Debtors shall be authorized to consummate the Sale Transaction contemplated by the Successful Bid and, among other things, the Debtors' assets (including executory contracts and unexpired leases assumed and assigned to the Successful Bidder pursuant to Article VIII hereof) shall, pursuant to Section 1141 of the Bankruptcy Code, be transferred to and vest in the applicable Successful Bidder free and clear of all Liens, Claims, charges, or other encumbrances pursuant to the terms of the applicable purchase agreement and Confirmation Order.

(b)  *Wind Down and Dissolution of the Debtors*

(i)  The Plan Administrator shall have the authority and right on behalf of each of the Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:  (a) except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors, other than with respect to General Unsecured Claims; (b) make distributions to holders of Allowed Claims in accordance with the Plan, other than with respect to holders of Allowed General Unsecured Claims; (c) prosecute all Causes of Action on behalf of the Debtors, elect not to pursue any Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of the Debtors, other than with respect to the GUC Recovery Trust Causes of Action; (d) retain professionals to assist in performing its duties under the Plan; (e) maintain the books, records, and accounts of the Debtors; (f) complete and file, as necessary, all final or otherwise required federal, state, and local tax returns for the Debtors; and (g) perform other duties and functions that are consistent with the implementation of the Plan.

(ii)  After the Effective Date, pursuant to the Plan, the Plan Administrator shall wind down, sell, liquidate, and may operate, use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action remaining with the Debtors' after consummation of the Sale Transaction contemplated by the Successful Bid without approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than with respect to General Unsecured Claims and GUC Recovery Trust Causes of Action.

(iii)    Each of the Debtors shall indemnify and hold harmless the Plan Administrator solely in its capacity as such for any losses incurred in such capacity, except to the extent such losses were the result of the Plan Administrator's gross negligence, willful misconduct, or criminal conduct.

(iv)    Subject to Section 6.3(b) of the Plan, the Debtors shall make an initial distribution on the Effective Date and thereafter, the Plan Administrator shall, in an expeditious but orderly manner, make timely distributions pursuant to the Plan and the Confirmation Order.

(v)    The Plan Administrator shall be authorized to file on behalf of the Debtors and any non-Debtor subsidiaries, certificates of dissolution and any and all other corporate and company documents necessary to effectuate the Wind Down without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, the board of directors, or board of directors or similar governing body of the Debtors.

(vi)    The Plan Administrator shall effectuate the Wind Down with the amounts reserved in the Wind Down Budget.

**7.    Reorganization Transaction.**

(a)    If the Debtors pursue the Reorganization Transaction, the Debtors shall implement the Reorganization Transaction as set forth in the Plan.

(a)    ***Amended and Restated Credit Facility***

(i)    On the Effective Date, the Amended and Restated Credit Facility Agreement shall be executed and delivered, and the Reorganized Debtors shall be authorized to execute, deliver and enter into, the Amended and Restated Credit Facility Agreement and the other Amended and Restated Credit Facility Documents, without the need for any further corporate action and without further action by the holders of Claims or Interests.

(ii)    Except as otherwise modified by the Amended and Restated Credit Facility Agreement, all Liens, mortgages and security interests securing the obligations arising under the Amended and Restated Credit Facility Agreement and the other Amended and Restated Credit Facility Documents that were collateral securing the Term Loan Claims as of the Commencement Date are unaltered by the Plan, and all such liens, mortgages and security interests are created and perfected with respect to the Amended and Restated Credit Facility Documents to the same extent, in the same manner and on the same terms and priorities as they were with respect to the Term Loan Claims, except as the foregoing may be modified pursuant to the Amended and Restated Credit Facility Documents. All Liens and security interests granted and continuing pursuant to the Amended and Restated Credit Facility Documents shall be (i) valid, binding, perfected, and enforceable Liens and security interests in the personal and real property described in and subject to such document, with the priorities established in respect thereof under applicable non-bankruptcy law; (ii) granted in good faith and deemed not to constitute a fraudulent conveyance or fraudulent transfer; and (iii) not otherwise subject to avoidance, recharacterization, or subordination (whether equitable, contractual or otherwise) under any applicable law. The Debtors, the Reorganized Debtors, and the Entities granted such

57

Liens and security interests are authorized to make, and to the extent contemplated by the Amended and Restated Credit Facility Documents, the Debtors, the Reorganized Debtors, and their respective Affiliates will make, all filings and recordings, and to obtain all governmental approvals and consents necessary (but otherwise consistent with the consents and approvals obtained in connection with the Prepetition Credit Agreement) to establish, attach and perfect such Liens and security interests under any applicable law, and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interest to third parties.  For purposes of all mortgages and deposit account control agreements that secured the obligations arising under the Prepetition Credit Agreement, the Amended and Restated Credit Facility Agreement is deemed an amendment and restatement of the Prepetition Credit Agreement, and such mortgages and control agreements shall survive the Effective Date, shall not be cancelled, and shall continue to secure the Amended and Restated Credit Facility Agreement, except as expressly set forth in the Amended and Restated Credit Facility Agreement.

(iii)    The Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the Amended and Restated Credit Facility Documents without the need for any further corporate or limited liability company action and without further action by the holders of Claims or Interests.

(b)    *Exit Warehouse Facilities*

On the Effective Date, the Reorganized Debtors shall be authorized to execute and perform under the Exit Warehouse Facilities Documents without the need for any further corporate action and without further action by the holders of Claims or Interests.

(c)    *Authorization and Issuance of New Plan Securities*

(i)    On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, are authorized to issue or cause to be issued and shall issue the New Common Stock in accordance with the terms of the Plan and the Amended Organizational Documents without the need for any further corporate or stockholder action.  All of the New Common Stock issuable under the Plan, when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable.

(ii)    The distribution of the New Common Stock pursuant to the Plan may be made by means of book-entry registration on the books of a transfer agent for shares of New Common Stock or by means of book-entry exchange through the facilities of a transfer agent reasonably satisfactory to the Debtors, in accordance with the customary practices of such agent, as and to the extent practicable.

(d)    *Continued Corporate Existence*

(i)    The Debtors shall continue to exist after the Effective Date as Reorganized Debtors as a private company in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the Amended Organizational Documents unless otherwise determined in accordance with Section 5.10 of the Plan.

WEIL:\97031080\1\41703.0011

(ii)    On or after the Effective Date, the Reorganized Debtors may take such action that may be necessary or appropriate as permitted by applicable law and the Reorganized Debtors' Amended Organizational Documents, as the Reorganized Debtors may determine is reasonable and appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate the Plan.

(e)    ***Officers and Board of Directors***

(i)    Upon the Effective Date, the New Board shall consist of five (5) directors. Four (4) directors shall be selected by the Requisite Term Lenders and one (1) director shall be the chief executive officer ("**CEO**") of Reorganized DHCP, who shall be Thomas F. Marano.  The identities of the directors and officers of the Reorganized Debtors, to the extent known, shall be disclosed prior to the Confirmation Hearing in accordance with section 1129(a)(5) of the Bankruptcy Code.

(ii)    Except to the extent that a member of the board of directors or managers, as applicable, of a Debtor continues to serve as a director or manager of such Debtor on and after the Effective Date, the members of the board of directors or managers of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date and each such director or manager will be deemed to have resigned or shall otherwise cease to be a director or manager of the applicable Debtor on the Effective Date.

(f)    ***Reorganized Debtors' Authority***

(i)    The Reorganized Debtors shall have the authority and right on behalf of each of the Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:  (a) except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors; (b) make distributions to holders of Allowed Claims in accordance with the Plan; (c) prosecute all Causes of Action on behalf of the Debtors, elect not to pursue any Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of the Debtors; (d) retain professionals to assist in performing its duties under the Plan; (e) maintain the books, records, and accounts of the Debtors; (f) complete and file, as necessary, all final or otherwise required federal, state, and local tax returns for the Debtors; and (g) perform other duties and functions that are consistent with the implementation of the Plan.

(ii)    After the Effective Date, the Reorganized Debtors may operate the Debtors' business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**8.    Fannie Mae; Freddie Mac; Ginnie Mae**

(a)    *Fannie Mae.*  Notwithstanding anything in the Disclosure Statement, the Plan or in the Confirmation Order, Plan Supplement, Exit Warehouse Facilities Documents, Exit Working Capital Facility Documents, the Amended and Restated Credit Facility Documents, or any other order in the Chapter 11 Cases to the contrary, (i) the Debtors' mortgage servicing rights and obligations relating to

59

Fannie Mae shall not be transferred by the Debtors to a Successful Bidder (or any other person or entity) without the express prior written consent of Fannie Mae in its sole and absolute discretion; (ii) the assumption or assumption and assignment of any agreements between any of the Debtors and Fannie Mae, including, without limitation, the Fannie Mae Lender Contracts, shall be subject to the express prior written consent of Fannie Mae in its sole and absolute discretion; (iii) any proposed severance of rights and obligations or any other proposed modification of any agreement, including, without limitation, the Fannie Mae Lender Contracts, between any of the Debtors and Fannie Mae shall be subject to the prior written consent of Fannie Mae in its sole and absolute discretion; (iv) Fannie Mae's rights, powers, prerogatives, remedies, payment or lien priorities, and claims against the Debtors, any non-Debtor affiliate or any other person or entity under the Fannie Mae Lender Contracts (including, without limitation, any guaranty by any Debtor of the obligations thereunder) shall not be impaired, released, modified, or limited in any respect, except as otherwise expressly agreed in writing by Fannie Mae; (v) no lien or security interest shall attach to, modify, prime or otherwise affect (A) mortgage servicing rights with respect to mortgages which are now or hereafter serviced by Ditech or RMS (or any of their affiliates) for Fannie Mae, except as otherwise expressly authorized by Fannie Mae pursuant to the applicable Fannie Mae Acknowledgment Agreements, (B) any other rights related to the Fannie Mae Lender Contracts, between any of the Debtors and Fannie Mae, including the "Purchased Servicing Advance Receivables" as defined and referenced in, and except as otherwise expressly authorized by, the Fannie Mae Acknowledgment Agreements, or (C) any cash, accounts, securities, or other collateral (and any proceeds thereof) pledged to Fannie Mae pursuant to any collateral pledge agreement or other security agreement between Ditech and Fannie Mae (including the Collateral as defined in that certain Pledge and Security Agreement in favor of Fannie Mae dated as of December 19, 2014 (as amended)); (vi) the term of Fannie Mae Acknowledgment Agreements shall remain unchanged, and any extension of the term or changes to other provisions of the Fannie Mae Acknowledgment Agreements must be expressly agreed to by the parties in a separate written agreement; (vii) Fannie Mae does not, and shall not be deemed to, release any Released Party or any other person or entity from any claims or causes of action that it may have, nor shall Fannie Mae be enjoined from pursuing any such claims or causes of action; (viii) in a Reorganization Transaction, the Fannie Mae Lender Contracts shall be, upon the Effective Date, assumed by the Reorganized Debtors; and (ix) all transactions with and transfers to Fannie Mae prior to the Effective Date are hereby reaffirmed and ratified by the Debtors and shall not be subject to avoidance.  Without limiting the generality of, and subject to, the foregoing, in connection with the proposed assumption or assumption and assignment of any agreement, including, without limitation, the Fannie Mae Lender Contracts, between any of the Debtors and Fannie Mae, such agreements may be assumed or assumed and assigned only upon (i)(1) the Reorganized Debtors agreeing to honor all obligations under the Fannie Mae Lender Contracts whether incurred prior to or after the Effective Date; (2) in the case of an assignment in a Sale Transaction  repayment in full of the Cure Amounts; or (3) such other treatment of the Cure Amount or any other obligations as shall be agreed to by Fannie Mae and the Debtors in good faith negotiations and (ii) adequate assurance of future performance.

      (b)    *Freddie Mac.*

      (i)    Notwithstanding anything herein or in the Confirmation Order, Plan Supplement, Exit Warehouse Facilities Documents, Exit Working Capital Facility Documents, the Amended and Restated Credit Facility Documents, or any other order in the Chapter 11 Cases to the contrary, (1) Freddie Mac's rights, powers, prerogatives, remedies, payment or lien priorities, and claims against the Debtors or any other person or entity under the Freddie Mac Agreements shall not be impaired, released, modified, or limited in any respect, except as otherwise expressly agreed in writing by Freddie Mac; (2) no lien or security interest shall (a) attach to, modify, include or otherwise affect mortgage servicing rights with respect to mortgages which are now or hereafter serviced by Ditech (or any of its affiliates) for Freddie Mac, (b) attach to, modify, include or otherwise affect the "**Servicing Collateral**" (as defined and referenced in, and except as otherwise

expressly authorized by, the Freddie Mac Acknowledgment Agreement), (c) attach to, modify, include or otherwise affect any cash, accounts, securities, or other collateral (and any proceeds thereof) pledged to Freddie Mac pursuant to any collateral pledge agreement or other security agreement between Ditech and Freddie Mac (including, without limitation, the Freddie Mac Pledge Agreement), or (d) impair Freddie Mac's rights, remedies, powers, interests, payment or lien priority, or prerogatives set forth in any of the foregoing; and (3) Freddie Mac does not, and shall not be deemed to, release any Released Party or any other person or entity from any claims or causes of action that it may have, nor shall Freddie Mac be enjoined from pursuing any such claims or causes of action.

(ii)    Notwithstanding anything herein or in the Confirmation Order, Plan Supplement, Exit Warehouse Facilities Documents, Exit Working Capital Facility Documents, the Amended and Restated Credit Facility Documents, or any other order in the Chapter 11 Cases to the contrary, (1) the Debtors' mortgage servicing rights with respect to mortgages which are now or hereafter serviced by Ditech (or any of its affiliates) for Freddie Mac shall not be transferred by the Debtors to a Successful Bidder (or any other entity) without the express prior written consent of Freddie Mac in its sole and absolute discretion; (2) the Debtors and the Reorganized Debtors shall not assume or assume and assign any agreement between any of the Debtors and Freddie Mac, including, without limitation, the Freddie Mac Agreements, without the express prior written consent of Freddie Mac in its sole and absolute discretion; (3) any proposed severance of rights and obligations or any other proposed modification of any agreement, including, without limitation, the Freddie Mac Agreements, between any of the Debtors and Freddie Mac shall be subject to the prior written consent of Freddie Mac in its sole and absolute discretion; and (4) all transactions with and transfers to Freddie Mac prior to the Effective Date are hereby reaffirmed and ratified by the Debtors and shall not be subject to avoidance. The Debtors and Freddie Mac shall enter into good faith negotiations and use commercially reasonable efforts to resolve the claims of Freddie Mac and the assumption or assumption and assignment of the Freddie Mac Agreements in the Reorganization Transaction or the Sale Transaction, as applicable.

(c)    *Ginnie Mae.*  Notwithstanding anything in the Plan to the contrary, (i) the Debtors' mortgage servicing and securitization obligations relating to Ginnie Mae shall not be transferred by the Debtors to a Successful Bidder without the express prior written consent of Ginnie Mae in its sole and absolute discretion; (ii) the assumption or assumption and assignment of any agreements between any of the Debtors and Ginnie Mae, including, without limitation, the Ginnie Mae Agreements, shall be subject to the express prior written consent of Ginnie Mae in its sole and absolute discretion; and (iii) any proposed severance of rights and obligations or any other proposed modification of any agreement, including, without limitation, the Ginnie Mae Agreements, between any of the Debtors and Ginnie Mae shall be subject to the prior written consent of Ginnie Mae in its sole and absolute discretion.  The Debtors and Ginnie Mae shall enter into good faith negotiations and use commercially reasonable efforts to resolve the claims of Ginnie Mae and the assumption or assumption and assignment of the Ginnie Mae Agreements in the Reorganization Transaction or the Sale Transaction, as applicable.

### 9.    Employee Matters

(a)    Subject to Section 5.9(c) of the Plan, on the Effective Date, solely with respect to the Reorganization Transaction, the Reorganized Debtors shall be deemed to have assumed all employee compensation plans, Benefit Plans, employment agreements, offer letters, or award letters to which the Debtors are a party (collectively, the "**Employee Arrangements**").  Notwithstanding the foregoing, if an Employee Arrangement, other than any postpetition employee incentive program approved by the

Bankruptcy Court, provides in part for a payment, premium, or other award upon the occurrence of a change of control, change in control, or other similar event, then such Employee Arrangement shall only be assumed to the extent that the Reorganization Transaction, including consummation of the Plan, shall not be treated as a change of control, change in control, or other similar event under such Employee Arrangement.

(b)     Following the Effective Date, solely with respect to the Reorganization Transaction, the applicable Reorganized Debtors shall enter into the Management Incentive Plan.  All awards issued under the Management Incentive Plan will be dilutive of all other New Common Stock issued pursuant to the Plan.  Within thirty (30) days following the Effective Date, the Management Incentive Plan and individual grants thereunder shall be independently considered and, subject to the exercise of its fiduciary duties and to the extent it deems appropriate, approved by the New Board.

(c)     For the avoidance of doubt, (i) if an Employee Arrangement provides for an award or potential award of Interests or consideration based on the value of Interests prior to the Effective Date, such Interest shall be treated in accordance with Section 4.9 of the Plan and cancelled notwithstanding assumption of the applicable Employee Arrangement, and (ii) the Ditech Holding Corporation 2018 Equity Incentive Plan (as amended and restated) shall not be assumed and shall be deemed terminated.

(d)     In the event of a Sale Transaction, the Sale Incentive Awards shall be paid in Cash from the Sale Transaction Proceeds as Allowed Administrative Expense Claims.  Such distributions shall be deemed to be distributions made to holders of Allowed Term Loan Claims in accordance with Section 4.3 of the Plan.

## 10.     Effectuating Documents; Further Transactions

(a)     On or as soon as practicable after the Effective Date, the Reorganized Debtors, or the Plan Administrator, as applicable, shall take such actions as may be or become necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan and the Global Settlement, including (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, financing, conversion, disposition, transfer, dissolution, transition services, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may determine; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution and the Amended Organizational Documents pursuant to applicable state law; (iv) the issuance of securities, all of which shall be authorized and approved in all respects, in each case, without further action being required under applicable law, regulation, order, or rule; and (v) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law or to reincorporate in another jurisdiction, subject, in each case, to the Amended Organizational Documents.

(b)     Each officer, manager, or member of the board of directors of the Debtors is (and each officer, manager, or member of the board of directors of the Reorganized Debtors and the Plan Administrator, as applicable, shall be) authorized and directed to issue, execute, deliver, file, or record such contracts, securities, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors or Wind Down Estates, all of which shall be authorized and approved in all respects,

in each case, without the need for any approvals, authorization, consents, or any further action required under applicable law, regulation, order, or rule (including, without limitation, any action by the stockholders or directors or managers of the Debtors, the Reorganized Debtors, or Wind Down Estates) except for those expressly required pursuant to the Plan.

(c)    In order to preserve the Reorganized Debtors' or Wind Down Estates' ability to utilize certain tax attributes that exist as of the Effective Date, the charter, bylaws, and other organizational documents may restrict certain transfers of the New Common Stock.

(d)    The Debtors shall be authorized to implement the Reorganization Transaction, Asset Sale Transaction, or Sale Transaction, as applicable, and the Global Settlement, including the creation of the GUC Recovery Trust, in the manner most tax efficient to the Reorganized Debtors or Wind Down Estates, as determined by the Debtors in their business judgment, given the totality of the circumstances.

(e)    All matters provided for in the Plan involving the corporate structure of the Debtors. Reorganized Debtors, or Wind Down Estates, to the extent applicable, or any corporate or related action required by the Debtors, Reorganized Debtors, or Wind Down Estates in connection herewith shall be deemed to have occurred and shall be in effect, without any requirement of further action by the stockholders, members, or directors or managers of the Debtors or Reorganized Debtors, and with like effect as though such action had been taken unanimously by the stockholders, members, directors, managers, or officers, as applicable, of the Debtors, Reorganized Debtors, or Wind Down Estates.

## 11.    Section 1145 Exemption

(a)    The offer, issuance, and distribution of the New Common Stock hereunder to holders of the Term Loan Claims under Section 4.3 of the Plan shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without further act or action by any Entity, from registration under (i) the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder and (ii) any state or local law requiring registration for the offer, issuance, or distribution of Securities.

(b)    The New Common Stock shall be freely tradable by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act of 1933; (ii) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (iii) any restrictions, to the extent necessary for the Debtors to preserve their ability to utilize certain tax attributes that exist as of the Effective Date, on the transferability and ownership of New Common Stock, (iv) applicable regulatory approval, and (v) the Stockholders Agreement.

## 12.    Cancellation of Existing Securities and Agreements

(a)    Solely with respect to the Reorganization Transaction, except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, including with respect to executory contracts or unexpired leases that shall be assumed by the Reorganized Debtors, and subject in all respects to the Prepetition Intercreditor Agreement, on the Effective Date, all agreements, instruments, and other documents evidencing or issued pursuant to the Prepetition Credit Agreement, the Prepetition Second Lien Notes Indenture, or any indebtedness or other obligations thereunder, and any Interest, and any rights of any holder in respect thereof, shall be deemed cancelled, discharged, and of no force or effect, and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

(b)    Notwithstanding such cancellation and discharge, the Prepetition Credit Agreement and the Prepetition Second Lien Notes Indenture shall continue in effect to the extent necessary (i) to allow the holders of such Claims to receive distributions under the Plan; (ii) to allow the Debtors, the Reorganized Debtors, the Prepetition Administrative Agent, and the Prepetition Second Lien Notes Trustee to make post-Effective Date distributions or take such other action pursuant to the Plan on account of such Claims and to otherwise exercise their rights and discharge their obligations relating to the interests of the holders of such Claims; (iii) to allow holders of Claims to retain their respective rights and obligations vis-à-vis other holders of Claims pursuant to any applicable loan documents; (iv) to allow the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to enforce their rights, claims, and interests vis-à-vis any party other than the Debtors, including any rights with respect to priority of payment and/or to exercise charging liens; (v) to preserve any rights of the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to payment of fees, expenses, and indemnification obligations as against any money or property distributable to lenders under the Prepetition Credit Agreement and holders under the Prepetition Second Lien Notes Indenture, as applicable, including any rights to priority of payment and/or to exercise charging liens; (vi) to allow the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to enforce any obligations owed to it under the Plan; (vii) to allow the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to exercise rights and obligations relating to the interests of lenders under the Prepetition Credit Agreement and holders under the Prepetition Second Lien Notes Indenture, as applicable; (viii) to permit the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to perform any function necessary to effectuate the foregoing; (ix) to allow the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court relating to the Prepetition Credit Agreement or the Prepetition Second Lien Notes Indenture; and (x) to permit the continuation of the collateral, security, and related agreements under the Prepetition Credit Agreement with respect to the Amended and Restated Credit Facility Agreement as provided under the Plan; provided, that nothing in this Section 5.12 shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any liability or expense to the Reorganized Debtors.  In a Reorganization Transaction, notwithstanding anything to the contrary in the Plan, the indemnity obligations of the Debtors under the Prepetition Credit Agreement shall survive the termination thereof and shall not be discharged or released pursuant to the Plan or the Confirmation Order.  Notwithstanding anything to the contrary herein, the indemnity obligations of the Debtors under the Prepetition Credit Agreement and the Prepetition Second Lien Notes Indenture shall survive the termination thereof and shall not be discharged or released pursuant to the Plan or the Confirmation Order.

(c)    Except for the foregoing, subsequent to the performance by the Prepetition Administrative Agent of its obligations pursuant to the Plan, the Prepetition Administrative Agent and its agents shall be relieved of all further duties and responsibilities related to the Prepetition Credit Agreement, except with respect to any duties and responsibilities of the Prepetition Administrative Agent that, pursuant to the Amended and Restated Credit Facility Agreement, survive the termination of the Prepetition Credit Agreement.

(d)    Except for the foregoing, subsequent to the performance by the Prepetition Second Lien Notes Trustee of its obligations pursuant to the Plan, the Prepetition Second Lien Notes Trustee and its agents shall be relieved of all further duties and responsibilities related to the Prepetition Second Lien Notes Indenture.  Nothing in this Section 5.12 shall in any way affect or diminish the rights of the Prepetition Second Lien Notes Trustee to exercise any charging lien against distributions to holders of Second Lien Notes Claims with respect to any unpaid fees.

(e)    Notwithstanding anything to the contrary in the Plan, all rights under the Prepetition Second Lien Notes Indenture shall remain subject to the Prepetition Intercreditor Agreement.

WEIL:\97031080\1\41703.0011

(f)    Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in the Plan shall be deemed null and void and shall be of no force and effect.  Nothing contained in the Plan shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under any executory contract or lease to the extent such executory contract or lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court or hereunder.

## 13.    Cancellation of Liens

Except as otherwise specifically provided in the Plan, upon the payment in full in Cash of an Other Secured Claim, any Lien securing an Other Secured Claim that is paid in full, in Cash, shall be deemed released, and the holder of such Other Secured Claim shall be authorized and directed to release any collateral or other property of the Debtors (including any Cash collateral) held by such holder and to take such actions as may be requested by the Reorganized Debtors, to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Reorganized Debtors.

## 14.    Subordination Agreements

Pursuant to section 510(a) of the Bankruptcy Code, all subordination agreements, including but not limited to, the Prepetition Intercreditor Agreement and the Prepetition Second Lien Notes Indenture, governing Claims or Interests shall be enforced in accordance with such agreements' terms; provided, that the subordination provisions in such agreements shall not apply to distributions to holders of Allowed Second Lien Notes Claims pursuant to Section 4.4(b) of the Plan.

## 15.    Nonconsensual Confirmation

The Debtors intend to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code as to any Classes that reject or are deemed to reject the Plan.

## 16.    Closing of Chapter 11 Cases

After an Estate has been fully administered, the Reorganized Debtors or Plan Administrator shall seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case(s) in accordance with the Bankruptcy Code and Bankruptcy Rules.

## 17.    Notice of Effective Date

As soon as practicable, but not later than three (3) Business Days following the Effective Date, the Debtors shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

## 18.    Separability

Notwithstanding the combination of the separate plans of reorganization for the Debtors set forth in the Plan for purposes of economy and efficiency, the Plan constitutes a separate chapter 11 plan for each Debtor.  Accordingly, if the Bankruptcy Court does not confirm the Plan with respect to one or more Debtors, it may still, subject to the consent of the applicable Debtors, confirm the Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

### 19. GUC Recovery Trust

(a)    *Creation and Governance of the GUC Recovery Trust*.  On the Effective Date, the Debtors shall transfer the GUC Recovery Trust Assets to the GUC Recovery Trust and the Debtors and the GUC Trustee shall execute the GUC Recovery Trust Agreement and shall take all steps necessary to establish the GUC Recovery Trust in accordance with the Plan and the beneficial interests therein.  In the event of any conflict between the terms of the Plan and the terms of the GUC Recovery Trust Agreement, the terms of the Plan shall govern.  Additionally, on the Effective Date, the Debtors shall transfer and shall be deemed to transfer to the GUC Recovery Trust all of their rights, title and interest in and to all of the GUC Recovery Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the GUC Recovery Trust Assets shall automatically vest in the GUC Recovery Trust free and clear of all Claims and Liens, and such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax.  The GUC Trustee shall be the exclusive administrator of the assets of the GUC Recovery Trust for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representatives of the Estate of each of the Debtors appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, solely for purposes of carrying out the GUC Trustee's duties under the GUC Recovery Trust Agreement.  The GUC Recovery Trust shall be governed by the GUC Recovery Trust Agreement and administered by the GUC Trustee.  The powers, rights, and responsibilities of the GUC Trustee shall be specified in the GUC Recovery Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this Section 5.19.  The GUC Trustee shall hold and distribute the GUC Recovery Trust Assets in accordance with the provisions of the Plan and the GUC Recovery Trust Agreement.  Other rights and duties of the GUC Trustee shall be as set forth in the GUC Recovery Trust Agreement.  After the Effective Date, the Debtors and the Reorganized Debtors shall have no interest in the GUC Recovery Trust Assets except as set forth in the GUC Recovery Trust Agreement.

(b)    *GUC Trustee and GUC Recovery Trust Agreement*.  The GUC Recovery Trust Agreement generally will provide for, among other things:  (i) the transfer of the GUC Recovery Trust Assets to the GUC Recovery Trust; (ii) the payment of certain reasonable expenses of the GUC Recovery Trust; (iii) litigation of any GUC Recovery Trust Causes of Action, which may include the prosecution, settlement, abandonment or dismissal of any such Causes of Action; and (iv) make distributions to holders of Allowed General Unsecured Claims as provided herein and in the GUC Recovery Trust Agreement.  The GUC Recovery Trust Agreement may include reasonable and customary provisions that allow for indemnification by the GUC Recovery Trust.  Any such indemnification shall be the sole responsibility of the GUC Recovery Trust and payable solely from the GUC Recovery Trust Assets.  The GUC Trustee shall be responsible for all decisions and duties with respect to the GUC Recovery Trust and the GUC Recovery Trust Assets, except as otherwise provided in the GUC Recovery Trust Agreement.

(c)    *Cooperation of Reorganized Debtors*.  Subject to subsection (d) of this Section 5.19, the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, upon reasonable notice, shall provide reasonable cooperation with the GUC Trustee in the administration of the GUC Recovery Trust, including providing reasonable access to pertinent documents, including books and records, to the extent the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, have such information and/or documents, to the GUC Trustee sufficient to enable the GUC Trustee to perform its duties hereunder.  The Reorganized Debtors shall reasonably cooperate with the GUC Trustee in the administration of the GUC Recovery Trust, including, providing reasonable access to documents and current officers and directors with respect to (i) the prosecution of the GUC Recovery Trust Causes of Action, and (ii) contesting, settling, compromising, reconciling, and objecting to General Unsecured Claims, in each case, the GUC Recovery Trust agrees to reimburse reasonable out-of-pocket expenses for preservation of documents, copying or similar expenses.  The collection, review, and preservation of documents for any investigation or litigation by the GUC Trustee shall be at the expense of the GUC Recovery Trust.

66

WEIL:\97031080\1\41703.0011

(d)     *Preservation of Privilege.*  The Debtors and the GUC Recovery Trust shall enter into a common interest agreement whereby the Debtors will be able to share documents, information or communications (whether written or oral) relating to the GUC Recovery Trust Assets.  The GUC Recovery Trust shall seek to preserve and protect all applicable privileges attaching to any such documents, information, or communications.  The GUC Trustee's receipt of such documents, information or communications shall not constitute a waiver of any privilege.  All privileges shall remain in the control of the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, and the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, retain the right to waive their own privileges.

(e)     *GUC Recovery Trust Assets.*  The GUC Trustee shall have the exclusive right in respect of all GUC Recovery Trust Causes of Action to institute, file, prosecute, enforce, settle, compromise, release, abandon, or withdraw any and all GUC Recovery Trust Causes of Action without any further order of the Bankruptcy Court or consent of any other party, except as otherwise provided herein or in the GUC Recovery Trust Agreement.  From and after the Effective Date, the GUC Trustee, in accordance with section 1123(b)(3) of the Bankruptcy Code, and on behalf of the GUC Recovery Trust, shall serve as a representative of the Estates, solely for purposes of carrying out the GUC Trustee's duties under the GUC Recovery Trust Agreement.  In connection with the investigation, prosecution and/or compromise of the GUC Recovery Trust Causes of Action, the GUC Trustee may expend such portion of the GUC Recovery Trust Assets as the GUC Trustee deems necessary.

(f)     *GUC Recovery Trust Fees and Expenses.*  From and after the Effective Date, the GUC Trustee, on behalf of the GUC Recovery Trust, shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the GUC Recovery Trust and any professionals retained by the GUC Recovery Trust from the GUC Recovery Trust Assets, except as otherwise provided in the GUC Recovery Trust Agreement.  The Reorganized Debtors or the Wind Down Estates, as applicable, shall not be responsible for any costs, fees, or expenses of the GUC Recovery Trust.

(g)     *Tax Treatment.*  In furtherance of this Section 5.19 of the Plan, (i) the GUC Recovery Trust shall be structured to qualify as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code to the holders of General Unsecured Claims, consistent with the terms of the Plan; (ii) the sole purpose of the GUC Recovery Trust shall be the liquidation and distribution of the GUC Recovery Trust Assets in accordance with Treasury Regulation section 301.7701-4(d), including the resolution of General Unsecured Claims in accordance with this Plan, with no objective to continue or engage in the conduct of a trade or business; (iii) all parties (including the Debtors and the Estates, holders of General Unsecured Claims and the GUC Trustee) shall report consistently with such treatment; (iv) all parties shall report consistently with the valuation of the GUC Recovery Trust Assets transferred to the GUC Recovery Trust as determined by the GUC Trustee (or its designee); (v) the GUC Trustee shall be responsible for filing returns for the GUC Recovery Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a); and (vi) the GUC Trustee shall annually send to each holder of an interest in the GUC Recovery Trust a separate statement regarding the receipts and expenditures of the trust as relevant for U.S. federal income tax purposes.  Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the GUC Trustee of a private letter ruling if the GUC Trustee so requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the GUC Trustee), the GUC Trustee may timely elect to (i) treat the any portion of the GUC Recovery Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  If a "disputed ownership fund" election is made, all parties (including the Debtors and the Estates, holders of General Unsecured Claims

and GUC Trustee) shall report for United States federal, state, and local income tax purposes consistently with the foregoing.

(h)    *Non-Transferability of Interests in GUC Recovery Trust.*  Any and all interests in the GUC Recovery Trust shall be non-transferable other than if transferred by will, intestate succession, or otherwise by operation of law.

(i)    *Dissolution of the GUC Litigation Trust.*  The GUC Trustee and the GUC Recovery Trust shall be discharged or dissolved, as the case may be, at such time as (i) the GUC Trustee determines that the pursuit of additional GUC Recovery Trust Causes of Action is not likely to yield sufficient additional proceeds to justify further pursuit of such claims and (ii) all distributions required to be made by the GUC Trustee under the Plan have been made.  Upon dissolution of the GUC Recovery Trust, any remaining GUC Recovery Trust Assets shall be distributed to holders of Allowed General Unsecured Claims in accordance with the Plan and the GUC Recovery Trust Agreement as appropriate.

(j)    *Single Satisfaction of Allowed General Unsecured Claims.*  Notwithstanding anything to the contrary herein, in no event shall holders of Allowed General Unsecured Claims recover more than the full amount of their Allowed General Unsecured Claims from the GUC Recovery Trust.

E.    **Distributions**

1.    **Distributions Generally**

Except as otherwise provided in the Plan and in the GUC Recovery Trust Agreement, one or more Disbursing Agents shall make all distributions under the Plan to the appropriate holders of Allowed Claims in accordance with the terms of the Plan.

2.    **Distribution Record Date**

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed for purposes of determining whether a holder of such a Claim or Interest is a record holder entitled to distributions under the Plan, and there shall be no further changes in the record holders or the permitted designees of any such Claims or Interests.  The Debtors, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable, shall have no obligation to recognize any transfer or designation of such Claims or Interests occurring after the close of business on the Distribution Record Date.  In addition, with respect to payment of any Cure Amounts or assumption disputes, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease as of the close of business on the Distribution Record Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount. For the avoidance of doubt, the Distribution Record Date shall not apply to the Second Lien Notes, the holders of which shall receive a distribution in accordance with Article IV of the Plan and the customary procedures of DTC on or as soon as practical after the Effective Date. For the further avoidance of doubt, all distributions made pursuant to the Plan on account of the Second Lien Notes shall be made by the Disbursing Agent to, or at the direction of, the Prepetition Second Lien Notes Trustee, for further distribution to holders of Second Lien Notes, in accordance with the Plan and the Confirmation Order, subject to and in accordance with the terms of the Prepetition Second Lien Notes Indenture, including, without limitation, subject to the application of the charging lien of the Prepetition Second Lien Notes Trustee for payment of any unpaid fees and expenses.

68

**264**

### 3.    Date of Distributions

(a)    Except as otherwise provided in the Plan and in the GUC Recovery Trust Agreement, any distributions and deliveries to be made under the Plan shall be made on the Effective Date or as otherwise determined in accordance with the Plan, including, without limitation, the treatment provisions of **Error! Reference source not found.** of the Plan, or as soon as practicable thereafter; provided, that the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable, shall from time to time determine subsequent distribution dates to the extent they determine them to be appropriate.

(b)    In a Sale Transaction, the Plan Administrator shall reserve an amount sufficient to pay holders of Disputed Administrative Expense Claims and Disputed Priority Tax Claims the amount such holders would be entitled to receive under the Plan if such Claims were to become Allowed Claims.  After the resolution of all Disputed Administrative Expense Claims and Disputed Priority Tax Claims, the Plan Administrator shall treat any amounts that were reserved for Disputed Administrative Expense Claims and Disputed Priority Tax Claims that do not become Allowed Claims as Net Cash Proceeds.

### 4.    Disbursing Agent

All distributions under this Plan shall be made by the Disbursing Agent on and after the Effective Date as provided in the Plan.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.  The Reorganized Debtors or Plan Administrator shall use all commercially reasonable efforts to provide the Disbursing Agent (if other than the Reorganized Debtors) with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors', Reorganized Debtors', or Wind Down Estates', as applicable, books and records.  The Reorganized Debtors or Plan Administrator shall cooperate in good faith with the applicable Disbursing Agent (if other than the Reorganized Debtors) to comply with the reporting and withholding requirements outlined in Section 6.19 of the Plan.

### 5.    Rights and Powers of Disbursing Agent

(a)    From and after the Effective Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against and Interests in the Debtors and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent.  No holder of a Claim or Interest or other party in interest shall have or pursue any claim or Cause of Action against the Disbursing Agent, solely in its capacity as Disbursing Agent, for making distributions in accordance with the Plan or for implementing provisions of the Plan, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent.

(b)    A Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder; (ii) make all distributions contemplated hereby; and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

6.        **Expenses of Disbursing Agent**

Except as otherwise ordered by the Bankruptcy Court, any reasonable and documented fees and expenses incurred by the Disbursing Agent acting in such capacity (including reasonable documented attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash; provided, that the fees and expenses incurred by the GUC Trustee shall be paid solely from the GUC Recovery Trust Assets in accordance with the GUC Recovery Trust Agreement.

7.        **No Postpetition Interest on Claims**

Except as otherwise provided in the Plan, the Confirmation Order, the DIP Order, or another order of the Bankruptcy Court or required by the Bankruptcy Code (including postpetition interest in accordance with sections 506(b) and 726(a)(5) of the Bankruptcy Code), interest shall not accrue or be paid on any Claims on or after the Commencement Date; provided, that if interest is payable pursuant to the preceding sentence, interest shall accrue at the federal judgment rate pursuant to 28 U.S.C. § 1961 on a non-compounded basis from the date the obligation underlying the Claim becomes due and is not timely paid through the date of payment.

8.        **Delivery of Distributions**

(a)        Subject to Bankruptcy Rule 9010, all distributions to any holder or permitted designee, as applicable, of an Allowed Claim or Interest shall be made to a Disbursing Agent, who shall transmit such distribution to the applicable holders or permitted designees of Allowed Claims or Interests on behalf of the Debtors. In the event that any distribution to any holder or permitted designee is returned as undeliverable, no further distributions shall be made to such holder or such permitted designee unless and until such Disbursing Agent is notified in writing of such holder's or permitted designee's, as applicable, then-current address, at which time all currently-due, missed distributions shall be made to such holder as soon as reasonably practicable thereafter without interest. Nothing in the Plan shall require the Disbursing Agent to attempt to locate holders or permitted designees, as applicable, of undeliverable distributions and, if located, assist such holders or permitted designees, as applicable, in complying with Section 6.19 of the Plan.

(b)        Notwithstanding the foregoing, all distributions of Cash on account of Term Loan Claims or Second Lien Notes Claims, if any, shall be deposited with the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee, as applicable, for distribution to holders of Term Loan Claims or Second Lien Notes Claims in accordance with the terms of the Prepetition Credit Agreement and the Prepetition Second Lien Notes Indenture. All distributions other than of Cash on account of Term Loan Claims or Second Lien Notes Claims, if any, may, with the consent of the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee, be made by the Disbursing Agent directly to holders of Term Loan Claims and Second Lien Notes Claims in accordance with the terms of the Plan, the Prepetition Credit Agreement, and the Prepetition Second Lien Notes Indenture. To the extent the Prepetition Administrative Agent or the Prepetition Second Lien Notes Trustee effectuates, or is requested to effectuate, any distributions hereunder, the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee shall be deemed a "Disbursing Agent" for purposes of the Plan.

(c)        As soon as reasonably practicable after the Confirmation Order is entered, the DIP Agent shall provide to counsel to the Debtors a list of all holders of DIP Claims as of such date and such additional information as may be reasonably requested by counsel to the Debtors or the Disbursing Agent to make distributions under the Plan. All distributions to holders of DIP Claims shall be governed by the DIP Documents and the DIP Order and shall be made to each holder of an Allowed DIP Claim or such holder's authorized designee for purposes of distributions to be made hereunder. All reasonable and

70

documented fees and expenses of the DIP Agent incurred after the Effective Date as part of this Section 6.8 shall be paid by the Debtors or Reorganized Debtors, as applicable.

### 9. Distributions after Effective Date

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 10. Unclaimed Property

Undeliverable distributions or unclaimed distributions shall remain in the possession of the Debtors or GUC Recovery Trust, as applicable, until such time as a distribution becomes deliverable or holder accepts distribution, or such distribution reverts back to the Debtors, Reorganized Debtors, Wind Down Estates, or GUC Recovery Trust, as applicable, and shall not be supplemented with any interest, dividends, or other accruals of any kind. Such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of three hundred and sixty-five (365) days from the date of distribution. After such date all unclaimed property or interest in property shall revert to the Reorganized Debtors, Wind Down Estates, or GUC Recovery Trust, as applicable, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred.

### 11. Time Bar to Cash Payments

Checks issued by the Disbursing Agent in respect of Allowed Claims shall be null and void if not negotiated within one hundred and twenty (120) days after the date of issuance thereof. Thereafter, the amount represented by such voided check shall irrevocably revert to the Reorganized Debtors or Wind Down Estates (or GUC Recovery Trust in the case of checks issued by the GUC Recovery Trust), and any Claim in respect of such voided check shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary. Requests for re-issuance of any check shall be made to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued.

### 12. Manner of Payment under Plan

Except as otherwise specifically provided in the Plan, at the option of the Debtors, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

### 13. Satisfaction of Claims

Except as otherwise specifically provided in the Plan, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

### 14. Fractional Stock and Notes

If any distributions of New Common Stock pursuant to the Plan would result in the issuance of a fractional share of New Common Stock, then the number of shares of New Common Stock to be issued in respect of such distribution will be calculated to one decimal place and rounded up or down to the closest whole share (with a half share or greater rounded up and less than a half share rounded down). The total number of shares of New Common Stock to be distributed in connection with the Plan shall be adjusted as necessary

71

to account for the rounding provided for in this Section 6.14. No consideration shall be provided in lieu of fractional shares that are rounded down. Neither the Reorganized Debtors, Wind Down Estates, nor the Disbursing Agent shall have any obligation to make a distribution that is less than one (1) share of New Common Stock.

### 15.    Minimum Cash Distributions

The Disbursing Agent shall not be required to make any distribution of Cash less than One Hundred Dollars ($100) to any holder of an Allowed Claim; provided, that if any distribution is not made pursuant to this Section 6.15, such distribution shall be added to any subsequent distribution to be made on behalf of the holder's Allowed Claim.

### 16.    Setoffs and Recoupments

The Debtors, the Reorganized Debtors, or Wind Down Estates, as applicable, or such entity's designee (including, without limitation, the Disbursing Agent) may, but shall not be required to, set off or recoup against any Claim, and any distribution to be made on account of such Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that the Debtors, the Reorganized Debtors, or the Wind Down Estates may have against the holder of such Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law; provided, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by a Debtor or Reorganized Debtor or its successor of any claims, rights, or Causes of Action that a Debtor or Reorganized Debtor or its successor or assign may possess against the holder of such Claim.

### 17.    Allocation of Distributions between Principal and Interest

Except as otherwise required by law (as reasonably determined by the Reorganized Debtors or Wind Down Estates), distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

### 18.    No Distribution in Excess of Amount of Allowed Claim

Except as provided in Section 6.7 of the Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, distributions in excess of the Allowed amount of such Claim.

### 19.    Withholding and Reporting Requirements

(a)    *Withholding Rights*.  In connection with the Plan, any party issuing any instrument or making any distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  In the case of a non-Cash distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and either (i) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld property. Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Entity that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any governmental unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  Any party issuing any instrument or making

72

any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)      *Forms*.  Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the Disbursing Agent or such other Entity designated by the Reorganized Debtors or Wind Down Estates or GUC Trustee (which Entity shall subsequently deliver to the Disbursing Agent any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Entity) Form W-8.  If such request is made by the Reorganized Debtors or Wind Down Estates, the Disbursing Agent, or such other Entity designated by the Reorganized Debtors, Wind Down Estates, or Disbursing Agent and the holder fails to comply before the earlier of (i) the date that is one hundred and eighty (180) days after the request is made and (ii) the date that is one hundred and eighty (180) days after the date of distribution, the amount of such distribution shall irrevocably revert to the applicable Reorganized Debtor and any Claim in respect of such distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property.  If such request is made by the GUC Trustee, or such other Entity designated by the GUC Trustee, and the holder fails to comply within ninety (90) days after the request is made, the amount of such distribution shall irrevocably revert to the GUC Recovery Trust and any General Unsecured Claim in respect of such distribution shall be discharged and forever barred from assertion against the GUC Trustee, the GUC Recovery Trust, or its respective property.

20.    **Hart-Scott-Rodino Antitrust Improvements Act**

Any New Common Stock to be distributed under the Plan to an Entity required to file a premerger notification and report form under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, to the extent applicable, shall not be distributed until the notification and waiting periods applicable under such Act to such Entity have expired or been terminated.

F.    **Procedures for Disputed Claims**

1.    **Objections to Claims**

The Debtors, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable, shall exclusively be entitled to object to Claims.  After the Effective Date, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable, shall have and retain any and all rights and defenses that the Debtors had with regard to any Claim to which they may object, except with respect to any Claim that is Allowed.  Any objections to proofs of Claim shall be served and filed on or before the later of (a) one-hundred and eighty (180) days after the Effective Date, and (b) on such later date as ordered by the Bankruptcy Court for cause.  The expiration of such period shall not limit or affect the Debtors', Reorganized Debtors', Plan Administrators', or GUC Trustee's, as applicable, rights to dispute Claims asserted in the ordinary course of business other than through a proof of Claim.

2.    **Resolution of Disputed Administrative Expenses and Disputed Claims**

On and after the Effective Date, the Debtors, (a) the Reorganized Debtors, or the Plan Administrator, as applicable, shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Claims (other than General Unsecured Claims) without approval of the Bankruptcy Court, other than with respect to Fee Claims; and (b) upon the creation of the GUC Recovery Trust, the GUC Trustee shall have the exclusive authority to compromise, settle, otherwise resolve, or withdraw any objections to General Unsecured Claims without approval of the Bankruptcy Court.  The Debtors, Reorganized Debtors, or Plan Administrator, as applicable, and the GUC Trustee shall cooperate with respect to any objections to Claims

WEIL:\97031080\1\41703.0011

that seek to convert Claims into General Unsecured Claims or General Unsecured Claims into other senior Claims, and the Debtors' rights and defenses to any such objections are fully preserved.

### 3.        Payments and Distributions with Respect to Disputed Claims

Notwithstanding anything in the Plan to the contrary, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

### 4.        Distributions after Allowance

After such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, the holder thereof shall be entitled to distributions, if any, to which such holder is then entitled as provided in this Plan, without interest, as provided in Section 7.9 of the Plan.  Such distributions shall be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim (or portion thereof) becomes a Final Order.

### 5.        Disallowance of Claims

Except to the extent otherwise agreed to by the Debtors, Reorganized Debtors, Plan Administrator, or GUC Trustee, as applicable, or as provided in Section 5.2(b)(vii) of the Plan, any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, as determined by a Final Order, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Final Order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable.  All proofs of Claim filed on account of an indemnification obligation to a current or former director, officer, or employee shall be deemed satisfied and expunged from the claims register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

### 6.        Estimation of Claims

The Debtors, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee as to General Unsecured Claims, as applicable, may (a) determine, resolve and otherwise adjudicate all contingent, unliquidated, and Disputed Claims in the Bankruptcy Court and (b) at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim; provided, that such limitation shall not apply to Claims requested by the Debtors to be estimated for voting purposes only.

74

### 7. No Distributions Pending Allowance

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

### 8. Claim Resolution Procedures Cumulative

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

### 9. Interest

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim shall not be entitled to any interest that accrued thereon from and after the Effective Date, except as provided in Section 6.7 of the Plan.

### 10. Insured Claims

If any portion of an Allowed Claim is an Insured Claim, no distributions under the Plan shall be made on account of such Allowed Claim until the holder of such Allowed Claim has exhausted all remedies with respect to any applicable insurance policies. To the extent that the Debtors' insurers agree to satisfy a Claim in whole or in part, then immediately upon such agreement, the portion of such Claim so satisfied may be expunged without an objection to such Claim having to be filed and without any further notice to or action, order or approval of the Court.

## G. Executory Contracts and Unexpired Leases

### 1. General Treatment

(a)    As of and subject to the occurrence of the Effective Date and solely with respect to the Reorganization Transaction, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed rejected, including, but not limited to those set forth on the Rejection Schedule included in the Plan Supplement, unless such contract or lease (i) was previously assumed or rejected by the Debtors pursuant to an order of the Bankruptcy Court; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtors on or before the Confirmation Date; (iv) is identified in section 5.9(a) of the Plan; (v) is identified in section 8.4 of the Plan; (vi) is reinstated in section 4.2 of the Plan; or (vii) is identified for assumption on the Assumption Schedule included in the Plan Supplement. Solely with respect to the Sale Transaction, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed assumed, assumed and assigned, or rejected by the Successful Bidder in accordance with the applicable purchase agreement.

(b)    Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions, assumptions and assignments, or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Reorganized Debtors or Successful Bidder, as applicable, have provided adequate assurance of future performance under such assumed executory contracts and unexpired leases. Each executory contract and unexpired lease assumed or assumed and assigned pursuant to the Plan shall vest in and be fully enforceable by the Reorganized Debtors or Successful Bidder, as

75

applicable, in accordance with its terms, except as modified by the provision of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption or applicable law.

## 2.    Determination of Assumption Disputes and Deemed Consent

(a)    Any Cure Amount shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount, as reflected in the applicable cure notice, in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such executory contracts or unexpired leases and the Debtors may otherwise agree.  The Debtors or the Wind Down Estates, as applicable, shall satisfy all Cure Amounts with the Sale Transaction Proceeds in the event of a Sale Transaction.

(b)    The Debtors shall file, as part of the Plan Supplement, the Assumption Schedule. At least ten (10) days before the deadline to object to confirmation of the Plan, the Debtors shall serve a notice on parties to executory contracts or unexpired leases to be assumed or assumed and assigned reflecting the Debtors' intention to potentially assume or assume and assign the contract or lease in connection with this Plan and, where applicable, setting forth the proposed Cure Amount (if any).  **Any objection by a counterparty to an executory contract or unexpired lease to the proposed assumption, assumption and assignment, or related Cure Amount must be filed, served, and actually received by the Debtors within ten (10) days of the service of the assumption notice, or such shorter period as agreed to by the parties or authorized by the Bankruptcy Court**.  Any counterparty to an executory contract or unexpired lease that does not timely object to the notice of the proposed assumption of such executory contract or unexpired lease shall be deemed to have assented to assumption of the applicable executory contract or unexpired lease notwithstanding any provision thereof that purports to (i) prohibit, restrict, or condition the transfer or assignment of such contract or lease; (ii) terminate or modify, or permit the termination or modification of, a contract or lease as a result of any direct or indirect transfer or assignment of the rights of any Debtor under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan; (iii) increase, accelerate, or otherwise alter any obligations or liabilities of any Debtor or any Reorganized Debtor under such executory contract or unexpired lease; or (iv) create or impose a Lien upon any property or Asset of any Debtor or any Reorganized Debtor, as applicable.  Each such provision shall be deemed to not apply to the assumption of such executory contract or unexpired lease pursuant to the Plan and counterparties to assumed executory contracts or unexpired leases that fail to object to the proposed assumption in accordance with the terms set forth in Section 8.2(b) of the Plan, shall forever be barred and enjoined from objecting to the proposed assumption or to the validity of such assumption (including with respect to any Cure Amounts or the provision of adequate assurance of future performance), or taking actions prohibited by the foregoing or the Bankruptcy Code on account of transactions contemplated by the Plan.

(c)    If there is an Assumption Dispute pertaining to assumption of an executory contract or unexpired lease (other than a dispute pertaining to a Cure Amount), such dispute shall be heard by the Bankruptcy Court prior to such assumption being effective, provided, that the Debtors or the Reorganized Debtors, as applicable, may settle any dispute regarding the Cure Amount or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(d)    To the extent an Assumption Dispute relates solely to the Cure Amount, the Debtors may assume and/or assume and assign the applicable executory contract or unexpired lease prior to the resolution of the Assumption Dispute; provided, that the Debtors or the Reorganized Debtors reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the non-Debtor party to such executory contract or unexpired lease (or such smaller amount as may be fixed or estimated by the Bankruptcy Court or otherwise agreed to by such non-Debtor party and the applicable Reorganized Debtor).

(e)    Assumption or assumption and assignment of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against any Debtor or defaults by any Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date that the Debtors assume or assume and assign such executory contract or unexpired lease.  Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, upon the assumption of such executory contract or unexpired lease.

### 3.    Rejection Damages Claims

In the event that the rejection of an executory contract or unexpired lease hereunder results in damages to the other party or parties to such contract or lease, any Claim for such damages shall be classified and treated in Class 5 (General Unsecured Claims).  Such Claim shall be forever barred and shall not be enforceable against the Debtors, the Reorganized Debtors, the GUC Recovery Trust, or their respective Estates, properties or interests in property as agents, successors, or assigns, unless a proof of Claim is filed with the Bankruptcy Court and served upon counsel for the Debtors or the Reorganized Debtors, as applicable, by the later of (i) forty-five (45) days after the filing and service of the notice of the occurrence of the Effective Date; and (ii) thirty (30) days after entry of an Order rejecting such contract or lease if such contract or lease is the subject of a pending Assumption Dispute.

### 4.    Insurance Policies

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any bar date notice, or claim objection, and any other document related to any of the foregoing: on the Effective Date (i) all insurance policies issued or providing coverage to the Debtors shall, unless designated by the Debtors as a rejected executory contract on the Rejection Schedule (subject to the applicable insurer's right to object to such designation), be assumed in their entirety by the Debtors, and upon such assumption, the Reorganized Debtors or Plan Administrator, as applicable, shall remain liable in full for any and all now existing or hereinafter arising obligations, liabilities, terms, provisions and covenants of any of the Debtors under such insurance policies, without the need or requirement for an insurer to file a proof of Claim, Administrative Claim or objection to any cure amount; (ii) nothing shall alter or modify the terms and conditions of and/or any rights, benefits, claims, rights to payments, or recoveries under the insurance policies without the express written consent of the applicable insurer; (iii) if there is a Sale Transaction or Asset Sale Transaction, insurance policies shall (a) if assumed pursuant to subsection (i) hereof, be assigned to the purchaser only upon the express written consent of the applicable insurer (to the extent consent is required by applicable non-bankruptcy law or a provision of the applicable insurance policy, but only to the extent such are enforceable against the Debtors under applicable bankruptcy law), or (b) be rejected by the Debtors subject to subsection (i) hereof; and (iv) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Court, solely to permit: (a) claimants with valid workers' compensation claims or direct action claims against an insurer under applicable nonbankruptcy law to proceed with their claims; (b) insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (I) workers' compensation claims, (II) claims where a claimant asserts a direct claim against any insurer under applicable non-bankruptcy law, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay to proceed with its claim, and (III) all costs in relation to each of the foregoing; and (c) the insurers to cancel any insurance policies, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the insurance policies.

### 5.    Intellectual Property Licenses and Agreements

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any bar date notice or claim objection, and any other document related to any of the foregoing, all intellectual property contracts, licenses, royalties, or other similar agreements to which the Debtors have any rights or obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the Debtors and Reorganized Debtors and shall continue in full force and effect unless any such intellectual property contract, license, royalty, or other similar agreement otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Debtors in accordance with Section 8.1 of the Plan. Unless otherwise noted in the Plan, all other intellectual property contracts, licenses, royalties, or other similar agreements shall vest in the Reorganized Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to ensure such vesting as contemplated in the Plan.

### 6.    Tax Agreements

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any bar date notice or claim objection, and any other document related to any of the foregoing, any tax sharing agreements to which the Debtors are a party (of which the principal purpose is the allocation of taxes) in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and, to the extent the Debtors determine (in their sole discretion) such agreements are beneficial to the Debtors, shall be assumed by the Debtors and Reorganized Debtors and shall continue in full force and effect thereafter in accordance with their respective terms, unless any such tax sharing agreement (of which the principal purpose is the allocation of taxes) otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Debtors in accordance with Section 8.1 of the Plan. Unless otherwise noted in the Plan, all other tax sharing agreements to which the Debtors are a party (of which the principal purpose is the allocation of taxes) shall vest in the Reorganized Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to ensure such vesting as contemplated in the Plan.

### 7.    Assignment

To the extent provided under the Bankruptcy Code or other applicable law, any executory contract or unexpired lease transferred and assigned hereunder shall remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such executory contract or unexpired lease (including those of the type set forth in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment. To the extent provided under the Bankruptcy Code or other applicable law, any provision that prohibits, restricts, or conditions the assignment or transfer of any such executory contract or unexpired lease or that terminates or modifies such executory contract or unexpired lease or allows the counterparty to such executory contract or unexpired lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such transfer and assignment, constitutes an unenforceable anti-assignment provision and is void and of no force or effect with respect to any assignment pursuant to the Plan.

### 8.    Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other

document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed in the notice of assumed contracts.

9.      **Reservation of Rights**

(a)      The Debtors may amend the Assumption Schedule and any cure notice until the Business Day immediately prior to the commencement of the Confirmation Hearing in order to (i) add, delete, or reclassify any executory contract or unexpired lease or amend a proposed assignment and/or (ii) amend the proposed Cure Amount; provided, that if the Confirmation Hearing is adjourned for a period of more than two (2) consecutive calendar days, the Debtors' right to amend such schedules and notices shall be extended to the Business Day immediately prior to the adjourned date of the Confirmation Hearing, with such extension applying in the case of any and all subsequent adjournments of the Confirmation Hearing. The Debtors shall provide notice of such amendment to any affected counterparty as soon as reasonably practicable.

(b)      Neither the exclusion nor inclusion of any contract or lease by the Debtors on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, will constitute an admission by the Debtors that any such contract or lease is or is not in fact an executory contract or unexpired lease or that the Debtors, Reorganized Debtors, or Wind Down Estates or their respective affiliates have any liability thereunder.

(c)      Except as otherwise provided in the Plan, nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtors and the Reorganized Debtors under any executory or non-executory contract or any unexpired or expired lease.

(d)      Nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors, as applicable, under any executory or non-executory contract or any unexpired or expired lease.

H.      **Conditions Precedent to Confirmation of Plan and Effective Date**

1.      **Conditions Precedent to Confirmation of Plan**

The following are conditions precedent to confirmation of the Plan:

(a)      the Disclosure Statement Order shall have been entered;

(b)      the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed;

(c)      the RSA shall not have been terminated and shall be in full force and effect; and

(d)      the DIP Order and the DIP Documents shall be in full force and effect in accordance with the terms thereof, and no event of default shall be continuing thereunder or occur as a result of entry of the Confirmation Order.

2.      **Conditions Precedent to Effective Date**

(a)      The following are conditions precedent to the Effective Date of the Plan with respect to both the Reorganization Transaction and the Sale Transaction:

<div align="center">79</div>

(i)    the Confirmation Order (in form and substance reasonably acceptable to the Creditors' Committee) shall have been entered and shall be in full force and effect and no stay thereof shall be in effect;

(ii)    an event of default under the DIP Documents shall not be continuing and an acceleration of the obligations or termination of the DIP Lenders' commitments under the DIP Facilities shall not have occurred;

(iii)    all actions, documents, and agreements necessary to implement and consummate the Plan shall have been effected or executed and binding on all parties thereto and, to the extent required, filed with the applicable governmental units in accordance with applicable laws;

(iv)    all governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Plan shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions;

(v)    the Creditors' Committee shall not have objected to or taken any other action that was inconsistent with or that would reasonably be expected to have prevented, interfered with, delayed, or impeded the confirmation and consummation of the Plan or approval of the Global Settlement; and

(vi)    all accrued and unpaid Restructuring Expenses shall have been paid in Cash, to the extent invoiced, at least two (2) business days prior to the Effective Date.

(b)    The following are additional conditions precedent to the Effective Date of the Plan solely with respect to the Reorganization Transaction:

(i)    the Amended Organizational Documents shall have been filed with the appropriate governmental authority, as applicable; and

(ii)    the Amended and Restated Credit Facility Agreement, Exit Warehouse Facilities Documents, and Exit Working Capital Facility Agreement, shall (i) have been (or deemed) executed and delivered, and any conditions precedent contained to effectiveness therein have been satisfied or waived in accordance therewith, (ii) be in full force and effect and binding upon the relevant parties; and (iii) contain terms and conditions consistent in all material respects with the RSA.

(c)    The following are additional conditions precedent to the Effective Date of the Plan solely with respect to the Sale Transaction:

(i)    the applicable purchase agreement(s) shall (i) have been executed and delivered, and any conditions precedent contained to effectiveness therein have been satisfied or waived in accordance therewith, (ii) be in full force and effect and binding upon the relevant parties; and (iii) contain terms and conditions consistent in all material respects with the RSA.

WEIL:\97031080\1\41703.0011

(d)    Notwithstanding when a condition precedent to the Effective Date occurs, for purposes of the Plan, such condition precedent shall be deemed to have occurred simultaneously upon the completion of the applicable conditions precedent to the Effective Date; provided, that to the extent a condition precedent (a "**Prerequisite Condition**") may be required to occur prior to another condition precedent (a "**Subsequent Condition**") then, for purposes of the Plan, the Prerequisite Condition shall be deemed to have occurred immediately prior to a Subsequent Condition regardless of when such Prerequisite Condition or Subsequent Condition shall have occurred.

### 3.    Waiver of Conditions Precedent

(a)    Except as otherwise provided in the Plan, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.  Each of the conditions precedent in Section 1 and Section V.H.2 of the Plan may be waived in writing by the Debtors with the prior written consent of (i) the Requisite Term Lenders, and (ii) solely with respect to the condition set forth in Section 9.1(d) and 9.2(a)(ii) of the Plan, the DIP Agent (acting at the direction of the Required Buyers (as defined in the DIP Documents)), in each case without leave of or order of the Bankruptcy Court and such consent not to be unreasonably withheld; provided that any such consent provided by the DIP Agent shall solely be for purposes of this Article IX and shall not otherwise limit, restrict or impair any rights or remedies of any DIP Credit Party under the DIP Documents.  If the Plan is confirmed for fewer than all of the Debtors as provided for in Section 5.18 of the Plan, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur as to such Debtors.  Notwithstanding anything to the contrary herein, any condition precedent pertaining to the Global Settlement, the GUC Recovery Trust, or GUC Recovery Trust Assets shall not be waived without the prior written consent of the Creditors' Committee.

(b)    The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

### 4.    Effect of Failure of a Condition

If the conditions listed in Section 9.2 of the Plan are not satisfied or waived in accordance with Section 9.3 of the Plan on or before the first Business Day that is more than sixty (60) days after the date on which the Confirmation Order is entered or by such later date as set forth by the Debtors in a notice filed with the Bankruptcy Court prior to the expiration of such period, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (b) prejudice in any manner the rights of any Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, the Requisite Term Lenders, or any other Entity.

### I.    Effect of Confirmation of Plan

### 1.    Vesting of Assets

(a)    On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all remaining property of the Debtors' Estates shall vest in the Reorganized Debtors or the Wind Down Estates free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided pursuant to the Plan, the Confirmation Order, the GUC Recovery Trust Agreement, Amended and Restated Credit Facility Documents, the Exit Warehouse Facilities Documents, or the Exit Working Capital Facility Documents.  On and after the Effective Date, the Reorganized Debtor may take any action,

including, without limitation, the operation of its businesses; the use, acquisition, sale, lease and disposition of property; and the entry into transactions, agreements, understandings, or arrangements, whether in or other than in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and in all respects as if there was no pending case under any chapter or provision of the Bankruptcy Code, except as expressly provided in the Plan. Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

(b)    On the Effective Date and solely with respect to the Sale Transaction, all property of the Debtors' Estates shall vest in the Wind Down Estates free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided pursuant to the Plan, the Confirmation Order, the GUC Recovery Trust Agreement, and the applicable purchase agreement.

### 2.    Binding Effect

As of the Effective Date, the Plan shall bind all holders of Claims against and Interests in the Debtors and their respective successors and assigns, notwithstanding whether any such holders were (a) Impaired or Unimpaired under the Plan; (b) deemed to accept or reject the Plan; (c) failed to vote to accept or reject the Plan; (d) voted to reject the Plan; or (e) received any distribution under the Plan.

### 3.    Discharge of Claims and Termination of Interests

In a Reorganization Transaction, upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise expressly provided under the Plan, each holder (as well as any representatives, trustees, or agents on behalf of each holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interest, rights, and liabilities that arose prior to the Effective Date; provided that Borrower Non-Discharged Claims shall not be discharged. Upon the Effective Date, all such Entities shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in the Debtors against the Debtors, the Reorganized Debtors, or any of their Assets or property, whether or not such holder has filed a proof of Claim and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date.

### 4.    Term of Injunctions or Stays

Unless otherwise provided in the Plan, the Confirmation Order, or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### 5.    Injunction

(a)    **Upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim extinguished, discharged, or released pursuant to the Plan.**

(b)    Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court or as agreed to by the Debtors and a holder of a Claim against or Interest in the Debtors, all Entities who have held, hold, or may hold Claims against or Interests in the Debtors (whether proof of such Claims or Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action that will be or are extinguished, discharged, or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Reorganized Debtors, or the GUC Recovery Trust, or the property of any of the Debtors, the Reorganized Debtors, or the GUC Recovery Trust; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtors, the Reorganized Debtors, or the GUC Recovery Trust, or the property of any of the Debtors, the Reorganized Debtors, or the GUC Recovery Trust; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Reorganized Debtors, or the GUC Recovery Trust or the property of any of the Debtors, the Reorganized Debtors, or the GUC Recovery Trust; (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtors, the Reorganized Debtors, or the GUC Recovery Trust or against property or interests in property of any of the Debtors, the Reorganized Debtors, or the GUC Recovery Trust, except as contemplated or Allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

(c)    By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest extinguished, discharged, or released pursuant to the Plan will be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth in Section 10.5 of the Plan.

(d)    The injunctions in Section 10.5 of the Plan shall extend to any successors of the Debtors and the Reorganized Debtors and their respective property and interests in property.

6.    **Releases**

(a)    **Estate Releases**

As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Definitive Documents, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the restructuring, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties will be deemed forever released and discharged, to the maximum extent permitted by law, by the Debtors, the Reorganized Debtors and their Estates, the Wind Down Estates, and the GUC Recovery Trust from any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, remedies, losses, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, or Reorganized Debtors (as the case may be), or the Estates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors or Reorganized Debtors (as the case may be), or the Estates would have been legally entitled to assert in

83

their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising prior to the Effective Date from, in whole or in part, the Debtors, the Chapter 11 Cases, the pre- and postpetition marketing and sale process, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any of the Debtors and any Released Party, the restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Disclosure Statement, the RSA, the Plan (including the Plan Supplement), the DIP Documents, and the Prepetition Warehouse Facilities (as defined in the DIP Order), or any related agreements, instruments, and other documents (including the Definitive Documents), and the negotiation, formulation, or preparation thereof, the solicitation of votes with respect to the Plan, or any other act or omission, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; provided, that nothing in this Section 10.6(a) shall be construed to release the Released Parties from willful misconduct, or intentional fraud as determined by a Final Order.

(b)    **Third-Party Releases**

As of the Effective Date, except (i) for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remain in effect or become effective after the Effective Date or (ii) as otherwise expressly provided in the Plan or in the Confirmation Order, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever, released, and discharged by:

(i)    the holders of Impaired Claims who voted to accept the Plan;

(ii)    the Consenting Term Lenders;

(iii)    holders of Term Loan Claims (Class 3) who abstain from voting on the Plan or vote to reject the Plan but do not opt-out of these releases on the Ballots;

(iv)    the Creditors' Committee and each of its members in their capacity as such; and

(v)    with respect to any Entity in the foregoing clauses (i) through (iv), such Entity's (x) predecessors, successors and assigns, (y) subsidiaries, affiliates, managed accounts or funds, managed or controlled by such Entity and (z) all Persons entitled to assert Claims through or on behalf of such Entities with respect to the matters for which the releasing entities are providing releases.

in each case, from any and all Claims, Interests, or Causes of Action whatsoever, including any derivative Claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on, relating to, or arising prior to the Effective Date from, in whole or in part, the Debtors, the restructuring, the Chapter 11 Cases, the pre- and postpetition marketing and sale process, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or

84

contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Plan (including the Plan Supplement), the RSA, the Definitive Documents, the DIP Documents, the Prepetition Warehouse Facilities (as defined in the DIP Order), or any related agreements, instruments, or other documents, the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; provided, that nothing in this Section 10.6(b) shall be construed to release the Released Parties from willful misconduct or intentional fraud as determined by a Final Order.  The Persons and Entities in (i) through (v) of this Section 10.6(b) shall be permanently enjoined from prosecuting any of the foregoing Claims or Causes of Action released under this Section 10.6(b) against each of the Released Parties.

7.    Exculpation

To the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any claim in connection with or arising out of the administration of the Chapter 11 Cases, the postpetition marketing and sale process, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors; the negotiation and pursuit of the Disclosure Statement, the RSA, the Reorganization Transaction or the Sale Transaction, as applicable, the Plan, or the solicitation of votes for, or confirmation of, the Plan; the funding or consummation of the Plan; the occurrence of the Effective Date; the DIP Documents; the Prepetition Warehouse Facilities (as defined in the DIP Order); the administration of the Plan or the property to be distributed under the Plan; the issuance of Securities under or in connection with the Plan; or the transactions in furtherance of any of the foregoing; except for fraud or willful misconduct, as determined by a Final Order.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability.

8.    Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors (or the GUC Trustee, solely with respect to Allowed General Unsecured Claims) reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

9.    Retention of Causes of Action/Reservation of Rights

Except as otherwise provided in Sections 10.5, 10.6, and 10.7 of the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, Claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of their Estates or itself in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, any affirmative Causes of Action against parties with a relationship with the Debtors including actions arising under chapter 5 of the Bankruptcy Code.  The Reorganized Debtors or the GUC Trustee in connection with the pursuit of GUC Recovery Trust Causes of Action or objection to General Unsecured Claims, shall have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff or recoupment, and other

legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.  Notwithstanding the foregoing, the Debtors and the Reorganized Debtors shall not retain any Claims or Causes of Action released pursuant to the Plan against the Released Parties.

### 10.    Solicitation of Plan

As of and subject to the occurrence of the Confirmation Date:  (i) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; and (ii) the Debtors and each of their respective directors, officers, employees, affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore are not, and on account of such offer, issuance, and solicitation shall not be, liable at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

### 11.    Corporate and Limited Liability Company Action

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (a) those set forth in Sections 5.6 and 5.7 of the Plan; (b) the performance of the RSA; and (c) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date), in each case, in accordance with and subject to the terms of the Plan.  All matters provided for in the Plan involving the corporate or limited liability company structure of the Debtors or the Reorganized Debtors, and any corporate or limited liability company action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors.  On or (as applicable) before the Effective Date, the authorized officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including, but not limited to: (i) the Amended Organizational Documents; (ii) the Exit Warehouse Facilities; (iii) the Amended and Restated Credit Facility Documents; (iv) the Exit Working Capital Facility Documents; (v) any purchase agreement in connection with the Sale Transaction or an Asset Sale Transaction; (vi) the GUC Recovery Trust Agreement; and (vii) any and all other agreements, documents, securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by Section 10.11 of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### J.    Retention of Jurisdiction

### 1.    Retention of Jurisdiction

On and after the Effective Date, the Bankruptcy Court shall retain non-exclusive jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:

(a)    to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases, including Assumption Disputes, and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting therefrom;

(b)    to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(c)    to ensure that distributions to holders of Allowed Claims are accomplished as provided for in the Plan and Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under the Plan, including, cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely paid;

(d)    to consider the allowance, classification, priority, compromise, estimation, or payment of any Claim;

(e)    to enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(f)    to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g)    to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)    to hear and determine all Fee Claims and Restructuring Expenses;

(i)    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Plan Supplement, the Global Settlement, Asset Sale Transaction, Sale Transaction, or the Confirmation Order, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(j)    to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan;

(k)    to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(l)    to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(m)    to hear, adjudicate, decide, or resolve any and all matters related to Article X of the Plan, including, without limitation, the releases, discharge, exculpations, and injunctions issued thereunder;

(n)    to resolve disputes concerning Disputed Claims or the administration thereof;

(o)    to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(p)    to enter one or more final decrees closing the Chapter 11 Cases;

(q)    to recover all Assets of the Debtors and property of the Debtors' Estates, wherever located;

(r)    to resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(s)    to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtors or the GUC Trustee pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory; and

(t)    to hear and resolve any dispute over the application to any Claim of any limit on the allowance of such Claim set forth in sections 502 or 503 of the Bankruptcy Code, other than defenses or limits that are asserted under non-bankruptcy law pursuant to section 502(b)(1) of the Bankruptcy Code.

### 2.    Courts of Competent Jurisdiction

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

### K.    Miscellaneous Provisions

### 1.    Payment of Statutory Fees

On the Effective Date and thereafter as may be required, the Reorganized Debtors shall pay all fees incurred pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for the Debtors' cases, or until such time as a final decree is entered closing the Debtors' cases, a Final Order converting the Debtors' cases to cases under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing the Debtors' cases is entered.

### 2.    Substantial Consummation of the Plan

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 3.    Plan Supplement

The Plan Supplement shall be filed with the Clerk of the Bankruptcy Court.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.  Documents included in the Plan Supplement will be posted at the website of the Debtors' notice, claims, and solicitation agent.

WEIL:\97031080\1\41703.0011

### 4.    Request for Expedited Determination of Taxes

The Debtors and the Reorganized Debtors, as applicable, shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Commencement Date through the Effective Date and, in the case of a Sale Transaction, through the dissolution of the Debtors.

### 5.    Exemption from Certain Transfer Taxes

Pursuant to section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any Lien, mortgage, deed of trust, or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including, without limitation, any deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan or the reinvesting, transfer, or sale of any real or personal property of the Debtors pursuant to, in implementation of or as contemplated in the Plan (whether to one or more of the Reorganized Debtors or otherwise), (d) the grant of collateral under the Amended and Restated Credit Facility, and (e) the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax, or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

### 6.    Amendments

(a)    *Plan Modifications*.  Subject to the terms of the RSA and all consent rights contained therein, (i) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code, and (ii) after entry of the Confirmation Order, the Debtors may, upon order of the Court, amend, modify or supplement the Plan in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, in each case without additional disclosure pursuant to section 1125 of the Bankruptcy Code.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims or Allowed Interests pursuant to the Plan and subject to the reasonable consent of the Requisite Term Lenders (and the Creditors' Committee, solely as it pertains to the Global Settlement or General Unsecured Claims), the Debtors may remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes or effects of this Plan, and any holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented.

(b)    *Other Amendments*.  Subject to the terms of the RSA, before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court.

WEIL:\97031080\1\41703.0011

### 7.    Effectuating Documents and Further Transactions

Each of the officers, managers, or members of the Reorganized Debtors is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 8.    Revocation or Withdrawal of Plan

Subject to the terms of the RSA, the Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date.  If the Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date does not occur, then:  (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, the Debtors or any other Entity; (ii) prejudice in any manner the rights of the Debtors or any other Entity; or (iii) constitute an admission of any sort by the Debtors, any Consenting Term Lenders, or any other Entity.  This provision shall have no impact on the rights of the Consenting Term Lenders or the Debtors, as set forth in the RSA, in respect of any such revocation or withdrawal.

### 9.    Dissolution of Creditors' Committee

On the Effective Date, the Creditors' Committee shall dissolve and, on the Effective Date, each member (including each officer, director, employee, or agent thereof) of the Creditors' Committee and each professional retained by the Creditors' Committee shall be released and discharged from all rights, duties, responsibilities, and obligations arising from, or related to, the Debtors, their membership on the Creditors' Committee, the Plan, or the Chapter 11 Cases, except with respect to any matters concerning any Fee Claims held or asserted by any professional retained by the Creditors' Committee.

### 10.    Severability of Plan Provisions

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors with the prior consent of the Requisite Term Lenders and the DIP Agent (acting at the direction of the Required Buyers), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Reorganized Debtors (as the case may be), and (c) nonseverable and mutually dependent.

### 11.    Governing Law

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement or a Definitive Document provides otherwise, the rights, duties,

90

and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof; provided, however, that corporate or entity governance matters relating to any Debtors or Reorganized Debtors shall be governed by the laws of the state of incorporation or organization of the applicable Debtors or Reorganized Debtors.

### 12.    Time

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 13.    Dates of Actions to Implement the Plan

In the event that any payment or act under the Plan is required to be made or performed on a date that is on a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 14.    Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns, including, without limitation, the Reorganized Debtors.

### 15.    Deemed Acts

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

### 16.    Successor and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each Entity.

### 17.    Entire Agreement

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### 18.    Exhibits to Plan

All exhibits, schedules, supplements, and appendices to the Plan (including the Plan Supplement) are incorporated into and are a part of the Plan as if set forth in full in the Plan.

### 19.    Notices

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by electronic or facsimile transmission) and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

        (a)       If to the Debtors or the Reorganized Debtors:

                Ditech Holding Corporation
                3000 Bayport Drive, Suite 985
                Tampa, FL 33607
                Attn: John Haas, General Counsel, Chief Legal Officer and Secretary
                Email: JHaas@ditech.com

                    -and-

                Weil, Gotshal & Manges LLP
                767 Fifth Avenue
                New York, New York 10153
                Attn:    Ray C. Schrock, P.C.
                          Sunny Singh
                Telephone:  (212) 310-8000
                Facsimile:  (212) 310-8007
                Email:  ray.schrock@weil.com
                          sunny.singh@weil.com

        (b)       If to the Consenting Term Lenders:

                Kirkland & Ellis LLP
                300 North LaSalle
                Chicago, Il 60654
                Attn: Patrick J. Nash Jr., P.C.
                Email:  patrick.nash@kirkland.com
                Attn: John R. Luze
                Email: john.luze@kirkland.com

After the Effective Date, the Debtors have authority to send a notice to Entities providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors, Reorganized Debtors, and Wind Down Estates, as applicable, are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

### VI.
### VALUATION ANALYSIS

As described above, the Debtors are presently engaged in the Marketing Process.  The Debtors believe that the Marketing Process is the best method of valuing their business as it allows the market to speak as to their value.  The Marketing Process is a comprehensive and arm's length process with the goal of identifying counterparties for a potential transaction.  Accordingly, to ensure that the integrity of the Marketing Process is preserved and value is maximized, the expected recoveries for Term Loan Claims are

92

not, at this time, being disclosed herein and the Debtors are not filing a valuation analysis. *See* Section 1125(b) ("The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets."); *In re Gastar Exploration Inc.*, Case No. 18-36057 (MI) (Bankr. S.D. Tex. Dec. 21, 2018) (ECF No. 282). The Debtors will file, no later than the date that the Plan Supplement is filed, the expected recoveries to creditors under the Plan and will serve notice thereof on holders of Claims in the Voting Class as promptly as practicable upon filing. Further, if necessary, the Debtors will file, no later than the date that the Plan Supplement is filed, a valuation analysis and will serve notice thereon on holders of Claims in the Voting Class as promptly as practicable upon filing.

## VII.
## TRANSFER RESTRICTIONS AND CONSEQUENCES
## UNDER FEDERAL SECURITIES LAWS

The issuance of and the distribution under the Plan of the New Common Stock shall be exempt from registration under the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code.

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale under a chapter 11 plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under a plan, if such securities are offered or sold in exchange for a claim against, or an interest in, the debtor or such affiliate, or principally in such exchange and partly for cash. In reliance upon this exemption, the New Common Stock will be exempt from the registration requirements of the Securities Act, and state and local securities laws. These securities may be resold without registration under the Securities Act or other federal or state securities laws pursuant to the exemption provided by Section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who, except with respect to ordinary trading transactions, (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution or (d) is an issuer, as used in Section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer. Further, based on the legislative history of Section 1145 of the Bankruptcy Code, a creditor who owns 10% or more of the voting securities of a reorganized debtor and/or has the right to appoint a director to the board of directors of a reorganized debtor may be presumed to be a control person, and therefore, an underwriter.

Notwithstanding the foregoing, control person underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 of the Securities Act which, in effect, permit the resale of securities received by such underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements, and certain other conditions. Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisers as to the availability of the exemption provided by Rule 144.

In any case, recipients of New Common Stock issued under the Plan are advised to consult with their own legal advisers as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability. In order to preserve the ability to utilize tax attributes following the Effective Date, the charter, bylaws, and other organizational

documents, as applicable, of the Reorganized Debtors may restrict certain transfers of the New Common Stock.

_Legends_.  To the extent certificated, certificates evidencing the New Common Stock held by holders of 10% or more of the outstanding New Common Stock, or who are otherwise underwriters as defined in Section 1145(b) of the Bankruptcy Code, will bear a legend substantially in the form below:

THE SHARES OF NEW COMMON STOCK HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS THE DEBTOR RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

## VIII.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF PLAN

The following discussion summarizes certain material U.S. federal income tax consequences of the implementation of the Plan to the Debtors (including the Reorganized Debtors) and to holders of certain Claims.  This discussion does not address the U.S. federal income tax consequences to holders of Claims or equity interests who are unimpaired or deemed to reject the Plan and does not address the consequences of a Sale Transaction.

The discussion of U.S. federal income tax consequences below is based on the Tax Code, Treasury regulations, judicial authorities, published positions of the Internal Revenue Service ("**IRS**"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect).  The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties.  The Debtors have not requested an opinion of counsel or a ruling from the IRS or any other taxing authority with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, or local tax consequences of the contemplated transactions, nor does it purport to address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (e.g., foreign taxpayers, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold their Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the "Medicare" tax on net investment income, persons subject to special accounting rules under Section 451(b) of the Code, and persons whose Claims are part of a straddle, hedging, constructive sale, or conversion transaction).  In addition, this discussion does not address U.S. federal taxes other than income taxes, nor does it apply to any person that acquired any of the New Common Stock or New Term Loan in the secondary market, unless otherwise provided herein.  This discussion assumes that the New Common Stock and the New Term Loans will be held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code and that the various debt and other arrangements to which any of the Debtors is a party will be respected for U.S. federal income tax purposes in accordance with their form.

The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon your individual circumstances. You are urged to consult your own tax advisor for the U.S. federal, state, local, non-U.S., and other tax consequences applicable under the Plan.

## A.    Consequences to the Debtors

For U.S. federal income tax purposes, DHCP is a common parent of an affiliated group of corporations which files a single consolidated U.S. federal income tax return (the "**Ditech Group**"). The Debtors estimate that, as of January 1, 2019, the Ditech Group had incurred, for U.S. federal income tax purposes, a consolidated NOL (defined below) in excess of $20 million. In addition, the Ditech Group has substantial other deferred tax assets, including substantial tax basis in excess of the fair market value of its assets based upon the valuation of the Debtors. The amount of any such NOL carryforwards and other tax attributes remain subject to audit and adjustment by the IRS. As discussed below, such NOL carryforwards and other tax attributes could, depending on the treatment under section 382 of the prior ownership change which occurred in connection with the WIMC Chapter 11 Case, be subject to current limitation. In addition, equity trading activity and certain other actions prior to the Effective Date could result in an ownership change of DHCP independent of the Plan which could adversely affect the ability to fully utilize the Ditech Group's NOLs. In an attempt to minimize the likelihood of such an ownership change occurring, the Debtors obtained at the inception of the Chapter 11 Cases an interim order from the Bankruptcy Court authorizing a protective equity trading order.

The U.S. federal income tax consequences to the Debtors with respect to the implementation of the Plan depend in part on whether the Debtors, in connection with Consenting Term Lenders, elects to consummate a potential Sale Transaction (as provided in the Restructuring Service Agreement). Absent such an election, the Plan provides for a Reorganization Transaction in which the holders of Term Loan Claims would receive New Common Stock and New Term Loans in satisfaction of the Term Loan Claims. As discussed below, in connection with the implementation of the Plan, the Debtors expect the amount of the Ditech Group's NOL carryforwards would be eliminated, and that other tax attributes (in particular, the adjusted basis in the Debtors' assets) will be reduced. In addition, the subsequent utilization of any loss and possibly other tax attributes remaining following the Effective Date may be severely restricted.

### 1.    Cancellation of Debt Income

In general, absent an exception, a debtor will realize and recognize cancellation of debt ("**COD**") income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of Cash paid, (ii) the issue price of any new indebtedness of the taxpayer issued, and (iii) the fair market value of any other new consideration (including stock of the debtor or a party related to the debtor) given in satisfaction, or as part of the discharge, of such indebtedness at the time of the exchange. Because the Plan provides that holders of Term Loans will receive New Common Stock and New Term Loans, the amount of COD will depend in part on the fair market value of the New Common Stock and the issue price of the New Term Loan. This value, and, consequently, the amount of COD that will be realized by the Debtors as a result of the Plan, cannot be determined at this time.

Under section 108 of the Tax Code, any COD of a debtor is excluded from gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. As a consequence of such exclusion, a debtor generally must reduce its tax attributes by the amount of COD that it excluded from gross income. As noted above, the amount of COD, and accordingly the amount of tax attributes required to be reduced, cannot be determined at this

time. In general, tax attributes of the debtor will be reduced in the following order: (a) net operating loss ("**NOLs**") and NOL carryovers; (b) general business credit carryovers; (c) alternative minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets, which includes the stock of subsidiaries; (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers. Alternatively, a debtor with excluded COD income may elect first to reduce the basis of its depreciable assets. The reduction of the debtor's tax attributes occurs at the end of the tax year for which the excluded COD income is realized, but only after the tax for the year of the debt discharge has been determined; in this way, the attribute reduction is generally effective as of the start of the year following the discharge. If the amount of excluded COD income exceeds available tax attributes, the excess generally is not subject to U.S. federal income tax and has no other U.S. federal income tax impact. Where the debtor joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury regulations require, in certain circumstances, that the tax attributes of the consolidated subsidiaries of the debtor and other members of the group also be reduced.

## 2.    Limitation of NOL Carryforwards and Other Tax Attributes

The WIMC Chapter 11 Case resulted in an "ownership change" of the Debtors under sections 382 and 383 of the Tax Code. With respect to that restructuring, Debtors will apply one of two special rules available under section 382 of the Tax Code in connection with an ownership change resulting from a court-ordered restructuring under chapter 11. See general discussion of section 382 rules below. A decision regarding which of those special rules Debtors will choose for the WIMC Chapter 11 Case must be made by the Reorganized Debtors in connection with filing their 2018 federal income tax return. Until this point in time, the Debtors have planned to apply the rule in section 382(l)(5) (as generally described below), but have not finally decided which of the rules to apply to the WIMC Chapter 11 Case; that decision will be made based on further development and analysis of relevant facts. The decision to use one or the other of these special rules under section 382 in respect of the WIMC Chapter 11 Case will affect both the ability to use the Debtors' NOLs and other attributes from the time of the 2018 emergence as well as the availability and ability to use such NOLs and other attributes following the Effective Date. If Debtors decide to have section 382(l)(5) apply to the WIMC Chapter 11 Case, then in connection with the ownership change of the Debtors which will result from the implementation of the Plan, the Debtors' NOLs and other tax attributes (that remain) may be rendered effectively useless for all future taxable periods following the Effective Date. If instead Debtors elect to have section 382(l)(6) (as generally described below) apply to the WIMC Chapter 11 Case, then the Debtors' NOLs and other attributes would be subject to limitation from the time of the 2018 emergence, and the attributes (that remain) may be even further limited as a result of the ownership change of the Debtors which will result from the implementation of the Plan.

Following the Effective Date, any remaining NOL carryforwards and certain other tax attributes (collectively, "**Pre-Change Losses**") will be subject to additional limitations under section 382 and 383 of the Tax Code. Any such limitation applies in addition to, and not in lieu of, the use of attributes or the attribute reduction that results from COD income arising in connection with the Plan.

If a corporation undergoes an ownership change, the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally is subject to an annual limitation. The Debtors anticipate that the distribution of the New Common Stock pursuant to the Plan will result in an "ownership change" of the Reorganized Debtors for these purposes, and that the Reorganized Debtors' use of its Pre-Change Losses will be subject to further limitation unless an exception to the general rules of section 382 and 383 of the Tax Code applies.

Generally, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then built-in losses (including, but not limited to, amortization or depreciation deductions attributable to such built-in losses) recognized during the sixty (60) month period following the "ownership change" (up to the

amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses, the deductibility of which will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) fifteen percent (15%) of the fair market value of its assets (with certain adjustments) before the ownership change. It is currently uncertain whether the Ditech Group will have a net unrealized built-in loss or a net unrealized built-in gain as of the Effective Date.

        (a)      <u>General Annual Limitation</u>

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs: 2.51 percent for February, 2019). For a corporation (or consolidated group) in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the fair market value of the stock of the corporation (or the parent of the consolidated group) is generally determined immediately after (rather than before) the ownership change, but subject to certain adjustments (the "**382(l)(6) Exception**"); in no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets.

Any unused annual limitation may be carried forward and therefore available to be utilized in a subsequent taxable year. Where a corporation is subject to a prior annual limitation, both annual limitations apply, effectively subjecting any Pre-Change Losses which pre-date the prior ownership change to the more restrictive of the limitations.

        (b)      <u>Section 382(l)(5) Bankruptcy Exception</u>

An exception to the foregoing annual limitation rules generally applies when existing shareholders and "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their equity interests or claims (as applicable), at least fifty percent (50%) of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "**382(l)(5) Exception**"). The IRS has in private letter rulings applied the 382(l)(5) Exception on a consolidated basis where the parent corporation is in bankruptcy. Generally, qualified creditors are creditors who (1) held their claims continuously for at least eighteen (18) months at the time the bankruptcy petition is filed and thereafter, (2) hold claims incurred in the ordinary course of the debtor's business and held those claims continuously since they were incurred, or (3) in certain cases, do not become five percent (5%) shareholders of the reorganized corporation.

Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not subject to the annual limitation. However, if the 382(l)(5) Exception applies, the Ditech Group's NOL carryovers will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two (2) years after the Effective Date, any further ownership change of the Ditech Group within a two-year period after the Effective Date would preclude the Ditech Group's utilization of any Pre-Change Losses at the time of the subsequent ownership change against future income. A future "ownership change" after such two-year period would subject the Reorganized Debtors to the general limitations under section 382. A debtor that qualifies for this exception may, if it so desires, elect not to have the 382(l)(5) Exception apply and instead remain subject to the annual limitation described above (as to the prior ownership change in connection with the WIMC Chapter 11 Case, the Debtors have

until the time for filing the federal income tax return for the Ditech Group for 2018 to decide about making such an election).

In order to preserve the potential to qualify for the 382(l)(5) Exception, the Debtors obtained at the inception of the Chapter 11 Cases an interim order from the Bankruptcy Court authorizing certain procedures and potential restrictions on the accumulation of Claims with persons who are or will be substantial claimholders.

(c)     Section 382(l)(6) Bankruptcy Exception

As described above, where the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), the 382(l)(6) Exception will generally apply.  When the 382(l)(6) Exception applies, a debtor corporation that undergoes an ownership change generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy.  This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the change.  The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that the debtor corporation is not required to reduce its NOLs by interest deductions in the manner described above, and the debtor may undergo a change of ownership within two years without triggering a complete elimination of its Pre-Change Losses.

### 3.     Transfer of GUC Recovery Trust Causes of Actions and other GUC Recovery Trust Assets

Pursuant to the Plan, on or before the Effective Date, the GUC Recovery Trust will be established, and on the Effective Date, all of the GUC Recovery Trust Assets will be transferred to the Liquidating Trust and a 50% undivided interest in the GUC Recovery Trust Causes of Actions will be distributed to the holders of the Term Loan Claims.  For U.S. federal income tax purposes, such transfers generally will be treated as if the Debtors sold such assets and causes of actions at then fair market value.  *See* Section E — "Tax Treatment of The GUC Recovery Trust," below.

### B.     Consequences to Holders of Term Loan Claims

This summary discusses the U.S. federal income tax consequences to holders of Term Loan Claims who are U.S. Holders and does not discuss tax consequences for those who are not U.S. Holders. The discussion below generally assumes that holders of Term Loan Claims will, as a class, vote to accept the Plan.  As used herein, the term "U.S. Holder" means a beneficial owner of Term Loan Claims, New Term Loans, or New Common Stock, that is for U.S. federal income tax purposes:

•     an individual who is a citizen or resident of the United States;

•     a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

•     an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

•     a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial

WEIL:\97031080\1\41703.0011

decisions, or if the trust has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

If a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes holds Term Loan Claims, New Term Loans, or New Common Stock, the tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership.  If you are a partner in such a partnership holding any of such instruments, you should consult your own tax advisor.

### 1.    Holders of Term Loan Claims

Pursuant to the Plan, and assuming a Reorganization Transaction occurs, holders of Allowed Term Loan Claims will receive New Common Stock, New Term Loans, and a Pro Rata share of a fifty percent (50%) undivided interest in (and thus in the net proceeds from) the GUC Recovery Trust Causes of Action (the "**50% Interest**"), in complete and final satisfaction of their Term Loan Claims.

The U.S. federal income tax consequences of the Plan to a U.S. Holder of Term Loan Claims depends, in part, on whether the holders' Claim constitutes a "security" of the Debtors for U.S. federal income tax purposes.  If a Term Loan Claim constitutes a security of the Debtors, then the receipt of New Term Loans, New Common Stock, and the 50% Interest should be treated as part of a tax "reorganization" for U.S. federal income tax purposes, in each case, with the consequences described below.  If, on the other hand, a Term Loan Claim does not constitute a security of the Debtors, then the receipt of the consideration in exchange therefor will be treated as a fully taxable transaction.

The term "security" is not defined in the Tax Code or in the Treasury regulations issued thereunder and has not been clearly defined by judicial decisions.  The determination of whether a particular debt obligation constitutes a "security" depends on an overall evaluation of the nature of the debt, including whether the holder of such debt obligation is subject to a material level of entrepreneurial risk and whether a continuing proprietary interest is intended or not.  One of the most significant factors considered in determining whether a particular debt obligation is a security is its original term.  In general, debt obligations issued with a weighted average maturity at issuance of less than five (5) years do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of ten (10) years or more constitute securities.  Additionally, the IRS has ruled that new debt obligations with a term of less than five years issued in exchange for and bearing the same terms (other than interest rate) as securities should also be classified as securities for this purpose, since the new debt represents a continuation of the holder's investment in the corporation in substantially the same form.  A holder of a Term Loan Claim is urged to consult its own tax advisor regarding the appropriate status for U.S. federal income tax purposes of its Term Loan Claim.

If each of the Term Loan Claims constitute "securities" for U.S. federal income tax purposes, the receipt of New Common Stock, New Term Loans and the 50% Interest in exchange for Term Loan Claims would qualify for reorganization exchange treatment for U.S. federal income tax purposes.  The classification as a reorganization exchange generally serves to defer the recognition of any taxable gain or loss by the U.S. Holder.  However, a U.S. Holder generally is still required to recognize any gain to the extent the holder receives "boot" in the reorganization exchange, *i.e.,* consideration other than stock or "securities" of the exchanging company – namely, the 50% Interest and, if the New Term Loans are not considered "securities" for this purpose, the New Term Loans.  Accordingly, a U.S. Holder will recognize any realized gain up to the total amount of boot received in exchange, which would equal the sum of the fair market value as of the Effective Date of the portion of the 50% Interest and the issue price of the New Term Loans received by the U.S. Holder in the exchange in respect of its Term Loans Claim (other than any portion received in respect of a Claim for for accrued but unpaid interest and possibly accrued original issue discount, or "**OID**").  In addition, even within an otherwise tax-free exchange, a U.S. Holder will have interest income to the extent of any exchange consideration allocable to accrued but unpaid interest or accrued OID not

99

previously included in income.  *See* Section B.1(a) — "Distributions in Discharge of Accrued Interest or OID," below.

If an exchange of Term Loan Claims treated as a reorganization, a U.S. Holder's aggregate tax basis in the New Term Loans (if such loans constitute "securities" for U.S. federal income tax purposes) and New Common Stock will equal such holder's aggregate adjusted tax basis in the Term Loan Claims exchanged therefor, increased by any gain or interest income recognized in the exchange, and decreased by the fair market value of the portion of the 50% Interest and, if the New Term loans do not constitute "securities," the issue price of the New Term Loans received in the exchange.  Such aggregate tax basis should be allocated among the New Common Stock and (if they constitute "securities") the New Term Loans in accordance with their relative fair market values.  In an exchange treated as a reorganization, a U.S. Holder's holding period in such carryover basis property will include its holding period in the Term Loan Claim exchanged therefor, except to the extent of any exchange consideration received in respect of accrued but unpaid interest and possibly accrued OID).  If the New Term Loans do not constitute "securities," then a U.S. Holder will have tax basis in the New Term Loan received equal to its issue price, and its holding period in such New Term Loan received should begin on the day following the exchange date.

If the exchange of a Term Loan Claim does not constitute a reorganization, the exchange will be taxable and the U.S. Holder of a Term Loan Claim will recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of the issue price of the New Term Loans, the fair market value of the New Common Stock, and the fair market value of the portion of the 50% Interest received (other than any consideration received in respect of a Term Loan Claim for accrued but unpaid interest and possibly accrued OID), and (ii) the U.S. Holder's adjusted tax basis in the Term Loan Claim exchanged (other than any tax basis attributable to accrued but unpaid interest and possibly accrued OID).  *See* Section B.1(b)— "Character of Gain or Loss," below.  In addition, a U.S. Holder of a Claim will have ordinary interest income to the extent of any exchange consideration allocable to accrued but unpaid interest or accrued OID not previously included in income.  *See* Section B.1(a) — "Distributions in Discharge of Accrued Interest or OID," below.

In the case of a taxable exchange, a U.S. Holder of Term Loan Claims will have a tax basis in the New Term Loans received equal to its issue price and a tax basis in the New Common Stock received equal to its fair market value.  The U.S. Holder's holding period in such New Term Loans and New Common Stock received should begin on the day following the exchange date.

The tax characterization of the 50% Interest as either an equity-type interest in the GUC Recovery Trust (even though receiving a direct undivided interest in the GUC Recovery Trust Causes of Action) or a separate property right is uncertain, and may depend in part on the terms and provisions of the GUC Recovery Trust Agreement.  Accordingly, each holder of a Term Loan Claim is urged to consult its tax adviser regarding the receipt and ownership of a portion of the 50% Interest, including the tax treatment of any income, loss and distributions from the GUC Recovery Trust.  *See* Section E — "Tax Treatment of The GUC Recovery Trust," below.  A U.S. Holder will have an aggregate tax basis in its undivided interest in the causes of action received equal to its fair market value, and the holder's holding period should begin on the day following the exchange date.

<div style="text-align:center">(a)    <u>Distributions in Discharge of Accrued Interest</u></div>

In general, to the extent that any exchange consideration received pursuant to the Plan by a U.S. Holder of a Claim is received in satisfaction of accrued interest or OID during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income).  Conversely, a U.S. Holder may be entitled to recognize a deductible loss to the extent any accrued interest or OID was previously included in its gross income and is not paid in full.  However, the IRS has privately

<div style="text-align:center">100</div>

ruled that a holder of a "security" of a corporate issuer, in an otherwise tax-free exchange, could not claim a current deduction with respect to any unpaid OID. Accordingly, it is also unclear whether, by analogy, a U.S. Holder of a Term Loan Claim that does not constitute a "security" would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.

The Plan provides that except as otherwise required by law (as reasonably determined by the Reorganized Debtors or Wind Down Estates), consideration received in respect of a Term Loan Claim is allocable first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to the remaining portion of such Allowed Claim, if any. *See* Section 6.17 of the Plan. There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes. You are urged to consult your own tax advisor regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid interest (including OID) and the character of any loss claimed with respect to accrued but unpaid interest (including OID) previously included in gross income for U.S. federal income tax purposes.

(b)    Character of Gain or Loss

Where gain or loss is recognized by a U.S. Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Term Loan Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Term Loan Claim was acquired at a market discount, and whether and to what extent the holder previously claimed a bad debt deduction.

A U.S. Holder that purchased its Term Loan Claims from a prior holder at a "market discount" (relative to the principal amount of the Term Loan Claims at the time of acquisition) may be subject to the market discount rules of the Tax Code. In general, a debt instrument is considered to have been acquired with "market discount" if the holder's adjusted tax basis in the debt instrument is less than (i) its stated principal amount or (ii) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a de minimis amount. Under these rules, any gain recognized on the exchange of Term Loan Claims (other than in respect of a Term Loan Claim for accrued but unpaid interest) generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the holder, on a constant yield basis) during the holder's period of ownership, unless the holder elected to include the market discount in income as it accrued. If a U.S. Holder of a Loan Claim did not elect to include market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Term Loan Claim, such deferred amounts would become deductible at the time of the exchange but, if the exchange is a reorganization exchange, only up to the amount of gain that the holder recognizes in the exchange.

In the case of an exchange of a Term Loan Claim that qualifies as a reorganization exchange, the Tax Code indicates that any accrued market discount in respect of the Term Loan Claim should not be currently includible in income under Treasury regulations to be issued, except to the extent of any gain recognized due to the receipt of boot. Any accrued market discount that is not included in income should carry over to any nonrecognition property received in exchange therefor (*i.e.,* for New Common Stock and, if treated as a "security" for U.S. federal income tax purposes, New Term Loans). Any gain recognized by a U.S. Holder upon a subsequent disposition of such New Common Stock or New Term Loans should be treated as ordinary income to the extent of any accrued market discount carried over to such stock or loans not previously included in income. To date, specific Treasury regulations implementing this rule have not been issued.

### C.      Disposition of New Common Stock

Unless a nonrecognition provision applies and subject to the discussion above with respect to market discount and the discussion below, U.S. Holders generally will recognize capital gain or loss upon the sale or exchange of the New Common Stock in an amount equal to the difference between (i) the holder's adjusted tax basis in the New Common Stock held and (ii) the sum of the cash and the fair market value of any property received from such disposition. Any such gain or loss generally should be long-term capital gain or loss if the holder's holding period for its New Common Stock is more than one year at that time. A reduced tax rate on long-term capital gain may apply to non-corporate holders. The deductibility of capital loss is subject to significant limitations.

In general, any gain recognized by a U.S. Holder upon a disposition of the New Common Stock (or any stock or property received for such New Common Stock in a later tax-free exchange) received in exchange for a Term Loan Claim will be treated as ordinary income for U.S. federal income tax purposes to the extent of (i) any ordinary loss deductions previously claimed as a result of the write-down of the Term Loan Claim, decreased by any income (other than interest income) recognized by the holder upon exchange of the Term Loan Claim, and (ii) with respect to a cash-basis holder and in addition to clause (i) above, any amounts which would have been included in its gross income if the holder's Term Loan Claim had been satisfied in full but which was not included by reason of the cash method of accounting.

### D.      Ownership and Disposition of the New Term Loan

The U.S. federal income tax consequences to a holder of a New Term Loan may depend on certain terms of the New Term Loan which have not yet been finalized. The final terms of the New Term Loan will be described at a later date in a Plan Supplement. Accordingly, depending on the final terms of the New Term Loan, the U.S. federal income tax consequences of owning and disposing of a New Term Loan may differ from that described below.

#### 1.      Payment of Interest and OID on the New Term Loan

Stated interest paid on the New Term Loan will be taxable to a U.S. Holder as ordinary interest income at the time it accrues or is received, in accordance with its method of accounting for U.S. federal income tax purposes to the extent such stated interest is "qualified stated interest." Stated interest is "qualified stated interest" if it is payable in cash at least annually. Thus, the cash interest payable on the New Term Loan is expected to be treated as qualified stated interest. The remainder of the stated interest payable on the New Term Loan is payable by the issuance of additional notes ("**PIK interest**"); the amount of PIK interest payable on the New Term Loan will be included in the determination of the OID on such debt, as discussed below. Accordingly, the New Term Loan will be issued with OID to the extent of the PIK interest and, depending on the issue price of the New Term Loan, the New Term Loan may be issued with additional OID.

If the principal amount of the New Term Loan exceeds its issue price by more than a de minimis amount, then the New Term Loan will be considered to have been issued with OID for U.S. federal income tax purposes in the amount of such excess. For these purposes, the PIK interest will be included in the principal amount of the New Term Loan at maturity and taxed as part of OID. A U.S. Holder will be required to include any such OID in income for U.S. federal income tax purposes as it accrues, regardless of its regular method of accounting, in accordance with a constant-yield method, before the receipt of cash payments attributable to this income. Under this method, a U.S. Holder generally will be required to include in income increasingly greater amounts of OID in successive accrual periods.

If the New Term Loan is not considered to be publicly traded, but a substantial portion of the Term Loan Claims are considered publicly traded, the issue price of the New Term Loan will be determined by reference to the fair market value of such publicly traded Term Loan Claims on the Effective Date. If the New Term Loan is publicly traded, the issue price of the New Term Loan is its fair market value. If neither the New Term Loan nor the Term Loan Claims are considered publicly traded, the issue price of the New Term Loan will equal their stated principal amount. The determination of whether a debt instrument is "publicly traded" for these purposes depends on whether such instrument is traded on an established market. A debt instrument is traded on an established market for U.S. federal income tax purposes only if they are traded on an established market during the 31-day period ending 15 days after the Effective Date. Pursuant to applicable Treasury regulations, an "established market" need not be a formal market. It is sufficient if there is a readily available sales price for an executed purchase or sale of the debt instrument, or if there is one or more "firm quotes" or "indicative quotes" for such debt, in each case as such terms are defined in applicable Treasury regulations.

Under the applicable Treasury regulations, the Reorganized Debtors are required to determine whether the New Term Loan is publicly traded and, if so, the fair market value of the New Term Loan, and make these determinations available to holders in a commercially reasonable fashion, including by electronic publication, within ninety (90) days of the issue date of the New Term Loan. The Debtors intend to make this information available on our website. Our determination is binding on a U.S. Holder unless a U.S. Holder explicitly discloses on its tax return that its determination is different and the reasons for its determination (including how it determined the fair market value of its New Term Loan or Term Loan Claims, if applicable). The Debtors expect that the New Term Loan will be considered to be "publicly traded" for U.S. federal income tax purposes and that, accordingly, the issue price of the New Term Loan will equal their fair market value on the Effective Date.

### 2. Market Discount on the New Term Loan

A U.S. Holder will have market discount with respect to a New Term Loan if its initial basis in any portion of the New Term Loan is less than the issue price of such portion of the New Term Loan, unless the difference is less than a specified de minimis amount. If a U.S. Holder's New Term Loan has market discount with respect to any portion of such New Term Loan and, if such holder so elects or has so elected, it will be required to include the market discount as ordinary income as it accrues, either on a ratable basis or on the basis of a constant-yield method. Any such election applies to all debt instruments with market discount that the U.S. Holder acquires on or after the first day of the first taxable year to which the election applies. In addition, the U.S. Holder may be required to defer, until the maturity of the New Term Loan, as applicable, or its earlier disposition (including in one of certain nontaxable transactions), the deduction of all or a portion of the interest expense on any indebtedness incurred or maintained to purchase or carry any portion of such New Term Loan with respect of which the U.S. Holder has market discount.

### 3. Acquisition and Bond Premium on the New Term Loan

A U.S. Holder will have acquisition premium with respect to a New Term Loan if its initial basis in any portion of the New Term Loan, as applicable, exceeds the issue price of such portion of the New Term Loan but does not exceed the stated redemption price at maturity of such portion of the New Term Loan. If a U.S. Holder has acquisition premium with respect to a portion of the New Term Loan, it may reduce the amount of any OID accruing on such portion of the New Term Loan for any taxable year by a portion of the acquisition premium properly allocable to that year.

If a U.S. Holder's initial basis in any portion of the New Term Loan exceeds the stated redemption price at maturity of such portion of the New Term Loan, the excess generally will constitute amortizable bond premium and the U.S. Holder will not be required to include any OID attributable to its income with respect

WEIL:\97031080\1\41703.0011

to such portion of the New Term Loan.  Generally a U.S. Holder may elect to amortize this bond premium over the remaining term of such portion of the New Term Loan using a constant yield method and apply the amortization to offset stated interest otherwise required to be included in income with respect to such portion of the New Term Loan.

### 4.        Disposition of the New Term Loan

Upon the sale or other taxable disposition of a New Term Loan, a U.S. Holder will recognize taxable gain or loss equal to the difference between the amount realized on the sale or other taxable disposition and its adjusted tax basis in the New Term Loan.  A U.S. Holder's adjusted tax basis in a New Term generally will equal its initial tax basis in the New Term Loan, increased by any OID or market discount previously included in income with respect to the New Term Loan and decreased by payments on the New Term Loan other than payments of stated interest and any previously amortized bond premium. For these purposes, the amount realized does not include any amount attributable to accrued interest, which will be taxable as interest if not previously included in income. Except to the extent attributable to any accrued market discount not previously included in income, gain or loss recognized on the sale or other taxable disposition of a New Term Loan will generally be capital gain or loss and will be long-term capital gain or loss if, at the time of sale or other taxable disposition, the New Term Loan is treated as held for more than one year. Any gain attributable to accrued market discount not previously included in income will be recharacterized as ordinary income. Long-term capital gains recognized by non-corporate taxpayers are subject to reduced tax rates. The deductibility of capital losses is subject to significant limitations.

### E.        Tax Treatment of The GUC Recovery Trust

As indicated above, the Debtors will transfer the GUC Recovery Trust Assets to the GUC Recovery Trust in accordance with the Plan and the beneficial interests therein.

### 1.        Classification of the GUC Recovery Trust

The GUC Recovery Trust is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes (other than in respect of any portion of the GUC Recovery Trust Assets allocable to, or retained on account of, Disputed Claims, as discussed below).  In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust (*i.e.,* a pass-through entity).  The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan.  The GUC Recovery Trust will be structured with the intention of complying with such general criteria.  In conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtors, the GUC Trustee and GUC Recovery Trust beneficiaries) will be required to treat the transfer of the GUC Recovery Trust Assets to the GUC Recovery Trust as (1) a transfer of the GUC Recovery Trust Assets (subject to any obligations relating to those assets) directly to GUC Recovery Trust beneficiaries (other than to the extent any GUC Recovery Trust Assets are allocable to Disputed Claims), followed by (2) the transfer by such beneficiaries to the GUC Recovery Trust of GUC Recovery Trust Assets in exchange for GUC Recovery Trust Interests. Accordingly, except in the event of contrary definitive guidance, GUC Recovery Trust beneficiaries as determined for U.S. federal income tax purposes – which, as discussed above and subject to the provisions of the GUC Recovery Trust Agreement, potentially could include holders of Term Loan Claims – will be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of GUC Recovery Trust Assets (other than such GUC Recovery Trust Assets as are allocable to Disputed Claims).

While the following discussion assumes that the GUC Recovery Trust would be so treated for U.S. federal income tax purposes, no ruling will be requested from the IRS concerning the tax status of the GUC Recovery Trust as a grantor trust.  Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the GUC Recovery Trust as a grantor trust.  If the IRS were to

challenge successfully such classification, the U.S. federal income tax consequences to the GUC Recovery Trust and the holders of Claims could vary from those discussed herein.

### 2. General Tax Reporting by the GUC Recovery Trust and GUC Recovery Trust Beneficiaries

For all U.S. federal income tax purposes, all parties must treat the GUC Recovery Trust as a grantor trust of which holders of Claims who become GUC Recovery Trust beneficiaries (as determined for U.S. federal income tax purposes) are the owners and grantors. Accordingly, GUC Recovery Trust beneficiaries are treated for U.S. federal income tax purposes as the direct owners of an undivided interest in the GUC Recovery Trust Assets (other than any assets allocable to Disputed Claims), consistent with their economic interests therein. The GUC Trustee will file tax returns for the GUC Recovery Trust treating the GUC Recovery Trust as a grantor trust pursuant to section 1.671-4(a) of the Treasury regulations. The GUC Trustee also shall annually send to each GUC Recovery Trust beneficiary a separate statement regarding the receipts and expenditures of the GUC Recovery Trust as relevant for U.S. federal income tax purposes.

All taxable income and loss of the GUC Recovery Trust will be allocated among, and treated as directly earned and incurred by, the GUC Recovery Trust beneficiaries with respect to such GUC Recovery Trust beneficiary's undivided interest in the GUC Recovery Trust Assets (and not as income or loss with respect to its prior Claims), with the possible exception of any taxable income and loss allocable to any assets allocable to, or retained on account of, Disputed Claims. The character of any income and the character and ability to use any loss will depend on the particular situation of the GUC Recovery Trust beneficiary.

In accordance with the GUC Recovery Trust Agreement, the GUC Trustee will make a good faith valuation of the GUC Recovery Trust Assets. All parties to the GUC Recovery Trust must consistently use such valuation for all U.S. federal income tax purposes. The valuation will be made available, from time to time, as relevant for tax reporting purposes.

The U.S. federal income tax obligations of a GUC Recovery Trust beneficiary is not dependent on the GUC Recovery Trust distributing any Cash or other proceeds. Thus, a holder of a beneficial interest may incur a U.S. federal income tax liability with respect to its allocable share of the GUC Recovery Trust's income even if the GUC Recovery Trust does not make a concurrent distribution to the holder. In general, other than in respect of Cash retained on account of Disputed Claims and distributions resulting from undeliverable distributions (the subsequent distribution of which still relates to a holder's Term Loan Claims), a distribution of Cash by the GUC Recovery Trust will not be separately taxable to a GUC Recovery Trust beneficiary since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the Cash was earned or received by the GUC Recovery Trust). Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of any subsequent distributions of Cash originally retained by the GUC Recovery Trust on account of Disputed Claims.

The GUC Trustee will comply with all applicable governmental withholding requirements (*see* section 6.19 of the Plan). Thus, in the case of any GUC Recovery Trust beneficiaries that are not U.S. persons, the GUC Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate). As indicated above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. holders; accordingly, such holders should consult their tax advisors with respect to the U.S. federal income tax consequences of the Plan, including owning an interest in the GUC Recovery Trust.

### 3. Tax Reporting for Assets Allocable to Disputed Claims

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the GUC Trustee of an IRS private letter ruling if the GUC Trustee so requests one, or the

WEIL:\97031080\1\41703.0011

**301**

receipt of an adverse determination by the IRS upon audit if not contested by the GUC Trustee), the GUC Trustee (A) may elect to treat any GUC Recovery Trust Assets allocable to, or retained on account of, Disputed Claims (a "**Disputed Claims Reserve**") as a "disputed ownership fund" governed by section 1.468B-9 of the Treasury regulations, if applicable, and (B) to the extent permitted by applicable law, will report consistently for state and local income tax purposes.

Accordingly, if a "disputed ownership fund" election is made with respect to a Disputed Claims Reserve, such reserve will be subject to tax annually on a separate entity basis on any net income earned with respect to the GUC Recovery Trust Assets (including any gain recognized upon the disposition of such assets). All distributions from such reserves (which distributions will be net of the expenses, including taxes, relating to the retention or disposition of such assets) will be treated as received by holders in respect of their Claims as if distributed by the Debtors. All parties (including, without limitation, the Debtors, the GUC Trustee and the GUC Recovery Trust beneficiaries) will be required to report for tax purposes consistently with the foregoing.

A Disputed Claims Reserve will be responsible for payment, out of the assets of the Disputed Claims Reserve, of any taxes imposed on the Disputed Claims Reserve or its assets. In the event, and to the extent, any Cash in the Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of such reserve (including any income that may arise upon the distribution of the assets in such reserve), assets of the Disputed Claims Reserve may be sold to pay such taxes.

## F.    Information Reporting and Backup Withholding

Payments of interest (including accruals of OID) or dividends and any other reportable payments, possibly including amounts received pursuant to the Plan and payments of proceeds from the sale, retirement or other disposition of the exchange consideration, may be subject to "backup withholding" (currently at a rate of 24%) if a recipient of those payments fails to furnish to the payor certain identifying information and, in some cases, a certification that the recipient is not subject to backup withholding. Backup withholding is not an additional tax. Any amounts deducted and withheld generally should be allowed as a credit against that recipient's U.S. federal income tax, provided that appropriate proof is timely provided under rules established by the IRS. Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner. Backup withholding generally should not apply with respect to payments made to certain exempt recipients, such as corporations and financial institutions. Information may also be required to be provided to the IRS concerning payments, unless an exemption applies. You should consult your own tax advisor regarding your qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds. You are urged to consult your own tax advisor regarding these regulations and whether the contemplated transactions under the Plan would be subject to these regulations and require disclosure on your tax return.

The foregoing summary has been provided for informational purposes only and does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular holder of a Term Loan Claim. All holders of Term Loan Claims are urged to consult their tax advisors concerning the federal, state, local, non U.S., and other tax consequences applicable under the Plan.

WEIL:\97031080\1\41703.0011

# IX.
# CERTAIN RISK FACTORS TO BE CONSIDERED

Prior to voting to accept or reject the Plan, holders of Claims and Interests should read and carefully consider the risk factors set forth below, in addition to the other information set forth in this Disclosure Statement including any attachments, exhibits, or documents incorporated by reference.

THIS SECTION PROVIDES INFORMATION REGARDING POTENTIAL RISKS IN CONNECTION WITH THE PLAN. THE FACTORS BELOW SHOULD NOT BE REGARDED AS THE ONLY RISKS ASSOCIATED WITH THE PLAN OR ITS IMPLEMENTATION. ADDITIONAL RISK FACTORS IDENTIFIED IN THE COMPANY'S PUBLIC FILINGS WITH THE SEC MAY ALSO BE APPLICABLE TO THE MATTERS SET OUT HEREIN AND SHOULD BE REVIEWED AND CONSIDERED IN CONJUNCTION WITH THIS DISCLOSURE STATEMENT, TO THE EXTENT APPLICABLE. THE RISK FACTORS SET FORTH IN DHCP'S ANNUAL REPORT ON FORM 10-K FOR THE FISCAL YEAR ENDED DECEMBER 31, 2017 FILED WITH THE SEC ON APRIL 16, 2018, AS UPDATED BY THE QUARTERLY REPORT ON FORM 10-Q FOR THE QUARTER ENDED MARCH 31, 2018 FILED WITH THE SEC ON JUNE 6, 2018, THE QUARTERLY REPORT ON FORM 10-Q FOR THE QUARTER ENDED JUNE 30, 2018 FILED WITH THE SEC ON AUGUST 9, 2018, AND THE QUARTERLY REPORT ON FORM 10-Q FOR THE QUARTER ENDED SEPTEMBER 30, 2018 FILED WITH THE SEC ON NOVEMBER 14, 2018 ARE HEREBY INCORPORATED BY REFERENCE. NEW FACTORS, RISKS AND UNCERTAINTIES EMERGE FROM TIME TO TIME AND IT IS NOT POSSIBLE TO PREDICT ALL SUCH FACTORS, RISKS AND UNCERTAINTIES.

## A.    Certain Bankruptcy Law Considerations

### 1.    General

While the Debtors believe that the Chapter 11 Cases will be of short duration and will not be materially disruptive to the Company's business, the Debtors cannot be certain that this will be the case. Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed. Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan could have an adverse effect on the Company's business. Among other things, it is possible that bankruptcy proceedings could adversely affect the Company's relationships with its key customers and employees. In addition, the bankruptcy proceedings may divert some of the attention of the Debtors' management away from business operations and the Company will incur additional expenses.

### 2.    Risk of Non-Confirmation of Plan

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes. Moreover, the Debtors can make no assurances that it will receive the requisite acceptances to confirm the Plan, and even if the Voting Class (defined below) voted in favor of the Plan or the requirements for "cramdown" are met with respect to any Class that rejected the Plan, the Bankruptcy Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Plan. If the Plan is not confirmed, it is unclear what distributions (if any) holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of reorganization.

### 3. Risk of Failing to Satisfy Vote Requirement

In the event that the Debtors are unable to get sufficient votes from the Voting Class, the Debtors may seek to accomplish an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to holders of Allowed Claims and Parent Equity Interests as those proposed in the Plan.

### 4. Risk of Non-Consensual Confirmation

In the event that any impaired class of Claims or Parent Equity Interests does not accept or is deemed not to accept the Plan, the Bankruptcy Court may nevertheless confirm such Plan at the request of the Debtors if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. Should any Class vote to reject the Plan, then these requirements must be satisfied with respect to such rejecting Classes. The Debtors believe that the Plan satisfies these requirements.

### 5. Risk of Non-Occurrence of Effective Date

There can be no assurance as to the timing of the Effective Date. If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Section 9.3 of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

### 6. Risk of Termination of Restructuring Support Agreement

The Restructuring Support Agreement contains certain provisions that give the parties the ability to terminate the Restructuring Support Agreement if various conditions are satisfied. As noted above, termination of the Restructuring Support Agreement could result in protracted Chapter 11 Cases, which could significantly and detrimentally impact the Company's relationships with GSEs, regulators, government agencies, vendors, suppliers, employees, and major customers. If the Restructuring Support Agreement is terminated, each vote or any consent given by any Consenting Term Lender prior to such termination will be deemed null and void *ab initio*. If the termination of the Restructuring Support Agreement takes place when Bankruptcy Court approval is required for a Consenting Term Lender to change or withdraw its vote to accept the Plan, the Company has agreed to support and not oppose any such attempt to change or withdraw a vote. Future termination of the Restructuring Support Agreement is an "Event of Default" under the Debtors' DIP Facilities. If the Debtors lose access to their DIP Facilities it may force the Debtors to liquidate the Company.

### 7. Risk Related to Parties in Interest Objecting to Debtors' Classification of Claims and Equity Interests

Bankruptcy Code Section 1122 provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that a party in interest will not object or that the Bankruptcy Court will approve the classifications.

### 8. Risk Related to Possible Objections to Plan

There is a risk that certain parties could oppose and object to the Plan in the Bankruptcy Court either in its entirety or to specific provisions of the Plan. While the Debtors believe that the proposed Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

### 9. Conversion to Chapter 7 Case

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a chapter 7 trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. See Article XII hereof, as well as the liquidation analysis, which will be filed no later than the date on which the Plan Supplement is filed and served on holders of Claims in the Voting Class as promptly as practicable upon filing (the "**Liquidation Analysis**"), for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests on a Debtor-by-Debtor basis.

## B. Additional Factors Affecting Value of Reorganized Debtors

### 1. Claims Could be More than Projected

There can be no assurance that the estimated Allowed amount of Claims in certain Classes will not be significantly more than projected, which, in turn, could cause the value of distributions to be reduced substantially. Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate results. Therefore, the actual amount of Allowed Claims may vary from the Debtors' Financial Projections and feasibility analysis, and that variation may be material.

### 2. Projections and Other Forward-Looking Statements are not Assured, and Actual Results May Vary

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, and contains (i) estimates and assumptions which might ultimately prove to be incorrect and (ii) projections which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed. The future results of the Reorganized Debtors are dependent upon various factors, many of which are beyond the control or knowledge of the Debtors, and consequently are inherently difficult to project. The Reorganized Debtors' actual future results may differ materially (positively or negatively) from the Financial Projections and as a result, the actual total enterprise value of the Reorganized Debtors may be significantly higher or lower than the estimated range herein.

## C. Risks Relating to Debtors' Business and Financial Condition

### 1. Risks Associated with Debtors' Business and Industry

The Debtors' business is subject to extensive regulation by federal, state and local governmental and regulatory authorities. Further, in recent years the policies, laws, rules and regulations applicable to the Debtors' business have been rapidly evolving. Such changes, as well as the actual or alleged failure to comply with applicable federal, state, and local laws and regulations, GSE, Ginnie Mae and other business counterparty requirements, or to implement and adhere to adequate remedial measures designed to address

any identified compliance deficiencies, may have an adverse consequence on the Company or its business, in addition to the following factors, risks or uncertainties that may affect the Company or its business:

- Limitations, restrictions or complete bans on the Debtors' business or various segments of the business;

- Damage to the Debtors' reputation;

- Scrutiny of the industry by, and potential enforcement actions by, federal and state authorities;

- The substantial resources (including senior management time and attention) the Company devotes to, and the significant compliance costs the Company incurs in connection with, regulatory compliance and regulatory examinations and inquiries, and any consume redress, fines, penalties or similar payments made in connection with resolving such matters;

- Uncertainties relating to interest curtailment obligations and any related financial and litigation exposure (including exposure relating to false claims);

- Potential costs and uncertainties, including the effect on future revenues, associated with and arising from litigation, regulatory investigations, and other legal proceedings, and uncertainties relating to the reaction of key counterparties to the announcement of any such matters;

- Dependence on GSEs and agencies (especially Fannie Mae, Freddie Mac and Ginnie Mae) and their residential loan programs and the Company's ability to maintain relationships with such entities, and uncertainties relating to the status and future role of GSEs and agencies;

- Ability to remain qualified as a GSE and agency approved seller, servicer or component servicer, including the ability to continue to comply with the GSEs' and agencies' respective residential loan selling and servicing guides;

- The ability to maintain the loan servicing, loan origination or collection agency licenses and/or third-party default specialists, or any other licenses necessary to operate the business, or changes to, or ability to comply with, licensing requirements;

- The ability to comply with the terms of the stipulated order resolving allegations arising from an Federal Trade Commission and CFPB investigation of Ditech Financial and RMS;

- The ability to comply with HUD Guidelines or VA regulations regarding mortgage loan conditions;

- Operational risks inherent in the mortgage servicing and mortgage origination businesses, including the ability to comply with the various contracts to which the Company is a party and reputational risks;

- Risks related to a significant amount of senior management turnover and employee reductions;

- Risks related to the substantial level of indebtedness, including ability to comply with covenants contained in debt agreements or obtain any necessary waivers or amendments, generate sufficient cash to service such indebtedness and refinance such indebtedness on favorable terms, if at all, as well as the ability to incur substantially more debt;

- The ability to maintain or grow the residential loan servicing or subservicing business and the mortgage loan originations business;

- The ability to achieve the Company's strategic initiatives, particularly the ability to: enter into new subservicing arrangements; improve servicing performance, successfully develop origination capabilities; and execute and realize planned operational improvements and efficiencies;

- The success of the business strategy in returning to sustained profitability;

- Changes in prepayment rates and delinquency rates on the loans serviced and subserviced;

WEIL:\97031080\1\41703.0011

- A downgrade of, other adverse change, relating to, or the Company's inability to improve the servicer rating or credit ratings;

- The Company's ability to collect reimbursements for servicing advances and earn and timely receive incentive payments and ancillary fees on the servicing portfolio;

- The ability to collect indemnification payments and enforce repurchase obligations relating to mortgage loans the Company purchases from correspondent clients and the ability to collect in a timely manner indemnification payments relating to servicing rights purchased from prior servicers;

- Local, regional, national, and global economic trends and developments in general, and local, regional, and national real estate and residential mortgage market trends in particular, including the volume and pricing of home sales and uncertainty regarding the levels of mortgage originations and prepayments;

- Risks associated with the reverse mortgage business, including changes to reverse mortgage programs operated by FHA, HUD, or Ginnie Mae; the Company's ability to accurately estimate interest curtailment liabilities; the Company's ability to fund HECM repurchase obligations; the Company's ability to fund principal additions on the HECM loans, and the Company's ability to securitize the HECM tails;

- Changes in interest rates and the effectiveness of any hedge the Company may employ against such changes;

- Risks and potential costs associated with technology and cybersecurity, including: the risks of technology failures and of cyber-attacks against us or our vendors; our ability to adequately respond to actual or attempted cyber-attacks; and our ability to implement adequate internal security measures and protect confidential borrower information;

- Risks and potential costs associated with the implementation of new or more current technology, the use of vendors, or the transfer of the Company's servers or other infrastructure to new data center facilities;

- Risks related to the Company's deferred tax asset, risk of an "ownership change," including uncertainties as to the Company's ability to preserve the tax assets through and after a bankruptcy filing;

- The ability to renew advance financing facilities or warehouse facilities on favorable terms, or at all, and maintain adequate borrowing capacity under such facilities;

- Risks related to the concentration of the Company's subservicing portfolio and the ability of the Company's subservicing clients to terminate the Company as a subservicer;

- The ability of Fannie Mae, Freddie Mac and Ginnie Mae, as well as other clients and credit owners, to transfer or otherwise terminate our servicing or subservicing rights, with or without cause;

- The effects of competition on existing and potential future business, including the impact of competitors with greater financial resources and broader scopes of operation;

- The expiration of, or changes to, government mortgage modification, refinancing or other programs;

- The ability to comply with evolving and complex accounting rules, many of which involve significant judgment and assumptions;

- The ability to implement and maintain effective internal controls over financial reporting and disclosure controls and procedures;

111

- Uncertainties regarding impairment charges relating to the intangible assets of the Company;

- Risks related to the Company's relationship with Walter Energy;

- Administrative fines and financial penalties;

- Litigation, including class action lawsuits; and

- Civil and criminal liability.

### 2.    Loss of Subservicing Clients

The Company, as of December 31, 2018, subserviced 0.8 million forward and reverse loan accounts with an unpaid principal balance of $111.7 billion.  Under the Company's subservicing contracts, the primary servicers for whom the Company conducts subservicing activities have the right to terminate such contracts, with or without cause, with generally 60-90 days' notice.  In some instances, the subservicing contracts require payment to the Company of deboarding, deconversion or other fees in connection with any termination thereof, while in other instances there is little to no consideration owed to the Company in connection with the termination of subservicing contract.  The Company's business may suffer significant hardship if these subservicing contracts are terminated.

As described above, on January 17, 2019, the Company received notice from NRM, its largest subservicing customer, terminating the Subservicing Agreement for cause.  The Debtors have disputed NRM's basis for termination and intend to explore all legal remedies against NRM in connection with the timing and issuance of the Termination Notice.  NRM asserts that the Termination Notice was properly issued, was based on the occurrence of certain alleged termination events and was effective to terminate the Subservicing Agreement.  The Debtors, NRM and its parent company, New Residential Investment Corp., have each reserved all rights and remedies with respect to the Subservicing Agreement and the purported termination thereof.  The Company is evaluating the impact, if any, of any fees and costs payable in connection with the termination of the Subservicing Agreement.

### 3.    Downgrade in the Company's Servicer Ratings

Standard & Poor's and Moody's rate the Company as a residential loan servicer.  Certain of these ratings have been downgraded in the past, and any of these ratings may be downgraded in the future.  Any such downgrade could adversely affect the Company, financial condition, or results of operations, as well as the Company's ability to finance servicing advances and maintain the Company's status as an approved servicer by Fannie Mae, Freddie Mac, and Ginnie Mae.  The Company's failure to maintain favorable or specified ratings may cause the Company's termination as servicer and further impair the Company's ability to consummate future servicing transactions.

### 4.    Risk of Ginnie Mae, Fannie Mae, and Freddie Mac Termination

Under the terms of the Ginnie MBS Guide and the required Ginnie Mae Guaranty Agreement that is executed in connection with each GMBS the Company issues (together with related documents, the "**Ginnie Mae Guaranty Agreement**"), Ginnie Mae may terminate Ditech Financial for cause as the issuer of GMBS and as servicer of the underlying mortgage loans, and transfer all of Ditech Financial's rights as issuer and servicer, including the servicing rights relating to the mortgage loans underlying the GMBS issued by the Company, to a third party without payment to the Company of any consideration in connection therewith.  Events that could allow Ginnie Mae to terminate the Company as issuer and servicer include, without limitation, the impending or actual insolvency of Ditech Financial; any withdrawal or suspension of Ditech Financial's status as an approved mortgagee by FHA or an approved seller/servicer by Fannie Mae or Freddie Mac; or any change to Ditech Financial's business condition which materially and adversely affects its ability to carry out its obligations as an approved Ginnie Mae issuer.  A default by Ditech Financial's

affiliate, RMS, under RMS's Ginnie Mae Guaranty Agreements may also result in an event of default under Ditech Financial's Ginnie Mae Guaranty Agreement under a cross-default agreement among Ginnie Mae, Ditech Financial, and RMS, which could result in the Company's termination as issuer and servicer of all GMBS and HMBS.  If the Company were to have the Ginnie Mae issuer and servicing rights transferred or otherwise terminated, this could materially and adversely affect the Company's business, financial condition, liquidity and results of operations.

Under the terms of Ditech Financial's master servicing agreement (including any amendments and addendums thereto) with Fannie Mae, Fannie Mae has the ability to terminate Ditech Financial as servicer for some or all of the Fannie Mae loans it services, with or without cause.  In connection with such termination by Fannie Mae without cause, Ditech Financial would have a right to a specified termination fee; however, in connection with such termination by Fannie Mae for cause, Ditech Financial would not have any right to a termination fee or other consideration in connection with such termination and the related transfer of servicing rights to another servicer.  Events that could allow Fannie Mae to terminate Ditech Financial for cause as servicer of some or all of the Fannie Mae loans include, without limitation, a breach of the mortgage selling and servicing contract by Ditech Financial; unacceptable performance as determined by Fannie Mae with regard to Ditech Financial's compliance with, among other things, servicer performance as determined by Fannie Mae with regard to Ditech Financial's compliance with, among other things, servicer performance measurements and any written performance improvement plan; Ditech Financial's insolvency, the adjudication of Ditech Financial as bankrupt or the execution by Ditech Financial of a general assignment for the benefit of its creditors; any change in Ditech Financial's financial status that, in Fannie Mae's opinion, materially and adversely affects Ditech Financial's ability to provide satisfactory servicing of mortgages; the sale of a majority interest in Ditech Financial without Fannie Mae's prior written consent; a change in Ditech Financial's financial or business condition, or in its operations, which, in Fannie Mae's sole judgment, is material and adverse; Ditech Financial has certain delinquency rates or REO Property rates more than 50% higher than the average of such rates for certain specified Fannie Mae portfolios; and any judgment, order, finding, or regulatory action to which Ditech Financial is subject that would materially and adversely affect Ditech Financial's ability to comply with the terms or conditions of its Fannie Mae contract.  In addition, a default by Ditech Financial's affiliate, RMS, under RMS's agreements with Fannie Mae may also result in an event of default under Ditech Financial's Fannie Mae contract under a cross-default agreement.

Under the terms of Ditech Financial's master servicing agreement and the Freddie Mac Seller/Servicer Guide (including any amendments and addendums thereto), Freddie Mac has the ability to terminate Ditech Financial as servicer for some or all of the Freddie Mac loans it services, with or without cause.  If Freddie Mac terminated Ditech Financial without cause, Ditech Financial would have a right to a specified termination fee; however, if Freddie Mac terminates Ditech Financial as servicer for cause, Ditech Financial would not have any right to a termination fee or other consideration in connection with such termination and the related transfer of servicing rights to another servicer.  Events that could allow Freddie Mac to terminate Ditech Financial for cause as servicer of some or all of the Freddie Mac loans include, without limitation, the impending or actual insolvency of Ditech Financial or an affiliate thereof; the filing of a voluntary petition by Ditech Financial or an affiliate thereof under federal bankruptcy or state insolvency laws; Ditech Financial's failure to maintain qualified staff and/or adequate facilities to assure the adequacy of servicing Freddie Mac loans; any weakness or notable change in the financial or organizational status or management of Ditech Financial or an affiliate thereof, including any adverse change in profitability or liquidity that, in the opinion of Freddie Mac, could adversely affect Freddie Mac; Ditech Financial's failure to meet any eligibility requirement, including failure to maintain acceptable net worth or other indicia of financial soundness; Ditech Financial having delinquency rates or REO rates higher than certain averaged; and Freddie Mac's determination that Ditech Financial's overall performance is unacceptable (taking into account, among other things, scorecard results that rate absolute and comparative performance with respect

to various measures such as loss mitigation, workout effectiveness, default timeline management, data integrity, investor reporting, and alternatives to foreclosure).

### 5.    DIP Facilities

The DIP Facilities are intended to provide liquidity to the Debtors during the pendency of the Chapter 11 Cases. If the Chapter 11 Cases take longer than expected to conclude, the Debtors may exhaust or lose access to their financing. There is no assurance that the Debtors will be able to obtain additional financing from the Debtors' existing lenders or otherwise. In either such case, the liquidity necessary for the orderly functioning of the Debtors' business may be materially impaired.

Relatedly, the continuation of the National Founders Facility is necessary for RMS's servicing activities during the Chapter 11 Cases. There can be no assurance that National Founders will continue to provide RMS access to postpetition credit for servicing advances or that it would agree to forbear from seeking to enforce remedies against RMS's non-debtor affiliate, each of which would materially disrupt the Debtors' business.

### 6.    Post-Effective Date Indebtedness

Following the Effective Date, in the Reorganization Transaction only, the Reorganized Debtors expect to have outstanding funded debt of up to approximately $550 million. The Reorganized Debtors' ability to service their debt obligations will depend on, among other things, the Debtors' compliance with affirmative and negative covenants, the Debtors' future operating performance, which depends partly on economic, financial, competitive, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may not be able to generate sufficient cash from operations to meet their debt service obligations as well as fund necessary capital expenditures. In addition, if the Reorganized Debtors need to refinance their debt, obtain additional financing, or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

### D.    <u>Factors Relating to Securities to be Issued Under Plan, Generally</u>

### 1.    Market for Securities

There is currently no market for the New Common Stock and there can be no assurance as to the development or liquidity of any market for any such securities. The Reorganized Debtors are under no obligation to list any securities on any national securities exchange. Therefore, there can be no assurance that any of the foregoing securities will be tradable or liquid at any time after the Effective Date. If a trading market does not develop or is not maintained, holders of the foregoing securities may experience difficulty in reselling such securities or may be unable to sell them at all. Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in this Disclosure Statement depending upon many factors including, without limitation, prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for, the Reorganized Debtors.

### 2.    Potential Dilution

The ownership percentage represented by the New Common Stock distributed on the Effective Date under the Plan will be subject to dilution from the conversion of any options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence, including under the Management Incentive Plan.

In the future, similar to all companies, additional equity financings or other share issuances by any of the Reorganized Debtors could adversely affect the value of the New Common Stock. The amount and dilutive effect of any of the foregoing could be material.

### E.    Risk Related to Obtaining Exit Financing

During the course of these Chapter 11 Cases, the Debtors will solicit commitments to provide exit financing to refinance the DIP Facilities prior to the Effective Date. However, there is no assurance that such commitments will be obtained, which will hinder the Debtors' ability to consummate the Reorganization Transaction. As of the date of this Disclosure Statement, the Debtors have not received any commitment for an Exit Working Capital Facility. Even if the Debtors are able to obtain a commitment for an Exit Working Capital Facility, there can be no assurance that the Reorganized Debtors will be able to meet the terms of such exit facility and there is a risk that the Reorganized Debtors default thereunder and the lenders take enforcement action against the Reorganized Debtors, including execution or foreclosure against assets of the Reorganized Debtors.

### F.    Risks Related to Investment in New Common Stock

#### 1.    Significant Holders

Pursuant to the Plan, certain holders of Term Loan Claims may acquire a significant ownership interest in the New Common Stock. If such holders of New Common Stock were to act as a group, such holders would be in a position to control all actions requiring stockholder approval, including the election of directors, without the approval of other stockholders. This concentration of ownership could also facilitate or hinder a negotiated change of control of the Reorganized Debtors and, consequently, have an impact upon the value of the New Common Stock.

#### 2.    Equity Interests Subordinated to Reorganized Debtors' Indebtedness

In any subsequent liquidation, dissolution, or winding up of the Reorganized Debtors, the New Common Stock will rank below all debt claims against the Reorganized Debtors. As a result, holders of the New Common Stock will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all the Reorganized Debtors' obligations to its debt holders have been satisfied.

#### 3.    Implied Valuation of New Common Stock Not Intended to Represent Trading Value of New Common Stock

The valuation of the Reorganized Debtors may not represent the trading value of the New Common Stock in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things: (1) prevailing interest rates; (2) conditions in the financial markets; (3) the anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis; and (4) other factors that generally influence the prices of securities. The actual market price of the New Common Stock is likely to be volatile. Many factors including factors unrelated to the Reorganized Debtors' actual operating performance and other factors not possible to predict, could cause the market price of the New Common Stock to rise and fall. Accordingly, the implied value, stated herein and in the Plan, of the securities to be issued does not necessarily reflect, and should not be construed as reflecting, values that will be attained for the New Common Stock in the public or private markets.

WEIL:\97031080\1\41703.0011

### 4.    No Intention to Pay Dividends

The Reorganized Debtors do not anticipate paying any dividends on the New Common Stock as they expect to retain any future cash flows for debt reduction and to support operations.  As a result, the success of an investment in the New Common Stock will depend entirely upon any future appreciation in the value of the New Common Stock.  There is, however, no guarantee that the New Common Stock will appreciate in value or even maintain its initial value.

### 5.    The New Common Stock May be Subject to Further Dilution

The New Common Stock to be issued on the Effective Date is subject to dilution from the Management Incentive Plan.  In addition, in the future, the Company may issue equity securities in connection with future investments, acquisitions or capital rising transactions.  Such issuances or grants could constitute a significant portion of the then-outstanding common stock, which may result in a dilution in ownership of common stock, including shares of New Common Stock issued pursuant to the Plan.

### G.    Additional Factors

### 1.    Debtors Could Withdraw Plan

Subject to the terms of, and without prejudice to, the rights of any party to the Restructuring Support Agreement, the Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtors.

### 2.    Debtors Have no Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### 3.    No Representations Outside Disclosure Statement are Authorized

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

### 4.    No Legal or Tax Advice is Provided by Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each Claim or Interest holder should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### 5.    No Admission Made

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or on holders of Claims or Interests.

WEIL:\97031080\1\41703.0011

### 6.      Certain Tax Consequences

For a discussion of certain tax considerations to the Debtors and certain holders of Claims in connection with the implementation of the Plan, see Article VIII hereof.

### X.
### VOTING PROCEDURES AND REQUIREMENTS

### A.      Voting Deadline

Before voting to accept or reject the Plan, each Eligible Holder (defined below) as of the Voting Record Date should carefully review the Plan attached hereto as Exhibit A.  All descriptions of the Plan set forth in this Disclosure Statement are subject to the terms and conditions of the Plan.

Ballots will be provided for holders of Voting Claims as of the Voting Record Date (May 8, 2019) to vote to accept or reject the Plan (a "**Ballot**").  Only holders of Class 3 Claims (Term Loan Claims) (the "**Eligible Holders**") are entitled to vote to accept or reject the Plan.  Because Classes 1, 2, 6 (in a Reorganization Transaction), 7, and 8 are unimpaired and deemed to accept, and Classes 4, 5, 6 (in a Sale Transaction), 9, and 10 are conclusively deemed to reject, only Class 3 is entitled to vote.

Each Ballot contains detailed voting instructions and sets forth in detail, among other things, the deadlines, procedures, and instructions for voting to accept or reject the Plan, the Voting Record Date for voting purposes, and the applicable standards for tabulating Ballots.

The Debtor has engaged Epiq Corporate Restructuring, LLC as its voting agent (the "**Voting Agent**") to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan.

THE VOTING DEADLINE IS 4:00 P.M., PREVAILING EASTERN TIME, ON JUNE 10, 2019, UNLESS EXTENDED BY THE DEBTORS (THE "**VOTING DEADLINE**").

CLASS 3:  IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE EXECUTED IN ACCORDANCE WITH THE INSTRUCTIONS INCLUDED IN THE BALLOT AND RECEIVED BY THE VOTING AGENT AT THE ADDRESS SET FORTH BELOW ON OR BEFORE THE VOTING DEADLINE.

Delivery of a Ballot must conform to the instructions on the Ballot.  Mailed Ballots must be returned by the Voting Deadline with an original signed copy to:

By Overnight Courier or Hand Delivery:

**DITECH BALLOT PROCESSING
C/O EPIQ CORPORATE RESTRUCTURING, LLC
10300 SW ALLEN BOULEVARD
BEAVERTON, OREGON 97005**

By First Class Mail:

**DITECH BALLOT PROCESSING
C/O EPIQ CORPORATE RESTRUCTURING, LLC
P.O. BOX 4422
BEAVERTON, OREGON 97076-4422**

FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE EXECUTED IN ACCORDANCE WITH THE INSTRUCTIONS INCLUDED IN THE APPLICABLE BALLOT AND MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT NO LATER THAN THE VOTING DEADLINE.

ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED. THE DEBTORS, IN THEIR SOLE DISCRETION, MAY REQUEST THAT THE VOTING AGENT ATTEMPT TO CONTACT SUCH VOTERS TO CURE ANY SUCH DEFECTS IN THE BALLOTS. THE FAILURE TO VOTE DOES NOT CONSTITUTE A VOTE TO ACCEPT OR REJECT THE PLAN.    AN OBJECTION TO THE CONFIRMATION OF THE PLAN, EVEN IF TIMELY SERVED, DOES NOT CONSTITUTE A VOTE TO ACCEPT OR REJECT THE PLAN.

### B.    Voting Procedures

The Debtors are providing copies of this Disclosure Statement (including all exhibits and appendices) and related materials and a Ballot (collectively, a "**Solicitation Package**") to record holders of the Term Loan Claims.  In order to vote, holders of Term Loan Claims should provide all of the information requested by the Ballot and, as applicable, should complete and deliver their completed Ballots so that they are actually received by the Voting Agent no later than the Voting Deadline.

### C.    Parties Entitled to Vote

Under the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on a plan.  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and interests do not actually vote on the plan.  If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan by a class of:  (i) claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims that cast ballots for acceptance or rejection of the plan; and (ii) interests as acceptance by interest holders in that class that hold at least two-thirds (2/3) in dollar amount of the interests that cast ballots for acceptance or rejection of the plan.

Class 3 (Term Loan Claims) is impaired under the Plan and the only Class of Claims or Interests entitled to vote to accept or reject the Plan (the "**Voting Class**" or the "**Voting Claims**").

Claims in all other Classes are either unimpaired and deemed to accept or impaired and deemed to reject the Plan and are not entitled to vote. For a detailed description of the treatment of Claims and Interests under the Plan, *see* Article I of this Disclosure Statement.

The Debtors will request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code over the deemed rejection of the Plan by all classes deemed to reject, Parent Equity Interests, and Subordinated Securities Claims. Section 1129(b) of the Bankruptcy Code permits the confirmation of a chapter 11 plan notwithstanding the rejection of such plan by one or more impaired classes of claims or interests. Under section 1129(b), a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class. For a more detailed description of the requirements for confirmation of a nonconsensual plan, *see* Article XI of this Disclosure Statement.

### 1.      Miscellaneous

All Ballots must be signed by the Eligible Holder, or any person who has obtained a properly completed Ballot proxy from the Eligible Holder by the Voting Record Date. Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted. The Debtors, in their sole discretion, may request that the Voting Agent attempt to contact such voters to cure any such defects in the Ballots. Any Ballot marked to both accept and reject the Plan will not be counted. If you cast more than one Ballot voting the same Claim(s) before the Voting Deadline, the last valid Ballot received on or before the Voting Deadline will be deemed to reflect your intent, and thus, will supersede any prior Ballot. If you cast Ballots received by the Voting Agent on the same day, but which are voted inconsistently, such Ballots will not be counted.

An otherwise properly executed Ballot that attempts to partially accept and partially reject the Plan will likewise not be counted.

The Ballots provided to Eligible Holders will reflect the amount of such Eligible Holder's Claim; however, when tabulating votes, the Voting Agent may adjust the amount of such Eligible Holder's Claim by multiplying that amount by a factor that reflects all amounts accrued between the Voting Record Date and the Commencement Date including, without limitation, interest.

Under the Bankruptcy Code, for purposes of determining whether the requisite votes for acceptance have been received, only holders of the Term Loan Claims who actually vote will be counted. The failure of a holder to deliver a duly executed Ballot to the Voting Agent will be deemed to constitute an abstention by such holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan.

Except as provided below, unless the Ballot is timely submitted to the Voting Agent before the Voting Deadline together with any other documents required by such Ballot, the Debtors may, in their sole discretion, reject such Ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan.

### 2.      Fiduciaries and Other Representatives

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another, acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, if requested, must submit proper evidence satisfactory to the Debtor of authority to so act. Authorized signatories should submit a separate Ballot of each Eligible Holder for whom they are voting.

WEIL:\97031080\1\41703.0011

UNLESS THE BALLOT IS SUBMITTED TO THE VOTING AGENT ON OR PRIOR TO THE VOTING DEADLINE, SUCH BALLOT WILL BE REJECTED AS INVALID AND WILL NOT BE COUNTED AS AN ACCEPTANCE OR REJECTION OF THE PLAN; PROVIDED, HOWEVER, THAT THE DEBTORs RESERVE THE RIGHT, IN their SOLE DISCRETION, TO REQUEST THE BANKRUPTCY COURT TO ALLOW SUCH BALLOT TO BE COUNTED.

### 3.    Agreements Upon Furnishing Ballots

The delivery of an accepting Ballot pursuant to one of the procedures set forth above will constitute the agreement of the creditor with respect to such Ballot to accept:  (i) all of the terms of, and conditions to, the solicitation; and (ii) the terms of the Plan including the injunction, releases, and exculpations set forth in Sections 10.5, 10.6, and 10.7 of the Plan.  All parties in interest retain their right to object to confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code, subject to any applicable terms of the Restructuring Support Agreement.

### 4.    Change of Vote

Subject to the terms of the Restructuring Support Agreement, any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent, properly completed Ballot voting for acceptance or rejection of the Plan.

### 5.    Waivers of Defects, Irregularities, etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by the Voting Agent and/or the Debtors, as applicable, in their sole discretion, which determination will be final and binding.  The Debtors reserve the right to reject any and all Ballots submitted by any of their respective creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful.  The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any of their creditors.  The interpretation (including the Ballot and the respective instructions thereto) by the applicable Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.  Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determines.  Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

## XI.
## CONFIRMATION OF PLAN

### A.    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties.  The Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing.  Notice of the Confirmation Hearing will be provided to all known creditors and equity holders or their representatives.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjourned date made at the

Confirmation Hearing, at any subsequent adjourned Confirmation Hearing, or pursuant to a notice filed on the docket of the Chapter 11 Cases.

### B.  Objections to Confirmation

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to confirmation of the Plan must (a) be in writing; (b) state the name and address of the objecting party and the amount and nature of the Claim or Interest of such party; (c) state with particularity the basis and nature of any objection, and provide proposed language that, if accepted and incorporated by the Debtors, would obviate such objection; (d) conform to the Bankruptcy Rules and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Southern District of New York; (e) be filed with the Bankruptcy Court, with a copy to the chambers of the United States Bankruptcy Judge appointed to the Chapter 11 Cases, together with proof of service thereof; and (f) be served upon the following parties, including such other parties as the Bankruptcy Court may order:

(a)  **The Debtor at:**

Ditech Holding Corporation
3000 Bayport Drive, Suite 985
Tampa, FL 33607
Attn:  John Haas, General Counsel, Chief Legal Officer and Secretary

(b)  **Office of the U.S. Trustee at:**

William K. Harrington, U.S. Department of Justice
Office of the U.S. Trustee
201 Varick Street, Suite 1006
New York, New York 10014
Attn:    Greg M. Zipes, Esq.
         Benjamin J. Higgins, Esq.

(c)  **Counsel to the Debtors at:**

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn:    Ray C. Schrock, P.C.
         Sunny Singh, Esq.

(d)  **Counsel to the Prepetition Administrative Agent at:**

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York, 10017
Attn:    Brian M. Resnick, Esq.
         Michelle M. McGreal, Esq.

(e)  **Counsel to the Term Loan Ad Hoc Group at:**

Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
Attn:  Patrick J. Nash Jr., P.C.
       John Luze, Esq.

(f)  **Counsel to the DIP Agent and DIP Lender at:**

Skadden, Arps, Slate, Meagher & Flom LLP
4 Times Square
New York, New York 10036
Attn:  Sarah M. Ward, Esq.
       Mark A. McDermott, Esq.
       Melissa Tiarks, Esq.

(g)  **Counsel to Nomura Corporate Funding Americas, LLC at:**

Jones Day
250 Vesey Street
New York, New York 10281
Attn:  Ben Rosenblum, Esq.

(h)  **Counsel to the Creditors' Committee at:**

Pachulski Stang Ziehl & Jones LLP
780 Third Avenue, 34th Floor
New York, New York 10017
Attn:  Robert J. Feinstein, Esq.
       Bradford J. Sandler, Esq.s
       Steven W. Golden, Esq.

       - and -

Rich Michaelson Megaliff, LP
335 Madison Avenue, 9th Floor
New York, New York 10017
Attn:  Robert N. Michaelson, Esq.
       Elwood F. Collins, Esq.

---

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

**318**

C.      **Requirements for Confirmation of Plan**

1.      **Requirements of Section 1129(a) of Bankruptcy Code**

(a)      General Requirements

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied including, without limitation, whether:

> (i)      the Plan complies with the applicable provisions of the Bankruptcy Code;

> (ii)      the Debtors have complied with the applicable provisions of the Bankruptcy Code;

> (iii)      the Plan has been proposed in good faith and not by any means forbidden by law;

> (iv)      any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

> (v)      the Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Reorganized Debtors, an affiliate of the Debtors participating in a Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of the holders of Claims and Interests and with public policy, and the Debtors have disclosed the identity of any insider who will be employed or retained by the Reorganized Debtors, and the nature of any compensation for such insider;

> (vi)      with respect to each Class of Claims or Interests, each holder of an impaired Claim or impaired Interest has either accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim or Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code;

> (vii)      except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims either accepted the Plan or is not impaired under the Plan;

> (viii)      except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that administrative expenses and priority Claims, other than Priority Tax Claims, will be paid in full on the Effective Date, and that Priority Tax Claims will receive either payment in full on the Effective Date or deferred cash payments over a period not exceeding five years after the Commencement

123

Date, of a value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claims;

(ix)    at least one Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

(x)    confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan; and

(xi)    all fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

(b)    Best Interests Test

As noted above, with respect to each impaired class of claims and equity interests, confirmation of a plan requires that each such holder either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code. This requirement is referred to as the "best interests test."

This test requires a Bankruptcy Court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtors believe that under the Plan all holders of impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code. The Debtors' belief is based primarily on (i) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims and Interests and (ii) the Liquidation Analysis (which will be filed no later than the date the Plan Supplement is filed and served on holders of Claims in the Voting Class as promptly as practicable upon filing).[18]

The Debtors believe that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors. The Liquidation Analysis will be provided solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein and will be on a Debtor-by-Debtor basis with a summary on a consolidated basis. There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that a bankruptcy court will accept the Debtors'

---

[18]    Given that the Debtors are engaged in a competitive Marketing Process, which process will establish the Debtors' value, it is appropriate that the Debtors abstain from filing any analysis that could undercut that process. *See In re LBI Media, Inc.*, Case No. 18-12655 (CSS) (Bankr. D. Del. Jan. 22, 2019) (ECF No. 360) (order approving disclosure statement where the Debtors abstained from filing liquidation analysis while pursuing marketing process).

conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

      (c)    <u>Feasibility</u>

Also as noted above, section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtor has analyzed its ability to meet its obligations under the Plan.  As part of this analysis, the Debtors have prepared the Financial Projections attached hereto as <u>Exhibit D</u>.[19]  Based upon the Financial Projections, the Debtors believe they will have sufficient resources to make all payments required pursuant to the Plan and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization. Moreover, Section VIII hereof sets forth certain risk factors that could impact the feasibility of the Plan.

      (d)    <u>Equitable Distribution of Voting Power</u>

On or before the Effective Date, pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, the organizational documents for the Debtors will be amended as necessary to satisfy the provisions of the Bankruptcy Code and will include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, (i) a provision prohibiting the issuance of non-voting equity securities and (ii) a provision setting forth an appropriate distribution of voting power among classes of equity securities possessing voting power.

## 2.    Additional Requirements for Non-Consensual Confirmation

In the event that any impaired Class of Claims or Interests does not accept or is deemed to reject the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired Class of Claims or Interests that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Classes of Claims or Interests, pursuant to section 1129(b) of the Bankruptcy Code.  Both of these requirements are in addition to other requirements established by case law interpreting the statutory requirements.

Pursuant to the Plan, holders of Interests in Class 9 (Parent Equity Interests) and Claims in Class 4 (Second Lien Note Claims), Class 5 (General Unsecured Claims), and Class 9 (Subordinated Securities Claims) will not receive a distribution and are thereby deemed to reject the Plan.  However, the Debtors submit that they satisfy the "unfair discrimination" and "fair and equitable" tests, as discussed in further detail below.

      (a)    <u>Unfair Discrimination Test</u>

The "unfair discrimination" test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan.  A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting Class are treated in a manner consistent with the treatment of other Classes whose legal rights are substantially similar to those of the dissenting Class and if no Class of Claims or Interests receives more than it legally is entitled to receive for its Claims

---

[19]    The Debtors will file updated projections in the event of the occurrence of unanticipated events that result in material changes to the projections.

WEIL:\97031080\1\41703.0011

or Interests. This test does not require that the treatment be the same or equivalent, but that such treatment is "fair."

The Debtors believe the Plan satisfies the "unfair discrimination" test. Claims of equal priority are receiving comparable treatment and such treatment is fair under the circumstances.

> (b)    Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to dissenting classes, the test sets different standards depending on the type of claims in such class. The Debtors believe that the Plan satisfies the "fair and equitable" test as further explained below.

> (i)    *Other Secured Creditors*

The Bankruptcy Code provides that each holder of an impaired secured claim either (i) retains its liens on the property to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date, of at least the allowed amount of such claim, (ii) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale or (iii) receives the "indubitable equivalent" of its allowed secured claim.

> (ii)    *Unsecured Creditors*

The Bankruptcy Code provides that either (i) each holder of an impaired unsecured claim receives or retains under the plan of reorganization, property of a value equal to the amount of its allowed claim or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive any property under the plan of reorganization. The Plan provides that the holders of General Unsecured Claims in Class 5 will receive the treatment summarized above in Article V of this Disclosure Statement.

> (iii)    *Equity Interests*

The Bankruptcy Code requires that either (a) each holder of an equity interest receive or retain under the plan property of a value equal to the greater of (i) the fixed liquidation preference or redemption price, if any, of such stock and (ii) the value of the stock, or (b) the holders of equity interests that are junior to any dissenting class of equity interests not receive any property under the plan. Pursuant to the Plan, all Intercompany Equity Interests will be cancelled, reinstated, or receive such other treatment as is determined by the Debtors and the Requisite Term Lenders and the holders of Parent Equity Interests will neither receive nor retain any property on account of such interests.

# XII.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN

The Debtors have evaluated several alternatives to the Plan. After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan. If the Plan is not confirmed and consummated, the alternatives to the Plan are (i) the preparation and presentation of an alternative plan of reorganization, (ii) a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or (iii) a liquidation under chapter 7 of the Bankruptcy Code.

WEIL:\97031080\1\41703.0011

### A.    Alternative Plan of Reorganization

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan.  Such a plan might involve either:  (i) a reorganization and continuation of the Debtors' business or (ii) an orderly liquidation of the Debtors' assets.  The Debtors, however, submit that the Plan, as described herein, enables their creditors to realize the most value under the circumstances.

### B.    Sale Under Section 363 of Bankruptcy Code

If the Plan is not confirmed, the Debtors could seek from the Bankruptcy Court, after notice and a hearing, authorization to sell their assets through a stand-alone alternative transaction under section 363 of the Bankruptcy Code.  Upon analysis and consideration of this alternative, the Debtors do not believe that a stand-alone alternative sale of their assets under section 363 of the Bankruptcy Code (as opposed to the consummation of the Sale Transaction pursuant to the Plan) would yield a higher recovery for holders of Claims and Interests than the Plan.

### C.    Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law

If no plan can be confirmed, the Chapter 11 Cases may be converted to a case under chapter 7 of the Bankruptcy Code in which a chapter 7 trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to the Debtors' creditors in accordance with the priorities established by the Bankruptcy Code.  The effect a chapter 7 liquidation would have on the recovery of holders of Allowed Claims and Interests will be set forth in the Liquidation Analysis that the Debtors will file no later than the date that the Plan Supplement is filed.

As noted in Article XII of this Disclosure Statement, the Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of the delay resulting from the conversion of the cases and the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals who would be required to become familiar with the many legal and factual issues in the Chapter 11 Cases.

WEIL:\97031080\1\41703.0011

**XIII.**
**CONCLUSION AND RECOMMENDATION**

The Debtors believe the Plan is in the best interests of all stakeholders and urge the holders of Claims in Class 3 to vote in favor thereof.

Dated:  May 9, 2019

**DEBTORS**

**DF INSURANCE AGENCY LLC**

**DITECH FINANCIAL LLC**

**DITECH HOLDING CORPORATION**

**GREEN TREE INSURANCE AGENCY OF NEVADA, INC.**

By:   /s/ Kimberly Perez
_____
Name: Kimberly Perez

Title:   Senior Vice President and Chief Accounting Officer

128

**DEBTORS**

**GREEN TREE CREDIT LLC**

**GREEN TREE CREDIT SOLUTIONS LLC**

**GREEN TREE INVESTMENT HOLDINGS III LLC**

**GREEN TREE SERVICING CORP.**

**WALTER MANAGEMENT HOLDING COMPANY LLC**

**WALTER REVERSE ACQUISITION LLC**


By:   /s/ Laura Reichel
      Name: Laura Reichel

      Title:   President

SIGNATURE PAGE TO DISCLOSURE STATEMENT

WEIL:\97031080\1\41703.0011

**<u>DEBTOR</u>**

**MARIX SERVICING LLC**

By:   /s/ Clinton Hodder
       Name: Clinton Hodder

       Title:   President

**<u>DEBTORS</u>**

**MORTGAGE ASSET SYSTEMS, LLC**

**REO MANAGEMENT SOLUTIONS, LLC**

**REVERSE MORTGAGE SOLUTIONS, INC.**

By:   /s/ Jeanetta Brown
      _____
      Name: Jeanetta Brown

      Title:   Vice President

**<u>Exhibit A</u>**

**The Joint Chapter 11 Plan**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------X
                                :

In re                                :        **Chapter 11**
                                :

**DITECH HOLDING CORPORATION, *et al.*,**  :        **Case No. 19-10412 (JLG)**
                                :

           **Debtors.[1]**               :        **(Jointly Administered)**
                                :
---------------------------------------------------------------X

## AMENDED JOINT CHAPTER 11 PLAN OF DITECH
## HOLDING CORPORATION AND ITS AFFILIATED DEBTORS

**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock, P.C.
Sunny Singh
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Debtors*
*and Debtors in Possession*

Dated:  May 9, 2019
        New York, New York

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Debtors' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

<u>Table of Contents</u>

<div align="right"><u>Page</u></div>

**ARTICLE I**    DEFINITIONS AND INTERPRETATION. ................................................................. 1

    A.      Definitions ............................................................................................................ 1
    B.      Interpretation; Application of Definitions and Rules of Construction. ......................... 14
    C.      Reference to Monetary Figures........................................................................... 14
    D.      Controlling Document. ......................................................................................... 15
    E.      Certain Consent Rights. ....................................................................................... 15

**ARTICLE II**    ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS. ................................... 15

    2.1.     Administrative Expense Claims. ........................................................................... 15
    2.2.     Fee Claims. ........................................................................................................ 15
    2.3.     Priority Tax Claims. ............................................................................................ 16
    2.4.     DIP Claims. ....................................................................................................... 16
    2.5.     Restructuring Expenses. ....................................................................................... 17

**ARTICLE III**    CLASSIFICATION OF CLAIMS AND INTERESTS. ........................................ 17

    3.1.     Classification in General. ..................................................................................... 17
    3.2.     Grouping of Debtors for Convenience Only............................................................. 17
    3.3.     Summary of Classification. .................................................................................. 17
    3.4.     Special Provision Governing Unimpaired Claims. ................................................... 18
    3.5.     Elimination of Vacant Classes. ............................................................................. 18

**ARTICLE IV**    TREATMENT OF CLAIMS AND INTERESTS................................................. 18

    4.1.     Priority Non-Tax Claims (Class 1)........................................................................ 18
    4.2.     Other Secured Claims (Class 2). .......................................................................... 19
    4.3.     Term Loan Claims (Class 3)................................................................................. 19
    4.4.     Second Lien Notes Claims (Class 4). .................................................................... 20
    4.5.     General Unsecured Claims (Class 5). .................................................................... 21
    4.6.     Borrower Non-Discharged Claims (Class 6). ......................................................... 21
    4.7.     Intercompany Claims (Class 7)............................................................................. 22
    4.8.     Intercompany Interests (Class 8)........................................................................... 22
    4.9.     Parent Equity Interests (Class 9). ......................................................................... 23
    4.10.    Subordinated Securities Claims (Class 10)............................................................. 23

**ARTICLE V**    MEANS FOR IMPLEMENTATION.................................................................. 24

    5.1.     No Substantive Consolidation................................................................................ 24
    5.2.     Compromise and Settlement of Claims, Interests, and Controversies............................ 24
    5.3.     Marketing Process. .............................................................................................. 26
    5.4.     Election Notice................................................................................................... 26
    5.5.     Sources of Consideration for Plan Distributions....................................................... 27
    5.6.     Sale Transaction. ................................................................................................. 27
    5.7.     Reorganization Transaction. ................................................................................. 28
    5.8.     Fannie Mae; Freddie Mac; Ginnie Mae................................................................. 31
    5.9.     Employee Matters. .............................................................................................. 33

<div align="center">i</div>

Table of Contents
(continued)

| | | |
|---|---|---|
| 5.10. | Effectuating Documents; Further Transactions. | 33 |
| 5.11. | Section 1145 Exemption. | 34 |
| 5.12. | Cancellation of Existing Securities and Agreements. | 34 |
| 5.13. | Cancellation of Liens. | 36 |
| 5.14. | Subordination Agreements. | 36 |
| 5.15. | Nonconsensual Confirmation. | 36 |
| 5.16. | Closing of Chapter 11 Cases. | 36 |
| 5.17. | Notice of Effective Date. | 37 |
| 5.18. | Separability. | 37 |
| 5.19. | GUC Recovery Trust. | 37 |

**ARTICLE VI   DISTRIBUTIONS** ........................................................................ 39

| | | |
|---|---|---|
| 6.1. | Distributions Generally. | 39 |
| 6.2. | Distribution Record Date. | 39 |
| 6.3. | Date of Distributions. | 40 |
| 6.4. | Disbursing Agent. | 40 |
| 6.5. | Rights and Powers of Disbursing Agent. | 40 |
| 6.6. | Expenses of Disbursing Agent. | 41 |
| 6.7. | No Postpetition Interest on Claims. | 41 |
| 6.8. | Delivery of Distributions. | 41 |
| 6.9. | Distributions after Effective Date. | 42 |
| 6.10. | Unclaimed Property. | 42 |
| 6.11. | Time Bar to Cash Payments. | 42 |
| 6.12. | Manner of Payment under Plan. | 43 |
| 6.13. | Satisfaction of Claims. | 43 |
| 6.14. | Fractional Stock and Notes. | 43 |
| 6.15. | Minimum Cash Distributions. | 43 |
| 6.16. | Setoffs and Recoupments. | 43 |
| 6.17. | Allocation of Distributions between Principal and Interest. | 43 |
| 6.18. | No Distribution in Excess of Amount of Allowed Claim. | 44 |
| 6.19. | Withholding and Reporting Requirements. | 44 |
| 6.20. | Hart-Scott-Rodino Antitrust Improvements Act. | 44 |

**ARTICLE VII PROCEDURES FOR DISPUTED CLAIMS** .................................................. 45

| | | |
|---|---|---|
| 7.1. | Objections to Claims. | 45 |
| 7.2. | Resolution of Disputed Administrative Expenses and Disputed Claims. | 45 |
| 7.3. | Payments and Distributions with Respect to Disputed Claims. | 45 |
| 7.4. | Distributions after Allowance. | 45 |
| 7.5. | Disallowance of Claims. | 45 |
| 7.6. | Estimation of Claims. | 46 |
| 7.7. | No Distributions Pending Allowance. | 46 |
| 7.8. | Claim Resolution Procedures Cumulative. | 46 |
| 7.9. | Interest. | 46 |

ii

Table of Contents
(continued)

7.10.    Insured Claims. .................................................................................... 46

**ARTICLE VIII**  EXECUTORY CONTRACTS AND UNEXPIRED LEASES. .................................. 47

8.1.    General Treatment. ............................................................................... 47
8.2.    Determination of Assumption Disputes and Deemed Consent. ................... 47
8.3.    Rejection Damages Claims. .................................................................... 48
8.4.    Insurance Policies. ................................................................................ 49
8.5.    Intellectual Property Licenses and Agreements. ...................................... 49
8.6.    Tax Agreements. ................................................................................... 49
8.7.    Assignment. ......................................................................................... 50
8.8.    Modifications, Amendments, Supplements, Restatements, or Other
          Agreements. ......................................................................................... 50
8.9.    Reservation of Rights. .......................................................................... 50

**ARTICLE IX**  CONDITIONS PRECEDENT TO CONFIRMATION OF PLAN AND
                  EFFECTIVE DATE. ................................................................................ 51

9.1.    Conditions Precedent to Confirmation of Plan. ....................................... 51
9.2.    Conditions Precedent to Effective Date. ................................................. 51
9.3.    Waiver of Conditions Precedent. ........................................................... 52
9.4.    Effect of Failure of a Condition. ............................................................ 53

**ARTICLE X**  EFFECT OF CONFIRMATION OF PLAN. ...................................................... 53

10.1.    Vesting of Assets. ............................................................................... 53
10.2.    Binding Effect. .................................................................................... 53
10.3.    Discharge of Claims and Termination of Interests. ................................. 54
10.4.    Term of Injunctions or Stays. ............................................................... 54
10.5.    Injunction. .......................................................................................... 54
10.6.    Releases. ............................................................................................ 55
10.7.    Exculpation. ........................................................................................ 56
10.8.    Subordinated Claims. .......................................................................... 57
10.9.    Retention of Causes of Action/Reservation of Rights. ............................. 57
10.10.   Solicitation of Plan. ............................................................................. 57
10.11.   Corporate and Limited Liability Company Action. .................................. 58

**ARTICLE XI**  RETENTION OF JURISDICTION. ................................................................ 58

11.1.    Retention of Jurisdiction. ..................................................................... 58
11.2.    Courts of Competent Jurisdiction. ......................................................... 60

**ARTICLE XII** MISCELLANEOUS PROVISIONS. ............................................................... 60

12.1.    Payment of Statutory Fees. .................................................................. 60
12.2.    Substantial Consummation of the Plan. ................................................. 60
12.3.    Plan Supplement. ................................................................................ 60

iii

**332**

Table of Contents
(continued)

| 12.4. | Request for Expedited Determination of Taxes. | 60 |
| 12.5. | Exemption from Certain Transfer Taxes. | 60 |
| 12.6. | Amendments. | 61 |
| 12.7. | Effectuating Documents and Further Transactions. | 61 |
| 12.8. | Revocation or Withdrawal of Plan. | 61 |
| 12.9. | Dissolution of Creditors' Committee. | 62 |
| 12.10. | Severability of Plan Provisions. | 62 |
| 12.11. | Governing Law. | 62 |
| 12.12. | Time. | 62 |
| 12.13. | Dates of Actions to Implement the Plan. | 63 |
| 12.14. | Immediate Binding Effect. | 63 |
| 12.15. | Deemed Acts. | 63 |
| 12.16. | Successor and Assigns. | 63 |
| 12.17. | Entire Agreement. | 63 |
| 12.18. | Exhibits to Plan. | 63 |
| 12.19. | Notices. | 63 |

WEIL:\97031056\1\41703.0010

Each of Ditech Holding Corporation, DF Insurance Agency LLC, Ditech Financial LLC, Green Tree Credit LLC, Green Tree Credit Solutions LLC, Green Tree Insurance Agency of Nevada, Inc., Green Tree Investment Holdings III LLC, Green Tree Servicing Corp., Marix Servicing LLC, Mortgage Asset Systems, LLC, REO Management Solutions, LLC, Reverse Mortgage Solutions, Inc., Walter Management Holding Company LLC, and Walter Reverse Acquisition LLC (each, a "**Debtor**" and, collectively, the "**Debtors**") propose the following joint chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code. Capitalized terms used herein shall have the meanings set forth in Article I.A.

## ARTICLE I    DEFINITIONS AND INTERPRETATION.

A.    **Definitions.** The following terms shall have the respective meanings specified below:

1.1    *Accepting Class* means a Class that votes to accept the Plan in accordance with section 1126 of the Bankruptcy Code.

1.2    *Administrative Expense Claim* means any right to payment constituting a cost or expense of administration incurred during the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Commencement Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Fee Claims; (c) Restructuring Expenses; (d) the DIP Claims; and (e) any other such claims expressly provided under the DIP Order.

1.3    *Affiliates* means "Affiliates" as such term is defined in section 101(2) of the Bankruptcy Code.

1.4    *Allowed* means, with reference to any Claim or Interest, a Claim or Interest (a) arising on or before the Effective Date as to which (i) no objection to allowance or priority, and no request for estimation or other challenge, including, without limitation, pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed and not withdrawn within the applicable period fixed by the Plan or applicable law, or (ii) any objection has been determined in favor of the holder of the Claim or Interest by a Final Order; (b) that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtors, Reorganized Debtors, GUC Trustee, or Plan Administrator, as applicable; (c) as to which the liability of the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, and the amount thereof are determined by a Final Order of a court of competent jurisdiction; or (d) expressly allowed hereunder; provided, however, that notwithstanding the foregoing, (x) unless expressly waived by the Plan, the Allowed amount of Claims or Interests shall be subject to and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable, and (y) the Reorganized Debtors or GUC Recovery Trust, as applicable, shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan.

1.5    *Amended and Restated Credit Facility* means, solely with respect to the Reorganization Transaction, the credit facility available under the Amended and Restated Credit Facility Agreement in an aggregate principal amount equal to $400,000,000 with Reorganized Ditech, as borrower, in accordance with and subject to the terms and conditions of the Amended and Restated Credit Facility Documents.

1.6    *Amended and Restated Credit Facility Agent* means an Entity appointed to serve as the administrative agent and collateral agent under the Amended and Restated Credit Facility Agreement, and its successors and assigns, solely in its capacity as such.

1.7    ***Amended and Restated Credit Facility Agreement*** means, solely with respect to the Reorganization Transaction, that certain credit agreement that amends and restates the Prepetition Credit Agreement, dated as of the Effective Date, among Reorganized Ditech, as borrower, the Amended and Restated Credit Facility Agent, solely in its capacity as administrative agent and collateral agent, and the Term Lenders, which shall be consistent with the terms in the RSA.

1.8    ***Amended and Restated Credit Facility Documents*** means, solely with respect to the Reorganization Transaction, collectively, the Amended and Restated Credit Facility Agreement and each other agreement, security agreement, pledge agreement, collateral assignment, mortgage, control agreement, guarantee, certificate, document or instrument executed and/or delivered in connection with any of the foregoing, whether or not specifically mentioned herein or therein, as the same may be modified, amended, restated, supplemented or replaced from time to time.

1.9    ***Amended Organizational Documents*** means, solely with respect to the Reorganization Transaction, the forms of certificates of incorporation, certificates of formation, limited liability company agreements, or other forms of organizational documents and bylaws, as applicable, of the Reorganized Debtors.

1.10    ***Asset*** means all of the right, title, and interest of the Debtors in and to property of whatever type or nature (including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property).

1.11    ***Asset Sale Proceeds*** means the net proceeds of an Asset Sale Transaction.

1.12    ***Asset Sale Transaction*** means the sale of a portion of the Debtors' assets consummated on or as soon as reasonably practicable after the Effective Date other than (i) a sale in the ordinary course of business, (ii) in connection with the Exit Working Capital Facility, or (iii) a Sale Transaction; *provided*, that such sale shall be conducted in accordance with the terms of the RSA and the DIP Order.

1.13    ***Assumption Dispute*** means a pending objection relating to assumption of an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code.

1.14    ***Assumption Schedule*** means the schedule of executory contracts and unexpired leases to be assumed by the Debtors pursuant to the Plan that will be included in the Plan Supplement.

1.15    ***Ballot*** means the form(s) distributed to holders of Impaired Claims entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

1.16    ***Bankruptcy Code*** means title 11 of the United States Code, 11 U.S.C. § 101, *et seq.*, as amended from time to time, as applicable to the Chapter 11 Cases.

1.17    ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases or any other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of any reference under 28 U.S.C. § 157, the United States District Court for the Southern District of New York.

1.18    ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code and any Local Bankruptcy Rules of the Bankruptcy Court, in each case, as amended from time to time and applicable to the Chapter 11 Cases.

1.19    ***Benefit Plans*** means each (a) "employee benefit plan," as defined in section 3(3) of ERISA and (b) all other pension, retirement, bonus, incentive, health, life, disability, group insurance, vacation, holiday and fringe benefit plan, program, contract, or arrangement (whether written or unwritten) maintained, contributed to, or required to be contributed to, by the Debtors for the benefit of any of its current or former employees or independent contractors, other than those that entitle employees to, or that otherwise give rise to, Interests or consideration based on the value of Interests, in the Debtors.

1.20    ***Bidding Procedures*** means the procedures governing the auction and sale process relating to any potential Sale Transaction or Asset Sale Transaction, as approved by the Bankruptcy Court and as may be amended from time to time in accordance with their terms and otherwise in accordance with the RSA and the DIP Order.

1.21    ***Bidding Procedures Order*** means the *Order (I) Approving Bidding Procedures, (II) Approving Assumption and Assignment Procedures, and (III) Granting Related Relief* (ECF No. 456).

1.22    ***Borrower*** means any individual, as of the Commencement Date, whose current or former mortgage loan or reverse mortgage was originated, serviced, sold, consolidated, or owned by any of the Debtors.

1.23    ***Borrower Non-Discharged Claims*** means a Claim of a Borrower of the kind set forth on Schedule 1 of this Plan.

1.24    ***Business Day*** means any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

1.25    ***Cash*** means legal tender of the United States of America.

1.26    ***Causes of Action*** means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, lien, indemnity, guaranty, suit, obligation, liability, loss, debt, damage, judgment, account, defense, remedies, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Commencement Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including, without limitation, under any state or federal securities laws).  Causes of Action also includes:  (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

1.27    ***Chapter 11 Cases*** means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Commencement Date in the Bankruptcy Court.

1.28    ***Claim*** has the meaning set forth in section 101(5) of the Bankruptcy Code, as against any Debtor.

1.29    ***Class*** means any group of Claims or Interests classified as set forth in Article III of the Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

1.30     ***Commencement Date*** means the date on which the Debtors commenced the Chapter 11 Cases.

1.31     ***Confirmation Date*** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

1.32     ***Confirmation Hearing*** means the hearing to be held by the Bankruptcy Court to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.33     ***Confirmation Order*** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1.34     ***Consenting Term Lenders*** means the Term Lenders that are party to the RSA together with their respective successors and permitted assigns and any subsequent Term Lenders that become party to the RSA in accordance with the terms of the RSA.

1.35     ***Contributed Sale Proceeds*** means, as a carve out from the Term Lenders' collateral (or the proceeds or value thereof), an amount of Cash equal to one and a half percent (1.5%) of Net Cash Proceeds distributed to the holders of Allowed Term Loan Claims in excess of seventy percent (70%) of Allowed Term Loan Claims, excluding distributions on account of proceeds from the GUC Recovery Trust Causes of Action in accordance with the GUC Recovery Trust Agreement.  For the avoidance of doubt, when calculating Contributed Sale Proceeds, the Contributed Sale Proceeds shall not be subtracted from the Net Cash Proceeds notwithstanding anything to the contrary in the Plan.

1.36     ***Creditors' Committee*** means the statutory committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

1.37     ***Creditors' Committee Budget*** means the reasonable and documented fees and expenses in an amount not exceeding $300,000 per month incurred by the Creditors' Committee's advisors from the date of entry of the Disclosure Statement Order through and including the Effective Date; provided, that any amounts incurred by the Creditors' Committee's advisors in connection with (i) defending against objections to or prosecuting the approval of the Global Settlement and (ii) preserving the economic benefits contemplated in the Global Settlement shall be excluded from such calculation.

1.38     ***Cure Amount*** means the payment of Cash by the Debtors, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary pursuant to section 365(b)(1)(A) of the Bankruptcy Code to permit the Debtors to assume such executory contract or unexpired lease.

1.39     ***Debtor or Debtors*** has the meaning set forth in the introductory paragraph of the Plan.

1.40     ***Debtors in Possession*** means the Debtors in their capacity as debtors in possession in the Chapter 11 Cases pursuant to sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

1.41     ***Definitive Documents*** means the documents (including any related orders, agreements, instruments, schedules or exhibits) that are necessary or desirable to implement, or otherwise relate to the Restructuring Transaction or the Sale Transaction, including, but not limited to: (a) the Plan; (b) the Bidding Procedures; (c) the Disclosure Statement; (d) any motion seeking approval of the adequacy of the Disclosure Statement, solicitation of the Plan, and the Bidding Procedures; (e) the Disclosure Statement Order; (f) the Bidding Procedures Order; (g) the DIP Order; (h) each of the documents comprising the Plan Supplement; (i) the Confirmation Order; (j) the GUC Recovery Trust Agreement; (k) the

Management Incentive Plan Term Sheet; and (l) any purchase agreement in connection with the Sale Transaction or an Asset Sale Transaction.

1.42    **DIP Agent** means "DIP Agent" as defined in the DIP Order.

1.43    **DIP Claims** means all Claims held by the DIP Credit Parties on account of, arising under or relating to the DIP Documents or the DIP Order, which for the avoidance of doubt, shall include all "DIP Obligations" as such term is defined in the DIP Order.

1.44    **DIP Credit Parties** means "DIP Credit Parties" as defined in the DIP Order.

1.45    **DIP Documents** means "DIP Documents" as defined in the DIP Order.

1.46    **DIP Facilities** means "DIP Facilities" as defined in the DIP Order.

1.47    **DIP Lenders** means "DIP Lenders" as defined in the DIP Order.

1.48    **DIP Motion** means the *Debtors' Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 507, 546, 548, 555, 559, 560 and 561 (A) Authorizing Debtors to Enter Into Repurchase Agreement Facilities, Servicer Advance Facilities and Related Documents; (B) Authorizing Debtors to Sell Mortgage Loans and Servicer Advance Receivables in the Ordinary Course of Business; (C) Granting Back-Up Liens and Superpriority Administrative Expense Claims; (D) Authorizing Use of Cash Collateral and Granting Adequate Protection; (E) Modifying the Automatic Stay; (F) Scheduling a Final Hearing; and (G) Granting Related Relief* (ECF No. 26).

1.49    **DIP Order** means the final order approving the DIP Motion (ECF No. 422).

1.50    **Disallowed** means, with respect to any Claim or Interest, that such Claim or Interest has been determined by a Final Order or specified in a provision of the Plan not to be Allowed.

1.51    **Disbursing Agent** means (a) solely with respect to the Reorganization Transaction, the Reorganized Debtors; and (b) solely with respect to the Sale Transaction, the Plan Administrator; provided, that with respect to distributions to holders of Allowed General Unsecured Claims, the GUC Trustee shall distribute the GUC Recovery Trust Assets as and when provided for in the GUC Recovery Trust Agreement.

1.52    **Disclosure Statement** means the disclosure statement filed by the Debtors in support of the Plan, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

1.53    **Disclosure Statement Motion** means the *Motion of Debtors For Entry of an Order (I) Approving Disclosure Statement and Notice of Disclosure Statement Hearing, (II) Establishing Solicitation and Voting Procedures, (III) Scheduling Sale and Confirmation Hearing, (IV) Approving Sale and Confirmation Objection Procedures and Notice of Sale and Confirmation Hearing, (V) Approving Bidding Procedures, (VI) Approving Assumption and Assignment Procedures, and (VII) Granting Related Relief* (ECF No. 147).

1.54    **Disclosure Statement Order** means the order entered by the Bankruptcy Court (a) finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code; (b) authorizing solicitation of the Plan; and (c) approving the Bidding Procedures.

1.55    **_Disputed_** means with respect to a Claim or Interest, that (a) is neither Allowed nor Disallowed under the Plan or a Final Order, nor deemed Allowed under sections 502, 503, or 1111 of the Bankruptcy Code; or (b) the Debtors or any parties in interest have interposed a timely objection or request for estimation, and such objection or request for estimation has not been withdrawn or determined by a Final Order.  If the Debtors dispute only a portion of a Claim, such Claim shall be deemed Allowed in any amount the Debtors do not dispute, and Disputed as to the balance of such Claim.

1.56    **_Distribution Record Date_** means the Effective Date (or as soon as practicable thereafter) or such other date as agreed upon among the Debtors, the Requisite Term Lenders, and the Prepetition Administrative Agent.

1.57    **_Ditech_** means Ditech Holding Corporation.

1.58    **_Ditech Financial_** means Ditech Financial LLC.

1.59    **_DTC_** means the Depository Trust Company.

1.60    **_Effective Date_** means the date on which all conditions to the effectiveness of the Plan set forth in Article IX hereof have been satisfied or waived in accordance with the terms of the Plan.

1.61    **_Elected Transaction_** shall have the meaning ascribed to such term in Section 5.4 of the Plan.

1.62    **_Electing Term Lenders_** shall have the meaning ascribed to such term in Section 5.4 of the Plan.

1.63    **_Election Date_** shall have the meaning ascribed to such term in Section 5.4 of the Plan.

1.64    **_Election Notice_** shall have the meaning ascribed to such term in Section 5.4 of the Plan.

1.65    **_Employee Arrangements_** shall have the meaning ascribed to such term in Section 5.9 of the Plan.

1.66    **_Entity_** means an individual, corporation, partnership, limited partnership, limited liability company, association, joint stock company, joint venture, estate, trust, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code) or any political subdivision thereof, or other person (as defined in section 101(41) of the Bankruptcy Code) or other entity.

1.67    **_ERISA_** means the Employee Retirement Income Security Act of 1974, as amended.

1.68    **_Estate or Estates_** means, individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

1.69    **_Exchange Act_** means the Securities Exchange Act of 1934, as amended.

1.70    **_Exculpated Parties_** means collectively the: (a) Debtors; (b) Reorganized Debtors; (c) Plan Administrator; (d) the Wind Down Estates; (e) Consenting Term Lenders; (f) Prepetition Administrative Agent; (g) Prepetition Warehouse Parties, (h) DIP Credit Parties; (i) Creditors' Committee and each of its members in their capacity as such; (j) Exit Warehouse Facilities Lenders; (k) National Founders; (l) GUC Trustee; and (m) with respect to each of the foregoing Entities in clauses (a) through

(l), all Persons and Entities who acted on their behalf in connection with the matters as to which exculpation is provided herein.

1.71    ***Exit Warehouse Facilities*** means, solely with respect to the Reorganization Transaction, the facilities to be entered into by the Reorganized Debtors and the Exit Warehouse Facilities Lenders on the Effective Date.

1.72    ***Exit Warehouse Facilities Documents*** means, solely with respect to the Reorganization Transaction, collectively, each agreement, security agreement, pledge agreement, collateral assignments, mortgages, control agreements, guarantee, certificate, document or instrument executed and/or delivered in connection with any of the foregoing, whether or not specifically mentioned herein or therein, as the same may be modified, amended, restated, supplemented or replaced from time to time that shall govern the Exit Warehouse Facilities.

1.73    ***Exit Warehouse Facilities Lenders*** means the Persons party to the Exit Warehouse Facilities Documents as "Lenders", "Buyers", "Administrative Agent", "Credit Parties" and/or similar terms thereunder, and each of their respective successors and permitted assigns.

1.74    ***Exit Working Capital Facility*** means, solely with respect to the Reorganization Transaction, (a) the facility to be entered into by Reorganized Ditech, as borrower, and the Exit Working Capital Facility Lenders on the Effective Date, in accordance with the terms of the Exit Working Capital Facility Agreement, or (b) an asset sale or financing transaction to enhance the liquidity of the Reorganized Debtors, including a sale of mortgage servicing rights, that is designated by the Debtors and Requisite Term Lenders as an "Exit Working Capital Facility."

1.75    ***Exit Working Capital Facility Agreement*** means, solely with respect to the Reorganization Transaction, the agreement to be entered into by Reorganized Ditech on the Effective Date, that shall govern the Exit Working Capital Facility.

1.76    ***Exit Working Capital Facility Documents*** means, solely with respect to the Reorganization Transaction, collectively, the Exit Working Capital Facility Agreement and each other agreement, security agreement, pledge agreement, collateral assignment, mortgage, control agreement, guarantee, certificate, document or instrument executed and/or delivered in connection with any of the foregoing, whether or not specifically mentioned herein or therein, as the same may be modified, amended, restated, supplemented or replaced from time to time, that shall govern the Exit Working Capital Facility.

1.77    ***Exit Working Capital Facility Lenders*** means the Persons party to the Exit Working Capital Facility Agreement as "Lenders", "Buyers", "Administrative Agent", "Credit Parties" and/or similar terms thereunder, and each of their respective successors and permitted assigns.

1.78    ***Fannie Mae*** means the Federal National Mortgage Association.

1.79    ***Fannie Mae Acknowledgement Agreement*** means "Fannie Mae Acknowledgement Agreements" as defined in the DIP Order.

1.80    ***Fannie Mae Lender Contracts*** means "Fannie Mae Lender Contracts" as defined in the DIP Order.

1.81    ***Fee Claim*** means a Claim for professional services rendered or costs incurred on or after the Commencement Date through the Effective Date by professional persons retained by the Debtors or

the Creditors' Committee by an order of the Bankruptcy Court pursuant to sections 327, 328, 329, 330, 331, or 503(b) of the Bankruptcy Code in the Chapter 11 Cases.

1.82    ***Final Order*** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending; or (b) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument, or rehearing shall have expired; provided, however, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

1.83    ***Freddie Mac*** means the Federal Home Loan Mortgage Corporation.

1.84    ***Freddie Mac Agreements*** means the (a) Freddie Mac Acknowledgment Agreement; (b) Freddie Mac Pledge Agreement; (c) Freddie Mac Master Agreement; (d) Freddie Mac Purchase Agreement (items (a) through (d), as defined in the DIP Order); and (e) Freddie Mac Single-Family Seller/Servicer Guide.

1.85    ***General Unsecured Claim*** means any Claim against the Debtors (other than any Intercompany Claims or Borrower Non-Discharged Claims) as of the Commencement Date that is neither secured by collateral nor entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court; provided, that a General Unsecured Claim shall not include the Term Loan Deficiency Claim or a deficiency Claim on account of Second Lien Notes Claims.

1.86    ***GUC Recovery Trust*** means the trust established pursuant to the GUC Recovery Trust Agreement.

1.87    ***GUC Recovery Trust Agreement*** means the trust agreement by and among the Debtors and the GUC Trustee, substantially in the form included in the Plan Supplement and consistent with Section 5.2(b) of the Plan; provided, that the GUC Recovery Trust Agreement shall be in form and substance reasonably acceptable to the Creditors' Committee, the Debtors, and the Requisite Term Lenders.

1.88    ***GUC Recovery Trust Assets*** shall consist of (a) Cash in the amount of $4,000,000 less (i) the Remaining IT Fees payable on the Effective Date pursuant to Section 5.2(b)(v) of the Plan and (ii) any fees and expenses of the Creditors' Committee's advisors in excess of the Creditors' Committee Budget; (b) a fifty percent (50%) undivided interest in the GUC Recovery Trust Causes of Action and the net proceeds thereof; and (c) Contributed Sale Proceeds less any Contributed Sale Proceeds paid to holders of Allowed Second Lien Notes Claims in accordance with Section 4.4(b) of the Plan.

1.89    ***GUC Recovery Trust Causes of Action*** means all Causes of Action of the Debtors under chapter 5 of the Bankruptcy Code or under similar or related state or federal statutes and common law, including, without limitation, all preference, fraudulent conveyance, fraudulent transfer, and/or other similar avoidance claims, rights, and causes of action, and commercial tort law, except any such Causes

of Action against any (a) Released Party that are released pursuant to the Plan; (b) landlords; and (c) third party vendors providing services or goods to the Debtors in the ordinary course of business.

1.90    **GUC Trustee** means the Person selected by the Creditors' Committee that is reasonably acceptable to the Debtors and the Requisite Term Lenders, and identified in the Plan Supplement, to serve as the trustee of the GUC Recovery Trust, and any successor thereto in accordance with the GUC Recovery Trust Agreement.

1.91    **Ginnie Mae** means the Government National Mortgage Association.

1.92    **Ginnie Mae Agreements** means "Ginnie Mae Agreements" as defined in the DIP Order.

1.93    **Global Settlement** shall have the meaning ascribed to such term in Section 5.2(b) of the Plan.

1.94    **Impaired** means, with respect to a Claim, Interest, or Class of Claims or Interests, "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

1.95    **Insured Claims** means any Claim or portion of a Claim that is, or may be, insured under any of the Debtors' insurance policies.

1.96    **Intercompany Claim** means any pre- or postpetition Claim against a Debtor held by another Debtor.

1.97    **Intercompany Interest** means an Interest in a Debtor held by another Debtor.  For the avoidance of doubt, an Intercompany Interest shall exclude a Parent Equity Interest.

1.98    **Interests** means any equity security (as defined in section 101(16) of the Bankruptcy Code) of a Debtor, including all shares, common stock, preferred stock, or other instrument evidencing any fixed or contingent ownership interest in any Debtor, whether or not transferable, and any option, warrant, or other right, contractual or otherwise, to acquire any such interest in the Debtors, whether fully vested or vesting in the future, including, without limitation, equity or equity-based incentives, grants, or other instruments issued, granted or promised to be granted to current or former employees, directors, officers, or contractors of the Debtors, to acquire any such interests in the Debtors that existed immediately before the Effective Date.

1.99    **KEIP Order** means the *Order Approving Key Employee Incentive Program* (ECF No. 450).

1.100    **Lien** has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.101    **Management Incentive Plan** means, solely with respect to the Reorganization Transaction, a post-emergence management incentive plan, under which up to 10% of the New Common Stock (after taking into account the shares to be issued under the Management Incentive Plan) will be reserved for issuance as awards on terms and conditions described in and consistent with the Management Incentive Plan Term Sheet.

1.102    **Management Incentive Plan Term Sheet** means, solely with respect to the Reorganization Transaction, the term sheet for the Management Incentive Plan included in the Plan Supplement.

WEIL:\97031056\1\41703.0010

1.103    **MBS Trustee** means Deutsche Bank National Trust Company, in its capacity as an indenture trustee or trustee under certain indentures, pooling and servicing agreements, or other trust governing agreements pursuant to which certain mortgage-backed securities were issued.

1.104    **National Founders** means "National Founders Facility Parties" as defined in the DIP Order.

1.105    **National Founders Facility** means "National Founders Facility" as defined in the DIP Order.

1.106    **National Founders Facility Agreement** means "National Founders Facility Agreement" as defined in the DIP Order.

1.107    **National Founders Facility Claim** means all Claims held by National Founders on account of, arising under or relating to the National Founders Facility Agreement.

1.108    **Net Cash Proceeds** means (a) all Cash of the Debtors realized from their business operations, the Sale Transaction Proceeds, and the Asset Sale Proceeds less (b) the amount of Cash (i) necessary to pay holders of Allowed (or reserve for Disputed) Administrative Expense Claims, Fee Claims, Priority Tax Claims, DIP Claims, Priority Non-Tax Claims, and Other Secured Claims; (ii) contributed on the Effective Date to the GUC Recovery Trust or the Second Lien Recovery Cash Pool; (iii) constituting Contributed Sale Proceeds; and (iv) estimated and reserved by the Debtors or the Plan Administrator to adequately fund the Wind Down of the Estates.

1.109    **New Board** means, solely with respect to the Reorganization Transaction, the new board of directors of Reorganized Ditech.

1.110    **New Common Stock** means, solely with respect to the Reorganization Transaction, the shares of common stock, par value $.01 per share to be issued by Reorganized Ditech authorized pursuant to the Amended Organizational Documents of Reorganized Ditech, and all of which shall be deemed validly issued, fully-paid, and non-assessable.

1.111    **Other Secured Claim** means a Secured Claim, other than an Administrative Expense Claim, a DIP Claim, a Priority Tax Claim, a Term Loan Claim, or a Second Lien Notes Claim.

1.112    **Parent Equity Interests** means any Interest in Ditech.

1.113    **Person** means any individual, corporation, partnership, limited liability company, association, indenture trustee, organization, joint stock company, joint venture, estate, trust, Governmental Unit or any political subdivision thereof, or any other Entity.

1.114    **Plan** means this joint chapter 11 plan, including all appendices, exhibits, schedules, and supplements hereto (including, without limitation, any appendices, schedules, and supplements to the Plan contained in the Plan Supplement), as the same may be amended, supplemented, or modified from time to time in accordance with the RSA, DIP Order, the provisions of the Bankruptcy Code and the terms hereof.

1.115    **Plan Administrator** means, solely with respect to the Sale Transaction, a Person or Entity selected by the Debtors and the Requisite Term Lenders to serve as plan administrator for each of the Debtors and their Estates.

1.116    ***Plan Supplement*** means a supplemental appendix to the Plan containing, among other things, forms or term sheets of applicable documents, schedules, and exhibits to the Plan to be filed with the Court, including, but not limited to, the following: (a) Amended Organizational Documents (to the extent such Amended Organizational Documents reflect material changes from the Debtors' existing organizational documents and bylaws); (b) Amended and Restated Credit Facility Agreement; (c) Exit Working Capital Facility Agreement; (d) Stockholders' Agreement; (e) Exit Warehouse Facilities Documents; (f) Management Incentive Plan Term Sheet; (g) Assumption Schedule; (h) Rejection Schedule; (i) to the extent known, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; and (j) GUC Recovery Trust Agreement; provided, that through the Effective Date, the Debtors shall have the right to amend the Plan Supplement and any schedules, exhibits, or amendments thereto, in accordance with the terms of the Plan and the RSA.    The Plan Supplement shall be filed with the Bankruptcy Court no later than seven (7) calendar days prior to the deadline to object to the Plan.    The Debtors shall have the right to amend the documents contained in the Plan Supplement through and including the Effective Date in accordance with Article IX of the Plan (including, for the avoidance of doubt, to reflect the terms and conditions of the Sale Transaction).

1.117    ***Prepetition Administrative Agent*** means Credit Suisse AG, Cayman Islands Branch (formerly Credit Suisse AG), solely in its capacity as administrative agent and collateral agent under the Prepetition Credit Agreement, and its successors and assigns.

1.118    ***Prepetition Credit Agreement*** means that certain Second Amended and Restated Credit Agreement, dated as of February 9, 2018 (and as amended by that certain Amendment No. 1 to Second Amended and Restated Credit Agreement, dated as of March 29, 2018), among Ditech, as the borrower, the Prepetition Administrative Agent and the other lenders party thereto, as amended, modified, or supplemented from time to time prior to the Commencement Date.

1.119    ***Prepetition Intercreditor Agreement*** means "Intercreditor Agreement" as defined in the Prepetition Credit Agreement.

1.120    ***Prepetition Second Lien Notes Indenture*** means that certain indenture dated as of February 9, 2018, between Ditech, the guarantors named therein, and the Prepetition Second Lien Notes Trustee, as amended, modified, or supplemented from time to time prior to the Commencement Date.

1.121    ***Prepetition Second Lien Notes Trustee*** means Wilmington Savings Fund Society, FSB, solely in its capacity as trustee under the Prepetition Second Lien Notes Indenture, and its successors and assigns.

1.122    ***Prepetition Term Loans*** means "Term Loans" as defined in the Prepetition Credit Agreement.

1.123    ***Prepetition Warehouse Parties*** means "Prepetition Warehouse Parties" as defined in the DIP Order.

1.124    ***Priority Non-Tax Claim*** means any Claim other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

1.125    ***Priority Tax Claim*** means any Secured Claim or unsecured Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

WEIL:\97031056\1\41703.0010

1.126    ***Pro Rata*** means the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that Class, or the proportion that Allowed Claims or Interests in a particular Class bear to the aggregate amount of Allowed Claims and Disputed Claims or Allowed Interests and Disputed Interests in a particular Class and other Classes entitled to share in the same recovery as such Class under the Plan.

1.127    ***Reinstate, Reinstated, or Reinstatement*** means leaving a Claim Unimpaired under the Plan.

1.128    ***Rejection Schedule*** means the schedule of certain specific executory contracts and unexpired leases to be rejected by the Debtors pursuant to the Plan.

1.129    ***Related Parties*** means with respect to any Exculpated Party or any Released Party, such Entities' predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, and all of their respective current and former officers, directors, principals, stockholders (and any fund managers, fiduciaries or other agents of stockholders with any involvement related to the Debtors), members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such persons' respective heirs, executors, estates, servants and nominees.

1.130    ***Released Parties*** means collectively the: (a) Debtors; (b) Reorganized Debtors; (c) the Wind Down Estates (if applicable); (d) Consenting Term Lenders; (e) Prepetition Administrative Agent; (f) Prepetition Warehouse Parties; (g) DIP Credit Parties; (h) National Founders; (i) Creditors' Committee and each of its members in their capacity as such; (j) GUC Trustee; and (k) Related Parties for each of the foregoing.

1.131    ***Remaining IT Fees*** means, collectively, the reasonable and documented fees, costs and expenses incurred by the Prepetition Second Lien Notes Trustee and the MBS Trustee not payable as a cure of any assumed or assumed and assigned contracts.

1.132    ***Reorganization Transaction*** means, collectively, (a) issuance of the New Common Stock; (b) entry into the Amended and Restated Credit Facility Agreement; (c) entry into the Exit Working Capital Facility Agreement; (d) entry into the Exit Warehouse Facilities Documents; (e) execution of the Amended Organizational Documents; (f) vesting of the Debtors' assets in the Reorganized Debtors, in each case, in accordance with the Plan; and (g) the other transactions that the Debtors and the Requisite Term Lenders reasonably determine are necessary or appropriate to implement the foregoing, in each case, in accordance with the Plan, RSA, and the DIP Order.

1.133    ***Reorganized Debtors*** means, solely with respect to the Reorganization Transaction, the Debtors, as reorganized pursuant to and under the Plan on or after the Effective Date.

1.134    ***Reorganized Ditech*** means, solely with respect to the Reorganization Transaction, Ditech, as reorganized pursuant to and under the Plan on or after the Effective Date.

1.135    ***Requisite Term Lenders*** means, as of the date of determination, Consenting Term Lenders holding at least a majority in aggregate principal amount outstanding of the Prepetition Term Loans held by the Consenting Term Lenders as of such date.

1.136    ***Restructuring Expenses*** means with respect to (a) the Requisite Term Lenders, the reasonable and documented fees, costs, and expenses of (i) Kirkland & Ellis LLP, (ii) one law firm acting as local counsel (if any), and (iii) FTI Consulting Inc.; and (b) the Prepetition Administrative Agent, the

reasonable fees, costs, and expenses of (i) the Prepetition Administrative Agent, (ii) Davis Polk & Wardwell LLP, and (iii) one law firm acting as local counsel (if any), in each case, in accordance with the Prepetition Credit Agreement.

1.137    *RMS* means Reverse Mortgage Solutions, Inc.

1.138    *RSA* means that certain restructuring support agreement, dated as of February 8, 2019, by and among the Debtors and the Consenting Term Lenders (as may be amended, supplemented, or modified from time to time in accordance with the terms thereof) annexed to the Disclosure Statement as Exhibit B.

1.139    *Sale Incentive Awards* means "Sale Incentive Awards" as defined in the KEIP Order.

1.140    *Sale Transaction* means the sale of all or substantially all of the Debtors' assets, or Interests in the Debtors owning all or substantially all of the Debtors' assets, contemplated by the Successful Bid.

1.141    *Sale Transaction Proceeds* means the net proceeds of a Sale Transaction.

1.142    *Second Lien Noteholders* means the holders of Second Lien Notes in their respective capacities as such.

1.143    *Second Lien Notes* means the 9.0% Second Lien Senior Subordinated PIK Toggle Notes due 2024 issued pursuant to the Prepetition Second Lien Notes Indenture.

1.144    *Second Lien Notes Claims* means any Claims arising from or in connection with the Prepetition Second Lien Notes Indenture.

1.145    *Second Lien Recovery Cash Pool* means, as a carve out from the Term Lenders' collateral (or the proceeds or value thereof), Cash in the amount of $1,500,000, for distribution to holders of Allowed Second Lien Notes Claims in accordance with Section 4.4(b).

1.146    *Secured Claim* means a Claim (a) secured by a Lien on collateral to the extent of the value of such collateral as (i) set forth in the Plan, (ii) agreed to by the holder of such Claim and the Debtors, or (iii) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code; or (b) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code.  For the avoidance of doubt, the National Founders Facility Claim shall be deemed a Secured Claim.

1.147    *Security* has the meaning set forth in section 101(49) of the Bankruptcy Code.

1.148    *Stockholders Agreement* means, solely with respect to the Reorganization Transaction, that certain Stockholders Agreement substantially in the form included in the Plan Supplement.

1.149    *Subordinated Securities Claims* means a Claim subject to subordination under section 510(b) of the Bankruptcy Code.

1.150    *Successful Bid* means one or more bids to purchase all or substantially all of the Debtors' assets, or Interests in the Debtors owning all or substantially all of the Debtors' assets, that the Debtors determine, in an exercise of their business judgment and subject to the RSA, constitutes the highest or best bid.

WEIL:\97031056\1\41703.0010

1.151    ***Successful Bidder*** means the bidder(s) who submit(s) a Successful Bid.

1.152    ***Tax Code*** means the Internal Revenue Code of 1986, as amended from time to time.

1.153    ***Term Lenders*** means "Term Lenders" as defined in the Prepetition Credit Agreement.

1.154    ***Term Loan Claims*** mean any Claims arising from or in connection with the Prepetition Credit Agreement, other than Restructuring Expenses.

1.155    ***Term Loan Deficiency Claim*** means the deficiency Claims on account of the indebtedness under the Prepetition Credit Agreement under section 506(a) of the Bankruptcy Code.

1.156    ***Unimpaired*** means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

1.157    ***U.S. Trustee*** means the United States Trustee for the Southern District of New York.

1.158    ***Voting Deadline*** means the date by which all persons or Entities entitled to vote on the Plan must vote to accept or reject the Plan.

1.159    ***Wind Down*** means, following the closing of the Sale Transaction, the process to wind down, dissolve and liquidate the Estates and distribute any remaining assets in accordance with the Plan.

1.160    ***Wind Down Budget*** means an amount set forth in the Plan Supplement to be agreed between the Debtors and the Requisite Term Lenders for the purpose of effectuating the Wind Down.

1.161    ***Wind Down Estates*** means, solely with respect to the Sale Transaction, the Debtors pursuant to and under the Plan on or after the Effective Date.

B.    **Interpretation; Application of Definitions and Rules of Construction.**

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto; (d) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (e) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

C.    **Reference to Monetary Figures.**

All references in the Plan to monetary figures shall refer to the legal tender of the United States of America, unless otherwise expressly provided.

D.     **Controlling Document.**

In the event of any conflict between the terms and provisions in the Plan (without reference to the Plan Supplement) and the terms and provisions in the Disclosure Statement, the Plan Supplement, any other instrument or document created or executed pursuant to the Plan (including any Restructuring Document or Sale Transaction Document), or any order (other than the Confirmation Order or the DIP Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), the Plan (without reference to the Plan Supplement) shall govern and control; provided, however, that, in the event of a conflict between the DIP Order, on the one hand, and any of the Plan, the Plan Supplement, or the Definitive Documents, on the other hand, the DIP Order shall govern and control in all respects; provided, further, that in the event of a conflict between Confirmation Order, on the one hand, and any of the Plan, the Plan Supplement, the Definitive Documents, or the DIP Order on the other hand, the Confirmation Order shall govern and control in all respects.

E.     **Certain Consent Rights.**

Notwithstanding anything in the Plan to the contrary, any and all consent rights of any of the DIP Credit Parties and the parties to the RSA as set forth in the RSA and the DIP Documents with respect to the form and substance of the Plan, the Plan Supplement, and any Definitive Document, including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I hereof) and fully enforceable as if stated in full herein until such time as the RSA (with respect to the parties to the RSA) or the DIP Documents (with respect to the DIP Credit Parties) is terminated in accordance with its terms.

### ARTICLE II    ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS.

2.1.    *Administrative Expense Claims.*

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, each holder of an Allowed Administrative Expense Claim (other than a Fee Claim, a DIP Claim, or a Restructuring Expense) shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Administrative Expense Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; provided, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any course of dealing or agreements governing, instruments evidencing, or other documents relating to such transactions.

2.2.    *Fee Claims.*

(a)     All Entities seeking an award by the Bankruptcy Court of Fee Claims shall file and serve on counsel to the Debtors, the U.S. Trustee, and counsel to the Requisite Term Lenders, on or before the date that is forty-five (45) days after the Effective Date, their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred from the Commencement Date through the Effective Date. Objections to any Fee Claims must be filed and served on counsel to the Debtors, counsel to the Requisite Term Lenders, and the requesting party no later than

twenty-one (21) calendar days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the Debtors or the Reorganized Debtors, as applicable, and the party requesting compensation of a Fee Claim).

(b)    Allowed Fee Claims shall be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court (i) on the date upon which an order relating to any such Allowed Fee Claim is entered or as soon as reasonably practicable thereafter; or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable.  Notwithstanding the foregoing, any Fee Claims that are authorized to be paid pursuant to any administrative orders entered by the Bankruptcy Court may be paid at the times and in the amounts authorized pursuant to such orders.

(c)    On or about the Effective Date, holders of Fee Claims shall provide a reasonable estimate of unpaid Fee Claims incurred in rendering services before the Effective Date to the Debtors or the Creditors' Committee, as applicable, and the Debtors or Reorganized Debtors, as applicable, shall separately escrow such estimated amounts for the benefit of the holders of the Fee Claims until the fee applications related thereto are resolved by Final Order or agreement of the parties.  If a holder of a Fee Claim does not provide an estimate, the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, may estimate the unpaid and unbilled reasonable and necessary fees and out-of-pocket expenses of such holder of a Fee Claim.  When all such Allowed Fee Claims have been paid in full, any remaining amount in such escrow shall promptly be released from such escrow and revert to, and ownership thereof shall vest in, the Reorganized Debtors or Plan Administrator, as applicable, without any further action or order of the Bankruptcy Court.

(d)    The Reorganized Debtors or the Plan Administrator, as applicable, are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

2.3.    *Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction of such Allowed Priority Tax Claim, at the sole option of the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable, (a) Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date; (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; and (iii) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due; provided, that the Debtors reserve the right to prepay all or a portion of any such amounts at any time under this option without penalty or premium; or (b) equal annual Cash payments in an aggregate amount equal to the amount of such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years from and after the Commencement Date.

2.4.    *DIP Claims.*

On the Effective Date, in full and final satisfaction of the Allowed DIP Claims, the commitments of the DIP Credit Parties under the DIP Documents shall be terminated and DIP Claims shall be (a) paid in full in Cash upon the consummation of the Sale Transaction if the Sale Transaction occurs or (b) refinanced in full in Cash by the Exit Warehouse Facilities if the Reorganization Transaction occurs.  The Debtors' and their respective Affiliates' contingent or unliquidated expense reimbursement

16

and indemnity obligations under the DIP Documents, to the extent not paid in full in Cash on the Effective Date or otherwise satisfied by the Debtors and their respective Affiliates in a manner reasonably acceptable to the DIP Agent, shall survive the Effective Date and shall not be released or discharged pursuant to the Plan or Confirmation Order, notwithstanding any provision hereof or thereof to the contrary.

2.5.    *Restructuring Expenses.*

During the period commencing on the Commencement Date through the Effective Date, the Debtors will promptly pay in full in Cash any Restructuring Expenses in accordance with the terms of the RSA. Without limiting the foregoing, to the extent that any Restructuring Expenses remain unpaid as of the Business Day prior to the Effective Date, on the Effective Date, the Reorganized Debtors, or Plan Administrator, as applicable, shall pay in full in Cash any outstanding Restructuring Expenses that are invoiced without the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases, and without any requirement for further notice or Bankruptcy Court review or approval.  For the avoidance of doubt, any Restructuring Expenses invoiced after the Effective Date shall be paid promptly, but no later than ten (10) business days of receiving an invoice.

## ARTICLE III  CLASSIFICATION OF CLAIMS AND INTERESTS.

3.1.    *Classification in General.*

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; provided, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Allowed Claim or Allowed Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

3.2.    *Grouping of Debtors for Convenience Only.*

The Plan groups the Debtors together solely for the purpose of describing treatment of Claims and Interests under this Plan and confirmation of this Plan. Although this Plan applies to all of the Debtors, the Plan constitutes fourteen (14) distinct chapter 11 plans, one for each Debtor.  Each Class of Claims will be deemed to contain sub-classes for each of the Debtors, to the extent applicable for voting and distribution purposes.   To the extent there are no Allowed Claims or Interests with respect to a particular Debtor, such Class is deemed to be omitted with respect to such Debtor.  Except as otherwise provided herein, to the extent a holder has a Claim that may be asserted against more than one Debtor, the vote of such holder in connection with such Claims shall be counted as a vote of such Claim against each Debtor against which such holder has a Claim.  The grouping of the Debtors in this manner shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal Entities, or cause the transfer of any Assets, and, except as otherwise provided by or permitted under this Plan, all Debtors shall continue to exist as separate legal Entities.

3.3.    *Summary of Classification.*

The following table designates the Classes of Claims against and Interests in the Debtor and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan; (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; and (c) deemed to

WEIL:\97031056\1\41703.0010

accept or reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified.

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Priority Non-Tax Claims | Unimpaired | No (Presumed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| 3 | Term Loan Claims | Impaired | Yes |
| 4 | Second Lien Notes Claims | Impaired | No (Deemed to reject) |
| 5 | General Unsecured Claims | Impaired | No (Deemed to reject) |
| 6 | Borrower Non-Discharged Claims | Reorganization Transaction (Unimpaired)<br><br>Sale Transaction (Impaired) | Reorganization Transaction (Presumed to Accept)<br><br>Sale Transaction (Deemed to Reject) |
| 7 | Intercompany Claims | Unimpaired | No (Presumed to accept) |
| 8 | Intercompany Interests | Unimpaired | No (Presumed to accept) |
| 9 | Parent Equity Interests | Impaired | No (Deemed to reject) |
| 10 | Subordinated Securities Claims | Impaired | No (Deemed to reject) |

3.4.    ***Special Provision Governing Unimpaired Claims.***

Nothing under the Plan shall affect the rights of the Debtors or the Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

3.5.    ***Elimination of Vacant Classes.***

Any Class of Claims against or Interests in the Debtors that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

## ARTICLE IV  TREATMENT OF CLAIMS AND INTERESTS.

4.1.    ***Priority Non-Tax Claims (Class 1).***

(a)    *Classification*:  Class 1 consists of Priority Non-Tax Claims.

(b)    *Treatment*:  Except to the extent that a holder of an Allowed Priority Non-Tax Claim against the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction of such Allowed Priority Non-Tax Claim, at the sole option of the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable:  (i) each such holder shall receive payment in Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is reasonably practicable; (ii) such holder's Allowed Priority Non-Tax Claim shall be Reinstated; or (iii) such holder shall receive such other treatment so as to render such holder's Allowed Priority Non-Tax Claim Unimpaired.

18

(c)      *Voting*:  Class 1 is Unimpaired, and holders of Priority Non-Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Priority Non-Tax Claims.

4.2.      **Other Secured Claims (Class 2).**

(a)      *Classification*:  Class 2 consists of the Other Secured Claims.  To the extent that Other Secured Claims are secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 2 for purposes of voting to accept or reject the Plan and receiving distributions under the Plan.

(b)      *Treatment*:

(i)      Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim will receive, on account of such Allowed Claim, at the sole option of the Debtors, Reorganized Debtors, or the Plan Administrator, as applicable:  (i) Cash in an amount equal to the Allowed amount of such Claim; (ii) Reinstatement of such holder's Allowed Other Secured Claim; (iii) such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired; or (iv) return of the applicable collateral in satisfaction of the Allowed amount of such Other Secured Claim.

(ii)      Upon the Effective Date and solely with respect to the Reorganization Transaction, the National Founders Facility shall be Reinstated and shall either be paid in full in Cash on account of the National Founders Facility Claim or receive such other treatment as agreed to among the Debtors and National Founders.

(c)      *Voting*:  Class 2 is Unimpaired, and holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Other Secured Claims.

4.3.      **Term Loan Claims (Class 3).**

(a)      *Classification*:  Class 3 consists of Term Loan Claims.

(b)      *Allowance*:  The Term Loan Claims are Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $961,355,635.34, plus amounts owing (if any) on account of call protections contained in the Prepetition Credit Agreement, plus all accrued but unpaid interest, costs, fees, and expenses then outstanding under the Prepetition Credit Agreement.  The Prepetition Administrative Agent and the Term Lenders shall not be required to file proofs of Claim on account of any Term Loan Claims.

(c)      *Treatment*:  Except to the extent that a holder of an Allowed Term Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed Term Loan Claim, each such holder thereof shall receive:

19

(i)      **If the Sale Transaction occurs**, on the Effective Date, such holder's Pro Rata share of Net Cash Proceeds until all Allowed Term Loan Claims are satisfied in full in Cash.   On the Effective Date, the Prepetition Credit Agreement shall be deemed cancelled (except as set forth in Section 5.12 hereof).

(ii)      **If the Reorganization Transaction occurs**, on the Effective Date, such holder's Pro Rata share of (a) term loans under the Amended and Restated Credit Facility Agreement; (b) 100% of the New Common Stock; provided, that the New Common Stock shall be subject to dilution by the Management Incentive Plan; and (c) if applicable, the Asset Sale Proceeds.   On the Effective Date, the Prepetition Credit Agreement shall be deemed cancelled (except as set forth in Section 5.12 hereof) and replaced by the Amended and Restated Credit Facility Agreement, without the need for any holder of a Term Loan Claim that does not vote for the Plan or votes to reject the Plan executing the Amended and Restated Credit Facility Agreement, and each Lien, mortgage and security interest that secures the obligations arising under the Prepetition Credit Agreement as of the Commencement Date shall be reaffirmed, ratified and deemed granted by the Reorganized Debtors to secure all obligations of the Reorganized Debtors arising under the Amended and Restated Credit Facility Agreement.

In each case, holders of Allowed Term Loan Claims shall also be entitled to receive their Pro Rata share of a fifty percent (50%) undivided interest in GUC Recovery Trust Causes of Action and the net proceeds thereof in accordance with the GUC Recovery Trust Agreement.

(d)      *Voting*:   Class 3 is Impaired, and holders of Term Loan Claims in Class 3 are entitled to vote to accept or reject the Plan.

4.4.      ***Second Lien Notes Claims (Class 4).***

(a)      *Classification*:   Class 4 consists of Second Lien Notes Claims.

(b)      *Treatment*:   The Second Lien Notes Claims are Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $ 253,895,875. Except to the extent that a holder of an Allowed Second Lien Notes Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed Second Lien Notes Claim, each such holder thereof shall receive:

(i)      **If the Sale Transactions occurs**, such holder's (x) Pro Rata share of the Second Lien Recovery Cash Pool; (y) Pro Rata share as between Allowed Claims in Class 4 and Class 5 of the Contributed Sale Proceeds; and (z) Pro Rata share of the Net Cash Proceeds as such holders are entitled to under applicable nonbankruptcy law after the Term Loan Claims are satisfied in full in Cash, until all Allowed Second Lien Notes Claims are satisfied in full; provided, that distributions on account of (x) and (y) of this Section 4.4(b)(i) shall be subject to the approval and consummation of the Global Settlement.

(ii)      **If the Reorganization Transaction occurs**, such holder's Pro Rata share of the Second Lien Recovery Cash Pool; provided, that such distribution shall be subject to the approval and consummation of the Global Settlement.

**If either the Sale Transaction or the Reorganization Transaction occurs**, on the Effective Date, the Second Lien Notes shall be deemed cancelled (except as set forth in Section 5.12 hereof) without further action by or order of the Bankruptcy Court.

(c)    *Voting*:  Class 4 is Impaired, and holders of Second Lien Notes Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Second Lien Notes Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Second Lien Notes Claims.

4.5.    ***General Unsecured Claims (Class 5).***

(a)    *Classification*: Class 5 consists of General Unsecured Claims.

(b)    *Treatment*:  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed General Unsecured Claim, each such holder thereof shall receive:

(i)    **If the Sale Transaction occurs**, such holder's Pro Rata share of (y) the GUC Recovery Trust Assets; and (z) the Net Cash Proceeds (until all Allowed General Unsecured Claims are satisfied in full) after the Term Loan Claims and Second Lien Notes Claims are satisfied in full in Cash; provided, that distributions on account of (y) of this Section 4.5(b)(i) shall be subject to the approval and consummation of the Global Settlement.

(ii)    **If the Reorganization Transaction occurs**, such holder's Pro Rata share of the GUC Recovery Trust Assets; provided, that such distribution shall be subject to the approval and consummation of the Global Settlement.

For the avoidance of doubt, a holder of a Term Loan Deficiency Claim and a holder of a deficiency Claim on account of a Second Lien Notes Claim shall not receive distributions in accordance with this Section 4.5(b) and such claims are waived solely for purposes of distribution pursuant to and in accordance with this Section 4.5(b).

(c)    *Voting*:  Class 5 is Impaired, and holders of General Unsecured Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of General Unsecured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such General Unsecured Claims.

4.6.    ***Borrower Non-Discharged Claims (Class 6).***

(a)    *Classification*: Class 6 consists of Borrower Non-Discharged Claims.

(b)    *Treatment*:  Except to the extent that a holder of an Allowed Borrower Non-Discharged Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed Borrower Non-Discharged Claim, each such holder thereof shall receive:

(i)    **If the Sale Transaction occurs**, the same treatment as Allowed General Unsecured Claims in accordance with Section 4.5(b) hereof, unless such Borrower Non-Discharged Claim is assumed by a purchaser as an assumed liability.  For the avoidance of doubt, holders of Allowed Borrower Non-Discharged Claims and holders of Allowed

General Unsecured Claims shall receive distributions from the GUC Recovery Trust Assets on a Pro Rata basis.

        (ii)    **If the Reorganization Transaction occurs**, on or after the Effective Date, as a carve out from the Term Lenders' collateral (or the proceeds or value thereof), holders of Allowed Borrower Non-Discharged Claims shall be treated in the ordinary course of business as if the Chapter 11 Cases had not been commenced, subject to all defenses or disputes the Debtors and Reorganized Debtors may assert as to the validity or amount of such Claims, including as provided in Section 10.9 of the Plan.

    (c)    *Voting*:

        (i)    **If the Sale Transaction occurs**, Class 6 is Impaired, and holders of Borrower Non-Discharged Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

        (ii)    **If the Reorganization Transaction occurs**, Class 6 is Unimpaired, and holders of Borrower Non-Discharged Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

Therefore, holders of Borrower Non-Discharged Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Borrower Non-Discharged Claims.

    4.7.    ***Intercompany Claims (Class 7).***

    (a)    *Classification*:  Class 7 consists of Intercompany Claims.

    (b)    *Treatment*:  On or after the Effective Date, all Intercompany Claims will be adjusted, continued, settled, reinstated, discharged, or eliminated as determined by the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, and the Requisite Term Lenders, in their respective reasonable discretion; provided, that if the Sale Transaction occurs, holders of Intercompany Claims shall not receive Cash on account of such Intercompany Claims.

    (c)    *Voting*:  Class 7 is Unimpaired, and holders of Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Intercompany Claims.

    4.8.    ***Intercompany Interests (Class 8).***

    (a)    *Classification*:  Class 8 consists of Intercompany Interests.

    (b)    *Treatment:*  On or after the Effective Date, all Intercompany Interests shall be cancelled, reinstated, or receive such other treatment as determined by the Debtors or Reorganized Debtors, as applicable, and the Requisite Term Lenders, in their respective reasonable discretion; provided, that if the Sale Transaction occurs, holders of Intercompany Interests shall not receive Cash on account of such Intercompany Interests.

    (c)    *Voting:*  Class 8 is Unimpaired, and holders of Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

WEIL:\97031056\1\41703.0010

Therefore, holders of Intercompany Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Intercompany Interests.

4.9.    ***Parent Equity Interests (Class 9).***

(a)    *Classification*:  Class 9 consists of Parent Equity Interests.

(b)    *Treatment*:  Except to the extent that a holder of Parent Equity Interests agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for Parent Equity Interests, each such holder thereof shall receive:

(i)    **If the Sale Transaction occurs**, (A) on the Effective Date, all Parent Equity Interests shall be cancelled and one share of Ditech common stock (the "***Single Share***") shall be issued to the Plan Administrator to hold in trust as custodian for the benefit of the former holders of Ditech common stock and preferred stock consistent with their former relative priority and economic entitlements.  The Single Share shall be recorded on the books and records maintained by the Plan Administrator.  To the extent not previously filed, on or promptly after the Effective Date, a Form 15 for the purpose of terminating the registration of Ditech's common stock and suspending Ditech's reporting obligations, as applicable, shall be filed with the Securities and Exchange Commission to the extent permitted by applicable law; (B) each former holder of a Parent Equity Interest (through their interest in the Single Share, as applicable) shall neither receive nor retain any property of the Estate or direct interest in property of the Estate on account of such Parent Equity Interests; *provided*, that in the event that all Allowed Claims have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each former holder of a Parent Equity Interest may receive its share of any remaining assets of Ditech consistent with such holder's rights of payment existing immediately prior to the Commencement Date. Unless otherwise determined by the Plan Administrator, on the date that Ditech's Chapter 11 Case is closed in accordance with Section 5.16 of the Plan, the Single Share issued on the Effective Date shall be deemed cancelled and of no further force and effect provided that such cancellation does not adversely impact the Debtors' Estates; (C) the continuing rights of former holders of Parent Equity Interests (including through their interest in Single Share or otherwise) shall be nontransferable except (i) by operation of law or (ii) for administrative transfers where the ultimate beneficiary has not changed, subject to the Plan Administrator's consent.

(ii)    **If the Reorganization Transaction occurs**, on the Effective Date, all Parent Equity Interests shall be deemed cancelled without further action by or order of the Bankruptcy Court, and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

(c)    *Voting*:  Class 9 is Impaired, and holders of Parent Equity Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Parent Equity Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Parent Equity Interests.

4.10.    ***Subordinated Securities Claims (Class 10).***

(a)    *Classification*: Class 10 consists of Subordinated Securities Claims.

(b)    *Treatment*:  Holders of Subordinated Securities Claims shall not receive or retain any property under the Plan on account of such Subordinated Securities Claims.  On the Effective Date, all Subordinated Securities Claims shall be deemed cancelled without further action by or order of the Bankruptcy Court, and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

(c)    *Voting*:  Class 10 is Impaired, and the holders of Subordinated Securities Claims are conclusively deemed to have rejected the Plan.  Therefore, holders of Subordinated Securities Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders of Subordinated Securities Claims will not be solicited.

## ARTICLE V    MEANS FOR IMPLEMENTATION.

5.1.    ***No Substantive Consolidation.***

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor. The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan.

5.2.    ***Compromise and Settlement of Claims, Interests, and Controversies.***

(a)    Pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan and the Global Settlement shall constitute a good faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a creditor or an Interest holder may have with respect to any Claim or Interest or any distribution to be made on account of an Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable, and reasonable.

(b)    The treatment provided for hereunder to Allowed Second Lien Notes Claims and Allowed General Unsecured Claims incorporates and reflects a proposed compromise and settlement by and among the Debtors, the Creditors' Committee, and the Consenting Term Lenders (the "Global Settlement").  The following constitutes the provisions and conditions of the Global Settlement:

(i)    On the Effective Date, and solely for purposes of distributions from the GUC Recovery Trust:  (i) all GUC Recovery Trust Assets (and all proceeds thereof) and all liabilities of each of the Debtors shall be deemed merged or treated as though they were merged into and with the assets and liabilities of each other; (ii) all guaranties of the Debtors of the obligations of any other Debtor shall be deemed eliminated and extinguished so that any General Unsecured Claim against any Debtor and any guarantee thereof executed by any Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors; (iii) each and every General Unsecured Claim filed or to be filed in any of the Chapter 11 Cases shall be treated filed against the consolidated Debtors and shall be treated as one General Unsecured Claim against and obligation of the consolidated Debtors; and (iv) for purposes of determining the availability of the right of set off under section 553 of the Bankruptcy Code, the Debtors shall be treated as one entity so that, subject to the other provisions of section 553 of the Bankruptcy Code, debts due to any of the Debtors may

be set off against the debts of any of the other Debtors. Such substantive consolidation shall not (other than for purposes relating to the Plan) affect the legal and corporate structures of the Reorganized Debtors. Moreover, such substantive consolidation shall not affect any subordination provisions set forth in any agreement relating to any General Unsecured Claim or the ability of the GUC Trustee to seek to have any General Unsecured Claim subordinated in accordance with any contractual rights or equitable principles.

(ii)    On the Effective Date, the GUC Recovery Trust shall be established in accordance with Section 5.19 of the Plan and shall be governed and administered in accordance with the GUC Recovery Trust Agreement.

(iii)    On the Effective Date, the Debtors and the Estates shall transfer to (i) the GUC Recovery Trust the GUC Recovery Trust Assets and (ii) the Prepetition Second Lien Notes Trustee, the Second Lien Recovery Cash Pool and the portion of the Contributed Sale Proceeds payable on account of the Second Lien Notes Claims, in each case, free and clear of all Liens, charges, Claims, encumbrances, and interests for the benefit of the holders of Allowed General Unsecured Claims and the Second Lien Noteholders. In accordance with Section 1141 of the Bankruptcy Code, all of the GUC Recovery Trust Assets, as well as the rights and powers of the Debtors' Estates applicable to the GUC Recovery Trust Assets, shall vest in the GUC Recovery Trust, for the benefit of the holders of Allowed General Unsecured Claims.

(iv)    The GUC Recovery Trust shall determine whether to enforce, settle, release, or compromise the GUC Recovery Trust Causes of Action (or decline to do any of the foregoing). The Reorganized Debtors and the Plan Administrator, as applicable, shall not be subject to any claims or counterclaims with respect to the GUC Recovery Trust Causes of Action, or otherwise.

(v)    On the Effective Date, the Debtors shall transfer to the Prepetition Second Lien Notes Trustee and MBS Trustee, as applicable, the applicable Remaining IT Fees, without any further notice to or action, order, or approval of the Bankruptcy Court. Nothing in this Section 5.2 shall in any way affect or diminish the rights of the Prepetition Second Lien Notes Trustee to exercise any charging lien against distributions to holders of Second Lien Notes Claims with respect to any unpaid fees or expenses.

(vi)    On the Effective Date, the Contributed Sale Proceeds shall be transferred to the GUC Recovery Trust and the Prepetition Second Lien Notes Trustee to be distributed in accordance with the Plan.

(vii)    The holders of Allowed Term Loan Claims shall be entitled to receive fifty percent (50%) of the net proceeds from the GUC Recovery Trust Causes of Action in accordance with the GUC Recovery Trust Agreement and shall be deemed to have otherwise waived any Term Loan Deficiency Claim solely for purposes of distribution pursuant to and in accordance with Section 4.5(b).

(viii)    The Creditors' Committee's previous objections to the Creditors' Committee Budget are resolved based on the definition of Creditors' Committee Budget under the Plan.

WEIL:\97031056\1\41703.0010

(ix)    On the Effective Date, all Claims or Causes of Action against (a) the Debtors' landlords under leases of nonresidential real property and (b) third party vendors providing services or goods to the Debtors in the ordinary course of business arising under chapter 5 of the Bankruptcy Code, including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever, released.

(x)    On the Effective Date, the Creditors' Committee's objection to the Disclosure Statement Motion shall be deemed resolved and withdrawn with prejudice. The Creditors' Committee shall not prosecute such objection or any other objection to the Disclosure Statement, Plan, or any Sale Transaction (provided that the terms of the Bidding Procedures are complied with).

(xi)    On the Effective Date, (a) the Challenge Period (as defined in the DIP Order) shall be deemed expired with respect to the Creditors' Committee; (b) the stipulations set forth in Sections H, I, and J of the DIP Order shall be final; and (c) the releases in paragraph 48(c) of the DIP Order shall be final.

(xii)    As a condition precedent to consummation of the Global Settlement, the Creditors' Committee shall not object to or take any other action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay, or impede the confirmation and consummation of the Plan or approval of the Global Settlement.

5.3.    *Marketing Process.*

Following the Commencement Date, the Debtors shall oversee and manage the sale process relating to any potential Sale Transaction and, if applicable, an Asset Sale Transaction, in good-faith consultation with the Requisite Term Lenders the DIP Agent, the Creditors' Committee, Freddie Mac, Fannie Mae, and Ginnie Mae.  The Requisite Term Lenders, the DIP Agent, the Creditors' Committee, Freddie Mac, Fannie Mae, and Ginnie Mae and their respective advisors shall have the right to review all information, diligence, and materials provided by the Debtors to any bidder or prospective bidder, subject to confidentiality, with respect to the sale and to consult with the Debtors with respect to any potential Sale Transaction or Asset Sale Transaction.  The Debtors, the Requisite Term Lenders, the DIP Agent, the Creditors' Committee, Freddie Mac, Fannie Mae, and Ginnie Mae shall consult in good faith regarding the sale process, including any diligence and other information requested by the Requisite Term Lenders.  The Debtors shall solicit bids on any and all bases, including soliciting bids that do not satisfy the Term Loan Claims in full.

5.4.    *Election Notice.*

Unless extended by the Debtors, within five (5) business days following the earlier of (a) the conclusion of the Debtors' marketing and sale process and (b) ninety-five (95) calendar days after the Commencement Date (the earliest such date, the "***Election Date***"), holders of at least $66^{2/3}\%$ in aggregate principal amount outstanding under the Prepetition Credit Agreement (the "***Electing Term Lenders***") shall deliver a notice (the "***Election Notice***") to the Debtors stating that the Electing Term Lenders wish to consummate a transaction (the "***Elected Transaction***"), being a:  (i) Reorganization Transaction or (ii) Sale Transaction, and, if applicable, (iii) in connection and together with an election of

(i) or (ii), any Asset Sale Transaction(s); provided, that inclusion of any such Asset Sale Transaction(s) is not incompatible with the successful consummation of the Elected Transaction in (i) or (ii).

5.5.     ***Sources of Consideration for Plan Distributions.***

(a)     ***Sale Transaction***.  The Debtors shall fund distributions and satisfy applicable Allowed Claims and Allowed Interests under the Plan with respect to the Sale Transaction using Cash on hand, the Sale Transaction Proceeds, and, if applicable, the Asset Sale Proceeds, in each case, as a carve out from the Term Lenders' collateral (or the proceeds or value thereof).

(b)     ***Reorganization Transaction***.  The Debtors shall fund distributions and satisfy applicable Allowed Claims and Allowed Interests under the Plan with respect to the Reorganization Transaction with Cash on hand, the Amended and Restated Credit Facility, Exit Working Capital Facility, the Exit Warehouse Facilities, New Common Stock, and, if applicable, the Asset Sale Proceeds.

5.6.     ***Sale Transaction.***

(a)     ***Closing of Sale Transaction (If Any).***

(i)     On the Effective Date, the Debtors shall be authorized to consummate the Sale Transaction contemplated by the Successful Bid and, among other things, the Debtors' assets (including executory contracts and unexpired leases assumed and assigned to the Successful Bidder pursuant to Article VIII hereof) shall, pursuant to Section 1141 of the Bankruptcy Code, be transferred to and vest in the applicable Successful Bidder free and clear of all Liens, Claims, charges, or other encumbrances pursuant to the terms of the applicable purchase agreement and Confirmation Order.

(b)     ***Wind Down and Dissolution of the Debtors.***

(i)     The Plan Administrator shall have the authority and right on behalf of each of the Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:  (a) except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors, other than with respect to General Unsecured Claims; (b) make distributions to holders of Allowed Claims in accordance with the Plan, other than with respect to holders of Allowed General Unsecured Claims; (c) prosecute all Causes of Action on behalf of the Debtors, elect not to pursue any Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of the Debtors, other than with respect to the GUC Recovery Trust Causes of Action; (d) retain professionals to assist in performing its duties under the Plan; (e) maintain the books, records, and accounts of the Debtors; (f) complete and file, as necessary, all final or otherwise required federal, state, and local tax returns for the Debtors; and (g) perform other duties and functions that are consistent with the implementation of the Plan.

(ii)     After the Effective Date, pursuant to the Plan, the Plan Administrator shall wind down, sell, liquidate, and may operate, use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action remaining with the Debtors' after consummation of the Sale Transaction contemplated by the Successful Bid

without approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than with respect to General Unsecured Claims and GUC Recovery Trust Causes of Action.

(iii)    Each of the Debtors shall indemnify and hold harmless the Plan Administrator solely in its capacity as such for any losses incurred in such capacity, except to the extent such losses were the result of the Plan Administrator's gross negligence, willful misconduct, or criminal conduct.

(iv)    Subject to Section 6.3(b) of the Plan, the Debtors shall make an initial distribution on the Effective Date and thereafter, the Plan Administrator shall, in an expeditious but orderly manner, make timely distributions pursuant to the Plan and the Confirmation Order.

(v)    The Plan Administrator shall be authorized to file on behalf of the Debtors and any non-Debtor subsidiaries, certificates of dissolution and any and all other corporate and company documents necessary to effectuate the Wind Down without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, the board of directors, or board of directors or similar governing body of the Debtors.

(vi)    The Plan Administrator shall effectuate the Wind Down with the amounts reserved in the Wind Down Budget.

5.7.    ***Reorganization Transaction.***

(a)    If the Debtors pursue the Reorganization Transaction, the Debtors shall implement the Reorganization Transaction as set forth herein.

(b)    ***Amended and Restated Credit Facility***.

(i)    On the Effective Date, the Amended and Restated Credit Facility Agreement shall be executed and delivered, and the Reorganized Debtors shall be authorized to execute, deliver and enter into, the Amended and Restated Credit Facility Agreement and the other Amended and Restated Credit Facility Documents, without the need for any further corporate action and without further action by the holders of Claims or Interests.

(ii)    Except as otherwise modified by the Amended and Restated Credit Facility Agreement, all Liens, mortgages and security interests securing the obligations arising under the Amended and Restated Credit Facility Agreement and the other Amended and Restated Credit Facility Documents that were collateral securing the Term Loan Claims as of the Commencement Date are unaltered by the Plan, and all such liens, mortgages and security interests are created and perfected with respect to the Amended and Restated Credit Facility Documents to the same extent, in the same manner and on the same terms and priorities as they were with respect to the Term Loan Claims, except as the foregoing may be modified pursuant to the Amended and Restated Credit Facility Documents. All Liens and security interests granted and continuing pursuant to the Amended and Restated Credit Facility Documents shall be (i) valid, binding, perfected, and enforceable Liens and security interests in the personal and real property described in and subject to such document, with the priorities established in respect thereof under

WEIL:\97031056\1\41703.0010

applicable non-bankruptcy law; (ii) granted in good faith and deemed not to constitute a fraudulent conveyance or fraudulent transfer; and (iii) not otherwise subject to avoidance, recharacterization, or subordination (whether equitable, contractual or otherwise) under any applicable law.  The Debtors, the Reorganized Debtors, and the Entities granted such Liens and security interests are authorized to make, and to the extent contemplated by the Amended and Restated Credit Facility Documents, the Debtors, the Reorganized Debtors, and their respective Affiliates will make, all filings and recordings, and to obtain all governmental approvals and consents necessary (but otherwise consistent with the consents and approvals obtained in connection with the Prepetition Credit Agreement) to establish, attach and perfect such Liens and security interests under any applicable law, and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interest to third parties.  For purposes of all mortgages and deposit account control agreements that secured the obligations arising under the Prepetition Credit Agreement, the Amended and Restated Credit Facility Agreement is deemed an amendment and restatement of the Prepetition Credit Agreement, and such mortgages and control agreements shall survive the Effective Date, shall not be cancelled, and shall continue to secure the Amended and Restated Credit Facility Agreement, except as expressly set forth in the Amended and Restated Credit Facility Agreement.

(iii)    The Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the Amended and Restated Credit Facility Documents without the need for any further corporate or limited liability company action and without further action by the holders of Claims or Interests.

(c)    *Exit Warehouse Facilities*.

On the Effective Date, the Reorganized Debtors shall be authorized to execute and perform under the Exit Warehouse Facilities Documents without the need for any further corporate action and without further action by the holders of Claims or Interests.

(d)    *Authorization and Issuance of New Plan Securities*.

(i)    On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, are authorized to issue or cause to be issued and shall issue the New Common Stock in accordance with the terms of the Plan and the Amended Organizational Documents without the need for any further corporate or stockholder action.  All of the New Common Stock issuable under the Plan, when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable.

(ii)    The distribution of the New Common Stock pursuant to the Plan may be made by means of book-entry registration on the books of a transfer agent for shares of New Common Stock or by means of book-entry exchange through the facilities of a transfer agent reasonably satisfactory to the Debtors, in accordance with the customary practices of such agent, as and to the extent practicable.

(e)    *Continued Corporate Existence*.

(i)    The Debtors shall continue to exist after the Effective Date as Reorganized Debtors as a private company in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the

WEIL:\97031056\1\41703.0010

Amended Organizational Documents unless otherwise determined in accordance with Section 5.10 of the Plan.

(ii)    On or after the Effective Date, the Reorganized Debtors may take such action that may be necessary or appropriate as permitted by applicable law and the Reorganized Debtors' Amended Organizational Documents, as the Reorganized Debtors may determine is reasonable and appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate the Plan.

(f)    ***Officers and Board of Directors***.

(i)    Upon the Effective Date, the New Board shall consist of five (5) directors.  Four (4) directors shall be selected by the Requisite Term Lenders and one (1) director shall be the chief executive officer ("***CEO***") of Reorganized Ditech, who shall be Thomas F. Marano.  The identities of the directors and officers of the Reorganized Debtors, to the extent known, shall be disclosed prior to the Confirmation Hearing in accordance with section 1129(a)(5) of the Bankruptcy Code.

(ii)    Except to the extent that a member of the board of directors or managers, as applicable, of a Debtor continues to serve as a director or manager of such Debtor on and after the Effective Date, the members of the board of directors or managers of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date and each such director or manager will be deemed to have resigned or shall otherwise cease to be a director or manager of the applicable Debtor on the Effective Date.

(g)    ***Reorganized Debtors' Authority.***

(i)    The Reorganized Debtors shall have the authority and right on behalf of each of the Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:  (a) except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors; (b) make distributions to holders of Allowed Claims in accordance with the Plan; (c) prosecute all Causes of Action on behalf of the Debtors, elect not to pursue any Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of the Debtors; (d) retain professionals to assist in performing its duties under the Plan; (e) maintain the books, records, and accounts of the Debtors; (f) complete and file, as necessary, all final or otherwise required federal, state, and local tax returns for the Debtors; and (g) perform other duties and functions that are consistent with the implementation of the Plan.

(ii)    After the Effective Date, the Reorganized Debtors may operate the Debtors' business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

5.8.    *Fannie Mae; Freddie Mac; Ginnie Mae.*

(a)    ***Fannie Mae.***  Notwithstanding anything herein or in the Confirmation Order, Plan Supplement, Exit Warehouse Facilities Documents, Exit Working Capital Facility Documents, the Amended and Restated Credit Facility Documents, or any other order in the Chapter 11 Cases to the contrary, (i) the Debtors' mortgage servicing rights and obligations relating to Fannie Mae shall not be transferred by the Debtors to a Successful Bidder (or any other person or entity) without the express prior written consent of Fannie Mae in its sole and absolute discretion; (ii) the assumption or assumption and assignment of any agreements between any of the Debtors and Fannie Mae, including, without limitation, the Fannie Mae Lender Contracts, shall be subject to the express prior written consent of Fannie Mae in its sole and absolute discretion; (iii) any proposed severance of rights and obligations or any other proposed modification of any agreement, including, without limitation, the Fannie Mae Lender Contracts, between any of the Debtors and Fannie Mae shall be subject to the prior written consent of Fannie Mae in its sole and absolute discretion; (iv) Fannie Mae's rights, powers, prerogatives, remedies, payment or lien priorities, and claims against the Debtors, any non-Debtor affiliate or any other person or entity under the Fannie Mae Lender Contracts (including, without limitation, any guaranty by any Debtor of the obligations thereunder) shall not be impaired, released, modified, or limited in any respect, except as otherwise expressly agreed in writing by Fannie Mae; (v) no lien or security interest shall attach to, modify, prime or otherwise affect (A) mortgage servicing rights with respect to mortgages which are now or hereafter serviced by Ditech or RMS (or any of their affiliates) for Fannie Mae, except as otherwise expressly authorized by Fannie Mae pursuant to the applicable Fannie Mae Acknowledgment Agreements, (B) any other rights related to the Fannie Mae Lender Contracts, between any of the Debtors and Fannie Mae, including the "Purchased Servicing Advance Receivables" as defined and referenced in, and except as otherwise expressly authorized by, the Fannie Mae Acknowledgment Agreements, or (C) any cash, accounts, securities, or other collateral (and any proceeds thereof) pledged to Fannie Mae pursuant to any collateral pledge agreement or other security agreement between Ditech and Fannie Mae (including the Collateral as defined in that certain Pledge and Security Agreement in favor of Fannie Mae dated as of December 19, 2014 (as amended)); (vi) the term of Fannie Mae Acknowledgment Agreements shall remain unchanged, and any extension of the term or changes to other provisions of the Fannie Mae Acknowledgment Agreements must be expressly agreed to by the parties in a separate written agreement; (vii) Fannie Mae does not, and shall not be deemed to, release any Released Party or any other person or entity from any claims or causes of action that it may have, nor shall Fannie Mae be enjoined from pursuing any such claims or causes of action; and (viii) in a Reorganization Transaction, the Fannie Mae Lender Contracts shall be, upon the Effective Date, assumed by the Reorganized Debtors; and (ix) all transactions with and transfers to Fannie Mae prior to the Effective Date are hereby reaffirmed and ratified by the Debtors and shall not be subject to avoidance.  Without limiting the generality of, and subject to, the foregoing, in connection with the proposed assumption or assumption and assignment of any agreement, including, without limitation, the Fannie Mae Lender Contracts, between any of the Debtors and Fannie Mae, such agreements may be assumed or assumed and assigned only upon (i)(1) the Reorganized Debtors agreeing to honor all obligations under the Fannie Mae Lender Contracts whether incurred prior to or after the Effective Date; (2) in the case of an assignment in a Sale Transaction repayment in full of the Cure Amounts; or (3) such other treatment of the Cure Amount or any other obligations as shall be agreed to by Fannie Mae and the Debtors in good faith negotiations and (ii) adequate assurance of future performance.

(b)    ***Freddie Mac.***

(i)    Notwithstanding anything herein or in the Confirmation Order, Plan Supplement, Exit Warehouse Facilities Documents, Exit Working Capital Facility Documents, the Amended and Restated Credit Facility Documents, or any other order in the Chapter 11 Cases to the contrary, (1) Freddie Mac's rights, powers, prerogatives,

remedies, payment or lien priorities, and claims against the Debtors or any other person or entity under the Freddie Mac Agreements shall not be impaired, released, modified, or limited in any respect, except as otherwise expressly agreed in writing by Freddie Mac; (2) no lien or security interest shall (a) attach to, modify, include or otherwise affect mortgage servicing rights with respect to mortgages which are now or hereafter serviced by Ditech (or any of its affiliates) for Freddie Mac, (b) attach to, modify, include or otherwise affect the "***Servicing Collateral***" (as defined and referenced in, and except as otherwise expressly authorized by, the Freddie Mac Acknowledgment Agreement), (c) attach to, modify, include or otherwise affect any cash, accounts, securities, or other collateral (and any proceeds thereof) pledged to Freddie Mac pursuant to any collateral pledge agreement or other security agreement between Ditech and Freddie Mac (including, without limitation, the Freddie Mac Pledge Agreement), or (d) impair Freddie Mac's rights, remedies, powers, interests, payment or lien priority, or prerogatives set forth in any of the foregoing; and (3) Freddie Mac does not, and shall not be deemed to, release any Released Party or any other person or entity from any claims or causes of action that it may have, nor shall Freddie Mac be enjoined from pursuing any such claims or causes of action.

(ii)    Notwithstanding anything herein or in the Confirmation Order, Plan Supplement, Exit Warehouse Facilities Documents, Exit Working Capital Facility Documents, the Amended and Restated Credit Facility Documents, or any other order in the Chapter 11 Cases to the contrary, (1) the Debtors' mortgage servicing rights with respect to mortgages which are now or hereafter serviced by Ditech (or any of its affiliates) for Freddie Mac shall not be transferred by the Debtors to a Successful Bidder (or any other entity) without the express prior written consent of Freddie Mac in its sole and absolute discretion; (2) the Debtors and the Reorganized Debtors shall not assume or assume and assign any agreement between any of the Debtors and Freddie Mac, including, without limitation, the Freddie Mac Agreements, without the express prior written consent of Freddie Mac in its sole and absolute discretion; (3) any proposed severance of rights and obligations or any other proposed modification of any agreement, including, without limitation, the Freddie Mac Agreements, between any of the Debtors and Freddie Mac shall be subject to the prior written consent of Freddie Mac in its sole and absolute discretion; and (4) all transactions with and transfers to Freddie Mac prior to the Effective Date are hereby reaffirmed and ratified by the Debtors and shall not be subject to avoidance.    The Debtors and Freddie Mac shall enter into good faith negotiations and use commercially reasonable efforts to resolve the claims of Freddie Mac and the assumption or assumption and assignment of the Freddie Mac Agreements in the Reorganization Transaction or the Sale Transaction, as applicable.

(c)    ***Ginnie Mae.***    Notwithstanding anything herein to the contrary, (i) the Debtors' mortgage servicing and securitization obligations relating to Ginnie Mae shall not be transferred by the Debtors to a Successful Bidder without the express prior written consent of Ginnie Mae in its sole and absolute discretion; (ii) the assumption or assumption and assignment of any agreements between any of the Debtors and Ginnie Mae, including, without limitation, the Ginnie Mae Agreements, shall be subject to the express prior written consent of Ginnie Mae in its sole and absolute discretion; and (iii) any proposed severance of rights and obligations or any other proposed modification of any agreement, including, without limitation, the Ginnie Mae Agreements, between any of the Debtors and Ginnie Mae shall be subject to the prior written consent of Ginnie Mae in its sole and absolute discretion.    The Debtors and Ginnie Mae shall enter into good faith negotiations and use commercially reasonable efforts to resolve the claims of Ginnie Mae and the assumption or assumption and assignment of the Ginnie Mae Agreements in the Reorganization Transaction or the Sale Transaction, as applicable.

5.9.    *Employee Matters.*

(a)      Subject to Section 5.9(c) of the Plan, on the Effective Date, solely with respect to the Reorganization Transaction, the Reorganized Debtors shall be deemed to have assumed all employee compensation plans, Benefit Plans, employment agreements, offer letters, or award letters to which the Debtors are a party (collectively, the "*Employee Arrangements*").  Notwithstanding the foregoing, if an Employee Arrangement, other than any postpetition employee incentive program approved by the Bankruptcy Court, provides in part for a payment, premium, or other award upon the occurrence of a change of control, change in control, or other similar event, then such Employee Arrangement shall only be assumed to the extent that the Reorganization Transaction, including consummation of the Plan, shall not be treated as a change of control, change in control, or other similar event under such Employee Arrangement.

(b)      Following the Effective Date, solely with respect to the Reorganization Transaction, the applicable Reorganized Debtors shall enter into the Management Incentive Plan.  All awards issued under the Management Incentive Plan will be dilutive of all other New Common Stock issued pursuant to the Plan.  Within thirty (30) days following the Effective Date, the Management Incentive Plan and individual grants thereunder shall be independently considered and, subject to the exercise of its fiduciary duties and to the extent it deems appropriate, approved by the New Board.

(c)      For the avoidance of doubt, (i) if an Employee Arrangement provides for an award or potential award of Interests or consideration based on the value of Interests prior to the Effective Date, such Interest shall be treated in accordance with Section 4.9 of the Plan and cancelled notwithstanding assumption of the applicable Employee Arrangement, and (ii) the Ditech Holding Corporation 2018 Equity Incentive Plan (as amended and restated) shall not be assumed and shall be deemed terminated.

(d)      In the event of a Sale Transaction, the Sale Incentive Awards shall be paid in Cash from the Sale Transaction Proceeds as Allowed Administrative Expense Claims.  Such distributions shall be deemed to be distributions made to holders of Allowed Term Loan Claims in accordance with Section 4.3 of the Plan.

5.10.    *Effectuating Documents; Further Transactions.*

(a)      On or as soon as practicable after the Effective Date, the Reorganized Debtors, or the Plan Administrator, as applicable, shall take such actions as may be or become necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan and the Global Settlement, including (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, financing, conversion, disposition, transfer, dissolution, transition services, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may determine; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution and the Amended Organizational Documents pursuant to applicable state law; (iv) the issuance of securities, all of which shall be authorized and approved in all respects, in each case, without further action being required under applicable law, regulation, order, or rule; and (v) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law or to reincorporate in another jurisdiction, subject, in each case, to the Amended Organizational Documents.

(b)    Each officer, manager, or member of the board of directors of the Debtors is (and each officer, manager, or member of the board of directors of the Reorganized Debtors and the Plan Administrator, as applicable, shall be) authorized and directed to issue, execute, deliver, file, or record such contracts, securities, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors or Wind Down Estates, all of which shall be authorized and approved in all respects, in each case, without the need for any approvals, authorization, consents, or any further action required under applicable law, regulation, order, or rule (including, without limitation, any action by the stockholders or directors or managers of the Debtors, the Reorganized Debtors, or Wind Down Estates) except for those expressly required pursuant to the Plan.

(c)    In order to preserve the Reorganized Debtors' or Wind Down Estates' ability to utilize certain tax attributes that exist as of the Effective Date, the charter, bylaws, and other organizational documents may restrict certain transfers of the New Common Stock.

(d)    The Debtors shall be authorized to implement the Reorganization Transaction, Asset Sale Transaction, or Sale Transaction, as applicable, and the Global Settlement, including the creation of the GUC Recovery Trust, in the manner most tax efficient to the Reorganized Debtors or Wind Down Estates, as determined by the Debtors in their business judgment, given the totality of the circumstances.

(e)    All matters provided for herein involving the corporate structure of the Debtors. Reorganized Debtors, or Wind Down Estates, to the extent applicable, or any corporate or related action required by the Debtors, Reorganized Debtors, or Wind Down Estates in connection herewith shall be deemed to have occurred and shall be in effect, without any requirement of further action by the stockholders, members, or directors or managers of the Debtors or Reorganized Debtors, and with like effect as though such action had been taken unanimously by the stockholders, members, directors, managers, or officers, as applicable, of the Debtors, Reorganized Debtors, or Wind Down Estates.

5.11.    *Section 1145 Exemption.*

(a)    The offer, issuance, and distribution of the New Common Stock hereunder to holders of the Term Loan Claims under Section 4.3 of the Plan shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without further act or action by any Entity, from registration under (i) the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder and (ii) any state or local law requiring registration for the offer, issuance, or distribution of Securities.

(b)    The New Common Stock shall be freely tradable by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act of 1933; (ii) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (iii) any restrictions, to the extent necessary for the Debtors to preserve their ability to utilize certain tax attributes that exist as of the Effective Date, on the transferability and ownership of New Common Stock, (iv) applicable regulatory approval, and (v) the Stockholders Agreement.

5.12.    *Cancellation of Existing Securities and Agreements.*

(a)    Solely with respect to the Reorganization Transaction, except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, including

with respect to executory contracts or unexpired leases that shall be assumed by the Reorganized Debtors, and subject in all respects to the Prepetition Intercreditor Agreement, on the Effective Date, all agreements, instruments, and other documents evidencing or issued pursuant to the Prepetition Credit Agreement, the Prepetition Second Lien Notes Indenture, or any indebtedness or other obligations thereunder, and any Interest, and any rights of any holder in respect thereof, shall be deemed cancelled, discharged, and of no force or effect, and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

(b)     Notwithstanding such cancellation and discharge, the Prepetition Credit Agreement and the Prepetition Second Lien Notes Indenture shall continue in effect to the extent necessary (i) to allow the holders of such Claims to receive distributions under the Plan; (ii) to allow the Debtors, the Reorganized Debtors, the Prepetition Administrative Agent, and the Prepetition Second Lien Notes Trustee to make post-Effective Date distributions or take such other action pursuant to the Plan on account of such Claims and to otherwise exercise their rights and discharge their obligations relating to the interests of the holders of such Claims; (iii) to allow holders of Claims to retain their respective rights and obligations vis-à-vis other holders of Claims pursuant to any applicable loan documents; (iv) to allow the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to enforce their rights, claims, and interests vis-à-vis any party other than the Debtors, including any rights with respect to priority of payment and/or to exercise charging liens; (v) to preserve any rights of the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to payment of fees, expenses, and indemnification obligations as against any money or property distributable to lenders under the Prepetition Credit Agreement and holders under the Prepetition Second Lien Notes Indenture, as applicable, including any rights to priority of payment and/or to exercise charging liens; (vi) to allow the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to enforce any obligations owed to it under the Plan; (vii) to allow the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to exercise rights and obligations relating to the interests of lenders under the Prepetition Credit Agreement and holders under the Prepetition Second Lien Notes Indenture, as applicable; (viii) to permit the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to perform any function necessary to effectuate the foregoing; (ix) to allow the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court relating to the Prepetition Credit Agreement or the Prepetition Second Lien Notes Indenture; and (x) to permit the continuation of the collateral, security, and related agreements under the Prepetition Credit Agreement with respect to the Amended and Restated Credit Facility Agreement as provided under the Plan; provided, that nothing in this Section 5.12 shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any liability or expense to the Reorganized Debtors.  In a Reorganization Transaction, notwithstanding anything to the contrary herein, the indemnity obligations of the Debtors under the Prepetition Credit Agreement shall survive the termination thereof and shall not be discharged or released pursuant to the Plan or the Confirmation Order.  Notwithstanding anything to the contrary herein, the indemnity obligations of the Debtors under the Prepetition Credit Agreement and the Prepetition Second Lien Notes Indenture shall survive the termination thereof and shall not be discharged or released pursuant to the Plan or the Confirmation Order.

(c)     Except for the foregoing, subsequent to the performance by the Prepetition Administrative Agent of its obligations pursuant to the Plan, the Prepetition Administrative Agent and its agents shall be relieved of all further duties and responsibilities related to the Prepetition Credit Agreement, except with respect to any duties and responsibilities of the Prepetition Administrative Agent that, pursuant to the Amended and Restated Credit Facility Agreement, survive the termination of the Prepetition Credit Agreement.

WEIL:\97031056\1\41703.0010

(d)      Except for the foregoing, subsequent to the performance by the Prepetition Second Lien Notes Trustee of its obligations pursuant to the Plan, the Prepetition Second Lien Notes Trustee and its agents shall be relieved of all further duties and responsibilities related to the Prepetition Second Lien Notes Indenture.  Nothing in this Section 5.12 shall in any way affect or diminish the rights of the Prepetition Second Lien Notes Trustee to exercise any charging lien against distributions to holders of Second Lien Notes Claims with respect to any unpaid fees.

(e)      Notwithstanding anything to the contrary herein, all rights under the Prepetition Second Lien Notes Indenture shall remain subject to the Prepetition Intercreditor Agreement.

(f)      Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in the Plan shall be deemed null and void and shall be of no force and effect.  Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under any executory contract or lease to the extent such executory contract or lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court or hereunder.

### 5.13.   *Cancellation of Liens.*

Except as otherwise specifically provided herein, upon the payment in full in Cash of an Other Secured Claim, any Lien securing an Other Secured Claim that is paid in full, in Cash, shall be deemed released, and the holder of such Other Secured Claim shall be authorized and directed to release any collateral or other property of the Debtors (including any Cash collateral) held by such holder and to take such actions as may be requested by the Reorganized Debtors, to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Reorganized Debtors.

### 5.14.   *Subordination Agreements.*

Pursuant to section 510(a) of the Bankruptcy Code, all subordination agreements, including but not limited to, the Prepetition Intercreditor Agreement and the Prepetition Second Lien Notes Indenture, governing Claims or Interests shall be enforced in accordance with such agreements' terms; provided, that the subordination provisions in such agreements shall not apply to distributions to holders of Allowed Second Lien Notes Claims pursuant to Section 4.4(b) of the Plan.

### 5.15.   *Nonconsensual Confirmation.*

The Debtors intend to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code as to any Classes that reject or are deemed to reject the Plan.

### 5.16.   *Closing of Chapter 11 Cases.*

After an Estate has been fully administered, the Reorganized Debtors or Plan Administrator shall seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case(s) in accordance with the Bankruptcy Code and Bankruptcy Rules.

WEIL:\97031056\1\41703.0010

5.17.    *Notice of Effective Date.*

As soon as practicable, but not later than three (3) Business Days following the Effective Date, the Debtors shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

5.18.    *Separability.*

Notwithstanding the combination of the separate plans of reorganization for the Debtors set forth in the Plan for purposes of economy and efficiency, the Plan constitutes a separate chapter 11 plan for each Debtor. Accordingly, if the Bankruptcy Court does not confirm the Plan with respect to one or more Debtors, it may still, subject to the consent of the applicable Debtors, confirm the Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

5.19.    *GUC Recovery Trust.*

(a)    *Creation and Governance of the GUC Recovery Trust.* On the Effective Date, the Debtors shall transfer the GUC Recovery Trust Assets to the GUC Recovery Trust and the Debtors and the GUC Trustee shall execute the GUC Recovery Trust Agreement and shall take all steps necessary to establish the GUC Recovery Trust in accordance with the Plan and the beneficial interests therein. In the event of any conflict between the terms of the Plan and the terms of the GUC Recovery Trust Agreement, the terms of the Plan shall govern. Additionally, on the Effective Date, the Debtors shall transfer and shall be deemed to transfer to the GUC Recovery Trust all of their rights, title and interest in and to all of the GUC Recovery Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the GUC Recovery Trust Assets shall automatically vest in the GUC Recovery Trust free and clear of all Claims and Liens, and such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax. The GUC Trustee shall be the exclusive administrator of the assets of the GUC Recovery Trust for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representatives of the Estate of each of the Debtors appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, solely for purposes of carrying out the GUC Trustee's duties under the GUC Recovery Trust Agreement. The GUC Recovery Trust shall be governed by the GUC Recovery Trust Agreement and administered by the GUC Trustee. The powers, rights, and responsibilities of the GUC Trustee shall be specified in the GUC Recovery Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this Section 5.19. The GUC Trustee shall hold and distribute the GUC Recovery Trust Assets in accordance with the provisions of the Plan and the GUC Recovery Trust Agreement. Other rights and duties of the GUC Trustee shall be as set forth in the GUC Recovery Trust Agreement. After the Effective Date, the Debtors and the Reorganized Debtors shall have no interest in the GUC Recovery Trust Assets except as set forth in the GUC Recovery Trust Agreement.

(b)    *GUC Trustee and GUC Recovery Trust Agreement.* The GUC Recovery Trust Agreement generally will provide for, among other things: (i) the transfer of the GUC Recovery Trust Assets to the GUC Recovery Trust; (ii) the payment of certain reasonable expenses of the GUC Recovery Trust; (iii) litigation of any GUC Recovery Trust Causes of Action, which may include the prosecution, settlement, abandonment or dismissal of any such Causes of Action; and (iv) make distributions to holders of Allowed General Unsecured Claims as provided herein and in the GUC Recovery Trust Agreement. The GUC Recovery Trust Agreement may include reasonable and customary provisions that allow for indemnification by the GUC Recovery Trust. Any such indemnification shall be the sole responsibility of the GUC Recovery Trust and payable solely from the GUC Recovery Trust Assets. The GUC Trustee shall be responsible for all decisions and duties with respect to the GUC Recovery Trust

WEIL:\97031056\1\41703.0010

and the GUC Recovery Trust Assets, except as otherwise provided in the GUC Recovery Trust Agreement.

(c)     *Cooperation of Reorganized Debtors*.   Subject to subsection (d) of this Section 5.19, the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, upon reasonable notice, shall provide reasonable cooperation with the GUC Trustee in the administration of the GUC Recovery Trust, including providing reasonable access to pertinent documents, including books and records, to the extent the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, have such information and/or documents, to the GUC Trustee sufficient to enable the GUC Trustee to perform its duties hereunder.   The Reorganized Debtors shall reasonably cooperate with the GUC Trustee in the administration of the GUC Recovery Trust, including, providing reasonable access to documents and current officers and directors with respect to (i) the prosecution of the GUC Recovery Trust Causes of Action, and (ii) contesting, settling, compromising, reconciling, and objecting to General Unsecured Claims, in each case, the GUC Recovery Trust agrees to reimburse reasonable out-of-pocket expenses for preservation of documents, copying or similar expenses.   The collection, review, and preservation of documents for any investigation or litigation by the GUC Trustee shall be at the expense of the GUC Recovery Trust.

(d)     *Preservation of Privilege*.   The Debtors and the GUC Recovery Trust shall enter into a common interest agreement whereby the Debtors will be able to share documents, information or communications (whether written or oral) relating to the GUC Recovery Trust Assets.   The GUC Recovery Trust shall seek to preserve and protect all applicable privileges attaching to any such documents, information, or communications.   The GUC Trustee's receipt of such documents, information or communications shall not constitute a waiver of any privilege.   All privileges shall remain in the control of the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, and the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, retain the right to waive their own privileges.

(e)     *GUC Recovery Trust Assets*.   The GUC Trustee shall have the exclusive right in respect of all GUC Recovery Trust Causes of Action to institute, file, prosecute, enforce, settle, compromise, release, abandon, or withdraw any and all GUC Recovery Trust Causes of Action without any further order of the Bankruptcy Court or consent of any other party, except as otherwise provided herein or in the GUC Recovery Trust Agreement.   From and after the Effective Date, the GUC Trustee, in accordance with section 1123(b)(3) of the Bankruptcy Code, and on behalf of the GUC Recovery Trust, shall serve as a representative of the Estates, solely for purposes of carrying out the GUC Trustee's duties under the GUC Recovery Trust Agreement.   In connection with the investigation, prosecution and/or compromise of the GUC Recovery Trust Causes of Action, the GUC Trustee may expend such portion of the GUC Recovery Trust Assets as the GUC Trustee deems necessary.

(f)     *GUC Recovery Trust Fees and Expenses*.   From and after the Effective Date, the GUC Trustee, on behalf of the GUC Recovery Trust, shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the GUC Recovery Trust and any professionals retained by the GUC Recovery Trust from the GUC Recovery Trust Assets, except as otherwise provided in the GUC Recovery Trust Agreement.   The Reorganized Debtors or the Wind Down Estates, as applicable, shall not be responsible for any costs, fees, or expenses of the GUC Recovery Trust.

(g)     *Tax Treatment*.   In furtherance of this Section 5.19 of the Plan, (i) the GUC Recovery Trust shall be structured to qualify as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code to the holders of General Unsecured Claims, consistent with the terms of the Plan; (ii) the sole purpose of the

GUC Recovery Trust shall be the liquidation and distribution of the GUC Recovery Trust Assets in accordance with Treasury Regulation section 301.7701-4(d), including the resolution of General Unsecured Claims in accordance with this Plan, with no objective to continue or engage in the conduct of a trade or business; (iii) all parties (including the Debtors and the Estates, holders of General Unsecured Claims and the GUC Trustee) shall report consistently with such treatment; (iv) all parties shall report consistently with the valuation of the GUC Recovery Trust Assets transferred to the GUC Recovery Trust as determined by the GUC Trustee (or its designee); (v) the GUC Trustee shall be responsible for filing returns for the GUC Recovery Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a); and (vi) the GUC Trustee shall annually send to each holder of an interest in the GUC Recovery Trust a separate statement regarding the receipts and expenditures of the trust as relevant for U.S. federal income tax purposes. Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the GUC Trustee of a private letter ruling if the GUC Trustee so requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the GUC Trustee), the GUC Trustee may timely elect to (i) treat the any portion of the GUC Recovery Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. If a "disputed ownership fund" election is made, all parties (including the Debtors and the Estates, holders of General Unsecured Claims and GUC Trustee) shall report for United States federal, state, and local income tax purposes consistently with the foregoing.

(h)      *Non-Transferability of Interests in GUC Recovery Trust.*  Any and all interests in the GUC Recovery Trust shall be non-transferable other than if transferred by will, intestate succession, or otherwise by operation of law.

(i)      *Dissolution of the GUC Litigation Trust.*  The GUC Trustee and the GUC Recovery Trust shall be discharged or dissolved, as the case may be, at such time as (i) the GUC Trustee determines that the pursuit of additional GUC Recovery Trust Causes of Action is not likely to yield sufficient additional proceeds to justify further pursuit of such claims and (ii) all distributions required to be made by the GUC Trustee under the Plan have been made. Upon dissolution of the GUC Recovery Trust, any remaining GUC Recovery Trust Assets shall be distributed to holders of Allowed General Unsecured Claims in accordance with the Plan and the GUC Recovery Trust Agreement as appropriate.

(j)      *Single Satisfaction of Allowed General Unsecured Claims.*  Notwithstanding anything to the contrary herein, in no event shall holders of Allowed General Unsecured Claims recover more than the full amount of their Allowed General Unsecured Claims from the GUC Recovery Trust.

## ARTICLE VI  DISTRIBUTIONS.

### 6.1.    *Distributions Generally.*

Except as otherwise provided in the Plan and in the GUC Recovery Trust Agreement, one or more Disbursing Agents shall make all distributions under the Plan to the appropriate holders of Allowed Claims in accordance with the terms of the Plan.

### 6.2.    *Distribution Record Date.*

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed for purposes of determining whether a holder of such a Claim or Interest is a record holder entitled to distributions under the Plan, and there shall be no further changes in the record holders

or the permitted designees of any such Claims or Interests. The Debtors, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable, shall have no obligation to recognize any transfer or designation of such Claims or Interests occurring after the close of business on the Distribution Record Date. In addition, with respect to payment of any Cure Amounts or assumption disputes, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease as of the close of business on the Distribution Record Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount. For the avoidance of doubt, the Distribution Record Date shall not apply to the Second Lien Notes, the holders of which shall receive a distribution in accordance with Article IV of the Plan and the customary procedures of DTC on or as soon as practical after the Effective Date. For the further avoidance of doubt, all distributions made pursuant to the Plan on account of the Second Lien Notes shall be made by the Disbursing Agent to, or at the direction of, the Prepetition Second Lien Notes Trustee, for further distribution to holders of Second Lien Notes, in accordance with the Plan and the Confirmation Order, subject to and in accordance with the terms of the Prepetition Second Lien Notes Indenture, including, without limitation, subject to the application of the charging lien of the Prepetition Second Lien Notes Trustee for payment of any unpaid fees and expenses.

### 6.3. *Date of Distributions.*

(a)    Except as otherwise provided in the Plan and in the GUC Recovery Trust Agreement, any distributions and deliveries to be made under the Plan shall be made on the Effective Date or as otherwise determined in accordance with the Plan, including, without limitation, the treatment provisions of Article IV of the Plan, or as soon as practicable thereafter; provided, that the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable, shall from time to time determine subsequent distribution dates to the extent they determine them to be appropriate.

(b)    In a Sale Transaction, the Plan Administrator shall reserve an amount sufficient to pay holders of Disputed Administrative Expense Claims and Disputed Priority Tax Claims the amount such holders would be entitled to receive under the Plan if such Claims were to become Allowed Claims. After the resolution of all Disputed Administrative Expense Claims and Disputed Priority Tax Claims, the Plan Administrator shall treat any amounts that were reserved for Disputed Administrative Expense Claims and Disputed Priority Tax Claims that do not become Allowed Claims as Net Cash Proceeds.

### 6.4. *Disbursing Agent.*

All distributions under this Plan shall be made by the Disbursing Agent on and after the Effective Date as provided herein. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties. The Reorganized Debtors or Plan Administrator shall use all commercially reasonable efforts to provide the Disbursing Agent (if other than the Reorganized Debtors) with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors', Reorganized Debtors', or Wind Down Estates', as applicable, books and records. The Reorganized Debtors or Plan Administrator shall cooperate in good faith with the applicable Disbursing Agent (if other than the Reorganized Debtors) to comply with the reporting and withholding requirements outlined in Section 6.19 of the Plan.

### 6.5. *Rights and Powers of Disbursing Agent.*

(a)    From and after the Effective Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against and Interests in the Debtors and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred

upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent.  No holder of a Claim or Interest or other party in interest shall have or pursue any claim or Cause of Action against the Disbursing Agent, solely in its capacity as Disbursing Agent, for making distributions in accordance with the Plan or for implementing provisions of the Plan, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent.

(b)    A Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder; (ii) make all distributions contemplated hereby; and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

6.6.    ***Expenses of Disbursing Agent.***

Except as otherwise ordered by the Bankruptcy Court, any reasonable and documented fees and expenses incurred by the Disbursing Agent acting in such capacity (including reasonable documented attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash; provided, that the fees and expenses incurred by the GUC Trustee shall be paid solely from the GUC Recovery Trust Assets in accordance with the GUC Recovery Trust Agreement.

6.7.    ***No Postpetition Interest on Claims.***

Except as otherwise provided in the Plan, the Confirmation Order, the DIP Order, or another order of the Bankruptcy Court or required by the Bankruptcy Code (including postpetition interest in accordance with sections 506(b) and 726(a)(5) of the Bankruptcy Code), interest shall not accrue or be paid on any Claims on or after the Commencement Date; provided, that if interest is payable pursuant to the preceding sentence, interest shall accrue at the federal judgment rate pursuant to 28 U.S.C. § 1961 on a non-compounded basis from the date the obligation underlying the Claim becomes due and is not timely paid through the date of payment.

6.8.    ***Delivery of Distributions.***

(a)    Subject to Bankruptcy Rule 9010, all distributions to any holder or permitted designee, as applicable, of an Allowed Claim or Interest shall be made to a Disbursing Agent, who shall transmit such distribution to the applicable holders or permitted designees of Allowed Claims or Interests on behalf of the Debtors.  In the event that any distribution to any holder or permitted designee is returned as undeliverable, no further distributions shall be made to such holder or such permitted designee unless and until such Disbursing Agent is notified in writing of such holder's or permitted designee's, as applicable, then-current address, at which time all currently-due, missed distributions shall be made to such holder as soon as reasonably practicable thereafter without interest.  Nothing herein shall require the Disbursing Agent to attempt to locate holders or permitted designees, as applicable, of undeliverable distributions and, if located, assist such holders or permitted designees, as applicable, in complying with Section 6.19 of the Plan.

(b)    Notwithstanding the foregoing, all distributions of Cash on account of Term Loan Claims or Second Lien Notes Claims, if any, shall be deposited with the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee, as applicable, for distribution to holders of Term Loan Claims or Second Lien Notes Claims in accordance with the terms of the Prepetition Credit

41

Agreement and the Prepetition Second Lien Notes Indenture. All distributions other than of Cash on account of Term Loan Claims or Second Lien Notes Claims, if any, may, with the consent of the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee, be made by the Disbursing Agent directly to holders of Term Loan Claims and Second Lien Notes Claims in accordance with the terms of the Plan, the Prepetition Credit Agreement, and the Prepetition Second Lien Notes Indenture. To the extent the Prepetition Administrative Agent or the Prepetition Second Lien Notes Trustee effectuates, or is requested to effectuate, any distributions hereunder, the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee shall be deemed a "Disbursing Agent" for purposes of the Plan.

(c)        As soon as reasonably practicable after the Confirmation Order is entered, the DIP Agent shall provide to counsel to the Debtors a list of all holders of DIP Claims as of such date and such additional information as may be reasonably requested by counsel to the Debtors or the Disbursing Agent to make distributions under the Plan. All distributions to holders of DIP Claims shall be governed by the DIP Documents and the DIP Order and shall be made to each holder of an Allowed DIP Claim or such holder's authorized designee for purposes of distributions to be made hereunder. All reasonable and documented fees and expenses of the DIP Agent incurred after the Effective Date as part of this Section 6.8 shall be paid by the Debtors or Reorganized Debtors, as applicable.

### 6.9.    *Distributions after Effective Date.*

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 6.10.    *Unclaimed Property.*

Undeliverable distributions or unclaimed distributions shall remain in the possession of the Debtors or GUC Recovery Trust, as applicable, until such time as a distribution becomes deliverable or holder accepts distribution, or such distribution reverts back to the Debtors, Reorganized Debtors, Wind Down Estates, or GUC Recovery Trust, as applicable, and shall not be supplemented with any interest, dividends, or other accruals of any kind. Such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of three hundred and sixty-five (365) days from the date of distribution. After such date all unclaimed property or interest in property shall revert to the Reorganized Debtors, Wind Down Estates, or GUC Recovery Trust, as applicable, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred.

### 6.11.    *Time Bar to Cash Payments.*

Checks issued by the Disbursing Agent in respect of Allowed Claims shall be null and void if not negotiated within one hundred and twenty (120) days after the date of issuance thereof. Thereafter, the amount represented by such voided check shall irrevocably revert to the Reorganized Debtors or Wind Down Estates (or GUC Recovery Trust in the case of checks issued by the GUC Recovery Trust), and any Claim in respect of such voided check shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary. Requests for re-issuance of any check shall be made to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued.

6.12.    *Manner of Payment under Plan.*

Except as otherwise specifically provided in the Plan, at the option of the Debtors, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

6.13.    *Satisfaction of Claims.*

Except as otherwise specifically provided in the Plan, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

6.14.    *Fractional Stock and Notes.*

If any distributions of New Common Stock pursuant to the Plan would result in the issuance of a fractional share of New Common Stock, then the number of shares of New Common Stock to be issued in respect of such distribution will be calculated to one decimal place and rounded up or down to the closest whole share (with a half share or greater rounded up and less than a half share rounded down).  The total number of shares of New Common Stock to be distributed in connection with the Plan shall be adjusted as necessary to account for the rounding provided for in this Section 6.14.  No consideration shall be provided in lieu of fractional shares that are rounded down.  Neither the Reorganized Debtors, Wind Down Estates, nor the Disbursing Agent shall have any obligation to make a distribution that is less than one (1) share of New Common Stock.

6.15.    *Minimum Cash Distributions.*

The Disbursing Agent shall not be required to make any distribution of Cash less than One Hundred Dollars ($100) to any holder of an Allowed Claim; provided, that if any distribution is not made pursuant to this Section 6.15, such distribution shall be added to any subsequent distribution to be made on behalf of the holder's Allowed Claim.

6.16.    *Setoffs and Recoupments.*

The Debtors, the Reorganized Debtors, or Wind Down Estates, as applicable, or such entity's designee (including, without limitation, the Disbursing Agent) may, but shall not be required to, set off or recoup against any Claim, and any distribution to be made on account of such Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that the Debtors, the Reorganized Debtors, or the Wind Down Estates may have against the holder of such Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law; provided, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by a Debtor or Reorganized Debtor or its successor of any claims, rights, or Causes of Action that a Debtor or Reorganized Debtor or its successor or assign may possess against the holder of such Claim.

6.17.    *Allocation of Distributions between Principal and Interest.*

Except as otherwise required by law (as reasonably determined by the Reorganized Debtors or Wind Down Estates), distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

6.18.    *No Distribution in Excess of Amount of Allowed Claim.*

Except as provided in Section 6.7 of the Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, distributions in excess of the Allowed amount of such Claim.

6.19.    *Withholding and Reporting Requirements.*

(a)    *Withholding Rights.*  In connection with the Plan, any party issuing any instrument or making any distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  In the case of a non-Cash distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and either (i) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld property.  Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Entity that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any governmental unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)    *Forms.*  Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the Disbursing Agent or such other Entity designated by the Reorganized Debtors or Wind Down Estates or GUC Trustee (which Entity shall subsequently deliver to the Disbursing Agent any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Entity) Form W-8.  If such request is made by the Reorganized Debtors or Wind Down Estates, the Disbursing Agent, or such other Entity designated by the Reorganized Debtors, Wind Down Estates, or Disbursing Agent and the holder fails to comply before the earlier of (i) the date that is one hundred and eighty (180) days after the request is made and (ii) the date that is one hundred and eighty (180) days after the date of distribution, the amount of such distribution shall irrevocably revert to the applicable Reorganized Debtor and any Claim in respect of such distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property.  If such request is made by the GUC Trustee, or such other Entity designated by the GUC Trustee, and the holder fails to comply within ninety (90) days after the request is made, the amount of such distribution shall irrevocably revert to the GUC Recovery Trust and any General Unsecured Claim in respect of such distribution shall be discharged and forever barred from assertion against the GUC Trustee, the GUC Recovery Trust, or its respective property.

6.20.    *Hart-Scott-Rodino Antitrust Improvements Act.*

Any New Common Stock to be distributed under the Plan to an Entity required to file a premerger notification and report form under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, to the extent applicable, shall not be distributed until the notification and waiting periods applicable under such Act to such Entity have expired or been terminated.

WEIL:\97031056\1\41703.0010

## ARTICLE VII PROCEDURES FOR DISPUTED CLAIMS.

7.1.    *Objections to Claims.*

The Debtors, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable, shall exclusively be entitled to object to Claims. After the Effective Date, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable, shall have and retain any and all rights and defenses that the Debtors had with regard to any Claim to which they may object, except with respect to any Claim that is Allowed. Any objections to proofs of Claim shall be served and filed on or before the later of (a) one-hundred and eighty (180) days after the Effective Date, and (b) on such later date as ordered by the Bankruptcy Court for cause. The expiration of such period shall not limit or affect the Debtors', Reorganized Debtors', Plan Administrators', or GUC Trustee's, as applicable, rights to dispute Claims asserted in the ordinary course of business other than through a proof of Claim.

7.2.    *Resolution of Disputed Administrative Expenses and Disputed Claims.*

On and after the Effective Date, (a) the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable, shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Claims (other than General Unsecured Claims) without approval of the Bankruptcy Court, other than with respect to Fee Claims; and (b) upon the creation of the GUC Recovery Trust, the GUC Trustee shall have the exclusive authority to compromise, settle, otherwise resolve, or withdraw any objections to General Unsecured Claims without approval of the Bankruptcy Court. The Debtors, Reorganized Debtors, or Plan Administrator, as applicable, and the GUC Trustee shall cooperate with respect to any objections to Claims that seek to convert Claims into General Unsecured Claims or General Unsecured Claims into other senior Claims, and the Debtors' rights and defenses to any such objections are fully preserved.

7.3.    *Payments and Distributions with Respect to Disputed Claims.*

Notwithstanding anything herein to the contrary, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

7.4.    *Distributions after Allowance.*

After such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, the holder thereof shall be entitled to distributions, if any, to which such holder is then entitled as provided in this Plan, without interest, as provided in Section 7.9 of the Plan. Such distributions shall be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim (or portion thereof) becomes a Final Order.

7.5.    *Disallowance of Claims.*

Except to the extent otherwise agreed to by the Debtors, Reorganized Debtors, Plan Administrator, or GUC Trustee, as applicable, or as provided in Section 5.2(b)(vii) of the Plan, any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, as determined by a Final Order, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Final Order with respect thereto has been entered and all sums due, if any, to

the Debtors by that Entity have been turned over or paid to the Debtors, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable. All proofs of Claim filed on account of an indemnification obligation to a current or former director, officer, or employee shall be deemed satisfied and expunged from the claims register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

7.6. **Estimation of Claims.**

The Debtors, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee as to General Unsecured Claims, as applicable, may (a) determine, resolve and otherwise adjudicate all contingent, unliquidated, and Disputed Claims in the Bankruptcy Court and (b) at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim; provided, that such limitation shall not apply to Claims requested by the Debtors to be estimated for voting purposes only.

7.7. **No Distributions Pending Allowance.**

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

7.8. **Claim Resolution Procedures Cumulative.**

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

7.9. **Interest.**

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim shall not be entitled to any interest that accrued thereon from and after the Effective Date, except as provided in Section 6.7 of the Plan.

7.10. **Insured Claims.**

If any portion of an Allowed Claim is an Insured Claim, no distributions under the Plan shall be made on account of such Allowed Claim until the holder of such Allowed Claim has exhausted all remedies with respect to any applicable insurance policies. To the extent that the Debtors' insurers agree to satisfy a Claim in whole or in part, then immediately upon such agreement, the portion of such

Claim so satisfied may be expunged without an objection to such Claim having to be filed and without any further notice to or action, order or approval of the Court.

### ARTICLE VIII        EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

8.1.    *General Treatment.*

(a)    As of and subject to the occurrence of the Effective Date and solely with respect to the Reorganization Transaction, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed rejected, including, but not limited to those set forth on the Rejection Schedule included in the Plan Supplement, unless such contract or lease (i) was previously assumed or rejected by the Debtors pursuant to an order of the Bankruptcy Court; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtors on or before the Confirmation Date; (iv) is identified in section 5.9(a) of the Plan; (v) is identified in section 8.4 of the Plan; (vi) is reinstated in section 4.2 of the Plan; or (vii) is identified for assumption on the Assumption Schedule included in the Plan Supplement. Solely with respect to the Sale Transaction, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed assumed, assumed and assigned, or rejected by the Successful Bidder in accordance with the applicable purchase agreement.

(b)    Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions, assumptions and assignments, or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Reorganized Debtors or Successful Bidder, as applicable, have provided adequate assurance of future performance under such assumed executory contracts and unexpired leases. Each executory contract and unexpired lease assumed or assumed and assigned pursuant to the Plan shall vest in and be fully enforceable by the Reorganized Debtors or Successful Bidder, as applicable, in accordance with its terms, except as modified by the provision of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption or applicable law.

8.2.    *Determination of Assumption Disputes and Deemed Consent.*

(a)    Any Cure Amount shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount, as reflected in the applicable cure notice, in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such executory contracts or unexpired leases and the Debtors may otherwise agree. The Debtors or the Wind Down Estates, as applicable, shall satisfy all Cure Amounts with the Sale Transaction Proceeds in the event of a Sale Transaction.

(b)    The Debtors shall file, as part of the Plan Supplement, the Assumption Schedule. At least ten (10) days before the deadline to object to confirmation of the Plan, the Debtors shall serve a notice on parties to executory contracts or unexpired leases to be assumed or assumed and assigned reflecting the Debtors' intention to potentially assume or assume and assign the contract or lease in connection with this Plan and, where applicable, setting forth the proposed Cure Amount (if any). **Any objection by a counterparty to an executory contract or unexpired lease to the proposed assumption, assumption and assignment, or related Cure Amount must be filed, served, and actually received by the Debtors within ten (10) days of the service of the assumption notice, or such shorter period as agreed to by the parties or authorized by the Bankruptcy Court**. Any counterparty to an executory contract or unexpired lease that does not timely object to the notice of the proposed assumption of such executory contract or unexpired lease shall be deemed to have assented to assumption of the applicable executory contract or unexpired lease notwithstanding any provision thereof that

purports to (i) prohibit, restrict, or condition the transfer or assignment of such contract or lease; (ii) terminate or modify, or permit the termination or modification of, a contract or lease as a result of any direct or indirect transfer or assignment of the rights of any Debtor under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan; (iii) increase, accelerate, or otherwise alter any obligations or liabilities of any Debtor or any Reorganized Debtor under such executory contract or unexpired lease; or (iv) create or impose a Lien upon any property or Asset of any Debtor or any Reorganized Debtor, as applicable. Each such provision shall be deemed to not apply to the assumption of such executory contract or unexpired lease pursuant to the Plan and counterparties to assumed executory contracts or unexpired leases that fail to object to the proposed assumption in accordance with the terms set forth in this Section 8.2(b), shall forever be barred and enjoined from objecting to the proposed assumption or to the validity of such assumption (including with respect to any Cure Amounts or the provision of adequate assurance of future performance), or taking actions prohibited by the foregoing or the Bankruptcy Code on account of transactions contemplated by the Plan.

(c)     If there is an Assumption Dispute pertaining to assumption of an executory contract or unexpired lease (other than a dispute pertaining to a Cure Amount), such dispute shall be heard by the Bankruptcy Court prior to such assumption being effective, provided, that the Debtors or the Reorganized Debtors, as applicable, may settle any dispute regarding the Cure Amount or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(d)     To the extent an Assumption Dispute relates solely to the Cure Amount, the Debtors may assume and/or assume and assign the applicable executory contract or unexpired lease prior to the resolution of the Assumption Dispute; provided, that the Debtors or the Reorganized Debtors reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the non-Debtor party to such executory contract or unexpired lease (or such smaller amount as may be fixed or estimated by the Bankruptcy Court or otherwise agreed to by such non-Debtor party and the applicable Reorganized Debtor).

(e)     Assumption or assumption and assignment of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against any Debtor or defaults by any Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date that the Debtors assume or assume and assign such executory contract or unexpired lease. Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, upon the assumption of such executory contract or unexpired lease.

8.3.    ***Rejection Damages Claims.***

In the event that the rejection of an executory contract or unexpired lease hereunder results in damages to the other party or parties to such contract or lease, any Claim for such damages shall be classified and treated in Class 5 (General Unsecured Claims). Such Claim shall be forever barred and shall not be enforceable against the Debtors, the Reorganized Debtors, the GUC Recovery Trust, or their respective Estates, properties or interests in property as agents, successors, or assigns, unless a proof of Claim is filed with the Bankruptcy Court and served upon counsel for the Debtors or the Reorganized Debtors, as applicable, by the later of (i) forty-five (45) days after the filing and service of the notice of the occurrence of the Effective Date; and (ii) thirty (30) days after entry of an Order rejecting such contract or lease if such contract or lease is the subject of a pending Assumption Dispute.

8.4.    *Insurance Policies.*

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any bar date notice, or claim objection, and any other document related to any of the foregoing: on the Effective Date (i) all insurance policies issued or providing coverage to the Debtors shall, unless designated by the Debtors as a rejected executory contract on the Rejection Schedule (subject to the applicable insurer's right to object to such designation), be assumed in their entirety by the Debtors, and upon such assumption, the Reorganized Debtors or Plan Administrator, as applicable, shall remain liable in full for any and all now existing or hereinafter arising obligations, liabilities, terms, provisions and covenants of any of the Debtors under such insurance policies, without the need or requirement for an insurer to file a proof of Claim, Administrative Claim or objection to any cure amount; (ii) nothing shall alter or modify the terms and conditions of and/or any rights, benefits, claims, rights to payments, or recoveries under the insurance policies without the express written consent of the applicable insurer; (iii) if there is a Sale Transaction or Asset Sale Transaction, insurance policies shall (a) if assumed pursuant to subsection (i) hereof, be assigned to the purchaser only upon the express written consent of the applicable insurer (to the extent consent is required by applicable non-bankruptcy law or a provision of the applicable insurance policy, but only to the extent such are enforceable against the Debtors under applicable bankruptcy law), or (b) if rejected by the Debtors subject to subsection (i) hereof; and (iv) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Court, solely to permit: (a) claimants with valid workers' compensation claims or direct action claims against an insurer under applicable nonbankruptcy law to proceed with their claims; (b) insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (I) workers' compensation claims, (II) claims where a claimant asserts a direct claim against any insurer under applicable non-bankruptcy law, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay to proceed with its claim, and (III) all costs in relation to each of the foregoing; and (c) the insurers to cancel any insurance policies, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the insurance policies.

8.5.    *Intellectual Property Licenses and Agreements.*

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any bar date notice or claim objection, and any other document related to any of the foregoing, all intellectual property contracts, licenses, royalties, or other similar agreements to which the Debtors have any rights or obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the Debtors and Reorganized Debtors and shall continue in full force and effect unless any such intellectual property contract, license, royalty, or other similar agreement otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Debtors in accordance with Section 8.1 of the Plan.  Unless otherwise noted hereunder, all other intellectual property contracts, licenses, royalties, or other similar agreements shall vest in the Reorganized Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to ensure such vesting as contemplated herein.

8.6.    *Tax Agreements.*

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any bar date notice or claim objection, and any other document related to any of the foregoing, any tax sharing agreements to which the Debtors are a party (of which the principal purpose is the allocation of taxes) in effect as of the date of the Confirmation Order shall be deemed and treated as

executory contracts pursuant to the Plan and, to the extent the Debtors determine (in their sole discretion) such agreements are beneficial to the Debtors, shall be assumed by the Debtors and Reorganized Debtors and shall continue in full force and effect thereafter in accordance with their respective terms, unless any such tax sharing agreement (of which the principal purpose is the allocation of taxes) otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Debtors in accordance with Section 8.1 of the Plan. Unless otherwise noted hereunder, all other tax sharing agreements to which the Debtors are a party (of which the principal purpose is the allocation of taxes) shall vest in the Reorganized Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to ensure such vesting as contemplated herein.

8.7.    *Assignment.*

To the extent provided under the Bankruptcy Code or other applicable law, any executory contract or unexpired lease transferred and assigned hereunder shall remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such executory contract or unexpired lease (including those of the type set forth in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment. To the extent provided under the Bankruptcy Code or other applicable law, any provision that prohibits, restricts, or conditions the assignment or transfer of any such executory contract or unexpired lease or that terminates or modifies such executory contract or unexpired lease or allows the counterparty to such executory contract or unexpired lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such transfer and assignment, constitutes an unenforceable anti-assignment provision and is void and of no force or effect with respect to any assignment pursuant to the Plan.

8.8.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed in the notice of assumed contracts.

8.9.    *Reservation of Rights.*

(a)    The Debtors may amend the Assumption Schedule and any cure notice until the Business Day immediately prior to the commencement of the Confirmation Hearing in order to (i) add, delete, or reclassify any executory contract or unexpired lease or amend a proposed assignment and/or (ii) amend the proposed Cure Amount; provided, that if the Confirmation Hearing is adjourned for a period of more than two (2) consecutive calendar days, the Debtors' right to amend such schedules and notices shall be extended to the Business Day immediately prior to the adjourned date of the Confirmation Hearing, with such extension applying in the case of any and all subsequent adjournments of the Confirmation Hearing. The Debtors shall provide notice of such amendment to any affected counterparty as soon as reasonably practicable.

(b)    Neither the exclusion nor inclusion of any contract or lease by the Debtors on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, will constitute an admission by the Debtors that any such contract or lease is or is not in fact an executory contract or unexpired lease or that the Debtors, Reorganized Debtors, or Wind Down Estates or their respective affiliates have any liability thereunder.

(c)      Except as otherwise provided in the Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtors and the Reorganized Debtors under any executory or non-executory contract or any unexpired or expired lease.

(d)      Nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors, as applicable, under any executory or non-executory contract or any unexpired or expired lease.

## ARTICLE IX  CONDITIONS PRECEDENT TO CONFIRMATION OF PLAN AND EFFECTIVE DATE.

9.1.    *Conditions Precedent to Confirmation of Plan.*

The following are conditions precedent to confirmation of the Plan:

(a)      the Disclosure Statement Order shall have been entered;

(b)      the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed;

(c)      the RSA shall not have been terminated and shall be in full force and effect; and

(d)      the DIP Order and the DIP Documents shall be in full force and effect in accordance with the terms thereof, and no event of default shall be continuing thereunder or occur as a result of entry of the Confirmation Order.

9.2.    *Conditions Precedent to Effective Date.*

(a)      The following are conditions precedent to the Effective Date of the Plan with respect to both the Reorganization Transaction and the Sale Transaction:

(i)      the Confirmation Order (in form and substance reasonably acceptable to the Creditors' Committee) shall have been entered and shall be in full force and effect and no stay thereof shall be in effect;

(ii)      an event of default under the DIP Documents shall not be continuing and an acceleration of the obligations or termination of the DIP Lenders' commitments under the DIP Facilities shall not have occurred;

(iii)      all actions, documents, and agreements necessary to implement and consummate the Plan shall have been effected or executed and binding on all parties thereto and, to the extent required, filed with the applicable governmental units in accordance with applicable laws;

(iv)      all governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Plan shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions;

(v)    the RSA shall not have been terminated and shall be in full force and effect; and

(vi)    all accrued and unpaid Restructuring Expenses shall have been paid in Cash, to the extent invoiced, at least two (2) business days prior to the Effective Date.

(b)    The following are additional conditions precedent to the Effective Date of the Plan solely with respect to the Reorganization Transaction:

(i)    the Amended Organizational Documents shall have been filed with the appropriate governmental authority, as applicable; and

(ii)    the Amended and Restated Credit Facility Agreement, Exit Warehouse Facilities Documents, and Exit Working Capital Facility Agreement shall (i) have been (or deemed) executed and delivered, and any conditions precedent contained to effectiveness therein have been satisfied or waived in accordance therewith, (ii) be in full force and effect and binding upon the relevant parties; and (iii) contain terms and conditions consistent in all material respects with the RSA.

(c)    The following are additional conditions precedent to the Effective Date of the Plan solely with respect to the Sale Transaction:

(i)    the applicable purchase agreement(s) shall (i) have been executed and delivered, and any conditions precedent contained to effectiveness therein have been satisfied or waived in accordance therewith, (ii) be in full force and effect and binding upon the relevant parties; and (iii) contain terms and conditions consistent in all material respects with the RSA.

(d)    Notwithstanding when a condition precedent to the Effective Date occurs, for purposes of the Plan, such condition precedent shall be deemed to have occurred simultaneously upon the completion of the applicable conditions precedent to the Effective Date; provided, that to the extent a condition precedent (a "**Prerequisite Condition**") may be required to occur prior to another condition precedent (a "**Subsequent Condition**") then, for purposes of the Plan, the Prerequisite Condition shall be deemed to have occurred immediately prior to a Subsequent Condition regardless of when such Prerequisite Condition or Subsequent Condition shall have occurred.

9.3.    *Waiver of Conditions Precedent.*

(a)    Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.  Each of the conditions precedent in Section 9.1 and Section 9.2 of the Plan may be waived in writing by the Debtors with the prior written consent of (i) the Requisite Term Lenders, and (ii) solely with respect to the condition set forth in Section 9.1(d) and 9.2(a)(ii) of the Plan, the DIP Agent (acting at the direction of the Required Buyers (as defined in the DIP Documents)), in each case without leave of or order of the Bankruptcy Court and such consent not to be unreasonably withheld; provided, that any such consent provided by the DIP Agent shall solely be for purposes of this Article IX and shall not otherwise limit, restrict or impair any rights or remedies of any DIP Credit Party under the DIP Documents.  If the Plan is confirmed for fewer than all of the Debtors as provided for in Section 5.18 of the Plan, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur as to such Debtors.  Notwithstanding anything to the contrary herein, any condition precedent

pertaining to the Global Settlement, the GUC Recovery Trust, or GUC Recovery Trust Assets shall not be waived without the prior written consent of the Creditors' Committee.

(b)    The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

### 9.4.    *Effect of Failure of a Condition.*

If the conditions listed in Section 9.2 of the Plan are not satisfied or waived in accordance with Section 9.3 of the Plan on or before the first Business Day that is more than sixty (60) days after the date on which the Confirmation Order is entered or by such later date as set forth by the Debtors in a notice filed with the Bankruptcy Court prior to the expiration of such period, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (b) prejudice in any manner the rights of any Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, the Requisite Term Lenders, or any other Entity.

## ARTICLE X    EFFECT OF CONFIRMATION OF PLAN.

### 10.1.    *Vesting of Assets.*

(a)    On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all remaining property of the Debtors' Estates shall vest in the Reorganized Debtor or the Wind Down Estates free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided pursuant to the Plan, the Confirmation Order, the GUC Recovery Trust Agreement, Amended and Restated Credit Facility Documents, the Exit Warehouse Facilities Documents, or the Exit Working Capital Facility Documents.   On and after the Effective Date, the Reorganized Debtor may take any action, including, without limitation, the operation of its businesses; the use, acquisition, sale, lease and disposition of property; and the entry into transactions, agreements, understandings, or arrangements, whether in or other than in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and in all respects as if there was no pending case under any chapter or provision of the Bankruptcy Code, except as expressly provided herein.   Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

(b)    On the Effective Date and solely with respect to the Sale Transaction, all property of the Debtors' Estates shall vest in the Wind Down Estates free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided pursuant to the Plan, the Confirmation Order, the GUC Recovery Trust Agreement, and the applicable purchase agreement.

### 10.2.    *Binding Effect.*

As of the Effective Date, the Plan shall bind all holders of Claims against and Interests in the Debtors and their respective successors and assigns, notwithstanding whether any such holders were (a) Impaired or Unimpaired under the Plan; (b) deemed to accept or reject the Plan; (c) failed to vote to accept or reject the Plan; (d) voted to reject the Plan; or (e) received any distribution under the Plan.

10.3. ***Discharge of Claims and Termination of Interests.***

In a Reorganization Transaction, upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise expressly provided under the Plan, each holder (as well as any representatives, trustees, or agents on behalf of each holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interest, rights, and liabilities that arose prior to the Effective Date; provided, that Borrower Non-Discharged Claims shall not be discharged. Upon the Effective Date, all such Entities shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in the Debtors against the Debtors, the Reorganized Debtors, or any of their Assets or property, whether or not such holder has filed a proof of Claim and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date.

10.4. ***Term of Injunctions or Stays.***

Unless otherwise provided herein, the Confirmation Order, or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

10.5. ***Injunction.***

(a)     **Upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim extinguished, discharged, or released pursuant to the Plan.**

(b)     **Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court or as agreed to by the Debtors and a holder of a Claim against or Interest in the Debtors, all Entities who have held, hold, or may hold Claims against or Interests in the Debtors (whether proof of such Claims or Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action that will be or are extinguished, discharged, or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Reorganized Debtors, or the GUC Recovery Trust, or the property of any of the Debtors, the Reorganized Debtors, or the GUC Recovery Trust; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtors, the Reorganized Debtors, or the GUC Recovery Trust, or the property of any of the Debtors, the Reorganized Debtors, or the GUC Recovery Trust; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Reorganized Debtors, or the GUC Recovery Trust or the property of any of the**

WEIL:\97031056\1\41703.0010

Debtors, the Reorganized Debtors, or the GUC Recovery Trust; (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtors, the Reorganized Debtors, or the GUC Recovery Trust or against property or interests in property of any of the Debtors, the Reorganized Debtors, or the GUC Recovery Trust, except as contemplated or Allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

(c)    By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest extinguished, discharged, or released pursuant to the Plan will be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth in this Section 10.5.

(d)    The injunctions in this Section 10.5 shall extend to any successors of the Debtors and the Reorganized Debtors and their respective property and interests in property.

10.6.    *Releases.*

(a)    <u>Estate Releases</u>.

As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Definitive Documents, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the restructuring, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties will be deemed forever released and discharged, to the maximum extent permitted by law, by the Debtors, the Reorganized Debtors and their Estates, the Wind Down Estates, and the GUC Recovery Trust from any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, remedies, losses, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, or Reorganized Debtors (as the case may be), or the Estates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors or Reorganized Debtors (as the case may be), or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising prior to the Effective Date from, in whole or in part, the Debtors, the Chapter 11 Cases, the pre- and postpetition marketing and sale process, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any of the Debtors and any Released Party, the restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Disclosure Statement, the RSA, the Plan (including the Plan Supplement), the DIP Documents, and the Prepetition Warehouse Facilities (as defined in the DIP Order), or any related agreements, instruments, and other documents (including the Definitive Documents), and the negotiation, formulation, or preparation thereof, the solicitation of votes with respect to the Plan, or any other act or omission, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; provided, that nothing in this Section 10.6(a) shall be construed to release the Released Parties from willful misconduct, or intentional fraud as determined by a Final Order. The Debtors, the Reorganized Debtors and their Estates, the Wind Down Estates, and the GUC Recovery Trust shall be permanently enjoined from prosecuting any of the foregoing Claims or Causes of Action released under this Section 10.6(a) against each of the Released Parties.

(b)    **Third-Party Releases**.

As of the Effective Date, except (i) for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remain in effect or become effective after the Effective Date or (ii) as otherwise expressly provided in the Plan or in the Confirmation Order, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever, released, and discharged by:

(i)    the holders of Impaired Claims who voted to accept the Plan;

(ii)    the Consenting Term Lenders;

(iii)    holders of Term Loan Claims (Class 3) who abstain from voting on the Plan or vote to reject the Plan but do not opt-out of these releases on the Ballots;

(iv)    the Creditors' Committee and each of its members in their capacity as such; and

(v)    with respect to any Entity in the foregoing clauses (i) through (iv), such Entity's (x) predecessors, successors and assigns, (y) subsidiaries, affiliates, managed accounts or funds, managed or controlled by such Entity and (z) all Persons entitled to assert Claims through or on behalf of such Entities with respect to the matters for which the releasing entities are providing releases.

in each case, from any and all Claims, Interests, or Causes of Action whatsoever, including any derivative Claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on, relating to, or arising prior to the Effective Date from, in whole or in part, the Debtors, the restructuring, the Chapter 11 Cases, the pre- and postpetition marketing and sale process, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Plan (including the Plan Supplement), the RSA, the Definitive Documents, the DIP Documents, the Prepetition Warehouse Facilities (as defined in the DIP Order), or any related agreements, instruments, or other documents, the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; provided, that nothing in this Section 10.6(b) shall be construed to release the Released Parties from willful misconduct or intentional fraud as determined by a Final Order.  The Persons and Entities in (i) through (v) of this Section 10.6(b) shall be permanently enjoined from prosecuting any of the foregoing Claims or Causes of Action released under this Section 10.6(b) against each of the Released Parties.

10.7.    *Exculpation.*

To the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation,

WEIL:\97031056\1\41703.0010

suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any claim in connection with or arising out of the administration of the Chapter 11 Cases, the postpetition marketing and sale process, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors; the negotiation and pursuit of the Disclosure Statement, the RSA, the Reorganization Transaction or the Sale Transaction, as applicable, the Plan, or the solicitation of votes for, or confirmation of, the Plan; the funding or consummation of the Plan; the occurrence of the Effective Date; the DIP Documents; the Prepetition Warehouse Facilities (as defined in the DIP Order); the administration of the Plan or the property to be distributed under the Plan; the issuance of Securities under or in connection with the Plan; or the transactions in furtherance of any of the foregoing; except for fraud or willful misconduct, as determined by a Final Order. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability.

    10.8.    *Subordinated Claims.*

       The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors (or the GUC Trustee, solely with respect to Allowed General Unsecured Claims) reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

    10.9.    *Retention of Causes of Action/Reservation of Rights.*

       Except as otherwise provided in Sections 10.5, 10.6, and 10.7 of the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, Claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of their Estates or itself in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, any affirmative Causes of Action against parties with a relationship with the Debtors including actions arising under chapter 5 of the Bankruptcy Code. The Reorganized Debtors or the GUC Trustee in connection with the pursuit of GUC Recovery Trust Causes of Action or objection to General Unsecured Claims, shall have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced. Notwithstanding the foregoing, the Debtors and the Reorganized Debtors shall not retain any Claims or Causes of Action released pursuant to the Plan against the Released Parties.

    10.10.    *Solicitation of Plan.*

       As of and subject to the occurrence of the Confirmation Date: (i) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; and (ii) the Debtors and each of their respective directors, officers, employees, affiliates, agents, financial advisors, investment bankers, professionals, accountants,

and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore are not, and on account of such offer, issuance, and solicitation shall not be, liable at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

10.11. ***Corporate and Limited Liability Company Action.***

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (a) those set forth in Sections 5.6 and 5.7 of the Plan; (b) the performance of the RSA; and (c) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date), in each case, in accordance with and subject to the terms hereof. All matters provided for in the Plan involving the corporate or limited liability company structure of the Debtors or the Reorganized Debtors, and any corporate or limited liability company action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors. On or (as applicable) before the Effective Date, the authorized officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including, but not limited to: (i) the Amended Organizational Documents; (ii) the Exit Warehouse Facilities; (iii) the Amended and Restated Credit Facility Documents; (iv) the Exit Working Capital Facility Documents; (v) any purchase agreement in connection with the Sale Transaction or an Asset Sale Transaction; (vi) the GUC Recovery Trust Agreement; and (vii) any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Section 10.11 shall be effective notwithstanding any requirements under non-bankruptcy law.

## ARTICLE XI  RETENTION OF JURISDICTION.

11.1. ***Retention of Jurisdiction.***

On and after the Effective Date, the Bankruptcy Court shall retain non-exclusive jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:

(a)    to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases, including Assumption Disputes, and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting therefrom;

(b)    to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(c)    to ensure that distributions to holders of Allowed Claims are accomplished as provided for in the Plan and Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under the Plan, including, cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely paid;

(d)    to consider the allowance, classification, priority, compromise, estimation, or payment of any Claim;

(e)      to enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(f)      to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g)      to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)      to hear and determine all Fee Claims and Restructuring Expenses;

(i)      to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Plan Supplement, the Global Settlement, Asset Sale Transaction, Sale Transaction, or the Confirmation Order, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(j)      to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan;

(k)      to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(l)      to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(m)     to hear, adjudicate, decide, or resolve any and all matters related to Article X of the Plan, including, without limitation, the releases, discharge, exculpations, and injunctions issued thereunder;

(n)      to resolve disputes concerning Disputed Claims or the administration thereof;

(o)      to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(p)      to enter one or more final decrees closing the Chapter 11 Cases;

(q)      to recover all Assets of the Debtors and property of the Debtors' Estates, wherever located;

(r)      to resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(s)      to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtors or the GUC Trustee pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory; and

(t)      to hear and resolve any dispute over the application to any Claim of any limit on the allowance of such Claim set forth in sections 502 or 503 of the Bankruptcy Code, other than defenses or limits that are asserted under non-bankruptcy law pursuant to section 502(b)(1) of the Bankruptcy Code.

### 11.2.    *Courts of Competent Jurisdiction.*

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## ARTICLE XII MISCELLANEOUS PROVISIONS.

### 12.1.    *Payment of Statutory Fees.*

On the Effective Date and thereafter as may be required, the Reorganized Debtors shall pay all fees incurred pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for the Debtors' cases, or until such time as a final decree is entered closing the Debtors' cases, a Final Order converting the Debtors' cases to cases under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing the Debtors' cases is entered.

### 12.2.    *Substantial Consummation of the Plan.*

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 12.3.    *Plan Supplement.*

The Plan Supplement shall be filed with the Clerk of the Bankruptcy Court.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.  Documents included in the Plan Supplement will be posted at the website of the Debtors' notice, claims, and solicitation agent.

### 12.4.    *Request for Expedited Determination of Taxes.*

The Debtors and the Reorganized Debtors, as applicable, shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Commencement Date through the Effective Date and, in the case of a Sale Transaction, through the dissolution of the Debtors.

### 12.5.    *Exemption from Certain Transfer Taxes.*

Pursuant to section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any Lien, mortgage, deed of trust, or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any

WEIL:\97031056\1\41703.0010

deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including, without limitation, any deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan or the reinvesting, transfer, or sale of any real or personal property of the Debtors pursuant to, in implementation of or as contemplated in the Plan (whether to one or more of the Reorganized Debtors or otherwise), (d) the grant of collateral under the Amended and Restated Credit Facility, and (e) the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax, or other similar tax or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

### 12.6. *Amendments.*

(a) *Plan Modifications*. Subject to the terms of the RSA and all consent rights contained therein, (i) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code, and (ii) after entry of the Confirmation Order, the Debtors may, upon order of the Court, amend, modify or supplement the Plan in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, in each case without additional disclosure pursuant to section 1125 of the Bankruptcy Code. In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims or Allowed Interests pursuant to the Plan and subject to the reasonable consent of the Requisite Term Lenders (and the Creditors' Committee, solely as it pertains to the Global Settlement or General Unsecured Claims), the Debtors may remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes or effects of this Plan, and any holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented.

(b) *Other Amendments*. Subject to the terms of the RSA, before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court.

### 12.7. *Effectuating Documents and Further Transactions.*

Each of the officers, managers, or members of the Reorganized Debtors is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 12.8. *Revocation or Withdrawal of Plan.*

Subject to the terms of the RSA, the Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date. If the Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption of executory

contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, the Debtors or any other Entity; (ii) prejudice in any manner the rights of the Debtors or any other Entity; or (iii) constitute an admission of any sort by the Debtors, any Consenting Term Lenders, or any other Entity.  This provision shall have no impact on the rights of the Consenting Term Lenders or the Debtors, as set forth in the RSA, in respect of any such revocation or withdrawal.

### 12.9.    *Dissolution of Creditors' Committee.*

On the Effective Date, the Creditors' Committee shall dissolve and, on the Effective Date, each member (including each officer, director, employee, or agent thereof) of the Creditors' Committee and each professional retained by the Creditors' Committee shall be released and discharged from all rights, duties, responsibilities, and obligations arising from, or related to, the Debtors, their membership on the Creditors' Committee, the Plan, or the Chapter 11 Cases, except with respect to any matters concerning any Fee Claims held or asserted by any professional retained by the Creditors' Committee.

### 12.10.    *Severability of Plan Provisions.*

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors with the prior consent of the Requisite Term Lenders and the DIP Agent (acting at the direction of the Required Buyers), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Reorganized Debtors (as the case may be), and (c) nonseverable and mutually dependent.

### 12.11.    *Governing Law.*

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement or a Definitive Document provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof; provided, however, that corporate or entity governance matters relating to any Debtors or Reorganized Debtors shall be governed by the laws of the state of incorporation or organization of the applicable Debtors or Reorganized Debtors.

### 12.12.    *Time.*

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

12.13.   *Dates of Actions to Implement the Plan.*

In the event that any payment or act under the Plan is required to be made or performed on a date that is on a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

12.14.   *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns, including, without limitation, the Reorganized Debtors.

12.15.   *Deemed Acts.*

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

12.16.   *Successor and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each Entity.

12.17.   *Entire Agreement.*

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

12.18.   *Exhibits to Plan.*

All exhibits, schedules, supplements, and appendices to the Plan (including the Plan Supplement) are incorporated into and are a part of the Plan as if set forth in full herein.

12.19.   *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by electronic or facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(a)       If to the Debtors or the Reorganized Debtors:

Ditech Holding Corporation
3000 Bayport Drive, Suite 985

WEIL:\97031056\1\41703.0010

Tampa, FL 33607
Attn: John Haas, General Counsel, Chief Legal Officer and Secretary
Email: JHaas@ditech.com

-and-

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn:    Ray C. Schrock, P.C.
         Sunny Singh
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:  ray.schrock@weil.com
        sunny.singh@weil.com

(b)    If to the Consenting Term Lenders:

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Il 60654
Attn: Patrick J. Nash Jr., P.C.
Email:  patrick.nash@kirkland.com
Attn: John R. Luze
Email: john.luze@kirkland.com

After the Effective Date, the Debtors have authority to send a notice to Entities providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors, Reorganized Debtors, and Wind Down Estates, as applicable, are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

WEIL:\97031056\1\41703.0010

Dated:    May 9, 2019

**DF INSURANCE AGENCY LLC**

**DITECH FINANCIAL LLC**

**DITECH HOLDING CORPORATION**

**GREEN TREE INSURANCE AGENCY OF
NEVADA, INC.**

By:    /s/ Kimberly Perez
        Name:  Kimberly Perez
        Title:    Senior Vice President and
                Chief Accounting Officer

Dated:  May 9, 2019

**GREEN TREE CREDIT LLC**

**GREEN TREE CREDIT SOLUTIONS LLC**

**GREEN TREE INVESTMENT HOLDINGS III LLC**

**GREEN TREE SERVICING CORP.**

**WALTER MANAGEMENT HOLDING COMPANY LLC**

**WALTER REVERSE ACQUISITION LLC**

By:    /s/ Laura Reichel
          Name: Laura Reichel
          Title:   President

Dated:  May 9, 2019

**MARIX SERVICING LLC**

By:    /s/ Clinton Hodder          
        Name: Clinton Hodder
        Title:   President

Dated:  May 9, 2019

**MORTGAGE ASSET SYSTEMS, LLC**

**REO MANAGEMENT SOLUTIONS, LLC**

**REVERSE MORTGAGE SOLUTIONS, INC.**

By:  /s/ Jeanetta Brown
         Name: Jeanetta Brown
        Title:   Vice President

## Schedule 1

**Borrower Non-Discharged Claims**

"**Borrower Non-Discharged Claims**" shall mean, Claims of Borrowers, to the limited extent such claims, cross-claims, third-party claims, and counterclaims (a) do not result in any order, judgment, verdict, decree, or arbitration award against the Debtors or Reorganized Debtors entitling any party to an award of monetary damages, including, without limitation, attorneys' fees or costs, penalties or fines (including, for the avoidance of doubt, statutory penalties and fines) but excluding restitution, reimbursement, refunds, or account credits relating solely to a final, non-appealable judgment that a Debtor made a servicing or origination error, or committed fraud, and (b) are necessary for the resolution of the following actions:

1. A claim or defense involving the amount, validity, and/or priority of liens with respect to properties subject to mortgages (including reverse mortgages) owned or serviced by the Debtors, including quiet title suits, efforts by third parties to foreclose their liens, eminent domain and condemnation suits, corrective and reformation actions, disputes with home owners associations or common interest associations, code violation actions, tax sales, and other analogous causes of action;

2. A claim or defense brought by a bankrupt Borrower (including any heir, non-borrowing spouse, estate, and/or other successor in interest) who has sought, or may seek, bankruptcy protection under chapters 7, 11, 12, or 13 of the Bankruptcy Code (each, a "**Bankrupt Borrower**") to:

    a) assert a proof of claim, notice of payment change, notice of postpetition fee, expense, or charge, or response to notice of final cure;

    b) assert or continue to assert an objection to a motion to lift the automatic stay filed by the Debtors in the Bankrupt Borrower's bankruptcy case;

    c) assert appeals with respect to items (a) and (b); or

    d) seek accounting from the Debtors with respect to the underlying reverse mortgage loan;

3. A claim or defense that is the subject of § 363(o) of the Bankruptcy Code; or

4. A claim or defense brought by a Borrower on account of a Debtor's alleged prepetition:

    a) failure to comply with loan modification obligations;

    b) improper assignment of deeds of trust;

    c) violation of the Real Estate Settlement Procedures Act of 1974 (RESPA) (12 U.S.C. § 2601 et seq., the Fair Credit Reporting Act (15 U.S.C. § 1681)), and/or the Truth in Lending Act (12 C.F.R. § 1026);

    d) failure to remit payment to the taxing authority that results in penalties to the Borrower;

e) failure to remit payment to insurance authorities, the consequence of which includes both a lapse in coverage and actual pecuniary harm to the Borrower; or

f) servicing errors directly relating to Debtors' prepetition:

    i.    misapplication of borrower payments;

    ii.    miscalculations of loan principal amounts;

    iii.    miscalculations of loan interest amounts; or

    iv.    failure to credit funds to the correct account.

**Exhibit A-1**

**Borrower Non-Discharged Claims**

## BORROWER NON-DISCHARGED CLAIMS
## FOR NON-MONETARY DAMAGES AND OTHER RELIEF

Pursuant to the Plan, on the Effective Date, unless assumed in full by a purchaser, certain claims against or liabilities of the Debtors will be discharged. However, as described more fully below, the Reorganized Debtors will continue to be liable for certain consumer borrower claims other than Claims for monetary damages (including penalties and fines) relating to certain prepetition acts or omissions of any Debtor in connection with the origination or servicing of a forward or reverse mortgage loan, as described below.

In the event of a Reorganization Transaction (unless assumed by a purchaser as an assumed liability in any Asset Sale Transaction), Claims for monetary damages against the Debtors or Reorganized Debtors shall be discharged except as expressly provided for herein. As described in more detail below and as provided for in, and subject to the terms of, the Plan, certain consumer borrower claims for non-monetary damages shall be Unimpaired and shall not be discharged by the Plan upon the Effective Date.

In the event of a Reorganization Transaction, following the Effective Date, to the extent described below and provided for in, and subject to, the Plan, holders of such Claims (as set out below) shall be entitled to defend, assert, and prosecute claims, cross-claims, third-party claims, and counter-claims, including the appeal or settlement of such claims **to the limited extent such claims, cross-claims, third-party claims, and counterclaims (a) do not result in any order, judgment, verdict, decree or arbitration award against the Debtors or Reorganized Debtors entitling any party to an award of monetary damages, including, without limitation, attorneys' fees or costs, penalties or fines (including, for the avoidance of doubt, statutory penalties and fines) but excluding restitution, reimbursement, refunds, or account credits relating solely to a final, non-appealable judgment that a Debtor made a servicing or origination error, or committed fraud, and (b) are necessary for the resolution of the following actions** ("**Borrower Non-Discharged Claims**"):

1. A claim or defense involving the amount, validity, and/or priority of liens with respect to properties subject to mortgages (including reverse mortgages) owned or serviced by the Debtors, including quiet title suits, efforts by third parties to foreclose their liens, eminent domain and condemnation suits, corrective and reformation actions, disputes with home owners associations or common interest associations, code violation actions, tax sales, and other analogous causes of action;

2. A claim or defense brought by a bankrupt Borrower (including any heir, non-borrowing spouse, estate, and/or other successor in interest) who has sought, or may seek, bankruptcy protection under chapters 7, 11, 12, or 13 of the Bankruptcy Code (each, a "**Bankrupt Borrower**") to:

   a) assert a proof of claim, notice of payment change, notice of postpetition fee, expense, or charge, or response to notice of final cure;

    b)   assert or continue to assert an objection to a motion to lift the automatic stay filed by the Debtors in the Bankrupt Borrower's bankruptcy case;

    c)   assert appeals with respect to items (a) and (b); or

    d)   seek accounting from the Debtors with respect to the underlying reverse mortgage loan;

3. A claim or defense that is the subject of § 363(o) of the Bankruptcy Code; or

4. A claim or defense brought by a Borrower on account of a Debtor's alleged prepetition:

    a)   failure to comply with loan modification obligations;

    b)   improper assignment of deeds of trust;

    c)   violation of the Real Estate Settlement Procedures Act of 1974 (RESPA)(12 U.S.C. § 2601 et seq.), the Fair Credit Reporting Act (15 U.S.C. § 1681), and/or the Truth in Lending Act (12 C.F.R. § 1026);

    d)   failure to remit payment to the taxing authority that results in penalties to the Borrower;

    e)   failure to remit payment to insurance authorities, the consequence of which includes both a lapse in coverage and actual pecuniary harm to the Borrower; or

    f)   servicing errors directly relating to Debtors' prepetition:

        i.   misapplication of borrower payments;

        ii.   miscalculations of loan principal amounts;

        iii.   miscalculations of loan interest amounts; or

        iv.   failure to credit funds to the correct account.

Therefore, on or after the Effective Date holders of Borrower Non-Discharged Claims shall be entitled to defend and assert and prosecute claims, cross-claims, third-party claims, and counter-claims, including the appeal or settlement of such claims (x) in a Sale Transaction, against the Wind Down Estate, in accordance with section 4.6(b)(i) of the Plan, or (y) in a Reorganization Transaction, in the ordinary course of business, in accordance with section 4.6(b)(ii) of the Plan. **The Debtors reserve all rights to defend such Borrower Non-Discharged Claims on all grounds (including that any such Claim is not entitled to be classified as or is not an Allowed Borrower Non-Discharged Claim) other than on the basis that such Claims are discharged.**

In the event of a Sale Transaction (unless a Claim is assumed by a purchaser as an assumed liability), the Debtors do not anticipate obtaining a discharge of any Borrower Non-Discharged Claim. Accordingly, Borrower Non-Discharged Claims shall receive the recovery to which they

2

are entitled from the proceeds of any Sale Transaction in accordance with the Plan, which provides that they will receive the same treatment as General Unsecured Claims, and as administered in the Wind Down Estates.

WEIL:\97029854\1\41703.0011

**<u>Exhibit B</u>**

**Restructuring Support Agreement**

EXECUTION VERSION

# RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, and including any exhibits or schedules hereto, this "***Agreement***"), dated as of February 8, 2019, is entered into by and between:

(i)    Ditech Holding Corporation and its direct and indirect subsidiaries (the "***Company***"); and

(ii)    each undersigned entity, in each such entity's respective capacity as lender under, or as nominee, investment adviser, sub-adviser, or investment manager, as applicable, to certain funds, accounts, and other entities (including subsidiaries and affiliates of such funds, accounts, and entities) that is a lender (in its respective capacity as such, each, a "***Term Lender***," and, collectively, the "***Term Lenders***" and, together with their respective successors and permitted assigns and any subsequent Term Lender that becomes party hereto in accordance with the terms hereof, each, a "***Consenting Term Lender***," and, collectively, the "***Consenting Term Lenders***") party to that certain Second Amended and Restated Credit Agreement, dated as of February 9, 2018 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "***Credit Agreement***," and the term loan facility thereunder, the "***Term Loan Facility***"), by and among the Company, as the borrower, Credit Suisse AG, Cayman Islands Branch (formerly Credit Suisse AG), as administrative agent (together with any successor administrative agent, in each case, in such capacity, the "***Administrative Agent***"), the other term lenders party thereto and the other lenders party thereto.

The Company, each Consenting Term Lender, and any subsequent Person that becomes a party hereto in accordance with the terms hereof are referred to herein as the "***Parties***" and individually as a "***Party***."

**WHEREAS**, the Parties have agreed to the Restructuring consistent with the terms and subject to the conditions set forth herein, including in the Term Sheet, which are the product of arm's-length, good faith discussions between the Parties and their respective professionals;

**WHEREAS**, as of the date hereof, the Consenting Term Lenders in the aggregate hold, or act as the nominee, investment adviser, sub-adviser, or investment manager to entities that hold, as of the date hereof, more than $66^{2/3}\%$ of the aggregate outstanding principal amount of the Loans and Commitments (each as defined in the Credit Agreement);

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment in respect of the matters discussed in the Term Sheet and hereunder.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

### 1.    Certain Definitions.

Capitalized terms used but not defined herein shall have the meaning ascribed to them in the restructuring term sheet attached hereto as **Exhibit A** (together with all schedules, exhibits, and annexes attached thereto, and as may be modified in accordance with <u>Section 9</u> hereof, the "*Term Sheet*"), or as the context otherwise requires.

As used in this Agreement, the following terms have the following meanings:

(a)    "*Alternative Transaction*" means any plan, dissolution, winding up, liquidation, sale or disposition, reorganization, merger or restructuring of the Company or its assets other than the Restructuring, as set forth herein, including in the Term Sheet;

(b)    "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended from time to time.

(c)    "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157, pursuant to 28 U.S.C. § 151, the United States District Court for the Southern District of New York.

(d)    "*Bidding Procedures Motion*" means a motion filed by the Debtors with the Bankruptcy Court for entry of a Bidding Procedures Order.

(e)    "*Bidding Procedures Order*" means any order (1) approving Bidding Procedures, and (2) setting dates for the submission of bids and the auction (if any), and (3) granting related relief.

(f)    *Commencement Date*" means the date that Debtors commence the Chapter 11 Cases.

(g)    "*Confirmation Order*" means an order of the Bankruptcy Court confirming the Plan.

(h)    "*Definitive Documents*" means the documents (including any related orders, agreements, instruments, schedules or exhibits) that are contemplated by the Term Sheet and that are otherwise necessary or desirable to implement, or otherwise relate to the Restructuring and the Restructuring Transactions, including:  (A) the Plan; (B) the Bidding Procedures; (C) the Bidding Procedures Motion; (D) the Bidding Procedures Order; (E) each of the documents comprising the Plan Supplement; (F) the Disclosure Statement; (G) any motion seeking the approval of the adequacy of the Disclosure Statement and solicitation of the Plan; (H) the Confirmation Order; (I) the motion for use of cash collateral and to incur postpetition financing and any credit agreement with

2

respect thereto (the "***Financing Motion***"); (J) any Financing Orders, and (K) any asset purchase agreement for the Sale Transaction or an Asset Sale Transaction.  Each of the Definitive Documents shall contain terms and conditions consistent in all material respects with this Agreement and the Term Sheet, and, except to the extent such Definitive Documents must be acceptable to the Requisite Term Lenders in accordance with the Term Sheet, shall otherwise be reasonably acceptable in all material respects to the Required Parties, including with respect to any modifications, amendments, or supplements to such Definitive Documents at any time during the Support Period; provided, that the terms of the Plan and Confirmation Order with respect to the treatment of the Term Loans and the treatment of any matters with respect to the Credit Agreement or any economic interest of the Term Lenders, and the Financing Motion and the Financing Orders shall be acceptable in all material respects to the Requisite Term Lenders.

(i)       "***Effective Date***" means the date on which the Plan is consummated.

(j)       "***Financing Orders***" means any orders authorizing Debtors to continue to access cash collateral and incur any postpetition financing on an interim basis or final basis consistent with the Term Sheet.

(k)       "***Outside Commencement Date***" means February 15, 2019.

(l)       "***Person***" means any "person" as defined in section 101(41) of the Bankruptcy Code, including, without limitation, any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof or other entity.

(m)       "***Plan Supplement***" means the plan supplement to the Plan, comprising the following documents, as applicable:  (A) the Amended and Restated Credit Facility Agreement, (B) new organizational documents, (C) the Exit Working Capital Facility documentation, (D) the Management Incentive Plan, (E) shareholders agreement, (F) a schedule of executory contracts and unexpired leases to be assumed and an associated notice of cure amount, (G) a schedule of retained causes of action, (H) any other documents the Company and the Requisite Term Lenders agree shall comprise the Plan Supplement.

(n)       "***Required Lenders***" means the "Required Lenders" as defined in the Credit Agreement.

(o)       "***Required Parties***" means each of (A) the Company and (B) the Requisite Term Lenders.

(p)       "***Requisite Term Lenders***" means, as of the date of determination, Consenting Term Lenders holding at least a majority in aggregate principal amount outstanding of the Term Loans held by the Consenting Term Lenders as of such date.

3

(q)    "***Restructuring Transactions***" means all acts, events, and transactions contemplated by, required for, and taken to implement the Restructuring, the Definitive Documents, the Plan Supplement, this Agreement, and the Elected Transaction (as defined below), each in the singular and collectively, as applicable.

(r)    "***SEC***" means the Securities & Exchange Commission.

(s)    "***Securities Act***" means the Securities Act of 1933, as amended.

(t)    "***Support Effective Date***" means the date on which the counterpart signature pages to this Agreement shall have been executed and delivered by the Company and Consenting Term Lenders (A) holding at least $66^{2/3}$% in aggregate principal amount outstanding of the Term Loans and (B) representing the Required Lenders.

(u)    "***Support Period***" means the period commencing on the Support Effective Date and ending on the earlier of the (A) date on which this Agreement is terminated in accordance with Section 5 hereof and (B) the Effective Date.

## 2.    Term Sheet and Plan.

The Term Sheet is expressly incorporated herein by reference and made part of this Agreement as if fully set forth herein.  The Term Sheet, including the schedules, annexes and exhibits thereto, sets forth certain material terms and conditions of the Restructuring. Notwithstanding anything else in this Agreement to the contrary, in the event of any inconsistency between this Agreement and the Term Sheet, the Term Sheet shall control.

## 3.    Agreements of the Consenting Term Lenders.

(a)    Agreement to Support.  During the Support Period, subject to the terms and conditions hereof, each of the Consenting Term Lenders agrees, severally and not jointly, that it shall:

(i)    use its commercially reasonable efforts to support the Restructuring and the Restructuring Transactions, and to act in good faith and take any and all reasonable actions necessary to consummate the Restructuring and the Restructuring Transactions, in a manner consistent with this Agreement;

(ii)    refrain from initiating (or directing or encouraging the Administrative Agent or any other party to initiate) any actions, including legal proceedings, that are inconsistent with, or that would delay, prevent, frustrate or impede the approval, confirmation or consummation, as applicable, of the Restructuring or Restructuring Transactions;

(iii)    timely vote (pursuant to the Plan) or cause to be voted all of its Claims (including on account of the Second Lien Notes, or any securities, owned or controlled by such Consenting Term Lender) to accept the Plan by delivering its duly executed and completed ballot or ballots, as applicable, accepting the Plan on a timely

basis following commencement of the solicitation of acceptances of the Plan in accordance with sections 1125 and 1126 of the Bankruptcy Code;

(iv)     negotiate in good faith with the Company the forms of the Definitive Documents (to the extent such Consenting Term Lender is a party thereto) and subject to the consent thresholds specified herein execute the Definitive Documents;

(v)     not change or withdraw its votes to accept the Plan (or cause or direct such vote to be changed or withdrawn); provided, however, that such vote shall, without any further action by the applicable Consenting Term Lender, be deemed automatically revoked (and, upon such revocation, deemed void *ab initio*) by the applicable Consenting Term Lender at any time following the expiration of the Support Period with respect to such Consenting Term Lender;

(vi)     not directly or indirectly, through any Person, take any action that would reasonably be expected to prevent, interfere with, delay or impede the consummation of the Restructuring or Restructuring Transactions, including the approval of any Bidding Procedures Motion, the entry of any Bidding Procedures Order, the approval of the Disclosure Statement, or the solicitation of votes on, and confirmation of, the Plan;

(vii)     use its commercially reasonable efforts to support and take all actions as are reasonably necessary and appropriate for such Consenting Term Lender to obtain any and all required regulatory and/or third-party approvals for such Consenting Term Lender to consummate the Restructuring Transactions; and

(viii)     support and take all reasonable actions necessary or reasonably requested by the Company to confirm such Consenting Term Lender's support for the Bankruptcy Court's approval of the Bidding Procedures Motion, the entry of any Bidding Procedures Order, the approval of the Plan and Disclosure Statement, the solicitation of votes on the Plan by the Company, and the confirmation and consummation of the Plan and the Restructuring Transactions.

(b)     Transfers.

(i)     Each Consenting Term Lender agrees that, for the duration of the Support Period, such Consenting Term Lender shall not sell, transfer, loan, issue, participate, pledge, hypothecate, assign or otherwise dispose of (other than ordinary course pledges and/or swaps) (each, a "*Transfer*"), directly or indirectly, in whole or in part, any of its Claims, including any beneficial ownership in any such Claims,[1] or any option thereon or any right or interest therein, unless the transferee thereof either (A) is a Consenting Term Lender (with respect to a transfer by a Consenting Term Lender) or (B) prior to such Transfer, agrees in writing for the benefit of the Parties to become a

---

[1] As used herein, the term "***beneficial ownership***" means the direct or indirect economic ownership of, and/or the power, whether by contract or otherwise, to direct the exercise of the voting rights and the disposition of, any Claims subject to this Agreement or the right to acquire such Claims.

Consenting Term Lender and to be bound by all of the terms of this Agreement applicable to Consenting Term Lenders (including with respect to any and all Claims it already may hold against or in the Company prior to such Transfer) by executing a joinder agreement, a form of which is attached hereto as **Exhibit B** (a "*Joinder Agreement*"), and delivering an executed copy thereof within two (2) business days of such execution, to (1) Weil, Gotshal and Manges LLP ("*Weil*"), as counsel to the Company, (2) Kirkland & Ellis LLP, as counsel to an ad hoc group of Consenting Term Lenders ("*Kirkland*"), and (3) Davis Polk & Wardwell LLP ("*Davis Polk*"), as counsel to the Administrative Agent, in which event (x) the transferee shall be deemed to be a Consenting Term Lender hereunder to the extent of such transferred Claims and (y) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred Claims (such transfer, a "*Permitted Transfer*" and such party to such Permitted Transfer, a "*Permitted Transferee*"). Each Consenting Term Lender agrees that any Transfer of any Claim that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and the Company and each other Consenting Term Lender shall have the right to enforce the voiding of such Transfer.

(ii)    Notwithstanding anything to the contrary herein, (A) a Qualified Marketmaker[2] that acquires any Claims subject to this Agreement held by a Consenting Term Lender with the purpose and intent of acting as a Qualified Marketmaker for such Claims, shall not be required to become a party to this Agreement as a Consenting Term Lender, if (x) such Qualified Marketmaker transfers such Claims (by purchase, sale, assignment, or other similar means) within the earlier of ten (10) business days of its acquisition and the plan voting deadline to a Permitted Transferee and the transfer otherwise is a Permitted Transfer and (y) such Consenting Term Lender shall be solely responsible for the Qualified Marketmaker's failure to comply with this Section 3(b) and (B) to the extent any Party is acting solely in its capacity as a Qualified Marketmaker, it may Transfer any ownership interests in the Claims that it acquires from a holder of Claims that is not a Consenting Term Lender to a transferee that is not a Consenting Term Lender at the time of such Transfer without the requirement that the transferee be or become a signatory to this Agreement or execute a Joinder Agreement.

(iii)    This Section 3(b) shall not impose any obligation on the Company to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Term Lender to Transfer any Claims. Notwithstanding anything to the contrary herein, to the extent the Company and another Party have entered into a separate agreement with respect to the issuance of a "cleansing letter" or other public disclosure of information, the terms of such confidentiality agreement shall continue to apply and remain in full force and effect according to its terms.

---

[2] As used herein, the term "*Qualified Marketmaker*" means an entity that (a) holds itself out to the public, the syndicated loan market, and/or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers claims against, and/or equity interests in, the Company, including Term Loans, or enter with customers into long and short positions in claims against the Company), in its capacity as a dealer or market maker in such claims and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including term, loans, and/or debt or equity securities).

6

(c)     Additional Claims.  This Agreement shall in no way be construed to preclude the Consenting Term Lenders from acquiring additional Claims; provided that, to the extent any Consenting Term Lender (i) acquires additional Claims, (ii) holds or acquires any other claims against the Company entitled to vote on the Plan or (iii) holds or acquires any equity interests in the Company entitled to vote on the Plan, then, in each case, each such Consenting Term Lender shall promptly notify Weil, Kirkland and Davis Polk, and each such Consenting Term Lender agrees that all such Claims shall be subject to this Agreement, and agrees that, for the duration of the Support Period and subject to the terms of this Agreement, it shall vote in favor of the Plan (or cause to be voted) any such additional Claims and/or equity interests entitled to vote on the Plan (to the extent still held by it on or on its behalf at the time of such vote), in a manner consistent with Section 3(a) hereof.  For the avoidance of any doubt, any obligation to vote for the Plan or any other plan of reorganization shall be subject to sections 1125 and 1126 of the Bankruptcy Code.

(d)     Preservation of Rights.  Notwithstanding the foregoing, nothing in this Agreement, and neither a vote to accept the Plan by any Consenting Term Lender, nor the acceptance of the Plan by any Consenting Term Lender, shall:  (i) be construed to limit consent and approval rights provided in this Agreement, the Term Sheet, and the Definitive Documentation; (ii) be construed to prohibit any Consenting Term Lender from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement, or exercising rights or remedies specifically reserved herein; (iii) be construed to prohibit any Consenting Term Lender from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and are not for the purpose of (or could not reasonably be expected to) hindering, delaying, or preventing the consummation of the Restructuring Transactions; (iv) impair or waive the rights of any Consenting Term Lender to assert or raise any objection expressly permitted under this Agreement in connection with any hearing in the Bankruptcy Court, including, without limitation, any hearing on confirmation of the Plan; or (v) subject to Section 3(f), limit the ability of any Consenting Term Lender to assert any rights, claims, and/or defenses under the Credit Agreement, the Security Agreement (as defined in the Credit Agreement), and any related documents or agreements (including, without limitation, the right of any Consenting Term Lender to assert that any potential action of the Company or any Credit Party (as defined in the Credit Agreement) that is inconsistent with, or any potential omission of the Company or any Credit Party (as defined in the Credit Agreement) to take any action required, by the Credit Agreement and/or that a potential Default or Event of Default has occurred under the Credit Agreement).

(e)     Negative Covenants.  The Consenting Term Lenders agree that, for the duration of the Support Period, each Consenting Term Lender shall not take any action inconsistent with, or omit to take any action required by the Credit Agreement, except to the extent that any such action or inaction is expressly contemplated or permitted by this Agreement, the Plan, or any of the other Definitive Documents.

### 4.      **Agreements of the Company.**

(a)      <u>Covenants</u>.  The Company agrees that, for the duration of the Support Period, the Company shall:

(i)      (A) support and use commercially reasonable efforts to consummate and complete the Restructuring, the Restructuring Transactions, and all transactions contemplated under this Agreement (including, without limitation, those described in the Term Sheet and once filed, any Bidding Procedures Motion, and the Plan) including, without limitation, (1) take any and all reasonably necessary actions in furtherance of the Restructuring, the Restructuring Transactions, and the transactions contemplated under this Agreement, including, without limitation, as set forth in the Term Sheet and, once filed, any Bidding Procedures Motion and the Plan, (2) commence the Chapter 11 Cases on or before the Outside Commencement Date and complete and file, within the timeframes contemplated herein, the Plan, the Disclosure Statement, and the other Definitive Documents, and (3) use commercially reasonable efforts to obtain orders of the Bankruptcy Court approving any Bidding Procedures Motion, and the Disclosure Statement and confirming the Plan within the timeframes contemplated by this Agreement; (B) use commercially reasonable efforts to obtain any and all required regulatory approvals for the Restructuring Transactions embodied in the Definitive Documents, including the Plan; and (C) not take any action that is inconsistent with, or to alter, delay, impede, or interfere with, approval of any Bidding Procedures Order, or the Disclosure Statement, confirmation of the Plan, or consummation of the Plan and the Restructuring Transactions, in the case of each of clauses (A) through (C) to the extent consistent with, upon the advice of counsel, the fiduciary duties of the boards of directors of the Company;

(ii)      not commence an avoidance action or other legal proceeding that challenges the validity, enforceability, or priority of the Term Loans or obligations under the Credit Agreement;

(iii)      if the Company receives an unsolicited bona fide proposal or expression of interest in undertaking an Alternative Transaction that the boards of directors, members, or managers (as applicable) of the Company, determine in their good-faith judgment provides a higher or better economic recovery to the Company's stakeholders than that set forth in this Agreement and such Alternative Transaction is from a proponent that the boards of directors, members, or managers (as applicable) of the Company has reasonably determined is capable of timely consummating such Alternative Transaction, the Company will within 48 hours of the receipt of such proposal or expression of interest, notify Kirkland and Davis Polk of the receipt thereof, with such notice to include the material terms thereof, including the identity of the Person or group of Persons involved;

(iv)      provide draft copies of all material motions or applications and other documents (including all "first day" and "second day" motions and orders, any Bidding Procedures Motion, any Bidding Procedures Order, the Plan, the Disclosure Statement, the ballots and other solicitation materials in respect of the Plan, and the

8

Confirmation Order) the Debtors intend to file with the Bankruptcy Court to Kirkland and to Davis Polk, if reasonably practical, at least three (3) business days prior to the date when the Company intends to file any such pleading or other document (provided that if delivery of such motions, orders or materials (other than any Bidding Procedures Motion, the Plan, the Disclosure Statement, the Confirmation Order or an adequate protection order) at least three (3) business days in advance is not reasonably practicable, such motion, order or material shall be delivered as soon as reasonably practicable prior to filing) and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court;

(v)     file such "first day" motions and pleadings reasonably determined by the Debtors, in form and substance reasonably acceptable to the Requisite Term Lenders, to be necessary, and to seek interim and final (to the extent necessary) orders, in form and substance reasonably acceptable to the Debtors and the Requisite Term Lenders, from the Bankruptcy Court approving the relief requested in such "first day" motions;

(vi)     subject to appropriate confidentiality arrangements, provide to the Consenting Term Lenders' professionals, upon reasonable advance notice to the Company:  (A) reasonable access (without any material disruption to the conduct of the Company's business) during normal business hours to the Company's books, records, and facilities; (B) reasonable access to the respective management and advisors of the Company for the purposes of evaluating the Company's finances and operations and participating in the planning process with respect to the Restructuring or Restructuring Transactions; (C) prompt access to any information provided to any existing or prospective financing sources (including lenders under any debtor-in-possession and/or exit financing); and (D) prompt and reasonable responses to all reasonable diligence requests;

(vii)     use their commercially reasonable efforts to support and take all actions as are reasonably necessary and appropriate to obtain any and all required regulatory and/or third-party approvals to consummate the Restructuring;

(viii)     promptly pay all prepetition and postpetition reasonable and documented fees and expenses of (x) Kirkland, FTI Consulting Inc. ("*FTI*"), and one firm acting as local counsel for the Requisite Term Lenders, if required, in each case in accordance with the terms of their respective engagement letters with the Company and (y) the Administrative Agent, Davis Polk, and one firm acting as local counsel for the Administrative Agent, if required, in each case, in accordance with the Credit Agreement and the Term Sheet;

(ix)     not, nor encourage any other person or entity to, take any action which would, or would reasonably be expected to, breach or be inconsistent with this Agreement or delay, impede, appeal, or take any other negative action, directly or indirectly, to interfere with the acceptance, confirmation, or consummation of the Plan or implementation of the Restructuring;

9

(x)    subject to applicable laws, use commercially reasonable efforts to, consistent with the pursuit and consummation of the Restructuring and the Restructuring Transactions, preserve intact in all material respects the current business operations of the Company (other than as consistent with applicable fiduciary duties), keep available the services of its current officers and material employees (in each case, other than voluntary resignations, terminations for cause, or terminations consistent with applicable fiduciary duties) and preserve in all material respects its relationships with customers, sales representatives, suppliers, distributors, and others, including the warehouse lenders, in each case, having material business dealings with the Company (other than terminations for cause or consistent with applicable fiduciary duties);

(xi)    provide prompt written notice to the Requisite Term Lenders between the date hereof and the Effective Date of (A) receipt of any written notice from any third party alleging that the consent of such party is or may be required in connection with the Restructuring Transactions, (B) receipt of any written notice from any governmental body in connection with this Agreement or the Restructuring Transactions, and (C) receipt of any written notice of any proceeding commenced, or, to the actual knowledge of the Company, threatened against the Company, relating to or involving or otherwise affecting in any material respect the Restructuring Transactions; and

(xii)    unless otherwise agreed by the Company and the applicable firm, on the date that is at least one (1) calendar day prior to the Commencement Date, pay to (A) Kirkland, (B) one firm acting as local counsel for the Requisite Term Lenders, if any, (C) FTI, (D) the Administrative Agent, (E) Davis Polk and (F) one firm acting as local counsel for the Administrative Agent, if any, in each case (x) all reasonable and documented fees and expenses accrued but unpaid as of such date, whether or not such fees and expenses are then due, outstanding, or otherwise payable in connection with this matter and (y) fund or replenish, as the case may be, any retainers reasonably requested by Kirkland or FTI, in each case in accordance with the terms of their respective engagement letters with the Company.

(b)    <u>Automatic Stay</u>.  The Company acknowledges and agrees and shall not dispute that after the commencement of the Chapter 11 Cases, the giving of notice of termination by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Company hereby waives, to the greatest extent possible, the applicability of the automatic stay to the giving of such notice); <u>provided</u> that nothing herein shall prejudice any Party's rights to argue that the giving of notice of default or termination was not proper under the terms of this Agreement.

(c)    <u>Negative Covenants</u>.  The Company agrees that, for the duration of the Support Period, the Company shall not take any action inconsistent with, or omit to take any action required by the Credit Agreement, except to the extent that any such action or inaction is expressly contemplated or permitted by this Agreement, the Term Sheet, the Plan or any of the other Definitive Documents.

10

## 5.    Termination of Agreement.

(a)    This Agreement shall terminate upon the receipt of written notice to the other Parties, delivered in accordance with Section 19 hereof, from (x) the Requisite Term Lenders at any time after and during the continuance of any Lender Termination Event or (y) the Company at any time after and during the continuance of any Company Termination Event, as applicable.

(b)    A "*Lender Termination Event*" shall mean any of the following:

(i)    the breach by the Company of (a) any covenant contained in this Agreement or (b) any other obligations of the Company set forth in this Agreement, in each case, in any material respect and, in either respect, such breach remains uncured for a period of five (5) business days following the Company's receipt of written notice pursuant to Sections 5(a) and 19 hereof (as applicable);

(ii)    any representation or warranty in this Agreement made by the Company shall have been untrue in any material respect when made or shall have become untrue in any material respect, and such breach remains uncured for a period of five (5) business days following the Company's receipt of notice pursuant to Sections 5(a) and 19 hereof (as applicable);

(iii)    the Definitive Documents and any amendments, modifications, or supplements thereto filed by the Company include terms that are materially inconsistent with the Term Sheet and are not otherwise acceptable to the Requisite Term Lenders, and such event remains unremedied for a period of three (3) business days following the Company's receipt of notice pursuant to Sections 5(a) and 19 hereto (as applicable);

(iv)    a Definitive Document alters the treatment of the Term Lenders specified in the Term Sheet without complying with Section 9 hereof and the Requisite Term Lenders have not otherwise consented to such Definitive Document;

(v)    solely in the context of a Reorganization Transaction, the failure of the Company to secure commitments to fund the Exit Working Capital Facility prior to the Confirmation Hearing on terms acceptable to the Company and to holders of at least $66^{2/3}$% in aggregate principal amount outstanding of the Term Loans;

(vi)    the Company, after delivery of an Election Notice (as defined below), fails to pursue consummation of the Elected Transaction or pursues consummation of a transaction other than the Elected Transaction;

(vii)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and either (A) such ruling, judgment or order has been issued at the request of or with the acquiescence of the Company, or (B) in all other circumstances, such ruling, judgment or order has not been not stayed, reversed or vacated within fifteen (15) calendar days after such issuance;

11

(viii)    the Support Effective Date shall not have occurred on or before the Commencement Date;

(ix)    the Commencement Date shall not have occurred on or before the Outside Commencement Date;

(x)    the Debtors shall not have complied with Milestones set out in the Term Sheet;

(xi)    the Bankruptcy Court enters an order that is not stayed (A) directing the appointment of an examiner with expanded powers or a trustee in the Chapter 11 Cases, (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing the Chapter 11 Cases, (D) denying confirmation of the Plan, the effect of which would render the Plan incapable of consummation on the terms set forth herein or (E) granting relief that is inconsistent with this Agreement or the Plan in any materially adverse respect to the Consenting Term Lenders, in each case;

(xii)    the Confirmation Order is reversed or vacated by a Final Order;

(xiii)    any court of competent jurisdiction has entered a final, non-appealable judgment or order declaring this Agreement to be unenforceable;

(xiv)    if either (A) the Company (or any person or entity on behalf of the Company or its bankruptcy estate with proper standing) files a motion, application or adversary proceeding (or supports or fails to timely object to such a filing) (1) challenging the validity, enforceability, perfection or priority of, or seeking invalidation, avoidance, disallowance, recharacterization or subordination of, the obligations or Claims under the Credit Agreement or (2) challenging the seniority of the obligations or Claims under the Credit Agreement over any obligations or Claims under the Second Lien Notes Indenture or (B) the Bankruptcy Court (or any court with jurisdiction over the Chapter 11 Cases) enters an order providing relief against the interests of the Term Lenders with respect to any of the foregoing causes of action or proceedings, including, but not limited to, invalidating, avoiding, disallowing, recharacterizing, subordinating, or limiting the enforceability of any of the obligations or Claims arising under or related to the Credit Agreement;

(xv)    the terms and conditions of the debtor-in-possession financing (including, but not limited to, any Definitive Documents memorializing such facility) are not acceptable to the Requisite Term Lenders in all material respects;

(xvi)    the debtor-in-possession financing contemplated by the Term Sheet is not approved by the Bankruptcy Court or terminated;

(xvii)    the Company (unless the Company is acting at the direction or instruction or with the consent of the Requisite Term Lenders, including any of their respective employees, agents, or representatives) files or seeks approval of, or supports (or fails to timely object to) another party in filing or seeking approval of an Alternative Transaction;

12

(xviii) the commencement of an involuntary bankruptcy case against the Company under the Bankruptcy Code, if such involuntary case is not dismissed within sixty (60) calendar days after the filing thereof, or if a court order grants the relief sought in such involuntary case;

(xix)   if the Company (A) withdraws the Plan, (B) publicly announces its intention not to support the Restructuring or the Plan, (C) files a motion with the Bankruptcy Court seeking the approval of an Alternative Transaction or (D) agrees to pursue (including, for the avoidance of doubt, as may be evidenced by a term sheet, letter of intent, or similar document) or publicly announces its intent to pursue an Alternative Transaction;

(xx)   the Bankruptcy Court enters an order modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization (including the Plan); or

(xxi)   if the Company or any other Credit Party (as defined in the Credit Agreement) makes, or causes to be made, any payment of principal or interest on any indebtedness constituting Second Lien Notes.

(c)   A "*Company Termination Event*" shall mean any of the following:

(i)   the breach in any material respect by one or more of the Consenting Term Lenders, of any of the undertakings, representations, warranties, or covenants of the Consenting Term Lenders set forth herein in any material respect which remains uncured for a period of five (5) business days after the receipt of written notice of such breach pursuant to Sections 5(a) and 19 hereof (as applicable), but only if the non-breaching Consenting Term Lenders own less than $66^{2/3}$% of the Claims;

(ii)   the board of directors, members, or managers (as applicable) of the Company reasonably determines in good faith based upon the advice of outside counsel that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law; provided, that the Company shall provide notice of such determination to Kirkland and Davis Polk via email within one (1) business day after the date thereof;

(iii)   the Company shall not have obtained votes accepting the Plan from holders of the Term Loans sufficient to satisfy the conditions for acceptance set forth in section 1126(c) of the Bankruptcy Code on or before the voting deadline set forth in the solicitation materials distributed in connection with the Plan;

(iv)   the Support Effective Date shall not have occurred on or before the Commencement Date;

(v)   if the Effective Date shall not have occurred on or before 125 days following the Commencement Date;

13

(vi)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and such ruling, judgment or order has not been not stayed, reversed or vacated within fifteen (15) calendar days after such issuance; or

(vii)    solely in the context of a Reorganization Transaction, the failure of the Company to secure commitments to fund the Exit Working Capital Facility prior to the Confirmation Hearing on terms acceptable to the Company and to holders of at least $66^{2/3}$% in aggregate principal amount outstanding of the Term Loans;

(d)    <u>Mutual Termination</u>.    This Agreement may be terminated by mutual agreement of the Company and the Requisite Term Lenders upon the receipt of written notice delivered in accordance with <u>Section 19</u> hereof.

(e)    <u>Automatic Termination</u>.    This Agreement shall terminate automatically, without any further action required by any Party, upon the occurrence of the Effective Date.

(f)    <u>Effect of Termination</u>.    Upon the termination of this Agreement in accordance with this <u>Section 5</u> (other than pursuant to <u>Section 5(e)</u>) if the Restructuring has not been consummated, and except as provided in <u>Section 13</u> hereof, this Agreement shall forthwith become void and of no further force or effect and each Party shall, except as provided otherwise in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law, the Credit Agreement and any ancillary documents or agreements thereto; <u>provided, however</u>, that in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.    Upon any such termination of this Agreement, each vote or any consents given by any Consenting Term Lender prior to such termination shall be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement, in each case, without further confirmation or other action by such Consenting Term Lender.    If this Agreement has been terminated as to any Consenting Term Lender in accordance with this <u>Section 5</u> (other than pursuant to <u>Section 5(e)</u>) at a time when permission of the Bankruptcy Court shall be required for a Consenting Term Lender to change or withdraw (or cause to change or withdraw) its vote to accept the Plan, the Company shall support and not oppose any attempt by such Consenting Term Lender to change or withdraw (or cause to change or withdraw) such vote at such time, subject to all remedies available to the Company at law, equity, or otherwise, including those remedies set forth in <u>Section 12</u> hereof.    The Consenting Term Lender shall have no liability to the Company or to each other in respect of any termination of this Agreement in accordance with the terms of this <u>Section 5</u> and <u>Section 19</u> hereof.

14

(g)    If the Restructuring has not been consummated prior to the date of termination of this Agreement, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights and the Parties expressly reserve any and all of their respective rights.   Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

## 6.    **Definitive Documents; Good Faith Cooperation; Further Assurances.**

Subject to the terms and conditions described herein, during the Support Period, each Party, severally and not jointly, hereby covenants and agrees to reasonably cooperate with each other in good faith in connection with, and shall exercise commercially reasonable efforts with respect to the pursuit, approval, implementation, and consummation of the Plan and the Restructuring, as well as the negotiation, drafting, execution (to the extent such Party is a party thereto), and delivery of the Definitive Documents.   Furthermore, subject to the terms and conditions hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, including making and filing any required regulatory filings and voting any claims against or securities of the Company in favor of the Restructuring, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement; provided that no Consenting Term Lender shall be required to incur any material cost, expense, or liability in connection therewith.

## 7.    **Representations and Warranties.**

(a)    Each Party, severally and not jointly, represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof (or, with respect to a Consenting Term Lender that becomes a party hereto after the date hereof, as of the date such Consenting Term Lender becomes a party hereto):

(i)    such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder, and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(ii)    the execution, delivery and performance by such Party of this Agreement does not and will not (A) violate any material provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries or (B) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party;

15

(iii)    the execution, delivery and performance by such Party of this Agreement does not and will not require any material registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state or governmental authority or regulatory body, except such filings as may be necessary and/or required by the SEC; and

(iv)    this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(b)    Each Consenting Term Lender severally (and not jointly), represents and warrants to the Company that, as of the date hereof (or as of the date such Consenting Term Lender becomes a party hereto), such Consenting Term Lender (i) is the beneficial owner of the aggregate principal amount of Term Loans set forth below its name on the signature page hereof (or below its name on the signature page of a Joinder Agreement for any Consenting Term Lender that becomes a party hereto after the date hereof) and does not beneficially own any other Term Loans and/or (ii) has, with respect to the beneficial owners of such Term Loans, (A) sole investment or voting discretion with respect to such Term Loans, (B) full power and authority to vote on and consent to matters concerning such Term Loans or to exchange, assign and transfer such Term Loans and (C) full power and authority to bind or act on the behalf of, such beneficial owners.

(c)    Each Consenting Term Lender severally (and not jointly) makes the representations and warranties set forth in this Section 7, in each case, to the other Parties.

## 8.    Disclosure; Publicity.

(a)    Subject to the provisions set forth in Section 8(b) hereof, the Company shall disseminate publication on Form 8-K or a press release disclosing the existence of this Agreement and the terms hereof (including any schedules and exhibits thereto that are filed with the Bankruptcy Court on the Commencement Date) with such redactions as may be reasonably requested by Kirkland to maintain the confidentiality of the items identified in Section 8(b) hereof, except as otherwise required by law.  In the event that the Company fails to make the foregoing disclosures in compliance with the terms specified herein, any such Consenting Term Lender may publicly disclose the foregoing, including, without limitation, this Agreement and all of its exhibits and schedules (subject to the redactions called for by Section 8 hereof), and the Company hereby waives any claims against the Consenting Term Lenders arising as a result of such disclosure by a Consenting Term Lender in compliance with this Agreement.

(b)    The Company shall submit drafts to Kirkland of any press releases, public documents and any and all filings with the SEC that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement, or any

16

other matter relating to the Term Loans, at least one (1) business day prior to making any such disclosure, and any such press releases, public documents, and other SEC filings shall be reasonably acceptable in all material respects to the Requisite Term Lenders. Except as required by applicable law or otherwise permitted under the terms of any other agreement between the Company and any Consenting Term Lender, no Party or its advisors shall disclose to any person (including, for the avoidance of doubt, any other Consenting Term Lender), other than advisors to the Company, the principal amount of the Term Loans held by the Consenting Term Lender, without such Consenting Term Lender's prior written consent; provided, however, that (i) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall, to the extent permitted by law, afford the relevant Consenting Term Lender a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure (the expense of which, if any, shall be borne by the relevant Consenting Term Lender) and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate outstanding principal amount of the Term Loans held by all the Consenting Term Lenders collectively.

## 9.    Amendments and Waivers; Term Lender Election.

(a)    This Agreement, including any exhibits or schedules hereto, may not be waived, modified, amended or supplemented except with the written consent of the Company and the Requisite Term Lenders; provided, however, that any waiver, modification, amendment or supplement to this Section 9 shall require the written consent of all of the Parties; provided, further, that any modification, amendment or change to the definition of Requisite Term Lenders shall require the written consent of each Consenting Term Lender; provided, further, that any change, modification or amendment to this Agreement, the Term Sheet, or the Plan that treats or affects any Consenting Term Lender in a manner that is disproportionately adverse, on an economic or non-economic basis, to the manner in which any of the other Consenting Term Lenders are treated (after taking into account each of the Consenting Term Lender's respective holdings and interests in the Company and the recoveries contemplated by the Term Sheet (as in effect on the date hereof)) shall require the written consent of such Consenting Term Lender; provided, further, that if any change, modification or amendment to this Agreement, the Term Sheet or the Plan does not materially, adversely affect the rights of a Consenting Term Lender, the consent of such Consenting Term Lender shall not be required.  In the event that an adversely affected Consenting Term Lender ("***Non-Consenting Term Lender***") does not consent to a waiver, change, modification or amendment to this Agreement requiring the consent of each Consenting Term Lender, but such waiver, change, modification or amendment receives the consent of Consenting Term Lenders owning at least $66^{2/3}\%$ of the aggregate outstanding principal amount of the Term Loans, this Agreement shall be deemed to have been terminated only as to such Non-Consenting Term Lender, but this Agreement shall continue in full force and effect in respect to all other Consenting Term Lenders who have so consented, in a way consistent with (or otherwise reasonably acceptable to the Requisite Term Lenders) this Agreement and the Term Sheet as waived, changed, modified, or amended, as applicable.

17

(b)      Unless extended by the Company, within five (5) business days following the earlier of (a) the conclusion of the Company's post-Commencement Date marketing and sale process and (b) 95 days after the Commencement Date (the earliest such date, the "*Election Date*"), holders of at least 662/3% in aggregate principal amount outstanding of the Term Loans (the "Electing Term Lenders") shall deliver a notice (the "*Election Notice*") to the Company stating that the Electing Term Lenders wish to consummate a transaction (the "*Elected Transaction*"), being a: (i) Reorganization Transaction, or (ii) Master Servicing Transaction (as part of a Reorganization Transaction), or (iii) Sale Transaction, and, if applicable, (iv) in connection and together with an election of (i), (ii), or (iii), any Asset Sale Transaction(s); <u>provided</u> that inclusion of any such Asset Sale Transaction(s) is not incompatible with the successful consummation of the elected transaction in (i), (ii), or (iii).

10.    **Effectiveness.**

This Agreement shall become effective and binding on the Parties on the Support Effective Date, and not before such date; <u>provided</u> that signature pages executed by Consenting Term Lenders shall be delivered to (a) the other Consenting Term Lenders in a redacted form that removes such Consenting Term Lenders' holdings of the Term Loans or any other Claims against or interests in the Company and any schedules to such Consenting Term Lenders' holdings (if applicable) and (b) the Company, Weil and Kirkland in an unredacted form (and to be kept confidential by the Company, Weil and Kirkland).

11.    **Governing Law; Jurisdiction; Waiver of Jury Trial.**

(a)      This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York, without giving effect to the conflict of laws principles thereof.

(b)      Each of the Parties irrevocably agrees that any legal action, suit or proceeding arising out of or relating to this Agreement brought by any party or its successors or assigns shall be brought and determined in any federal or state court in the State of New York, and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement or the Restructuring. Each of the Parties agrees not to commence any proceeding relating hereto or thereto except in the courts described above in New York, other than proceedings in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any such court in New York as described herein. Each of the Parties further agrees that notice as provided herein shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient. Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any proceeding arising out of or relating to this Agreement or the Restructuring, (i) any claim that it is not personally subject to the jurisdiction of the courts in New York as described herein for any reason, (ii) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of

18

notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (iii) that (A) the proceeding in any such court is brought in an inconvenient forum, (B) the venue of such proceeding is improper or (C) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.  Notwithstanding the foregoing, during the pendency of the Chapter 11 Cases, all proceedings contemplated by this Section 11(b) shall be brought in the Bankruptcy Court.

(c)    EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

## 12.    Specific Performance/Remedies.

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder.

## 13.    Survival.

Notwithstanding the termination of this Agreement pursuant to Section 5 hereof, the agreements and obligations of the Parties in this Section 13, and Sections 4(b), 5(f), 8, 10, 11, 12, 14, 15, 16, 17, 18, 19, and 20 hereof (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect in accordance with the terms hereof; provided, however, that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

## 14.    Headings.

The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

## 15.    Successors and Assigns; Severability; Several Obligations.

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives;

provided, however, that nothing contained in this Section 15 shall be deemed to permit Transfers of the Term Loans or claims arising under the Term Loans other than in accordance with the express terms of this Agreement. If any provision of this Agreement, or the application of any such provision to any Person or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible. The agreements, representations and obligations of the Parties are, in all respects, ratable and several and neither joint nor joint and several.

## 16.    No Third-Party Beneficiaries.

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties (and their respective successors, permitted assigns, heirs, executors, administrators and representatives) and no other Person shall be a third-party beneficiary hereof.

## 17.    Prior Negotiations; Entire Agreement.

This Agreement, including the exhibits and schedules hereto (including the Term Sheet) constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof and thereof, except that the Parties acknowledge that any confidentiality agreements (if any) heretofore executed between the Company and each Consenting Term Lender shall continue in full force and effect.

## 18.    Counterparts.

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement may be delivered by facsimile or by electronic mail in portable document format (pdf), which shall be deemed to be an original for the purposes of this paragraph.

## 19.    Notices.

All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, facsimile, courier or by registered or certified mail (return receipt requested) to the following addresses and facsimile numbers:

(1)    If to the Company or Debtors, to:

Ditech Holding Corporation
3000 Bayport Drive, Suite 985
Tampa, FL 33607
Attn: John Haas, General Counsel, Chief Legal Officer and Secretary

20

Email:  JHaas@ditech.com

With a copy to (which shall not constitute notice):

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attn:  Ray C. Schrock, P.C.
Email:  Ray.Schrock@weil.com
Attn:  Sunny Singh, Esq.
Email:  Sunny.Singh@weil.com
Attn: Alexander Welch, Esq.
Email: Alexander.Welch@weil.com

(2)    If to a Consenting Term Lender, or a transferee thereof, to the addresses or
        facsimile numbers set forth below following the Consenting Term
        Lender's signature (or as directed by any transferee thereof), as the case
        may be, with copies to:

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Il 606545
Attn:  Patrick J Nash Jr., P.C.
Email:  Patrick.Nash@kirkland.com
Attn:  John Luze
Email:  John.Luze@kirkland.com

(3)    If to the Administrative Agent:

Credit Suisse AG
11 Madison Avenue,
New York, NY 10010
Attn:  Megan Kane
Email:  Megan.Kane@credit-suisse.com
Attn:  Peter Winstanley
Email:  Peter.Winstanley@credit-suisse.com

With a copy to (which shall not constitute notice):

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Attn: Brian M. Resnick
Email:  Brian.Resnick@davispolk.com
Attn: Michelle McGreal
Email:  Michelle.Mcgreal@davispolk.com

21

Any notice given by delivery, mail or courier shall be effective when received. Any notice given by facsimile or electronic mail shall be effective upon oral, machine or electronic mail (as applicable) confirmation of transmission.

### 20.    Reservation of Rights; No Admission.

(a)    Nothing contained herein shall:  (i) limit (A) the ability of any Party to consult with other Parties or (B) the rights of any Party under any applicable bankruptcy, insolvency, foreclosure, or similar proceeding, including the right to appear as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, in each case, so long as such consultation or appearance is consistent with such Party's obligations hereunder, or under the terms of the Plan; (ii) limit the ability of any Consenting Term Lender to sell or enter into any transactions in connection with the Second Lien Notes owned or controlled by such Consenting Term Lender, or any other claims against or interests in the Company, subject to the terms of Section 3(b) hereof; (iii) limit the rights of any Consenting Term Lender under the Credit Agreement or any agreements executed in connection with the Credit Agreement; or (iv) constitute a waiver or amendment of any provision of the Credit Agreement or any agreements executed in connection with the Credit Agreement.

(b)    Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of each of the Parties to protect and preserve its rights, remedies, and interests, including its claims against any of the other Parties (or their respective affiliates or subsidiaries) or its full participation in any bankruptcy case filed by the Company or any of its affiliates and subsidiaries.  This Agreement, the Term Sheet and the Plan are part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties.  Pursuant to Rule 408 of the Federal Rule of Evidence, any applicable state rules of evidence, and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.  This Agreement shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever.  Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

### 21.    Relationship Among Consenting Term Lenders.

It is understood and agreed that no Consenting Term Lender has any duty of trust or confidence in any kind or form with any other Consenting Term Lender, and, except as expressly provided in this Agreement, there are no commitments among or between them.  In this regard, it is understood and agreed that any Consenting Term Lender may trade in the Second Lien Notes or other debt of the Company without the consent of the Company or any other Consenting Term Lender, subject to applicable securities laws, the terms of this Agreement, and any confidentiality agreement entered into with the Company; provided that no Consenting Term Lender shall have any responsibility for any such trading to any other person or entity by virtue of this Agreement.  No prior history, pattern, or practice of sharing

22

confidences among or between the Consenting Term Lender shall in any way affect or negate this understanding and agreement.

### 22.    No Solicitation; Representation by Counsel; Adequate Information.

(a)    This Agreement is not and shall not be deemed to be a solicitation for votes in favor of the Plan in the Chapter 11 Cases by the Term Lenders or a solicitation to tender or exchange any of the Term Loans.  The acceptances of the Consenting Term Lenders with respect to the Plan will not be solicited until such Consenting Term Lender has received the Disclosure Statement and related ballots and solicitation materials, each as approved or ratified by the Bankruptcy Court.

(b)    Each Party acknowledges that it has had an opportunity to receive information from the Company and that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

(c)    Although none of the Parties intends that this Agreement should constitute, and they each believe it does not constitute, a solicitation or acceptance of a chapter 11 plan of reorganization or an offering of securities, each Consenting Term Lender acknowledges, agrees and represents to the other Parties that it (i) is a "qualified institutional buyer" as such term is defined in Rule 144A of the Securities Act or a non-US person participating in the offering outside the United States in reliance on Regulation S under the Securities Act, (ii) is an accredited investor (as such term is defined in Rule 501(a) of Regulation D promulgated under the Securities Act), (iii) understands that the securities to be acquired by it (if any) pursuant to the Restructuring have not been registered under the Securities Act and that such securities are, to the extent not acquired pursuant to section 1145 of the Bankruptcy Code, being offered and sold pursuant to an exemption from registration contained in the Securities Act, based in part upon such Consenting Term Lender's representations contained in this Agreement and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available and (iv) has such knowledge and experience in financial and business matters that such Consenting Term Lender is capable of evaluating the merits and risks of the securities to be acquired by it (if any) pursuant to Restructuring and understands and is able to bear any economic risks with such investment.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

Dated: February 8, 2019

**DF INSURANCE AGENCY LLC**

**DITECH FINANCIAL LLC**

**DITECH HOLDING CORPORATION**

**GREEN TREE INSURANCE AGENCY OF NEVADA, INC.**

By: _____

Name: Joanna Colaneri
Title:   Senior Vice President and Treasurer

SIGNATURE PAGE TO RESTRUCTURING SUPPORT AGREEMENT

Dated: February 8, 2019

**GREEN TREE CREDIT LLC**

**GREEN TREE CREDIT SOLUTIONS LLC**

**GREEN TREE INVESTMENT HOLDINGS III LLC**

**GREEN TREE SERVICING CORP.**

**WALTER MANAGEMENT HOLDING COMPANY LLC**

**WALTER REVERSE ACQUISITION LLC**

By: _____
Name: Laura Reichel
Title:  President

SIGNATURE PAGE TO RESTRUCTURING SUPPORT AGREEMENT

Dated: February 8, 2019

**MARIX SERVICING LLC**

By: _____
Name: Clinton Hodder
Title: President

Dated: February  8, 2019

MORTGAGE ASSET SYSTEMS, LLC

REO MANAGEMENT SOLUTIONS,
LLC

REVERSE MORTGAGE SOLUTIONS,
INC.

By: _____
      Name: Jeanetta Brown
      Title:  Vice President

SIGNATURE PAGE TO RESTRUCTURING SUPPORT AGREEMENT

**EXHIBIT A**

**RESTRUCTURING TERM SHEET**

### DITECH HOLDING CORPORATION
### RESTRUCTURING TERM SHEET

**This Term Sheet is attached as <u>Exhibit A</u> to the restructuring support agreement dated February 8, 2019 (as amended and restated), by and among holders (the "*Consenting Term Lenders*") of outstanding Term Loans (as defined in the Credit Agreement (defined below)) and Ditech Holding Corporation (the "*RSA*"). Capitalized terms used in this Term Sheet not defined shall have the meaning ascribed to them in <u>Annex A</u>.**

**This Term Sheet is not an offer or a solicitation with respect to any securities of the Company, nor is it a solicitation of acceptances of a plan of reorganization as contemplated by sections 1125 and/or 1126 of the Bankruptcy Code. Any such offer or solicitation shall comply with all applicable securities laws and/or provisions of the Bankruptcy Code.**

**This Term Sheet is a settlement proposal in furtherance of settlement discussions. Accordingly, this Term Sheet is protected by rule 408 of the Federal Rules of Evidence and any other applicable statutes or doctrines protecting the use or disclosure of confidential settlement discussions.**

**This Term Sheet is for discussion purposes only and does not purport to summarize all of the terms, conditions, representations, warranties, and other provisions with respect to the transactions described herein, which transactions will be subject to the completion of definitive documents incorporating the terms set forth herein and the closing of any transaction shall be subject to the terms and conditions set forth in such definitive documents. No binding obligations will be created by this Term Sheet unless and until binding definitive documents are executed and delivered by all applicable parties.**

| Introduction | |
|---|---|
| **Overview** | This Term Sheet summarizes the terms of a restructuring (the "*Restructuring*") of the Company to be effectuated pursuant to the Plan. |
| **The Company** | Ditech Holding Corporation ("*Ditech*") and its subsidiaries that will be debtors and debtors in possession (the "*Debtors*" or collectively, the "*Company*"). |
| **Claims and Interests to be Restructured** | <u>First Lien Senior Secured Term Loan Claims</u>: Claims on account of term loans ("*Term Loan Claims*") under that certain Second Amended and Restated Credit Agreement, dated as of February 9, 2018 (and as amended by that certain Amendment No. 1 to Second Amended and Restated Credit Agreement, dated as of March 29, 2018) (the "*Credit Agreement*"), among Ditech, the lenders party thereto (each, a "*Term Lender*"), and Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent for the Term Lenders (the "*Administrative Agent*"). Term Loan Claims shall be allowed in the outstanding principal amount of $961,355,635.34, plus any amounts owing on account of call protections contained in the Credit Agreement, plus all accrued interest, costs, fees, and expenses under the Credit Agreement.<br><br><u>Second Lien Notes Claims</u>: Claims on account of the 9.0% Second Lien Senior Subordinated PIK Toggle Notes due 2024 (the "*Second Lien Notes*"), |

| Introduction | |
|---|---|
| | issued by Ditech pursuant to the Indenture dated as of the Effective Date (as amended, restated, supplemented or otherwise modified from time to time), under which the Second Lien Notes were issued, among Ditech, as issuer, certain of the subsidiary guarantors party thereto, as guarantors, and Wilmington Savings Fund Society, FSB, as trustee and collateral agent (the "**Second Lien Notes Trustee**"). |
| | General Unsecured Claims: Consisting of any Claim against the Company (other than any Intercompany Claims or Go-Forward Trade Claims (as defined below)) as of the Commencement Date that is neither secured by collateral nor entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court including any deficiency claim under section 506(a) of the Bankruptcy Code (collectively, the "**General Unsecured Claims**"). |
| | Go-Forward Trade Claims: Consisting of any Claim against the Company (other than any Intercompany Claims or General Unsecured Claims) as of the Commencement Date that is neither secured by collateral nor entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court identified by the Company (with the consent of the Requisite Term Lenders) as being integral to and necessary for the ongoing operations of New Ditech (the "**Go-Forward Trade Claims**"). |
| | Existing Equity Interests: Consisting of any common stock, preferred stock, warrants, or other ownership interest of or in Ditech pursuant to the Ditech Certificate of Incorporation or otherwise that are issued and outstanding as of the Commencement Date (the "**Existing Equity Interests**"). |
| Transaction Overview | |
| **Implementation** | The Company will commence the Chapter 11 Cases and implement the Restructuring pursuant to the Plan as provided in the RSA. The transactions in this Term Sheet may be effectuated pursuant to the Plan as (a) a standalone reorganization and/or credit bid of Allowed Term Loan Claims by the Term Lenders; or (b) a sale to a third party. |
| **DIP Financing** | The Company will execute certain new refinancing agreements to be entered into by Ditech Financial LLC and Reverse Mortgage Solutions Inc., as borrowers (the "**DIP Warehouse Facility**"), which shall provide for the refinancing of existing warehouse, repurchase, and advance facilities of Ditech Financial LLC and Reverse Mortgage Solutions Inc., including the Existing Warehouse and Repurchase Facilities; *provided* that, the terms and conditions of the DIP Warehouse Facility (including, but not limited to, any Definitive Documents memorializing the DIP Warehouse Facility) shall be acceptable to the Requisite Term Lenders in all material respects; *provided further*, that, exit financing refinancing the DIP Warehouse Facility shall be raised following the Commencement Date but prior to the Effective Date (if necessary). |
| **Exit Working Capital Facility** | On the Effective Date, the Company, subject to the consent of the Requisite Term Lenders, shall enter into a new-money revolver or delayed-draw term loan facility in an amount equal to $150 million (the "***Exit Working Capital*** |

| Introduction | |
|---|---|
| | *Facility*"), or such lesser amount as is acceptable to the Company and the Requisite Term Lenders; *provided*, that, $30 million of the Exit Working Capital Facility may be reserved for a letter of credit sub-facility or synthetic letter of credit sub-facility (or shall have a reserve for any separately incurred letter of credit facility not to exceed $30 million). The terms of the Exit Working Capital Facility shall be otherwise in form and substance acceptable to the Requisite Term Lenders and the Company; provided, that, the Exit Working Capital Facility shall be co-terminus with the Amended and Restated Term Loan Facility.<br><br>The Exit Working Capital Facility will be funded by: (i) some or all of the Term Lenders providing a revolving credit facility or similar financing, subject to ongoing diligence and acceptable documentation; (ii) third party senior financing; (iii) asset sales, or (iv) some combination of the foregoing (i), (ii) and (iii), each of (i)-(iv) on customary terms and otherwise acceptable to the Company and Requisite Term Lenders; *provided* that with respect to any third party senior financing, the Consenting Term Lenders shall have the option to fund any such financing on substantially the same terms in place of any third party financing source. |
| **Use of Cash Collateral** | The Company will be authorized to use cash collateral (as defined in section 363(a) of the Bankruptcy Code) of the Term Lenders with the consent of the Administrative Agent, acting at the direction of the Requisite Term Lenders, subject to the following terms and conditions and such other terms and conditions that are mutually acceptable to the Company and the Requisite Term Lenders; provided that notwithstanding anything to the contrary herein, the following shall be subject in all respects to the terms of the orders approving the DIP Warehouse Facility:<br><br>• Adequate Protection Lien. The Administrative Agent (on behalf of itself and the Term Lenders) shall receive a replacement security interest in and lien on (the "**Term Loan AP Liens**") all assets and property of the Debtors, whether arising prepetition or postpetition of any nature whatsoever, which liens and security interests shall be subordinate only to (i) Permitted Liens (as defined in the Credit Agreement) to the extent any such Permitted Liens are senior in priority under applicable non-bankruptcy law to the liens securing the Obligations under the Credit Agreement and (ii) the liens granted under the DIP Warehouse Facility (the "**DIP Liens**") and (iii) a customary professional fee "carve-out" in an amount to be agreed upon by the Company and the Requisite Term Lenders (the "***Carve Out***"). The Term Loan AP Liens shall not be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtor's estate under section 551 of the Bankruptcy Code or (ii) subordinated to or made pari passu with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise, except as expressly provided in the Financing Orders. |

| Introduction | |
|---|---|
| | • 507(b) Claim. The Administrative Agent (on behalf of itself and the Term Lenders) shall receive an administrative expense claim pursuant to Bankruptcy Code section 507(b) with priority over all other administrative expenses, subject to the Carve Out and adequate protection granted on account of the DIP Warehouse Facility.<br><br>• Adequate Protection Payments. The Debtors' prompt payment of, whether incurred prior to or following the Commencement Date, all reasonable fees and expenses of the Administrative Agent (in accordance with the Credit Agreement), including but not limited to Kirkland and FTI, as provided herein; *provided*, that, subject to the terms of the Intercreditor Agreement, the right of any party in interest (other than, so long as the RSA is in effect, the Company) to file a complaint with the Bankruptcy Court to recharacterize any such payments as payments against principal on the ground that the Allowed Term Loans are under-collateralized is reserved, subject to the rights of the Administrative Agent and Term Lenders to oppose such complaint and raise any and all defenses thereto.<br><br>• Financial Reporting. Until the Effective Date, the Debtors shall continue to provide the Administrative Agent, Kirkland, and FTI with financial and other reporting in compliance with the Prepetition Documents and any reporting described in the Financing Orders, including monthly financial reporting in form and substance reasonably acceptable to the Requisite Term Lenders.<br><br>The Company will be authorized to use any collateral, including cash collateral (as defined in section 363(a) of the Bankruptcy Code), of the holders of Second Lien Notes, and the Second Lien Notes Trustee (on behalf of itself and the holders of Second Lien Notes) shall receive a replacement security interest in and lien on all assets and property of the Debtors, whether arising prepetition or postpetition of any nature whatsoever, which liens and security interests shall be subordinate to (i) the DIP Liens; (ii) the Term Lenders AP Liens; (iii) the prepetition liens of the Term Lenders; (iv) permitted liens under the indenture governing the Second Lien Notes to the extent any such liens are senior in priority under applicable non-bankruptcy law to the liens securing the Second Lien Notes and (v) the Carve Out. The second lien adequate protection liens shall not be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtor's estate under section 551 of the Bankruptcy Code or (ii) subordinated to or made pari passu with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise, except as expressly provided in the Financing Orders. Neither the Second Lien Notes Trustee nor holders of Second Lien Notes shall receive any other form of adequate protection. |
| **Amended and Restated Credit Facility Agreement** | On the Effective Date, New Ditech and the Term Lenders will enter into or shall be deemed to have entered into, pursuant to the Plan, the Third Amended and Restated Credit Facility Agreement, included as an exhibit to the Plan Supplement in form and substance consistent with this Term Sheet and otherwise acceptable to the Requisite Term Lenders and the Company (the |

WEIL:\96911480\1\41703.0010

| Introduction |
|---|

|  | "**_Amended and Restated Credit Facility Agreement_**").

The Amended and Restated Credit Facility Agreement shall provide for new term loans (the "**_New Term Loans_**"), which New Term Loans shall provide for the following material terms:

- Principal Amount:  $400,000,000

- Maturity Date:  5 Years post-Effective Date.

- Interest Rate:  LIBOR + 6.0% cash interest per annum, plus 2.0% PIK interest per annum.

- Amortization:
  - 2019: None
  - 2020: [TBD]
  - 2021: [TBD]

- Call Protection: callable at 103%, 102%, 101% for the first, second, and third years, respectively, following the Effective Date.

- Covenants:  no less favorable to the Term Lenders than as provided for in the Credit Agreement or as otherwise acceptable to the Requisite Term Lenders and Company, and to include the following:

  - Minimum Tangible Net Worth: [TBD]

  - Asset Coverage Tests: [TBD]

  - Monthly MSR Detailed Information: [TBD]

  - All covenant levels and thresholds to be otherwise acceptable to the Requisite Term Lenders and the Company.

- Cash Sweep:  [TBD]

- Closing Conditions: customary closing conditions (including, but not limited to, customary legal opinions from borrower's counsel (including local counsel)) and otherwise as acceptable to the Requisite Term Lenders and the Company.

The Amended and Restated Credit Facility Agreement shall provide for other financial covenants, other covenants, representations, warranties, and Events of Default (taken as a whole) no less favorable to the Term Lenders than as provided for in the Credit Agreement or as otherwise acceptable to the Requisite Term Lenders and Company. |
| **New Common Stock** | On the Effective Date, New Ditech will issue new common stock of the Company (the "**New Common Stock**"), and which will be in a form and manner acceptable to the Requisite Term Lenders. |
| **No Substantive Consolidation** | The Plan will be implemented without any substantive consolidation. |

WEIL:\96911480\1\41703.0010

| Introduction | |
|---|---|
| | |

| **Marketing Process** | "**Reorganization Transaction**" means, collectively, (a) the issuance of the New Common Stock; (b) the entry into the New Term Loans; (c) the entry into the Exit Working Capital Facility; (d) the execution of any new organizational documents; (e) the vesting of the Company's assets in New Ditech pursuant to the Plan; (f) the consummation of any transactions with respect to the foregoing, as determined by the Requisite Term Lenders in their reasonable discretion in accordance with the RSA; and (g) if applicable and only if the terms there of are acceptable to the Requisite Term Lenders, a Master Servicing Transaction. |
|---|---|
| | "**Master Servicing Transaction**" means, as part of a Reorganization Transaction to the extent the terms thereof are acceptable to the Requisite Term Lenders, entry by the Company into an agreement or agreements with an approved subservicer or subservicers (the "**New Subservicer**") whereby, following the Effective Date, all or substantially all of the Company's mortgage servicing rights are subserviced by the New Subservicer. The Debtors shall conduct request for proposal process for the Master Servicing Transaction in accordance with the Bid Procedures. |
| | "*Sale Transaction*" means the sale of substantially all of the Company's assets, as contemplated by one or more Successful Bids, in each case, as provided in the RSA. |
| | "*Successful Bid*" means one or more bids to purchase all or substantially all of the Company's assets that the Company determines, in an exercise of its business judgment: (a) provides sufficient cash consideration to satisfy the following Claims in full in cash in accordance with the priorities set forth in the plan: (i) Allowed Other Secured Claims (except to the extent the applicable purchase agreement provides for a different method of rendering such Claims unimpaired); (ii) Allowed Administrative Claims; (iii) Allowed Professional Fee Claims; (iv) Allowed Priority Tax Claims (unless paid in another manner permitted by section 1129(a)(9)(c) of the Bankruptcy Code); (v) Allowed Other Priority Claims; (vi) pays in full in cash the prepetition warehouse facilities and the DIP Warehouse Facility Claims; and (vii) Allowed Term Loan Claims (or such lesser amount as is acceptable to the Requisite Term Lenders in their sole and absolute discretion); (b) provides consideration that the Company and the Requisite Term Lenders determine is sufficient to pay or reserve for payments pursuant to and in accordance with the Plan, including consideration sufficient to wind down the estates following the closing of the Sale Transaction; and (c) includes such other terms and conditions as the Company and the Requisite Term Lenders may reasonably require. |
| | "*Asset Sale Transaction*" means the sale of a portion of the Company's assets other than a Sale Transaction consummated on or as soon as is reasonably practicable after the Effective Date; provided such sale shall only be conducted with the consent of the Requisite Term Lenders.  Net proceeds of any Asset Sale Transaction shall be "*Asset Sale Proceeds*." |
| | Following the Commencement Date, the Company shall oversee and manage the sale process and solicit bids for a potential Sale Transaction, Master Servicing Transaction, and if applicable, an Asset Sale Transaction, in good- |

WEIL:\96911480\1\41703.0010

| Introduction | |
|---|---|
| | faith consultation with the Requisite Term Lenders. The sale and plan solicitation process shall generally be conducted in accordance with the procedures and timeline set forth on in the Bidding Procedures and the order approving the Disclosure Statement, subject to approval of the Bankruptcy Court. The Requisite Term Lenders and their advisors shall have the right to review all information, diligence, and materials provided by the investment banker retained by the Company to any bidder or prospective bidder with respect to the sale and to consult with such investment banker with respect to any potential Sale Transaction, Asset Sale Transaction, or Master Servicing Transaction. The Company and the advisors for the Requisite Term Lenders shall consult in good faith regarding the sale process, including any diligence and other information requested by the Requisite Term Lenders and their advisors with respect thereto. |
| | The Company shall solicit bids on any and all bases, including soliciting bids that do not pay Allowed Term Loans in full. The Company shall only consummate the Sale Transaction on the Effective Date, if the Company receives a bid with respect to a possible Sale Transaction that would satisfy all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, and Term Loan Claims (or such lesser amount as is acceptable to the Requisite Term Lenders in their sole and absolute discretion) in full in Cash and would satisfy the DIP Warehouse Facility in full in Cash. |
| **Milestones** | The Consenting Term Lenders' support for the Restructuring shall be subject to the timely satisfaction of the following milestones (the "***Milestones***"), which may be extended with the prior written consent of the Requisite Term Lenders:<br><br>• File the Plan, Disclosure Statement, and a motion seeking Bankruptcy Court approval of the Bidding Procedures: not later than 15 days after the Commencement Date;<br><br>• Entry of Orders approving the Disclosure Statement and Bidding Procedures: not later than 50 days after the Commencement Date;<br><br>• Deadline to commence the Auction: not later than 95 days after the Commencement Date;<br><br>• Deadline to commence the Confirmation Hearing: not later than 115 days after the Commencement Date; and<br><br>• Deadline for Effective Date under the Plan to Occur; not later than 125 days from the Commencement Date. |
| **Treatment of Claims and Interests** | |
| **Class** | **Treatment** |
| **DIP Warehouse** | **Unimpaired; Non-Voting**. The DIP Warehouse Facility Claim shall be paid |

WEIL:\96911480\1\41703.0010

| Introduction | |
|---|---|
| **Facility Claims** | in full in Cash on the Effective Date. |
| **Other Priority Claims, Priority Tax Claims, Other Secured Claims** | **Unimpaired; Non-Voting.** All Priority Tax Claims, other priority Claims, and other secured Claims, other than those Claims otherwise referenced herein, will be unimpaired under the Plan and/or paid in full in the ordinary course of business. |
| **Term Loan Claims** | **Impaired; Voting.** Term Loan Claims shall be allowed in the outstanding principal amount of $961,355,635.34, plus all accrued interest, costs, fees, and expenses under the Credit Agreement.<br><br>a) **If the Company consummates the Reorganization Transaction, including a Master Servicing Transaction (if applicable)**, on the Effective Date, the holders of Term Loan Claims will receive their pro rata share of (i) New Term Loans under the Amended and Restated Credit Facility Agreement; (ii) 100% of the New Common Stock; *provided* that the New Common Stock will be subject to dilution by the Management Incentive Plan, and (iii) if applicable, Asset Sale Proceeds; or<br><br>b) **If the Company consummates the Sale Transaction**, on the Effective Date, the holders of Term Loan Claims will receive their pro rata share of Cash in an amount equal to all Allowed Term Loan Claims, and if applicable, Asset Sale Proceeds. |
| **Second Lien Notes Claims** | **Impaired; Non-Voting**.<br><br>a) **If the Company consummates the Reorganization Transaction, including a Master Servicing Transaction (if applicable)**, the holders of such Claims will not receive any distribution; or<br><br>b) **If the Company consummates the Sale Transaction**, on the Effective Date the holders of Second Lien Notes will receive their pro rata share of Cash in an amount equal to the Cash proceeds as such holders are entitled to under applicable nonbankruptcy law (subject to the Intercreditor Agreement) after the Term Loan Claims are paid in full in Cash, plus the payment in full in Cash of other accrued administrative and priority costs. |
| **General Unsecured Creditors** | **Impaired; Non-Voting**. Holders of all General Unsecured Claims shall not be entitled to any recovery under the Plan; provided, that, in a Sale Transaction, holders of General Unsecured Claims will receive their pro rata share of Cash in an amount equal to the Cash proceeds as such holders are entitled to receive after the Term Loan Claims and Second Lien Notes Claims are paid in full in Cash, plus the payment in full in Cash of other accrued administrative and priority costs. |
| **Go-Forward Trade Claims** | **Impaired; Non-Voting**.<br><br>a) **If the Company consummates the Reorganization Transaction, including a Master Servicing Transaction (if applicable)**, holders of |

WEIL:\96911480\1\41703.0010

| Introduction | |
|---|---|
| | all Go-Forward Trade Claims shall receive a distribution in Cash in an amount equaling not less than [●]% of their Claim, subject to an aggregate cap of $[●], after which any further payments on account of Go-Forward Trade Claims will be subject to the consent of the Requisite Term Lenders; or<br><br>b) **If the Company consummates the Sale Transaction**, holders of Go-Forward Trade Claims shall receive the same treatment as General Unsecured Creditors. |
| **Intercompany Claims** | **Impaired or Unimpaired; Non-Voting**.  Intercompany Claims shall be canceled, reinstated, or receive such other treatment that is acceptable to the Company and the Requisite Term Lenders in their respective reasonable discretion. |
| **Intercompany Interests** | **Impaired or Unimpaired; Non-Voting**. Intercompany Interests shall be canceled, reinstated, or receive such other treatment that is acceptable to the Company and the Requisite Term Lenders in their respective reasonable discretion. |
| **Subordinated Security Claims** | **Impaired; Deemed to Reject**.  Any Claim or Interest subject to subordination pursuant to section 510 of the Bankruptcy Code shall be cancelled and deemed to reject the Plan, and the holders of any such Claims or Interests will not receive any recovery with respect thereto under the Plan. |
| **Existing Equity Interests** | **Impaired; Deemed to Reject**.  Holders of Existing Equity Interests issued and outstanding as of the Effective Date will not receive any recovery on account of their Existing Equity Interests under the Plan and such Existing Equity Interests shall be cancelled and deemed to reject the Plan. |

| Other Key Terms | |
|---|---|
| **Term** | **Description** |
| **Management Incentive Plan** | Following the Effective Date, New Ditech will enter into a post-Restructuring management incentive plan ("***Management Incentive Plan***"), under which up to 10% of the New Common Stock (after taking into account the shares to be issued under the Management Incentive Plan) will be reserved for issuance as awards under the Management Incentive Plan.  If the Company pursues a Reorganization Transaction, the Company shall file a term sheet with proposed terms of the Management Incentive Plan, including initial allocations, no later than the Plan Supplement filing date. |
| **Private Company** | New Ditech will be privately held and shall not be subject to any United States Securities and Exchange Commission reporting obligations. |
| **Government Entities Contracts** | All contracts with government entities such as Ginnie Mae, FNMA, and FHLMC will be assumed or honored as part of the Company's first day relief. |

9

446

| Introduction | |
|---|---|
| **Intercreditor Agreement** | The Intercreditor Agreement shall remain in full force and effect and shall be fully enforceable according to its terms. |
| **Credit Bidding** | Upon the direction of the Term Lenders, the Administrative Agent or its designee shall have the right to credit bid all or any portion of the Term Loan Claims in accordance with section 363(k) of the Bankruptcy Code in connection with any transaction, including a Sale Transaction or the Reorganization Transaction, if structured as a sale transaction. |
| **Executory Contracts** | Unless the Company is pursuing a Sale Transaction, subject to the prior written consent of the Requisite Term Lenders, all executory contracts and unexpired leases, other than those expressly identified by the Company for assumption, will be deemed rejected. |
| **Employee Compensation and Benefit Plans** | To be discussed. |
| **Board of Directors of New Ditech** | Upon the Effective Date, the Board of New Ditech will consist of five (5) members, four (4) of whom shall be nominated by the Requisite Term Lenders and one (1) of whom shall be the chief executive officer of New Ditech, Thomas F. Marano.<br><br>Corporate governance for New Ditech, including charters, bylaws, operating agreements, or other organization documents, as applicable, shall be consistent with this Term Sheet and section 1123(a)(6) of the Bankruptcy Code (as applicable) and documentation therefor shall be otherwise acceptable to the Requisite Term Lenders. |
| **Charter; Bylaws** | The charter, bylaws, limited liability company agreements and other organizational documents of New Ditech and each of its subsidiaries will be amended or amended and restated by New Ditech consistent with section 1123(a)(6) of the Bankruptcy Code, if applicable, and otherwise in accordance with the Plan, and the RSA. |
| **Cancellation of Notes, Interest, Instruments, Certificates and other Documents** | Except as provided herein and in connection with the Credit Agreement, on the Effective Date, all notes, instruments, certificates evidencing debt to, or Interests in, the Company, including, without limitation, the Second Lien Notes and Existing Equity Interests, will be cancelled and obligations of the Company thereunder will be discharged. In addition, on the Effective Date, any registration rights or similar agreements with respect to Existing Equity Interests will also be cancelled and any obligations of the Company thereunder will be discharged. |
| **Vesting of Assets** | On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all assets of the Company's Estate will vest in New Ditech free and clear of all claims, liens, encumbrances, charges and other interests, except as otherwise provided in the Plan. |

| Introduction | |
|---|---|
| **Compromise and Settlement** | The Plan will contain provisions for the compromise and settlement of Claims stating that, except as provided herein, the allowance, classification and treatment of Allowed Claims and Interests and their respective distributions take into account and conform to the relative priority and rights of such Claims and Interests in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise. |
| **Released Parties** | "***Released Parties***" means, collectively:  (a) the Consenting Term Lenders; (b) the Administrative Agent; (c) such other entities as agreed between the Company and the Requisite Term Lenders; and (d) with respect to each of the Company, New Ditech, and each of the foregoing entities in clauses (a) through (c), such entities' predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, and all of their respective current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such persons' respective heirs, executors, estates, servants and nominees. |
| **Releases** | To the extent the Restructuring is consummated, the Plan will provide for releases with language substantially to the effect of the following: <br><br>Releases by the Company:  As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Definitive Documents, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties to facilitate the reorganization of the Company and the implementation of the Restructuring, and except as otherwise provided in the Plan or in the confirmation order for the Plan, the Released Parties will be deemed forever released and discharged, to the maximum extent permitted by law, by the Company, New Ditech, and Estate and all affiliates or subsidiaries managed or controlled thereby, from any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, remedies, losses, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Company, or New Ditech (as the case may be), or the Estate, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Company, or New Ditech (as the case may be), or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or interest or other person, based on or relating to, or in any manner arising prior to the Effective Date from, in whole or in part, the Company, the chapter 11 cases, the purchase, sale, or rescission of the purchase or sale of any security of the Company, the subject matter of, or the transactions or events giving rise to, any Claim or interest that is treated in the Plan, the business or contractual arrangements between any of the Company and any Released Party, the Restructuring, the restructuring of any Claim or interest before or during the Chapter 11 Cases, the Disclosure Statement, the RSA, and the Plan |

| Introduction |
|---|

and related agreements, instruments, and other documents (including the Definitive Documents), and the negotiation, formulation, or preparation thereof, the solicitation of votes with respect to the Plan, or any other act or omission, other than claims or causes of action arising out of or related to any act or omission of a Released Party that constitutes fraud or willful misconduct, as determined by a Final Order.

Releases by holders of Impaired Claims: As of the Effective Date, except (i) for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remain in effect or become effective after the Effective Date or (ii) as otherwise expressly provided in the Plan or in confirmation order for the Plan, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever, released, and discharged by

(1)     the holders of Impaired Claims who voted to accept the Plan;

(2)     the parties to the RSA, in accordance with and subject to the terms of the RSA; and

(3)     with respect to any entity in the foregoing clauses (1) and (2), such Entity's (a) predecessors, successors and assigns, (b) any subsidiaries, affiliates, managed accounts or funds, managed or controlled by such entity and (c) all persons entitled to assert claims through or on behalf of such entities with respect to the matters for which the releasing entities are providing releases,

in each case, from any and all Claims, interests or Causes of Action whatsoever, including any derivative Claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on, relating to, or arising prior to the Effective Date from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or New Ditech, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Plan (including the Plan Supplement), the RSA, the Definitive Documents, or any related agreements, instruments, or other documents, the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; *provided* that nothing in this the Plan shall be construed to release the Released Parties from willful misconduct or intentional fraud as determined by a Final Order.

WEIL:\96911480\1\41703.0010

| Introduction | |
|---|---|
| **Injunction** | The Plan will provide for an injunction solely with respect to any Claim or Interest extinguished, discharged, or released pursuant to the Plan, with language substantially to the effect of the following:<br><br>(a)      Upon entry of the confirmation order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim extinguished, discharged, or released pursuant to the Plan.<br><br>(b)      Except as expressly provided in the Plan, the confirmation order, or a separate order of the Bankruptcy Court or as agreed to by the Debtors and a holder of a Claim against or Interest in the Debtors, all Entities who have held, hold, or may hold Claims against or Interests in the Debtors (whether proof of such Claims or Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action that will be or are extinguished, discharged, or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Released Parties or the property of any of the Released Parties, (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Released Parties or the property of any of the Released Parties, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Released Parties or the property of any of the Released Parties, (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Released Parties or the property of any of the Released Parties, except as contemplated or Allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.<br><br>(c)      By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest extinguished, discharged, or released pursuant to the Plan will be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth in the Plan.<br><br>(d)      The injunctions in the Plan shall extend to any successors of the Debtors and New Ditech and their respective property and interests in property. |
| **Exculpation** | The Plan will provide that "***Exculpated Parties***" will have the same meaning as Released Parties. |

| Introduction | |
|---|---|
| | The Plan will contain exculpation provisions with language substantially to the effect of the following: |
| | To the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any claim in connection with or arising out of the administration of the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Company; the negotiation and pursuit of the Disclosure Statement, the RSA, the Restructuring Transactions, the Plan, or the solicitation of votes for, or confirmation of, the Plan; the funding or consummation of the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; the issuance of securities under or in connection with the Plan; or the transactions in furtherance of any of the foregoing; except for fraud or willful misconduct, as determined by a Final Order. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability. |
| **Tax Treatment** | The Restructuring contemplated by this Term Sheet shall be structured, with the reasonable consent of the RSA Parties, (1) to preserve favorable tax attributes of the Company to the extent practicable and (2) in a tax efficient manner for the Consenting Term Lenders and the Company. |
| **Conditions to Effectiveness** | The Plan will be subject to usual and customary conditions to confirmation and effectiveness (as applicable), as well as such other conditions that are reasonably satisfactory to the Company and the Requisite Term Lenders including the following:<br><br>1.  the Definitive Documents will contain terms and conditions consistent in all respects with this Term Sheet and the RSA and will otherwise be satisfactory or reasonably satisfactory in form and substance to the Requisite Term Lenders and the Company to the extent set forth in the RSA or this Term Sheet;<br><br>2.  the Bankruptcy Court will have entered the confirmation order for the Plan, and such confirmation order will not have been reversed, stayed or modified;<br><br>3.  the RSA will not have been terminated, and will be in full force and effect;<br><br>4.  all Restructuring Expenses will have been paid in full in Cash;<br><br>5.  the conditions to closing of the Amended and Rested Credit Facility Agreement and Exit Working Capital Facility shall have been satisfied; and<br><br>6.  all governmental and third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by this Term Sheet will have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable |

WEIL:\96911480\1\41703.0010

| Introduction | |
|---|---|
| | waiting periods will have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions.<br><br>The conditions to effectiveness may be waived in writing by the Company together with the Requisite Term Lenders. |
| **Securities Exemptions** | The issuance and distribution under the Plan of the New Common Stock, if applicable, to the Term Lenders will be exempt from registration under the Securities Act or other applicable securities laws without further act or action by any Person pursuant to section 1145(a) of the Bankruptcy Code and/or any other applicable exemptions. |
| **Fees and Expenses** | The Company shall pay or reimburse all reasonable and documented fees and out-of-pocket expenses (regardless of whether such fees and expenses were incurred before or after the Commencement Date) of Kirkland & Ellis LLP and FTI Consulting, in connection with the subject matter of this Term Sheet and the Restructuring pursuant to the economic terms of their respective engagement letters. The Company will also pay the fees and expenses of the Administrative Agent (including its counsel) in the manner set forth in, and to the extent required by, the Credit Agreement. |
| **Retention of Jurisdiction** | The Plan will provide for a broad retention of jurisdiction by the Bankruptcy Court for (a) resolution of claims, (b) allowance of compensation and expenses for pre-Effective Date services, (c) resolution of motions, adversary proceedings or other contested matters, (d) entering such orders as necessary to implement or consummate the Plan and any related documents or agreements and (e) other purposes. |
| **Resolution of Disputed Claims** | The Plan will provide customary procedures for the resolution of disputed Claims, including the ability (but not requirement) to establish a claims bar date pursuant to an order of the Bankruptcy Court. Once resolved, the claimants will receive distributions, if any, in accordance with the provisions of the Plan and the classification of their Allowed Claim. |
| **Definitive Documents** | This Term Sheet is indicative, and any final agreement will be subject to the Definitive Documents. The Definitive Documents will contain terms, conditions, representations, warranties, and covenants, each customary for the transactions described herein consistent with the terms of this Term Sheet, and in accordance with the RSA. |
| **Other Terms** | Acceptable to the RSA Parties in accordance with the RSA. |

WEIL:\96911480\1\41703.0010

## ANNEX A

**Certain Defined Terms**

WEIL:\96911480\1\41703.0010

| **Defined Terms** |
|---|
| **"Administrative Expense Claim"** | Means any right to payment constituting a cost or expense of administration incurred during the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Commencement Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Fee Claims; (c) Restructuring Expenses; and (d) any Claim under the DIP Warehouse Facility, against a Debtor. |
| **"Allowed"** | Means, with reference to any Claim or Interest, a Claim or Interest (a) arising on or before the Effective Date as to which (i) no objection to allowance or priority, and no request for estimation or other challenge, including, without limitation, pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed and not withdrawn within the applicable period fixed by the Plan or applicable law, or (ii) any objection has been determined in favor of the holder of the Claim or Interest by a Final Order, (b) that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtors or New Ditech, (c) as to which the liability of the Debtors or New Ditech, as applicable, and the amount thereof are determined by a Final Order of a court of competent jurisdiction, or (d) expressly allowed hereunder; provided, however, that notwithstanding the foregoing, (x) unless expressly waived by the Plan, the Allowed amount of Claims or Interests shall be subject to and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable, and (y) New Ditech shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan. |
| **"Bankruptcy Code"** | Has the same meaning as in the RSA. |
| **"Bankruptcy Court"** | Has the same meaning as in the RSA. |
| **"Bidding Procedures"** | Means the procedures governing the auction and sale process relating to any potential Sale Transaction, Asset Sale Transaction, or Master Servicing Transaction, as approved by the Bankruptcy Court and as may be amended from time to time in accordance with their terms and otherwise as acceptable to the Company and the Requisite Term Lenders. |
| **"Cash"** | Means legal tender of the United States of America. |
| **"Cause of Action"** | Means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, lien, indemnity, guaranty, suit, obligation, liability, loss, debt, damage, judgment, account, defense, remedies, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or |

WEIL:\96911480\1\41703.0010

| **Defined Terms** | |
|---|---|
| | unsecured, assertable directly or derivatively, whether arising before, on, or after the Commencement Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including, without limitation, under any state or federal securities laws). Causes of Action also includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim. |
| *"Chapter 11 Cases"* | Means the cases under chapter 11 of the Bankruptcy Code to be commenced by the Company by no later than the Outside Commencement Date, in the Bankruptcy Court and styled *In re Ditech Holding Corp.*; *provided*, that, to the extent that any other subsidiary or affiliate of the Company commences a case under chapter 11 of the Bankruptcy Code, the Company will seek to have such case jointly administered on a procedural basis with the Company's chapter 11 cases, and any reference to the Chapter 11 Cases shall be deemed to include such other cases (if any) filed by the Company's subsidiaries and affiliates. |
| *"Claim"* | A "claim," as defined in section 101(5) of the Bankruptcy Code, as against any Debtor. |
| *"Class"* | Any group of Claims or Interests classified by the Plan pursuant to section 1122(a)(1) of the Bankruptcy Code. |
| *"Confirmation Hearing"* | A hearing at which the Bankruptcy Court will confirm the Plan, as applicable. |
| *"Definitive Documents"* | Shall have the same meaning as in the RSA, as applicable. |
| *"Disclosure Statement"* | The disclosure statement filed by the Debtors in support of the Plan. |
| *"Effective Date"* | Shall have the same meaning as in the RSA. |
| *"Estate(s)"* | Individually or collectively, the estate or estates of a Debtor created under section 541 of the Bankruptcy Code. |
| *"Existing Warehouse and Repurchase Facilities"* | Means, each of and collectively, the (i) Second Amended and Restated Master Repurchase Agreement, dated as of November 30, 2017, by and among Reverse Mortgage Solutions, Inc., as seller, the seller parties party thereto, Credit Suisse First Boston Mortgage Capital LLC, as administrative agent, and the buyers party thereto, (ii) Amended and Restated Master Repurchase Agreement, dated November 18, 2016, by and among Ditech Financial LLC, as seller, Credit Suisse First Boston Mortgage Capital LLC, as administrative agent, and the buyers party |

| **Defined Terms** | |
|---|---|
| | thereto, (iii) Master Repurchase Agreement, dated as of April 23, 2018, between Reverse Mortgage Solutions, Inc. as seller and Barclays Bank PLC, as purchaser and agent, (iv) Participation Interest Sale and Contribution Agreement, dated as of October 1, 2018, by and among Reverse Mortgage Solutions, Inc. and one of its subsidiaries, and the related Note Purchase Agreement of even date therewith, between such subsidiary and National Founders LP, (v) the Indenture and the supplement thereto, each dated as of February 9, 2018, among Ditech Agency Advance Trust, Wells Fargo, as indenture agent, calculation agent, paying agent and securities intermediary, Ditech Financial LLC, as servicer and administrator, and Credit Suisse, as administrative agent and (vi) the Indenture and the supplement thereto, each dated as of February 9, 2018, among Ditech DPAT II Advance Trust II, Wells Fargo, as indenture trustee, calculation agent, paying agent and securities intermediary, Ditech Financial LLC, as servicer and administrator, and Credit Suisse, as administrative agent (in each case, as amended, restated, amended and restated, supplemented or otherwise modified from time to time). |
| *"Fee Claim"* | Means a Claim for professional services rendered or costs incurred on or after the Commencement Date through the Effective Date by professional persons retained by the Debtors by an order of the Bankruptcy Court pursuant to sections 327, 328, 329, 330, 331, or 503(b) of the Bankruptcy Code in the Chapter 11 Case. |
| *"Final Order"* | Means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument, or rehearing shall have expired; provided, however, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment. |
| *"Impaired"* | Means, with respect to a Claim, Interest, or Class of Claims or Interests, "impaired" within the meaning of sections 1123(a)(4) and 1124 of the |

WEIL:\96911480\1\41703.0010

| Defined Terms | |
|---|---|
| | Bankruptcy Code. |
| *"Intercompany Claim"* | Any Claim against any of the Company's entities held by another of the Company's entities. |
| *"Intercompany Interest"* | An Interest in any of the Company's direct or indirect subsidiaries held by another of the Company's entities or an Interest in the Company held by an affiliate of the Company (other than any Preferred Stock or Existing Equity Interest in Holdings). |
| *"Intercreditor Agreement"* | Shall have the same meaning as ascribed to it in the Credit Agreement. |
| *"Interests"* | Means any equity security (as defined in section 101(16) of the Bankruptcy Code) of a Debtor, including all shares, common stock, preferred stock, or other instrument evidencing any fixed or contingent ownership interest in any Debtor, whether or not transferable, and any option, warrant, or other right, contractual or otherwise, to acquire any such interest in the Debtors, whether fully vested or vesting in the future, including, without limitation, equity or equity-based incentives, grants, or other instruments issued, granted or promised to be granted to current or former employees, directors, officers, or contractors of the Debtors, to acquire any such interests in the Debtors that existed immediately before the Effective Date. |
| *"New Ditech"* | Means, on or after the Effective Date, Ditech and each of the other Debtors, as reorganized, pursuant to and under the Plan or any successor thereto, and/or one or more acquiring entities, in each case, after giving effect to the Reorganization Transaction, whether structured as a debt-for-equity exchange or credit bid and asset sale transaction. |
| *"Other Secured Claim"* | Means a Secured Claim, other than an Administrative Expense Claim, a Claim in connection with the DIP Warehouse Facility, a Priority Tax Claim, or a Term Loan Claim. |
| *"Commencement Date"* | Has the same meaning as in the RSA. |
| *"Plan Supplement"* | Has the same meaning as in the RSA. |
| *"Priority Non-Tax Claim"* | Means any Claim other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code. |
| *"Priority Tax Claim"* | Means any Secured Claim or unsecured Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code. |
| *"Reinstate", "Reinstated", or* | Means leaving a Claim Unimpaired under the Plan. |

WEIL:\96911480\1\41703.0010

| Defined Terms | |
|---|---|
| *"Reinstatement"*' | |
| *"Rejecting Class"* | Means a Class that does not vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code. |
| *"Requisite Term Lenders"* | Has the same meaning as in the RSA. |
| *"Restructuring Expenses"* | Means, with respect to, (a) the Requisite Term Lenders, the reasonable and documented fees, costs, and expenses of (i) Kirkland & Ellis LLP, (ii) one law firm acting as local counsel (if any), and (iii) FTI Consulting Inc.; (b) the Administrative Agent, to the extent provided under the Credit Agreement, pursuant to the economic terms of their respective engagement letters with the Company or, in the case of the Administrative Agent, the Credit Agreement. |
| *"Restructuring Transactions"* | Has the same meaning as in the RSA. |
| *"RSA Parties"* | Means the Consenting Term Lenders (as defined in the RSA). |
| *"Unimpaired"* | Means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code. |

WEIL:\96911480\1\41703.0010

## EXHIBIT B

## FORM OF JOINDER AGREEMENT FOR CONSENTING TERM LENDERS

This Joinder Agreement to the Restructuring Support Agreement, dated as of [●] (as amended, supplemented or otherwise modified from time to time, the "***Agreement***"), by and among Ditech Holding Corporation, and the holders of the Term Loans (together with their respective successors and permitted assigns, the "***Consenting Term Lenders***" and each, a "***Consenting Term Lender***") is executed and delivered by _____ (the "***Joining Party***") as of _____ __, 2019.  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1.  <u>Agreement to be Bound</u>.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as **<u>Annex I</u>** (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions hereof).  The Joining Party shall hereafter be deemed to be a "Consenting Term Lender" and a "Party" for all purposes under the Agreement and with respect to any and all Claims held by such Joining Party.

2.  <u>Representations and Warranties</u>.  With respect to the aggregate principal amount of Term Loans set forth below its name on the signature page hereto, the Joining Party hereby makes the representations and warranties of the Consenting Term Lenders set forth in <u>Section 7</u> of the Agreement to each other Party to the Agreement.

3.  <u>Governing Law</u>.  This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflict of laws provisions which would require the application of the law of any other jurisdiction.

[Signature Page Follows]

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**CONSENTING TERM LENDER**

By:_____

Name:

Title:

Notice Address:

_____

_____

_____

Fax: _____

Attention:

Email:

                                                                Acknowledged:


                                                                **DITECH HOLDING CORPORATION**
                                                                on its own behalf and on behalf of its direct
                                                                and indirect subsidiaries


                                                                By:_____

                                                                Name:
                                                                Title:


SIGNATURE PAGE TO JOINDER AGREEMENT

**EXHIBIT C**

**Organizational Structure Chart**



Ditech Holding Corporation
Mid-State Capital, LLC
Walter Reverse Acquisition LLC
Hanover SPC-A, Inc.
Green Tree Credit Solutions LLC
Marix Servicing LLC
WIMC Real Estate Investment LLC
Reverse Mortgage Solutions, Inc.
Green Tree Insurance Agency of Nevada, Inc.
Walter Management Holding Company LLC
DF Insurance Agency LLC
Green Tree Investment Holdings III LLC
Mortgage Asset Systems, LLC
Green Tree Credit LLC
REO Management Solutions, LLC
Green Tree Servicing Corp.
(non-economic member of Ditech Financial LLC)
RMS REO BRC, LLC
Ditech Financial LLC
RMS REO CS, LLC
Green Tree Advance Receivables III LLC
RMS REO BRC II, LLC
Ditech Agency Advance Depositor LLC
RMS 2018-09, LLC
Ditech PLS Advance Depositor LLC

## **EXHIBIT D**

**Financial Information and Projections**

## FINANCIAL INFORMATION AND PROJECTIONS

The Debtors[1] prepared the financial projections set forth herein (the "**Financial Projections**") based on, among other things, the anticipated future financial condition and results of operations of the Debtors in a recapitalization scenario. In conjunction with the Debtors' advisors, the Debtors' management team developed and refined the Debtors' business plan and prepared consolidated financial projections[2] for fiscal year 2019 through fiscal year 2021 (the "**Projection Period**").

As described in Article X, Section C.1(c) of the Disclosure Statement, the Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code as confirmation of the Plan is not likely to be followed by the liquidation or further financial reorganization of the Debtors or any successors under the Plan. In connection with the development of the Plan, and for the purposes of determining whether the Plan satisfies the feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.

The Financial Projections assume that the Effective Date of the Plan will occur in June 2019. Any significant delay in the Effective Date may have a significant negative impact on the operations and financial performance of the Debtors including, but not limited to, an increased risk or inability to meet forecasts and the incurrence of higher Administrative Expense Claims, Fee Claims, and Restructuring Expenses, which could also impact the Financial Projections.

Although the Financial Projections represent the Debtors' commercially reasonable estimates and good faith judgment of the results of the Debtors' future operations, financial position, and cash flows, they are only estimates and actual results may vary considerably from the Financial Projections. Consequently, the inclusion of the Financial Projections should not be regarded as a representation by the Debtors, the Debtors' advisors, or any other person that the projected results of the Debtors' operations, financial position, and cash flows presented herein will be achieved. The Financial Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, changes in interest rates, further competition within the mortgage industry, changes in terms with material vendors and service providers, and/or a variety of other factors. Consequently, the estimates and assumptions underlying the Financial Projections are inherently uncertain and are subject to material business, economic, and other uncertainties.

The Debtors do not, as a matter of course, publish their business plan, financial projections, or anticipated financial position. In connection with the planning and development of the Plan, these Financial Projections were prepared by the Debtors, with the assistance of their advisors, to present the anticipated impact of the Plan. The Debtors do not intend, and disclaim any obligation, to further update or otherwise revise the Financial Projections to reflect circumstances that may occur after their preparation, or to reflect the occurrence of unanticipated events, even in the event that any or all of the underlying assumptions are shown to be in error. Additional information relating to the principal assumptions used in preparing the Financial Projections is set forth below.

THE DEBTORS' MANAGEMENT PREPARED THE FINANCIAL PROJECTIONS. THE FINANCIAL PROJECTIONS WERE NOT PREPARED TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS OR THE RULES AND REGULATIONS OF THE SEC, AND BY THEIR NATURE ARE NOT FINANCIAL STATEMENTS PREPARED IN ACCORDANCE WITH ACCOUNTING PRINCIPLES

---

[1]    Unless otherwise defined herein, capitalized terms used in this Exhibit shall have the meaning ascribed to such terms in the Disclosure Statement or the Plan, as applicable, or as the context otherwise requires.

[2]    A breakdown of the consolidated financial projections by business segment is attached hereto as **Schedule 1**.

GENERALLY ACCEPTED IN THE UNITED STATES OF AMERICA.

THE DEBTORS' INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE ACCOMPANYING FINANCIAL PROJECTIONS AND ACCORDINGLY DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE FINANCIAL PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE FINANCIAL PROJECTIONS, AND DISCLAIM ANY ASSOCIATION WITH THE FINANCIAL PROJECTIONS.

THE FINANCIAL PROJECTIONS DO NOT REFLECT THE IMPACT OF FRESH START REPORTING IN ACCORDANCE WITH AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS STATEMENT OF POSITION 90-7 "FINANCIAL REPORTING BY ENTITIES IN REORGANIZATION UNDER THE BANKRUPTCY CODE." THE IMPACT OF FRESH START REPORTING AT THE EFFECTIVE DATE MAY HAVE AN IMPACT ON ASSETS, LIABILITIES, AND SHAREHOLDER EQUITY AS REFLECTED ON THE REORGANIZED DEBTORS' CONSOLIDATED BALANCE SHEETS AND PROSPECTIVE RESULTS OF OPERATIONS.

MOREOVER, THE FINANCIAL PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING RELATED TO THE IMPLEMENTATION OF THE PLAN, THE CHAPTER 11 CASES, MANAGEMENT'S STRATEGY, ACHIEVING OPERATING EFFICIENCIES, INDUSTRY-SPECIFIC RISK FACTORS, AND OTHER MARKET AND COMPETITIVE CONDITIONS. IMPORTANT ASSUMPTIONS AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THOSE EXPECTED INCLUDE, BUT ARE NOT LIMITED TO, THOSE FACTORS, RISKS AND UNCERTAINTIES DESCRIBED IN MORE DETAIL UNDER THE HEADING "CERTAIN RISK FACTORS TO BE CONSIDERED" IN SECTION VIII OF THE DISCLOSURE STATEMENT AND UNDER THE HEADING "RISK FACTORS" AND ELSEWHERE IN THE DEBTORS' ANNUAL AND QUARTERLY REPORTS, AND OTHER FILINGS WITH THE SEC. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE, ARE BASED ON THE DEBTORS' CURRENT BELIEFS, INTENTIONS AND EXPECTATIONS, AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, INDUSTRY, REGULATORY, LEGAL, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' OR REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE DEBTORS PREPARED THESE FINANCIAL PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. EXCEPT AS

WEIL:\96988187\4\41703.0010

OTHERWISE PROVIDED IN THE PLAN OR THIS DISCLOSURE STATEMENT, THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE FINANCIAL PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS IN THE VOTING CLASS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE FINANCIAL PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

## General Assumptions and Methodology

### 1. General Assumptions/Overview

The Financial Projections assume Ditech will continue its business strategy consistent with current operations. This strategy includes originating and servicing forward mortgage loans and servicing reverse mortgage loans.

The Financial Projections reflect the continuation of many of the Debtors' improvement initiatives, including improving the customer experience, right sizing the organization, improving servicing performance and costs, and consolidating sites. The attached segment-level breakdown offers insight into which lines of businesses are benefitting from the Debtors' improvement initiatives. The details or savings estimates for these initiatives are not disclosed because of their proprietary nature and because of ongoing negotiations with third-parties.

The Financial Projections also reflect the purported termination of the subservicing agreement with New Residential Mortgage LLC ("**NRM**") and the subservicing of those loans moving to other mortgage servicers in Q2 2019 primarily.

The Financial Projections do not reflect any projected fair value adjustments to MSRs after January 2019.

The Financial Projections reflect recognition of an economic gain of approximately $770 million, related primarily to the cancellation of debt.

The Financial Projections do not anticipate a material net impact due to the recent decline in the interest rates as any increase in originations revenue from new loan activity will likely be offset by a decrease in servicing revenue due to increased payoffs of existing loans that are refinanced. However, the decline in interest rates may have a material impact on the fair value of the MSRs. The Company does not forecast changes to the fair value of the MSRs.

The interest rate assumptions used in the Financial Projections are based on the 1-month LIBOR, 3-month LIBOR, and 30-year forward interest rate curves as of November 30, 2018.

### 2. Projected Income Statement Assumptions

The Projected Income Statement assumes that no income tax will be payable due to the Debtors' accumulated tax losses. This assumption is subject to change, pending the outcome of the analysis by the Debtors' tax team, which is currently in process.

(a) Servicing Segment

3

The servicing segment reflects the servicing of GSE, Ginnie Mae and private label residential mortgages. Revenues are comprised of direct servicing fees, incentive fees, ancillary fees, and other servicing fees.

The Financial Projections assume the NRM Subservicing Agreement is terminated and that the number of loans subserviced by the Debtors is further reduced.[3]

The servicing segment is projected to benefit from several cost improvement initiatives, including technology investments to improve customer experience and consolidate back-end systems, lower third-party vendor costs due to recently completed contract negotiations, enhanced quality reviews of processes, and the outsourcing of services to lower cost providers. These initiatives are expected to result in a lower cost to service per loan.

The servicing portfolio will benefit from a reduction in the amount of MSR sales. Servicing retained MSR sales are projected to account for 50% of the Debtors' Fannie Mae eligible originations in 2019, 25% in 2020, and 0% in 2021. No MSR sales of Ginnie Mae eligible loans are projected.

The Financial Projections include revenue from new subservicing clients, as the Debtors' lower servicing costs combined with even stronger customer service is projected to position the Debtors to attract new business.

    (b) Origination Segment

The origination segment reflects the origination of GSE and Ginnie Mae eligible mortgages through the direct-to-consumer channel, as well as the correspondent and warehouse lending channels. Revenues are comprised of gains on sale revenue, as well as interest and other fee income.

The Financial Projections primarily reflect a return to the level of the origination volumes achieved in Q4 2018.

Adjustments include a reduction in consumer volumes related to the loss of the NRM loans from the servicing portfolio, and the corresponding reduction in recapture opportunities. In addition, correspondent volumes are projected to be negatively impacted in the short term by the Chapter 11 Cases, but are then expected to return close to Q4 2018 levels in late 2019.

The Financial Projections reflect costs consistent with cost reductions taken in Q4 2018.

The origination segment is projected to benefit from several cost improvement initiatives, including the organizational changes that took place in Q4 2018, and enhanced website and mobile capabilities. These initiatives, together with prior targeted efforts, significantly improved closing cycle times during the second half of 2018. In addition, stronger customer service within the servicing segment is projected to support a stronger recapture rate for the origination segment due to higher customer satisfaction.

    (c) Reverse Segment

The reverse segment reflects the servicing of reverse mortgage loans.

The Financial Projections reflect a continuation of the cost reduction initiatives undertaken in 2018, as well as an increase in new subservicing business, primarily from existing customers, once the Debtors' restructuring is completed and their financial condition is improved.

---

[3]    As noted in the Disclosure Statement, certain of the loans that Ditech historically subserviced for NRM have already been offboarded and transitioned to alternative subservicers.

WEIL:\96988187\4\41703.0010

3.  **Balance Sheet and Liquidity Assumptions**

The projected balance sheet and liquidity projections reflect a post-emergence restructured capital structure for the Debtors consisting of (i) a $150 million Exit Working Capital Facility, (ii) a $400 million Amended and Restated Credit Facility ("**New Term Loans**") and (iii) New Common Stock which will be in a form and manner acceptable to the Requisite Term Lenders.

The accounting for HMBS buyouts involves recording Residential Loans, net as an asset and the corresponding HMBS Related Obligations at Fair Value as a liability on the balance sheet. Excluding this impact, the balance sheet is relatively unchanged over the forecast period.

**Projected Income Statement**
($ in millions)

| | | FY 2019 | FY 2020 | FY 2021 |
|---|---|---|---|---|
| Revenue | $ | 702.2 | $  678.4 | $  686.3 |
| Operating Expense | | (454.8) | (362.4) | (341.0) |
| Operating Margin | | 247.4 | 316.0 | 345.3 |
| Direct Support | | (86.2) | (76.0) | (77.7) |
| Corporate Overhead | | (55.5) | (41.1) | (43.8) |
| **AEBITDA** | | **105.7** | **198.9** | **223.7** |
| Depeciation and Amortization | | (144.1) | (136.0) | (148.7) |
| Prov for Purch Oblig & Rep & Warrants | | (4.0) | (6.0) | (7.0) |
| Non-Cash & Corporate Interest Expense | | (47.3) | (52.7) | (55.1) |
| Fair Value Adjustment | | (14.8) | - | - |
| Reorganization Gain | | 770.0 | - | - |
| Recovery & Transformation | | (22.9) | (11.8) | (4.8) |
| Other Expenses | | (59.8) | (4.5) | (6.8) |
| **Pre-tax Income** | | **582.9** | **(12.0)** | **1.4** |
| Income Tax (1) | | - | - | - |
| **Net Income** | $ | **582.9** | **(12.0)** $ | **1.4** |

(1) - Per preliminary advice of tax group. Subject to change.

WEIL:\96988187\4\41703.0010

**Projected Liquidity**

($ in millions)

| | FY 2019 | FY 2020 | FY 2021 |
|---|---|---|---|
| Adjusted EBITDA | $ 105.7 | $ 198.9 | $ 223.7 |
| Less: Non-Cash OMSR | (150.7) | (193.7) | (216.0) |
| **Total Adj EBITDA less Capitalized OMSRs** | **(45.0)** | **5.3** | **7.7** |
| | | | |
| Cash Taxes | 13.2 | - | - |
| Cash Interest on Corporate Debt | (29.1) | (40.2) | (44.4) |
| Capital Expenditures | (11.1) | (12.0) | (10.0) |
| Reverse GNMA Buyouts (Net of Financing) | 55.3 | 16.9 | (22.0) |
| Forward GNMA Buyouts (Net of Financing) | (1.9) | 0.4 | 0.8 |
| Servicing Advances (Net of Financing) | (22.3) | (6.0) | (5.5) |
| HFS Loans (Net of Financing) and Cash Adj for Derivatives | 32.3 | (13.6) | (4.9) |
| Other Changes in Assets, Accruals and Reserves | (78.5) | 10.4 | 14.0 |
| **Operating Cash Flows** | **(42.0)** | **(44.1)** | **(72.1)** |
| | | | |
| OMSR Flow Sales | 50.7 | 19.8 | - |
| Other MSR Sales | 3.9 | 0.7 | 0.7 |
| **Investing Cash Flows** | **54.7** | **20.4** | **0.7** |
| | | | |
| New Term Loan Payments | (0.3) | (0.5) | (0.5) |
| Revolver Draw (Repayment) | 45.6 | 19.7 | 64.7 |
| Financing Fees | (0.7) | (0.7) | (0.5) |
| **Financing Cash Flows** | **44.6** | **18.5** | **63.7** |
| | | | |
| Change in Cash and Cash Equivalents | 12.3 | (0.0) | - |
| Beginning Cash and Cash Equivalents | 187.7 | 200.0 | 200.0 |
| **Ending Cash and Cash Equivalents** | **$ 200.0** | **$ 200.0** | **$ 200.0** |

WEIL:\96988187\4\41703.0010

**469**

**Projected Balance Sheet**
($ in millions)

| | 12/31/2019 | 12/31/2020 | 12/31/2021 |
|---|---|---|---|
| **Assets** | | | |
| Cash and Cash Equivalents | $ 200.0 | $ 200.0 | $ 200.0 |
| Restricted Cash | 101.8 | 105.6 | 109.3 |
| Residential Loans, Net | 7,397.1 | 6,212.7 | 5,703.2 |
| Receivables, Net | 91.3 | 91.6 | 91.0 |
| Servicer and Protective Advances, Net | 319.5 | 257.6 | 208.8 |
| Servicing Rights, Net | 587.7 | 655.6 | 748.1 |
| Intangible Asset, Net | 20.3 | 17.1 | 16.2 |
| Premises and Equipment, Net | 54.3 | 43.7 | 34.4 |
| Other Assets | 125.9 | 125.4 | 127.6 |
| **Total Assets** | **8,898.1** | **7,709.4** | **7,238.7** |
| | | | |
| **Liabilities** | | | |
| Payables and Accrued Liabilities | 945.7 | 934.8 | 923.1 |
| Servicer Payables | 115.5 | 118.6 | 121.8 |
| Servicing Advance Liabilities | 134.1 | 98.6 | 75.9 |
| Warehouse Borrowings | 1,391.6 | 1,483.1 | 1,601.0 |
| New Term Loan | 396.0 | 406.8 | 417.8 |
| Working Capital Line | 45.6 | 65.2 | 130.0 |
| Mortgage-Backed Debt | 54.6 | 46.8 | 40.5 |
| HMBS Related Obligations at Fair Value | 5,231.7 | 3,979.7 | 3,345.0 |
| Deferred Tax Liability, Net | 2.4 | 2.4 | 2.4 |
| **Total Liabilities** | **8,317.1** | **7,136.2** | **6,657.5** |
| Stockholders' Equity | 581.0 | 573.2 | 581.2 |
| **Total Liabilities and Equity** | **$ 8,898.1** | **$ 7,709.4** | **$ 7,238.7** |

7

## **Schedule 1**

8

**471**

DITECH CONFIDENTIAL
PRELIMINARY DRAFT

# 2019 – 2021 Budget Overview

| $ millions | | 2018A | | | | | 2019B | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | a | b | c | d | e | f | g | h | i | j |
| | | Orig. | Servicing | RMS | Corporate | Cons. | Orig. | Servicing | RMS | Corporate | Cons. |
| (1) | Revenue | $219.7 | $577.7 | $128.3 | $1.2 | $926.9 | $159.9 | $425.3 | $117.0 | - | $702.2 |
| (2) | Operating Expense | (186.3) | (330.3) | (114.6) | (0.6) | (631.9) | (121.5) | (213.4) | (119.8) | (0.0) | (454.8) |
| (3) | **Operating Margin** | **$33.4** | **$247.4** | **$13.7** | **$0.6** | **$295.1** | **$38.3** | **$212.0** | **($2.9)** | **($0.0)** | **$247.4** |
| (4) | Direct Support | (27.7) | (81.6) | (14.5) | - | (123.8) | (16.5) | (61.6) | (8.2) | - | (86.2) |
| (5) | Corporate Overhead | - | - | - | (76.0) | (76.0) | - | - | - | (55.5) | (55.5) |
| (6) | **AEBITDA** | **$5.7** | **$165.8** | **($0.8)** | **($75.4)** | **$95.3** | **$21.8** | **$150.5** | **($11.1)** | **($55.5)** | **$105.7** |
| (7) | Depreciation and Amortization | (16.0) | (119.0) | (4.1) | (1.0) | (140.1) | (14.8) | (125.8) | (3.1) | (0.3) | (144.1) |
| (8) | Prov for Purch Oblig & Rep & Warr | 4.0 | - | - | - | 4.0 | (4.0) | - | - | - | (4.0) |
| (9) | Non-Cash & Corporate Interest Expense | (6.6) | (5.5) | (7.1) | (119.2) | (138.5) | (1.5) | (0.1) | (1.8) | (43.8) | (47.3) |
| (10) | Fair Value Adjustment | - | 97.6 | (38.1) | - | 59.5 | - | (13.2) | (1.6) | - | (14.8) |
| (11) | Reorganization Gain/Expense | - | - | - | 384.6 | 384.6 | - | - | - | 770.0 | 770.0 |
| (12) | Recovery & Transformation | (6.7) | (9.3) | (1.3) | (9.3) | (26.6) | (2.2) | (8.6) | (0.9) | (11.3) | (22.9) |
| (13) | Stock Based Comp, & Other | (0.6) | 17.0 | 7.3 | 66.4 | 90.1 | (0.0) | (0.3) | (0.0) | (59.5) | (59.8) |
| (14) | **Pre-tax Income** | **($20.1)** | **$146.5** | **($44.1)** | **$246.0** | **$328.4** | **($0.7)** | **$2.5** | **($18.5)** | **$599.6** | **$582.9** |
| (15) | plus: non-cash & corporate interest | 6.6 | 5.5 | 7.1 | 119.2 | 138.5 | 1.5 | 0.1 | 1.8 | 43.8 | 47.3 |
| (16) | **EBIT** | **($13.5)** | **$152.1** | **($36.9)** | **$365.2** | **$466.9** | **$0.8** | **$2.6** | **($16.7)** | **$643.5** | **$630.2** |

| $ millions | | 2020B | | | | | 2021B | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Orig. | Servicing | RMS | Corp. | Cons. | Orig. | Servicing | RMS | Corp. | Cons. |
| (17) | Revenue | $171.4 | $395.4 | $111.7 | - | $678.4 | $180.3 | $412.7 | $93.3 | - | $686.3 |
| (18) | Operating Expense | (118.0) | (142.3) | (102.1) | (0.0) | (362.4) | (124.2) | (128.9) | (87.9) | - | (341.0) |
| (19) | **Operating Margin** | **$53.4** | **$253.1** | **$9.6** | **($0.0)** | **$316.0** | **$56.1** | **$283.8** | **$5.4** | **-** | **$345.3** |
| (20) | Direct Support | (14.9) | (53.1) | (8.0) | - | (76.0) | (14.8) | (54.6) | (8.4) | - | (77.7) |
| (21) | Corporate Overhead | - | - | - | (41.1) | (41.1) | - | - | - | (43.8) | (43.8) |
| (22) | **AEBITDA** | **$38.5** | **$200.0** | **$1.5** | **($41.1)** | **$198.9** | **$41.3** | **$229.2** | **($3.0)** | **($43.8)** | **$223.7** |
| (23) | Depreciation and Amortization | (10.7) | (122.4) | (2.5) | 0.4 | (136.0) | (8.3) | (138.9) | (1.5) | - | (148.7) |
| (24) | Prov for Purch Oblig & Rep & Warr | (6.0) | - | - | - | (6.0) | (7.0) | - | - | - | (7.0) |
| (25) | Non-Cash & Corporate Interest Expense | - | - | - | (52.7) | (52.7) | - | - | - | (55.1) | (55.1) |
| (26) | Fair Value Adjustment | - | - | - | - | - | - | - | - | - | - |
| (27) | Reorganization Gain/Expense | - | - | - | - | - | - | - | - | - | - |
| (28) | Recovery & Transformation | (4.1) | (1.6) | (0.1) | (6.0) | (11.8) | (1.2) | (1.2) | - | (2.4) | (4.8) |
| (29) | Stock Based Comp, & Other | - | (0.2) | - | (4.3) | (4.5) | - | (0.2) | - | (6.6) | (6.8) |
| (30) | **Pre-tax Income** | **$17.8** | **$75.8** | **($1.1)** | **($104.5)** | **($12.0)** | **$24.8** | **$88.9** | **($4.5)** | **($107.9)** | **$1.4** |
| (31) | plus: non-cash & corporate interest | - | - | - | 52.7 | 52.7 | - | - | - | 55.1 | 55.1 |
| (32) | **EBIT** | **$17.8** | **$75.8** | **($1.1)** | **($51.9)** | **$40.6** | **$24.8** | **$88.9** | **($4.5)** | **($52.8)** | **$56.4** |

**Note:** 2018 amounts are preliminary and unaudited

472

DITECH HOLDING CORPORATION

**EXHIBIT E**[1]

**Liquidation Analysis**

**To Be Filed Separately**

---

[1]    Given that the Debtors are engaged in a competitive Marketing Process, which process will establish the Debtors' value, it is appropriate that the Debtors abstain from filing any analysis that could undercut that process.  *See In re LBI Media, Inc.*, Case No. 18-12655 (CSS) (Bankr. D. Del. Jan. 22, 2019) (ECF No. 360) (order approving disclosure statement where the Debtors abstained from filing liquidation analysis while pursuing marketing process).  The Debtors will file, no later than the date that the Plan Supplement is filed, the Liquidation Analysis and will serve notice thereof on holders of Claims in the Voting Class as promptly as practicable upon filing on a Debtor-by-Debtor basis.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------- X
                                        :

In re                              :          **Chapter 11**

**DITECH HOLDING CORPORATION, *et al.*,**  :          **Case No. 19-10412 (JLG)**
                                            :

             **Debtors.[1]**         :          **(Jointly Administered)**
                                            :          **Related Docket No. 1326**
--------------------------------------------------------------- X

## ORDER CONFIRMING THIRD AMENDED JOINT CHAPTER 11 PLAN OF
## DITECH HOLDING CORPORATION AND ITS AFFILIATED DEBTORS

        Upon the filing by Ditech Holding Corporation and its affiliated debtors in the above captioned chapter 11 cases (collectively, the "**Debtors**"), as "proponents of the plan" within the meaning of section 1129 of title 11 of the United States Code (the "**Bankruptcy Code**"), of the *Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors*, dated September 22, 2019 [ECF No. 1326] (as amended, modified, or supplemented in accordance with its terms, the "**Third Amended Plan**"), which is attached hereto as **Exhibit A**;[2] and the Court previously having approved the *Amended Disclosure Statement for Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors*, dated May 10, 2019 [ECF No. 543] (the "**Disclosure Statement**") and the solicitation procedures related to the Disclosure Statement, Third Amended Plan, and the *Disclosure*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Debtors' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

[2]    Capitalized terms used in this order (the "**Order**") but not otherwise defined herein shall have the meanings ascribed to such terms in the Third Amended Plan (as defined below), or as the context otherwise requires.

*Statement Supplement for the Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors* (the "**Disclosure Statement Supplement**") [ECF No. 1287]; and the Court having entered the *Memorandum Decision on Confirmation of the Second Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors* [ECF No. 1240], in which the Court denied confirmation of the Debtors' Second Amended Plan; and the Disclosure Statement Supplement and the Third Amended Plan reflecting a settlement with the Consumer Creditors' Committee and extending the Voting Record Date and the Voting Deadline; and the Debtors having complied with the solicitation and notice requirements of the Disclosure Statement Order, *see Affidavits of Service* [ECF Nos. 1293, 1319, 1337]; and the Court having re-considered the record in these Chapter 11 Cases, the stakeholder support for the Third Amended Plan evidenced on the record and in the *Second Supplemental Declaration of Jane Sullivan of Epiq Corporate Restructuring, LLC Regarding Voting and Tabulation of Ballots Cast on the Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors* [ECF No. 1333], the Sale Transactions incorporated in the Third Amended Plan, the compromises and settlements embodied in and contemplated by the Third Amended Plan, the briefs and arguments regarding confirmation of the Third Amended Plan, the evidence in support of the Third Amended Plan adduced at the Confirmation Hearing (defined below), and a hearing on confirmation of the Third Amended Plan having been held on September 25, 2019 (the "**Confirmation Hearing**"); and after due deliberation:

### IT IS HEREBY FOUND AND DETERMINED THAT:

A.    The Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b), and venue is proper under 28 U.S.C. §§ 1408 and 1409.

B.      The Third Amended Plan satisfies the requirements for confirmation of section 1129 of the Bankruptcy Code by a preponderance of evidence.

C.      The Disclosure Statement Supplement contains adequate information within the meaning of section 1125 of the Bankruptcy Code, and the extension of the Voting Record Date and Voting Deadline was reasonable and appropriate.

D.      The Third Amended Plan was solicited in good faith and in compliance with applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and the Disclosure Statement Order.  The Debtors participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the solicitation, offer, issuance, sale, and/or purchase of the assets and securities offered under the Third Amended Plan, and therefore are entitled to the protections of section 1125(e) of the Bankruptcy Code.

E.      The Third Amended Plan has been proposed in good faith and not by any means forbidden by law.  In so finding, the Court has considered the totality of the circumstances of the Chapter 11 Cases.  The Third Amended Plan is the result of extensive, good faith, arm's length negotiations among the Debtors and their principal constituencies.

F.      The Third Amended Plan is "fair and equitable" with respect to the Classes that are Impaired and are deemed to reject the Third Amended Plan, because no Class senior to any rejecting Class is being paid more than in full and the Third Amended Plan does not provide a recovery on account of any Claim or Interest that is junior to such rejecting Classes.

G.      The releases contained in Article X of the Third Amended Plan are an essential component of the Third Amended Plan and appropriate.  The Third Party Release contained in Section 10.6(b) of the Third Amended Plan is consensual because all parties to be bound by such release were entitled to vote, given due and adequate notice of the Third Party Release and

**476**

sufficient opportunity and instruction to elect to opt out of such release if they rejected the Third Amended Plan or abstained from voting on the Third Amended Plan. Good and valid justification have been demonstrated in support of the Debtor Release. Accordingly, the releases contained in Section 10.6 of the Third Amended Plan are: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the Claims released by Section 10.6 of the Third Amended Plan; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; and (e) given and made after due notice and opportunity for hearing.

H.    The exculpation provided by Section 10.7 of the Third Amended Plan for the benefit of the Exculpated Parties is appropriately tailored to the circumstances of the Chapter 11 Cases.

I.    The Third Amended Plan does not discriminate unfairly among the different Classes of unsecured creditors and does not offend the fair and equitable standard of the Bankruptcy Code because grounds and justifications exist for treating the Classes differently in the Chapter 11 Cases.

J.    The UCC Settlement and CCC Settlement were negotiated in good faith and at arm's length and are essential elements of the Third Amended Plan. The UCC Settlement and CCC Settlement are fair, equitable, and in the best interest of the Debtors, the Debtors' Estates, the Debtors' creditors, and all parties in interest, and satisfy the standards for approval under Bankruptcy Rule 9019.

K.    As of the date of this Order, Fannie Mae has not consented to the Debtors' assumption or assignment of any Fannie Mae-related mortgage servicing contracts and/or rights (or other contracts, agreements, or rights) subject to the Sale Transactions provided under the

Third Amended Plan.  Nor have the Debtors reached agreement with Fannie Mae regarding the respective Cure Amounts and other amounts to be paid to Fannie Mae to cover the resolution of certain of their contractual obligations to Fannie Mae that are not being transferred to the Forward Buyer and the Reverse Buyer that must be completed as a pre-condition to Fannie Mae's consent to the Sale Transactions.

L.    A consumer privacy ombudsman has been appointed (the "**Ombudsman**") [ECF No. 1206], and the Ombudsman filed the *Report of the Consumer Privacy Ombudsman* [ECF Nos. 1237, 1379] (the "**Ombudsman Report**"), recommending, from a privacy perspective, that the Court approve the proposed sale and transfer of the Debtors' assets and related loan files containing personally identifiable information, subject to continued compliance with applicable federal and state law.

M.    The findings of fact and conclusions of law set forth on **Schedule 1** and **Schedule 2** to this Order as to the Successful Bids of Mortgage Assets Management, LLC and SHAP 2018-1, LLC (together, the "**Reverse Buyer**") under the Stock and Asset Purchase Agreement,[3] and New Residential Investment Corp. (the "**Forward Buyer**" and together with the Reverse Buyer, the "**Buyers**") under the Asset Purchase Agreement,[4] are incorporated herein by reference in their entirety.

N.    The NRZ Exit Tail Bridge Facility is an essential element of the Plan and entry into the NRZ Exit Tail Bridge Facility is in the best interests of the Debtors, their Estates, and

---

[3]    The "**Stock and Asset Purchase Agreement**" means that certain *Stock and Asset Purchase Agreement* by and among Ditech Holding Corporation, Walter Reverse Acquisition LLC, Reverse Mortgage Solutions, Inc., Mortgage Assets Management, LLC, and SHAP 2018-1, LLC, dated June 17, 2019 (as amended, modified, and supplemented from time to time).

[4]    The "**Asset Purchase Agreement**" means that certain *Asset Purchase Agreement* by and among Ditech Holding Corporation, Ditech Financial LLC, and New Residential Investment Corp., dated June 17, 2019 (as amended, modified, and supplemented from time to time).

their creditors.  The Debtors have exercised sound business judgment in deciding to enter into the NRZ Exit Tail Bridge Facility and have provided adequate notice thereof.  The NRZ Exit Tail Bridge Facility has been negotiated in good faith and at arm's length among the Debtors and the NRZ Exit Tail Bridge Facility Credit Parties, and any credit extended to and transactions entered into thereunder with the Debtors or Wind Down Estates, as applicable, and any fees paid thereunder are deemed to have been extended, issued, and made in good faith.

**FURTHER, IT IS HEREBY ORDERED THAT:**

**Confirmation of the Third Amended Plan**

1.      The Third Amended Plan is confirmed.

2.      Any and all objections (except for objections that have been adjourned as identified on Exhibit A to the Debtors' Amended Agenda [ECF No. 1374] (the "**Adjourned Cure/Adequate Assurance Objections**")) to the entry of this Order, the Third Amended Plan, the Sale Transactions, including any objections to Cure Amounts, the assumption and/or assumption and assignment of executory contracts and unexpired leases, or any terms of the Asset Purchase Agreement, the Stock and Asset Purchase Agreement, or the NRZ Exit Tail Bridge Facility Documents, and any joinders thereto, that have not been withdrawn, waived, or settled, or not otherwise resolved pursuant to the terms hereof, if any, hereby are denied and overruled on the merits with prejudice, except to the extent any objections to the assumption and assignment of assigned contracts or Cure Amounts or the Debtors' right to assume and assign any such assumed contract were unresolved and/or adjourned prior to or at the Confirmation Hearing.

3.      The documents contained in the Plan Supplement are integral to the Third Amended Plan and are approved by the Court, and the Debtors, the Plan Administrator, the GUC

WEIL:\97193774\3\41703.0011

**479**

Trustee, and the Consumer Representative (as applicable) are authorized to take all actions required under the Third Amended Plan and the Plan Supplement to effectuate the Third Amended Plan and the transactions contemplated therein.

4.    On September 24, 2019, the Debtors filed the Consumer Representative Agreement [ECF No. 1371], which is hereby approved by the Court.

5.    The terms and provisions of the Third Amended Plan, including the terms of the Asset Purchase Agreement and the Stock and Asset Purchase Agreement incorporated therein, the Plan Supplement, and the exhibits thereto are incorporated herein by reference and are an integral part of this Order.  The terms of the Third Amended Plan, the Plan Supplement, all exhibits thereto, the Asset Purchase Agreement, the Stock and Asset Purchase Agreement, the NRZ Exit Tail Bridge Facility Documents, and all other relevant and necessary documents shall, on and after the Effective Date, be binding in all respects upon, and shall inure to the benefit of, the Debtors, their Estates and their creditors, non-debtor affiliates, any affected third parties, all holders of equity interests in the Debtors, all holders of any Claims, whether known or unknown, against the Debtors, any holders of Claims against or on all or any portion of the Acquired Assets owned by the Debtors, including, but not limited to all contract counterparties, Borrowers, leaseholders, governmental units, and any trustees, examiners, administrators, responsible officers, estate representatives, or similar entities for the Debtors, if any, subsequently appointed in any of the Chapter 11 Cases or upon a conversion to chapter 7 under the Bankruptcy Code of any of the Chapter 11 Cases, and each of their respective affiliates, successors and assigns.  The Asset Purchase Agreement, the Stock and Asset Purchase Agreement, the Third Amended Plan, and this Order shall inure to the benefit of the Debtors, their Estates and creditors, the Forward Buyer, the Reverse Buyer, Reorganized RMS, and their respective successors and assigns.  The

NRZ Exit Tail Bridge Facility Documents, the Third Amended Plan, and this Order shall inure to the benefit of the Wind Down Estates party to the NRZ Exit Tail Bridge Facility Documents, the NRZ Exit Tail Bridge Facility Credit Parties and their respective successors and assigns. The Asset Purchase Agreement (including the transactions contemplated thereby), the Stock and Asset Purchase Agreement (including the transactions contemplated thereby), the NRZ Exit Tail Bridge Facility Documents (including the transactions contemplated thereby), and this Order shall not be subject to rejection or avoidance by the Debtors, their Estates, their creditors or any trustee, examiner or receiver.

6.      Any failure of this Order to specifically include or refer to any particular article, section, or provision of the Third Amended Plan, the Plan Supplement, the Stock and Asset Purchase Agreement, the Asset Purchase Agreement, the NRZ Exit Tail Bridge Facility Documents, or any related document does not and shall not be deemed to diminish or impair the effectiveness or enforceability of such article, section, or provision; it being the intention of the Court that all such documents are approved in their entirety.

7.      Except as provided in the Third Amended Plan, the Asset Purchase Agreement, the Stock and Asset Purchase Agreement, and the NRZ Exit Tail Bridge Facility Documents, this Order shall constitute all approvals and consents required, if any, by the laws, rules or regulations of any state or any other governmental authority with respect to the implementation or consummation of the Third Amended Plan and any other acts that may be necessary or appropriate for the implementation or consummation of the Third Amended Plan.

8.      Subject to payment of any applicable filing fees under applicable non-bankruptcy law, each federal, state, commonwealth, local, foreign, or other governmental agency is directed and authorized to accept for filing and/or recording any and all documents, mortgages

and instruments necessary or appropriate to effectuate, implement or consummate the transactions contemplated by the Third Amended Plan and this Order.

9.      The compromises and settlements set forth in the Third Amended Plan are approved, including, but not limited to, the UCC Settlement and CCC Settlement (for the avoidance of doubt, including the release of Claims and Causes of Action contained in Section 5.2(b)(x) of the Third Amended Plan), and the resolution with National Founders (the "**National Founders Resolution**"), and will be effective immediately and binding on all parties in interest on the Effective Date.

10.      Pursuant to Bankruptcy Rule 3020(c)(1), the following provisions in the Third Amended Plan are hereby approved and will be effective immediately on the Effective Date without further order or action by the Court, any of the parties to such release, or any other Entity: (a) Estate Releases (Section 10.6(a)); (b) Third-Party Release (Section 10.6(b)); (c) Exculpation (Section 10.7); (d) Injunction (Section 10.5), and (e) Discharge of Claims and Termination of Interests (Section 10.3).

11.      Notwithstanding the injunction provision in Section 10.5 of the Third Amended Plan, the limited relief granted pursuant to paragraphs 16 through 22 of the *Final Order: (I) Authorizing Debtors to Continue Origination and Servicing of Forward Mortgage Loans in Ordinary Course and Granting Related Relief, (II) Modifying Automatic Stay on a Limited Basis to Facilitate Debtors Ongoing Operations* [ECF No. 224] (the "**Forward OCB Order**") and paragraphs 15 through 21 of the *Final Order (I) Authorizing Debtors to Continue Honoring Reverse Issuer and Servicing Obligations in the Ordinary Course and Granting Related Relief, (II) Modifying Automatic Stay on a Limited Basis to Facilitate Debtors Ongoing Operations* [ECF No. 229] (the "**Reverse OCB Order**"), as applicable, including the

9

WEIL:\97193774\3\41703.0011

continuation of actions seeking of nonmonetary relief in Permitted Default Actions, Bankrupt

Borrower proceedings, and Permitted Title Disputes (as defined in the Forward OCB Order and

Reverse OCB Order), shall apply on and after the Effective Date to assets vesting to the Wind

Down Estates pursuant to Section 10.1 of the Third Amended Plan.  For the avoidance of doubt,

such limited relief will not apply to assets transferred to either of the Buyers.  Further, the

injunction provision in Section 10.5 of the Third Amended Plan shall not affect Borrowers'

rights to assert defenses or rights of recoupment as set forth in Sections 4.6(b) and 5.6(d) of the

Third Amended Plan.

12.    Except as otherwise provided in the Third Amended Plan, the Stock and

Asset Purchase Agreement, the Asset Purchase Agreement, the NRZ Exit Tail Bridge Facility

Documents, or in any contract, instrument, release, or other agreement or document created

pursuant to the Third Amended Plan, on the Effective Date and, in the case of an Other Secured

Claim, satisfaction in accordance with the Third Amended Plan of the Other Secured Claim that

is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other

security interests against any property of the Estates shall be deemed fully released, and the

holder of such Other Secured Claim shall be authorized and directed to take such action as

provided in Section 5.13 of the Third Amended Plan.  All holders of Other Secured Claims are

directed to cooperate with the Debtors or the Plan Administrator, as the case may be, in

implementing this paragraph and any administrative details relating thereto.

13.    For the avoidance of doubt, nothing in the Third Amended Plan, the Sale

Transactions, or this Order shall be deemed to release any lien or security interest held by Fannie

Mae in custody accounts and amounts therein (the "**Collateral**" as defined in that certain Pledge

and Security Agreement effective as of December 19, 2014 together with all supplements,

addenda, and amendments thereto and related agreements) as collateral security for, among other things, the Debtors' obligations under the Fannie Mae Lender Contracts (the "**Fannie Mae Collateral**"). If and to the extent the automatic stay under Bankruptcy Code section 362(a) applies to any request by Fannie Mae to transfer the Fannie Mae Collateral to Fannie Mae on account of the respective Cure Amounts and other amounts to be paid to Fannie Mae to cover the resolution of certain of the Debtors' contractual obligations to Fannie Mae that are not being transferred to the Forward Buyer and the Reverse Buyer that must be completed as a pre-condition to Fannie Mae's consent to the Sale Transactions, the automatic stay is hereby modified to permit such request and the transfer of the Fannie Mae Collateral to Fannie Mae.

14. The Debtors shall cause to be served a notice (the "**Confirmation Notice**") of the entry of this Order and the Administrative Expense Claims Bar Date (as defined herein) upon (a) all parties listed in the creditor matrix maintained by Epiq Corporate Restructuring, LLC (the "**Claims and Noticing Agent**"), (b) all Borrowers, and (c) such additional persons and entities as deemed appropriate by the Debtors, no later than five (5) business days after the entry of this Order, or as soon as practicable thereafter. The Debtors shall cause the Confirmation Notice to be published in the national editions of *The New York Times* and *USA Today* no later than five (5) business days after the entry of this Order, or as soon as practicable thereafter.

15. If the Debtors, a DIP MSFTA Counterparty, and the Forward Buyer agree, the Debtors shall be authorized to enter into, execute and perform under agreements with a DIP MSFTA Counterparty (as defined in the DIP Order) and the Forward Buyer to provide for the assignment, transfer or novation of the transactions under the DIP MSFTAs (as defined in the DIP Order) to the Forward Buyer on the Effective Date on terms mutually satisfactory to the

WEIL:\97193774\3\41703.0011

Debtors, the applicable DIP MSFTA Counterparty and the Forward Buyer and without the need for any further corporate actions and without further action by other holders of Claims or Interests.    To the extent the Debtors, a DIP MSFTA Counterparty and the Forward Buyer mutually agree to such assignment, transfer and/or novation of the transactions under a DIP MSFTA, the Debtors' DIP MSFTA Obligations (as defined in the DIP Order) to such DIP MSFTA Counterparty shall, except as otherwise provided in the second sentence of Section 2.4 of the Third Amended Plan, be deemed fully and finally satisfied upon consummation of such assignment, transfer and/or novation to the Forward Buyer on the Effective Date.    The Debtors shall be further authorized to enter into, execute and perform under ancillary agreements and letters and to take all necessary steps, including making any necessary cash payments, transfers of margin, transfers of cash collateral, or otherwise, in furtherance of such assignment, transfer or novation agreement.

## Findings and Decrees Relating to the Sale Transactions

16.    The findings of fact and conclusions of law set forth on **Schedule 1** to this Order are incorporated herein by reference in their entirety and shall govern the sale of the Acquired Assets (as defined in the Stock and Asset Purchase Agreement) from the Debtors to the Reverse Buyer.

17.    The findings of fact and conclusions of law set forth on **Schedule 2** to this Order are incorporated herein by reference in their entirety and shall govern the sale of the Assets (as defined in the Asset Purchase Agreement) from the Debtors to the Forward Buyer.

## Findings and Decrees Relating to the NRZ Exit Tail Bridge Facility

18.    From and after the Effective Date, the Plan Administrator and the applicable Wind Down Estates shall be authorized to enter into the NRZ Exit Tail Bridge Facility and the transactions thereunder, the terms of which will be set forth in the NRZ Exit Tail

Bridge Facility Documents. Confirmation of the Plan shall be deemed approval of the entry into the NRZ Exit Tail Bridge Facility Documents by the Plan Administrator and the Wind Down Estates, as applicable, and authorization of the Plan Administrator or Wind Down Estates, as applicable, to enter into and execute the NRZ Exit Tail Bridge Facility Documents and such other documents as may be required to effectuate the treatment afforded by the NRZ Exit Tail Bridge Facility, and no further corporate action or any further action by the Plan Administrator, the Debtors, or the Wind Down Estates, as applicable, and no further notice to or action, order, or approval of the Court shall be required in connection therewith.

19.    The Plan Administrator, the Debtors, and the Wind Down Estates, as applicable, and the persons and entities granted such liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents as necessary to establish and perfect such liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interests to third parties.

20.    To the extent mutually agreed among the Plan Administrator, the applicable Wind Down Estates, and the NRZ Exit Tail Bridge Facility Credit Parties, the custodial and disbursement agreement and certain account control agreements for the NRZ Exit Tail Bridge Facility are authorized to be in the form of amendments and restatements of certain existing custodial and disbursement agreements and account control agreements relating to the

DIP Facilities.  Any such amendment and restatement of any such existing agreement entered into by the NRZ Exit Tail Bridge Facility Credit Parties on the Effective Date after, or substantially concurrently with, the payment in full of the DIP Claims shall not require the consent of the DIP Lenders, so long as (x) all obligations of the DIP Agent (in its capacity as such) and the DIP Lenders (in their capacities as such) under such agreement are terminated as of the amendment and restatement thereof and (y) all rights of the DIP Agent and DIP Lenders to indemnification and similar rights under such agreement are preserved, to the extent that such rights would otherwise survive the termination of such agreement. Upon any such agreement being amended and restated, such agreement, as so amended and restated, shall continue in effect from and after the Effective Date as a NRZ Exit Tail Bridge Facility Document.

21.   Notwithstanding anything to the contrary in the Third Amended Plan or this Order, in the event of any conflict between the terms and provisions of the NRZ Exit Tail Bridge Facility Documents, on the one hand, and any other document or order referred to in Article I.D. of the Third Amended Plan, on the other hand, the terms of the NRZ Exit Tail Bridge Facility Documents shall govern and control in all respects solely as to the rights and obligations between the Wind Down Estates and the NRZ Exit Tail Bridge Facility Credit Parties under the NRZ Exit Tail Bridge Facility Documents.

## Administrative Expense Claims Bar Date

22.   Except as otherwise provided in the DIP Order, the orders approving the bar date (ECF Nos. 90, 392, 496, and 272) or the Third Amended Plan, requests for payment of Administrative Expense Claims (other than Fee Claims and DIP Claims) must be filed with the Bankruptcy Court and served on the Debtors or Plan Administrator (as the case may be), the Claims and Noticing Agent, and the U.S. Trustee within thirty-five (35) days from the date of service of notice of the entry of this Order (the "**Administrative Expense Claims Bar Date**").

Such proof of Administrative Expense Claim must include at a minimum: (a) the name of the applicable Debtor that is purported to be liable for the Administrative Expense Claim and if the Administrative Expense Claim is asserted against more than one Debtor, the exact amount asserted to be owed by each such Debtor; (b) the name of the holder of the Administrative Expense Claim; (c) the asserted amount of the Administrative Expense Claim; (d) the basis of the Administrative Expense Claim; and (e) supporting documentation for the Administrative Expense Claim. **FAILURE TO FILE AND SERVE SUCH PROOF OF ADMINISTRATIVE EXPENSE CLAIM TIMELY AND PROPERLY SHALL RESULT IN SUCH CLAIM BEING FOREVER BARRED AND DISCHARGED. IF, FOR ANY REASON, ANY SUCH ADMINISTRATIVE EXPENSE CLAIM IS INCAPABLE OF BEING FOREVER BARRED AND DISALLOWED, THEN THE HOLDER OF SUCH CLAIM SHALL IN NO EVENT HAVE RECOURSE TO ANY PROPERTY TO BE DISTRIBUTED PURSUANT TO THE THIRD AMENDED PLAN.**

### Provisions Related to Fannie Mae Consent to Sale Transactions

23.     The Sale Transactions under the Third Amended Plan require Fannie Mae's express written consent to become effective. The Debtors' assumption and/or assignment of Fannie Mae-related mortgage servicing contracts and/or rights in connection with the Sale Transactions are conditioned on its consent under the Fannie Mae Lender Contracts and applicable law. The terms of any consent provided by Fannie Mae, and any related agreements upon which Fannie Mae's consent is conditioned, shall be binding upon the parties to any such assumed and/or assigned agreements including, without limitation, Reorganized RMS.

24.     The Debtors, Buyers, and Fannie Mae are authorized to enter into and perform resolution and/or servicing transfer agreements to obtain Fannie Mae's consent to the closing of the Sale Transactions and to effectuate the transfer of Fannie-Mae related mortgage

WEIL:\97193774\3\41703.0011

servicing contracts and/or rights to the Forward Buyer and Reverse Buyer, respectively, in connection with the Sale Transactions. The Debtors are authorized to pay Cure Amounts and other amounts to Fannie Mae to cover the resolution of certain of their contractual obligations to Fannie Mae that are not being transferred to the Forward Buyer and the Reverse Buyer. The Debtors are authorized to cover the Cure Amounts and other amounts related to the Fannie Mae contracts and/or rights that will be subject to resolution and/or transfer agreements in the amount of up to $45 million (the "**Maximum Fannie Mae Payment**"). Fannie Mae is authorized to demand payment equal to, or, subject to Court approval, above the Maximum Fannie Mae Payment. The Debtors are further authorized to enter, and perform under, such supplemental agreements with Fannie Mae as may be necessary and appropriate to effectuate Fannie Mae's rights as provided or preserved in this Order, the Bidding Procedures Order, the Third Amended Plan, and applicable law.

25. To the extent the automatic stay of section 362(a) of the Bankruptcy Code applies to Fannie Mae's termination of the Debtors' Fannie Mae Lender Contracts and related agreements that are not being assumed and assigned in connection with the Sale Transactions, or to the Debtors' payment to Fannie Mae of the Cure Amounts or other amounts due under the applicable resolution and/or transfer agreements, the automatic stay is modified to permit such termination and payment.

26. The Debtors, the Wind Down Estates, and the Plan Administrator shall perform all obligations, and pay all claims and amounts due, under the Fannie Mae Lender Contracts (and any other agreements with Fannie Mae) whether arising prior to or after the Commencement Date and are directed to maintain compliance with the Fannie Mae Assurances of Future Performance (as set forth on Schedule 1 to the *Final Order (I) Authorizing Debtors to*

**489**

*Continue Origination and Servicing of Forward Mortgage Loans in Ordinary Course and Granting Related Relief and (II) Modifying Automatic Stay on a Limited Basis to Facilitate Debtors' Ongoing Operations* [ECF No. 224]) and the *Stipulation Regarding Assurances of Performance of Debtors' Obligations Under Fannie Mae Agreements and Adequate Protection and Order Thereon* [ECF No. 1399]) pending any transfer of servicing approved by Fannie Mae, any assumption or rejection of the Fannie Mae Lender Contracts by the Debtors, or any exercise of Fannie Mae's rights to terminate the Fannie Mae Lender Contracts and transfer servicing of loans owned by Fannie Mae.

27.     Fannie Mae shall not be required to file a proof of claim, an administrative expense claim, or take any other action to preserve any of its rights, claims, or defenses against the Debtors, all of which are expressly preserved and shall survive entry of this Order, the Third Amended Plan's discharge and injunction provisions, and the effectiveness of the Third Amended Plan.  If the Debtors, the Wind Down Estates, or the Plan Administrator fail to satisfy all of the obligations owing to Fannie Mae, Fannie Mae shall be permitted to seek recovery against the Debtors, or the Wind Down Estates (as applicable), and Fannie Mae shall reserve its rights, if any, to recovery against the GUC Recovery Trust.  Neither the automatic stay nor any post-confirmation injunction, including the Injunction provision in Section 10.5 of the Third Amended Plan, shall apply to Fannie Mae's exercise of any rights or remedies under the Fannie Mae Lender Contracts (or any other agreement), including with respect to any collateral securing Fannie Mae's claims or with respect to Fannie Mae's rights to unilaterally terminate or transfer servicing of loans owned by Fannie Mae.

28.     Notwithstanding any other provision of this Order, absent express written consent by Fannie Mae, all of Fannie Mae's rights with respect to the Sale Transactions, its

mortgage servicing rights, the Fannie Mae Lender Contracts, and all other related agreements are reserved. Fannie Mae further reserves all other rights provided in the Bidding Procedures Order, the Third Amended Plan, and applicable law.

### Ginnie Mae/HUD Provision

29.     Nothing in this Order (including any schedule), the Plan, the Asset Purchase Agreement, or the Stock and Asset Purchase Agreement shall preclude or limit: (1) Ginnie Mae's rights pursuant to 12 U.S.C. § 1721(g) or the Ginnie Mae Agreements; (2) HUD's rights pursuant to 12 U.S.C. §§ 1708, 1709, 1710, 1715u, and 1715z-20 or HUD Agreements; or (3) the right of any governmental unit to take any action not subject to the automatic stay with respect to the Debtors or the Wind Down Estates. The express approvals of Ginnie Mae and HUD are conditions precedent for consummation of the Reverse Sale Transaction, and nothing in this Order, the Third Amended Plan, or the Stock and Asset Purchase Agreement shall be construed as the provision of either approval. The express approval of Ginnie Mae is a condition precedent to the occurrence of the Ginnie Mae Closing (as defined in the Asset Purchase Agreement) in connection with the Forward Sale Transaction, and nothing in this Order (including any schedule), the Third Amended Plan, or the Asset Purchase Agreement shall be construed as the provision of such approval. In the event of a conflict between the Ginnie Mae Agreements, on the one hand, and this Order (including any schedule), the Third Amended Plan, the Asset Purchase Agreement, or the Stock and Asset Purchase Agreement, on the other, the relevant terms of the Ginnie Mae Agreements shall govern.

30.     Nothing in the Third Amended Plan, the Plan Supplement, this Order (including any schedule), the Asset Purchase Agreement (Forward Business), the Stock and Asset Purchase Agreement (Reverse Business), DIP Order, Bidding Procedures Order, or the GUC Recovery Trust Agreement, including any amendments, supplements or modifications

thereto, shall discharge, release, extinguish, terminate, modify, subordinate, prime, grant a lien or administrative claim in, or otherwise impair, Ginnie Mae's interests in or rights to the mortgages backing the Ginnie Mae securities and any related collateral.  Ginnie Mae's collateral includes, but is not limited to, cash, account or collateral held or required to be held by the Debtors, the non-Debtor affiliates, Ginnie Mae, or any other party in connection with the Ginnie Mae Guaranty Agreements, including without limitation Principal and Interest Custodial Accounts and funds, and Taxes and Insurance Custodial Accounts and funds, established in accordance with the Ginnie Mae program requirements.  Nothing in this Order (including any schedule), the Third Amended Plan, the Asset Purchase Agreement, or the Stock and Asset Purchase Agreement shall permit any entity to acquire, possess, or control Ginnie Mae securities or related collateral except with Ginnie Mae's express written consent and in accordance with the Ginnie Mae Agreements.

31.    The Debtors, the Wind Down Estates, and the Plan Administrator shall perform all obligations, and pay all amounts due under the Ginnie Mae Guaranty Agreements (and any other agreements with Ginnie Mae) whether arising prior to or after the Commencement Date, and are directed to maintain compliance with the Ginnie Mae Assurances of Future Performance (as set forth on Schedule 3 to the *Final Order (I) Authorizing Debtors to Continue Origination and Servicing of Forward Mortgage Loans in Ordinary Course and Granting Related Relief and (II) Modifying Automatic Stay on a Limited Basis to Facilitate Debtors' Ongoing Operations* [ECF No. 224]; and the *Final Order (I) Authorizing Debtors to Continue Honoring Reverse Issuer and Servicing Obligations in the Ordinary Course and Granting Related Relief, (II) Modifying Automatic Stay on a Limited Basis to Facilitate Debtors*

WEIL:\97193774\3\41703.0011

*Ongoing Operations* [ECF No. 229]) pending any transfer of servicing by the Debtors subject to the approval of Ginnie Mae.

32.    Ginnie Mae shall not be required to file a proof of claim, an administrative expense claim, or take any other action to preserve any of its rights, claims, or defenses against the Debtors, all of which are expressly preserved and shall survive entry of this Order and the effectiveness of the Third Amended Plan, and notwithstanding any provisions of the Third Amended Plan (including but not limited to the discharge and injunction provisions of the Third Amended Plan).

33.    Nothing in this Order (including any schedule), the Third Amended Plan, the Asset Purchase Agreement, or the Stock and Asset Purchase Agreement shall permit any entity other than an FHA-approved mortgagee from acquiring or possessing FHA-insured mortgages and the related servicing rights in accordance with applicable law and FHA requirements.

## **Freddie Mac Provisions**

34.    Notwithstanding any other provision of this Order, the Third Amended Plan, the Plan Supplement, the Sale Transactions, the Exit Warehouse Facilities Documents, the Exit Working Capital Facility Documents, or any other order in the Chapter 11 Cases (a) neither the Freddie Mac Agreements nor any other agreement between the Debtors and Freddie Mac shall be assumed, assumed and assigned, or rejected and instead such agreements shall ride through the Chapter 11 Cases unaffected in any respect; (b) none of the Debtors' rights with respect to the Freddie Mac Agreements or the loans serviced by the Debtors on behalf of Freddie Mac shall be transferred, sold, or otherwise conveyed to the Buyers (or any other entity) absent Freddie Mac's express written consent; (c) the Debtors, the Wind Down Estates, and the Plan Administrator shall perform all obligations, and pay all claims and amounts due, under the

WEIL:\97193774\3\41703.0011

Freddie Mac Agreements (and any other agreements with Freddie Mac) whether arising prior to or after the Commencement Date and are directed to maintain compliance with the Freddie Mac Assurances of Future Performance (as set forth on Schedule 2 to the *Final Order (I) Authorizing Debtors to Continue Origination and Servicing of Forward Mortgage Loans in Ordinary Course and Granting Related Relief and (II) Modifying Automatic Stay on a Limited Basis to Facilitate Debtors' Ongoing Operations* [ECF No. 224]) pending any transfer of servicing approved by Freddie Mac; and (d) Freddie Mac's rights, powers, prerogatives, remedies, payment or lien priorities, lien rights, security interests, and claims against the Debtors or any other entity shall not be discharged, enjoined, impaired, released, modified, or limited in any respect.

35.    Freddie Mac shall not be required to file a proof of claim, an administrative expense claim, or take any other action to preserve any of its rights, claims, or defenses against the Debtors, all of which are expressly preserved and shall survive entry of this Order, the Third Amended Plan's discharge and injunction provisions, and the effectiveness of the Third Amended Plan.  If the Debtors, the Wind Down Estates, or the Plan Administrator fail to satisfy all of the obligations owing to Freddie Mac, then Freddie Mac shall be permitted to seek recovery against the Debtors, or the Wind Down Estates (as applicable), and Freddie Mac shall reserve its rights, if any, to recovery against the GUC Recovery Trust.  Neither the automatic stay nor any post-confirmation injunction shall apply to Freddie Mac's exercise of any rights or remedies under the Freddie Mac Agreements (or any other agreement), including with respect to any collateral securing Freddie Mac's claims or with respect to Freddie Mac's rights to unilaterally terminate or transfer servicing of loans owned by Freddie Mac.

36.    Immediately upon entry of this Order, the Debtors, the Wind Down Estates, and the Plan Administrator are authorized to enter into, and perform under, any

**494**

agreements or settlements with Freddie Mac, including with respect to the resolution of claims, the termination of servicing rights, or the transfer of servicing rights, without further court approval or order.

### Provisions for Governmental Units

37.     As to any Governmental Unit (as defined in section 101(27) of the Bankruptcy Code), nothing in the Third Amended Plan or this Order shall limit or expand the scope of discharge, release or injunction to which the Debtors, the Wind Down Estates, Reorganized RMS, the Buyers, or the GUC Recovery Trust are entitled to under the Bankruptcy Code, if any.  The discharge, release, and injunction provisions contained in the Third Amended Plan and this Order are not intended and shall not be construed to bar any Governmental Unit from, subsequent to this Order, pursuing any police or regulatory action.

38.     Accordingly, notwithstanding anything contained in the Third Amended Plan or this Order to the contrary, nothing in the Third Amended Plan or this Order shall discharge, release, impair or otherwise preclude:  (1) any liability to any Governmental Unit that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (2) any Claim of any Governmental Unit arising on or after the Effective Date; (3) any valid right of setoff or recoupment of any Governmental Unit against any of the Debtors; or (4) any liability of the Debtors, the Wind Down Estates, Reorganized RMS, the Buyers, or the GUC Recovery Trust under police or regulatory statutes or regulations to any Governmental Unit as the owner, lessor, lessee or operator of property that such entity owns, operates or leases after the Effective Date. Nor shall anything in this Order or the Third Amended Plan: (i) enjoin or otherwise bar any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding sentence; or (ii) divest any court, commission, or tribunal of

**495**

jurisdiction to determine whether any liabilities asserted by any Governmental Unit are discharged or otherwise barred by this Order, the Third Amended Plan, or the Bankruptcy Code.

39.    Nothing in this Order or the Third Amended Plan shall release or exculpate any non-debtor, including any Released Parties and/or Exculpated Parties, from any liability to any Governmental Unit, including but not limited to any liabilities arising under the Internal Revenue Code, the environmental laws, or the criminal laws against the Released Parties and/or Exculpated Parties, nor shall anything in this Order or the Third Amended Plan enjoin any Governmental Unit from bringing any claim, suit, action or other proceeding against any non-debtor for any liability whatsoever; provided, however, that the foregoing sentence shall not (x) limit the scope of discharge granted to the Debtors and Reorganized RMS under sections 524 and 1141 of the Bankruptcy Code, or (y) diminish the scope of any exculpation to which any party is entitled under section 1125(e) of the Bankruptcy Code.

40.    Nothing contained in the Third Amended Plan or this Order (including Schedules 1 and 2) shall be deemed to determine the tax liability to a Governmental Unit of any person or entity, including but not limited to the Debtors, the Wind Down Estates, Reorganized RMS, the Buyers, and the GUC Recovery Trust, nor shall the Third Amended Plan or this Order be deemed to have determined the federal tax treatment of any item, distribution, or entity, including the federal tax consequences of this Third Amended Plan, the Reverse Investment Transaction (as defined in Schedule 1 to this Order), or the Forward Sale Transaction, nor shall anything in the Third Amended Plan or this Order be deemed to have conferred jurisdiction upon the Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment except as provided under 11 U.S.C. § 505.

WEIL:\97193774\3\41703.0011

41.    With respect to any Governmental Unit, nothing in the Third Amended Plan, this Order, or any schedules to the Third Amended Plan or this Order, including the four paragraphs above, shall limit or expand the meaning or effect of section 1141(c) of the Bankruptcy Code with respect to the sale transactions set forth in the Asset Purchase Agreement and the Stock and Asset Purchase Agreement, including but not limited to the provision that "the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor."  With respect to any property transferred in the Reverse Sale Transaction (as described in Schedule 1 to this Order) and the Forward Sale Transaction (as described in Schedule 2 to this Order), nothing in the Plan, this Order (including any schedule), the Asset Purchase Agreement, or the Stock and Asset Purchase Agreement (as applicable) releases, nullifies, precludes or enjoins the enforcement of any liability to a Governmental Unit under police and regulatory statutes or regulations (including but not limited to environmental laws or regulations), and any associated liabilities for penalties, damages, restitution, cost recovery, or injunctive relief that any entity would be subject to as the owner, lessor, lessee, or operator of the property after the date of entry of this Order; provided, however, that all parties' rights and defenses under non-bankruptcy law are fully preserved. Nothing contained in this Order (including any schedule), the Third Amended Plan, the Asset Purchase Agreement, or the Stock and Asset Purchase Agreement (as applicable) shall in any way diminish the obligation of any entity, including the Debtors and the Buyers, to comply with environmental laws.  Nothing in the Third Amended Plan, this Order (including any schedule), the Asset Purchase Agreement, or the Stock and Asset Purchase Agreement (as applicable) authorizes the transfer to the Buyers of any licenses, permits, registrations, or governmental

authorizations and approvals without the Buyer's compliance with all applicable legal requirements under non-bankruptcy law governing such transfers.

### IRS Settlement

42.    New WEI, Inc. ("**New WEI**"), on its own behalf and as common parent and agent for its consolidated group and subsidiaries, and the United States of America (the "**United States**"), by and through the Internal Revenue Service (the "**IRS**"), have agreed on a global settlement in principle of the unpaid consolidated income tax liabilities of New WEI, its consolidated group and its subsidiaries (together, the "**New WEI Group**" (formerly, the Walter Energy, Inc., Walter Industries, Inc., Hillsborough Holdings Corp., and Jim Walter Corporation consolidated group)) for the tax years ended August 31, 1983, through 1987; May 31, 1990, through 1994; May 31, 2000; December 31, 2000, through 2002; and December 31, 2004, through 2006, plus interest thereon (collectively, the "**New WEI Group Tax Liabilities**" or "**New WEI Group Tax Debts**").  New WEI and the United States have agreed in principle to settle the New WEI Group Tax Liabilities for the sum of approximately $37,397,495.92 as of January 31, 2019, plus interest thereon (totaling approximately $39 million as of September 30, 2019) (the "**New WEI Settled Tax Liabilities**"), subject to and conditioned upon approval of a full and controlling written settlement agreement by the United States Bankruptcy Court for the Northern District of Alabama ("**Alabama Bankruptcy Court**"), *In re New WEI, Inc., et al.,* Case No. 15-02741-TOM7 and *Hillsborough Holdings Corp. v. United States*, Adv. Proc. No. 15-00127-TOM (the "**New WEI Settlement**").

43.    Certain of the Debtors and Mueller Water Products, Inc. ("**Mueller Water**"), as former members of the New WEI Group, may be severally liable for the New WEI Group Tax Debts.  *See* 26 C.F.R. § 1.1502-6(a).  Accordingly, in recognition of certain of the Debtors' and Mueller Water's potential respective several obligations for the New WEI Group

**498**

Tax Liabilities, the Debtors and Mueller Water have agreed that they will pay the New WEI Settled Tax Liabilities as follows: (a) the Debtors shall pay in the manner set forth in Paragraphs 44 and 45, below (the "**Debtors' Payment**"), an amount that is estimated to be approximately $16.5 million as of September 30, 2019; and (b) Mueller Water shall pay the balance of the New WEI Settled Tax Liabilities after taking into account the Debtors' Payment, an amount that is estimated to be approximately $22.5 million as of September 30, 2019.

44.     The Debtors agree that they shall fund the Debtors' Payment as follows: (a) by authorizing the IRS to set off the overpayments of consolidated income taxes of Ditech Holding Corporation and its subsidiaries (together, the "**Ditech Group**") for the tax years 2013 and 2014 net of the agreed tax deficiencies of the Ditech Group for the tax years 2015 and 2016 in the approximate amounts of $280,000 and $204,000, respectively (subject to interest netting, if applicable, pursuant to 26 U.S.C. § 6621(d)) (the "**Ditech Group Overpayments**"), an amount estimated to be approximately $13.8 million, including interest thereon as of September 30, 2019, against the New WEI Settled Tax Liabilities, and with respect to the Ditech Group Overpayments, the Debtors shall be deemed to have fully, finally and forever surrendered, relinquished and released any right, title or interest in such overpayments; and (b) upon occurrence of the Effective Date, the Debtors shall deposit the sum of $2,735,000 in an escrow account for the benefit of the IRS (the "**IRS Escrowed Amount**"), and with respect to said escrow account, the Debtors shall be deemed to have waived any and all rights to challenge the IRS's ability to collect from that account once the New WEI Settlement is approved by the Alabama Bankruptcy Court.

45.     Within five calendar days of the later of (i) entry of an order by the Alabama Bankruptcy Court approving the New WEI Settlement, or (ii) the Effective Date,

WEIL:\97193774\3\41703.0011

(1) the Debtors shall cause the IRS Escrowed Amount to be disbursed to the United States, and

(2) the IRS shall set off the Ditech Group Overpayments against the New WEI Settled Tax

Liabilities.  To the extent the automatic stay of section 362 of the Bankruptcy Code applicable in

Debtors' bankruptcy cases would otherwise bar such setoff, the Court finds that cause pursuant

to section 362(d) exists, and the stay is hereby modified to permit the IRS to effect such a setoff.

46.    Upon the United States' receipt of the Debtors' Payment in full, as

described above, the Debtors, the Ditech Group, the Released Parties, and the Related Parties

shall be deemed fully and forever released and discharged from any and all civil liabilities or

obligations arising out of or in connection with the New WEI Group Tax Liabilities by the

United States (including the IRS) and Mueller Water or that were or could have been raised in

the pending cases.  Within ten calendar days of the United States' receipt of the Debtors'

Payment in full, the IRS shall withdraw its Proof of Claim in Debtors' bankruptcy, Claim No.

24019.  If the IRS fails to withdraw Claim No. 24019 within such time period, Claim No. 24019

shall be deemed withdrawn in its entirety with prejudice.

47.    For the avoidance of doubt, nothing in Paragraphs 42 or 46 of this Order

shall or shall be construed to impose any liability on the Buyers and Reorganized RMS on

account of the New WEI Group Tax Liabilities or the New WEI Settled Tax Liabilities,

including the Debtors' Payment.

48.    For the avoidance of doubt, nothing in the Third Amended Plan, the Plan

Supplement, this Order (including the findings of fact and conclusions of law set forth in

Schedules 1 and 2 attached hereto and incorporated herein), the Asset Purchase Agreement

(Forward Business), the Stock and Asset Purchase Agreement (Reverse Business), or the GUC

Recovery Trust Agreement, including any amendments, supplements or modifications thereto,

WEIL:\97193774\3\41703.0011

**500**

shall discharge, release, extinguish, terminate, modify, impair or otherwise preclude the United States' right to offset any overpayments of tax of Ditech Holding Corporation and its subsidiaries (and any successors thereto), plus interest thereon, against New WEI Group's unpaid tax debts (to the extent such offset rights exist), as described further in the Internal Revenue Service's proof of claim and the United States' objection to confirmation. The Debtors, Wind Down Estates, GUC Recovery Trustee, and Plan Administrator retain the right to dispute any such asserted right of offset by the IRS, except with respect to the setoff of the Ditech Group Overpayments against the New WEI Settled Tax Liabilities, provided for in paragraphs 44 through 46 of this Order.

### U.S. Trustee

49.     For the avoidance of doubt, the discharge, release, and injunction provisions contained in the Third Amended Plan and this Order are not intended and shall not be construed to bar the United States Trustee Program from enforcing any liabilities relating to the conduct described in that certain Memorandum of Understanding between Ditech and the United States Trustee Program dated September 25, 2019. Nothing contained in this Order or the Third Amended Plan shall (1) release or exculpate any non-debtor, including any Released Parties and/or Exculpated Parties, from any liabilities to a Governmental Unit relating to the conduct addressed in the Memorandum of Understanding between Ditech and the United States Trustee Program, or (2) be construed to change, amend, or deem ineffective the terms of that Memorandum of Understanding.

### Taxing Authorities

50.     Holders of Allowed Priority and/or Secured Tax Claims ("**Tax Claims**") shall retain their tax liens to the same validity, extent, and priority as existed on the Commencement Date until all validly determined taxes and related interest, penalties, and fees

**501**

(if any) have been paid in full. To the extent they are not paid in the ordinary course of business, payment of Tax Claims shall include interest through the date of payment at the applicable state statutory rate as set forth in sections 506(b), 511, and 1129 of the Bankruptcy Code.

51.    Delinquent property taxes, penalties, and interest are to be paid in full from the proceeds of the sale, at the time of the closing of the Sale Transactions, and the ad valorem tax liens for the 2019 tax year are hereby expressly retained until payment by the Debtors and Buyers of the 2019 ad valorem taxes, as apportioned and prorated between those parties pursuant to the Stock and Asset Purchase Agreement and the Asset Purchase Agreement (as applicable), and any penalties or interest which may ultimately accrue to those taxes in the ordinary course of business.

## Sureties

52.    Notwithstanding any other provision of (i) this Order (including the Schedules), (ii) the Third Amended Plan, (iii) the Plan Supplement, (iv) the Sale Transactions (including any order or purchase agreements related thereto), and (v) any amended versions of the foregoing (the "**Confirmation and Sale Documents**"), the rights of International Fidelity Insurance Company and Allegheny Casualty Company (collectively, the "**Surety**") against the Debtors and Wind Down Estates in connection with (a) the surety bonds issued by the Surety in connection with the business operations of any of the Debtors and/or non-Debtor affiliates (collectively, the "**Bonds**"); (b) that certain Agreement of Indemnity, dated July 16, 2018, between Ditech Holding Corporation and the Surety (the "**Indemnity Agreement**"); (c) that certain Cash Collateral Escrow Agreement, dated February 8, 2018, between Walter Investment Management Corp. and the Surety (the "**Cash Collateral Agreement**") (sections (a) through (c) herein collectively, the "**Surety Documents**"); and (d) the cash collateral held by the Surety in connection with the Bonds and pursuant to the Indemnity Agreement and the Cash Collateral

Agreement in the amount of $15,000,000 (the "**Cash Collateral**") are neither affected nor impaired by the Confirmation and Sale Documents.  Nothing in the Confirmation and Sale Documents shall restrict, limit, transfer or otherwise negatively impact the Surety's rights against the Debtors or Wind Down Estates.  Nothing in the Confirmation and Sale Documents shall restrict, limit, transfer, or otherwise negatively impact the Surety's right to hold and/or apply collateral, including, but not limited to, the Cash Collateral in accordance with the terms of the Indemnity Agreement, Cash Collateral Agreement, and/or applicable law.  Notwithstanding any provision in the Confirmation and Sale Documents:

(a)  Surety has a trust fund claim and the Surety may continue to hold trust funds to apply against any and all liability for losses and/or expenses in accordance with the terms of the Indemnity Agreement;

(b)  All set-off and recoupment rights of Surety and obligees pursuant to the Bonds are preserved against the Debtors and Wind Down Estates; to the extent that any sales are free and clear of set-off and recoupment rights of Surety and any obligees under any of the Bonds, such rights may be asserted against the proceeds of any sale in the same priority as may have existed against the asset being sold pre-closing;

(c)  The Surety Documents may not be assumed, assumed and assigned, or otherwise used for the benefit of the Buyers, Debtors, Reorganized RMS, Wind Down Estates, and/or the Plan Administrator or any related entities without the Surety's express consent;

(d)  The Debtors, Wind Down Estates, and/or Plan Administrator (collectively, the "**Debtor Entities**") shall not be permitted to use the Bonds after the Effective Date of the Third Amended Plan without the Surety's express consent.  To the extent the Bonds are required for operations post-Effective Date and the Surety does not consent

to the use of such Bonds, the Debtor Entities will have replacement bonds in place prior to the Effective Date;

(e)    The Surety reserves all of its rights to modify, extend, or cancel any and all existing Bonds in accordance with the Indemnity Agreement to the extent permitted by law;

(f)    The Surety has no obligation to issue any new bonds to any entity;

(g)    For the avoidance of doubt, the third-party releases in the Third Amended Plan shall not purport to release claims held by the Surety or the obligees under the Bonds;

(h)    The Surety retains its claims against individual Debtors, and such claims are not reduced or consolidated into one claim;

(i)    The Debtor Entities shall not knowingly destroy any books or records that they may possess pertaining to any of the Debtors' obligations which relate to the Bonds that have not been fully released or otherwise fully discharged, and, if the Surety receives a claim under any of the Bonds, any books and/or records that may then be in the possession of the Debtor Entities related to such claim shall be produced to the Surety upon written request.

The rights of the Debtors and the Wind Down Estates, as applicable, to raise any objections, claims, or defenses in connection with subsections (a), (b), (e), and (h) of this paragraph (including the right to amend the provisions in this paragraph as agreed to with the Surety (and, to the extent any such amendment affects the Buyer(s) and/or Reorganized RMS, the Buyer(s) and/or Reorganized RMS, as applicable) without further Court order) are fully preserved.

### **Consumer Representative**

53.    The Consumer Representative Agreement shall become effective on the Effective Date and a Consumer Representative shall be appointed and have all powers necessary to establish a Consumer Creditor Reserve as a trust and implement the provisions of the

WEIL:\97193774\3\41703.0011

**504**

Consumer Representative Agreement and administer the Consumer Creditor Reserve, including, without limitation, the power to: (i) reconcile and resolve Consumer Creditor Claims, (ii) hold, manage and administer the Consumer Creditor Recovery Cash Pool, (iii) distribute the Consumer Creditor Net Proceeds to holders of Allowed Consumer Creditor Claims, (iv) facilitate inquiries by Borrowers with respect to the obligations of the Wind Down Estates, Forward Buyer, Reverse Buyer, and Reorganized RMS to reasonably investigate alleged errors in the prior servicing or accounting of the loan asserted by any Borrower and, if warranted, correct such errors in accordance with Sections 4.6(b) and 5.6(d) of the Third Amended Plan, and (v) otherwise perform the functions and take the actions provided for in the Consumer Representative Agreement or permitted in the Third Amended Plan and/or this Order or in any other agreement executed pursuant to the Third Amended Plan. In the event of a conflict between the provisions of this Order (including its schedules) and the Third Amended Plan, on the one hand, and the Consumer Representative Agreement and/or any other agreement executed pursuant to the Third Amended Plan, on the other hand, the relevant provisions of this Order (including its schedules) and/or the Third Amended Plan shall govern.

54.     To facilitate the appointment of the Consumer Representative and provide for the efficient administration of its duties, the Consumer Creditors' Committee, notwithstanding section 12.9 of the Third Amended Plan, shall continue to exist and retain professionals, for a period of no more than three (3) weeks (unless otherwise agreed to by the Term Lenders) (the "**Consumer Representative Transition Period**"), for the limited purpose of assisting the Consumer Representative in its duties. For the avoidance of doubt, the fees and expenses of any professionals retained by the Consumer Creditors' Committee during the

**505**

Consumer Representative Transition Period shall be paid by the Reorganized Debtors pursuant to section 2.2(d) of the Third Amended Plan, but shall not exceed $80,000 in the aggregate.

## **Miscellaneous**

55.     With respect to executory contracts and/or unexpired leases of nonresidential real property that are being assumed or assumed and assigned pursuant to the Third Amended Plan and this Order, the Cure Amounts set forth in the Cure Notices[5] only relate to any outstanding prepetition amounts owed by the Debtors.  The Debtors shall continue to timely perform in the ordinary course of business and in accordance with the terms of such executory contracts and/or unexpired leases of nonresidential real property with respect to obligations accruing postpetition as required under section 365 of the Bankruptcy Code until the Effective Date, at which time the Wind Down Estates, Reorganized RMS, or the Forward Buyer, as applicable, will assume responsibility of performing under the assumed and assumed and assigned executory contracts and/or unexpired leases with respect to obligations accruing from and after the Effective Date.

56.     **No Waiver of Rights and Defenses.** Except as otherwise agreed, the provisions of the Third Amended Plan and this Order shall not enjoin, impair, prejudice, have any preclusive effect upon, or otherwise affect the rights of any Creditor to effectuate, subject to advance Bankruptcy Court approval, a defensive right of recoupment pursuant to common law or defensive right of setoff pursuant to common law or otherwise in accordance with section 553 of the Bankruptcy Code against the Debtors, the Wind Down Estates or the GUC Recovery Trust,

---

[5]     "**Cure Notices**" means collectively, the *Notice of Cure Costs and Potential Assumption or Assumption and Assignment of Executory Contracts and Unexpired Leases of Debtors* (ECF No. 824); *Supplemental Notice of Cure Costs and Potential Assumption or Assumption and Assignment of Executory Contracts and Unexpired Leases of Debtors* (ECF No. 834); and *Second Supplemental Notice of Cure Costs and Potential Assumption or Assumption and Assignment of Executory Contracts and Unexpired Leases of Debtors* (ECF No. 1013).

**506**

as applicable (subject to the Debtors', Wind Down Estates' or GUC Recovery Trust's rights to contest the validity of such asserted right of setoff or recoupment); provided, however, that no such rights of recoupment and/or setoff may be asserted against the Buyers, Reorganized RMS, or any of their respective affiliates, successors, and assigns.  This paragraph shall not affect or limit Sections 4.6 or 5.6(d) of the Third Amended Plan with respect to the Borrowers.

57.    For the avoidance of doubt, and notwithstanding anything to the contrary in this Order, nothing in this Order shall be deemed to give a Borrower a right to payment, allowed Claim or any other right against the Debtors' Estates by virtue of entry of this Order, and all of the Debtors' defenses, Claims and other rights and actions with regard to the distribution of assets of the Debtors' Estates, whether in law or equity, are expressly preserved.

58.    **Borrower Rights.**  For the avoidance of doubt, notwithstanding any other provisions of the Confirmation and Sale Documents, nothing in this Order or any other Confirmation and Sale Documents shall be deemed to limit Borrowers' rights under, *inter alia*, Sections 4.6, 5.2(c), and 5.6(d) of the Third Amended Plan.

59.    **National Founders Facility Resolution.**  The Debtors are authorized to and shall take all steps necessary to effectuate the National Founders Resolution, and such National Founders Resolution is hereby approved in complete resolution of the National Founders Objection, consisting of the following:[6]

(a)    The Debtors, National Founders and the Reverse Buyer (on behalf of itself and Reorganized RMS) have agreed to and shall enter into a modified servicing

---

[6]    Unless expressly indicated otherwise, capitalized terms used but not defined in connection with the National Founders Resolution shall be defined as they are in the *Debtors' (I) Memorandum of Law in Support of Confirmation of Second Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors and (II) Omnibus Reply to Objections Thereto* (ECF No. 1029) or the Third Amended Plan, as applicable.

WEIL:\97193774\3\41703.0011

**507**

arrangement (the "**Modified National Founders Servicing Arrangement**") to take

effect on the Effective Date.  Notwithstanding anything else in the Third Amended

Plan, the Order, or the Stock and Asset Purchase Agreement, the Modified National

Founders Servicing Arrangement shall be incorporated into the Plan pursuant to this

Order and shall include the following: (i) Reorganized RMS shall (A) enter into and

be bound by (1) a sub-servicing agreement by and among National Founders,

Reorganized RMS, and the RMS SPV to service the National Founders Facility, the

TRM, LLC Portfolio and Low Valley Trust Portfolio, subject to and pursuant to the

terms of thereof (the "**National Founders Sub-Servicing Agreement**"), provided,

for the avoidance of doubt, that the National Founders Servicing Agreement and the

TRM, LLC Servicing Agreement shall be deemed rejected by the Debtors as of the

Effective Date, and (2) an acknowledgement, assumption and recognition agreement

by and among National Founders, Reorganized RMS, and the RMS SPV (the

"**National Founder AA&R Agreement**" and with the National Founders Sub-

Servicing Agreement, the "**New National Founders Agreements**") to, among other

things and subject to the terms thereof, incorporate the National Founders Sub-

Servicing Agreement into the National Founders Facility, and (B) in accordance with

the terms of the National Founders AA&R Agreement, assume, acknowledge and

recognize the transaction documents, as modified, related to and comprising the

National Founders Facility to which RMS is a party, and assume all of RMS's

obligations thereunder, including (1) that certain Participation Interest Sale and

Contribution Agreement, dated as of October 1, 2018, (2) that certain Deposit

Account Control Agreement, dated as of October 1, 2018, and (3) that certain

Custodial Agreement, dated as of October 1, 2018 (documents (1) through (3) of this clause (B), collectively, the "**Assumed National Founders Transaction Documents**"); <u>provided however</u>, the parties agree that no uncured defaults under the Assumed National Founders Transaction Documents exist as of the date hereof and that in no event shall Reorganized RMS, the Reverse Buyer, or any of their respective Affiliates, be liable for any claim for damages, costs, cure amounts or other amounts arising from such a default, if any, owed under the Assumed National Founders Transaction Documents arising or due prior to the Effective Date, and (ii) upon the entry into and consummation of the National Founders Sub-Servicing Agreement, all of Debtors' rights, title and interest in and to the SPV Equity, bare legal title of the Mortgage Assets and the Collateral Accounts, including any Mortgage Asset Proceeds, shall be deemed to be "Acquired Assets" under the Stock and Asset Purchase Agreement and, in accordance with section 1141 of the Bankruptcy Code, shall automatically vest in Reorganized RMS free and clear of Claims and Liens other than the National Founders Facility Prepetition Liens (as defined in the DIP Order), National Founders Facility Adequate Protection Liens (as defined in the DIP Order), and any other rights, claims, or interests of National Founders or the RMS SPV in connection therewith.

(b)   In addition, notwithstanding anything else in the Third Amended Plan, the Order, or the Stock and Asset Purchase Agreement, the Reserved Reimbursement Claims, the National Founders Superpriority Claims (as defined in the DIP Order), any other Claims of National Founders provided under the DIP Order, and any other claims of National Founders arising from the rejection of the National Founders Servicing

Agreement or the TRM, LLC Servicing Agreement against the Debtors, the Reorganized Debtors, the Wind Down Estates, or the GUC Recovery Trust, as applicable, are preserved in all respects and, to the extent allowed, shall be treated in accordance with this Order; provided, however, (1) that in no event shall Reorganized RMS, the Reverse Buyer, or any of their respective Affiliates be liable for, or otherwise responsible for satisfying, such Claims; and (2) payment of any such Claims as Allowed Administrative Expense Claims or on account of National Founders Facility Adequate Protection may not exceed $8 million in the aggregate. For the avoidance of doubt, any Secured Claim of National Founders against the Debtors, the Wind Down Estates or the GUC Trust shall be satisfied in full pursuant to the Plan upon the transfer of National Founders Facility Prepetition Collateral (as defined in the DIP Order, which shall remain subject to National Founders Facility Prepetition Liens, National Founders Facility Adequate Protection Liens, and any other rights, claims, or interests of National Founders or the RMS SPV in connection therewith, as provided herein) to National Founders or Reorganized RMS, as applicable, pursuant to this Order.

60.    Nothing in the Third Amended Plan, Plan Supplement, or this Order shall waive, release, discharge, enjoin or otherwise limit (a) any rights or any defenses, including for setoff, of TIAA, FSB f/k/a Everbank against the Debtors, in connection with the Mortgage Servicing Rights Purchase and Sale Agreement dated October 30, 2013, between TIAA, FSB f/k/a Everbank and Ditech Financial LLC f/k/a Green Tree Servicing LLC ("**2013 MSR PSA**") and the Amended and Restated Mortgage Servicing Rights Purchase and Sale Agreement dated May 20, 2015, between TIAA, FSB f/k/a Everbank and Ditech Financial LLC f/k/a Green Tree

WEIL:\97193774\3\41703.0011

Servicing LLC ("**2015 MSR PSA**"); or (b) any claims of TIAA, FSB f/k/a Everbank against the Debtors in connection with the 2013 MSR PSA and 2015 MSR PSA, as asserted in Claim No. 21420, as may be amended.

61.    The *Objection of Bank of America, N.A. to the Plan, the Proposed Sales, and Related Matters Set For Hearing on August 7, 2019* [ECF No. 941] (the "**BANA Objection**") with respect to matters other than setoff and recoupment, which are resolved in accordance with paragraph 62 of this Order, is resolved on the terms set forth in this paragraph. Reverse Mortgage Solutions, Inc. ("**RMS**"), the Reverse Buyer (on behalf of itself and Reorganized RMS), and Bank of America, N.A. ("**BANA**") have negotiated that certain Term Sheet dated September 20, 2019 (the "**Term Sheet**") and are negotiating a definitive form of subservicing agreement to (the "**New BANA Subservicing Agreement**") consistent with the Term Sheet. During the period from and after the Effective Date until execution of the New BANA Subservicing Agreement, the Reverse Buyer and/or Reorganized RMS, as applicable, will provide subservicing to BANA with respect to the loans being subserviced under the Reverse Mortgage Agreement (as defined in the BANA Objection), on the terms set forth in the Term Sheet, as supplemented by any non-conflicting terms of the Reverse Mortgage Agreement. The New BANA Subservicing Agreement, once executed and effective, shall supersede and replace the Term Sheet and the Reverse Mortgage Agreement. On the Effective Date, the Reverse Mortgage Agreement shall be deemed rejected by the Debtors. In no event shall the Reverse Buyer or its Affiliates, or Reorganized RMS and its Affiliates (other than any Debtor) be liable for any claim for damages, costs or other amounts arising in connection with the rejection of the Reverse Mortgage Agreement (as defined in the BANA Objection). Nothing herein waives any claim or damages rights of BANA against the Debtors arising from the

rejection of the Reverse Mortgage Agreement, or the Debtors' rights to object to such claims or damages.

62.    **Preservation of BANA and Nationstar Setoff and Recoupment**. Notwithstanding anything to the contrary contained in this Order, the provisions of the Third Amended Plan or the Plan Supplement, except as provided in this paragraph and subject to compliance with section 553 of the Bankruptcy Code as to setoff rights arising before the Commencement Date, all rights of setoff or recoupment of BANA and Nationstar Mortgage LLC (including any of its affiliates doing business with the Debtors, collectively "**Nationstar**"), respectively, against the Debtors (including the rights of setoff provided in Section 5.2(b) of the Third Amended Plan) are preserved and retained and shall not be enjoined, impaired, prejudiced, discharged, or released against the Debtors, the Wind Down Estates, or the GUC Recovery Trust, and each of BANA and Nationstar shall be entitled to assert any and all setoff and recoupment rights against the Debtors, the Wind Down Estates, or the GUC Recovery Trust. For so long as the Bankruptcy Cases are open or the Wind Down Estates or GUC Recovery Trust are in existence, a determination on the merits of BANA's or Nationstar's asserted setoff and recoupment rights shall either be made by agreement of the parties, who shall negotiate in good faith to resolve any dispute, or failing that, a court of competent jurisdiction, absent which, BANA or Nationstar may not effectuate any setoff or recoupment. For the sake of clarity, the Bankruptcy Court retains non-exclusive jurisdiction to adjudicate the merits of BANA's or Nationstar's asserted setoff and recoupment rights. Other than rights, claims, liabilities, and obligations arising under Transferred Contracts (as defined in the Stock and Asset Purchase Agreement and the Asset Purchase Agreement) as part of the Sale Transactions, all receivables asserted by the Debtors relating to BANA or Nationstar or arising under the (a) Agreement for

WEIL:\97193774\3\41703.0011

the Flow Purchase and Sale of Mortgage Servicing Rights dated October 31, 2018; (b) Mortgage Servicing Rights Purchase and Sale Agreement dated January 6, 2013; (c) Flow Subservicing Agreement dated May 23, 2012; (d) Flow Servicing Agreement dated November 27, 2012 (CC-20003); (e) Settlement Agreement and Mutual Release dated December 31, 2018; (vi) Second Settlement Agreement and Mutual Release dated May 20, 2019; (f) Flow Servicing Agreement dated as of March 1, 2011 (CC-10180); and (g) Investor Agreement (CC-20004) are deemed to be "Excluded Assets" (as defined in the Stock and Asset Purchase Agreement and the Asset Purchase Agreement). Accordingly, effective as of the Effective Date, such receivables will be the exclusive property of the Debtors, the Wind Down Estates, or the GUC Recovery Trust.

63.    Notwithstanding Bankruptcy Rule 3020(e), the terms and conditions of this Order will be effective and enforceable immediately upon its entry.

64.    Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, subject to the occurrence of the Effective Date, on and after the entry of this Order, the provisions of the Third Amended Plan shall bind every holder of a Claim against or Interest in any Debtor and inure to the benefit of and be binding on such holders' respective successors and assigns, regardless of whether the Claim or Interest of such holder is impaired under the Third Amended Plan and whether such holder has accepted the Third Amended Plan.

65.    Each federal, state, commonwealth, local, foreign, or other governmental agency is hereby authorized to accept any and all documents, mortgages, and instruments necessary or appropriate to effectuate, implement or consummate the transactions contemplated by the Third Amended Plan.

66.    This Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and enforce the terms and

**513**

provisions of this Order, all amendments thereto, and any waivers and consents thereunder, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Acquired Assets and issuance of equity securities in Reorganized RMS, as applicable, to the Buyers; (b) interpret, implement, and enforce the provisions of this Order, the Asset Purchase Agreement, and the Stock and Asset Purchase Agreement; (c) protect the Buyers against any Interests against the Sellers or the Acquired Assets of any kind or nature whatsoever, and (d) enter any order under section 365 of the Bankruptcy Code.

Dated: September 26 , 2019
        New York, New York


/s/ *James L. Garrity, Jr.*
THE HONORABLE JAMES L. GARRITY, JR.
UNITED STATES BANKRUPTCY JUDGE

WEIL:\97193774\3\41703.0011

**514**

**Exhibit A**

Dkt. No. 1404-1

**<u>Third Amended Plan</u>**

INCLUDED SEPARATELY IN APPENDIX

## SCHEDULE 1

### Stock and Asset Purchase Agreement[1]

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A. **Findings of Fact and Conclusions of Law.** The findings and conclusions set forth in this Order constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable herein by Bankruptcy Rules 7052 and 9014. To the extent any findings of fact constitute conclusions of law, or any conclusions of law constitute findings of fact, they are adopted as such.

B. **Jurisdiction.** This Court has jurisdiction over the issuance of the Reorganized RMS Stock to the Reverse Buyer and sale of Acquired Assets and the assumption of the Assumed Liabilities (collectively, the Acquired Assets and the Assumed Liabilities, the "**RMS Assets**") in accordance with the Stock and Asset Purchase Agreement (the "**Reverse Investment Transaction**") pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N).

C. **Notice and Opportunity to Object.** As evidenced by the affidavits and certificates of service and publication notice previously filed with the Court, due, proper, timely, adequate, and sufficient notice of the Bidding Procedures Motion, the Bidding Procedures Order, the Bidding Procedures, the Sale Transaction, including the Reverse Investment Transaction, the Stock and Asset Purchase Agreement, the *Notice of Designation of Stalking Horse Bid and Request for Approval of Stalking Horse Bid Protections (Reverse Business)* [ECF No. 724], the *Notice of Cure Costs and Potential Assumption or Assumption and Assignment of Executory Contracts and*

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Third Amended Plan or the Stock and Asset Purchase Agreement (as amended, modified, and supplemented from time to time), as applicable, or as the context otherwise requires.

*Unexpired Leases of Debtors* [ECF No. 824], *Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases of Debtors (Reverse Buyer)* (ECF No. 839) (the "**Initial Assumption and Assignment Notice**"), *Supplemental Notice of Assumption of Executory Contracts and Unexpired Leases of Debtors and Removal of Executory Contracts and Unexpired Leases from Transferred Contracts Schedule (Reorganized RMS)* [ECF No. 1101] (the "**Supplemental Assumption Notice**"), the Third Amended Plan, and the Confirmation Hearing have been provided in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Case Management Order, the Disclosure Statement Order, and Bidding Procedures Order to all interested Persons and entities.

D.    **Title to the RMS Assets.**  Subject to Sections 4.6(b) and 5.6(d) of the Third Amended Plan, the RMS Assets constitute property of RMS's Estate and good title is presently vested in RMS within the meaning of section 541(a) of the Bankruptcy Code.[2]  Except as provided in the Stock and Asset Purchase Agreement and subject to Sections 4.6(b) and 5.6(d) of the Third Amended Plan, RMS is the sole and rightful owner of such RMS Assets with all rights, title and interests to the RMS Assets, and no other person has any ownership right, title, or interests therein.

E.    **Extensive Efforts by Debtors.**  As of the Commencement Date and for a period of more than nine months preceding the Commencement Date, the Debtors, with the assistance of their counsel and other advisors, evaluated strategic alternatives including extensive marketing efforts.  The Debtors have presented credible evidence that they explored various strategic alternatives for the Debtors' businesses over an extended period of time and communicated with numerous parties regarding, among other potential transactions, a possible

---

[2]    Pursuant to the DIP Facilities, certain of the Acquired Assets consisting of mortgage loans originated or acquired by the Debtors are currently subject to "repurchase agreements" as defined under Section 101(47) of the Bankruptcy Code.

**517**

sale of all or substantially all of the Debtors' assets.  The Reverse Investment Transaction is the result of the Debtors' extensive efforts in seeking to maximize recoveries to the Debtors' Estates for the benefit of creditors.

F.    **Business Justification.**    The Debtors have demonstrated compelling circumstances and good, sufficient and sound business purposes and justifications for this Court to approve the issuance and sale of the Reorganized RMS Stock, and the transfer to Reverse Buyer of the Acquired Assets and the assumption by Reverse Buyer of the Assumed Liabilities in accordance with the Stock and Asset Purchase Agreement and the Related Agreements pursuant to sections 1123(a)(5), 1123(b) and 1141(c) of the Bankruptcy Code.  In light of the circumstances of these Chapter 11 Cases and the risk of deterioration in the going concern value of the RMS Assets pending the issuance of the Reorganized RMS Stock and consummation of the Reverse Investment Transaction, time is of the essence in (i) consummating the Reverse Investment Transaction, (ii) preserving the value of the RMS Assets and viability of RMS's business as a going concern, and (iii) minimizing widespread and adverse economic consequences for RMS, its Estates, and its creditors and employees.  RMS's entry into and performance under the Stock and Asset Purchase Agreement: (x) are a result of due deliberation by RMS and constitute a sound and reasonable exercise of RMS's business judgment consistent with its fiduciary duties; (y) provide value to and are beneficial to RMS's Estate, and are in the best interests of RMS and its Estate, creditors and other parties in interest; and (z) are reasonable and appropriate under the circumstances.

G.    **Compliance with Bidding Procedures.**    The Bidding Procedures were substantively and procedurally fair to all parties, including all potential bidders.  The Bidding Procedures afforded adequate notice and a full, fair, and reasonable opportunity for any Person to

3

make a higher or otherwise better offer to purchase the RMS Assets. The Debtors, the Reverse Buyer and their respective counsel and other advisors have complied with the Bidding Procedures and Bidding Procedures Order in all respects.

H.    **Adequate Marketing; Highest or Best Offer.**   Other than the Stock and Asset Purchase Agreement, no Qualified Bids for the RMS Assets were received by the Debtors before the Bid Deadline. The Debtors cancelled the Auction in accordance with the Bidding Procedures Order and, on July 10, 2019, caused the *Notice of (I) Cancellation of Auction, (II) Sale and Confirmation Objection Deadline, and (III) Successful Bidders* [ECF No. 830] to be filed with the Court identifying the Reverse Buyer as the Successful Bidder in accordance with the Bidding Procedures. As demonstrated by (i) the testimony and other evidence proffered or adduced at the Confirmation Hearing, and (ii) the representations of counsel made on the record at the Confirmation Hearing, (a) the Debtors and their advisors have adequately marketed the RMS Assets and conducted the sale process in compliance with the Bidding Procedures and Bidding Procedures Order; (b) full, fair, and reasonable opportunity was given to all Persons to make a higher or better offer to purchase the RMS Assets; (c) no Person, other than the Reverse Buyer, timely submitted a Qualified Bid in accordance with the Bidding Procedures Order; (d) the Reverse Buyer submitted the highest and best bid for the RMS Assets and was designated as the Successful Bidder; (e) the consideration provided by the Reverse Buyer under the Stock and Asset Purchase Agreement constitutes the highest and best offer for the RMS Assets; (f) the consideration provided by the Reverse Buyer for the RMS Assets under the Stock and Asset Purchase Agreement is fair and reasonable consideration for the RMS Assets and constitutes reasonably equivalent value under the Bankruptcy Code, (g) the consideration provided by the Reverse Buyer for the RMS Assets under the Stock and Asset Purchase Agreement provides reasonably equivalent value

4

**519**

and constitutes fair consideration under the Uniform Fraudulent Transfer Act and the Uniform Fraudulent Conveyance Act; (h)  taking into consideration all relevant factors and circumstances, the Reverse Investment Transaction will provide a greater recovery for the Debtors' creditors than would be provided by any other practically available alternative, including liquidation under chapters 7 or 11 of the Bankruptcy Code; (i) no other Person has offered to purchase the RMS Assets for greater economic or non-economic value to the Debtors or their Estates; and (j) the Debtors' determination that the Reverse Investment Transaction and the Stock and Asset Purchase Agreement constitutes the highest and best offer for the RMS Assets constitutes a valid, sound and reasonable exercise of the Debtors' business judgment.

I.    **Good Faith; No Collusion**.  The Stock and Asset Purchase Agreement and all aspects of the Reverse Investment Transaction were negotiated, proposed, and entered into by the Debtors and the Reverse Buyer and each of their management, board of directors or equivalent governing body, officers, directors, employees, agents, members, managers and representatives, in good faith, without collusion or fraud, and from arms'-length bargaining positions.  The Reverse Buyer has proceeded in good faith in all respects in that, among other things: (i) the Reverse Buyer has recognized that the Debtors were free to deal with any Person in connection with the marketing and sale of the RMS Assets; (ii) the Reverse Buyer has complied with the applicable provisions of the Bidding Procedures Order in all respects; (iii) the Reverse Buyer's bid was subjected to competitive Bidding Procedures as set forth in the Bidding Procedures Order; and (iv) all payments to be made by the Reverse Buyer under the Stock and Asset Purchase Agreement, the Related Agreements and all other material agreements or arrangements entered into by the Reverse Buyer and the Debtors in connection with the Reverse Investment Transaction have been disclosed and are reasonable and appropriate.  Neither the Debtors nor the Reverse Buyer, nor any affiliate of

the Reverse Buyer, have engaged in collusion or fraud. Specifically, the Reverse Buyer has not acted in a collusive manner with any Person or entity.

J.      **Opportunity to Object.**  In compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Case Management Order, the Disclosure Statement Order, and the Bidding Procedures Order, a fair and reasonable opportunity to object or be heard with respect to the Third Amended Plan, the Reverse Investment Transaction, and the Stock and Asset Purchase Agreement have been afforded to all interested Persons, including, without limitation, the Objection Notice Parties (as defined in the Bidding Procedures Order).

K.      **Best Interests.**  The actions represented to have been taken, or to be taken, by the Sellers (as defined in the Stock and Asset Purchase Agreement) and the Reverse Buyer are appropriate under the circumstances of these Chapter 11 Cases and are in the best interests of the Debtors, their Estates, creditors, and other parties in interest.  Approval of the Stock and Asset Purchase Agreement and of the Reverse Investment Transaction at this time is in the best interests of the Debtors, their creditors, their Estates and all other parties in interest.

L.      **Prompt Consummation.**  The Stock and Asset Purchase Agreement and the Reverse Investment Transaction must be approved and consummated as promptly as practicable in order to preserve the value of the RMS Assets and the viability of the business to which the RMS Assets relate as a going concern.

M.      **Corporate Authority.**  Each applicable Debtor (i) has full organizational power and authority to execute the Stock and Asset Purchase Agreement, the Related Agreements, and all other documents contemplated thereby, and the Reverse Investment Transaction has been duly and validly authorized by all necessary organizational action of each of the applicable Debtor, (ii) has all of the organizational power and authority necessary to consummate the transactions

WEIL:\97193783\2\41703.0011

contemplated by the Stock and Asset Purchase Agreement, the Related Agreements, and all other documents contemplated thereby, (iii) has taken all organizational action necessary to authorize and approve the Stock and Asset Purchase Agreement, the Related Agreements, and all other documents contemplated thereby and the consummation by RMS of the Reverse Investment Transaction, and (iv) needs no consents or approvals, other than those expressly provided for in the Stock and Asset Purchase Agreement and the Related Agreements, from any other person to consummate the Reverse Investment Transaction.

N.    **Discharge.**    On the Effective Date, other than the Excluded Assets and Excluded Liabilities, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of RMS shall vest in Reorganized RMS free and clear of all liens, claims (including those that constitute a "claim" as defined in section 101(5) of the Bankruptcy Code), rights, liabilities, mortgages, deeds of trust, pledges, charges, security interests, of whatever kind or nature, rights of first refusal, rights of offset or recoupment, royalties, conditional sales or title retention agreements, hypothecations, preferences, debts, easements, suits, licenses, options, rights-of-recovery, judgments, orders and decrees of any court or foreign domestic governmental entity, taxes (including foreign, state and local taxes), covenants, restrictions, indentures, instruments, leases, options, off-sets, recoupments, claims for reimbursement or subrogation, contribution, indemnity or exoneration, encumbrances and other interests of any kind or nature whatsoever against RMS or any of the RMS Assets, including, without limitation, any debts arising under or out of, in connection with, or in any way relating to, any acts or omissions, obligations, demands, guaranties, rights, contractual commitments, restrictions, product liability claims, environmental liabilities, employment or labor law claims or liabilities, employee pension or benefit plan claims, multiemployer benefit plan claims, retiree healthcare or life insurance claims or claims for taxes

of or against any of the Debtors, Claims or Liabilities relating to any act or omission of any originator, holder or servicer of Mortgage Loans prior to the Effective Date, any indemnification Claims or Liabilities relating to any act or omission of the Sellers or any other Person prior to the Effective Date or any Excluded Liabilities, any derivative, vicarious, transferee or successor liability claims, alter ego claims, *de facto* merger claims, rights or causes of action (whether in law or in equity, under any law, statute, rule or regulation of the United States, any state, territory, or possession thereof or the District of Columbia), whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, whether known or unknown, contingent or matured, liquidated or unliquidated, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material statutory or  non-statutory, legal or equitable, and whether imposed by agreement, understanding, law, equity or otherwise arising under or out of, in connection with, or in any way related to any of the Debtors, any of the Debtors' interests in the RMS Assets, the operation of any of the Debtors' businesses before the Effective Date (collectively, excluding any Assumed Liabilities and Permitted Liens, or as provided in Sections 4.6(b) or 5.6(d) of the Third Amended Plan, the "**Claims**").

O.    **Section 363(o) of the Bankruptcy Code.**    The Reverse Investment Transaction does not constitute a sale pursuant to section 363 of the Bankruptcy Code and section 363(o) of the Bankruptcy Code shall not apply.  As used herein, except for the Assumed Claims (as defined in the Stock and Asset Purchase Agreement), or as provided in Sections 4.6(b) or 5.6(d) of the Third Amended Plan, the term "Claims" shall include (a) all Claims or Causes of Action relating to conduct prior to Closing brought by a consumer borrower against any Debtor for the violation of (i) The Real Estate Settlement Procedures Act of 1974 (RESPA) (12 U.S.C. § 2601 et

seq.), (ii) The Fair Credit Reporting Act (15 U.S.C. § 1681), (iii) The Truth in Lending Act (12

C.F.R. § 1026), (iv) The Fair Debt Collection Practices Act (15 U.S.C. §§ 1692–1692p) and

(v) any and all state law equivalents of the foregoing clauses (i) through (iv) and (b) any other

Claim or Cause of Action for fraudulent inducement of a consumer borrower to enter into a loan.

All such Claims and any other similar claims implied in section 363(o) of the Bankruptcy Code

shall be discharged against RMS, Reorganized RMS, and the Reverse Buyer (and their respective

property, affiliates, successors and assigns) to the maximum extent permitted in section 1141 of

the Bankruptcy Code except as specifically set forth in the Stock and Asset Purchase Agreement.

P.     The Purchase Price was calculated in a manner consistent with the Reverse

Buyer's reliance on this Order to vest Reorganized RMS with all rights, title, and interest in and

to the RMS Assets free and clear of all Claims, including, without limitation, any claims that are

the subject of section 363(o) of the Bankruptcy Code.  For the avoidance of doubt, notwithstanding

any other provisions of the (i) Order (including the Schedules), (ii) the Third Amended Plan, (iii)

the Plan Supplement, (iv) the Sale Transactions (including any order or purchase agreements

related thereto), and (v) any amended versions of the foregoing (the "**Confirmation and Sale**

**Documents**"), nothing in the Confirmation and Sale Documents shall be deemed to (a) limit or

alter Borrowers' express rights under the Third Amended Plan, including, *inter alia*, Sections

4.6(b), 5.2(c), and 5.6(d) of the Third Amended Plan, or (b) otherwise modify the CCC Settlement.

Q.     Except as applicable to the assertion of rights protected by Sections 4.6(b),

5.2(c), or 5.6(d) of the Third Amended Plan, all Persons having Claims of any kind or nature

whatsoever against the Debtors or the RMS Assets (including, without limitation, Claims or

Liabilities relating to any act or omission of any originator, holder or servicer of Mortgage Loans

prior to the Effective Date, and any indemnification Claims or Liabilities relating to any act or

omission of the Sellers or any other Person prior to the Effective Date) shall be forever barred, estopped and permanently enjoined from creating, perfecting, pursuing, enforcing, attaching, collecting, recovering, or asserting such Claims against Reorganized RMS, the Reverse Buyer , or any Affiliate of the Reverse Buyer  or any of their respective property, successors and assigns, as an alleged successor or on any other ground, it being understood that nothing herein shall affect assets of the Debtors that are not RMS Assets.

R.    The Reverse Buyer would not have entered into the Stock and Asset Purchase Agreement and would not consummate the value maximizing transaction contemplated thereby if the Claims against the RMS Assets were not discharged, if the Reverse Buyer or Reorganized RMS would, or in the future could, be liable for any such Claims, including, as applicable, certain liabilities that will not be assumed by Reorganized RMS, as described in the Stock and Asset Purchase Agreement.

S.    **Necessity of Order.**  The Reverse Buyer would not have entered into the Stock and Asset Purchase Agreement and would not consummate the Reverse Investment Transaction without all of the relief provided for in this Order (including that, in each case other than the assumption of the Assumed Liabilities, except as provided in Sections 4.6(b) and 5.6(d) of the Third Amended Plan, (1) the transfer of the Reorganized RMS Stock to the Reverse Buyer be free and clear of all Claims, Interests, Liens, and encumbrances, including rights or Claims based upon successor or transferee liability, Claims or Liabilities relating to any act or omission of any originator, holder or servicer of Mortgage Loans prior to the Effective Date, and any indemnification Claims or Liabilities relating to any act or omission of the Sellers or any other Person prior to the Effective Date, and (2) the Reverse Buyer not be liable for any Cure Costs or any other pre-Closing liabilities with respect to any Assumed Contracts (as defined below)).  The

WEIL:\97193783\2\41703.0011

consummation of the Reverse Investment Transaction pursuant to this Order and the Stock and Asset Purchase Agreement is necessary for the Debtors to maximize the value of their Estates for the benefit of all creditors and other parties in interest.  The Reverse Buyer has agreed to the Reverse Investment Transaction with the intent of purchasing the Reorganized RMS Stock and purchased assets and does not and would not agree to assume any Liabilities other than the Assumed Liabilities or as provided in Sections 4.6(b) and 5.6(d) of the Third Amended Plan.

T.      **Cure Notice**.  As evidenced by the affidavits of service filed with the Court, and in accordance with the provisions of the Bidding Procedures Order, the Debtors have served, prior to the Confirmation Hearing, the Cure Notice (as defined below) on each non-Debtor counterparty to the Assumed Contracts (each, a "**Counterparty**" and collectively, the "**Counterparties**"), dated July 8, 2019 and August 5, 2019, which provided notice of the Debtors' intent to potentially assume such Assumed Contracts (to the extent the Assumed Contract is an executory contract or lease) and notice of the related proposed Cure Costs upon each Counterparty. The service of the Cure Notice was timely, good, sufficient and appropriate under the circumstances and no further notice need be given with respect to the Cure Costs for the assumption of the Assumed Contracts.  *See Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases of Debtors* [ECF No. 824]; *Third Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases of Debtors* [ECF No. 1087] (collectively, the "**Cure Notices**"); *see also Affidavits of Service* [ECF Nos. 867, 868, 1119].  All Counterparties (to the extent the Assumed Contract is an executory contract or lease and was listed on the Cure Notices) have had

a reasonable opportunity to object both to the Cure Costs listed on the applicable Cure Notice and to the assumption of the Assumed Contracts in accordance with the Bidding Procedures Order.

U.    **Assumption of Assumed Contracts.**    It is an exercise of the Debtors' reasonable and sound business judgment to assume the Assumed Contracts in connection with the consummation of the Reverse Investment Transaction, and the assumption of the Assumed Contracts is in the best interests of the Debtors, their Estates and creditors, and other parties in interest.    The assumption of the Assumed Contracts (i) is an integral part of the business of Reorganized RMS, (ii) allows the Debtors to sell their business to the Reverse Buyer as a going concern, (iii) limits the losses suffered by counterparties to the Assumed Contracts, and (iv) maximizes the recoveries to other creditors of the Debtors by limiting the amount of claims against the Debtors' Estates by avoiding the rejection of the Assumed Contracts.

V.    **Cure/Adequate Assurance.**    Other than with respect to the Adjourned Cure/Adequate Assurance Objections, the Debtors have cured or demonstrated their ability to cure any default with respect to any act or omission that occurred prior to the Effective Date under any of the Assumed Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code. For the avoidance of doubt, all objections identified on Exhibit A to the Debtors' Agenda [ECF No. 1091] are adjourned.    Unless otherwise agreed to by the parties, the Cure Costs set forth in the Cure Notice are deemed the amounts necessary to "cure" within the meaning of section 365(b)(1) of the Bankruptcy Code all "defaults" within the meaning of section 365(b) of the Bankruptcy Code under such Assumed Contracts.    Reorganized RMS's promise to perform the obligations under the Assumed Contracts after the Effective Date shall constitute adequate assurance of its future performance of and under the Assumed Contracts, within the meaning of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code.    For the avoidance of doubt, all pre-Effective Date accrued

WEIL:\97193783\2\41703.0011

amounts due under such Assumed Contracts shall be satisfied by the Debtors. All Counterparties who did not timely file an objection to the assumption of the Assumed Contracts in accordance with the Third Amended Plan, Initial Assumption and Assignment Notice, and the Supplemental Assumption Notice are deemed to consent to the assumption by Reorganized RMS of their respective Assumed Contract. To the extent not resolved and/or adjourned at or prior to the Confirmation Hearing, the objections of all Counterparties of Assumed Contracts that did file a timely objection to the assumption of such Counterparties' respective Assumed Contracts relating thereto were heard at the Confirmation Hearing (to the extent not withdrawn), were considered by the Court, and are overruled on the merits with prejudice; provided, however, that to the extent an objection of a Counterparty, or unresolved portion thereof, relates solely to Cure Costs (a "**Cure Dispute**"), RMS or Reorganized RMS, as applicable, may assume the applicable Assumed Contract(s) prior to the resolution of the Cure Dispute, provided, that RMS either (i) reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the applicable Counterparty (or such smaller amount as may be fixed or estimated by the Bankruptcy Court or otherwise agreed to by such Counterparty and RMS), or (ii) with the consent of a Counterparty, such Counterparty shall have an administrative priority claim. The Court finds that with respect to all such Assumed Contracts the payment of the Cure Costs is appropriate and is deemed to fully satisfy RMS's obligations under section 365(b) of the Bankruptcy Code. Accordingly, all of the requirements of sections 1123(b)(2) and 365(b) of the Bankruptcy Code have been satisfied for the assumption by the Debtors of each of the Assumed Contracts.

W.     Notwithstanding anything else contained in this Order, this Court: (a) has not found that the Debtors have demonstrated that the proposed transactions, pursuant to which the Debtors propose to transfer to the Reverse Buyer the servicing and servicing-related rights and

**528**

obligations the Debtors hold with respect to the PLS Trusts[3] (i) will result in the cure of all applicable defaults under the relevant agreements nor (ii) provide the PLS Trustees with adequate assurance of future performance, in each case as required pursuant to section 365 of the Bankruptcy Code, and (b) has, as the date hereof, neither authorized nor approved RMS' rejection of servicing and servicing-related rights with respect to any reverse mortgage that is part of a PLS Trust or otherwise administered by a PLS Trustee, and a hearing on the foregoing matters may be scheduled for a date to be agreed upon by the parties (the "**PLS Hearing**").  In the event the Debtors and the PLS Trustees are able to resolve the foregoing, as well as any other outstanding issues, the Debtors will seek entry of a separate order in respect of such resolution.  If such disputes cannot be resolved, the Debtors may seek a determination by the Court upon adequate notice to be given by the Debtors.

X.    **Surety**.  Notwithstanding any provision in this Order or the Stock and Asset Purchase Agreement, if the Reverse Buyer (and/or any entity acquired by the Reverse Buyer) requires bonds for operations for which Debtors currently have any Bonds posted by Surety, and the Reverse Buyer and Surety have not reached an agreement otherwise, then the Reverse Buyer (or such acquired entity), by the time of closing, will post bonds that replace any and all such Bonds.  The Reverse Buyer has indicated that it may wish to use some of the Bonds or otherwise obtain surety credit from the Surety.  If no agreement between Reverse Buyer and Surety is reached with respect to the use of any Bonds or surety credit from the Surety, and Reverse Buyer is unable to post the aforementioned replacement bonds at the time of closing after using its best efforts,

---

[3]    The Bank of New York Mellon Trust Company, The Bank of New York Mellon, Deutsche Bank National Trust Company, and U.S. Bank National Association, each on its own behalf and in its various capacities as trustee, co-trustee, indenture trustee, registrar, custodian and other agency roles and on behalf of certain affiliates in similar roles are referred to in such capacities, collectively as the "**PLS Trustees**" in connection with certain private label securitization trusts or similar structures (the "**PLS Trusts**").

WEIL:\97193783\2\41703.0011

**529**

then Reverse Buyer will: protect Surety from liability from any loss associated with the use of such Bonds; cause to be issued a letter of credit in favor of Surety by the time of closing on the Reverse Business in the amount of the penal sum of the Bonds not replaced; and is required to continue to use its best efforts to obtain aforementioned replacement bonds. Post-Effective Date, there shall be no transition or interim agreement with respect to the sale of the Reverse Business. From and after the closing of the Reverse Investment Transaction, the Reverse Buyer shall not knowingly destroy any books or records that it may possess which may pertain to any of the obligations of the Debtors and/or their non-debtor affiliates (and Reverse Buyer, to the extent applicable) which relate to the Bonds; and, if the Surety receives a claim under any of the Bonds, any books and/or records that may then be in the possession of the Reverse Buyer related to such claim shall be produced to the Surety upon its written request.

Y.     **Valid and Binding Contract.** The Stock and Asset Purchase Agreement is a valid and binding contract between the Debtors and the Reverse Buyer and shall be enforceable pursuant to its terms. The Stock and Asset Purchase Agreement and Related Agreements were not entered into for the purpose of hindering, delaying or defrauding the Debtors' present or future creditors under the Bankruptcy Code or under laws of the United States, any state, territory, possession or the District of Columbia. None of the Debtors or the Reverse Buyer is, or will be, entering into the Stock and Asset Purchase Agreement and transactions contemplated therein fraudulently (including with respect to statutory or common law fraudulent conveyance or fraudulent transfer claims, whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing) or for an otherwise improper purpose. The Stock and Asset Purchase Agreement and the Reverse Investment Transaction itself, and the

consummation thereof shall be specifically enforceable against and binding upon (without posting any bond) the Debtors, and any chapter 7 or chapter 11 trustee appointed in the Chapter 11 Cases, and shall not be subject to rejection or avoidance by the foregoing parties or any other Person.

Z.    **Unenforceability of Anti-Assignment Provisions.**    Anti-assignment provisions in any Assumed Contract—including any provisions requiring rating agency confirmation, "no downgrade" letters, any other third party consent, or of the type described in sections 365(b)(2), (e)(1), and (f) of the Bankruptcy Code—shall not restrict, limit, or prohibit the assumption, assignment, and sale of the Assumed Contracts and are unenforceable anti-assignment provisions in connection with the Reverse Investment Transaction within the meaning of section 365(f) of the Bankruptcy Code.

AA.    **Final Order.**    This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.    **Approval.**    Pursuant to sections 1123(b)(4) and 1141(c) of the Bankruptcy Code, the issuance, sale and/or transfer (as applicable) of the Reorganized RMS Stock to the Reverse Buyer in accordance with the terms of the Third Amended Plan and the Stock and Asset Purchase Agreement and the Related Agreements, and all transactions contemplated thereby, and all of the terms and conditions thereof, are authorized and approved.  The failure to specifically reference any particular provision of the Stock and Asset Purchase Agreement or any of the Related Agreements in this Order shall not diminish or impair the efficacy of such provision, it being the intent of this Court that the Stock and Asset Purchase Agreement, the Related Agreements and all other material agreements or arrangements entered into by the Reverse Buyer

WEIL:\97193783\2\41703.0011

and the Debtors in connection with the Reverse Investment Transaction, and each and every provision, term, and condition thereof be authorized and approved in its entirety.

2.    **Fair Purchase Price**.  The consideration provided by the Reverse Buyer under the Stock and Asset Purchase Agreement is fair and reasonable and constitutes (i) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act, (ii) fair consideration under the Uniform Fraudulent Conveyance Act, and (iii) reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession or the District of Columbia.

3.    **Consummation of the Reverse Investment Transaction.**  The Debtors, their affiliates and their respective officers, employees and agents, are authorized to execute and deliver, and empowered to perform under, consummate, and implement, the Stock and Asset Purchase Agreement, the Related Agreements and all additional instruments and documents that the Debtors or the Reverse Buyer deem necessary or appropriate to implement the Stock and Asset Purchase Agreement or the Related Agreements and effectuate the issuance, sale and/or transfer of the Reorganized RMS Stock to the Reverse Buyer, and to take all further actions as may be reasonably required by the Reverse Buyer for the purpose of issuing, assigning, transferring, granting, and conveying to and conferring on (as applicable) to the Reverse Buyer, the Reorganized RMS Stock, the RMS Assets, and assumption of the Assumed Liabilities or as may be necessary or appropriate to the performance of the parties' obligations under the Stock and Asset Purchase Agreement, Related Agreements, the Third Amended Plan, and this Order, including any and all actions reasonably requested by the Reverse Buyer that are consistent with the Stock and Asset Purchase Agreement, the Related Agreements and any and all instruments and documents entered

into in connection therewith shall be deemed authorized, approved, and consummated, all without further order of the Court.

4.    **Surrender of Possession.**  All Persons that are currently in possession of some or all of the RMS Assets are hereby directed to surrender possession of such RMS Assets to Reorganized RMS as of the Closing or at such later time as the Reverse Buyer or Reorganized RMS reasonably requests.  To the extent required by the Stock and Asset Purchase Agreement, the Debtors agree to exercise commercially reasonable efforts to assist Reorganized RMS in assuring that all Persons that are presently, or on the Closing Date may be, in possession of some or all of the RMS Assets will surrender possession of the RMS Assets to either (i) the Debtors before the Closing Date or (ii) Reorganized RMS on or after the Closing Date.

5.    **Direction to Release Liens.**  As of the Effective Date, each of RMS's creditors and any holder of a Lien, including rights or Claims based on any successor or transferee liability, is authorized and directed to execute such documents and take all other actions as may be necessary to release its Lien on or against the RMS Assets, if any, as such Lien may have been recorded or may otherwise exist.  If any Person that has filed financing statements, mortgages, mechanic's liens, *lis pendens* or other documents or agreements evidencing Liens or Claims against or in the Debtors or the RMS Assets owned by the Debtors shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or, as appropriate, releases of all Liens and Claims (collectively, the "**Release Documents**") the Person has with respect to the Debtors or Reorganized RMS or otherwise: (i) the Debtors are hereby authorized and directed to, and the Reverse Buyer or Reorganized RMS is hereby authorized to, execute and file such statements, instruments, releases and other documents on behalf of the person with respect to the RMS Assets;

**533**

(ii) the Reverse Buyer or Reorganized RMS is hereby authorized to file, register or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Claims and Liens against Reorganized RMS; and (iii) the Reverse Buyer or Reorganized RMS may seek in this Court or any other court to compel appropriate persons to execute termination statements, instruments of satisfaction, and releases of all Liens and Claims with respect to Reorganized RMS other than liabilities expressly assumed under the Stock and Asset Purchase Agreement, or as set forth in Sections 4.6(b) or 5.6(d) of the Third Amended Plan; provided that, notwithstanding anything in this Order or the Stock and Asset Purchase Agreement to the contrary, the provisions of this Order shall be self-executing, and neither the Sellers nor Reverse Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Order. This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, county or local government agency, department or office.

6. **Direction to Government Agencies.** This Order is and shall be binding upon and govern the acts of all persons, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrar of patents, trademarks, or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal, state, county and local officials, and all other persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease (all such entities being referred to as "**Recording Officers**"). Each and every Recording Officer is authorized and specifically directed, from and

WEIL:\97193783\2\41703.0011

after the Effective Date, to strike all recorded Claims, Interests, Liens, or other encumbrances in, on or against Reorganized RMS (other than the Assumed Liabilities, the Permitted Liens, or as provided in Sections 4.6(b) or 5.6(d) of the Third Amended Plan) and/or RMS Assets from their records, official or otherwise without further order of the Court or act of any party. A certified copy of this Order may be filed with the appropriate Recording Officers to evidence cancellation of any recorded Claims recorded prior to the date of this Order. All Recording Officers are hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Stock and Asset Purchase Agreement, and to accept and rely on this Order as the sole and sufficient evidence of the issuance of the Reorganized RMS Stock to the Reverse Buyer.

7.     **No Discriminatory Treatment.**  To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of Reorganized RMS on account of the filing or pendency of the Chapter 11 Cases or the consummation of the transactions contemplated by the Stock and Asset Purchase Agreement.

8.     **The Reverse Investment Transaction is Not Subject to Section 363(o) of the Bankruptcy Code**.  The Reverse Investment Transaction is not and shall not be deemed or construed to be a sale pursuant to section 363 of the Bankruptcy Code, and section 363(o) of the Bankruptcy Code does not and shall not be deemed or construed to apply to the Reverse Investment Transaction.

9.     **Issuance of Reorganized RMS Stock Free and Clear**.  On the Effective Date, in accordance with the Stock and Asset Purchase Agreement, the Third Amended Plan, and this Order, the Reorganized RMS Stock shall be issued to the Reverse Buyer free and clear of all

Claims, Interests, Liens, and encumbrances to the maximum extent permitted by section 1141(c) of the Bankruptcy Code.  On the Effective Date, Reorganized RMS shall be discharged of all claims (including Intercompany Claims) and liabilities to the fullest extent allowed by section 1141 of the Bankruptcy Code, except with respect to the Assumed Liabilities, or as provided in Sections 4.6(b) or 5.6(d) of the Third Amended Plan.

10.     Pursuant to section 1141(c) of the Bankruptcy Code, all Persons are forever prohibited and enjoined from taking any action against Reorganized RMS or the Reverse Buyer (or any of their respective property, Affiliates, successors and assigns) based on any Claims, Interests, Liens, and other encumbrances (other than Assumed Liabilities or as provided in Sections 4.6(b) or 5.6(d) of the Third Amended Plan) to the extent such Claims, Interests, Liens, and other encumbrances are released or discharged pursuant to the terms of the Third Amended Plan; provided that the foregoing restriction shall not prevent any party from appealing this Order in accordance with applicable law or opposing any appeal of this Order.

11.     **No Successor or Other Derivative Liability**.  By virtue of the Reverse Investment Transaction, the Reverse Buyer and its affiliates, successors and assigns shall not be deemed or considered to:  (i) be a legal successor, or otherwise be deemed a successor to any of the Debtors; (ii) have, *de facto* or otherwise, merged with or into any or all Debtors; (iii) be consolidated with the Debtors or their Estates; or (iv) be an alter ego or a continuation or substantial continuation, or be holding itself out as a mere continuation, of any of the Debtors or their respective Estates, businesses or operations, or any enterprise of the Debtors, in each case by any law or equity, and the Reverse Buyer has not assumed nor is in any way responsible for any liability or obligation of the Debtors or the Debtors' Estates, except with respect to the Assumed Liabilities or as provided in Sections 4.6(b) or 5.6(d) of the Third Amended Plan.  Except as

WEIL:\97193783\2\41703.0011

expressly set forth in the Stock and Asset Purchase Agreement, the Reverse Buyer and its affiliates, successors and assigns shall have no successor, transferee or vicarious liability of any kind or character, including, without limitation, under any theory of foreign, federal, state or local antitrust, environmental, successor, tax, ERISA, assignee or transferee liability, labor, product liability, employment, *de facto* merger, substantial continuity, or other law, rule, regulation or doctrine, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Debtors or any obligations of the Debtors arising prior to the Effective Date, including, without limitation, liabilities on account of any taxes or other Governmental Authority fees, contributions or surcharges, in each case arising, accruing or payable under, out of, in connection with, or in any way relating to, the operation of RMS or the RMS Assets prior to the Closing Date or arising based on actions of the Debtors taken after the Closing Date.

12.    Except as provided in Sections 4.6(b) or 5.6(d) of the Third Amended Plan or as expressly set forth herein or in the Stock and Asset Purchase Agreement, Reorganized RMS and the Reverse Buyer and their respective successors, Affiliates, and assigns shall have no liability for any Claim against the Debtors, the Debtors' Estates, or Excluded Liabilities, whether known or unknown as of the Effective Date, now existing or hereafter arising, whether fixed or contingent, whether derivatively, vicariously, as a transferee, successor, alter ego, or otherwise, of any kind, nature or character whatsoever, by reason of any theory of law or equity, including Claims or Excluded Liabilities arising under, without limitation: (i) any employment or labor agreements or the termination thereof relating to the Debtors; (ii) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of or related to any of the Debtors or any Debtor's affiliates

WEIL:\97193783\2\41703.0011

or predecessors or any current or former employees of any of the foregoing, including, without limitation, the Employee Plans and any participation or other agreements related to the Employee Plans, or the termination of any of the foregoing; (iii) the Debtors' business operations or the cessation thereof; (iv) any litigation involving one or more of the Debtors; and (v) any employee, workers' compensation, occupational disease or unemployment or temporary disability related law, including, without limitation, claims that might otherwise arise under or pursuant to:  (A) the Employee Retirement Income Security Act of 1974, as amended; (B) the Fair Labor Standards Act; (C) Title VII of the Civil Rights Act of 1964; (D) the Federal Rehabilitation Act of 1973; (E) the National Labor Relations Act; (F) the Worker Adjustment and Retraining Notification Act of 1988; (G) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended; (H) the Americans with Disabilities Act of 1990; (I) the Consolidated Omnibus Budget Reconciliation Act of 1985; (J) the Multiemployer Pension Plan Amendments Act of 1980; (K) state and local discrimination laws; (L) state and local unemployment compensation laws or any other similar state and local laws; (M) state workers' compensation laws; (N) any other state, local or federal employee benefit laws, regulations or rules or other state, local or federal laws, regulations or rules relating to, wages, benefits, employment or termination of employment with any or all Debtors or any predecessors; (O) any antitrust laws; (P) any product liability or similar laws, whether state or federal or otherwise; (Q) any environmental laws, rules, or regulations, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, et seq., or similar state statutes; (R) PACA; (S) any bulk sales or similar laws; (T) any federal, state or local tax statutes, regulations or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; (U) the Claims or Liabilities relating to conduct prior to Closing brought by a

consumer borrower against any Debtor for the violation of (i) The Real Estate Settlement Procedures Act of 1974 (RESPA) (12 U.S.C. § 2601 et seq.), (ii) The Fair Credit Reporting Act (15 U.S.C. § 1681), (iii) The Truth in Lending Act (12 C.F.R. § 1026), (iv) The Fair Debt Collection Practices Act (15 U.S.C. §§ 1692–1692p), and (v) any and all state law equivalents of the foregoing clauses (i) through (iv); (V) any other Claim or Cause of Action for fraudulent inducement of a consumer borrower to enter into a loan; and (W) any common law doctrine of *de facto* merger or successor or transferee liability, successor-in-interest liability theory or any other theory of or related to successor liability.

13.  **Not an Insider.**  As of the date hereof, the Reverse Buyer is not an "insider" or "affiliate" of the Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders existed between the Debtors and the Reverse Buyer.

14.  **Assumption of Assumed Contracts.**  Pursuant to sections 1123(b)(2) and 365 of the Bankruptcy Code and subject to and conditioned upon the confirmation of the Third Amended Plan, the Debtors are hereby authorized to assume the Assumed Contracts.  With respect to each of the Assumed Contracts, the Debtors, in accordance with the provisions of the Third Amended Plan and Stock and Asset Purchase Agreement, have cured or will cure before the Effective Date, or have provided adequate assurance of the prompt cure after the Effective Date of, any monetary default required to be cured with respect to the Assumed Contracts under sections 1123(b)(2) and  365(b)(1) of the Bankruptcy Code, and the Reverse Buyer has provided adequate assurance of Reorganized RMS's future performance under the Assumed Contracts in satisfaction of sections 1123(b)(2), 365(b), and 365(f) of the Bankruptcy Code to the extent that any such assurance is required and not waived by the Counterparty to such Assumed Contracts.

**539**

15.     The Debtors served all Counterparties to the Assumed Contracts with the Initial Assumption and Assignment Notice, and the Supplemental Assumption Notice, and the deadline to object to the Cure Costs and adequate assurance of future performance has passed. Accordingly, unless an objection to the proposed Cure Costs or adequate assurance information was filed and served before the applicable deadline, each Counterparty to an Assumed Contract is forever barred, estopped and permanently enjoined from asserting against the Debtors, Reorganized RMS, or the Reverse Buyer, their Affiliates, successors or assigns or the property of any of them, any default existing as of the date of the Confirmation Hearing if such default was not raised or asserted prior to or at the Confirmation Hearing.

16.     All of the requirements of sections 1123(b)(2), 365(b), and 365(f), including without limitation, the demonstration of adequate assurance of future performance and Cure Costs required under the Bankruptcy Code have been satisfied for the assumption of the Assumed Contracts by Reorganized RMS.

17.     To the extent a Counterparty to an Assumed Contract failed to timely object to a Cure Cost, such Cure Cost has been and shall be deemed to be finally determined as of the Debtors' filing of the Supplemental Assumption Notice and any such Counterparty shall be barred, and forever prohibited from challenging, objecting to or denying the validity and finality of the Cure Cost as of such dates.

18.     Except as otherwise specifically provided for by order of this Court, upon the assumption of the Assumed Contracts under the provisions of this Order, no default shall exist under any Assumed Contracts, and no Counterparty to any Assumed Contracts shall be permitted to declare a default by any Debtor, Reorganized RMS or the Reverse Buyer or otherwise take action against Reorganized RMS or the Reverse Buyer (or any of their respective property,

Affiliates, successors and assigns) as a result of any Debtor's financial condition, bankruptcy or failure to perform any of its obligations under the relevant Assumed Contract. The failure of the Debtors, Reorganized RMS, or the Reverse Buyer to enforce at any time one or more terms or conditions of any Assumed Contract shall not be a waiver of such terms or conditions, or of the Debtors', Reorganized RMS's, and the Reverse Buyer's rights to enforce every term and condition of the Assumed Contract.

19.    Nothing contained in this Order or the Reverse Investment Transaction is intended to relieve the Reverse Buyer from the servicer's indemnification obligations to the PLS Trustees under the applicable provisions in the Assumed Contracts that provide indemnification to the PLS Trustees for losses, liabilities and expenses in connection with the performance of their obligations and the exercise of their rights under the Assumed Contracts arising after the Effective Date.

20.    **No Avoidance of Stock and Asset Purchase Agreement.** Neither the Debtors nor the Reverse Buyer have engaged in any conduct that would cause or permit the Stock and Asset Purchase Agreement to be avoided or costs or damages to be imposed. Accordingly, the Stock and Asset Purchase Agreement and the Reverse Investment Transaction shall not be avoidable under chapter 5 of the Bankruptcy Code, and no party shall be entitled to any damages or other recovery under the Bankruptcy Code in respect of the Stock and Asset Purchase Agreement or the Reverse Investment Transaction.

21.    **Modification of Stock and Asset Purchase Agreement**. The Stock and Asset Purchase Agreement and Related Agreements, documents or other instruments executed in connection therewith, may be modified, amended or supplemented by the parties thereto, in a writing signed by each party, and in accordance with the terms thereof, without further order of

WEIL:\97193783\2\41703.0011

the Court; <u>provided</u>, that any such modification, amendment or supplement does not materially change the terms of the Stock and Asset Purchase Agreement or Related Agreements, documents or other instruments or have any adverse effect on the Debtors' Estates.

22.    **No Stay of Order.**  This Order shall be effective immediately upon entry, and the Debtors and the Reverse Buyer are authorized to close the Reverse Investment Transaction immediately upon entry of this Order.  Time is of the essence in closing the Reverse Investment Transaction in accordance with the terms of the Stock and Asset Purchase Agreement, and the Debtors and the Reverse Buyer intend to close the Reverse Sale Transaction as soon as practicable. Any party objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay or risk its appeal being foreclosed as moot.

23.    **Releases**.  Upon entry of this Order approving the Reverse Investment Transaction contemplated by the Stock and Asset Purchase Agreement, except for the rights and obligations of the Debtors or the Reverse Buyer under the Stock and Asset Purchase Agreement and the Related Agreements, in connection with the Stock and Asset Purchase Agreement and for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the Reverse Buyer's payment of the Purchase Price under the Stock and Asset Purchase Agreement:

(a)    the Debtors and their controlled Affiliates, on behalf of themselves and, to the extent applicable, their Estates, shall and shall be deemed to fully, finally, and completely remise, release, acquit, and forever discharge the Reverse Buyer Parties[4] and its

---

[4]    "**Reverse Buyer Parties**" means Mortgage Assets Management, LLC, SHAP 2018-1, LLC, Reorganized RMS, and each of its and their respective parents, Affiliates, subsidiaries, managers, limited liability companies, special purpose vehicles, partnerships, joint ventures, and other related business entities, and each of its and their respective current or former parents, Affiliates, subsidiaries, managers, limited liability companies, special purpose vehicles, partnerships, joint ventures, other related business entities, principals, partners, shareholders, officers, directors, partners, employees, agents, insurers, attorneys, accountants, financial advisors, investment bankers, consultants, any other professionals, any other representatives or advisors, and any and all persons who

respective property of and from any and all claims, causes of action, obligations, rights, suits, judgments, remedies, interests, actions, liabilities, demands, duties, injuries, damages, expenses, fees, or costs of whatever kind or nature (including attorney's fees and expenses), whether liquidated or unliquidated, foreseen or unforeseen, actual or alleged, known or unknown, asserted or unasserted, fixed or contingent, matured or unmatured, existing or having arisen up to and including the signing of the Stock and Asset Purchase Agreement, whether in contract, tort, or otherwise, whether statutory, at common law, or in equity, arising out of, based upon, or relating in any way, in whole or in part, whether through a direct claim, derivative claim, cross-claim, third-party claim, subrogation claim, class action, or otherwise, to (i) the pursuit, negotiation, documentation, execution, or implementation of the Stock and Asset Purchase Agreement and the Related Agreements, or (ii) the Debtors' chapter 11 cases (collectively, the "**Ditech Released Claims**");

(b)    The Reverse Buyer and any of its respective Affiliates shall and shall be deemed to fully, finally, and completely remise, release, acquit, and forever discharge the Debtor Parties[5] and their respective property of and from any and all claims, causes of action, obligations, rights, suits, judgments, remedies, interests, actions, liabilities, demands, duties, injuries, damages, expenses, fees, or costs of whatever kind or nature (including attorney's fees

---

control any of the foregoing entities, as well as any predecessors-in-interest of any of the foregoing entities and any of the successors and assigns of any of the foregoing entities (each solely in its capacity as such).

[5]    "**Debtor Parties**" means the Debtors and their Estates (to the extent applicable), and each of its and their respective parents, Affiliates, subsidiaries, managers, limited liability companies, special purpose vehicles, partnerships, joint ventures, and other related business entities, and each of its and their respective current or former parents, Affiliates, subsidiaries, managers, limited liability companies, special purpose vehicles, partnerships, joint ventures, other related business entities, principals, partners, shareholders, officers, directors, partners, employees, agents, insurers, attorneys, accountants, financial advisors, investment bankers, consultants, any other professionals, any other representatives or advisors, and any and all persons who control any of the foregoing entities, as well as any predecessors-in-interest of any of the foregoing entities and any of the successors and assigns of any of the foregoing entities (each solely in its capacity as such).

WEIL:\97193783\2\41703.0011

and expenses), whether liquidated or unliquidated, foreseen or unforeseen, actual or alleged, known or unknown, asserted or unasserted, fixed or contingent, matured or unmatured, existing or having arisen up to and including the signing of the Stock and Asset Purchase Agreement, whether in contract, tort, or otherwise, whether statutory, at common law, or in equity, whether through a direct claim, derivative claim, cross-claim, third-party claim, subrogation claim, class action, or otherwise, to (i) the pursuit, negotiation, documentation, execution, or implementation of the Stock and Asset Purchase Agreement and the Related Agreements, except as expressly set forth therein, or (ii) the Debtors' chapter 11 cases (the foregoing released claims, collectively, the "**Reverse Buyer Released Claims**");

(c)       the Debtors, their controlled Affiliates, and, to the extent applicable, their Estates shall be, and shall be deemed to be, permanently and forever barred, estopped, stayed, and enjoined from: (i) pursuing any Ditech Released Claim against the Reverse Buyer Parties; (ii) continuing or commencing any action or other proceeding with respect to any Ditech Released Claim against the Reverse Buyer Parties; (iii) seeking the enforcement, attachment, collection, or recovery of any judgment, award, decree, or order against the Reverse Buyer Parties or property of the Reverse Buyer Parties with respect to any Ditech Released Claim; (iv) creating, perfecting, or enforcing any encumbrance of any kind against the Reverse Buyer Parties or the property of the Reverse Buyer Parties with respect to any Ditech Released Claim; and (v) asserting any right of setoff, subrogation, or recoupment of any kind against any obligations due to the Reverse Buyer Parties with respect to any Ditech Released Claim; and

(d)       The Reverse Buyer Parties and its respective Affiliates shall be, and shall be deemed to be, permanently and forever barred, estopped, stayed, and enjoined from: (i) pursuing any Reverse Buyer Released Claim against the Debtor Parties; (ii) continuing or

WEIL:\97193783\2\41703.0011

commencing any action or other proceeding with respect to any Reverse Buyer Released Claim against the Debtor Parties; (iii) seeking the enforcement, attachment, collection, or recovery of any judgment, award, decree, or order against the Debtor Parties or property of the Debtor Parties with respect to any Reverse Buyer Released Claim; (iv) creating, perfecting, or enforcing any encumbrance of any kind against the Debtor Parties or the property of the Debtor Parties with respect to any Reverse Buyer Released Claim; and (v) asserting any right of setoff, subrogation, or recoupment of any kind against any obligations due to the Debtor Parties with respect to any Reverse Buyer Released Claim.

(e)     Notwithstanding anything in this paragraph 23 or any Confirmation and Sale Documents, nothing in the Confirmation and Sale Documents shall affect or limit in any way any defenses or claim held by a Borrower against the Reverse Buyer or any third party or their affiliates or assigns for pre-existing liability that the Reverse Buyer or any third party would otherwise have to such Borrower had the Reverse Buyer not acquired the Acquired Assets.

Dated: September 26, 2019
New York, New York


/s/ *James L. Garrity, Jr.*
_____

Honorable James L. Garrity, Jr.
United States Bankruptcy Judge

WEIL:\97193783\2\41703.0011

**545**

<u>**SCHEDULE 2**</u>

**Asset Purchase Agreement[1]**

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.      <u>**Findings of Fact and Conclusions of Law**</u>.  The findings and conclusions set forth in this Order constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable herein by Bankruptcy Rules 7052 and 9014.  To the extent any findings of fact constitute conclusions of law, or any conclusions of law constitute findings of fact, they are adopted as such.

B.      <u>**Jurisdiction**</u>.  This Court has jurisdiction over the sale of the Acquired Assets from Debtors Ditech Holding Corporation and Ditech Financial LLC (together, the "**Sellers**") to the Forward Buyer and the assumption of the Assumed Liabilities by the Forward Buyer (the "**Forward Sale Transaction**") pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N).

C.      <u>**Notice and Opportunity to Object**</u>.  As evidenced by the affidavits and certificates of service and publication notice previously filed with the Court, due, proper, timely, adequate, and sufficient notice of the Bidding Procedures Motion, the Bidding Procedures Order, the Bidding Procedures, the Sale Transaction, including the Forward Sale Transaction, the Asset Purchase Agreement, the *Notice of Designation of Stalking Horse Bid and Request for Approval of Stalking Horse Bid Protections (Forward Business)* [ECF No. 722], the *Notice of Cure Costs and Potential Assumption or Assumption and Assignment of Executory Contracts and Unexpired Leases of Debtors* [ECF No. 824], the *Supplemental Notice of Cure Costs and Potential*

---

[1]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Third Amended Plan, the Asset Purchase Agreement, or the Bidding Procedures Order, as applicable, or as the context otherwise requires.

**546**

*Assumption or Assumption and Assignment of Executory Contracts and Unexpired Leases of Debtors* [ECF No. 834], the *Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases of Debtors (Forward Buyer)* [ECF No. 840] (the "**Initial Assumption and Assignment Notice**"), *Supplemental Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases of Debtors and Removal of Executory Contracts and Unexpired Leases from Initial Notice (Forward Buyer)* [ECF No. 1014] (the "**Supplemental Assumption and Assignment Notice**"), *Second Supplemental Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases of Debtors and Removal of Executory Contracts and Unexpired Leases from Initial Notice (Forward Buyer)* [ECF No. 1099] (the "**Final Assumption and Assignment Notice**"), the Third Amended Plan, and the Confirmation Hearing have been provided in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Case Management Order, the Disclosure Statement Order, and Bidding Procedures Order to all interested Persons and Entities.

D.     **Title to the Acquired Assets**.  Subject to Sections 4.6(b) and 5.6(d) of the Third Amended Plan, the Acquired Assets are owned by the Debtors and constitute property of the Debtors' Estates, and good title is presently vested in the Debtors' Estates within the meaning of section 541(a) of the Bankruptcy Code.[2]  Except as provided in the Asset Purchase Agreement and subject to Sections 4.6(b) and 5.6(d) of the Third Amended Plan, the Debtors are the sole and rightful owners of the Acquired Assets, with all right, title and interest to transfer and convey the

---

[2]     Pursuant to the DIP Facilities, certain of the Acquired Assets consisting of mortgage loans originated or acquired by the Debtors are currently subject to "repurchase agreements" as defined under Section 101(47) of the Bankruptcy Code.

2

WEIL:\97193817\2\41703.0011

Acquired Assets to the Forward Buyer, and no other Person or Entity has any ownership right, title, or interest therein.

E.    **Extensive Efforts by Debtors**.  As of the Commencement Date and for a period of more than nine months preceding the Commencement Date, the Debtors, with the assistance of their counsel and other advisors, evaluated strategic alternatives including extensive marketing efforts.  The Debtors have presented credible evidence that they explored various strategic alternatives for the Debtors' businesses over an extended period of time and communicated with numerous parties regarding, among other potential transactions, a possible sale of all or substantially all of the Debtors' assets.  The Forward Sale Transaction is the result of the Debtors' extensive efforts in seeking to maximize recoveries to the Debtors' Estates for the benefit of creditors.

F.    **Business Justification**.  The Debtors have demonstrated compelling circumstances and good, sufficient and sound business purposes and justifications for this Court to approve the Forward Sale Transaction, the Asset Purchase Agreement, and the Related Agreements pursuant to sections 1123(a)(5), 1123(b) and 1141(c) of the Bankruptcy Code.  In light of the circumstances of these Chapter 11 Cases and the risk of deterioration in the going concern value of the Acquired Assets pending consummation of the Forward Sale Transaction, time is of the essence in (i) consummating the Forward Sale Transaction, (ii) preserving the value of the Acquired Assets and the viability of the Debtors' businesses as going concerns, and (iii) minimizing the widespread and adverse economic consequences for the Debtors, their Estates, and their creditors and employees.  The Debtors' entry into and performance under the Asset Purchase Agreement: (x) are a result of due deliberation by the Debtors and constitute a sound and reasonable exercise of the Debtors' business judgment consistent with their fiduciary duties;

WEIL:\97193817\2\41703.0011

(y) provide value to and are beneficial to the Debtors' Estates, and are in the best interests of the Debtors and their Estates, creditors and other parties in interest; and (z) are reasonable and appropriate under the circumstances.

G.    **Compliance with Bidding Procedures**.  The Bidding Procedures were substantively and procedurally fair to all Persons, including all potential bidders.  The Bidding Procedures afforded adequate notice and a full, fair, and reasonable opportunity for any Person or Entity to make a higher or otherwise better offer to purchase the Acquired Assets.  The Debtors, the Forward Buyer and their respective counsel and other advisors have complied with the Bidding Procedures and Bidding Procedures Order in all respects.

H.    **Adequate Marketing; Highest or Best Offer**.    Other than the Asset Purchase Agreement, no Qualified Bids for the Acquired Assets were received by the Debtors before the Bid Deadline.  The Debtors cancelled the Auction in accordance with the Bidding Procedures Order and, on July 10, 2019, caused the *Notice of (I) Cancellation of Auction, (II) Sale and Confirmation Objection Deadline, and (III) Successful Bidders* [ECF No. 830] to be filed with the Court identifying the Forward Buyer as the Successful Bidder in accordance with the Bidding Procedures.  As demonstrated by (i) the testimony and other evidence proffered or adduced at the Confirmation Hearing, and (ii) the representations of counsel made on the record at the Confirmation Hearing, (a) the Debtors and their advisors have adequately marketed the Acquired Assets and conducted the marketing and sale process in compliance with the Bidding Procedures and the Bidding Procedures Order; (b) full, fair, and reasonable opportunity was given to all Persons and Entities to make a higher or otherwise better offer to purchase the Acquired Assets; (c) no Person or Entity, other than the Forward Buyer, timely submitted a Qualified Bid in accordance with the Bidding Procedures Order; (d) the Forward Buyer submitted the highest and

4

best bid for the Acquired Assets and was properly designated as the Successful Bidder; (e) the consideration provided by the Forward Buyer under the Asset Purchase Agreement constitutes the highest and best offer for the Acquired Assets; (f) the consideration provided by the Forward Buyer for the Acquired Assets under the Asset Purchase Agreement is reasonably equivalent value, fair consideration and fair value for the Acquired Assets under the Bankruptcy Code; (g) the consideration provided by the Forward Buyer for the Acquired Assets under the Asset Purchase Agreement is reasonably equivalent value and fair consideration under the Uniform Fraudulent Transfer Act and the Uniform Fraudulent Conveyance Act, respectively; (h) taking into consideration all relevant factors and circumstances, the Forward Sale Transaction will provide a greater recovery for the Debtors' creditors than would be provided by any other practically available alternative, including liquidation under chapters 7 or 11 of the Bankruptcy Code; (i) no other Person or Entity has offered to purchase the Acquired Assets for greater economic or non-economic value to the Debtors or their Estates; and (j) the Debtors' determination that the Forward Sale Transaction and the Asset Purchase Agreement constitutes the highest and best offer for the Acquired Assets constitutes a valid, sound and reasonable exercise of the Debtors' business judgment.

I.      **Good Faith; No Collusion**.  The Asset Purchase Agreement and all aspects of the Forward Sale Transaction were negotiated, proposed, and entered into by the Debtors and the Forward Buyer and each of their management, board of directors or equivalent governing body, officers, directors, employees, agents, members, managers and representatives, in good faith, without collusion or fraud, and from arm's-length bargaining positions.  The Forward Buyer is a "good faith purchaser" of the Acquired Assets.  The Forward Buyer has proceeded in good faith in all respects in that, among other things: (i) the Forward Buyer has recognized that the Debtors

were free to deal with any other Person or Entity in connection with the marketing and sale of the Acquired Assets; (ii) the Forward Buyer has complied with the applicable provisions of the Bidding Procedures Order in all respects; (iii) the Forward Buyer's bid was subjected to competitive Bidding Procedures as set forth in the Bidding Procedures Order; and (iv) all payments to be made by the Forward Buyer under the Asset Purchase Agreement, the Related Agreements and all other material agreements or arrangements entered into by the Forward Buyer and the Debtors in connection with the Forward Sale Transaction have been disclosed and are reasonable and appropriate.  The Purchase Price was not controlled by any agreement among potential bidders and neither the Debtors nor the Forward Buyer, nor any affiliate of the Forward Buyer, have engaged in collusion or fraud.  Specifically, the Forward Buyer has not acted in a collusive manner with any Person or Entity.

J.    **Opportunity to Object**.  In compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Case Management Order, the Disclosure Statement Order, and the Bidding Procedures Order, a fair and reasonable opportunity to object or be heard with respect to the Third Amended Plan, the Forward Sale Transaction, and the Asset Purchase Agreement have been afforded to all interested Persons and Entities, including, without limitation, the Objection Notice Parties.

K.    **Sale in Best Interests**.  The actions represented to have been taken, or to be taken, by the Sellers and the Forward Buyer are appropriate under the circumstances of these Chapter 11 Cases and are in the best interests of the Debtors, their Estates, creditors, and all other

WEIL:\97193817\2\41703.0011

parties in interest.  Approval of the Asset Purchase Agreement and of the Forward Sale Transaction

is in the best interests of the Debtors, their Estates, creditors, and all other parties in interest.

L.      **Prompt Consummation**.  The Asset Purchase Agreement and the Forward

Sale Transaction must be approved and consummated as promptly as practicable in order to

preserve the value of the Acquired Assets and the viability of the business to which the Acquired

Assets relate as a going concern.

M.      **Corporate Authority**.  Each of the Sellers (i) has full organizational power

and authority to execute the Asset Purchase Agreement, the Related Agreements, and all other

documents contemplated thereby, and the Forward Sale Transaction has been duly and validly

authorized by all necessary organizational action of each of the applicable Debtors, (ii) has all of

the organizational power and authority necessary to consummate the transactions contemplated by

the Asset Purchase Agreement, the Related Agreements, and all other documents contemplated

thereby, (iii) has taken all organizational action necessary to authorize and approve the Asset

Purchase Agreement, the Related Agreements, and all other documents contemplated thereby and

the consummation by the Debtors of the Forward Sale Transaction, and (iv) needs no consents or

approvals, other than those expressly provided for in the Asset Purchase Agreement and the

Related Agreements, from any other Person or Entity to consummate the Forward Sale

Transaction.

N.      **Binding and Valid Transfer**.  The transfer of the Acquired Assets to the

Forward Buyer will be a legal, valid, and effective transfer of the Acquired Assets and, except for

the Assumed Liabilities, the Permitted Liens, or as provided in Sections 4.6(b) or 5.6(d) of the

Third Amended Plan, will vest the Forward Buyer with all right, title, and interest of the Sellers in

and to the Acquired Assets free and clear of all Liens[3] of any kind or nature whatsoever, including, without limitation, rights or claims based on any successor or transferee liability; provided, however, that, nothing in this Order shall be deemed or construed as a ruling or determination by this Court that the Assumed Liabilities encumber the Acquired Assets.

      O.    **Section 363(o) of the Bankruptcy Code**.  The Forward Buyer would not have entered into the Asset Purchase Agreement and would not consummate the Forward Sale Transaction if the sale of the Acquired Assets was not free and clear of all Liens, including, without limitation, if the Forward Buyer would, or in the future could, be liable for any claims that are the subject of section 363(o) of the Bankruptcy Code, except as provided under Sections 4.6(b) or 5.6(d) of the Third Amended Plan.

      P.    The Purchase Price was calculated in a manner consistent with the Forward Buyer's reliance on this Order to vest the Forward Buyer with all right, title and interest in and to the Acquired Assets free and clear of all Claims, including, without limitation, any claims that are the subject of section 363(o) of the Bankruptcy Code.  For the avoidance of doubt, notwithstanding any other provisions of the (i) Order (including the Schedules), (ii) the Third Amended Plan, (iii) the Plan Supplement, (iv) the Sale Transactions (including any order or purchase agreements

---

[3]    The Asset Purchase Agreement defines (i) "**Lien**" as any mortgage, pledge, lien, charge, deed of trust, Claim, lease, security interest, option, right of first refusal, easement, security agreement or other encumbrance or restriction on the use or transfer of any property; provided, however, that "Lien" shall not be deemed to include any license, covenant or other right to or under Intellectual Property; and (ii) "**Claims**" as all claims, defenses, cross claims, counter claims, debts, suits, remedies, liabilities, demands, rights, obligations, damages, expenses, rights to refunds, reimbursement, recovery, indemnification or contribution, attorneys' or other professionals' fees and causes of action whatsoever, whether based on or sounding in or alleging (in whole or in part) tort, contract, negligence, gross negligence, strict liability, bad faith, contribution, subrogation, respondeat superior, violations of federal or state securities laws, breach of fiduciary duty, any other legal theory or otherwise, whether individual, class, direct or derivative in nature, liquidated or unliquidated, fixed or contingent, whether at law or in equity, whether based on federal, state or foreign law or right of action, foreseen or unforeseen, mature or not mature, known or unknown, disputed or undisputed, accrued or not accrued, contingent or absolute (including all causes of action arising under Sections 510, 544 through 551 and 553 of the Bankruptcy Code or under similar state Laws, including fraudulent conveyance claims, and all other causes of action of a trustee and debtor-in-possession under the Bankruptcy Code) or rights of set-off.

related thereto), and (v) any amended versions of the foregoing (the "**Confirmation and Sale Documents**"), nothing in the Confirmation and Sale Documents shall be deemed to (a) limit or alter Borrowers' express rights under the Third Amended Plan, including, inter alia, Sections 4.6(b), 5.2(c), and 5.6(d) of the Third Amended Plan, or (b) otherwise modify the CCC Settlement.

Q.    **Necessity of Order**.  The Forward Buyer would not have entered into the Asset Purchase Agreement and would not consummate the Forward Sale Transaction without all of the relief provided for in this Order (including, without limitation, that, in each case other than the assumption of the Assumed Liabilities, except as provided in Sections 4.6(b) and 5.6(d) of the Third Amended Plan, (1) the transfer of the Acquired Assets to the Forward Buyer be free and clear of all Liens, including rights or Claims based upon successor or transferee liability, Claims or Liabilities relating to any act or omission of any originator, holder or servicer of Mortgage Loans prior to the Closing Date, and any indemnification Claims or Liabilities relating to any act or omission of the Sellers or any other Person or Entity prior to the Closing Date, and (2) the Forward Buyer not be liable for any Cure Costs (except up to the Buyer Cure Cap) or any other pre-Closing Liabilities with respect to any Assigned Contracts (as defined below)).    The consummation of the Forward Sale Transaction pursuant to this Order and the Asset Purchase Agreement is necessary for the Debtors to maximize the value of their Estates for the benefit of all creditors and other parties in interest. The Forward Buyer has agreed to the Forward Sale Transaction with the intent of purchasing the Acquired Assets and does not and would not agree to assume any Liabilities other than the Assumed Liabilities.

R.    **Cure Notices**.  As evidenced by the affidavits of service filed with the Court, and in accordance with the provisions of the Bidding Procedures Order, the Debtors have served, prior to the Confirmation Hearing, the Cure Notices (as defined below) on each non-Debtor

counterparty to the Assigned Contracts (each, a "**Counterparty**" and collectively, the "**Counterparties**"), dated July 8, 2019, July 11, 2019, and July 26, 2019, which provided notice of the Debtors' intent to assume and assign such Assigned Contracts (to the extent the Assign Contract is an executory contract or lease) and notice of the related proposed Cure Costs upon each Counterparty. The service of the Cure Notices was timely, good, sufficient and appropriate under the circumstances and no further notice need be given with respect to the Cure Costs for the assumption and assignment of the Assigned Contracts. *See Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases of Debtors* [ECF No. 824], *Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases of Debtors* [ECF No. 834], *Second Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases of Debtors* [ECF No. 1013] (each, a "**Cure Notice**" and together, the "**Cure Notices**"); *see also Affidavits of Service* [ECF Nos. 867, 868, 900, 1048]. All Counterparties (to the extent the Assigned Contract is an executory contract or lease and was listed on the Cure Notices) have had a reasonable opportunity to object both to the Cure Costs listed on the applicable Cure Notice and to the assumption and assignment of the Assigned Contracts to the Forward Buyer in accordance with the Bidding Procedures Order.

S.    **Assumption and Assignment of Assigned Contracts**. It is a valid exercise of the Debtors' reasonable and sound business judgment to assume and assign the Assigned Contracts to the Forward Buyer in connection with the consummation of the Forward Sale Transaction, and the assumption and assignment of the Assigned Contracts is in the best interests of the Debtors, their Estates and creditors, and all other parties in interest. The assumption and assignment of the Assigned Contracts being assigned to the Forward Buyer or its designees (i) is

an integral part of the Acquired Assets being purchased by the Forward Buyer, (ii) allows the

Debtors to sell the Acquired Assets to the Forward Buyer as a going concern, (iii) limits the losses

suffered by counterparties to the Assigned Contracts, and (iv) maximizes the recoveries to other

creditors of the Debtors by limiting the amount of claims against the Debtors' Estates by avoiding

the rejection of the Assigned Contracts.

T.    **Validity of the Transactions**.    As of the Closing Date, the Debtors'

assumption and assignment of the Assigned Contracts to the Forward Buyer or its designees will

be a legal, valid and effective transfer of the Acquired Assets, and will vest the Forward Buyer

with all right, title and interest of the Debtors in and to the Acquired Assets, free and clear of all

Claims against the Debtors in accordance with the terms of this Order and the Third Amended

Plan, including Sections 4.6(b) and 5.6(d) thereof.    The consummation of the Forward Sale

Transaction is legal, valid and properly authorized under all applicable provisions of the

Bankruptcy Code and the Bankruptcy Rules, and all of the applicable requirements of such

applicable provisions have been complied with in respect of the Forward Sale Transaction.

U.    **Cure/Adequate Assurance**.    Other than with respect to the Adjourned

Cure/Adequate Assurance Objections, the Debtors and the Forward Buyer (in the case of the

Forward Buyer, subject to the Buyer Cure Cap) have cured or demonstrated their ability to cure

any default with respect to any act or omission that occurred prior to the Closing under any of the

Assigned Contracts, within the meaning of section 365(b)(1)(A) of the of the Bankruptcy Code.

For the avoidance of doubt, all objections identified on Exhibit A to the Debtors' Agenda [ECF

No. 1091] that are not resolved are adjourned.    Unless otherwise agreed to by the parties, the Cure

Costs set forth in the Cure Notices are deemed the amounts necessary to "cure" within the meaning

of section 365(b)(1) of the Bankruptcy Code all "defaults" within the meaning of section 365(b)

of the Bankruptcy Code under such Assigned Contracts.  The Forward Buyer's promise to perform the obligations under the Assigned Contracts after the Closing Date shall constitute adequate assurance of its future performance of and under the Assigned Contracts, within the meaning of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code.  For the avoidance of doubt, all post-Confirmation, pre-Effective Date accrued amounts due under such Assigned Contracts, to the extent not covered by the Buyer Cure Cap, shall be satisfied by the Debtors.  All Counterparties who failed to timely file an objection to the assumption and assignment of the Assigned Contracts in accordance with the Third Amended Plan, the Initial Assumption and Assignment Notice, the Supplemental Assumption and Assignment Notice, and the Final Assumption and Assignment Notice are deemed to consent to the assumption by the Debtors of their respective Assigned Contract and the assignment thereof to the Forward Buyer or its designees.  To the extent not resolved and/or adjourned at or prior to the Confirmation Hearing, the objections of all Counterparties of Assigned Contracts that did file a timely objection to the assumption and assignment of such Counterparties' respective Assigned Contracts relating thereto were heard at the Confirmation Hearing (to the extent not withdrawn), were considered by the Court, and are overruled on the merits with prejudice; provided, however, that to the extent an objection of a Counterparty, or unresolved portion thereof, relates solely to Cure Costs (a "**Cure Dispute**"), the Debtors may assume and assign the applicable Assigned Contract(s) prior to the resolution of the Cure Dispute, provided that the Debtors or the Forward Buyer (subject to the Buyer Cure Cap) reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the applicable Counterparty (or such smaller amount as may be fixed or estimated by the Bankruptcy Court or otherwise agreed to by such Counterparty and the applicable Debtor). The Court finds that with respect to all such Assigned Contracts the payment of the Cure Costs is

appropriate and is deemed to fully satisfy the Debtors' obligations under section 365(b) of the Bankruptcy Code. Accordingly, all of the requirements of sections 1123(b)(2) and 365(b) of the Bankruptcy Code have been satisfied for the assumption and the assignment by the Debtors to the Forward Buyer or its designees of each of the Assigned Contracts. To the extent any Assigned Contract is not an executory contract within the meaning of section 365 of the Bankruptcy Code, it shall be transferred to the Forward Buyer in accordance with the terms of the Order that are applicable to the Acquired Assets, and the Forward Buyer shall have no liability or obligation for any (a) defaults or breaches under such agreement that relate to acts or omissions that occurred or otherwise arose during the period prior to the date of the entry of the Order, and (b) Claims, counterclaims, offsets, or defenses (whether contractual or otherwise, including without limitation, any right of recoupment) with respect to such Assigned Contract, that relate to any acts or omissions that arose or occurred prior to the date of the entry of this Order.

V.    Notwithstanding anything else contained in this Order, this Court has not found that the Debtors have demonstrated that the proposed transactions, pursuant to which the Debtors propose to transfer to the Forward Buyer the servicing and servicing-related rights and obligations the Debtors hold with respect to the PLS Trusts[4] (i) will result in the cure of all applicable defaults under the relevant agreements nor (ii) provide the PLS Trustees with adequate assurance of future performance, in each case as required pursuant to section 365 of the Bankruptcy Code. In the event the Debtors and the PLS Trustees resolve the foregoing, as well as any other outstanding issues, the Debtors will seek entry of a separate order in respect of such resolution. If

---

[4]    The Bank of New York Mellon Trust Company, The Bank of New York Mellon, Deutsche Bank National Trust Company, and U.S. Bank National Association, each on its own behalf and in its various capacities as trustee, co-trustee, indenture trustee, registrar, custodian and other agency roles and on behalf of certain affiliates in similar roles are referred to in such capacities, collectively as the "**PLS Trustees**" in connection with certain private label securitization trusts or similar structures (the "**PLS Trusts**").

such disputes cannot be resolved, the Debtors may seek a determination by the Court upon adequate notice to be given by the Debtors.

W.    **Surety**.  The Forward Buyer has indicated that the only surety bond issued by International Fidelity Insurance Company or Allegheny Casualty Company (collectively, "**Surety**") in connection with the business operations of the Debtors and/or non-debtor affiliate(s) (each, a "**Bond**") that the Forward Buyer may need to rely on or replace prior to the termination of the given Bond pursuant to its terms, is the Bond issued by Surety bearing number 0743440. The Forward Buyer shall not rely on any other Bond absent the express consent of Surety.  The Forward Buyer will not acquire the Acquired Assets related to the Bond bearing number 0743440 issued by International Fidelity Insurance Co. ("**IFIC**") until it acquires a replacement bond or issues a standby letter of credit in favor of IFIC in an amount deemed sufficient by IFIC to collateralize the penal amount of the Bond bearing number 0743440.  From and after the closing of the Forward Sale Transaction until the later of (a) the second  anniversary thereof or (b) the time required under Forward Buyer's record retention policies, the Forward Buyer shall not knowingly destroy any books or records that it may possess pertaining to any of the obligations of the Debtors and/or their non-debtor affiliate(s) (or Forward Buyer, to the extent applicable) which relate to the Bonds, including, without limitation, the Bond bearing number 0743440 and, if the Surety receives a claim under any of the Bonds, any books and/or records that may then be in the possession of the Forward Buyer related to such claim shall be produced to the Surety upon its written request.

X.    **Valid and Binding Contract**.  The Asset Purchase Agreement and the Related Agreements are valid and binding contracts between the Debtors and the Forward Buyer and shall be enforceable pursuant to its terms.  The Asset Purchase Agreement and Related Agreements were not entered into for the purpose of hindering, delaying or defrauding the Debtors'

present or future creditors under the Bankruptcy Code or under laws of the United States, any state, territory, or possession thereof, or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.  None of the Debtors or the Forward Buyer is, or will be, entering into the Asset Purchase Agreement, the Related Agreements and the transactions contemplated therein fraudulently (including with respect to statutory or common law fraudulent conveyance or fraudulent transfer claims, whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing) or for an otherwise improper purpose.  The Asset Purchase Agreement and the Forward Sale Transaction itself, and the consummation thereof, shall be specifically enforceable against and binding upon (without posting any bond) the Debtors, and any chapter 7 or chapter 11 trustee appointed in these Chapter 11 Cases, and shall not be subject to rejection or avoidance by the foregoing parties or any other Person or Entity.

Y.    **Unenforceability of Anti-Assignment Provisions**.    Anti-assignment provisions in any Assigned Contract—including any provisions requiring rating agency confirmation, "no downgrade" letters, any other third party consent, or of the type described in sections 365(b)(2), (e)(1), and (f) of the Bankruptcy Code—shall not restrict, limit, or prohibit the assumption, assignment, and sale of the Assigned Contracts and are unenforceable anti-assignment provisions in connection with the Forward Sale Transaction within the meaning of section 365(f) of the Bankruptcy Code.

Z.    **Personally Identifiable Information**.  The Debtors have provided certain privacy policies to consumers that govern the disclosure of "personally identifiable information" (as defined in Bankruptcy Code section 101(41A)) to unaffiliated third parties.  Although sections

**560**

332 and 363(b)(1) do not apply to sales pursuant to a chapter 11 plan, the Debtors have complied and will continue to comply with these privacy policies in accordance with both sections and the Gramm-Leach-Bliley Act, consistent with the recommendation of the Ombudsman in the Ombudsman Report [ECF No. 1237].

AA.    **Final Order**.  This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.    **Approval**.  Pursuant to sections 1123(b)(4) and 1141(c) of the Bankruptcy Code, the sale and transfer of the Acquired Assets to the Forward Buyer in accordance with the terms of the Third Amended Plan and the Asset Purchase Agreement and the Related Agreements, and all transactions contemplated thereby, and all of the terms and conditions thereof, are authorized and approved.  The failure to specifically reference any particular provision of the Asset Purchase Agreement or any of the Related Agreements in this Order shall not diminish or impair the efficacy of such provision, it being the intent of this Court that the Asset Purchase Agreement, the Related Agreements and all other material agreements or arrangements entered into by the Forward Buyer and the Debtors in connection with the Forward Sale Transaction, and each and every provision, term, and condition thereof be authorized and approved in its entirety.

2.    **Binding Effect of Order**.  This Order and the Asset Purchase Agreement shall be binding in all respects upon all known and unknown creditors of, and holders of equity security interests in, any Debtor, including any holders of Claims (including holders of rights or claims based on any successor or transferee liability), all Counterparties, all successors and assigns of the Forward Buyer, each of the Sellers and their Affiliates and subsidiaries, the Acquired Assets,

WEIL:\97193817\2\41703.0011

and any trustees appointed in these Chapter 11 Cases or upon a conversion to cases under chapter 7 of the Bankruptcy Code.

        3.      **Injunction**.  All Persons and Entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Acquired Assets to the Forward Buyer in accordance with the Asset Purchase Agreement and this Order.  On and after the Closing, except for Persons or Entities entitled to enforce Assumed Liabilities and Permitted Liens, or as provided in Sections 4.6(b) or 5.6(d) of the Third Amended Plan, all Persons and Entities (including, but not limited to, the Debtors and/or their respective successors (including any trustee), creditors, investors, certificate holders, securitization trustees, borrowers, current and former employees and shareholders, administrative agencies, governmental units, secretaries of state, federal, state, and local officials, including those maintaining any authority relating to any environmental, health and safety laws, and the successors and assigns of each of the foregoing) holding Claims against the Acquired Assets or against the Debtors in respect of the Acquired Assets of any kind or nature whatsoever shall be, and hereby are, forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing any Claims of any kind or nature whatsoever (including, without limitation, Claims or Liabilities relating to any act or omission of any originator, holder or servicer of Mortgage Loans prior to the Closing, and any indemnification Claims or Liabilities relating to any act or omission of the Sellers or any other Person or Entity prior to the Closing) against the Forward Buyer or any Affiliate of the Forward Buyer or any of their respective property, successors and assigns, or the Acquired Assets, as an alleged successor or on any other grounds, it being understood that nothing herein shall affect assets of the Debtors that are not Acquired Assets.

WEIL:\97193817\2\41703.0011

4.      Except as provided in Sections 4.6(b) and 5.6(d) of the Third Amended Plan, upon the transfer or assignment of the Assigned Contracts to the Forward Buyer, each Counterparty to an Assigned Contract is hereby forever barred, estopped, and permanently enjoined from asserting against the Acquired Assets, the Forward Buyer, its Affiliates or its or their respective property (a) any setoff, defense, recoupment, Claim, counterclaim or default asserted or assertable against, or otherwise delay, defer or impair any rights of the Forward Buyer with respect to the Acquired Assets with respect to an act or omission of, the Debtors, or (b) any rent acceleration, assignment fee, default, breach or Claim, or pecuniary loss or condition to assignment or transfer, arising under or related to an Assigned Contract existing as of the Closing, or arising by reason of the Closing.  No delay or failure of performance under or in respect of any Excluded Contract will (i) affect any right of the Forward Buyer, or any obligation of any other Person or Entity, including any Counterparty, under any Assigned Contract or (ii) permit, result in or give rise to any setoff, delay, deferral, defense, recoupment, Claim, interest, counterclaim, default or other impairment of the right to receive any payment or otherwise to enforce any other rights under any Assigned Contract.

5.      Except as provided in Sections 4.6(b) and 5.6(d) of the Third Amended Plan, no Person or Entity shall assert, and the Forward Buyer and the Acquired Assets shall not be subject to, any defaults, breaches, counterclaims, offsets, defenses (whether contractual or otherwise, including, without limitation, any right of recoupment), Claims or Liabilities, of any kind or nature whatsoever to delay, defer, or impair any right of the Forward Buyer or the Debtors, or any obligation of any other Person or Entity, under or with respect to, any Acquired Assets (including, without limitation, an Assigned Contract), with respect to any act or omission that

occurred prior to the Closing or with respect to any Excluded Contract or any obligation of Debtors that is not an Assumed Liability.

6.      **General Assignment**.  Upon the Closing, this Order shall be considered and constitute for any and all purposes a full and complete general assignment, conveyance and transfer by the Sellers of the Acquired Assets acquired under the Asset Purchase Agreement or a bill of sale or assignment transferring good and marketable, indefeasible title and interest in all of the Debtors' right, title, and interest in and to the Acquired Assets to the Forward Buyer.  Each and every federal, state, and local governmental agency, quasi-agency, or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the Forward Sale Transaction.

7.      **Fair Purchase Price**.  The consideration provided by the Forward Buyer under the Asset Purchase Agreement is fair and reasonable and constitutes (i) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act, (ii) fair consideration under the Uniform Fraudulent Conveyance Act, and (iii) reasonably equivalent value, fair consideration and fair value under the laws of the United States, any state, territory, possession thereof, the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

8.      **Consummation of the Forward Sale Transaction**.  The Debtors, their Affiliates, and their respective officers, employees and agents, are authorized to execute and deliver, and empowered to perform under, consummate, and implement, the Asset Purchase Agreement, the Related Agreements and all additional instruments and documents that the Debtors or the Forward Buyer deem necessary or appropriate to implement the Asset Purchase Agreement or the Related Agreements and effectuate the sale and transfer of the Acquired Assets to the

WEIL:\97193817\2\41703.0011

Forward Buyer, and to take all further actions as may be reasonably requested by the Forward Buyer for the purpose of assigning, transferring, granting, and conveying to and conferring on the Forward Buyer, or reducing to the Forward Buyer's possession, the Acquired Assets or as may be necessary or appropriate to the performance of the parties' obligations under the Asset Purchase Agreement, the Related Agreements and the Third Amended Plan, including any and all actions reasonably requested by the Forward Buyer that are consistent with the Asset Purchase Agreement and the Related Agreements and the assumption and assignment of the Assigned Contracts, and any and all instruments and documents entered into in connection therewith shall be deemed authorized, approved, and consummated without further order of the Court.

9.      **Direction to Release Liens**.   As of the Closing, each of the Sellers' creditors and any other holder of a Lien, including rights or Claims based on any successor or transferee liability, is authorized and directed to execute such documents and take all other actions as may be necessary to release its Lien on or against the Acquired Assets, if any, as such Lien may have been recorded or may otherwise exist.   If any Person or Entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens* or other documents or agreements evidencing Liens or Claims in or against the Debtors or the Acquired Assets owned by the Debtors shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or, as appropriate, releases of all Liens the Person or Entity has with respect to the Debtors or the Acquired Assets or otherwise, then, with regard to the Acquired Assets that are purchased by the Forward Buyer pursuant to the Asset Purchase Agreement and this Order: (i) the Debtors are hereby authorized and directed to, and the Forward Buyer is hereby authorized to, execute and file such statements, instruments, releases and other documents on behalf of the applicable Person or Entity with respect

**565**

to the Acquired Assets; (ii) the Forward Buyer is hereby authorized to file, register or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Liens against the Acquired Assets; and (iii) the Forward Buyer may seek in this Court or any other court to compel appropriate Persons or Entities to execute termination statements, instruments of satisfaction, and releases of all Liens with respect to the Acquired Assets other than the Assumed Liabilities, the Permitted Liens, or as set forth in Sections 4.6(b) or 5.6(d) of the Third Amended Plan; provided that, notwithstanding anything in the Order or the Asset Purchase Agreement to the contrary, the provisions of this Order shall be self-executing, and neither the Sellers nor Forward Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of the Order.  This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, county or local government agency, department or office.

10.    **Surrender of Possession**.  All Persons or Entities that are currently in possession of some or all of the Acquired Assets are hereby directed to surrender possession of such Acquired Assets to the Forward Buyer as of the Closing or at such later time as the Forward Buyer reasonably requests.  To the extent required by the Asset Purchase Agreement or the Related Agreements, the Debtors agree to exercise commercially reasonable efforts to assist the Forward Buyer in assuring that all Persons or Entities that are presently, or on the Closing Date may be, in possession of some or all of the Acquired Assets will surrender possession of the Acquired Assets to either (i) the Debtors before the Closing or (ii) the Forward Buyer on or after the Closing.

11.    **Direction to Government Agencies**.  The Asset Purchase Agreement is binding on all filing agents, filing officers, title agents, title companies, recorders of mortgages,

WEIL:\97193817\2\41703.0011

recorders of deeds, registrars of deeds, registrars of patents, trademarks, or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other Persons or Entities who may be required by operation of law, the duties of their office, or contract to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease (the "**Recordation Officers**").  Each and every Recordation Officer is authorized, from and after the Closing, to strike all Liens, Claims, interests, or other encumbrances in, on or against the Acquired Assets (other than Assumed Liabilities and the Permitted Liens) from their records, official and otherwise, without further order of the Court or act of any Person or Entity.  Each and every Recordation Officer is authorized (i) to file, record, and/or register any and all documents and instruments presented to consummate or memorialize the Asset Purchase Agreement, and (ii) to accept and rely on this Order as the sole and sufficient evidence of the transfer of the Acquired Assets to the Forward Buyer.

12.    **No Interference**.  Following the Closing, no holder of any Lien or Claim shall interfere with the Forward Buyer's title to, or use and enjoyment of, the Acquired Assets based on, or related to, any such Lien or Claim, or based on any actions the Debtors may take in their Chapter 11 Cases.

13.    **No Discriminatory Treatment**.  To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Acquired Assets sold, transferred, or conveyed to the Forward Buyer on account of the filing or pendency of these Chapter 11 Cases or the consummation of the Forward Sale Transaction.

**567**

14. **The Forward Sale Transaction is Not Subject to Section 363(o) of the Bankruptcy Code**. The Forward Sale Transaction is not and shall not be deemed or construed to be a sale pursuant to section 363 of the Bankruptcy Code, and section 363(o) of the Bankruptcy Code does not and shall not be deemed or construed to apply to the Forward Sale Transaction.

15. **Transfer of the Acquired Assets Free and Clear**. Except for the Assumed Liabilities, the Permitted Liens, or as provided in Sections 4.6(b) or 5.6(d) of the Third Amended Plan, pursuant to sections 105(a), 1123(b)(4) and 1141(c) of the Bankruptcy Code, the Purchased Assets shall be transferred to the Forward Buyer as required under the Asset Purchase Agreement, and such transfer shall be free and clear of all Liens asserted by any Person or Entity (including, without limitation, Claims or Liabilities relating to any act or omission of any originator, holder or servicer of Mortgage Loans prior to the Closing, and any indemnification Claims or Liabilities relating to any act or omission of the Sellers or any other Person or Entity prior to the Closing) and any and all rights and claims under any bulk transfer statutes and similar laws, whether arising by agreement, by statute or otherwise and whether occurring or arising before, on or after the Commencement Date, whether known or unknown, occurring or arising prior to such transfer, with all such Liens to attach to the proceeds of the Forward Sale Transaction ultimately attributable to the property against or in which the holder of a Lien asserts or may assert a Lien, in the order of their priority, with the same validity, force, and effect which they now have, subject to any claims and defenses the Debtors may possess with respect thereto.

16. **Valid Transfer**. Upon the Closing, the transfer of the Acquired Assets to the Forward Buyer shall: (i) be valid, legal, binding and effective; (ii) vest the Forward Buyer with all right, title and interest of the Debtors in and to the Acquired Assets; and (iii) be free and clear

of all Liens of any kind or nature whatsoever, other than the Assumed Liabilities and the Permitted Liens, or as provided in Sections 4.6(b) or 5.6(d) of the Third Amended Plan.

17.    **No Successor or Other Derivative Liability**.  By virtue of the Forward Sale Transaction, the Forward Buyer and its Affiliates, and its and their respective successors and assigns shall not be deemed or considered to: (i) be a legal successor, or otherwise be deemed a successor to any of the Debtors; (ii) have, *de facto* or otherwise, merged with or into any or all Debtors; (iii) be consolidated with the Debtors or their Estates; or (iv) be an alter ego or a continuation or substantial continuation, or be holding itself out as a mere continuation, of any of the Debtors or their respective Estates, businesses or operations, or any enterprise of the Debtors, in each case by any law or equity, and neither the Forward Buyer nor its Affiliates, nor any of its or their respective successors or assigns have assumed or are in any way responsible for any liability or obligation of the Debtors or the Debtors' Estates, except with respect to the Assumed Liabilities or as provided in Sections 4.6(b) or 5.6(d) of the Third Amended Plan.  Except as expressly set forth in the Asset Purchase Agreement, neither the Forward Buyer nor its Affiliates, nor its or their respective successors or assigns shall have any successor, transferee or vicarious liability of any kind or character, including, without limitation, under any theory of foreign, federal, state or local antitrust, environmental, successor, tax, ERISA, assignee or transferee liability, labor, product liability, employment, *de facto* merger, substantial continuity, or other law, rule, regulation or doctrine, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Debtors or any obligations of the Debtors arising prior to the Closing Date, including, without limitation, liabilities on account of any taxes or other Governmental Authority fees, contributions or surcharges, in each case arising, accruing or payable under, out of, in

connection with, or in any way relating to, the operation of the Acquired Assets prior to the Closing Date or arising based on actions of the Debtors taken after the Closing Date.

18.    Except as provided in Sections 4.6(b) or 5.6(d) of the Third Amended Plan or as expressly set forth herein or in the Asset Purchase Agreement, neither the Forward Buyer, nor its Affiliates, nor its successors or assigns shall have any liability for any Lien or Claim against the Debtors or the Debtors' Estates or Excluded Liabilities, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, whether derivatively, vicariously, as a transferee, successor, alter ego, or otherwise, of any kind, nature or character whatsoever, by reason of any theory of law or equity, including Claims or Excluded Liabilities arising under, without limitation: (i) any employment or labor agreements or the termination thereof relating to the Debtors; (ii) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of or related to any of the Debtors or any Debtor's affiliates or predecessors or any current or former employees of any of the foregoing, including, without limitation, the Employee Arrangements and any participation or other agreements related to the Employee Arrangements, or the termination of any of the foregoing; (iii) the Debtors' business operations or the cessation thereof; (iv) any litigation involving one or more of the Debtors; and (v) any employee, workers' compensation, occupational disease or unemployment or temporary disability related law, including, without limitation, claims that might otherwise arise under or pursuant to: (A) the Employee Retirement Income Security Act of 1974, as amended; (B) the Fair Labor Standards Act; (C) Title VII of the Civil Rights Act of 1964; (D) the Federal Rehabilitation Act of 1973; (E) the National Labor Relations Act; (F) the Worker Adjustment and Retraining Notification Act of 1988; (G) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as

WEIL:\97193817\2\41703.0011

amended; (H) the Americans with Disabilities Act of 1990; (I) the Consolidated Omnibus Budget Reconciliation Act of 1985; (J) the Multiemployer Pension Plan Amendments Act of 1980; (K) state and local discrimination laws; (L) state and local unemployment compensation laws or any other similar state and local laws; (M) state workers' compensation laws; (N) any other state, local or federal employee benefit laws, regulations or rules or other state, local or federal laws, regulations or rules relating to, wages, benefits, employment or termination of employment with any or all Debtors or any predecessors; (O) any antitrust laws; (P) any product liability or similar laws, whether state or federal or otherwise; (Q) any environmental laws, rules, or regulations, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, et seq., or similar state statutes; (R) PACA; (S) any bulk sales or similar laws; (T) any federal, state or local tax statutes, regulations or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; (U) the "claims and defenses" that are the subject of section 363(o) of the Bankruptcy Code; and (V) any common law doctrine of *de facto* merger or successor or transferee liability, successor-in-interest liability theory or any other theory of or related to successor liability.

19.    **Application of Proceeds of Forward Sale Transaction**.  The net proceeds of the Forward Sale Transaction from the Acquired Assets upon which the DIP Credit Parties (as defined in the DIP Order) have a first lien shall be used to repay in full in cash all DIP Obligations (as defined in the DIP Order) on the Closing and all other Claims (including, without limitation, contingent indemnification obligations) that represent interests in property shall attach to the net proceeds of the Forward Sale Transaction, in the same order of their priority and with the same validity, force and effect which they now have against the Acquired Assets, subject to any claims

WEIL:\97193817\2\41703.0011

**571**

and defenses the Debtors may possess with respect thereto, in each case immediately before the Closing.

20.    **Transition Services**.    Pursuant to the Asset Purchase Agreement, the Parties shall enter into a Transition Services Agreement on the Closing Date, substantially in the form attached to the Asset Purchase Agreement as <u>Exhibit E</u>, pursuant to which the Sellers shall provide to the Forward Buyer and the Forward Buyer shall provide to the Sellers, as applicable, certain services for a specified time period following the Closing Date.    The Forward Buyer and the Sellers are hereby authorized to execute and deliver any additional documentation as contemplated by the Asset Purchase Agreement, and to perform all such other and further acts as may be required under or in connection with the Transition Services Agreement, including, without limitation, executing the Transition Services Agreement and performing and receiving services thereunder.

21.    **Not an Insider**.  As of the date hereof, the Forward Buyer is not an "insider" or "affiliate" of the Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders existed between the Debtors and the Forward Buyer.

22.    **Assumption and Assignment of Assigned Contracts**.    Pursuant to sections 1123(b)(2) and 365 of the Bankruptcy Code and subject to and conditioned upon the Closing, the Debtors are hereby authorized to assume and assign the Assigned Contracts to the Forward Buyer or its designees free and clear of all Liens and Claims to the extent set forth in this Order, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are deemed satisfied.

23.     The Debtors are hereby authorized to execute and deliver to the Forward Buyer such documents or other instruments as may be necessary to assign and transfer the Assigned Contacts to the Forward Buyer or its designees as provided in the Asset Purchase Agreement.  With respect to each of the Assigned Contracts, the Debtors or the Forward Buyer, in accordance with the provisions of the Third Amended Plan and Asset Purchase Agreement, has cured or will cure before the Closing (subject to the Buyer Cure Cap), or have provided adequate assurance of the prompt cure after the Closing of, any monetary default required to be cured with respect to the Assigned Contracts under sections 1123(b)(2) and  365(b)(1) of the Bankruptcy Code, and the Forward Buyer has provided adequate assurance of future performance under the Assigned Contracts in satisfaction of sections 1123(b)(2), 365(b), and 365(f) of the Bankruptcy Code to the extent that any such assurance is required and not waived by the Counterparty to such Assigned Contracts.  Upon the Closing Date or the applicable date of assumption and assignment with respect to an Assigned Contract, the Forward Buyer shall be fully and irrevocably vested with all rights, title and interest of the Debtors under such Assigned Contract and, pursuant to sections 1123(b)(2) and 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to breach of such Assigned Contract occurring after such assumption and assignment to the Forward Buyer or its designees.  The Forward Buyer acknowledges and agrees that from and after the applicable date of assumption and assignment with respect to an Assigned Contract, subject to and in accordance with the Asset Purchase Agreement, it shall comply with the terms of each of such Assigned Contract in its entirety, including any indemnification obligations expressly contained in such Assigned Contract that could arise as a result of events or omissions that occur from and after the Closing, unless any such provisions are not enforceable pursuant to the terms of this Order.  The assumption by the Debtors and assignment to the Forward

28

Buyer or its designees of any Assigned Contract shall not be a default under such Assigned Contract. To the extent any Assigned Contract provides that any Person's or Entity's consent is required as a condition to the assignment of such Assigned Contract, such consent requirement shall be deemed satisfied by virtue of the findings and conclusions in this Order and shall be of no further force or effect.

24. The Debtors served all Counterparties to the Assigned Contracts with the Initial Assumption and Assignment Notice, the Supplemental Assumption and Assignment Notice, and the Final Assumption and Assignment Notice, and the deadline to object to the Cure Costs and adequate assurance of future performance with respect to the Forward Buyer has passed. Accordingly, unless an objection to the proposed Cure Costs or adequate assurance information with respect to the Forward Buyer was filed and served before the applicable deadline, each Counterparty to an Assigned Contract is forever barred, estopped and permanently enjoined from asserting against the Debtors or the Forward Buyer, their affiliates, successors or assigns or the property of any of them, any default existing as of the date of the Confirmation Hearing if such default was not raised or asserted prior to or at the Confirmation Hearing.

25. All of the requirements of sections 1123(b)(2), 365(b), and 365(f), including without limitation, the demonstration of adequate assurance of future performance and Cure Costs required under the Bankruptcy Code have been satisfied for the assumption by the Debtors and assignment to the Forward Buyer or its designees of all Assigned Contracts. The Forward Buyer has satisfied its adequate assurance of future performance requirements with respect to the Assigned Contracts and demonstrated it is sufficiently capitalized to comply with the necessary obligations under the Assigned Contracts.

**574**

26.    To the extent a Counterparty to an Assigned Contract failed to timely object to a Cure Cost, such Cure Cost has been and shall be deemed to be finally determined as of the Debtors' filing of the applicable Cure Notice and any such Counterparty shall be barred, and forever prohibited from challenging, objecting to or denying the validity and finality of the Cure Cost as of such dates.

27.    The failure of the Sellers or the Forward Buyer to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions, or of the Sellers' and the Forward Buyer's rights to enforce every term and condition of the Assigned Contracts.

28.    Notwithstanding anything in the Third Amended Plan, the Plan Supplement, the Order, or the Asset Purchase Agreement, the Servicing Agreement dated April 27, 2015 between TIAA, FSB f/k/a Everbank ("**Everbank**") and Ditech Financial LLC f/k/a Green Tree Servicing LLC, Amended and Restated Mortgage Servicing Rights Purchase and Sale Agreement dated May 20, 2015 between Everbank and Ditech Financial LLC f/k/a Green Tree Servicing LLC, and the Acknowledgement Agreement dated January 3, 2017, by and among Citibank, N.A., solely as trustee of NRZ Pass-Through Trust VI, Ditech Financial LLC, and Nationstar Mortgage LLC (collectively, the "**Additional Contracts**") shall be Assigned Contracts, and all findings of fact and conclusions of law in the Order with respect to the Assigned Contracts shall apply to the Additional Contracts.

29.    The Flow Loan Servicing Agreement dated as of March 1, 2010, between DLJ Mortgage Capital, Inc. and Ditech Financial LLC f/k/a Green Tree Servicing LLC (the "**DLJ Agreement**"), noticed for assumption and assignment to the Forward Buyer on September 26, 2019 pursuant to the *Notice of Assumption and Assignment of Executory Contract of Debtors*

WEIL:\97193817\2\41703.0011

**575**

*(Forward Buyer)* (the "**Final Assumption and Assignment Notice**") [ECF No. 1393], shall be treated as an "adjourned contract" and shall be assumed and assigned upon the expiration of the objection deadline as set forth in the Final Assumption and Assignment Notice, unless the counterparty to such contract objects to such assumption and assignment. Upon the assumption and assignment of the DLJ Agreement, all findings of fact and conclusions of law in the Order with respect to the Assigned Contracts shall apply to the DLJ Agreement.

30.     **Ipso Facto Clauses Ineffective**. Except as otherwise specifically provided for by order of this Court or the Asset Purchase Agreement, the Assigned Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Forward Buyer, notwithstanding any provision in any such Assigned Contract (including, without limitation, those of the type described in sections 365(e)(1) and (f) of the Bankruptcy Code) that prohibits, restricts or conditions such assignment or transfer. There shall be no, and all Counterparties to any Assigned Contract are forever barred and permanently enjoined from raising or asserting against the Debtors or the Forward Buyer any defaults, breach, claim, pecuniary loss, rent accelerations, escalations, assignment fees, increases or any other fees charged to the Forward Buyer or the Debtors as a result of the assumption or assignment of the Assigned Contracts or the Closing to the maximum extent permitted by the Bankruptcy Code.

31.     Except as otherwise specifically provided for by order of this Court, upon the Debtors' assignment of the Assigned Contracts to the Forward Buyer or its designees under the provisions of this Order, no default shall exist under any Assigned Contracts, and no Counterparty to any Assigned Contracts shall be permitted to declare a default by any Debtor or the Forward Buyer or otherwise take action against the Forward Buyer as a result of any Debtor's financial condition, servicer rating, bankruptcy or failure to perform any of its obligations under

the relevant Assigned Contract.  Any provision in an Assigned Contract that prohibits or conditions the assignment of such Assigned Contract or allows the Counterparty thereto to terminate, recapture, impose any penalty, condition on renewal or extension, refuse to renew, or modify any term or condition upon such assignment, constitutes an unenforceable anti-assignment provision that is void and of no force and effect solely in connection with the transfer thereof pursuant to this Order.  The failure of the Debtors or the Forward Buyer to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions, or of the Debtors' and the Forward Buyer's rights to enforce every term and condition of the Assigned Contract.

32.    **Bulk Sale**.  No law of any state or other jurisdiction, including any bulk sales law or similar law, shall apply in any way to the transactions contemplated by the Asset Purchase Agreement and this Order.

33.    **No Avoidance of Asset Purchase Agreement**.  Neither the Debtors nor the Forward Buyer have engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided or costs or damages to be imposed.  Accordingly, the Asset Purchase Agreement and the Forward Sale Transaction shall not be avoidable under chapter 5 of the Bankruptcy Code, and no Person or Entity shall be entitled to any damages or other recovery under the Bankruptcy Code in respect of the Asset Purchase Agreement or the Forward Sale Transaction.

34.    **Modification of Asset Purchase Agreement**.  The Asset Purchase Agreement and the Related Agreements, documents or other instruments executed in connection therewith, may be modified, amended or supplemented by the parties thereto, in a writing signed by each party, and in accordance with the terms thereof, without further order of the Court; provided that any such modification, amendment or supplement does not materially change the

WEIL:\97193817\2\41703.0011

terms of the Asset Purchase Agreement or the Related Agreements, documents or other instruments or have any adverse effect on the Debtors' Estates.

35. **No Stay of Order**. This Order shall be effective immediately upon entry, and the Debtors and the Forward Buyer are authorized to close the Forward Sale Transaction immediately upon entry of this Order. Time is of the essence in closing the Forward Sale Transaction in accordance with the terms of the Asset Purchase Agreement, and the Debtors and the Forward Buyer intend to close the Forward Sale Transaction as soon as practicable. Any Person or Entity objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay or risk its appeal being foreclosed as moot.

36. **Releases**. Upon entry of this Order approving the Forward Sale Transaction contemplated by the Asset Purchase Agreement, except for the rights and obligations (i) of the Debtors or the Forward Buyer under the Asset Purchase Agreement and the Related Agreements and (ii) identified in Paragraph 39 below, in connection with the Asset Purchase Agreement and for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the Forward Buyer's payment of the Purchase Price under the Asset Purchase Agreement, and in acknowledgement that, at the time of issuance of termination notices of the Subservicing Agreement dated as of August 8, 2016 between New Residential Mortgage LLC ("**NRM**") and Ditech Financial LLC (as amended, the "**Subservicing Agreement**") by NRM, certain termination events had occurred under Section 5.3 of the Subservicing Agreement permitting a termination for cause of the Subservicing Agreement with respect to all mortgage loans, which termination events had not been timely cured or remedied (if applicable):

(a) the Debtors and their controlled Affiliates, on behalf of themselves and, to the extent applicable, their Estates, shall and shall be deemed to fully, finally, and

completely remise, release, acquit, and forever discharge the NRZ Parties[5] and their respective

property of and from any and all claims, causes of action, obligations, rights, suits, judgments,

remedies, interests, actions, liabilities, demands, duties, injuries, damages, expenses, fees, or costs

of whatever kind or nature (including attorney's fees and expenses), whether liquidated or

unliquidated, foreseen or unforeseen, actual or alleged, known or unknown, asserted or unasserted,

fixed or contingent, matured or unmatured, existing or having arisen up to and including the

signing of the Asset Purchase Agreement, whether in contract, tort, or otherwise, whether

statutory, at common law, or in equity, including, but not limited to, claims for breach of contract,

breach of the implied covenant of good faith and fair dealing, statutory or regulatory violations,

for subrogation, indemnity, contribution, or reimbursement, or punitive, exemplary, or extra-

contractual damages of any type, arising out of, based upon, or relating in any way, in whole or in

part, whether through a direct claim, derivative claim, cross-claim, third-party claim, subrogation

claim, class action, or otherwise, to (i) the pursuit, negotiation, documentation, execution, or

implementation of the Asset Purchase Agreement and the Related Agreements, except as expressly

set forth therein, (ii) the Debtors' chapter 11 cases, (iii) the Subservicing Agreement, including,

but not limited to, the termination thereof and the transfer of rights and transition of the

subservicing of loans thereunder, or (iv) any other agreement between the Forward Buyer, NRM,

NewRez LLC (f/k/a New Penn Financial, LLC) ("**NewRez**"), and any of their Affiliates, on the

---

[5]    "**NRZ Parties**" means New Residential Investment Corp., New Residential Mortgage LLC, NewRez LLC (f/k/a
New Penn Financial, LLC), and each of its and their respective parents, Affiliates, subsidiaries, managers, limited
liability companies, special purpose vehicles, partnerships, joint ventures, and other related business entities, and
each of its and their respective current or former parents, Affiliates, subsidiaries, managers, limited liability
companies, special purpose vehicles, partnerships, joint ventures, other related business entities, principals,
partners, shareholders, officers, directors, partners, employees, agents, insurers, attorneys, accountants, financial
advisors, investment bankers, consultants, any other professionals, any other representatives or advisors, and any
and all persons who control any of the foregoing entities, as well as any predecessors-in-interest of any of the
foregoing entities and any of the successors and assigns of any of the foregoing entities (each solely in its capacity
as such).

one hand, and one or more of the Debtors, on the other hand, or any performance guaranty executed

by one or more of the Debtors in favor of the Forward Buyer, NRM, NewRez, and any of their

Affiliates (the foregoing released claims, subject to Paragraph 39 below, collectively, the "**Ditech**

**Released Claims**");

(b)     The Forward Buyer, NRM, NewRez and any of their respective

Affiliates shall and shall be deemed to fully, finally, and completely remise, release, acquit, and

forever discharge the Debtor Parties[6] and their respective property of and from any and all claims,

causes of action, obligations, rights, suits, judgments, remedies, interests, actions, liabilities,

demands, duties, injuries, damages, expenses, fees, or costs of whatever kind or nature (including

attorney's fees and expenses), whether liquidated or unliquidated, foreseen or unforeseen, actual

or alleged, known or unknown, asserted or unasserted, fixed or contingent, matured or unmatured,

existing or having arisen up to and including the signing of the Asset Purchase Agreement, whether

in contract, tort, or otherwise, whether statutory, at common law, or in equity, including, but not

limited to, claims for breach of contract, breach of the implied covenant of good faith and fair

dealing, statutory or regulatory violations, for subrogation, indemnity, contribution, or

reimbursement, or punitive, exemplary, or extra-contractual damages of any type, arising out of,

based upon, or relating in any way, in whole or in part, whether through a direct claim, derivative

claim, cross-claim, third-party claim, subrogation claim, class action, or otherwise, to (i) the

pursuit, negotiation, documentation, execution, or implementation of the Asset Purchase

---

[6] "**Debtor Parties**" means the Debtors and their Estates (to the extent applicable), and each of its and their respective parents, Affiliates, subsidiaries, managers, limited liability companies, special purpose vehicles, partnerships, joint ventures, and other related business entities, and each of its and their respective current or former parents, Affiliates, subsidiaries, managers, limited liability companies, special purpose vehicles, partnerships, joint ventures, other related business entities, principals, partners, shareholders, officers, directors, partners, employees, agents, insurers, attorneys, accountants, financial advisors, investment bankers, consultants, any other professionals, any other representatives or advisors, and any and all persons who control any of the foregoing entities, as well as any predecessors-in-interest of any of the foregoing entities and any of the successors and assigns of any of the foregoing entities (each solely in its capacity as such).

Agreement and the Related Agreements, except as expressly set forth therein, (ii) the Debtors' chapter 11 cases, (iii) the Subservicing Agreement, including, but not limited to, the termination thereof and the transfer of rights and transition of the subservicing of loans thereunder, or (iv) any other agreement between the Forward Buyer, NRM, NewRez, and any of their Affiliates, on the one hand, and one or more of the Debtors, on the other hand, or any performance guaranty executed by one or more of the Debtors in favor of the Forward Buyer, NRM, NewRez, and any of their Affiliates (the foregoing released claims, subject to Paragraph 39 below, collectively, the "**NRZ Released Claims**");

(c)     the Debtors, their controlled Affiliates, and, to the extent applicable, their Estates shall be, and shall be deemed to be, permanently and forever barred, estopped, stayed, and enjoined from: (i) pursuing any Ditech Released Claim against the NRZ Parties; (ii) continuing or commencing any action or other proceeding with respect to any Ditech Released Claim against the NRZ Parties; (iii) seeking the enforcement, attachment, collection, or recovery of any judgment, award, decree, or order against the NRZ Parties or property of the NRZ Parties with respect to any Ditech Released Claim; (iv) creating, perfecting, or enforcing any encumbrance of any kind against the NRZ Parties or the property of the NRZ Parties with respect to any Ditech Released Claim; and (v) asserting any right of setoff, subrogation, or recoupment of any kind against any obligations due to the NRZ Parties with respect to any Ditech Released Claim; and

(d)     The Forward Buyer, NRM, NewRez, and their respective Affiliates shall be, and shall be deemed to be, permanently and forever barred, estopped, stayed, and enjoined from: (i) pursuing any NRZ Released Claim against the Debtor Parties; (ii) continuing or commencing any action or other proceeding with respect to any NRZ Released Claim against the Debtor Parties; (iii) seeking the enforcement, attachment, collection, or recovery of any judgment,

WEIL:\97193817\2\41703.0011

award, decree, or order against the Debtor Parties or property of the Debtor Parties with respect to any NRZ Released Claim; (iv) creating, perfecting, or enforcing any encumbrance of any kind against the Debtor Parties or the property of the Debtor Parties with respect to any NRZ Released Claim; and (v) asserting any right of setoff, subrogation, or recoupment of any kind against any obligations due to the Debtor Parties with respect to any NRZ Released Claim.

(e)    Notwithstanding anything in this paragraph 36 or any Confirmation and Sale Documents, nothing in the Confirmation and Sale Documents shall affect or limit in any way any defenses or claim held by a Borrower against the Forward Buyer or any third party or their affiliates or assigns for pre-existing liability that the Forward Buyer or any third party would otherwise have to such Borrower had the Forward Buyer not acquired the Acquired Assets.

37.    For the avoidance of doubt, the Ditech Released Claims, which pursuant to this Order are fully, finally, and completely remised, released, acquitted, and forever discharged, shall not constitute GUC Recovery Trust Causes of Action (or exist or be valid for any other purpose), and neither the GUC Trustee nor anyone else shall have any right to institute, file, prosecute, pursue, or take any other action with respect to the Ditech Released Claims.

38.    For the avoidance of doubt, except in respect of the Subservicing Agreement Claim (as defined below), pursuant to this Order, the NRZ Released Claims are fully, finally, and completely remised, released, acquitted, and forever discharged, notwithstanding any proofs of claim filed by the Forward Buyer, NRM, NewRez and any of their respective Affiliates in connection with the Debtors' chapter 11 cases.  All such proofs of claim shall be disallowed with prejudice, and the NRZ Parties shall not be entitled to any recovery thereon.  Notwithstanding the foregoing, nothing in this Order shall or shall be deemed to disallow, discharge, prejudice, or otherwise modify any proof of claim filed by the Forward Buyer, NRM, NewRez or any of their

respective Affiliates to the extent such proof of claim asserts amounts owed to the NRZ Parties under that certain Subservicing Agreement dated August 8, 2016, as amended (the "**Subservicing Agreement Claim**").    Any distribution to the NRZ Parties on account of the Subservicing Agreement Claim shall be made in accordance with the provisions of the Third Amended Plan for distributions to holders of Allowed General Unsecured Claims.

39.    Notwithstanding the entry of this Order or anything to the contrary contained herein, the Ditech Released Claims and the NRZ Released Claims shall not include, and the NRZ Parties and the Debtor Parties shall not be released from: (a) any servicing or document holdback obligations pursuant to any agreement between the Debtors and their controlled Affiliates, on the one hand, and the Forward Buyer, NRM, NewRez and any of their respective Affiliates, on the other hand (the "**Existing Agreements**"), pursuant to which any servicing or document holdback amounts shall continue to be paid to the relevant party thereto in accordance with the terms of the Existing Agreements up to and following the Closing (as defined in the Asset Purchase Agreement); (b) ordinary-course payments due in respect of interest on escrows, recapture and rebates, servicer incentives, remittance of advance recoveries and claims payments received by Debtors, payment by Debtors of interest on custodial accounts, servicing fees, and other amounts invoiced in the ordinary course of business between the Debtors and their controlled Affiliates, on the one hand, and the Forward Buyer, NRM, NewRez and any of their respective Affiliates, on the other hand, under the Existing Agreements, which shall continue to be paid to the relevant party thereto in accordance with the terms of the Existing Agreements, consistent with past practices, up to and following the Closing (as defined in the Asset Purchase Agreement); or (c) the amounts due and owing between the Debtors and their controlled Affiliates, on the one hand, and the Forward Buyer, NRM, NewRez, and their respective Affiliates, on the other hand,

WEIL:\97193817\2\41703.0011

under the Existing Agreements (the "**Existing Agreement Balances**") solely to the extent such amounts are listed on <u>Schedule A</u> to <u>Exhibit G</u> to the Asset Purchase Agreement.

      40.    For the avoidance of doubt, subject to Paragraph 39(b) and Paragraph 39(c) above, the Purchase Price (as defined in the Asset Purchase Agreement) shall be payable by the Forward Buyer without any set-off, offset, adjustment, counterclaim, recoupment or any other reduction to the Purchase Price including in connection with any NRZ Released Claim, except as set forth in the Asset Purchase Agreement.

Dated:  September 26, 2019
        New York, New York

/s/ *James L. Garrity, Jr.*
THE HONORABLE JAMES L. GARRITY, JR.
UNITED STATES BANKRUPTCY JUDGE

**584**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X
                                                    :
In re                                               :    **Chapter 11**
                                                    :
**DITECH HOLDING CORPORATION**, *et al.*,           :    **Case No. 19-10412 (JLG)**
                                                    :
        Debtors.[1]                                 :    **(Jointly Administered)**
                                                    :
-------------------------------------------------------------X

## THIRD AMENDED JOINT CHAPTER 11 PLAN OF DITECH HOLDING CORPORATION AND ITS AFFILIATED DEBTORS

**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock, P.C.
Sunny Singh
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Debtors*
*and Debtors in Possession*

Dated:  September 22, 2019
        New York, New York

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Debtors' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

## Table of Contents

Page

**ARTICLE I**  DEFINITIONS AND INTERPRETATION. ....................................................... 1
    A.    Definitions. ....................................................................................... 1
    B.    Interpretation; Application of Definitions and Rules of Construction. ......... 17
    C.    Reference to Monetary Figures. ........................................................... 17
    D.    Controlling Document. ........................................................................ 17
    E.    Certain Consent Rights. ...................................................................... 17

**ARTICLE II**  ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS. ...................... 18
    2.1.    Administrative Expense Claims. .......................................................... 18
    2.2.    Fee Claims. ...................................................................................... 18
    2.3.    Priority Tax Claims. ........................................................................... 19
    2.4.    DIP Claims. ...................................................................................... 19
    2.5.    Restructuring Expenses. ..................................................................... 19

**ARTICLE III**  CLASSIFICATION OF CLAIMS AND INTERESTS. ................................. 19
    3.1.    Classification in General. ................................................................... 19
    3.2.    Grouping of Debtors for Convenience Only. .......................................... 20
    3.3.    Summary of Classification. ................................................................. 20
    3.4.    Special Provision Governing Unimpaired Claims. .................................. 20
    3.5.    Elimination of Vacant Classes. ........................................................... 21

**ARTICLE IV**  TREATMENT OF CLAIMS AND INTERESTS. ......................................... 21
    4.1.    Priority Non-Tax Claims (Class 1). ...................................................... 21
    4.2.    Other Secured Claims (Class 2). .......................................................... 21
    4.3.    Term Loan Claims (Class 3). ............................................................... 22
    4.4.    Second Lien Notes Claims (Class 4). .................................................... 23
    4.5.    General Unsecured Claims (Class 5). .................................................... 23
    4.6.    Consumer Creditor Claims (Class 6). ................................................... 24
    4.7.    Intercompany Claims (Class 7). ........................................................... 25
    4.8.    Intercompany Interests (Class 8). ........................................................ 25
    4.9.    Parent Equity Interests (Class 9). ........................................................ 25
    4.10.    Subordinated Securities Claims (Class 10). ........................................... 26

**ARTICLE V**  MEANS FOR IMPLEMENTATION. .......................................................... 27
    5.1.    No Substantive Consolidation. ............................................................ 27
    5.2.    Compromise and Settlement of Claims, Interests, and Controversies. ......... 27
    5.3.    Marketing Process. ............................................................................ 30
    5.4.    Election Notice. ................................................................................ 31
    5.5.    Sources of Consideration for Plan Distributions. .................................... 31
    5.6.    Sale Transaction. .............................................................................. 31
    5.7.    Reorganization Transaction. ............................................................... 34
    5.8.    Fannie Mae; Freddie Mac; Ginnie Mae. ............................................... 37
    5.9.    Employee Matters. ............................................................................ 39

i

Table of Contents
(continued)

| | | |
|---|---|---|
| 5.10. | Effectuating Documents; Further Transactions. | 40 |
| 5.11. | Exemption from Securities Laws; Transferability. | 41 |
| 5.12. | Cancellation of Existing Securities and Agreements | 41 |
| 5.13. | Cancellation of Liens. | 43 |
| 5.14. | Subordination Agreements. | 43 |
| 5.15. | Nonconsensual Confirmation. | 43 |
| 5.16. | Closing of Chapter 11 Cases. | 43 |
| 5.17. | Notice of Effective Date. | 43 |
| 5.18. | Separability. | 43 |
| 5.19. | GUC Recovery Trust. | 44 |

**ARTICLE VI   DISTRIBUTIONS.** .......................................................................... 46

| | | |
|---|---|---|
| 6.1. | Distributions Generally. | 46 |
| 6.2. | Distribution Record Date. | 46 |
| 6.3. | Date of Distributions. | 47 |
| 6.4. | Disbursing Agent. | 47 |
| 6.5. | Rights and Powers of Disbursing Agent. | 48 |
| 6.6. | Expenses of Disbursing Agent. | 48 |
| 6.7. | No Postpetition Interest on Claims. | 48 |
| 6.8. | Delivery of Distributions. | 48 |
| 6.9. | Distributions after Effective Date. | 49 |
| 6.10. | Unclaimed Property. | 49 |
| 6.11. | Time Bar to Cash Payments. | 50 |
| 6.12. | Manner of Payment under Plan. | 50 |
| 6.13. | Satisfaction of Claims. | 50 |
| 6.14. | Fractional Stock and Notes. | 50 |
| 6.15. | Minimum Cash Distributions. | 50 |
| 6.16. | Setoffs and Recoupments. | 50 |
| 6.17. | Allocation of Distributions between Principal and Interest. | 51 |
| 6.18. | No Distribution in Excess of Amount of Allowed Claim. | 51 |
| 6.19. | Withholding and Reporting Requirements. | 51 |
| 6.20. | Hart-Scott-Rodino Antitrust Improvements Act. | 52 |

**ARTICLE VII PROCEDURES FOR DISPUTED CLAIMS.** .......................................... 52

| | | |
|---|---|---|
| 7.1. | Objections to Claims. | 52 |
| 7.2. | Resolution of Disputed Administrative Expenses and Disputed Claims. | 52 |
| 7.3. | Payments and Distributions with Respect to Disputed Claims. | 53 |
| 7.4. | Distributions after Allowance. | 53 |
| 7.5. | Disallowance of Claims. | 53 |
| 7.6. | Estimation of Claims. | 53 |
| 7.7. | No Distributions Pending Allowance. | 54 |
| 7.8. | Claim Resolution Procedures Cumulative. | 54 |
| 7.9. | Interest. | 54 |

Table of Contents
(continued)

7.10.    Insured Claims. ................................................................................................ 54

**ARTICLE VIII**          EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............... 54

8.1.    General Treatment. ........................................................................................... 54
8.2.    Determination of Assumption Disputes and Deemed Consent. .................... 55
8.3.    Rejection Damages Claims. ............................................................................ 56
8.4.    Insurance Policies. .......................................................................................... 56
8.5.    Intellectual Property Licenses and Agreements. ............................................ 57
8.6.    Tax Agreements. ............................................................................................. 57
8.7.    Assignment. .................................................................................................... 58
8.8.    Modifications, Amendments, Supplements, Restatements, or Other
         Agreements. .................................................................................................... 58
8.9.    Reservation of Rights. .................................................................................... 58

**ARTICLE IX**   CONDITIONS PRECEDENT TO CONFIRMATION OF PLAN AND
EFFECTIVE DATE. .......................................................................................... 59

9.1.    Conditions Precedent to Confirmation of Plan. ............................................. 59
9.2.    Conditions Precedent to Effective Date .......................................................... 59
9.3.    Waiver of Conditions Precedent. .................................................................... 60
9.4.    Effect of Failure of a Condition. .................................................................... 61

**ARTICLE X**   EFFECT OF CONFIRMATION OF PLAN. ....................................................... 61

10.1.    Vesting of Assets. ........................................................................................... 61
10.2.    Binding Effect. ............................................................................................... 61
10.3.    Discharge of Claims and Termination of Interests. ....................................... 61
10.4.    Term of Injunctions or Stays. ........................................................................ 62
10.5.    Injunction. ...................................................................................................... 62
10.6.    Releases. ......................................................................................................... 63
10.7.    Exculpation. ................................................................................................... 65
10.8.    Subordinated Claims. ..................................................................................... 65
10.9.    Retention of Causes of Action/Reservation of Rights. .................................. 66
10.10.   Solicitation of Plan. ....................................................................................... 66
10.11.   Corporate and Limited Liability Company Action. ....................................... 66

**ARTICLE XI**   RETENTION OF JURISDICTION. ................................................................. 67

11.1.    Retention of Jurisdiction. ............................................................................... 67
11.2.    Courts of Competent Jurisdiction. ................................................................. 68

**ARTICLE XII** MISCELLANEOUS PROVISIONS. ................................................................ 69

12.1.    Payment of Statutory Fees. ............................................................................ 69
12.2.    Substantial Consummation of the Plan. ......................................................... 69
12.3.    Plan Supplement. ........................................................................................... 69

WEIL:\97137790\1\41703.0010

Table of Contents
(continued)

Page

12.4.     Request for Expedited Determination of Taxes.............................................................. 69
12.5.     Exemption from Certain Transfer Taxes. ....................................................................... 69
12.6.     Amendments. ................................................................................................................. 70
12.7.     Effectuating Documents and Further Transactions. ....................................................... 70
12.8.     Revocation or Withdrawal of Plan. ............................................................................... 70
12.9.     Dissolution of Unsecured Creditors' Committee and Consumer Creditors'
          Committee. .................................................................................................................... 71
12.10.    Severability of Plan Provisions...................................................................................... 71
12.11.    Governing Law. ............................................................................................................. 71
12.12.    Time................................................................................................................................ 71
12.13.    Dates of Actions to Implement the Plan. ....................................................................... 71
12.14.    Immediate Binding Effect. ............................................................................................ 72
12.15.    Deemed Acts.................................................................................................................. 72
12.16.    Successor and Assigns.................................................................................................... 72
12.17.    Entire Agreement............................................................................................................ 72
12.18.    Exhibits to Plan.............................................................................................................. 72
12.19.    Notices............................................................................................................................ 72

WEIL:\97137790\1\41703.0010

Each of Ditech Holding Corporation, DF Insurance Agency LLC, Ditech Financial LLC, Green Tree Credit LLC, Green Tree Credit Solutions LLC, Green Tree Insurance Agency of Nevada, Inc., Green Tree Investment Holdings III LLC, Green Tree Servicing Corp., Marix Servicing LLC, Mortgage Asset Systems, LLC, REO Management Solutions, LLC, Reverse Mortgage Solutions, Inc., Walter Management Holding Company LLC, and Walter Reverse Acquisition LLC (each, a "**Debtor**" and, collectively, the "**Debtors**") propose the following joint chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code.  Capitalized terms used herein shall have the meanings set forth in Article I.A.

## ARTICLE I    DEFINITIONS AND INTERPRETATION.

A.    **Definitions.**  The following terms shall have the respective meanings specified below:

1.1    *363(o) Claim* means any Claim by a Borrower related to an interest (a) in a consumer credit transaction that is subject to the Truth in Lending Act or any interest in a consumer credit contract (as defined in section 433.1 of title 16 of the Code of Federal Regulations (January 1, 2004), as amended from time to time); and (b) that is purchased by the Forward Stalking Horse Purchaser in accordance with the Forward Stalking Horse Purchase Agreement or that is purchased by the Reverse Stalking Horse Purchaser or assumed by Reorganized RMS in accordance with the Reverse Stalking Horse Purchase Agreement, solely to the extent such Claim would be allowed against the Forward Stalking Horse Purchaser or Reorganized RMS as a successor-in-interest or otherwise under applicable nonbankruptcy law.

1.2    *Accepting Class* means a Class that votes to accept the Plan in accordance with section 1126 of the Bankruptcy Code.

1.3    *Administrative Expense Claim* means any right to payment constituting a cost or expense of administration incurred during the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Commencement Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Fee Claims; (c) Restructuring Expenses; (d) the DIP Claims; and (e) any other such claims expressly provided under the DIP Order.

1.4    *Affiliates* means "Affiliates" as such term is defined in section 101(2) of the Bankruptcy Code.

1.5    *Allowed* means, with reference to any Claim or Interest, a Claim or Interest (a) arising on or before the Effective Date as to which (i) no objection to allowance or priority, and no request for estimation or other challenge, including, without limitation, pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed and not withdrawn within the applicable period fixed by the Plan or applicable law, or (ii) any objection has been determined in favor of the holder of the Claim or Interest by a Final Order; (b) that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtors, Reorganized Debtors, GUC Recovery Trustee, Plan Administrator, or Consumer Representative, as applicable; (c) as to which the liability of the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, and the amount thereof are determined by a Final Order of a court of competent jurisdiction; or (d) expressly allowed hereunder; provided, however, that notwithstanding the foregoing, (x) unless expressly waived by the Plan, the Allowed amount of Claims or Interests shall be subject to and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable, and (y) the Reorganized Debtors and the GUC

Recovery Trust shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan.

1.6    ***Amended and Restated Credit Facility*** means, solely with respect to the Reorganization Transaction, the credit facility available under the Amended and Restated Credit Facility Agreement in an aggregate principal amount equal to $400,000,000 with Reorganized Ditech, as borrower, in accordance with and subject to the terms and conditions of the Amended and Restated Credit Facility Documents.

1.7    ***Amended and Restated Credit Facility Agent*** means an Entity appointed to serve as the administrative agent and collateral agent under the Amended and Restated Credit Facility Agreement, and its successors and assigns, solely in its capacity as such.

1.8    ***Amended and Restated Credit Facility Agreement*** means, solely with respect to the Reorganization Transaction, that certain credit agreement that amends and restates the Prepetition Credit Agreement, dated as of the Effective Date, among Reorganized Ditech, as borrower, the Amended and Restated Credit Facility Agent, solely in its capacity as administrative agent and collateral agent, and the Term Lenders, which shall be consistent with the terms in the RSA.

1.9    ***Amended and Restated Credit Facility Documents*** means, solely with respect to the Reorganization Transaction, collectively, the Amended and Restated Credit Facility Agreement and each other agreement, security agreement, pledge agreement, collateral assignment, mortgage, control agreement, guarantee, certificate, document or instrument executed and/or delivered in connection with any of the foregoing, whether or not specifically mentioned herein or therein, as the same may be modified, amended, restated, supplemented or replaced from time to time.

1.10    ***Amended Organizational Documents*** means the forms of certificates of incorporation, certificates of formation, limited liability company agreements, or other forms of organizational documents and bylaws, as applicable, of (i) solely with respect to the Sale Transaction, Ditech Holding Corporation on the Effective Date or (ii) solely with respect to the Reorganization Transaction, the Reorganized Debtors.

1.11    ***Asset*** means all of the right, title, and interest of the Debtors in and to property of whatever type or nature (including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property).

1.12    ***Asset Sale Proceeds*** means the net proceeds of an Asset Sale Transaction.

1.13    ***Asset Sale Transaction*** means the sale of a portion of the Debtors' assets consummated on or as soon as reasonably practicable after the Effective Date other than (i) a sale in the ordinary course of business, (ii) in connection with the Exit Working Capital Facility, (iii) a Sale Transaction, or (iv) the transactions pursuant to the NRZ Exit Tail Bridge Facility Documents; provided, that such sale shall be conducted in accordance with the terms of the RSA and the DIP Order.

1.14    ***Assumption Dispute*** means a pending objection relating to assumption of an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code.

1.15    ***Assumption Schedule*** means the schedule of executory contracts and unexpired leases to be assumed by the Debtors pursuant to the Plan that will be included in the Plan Supplement.

1.16    ***Ballot*** means the form(s) distributed to holders of Impaired Claims entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

1.17    ***Bankruptcy Code*** means title 11 of the United States Code, 11 U.S.C. § 101, *et seq.*, as amended from time to time, as applicable to the Chapter 11 Cases.

1.18    ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases or any other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of any reference under 28 U.S.C. § 157, the United States District Court for the Southern District of New York.

1.19    ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code and any Local Bankruptcy Rules of the Bankruptcy Court, in each case, as amended from time to time and applicable to the Chapter 11 Cases.

1.20    ***Benefit Plans*** means each (a) "employee benefit plan," as defined in section 3(3) of ERISA and (b) all other pension, retirement, bonus, incentive, health, life, disability, group insurance, vacation, holiday and fringe benefit plan, program, contract, or arrangement (whether written or unwritten) maintained, contributed to, or required to be contributed to, by the Debtors for the benefit of any of its current or former employees or independent contractors, other than those that entitle employees to, or that otherwise give rise to, Interests or consideration based on the value of Interests, in the Debtors.

1.21    ***Bidding Procedures*** means the procedures governing the auction and sale process relating to any potential Sale Transaction or Asset Sale Transaction, as approved by the Bankruptcy Court and as may be amended from time to time in accordance with their terms and otherwise in accordance with the RSA and the DIP Order.

1.22    ***Bidding Procedures Order*** means the *Order (I) Approving Bidding Procedures, (II) Approving Assumption and Assignment Procedures, and (III) Granting Related Relief* (ECF No. 456).

1.23    ***Borrower*** means any individual, as of the Commencement Date, whose current or former mortgage loan or reverse mortgage was originated, serviced, sold, consolidated, or owned by any of the Debtors.

1.24    ***Business Day*** means any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

1.25    ***Cash*** means legal tender of the United States of America.

1.26    ***Causes of Action*** means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, lien, indemnity, guaranty, suit, obligation, liability, loss, debt, damage, judgment, account, defense, remedies, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Commencement Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including, without limitation, under any state or federal securities laws).   Causes of Action also includes:  (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

WEIL:\97137790\1\41703.0010

1.27    *CCC Settlement* shall have the meaning ascribed to such term in Section 5.2(c) of the Plan.

1.28    *Chapter 11 Cases* means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Commencement Date in the Bankruptcy Court.

1.29    *Claim* has the meaning set forth in section 101(5) of the Bankruptcy Code, as against any Debtor.

1.30    *Class* means any group of Claims or Interests classified as set forth in Article III of the Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

1.31    *Commencement Date* means the date on which the Debtors commenced the Chapter 11 Cases.

1.32    *Confirmation Date* means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

1.33    *Confirmation Hearing* means the hearing to be held by the Bankruptcy Court to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.34    *Confirmation Order* means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1.35    *Consenting Term Lenders* means the Term Lenders that are party to the RSA together with their respective successors and permitted assigns and any subsequent Term Lenders that become party to the RSA in accordance with the terms of the RSA.

1.36    *Consumer Creditor Claim* means any Claim asserted by a Borrower against the Debtors including a 363(o) Claim.

1.37    *Consumer Creditor Net Proceeds* means the Consumer Creditor Recovery Cash Pool less the fees and expenses incurred by the Consumer Representative in connection with the satisfaction of its duties under the Plan in excess of the Consumer Representative Fee Reserve.

1.38    *Consumer Creditor Recovery Cash Pool* means, as a carve out from the Term Lenders' collateral (or the proceeds or value thereof), Cash in the amount of $10,000,000 to be contributed to the Consumer Creditor Reserve for the benefit of Allowed Consumer Creditor Claims.

1.39    *Consumer Creditor Reserve* means a reserve account consisting of the Consumer Creditor Recovery Cash Pool established by the Consumer Representative for distribution to holders of Allowed Consumer Creditor Claims in accordance with the Plan.

1.40    *Consumer Creditors' Committee* means the statutory committee of consumer creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

1.41    *Consumer Representative* means Tara Twomey, solely in her capacity as Consumer Representative, or any successor appointed in accordance with the Consumer Representative Agreement, responsible for the reconciliation and resolution of Consumer Creditor Claims and distribution of the Consumer Creditor Net Proceeds to holders of Allowed Consumer Creditor Claims in accordance with the Plan.

1.42    ***Consumer Representative Agreement*** means an agreement drafted by the Consumer Creditors' Committee, in consultation with the Debtors, governing the duties of the Consumer Representative in connection with the Plan.

1.43    ***Consumer Representative Fee Reserve*** means a reserve account consisting of $1,000,000 incurred by the Consumer Representative in connection with the satisfaction of its duties under the Plan from the date of selection of the Consumer Representative through and including the date of the final distribution to holders of Allowed Consumer Creditor Claims, subject to the reversionary provisions in Section 5.2(c)(vii) of the Plan.

1.44    ***Contributed Sale Proceeds*** means, as a carve out from the Term Lenders' collateral (or the proceeds or value thereof), an amount of Cash equal to one and a half percent (1.5%) of Net Cash Proceeds distributed to the holders of Allowed Term Loan Claims in excess of seventy percent (70%) of Allowed Term Loan Claims, excluding distributions on account of proceeds from the GUC Recovery Trust Causes of Action in accordance with the GUC Recovery Trust Agreement. For the avoidance of doubt, when calculating Contributed Sale Proceeds, the Contributed Sale Proceeds shall not be subtracted from the Net Cash Proceeds notwithstanding anything to the contrary in the Plan.

1.45    ***Cure Amount*** means the payment of Cash by the Debtors, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary pursuant to section 365(b)(1)(A) of the Bankruptcy Code to permit the Debtors to assume such executory contract or unexpired lease.

1.46    ***Debtor or Debtors*** has the meaning set forth in the introductory paragraph of the Plan.

1.47    ***Debtors in Possession*** means the Debtors in their capacity as debtors in possession in the Chapter 11 Cases pursuant to sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

1.48    ***Definitive Documents*** means the documents (including any related orders, agreements, instruments, schedules or exhibits) that are necessary or desirable to implement, or otherwise relate to the Restructuring Transaction or the Sale Transaction, including, but not limited to: (a) the Plan; (b) the Bidding Procedures; (c) the Disclosure Statement; (d) any motion seeking approval of the adequacy of the Disclosure Statement, solicitation of the Plan, and the Bidding Procedures; (e) the Disclosure Statement Order; (f) the Bidding Procedures Order; (g) the DIP Order; (h) each of the documents comprising the Plan Supplement; (i) the Confirmation Order; (j) the GUC Recovery Trust Agreement; (k) the Management Incentive Plan Term Sheet; (l) the Stalking Horse Purchase Agreement; and (m) the Consumer Representative Agreement.

1.49    ***DIP Agent*** means "DIP Agent" as defined in the DIP Order.

1.50    ***DIP Claims*** means all Claims held by the DIP Credit Parties on account of, arising under or relating to the DIP Documents or the DIP Order, which for the avoidance of doubt, shall include all "DIP Obligations" as such term is defined in the DIP Order.

1.51    ***DIP Credit Parties*** means "DIP Credit Parties" as defined in the DIP Order.

1.52    ***DIP Documents*** means "DIP Documents" as defined in the DIP Order.

1.53    ***DIP Facilities*** means "DIP Facilities" as defined in the DIP Order.

1.54    ***DIP Lenders*** means "DIP Lenders" as defined in the DIP Order.

1.55    **DIP Motion** means the *Debtors' Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 507, 546, 548, 555, 559, 560 and 561 (A) Authorizing Debtors to Enter Into Repurchase Agreement Facilities, Servicer Advance Facilities and Related Documents; (B) Authorizing Debtors to Sell Mortgage Loans and Servicer Advance Receivables in the Ordinary Course of Business; (C) Granting Back-Up Liens and Superpriority Administrative Expense Claims; (D) Authorizing Use of Cash Collateral and Granting Adequate Protection; (E) Modifying the Automatic Stay; (F) Scheduling a Final Hearing; and (G) Granting Related Relief* (ECF No. 26).

1.56    **DIP Order** means the final order approving the DIP Motion (ECF No. 422).

1.57    **Disallowed** means, with respect to any Claim or Interest, that such Claim or Interest has been determined by a Final Order or specified in a provision of the Plan not to be Allowed.

1.58    **Disbursing Agent** means (a) solely with respect to the Reorganization Transaction, the Reorganized Debtors; and (b) solely with respect to the Sale Transaction, the Plan Administrator; provided, that with respect to distributions to holders of (i) Allowed General Unsecured Claims, the GUC Recovery Trustee shall distribute the GUC Recovery Trust Assets as and when provided for in the GUC Recovery Trust Agreement; and (ii) Allowed Consumer Creditor Claims, the Consumer Representative.

1.59    **Disclosure Statement** means the disclosure statement filed by the Debtors in support of the Plan, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code (as may be amended, supplemented, or modified from time to time).

1.60    **Disclosure Statement Motion** means the *Motion of Debtors For Entry of an Order (I) Approving Disclosure Statement and Notice of Disclosure Statement Hearing, (II) Establishing Solicitation and Voting Procedures, (III) Scheduling Sale and Confirmation Hearing, (IV) Approving Sale and Confirmation Objection Procedures and Notice of Sale and Confirmation Hearing, (V) Approving Bidding Procedures, (VI) Approving Assumption and Assignment Procedures, and (VII) Granting Related Relief* (ECF No. 147).

1.61    **Disclosure Statement Order** means one or more orders entered by the Bankruptcy Court (a) finding that the Disclosure Statement (including any amendment, supplement, or modification thereto) contains adequate information pursuant to section 1125 of the Bankruptcy Code; (b) authorizing solicitation of the Plan; and (c) approving the Bidding Procedures.

1.62    **Disputed** means with respect to a Claim or Interest, that (a) is neither Allowed nor Disallowed under the Plan or a Final Order, nor deemed Allowed under sections 502, 503, or 1111 of the Bankruptcy Code; or (b) the Debtors or any parties in interest have interposed a timely objection or request for estimation, and such objection or request for estimation has not been withdrawn or determined by a Final Order.  If the Debtors dispute only a portion of a Claim, such Claim shall be deemed Allowed in any amount the Debtors do not dispute, and Disputed as to the balance of such Claim.

1.63    **Distribution Record Date** means the Effective Date (or as soon as practicable thereafter) or such other date as agreed upon among the Debtors, the Requisite Term Lenders, and the Prepetition Administrative Agent.

1.64    **Ditech** means Ditech Holding Corporation.

1.65    **Ditech Financial** means Ditech Financial LLC.

1.66    **DTC** means the Depository Trust Company.

1.67    ***Effective Date*** means the date on which all conditions to the effectiveness of the Plan set forth in Article IX hereof have been satisfied or waived in accordance with the terms of the Plan.

1.68    ***Elected Transaction*** shall have the meaning ascribed to such term in Section 5.4 of the Plan.

1.69    ***Electing Term Lenders*** shall have the meaning ascribed to such term in Section 5.4 of the Plan.

1.70    ***Election Date*** shall have the meaning ascribed to such term in Section 5.4 of the Plan.

1.71    ***Election Notice*** shall have the meaning ascribed to such term in Section 5.4 of the Plan.

1.72    ***Employee Arrangements*** shall have the meaning ascribed to such term in Section 5.9 of the Plan.

1.73    ***Entity*** means an individual, corporation, partnership, limited partnership, limited liability company, association, joint stock company, joint venture, estate, trust, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code) or any political subdivision thereof, or other person (as defined in section 101(41) of the Bankruptcy Code) or other entity.

1.74    ***ERISA*** means the Employee Retirement Income Security Act of 1974, as amended.

1.75    ***Estate or Estates*** means, individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

1.76    ***Exchange Act*** means the Securities Exchange Act of 1934, as amended.

1.77    ***Exculpated Parties*** means collectively the: (a) Debtors; (b) Reorganized Debtors; (c) Reorganized RMS; (d) Plan Administrator; (e) the Wind Down Estates; (f) Consenting Term Lenders; (g) Prepetition Administrative Agent; (h) Prepetition Warehouse Parties, (i) DIP Credit Parties; (j) Successful Bidders; (k) Unsecured Creditors' Committee and each of its members in their capacity as such; (l) Exit Warehouse Facilities Lenders; (m) National Founders; (n) GUC Recovery Trustee; (o) Consumer Creditors' Committee and each of its members in their capacity as such; (p) Consumer Representative; and (q) with respect to each of the foregoing Entities in clauses (a) through (p), all Persons and Entities who acted on their behalf in connection with the matters as to which exculpation is provided herein.

1.78    ***Exit Warehouse Facilities*** means, solely with respect to the Reorganization Transaction, the facilities to be entered into by the Reorganized Debtors and the Exit Warehouse Facilities Lenders on the Effective Date.

1.79    ***Exit Warehouse Facilities Documents*** means, solely with respect to the Reorganization Transaction, collectively, each agreement, security agreement, pledge agreement, collateral assignments, mortgages, control agreements, guarantee, certificate, document or instrument executed and/or delivered in connection with any of the foregoing, whether or not specifically mentioned herein or therein, as the same may be modified, amended, restated, supplemented or replaced from time to time that shall govern the Exit Warehouse Facilities.

WEIL:\97137790\1\41703.0010

1.80    ***Exit Warehouse Facilities Lenders*** means the Persons party to the Exit Warehouse Facilities Documents as "Lenders", "Buyers", "Administrative Agent", "Credit Parties" and/or similar terms thereunder, and each of their respective successors and permitted assigns.

1.81    ***Exit Working Capital Facility*** means, solely with respect to the Reorganization Transaction, (a) the facility to be entered into by Reorganized Ditech, as borrower, and the Exit Working Capital Facility Lenders on the Effective Date, in accordance with the terms of the Exit Working Capital Facility Agreement, or (b) an asset sale or financing transaction to enhance the liquidity of the Reorganized Debtors, including a sale of mortgage servicing rights, that is designated by the Debtors and Requisite Term Lenders as an "Exit Working Capital Facility."

1.82    ***Exit Working Capital Facility Agreement*** means, solely with respect to the Reorganization Transaction, the agreement to be entered into by Reorganized Ditech on the Effective Date, that shall govern the Exit Working Capital Facility.

1.83    ***Exit Working Capital Facility Documents*** means, solely with respect to the Reorganization Transaction, collectively, the Exit Working Capital Facility Agreement and each other agreement, security agreement, pledge agreement, collateral assignment, mortgage, control agreement, guarantee, certificate, document or instrument executed and/or delivered in connection with any of the foregoing, whether or not specifically mentioned herein or therein, as the same may be modified, amended, restated, supplemented or replaced from time to time, that shall govern the Exit Working Capital Facility.

1.84    ***Exit Working Capital Facility Lenders*** means the Persons party to the Exit Working Capital Facility Agreement as "Lenders", "Buyers", "Administrative Agent", "Credit Parties" and/or similar terms thereunder, and each of their respective successors and permitted assigns.

1.85    ***Fannie Mae*** means the Federal National Mortgage Association.

1.86    ***Fannie Mae Acknowledgement Agreement*** means "Fannie Mae Acknowledgement Agreements" as defined in the DIP Order.

1.87    ***Fannie Mae Lender Contracts*** means "Fannie Mae Lender Contracts" as defined in the DIP Order.

1.88    ***Fee Claim*** means a Claim for professional services rendered or costs incurred on or after the Commencement Date through the Effective Date by professional persons retained by the Debtors or the Unsecured Creditors' Committee by an order of the Bankruptcy Court pursuant to sections 327, 328, 329, 330, 331, or 503(b) of the Bankruptcy Code in the Chapter 11 Cases.

1.89    ***Final Order*** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending; or (b) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument, or rehearing shall have expired; provided, however, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any

WEIL:\97137790\1\41703.0010

analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

1.90    ***Forward Stalking Horse Purchase Agreement*** means that certain Asset Purchase Agreement between the Debtors and the Forward Stalking Horse Purchaser.

1.91    ***Forward Stalking Horse Purchaser*** means New Residential Investment Corp.

1.92    ***Freddie Mac*** means the Federal Home Loan Mortgage Corporation.

1.93    ***Freddie Mac Agreements*** means the (a) Freddie Mac Acknowledgment Agreement; (b) Freddie Mac Pledge Agreement; (c) Freddie Mac Master Agreement; (d) Freddie Mac Purchase Agreement (items (a) through (d), as defined in the DIP Order); and (e) Freddie Mac Single-Family Seller/Servicer Guide.

1.94    ***General Unsecured Claim*** means any Claim against the Debtors (excluding any Intercompany Claims and Consumer Creditor Claims) as of the Commencement Date that is neither secured by collateral nor entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court; provided, that a General Unsecured Claim shall not include the Term Loan Deficiency Claim or a deficiency Claim on account of Second Lien Notes Claims.

1.95    ***Ginnie Mae*** means the Government National Mortgage Association.

1.96    ***Ginnie Mae Agreements*** means "Ginnie Mae Agreements" as defined in the DIP Order.

1.97    ***GUC Recovery Trust*** means the trust established pursuant to the GUC Recovery Trust Agreement.

1.98    ***GUC Recovery Trust Agreement*** means the trust agreement by and among the Debtors and the GUC Recovery Trustee, substantially in the form included in the Plan Supplement and consistent with Section 5.2(b) of the Plan; provided, that the GUC Recovery Trust Agreement shall be in form and substance reasonably acceptable to the Unsecured Creditors' Committee, the Debtors, and the Requisite Term Lenders.

1.99    ***GUC Recovery Trust Assets*** shall, pursuant to the UCC Settlement, consist of (a) Cash in the amount of $4,000,000 less (i) the Remaining IT Fees payable on the Effective Date pursuant to Section 5.2(b)(v) of the Plan; (ii) the Remaining MBS Fees payable on the Effective Date pursuant to Section 5.2(b)(vi) of the Plan; and (iii) any fees and expenses of the Unsecured Creditors' Committee's advisors in excess of the Unsecured Creditors' Committee Budget; (b) a fifty percent (50%) undivided interest in the GUC Recovery Trust Causes of Action and the net proceeds thereof; and (c) Contributed Sale Proceeds less any Contributed Sale Proceeds paid to holders of Allowed Second Lien Notes Claims in accordance with Section 4.4(b) of the Plan.

1.100    ***GUC Recovery Trust Causes of Action*** means all Causes of Action of the Debtors under chapter 5 of the Bankruptcy Code or under similar or related state or federal statutes and common law, including, without limitation, all preference, fraudulent conveyance, fraudulent transfer, and/or other similar avoidance claims, rights, and causes of action, and commercial tort law, except any such Causes of Action against any (a) Released Party that are released pursuant to the Plan; (b) landlords; and (c) third party vendors providing services or goods to the Debtors in the ordinary course of business.

1.101 **GUC Recovery Trust Interest** means a non-certificated beneficial interest in the GUC Recovery Trust granted to each holder of an Allowed General Unsecured Claim, which shall entitle such holder to a Pro Rata share in the GUC Recovery Trust Assets in accordance with the GUC Recovery Trust Agreement with other holders of Allowed General Unsecured Claims.

1.102 **GUC Recovery Trustee** means the Person selected by the Unsecured Creditors' Committee to serve as the trustee of the GUC Recovery Trust, and any successor thereto in accordance with the GUC Recovery Trust Agreement.

1.103 **Impaired** means, with respect to a Claim, Interest, or Class of Claims or Interests, "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

1.104 **Insured Claims** means any Claim or portion of a Claim that is, or may be, insured under any of the Debtors' insurance policies.

1.105 **Intercompany Claim** means any pre- or postpetition Claim against a Debtor held by another Debtor.

1.106 **Intercompany Interest** means an Interest in a Debtor held by another Debtor.  For the avoidance of doubt, an Intercompany Interest shall exclude a Parent Equity Interest.

1.107 **Interests** means any equity security (as defined in section 101(16) of the Bankruptcy Code) of a Debtor, including all shares, common stock, preferred stock, or other instrument evidencing any fixed or contingent ownership interest in any Debtor, whether or not transferable, and any option, warrant, or other right, contractual or otherwise, to acquire any such interest in the Debtors, whether fully vested or vesting in the future, including, without limitation, equity or equity-based incentives, grants, or other instruments issued, granted or promised to be granted to current or former employees, directors, officers, or contractors of the Debtors, to acquire any such interests in the Debtors that existed immediately before the Effective Date.

1.108 **KEIP Order** means the *Order Approving Key Employee Incentive Program* (ECF No. 450).

1.109 **Lien** has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.110 **Management Incentive Plan** means, solely with respect to the Reorganization Transaction, a post-emergence management incentive plan, under which up to 10% of the New Common Stock (after taking into account the shares to be issued under the Management Incentive Plan) will be reserved for issuance as awards on terms and conditions described in and consistent with the Management Incentive Plan Term Sheet.

1.111 **Management Incentive Plan Term Sheet** means, solely with respect to the Reorganization Transaction, the term sheet for the Management Incentive Plan included in the Plan Supplement.

1.112 **MBS Trustees** means The Bank of New York Mellon, The Bank of New York Mellon Trust Company, N.A., Deutsche Bank National Trust Company, Deutsche Bank Trust Company Americas, U.S. Bank National Association, and all related affiliates, successors, and assigns, each in its capacity as an indenture trustee, trustee, registrar, custodian, account bank, auction agent, or similar agency capacity.

1.113   **Memorandum Decision** means the *Memorandum Decision on Confirmation of the Second Amended Joint Chapter 11 Plan of Ditech Holding Corporation and its Affiliated Debtors* (ECF No. 1240) entered by the Bankruptcy Court.

1.114   **National Founders** means "National Founders Facility Parties" as defined in the DIP Order.

1.115   **National Founders Facility** means "National Founders Facility" as defined in the DIP Order.

1.116   **National Founders Facility Agreement** means "National Founders Facility Agreement" as defined in the DIP Order.

1.117   **National Founders Facility Claim** means all Claims held by National Founders on account of, arising under or relating to the National Founders Facility Agreement.

1.118   **Net Cash Proceeds** means (a) all Cash of the Debtors realized from their business operations, the Sale Transaction Proceeds, and the Asset Sale Proceeds less (b) the amount of Cash (i) necessary to pay holders of Allowed (or reserve for Disputed) Administrative Expense Claims, Fee Claims, Priority Tax Claims, DIP Claims, Priority Non-Tax Claims, and Other Secured Claims; (ii) contributed on the Effective Date to the GUC Recovery Trust, or the Second Lien Recovery Cash Pool; (iii) constituting Contributed Sale Proceeds; (iv) estimated and reserved by the Debtors or the Plan Administrator to adequately fund the Wind Down of the Estates; (v) contributed on the Effective Date to the Consumer Creditor Reserve; (vi) contributed on the Effective Date to the Consumer Representative Fee Reserve; and (vii) necessary for the payment in full in Cash of all obligations outstanding from time to time under the NRZ Exit Tail Bridge Facility Documents. For the avoidance of doubt, the term "Net Cash Proceeds" shall not include any Repurchase Assets (as defined in the NRZ Exit Tail Bridge Facility Agreement) prior to the payment in full in Cash of all obligations outstanding from time to time under the NRZ Exit Tail Bridge Facility Documents and the termination of the NRZ Exit Tail Bridge Facility.

1.119   **New Board** means the new board of directors of (i) solely with respect to the Sale Transaction, Ditech Holding Corporation on the Effective Date or (ii) solely with respect to the Reorganization Transaction, Reorganized Ditech on the Effective Date.

1.120   **New Common Stock** means, solely with respect to the Reorganization Transaction, the shares of common stock, par value $.01 per share to be issued by Reorganized Ditech authorized pursuant to the Amended Organizational Documents of Reorganized Ditech, and all of which shall be deemed validly issued, fully-paid, and non-assessable.

1.121   **NRZ Exit Tail Bridge Facility** means, solely with respect to the Sale Transaction under the Forward Stalking Horse Purchase Agreement, the facility that may be entered into by the Plan Administrator or any of its designees acting as an officer of the applicable Wind Down Estate(s) (on behalf of the applicable Wind Down Estates) and the NRZ Exit Tail Bridge Facility Credit Parties on or after the Effective Date, in accordance with the terms of the NRZ Exit Tail Bridge Facility Agreement.

1.122   **NRZ Exit Tail Bridge Facility Agreement** means, solely with respect to the Sale Transaction under the Forward Stalking Horse Purchase Agreement, the agreement that shall govern the NRZ Exit Tail Bridge Facility, the material terms of which are set forth in the NRZ Exit Tail Bridge Facility Term Sheet.

1.123   ***NRZ Exit Tail Bridge Facility Credit Parties*** means, solely with respect to the Sale Transaction under the Forward Stalking Horse Purchase Agreement, the Persons party to the NRZ Exit Tail Bridge Facility Documents as "Lenders", "Buyers", "Administrative Agent", "Credit Parties" and/or similar terms thereunder, and each of their respective successors and permitted assigns.

1.124   ***NRZ Exit Tail Bridge Facility Documents*** means, solely with respect to the Sale Transaction under the Forward Stalking Horse Purchase Agreement, collectively, the NRZ Exit Tail Bridge Facility Agreement and each other agreement, security agreement, pledge agreement, collateral assignment, mortgage, control agreement, guarantee, certificate, document or instrument executed and/or delivered in connection with any of the foregoing, whether or not specifically mentioned herein or therein, as the same may be modified, amended, restated, supplemented or replaced from time to time in accordance with the terms thereof, that shall govern the NRZ Exit Tail Bridge Facility.

1.125   ***NRZ Exit Tail Bridge Facility Term Sheet*** means, solely with respect to the Sale Transaction under the Forward Stalking Horse Purchase Agreement, the term sheet for the NRZ Exit Tail Bridge Facility.

1.126   ***Other Secured Claim*** means a Secured Claim, other than an Administrative Expense Claim, a DIP Claim, a Priority Tax Claim, a Term Loan Claim, or a Second Lien Notes Claim.

1.127   ***Parent Equity Interests*** means any Interest in Ditech.

1.128   ***Person*** means any individual, corporation, partnership, limited liability company, association, indenture trustee, organization, joint stock company, joint venture, estate, trust, Governmental Unit or any political subdivision thereof, or any other Entity.

1.129   ***Plan*** means this joint chapter 11 plan, including all appendices, exhibits, schedules, and supplements hereto (including, without limitation, any appendices, schedules, and supplements to the Plan contained in the Plan Supplement), as the same may be amended, supplemented, or modified from time to time in accordance with the RSA, DIP Order, the provisions of the Bankruptcy Code and the terms hereof.

1.130   ***Plan Administrator*** means Gerald A. Lombardo, solely in his capacity as Plan Administrator, or any successor appointed by the New Board.

1.131   ***Plan Supplement*** means a supplemental appendix to the Plan containing, among other things, forms or term sheets of applicable documents, schedules, and exhibits to the Plan to be filed with the Court, including, but not limited to, the following: (a) Assumption Schedule; (b) Rejection Schedule; (c) to the extent known, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; and (d) GUC Recovery Trust Agreement; provided, that through the Effective Date, the Debtors shall have the right to amend the Plan Supplement and any schedules, exhibits, or amendments thereto, in accordance with the terms of the Plan and the RSA.  The Plan Supplement shall be filed with the Bankruptcy Court no later than seven (7) calendar days prior to the deadline to object to the Plan.  The Debtors shall have the right to amend the documents contained in the Plan Supplement through and including the Effective Date in accordance with Article IX of the Plan (including, for the avoidance of doubt, to reflect the terms and conditions of the Sale Transaction).

1.132   ***Prepetition Administrative Agent*** means Credit Suisse AG, Cayman Islands Branch (formerly Credit Suisse AG), solely in its capacity as administrative agent and collateral agent under the Prepetition Credit Agreement, and its successors and assigns.

WEIL:\97137790\1\41703.0010

**601**

1.133   ***Prepetition Credit Agreement*** means that certain Second Amended and Restated Credit Agreement, dated as of February 9, 2018 (and as amended by that certain Amendment No. 1 to Second Amended and Restated Credit Agreement, dated as of March 29, 2018), among Ditech, as the borrower, the Prepetition Administrative Agent and the other lenders party thereto, as amended, modified, or supplemented from time to time prior to the Commencement Date.

1.134   ***Prepetition Intercreditor Agreement*** means "Intercreditor Agreement" as defined in the Prepetition Credit Agreement.

1.135   ***Prepetition Second Lien Notes Indenture*** means that certain indenture dated as of February 9, 2018, between Ditech, the guarantors named therein, and the Prepetition Second Lien Notes Trustee, as amended, modified, or supplemented from time to time prior to the Commencement Date.

1.136   ***Prepetition Second Lien Notes Trustee*** means Wilmington Savings Fund Society, FSB, solely in its capacity as trustee under the Prepetition Second Lien Notes Indenture, and its successors and assigns.

1.137   ***Prepetition Term Loans*** means "Term Loans" as defined in the Prepetition Credit Agreement.

1.138   ***Prepetition Warehouse Parties*** means "Prepetition Warehouse Parties" as defined in the DIP Order.

1.139   ***Priority Non-Tax Claim*** means any Claim other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

1.140   ***Priority Tax Claim*** means any Secured Claim or unsecured Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.141   ***Pro Rata*** means the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that Class, or the proportion that Allowed Claims or Interests in a particular Class bear to the aggregate amount of Allowed Claims and Disputed Claims or Allowed Interests and Disputed Interests in a particular Class and other Classes entitled to share in the same recovery as such Class under the Plan.

1.142   ***Reinstate, Reinstated, or Reinstatement*** means leaving a Claim Unimpaired under the Plan.

1.143   ***Rejection Schedule*** means the schedule of certain specific executory contracts and unexpired leases to be rejected by the Debtors pursuant to the Plan.

1.144   ***Related Parties*** means with respect to (i) any Exculpated Party or any Released Party, such Entities' predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, (ii) all of their respective current and former officers, directors, principals, stockholders (and any fund managers, fiduciaries or other agents of stockholders with any involvement related to the Debtors), members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, solely to the extent such Persons and Entities acted on the behalf of the Released

Parties in connection with the matters as to which releases are provided herein, and (iii) such persons' respective heirs, executors, estates, servants and nominees.

1.145   **Released Parties** means collectively the: (a) Debtors; (b) Reorganized Debtors; (c) the Wind Down Estates (if applicable); (d) Consenting Term Lenders; (e) Prepetition Administrative Agent; (f) Prepetition Warehouse Parties; (g) DIP Credit Parties; (h) National Founders; (i) Unsecured Creditors' Committee and each of its members in their capacity as such; (j) GUC Recovery Trustee; (k) Reorganized RMS; (l) NRZ Exit Tail Bridge Facility Credit Parties; (m) Consumer Creditors' Committee and each of its members in their capacity as such; (n) Consumer Representative; and (o) Related Parties for each of the foregoing.

1.146   **Remaining IT Fees** means, collectively, the reasonable and documented fees, costs and expenses incurred by the Prepetition Second Lien Notes Trustee not payable as a cure of any assumed or assumed and assigned contracts.

1.147   **Remaining MBS Fees** means, collectively, the reasonable and documented fees, costs and expenses incurred by the MBS Trustees payable under the respective governing agreements, which have not been paid as a cure of any assumed or assumed and assigned contracts.

1.148   **Reorganization Transaction** means, collectively, (a) issuance of the New Common Stock; (b) entry into the Amended and Restated Credit Facility Agreement; (c) entry into the Exit Working Capital Facility Agreement; (d) entry into the Exit Warehouse Facilities Documents; (e) execution of the Amended Organizational Documents; (f) vesting of the Debtors' assets in the Reorganized Debtors, in each case, in accordance with the Plan; and (g) the other transactions that the Debtors and the Requisite Term Lenders reasonably determine are necessary or appropriate to implement the foregoing, in each case, in accordance with the Plan, RSA, and the DIP Order.

1.149   **Reorganized Debtors** means, solely with respect to the Reorganization Transaction, the Debtors, as reorganized pursuant to and under the Plan on or after the Effective Date.

1.150   **Reorganized Ditech** means, solely with respect to the Reorganization Transaction, Ditech, as reorganized pursuant to and under the Plan on or after the Effective Date.

1.151   **Reorganized RMS** means, solely with respect to the Sale Transaction, RMS, as reorganized pursuant to and under the Plan on or after the Effective Date.

1.152   **Reorganized RMS Stock** means, solely with respect to the Sale Transaction, one hundred percent (100%) of the equity interests in Reorganized RMS issued to Mortgage Assets Management, LLC on the Effective Date in accordance with the Reverse Stalking Horse Purchase Agreement.

1.153   **Requisite Term Lenders** means, as of the date of determination, Consenting Term Lenders holding at least a majority in aggregate principal amount outstanding of the Prepetition Term Loans held by the Consenting Term Lenders as of such date.

1.154   **Restructuring Expenses** means with respect to (a) the Requisite Term Lenders, the reasonable and documented fees, costs, and expenses of (i) Kirkland & Ellis LLP, (ii) one law firm acting as local counsel (if any), and (iii) FTI Consulting Inc.; and (b) the Prepetition Administrative Agent, the reasonable fees, costs, and expenses of (i) the Prepetition Administrative Agent, (ii) Davis Polk & Wardwell LLP, and (iii) one law firm acting as local counsel (if any), in each case, in accordance with the Prepetition Credit Agreement.

1.155    ***Reverse Stalking Horse Purchase Agreement*** means that certain Stock and Asset Purchase Agreement (as amended, supplemented, or modified from time to time) by and among Ditech Holding Corporation, Walter Reverse Acquisition LLC, Reverse Mortgage Solutions, Inc., and the Reverse Stalking Horse Purchaser.

1.156    ***Reverse Stalking Horse Purchaser*** means collectively, Mortgage Assets Management, LLC and SHAP 2018-1, LLC.

1.157    ***RMS*** means Reverse Mortgage Solutions, Inc.

1.158    ***RSA*** means that certain restructuring support agreement, dated as of February 8, 2019, by and among the Debtors and the Consenting Term Lenders (as may be amended, supplemented, or modified from time to time in accordance with the terms thereof) annexed to the Disclosure Statement as Exhibit B.

1.159    ***Sale Incentive Awards*** means "Sale Incentive Awards" as defined in the KEIP Order.

1.160    ***Sale Transaction*** means the transactions to be effectuated pursuant to the Stalking Horse Purchase Agreements.

1.161    ***Sale Transaction Proceeds*** means the net proceeds of a Sale Transaction.

1.162    ***Second Lien Noteholders*** means the holders of Second Lien Notes in their respective capacities as such.

1.163    ***Second Lien Notes*** means the 9.0% Second Lien Senior Subordinated PIK Toggle Notes due 2024 issued pursuant to the Prepetition Second Lien Notes Indenture.

1.164    ***Second Lien Notes Claims*** means any Claims arising from or in connection with the Prepetition Second Lien Notes Indenture.

1.165    ***Second Lien Recovery Cash Pool*** means, as a carve out from the Term Lenders' collateral (or the proceeds or value thereof), Cash in the amount of $1,500,000, for distribution to holders of Allowed Second Lien Notes Claims in accordance with Section 4.4(b).

1.166    ***Secured Claim*** means a Claim (a) secured by a Lien on collateral to the extent of the value of such collateral as (i) set forth in the Plan, (ii) agreed to by the holder of such Claim and the Debtors, or (iii) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code; or (b) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code.  For the avoidance of doubt, the National Founders Facility Claim shall be deemed a Secured Claim.

1.167    ***Securities Act*** means the Securities Act of 1933, as amended, together with the rules and regulations promulgated thereunder.

1.168    ***Security*** has the meaning set forth in section 101(49) of the Bankruptcy Code.

1.169    ***Stalking Horse Purchase Agreements*** means, collectively, the Forward Stalking Horse Purchase Agreement and the Reverse Stalking Horse Purchase Agreement.

1.170   **Stockholders Agreement** means, solely with respect to the Reorganization Transaction, that certain Stockholders Agreement substantially in the form included in the Plan Supplement.

1.171   **Subordinated Securities Claims** means a Claim subject to subordination under section 510(b) of the Bankruptcy Code.

1.172   **Successful Bid** means one or more bids to purchase all or substantially all of the Debtors' assets, or Interests in the Debtors owning all or substantially all of the Debtors' assets, that the Debtors determine, in an exercise of their business judgment and subject to the RSA, constitutes the highest or best bid.

1.173   **Successful Bidders** means collectively, the Forward Stalking Horse Purchaser and the Reverse Stalking Horse Purchaser.

1.174   **Tax Code** means the Internal Revenue Code of 1986, as amended from time to time.

1.175   **Term Lenders** means "Term Lenders" as defined in the Prepetition Credit Agreement.

1.176   **Term Loan Claims** mean any Claims arising from or in connection with the Prepetition Credit Agreement, other than Restructuring Expenses.

1.177   **Term Loan Deficiency Claim** means the deficiency Claims on account of the indebtedness under the Prepetition Credit Agreement under section 506(a) of the Bankruptcy Code.

1.178   **UCC Settlement** shall have the meaning ascribed to such term in Section 5.2(b) of the Plan.

1.179   **Unimpaired** means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

1.180   **Unsecured Creditors' Committee** means the statutory committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

1.181   **Unsecured Creditors' Committee Budget** means the reasonable and documented fees and expenses in an amount not exceeding $300,000 per month incurred by the Unsecured Creditors' Committee's advisors from the date of entry of the Disclosure Statement Order through and including the Effective Date; provided, that any amounts incurred by the Unsecured Creditors' Committee's advisors in connection with (i) defending against objections to or prosecuting the approval of the UCC Settlement and (ii) preserving the economic benefits contemplated in the UCC Settlement shall be excluded from such calculation.

1.182   **U.S. Trustee** means the United States Trustee for the Southern District of New York.

1.183   **Voting Deadline** means the date by which all persons or Entities entitled to vote on the Plan must vote to accept or reject the Plan.

1.184   **Wind Down** means, following the closing of the Sale Transaction, the process to wind down, dissolve and liquidate the Estates and distribute any remaining assets in accordance with the Plan.

1.185   **Wind Down Budget** means an amount to be agreed between the Debtors and the Requisite Term Lenders for the purpose of effectuating the Wind Down.

1.186    ***Wind Down Estates*** means, solely with respect to the Sale Transaction, the Debtors (excluding Reorganized RMS) pursuant to and under the Plan on or after the Effective Date.

### B.    Interpretation; Application of Definitions and Rules of Construction.

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  For purposes herein:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto; (d) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (e) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

### C.    Reference to Monetary Figures.

All references in the Plan to monetary figures shall refer to the legal tender of the United States of America, unless otherwise expressly provided.

### D.    Controlling Document.

In the event of any conflict between the terms and provisions in the Plan (without reference to the Plan Supplement) and the terms and provisions in the Disclosure Statement, the Plan Supplement, any other instrument or document created or executed pursuant to the Plan (including the Stalking Horse Purchase Agreements), or any order (other than the Confirmation Order or the DIP Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), the Plan (without reference to the Plan Supplement) shall govern and control; provided, however, that, in the event of a conflict between the DIP Order, on the one hand, and any of the Plan, the Plan Supplement, or the Definitive Documents, on the other hand, the DIP Order shall govern and control in all respects; provided, further, that in the event of a conflict between Confirmation Order, on the one hand, and any of the Plan, the Plan Supplement, the Definitive Documents, or the DIP Order on the other hand, the Confirmation Order shall govern and control in all respects.

### E.    Certain Consent Rights.

Notwithstanding anything in the Plan to the contrary, any and all consent rights of any of the DIP Credit Parties and the parties to the RSA as set forth in the RSA and the DIP Documents with respect to the form and substance of the Plan, the Plan Supplement, and any Definitive Document, including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I hereof) and fully enforceable as if stated in full herein until such time as the RSA (with respect to the parties to the RSA) or the DIP Documents (with respect to the DIP Credit Parties) is terminated in accordance with its terms.

## ARTICLE II   ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS.

2.1.   ***Administrative Expense Claims.***

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, each holder of an Allowed Administrative Expense Claim (other than a Fee Claim, a DIP Claim, or a Restructuring Expense) shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Administrative Expense Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; *provided*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any course of dealing or agreements governing, instruments evidencing, or other documents relating to such transactions.

2.2.   ***Fee Claims.***

(a)   All Entities seeking an award by the Bankruptcy Court of Fee Claims shall file and serve on counsel to the Debtors, the U.S. Trustee, and counsel to the Requisite Term Lenders, on or before the date that is forty-five (45) days after the Effective Date, their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred from the Commencement Date through the Effective Date.  Objections to any Fee Claims must be filed and served on counsel to the Debtors, counsel to the Requisite Term Lenders, and the requesting party no later than twenty-one (21) calendar days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the Debtors or the Reorganized Debtors, as applicable, and the party requesting compensation of a Fee Claim).

(b)   Allowed Fee Claims shall be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court (i) on the date upon which an order relating to any such Allowed Fee Claim is entered or as soon as reasonably practicable thereafter; or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable.  Notwithstanding the foregoing, any Fee Claims that are authorized to be paid pursuant to any administrative orders entered by the Bankruptcy Court may be paid at the times and in the amounts authorized pursuant to such orders.

(c)   On or about the Effective Date, holders of Fee Claims shall provide a reasonable estimate of unpaid Fee Claims incurred in rendering services before the Effective Date to the Debtors or the Unsecured Creditors' Committee, as applicable, and the Debtors or Reorganized Debtors, as applicable, shall separately escrow such estimated amounts for the benefit of the holders of the Fee Claims until the fee applications related thereto are resolved by Final Order or agreement of the parties. If a holder of a Fee Claim does not provide an estimate, the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, may estimate the unpaid and unbilled reasonable and necessary fees and out-of-pocket expenses of such holder of a Fee Claim.  When all such Allowed Fee Claims have been paid in full, any remaining amount in such escrow shall promptly be released from such escrow and revert to, and ownership thereof shall vest in, the Reorganized Debtors or Plan Administrator, as applicable, without any further action or order of the Bankruptcy Court.

WEIL:\97137790\1\41703.0010

(d)    The Reorganized Debtors or the Plan Administrator, as applicable, are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

2.3.    *Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction of such Allowed Priority Tax Claim, at the sole option of the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable, (a) Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date; (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; and (iii) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due; provided, that the Debtors reserve the right to prepay all or a portion of any such amounts at any time under this option without penalty or premium; or (b) equal annual Cash payments in an aggregate amount equal to the amount of such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years from and after the Commencement Date.

2.4.    *DIP Claims.*

On the Effective Date, in full and final satisfaction of the Allowed DIP Claims, the commitments of the DIP Credit Parties under the DIP Documents shall be terminated and DIP Claims shall be (a) paid in full in Cash upon the consummation of the Sale Transaction if the Sale Transaction occurs or (b) refinanced in full in Cash by the Exit Warehouse Facilities if the Reorganization Transaction occurs.  The Debtors' and their respective Affiliates' contingent or unliquidated expense reimbursement and indemnity obligations under the DIP Documents, to the extent not paid in full in Cash on the Effective Date or otherwise satisfied by the Debtors and their respective Affiliates in a manner reasonably acceptable to the DIP Agent, shall survive the Effective Date and shall not be released or discharged pursuant to the Plan or Confirmation Order, notwithstanding any provision hereof or thereof to the contrary.

2.5.    *Restructuring Expenses.*

During the period commencing on the Commencement Date through the Effective Date, the Debtors will promptly pay in full in Cash any Restructuring Expenses in accordance with the terms of the RSA. Without limiting the foregoing, to the extent that any Restructuring Expenses remain unpaid as of the Business Day prior to the Effective Date, on the Effective Date, the Reorganized Debtors, or Plan Administrator, as applicable, shall pay in full in Cash any outstanding Restructuring Expenses that are invoiced without the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases, and without any requirement for further notice or Bankruptcy Court review or approval.  For the avoidance of doubt, any Restructuring Expenses invoiced after the Effective Date shall be paid promptly, but no later than ten (10) business days of receiving an invoice.

### ARTICLE III  CLASSIFICATION OF CLAIMS AND INTERESTS.

3.1.    *Classification in General.*

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy

Code; provided, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Allowed Claim or Allowed Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

3.2.    ***Grouping of Debtors for Convenience Only.***

The Plan groups the Debtors together solely for the purpose of describing treatment of Claims and Interests under this Plan and confirmation of this Plan. Although this Plan applies to all of the Debtors, the Plan constitutes fourteen (14) distinct chapter 11 plans, one for each Debtor. Each Class of Claims will be deemed to contain sub-classes for each of the Debtors, to the extent applicable for voting and distribution purposes. To the extent there are no Allowed Claims or Interests with respect to a particular Debtor, such Class is deemed to be omitted with respect to such Debtor. Except as otherwise provided herein, to the extent a holder has a Claim that may be asserted against more than one Debtor, the vote of such holder in connection with such Claims shall be counted as a vote of such Claim against each Debtor against which such holder has a Claim. The grouping of the Debtors in this manner shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal Entities, or cause the transfer of any Assets, and, except as otherwise provided by or permitted under this Plan, all Debtors shall continue to exist as separate legal Entities.

3.3.    ***Summary of Classification.***

The following table designates the Classes of Claims against and Interests in the Debtor and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan; (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; and (c) deemed to accept or reject the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified.

| Class | Designation | Treatment | Entitled to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | No (Presumed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| 3 | Term Loan Claims | Impaired | Yes |
| 4 | Second Lien Notes Claims | Impaired | No (Deemed to reject) |
| 5 | General Unsecured Claims | Impaired | No (Deemed to reject) |
| 6 | Consumer Creditor Claims | Impaired | No (Deemed to reject) |
| 7 | Intercompany Claims | Unimpaired | No (Presumed to accept) |
| 8 | Intercompany Interests | Unimpaired | No (Presumed to accept) |
| 9 | Parent Equity Interests | Impaired | No (Deemed to reject) |
| 10 | Subordinated Securities Claims | Impaired | No (Deemed to reject) |

3.4.    ***Special Provision Governing Unimpaired Claims.***

Nothing under the Plan shall affect the rights of the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, setoffs or recoupments against, or estimation of any such Unimpaired Claims or Class of Unimpaired Claims.

WEIL:\97137790\1\41703.0010

609

3.5.    *Elimination of Vacant Classes.*

Any Class of Claims against or Interests in the Debtors that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

## ARTICLE IV   TREATMENT OF CLAIMS AND INTERESTS.

4.1.    *Priority Non-Tax Claims (Class 1).*

(a)    *Classification*: Class 1 consists of Priority Non-Tax Claims.

(b)    *Treatment*:  Except to the extent that a holder of an Allowed Priority Non-Tax Claim against the Debtors agrees to a less favorable treatment of such Claim, in full and final satisfaction of such Allowed Priority Non-Tax Claim, at the sole option of the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable:  (i) each such holder shall receive payment in Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is reasonably practicable; (ii) such holder's Allowed Priority Non-Tax Claim shall be Reinstated; or (iii) such holder shall receive such other treatment so as to render such holder's Allowed Priority Non-Tax Claim Unimpaired.

(c)    *Voting*:  Class 1 is Unimpaired, and holders of Priority Non-Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Priority Non-Tax Claims.

4.2.    *Other Secured Claims (Class 2).*

(a)    *Classification*:  Class 2 consists of the Other Secured Claims.  To the extent that Other Secured Claims are secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 2 for purposes of voting to accept or reject the Plan and receiving distributions under the Plan.

(b)    *Treatment*:

(i)    Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim will receive, on account of such Allowed Claim, at the sole option of the Debtors, Reorganized Debtors, or the Plan Administrator, as applicable:  (i) Cash in an amount equal to the Allowed amount of such Claim; (ii) Reinstatement of such holder's Allowed Other Secured Claim; (iii) such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired; or (iv) return of the applicable collateral in satisfaction of the Allowed amount of such Other Secured Claim.

(ii)    Upon the Effective Date and solely with respect to the Reorganization Transaction, the National Founders Facility shall be Reinstated and shall either be paid in

WEIL:\97137790\1\41703.0010

full in Cash on account of the National Founders Facility Claim or receive such other treatment as agreed to among the Debtors and National Founders.

(c)    *Voting*:    Class 2 is Unimpaired, and holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Other Secured Claims.

4.3.    ***Term Loan Claims (Class 3).***

(a)    *Classification*:    Class 3 consists of Term Loan Claims.

(b)    *Allowance*:    The Term Loan Claims are Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $961,355,635.34, plus amounts owing (if any) on account of call protections contained in the Prepetition Credit Agreement, plus all accrued but unpaid interest, costs, fees, and expenses then outstanding under the Prepetition Credit Agreement. The Prepetition Administrative Agent and the Term Lenders shall not be required to file proofs of Claim on account of any Term Loan Claims.

(c)    *Treatment*:    Except to the extent that a holder of an Allowed Term Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed Term Loan Claim, each such holder thereof shall receive:

(i)    **If the Sale Transaction occurs**, on the Effective Date and thereafter on subsequent distribution dates, such holder's Pro Rata share of Net Cash Proceeds until all Allowed Term Loan Claims are satisfied in full in Cash. On the Effective Date, the Prepetition Credit Agreement shall be deemed cancelled (except as set forth in Section 5.12 hereof).

(ii)    **If the Reorganization Transaction occurs**, on the Effective Date, such holder's Pro Rata share of (a) term loans under the Amended and Restated Credit Facility Agreement; (b) 100% of the New Common Stock; provided, that the New Common Stock shall be subject to dilution by the Management Incentive Plan; and (c) if applicable, the Asset Sale Proceeds. On the Effective Date, the Prepetition Credit Agreement shall be deemed cancelled (except as set forth in Section 5.12 hereof) and replaced by the Amended and Restated Credit Facility Agreement, without the need for any holder of a Term Loan Claim that does not vote for the Plan or votes to reject the Plan executing the Amended and Restated Credit Facility Agreement, and each Lien, mortgage and security interest that secures the obligations arising under the Prepetition Credit Agreement as of the Commencement Date shall be reaffirmed, ratified and deemed granted by the Reorganized Debtors to secure all obligations of the Reorganized Debtors arising under the Amended and Restated Credit Facility Agreement.

In each case, holders of Allowed Term Loan Claims shall also be entitled to receive their Pro Rata share of a fifty percent (50%) undivided interest in GUC Recovery Trust Causes of Action and the net proceeds thereof in accordance with the GUC Recovery Trust Agreement.

(d)    *Voting*:    Class 3 is Impaired, and holders of Term Loan Claims in Class 3 are entitled to vote to accept or reject the Plan.

4.4.  *Second Lien Notes Claims (Class 4).*

(a)  *Classification*:  Class 4 consists of Second Lien Notes Claims.

(b)  *Treatment*:  The Second Lien Notes Claims are Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $ 253,895,875. Except to the extent that a holder of an Allowed Second Lien Notes Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed Second Lien Notes Claim, each such holder thereof shall receive:

(i)  **If the Sale Transactions occurs**, such holder's (x) Pro Rata share of the Second Lien Recovery Cash Pool; (y) Pro Rata share as between Allowed Claims in Class 4 and Class 5 of the Contributed Sale Proceeds; and (z) Pro Rata share of the Net Cash Proceeds as such holders are entitled to under applicable nonbankruptcy law after the Term Loan Claims are satisfied in full in Cash, until all Allowed Second Lien Notes Claims are satisfied in full; provided, that distributions on account of (x) and (y) of this Section 4.4(b)(i) shall be subject to the approval and consummation of the UCC Settlement.

(ii)  **If the Reorganization Transaction occurs**, such holder's Pro Rata share of the Second Lien Recovery Cash Pool; provided, that such distribution shall be subject to the approval and consummation of the UCC Settlement.

**If either the Sale Transaction or the Reorganization Transaction occurs**, on the Effective Date, the Second Lien Notes shall be deemed cancelled (except as set forth in Section 5.12 hereof) without further action by or order of the Bankruptcy Court.

(c)  *Voting*:  Class 4 is Impaired, and holders of Second Lien Notes Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Second Lien Notes Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Second Lien Notes Claims.

4.5.  *General Unsecured Claims (Class 5).*

(a)  *Classification*:  Class 5 consists of General Unsecured Claims.

(b)  *Treatment*:  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed General Unsecured Claim, each such holder thereof shall receive:

(i)  **If the Sale Transaction occurs**, such holder's Pro Rata share of (y) the GUC Recovery Trust Interests (entitling such holder to a Pro Rata share of the GUC Recovery Trust Assets in accordance with the GUC Recovery Trust Agreement); and (z) the Net Cash Proceeds (until all Allowed General Unsecured Claims are satisfied in full) after the Term Loan Claims and Second Lien Notes Claims are satisfied in full in Cash; provided, that distributions on account of (y) of this Section 4.5(b)(i) shall be subject to the approval and consummation of the UCC Settlement.  For the avoidance of doubt, holders of Allowed General Unsecured Claims shall not receive distributions from the Consumer Creditor Reserve.

23

(ii)    **If the Reorganization Transaction occurs**, such holder's Pro Rata share of the GUC Recovery Trust Interests; provided, that such distribution shall be subject to the approval and consummation of the UCC Settlement.

For the avoidance of doubt, a holder of a Term Loan Deficiency Claim and a holder of a deficiency Claim on account of a Second Lien Notes Claim shall not receive distributions in accordance with this Section 4.5(b) and such claims are waived solely for purposes of distribution pursuant to and in accordance with this Section 4.5(b).

(c)    *Voting*:   Class 5 is Impaired, and holders of General Unsecured Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of General Unsecured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such General Unsecured Claims.

4.6.    ***Consumer Creditor Claims (Class 6)***

(a)    *Classification*:   Class 6 consists of Consumer Creditor Claims.

(b)    *Treatment*:   Except to the extent that a holder of an Allowed Consumer Creditor Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of an Allowed Consumer Creditor Claim, each such holder thereof shall receive such holder's Pro Rata share of the Consumer Creditor Net Proceeds until all Allowed Consumer Creditor Claims are satisfied in full; provided, that holders of Allowed 363(o) Claims shall be satisfied in full in Cash from the Consumer Creditor Net Proceeds or in accordance with Section 5.6(d) of the Plan, or through corrections implemented by the Debtors in coordination with the Forward Stalking Horse Purchaser, Reverse Stalking Horse Purchaser, or Reorganized RMS, as applicable, before loans are transferred to the Forward Stalking Horse Purchaser, Reverse Stalking Horse Purchaser, or Reorganized RMS, prior to distributions to holders of remaining Allowed Consumer Creditor Claims.  Each holder of a Consumer Creditor Claim, including a 363(o) Claim, shall be enjoined from bringing, asserting or prosecuting such Consumer Creditor Claim against the Forward Stalking Horse Purchaser, Reverse Stalking Horse Purchaser, Reorganized RMS, or any of their Affiliates (or anyone acting on their behalf), except as provided in Section 5.6(d)(iii), or seeking monetary damages from the Forward Stalking Horse Purchaser, Reverse Stalking Horse Purchaser, Reorganized RMS or any of their Affiliates (or anyone acting on their behalf) on account of such Consumer Creditor Claim, except that nothing in the Plan or Confirmation Order shall affect a Borrower's defenses or rights of recoupment under applicable nonbankruptcy law; provided, that notwithstanding anything contained in the Plan or the Confirmation Order to the contrary, application of those defenses and rights of recoupment shall not require the Forward Stalking Horse Purchaser, Reverse Stalking Horse Purchaser, Reorganized RMS, or any of their Affiliates (or anyone acting on their behalf) to pay money damages to, refund amounts paid by, or pay monies (except escrow advances) on behalf of or for the account of, a Borrower.  If a Consumer Creditor Claim, including a 363(o) Claim, is covered by Section 5.6(d)(iii) and is satisfied or addressed by the Forward Stalking Horse Purchaser, Reverse Stalking Horse Purchaser, or Reorganized RMS, or is otherwise voluntarily assumed by the foregoing parties, it shall not be entitled to Consumer Creditor Net Proceeds.  In no event shall any holder of an Allowed Consumer Creditor Claim be entitled to recoup from the Forward Stalking Horse Purchaser, Reverse Stalking Horse Purchaser, Reorganized RMS or any of their Affiliates (or anyone acting on their behalf) any amounts or Claims under any theory of liability for the same loss, damage, or other Claim that is satisfied by Consumer Creditor Net Proceeds.  In addition to the foregoing, except to the extent that a holder of an Allowed Consumer Creditor Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of an Allowed Consumer Creditor Claim, each such holder thereof shall receive such holder's Pro Rata share of the Net Cash Proceeds (to be shared on a Pro Rata basis with holders of Allowed General Unsecured Claims) after the Term Loan Claims and Second Lien

Notes Claims are satisfied in full in Cash.  For the avoidance of doubt, holders of Allowed Consumer Creditor Claims shall not receive distributions from the GUC Recovery Trust Assets.

(c)    *Voting*:  Class 6 is Impaired, and holders of Consumer Creditor Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Consumer Creditor Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Consumer Creditor Claims.

4.7.    ***Intercompany Claims (Class 7).***

(a)    *Classification*:  Class 7 consists of Intercompany Claims.

(b)    *Treatment*:  On or after the Effective Date, all Intercompany Claims will be adjusted, continued, settled, reinstated, discharged, or eliminated as determined by the Debtors, Reorganized Debtors (including Reorganized RMS), or Plan Administrator, as applicable, and the Requisite Term Lenders, in their respective reasonable discretion; provided, that if the Sale Transaction occurs, (i) all Intercompany Claims against RMS shall be discharged; and (ii) holders of Intercompany Claims shall not receive Cash on account of such Intercompany Claims.

(c)    *Voting*:  Class 7 is Unimpaired, and holders of Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Intercompany Claims.

4.8.    ***Intercompany Interests (Class 8).***

(a)    *Classification*:  Class 8 consists of Intercompany Interests.

(b)    *Treatment:*  On or after the Effective Date, all Intercompany Interests shall be cancelled, reinstated, or receive such other treatment as determined by the Debtors or Reorganized Debtors, as applicable, and the Requisite Term Lenders, in their respective reasonable discretion; provided, that if the Sale Transaction occurs, (i) holders of Intercompany Interests shall not receive Cash on account of such Intercompany Interests and (ii) the Intercompany Interests in RMS shall be cancelled and the Reorganized RMS Stock shall be distributed to the Reverse Stalking Horse Purchaser in accordance with Section 5.6 of the Plan.  On the Effective Date, all Intercompany Interests held by RMS shall be transferred in accordance with the terms of the Reverse Stalking Horse Purchase Agreement.

(c)    *Voting:*  Class 8 is Unimpaired, and holders of Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Intercompany Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Intercompany Interests.

4.9.    ***Parent Equity Interests (Class 9).***

(a)    *Classification*:  Class 9 consists of Parent Equity Interests.

(b)    *Treatment*:  Except to the extent that a holder of Parent Equity Interests agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for Parent Equity Interests, each such holder thereof shall receive:

25

(i)  **If the Sale Transaction occurs**, (A) on the Effective Date, all Parent Equity Interests shall be cancelled and one share of Ditech common stock (the "*Single Share*") shall be issued to the Plan Administrator to hold in trust as custodian for the benefit of the former holders of Ditech common stock and preferred stock consistent with their former relative priority and economic entitlements.  The Single Share shall be recorded on the books and records maintained by the Plan Administrator.  On or promptly after the Effective Date, any remaining steps shall be taken as necessary to suspend the trading of Ditech's common stock and warrants on the over the counter market; (B) each former holder of a Parent Equity Interest (through their interest in the Single Share, as applicable) shall neither receive nor retain any property of the Estate or direct interest in property of the Estate on account of such Parent Equity Interests; *provided*, that in the event that all Allowed Claims have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each former holder of a Parent Equity Interest may receive its share of any remaining assets of Ditech consistent with such holder's rights of payment existing immediately prior to the Commencement Date.  Unless otherwise determined by the Plan Administrator, on the date that Ditech's Chapter 11 Case is closed in accordance with Section 5.16 of the Plan, the Single Share issued on the Effective Date shall be deemed cancelled and of no further force and effect provided that such cancellation does not adversely impact the Debtors' Estates; (C) the continuing rights of former holders of Parent Equity Interests (including through their interest in Single Share or otherwise) shall be nontransferable except (i) by operation of law or (ii) for administrative transfers where the ultimate beneficiary has not changed, subject to the Plan Administrator's consent.

(ii)  **If the Reorganization Transaction occurs**, on the Effective Date, all Parent Equity Interests shall be deemed cancelled without further action by or order of the Bankruptcy Court, and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

(c)  *Voting*:  Class 9 is Impaired, and holders of Parent Equity Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of Parent Equity Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Parent Equity Interests.

4.10.  ***Subordinated Securities Claims (Class 10).***

(a)  *Classification*: Class 10 consists of Subordinated Securities Claims.

(b)  *Treatment*:  Holders of Subordinated Securities Claims shall not receive or retain any property under the Plan on account of such Subordinated Securities Claims.  On the Effective Date, all Subordinated Securities Claims shall be deemed cancelled without further action by or order of the Bankruptcy Court, and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

(c)  *Voting*:  Class 10 is Impaired, and the holders of Subordinated Securities Claims are conclusively deemed to have rejected the Plan.  Therefore, holders of Subordinated Securities Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders of Subordinated Securities Claims will not be solicited.

# ARTICLE V    MEANS FOR IMPLEMENTATION.

5.1.    *No Substantive Consolidation.*

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor. The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan.

5.2.    *Compromise and Settlement of Claims, Interests, and Controversies.*

(a)    Pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan, the UCC Settlement, and the CCC Settlement shall constitute a good faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a creditor or an Interest holder may have with respect to any Claim or Interest or any distribution to be made on account of an Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable, and reasonable.

(b)    The treatment provided for hereunder to Allowed Second Lien Notes Claims and Allowed General Unsecured Claims incorporates and reflects a proposed compromise and settlement by and among the Debtors, the Unsecured Creditors' Committee, and the Consenting Term Lenders (the "UCC Settlement").  The following constitutes the provisions and conditions of the UCC Settlement:

(i)    On the Effective Date, and solely for purposes of distributions from the GUC Recovery Trust:  (i) all GUC Recovery Trust Assets (and all proceeds thereof) and all liabilities of each of the Debtors shall be deemed merged or treated as though they were merged into and with the assets and liabilities of each other; (ii) all guaranties of the Debtors of the obligations of any other Debtor shall be deemed eliminated and extinguished so that any General Unsecured Claim against any Debtor and any guarantee thereof executed by any Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors; (iii) each and every General Unsecured Claim filed or to be filed in any of the Chapter 11 Cases shall be treated as filed against the consolidated Debtors and shall be treated as one General Unsecured Claim against and obligation of the consolidated Debtors; and (iv) for purposes of determining the availability of the right of set off under section 553 of the Bankruptcy Code, the Debtors shall be treated as one entity so that, subject to the other provisions of section 553 of the Bankruptcy Code, debts due to any of the Debtors may be set off against the debts of any of the other Debtors.  Such substantive consolidation shall not (other than for purposes relating to the Plan) affect the legal and corporate structures of the Reorganized Debtors.  Moreover, such substantive consolidation shall not affect (x) any subordination provisions set forth in any agreement relating to any General Unsecured Claim or the ability of the GUC Recovery Trustee to seek to have any General Unsecured Claim subordinated in accordance with any contractual rights or equitable principles or (y) any of the rights or remedies of the NRZ Exit Tail Bridge Facility Credit Parties or any of the obligations under the NRZ Exit Tail Bridge Facility Documents.

(ii)    On the Effective Date, the GUC Recovery Trust shall be established in accordance with Section 5.19 of the Plan and shall be governed and administered in accordance with the GUC Recovery Trust Agreement.

(iii)    On the Effective Date, the Debtors and the Estates shall transfer (i) to the GUC Recovery Trust, the GUC Recovery Trust Assets and (ii) to the Prepetition Second Lien Notes Trustee, the Second Lien Recovery Cash Pool and the portion of the Contributed Sale Proceeds payable on account of the Second Lien Notes Claims, in each case, free and clear of all Liens, charges, Claims, encumbrances, and interests for the benefit of the holders of Allowed General Unsecured Claims and Second Lien Noteholders. In accordance with Section 1141 of the Bankruptcy Code, all of the GUC Recovery Trust Assets, as well as the rights and powers of the Debtors' Estates applicable to the GUC Recovery Trust Assets, shall vest in the GUC Recovery Trust, for the benefit of the holders of Allowed General Unsecured Claims.

(iv)    The GUC Recovery Trustee shall determine whether to enforce, settle, release, or compromise the GUC Recovery Trust Causes of Action (or decline to do any of the foregoing).    The Reorganized Debtors, Reorganized RMS, and the Plan Administrator, as applicable, shall not be subject to any claims or counterclaims with respect to the GUC Recovery Trust Causes of Action, or otherwise.

(v)    On the Effective Date, the Debtors shall transfer to the Prepetition Second Lien Notes Trustee the applicable Remaining IT Fees, without any further notice to or action, order, or approval of the Bankruptcy Court.  Nothing in this Section 5.2 shall in any way affect or diminish the rights of the Prepetition Second Lien Notes Trustee to exercise any charging lien against distributions to holders of Second Lien Notes Claims with respect to any unpaid fees or expenses.

(vi)    On the Effective Date, the Debtors shall transfer to the MBS Trustees, the applicable Remaining MBS Fees, without any further notice to or action, order, or approval of the Bankruptcy Court.  Nothing in this Section 5.2 shall in any way affect or diminish the rights of each MBS Trustee to seek recovery of any unpaid fees or expenses under the respective governing agreements.

(vii)    On the Effective Date, the Contributed Sale Proceeds shall be transferred to the GUC Recovery Trust and the Prepetition Second Lien Notes Trustee to be distributed in accordance with the Plan.

(viii)    The holders of Allowed Term Loan Claims shall be entitled to receive fifty percent (50%) of the net proceeds from the GUC Recovery Trust Causes of Action in accordance with the GUC Recovery Trust Agreement and shall be deemed to have otherwise waived any Term Loan Deficiency Claim solely for purposes of distribution pursuant to and in accordance with Section 4.5(b).

(ix)    The Unsecured Creditors' Committee's previous objections to the Unsecured Creditors' Committee Budget are resolved based on the definition of Unsecured Creditors' Committee Budget under the Plan.

(x)    On the Effective Date, all Claims or Causes of Action against (a) the Debtors' landlords under leases of nonresidential real property and (b) third party vendors providing services or goods to the Debtors in the ordinary course of business arising

WEIL:\97137790\1\41703.0010

under chapter 5 of the Bankruptcy Code, including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever, released.

(xi)    On the Effective Date, the Unsecured Creditors' Committee's objection to the Disclosure Statement Motion shall be deemed resolved and withdrawn with prejudice.  The Unsecured Creditors' Committee shall not prosecute such objection or any other objection to the Disclosure Statement, the Sale Transaction or the Plan (provided that the terms of the Bidding Procedures are complied with).

(xii)    On the Effective Date, (a) the Challenge Period (as defined in the DIP Order) shall be deemed expired with respect to the Unsecured Creditors' Committee; (b) the stipulations set forth in Sections H, I, and J of the DIP Order shall be final; and (c) the releases in paragraph 48(c) of the DIP Order shall be final.

(xiii)    As a condition precedent to consummation of the UCC Settlement, the Unsecured Creditors' Committee shall not object to or take any other action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay, or impede the confirmation and consummation of the Plan or approval of the UCC Settlement.

(c)    The treatment provided for hereunder to Allowed Consumer Creditor Claims incorporates and reflects a proposed compromise and settlement by and among the Debtors, the Consumer Creditors' Committee, and the Consenting Term Lenders (the "CCC Settlement").  The following constitutes the provisions and conditions of the CCC Settlement:

(i)    The Consumer Creditors' Committee's objection to confirmation of the Plan (ECF No. 943) shall be deemed resolved and withdrawn with prejudice.  The Consumer Creditors' Committee shall (a) not prosecute such objection or any other objection to the Plan or the Sale Transaction and (b) use reasonable efforts to encourage holders of Consumer Creditor Claims and objecting parties who supported or filed joinders to the Consumer Creditors' Committee's objection to confirmation of the Plan (ECF No. 943) to support the Plan, as amended, including the CCC Settlement.

(ii)    The Debtors, the Consumer Creditors' Committee, members of the Consumer Creditors' Committee, and the Consenting Term Lenders each waive their respective rights to appeal the Memorandum Decision.

(iii)    The Debtors shall reasonably investigate in coordination with the Consumer Representative and the Forward Stalking Horse Purchaser, Reverse Stalking Horse Purchaser, or Reorganized RMS, as applicable, any alleged error and correct such error if appropriate, in the prior servicing or accounting of the loan asserted by a Borrower prior to transferring such loan to the Forward Stalking Horse Purchaser, Reverse Stalking Horse Purchaser, or Reorganized RMS under the applicable Stalking Horse Purchase Agreements.

(iv)    In the event all Allowed Consumer Creditor Claims are paid in full in Cash from the Consumer Creditor Net Proceeds, any remaining Consumer Creditor Net Proceeds shall be donated by the Consumer Representative to legal aid organizations dedicated to the protection of consumer rights.

(v)    The Consumer Representative may retain advisors as it deems necessary to facilitate its duties hereunder in connection with the Claims reconciliation process of Consumer Creditor Claims and distributions on account thereof, in each case, in accordance with the Consumer Representative Agreement; provided, that the fees and expenses of such advisors must be paid exclusively from the Consumer Creditor Reserve or the Consumer Representative Fee Reserve.  In no event shall the Forward Stalking Horse Purchaser, Reverse Stalking Horse Purchaser, Reorganized RMS or any of their Affiliates (or anyone acting on their behalf) be responsible for any costs, fees, or expenses of the Consumer Representative or its advisors.

(vi)    The Debtors, Wind Down Estates, or Plan Administrator, as applicable, upon reasonable notice, shall reasonably cooperate with the Consumer Representative with respect to the Claims reconciliation process of Consumer Creditor Claims, including by providing reasonable access to pertinent documents, including books and records, to the extent the Debtors, the Wind Down Estates, or Plan Administrator, as applicable, have such information and/or documents, to the Consumer Representative sufficient to enable the Consumer Representative to perform its duties hereunder; provided, that the Debtors, Wind Down Estates, and Consumer Representative (including its advisors, if any) shall enter into a confidentiality agreement and a common interest agreement prior to sharing such documents and/or information to the extent deemed reasonably necessary by the Debtors or Plan Administrator, as applicable.

(vii)    On the Effective Date, the Debtors shall transfer $1,000,000 to the Consumer Representative Fee Reserve.  The Wind Down Estates shall have a reversionary interest in the Cash remaining in the Consumer Representative Fee Reserve (if any) following the payment of all reasonable fees and expenses incurred by the Consumer Representative.

(viii)    The Consumer Representative shall have standing in the Bankruptcy Court with respect to the reconciliation, dispute, or resolution of any Consumer Creditor Claim, the enforcement of the CCC Settlement, and Sections 4.6 and 5.6(d) of the Plan.

5.3.    *Marketing Process.*

Following the Commencement Date, the Debtors shall oversee and manage the sale process relating to any potential Sale Transaction and, if applicable, an Asset Sale Transaction, in good-faith consultation with the Requisite Term Lenders the DIP Agent, the Unsecured Creditors' Committee, Freddie Mac, Fannie Mae, and Ginnie Mae.  The Requisite Term Lenders, the DIP Agent, the Unsecured Creditors' Committee, Freddie Mac, Fannie Mae, and Ginnie Mae and their respective advisors shall have the right to review all information, diligence, and materials provided by the Debtors to any bidder or prospective bidder, subject to confidentiality, with respect to the sale and to consult with the Debtors with respect to any potential Sale Transaction or Asset Sale Transaction.  The Debtors, the Requisite Term Lenders, the DIP Agent, the Unsecured Creditors' Committee, Freddie Mac, Fannie Mae, and Ginnie Mae shall consult in good faith regarding the sale process, including any diligence and other information requested by the Requisite Term Lenders.  The Debtors shall solicit bids on any and all bases, including soliciting bids that do not satisfy the Term Loan Claims in full.

5.4.    *Election Notice.*

Unless extended by the Debtors, within five (5) business days following the earlier of (a) the conclusion of the Debtors' marketing and sale process and (b) ninety-five (95) calendar days after the Commencement Date (the earliest such date, the "*Election Date*"), holders of at least 66$^{2/3}$% in aggregate principal amount outstanding under the Prepetition Credit Agreement (the "*Electing Term Lenders*") shall deliver a notice (the "*Election Notice*") to the Debtors stating that the Electing Term Lenders wish to consummate a transaction (the "*Elected Transaction*"), being a:  (i) Reorganization Transaction or (ii) Sale Transaction, and, if applicable, (iii) in connection and together with an election of (i) or (ii), any Asset Sale Transaction(s); provided, that inclusion of any such Asset Sale Transaction(s) is not incompatible with the successful consummation of the Elected Transaction in (i) or (ii).

5.5.    *Sources of Consideration for Plan Distributions.*

(a)    *Sale Transaction*.  The Debtors shall fund distributions and satisfy applicable Allowed Claims and Allowed Interests under the Plan with respect to the Sale Transaction using Cash on hand, the Sale Transaction Proceeds, and, if applicable, the Asset Sale Proceeds, in each case, as a carve out from the Term Lenders' collateral (or the proceeds or value thereof).

(b)    *Reorganization Transaction*.  The Debtors shall fund distributions and satisfy applicable Allowed Claims and Allowed Interests under the Plan with respect to the Reorganization Transaction with Cash on hand, the Amended and Restated Credit Facility, Exit Working Capital Facility, the Exit Warehouse Facilities, New Common Stock, and, if applicable, the Asset Sale Proceeds.

5.6.    *Sale Transaction.*

(a)    *Forward Stalking Horse Purchase Agreement.*

(i)    On the Closing Date (as defined in the Forward Stalking Horse Purchase Agreement), the Debtors shall consummate the Sale Transaction contemplated by the Forward Stalking Horse Purchase Agreement and the Debtors' Acquired Assets (as defined in the Forward Stalking Horse Purchase Agreement) shall, pursuant to Section 1141 of the Bankruptcy Code, be transferred to and vest in the Forward Stalking Horse Purchaser free and clear of all Liens, Claims (including, for the avoidance of doubt, Consumer Creditor Claims), charges, or other encumbrances pursuant to the terms of the Forward Stalking Horse Purchase Agreement, the Plan, and the Confirmation Order.

(b)    *Reverse Stalking Horse Purchase Agreement.*

(i)    Pursuant to and subject to the terms and conditions of the Reverse Stalking Horse Purchase Agreement, on the Effective Date, following the discharge pursuant to Section 10.3 of the Plan of all liabilities that are not "Assumed Liabilities" (as defined in the Reverse Stalking Horse Purchase Agreement) and the transfer of all assets that are not "Acquired Assets" (as defined in the Reverse Stalking Horse Purchase Agreement) to the Wind Down Estates, the GUC Recovery Trust, or a Debtor other than RMS, as provided in the Plan or, if not so provided, as determined by the Debtors, SHAP 2018-1, LLC will purchase certain mortgage loans and related servicing rights owned by RMS and assume certain liabilities relating thereto, free and clear of all Liens, Claims (including, for the avoidance of doubt, Consumer Creditor Claims), charges or other encumbrances pursuant to the terms of the Reverse Stalking Horse Purchase Agreement, the Plan and the Confirmation Order, and Mortgage Assets Management, LLC will be

issued one hundred percent (100%) of the equity interests in Reorganized RMS, free and clear of all Liens, Claims (including, for the avoidance of doubt, Consumer Creditor Claims), charges or other encumbrances, to the fullest extent permissible under applicable law, pursuant to the terms of the Reverse Stalking Horse Purchase Agreement, the Plan and the Confirmation Order.

(ii)    On the Effective Date, Reorganized RMS is authorized to issue or cause to be issued and shall issue the Reorganized RMS Stock in accordance with the terms of the Reverse Stalking Horse Purchase Agreement and the Plan without the need for any further corporate or stockholder action.  All of the Reorganized RMS Stock issuable under the Plan, when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable.

(c)    Upon entry of the Confirmation Order by the Bankruptcy Court, all matters provided for under the Sale Transaction and the Plan, and any documents in connection therewith, shall be deemed authorized and approved without any requirement of further act or action by the Debtors.  The Debtors are authorized to execute and deliver, and to consummate the transactions contemplated by the Sale Transaction (including the issuance of the Reorganized RMS Stock) and the Plan, as well as to execute, deliver, file, record, and issue any note, documents, or agreements in connection therewith, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, rule, or the vote, consent, authorization, or approval of any Entity.

(d)    Nothing in the Plan or Confirmation Order shall (i) constitute approval of the sale of any Assets that are not property of the Debtors' Estates, including amounts to which the Debtors do not have legal or equitable title; (ii) ratify any amounts due by a Borrower under any loan; or (iii) affect a Borrower's right, if any, to correct any inaccurate statement of amounts due under the Borrower's loan or any other inaccurate terms related to the Borrower's loan.  The Wind Down Estates, Forward Stalking Horse Purchaser, Reverse Stalking Horse Purchaser, or Reorganized RMS, as applicable, shall reasonably investigate any alleged error in the prior servicing or accounting of the loan asserted by Borrowers, whether or not originally asserted as a proof of claim in the Chapter 11 Cases, and, if warranted, correct the account of a Borrower as appropriate so that any incorrect statement of accounts is not perpetuated to the detriment of a Borrower in connection with the proper characterization of payment status, credit reporting status, the proper receipt and application of payments by or on behalf of a Borrower or any insurer, the proper advancing out of escrow accounts with funds previously provided by a Borrower, the proper processing and evaluation of a Borrower's requests for and the provision of available loss mitigation options by the Forward Stalking Horse Purchaser or Reorganized RMS, as applicable, the proper assessment of fees, costs or other charges to a Borrower's account, the proper pursuit of foreclosure and other disposition options in respect of any continuing default by a Borrower, or any other misstated terms of a Borrower's loan accounts.  For the avoidance of doubt, notwithstanding anything contained in the Plan or Confirmation Order to the contrary, in no event shall the Forward Stalking Horse Purchaser, Reverse Stalking Horse Purchaser, Reorganized RMS, or any of their Affiliates (or anyone acting on their behalf) be required to pay money damages to, refund amounts paid by, or pay monies (except escrow advances) on behalf of or for the account of a Borrower on account of the obligations imposed on the Forward Stalking Horse Purchaser, Reverse Stalking Horse Purchaser, or Reorganized RMS pursuant to this Section 5.6(d).  The Consumer Representative may facilitate any inquiries by Borrowers and be heard before the Bankruptcy Court with respect to the obligations of the Wind Down Estates, Forward Stalking Horse Purchaser, Reverse Stalking Horse Purchaser, and Reorganized RMS to reasonably investigate alleged errors and, if warranted, correct such errors in accordance with this Section 5.6(d).

(e)    ***Wind Down and Dissolution of the Debtors; NRZ Exit Tail Bridge Facility.***

(i)    The Plan Administrator shall have the authority and right on behalf of each of the Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:  (a) except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors, other than with respect to General Unsecured Claims and Consumer Creditor Claims (for the avoidance of doubt, the GUC Recovery Trustee shall be responsible for objecting to, reconciling, or settling General Unsecured Claims and the Consumer Representative shall be responsible for objecting to, reconciling, or settling Consumer Creditor Claims); (b) make distributions to holders of Allowed Claims in accordance with the Plan, other than with respect to holders of Allowed General Unsecured Claims and Allowed Consumer Creditor Claims; (c) prosecute all Causes of Action on behalf of the Debtors, elect not to pursue any Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of the Debtors, other than with respect to the GUC Recovery Trust Causes of Action; (d) retain professionals to assist in performing its duties under the Plan; (e) maintain the books, records, and accounts of the Debtors; (f) complete and file, as necessary, all final or otherwise required federal, state, and local tax returns for the Debtors; and (g) perform other duties and functions that are consistent with the implementation of the Plan.

(ii)    From and after the Effective Date, the Plan Administrator and the applicable Wind Down Estates (x) shall be authorized and directed to execute and perform under the NRZ Exit Tail Bridge Facility Documents, (y) shall be authorized and directed to maintain compliance with, and shall honor all obligations and pay all claims and amounts due under, the NRZ Exit Tail Bridge Facility Documents, and (z) shall be authorized and directed to take any and all actions necessary, advisable or appropriate to implement, effectuate, consummate, and/or perform their respective obligations under any of the transactions contemplated by the NRZ Exit Tail Bridge Facility Documents, including the granting of new and/or additional liens contemplated by the NRZ Exit Tail Bridge Facility Documents, in any such case, without the need for Bankruptcy Court approval or any further corporate or other organizational action and without further notice to the holders of Claims or Interests.  Notwithstanding anything to the contrary in the Plan, the Wind Down Estates and the Plan Administrator shall not take, and shall not cause, direct or authorize any other Person to take, any actions that are inconsistent with the terms of the NRZ Exit Tail Bridge Facility Documents or that could reasonably be expected to prevent, interfere with, or impede (x) the payment in full in Cash of the obligations under the NRZ Exit Tail Bridge Facility Documents as the same become due and payable or (y) any protections granted to the NRZ Exit Tail Bridge Facility Credit Parties pending such payment in full.

(iii)    After the Effective Date, pursuant to the Plan, the Plan Administrator shall wind down, sell, liquidate, and may operate, use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action remaining with the Debtors' after consummation of the Sale Transaction contemplated by the Successful Bid without approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than with respect to General Unsecured Claims, Consumer Creditor Claims, and GUC Recovery Trust Causes of Action.

(iv)    Each of the Debtors shall indemnify and hold harmless the Plan Administrator solely in its capacity as such for any losses incurred in such capacity, except to the extent such losses were the result of the Plan Administrator's gross negligence, willful misconduct, or criminal conduct.

(v)    Subject to Section 6.3(b) of the Plan, the Debtors shall make an initial distribution on the Effective Date (or as soon as practicable thereafter) and thereafter, the Plan Administrator shall, in an expeditious but orderly manner, make timely distributions pursuant to the Plan and the Confirmation Order.

(vi)    The Plan Administrator shall be authorized to file on behalf of the Debtors and any non-Debtor subsidiaries, certificates of dissolution and any and all other corporate and company documents necessary to effectuate the Wind Down without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, the board of directors, or board of directors or similar governing body of the Debtors.

(vii)    The Plan Administrator shall effectuate the Wind Down with the amounts reserved in the Wind Down Budget.

(f)    ***Officers and Board of Directors.***

(i)    Upon the Effective Date, the New Board shall consist of three (3) directors: Mr. John Ray, Mr. Rishi Jain, and Mr. Jeffrey Stein. The New Board shall be classified into three (3) classes, with directors serving for three-year staggered terms.

(ii)    Upon the Effective Date, the new governance structure of Ditech Holding Corporation will be set forth in the Amended Organizational Documents.

(iii)    The New Board shall, among other things, oversee and direct the Plan Administrator (solely in his capacity as the Plan Administrator and not in his capacity as the custodian of the Single Share) and the administration of the Wind Down Estates. On the Effective Date, or as soon as is reasonably practicable thereafter, the New Board shall establish, in consultation with the Requisite Term Lenders and the Plan Administrator, such procedures and protocols as it deems necessary to carry out its duties and as are otherwise acceptable to the Requisite Term Lenders and such procedures and protocols shall be deemed approved as of the Effective Date.

5.7.    ***Reorganization Transaction.***

(a)    If the Debtors pursue the Reorganization Transaction, the Debtors shall implement the Reorganization Transaction as set forth herein.

(b)    ***Amended and Restated Credit Facility***.

(i)    On the Effective Date, the Amended and Restated Credit Facility Agreement shall be executed and delivered, and the Reorganized Debtors shall be authorized to execute, deliver and enter into, the Amended and Restated Credit Facility Agreement and the other Amended and Restated Credit Facility Documents, without the need for any further corporate action and without further action by the holders of Claims or Interests.

34

**623**

(ii)    Except as otherwise modified by the Amended and Restated Credit Facility Agreement, all Liens, mortgages and security interests securing the obligations arising under the Amended and Restated Credit Facility Agreement and the other Amended and Restated Credit Facility Documents that were collateral securing the Term Loan Claims as of the Commencement Date are unaltered by the Plan, and all such liens, mortgages and security interests are created and perfected with respect to the Amended and Restated Credit Facility Documents to the same extent, in the same manner and on the same terms and priorities as they were with respect to the Term Loan Claims, except as the foregoing may be modified pursuant to the Amended and Restated Credit Facility Documents.  All Liens and security interests granted and continuing pursuant to the Amended and Restated Credit Facility Documents shall be (i) valid, binding, perfected, and enforceable Liens and security interests in the personal and real property described in and subject to such document, with the priorities established in respect thereof under applicable non-bankruptcy law; (ii) granted in good faith and deemed not to constitute a fraudulent conveyance or fraudulent transfer; and (iii) not otherwise subject to avoidance, recharacterization, or subordination (whether equitable, contractual or otherwise) under any applicable law.  The Debtors, the Reorganized Debtors, and the Entities granted such Liens and security interests are authorized to make, and to the extent contemplated by the Amended and Restated Credit Facility Documents, the Debtors, the Reorganized Debtors, and their respective Affiliates will make, all filings and recordings, and to obtain all governmental approvals and consents necessary (but otherwise consistent with the consents and approvals obtained in connection with the Prepetition Credit Agreement) to establish, attach and perfect such Liens and security interests under any applicable law, and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interest to third parties.  For purposes of all mortgages and deposit account control agreements that secured the obligations arising under the Prepetition Credit Agreement, the Amended and Restated Credit Facility Agreement is deemed an amendment and restatement of the Prepetition Credit Agreement, and such mortgages and control agreements shall survive the Effective Date, shall not be cancelled, and shall continue to secure the Amended and Restated Credit Facility Agreement, except as expressly set forth in the Amended and Restated Credit Facility Agreement.

(iii)    The Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the Amended and Restated Credit Facility Documents without the need for any further corporate or limited liability company action and without further action by the holders of Claims or Interests.

(iv)    Except to the extent that a member of the board of directors or managers, as applicable, of a Debtor continues to serve as a director or manager of such Debtor on and after the Effective Date, the members of the board of directors or managers of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to Ditech Holding Corporation on or after the Effective Date and each such director or manager will be deemed to have resigned or shall otherwise cease to be a director or manager of the applicable Debtor on the Effective Date.

WEIL:\97137790\1\41703.0010

(c)     *Exit Warehouse Facilities*.

On the Effective Date, the Reorganized Debtors shall be authorized to execute and perform under the Exit Warehouse Facilities Documents without the need for any further corporate action and without further action by the holders of Claims or Interests.

(d)     *Authorization and Issuance of New Plan Securities*.

(i)      On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, are authorized to issue or cause to be issued and shall issue the New Common Stock in accordance with the terms of the Plan and the Amended Organizational Documents without the need for any further corporate or stockholder action. All of the New Common Stock issuable under the Plan, when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable.

(ii)     The distribution of the New Common Stock pursuant to the Plan may be made by means of book-entry registration on the books of a transfer agent for shares of New Common Stock or by means of book-entry exchange through the facilities of a transfer agent reasonably satisfactory to the Debtors, in accordance with the customary practices of such agent, as and to the extent practicable.

(e)     *Continued Corporate Existence*.

(i)      The Debtors shall continue to exist after the Effective Date as Reorganized Debtors as a private company in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the Amended Organizational Documents unless otherwise determined in accordance with Section 5.10 of the Plan. Notwithstanding the foregoing, after the Effective Date, the continued existence of Reorganized RMS shall be separate from the Reorganized Debtors.

(ii)     On or after the Effective Date, the Reorganized Debtors may take such action that may be necessary or appropriate as permitted by applicable law and the Reorganized Debtors' Amended Organizational Documents, as the Reorganized Debtors may determine is reasonable and appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate the Plan.

(f)     *Officers and Board of Directors*.

(i)      Upon the Effective Date, the New Board shall consist of five (5) directors. Four (4) directors shall be selected by the Requisite Term Lenders and one (1) director shall be the chief executive officer ("*CEO*") of Reorganized Ditech, who shall be Thomas F. Marano. The identities of the directors and officers of the Reorganized Debtors, to the extent known, shall be disclosed prior to the Confirmation Hearing in accordance with section 1129(a)(5) of the Bankruptcy Code.

(ii)     Except to the extent that a member of the board of directors or managers, as applicable, of a Debtor continues to serve as a director or manager of such Debtor on and after the Effective Date, the members of the board of directors or managers of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date and each such

WEIL:\97137790\1\41703.0010

director or manager will be deemed to have resigned or shall otherwise cease to be a director or manager of the applicable Debtor on the Effective Date.

(g)     ***Reorganized Debtors' Authority.***

(i)     The Reorganized Debtors (excluding Reorganized RMS) shall have the authority and right on behalf of each of the Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:  (a) except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors; (b) make distributions to holders of Allowed Claims in accordance with the Plan; (c) prosecute all Causes of Action on behalf of the Debtors, elect not to pursue any Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of the Debtors; (d) retain professionals to assist in performing its duties under the Plan; (e) maintain the books, records, and accounts of the Debtors; (f) complete and file, as necessary, all final or otherwise required federal, state, and local tax returns for the Debtors; and (g) perform other duties and functions that are consistent with the implementation of the Plan.

(ii)     After the Effective Date, the Reorganized Debtors may operate the Debtors' business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

5.8.     ***Fannie Mae; Freddie Mac; Ginnie Mae.***

(a)     ***Fannie Mae.***  Notwithstanding anything herein or in the Confirmation Order, Plan Supplement, Exit Warehouse Facilities Documents, Exit Working Capital Facility Documents, NRZ Exit Tail Bridge Facility Documents, the Amended and Restated Credit Facility Documents, or any other order or document in the Chapter 11 Cases to the contrary, (i) the Debtors' mortgage servicing rights and obligations relating to Fannie Mae shall not be transferred by the Debtors to the Successful Bidders (or any other person or entity) without the express prior written consent of Fannie Mae in its sole and absolute discretion; (ii) the assumption or assumption and assignment of any agreements between any of the Debtors and Fannie Mae, including, without limitation, the Fannie Mae Lender Contracts, shall be subject to the express prior written consent of Fannie Mae in its sole and absolute discretion; (iii) any proposed severance of rights and obligations or any other proposed modification of any agreement, including, without limitation, the Fannie Mae Lender Contracts, between any of the Debtors and Fannie Mae shall be subject to the prior written consent of Fannie Mae in its sole and absolute discretion; (iv) Fannie Mae's rights, powers, prerogatives, remedies, payment or lien priorities, and claims against the Debtors, any non-Debtor affiliate or any other person or entity under the Fannie Mae Lender Contracts (including, without limitation, any guaranty by any Debtor of the obligations thereunder) shall not be impaired, released, modified, or limited in any respect, except as otherwise expressly agreed in writing by Fannie Mae; (v) no lien or security interest shall attach to, modify, prime or otherwise affect (A) mortgage servicing rights with respect to mortgages which are now or hereafter serviced by Ditech or RMS (or any of their affiliates) for Fannie Mae, except as otherwise expressly authorized by Fannie Mae pursuant to the applicable Fannie Mae Acknowledgment Agreements, (B) any other rights related to the Fannie Mae Lender Contracts, between any of the Debtors and Fannie Mae, including the "Purchased Servicing Advance Receivables" as defined and referenced in, and except as otherwise expressly authorized by, the Fannie Mae Acknowledgment Agreements, or (C) any cash, accounts, securities, or

other collateral (and any proceeds thereof) pledged to Fannie Mae pursuant to any collateral pledge agreement or other security agreement between Ditech and Fannie Mae (including the Collateral as defined in that certain Pledge and Security Agreement in favor of Fannie Mae dated as of December 19, 2014 (as amended)); (vi) the term of Fannie Mae Acknowledgment Agreements shall remain unchanged, and any extension of the term or changes to other provisions of the Fannie Mae Acknowledgment Agreements must be expressly agreed to by the parties in a separate written agreement; (vii) Fannie Mae does not, and shall not be deemed to, release any Released Party or any other person or entity from any claims or causes of action that it may have, nor shall Fannie Mae be enjoined from pursuing any such claims or causes of action; and (viii) in a Reorganization Transaction, the Fannie Mae Lender Contracts shall be, upon the Effective Date, assumed by the Reorganized Debtors; and (ix) all transactions with and transfers to Fannie Mae prior to the Effective Date are hereby reaffirmed and ratified by the Debtors and shall not be subject to avoidance.  Without limiting the generality of, and subject to, the foregoing, in connection with the proposed assumption or assumption and assignment of any agreement, including, without limitation, the Fannie Mae Lender Contracts, between any of the Debtors and Fannie Mae, such agreements may be assumed or assumed and assigned only upon (i)(1) the Reorganized Debtors agreeing to honor all obligations under the Fannie Mae Lender Contracts whether incurred prior to or after the Effective Date; (2) in the case of an assignment in a Sale Transaction  repayment in full of the Cure Amounts; or (3) such other treatment of the Cure Amount or any other obligations as shall be agreed to by Fannie Mae and the Debtors in good faith negotiations and (ii) adequate assurance of future performance.

(b)    ***Freddie Mac.***

(i)    Notwithstanding anything herein or in the Confirmation Order, Plan Supplement, Exit Warehouse Facilities Documents, Exit Working Capital Facility Documents, NRZ Exit Tail Bridge Facility Documents, the Amended and Restated Credit Facility Documents, or any other order or document in the Chapter 11 Cases to the contrary, (1) Freddie Mac's rights, powers, prerogatives, remedies, payment or lien priorities, and claims against the Debtors or any other person or entity under the Freddie Mac Agreements shall not be impaired, released, modified, or limited in any respect, except as otherwise expressly agreed in writing by Freddie Mac; (2) no lien or security interest shall (a) attach to, modify, include or otherwise affect mortgage servicing rights with respect to mortgages which are now or hereafter serviced by Ditech (or any of its affiliates) for Freddie Mac, (b) attach to, modify, include or otherwise affect the "***Servicing Collateral***" (as defined and referenced in, and except as otherwise expressly authorized by, the Freddie Mac Acknowledgment Agreement), (c) attach to, modify, include or otherwise affect any cash, accounts, securities, or other collateral (and any proceeds thereof) pledged to Freddie Mac pursuant to any collateral pledge agreement or other security agreement between Ditech and Freddie Mac (including, without limitation, the Freddie Mac Pledge Agreement), or (d) impair Freddie Mac's rights, remedies, powers, interests, payment or lien priority, or prerogatives set forth in any of the foregoing; and (3) Freddie Mac does not, and shall not be deemed to, release any Released Party or any other person or entity from any claims or causes of action that it may have, nor shall Freddie Mac be enjoined from pursuing any such claims or causes of action.

(ii)    Notwithstanding anything herein or in the Confirmation Order, Plan Supplement, Exit Warehouse Facilities Documents, Exit Working Capital Facility Documents, NRZ Exit Tail Bridge Facility Documents, the Amended and Restated Credit Facility Documents, or any other order in the Chapter 11 Cases to the contrary, (1) the Debtors' mortgage servicing rights with respect to mortgages which are now or hereafter serviced by Ditech (or any of its affiliates) for Freddie Mac shall not be transferred by the

Debtors to the Successful Bidders (or any other entity) without the express prior written consent of Freddie Mac in its sole and absolute discretion; (2) the Debtors and the Reorganized Debtors shall not assume or assume and assign any agreement between any of the Debtors and Freddie Mac, including, without limitation, the Freddie Mac Agreements, without the express prior written consent of Freddie Mac in its sole and absolute discretion; (3) any proposed severance of rights and obligations or any other proposed modification of any agreement, including, without limitation, the Freddie Mac Agreements, between any of the Debtors and Freddie Mac shall be subject to the prior written consent of Freddie Mac in its sole and absolute discretion; and (4) all transactions with and transfers to Freddie Mac prior to the Effective Date are hereby reaffirmed and ratified by the Debtors and shall not be subject to avoidance.  The Debtors and Freddie Mac shall enter into good faith negotiations and use commercially reasonable efforts to resolve the claims of Freddie Mac and the assumption or assumption and assignment of the Freddie Mac Agreements in the Reorganization Transaction or the Sale Transaction, as applicable.

(c)     ***Ginnie Mae.***  Notwithstanding anything herein to the contrary, (i) the Debtors' mortgage servicing and securitization obligations relating to Ginnie Mae shall not be transferred by the Debtors to the Successful Bidders without the express prior written consent of Ginnie Mae in its sole and absolute discretion; (ii) the assumption or assumption and assignment of any agreements between any of the Debtors and Ginnie Mae, including, without limitation, the Ginnie Mae Agreements, shall be subject to the express prior written consent of Ginnie Mae in its sole and absolute discretion; and (iii) any proposed severance of rights and obligations or any other proposed modification of any agreement, including, without limitation, the Ginnie Mae Agreements, between any of the Debtors and Ginnie Mae shall be subject to the prior written consent of Ginnie Mae in its sole and absolute discretion.  The Debtors and Ginnie Mae shall enter into good faith negotiations and use commercially reasonable efforts to resolve the claims of Ginnie Mae and the assumption or assumption and assignment of the Ginnie Mae Agreements in the Reorganization Transaction or the Sale Transaction, as applicable.

5.9.     ***Employee Matters.***

(a)     Subject to Section 5.9(c) of the Plan, on the Effective Date, solely with respect to the Reorganization Transaction, the Reorganized Debtors shall be deemed to have assumed all employee compensation plans, Benefit Plans, employment agreements, offer letters, or award letters to which the Debtors are a party (collectively, the "***Employee Arrangements***").  Notwithstanding the foregoing, if an Employee Arrangement, other than any postpetition employee incentive program approved by the Bankruptcy Court, provides in part for a payment, premium, or other award upon the occurrence of a change of control, change in control, or other similar event, then such Employee Arrangement shall only be assumed to the extent that the Reorganization Transaction, including consummation of the Plan, shall not be treated as a change of control, change in control, or other similar event under such Employee Arrangement.  The Plan Administrator, on behalf of the Wind Down Estates, shall be authorized to amend any existing or establish any new Benefit Plan or enter into employee agreements for the Wind Down Estates as it determines is in the best interests of creditors.

(b)     Following the Effective Date, solely with respect to the Reorganization Transaction, the applicable Reorganized Debtors shall enter into the Management Incentive Plan.  All awards issued under the Management Incentive Plan will be dilutive of all other New Common Stock issued pursuant to the Plan.  Within thirty (30) days following the Effective Date, the Management Incentive Plan and individual grants thereunder shall be independently considered and, subject to the exercise of its fiduciary duties and to the extent it deems appropriate, approved by the New Board.

(c)     For the avoidance of doubt, (i) if an Employee Arrangement provides for an award or potential award of Interests or consideration based on the value of Interests prior to the Effective Date, such Interest shall be treated in accordance with Section 4.9 of the Plan and cancelled notwithstanding assumption of the applicable Employee Arrangement, and (ii) the Ditech Holding Corporation 2018 Equity Incentive Plan (as amended and restated) shall not be assumed and shall be deemed terminated.

(d)     In the event of a Sale Transaction, the Sale Incentive Awards shall be paid in Cash from the Sale Transaction Proceeds as Allowed Administrative Expense Claims.  Such distributions shall be deemed to be distributions made to holders of Allowed Term Loan Claims in accordance with Section 4.3 of the Plan.

(e)     On the Effective Date, the Wind Down Estates shall be deemed to have assumed all agreements providing for retiree benefits within the meaning of section 1114 of the Bankruptcy Code.

5.10.   ***Effectuating Documents; Further Transactions.***

(a)     On or as soon as practicable after the Effective Date, the Reorganized Debtors, or the Plan Administrator, as applicable, shall take such actions as may be or become necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, the UCC Settlement, and the CCC Settlement, including (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, financing, conversion, disposition, transfer, dissolution, transition services, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may determine; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution and the Amended Organizational Documents pursuant to applicable state law; (iv) the issuance of securities, all of which shall be authorized and approved in all respects, in each case, without further action being required under applicable law, regulation, order, or rule; (v) the execution, delivery, or filing of contracts, instruments, releases, and other agreements to effectuate and implement the distribution of the GUC Recovery Trust Interests to be issued pursuant hereto without the need for any approvals, authorizations, actions, or consents; and (vi) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law or to reincorporate in another jurisdiction, subject, in each case, to the Amended Organizational Documents.

(b)     Each officer, manager, or member of the board of directors of the Debtors is (and each officer, manager, or member of the board of directors of the Reorganized Debtors and the Plan Administrator, as applicable, shall be) authorized and directed to issue, execute, deliver, file, or record such contracts, securities, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors or Wind Down Estates, all of which shall be authorized and approved in all respects, in each case, without the need for any approvals, authorization, consents, or any further action required under applicable law, regulation, order, or rule (including, without limitation, any action by the stockholders or directors or managers of the Debtors, the Reorganized Debtors, or Wind Down Estates) except for those expressly required pursuant to the Plan.

(c)    In order to preserve the Reorganized Debtors' or Wind Down Estates' ability to utilize certain tax attributes that exist as of the Effective Date, the charter, bylaws, and other organizational documents may restrict certain transfers of the New Common Stock.

(d)    The Debtors shall be authorized to implement the Reorganization Transaction, Asset Sale Transaction, or Sale Transaction, as applicable, the UCC Settlement (including the creation of the GUC Recovery Trust), and the CCC Settlement in the manner most tax efficient to the Reorganized Debtors or Wind Down Estates, as determined by the Debtors in their business judgment, given the totality of the circumstances.

(e)    All matters provided for herein involving the corporate structure of the Debtors. Reorganized Debtors, or Wind Down Estates, to the extent applicable, or any corporate or related action required by the Debtors, Reorganized Debtors, or Wind Down Estates in connection herewith shall be deemed to have occurred and shall be in effect, without any requirement of further action by the stockholders, members, or directors or managers of the Debtors or Reorganized Debtors, and with like effect as though such action had been taken unanimously by the stockholders, members, directors, managers, or officers, as applicable, of the Debtors, Reorganized Debtors, or Wind Down Estates.

5.11.    ***Exemption from Securities Laws; Transferability.***

(a)    Solely with respect to the Reorganization Transaction, (a) the offer, issuance, and distribution of New Common Stock to holders of Term Loan Claims pursuant to Section 4.3 of the Plan shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without further act or action by any Entity, from registration under  the Securities Act and any state or local law requiring registration for the offer, issuance, or distribution of Securities; and (b) such New Common Stock shall be freely tradable by such recipients thereof, subject to, (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act; (ii) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (iii) any restrictions, to the extent necessary for the Debtors to preserve their ability to utilize certain tax attributes that exist as of the Effective Date, on the transferability and ownership of New Common Stock; (iv) applicable regulatory approval; and (v) the Stockholders Agreement.

(b)    Solely with respect to the Sale Transaction, (a) the issuance and distribution of Reorganized RMS Stock to Mortgage Assets Management, LLC in accordance with the terms and conditions of the Reverse Stalking Horse Purchase Agreement, shall be exempt, pursuant to section 4(a)(2) of the Securities Act or any other applicable exemption, without further act or action by any Entity, from registration under the Securities Act; and (b) the Reorganized RMS Stock will be considered "restricted securities" under Rule 144 of the Exchange Act and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act.

5.12.    ***Cancellation of Existing Securities and Agreements.***

(a)    Solely with respect to the Reorganization Transaction, except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, including with respect to executory contracts or unexpired leases that shall be assumed by the Reorganized Debtors, and subject in all respects to the Prepetition Intercreditor Agreement, on the Effective Date, all agreements, instruments, and other documents evidencing or issued pursuant to the Prepetition Credit Agreement, the Prepetition Second Lien Notes Indenture, or any indebtedness or other obligations thereunder, and any Interest, and any rights of any holder in respect thereof, shall be deemed cancelled,

WEIL:\97137790\1\41703.0010

discharged, and of no force or effect, and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

(b)    Notwithstanding such cancellation and discharge, the Prepetition Credit Agreement and the Prepetition Second Lien Notes Indenture shall continue in effect to the extent necessary (i) to allow the holders of such Claims to receive distributions under the Plan; (ii) to allow the Debtors, the Reorganized Debtors, the Prepetition Administrative Agent, and the Prepetition Second Lien Notes Trustee to make post-Effective Date distributions or take such other action pursuant to the Plan on account of such Claims and to otherwise exercise their rights and discharge their obligations relating to the interests of the holders of such Claims; (iii) to allow holders of Claims to retain their respective rights and obligations vis-à-vis other holders of Claims pursuant to any applicable loan documents; (iv) to allow the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to enforce their rights, claims, and interests vis-à-vis any party other than the Debtors, including any rights with respect to priority of payment and/or to exercise charging liens; (v) to preserve any rights of the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to payment of fees, expenses, and indemnification obligations as against any money or property distributable to lenders under the Prepetition Credit Agreement and holders under the Prepetition Second Lien Notes Indenture, as applicable, including any rights to priority of payment and/or to exercise charging liens; (vi) to allow the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to enforce any obligations owed to it under the Plan; (vii) to allow the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to exercise rights and obligations relating to the interests of lenders under the Prepetition Credit Agreement and holders under the Prepetition Second Lien Notes Indenture, as applicable; (viii) to permit the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to perform any function necessary to effectuate the foregoing; (ix) to allow the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court relating to the Prepetition Credit Agreement or the Prepetition Second Lien Notes Indenture; and (x) to permit the continuation of the collateral, security, and related agreements under the Prepetition Credit Agreement with respect to the Amended and Restated Credit Facility Agreement as provided under the Plan; provided, that nothing in this Section 5.12 shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any liability or expense to the Reorganized Debtors.  In a Reorganization Transaction, notwithstanding anything to the contrary herein, the indemnity obligations of the Debtors under the Prepetition Credit Agreement shall survive the termination thereof and shall not be discharged or released pursuant to the Plan or the Confirmation Order.  Notwithstanding anything to the contrary herein, the indemnity obligations of the Debtors under the Prepetition Credit Agreement and the Prepetition Second Lien Notes Indenture shall survive the termination thereof and shall not be discharged or released pursuant to the Plan or the Confirmation Order.

(c)    Except for the foregoing, subsequent to the performance by the Prepetition Administrative Agent of its obligations pursuant to the Plan, the Prepetition Administrative Agent and its agents shall be relieved of all further duties and responsibilities related to the Prepetition Credit Agreement, except with respect to any duties and responsibilities of the Prepetition Administrative Agent that, pursuant to the Amended and Restated Credit Facility Agreement, survive the termination of the Prepetition Credit Agreement.

(d)    Except for the foregoing, subsequent to the performance by the Prepetition Second Lien Notes Trustee of its obligations pursuant to the Plan, the Prepetition Second Lien Notes Trustee and its agents shall be relieved of all further duties and responsibilities related to the Prepetition Second Lien Notes Indenture.  Nothing in this Section 5.12 shall in any way affect or diminish the rights of the Prepetition Second Lien Notes Trustee to exercise any charging lien against distributions to holders of Second Lien Notes Claims with respect to any unpaid fees.

(e)      Notwithstanding anything to the contrary herein, all rights under the Prepetition Second Lien Notes Indenture shall remain subject to the Prepetition Intercreditor Agreement.

(f)      Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in the Plan shall be deemed null and void and shall be of no force and effect.  Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under any executory contract or lease to the extent such executory contract or lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court or hereunder.

### 5.13.  *Cancellation of Liens.*

Except as otherwise specifically provided herein, upon the payment in full in Cash of an Other Secured Claim, any Lien securing an Other Secured Claim that is paid in full, in Cash, shall be deemed released, and the holder of such Other Secured Claim shall be authorized and directed to release any collateral or other property of the Debtors (including any Cash collateral) held by such holder and to take such actions as may be requested by the Reorganized Debtors, to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Reorganized Debtors.

### 5.14.  *Subordination Agreements.*

Pursuant to section 510(a) of the Bankruptcy Code, all subordination agreements, including but not limited to, the Prepetition Intercreditor Agreement and the Prepetition Second Lien Notes Indenture, governing Claims or Interests shall be enforced in accordance with such agreements' terms; provided, that the subordination provisions in such agreements shall not apply to distributions to holders of Allowed Second Lien Notes Claims pursuant to Section 4.4(b) of the Plan.

### 5.15.  *Nonconsensual Confirmation.*

The Debtors intend to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code as to any Classes that reject or are deemed to reject the Plan.

### 5.16.  *Closing of Chapter 11 Cases.*

After an Estate has been fully administered, the Reorganized Debtors or Plan Administrator shall seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case(s) in accordance with the Bankruptcy Code and Bankruptcy Rules.

### 5.17.  *Notice of Effective Date.*

As soon as practicable, but not later than three (3) Business Days following the Effective Date, the Debtors shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

### 5.18.  *Separability.*

Notwithstanding the combination of the separate plans of reorganization for the Debtors set forth in the Plan for purposes of economy and efficiency, the Plan constitutes a separate chapter 11 plan for each Debtor.  Accordingly, if the Bankruptcy Court does not confirm the Plan with respect to one

or more Debtors, it may still, subject to the consent of the applicable Debtors, confirm the Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

5.19.   **GUC Recovery Trust.**

(a)   *Creation and Governance of the GUC Recovery Trust*.   On the Effective Date, the Debtors shall transfer the GUC Recovery Trust Assets to the GUC Recovery Trust and the Debtors and the GUC Recovery Trustee shall execute the GUC Recovery Trust Agreement and shall take all steps necessary to establish the GUC Recovery Trust in accordance with the Plan and the beneficial interests therein.   In the event of any conflict between the terms of the Plan and the terms of the GUC Recovery Trust Agreement, the terms of the Plan shall govern.   Additionally, on the Effective Date, the Debtors shall transfer and shall be deemed to transfer to the GUC Recovery Trust all of their rights, title and interest in and to all of the GUC Recovery Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the GUC Recovery Trust Assets shall automatically vest in the GUC Recovery Trust free and clear of all Claims and Liens, and such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax.   The GUC Recovery Trustee shall be the exclusive administrator of the assets of the GUC Recovery Trust for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as a representative of the Estate of each of the Debtors appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, solely for purposes of carrying out the GUC Recovery Trustee's duties under the GUC Recovery Trust Agreement.   The GUC Recovery Trust shall be governed by the GUC Recovery Trust Agreement and administered by the GUC Recovery Trustee.   The powers, rights, and responsibilities of the GUC Recovery Trustee shall be specified in the GUC Recovery Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this Section 5.19.   The GUC Recovery Trustee shall hold and distribute the GUC Recovery Trust Assets in accordance with the provisions of the Plan and the GUC Recovery Trust Agreement.   Other rights and duties of the GUC Recovery Trustee shall be as set forth in the GUC Recovery Trust Agreement.   After the Effective Date, the Debtors and the Reorganized Debtors shall have no interest in the GUC Recovery Trust Assets except as set forth in the GUC Recovery Trust Agreement.

(b)   *GUC Recovery Trustee and GUC Recovery Trust Agreement*.   The GUC Recovery Trust Agreement generally will provide for, among other things:  (i) the transfer of the GUC Recovery Trust Assets to the GUC Recovery Trust; (ii) the payment of certain reasonable expenses of the GUC Recovery Trust; (iii) litigation of any GUC Recovery Trust Causes of Action, which may include the prosecution, settlement, abandonment or dismissal of any such Causes of Action; and (iv) distributions to holders of Allowed General Unsecured Claims as provided herein and in the GUC Recovery Trust Agreement.   The GUC Recovery Trust Agreement may include reasonable and customary provisions that allow for indemnification by the GUC Recovery Trust.   Any such indemnification shall be the sole responsibility of the GUC Recovery Trust and payable solely from the GUC Recovery Trust Assets.   The GUC Recovery Trustee shall be responsible for all decisions and duties with respect to the GUC Recovery Trust and the GUC Recovery Trust Assets, except as otherwise provided in the GUC Recovery Trust Agreement.

(c)   *Cooperation of Reorganized RMS and Wind Down Estates*.   Subject to subsection (d) of this Section 5.19, the Debtors, the Wind Down Estates, Reorganized RMS or Plan Administrator, as applicable, upon reasonable notice, shall reasonably cooperate with the GUC Recovery Trustee in the administration of the GUC Recovery Trust, including by providing, during regular business hours, reasonable access to pertinent documents, including books and records, to the extent the Debtors, the Wind Down Estates, Reorganized RMS, or Plan Administrator, as applicable, have such information and/or documents, to the GUC Recovery Trustee sufficient to enable the GUC Recovery Trustee to perform its duties hereunder.   The Debtors, the Wind Down Estates, Reorganized RMS, and the Plan

Administrator shall reasonably cooperate with the GUC Recovery Trustee in the administration of the GUC Recovery Trust, including, by providing, during regular business hours, reasonable access to documents and current officers and directors with respect to (i) the prosecution of the GUC Recovery Trust Causes of Action, and (ii) contesting, settling, compromising, reconciling, and objecting to General Unsecured Claims; provided that, the GUC Recovery Trust agrees upon request to reimburse reasonable out-of-pocket expenses for preservation of documents, copying or similar expenses. The collection, review, and preservation of documents for any investigation or litigation by the GUC Recovery Trustee shall be at the expense of the GUC Recovery Trust.

(d)       *Preservation of Privilege*. The Debtors and the GUC Recovery Trust shall enter into a common interest agreement whereby the Debtors will be able to share documents, information or communications (whether written or oral) relating to the GUC Recovery Trust Assets. The GUC Recovery Trust shall seek to preserve and protect all applicable privileges attaching to any such documents, information, or communications. The GUC Recovery Trustee's receipt of such documents, information or communications shall not constitute a waiver of any privilege. All privileges shall remain in the control of the Debtors, the Wind Down Estates, the Reorganized RMS or Plan Administrator, as applicable, and the Debtors, Wind Down Estates, Reorganized RMS or Plan Administrator, as applicable, retain the right to waive their own privileges.

(e)       *GUC Recovery Trust Assets*. The GUC Recovery Trustee shall have the exclusive right in respect of all GUC Recovery Trust Causes of Action to institute, file, prosecute, enforce, settle, compromise, release, abandon, or withdraw any and all GUC Recovery Trust Causes of Action without any further order of the Bankruptcy Court or consent of any other party, except as otherwise provided herein or in the GUC Recovery Trust Agreement. From and after the Effective Date, the GUC Recovery Trustee, in accordance with section 1123(b)(3) of the Bankruptcy Code, and on behalf of the GUC Recovery Trust, shall serve as a representative of the Estates, solely for purposes of carrying out the GUC Recovery Trustee's duties under the GUC Recovery Trust Agreement. In connection with the investigation, prosecution and/or compromise of the GUC Recovery Trust Causes of Action, the GUC Recovery Trustee may expend such portion of the GUC Recovery Trust Assets as the GUC Recovery Trustee deems necessary.

(f)       *GUC Recovery Trust Fees and Expenses*. From and after the Effective Date, the GUC Recovery Trustee, on behalf of the GUC Recovery Trust, shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable expenses (including professional fees) incurred by the GUC Recovery Trust and any professionals retained by the GUC Recovery Trust from the GUC Recovery Trust Assets, except as otherwise provided in the GUC Recovery Trust Agreement. The Reorganized Debtors, Reorganized RMS, or the Wind Down Estates, as applicable, or any of their Affiliates (or anyone acting on their behalf) shall not be responsible for any costs, fees, or expenses of the GUC Recovery Trust.

(g)       *Tax Treatment*. In furtherance of this Section 5.19 of the Plan, (i) the GUC Recovery Trust shall be structured to qualify as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code to the holders of General Unsecured Claims, consistent with the terms of the Plan; (ii) the sole purpose of the GUC Recovery Trust shall be the liquidation and distribution of the GUC Recovery Trust Assets in accordance with Treasury Regulation section 301.7701-4(d), including the resolution of General Unsecured Claims in accordance with this Plan, with no objective to continue or engage in the conduct of a trade or business; (iii) all parties (including the Debtors and the Estates, holders of General Unsecured Claims, and the GUC Recovery Trustee) shall report consistently with such treatment; (iv) all parties shall report consistently with the valuation of the GUC Recovery Trust Assets transferred to the GUC

Recovery Trust as determined by the GUC Recovery Trustee (or its designee); (v) the GUC Recovery Trustee shall be responsible for filing returns for the GUC Recovery Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a); and (vi) the GUC Recovery Trustee shall annually send to each holder of an interest in the GUC Recovery Trust a separate statement regarding the receipts and expenditures of the trust as relevant for U.S. federal income tax purposes. Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the GUC Recovery Trustee of a private letter ruling if the GUC Recovery Trustee so requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the GUC Recovery Trustee), the GUC Recovery Trustee may timely elect to (i) treat the any portion of the GUC Recovery Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. If a "disputed ownership fund" election is made, all parties (including the Debtors and the Estates, holders of General Unsecured Claims, and the GUC Recovery Trustee) shall report for United States federal, state, and local income tax purposes consistently with the foregoing.

(h)     *Non-Transferability of GUC Recovery Trust Interests.*   Any and all GUC Recovery Trust Interests shall be non-transferable other than if transferred by will, intestate succession, or otherwise by operation of law. In addition, any and all GUC Recovery Trust Interests will not constitute "securities" and will not be registered pursuant to the Securities Act or any applicable state or local securities law. However, if it should be determined that any such interests constitute "securities," the exemption provisions of Section 1145 of the Bankruptcy Code will be satisfied and the offer, issuance and distribution under the Plan of the GUC Recovery Trust Interests will be exempt from registration under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations.

(i)     *Dissolution of the GUC Recovery Trust.*   The GUC Recovery Trustee and the GUC Recovery Trust shall be discharged or dissolved, as the case may be, at such time as (i) the GUC Recovery Trustee determines that the pursuit of additional GUC Recovery Trust Causes of Action is not likely to yield sufficient additional proceeds to justify further pursuit of such claims and (ii) all distributions required to be made by the GUC Recovery Trustee under the Plan have been made. Upon dissolution of the GUC Recovery Trust, any remaining GUC Recovery Trust Assets shall be distributed to holders of Allowed General Unsecured Claims in accordance with the Plan and the GUC Recovery Trust Agreement, as appropriate.

(j)     *Single Satisfaction of Allowed General Unsecured Claims.*   Notwithstanding anything to the contrary herein, in no event shall holders of Allowed General Unsecured Claims recover more than the full amount of their Allowed General Unsecured Claims from the GUC Recovery Trust.

## ARTICLE VI  DISTRIBUTIONS.

6.1.   ***Distributions Generally.***

Except as otherwise provided in the Plan and the GUC Recovery Trust Agreement, one or more Disbursing Agents shall make all distributions under the Plan to the appropriate holders of Allowed Claims in accordance with the terms of the Plan.

6.2.   ***Distribution Record Date.***

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors or their respective agents shall

be deemed closed for purposes of determining whether a holder of such a Claim or Interest is a record holder entitled to distributions under the Plan, and there shall be no further changes in the record holders or the permitted designees of any such Claims or Interests. The Debtors, the Reorganized Debtors, the Plan Administrator, or the GUC Recovery Trustee, as applicable, shall have no obligation to recognize any transfer or designation of such Claims or Interests occurring after the close of business on the Distribution Record Date. Notwithstanding the foregoing, any Term Lender may agree in writing and upon written notice to the Plan Administrator and New Board to assign its right to a distribution under this Plan to another Term Lender. Any such assigning Term Lender shall immediately turn over any such assigned distributed funds to any such assignee Term Lender immediately upon receipt from the Disbursing Agent and otherwise in accordance with such written agreement. In addition, with respect to payment of any Cure Amounts or assumption disputes, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease as of the close of business on the Distribution Record Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount. For the avoidance of doubt, the Distribution Record Date shall not apply to the Second Lien Notes, the holders of which shall receive a distribution in accordance with Article IV of the Plan and the customary procedures of DTC on or as soon as practical after the Effective Date. For the further avoidance of doubt, all distributions made pursuant to the Plan on account of the Second Lien Notes shall be made by the Disbursing Agent to, or at the direction of, the Prepetition Second Lien Notes Trustee, for further distribution to holders of Second Lien Notes, in accordance with the Plan and the Confirmation Order, subject to and in accordance with the terms of the Prepetition Second Lien Notes Indenture, including, without limitation, subject to the application of the charging lien of the Prepetition Second Lien Notes Trustee for payment of any unpaid fees and expenses.

6.3. ***Date of Distributions.***

(a) Except as otherwise provided in the Plan and in the GUC Recovery Trust Agreement, any distributions and deliveries to be made under the Plan shall be made on the Effective Date or as otherwise determined in accordance with the Plan, including, without limitation, the treatment provisions of Article IV of the Plan, or as soon as practicable thereafter; provided, that the Reorganized Debtors, the Plan Administrator, the Consumer Representative, or the GUC Recovery Trustee, as applicable, shall from time to time determine subsequent distribution dates to the extent they determine them to be appropriate.

(b) In a Sale Transaction, the Plan Administrator shall reserve an amount sufficient to pay holders of Disputed Administrative Expense Claims and Disputed Priority Tax Claims the amount such holders would be entitled to receive under the Plan if such Claims were to become Allowed Claims. After the resolution of all Disputed Administrative Expense Claims and Disputed Priority Tax Claims, the Plan Administrator shall treat any amounts that were reserved for Disputed Administrative Expense Claims and Disputed Priority Tax Claims that do not become Allowed Claims as Net Cash Proceeds.

6.4. ***Disbursing Agent.***

All distributions under this Plan shall be made by the Disbursing Agent on and after the Effective Date as provided herein. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties. The Reorganized Debtors or Plan Administrator shall use all commercially reasonable efforts to provide the Disbursing Agent (if other than the Reorganized Debtors) with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors', Reorganized Debtors', or Wind Down Estates', as applicable, books and records. The Reorganized Debtors or Plan Administrator shall cooperate in good faith with the applicable

Disbursing Agent (if other than the Reorganized Debtors) to comply with the reporting and withholding requirements outlined in Section 6.19 of the Plan.

6.5.    ***Rights and Powers of Disbursing Agent.***

(a)    From and after the Effective Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against and Interests in the Debtors and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent.  No holder of a Claim or Interest or other party in interest shall have or pursue any claim or Cause of Action against the Disbursing Agent, solely in its capacity as Disbursing Agent, for making distributions in accordance with the Plan or for implementing provisions of the Plan, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent.

(b)    A Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder; (ii) make all distributions contemplated hereby; and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

6.6.    ***Expenses of Disbursing Agent.***

Except as otherwise ordered by the Bankruptcy Court, any reasonable and documented fees and expenses incurred by the Disbursing Agent acting in such capacity (including reasonable documented attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash; provided, that the fees and expenses incurred by (a) the GUC Recovery Trustee shall be paid solely from the GUC Recovery Trust Assets in accordance with the GUC Recovery Trust Agreement and (b) the Consumer Representative shall be paid solely from the Consumer Creditor Reserve and the Consumer Representative Fee Reserve.

6.7.    ***No Postpetition Interest on Claims.***

Except as otherwise provided in the Plan, the Confirmation Order, the DIP Order, or another order of the Bankruptcy Court or required by the Bankruptcy Code (including postpetition interest in accordance with sections 506(b) and 726(a)(5) of the Bankruptcy Code), interest shall not accrue or be paid on any Claims on or after the Commencement Date; provided, that if interest is payable pursuant to the preceding sentence, interest shall accrue at the federal judgment rate pursuant to 28 U.S.C. § 1961 on a non-compounded basis from the date the obligation underlying the Claim becomes due and is not timely paid through the date of payment.

6.8.    ***Delivery of Distributions.***

(a)    Subject to Bankruptcy Rule 9010, all distributions to any holder or permitted designee, as applicable, of an Allowed Claim or Interest shall be made to a Disbursing Agent, who shall transmit such distribution to the applicable holders or permitted designees of Allowed Claims or Interests on behalf of the Debtors.  In the event that any distribution to any holder or permitted designee is returned as undeliverable, no further distributions shall be made to such holder or such permitted designee unless

and until such Disbursing Agent is notified in writing of such holder's or permitted designee's, as applicable, then-current address, at which time all currently-due, missed distributions shall be made to such holder as soon as reasonably practicable thereafter without interest.  Nothing herein shall require the Disbursing Agent to attempt to locate holders or permitted designees, as applicable, of undeliverable distributions and, if located, assist such holders or permitted designees, as applicable, in complying with Section 6.19 of the Plan.

(b)     Notwithstanding the foregoing, all distributions of Cash on account of Term Loan Claims or Second Lien Notes Claims, if any, shall be deposited with the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee, as applicable, for distribution to holders of Term Loan Claims or Second Lien Notes Claims in accordance with the terms of the Prepetition Credit Agreement and the Prepetition Second Lien Notes Indenture.  All distributions other than of Cash on account of Term Loan Claims or Second Lien Notes Claims, if any, may, with the consent of the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee, be made by the Disbursing Agent directly to holders of Term Loan Claims and Second Lien Notes Claims in accordance with the terms of the Plan, the Prepetition Credit Agreement, and the Prepetition Second Lien Notes Indenture.  To the extent the Prepetition Administrative Agent or the Prepetition Second Lien Notes Trustee effectuates, or is requested to effectuate, any distributions hereunder, the Prepetition Administrative Agent and the Prepetition Second Lien Notes Trustee shall be deemed a "Disbursing Agent" for purposes of the Plan.

(c)     As soon as reasonably practicable after the Confirmation Order is entered, the DIP Agent shall provide to counsel to the Debtors a list of all holders of DIP Claims as of such date and such additional information as may be reasonably requested by counsel to the Debtors or the Disbursing Agent to make distributions under the Plan.  All distributions to holders of DIP Claims shall be governed by the DIP Documents and the DIP Order and shall be made to each holder of an Allowed DIP Claim or such holder's authorized designee for purposes of distributions to be made hereunder. All reasonable and documented fees and expenses of the DIP Agent incurred after the Effective Date as part of this Section 6.8 shall be paid by the Debtors or Reorganized Debtors, as applicable.

6.9.    ***Distributions after Effective Date.***

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

6.10.    ***Unclaimed Property.***

Undeliverable distributions or unclaimed distributions shall remain in the possession of the Debtors or GUC Recovery Trust, as applicable, until such time as a distribution becomes deliverable or holder accepts distribution, or such distribution reverts back to the Debtors, Reorganized Debtors, Wind Down Estates, or GUC Recovery Trust, as applicable, and shall not be supplemented with any interest, dividends, or other accruals of any kind.  Such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of three hundred and sixty-five (365) days from the date of distribution.  After such date all unclaimed property or interest in property shall revert to the Reorganized Debtors, Wind Down Estates, or GUC Recovery Trust, as applicable, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred.

6.11.    *Time Bar to Cash Payments.*

Checks issued by the Disbursing Agent in respect of Allowed Claims shall be null and void if not negotiated within one hundred and twenty (120) days after the date of issuance thereof. Thereafter, the amount represented by such voided check shall irrevocably revert to the Reorganized Debtors or Wind Down Estates (or GUC Recovery Trust in the case of checks issued by the GUC Recovery Trust or the Consumer Representative in the case of checks issued by the Consumer Representative), and any Claim in respect of such voided check shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary. Requests for re-issuance of any check shall be made to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued.

6.12.    *Manner of Payment under Plan.*

Except as otherwise specifically provided in the Plan, at the option of the Debtors, the Reorganized Debtors, the Plan Administrator, the GUC Recovery Trustee, or the Consumer Representative, as applicable, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

6.13.    *Satisfaction of Claims.*

Except as otherwise specifically provided in the Plan, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

6.14.    *Fractional Stock and Notes.*

If any distributions of New Common Stock pursuant to the Plan would result in the issuance of a fractional share of New Common Stock, then the number of shares of New Common Stock to be issued in respect of such distribution will be calculated to one decimal place and rounded up or down to the closest whole share (with a half share or greater rounded up and less than a half share rounded down). The total number of shares of New Common Stock to be distributed in connection with the Plan shall be adjusted as necessary to account for the rounding provided for in this Section 6.14. No consideration shall be provided in lieu of fractional shares that are rounded down. The Reorganized Debtors, Wind Down Estates, and the Disbursing Agent shall have no obligation to make a distribution that is less than one (1) share of New Common Stock.

6.15.    *Minimum Cash Distributions.*

The Disbursing Agent shall not be required to make any distribution of Cash less than One Hundred Dollars ($100) to any holder of an Allowed Claim; provided, that if any distribution is not made pursuant to this Section 6.15, such distribution shall be added to any subsequent distribution to be made on behalf of the holder's Allowed Claim.

6.16.    *Setoffs and Recoupments.*

The Debtors, the Reorganized Debtors, or Wind Down Estates, as applicable, or such entity's designee (including, without limitation, the Disbursing Agent) may, but shall not be required to, set off or recoup against any Claim, and any distribution to be made on account of such Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that the Debtors, the Reorganized Debtors,

WEIL:\97137790\1\41703.0010

or the Wind Down Estates may have against the holder of such Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law; provided, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by a Debtor or Reorganized Debtor or its successor of any claims, rights, or Causes of Action that a Debtor or Reorganized Debtor or its successor or assign may possess against the holder of such Claim.

### 6.17.  *Allocation of Distributions between Principal and Interest.*

Except as otherwise required by law (as reasonably determined by the Reorganized Debtors or Wind Down Estates), distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

### 6.18.  *No Distribution in Excess of Amount of Allowed Claim.*

Except as provided in Section 6.7 of the Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, distributions in excess of the Allowed amount of such Claim.

### 6.19.  *Withholding and Reporting Requirements.*

(a)    *Withholding Rights*.  In connection with the Plan, any party issuing any instrument or making any distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  In the case of a non-Cash distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and either (i) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld property.  Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Entity that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any governmental unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)    *Forms*.  Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the Disbursing Agent or such other Entity designated by the Reorganized Debtors, Wind Down Estates, or GUC Recovery Trustee (which Entity shall subsequently deliver to the Disbursing Agent any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Entity) Form W-8.  If such request is made by the Reorganized Debtors or Wind Down Estates, the Disbursing Agent, or such other Entity designated by the Reorganized Debtors, Wind Down Estates, or Disbursing Agent and the holder fails to comply before the earlier of (i) the date that is one hundred and eighty (180) days after the request is made and (ii) the date that is one hundred and eighty (180) days after the date of distribution, the amount of such distribution shall irrevocably revert to the applicable Reorganized Debtor and any Claim in respect of such distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property.  If such request is made by the GUC Recovery Trustee, or such other Entity designated by the GUC Recovery Trustee, and the holder fails to comply within ninety (90) days after the request is made, the amount of such distribution shall irrevocably revert to the GUC Recovery Trust and any General

Unsecured Claim in respect of such distribution shall be discharged and forever barred from assertion against the GUC Recovery Trustee, GUC Recovery Trust, or the property of each of them.

6.20. ***Hart-Scott-Rodino Antitrust Improvements Act.***

Any New Common Stock or Reorganized RMS Stock to be distributed under the Plan to an Entity required to file a premerger notification and report form under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, to the extent applicable, shall not be distributed until the notification and waiting periods applicable under such Act to such Entity have expired or been terminated.

## ARTICLE VII PROCEDURES FOR DISPUTED CLAIMS.

7.1. ***Objections to Claims.***

The Reorganized Debtors or the Plan Administrator, on behalf of each of the Wind Down Estates, shall exclusively be entitled to object to all Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and Intercompany Claims. The GUC Recovery Trustee, on behalf of the GUC Recovery Trust, shall have the exclusive authority to object to all General Unsecured Claims. The Consumer Representative shall have the exclusive authority to object to all Consumer Creditor Claims. After the Effective Date, the Reorganized Debtors, the Plan Administrator, the GUC Recovery Trustee, or the Consumer Representative, as applicable, shall have and retain any and all rights and defenses that the Debtors had with regard to any Claim to which they may object, except with respect to any Claim that is Allowed. Any objections to proofs of Claim shall be served and filed on or before the later of (a) one-hundred and eighty (180) days after the Effective Date, and (b) on such later date as ordered by the Bankruptcy Court for cause; provided, that the Consumer Representative shall reconcile and/or adjudicate Consumer Creditor Claims on a timeline determined by the Consumer Creditors' Committee and Consumer Representative, subject to approval by the Bankruptcy Court. The expiration of such period shall not limit or affect the Debtors', Reorganized Debtors', Plan Administrators', Creditor Representative's, or GUC Recovery Trustee's, as applicable, rights to dispute Claims asserted in the ordinary course of business other than through a proof of Claim. Notwithstanding anything to the contrary herein, (i) nothing herein shall, or is intended to, limit or preclude, in a manner inconsistent with section 502(a) of the Bankruptcy Code, a party in interest with standing from objecting to a Claim, but (ii) at least absent thirty (30) days' prior written notice of such an objection, the Plan Administrator, GUC Recovery Trustee, and the Consumer Representative, as applicable, shall have no liability for making distributions without regard to such an objection to a Claim (regardless of the result thereof).

7.2. ***Resolution of Disputed Administrative Expenses and Disputed Claims.***

On and after the Effective Date, (a) the Reorganized Debtors or the Plan Administrator, on behalf of each of the Wind Down Estates, shall have the authority to, in consultation with the Consenting Term Lenders, compromise, settle, otherwise resolve, or withdraw any objections to Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and Intercompany Claims without approval of the Bankruptcy Court, other than with respect to Fee Claims; (b) upon the creation of the GUC Recovery Trust, the GUC Recovery Trustee shall have the exclusive authority to compromise, settle, otherwise resolve, or withdraw any objections to General Unsecured Claims without approval of the Bankruptcy Court; and (c) the Consumer Representative shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Consumer Creditor Claims without approval of the Bankruptcy Court. The Debtors, Reorganized Debtors, Wind Down Estates, Plan Administrator, GUC Recovery Trustee, and the Consumer Representative, as applicable, shall cooperate with respect to any objections to Claims that seek to convert a type of Claim to another type of Claim as to which a

different party or parties may compromise, settle, otherwise resolve, or withdraw objections, and, in each case, the rights and defenses of the Debtors, Reorganized Debtors, Wind Down Estates, Plan Administrator, the GUC Recovery Trustee, or the Consumer Representative, as applicable, to any such objections are fully preserved.

### 7.3. *Payments and Distributions with Respect to Disputed Claims.*

Notwithstanding anything herein to the contrary, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

### 7.4. *Distributions after Allowance.*

After such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, the holder thereof shall be entitled to distributions, if any, to which such holder is then entitled as provided in this Plan, without interest, as provided in Section 7.9 of the Plan. Such distributions shall be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim (or portion thereof) becomes a Final Order.

### 7.5. *Disallowance of Claims.*

Except to the extent otherwise agreed to by the Debtors, Reorganized Debtors, Plan Administrator, or GUC Recovery Trustee, as applicable, or as provided in Section 5.2(b)(vii) of the Plan, any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, as determined by a Final Order, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Final Order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors, the Reorganized Debtors, the Plan Administrator, or the GUC Recovery Trustee, as applicable. All proofs of Claim filed on account of an indemnification obligation to a current or former director, officer, or employee shall be deemed satisfied and expunged from the claims register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

### 7.6. *Estimation of Claims.*

The (a) Debtors, Reorganized Debtors, or Plan Administrator (on behalf of each of the Wind Down Estates), as applicable, may determine, resolve and otherwise adjudicate all contingent, unliquidated, and Disputed Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and Intercompany Claims; (b) GUC Recovery Trustee may determine, resolve and otherwise adjudicate all contingent, unliquidated, and Disputed General Unsecured Claims; and (c) Consumer Representative may determine, resolve and otherwise adjudicate all contingent, unliquidated, and Disputed Consumer Creditor Claims. The (I) Debtors, Reorganized Debtors, or Plan Administrator (on behalf of each of the Wind Down Estates), with respect to the Claims set forth in (a) of this Section 7.6; (II) GUC Recovery Trustee, with respect to General Unsecured Claims; and (III) Consumer Representative, with respect to Consumer Creditor Claims, in each case, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim or Class of Claims pursuant to section 502(c) of the Bankruptcy Code or otherwise, including to establish a reserve for distribution purposes, regardless of whether such, or any, Person had previously objected to such Claim or whether

WEIL:\97137790\1\41703.0010

the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court will retain jurisdiction to estimate any Claim or Class of Claims at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim or Class of Claims, the amount so estimated shall constitute either the Allowed amount of such Claim or Class of Claims, or a maximum limitation on such Claim or Class of Claims, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim or Class of Claims, the Debtors, Reorganized Debtors, Plan Administrator, GUC Recovery Trustee, or Consumer Representative, as applicable, may pursue supplementary proceedings to object to the allowance of such Claims; provided, that such limitation shall not apply to Claims requested by the Debtors to be estimated for voting purposes only.

### 7.7. *No Distributions Pending Allowance.*

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

### 7.8. *Claim Resolution Procedures Cumulative.*

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

### 7.9. *Interest.*

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim shall not be entitled to any interest that accrued thereon from and after the Effective Date, except as provided in Section 6.7 of the Plan.

### 7.10. *Insured Claims.*

If any portion of an Allowed Claim is an Insured Claim, no distributions under the Plan shall be made on account of such Allowed Claim until the holder of such Allowed Claim has exhausted all remedies with respect to any applicable insurance policies.  To the extent that the Debtors' insurers agree to satisfy a Claim in whole or in part, then immediately upon such agreement, the portion of such Claim so satisfied may be expunged without an objection to such Claim having to be filed and without any further notice to or action, order or approval of the Court.

### ARTICLE VIII        EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

### 8.1. *General Treatment.*

(a)    As of and subject to the occurrence of the Effective Date and solely with respect to the Reorganization Transaction, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed rejected, including, but not limited to those set forth on the Rejection Schedule included in the Plan Supplement, unless such contract or lease (i) was previously assumed or rejected by the Debtors pursuant to an order of the Bankruptcy Court; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtors on or before the Confirmation Date; (iv) is identified in section 5.9(a) of

the Plan; (v) is identified in section 8.4 of the Plan; (vi) is reinstated in section 4.2 of the Plan; or (vii) is identified for assumption on the Assumption Schedule included in the Plan Supplement.  Solely with respect to the Sale Transaction, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed assumed, assumed and assigned, or rejected in accordance with the applicable Stalking Horse Purchase Agreement.  Any notice of assumption and assignment of an executory contract or unexpired lease to the Reverse Stalking Horse Purchaser shall be deemed to be a notice of assumption of such executory contract or unexpired lease by Reorganized RMS.

(b)      Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions, assumptions and assignments, or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Reorganized Debtors, Reorganized RMS, or Successful Bidders, as applicable, have provided adequate assurance of future performance under such assumed executory contracts and unexpired leases.  Each executory contract and unexpired lease assumed or assumed and assigned pursuant to the Plan shall vest in and be fully enforceable by the Reorganized Debtors, Reorganized RMS, or Successful Bidders, as applicable, in accordance with its terms, except as modified by the provision of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption or applicable law.

## 8.2. *Determination of Assumption Disputes and Deemed Consent.*

(a)      Any Cure Amount shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount, as reflected in the applicable cure notice, in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such executory contracts or unexpired leases and the Debtors may otherwise agree.  The Debtors or the Wind Down Estates, as applicable, shall satisfy all Cure Amounts with the Sale Transaction Proceeds in the event of a Sale Transaction.

(b)      The Debtors shall file, as part of the Plan Supplement, the Assumption Schedule.  At least ten (10) days before the deadline to object to confirmation of the Plan, the Debtors shall serve a notice on parties to executory contracts or unexpired leases to be assumed or assumed and assigned reflecting the Debtors' intention to potentially assume or assume and assign the contract or lease in connection with this Plan and, where applicable, setting forth the proposed Cure Amount (if any).  **Any objection by a counterparty to an executory contract or unexpired lease to the proposed assumption, assumption and assignment, or related Cure Amount must be filed, served, and actually received by the Debtors within ten (10) days of the service of the assumption notice, or such shorter period as agreed to by the parties or authorized by the Bankruptcy Court**.  Any counterparty to an executory contract or unexpired lease that does not timely object to the notice of the proposed assumption of such executory contract or unexpired lease shall be deemed to have assented to assumption of the applicable executory contract or unexpired lease notwithstanding any provision thereof that purports to (i) prohibit, restrict, or condition the transfer or assignment of such contract or lease; (ii) terminate or modify, or permit the termination or modification of, a contract or lease as a result of any direct or indirect transfer or assignment of the rights of any Debtor under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan; (iii) increase, accelerate, or otherwise alter any obligations or liabilities of any Debtor or any Reorganized Debtor under such executory contract or unexpired lease; or (iv) create or impose a Lien upon any property or Asset of any Debtor or any Reorganized Debtor, as applicable.  Each such provision shall be deemed to not apply to the assumption of such executory contract or unexpired lease pursuant to the Plan and counterparties to assumed executory contracts or unexpired leases that fail to object to the proposed assumption in accordance with the terms set forth in this Section 8.2(b), shall forever be barred and enjoined from objecting to the proposed assumption or to the validity of such assumption (including with respect to any

Cure Amounts or the provision of adequate assurance of future performance), or taking actions prohibited by the foregoing or the Bankruptcy Code on account of transactions contemplated by the Plan.

(c)    If there is an Assumption Dispute pertaining to assumption of an executory contract or unexpired lease (other than a dispute pertaining to a Cure Amount), such dispute shall be heard by the Bankruptcy Court prior to such assumption being effective, provided, that the Debtors or the Reorganized Debtors, as applicable, may settle any dispute regarding the Cure Amount or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(d)    To the extent an Assumption Dispute relates solely to the Cure Amount, the Debtors may assume and/or assume and assign the applicable executory contract or unexpired lease prior to the resolution of the Assumption Dispute; provided, that the Debtors or the Reorganized Debtors reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the non-Debtor party to such executory contract or unexpired lease (or such smaller amount as may be fixed or estimated by the Bankruptcy Court or otherwise agreed to by such non-Debtor party and the applicable Reorganized Debtor).

(e)    Assumption or assumption and assignment of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against any Debtor or defaults by any Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date that the Debtors assume or assume and assign such executory contract or unexpired lease. Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, upon the assumption of such executory contract or unexpired lease.

8.3.    *Rejection Damages Claims.*

In the event that the rejection of an executory contract or unexpired lease hereunder results in damages to the other party or parties to such contract or lease, any Claim for such damages shall be classified and treated in Class 5 (General Unsecured Claims).  Such Claim shall be forever barred and shall not be enforceable against the Debtors, the Reorganized Debtors, Reorganized RMS, the GUC Recovery Trust, or their respective Estates, properties or interests in property as agents, successors, or assigns, unless a proof of Claim is filed with the Bankruptcy Court and served upon counsel for the Debtors or the Reorganized Debtors, as applicable, by the later of (i) forty-five (45) days after the filing and service of the notice of the occurrence of the Effective Date; and (ii) thirty (30) days after entry of an Order rejecting such contract or lease if such contract or lease is the subject of a pending Assumption Dispute.

8.4.    *Insurance Policies.*

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any bar date notice, or claim objection, and any other document related to any of the foregoing: on the Effective Date (i) all insurance policies issued or providing coverage to the Debtors shall, unless designated by the Debtors as a rejected executory contract on the Rejection Schedule (subject to the applicable insurer's right to object to such designation), be assumed in their entirety by the Debtors, and upon such assumption, the Reorganized Debtors or Plan Administrator, as applicable, shall remain liable in full for any and all now existing or hereinafter arising obligations, liabilities, terms, provisions and covenants of any of the Debtors under such insurance policies, without the need or requirement for an

WEIL:\97137790\1\41703.0010

insurer to file a proof of Claim, Administrative Claim or objection to any cure amount; (ii) nothing shall alter or modify the terms and conditions of and/or any rights, benefits, claims, rights to payments, or recoveries under the insurance policies without the express written consent of the applicable insurer; (iii) if there is a Sale Transaction or Asset Sale Transaction, insurance policies shall (a) if assumed pursuant to subsection (i) hereof, be assigned to the purchaser only upon the express written consent of the applicable insurer (to the extent consent is required by applicable non-bankruptcy law or a provision of the applicable insurance policy, but only to the extent such are enforceable against the Debtors under applicable bankruptcy law), or (b) be rejected by the Debtors subject to subsection (i) hereof; and (iv) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Court, solely to permit: (a) claimants with valid workers' compensation claims or direct action claims against an insurer under applicable nonbankruptcy law to proceed with their claims; (b) insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (I) workers' compensation claims, (II) claims where a claimant asserts a direct claim against any insurer under applicable non-bankruptcy law, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay to proceed with its claim, and (III) all costs in relation to each of the foregoing; and (c) the insurers to cancel any insurance policies, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the insurance policies.

8.5.    ***Intellectual Property Licenses and Agreements.***

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any bar date notice or claim objection, and any other document related to any of the foregoing, all intellectual property contracts, licenses, royalties, or other similar agreements to which the Debtors have any rights or obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the Debtors and Reorganized Debtors and shall continue in full force and effect unless any such intellectual property contract, license, royalty, or other similar agreement otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Debtors in accordance with Section 8.1 of the Plan. Unless otherwise noted hereunder, all other intellectual property contracts, licenses, royalties, or other similar agreements shall vest in the Reorganized Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to ensure such vesting as contemplated herein.

8.6.    ***Tax Agreements.***

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any bar date notice or claim objection, and any other document related to any of the foregoing, any tax sharing agreements to which the Debtors are a party (of which the principal purpose is the allocation of taxes) in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and, to the extent the Debtors determine (in their sole discretion) such agreements are beneficial to the Debtors, shall be deemed assumed by the Debtors and Reorganized Debtors and shall continue in full force and effect thereafter in accordance with their respective terms, unless any such tax sharing agreement (of which the principal purpose is the allocation of taxes) otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Debtors in accordance with Section 8.1 of the Plan.

8.7.    *Assignment.*

To the extent provided under the Bankruptcy Code or other applicable law, any executory contract or unexpired lease transferred and assigned hereunder shall remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such executory contract or unexpired lease (including those of the type set forth in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment.  To the extent provided under the Bankruptcy Code or other applicable law, any provision that prohibits, restricts, or conditions the assignment or transfer of any such executory contract or unexpired lease or that terminates or modifies such executory contract or unexpired lease or allows the counterparty to such executory contract or unexpired lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such transfer and assignment, constitutes an unenforceable anti-assignment provision and is void and of no force or effect with respect to any assignment pursuant to the Plan.

8.8.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed in the notice of assumed contracts.

8.9.    *Reservation of Rights.*

(a)     The Debtors may amend the Assumption Schedule and any cure notice until the Business Day immediately prior to the commencement of the Confirmation Hearing in order to (i) add, delete, or reclassify any executory contract or unexpired lease or amend a proposed assignment and/or (ii) amend the proposed Cure Amount; provided, that if the Confirmation Hearing is adjourned for a period of more than two (2) consecutive calendar days, the Debtors' right to amend such schedules and notices shall be extended to the Business Day immediately prior to the adjourned date of the Confirmation Hearing, with such extension applying in the case of any and all subsequent adjournments of the Confirmation Hearing.  The Debtors shall provide notice of such amendment to any affected counterparty as soon as reasonably practicable.

(b)     Neither the exclusion nor inclusion of any contract or lease by the Debtors on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, will constitute an admission by the Debtors that any such contract or lease is or is not in fact an executory contract or unexpired lease or that the Debtors, Reorganized Debtors, or Wind Down Estates or their respective affiliates have any liability thereunder.

(c)     Except as otherwise provided in the Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtors and the Reorganized Debtors under any executory or non-executory contract or any unexpired or expired lease.

(d)     Nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors, as applicable, under any executory or non-executory contract or any unexpired or expired lease.

WEIL:\97137790\1\41703.0010

**647**

## ARTICLE IX  CONDITIONS PRECEDENT TO CONFIRMATION OF PLAN AND EFFECTIVE DATE.

9.1.    ***Conditions Precedent to Confirmation of Plan.***

The following are conditions precedent to confirmation of the Plan:

(a)    the Disclosure Statement Order shall have been entered;

(b)    the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed;

(c)    the RSA shall not have been terminated and shall be in full force and effect; and

(d)    the DIP Order and the DIP Documents shall be in full force and effect in accordance with the terms thereof, and no event of default shall be continuing thereunder or occur as a result of entry of the Confirmation Order.

9.2.    ***Conditions Precedent to Effective Date.***

(a)    The following are conditions precedent to the Effective Date of the Plan with respect to both the Reorganization Transaction and the Sale Transaction:

(i)    the Confirmation Order, in form and substance reasonably acceptable to the Unsecured Creditors' Committee, shall have been entered and shall be in full force and effect and no stay thereof shall be in effect;

(ii)    an event of default under the DIP Documents shall not be continuing and an acceleration of the obligations or termination of the DIP Lenders' commitments under the DIP Facilities shall not have occurred;

(iii)    all actions, documents, and agreements necessary to implement and consummate the Plan shall have been effected or executed and binding on all parties thereto and, to the extent required, filed with the applicable governmental units in accordance with applicable laws;

(iv)    all governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Plan shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions;

(v)    the RSA shall not have been terminated and shall be in full force and effect; and

(vi)    all accrued and unpaid Restructuring Expenses shall have been paid in Cash, to the extent invoiced, at least two (2) business days prior to the Effective Date.

(b)    The following are additional conditions precedent to the Effective Date of the Plan solely with respect to the Reorganization Transaction:

(i)    the Amended Organizational Documents shall have been filed with the appropriate governmental authority, as applicable; and

(ii)    the Amended and Restated Credit Facility Agreement, Exit Warehouse Facilities Documents, and Exit Working Capital Facility Agreement shall (i) have been (or deemed) executed and delivered, and any conditions precedent contained to effectiveness therein have been satisfied or waived in accordance therewith, (ii) be in full force and effect and binding upon the relevant parties; and (iii) contain terms and conditions consistent in all material respects with the RSA.

(c)    The following are additional conditions precedent to the Effective Date of the Plan solely with respect to the Sale Transaction:

(i)    the Stalking Horse Purchase Agreements shall (A) have been executed and delivered, and any conditions precedent contained to effectiveness therein have been satisfied or waived in accordance therewith, (B) be in full force and effect and binding upon the relevant parties; and (C) contain terms and conditions consistent in all material respects with the RSA.

(d)    Notwithstanding when a condition precedent to the Effective Date occurs, for purposes of the Plan, such condition precedent shall be deemed to have occurred simultaneously upon the completion of the applicable conditions precedent to the Effective Date; provided, that to the extent a condition precedent (a "**Prerequisite Condition**") may be required to occur prior to another condition precedent (a "**Subsequent Condition**") then, for purposes of the Plan, the Prerequisite Condition shall be deemed to have occurred immediately prior to a Subsequent Condition regardless of when such Prerequisite Condition or Subsequent Condition shall have occurred.

9.3.    *Waiver of Conditions Precedent.*

(a)    Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.  Each of the conditions precedent in Section 9.1 and Section 9.2 of the Plan may be waived in writing by the Debtors with the prior written consent of (i) the Requisite Term Lenders, and (ii) solely with respect to the condition set forth in Sections 9.1(d) and 9.2(a)(ii) of the Plan, the DIP Agent (acting at the direction of the Required Buyers (as defined in the DIP Documents)), in each case, without leave of or order of the Bankruptcy Court and such consent not to be unreasonably withheld; provided, that any such consent provided by the DIP Agent shall solely be for purposes of this Article IX and shall not otherwise limit, restrict or impair any rights or remedies of any DIP Credit Party under the DIP Documents.  If the Plan is confirmed for fewer than all of the Debtors as provided for in Section 5.18 of the Plan, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur as to such Debtors.  Notwithstanding anything to the contrary herein, any condition precedent pertaining to (x) the UCC Settlement, the GUC Recovery Trust, or GUC Recovery Trust Assets shall not be waived without the prior written consent of the Unsecured Creditors' Committee; and (y) the CCC Settlement, the Consumer Creditor Reserve, and the Consumer Representative Fee Reserve shall not be waived without the prior written consent of the Consumer Creditors' Committee.

(b)    The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

9.4.    *Effect of Failure of a Condition.*

If the conditions listed in Section 9.2 of the Plan are not satisfied or waived in accordance with Section 9.3 of the Plan on or before the first Business Day that is more than one hundred and eighty (180) days after the date on which the Confirmation Order is entered or by such later date as set forth by the Debtors in a notice filed with the Bankruptcy Court prior to the expiration of such period, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (b) prejudice in any manner the rights of any Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, the Requisite Term Lenders, or any other Entity.

## ARTICLE X    EFFECT OF CONFIRMATION OF PLAN.

10.1.    *Vesting of Assets.*

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, (i) all property of the Debtors' Estates acquired by the Forward Stalking Horse Purchaser under the Forward Stalking Horse Purchase Agreement shall vest free and clear of all Claims, Liens, encumbrances, charges and other interests in the Forward Stalking Horse Purchaser, except as provided pursuant to the Plan and the Confirmation Order; (ii) all property of RMS acquired by the Reverse Stalking Horse Purchaser under the Reverse Stalking Horse Purchase Agreement shall vest free and clear of all Claims, Liens, encumbrances, charges and other interests in Reorganized RMS, except as provided pursuant to the Plan and the Confirmation Order; and (iii) all remaining property of the Debtors' Estates shall vest in the Wind Down Estates free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided pursuant to the Plan, the Confirmation Order, the CCC Settlement, and the GUC Recovery Trust Agreement.  On and after the Effective Date, the Wind Down Estates may take any action, including, without limitation, the operation of their businesses; the use, acquisition, sale, lease and disposition of property; and the entry into transactions, agreements, understandings, or arrangements, whether in or other than in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and in all respects as if there was no pending case under any chapter or provision of the Bankruptcy Code, except as expressly provided herein.  Without limiting the foregoing, the Wind Down Estates may pay the charges that they incur on or after the Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

10.2.    *Binding Effect.*

As of the Effective Date, the Plan shall bind all holders of Claims against and Interests in the Debtors and their respective successors and assigns, notwithstanding whether any such holders were (a) Impaired or Unimpaired under the Plan; (b) deemed to accept or reject the Plan; (c) failed to vote to accept or reject the Plan; (d) voted to reject the Plan; or (e) received any distribution under the Plan.

10.3.    *Discharge of Claims and Termination of Interests.*

(a)    In a Reorganization Transaction, upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise expressly provided under the Plan, each holder (as well as any representatives, trustees, or agents on behalf of each holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interest, rights, and liabilities that arose prior to the Effective Date.  Upon the Effective Date, all

WEIL:\97137790\1\41703.0010

such Entities shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in the Debtors against the Debtors, the Reorganized Debtors, or any of their Assets or property, whether or not such holder has filed a proof of Claim and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date.

(b)    In a Sale Transaction, upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise expressly provided under the Plan, each holder (as well as any representatives, trustees, or agents on behalf of each holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged Reorganized RMS, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interest, rights, and liabilities against, in, or of Reorganized RMS that arose prior to the Effective Date; including, for the avoidance of doubt, Consumer Creditor Claims.  Upon the Effective Date, all such Entities shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in the Debtors, the Wind Down Estates, the Successful Bidders, the GUC Recovery Trust, or Reorganized RMS, or any of their Assets or property (including Assets acquired in a Sale Transaction), whether or not such holder has filed a proof of Claim and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date.

10.4.    *Term of Injunctions or Stays.*

Unless otherwise provided herein, the Confirmation Order, or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

10.5.    *Injunction.*

(a)    **Upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim extinguished, discharged, or released pursuant to the Plan.**

(b)    **Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court or as agreed to by the Debtors and a holder of a Claim against or Interest in the Debtors, all Entities who have held, hold, or may hold Claims against or Interests in the Debtors (whether proof of such Claims or Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action that will be or are extinguished, discharged, or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, Reorganized Debtors, Reorganized RMS, GUC Recovery Trust, or the Consumer Creditor Reserve or the property of any of the Debtors, Reorganized Debtors, Reorganized RMS, GUC Recovery Trust or the Consumer Creditor Reserve; (ii) enforcing, levying, attaching (including, without**

limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtors, Reorganized Debtors, Reorganized RMS, GUC Recovery Trust, or the Consumer Creditor Reserve; or the property of any of the Debtors, Reorganized Debtors, Reorganized RMS, GUC Recovery Trust or the Consumer Creditor Reserve; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, Reorganized Debtors, Reorganized RMS, GUC Recovery Trust or the Consumer Creditor Reserve or the property of any of the Debtors, Reorganized Debtors, Reorganized RMS, GUC Recovery Trust or the Consumer Creditor Reserve; (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtors, Reorganized Debtors, Reorganized RMS, GUC Recovery Trust or the Consumer Creditor Reserve or against property or interests in property of any of the Debtors, Reorganized Debtors, Reorganized RMS, GUC Recovery Trust, or the Consumer Creditor Reserve except as contemplated or Allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

(c)      By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest extinguished, discharged, or released pursuant to the Plan will be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth in this Section 10.5.

(d)      The injunctions in this Section 10.5 shall extend to any successors of the Debtors (including the Wind Down Estates), the Reorganized Debtors, Reorganized RMS, and their respective property and interests in property.

10.6.    **_Releases._**

(a)      **_Estate Releases_**.

As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Definitive Documents, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties to facilitate the implementation of the Sale Transaction and the Plan, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties will be deemed forever released and discharged, to the maximum extent permitted by law, by the Debtors, the Reorganized Debtors and their Estates, the Wind Down Estates, and the GUC Recovery Trust, from any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, remedies, losses, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, or Reorganized Debtors (as the case may be), or the Estates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors or Reorganized Debtors (as the case may be), or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising prior to the Effective Date from, in whole or in part, the Debtors, the Chapter 11 Cases, the pre- and postpetition marketing and sale process, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any of the Debtors and any Released Party, the restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Disclosure Statement, the RSA, the Plan (including the Plan Supplement), the DIP Documents, the Prepetition Warehouse Facilities (as defined in the DIP

Order), the NRZ Exit Tail Bridge Facility Documents, or any related agreements, instruments, and other documents (including the Definitive Documents), and the negotiation, formulation, or preparation thereof, the solicitation of votes with respect to the Plan, or any other act or omission, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; *provided*, that nothing in this Section 10.6(a) shall be construed to release the Released Parties from willful misconduct, or intentional fraud as determined by a Final Order.  The Debtors, the Reorganized Debtors and their Estates, the Wind Down Estates, and the GUC Recovery Trust shall be permanently enjoined from prosecuting any of the foregoing Claims or Causes of Action released under this Section 10.6(a) against each of the Released Parties.

        (b)        **Third-Party Releases**.

        As of the Effective Date, except (i) for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remain in effect or become effective after the Effective Date or (ii) as otherwise expressly provided in the Plan or in the Confirmation Order, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever, released, and discharged by:

        (i)        the holders of Impaired Claims who voted to accept the Plan;

        (ii)        the Consenting Term Lenders;

        (iii)        holders of Term Loan Claims (Class 3) who abstain from voting on the Plan or vote to reject the Plan but do not opt-out of these releases on the Ballots;

        (iv)        the Unsecured Creditors' Committee and each of its members in their capacity as such;

        (v)        the Consumer Creditors' Committee and each of its members in their capacity as such; and

        (vi)        with respect to any Entity in the foregoing clauses (i) through (v), such Entity's (x) predecessors, successors and assigns, (y) subsidiaries, affiliates, managed accounts or funds, managed or controlled by such Entity and (z) all Persons entitled to assert Claims through or on behalf of such Entities with respect to the matters for which the releasing entities are providing releases.

in each case, from any and all Claims, Interests, or Causes of Action whatsoever, including any derivative Claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on, relating to, or arising prior to the Effective Date from, in whole or in part, the Debtors, the restructuring, the Chapter 11 Cases, the pre- and postpetition marketing and sale process, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation,

64

formulation, preparation, or consummation of the Plan (including the Plan Supplement), the RSA, the Definitive Documents, the DIP Documents, the Prepetition Warehouse Facilities (as defined in the DIP Order), the NRZ Exit Tail Bridge Facility Documents, or any related agreements, instruments, or other documents, the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; **provided**, that nothing in this Section 10.6(b) shall be construed to release the Released Parties from willful misconduct or intentional fraud as determined by a Final Order. The Persons and Entities in (i) through (vi) of this Section 10.6(b) shall be permanently enjoined from prosecuting any of the foregoing Claims or Causes of Action released under this Section 10.6(b) against each of the Released Parties.  For the avoidance of doubt, nothing in this Section 10.6(b) affects or limits in any way any Claim held by a Borrower against any Released Party, any third party, or the Successful Bidders or their Affiliates for pre-existing liability that the Successful Bidders, any Released Party, or any third party would otherwise have to such Borrower had the Successful Bidders not acquired the Assets of the Debtors.

10.7.    *Exculpation.*

To the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any claim in connection with or arising out of the administration of the Chapter 11 Cases, the postpetition marketing and sale process, the purchase, sale, or rescission of the purchase or sale of any security or asset of the Debtors; the negotiation and pursuit of the Disclosure Statement, the RSA, the Reorganization Transaction or the Sale Transaction, as applicable, the Plan, or the solicitation of votes for, or confirmation of, the Plan; the funding or consummation of the Plan; the occurrence of the Effective Date; the DIP Documents; the Prepetition Warehouse Facilities (as defined in the DIP Order); the administration of the Plan or the property to be distributed under the Plan; the issuance of Securities under or in connection with the Plan; or the transactions in furtherance of any of the foregoing; except for fraud or willful misconduct, as determined by a Final Order.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability.  Nothing in this Section 10.7 shall in any way limit any right or obligation arising under any of the NRZ Exit Tail Bridge Facility Documents on or after the Effective Date or the rights and remedies of any party to any NRZ Exit Tail Bridge Facility Document to enforce any such right or obligation.  Notwithstanding anything to the contrary in the foregoing, the exculpation set forth herein does not release any post-Effective Date obligation or liability of any Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

10.8.    *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors (or the GUC Recovery Trustee, solely with respect to Allowed General Unsecured Claims) reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

10.9.    *Retention of Causes of Action/Reservation of Rights.*

Except as otherwise provided in Sections 10.5, 10.6, and 10.7 of the Plan or the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, Claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of their Estates or itself in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, any affirmative Causes of Action against parties with a relationship with the Debtors including actions arising under chapter 5 of the Bankruptcy Code. The Reorganized Debtors, Reorganized RMS, the Wind Down Estates, or the GUC Recovery Trustee in connection with the pursuit of GUC Recovery Trust Causes of Action or objection to General Unsecured Claims, shall have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced; provided, that, solely with respect to Reorganized RMS, the foregoing shall only apply to the extent such Claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses were acquired pursuant to the Stock and Purchase Agreement. Notwithstanding the foregoing, the Debtors, the Reorganized Debtors, and the Wind Down Estates, as applicable, shall not retain any Claims or Causes of Action released pursuant to the Plan against the Released Parties.

10.10.    *Solicitation of Plan.*

As of and subject to the occurrence of the Confirmation Date:  (i) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; and (ii) the Debtors and each of their respective directors, officers, employees, affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore are not, and on account of such offer, issuance, and solicitation shall not be, liable at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

10.11.    *Corporate and Limited Liability Company Action.*

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (a) those set forth in Sections 5.6 and 5.7 of the Plan; (b) the performance of the RSA; and (c) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date), in each case, in accordance with and subject to the terms hereof.  All matters provided for in the Plan involving the corporate or limited liability company structure of the Debtors or the Reorganized Debtors, and any corporate or limited liability company action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors.  On or (as applicable) before the Effective Date, the authorized officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including, but not limited to: (i) the Amended

Organizational Documents; (ii) the Exit Warehouse Facilities; (iii) the Amended and Restated Credit Facility Documents; (iv) the Exit Working Capital Facility Documents; (v) the Stalking Horse Purchase Agreements; (vi) the GUC Recovery Trust Agreement; (vii) the NRZ Exit Tail Bridge Facility Documents; and (vii) any and all other agreements, documents, securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by this Section 10.11 shall be effective notwithstanding any requirements under non-bankruptcy law.

## ARTICLE XI  RETENTION OF JURISDICTION.

11.1.    *Retention of Jurisdiction.*

On and after the Effective Date, the Bankruptcy Court shall retain non-exclusive jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:

(a)    to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases, including Assumption Disputes, and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting therefrom;

(b)    to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(c)    to ensure that distributions to holders of Allowed Claims are accomplished as provided for in the Plan and Confirmation Order, including to ensure that an Allowed Claim does not receive consideration in excess of the Allowed amount of such Claim, and to adjudicate any and all disputes arising from or relating to distributions under the Plan, including, cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely paid;

(d)    to consider the allowance, classification, priority, compromise, estimation, or payment of any Claim or Class of Claims;

(e)    to consider and adjudicate any dispute regarding a Borrower's or the Consumer Representative's right to request a correction to a loan account transferred by the Debtors under the Stalking Horse Purchase Agreements in accordance with Section 5.6(d) of the Plan or to assert recoupment rights or defenses under applicable nonbankruptcy law in connection with any such loan account;

(f)    to enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)    to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)    to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)     to hear and determine all Fee Claims and Restructuring Expenses;

(j)     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Plan Supplement, the UCC Settlement, the CCC Settlement, Asset Sale Transaction, Sale Transaction, or the Confirmation Order, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(k)     to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan;

(l)     to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(n)     to hear, adjudicate, decide, or resolve any and all matters related to Article X of the Plan, including, without limitation, the releases, discharge, exculpations, and injunctions issued thereunder;

(o)     to resolve disputes concerning Disputed Claims or the administration thereof;

(p)     to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(q)     to enter one or more final decrees closing the Chapter 11 Cases;

(r)     to recover all Assets of the Debtors and property of the Debtors' Estates, wherever located and adjudicate any disputes with respect thereto;

(s)     to resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(t)     to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtors or the GUC Recovery Trustee pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory; and

(u)     to hear and resolve any dispute over the application to any Claim of any limit on the allowance of such Claim set forth in sections 502 or 503 of the Bankruptcy Code, other than defenses or limits that are asserted under non-bankruptcy law pursuant to section 502(b)(1) of the Bankruptcy Code.

11.2.  ***Courts of Competent Jurisdiction.***

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or

WEIL:\97137790\1\41703.0010

failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## ARTICLE XII MISCELLANEOUS PROVISIONS.

### 12.1.    *Payment of Statutory Fees.*

On the Effective Date and thereafter as may be required, the Reorganized Debtors shall pay all fees incurred pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for the Debtors' cases, or until such time as a final decree is entered closing the Debtors' cases, a Final Order converting the Debtors' cases to cases under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing the Debtors' cases is entered.

### 12.2.    *Substantial Consummation of the Plan.*

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 12.3.    *Plan Supplement.*

The Plan Supplement shall be filed with the Clerk of the Bankruptcy Court.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.  Documents included in the Plan Supplement will be posted at the website of the Debtors' notice, claims, and solicitation agent.

### 12.4.    *Request for Expedited Determination of Taxes.*

The Debtors and the Reorganized Debtors, as applicable, shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Commencement Date through the Effective Date and, in the case of a Sale Transaction, through the dissolution of the Debtors.

### 12.5.    *Exemption from Certain Transfer Taxes.*

Pursuant to section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any Lien, mortgage, deed of trust, or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including, without limitation, any deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan or the reinvesting, transfer, or sale of any real or personal property of the Debtors pursuant to, in implementation of or as contemplated in the Plan (whether to the Successful Bidders, one or more of the Reorganized Debtors, the GUC Recovery Trust or otherwise), (d) the grant of collateral under the Amended and Restated Credit Facility, and (e) the issuance, renewal, modification, or securing of indebtedness  by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax, or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or governmental unit in which any instrument hereunder is to be

69

recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

12.6.    *Amendments.*

(a)    *Plan Modifications*.  Subject to the terms of the RSA and all consent rights contained therein, (i) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code, and (ii) after entry of the Confirmation Order, the Debtors may, upon order of the Court, amend, modify or supplement the Plan in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, in each case without additional disclosure pursuant to section 1125 of the Bankruptcy Code.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims or Allowed Interests pursuant to the Plan and subject to the reasonable consent of the Requisite Term Lenders (and the Unsecured Creditors' Committee, solely as it pertains to the UCC Settlement or General Unsecured Claims), the Debtors may remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes or effects of this Plan, and any holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented.

(b)    *Other Amendments*.  Subject to the terms of the RSA, before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court.

12.7.    **Effectuating Documents and Further Transactions.**

Each of the officers, managers, or members of the Reorganized Debtors is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

12.8.    **Revocation or Withdrawal of Plan.**

Subject to the terms of the RSA, the Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date.  If the Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date does not occur, then:  (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, the Debtors or any other Entity; (ii) prejudice in any manner the rights of the Debtors or any other Entity; or (iii) constitute an admission of any sort by the Debtors, any Consenting Term Lenders, or any other Entity.  This provision shall have no impact on the rights of the Consenting Term Lenders or the Debtors, as set forth in the RSA, in respect of any such revocation or withdrawal.

12.9.    ***Dissolution of Unsecured Creditors' Committee and Consumer Creditors' Committee.***

On the Effective Date, the Unsecured Creditors' Committee and the Consumer Creditors' Committee shall dissolve and, on the Effective Date, each member (including each officer, director, employee, or agent thereof) of the Unsecured Creditors' Committee and the Consumer Creditors' Committee and each professional retained by the Unsecured Creditors' Committee or the Consumer Creditors' Committee shall be released and discharged from all rights, duties, responsibilities, and obligations arising from, or related to, the Debtors, their membership on the Unsecured Creditors' Committee or the Consumer Creditors' Committee, the Plan, or the Chapter 11 Cases, except with respect to any matters concerning any Fee Claims held or asserted by any professional retained by the Unsecured Creditors' Committee or the Consumer Creditors' Committee.

12.10.    ***Severability of Plan Provisions.***

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors with the prior consent of the Requisite Term Lenders and the DIP Agent (acting at the direction of the Required Buyers), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Reorganized Debtors (as the case may be), and (c) nonseverable and mutually dependent.

12.11.    ***Governing Law.***

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement, a Definitive Document, or any NRZ Exit Tail Bridge Facility Document provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof; provided, however, that corporate or entity governance matters relating to any Debtors or Reorganized Debtors shall be governed by the laws of the state of incorporation or organization of the applicable Debtors or Reorganized Debtors.

12.12.    ***Time.***

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

12.13.    ***Dates of Actions to Implement the Plan.***

In the event that any payment or act under the Plan is required to be made or performed on a date that is on a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

12.14.  ***Immediate Binding Effect.***

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns, including, without limitation, the Reorganized Debtors.

12.15.  ***Deemed Acts.***

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

12.16.  ***Successor and Assigns.***

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each Entity.

12.17.  ***Entire Agreement.***

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

12.18.  ***Exhibits to Plan.***

All exhibits, schedules, supplements, and appendices to the Plan (including the Plan Supplement) are incorporated into and are a part of the Plan as if set forth in full herein.

12.19.  ***Notices.***

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by electronic or facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(a)    If to the Debtors or the Reorganized Debtors:

Ditech Holding Corporation
3000 Bayport Drive, Suite 985
Tampa, FL 33607
Attn: John Haas, General Counsel, Chief Legal Officer and Secretary
Email: JHaas@ditech.com

-and-

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attn:   Ray C. Schrock, P.C.
        Sunny Singh
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:  ray.schrock@weil.com
        sunny.singh@weil.com

(b)     If to the Consenting Term Lenders:

Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
Attn: Patrick J. Nash Jr., P.C.
Email:  patrick.nash@kirkland.com
Attn: John R. Luze
Email: john.luze@kirkland.com

(c)     If to Reorganized RMS:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Attn: Robert Britton
Email: rbritton@paulweiss.com

After the Effective Date, the Debtors have authority to send a notice to Entities providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors, Reorganized Debtors, and Wind Down Estates, as applicable, are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

WEIL:\97137790\1\41703.0010

Dated:   September 22, 2019

**DF INSURANCE AGENCY LLC**

**DITECH FINANCIAL LLC**

**DITECH HOLDING CORPORATION**

**GREEN TREE INSURANCE AGENCY OF NEVADA, INC.**

By:      /s/ Kimberly Perez
        Name:  Kimberly Perez
        Title:   Senior Vice President and
                 Chief Accounting Officer

Dated:  September 22, 2019

**GREEN TREE CREDIT LLC**

**GREEN TREE CREDIT SOLUTIONS LLC**

**GREEN TREE INVESTMENT HOLDINGS
III LLC**

**GREEN TREE SERVICING CORP.**

**WALTER MANAGEMENT HOLDING
COMPANY LLC**

**WALTER REVERSE ACQUISITION LLC**

By:    /s/ Laura Reichel
      Name: Laura Reichel
      Title:  President

Dated:  September 22, 2019

**MARIX SERVICING LLC**


By:    /s/ Clinton Hodder
      Name: Clinton Hodder
      Title:   President

Dated:  September 22, 2019

**MORTGAGE ASSET SYSTEMS, LLC**

**REO MANAGEMENT SOLUTIONS, LLC**

**REVERSE MORTGAGE SOLUTIONS, INC.**

By:    /s/ Jeanetta Brown

          Name: Jeanetta Brown
          Title:   Vice President

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- X
                                                    :
**In re**                                           :        **Chapter 11**
                                                    :
**DITECH HOLDING CORPORATION,** *et al.*,           :        **Case No. 19-10412 (JLG)**
                                                    :
                        **Debtors.¹**               :        **(Jointly Administered)**
                                                    :
---------------------------------------------------------------- X

**NOTICE OF (I) ENTRY OF ORDER CONFIRMING THIRD AMENDED
JOINT CHAPTER 11 PLAN OF DITECH HOLDING CORPORATION
AND ITS AFFILIATED DEBTORS, (II) OCCURRENCE OF EFFECTIVE DATE,
AND (III) FINAL DEADLINE FOR FILING ADMINISTRATIVE EXPENSE CLAIMS**

**PLEASE TAKE NOTICE THAT:**

1.      On September 22, 2019, Ditech Holding Corporation and its affiliated debtors in the above-captioned chapter 11 cases (collectively, the "**Debtors**") filed the *Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and its Affiliated Debtors* (ECF No. 1326) (the "**Third Amended Plan**").  On September 26, 2019, the Court entered the *Order Confirming Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and its Affiliated Debtors* (ECF No. 1404) (the "**Confirmation Order**").²

2.      The Third Amended Plan and Confirmation Order may be viewed at no charge at the website of the Debtors' claims and noticing agent, Epiq Corporate Restructuring, LLC ("**Epiq**") at https://dm.epiq11.com/ditech   or   for   a   fee   on   the   Bankruptcy   Court's   website   at http://www.deb.uscourts.gov.

---

¹       The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837).  The Debtors' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

²       Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Third Amended Plan, the Confirmation Order, that certain *Asset Purchase Agreement* by and among Ditech Holding Corporation, Ditech Financial LLC, and New Residential Investment Corp., dated June 17, 2019 (as amended, modified, and supplemented from time to time), or as the context otherwise requires.

**667**

3.      All conditions precedent to the Effective Date (as defined in the Third Amended Plan) have been satisfied or waived as provided in Article IX of the Third Amended Plan, such that the Third Amended Plan was substantially consummated, and the Effective Date occurred, at 12:01 a.m. on September 30, 2019.

4.      In accordance with the Transaction Accounting Principles, the Purchase Price for the mortgage servicing rights included in the Forward Sale Transaction with the Forward Buyer will be determined utilizing interest rates as of 3:00 p.m. (Prevailing Eastern Time) on September 30, 2019.

5.      As set forth in the Confirmation Order, all persons and entities that hold an Administrative Expense Claim (as defined in the Third Amended Plan) shall file a proof of such claim in writing or electronically in accordance with the instructions herein so that it is received on or before **November 11, 2019 at 5:00p.m. (Prevailing Eastern Time) (**the "**Administrative Claims Bar Date**").  Proofs of claim will be deemed filed only when <u>actually received</u> at the addresses listed below or via the Electronic Filing System (as defined herein) on or before the Administrative Claims Bar Date.

<u>IF BY U.S. POSTAL SERVICE MAIL OR OVERNIGHT DELIVERY</u>:

| | |
|---|---|
| Ditech Holding Corporation, Claims Processing Center<br>c/o Epiq Corporate Restructuring, LLC<br>P.O. Box 4421<br>Beaverton, OR 97076-4421 | Ditech Holding Corporation, Claims Processing Center<br>c/o Epiq Corporate Restructuring, LLC<br>10300 SW Allen Blvd.<br>Beaverton, OR 97005 |

<u>IF DELIVERED BY HAND</u>:

| | | |
|---|---|---|
| Ditech Holding Corporation, Claims Processing Center<br>c/o Epiq Corporate Restructuring, LLC<br>777 Third Avenue, 12th Floor<br>New York, NY 10017 | Ditech Holding Corporation, Claims Processing Center<br>c/o Epiq Corporate Restructuring, LLC<br>10300 SW Allen Blvd.<br>Beaverton, OR 97005 | United States Bankruptcy Court for the Southern District of New York<br>One Bowling Green<br>New York, NY 10004 |

<u>IF ELECTRONICALLY</u>:  The website established by Epiq using the interface available on such website located at http://dm.epiq11.com/Ditech (the "**Electronic Filing System**") and following the instructions provided.

**668**

**FAILURE TO FILE AND SERVE SUCH PROOF OF ADMINISTRATIVE EXPENSE CLAIM TIMELY AND PROPERLY SHALL RESULT IN SUCH CLAIM BEING FOREVER BARRED AND DISCHARGED.  IF FOR ANY REASON ANY SUCH ADMINISTRATIVE EXPENSE CLAIM IS INCAPABLE OF BEING FOREVER BARRED AND DISALLOWED, THEN THE HOLDER OF SUCH CLAIM SHALL IN NO EVENT HAVE RECOURSE TO ANY PROPERTY BEING DISTRIBUTED PURSUANT TO THE THIRD AMENDED PLAN.**

Dated:  September 30, 2019
      New York, New York

/s/ Sunny Singh
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

WEIL:\97149992\8\41703.0008

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                      :

In re                              :      **Chapter 11**

                                        :

**DITECH HOLDING CORPORATION, *et al.*,**   :      **Case No. 19-10412 (JLG)**

                                        :

                **Wind Down Estates.**[1]   :      **(Jointly Administered)**
                                        :      **Related Docket No. 1530**

------------------------------------------------------------X

<div align="center">

**ORDER APPROVING
(I) CLAIM OBJECTION PROCEDURES AND (II) CLAIM HEARING PROCEDURES**

</div>

Upon the Motion (the "**Motion**")[2] of the Plan Administrator, on behalf of Ditech

Holding Corporation (f/k/a Walter Investment Management Corp.) and its debtor affiliates

(excluding Reorganized RMS) (collectively, the "**Wind Down Estates**"), pursuant to section

105(a) of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 3007 and 9014

of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for entry of an order

approving certain claims objection procedures and claims hearings procedures intended to

streamline the claims process and conserve the resources of the Wind Down Estates, GUC

Recovery Trust, and Consumer Creditor Recovery Trust, all as more fully described in the Motion;

and the Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and

consideration of the Motion and the relief requested therein being a core proceeding pursuant to

---

[1]    The Wind Down Estates, along with the last four digits of each of their federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Wind Down Estates' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

[2]    Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion, the Third Amended Plan, or the Confirmation Order (as such terms are defined in the Motion), as applicable.

28 U.S.C. § 157(b); and sufficient notice of the Motion having been given, and it appearing that

no other or future notice need be provided; and the Court having found that the relief requested in

the Motion is in the best interests of the Wind Down Estates, their creditors, and all parties in

interest; and that the legal and factual bases set forth in the Motion establish just cause for the

relief granted herein; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is **GRANTED** to the extent set forth herein.

2.      The Plan Administrator, on behalf of the Wind Down Estates, the GUC

Recovery Trustee, and the Consumer Representative (each, an "**Estate Representative**" and

collectively, the "**Estate Representatives**") are authorized to object to Claims in accordance with

the following procedures (the "**Claim Objection Procedures**"):

(i)      Notwithstanding anything to the contrary in Bankruptcy Rule 3007, the Claims Objectors and other parties in interest are authorized to file Omnibus Objections to Claims seeking reduction, reclassification, or disallowance of Claims on one or more of the following grounds (the "**Additional Permitted Grounds**" and together with those grounds set forth in Bankruptcy Rule 3007(d), the "**Permitted Grounds**"):

a.      the amount claimed contradicts the Debtors' books and records;

b.      the Claim seeks recovery of amounts for which the Debtors are not liable;

c.      the Claims are not entitled to the asserted status or priority;

d.      there is insufficient legal basis for the Claim;

e.      the Claims do not include sufficient documentation to ascertain the validity of such Claims;

f.      the Claims were or will be satisfied in the normal course of business;

g.      the Claims have been waived, withdrawn, or disallowed pursuant to an agreement with the Debtors or an order of this Court; and

h.      the Claims are objectionable under section 502(e)(1) of the Bankruptcy Code.

(ii)    The Estate Representatives are authorized to file Omnibus Objections to no more than one hundred (100) Claims at a time on the Permitted Grounds and may include multiple bases for objection.

(iii)   Except as expressly provided herein, the Estate Representatives shall comply with the requirements for Omnibus Claims Objections set forth in Bankruptcy Rule 3007(e).

(iv)    Any order sustaining an Omnibus Claims Objection shall be treated as an order for each Claim referenced in the Omnibus Claims Objection as if an individual objection had been filed and an individual order had been entered for such Claim.

(v)     The Estate Representatives are authorized to serve a Claim Objection Notice, rather than the entire Omnibus Claim Objection, on each claimant whose Claim is the subject of the applicable omnibus claim objection and, if known, its counsel. The Claim Objection Notice shall be in a form substantially similar to the notice attached hereto as **<u>Exhibit 1</u>**, and shall include an explanation of the claim objection process, a description of the basis of the omnibus claim objection, information regarding the response deadline and hearing date, information on the Claim Hearing Procedures (as described herein), identification of the Claim that is the subject of the omnibus claim objection (with reference to an attached exhibit or otherwise), and information on how the claimant might obtain a complete copy of the omnibus objection. The Estate Representatives retain the right to serve Omnibus Claim Objections in their entirety in appropriate circumstances as determined in the Estate Representatives' sole discretion.

(vi)    The Estate Representatives shall file all omnibus and individual objections with this Court to be made publicly available for free on the website of the Debtors' approved claims and noticing agent, Epiq Corporate Restructuring, LLC ("**Epiq**").

(vii)   Notice of claim objections shall be limited to: (a) service of a complete copy of each claim objection (whether an omnibus objection or an individual objection) on the U.S. Trustee and by email to counsel to the other Estate Representatives; (b) with respect to Omnibus Claims Objections, service of a Claim Objection Notice

on the claimant whose Claims is the subject of the applicable omnibus claim objection and its counsel, if known; and (c) with respect to individual claim objections, service of a complete copy of each individual objection on the claimant whose Claim is the subject of the applicable individual claim objection and its counsel, if known, or, where counsel has appeared for a claimant, a complete copy of each individual objection to a Claim on the claimant's counsel by email.

(viii)    Responses to the Estate Representatives' individual and omnibus claim objections shall be due twenty-one (21) calendar days after mailing of the objection; *provided, however*, that the Estate Representatives reserve the right to request that the Court impose an alternative response date or grant expedited consideration with respect to certain objections, if the circumstances so require, which may result in shortened notice of both the hearing date and the response deadline.

3.    The following claims hearing procedures (the "**Claim Hearing Procedures**") shall apply:

(i)    The Estate Representatives shall schedule the return date for claims objections, omnibus or otherwise, for hearing at periodic omnibus hearings (the "**Omnibus Hearings**") established by the Court pursuant to the *Order Implementing Certain Notice and Case Management Procedures* (ECF No. 211) (the "**Case Management Order**") or other hearings the Estate Representatives may schedule with the Court.

(ii)    Any information submitted in connection with a Proof of Claim shall be part of the record with respect to the relevant Claim, and any such information already submitted need not be resubmitted in connection with the Claim Hearing Procedures.

(iii)    If a claimant does not properly file and serve a response (a "**Response**") to a claim objection, the Claim Hearing (as defined below) may be used as a hearing on the merits of such Claim and the Court may enter an order at the Claim Hearing sustaining the objection to the Claim.

(iv)    The hearing to consider an objection to Claims as to which a Response is properly filed and served (each, a "**Contested Claim**") shall be set for a contested hearing (each, a "**Claim Hearing**") to be scheduled by the Estate Representatives, in their sole discretion, as set forth herein.  The Estate Representatives shall schedule a Claim Hearing for a Contested Claim as follows:

**673**

a.   For a non-evidentiary hearing to address the whether the Contested Claim has failed to state a claim against the Debtors which can be allowed and should be dismissed pursuant to Bankruptcy Rule 7012 (a "**Sufficiency Hearing**"), unless the applicable Estate Representative serves the holder of the Claim (the "**Claimant**") with a Notice of Merits Hearing (as defined herein), the Sufficiency Hearing shall go forward at the return date set in accordance with (i) above (or such other date as may be scheduled by the applicable Estate Representative).  The legal standard of review that will be applied by the Court at a Sufficiency Hearing will be equivalent to the standard applied by the Court upon a motion to dismiss for failure to state a claim upon which relief can be granted.

b.   For an evidentiary hearing on the merits of a Contested Claim (a "**Merits Hearing**"), the applicable Estate Representative may, in its sole discretion, serve upon the relevant Claimant (by email or overnight delivery) and file with the Court, a notice substantially in the form attached hereto as **Exhibit 2** (a "**Notice of Merits Hearing**") at least thirty (30) calendar days prior to the date of such Merits Hearing.  The rules and procedures applicable to such Merits Hearing will be set forth in any scheduling order issued by the Court in connection therewith.

(v)   Discovery with respect to a Contested Claim will not be permitted until either (a) the Court has held a Sufficiency Hearing and determined that the Contested Claim states a claim that could be allowed and should not be dismissed pursuant to Bankruptcy Rule 7012 or (b) the Estate Representatives have served the relevant Claimant a Notice of Merits Hearing with respect to the Contested Claim.

(vi)   The Estate Representatives may file and serve a reply (a "**Reply**") to a Response no later than **4:00 p.m. prevailing Eastern Time on the day that is at least five (5) business days prior to the date of the applicable hearing.**

(vii)   The Estate Representatives, in their sole discretion, are authorized to further adjourn a hearing scheduled in accordance herewith at any time by providing notice to the Court and the Claimant.

4.   The Estate Representatives are authorized to take any and all steps that are necessary or appropriate to implement the Claim Hearing Procedures.

**674**

5.    Nothing in this Order shall constitute an admission of the validity, nature, amount or priority of any Claims asserted in these chapter 11 cases.

6.    Entry of this Order is without prejudice to the rights of the Wind Down Estates, GUC Recovery Trustee, and Consumer Representative to seek authorization to modify or supplement the relief granted herein.

7.    This Court shall retain jurisdiction with respect to all matters arising or related to the implementation of this Order.

Dated: November 18, 2019
New York, New York

/s/ *James L. Garrity, Jr.*
HONORABLE JAMES J. GARRITY, JR.
UNITED STATES BANKRUPTCY JUDGE

## Exhibit 1

**Notice of Omnibus Objection**

---

**THIS OBJECTION SEEKS TO REDUCE AND ALLOW OR DISALLOW AND
EXPUNGE CERTAIN FILED PROOFS OF CLAIM. PARTIES RECEIVING THIS
NOTICE OF THE [insert ordinal] OMNIBUS OBJECTION TO CLAIMS SHOULD
REVIEW THE OMNIBUS OBJECTION TO SEE IF THEIR NAME(S) AND/OR
CLAIM(S) ARE LOCATED IN THE OMNIBUS OBJECTION AND/OR THE EXHIBIT
ATTACHED THERETO TO DETERMINE WHETHER THIS OBJECTION AFFECTS
THEIR CLAIM(S).**

**IF YOU HAVE QUESTIONS, PLEASE CONTACT
DITECH HOLDING CORPORATION'S COUNSEL,
[insert name], AT 212-310-[insert telephone number].**

---

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X
                                              :
In re                                         :    **Chapter 11**
                                              :
**DITECH HOLDING CORPORATION,** *et al.*,     :    **Case No. 19-10412 (JLG)**
                                              :
          **Wind Down Estates.**[1]           :    **(Jointly Administered)**
                                              :
-------------------------------------------------------------X

**NOTICE OF HEARING ON DEBTORS' [insert ordinal]
OMNIBUS CLAIMS OBJECTION TO PROOFS OF CLAIM ([insert basis for objection])**

      **PLEASE TAKE NOTICE** that, on _____ __, 201[_], the Plan

Administrator, on behalf of Ditech Holding Corporation (f/k/a Walter Investment Management

Corp.) and its debtor affiliates (excluding Reorganized RMS) (collectively, the "**Wind Down

Estates**") filed the **[insert ordinal]** Omnibus Objection to Proofs of Claim (**[insert basis for**

---

[1]    The Wind Down Estates, along with the last four digits of each of their federal tax identification number, as
applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC
(5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency
of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552);
Marix Servicing LLC (6101); Walter Management Holding Company LLC (9818); and Walter Reverse
Acquisition LLC (8837).  The Wind Down Estates' principal offices are located at 1100 Virginia Drive, Suite
100, Fort Washington, Pennsylvania 19034.

objection]) (the "**Objection**") with the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").[2]

The Objection requests that the Bankruptcy Court expunge, reduce, reclassify, and/or disallow one or more of your claims listed on **Exhibit A** annexed hereto on the ground that **[insert basis for disallowance, reduction, reclassification or expungement]. Any claim that the Bankruptcy Court expunges and disallows will be treated as if it had not been filed and you will not be entitled to any distribution on account thereof.**

**PLEASE TAKE FURTHER NOTICE** that the *Court-Ordered Claim Hearing Procedures* (the "**Claim Hearing Procedures**") annexed hereto as **Exhibit B** apply and govern the objection to your Proof(s) of Claim. The Claim Hearing Procedures provide for certain mandatory actions by a Claimant within certain time periods. Therefore, please review the Claim Hearing Procedures carefully. Failure to comply with the Claim Hearing Procedures may result in the disallowance and expungement of a Proof of Claim without further notice to a Claimant.

If you do NOT oppose the disallowance, expungement, reduction or reclassification of your Claim(s) listed on **Exhibit A**, then you do NOT need to file a written response to the Objection and you do NOT need to appear at the hearing.

If you DO oppose the disallowance, expungement, reduction or reclassification of your Claim(s) listed on **Exhibit A**, then you MUST file with the Court <u>and</u> serve on the parties listed below a written response to the Objection that is received on or before **4:00 p.m. Prevailing Eastern Time on _____, 201[_]** (the "**Response Deadline**").

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the *Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors* (the "**Third Amended Plan**") (ECF No. 1326) or the *Order Approving (I) Claims Objection Procedures and (II) Claim Hearing Procedures* (the "**Order**") (ECF No. [●]), as applicable.

Your response, if any, must contain at a minimum the following: (i) a caption setting forth the name of the Bankruptcy Court, the names of the Wind Down Estates, the case number and the title of the Objection to which the response is directed; (ii) the name of the Claimant and description of the basis for the amount of the Claim; (iii) a concise statement setting forth the reasons why the Claim should not be disallowed, expunged, reduced, or reclassified for the reasons set forth in the Objection, including, but not limited to, the specific factual and legal bases upon which you will rely in opposing the Objection; (iv) all documentation or other evidence of the Claim, to the extent not included with the Proof of Claim previously filed with the Bankruptcy Court, upon which you will rely in opposing the Objection; (v) the address(es) to which the Wind Down Estates must return any reply to your response, if different from that presented in the Proof of Claim; and (vi) the name, address, and telephone number of the person (which may be you or your legal representative) possessing ultimate authority to reconcile, settle, or otherwise resolve the Claim on your behalf.

The Bankruptcy Court will consider a response only if the response is timely filed, served, and received.  A response will be deemed timely filed, served, and received <u>only</u> <u>if</u> the original response is <u>actually</u> <u>received</u> on or before the Response Deadline by (i) the chambers of the Honorable James L. Garrity, Jr., United States Bankruptcy Court, One Bowling Green, New York, New York, 10004; and (ii) Weil, Gotshal, & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn:  Sunny Singh, Esq.), attorney for the Plan Administrator.

Except as otherwise permitted under the Claim Hearing Procedures, a hearing to consider the Objection will be held on **_____, 201[_],** at __:__ _.m. Prevailing Eastern Time in the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room 601, New York, New York, 10004.  If you file a written response to the Objection, you should

plan to appear at the hearing.  The Plan Administrator, however, reserves the right to continue the hearing on the Objection with respect to your Claim(s).  If the Plan Administrator does continue the hearing with respect to your Claim(s), then the hearing will be held at a later date.  If the Plan Administrator does not continue the hearing with respect to your Claim(s), then a hearing on the Objection will be conducted on the above date.

You may participate in a hearing telephonically provided that you comply with the Court's instructions (including, without limitation, providing prior written notice to counsel for the Plan Administrator and any statutory committees), which can be found on the Court's website at www.nysb.uscourts.gov.

If you wish to view the complete Objection, you can do so for free at https://dm.epiq11.com/case/ditech, or by calling Epiq Corporate Restructuring, LLP at 866-486-4809 (Domestic) or 503-597-7698 (International) to request a copy by mail.  **CLAIMANTS SHOULD NOT CONTACT THE CLERK OF THE BANKRUPTCY COURT TO DISCUSS THE MERITS OF THEIR CLAIMS.**

Dated: [          ], 201[_]

New York, New York

<div style="margin-left:40%">

_____
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Sunny Singh

*Attorneys for Plan Administrator*

</div>

WEIL:\97251726\2\41703.0012

**680**

**Exhibit to Notice of Omnibus Objection**

**Claim Hearing Procedures**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
                                          :
In re                                     :    Chapter 11
                                          :
DITECH HOLDING CORPORATION, *et al.*,     :    Case No. 19-10412 (JLG)
                                          :
                    Wind Down Estates.[1] :    (Jointly Administered)
                                          :
---------------------------------------------------------------X

## COURT-ORDERED CLAIM HEARING PROCEDURES

The claim hearing procedures (the "**Claim Hearing Procedures**") described herein have been ordered by the United States Bankruptcy Court for the Southern District of New York (the "**Court**") to apply to the chapter 11 cases of the Ditech Holding Corporation (f/k/a Walter Investment Management Corp.) and its debtor affiliates (excluding Reorganized RMS) (collectively, the "**Wind Down Estates**").[2]

### Claim Hearing Procedures

1.    Pursuant to the *Order Implementing Certain Notice and Case Management Procedures*, dated March 19, 2019 (ECF No. 211) (the "**Case Management Order**"), the Court established periodic omnibus hearings (the "**Omnibus Hearings**") in these cases. The Plan Administrator, on behalf of the Wind Down Estates, shall schedule the return date for claims objections, omnibus or otherwise, for hearing at Omnibus Hearings or other hearings the Plan Administrator may schedule with the Court.

2.    The Court may enter an order at the scheduled hearing sustaining an objection to proofs of claim (each, a "**Proof of Claim**") with respect to which no response (a "**Response**")[3] is properly filed and served.

---

[1]    The Wind Down Estates, along with the last four digits of each of their federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Wind Down Estates' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

[2]    Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the *Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors* (the "**Third Amended Plan**") (ECF No. 1326) or the *Order Approving (I) Claims Objection Procedures and (II) Claim Hearing Procedures* (the "**Order**") (ECF No. [●]), as applicable.

[3]    Any information submitted in connection with a Proof of Claim shall be part of the record with respect to the relevant Claim, and any such information already submitted need not be resubmitted in connection with the Claim Hearing Procedures.

3.     The hearing to consider an objection to Proofs of Claim as to which a Response is properly filed and served (each, a "**Contested Claim**") shall be set for a contested hearing (each, a "**Claim Hearing**") to be scheduled by the Plan Administrator, in its sole discretion, as set forth herein.  The Plan Administrator may request that the Court schedule Claim Hearings on the date and/or time of the Omnibus Hearings or at another date and time.

4.     The Plan Administrator shall schedule a Claim Hearing for a Contested Claim as follows:

(a)     For a non-evidentiary hearing to address whether the Contested Claim has failed to state a claim against the Debtors which can be allowed and should be dismissed pursuant to Bankruptcy Rule 7012 (a "**Sufficiency Hearing**"), unless the Plan Administrator serves the Claimant with a Notice of Merits Hearing (as defined herein), the Sufficiency Hearing shall go forward at the return date set in accordance with paragraph 1 of these Claim Hearing Procedures.  The legal standard of review that will be applied by the Court at a Sufficiency Hearing will be equivalent to the standard applied by the Court upon a motion to dismiss for failure to state a claim upon which relief can be granted.

(b)     For an evidentiary hearing on the merits of a Contested Claim (a "**Merits Hearing**"), the Plan Administrator may, in its sole discretion, serve upon the relevant Claimant, by email or overnight delivery and file with the Court, a notice substantially in the form attached to the Order as <u>Exhibit 2</u> (a "**Notice of Merits Hearing**") at least thirty (30) calendar days prior to the date of such Merits Hearing. The rules and procedures applicable to such Merits Hearing will be set forth in any scheduling order issued by the Court in connection therewith.

5.     Discovery with respect to a Contested Claim will not be permitted until either (i) the Court has held a Sufficiency Hearing and determined that the Contested Claim states a claim that could be allowed and should not be dismissed pursuant to Bankruptcy Rule 7012 or (ii) the Plan Administrator has served the relevant Claimant a Notice of Merits Hearing with respect to the Contested Claim.

6.     The Plan Administrator may file and serve a reply (a "**Reply**") to a Response no later than **4:00 p.m. prevailing Eastern Time on the day that is at least five (5) business days prior to the date of the applicable hearing**.

7.     The Plan Administrator, in its sole discretion, is authorized to further adjourn a hearing scheduled in accordance herewith at any time by providing notice to the Court and the Claimant.

8.     The Court will consider appropriate sanctions, including allowance or disallowance of the Contested Claim, if either party does not follow the Claim Hearing Procedures.

<div align="center">BY ORDER OF THE COURT</div>

WEIL:\97251726\2\41703.0012

**683**

## Exhibit 2

**Notice of Merits Hearing**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
                                         :

In re                               :         **Chapter 11**

**DITECH HOLDING CORPORATION,** *et al.*,   :        **Case No. 19-10412 (JLG)**

                           :

          **Wind Down Estates.**[1]    :        **(Jointly Administered)**

                           :

---------------------------------------------------------------X

## NOTICE OF SCHEDULING OF MERITS HEARING WITH RESPECT TO DEBTORS' OBJECTION TO PROOF OF CLAIM NO. [_____]

       **PLEASE TAKE NOTICE** that on [_____ ___], 201[_], the Plan Administrator,[2] on behalf of Ditech Holding Corporation (f/k/a Walter Investment Management Corp.) and its debtor affiliates (excluding Reorganized RMS) (collectively, the "**Wind Down Estates**"), objected to proof of claim number [_____] (the "**Proof of Claim**") filed by [_____] (the "**Claimant**") pursuant to the [Title of Applicable Claims Objection] (the "**Objection**").

       **PLEASE TAKE FURTHER NOTICE** that on [_____ ___], 201[_], at 10:00 a.m. (Prevailing Eastern Time), in accordance with the *Order Approving (I) Claims Objection Procedures and (II) Claim Hearing Procedures*, entered [Date] (ECF No. [__]) (the "**Order**"), a copy of which is attached hereto, the United States Bankruptcy Court for the Southern District of New York (the "**Court**") will commence a Merits Hearing (as defined in the Order) for the purposes of holding an evidentiary hearing on the merits of the Proof of Claim. The rules and procedures applicable to such Merits Hearing will be set forth in any scheduling order issued by the Court in connection therewith.

---

[1]   The Wind Down Estates, along with the last four digits of each of their federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Wind Down Estates' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

[2]   Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the *Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors* (the "**Third Amended Plan**") (ECF No. 1326) or the *Order Approving (I) Claims Objection Procedures and (II) Claim Hearing Procedures* (ECF No. [●]), as applicable.

**PLEASE TAKE FURTHER NOTICE** that the Plan Administrator may further adjourn the Merits Hearing at any time by providing notice to the Court and the Claimant.

Dated: [_____ ___], 201[_]
      New York, New York

**686**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Sunny Singh

*Attorneys for Plan Administrator*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------X
:
**In re**                                              : **Chapter 11**
:
**DITECH HOLDING CORPORATION, *et al.*,**   : **Case No. 19-10412 (JLG)**
:
        **Debtors.**[1]                                 : **(Jointly Administered)**
:
---------------------------------------------------------------X

### NOTICE OF APPOINTMENT OF SUCCESSOR PLAN ADMINISTRATOR

**PLEASE TAKE NOTICE THAT:**

        1.      On September 22, 2019, Ditech Holding Corporation and its affiliated

debtors in the above-captioned chapter 11 cases (collectively, the "**Debtors**") filed the *Third*

*Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors* (ECF

No. 1326) (the "**Third Amended Plan**").  On September 26, 2019, the Court entered an order

confirming the Third Amended Plan (ECF No. 1404) (the "**Confirmation Order**"),[2] and the

---

[1] On September 26, 2019, the Court confirmed the *Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors* (ECF No. 1404), which created the Wind Down Estates.  The Wind Down Estates, along with the last four digits of their federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837).  The Wind Down Estates' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Third Amended Plan, the Confirmation Order, or as the context otherwise requires.

Effective Date of the Third Amended Plan occurred on September 30, 2019. *See Notice of (I) Entry of Order Confirming Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors, (II) Occurrence of Effective Date, and (III) Final Deadline for Filing Administrative Expense Claims* (ECF No. 1449).

2.      Pursuant to the Third Amended Plan, Gerald A. Lombardo was appointed the Plan Administrator for the Wind Down Estates (the "**Prior Plan Administrator**").

3.      Pursuant to section 1.130 of the Third Amended Plan, the New Board has appointed a newly created limited liability corporation, Mortgage Winddown LLC, as successor Plan Administrator.  Mortgage Winddown LLC shall be managed by the members of the New Board.

4.      In consideration for the additional role and services provided by the New Board, the board members shall be entitled to share in the base and incentive compensation that was to be paid to the Prior Plan Administrator.

5.      The appointment of Mortgage Winddown LLC (f/k/a Ditech PA LLC) as successor Plan Administrator became effective as of November 30, 2019.

Dated: December 3, 2019
      New York, New York

                        /s/ Sunny Singh
                        WEIL, GOTSHAL & MANGES LLP
                        767 Fifth Avenue
                        New York, New York  10153
                        Telephone:  (212) 310-8000
                        Facsimile:  (212) 310-8007
                        Ray C. Schrock, P.C.
                        Sunny Singh

                        *Attorneys for Plan Administrator*

2

> **THIS OBJECTION SEEKS TO RECLASSIFY CERTAIN FILED PROOFS OF CLAIM. PARTIES RECEIVING THIS NOTICE OF THE FIFTY-SECOND OMNIBUS OBJECTION TO CLAIMS SHOULD REVIEW THE OMNIBUS OBJECTION TO SEE IF THEIR NAME(S) AND/OR CLAIM(S) ARE LOCATED IN THE OMNIBUS OBJECTION AND/OR THE EXHIBIT ATTACHED THERETO TO DETERMINE WHETHER THIS OBJECTION AFFECTS THEIR CLAIM(S).**
>
> **IF YOU HAVE ANY QUESTIONS, PLEASE CONTACT THE PLAN ADMINISTRATOR'S COUNSEL, NATHALIE SOSA, ESQ., AT 305-577-3163 OR NATHALIE.SOSA@WEIL.COM**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
                                        :
**In re**                                :    **Chapter 11**
                                        :
**DITECH HOLDING CORPORATION,** *et al.*,  :    **Case No. 19-10412 (JLG)**
                                        :
            **Debtors.**[1]              :    **(Jointly Administered)**
                                        :
-------------------------------------------------------------X

### NOTICE OF HEARING ON FIFTY-SECOND OMNIBUS OBJECTION TO PROOFS OF CLAIM (MISCLASSIFIED CLAIMS)

   **PLEASE TAKE NOTICE** that, on April 17, 2020, the Plan Administrator, on

behalf of Ditech Holding Corporation (f/k/a Walter Investment Management Corp.) and its debtor

affiliates (excluding Reorganized RMS) (collectively, the "**Wind Down Estates**") filed the

*Fifty-Second Omnibus Objection to Proofs of Claim (Misclassified Claims)* (the "**Objection**")

---

[1] The Debtors' Third Amended Plan (as defined below) was confirmed, which created the Wind Down Estates. The Wind Down Estates, along with the last four digits of each of their federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Wind Down Estates' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

with the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").[2]

    The Objection requests that the Bankruptcy Court reclassify one or more proofs of claim (the "**Proof(s) of Claim**") listed on Exhibit A annexed to the Objection on the grounds that they have been improperly classified as administrative expense claims.[3]

    **PLEASE TAKE FURTHER NOTICE** that the *Court-Ordered Claim Hearing Procedures* (the "**Claim Hearing Procedures**") annexed hereto as **Exhibit A** apply and govern the objection to your Proof(s) of Claim. The Claim Hearing Procedures provide for certain mandatory actions by a Claimant within certain time periods. Therefore, please review the Claim Hearing Procedures carefully. Failure to comply with the Claim Hearing Procedures may result in the reclassification of a Proof of Claim without further notice.

    If you do NOT oppose the reclassification of your Proof(s) of Claim, then you do NOT need to file a written response to the Objection and you do NOT need to appear at the hearing.

    If you DO oppose the reclassification of your Proof(s) of Claim, then you MUST file with the Court and serve on the parties listed below a written response to the Objection that is received on or before **4:00 p.m. (prevailing Eastern Time) on May 8, 2020** (the "**Response Deadline**").

    Your response, if any, must contain at a minimum the following: (i) a caption setting forth the name of the Bankruptcy Court, Ditech Holding Corporation, *et al.*, the case

---

[2]    Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the *Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors* (the "**Third Amended Plan**") (ECF No. 1326) or the *Order Approving (I) Claims Objection Procedures and (II) Claim Hearing Procedures* (the "**Order**") (ECF No. 1632), as applicable.

[3]    Claimants will be served an individualized notice regarding their Proof(s) of Claim that are being objected to in the Objection.

WEIL:\97450079\3\41703.0012

number and the title of the Objection to which the response is directed; (ii) the name of the

Claimant and description of the basis for the amount of the Claim; (iii) a concise statement setting

forth the reasons why the Claim should not be reclassified for the reasons set forth in the Objection,

including, but not limited to, the specific factual and legal bases upon which you will rely in

opposing the Objection; (iv) all documentation or other evidence of the Claim, to the extent not

included with the Proof of Claim previously filed with the Bankruptcy Court, upon which you will

rely in opposing the Objection; (v) the address(es) to which the Wind Down Estates must return

any reply to your response, if different from that presented in the Proof of Claim; and (vi) the

name, address, and telephone number of the person (which may be you or your legal

representative) possessing ultimate authority to reconcile, settle, or otherwise resolve the Claim on

your behalf.

The Bankruptcy Court will consider a response only if the response is timely filed,

served, and received.  A response will be deemed timely filed, served, and received <u>only</u> <u>if</u> the

original response is <u>actually</u> <u>received</u> on or before the Response Deadline by (i) the chambers of

the Honorable James L. Garrity, Jr., United States Bankruptcy Court, One Bowling Green, New

York, New York, 10004 (CaseFiling@nysb.uscourts.gov) and (ii) Weil, Gotshal, & Manges LLP,

767 Fifth Avenue, New York, New York 10153 (Attn:   Patrick Feeney, Esq.

(Patrick.feeney@weil.com) ; Clifford Sonkin, Esq. (Cliff.sonkin@weil.com) ; and Nathalie Sosa,

Esq.) (Nathalie.sosa@weil.com)), attorneys for the Plan Administrator.

Except as otherwise permitted under the Claim Hearing Procedures, a hearing to

consider the Objection will be held on **May 20, 2020 at 11:00 a.m. (prevailing Eastern Time)** in

the United States Bankruptcy Court for the Southern District of New York, One Bowling Green,

Room 601, New York, New York, 10004.  If you file a written response to the Objection, you

3

should plan to appear telephonically at the hearing.  The Plan Administrator, however, reserves the right to continue the hearing on the Objection with respect to your Claim(s).  If the Plan Administrator does continue the hearing with respect to your Claim(s), then the hearing will be held at a later date.  If the Plan Administrator does not continue the hearing with respect to your Claim(s), then a hearing on the Objection will be conducted on the above date.

The Bankruptcy Court has entered General Order M-543 in order to protect public health, and in recognition of the national emergency that was declared by the President of the United States on March 13, 2020, the Bankruptcy Court has ordered all hearings to be conducted telephonically.  If you wish to appear at, or attend, the hearing, please refer to the Bankruptcy Judge's guidelines for telephonic appearances at www.nysb.uscourts.gov and make arrangements with Court Solutions LLC at (646) 760-4600 or https://court-solutions.com/.

If you wish to view the complete Objection, you can do so for free at https://dm.epiq11.com/case/ditech, or by calling Epiq Corporate Restructuring, LLP at 866-486-4809 (Domestic) or 503-597-7698 (International) to request a copy by mail.  **CLAIMANTS SHOULD NOT CONTACT THE CLERK OF THE BANKRUPTCY COURT TO DISCUSS THE MERITS OF THEIR CLAIMS.**

Dated:  April 17, 2020
New York, New York

/s/ Sunny Singh
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Sunny Singh

*Attorneys for Plan Administrator*

4

**Exhibit A**

**Claim Hearing Procedures**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
                                :

In re                           :       **Chapter 11**

**DITECH HOLDING CORPORATION,** *et al.*,  :       **Case No. 19-10412 (JLG)**
                                :

              **Debtors.**[1]       :       **(Jointly Administered)**
                                :
-------------------------------------------------------------X

## COURT-ORDERED CLAIM HEARING PROCEDURES

The claim hearing procedures (the "**Claim Hearing Procedures**") described herein have been ordered by the United States Bankruptcy Court for the Southern District of New York (the "**Court**") to apply to the chapter 11 cases of the Ditech Holding Corporation (f/k/a Walter Investment Management Corp.) and its debtor affiliates (excluding Reorganized RMS) (collectively, the "**Wind Down Estates**").[2]

**Claim Hearing Procedures**

1.    Pursuant to the *Order Implementing Certain Notice and Case Management Procedures*, dated March 19, 2019 (ECF No. 211) (the "**Case Management Order**"), the Court established periodic omnibus hearings (the "**Omnibus Hearings**") in these cases. The Plan Administrator, on behalf of the Wind Down Estates, shall schedule the return date for claims objections, omnibus or otherwise, for hearing at Omnibus Hearings or other hearings the Plan Administrator may schedule with the Court.

2.    The Court may enter an order at the scheduled hearing sustaining an objection to proofs of claim (each, a "**Proof of Claim**") with respect to which no response (a "**Response**")[3] is properly filed and served.

---

[1]    The Debtors' Third Amended Plan (as defined below) was confirmed, which created the Wind Down Estates. The Wind Down Estates, along with the last four digits of each of their federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Wind Down Estates' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

[2]    Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the *Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors* (the "**Third Amended Plan**") (ECF No. 1326) or the *Order Approving (I) Claims Objection Procedures and (II) Claim Hearing Procedures* (the "**Order**") (ECF No. 1632), as applicable.

[3]    Any information submitted in connection with a Proof of Claim shall be part of the record with respect to the relevant Claim, and any such information already submitted need not be resubmitted in connection with the Claim Hearing Procedures.

3.      The hearing to consider an objection to Proofs of Claim as to which a Response is properly filed and served (each, a "**Contested Claim**") shall be set for a contested hearing (each, a "**Claim Hearing**") to be scheduled by the Plan Administrator, in its sole discretion, as set forth herein.  The Plan Administrator may request that the Court schedule Claim Hearings on the date and/or time of the Omnibus Hearings or at another date and time.

4.      The Plan Administrator shall schedule a Claim Hearing for a Contested Claim as follows:

(a)     For a non-evidentiary hearing to address whether the Contested Claim has failed to state a claim against the Debtors which can be allowed and should be dismissed pursuant to Bankruptcy Rule 7012 (a "**Sufficiency Hearing**"), unless the Plan Administrator serves the Claimant with a Notice of Merits Hearing (as defined herein), the Sufficiency Hearing shall go forward at the return date set in accordance with paragraph 1 of these Claim Hearing Procedures.  The legal standard of review that will be applied by the Court at a Sufficiency Hearing will be equivalent to the standard applied by the Court upon a motion to dismiss for failure to state a claim upon which relief can be granted.

(b)     For an evidentiary hearing on the merits of a Contested Claim (a "**Merits Hearing**"), the Plan Administrator may, in its sole discretion, serve upon the relevant Claimant, by email or overnight delivery and file with the Court, a notice substantially in the form attached to the Order as Exhibit 2 (a "**Notice of Merits Hearing**") at least thirty (30) calendar days prior to the date of such Merits Hearing. The rules and procedures applicable to such Merits Hearing will be set forth in any scheduling order issued by the Court in connection therewith.

5.      Discovery with respect to a Contested Claim will not be permitted until either (i) the Court has held a Sufficiency Hearing and determined that the Contested Claim states a claim that could be allowed and should not be dismissed pursuant to Bankruptcy Rule 7012 or (ii) the Plan Administrator has served the relevant Claimant a Notice of Merits Hearing with respect to the Contested Claim.

6.      The Plan Administrator may file and serve a reply (a "**Reply**") to a Response no later than **4:00 p.m. (Prevailing Eastern Time) on the day that is at least five (5) business days prior to the date of the applicable hearing**.

7.      The Plan Administrator, in its sole discretion, is authorized to further adjourn a hearing scheduled in accordance herewith at any time by providing notice to the Court and the Claimant.

8.      The Court will consider appropriate sanctions, including allowance or disallowance of the Contested Claim, if either party does not follow the Claim Hearing Procedures.


BY ORDER OF THE COURT

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Sunny Singh

*Attorneys for Plan Administrator*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------X
:
**In re**                                          :    **Chapter 11**
:
**DITECH HOLDING CORPORATION,** *et al.,*    :    **Case No. 19-10412 (JLG)**
:
**Debtors.**[1]                              :    **(Jointly Administered)**
:
---------------------------------------------------------------X

## FIFTY-SECOND OMNIBUS OBJECTION
## TO PROOFS OF CLAIM (MISCLASSIFIED CLAIMS)

> **THIS OBJECTION SEEKS TO RECLASSIFY CERTAIN FILED PROOFS OF CLAIM. CLAIMANTS RECEIVING THIS OBJECTION SHOULD LOCATE THEIR NAMES AND CLAIMS ON THE EXHIBIT ATTACHED TO THIS OBJECTION.**
>
> **IF YOU HAVE ANY QUESTIONS, PLEASE CONTACT THE PLAN ADMINISTRATOR'S COUNSEL, NATHALIE SOSA, ESQ., AT 305-577-3163 OR NATHALIE.SOSA@WEIL.COM**

---

[1]    The Debtors' Third Amended Plan (as defined below) was confirmed, which created the Wind Down Estates. The Wind Down Estates, along with the last four digits of each of their federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Wind Down Estates' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

TO THE HONORABLE JAMES L. GARRITY, JR.,
UNITED STATES BANKRUPTCY JUDGE:

The Plan Administrator,[2] on behalf of Ditech Holding Corporation (f/k/a Walter Investment Management Corp.) and its debtor affiliates (excluding Reorganized RMS) (collectively, the "**Wind Down Estates**") respectfully represent as follows in support of this joint omnibus objection (the "**Objection**"):

## Background

1.    On February 11, 2019 (the "**Commencement Date**"), Ditech Holding Corporation (f/k/a Walter Investment Management Corp.) and certain of its affiliates (collectively, the "**Debtors**") each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

2.    The chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

3.    On September 26, 2019, the Court entered the Confirmation Order. Pursuant to the Third Amended Plan, the Debtors sold their forward and reverse business to the Forward Buyer and Reverse Buyer, respectively.

4.    The Effective Date of the Third Amended Plan occurred on September 30, 2019. *See Notice of (I) Entry of Order Confirming Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors, (II) Occurrence of Effective Date, and (III) Final Deadline for Filing Administrative Expense Claims* (ECF No. 1449).

---

[2]    Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the *Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors* (the "**Third Amended Plan**") (ECF No. 1326) or the *Order Confirming Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors* (ECF No. 1404) (the "**Confirmation Order**"), as applicable.

## **Claims Process**

5.      On March 27, 2019, the Debtors filed their schedules of assets and liabilities and statements of financial affairs (collectively, the "**Schedules**") (ECF Nos. 289-313). On May 7, 2019, the Debtors filed certain amended Schedules (ECF Nos. 511-512).

6.      On February 22, 2019, the Court entered the *Order Establishing Deadline for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* (ECF No. 90) (the "**Bar Date Order**"). Pursuant to the Bar Date Order, the Court set April 1, 2019 at 5:00 p.m. (Prevailing Eastern Time) as the deadline for each person or entity, not including governmental units (as defined in section 101(27) of the Bankruptcy Code) to file a proof of claim in the Debtors' chapter 11 cases (the "**General Bar Date**"). On March 27, 2019, the Court extended the General Bar Date to April 25, 2019 at 5:00 p.m. (Prevailing Eastern Time) (ECF No. 272) (the "**Extended General Bar Date**"). On May 2, 2019, the Court extended the Extended General Bar Date solely for consumer borrowers to June 3, 2019 at 5:00 p.m. (Prevailing Eastern Time) (ECF No. 496).

7.      Pursuant to the Confirmation Order, the Court set the deadline for each person or entity asserting Administrative Expense Claims to file proofs of claim in the chapter 11 cases to thirty-five (35) days from the date of service of the notice of entry of the Confirmation Order—November 11, 2019.

8.      Under the Third Amended Plan, (i) the Plan Administrator, on behalf of each of the Wind Down Estates, has exclusive authority to object to all Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and Other Secured Claims; (ii) the GUC Recovery Trustee, on behalf of the GUC Recovery Trust, has the exclusive authority to object to all General Unsecured Claims; and (iii) the Consumer Representative has the exclusive authority to object to all Consumer Creditor Claims.

9.      The claims register, prepared and maintained by Epiq Corporate Restructuring, LLC ("**Epiq**"), shows that approximately 7,800 proofs of claim (the "**Proofs of Claim**") were filed in the chapter 11 cases.  The Plan Administrator is actively reviewing and reconciling the Proofs of Claim, and the ongoing claims reconciliation process involves the collective effort of the Wind Down Estates' employees, the GUC Recovery Trustee, and the Consumer Representative.

10.      On November 19, 2019, the Bankruptcy Court entered the *Order Approving (I) Claim Objection Procedures and (II) Claim Hearing Procedures* (ECF No. 1632) (the "**Claims Procedures Order**").

## Jurisdiction

11.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

12.      The Plan Administrator files this Objection pursuant to the Claims Procedures Order, seeking entry of an order reclassifying the Claims listed on **Exhibit A** annexed hereto as General Unsecured Claims, as indicated under the heading "*Claim as Reclassified*" (the "**Misclassified Claims**").

13.      The Plan Administrator, with the assistance of its professionals, has examined each Misclassified Claim, the documentation provided with respect to each Misclassified Claim, if any, and the Debtors' respective books and records, and have determined in each case that the Misclassified Claims are improperly classified as administrative expense claims.  The Misclassified Claims are all damages claims arising from prepetition contracts that

were rejected in these chapter 11 cases, and therefore are properly classified as General Unsecured Claims.

14.     The Plan Administrator, therefore, requests that the Misclassified Claims be reclassified to General Unsecured Claims (collectively, the "**As-Reclassified Claims**"). A proposed form of order granting the relief requested herein is annexed hereto as **Exhibit B** (the "**Proposed Order**"). The GUC Recovery Trustee retains the right to object to the As-Reclassified Claims.

## The Misclassified Claims Should Be Reclassified

15.     A filed proof of claim is "deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a). Upon an objection, the claimant has the burden to demonstrate the validity of the claim. *See Residential Capital, LLC*, 2016 WL 796860, at *9 (S.D.N.Y. 2016); *In re Arcapita Bank B.S.C.(c)*, 2013 WL 6141616, at *1 (Bankr. S.D.N.Y. 2013), *aff'd sub nom. In re Arcapita Bank B.S.C.(c),* 508 B.R. 814 (S.D.N.Y. 2014); *In re Motors Liquidation Co.*, 2012 WL 1886755, at *3 (S.D.N.Y. 2012); *In re Oneida, Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009), *aff'd*, No. 09 Civ. 2229 (DC), 2010 WL 234827, at *5 (S.D.N.Y. Jan. 22, 2010).

16.     In addition, the claimant has the burden to demonstrate its entitlement to administrative priority. *See, e.g.*, *In re Bethlehem Steel Corp.*, 479 F.3d 167, 172 (2d Cir. 2007) ("The burden of proving entitlement to priority payment as an administrative expense . . . rests with the party requesting it."); *In re Drexel Burnham Lambert Grp. Inc.*, 134 B.R. 482, 489 (Bankr. S.D.N.Y. 1991) ("The burden of establishing entitlement to priority rests with the claimant and should only be granted under extraordinary circumstances . . . when the parties seeking priority have sustained their burden of demonstrating that their services are actual and necessary to preserve the estate.") (internal quotation omitted).

5

17.     Section 502(b)(1) of the Bankruptcy Code provides, in relevant part, that a claim may not be allowed to the extent that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law."  11 U.S.C. § 502(b)(1).

18.     The Plan Administrator has carefully reviewed the Misclassified Claims, all documents furnished by the claimants with respect to the Misclassified Claims, and the Debtors' books and records, and has determined that each Misclassified Claim is not entitled to administrative expense status under section 503(b) or any other section of the Bankruptcy Code.

19.     To ensure that the claims register is accurate and to avoid the possibility of excess recoveries, the Plan Administrator seeks entry of the Proposed Order to reclassify the Misclassified Claims as requested.

### Separate Contested Matters

20.     To the extent a Response is filed regarding any claim listed in this Objection and the Plan Administrator is unable to resolve the Response, the objection by the Plan Administrator to such claim shall constitute a separate contested matter as contemplated by Bankruptcy Rule 9014.  Any order entered by the Court regarding an objection asserted in this Objection shall be deemed a separate order with respect to each claim subject thereto.

### Reservation of Rights

21.     The rights of the Plan Administrator and the GUC Recovery Trustee to (i) file subsequent objections to any claims subject hereto on any ground to the extent there are surviving claims; (ii) amend, modify, or supplement this Objection including, without limitation, the filing of objections to further amended or newly-filed claims; (iii) seek to expunge or reduce any claim to the extent all or a portion of such claim has been paid; and (iv) settle any claim for less than the asserted amount are fully reserved.  Separate notice and a hearing will be provided in connection with any such additional objections.

WEIL:\97450079\3\41703.0012

**Notice**

22.     Notice of this Objection will be provided in accordance with the procedures set forth in Claims Procedures Order, and individualized notices will be provided to the claimants. The Plan Administrator respectfully submits that no further notice is required.

23.     No previous request for the relief sought herein has been made by the Plan Administrator to this or any other Court.

WHEREFORE the Plan Administrator, on behalf of the Wind Down Estates, respectfully requests entry of the Proposed Order granting the relief requested herein and such other and further relief as is just.

Dated: April 17, 2020
       New York, New York

/s/ Sunny Singh
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Sunny Singh

*Attorneys for Plan Administrator*

**702**

## **Exhibit A**

**Misclassified Claims**

**Exhibit**

*Ditech Holding Corporation, et al.*
*Case No 19-10412 Jointly Administered*

**Misclassified Claims**

| No. | Name of Claimant | Date Claim Filed | Claim Number | Asserted / Scheduled Claim Amount | | | | | Claim as Reclassified | | | | | Basis for Proposed Reclassification |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Secured | Admin | Priority | Unsecured | Total | Secured | Admin | Priority | Unsecured | Total | |
| 1. | FINANCE OF AMERICA REVERSE LLC<br>ATTN KAREN C TANKERSLEY, ESQ.<br>909 LAKE CAROLYN PKWY, STE 1550<br>IRVING, TX 75039 | 11/11/2019 | 60182 | $ - | $ 375,832.07 | $ - | $ - | $ 375,832.07 | $ - | $ - | $ - | $ 375,832.07 | $ 375,832.07 | Claim reclassed based on books and records review. Claim is for damages under rejected pre-petition contract. |
| 2. | FINANCE OF AMERICA REVERSE LLC<br>ATTN KAREN C TANKERSLEY, ESQ<br>909 LAKE CAROLYN PARKWAY, SUITE 1550<br>IRVING, TX 75039 | 4/25/2019 | 21347 | $ - | Unliquidated | $ - | $ 54,085,623.66 | $ 54,085,623.66 | $ - | $ - | $ - | $54,085,623.66 and Unliquidated | $54,085,623.66 and Unliquidated | Claim reclassed based on books and records review. Claim is for damages under rejected pre-petition contract. |
| 3. | LIBERTY HOME EQUITY SOLUTIONS, INC.<br>ATTN ADRIENNE COFFIN<br>1661 WORTHINGTON RD, STE 100<br>WEST PALM BEACH, FL 33409 | 11/11/2019 | 60214 | $ - | $ 4,145,648.48 | $ - | $ - | $ 4,145,648.48 | $ - | $ - | $ - | $ 4,145,648.48 | $ 4,145,648.48 | Claim reclassed based on books and records review. Claim is for damages under rejected pre-petition contract. |

**704**

Exhibit 1 of 1

**<u>Exhibit B</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
                                               :
In re                                          :    **Chapter 11**
                                               :
**DITECH HOLDING CORPORATION,** *et al.*,      :    **Case No. 19-10412 (JLG)**
                                               :
            **Debtors.**[1]                    :    **(Jointly Administered)**
                                               :
-------------------------------------------------------------X

**ORDER GRANTING FIFTY-SECOND OMNIBUS**
**<u>OBJECTION TO PROOFS OF CLAIM (MISCLASSIFIED CLAIMS)</u>**

Upon the *Fifty-Second Omnibus Objection to Proofs of Claim (Misclassified*

*Claims)* filed on April 17, 2020 (the "**Objection**"),[2] for an order (i) reclassifying the Misclassified

Claims, and (ii) granting related relief, all as more fully set forth in the Objection; and the

Bankruptcy Court having jurisdiction to consider the Objection and the relief requested therein in

accordance with 28 U.S.C. §§ 157(a)-(b) and 1334 and the *Amended Standing Order of Reference*

*M-431*, dated January 31, 2012 (Preska, C.J.); and consideration of the Objection and the relief

requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper

before this Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice

of the relief requested in the Objection having been provided, and it appearing that no other or

further notice need be provided in accordance with the Claims Procedures Order; and such notice

---

[1]    The Debtors confirmed the *Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors* (ECF No. 1326) (the "**Third Amended Plan**"), which created the Wind Down Estates. Wind Down Estates, along with the last four digits of their federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Wind Down Estates' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

[2]    Capitalized terms not otherwise herein defined shall have the meanings ascribed to such terms in the Objection.

having been adequate and appropriate under the circumstances; and the Bankruptcy Court having

held a hearing to consider the relief requested in the Objection on May 20, 2020 (the "**Hearing**");

and upon the record of the Hearing, and upon all of the proceedings had before the Bankruptcy

Court; and the Bankruptcy Court having determined that the legal and factual bases set forth in the

Objection establish just cause for the relief granted herein; and is in the best interests of the Wind

Down Estates, their creditors, and all parties in interest; and after due deliberation and sufficient

cause appearing therefor,

### IT IS HEREBY ORDERED THAT

1.      The Objection is granted to the extent set forth herein.

2.      Each Misclassified Claim listed on **Exhibit 1** annexed to this Order is

reclassified as a General Unsecured Claim as indicated under the heading "*Claim as Reclassified*"

as provided in **Exhibit 1** (the "**As-Reclassified Claims**").

3.      Nothing herein shall constitute an admission or finding concerning the

amount or validity of any of the As-Reclassified Claims.

4.      The rights the GUC Recovery Trustee to assert further objections to the

As-Reclassified Claims, in whole or in part, and on any basis, are fully preserved.

5.      Each Misclassified Claim and the objections by the Plan Administrator to

such Claims, as set forth on **Exhibit 1** hereto, constitutes a separate contested matter as

contemplated by Bankruptcy Rule 9014.  This Order shall be deemed a separate Order with respect

to each such Misclassified Claim.  Any stay of this Order pending appeal by any claimants whose

claims are subject to this Order shall only apply to the contested matter which involves such

claimant and shall not act to stay the applicability and/or finality of this Order with respect to the

other contested matters listed in the Objection or this Order.

6.      This Order has no res judicata, estoppel, or other effect on the validity, allowance, or disallowance of, and all rights to object to or defend on any basis are expressly reserved with respect to any claim referenced or identified in the Objection that is not listed on **Exhibit 1**.

7.      The Plan Administrator, Epiq, and the Clerk of this Bankruptcy Court are authorized to take all actions necessary or appropriate to give effect to this Order.

8.      The Bankruptcy Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Order.

9.      The terms and conditions of this Order are effective immediately upon entry.

Dated: _____, 2020
         New York, New York

_____
THE HONORABLE JAMES L. GARRITY, JR.
UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit 1</u>**

**Misclassified Claims**

Peter S. Partee, Sr.
Robert A. Rich
**HUNTON ANDREWS KURTH LLP**
200 Park Avenue
New York, New York 10166
(212) 309-1000
ppartee@huntonak.com
rrich2@huntonak.com

*Attorneys for Finance of America Reverse LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | ) | Chapter 11 |
| In re: | ) | |
| | ) | Case No. 19-10412 (JLG) |
| DITECH HOLDING CORPORATION, *et al.*,[1] | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | **Re: Docket No. 2186** |
| | ) | |

**FINANCE OF AMERICA REVERSE LLC'S RESPONSE TO FIFTY-SECOND**
**OMNIBUS OBJECTION TO PROOFS OF CLAIM (MISCLASSIFIED CLAIMS)**

**Hearing Date: May 20, 2020 at 11:00 a.m.**
**Objection Deadline: May 8, 2020**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837).

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ..........................................................................................1

II.     BACKGROUND ............................................................................................................2

        A.      The Subservicing Agreements ...............................................................................2

        B.      The Proofs of Claim...............................................................................................3

        C.      The Omnibus Objection..........................................................................................5

III.    ARGUMENT....................................................................................................................5

        A.      The Bankruptcy Code Accords Administrative Expense Priority to Actual and
                Necessary Expenses of Preserving the Estate.........................................................5

        B.      FoA's Claims for Damages Resulting from RMS' Breach of the Postpetition
                Extension Agreements are Entitled to Administrative Expense Priority.................6

        C.      FoA's Claims for Damages Resulting from RMS' Postpetition Breach of the
                Prepetition Subservicing Agreements are Entitled to Administrative Expense
                Priority. ..................................................................................................................8

IV.     RESERVATION OF RIGHTS .......................................................................................10

V.      CONCLUSION..............................................................................................................11

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Airport Executive Center, Ltd.*,
    138 B.R. 628 (Bankr. M.D. Fla. 1992) ...................................................................8

*Cappelli v. State Farm Mut. Auto. Ins. Co.*,
    259 A.D.2d 581, 686 N.Y.S.2d 494 (App. Div, 2d Dept. 1999) ..............................7

*Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*,
    536 F.2d 950 (1st Cir. 1976) ..................................................................................6

*In re Enron Corp.*,
    279 B.R. 79 (Bankr. S.D.N.Y. 2002) .............................................................5, 6, 8

*GATX Leasing Corp. v. Airlift Int'l, Inc. (In re Airlift Int'l, Inc.)*,
    761 F.2d 1503 (11th Cir. 1985) ...........................................................................6, 7

*In re IML Freight, Inc.*,
    37 B.R. 556 (Bankr. D. Utah 1984) .......................................................................8

*Karpen v. Ali*,
    46 Misc. 3d 1228(A), 9 N.Y.S.3d 593 (N.Y. Sup. Ct. 2015) ..................................7

*In re Leslie Fay Companies, Inc.*,
    168 B.R. 294 (Bankr. S.D.N.Y. 1994) ....................................................................7

*In re Mushroom Transportation Co.*,
    78 B.R. 754 (Bankr. E.D. Pa. 1987) ......................................................................6

*Nostas Assocs. v. Costich (In re Klein Sleep Products, Inc.)*,
    78 F.3d 18 (2d Cir. 1996) ...................................................................................6, 7

*In re Shoppers Paradise, Inc.*,
    8 B.R. 271 (Bankr. S.D.N.Y. 1980) ........................................................................9

*Texaco Inc. v. Bd. of Commissioners for the LaFourche*
    *Basin Levee Dist. (In re Texaco Inc.)*,
    254 B.R. 536 (Bankr. S.D.N.Y. 2000) ................................................................8, 9

*Trustees of the Amalgamated Ins. Fund v. McFarlin's, Inc.*,
    789 F.2d 98 (2d Cir. 1986) .....................................................................................5

*In re Yonkers Hamilton Sanitarium Inc.*,
    22 B.R. 427 (Bankr. S.D.N.Y. 1982) ..................................................................................9

*Zelin v. Unishops, Inc. (In re Unishops, Inc.)*,
    553 F.2d 305 (2d Cir. 1977) ..............................................................................................8

**Statutes**

11 U.S.C. § 365 .........................................................................................................................8

11 U.S.C. § 365(a) ....................................................................................................................8

11 U.S.C. § 363(c) ....................................................................................................................7

11 U.S.C. § 365(g) ..................................................................................................................10

11 U.S.C. § 503(b) ................................................................................................................5, 6

713

Finance of America Reverse LLC ("FoA") hereby responds to the *Fifty-Second Omnibus Objection to Proofs of Claim (Misclassified Claims)* [DN 2186] (the "Omnibus Objection")[2] filed by the Plan Administrator as follows.

## I. **PRELIMINARY STATEMENT**

1.     During its chapter 11 case, RMS has continued to subservice reverse mortgage loans and accept payment of subservicing fees under pre- and post-petition subservicing agreements with FoA.   As RMS has continued to receive benefits under the subservicing agreements, so too must it bear the burdens imposed by those subservicing agreements during the chapter 11 case as administrative expenses of preserving the estate.   These expenses include losses incurred by FoA as a result of RMS' post-petition subservicing errors and other material post-petition breaches of the subservicing agreements for which FoA timely filed administrative expense claims.

2.     The Plan Administrator's mistaken contention that FoA is seeking damages under rejected contracts serves as the sole basis for his objection to classification of FoA's claims as administrative expenses.   The majority of FoA's claims are asserted in connection with post-petition subservicing agreements that are not subject to rejection.   The balance of FoA's claims are asserted in connection with pre-petition agreements that either expired by their terms during the chapter 11 case and therefore never were rejected, or were rejected only after the period during which FoA incurred the damages giving rise to its claims.

3.     Congress afforded priority to administrative expenses so as to encourage third-parties, who might be reluctant to deal with a debtor-in-possession, to transact business with the debtor-in-possession and thereby facilitate its reorganization effort.   FoA has facilitated RMS'

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Omnibus Objection.

**714**

reorganization effort by continuing its subservicing relationship on a post-petition basis. FoA respectfully requests that the Court overrule the Plan Administrator's objection and allow FoA an administrative expense claim for damages it has incurred resulting from RMS' post-petition servicing errors and other post-petition breaches of the subservicing agreements.

## II. <u>BACKGROUND</u>

### A. <u>The Subservicing Agreements</u>

4.      On February 11, 2019 (the "<u>Petition Date</u>"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

5.      Prior to the Petition Date, FoA and Debtor Reverse Mortgage Solutions, Inc. ("<u>RMS</u>") entered into the following agreements pursuant to which RMS subserviced certain reverse mortgage loans for which FoA is the owner and/or the named servicer in exchange for subservicing fees and other consideration:

- Reverse Mortgage Subservicing Agreement, dated as of December 12, 2017, by and between RMS and FoA (the "<u>Dec 2017 Agreement</u>");

- Reverse Mortgage Subservicing Agreement, dated as of October 4, 2018, by and between RMS and FoA (the "<u>Oct 2018 Agreement</u>"); and

- Reverse Mortgage Subservicing Agreement, dated as of March 18, 2011, by and between RMS and FoA (f/k/a Urban Financial Group, Inc.) (the "<u>Mar 2011 Agreement</u>").

6.      The Dec 2017 and Oct 2018 Agreements each have one month terms subject to FoA's monthly renewal option. FoA exercised its monthly renewal option through February 2019 and through September 2019 under the respective agreements. RMS continued to subservice the covered reverse mortgage loans, and FoA continued to pay RMS subservicing fees, through the pre- and postpetition periods covered by the Dec 2017 and Oct 2018 Agreements in accordance with those agreements.

2

7.      The initial term of the Mar 2011 Agreement ran five years and automatically renewed for an additional two years through March 18, 2018.  FoA and RMS then entered into seven (7) pre-petition Extension Agreements (collectively, the "Prepetition Extension Agreements," together with the Dec 2017 Agreement, the Oct 2018 Agreement, and the Mar 2011 Agreement, the "Prepetition Subservicing Agreements") pursuant to which the parties agreed to extend the term of the Mar 2011 Agreement through the identified extension period, but otherwise on the same terms and conditions stated in the Mar 2011 Agreement.  The final Prepetition Extension Agreement, dated January 30, 2019, provided a subservicing term through March 31, 2019.  RMS continued to subservice the covered reverse mortgage loans, and FoA continued to pay RMS subservicing fees, through March 31, 2019 in accordance with the Prepetition Subservicing Agreements.

8.      After the Petition Date, FoA and RMS entered into four (4) additional Extension Agreements (collectively, the "Postpetition Extension Agreements," together with the Prepetition Subservicing Agreements, the "Subservicing Agreements") further extending the term of the Mar 2011 Agreement through expiration dates of April 15, 2019, June 30, 2019, August 31, 2019, and September 30, 2019, respectively.[3]  RMS continued to subservice the covered reverse mortgage loans, and FoA continued to pay RMS a subservicing fee, from April 1, 2019 through September 30, 2019 in accordance with the Postpetition Extension Agreements.

**B.      The Proofs of Claim**

9.      On April 25, 2019, FoA timely filed proof of claim number 21347 ("POC 21347") in RMS' chapter 11 case in the amount of $54,085,624, plus other amounts to be determined, for damages resulting from RMS' subservicing errors and other material breaches of

---

[3] The Postpetition Extension Agreements are dated as of March 29, 2019, April 15, 2019, June 30, 2019, and August 16, 2019, respectively.

3

**716**

the Prepetition Subservicing Agreements.  The claims set forth in POC 21347 arising from RMS'

pre-petition subservicing errors and other pre-petition breaches are asserted only as general

unsecured claims.  However, FoA expressly reserved the right to assert administrative expense

priority at the appropriate time for any damages resulting from RMS' subservicing errors and

other material breaches of the Prepetition Subservicing Agreements occurring after the Petition

Date.

10.     On September 26, 2019, the Court entered the Confirmation Order which

confirmed the Third Amended Plan.  Pursuant to the Third Amended Plan, the Debtors sold their

reverse mortgage business to the Reverse Buyer.  The docket reflects that the Effective Date of

the Third Amended Plan occurred, and the Debtors consummated the sale to the Reverse Buyer,

on September 30, 2019 [DN 1449, 1463].  The Subservicing Agreements expired on or before

Effective Date, and RMS did not assign any of the Subservicing Agreements to the Reverse

Buyer.

11.     The Third Amended Plan provides for the assumption of all executory contracts

listed by the Debtors on an assumption notice or on the Assumption Schedule.   All other

executory contracts of the Debtors are deemed rejected as of the Effective Date unless, among

other things, such executory contract previously expired or terminated pursuant to its own terms

or by agreement of the parties.  *See* Third Amended Plan, § 8.1.  None of the Subservicing

Agreements were assumed by the Debtors in connection with the Third Amended Plan.

12.     On November 11, 2019, FoA timely filed administrative expense claim number

60182 ("POC 60182," together with POC 21347, the "Proofs of Claim") in RMS' chapter 11

case in the amount of $375,832.07, plus other amounts to be determined, for damages resulting

from RMS' post-petition subservicing errors and other material post-petition breaches of the

4

**717**

Subservicing Agreements.  FoA has since quantified its realized and unrealized losses resulting

from RMS' post-petition subservicing errors and other material post-petition breaches in the

approximate amount of $14 million, plus other amounts to be determined.  FoA does not claim

any damages resulting from any purported rejection of the Subservicing Agreements, or for any

breach that may have occurred after the Effective Date.

**C.**     **The Omnibus Objection**

13.     On April 17, 2020, the Plan Administrator filed the Omnibus Objection through

which he alleges that the Proofs of Claim assert claims "for damages under rejected pre-petition

contract[s]" and that such claims should not be accorded administrative expense priority.

Omnibus Objection, Ex. A.

## III.  ARGUMENT

**A.**     **The Bankruptcy Code Accords Administrative Expense Priority
        to Actual and Necessary Expenses of Preserving the Estate.**

14.     Section 503(b) of the Bankruptcy Code provides that "[a]fter notice and a hearing,

there shall be allowed, administrative expenses … including the actual, necessary costs and

expenses of preserving the estate …" 11 U.S.C. § 503(b).

15.     A claim will be accorded administrative priority status as an actual and necessary

expense of preserving the estate if it (i) arises out of a transaction between the claimant and the

debtor-in-possession, and (ii) consideration supporting the claimant's right to payment was

supplied to and beneficial to the debtor-in-possession in the operation of the business.  *See In re*

*Enron Corp.,* 279 B.R. 79, 85 (Bankr. S.D.N.Y. 2002) (citing *Trustees of the Amalgamated Ins.*

*Fund v. McFarlin's, Inc*., 789 F.2d 98, 101 (2d Cir. 1986).  This administrative expense priority

is based on the premise that the operation of the business during the bankruptcy case benefits

pre-petition creditors; therefore, any claims that result from that operation are entitled to payment

**718**

prior to payment to "creditors for whose benefit the continued operation of the business was allowed." *Id.* (citing *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*, 536 F.2d 950, 954 (1st Cir. 1976).

**B.     FoA's Claims for Damages Resulting from RMS' Breach of the Postpetition Extension Agreements are Entitled to Administrative Expense Priority.**

16.     It is well-settled that agreements entered into by the debtor-in-possession, and supported by consideration beneficial to the debtor-in-possession, are actual and necessary to preserve the estate, and therefore a claim for damages arising from a debtor-in-possession's breach of a post-petition agreement gives rise to an administrative expense claim for the full amount of the damages provided for in the contract. *See Nostas Assocs. v. Costich (In re Klein Sleep Products, Inc.)*, 78 F.3d 18, 26 (2d Cir. 1996) ("[P]ostpetition claims ... arising, for example, ... from contracts entered into by the trustee or debtor-in-possession are entitled to administrative expense priority."); *GATX Leasing Corp. v. Airlift Int'l, Inc. (In re Airlift Int'l, Inc.)*, 761 F.2d 1503, 1509 (11th Cir. 1985) (holding that breach of post-petition contract gives rise to an administrative expense claim under section 503(b)); *In re Mushroom Transportation Co.*, 78 B.R. 754, 761 (Bankr. E.D. Pa. 1987) ("a breach of a valid postpetition lease is treated as an administrative expense.").

17.     The Postpetition Extension Agreements constitute new, post-petition contracts between FoA and RMS, as debtor-in-possession. The parties entered the Postpetition Extension Agreements after the Petition Date, on March 29, 2019, April 15, 2019, June 30, 2019, and August 16, 2019, respectively. Although the Postpetition Extension Agreements incorporate most of the provisions of the Mar 2011 Agreement, which was entered pre-petition, they modify the term of the Mar 2011 Agreement which otherwise would have expired. Such modification constitutes a new contract as of the time of the parties' agreement to the modification. *See*

6

*Karpen v. Ali*, 46 Misc. 3d 1228(A), 9 N.Y.S.3d 593 (N.Y. Sup. Ct. 2015) ("The modification of a contract results in the establishment of a new agreement between the parties which *pro tanto* supplants the affected provisions of the original agreement while leaving the balance of it intact."); *Cappelli v. State Farm Mut. Auto. Ins. Co.*, 259 A.D.2d 581, 686 N.Y.S.2d 494 (App. Div, 2d Dept. 1999) (same).[4]

18.     The Postpetition Extension Agreements are supported by consideration beneficial to RMS, including without limitation in the form of subservicing fee rights.[5]  RMS continued to subservice mortgage loans covered by the Postpetition Extension Agreements and to accept its subservicing fee through the end of the term of each Postpetition Extension Agreement. Whether the fees received by RMS ultimately prove to exceed FoA's damages claims resulting from RMS' performance is not relevant to the section 503(a) analysis.  *See In re Klein Sleep Products, Inc.*, 78 F.3d at 26.  To hold otherwise would mean "that any post-bankruptcy contract, entered into for the benefit of a bankrupt's estate, would cease to be entitled to priority the moment the deal turned sour."  *Id.*; *see also In re Airlift Intern., Inc.*, 761 F.2d at 1512 (holding that in determining the amount of an administrative claim arising from the debtor-in-possession's breach of a post-petition agreement, the terms of the agreement control).

19.     The Plan Administrator mistakenly contends that FoA claims damages under a rejected contract.  *See* Omnibus Objection, Ex. A.  Contracts entered post-petition, such as the Postpetition Extension Agreements, are not subject to assumption or rejection because they are not executory contracts "of the debtor".  11 U.S.C. § 365(a); *In re Leslie Fay Companies, Inc.*, 168 B.R. 294, 300 (Bankr. S.D.N.Y. 1994) ("[C]ontracts … entered into postpetition are not

---

[4] The Subservicing Agreements are governed by New York law.

[5] RMS was authorized to enter into the Postpetition Extension Agreements pursuant to section 363(c) of the Bankruptcy Code given that RMS enters into subservicing agreements in the ordinary course of its business, including by entering into similar agreements with FoA from time-to-time prior to the Petition Date.

subject to rejection under section 365."); *In re Airport Executive Center, Ltd*., 138 B.R. 628, 629

(Bankr. M.D. Fla. 1992) ("[Section 365(a)] applies to leases which exist pre-petition, and not

those which are entered into post-petition"); *In re IML Freight, Inc.,* 37 B.R. 556, 559 (Bankr. D.

Utah 1984) ("The post-petition agreements entered into between the Trustee for the estate and

the Unions were not executory contracts of the debtor and therefore are not subject to Section

365 of the Code.").  Even if the Postpetition Extension Agreements could be subject to rejection

(which they are not), as set forth below, FoA asserts no claims for damages resulting from any

failure by RMS to perform after the Effective Date, which is the earliest date any of the

Subservicing Agreements could be deemed rejected under the terms of the Third Amended Plan.

20.    Accordingly, FoA's timely filed administrative expense claims for damages

resulting from RMS' subservicing errors and other material breaches of the Postpetition

Extension Agreements are entitled to administrative expense priority.

**C.    FoA's Claims for Damages Resulting from RMS'
Postpetition Breach of the Prepetition Subservicing
Agreements are Entitled to Administrative Expense Priority.**

21.    A debtor's postpetition obligations under a pre-petition contract that has not yet

been assumed or rejected will give rise to administrative expense claims where the debtor-in-

possession continues to perform under such contract and receive the benefits thereunder.  *See*

*Zelin v. Unishops, Inc. (In re Unishops, Inc.)*, 553 F.2d 305, 308 (2d Cir. 1977) ("It is settled law

that a claim arising under an executory contract is entitled to priority if the trustee or debtor in

possession elects to assume the contract **_or_** if he receives benefits under it.") (emphasis added);

*In re Enron Corp.,* 279 B.R. at 85 ("With respect to an executory contract, the focus is on

whether the debtor used the nondebtor's property in the ordinary course of its business, and

continued to receive and accept the nondebtor's performance."); *Texaco Inc.  v.  Bd.  of*

Commissioners for the LaFourche Basin Levee Dist. (In re Texaco Inc.), 254 B.R. 536, 556 (Bankr. S.D.N.Y. 2000) ("As long as the debtor continues to receive benefits under such contract it must also bear the burdens or obligations imposed under the contract."); *In re Yonkers Hamilton Sanitarium Inc.*, 22 B.R. 427, 435 (Bankr. S.D.N.Y. 1982) (same); *In re Shoppers Paradise, Inc*., 8 B.R. 271, 279 (Bankr. S.D.N.Y. 1980) ("Even where court approval was not obtained the debtor-in-possession may be deemed to have adopted the contract or lease where it received benefits and when the issue presented is whether or not such benefits should be entitled to an administration expense claim.")

22.    RMS elected to continue subservicing reverse mortgage loans under the Prepetition Subservicing Agreements on a post-petition basis and accepted the post-petition subservicing fees paid in exchange for its performance through the end of the term of each agreement.    Accordingly, FoA's timely filed administrative expense claims for damages resulting from RMS' post-petition subservicing errors and other material post-petition breaches of the Prepetition Subservicing Agreements are entitled to administrative expense priority.

23.    Just as with the Postpetition Extension Agreements, the Plan Administrator mistakenly contends that FoA seeks damages under rejected contracts.  *See* Omnibus Objection, Ex. A.   The Third Amended Plan provides, in relevant part, that any executory contracts not identified for assumption are deemed rejected as of the Effective Date, unless such executory contract previously expired or terminated pursuant to its own terms or by agreement of the parties.  *See* Third Amended Plan, § 8.1.   RMS did not provide subservicing, and was not obligated to provide subservicing, after the Effective Date, which is the earliest any Subservicing Agreements could have been deemed rejected.

**722**

24.     The terms of the Dec 2017 Agreement and the Mar 2011 Agreement (as extended by the Prepetition Extension Agreements) expired at the end of February 2019 and March 2019, respectively, well before the Effective Date, and therefore never were assumed or rejected under the terms of the Third Amended Plan.  The term of Oct 2018 Agreement expired on the Effective Date, after which RMS was no longer obligated to subservice the covered mortgage loans.  FoA does not assert any claims resulting from any failure by RMS to perform after the Effective Date.[6]  Accordingly, FoA asserts no rejection damages claims that would be deemed to have occurred pre-petition under section 365(g) of the Bankruptcy Code.

## IV.  **RESERVATION OF RIGHTS**

25.     Through the Omnibus Objection, the Plan Administrator objects only to the classification of the Proofs of Claim as administrative expense claims, and not to the amount of the Proofs of Claim.  Although FoA quantifies certain of its damages herein and in the Proofs of Claim, in many instances the total amount of FoA's damages will not be realized until the relevant reverse mortgage loans are liquidated.  FoA reserves the right to update, amend, modify and/or supplement its quantification of damages asserted in the Proofs of Claim at the appropriate time, including without limitation based on events, information and/or documents obtained from the Debtors or others through discovery or otherwise.[7]

*[Remainder of page intentionally left blank.]*

---

[6] The Oct 2018 Agreement imposes on RMS certain offboarding obligations following the subservicing term, which ended on the Effective Date.  FoA asserts no claims for any damages resulting from any failure by RMS to observe its offboarding obligations or from any other failure to perform after the Effective Date.  Therefore the Court need not decide whether any such claims would be entitled to administrative claim priority.

[7] Pursuant to the Court-approved Claim Objection Procedures [DN 1632], discovery is stayed pending an initial hearing on the Omnibus Objection or the Plan Administrator's service of notice of a merits hearing.

10

## V.  <u>CONCLUSION</u>

WHEREFORE, FoA respectfully requests that the Court (a) deny the Omnibus Objection as it pertains to the Proofs of Claim, and (b) allow FoA an administrative expense claim for damages resulting from the RMS' post-petition servicing errors and other post-petition breaches of the Subservicing Agreements, in an amount to be determined, and (c) grant such other and further relief in favor of FoA as the Court may deem just or proper.

Dated: May 8, 2020
      New York, New York

By:    */s/ Peter S. Partee, Sr.*
        Peter S. Partee, Sr.
        Robert A. Rich
        **HUNTON ANDREWS KURTH LLP**
        200 Park Avenue
        New York, New York 10166
        (212) 309-1000
        ppartee@huntonak.com
        rrich2@huntonak.com

        *Attorneys for Finance of*
        *America Reverse LLC*

**724**