# 1:21-cv-10038-LAK

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

In re DITECH HOLDING CORPORATION, *et al.*

FINANCE OF AMERICA REVERSE LLC, Appellant,

v.

MORTGAGE WINDDOWN LLC, AS PLAN ADMINISTRATOR, Appellee.

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (GARRITY JR., J.)

IN RE DITECH HOLDING CORPORATION, *ET AL.,* CASE NO. 19-10412 (JOINTLY ADMINISTERED)

===============================================================

## APPELLANT FINANCE OF AMERICA REVERSE LLC'S
## APPENDIX VOLUME II OF II (725-1561)

===============================================================

Peter S. Partee, Sr.
Robert A. Rich
**HUNTON ANDREWS KURTH LLP**
200 Park Avenue
New York, New York 10166
(212) 309-1000
ppartee@huntonak.com
rrich2@huntonak.com

*Counsel for Appellant Finance of America Reverse LLC*

Dated: January 18, 2022

# TABLE OF CONTENTS[1]

| Document Title | Date of Filing | Bankr. Dkt. No. | App. Page |
|---|---|---|---|
| Memorandum Decision and Order signed on 10/21/2021 Sustaining Fifty-Second Omnibus Objection to Proofs of Claim (Misclassified Claims) with respect to Claims of Liberty Home Equity Solutions, Inc. and Finance of America Reverse LLC | October 21, 2021 | 3741 | 1 |
| Declaration of Gerald A. Lombardo Pursuant to Rule 1007-2 of Local Bankruptcy Rules for Southern District of New York | February 11, 2019 | 2 | 27 |
| Order Establishing Deadline for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof | February 22, 2019 | 90 | 168 |
| Order Further Extending General Bar Date for Filing Proofs of Claim for Consumer Borrowers Nunc Pro Tunc | May 2, 2019 | 496 | 191 |
| Amended Disclosure Statement for Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors | May 10, 2019 | 543 | 195 |
| Order Confirming Third Amended Chapter 11 Plan | September 26, 2019 | 1404 | 474 |

---

[1] Certain items in the record relate solely to the appeal filed by Liberty Home Equity Solutions, Inc. (Case No. 21-10221-LAK), which has been dismissed. With the exception of those items, Appellant has included the entire record of appeal in this appendix because (i) the record is not overly voluminous, (ii) most of the items are relevant to Appellant's opening brief, and (iii) the Court's individual rules require that Appellant provide the Court with a courtesy copy of the record on appeal.

| Document Title | Date of Filing | Bankr. Dkt. No. | App. Page |
|---|---|---|---|
| Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and its Affiliated Debtors | September 26, 2019 | 1404-1[2] | 585 |
| Notice of (I) Entry of Order Confirming Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors, (II) Occurrence of Effective Date, and (III) Final Deadline for Filing Administrative Expense Claims | September 30, 2019 | 1449 | 667 |
| Order Approving (I) Claims Objection Procedures and (II) Claim Hearing Procedures | November 19, 2019 | 1632 | 670 |
| Notice of Appointment of Successor Plan Administrator | December 3, 2019 | 1653 | 687 |
| Fifty-Second Omnibus Objection to Proofs of Claim (Misclassified Claims) | April 17, 2020 | 2186 | 689 |
| Finance of America Reverse LLC's Response to Fifty-Second Omnibus Objection to Proofs of Claim (Misclassified Claims) | May 8, 2020 | 2315 | 710 |
| Transcript of Hearing Held on 10-29-2020 | November 2, 2020 | 2940 | 725 |
| Memorandum Decision and Order Granting Plan Administrator's Sixth Omnibus Motion to Enforce the Plan Injunction and Confirmation Order as It Relates to Gautam and Panthobi Sharma | November 11, 2020 | 3034 | 837 |

---

[2] The *Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and its Affiliated Debtors* also was filed on September 22, 2019 at Bankruptcy Court Docket No. 1326.

| Document Title | Date of Filing | Bankr. Dkt. No. | App. Page |
|---|---|---|---|
| Reply of Plan Administrator of Support of Fifty-Second Omnibus Objection with Respect to Claims of Finance of America Reverse LLC (Claim Nos. 21347 and 60182) and Liberty Home Equity Solutions, Inc. (Claim No. 60214) | December 11, 2020 | 3076 | 858 |
| Transcript of Hearing Held on 12-17-2020 | December 18, 2020 | 3116 | 897 |
| Transcript of Hearing Held on 1-28-2021 | February 1, 2021 | 3206 | 1061 |
| Notice of Appeal of Finance of America Reverse LLC | November 3, 2021 | 3754 | 1147 |
| Finance of America Reverse LLC Claim No. 21347 | April 25, 2019 | Claim No. 21347 | 1183 |
| Finance of America Reverse LLC Claim No. 60182 | November 11, 2019 | Claim No. 60182 | 1206 |
| *In re Aralex Pharmaceuticals US Inc.*, Case No. 18-12425 (Bankr. S.D.N.Y. Aug. 27, 2018), Debtors' Omnibus Motion #1 For Order: (A) Authorizing Rejection Of Certain Executory Contracts *Nunc Pro Tunc* To The Petition Date; (B) Authorizing Rejection of Certain Unexpired Leases Effective As Of August 31, 2018; and (C) Granting Related Relief [ECF No. 61] | N/A | N/A | 1218 |
| *In re Aralex Pharmaceuticals US Inc.*, Case No. 18-12425 (Bankr. S.D.N.Y. Sept. 14, 2018), Omnibus Order #1: (A) Authorizing Rejection Of Certain Executory Contracts *Nunc Pro Tunc* To The Petition Date; (B) Authorizing Rejection of Certain Unexpired Leases Effective As Of August 31, 2018; and (C) Granting Related Relief [ECF No. 102] | N/A | N/A | 1240 |

| Document Title | Date of Filing | Bankr. Dkt. No. | App. Page |
|---|---|---|---|
| *In re Sound Shore Medical Center of Westchester,* Case No. 13-22840 (Bankr. S.D.N.Y. Jul. 30, 2013), Debtors' Motion For An Order Pursuant To Section 365 Of The Bankruptcy Code Authorizing Debtors To Reject Certain Executory Contracts, *Nunc Pro Tunc,* To The Date Of Termination Or The Filing Date Of This Motion, Whichever Is Earlier [ECF No. 215] | N/A | N/A | 1245 |
| *In re Sound Shore Medical Center of Westchester,* Case No. 13-22840 (Bankr. S.D.N.Y. Jan. 6, 2014), Order Pursuant To 11 U.S.C. § 365 Approving Rejection Of Executory Contracts [ECF No. 525] | N/A | N/A | 1257 |
| *In re Eastman Kodak Company*, Case No. 12-10202 (Bankr S.D.N.Y. Jan. 31, 2012), Debtors' Motion For An Order Authorizing Rejection Of Certain Executory Contract *Nunc Pro Tunc* to January 31, 2012 [ECF No. 172] | N/A | N/A | 1259 |
| *In re Eastman Kodak Company*, Case No. 12-10202 (Bankr S.D.N.Y. Feb. 15, 2012), Order Authorizing Rejection of Certain Executory Contract Nunc Pro Tunc to January 31, 2012 [ECF No. 372] | N/A | N/A | 1278 |
| Motion of the Debtors for Interim and Final Orders (I) Authorizing Debtors to Continue Honoring Reverse Issuer and Servicer Obligations in the Ordinary Course and Granting Related Relief, (II) Modifying Automatic Stay on a Limited Basis to Facilitate Debtors' Ongoing Operations, and (III) Scheduling a Final Hearing | February 11, 2019 | 10 | 1283 |

| Document Title | Date of Filing | Bankr. Dkt. No. | App. Page |
|---|---|---|---|
| Final Order (I) Authorizing Debtors to Continue Honoring Reverse Issuer and Servicer Obligations in the Ordinary Course and Granting Related Relief and (II) Modifying Automatic Stay on a Limited Basis to Facilitate Debtors' Ongoing Operations | March 21, 2019 | 229 | 1356 |
| Schedules of Assets and Liabilities for Reverse Mortgage Solutions, Inc. | March 28, 2019 | 308 | 1380 |

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5

6    In the Matter

7    DITECH HOLDING CORPORATION,          Case No. 19-10412-jlg

8              Debtor.

9    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10

11

12

13                   United States Bankruptcy Court

14                   One Bowling Green

15                   New York, New York 10004-1408

16

17                   October 29, 2020

18                   11:00 AM

19

20

21   B E F O R E:

22   HON. JAMES L. GARRITY, JR.

23   U.S. BANKRUPTCY JUDGE

24

25

Page 2

1    IN RE:   Case Conference (Doc. #57).

2

3    IN RE:   Consumer Claims Trustee's Twenty-Ninth Omnibus

4    Objection to Proofs of Claim (Insufficient Legal Basis

5    Unsecured Consumer Creditor Claims) (Doc. #2837).

6

7    IN RE:   Consumer Claims Trustee's Thirtieth Omnibus

8    Objection to Proofs of Claim (Insufficient Legal Basis

9    Unsecured Consumer Creditor Claims) (Doc. #2836).

10

11   IN RE:   Consumer Claims Trustee's Thirty-First Omnibus

12   Objection to Proofs of Claim (Insufficient Legal Basis

13   Unsecured Consumer Creditor Claims) (Doc. #2838).

14

15   IN RE: Sixty-Third Omnibus Objection to Proofs of Claim (No

16   Basis Consumer Creditor Claims) (Doc. #2840).

17

18   IN RE: Sixty-Fourth Omnibus Objection to Proofs of Claim (No

19   Basis Consumer Creditor Admin Claims (Doc. #2841).

20

21   IN RE: Plan Administrators' Amended Seventh Omnibus Motion

22   to Enforce the Plan Injunction and Confirmation Order

23   (Doc. #2873).

24

25

Page 3

1     IN RE: Forty-Ninth Omnibus Objection to Proofs of Claim

2     (Misclassified Consumer Creditor Claims) (Doc. #2149).

3

4     IN RE: Plan Administrators' Sixth Omnibus Motion to Enforce

5     the Plan Injunction and Confirmation Order (Doc. #2656).

6

7     IN RE: Motion to Clarify filed by Burton Dezihan (Doc.

8     #2744).

9

10    IN RE: Motion for Relief from Stay (Doc. #2814).

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed By:  Pamela A. Skaw and Jamie Gallagher

1    A P P E A R A N C E S :

2    WEIL, GOTSHAL & MANGES, LLP

3          Attorneys for Debtors

4          767 Fifth Avenue

5          New York, NY 10153-0119

6

7    BY:  DAVID HILL, ESQ.

8          SUNNY SINGH, ESQ.

9          RICHARD W. SLACK, ESQ.

10          CLIFF SONKIN, ESQ.

11

12    CADWALADER WICKERSHAM & TAFT, LLP

13          Attorneys for National Founders

14          200 Liberty Street

15          New York, NY 10281

16

17    BY:  INGRID BAGBY, ESQ.

18          RICHARD SOLOW, ESQ.

19

20

21

22

23

24

25

1    PACHULSKI, STANG, ZIEHL & JONES

2         Attorney for GUC Trust

3         780 Third Avenue

4         34th Floor

5         New York, NY 10017

6

7    BY:  BETH LEVINE, ESQ.

8

9

10   TANNENBAUM HELPERN SYRACUSE & HIRSCHTRITT, LLP

11        Attorney for Gautam & Panithobi Sharma

12        900 Third Avenue

13        New York, NY 10022

14

15   BY:  MICHAEL RIELA, ESQ.

16

17   Consumer Claims Trustee

18        8 The Green

19        Suite 7028

20        Dover, DE 19901

21

22   BY:  TARA TWOMEY

23

24

25

1    JENNER & BLOCK, LLP

2         Consumer Claim Trustee

3         919 3rd Avenue

4         New York, NY 10022

5

6    BY:  Richard Levin, ESQ.

7

8    HUNTON ANDREWS KURTH LLP

9         Attorney for Finance of America

10         200 Park Avenue

11         New York, NY^ 10166

12

13    BY:  ROBERT RICH, ESQ.

14

15

16    ALSO PRESENT:

17    HILDA HUTCHINSON

18    TIM CONKLIN

19    BURTON DEZIHAN

20    CHERANE PEFLEY

21

22

23

24

25

Page 7

1                    P R O C E E D I N G S

2              THE COURT:  All right.  Good morning.  It's

3      Judge Garrity.  I apologize for keeping you waiting.

4              We're here this morning in connection with the

5      Dietech Holding Corp., case number 19-10412.

6              Mr. Singh, or one of your colleagues, is going to

7      get us started.  Why don't we -- why don't we get going?

8              MR. SINGH:  Yes. Good morning, Your Honor.

9              Sunny Singh, Weil Gotschal on behalf of the

10     Debtors.

11             Your Honor, we did file an agenda, an amended

12     agenda, excuse me, for this hearing.  So if it's okay with

13     Your Honor, I'd propose to just move down the order of the

14     agenda?

15             THE COURT:  I think that's fine.  But when we get

16     to the contested matters, I would like to take the Sharma

17     matter last.

18             MR. SINGH:  Understood, Your Honor.  No problem

19             THE COURT:  Okay.

20             MR. SINGH:  So, Your Honor, first is really just a

21     case status conference and I believe a number of parties are

22     on the line for that.

23             I think one thing we wanted to discuss, really the

24     issue we wanted to discuss with Your Honor and if any other

25     parties who -- who have dialed in, is just scheduling of the

Page 8

```
 1    various contested claims objections that have not yet been

 2    heard that, you know, per the claims procedures orders are

 3    automatically continued until -- until they are scheduled by

 4    the Debtors, obviously subject to the Court's availability

 5    and the coordination with the opposing side.

 6            So we did file our letter, Your Honor, and we

 7    filed an amended exhibit yesterday as well that shows, in

 8    the amended exhibit, just the relevant -- the relevant

 9    pleadings.  So it may be a little easier for the Court and

10    -- and parties to follow along.

11            Just one thing I would note, Judge, there --

12    there's one objection that's not on here that we've

13    communicated with counsel, the Cadwalader team.  I think

14    they're on the line, is National Founders.  That objection,

15    the Debtors are scheduling for the November 19th omnibus

16    hearing and we intend to file our reply.  Will hit the

17    docket no later than tomorrow, Judge.  So then everybody

18    will have plenty of time to see -- to see that.

19            So that's just not on here but we -- we have

20    cleared the date at least with chambers and had advised

21    counsel with respect to that matter on the timing.

22            THE COURT:  All right.

23            MR. SINGH:  As to the other matters, Your Honor,

24    what I would just say is with respect to Finance of America

25    and I think there is a similar, although obviously there's
```

Page 9

1    -- they're separate -- they're, you know, separate claims,

2    separate entities, Liberty Home.

3           Your Honor, we would request a status conference

4    on the 19th.  We'll get our pleadings on file in advance,

5    you know, by the 12th of November, per the claims

6    procedures.  We wouldn't go forward on the merits, just a

7    status conference so that, Your Honor, we can apprise you of

8    the issues.

9           I'd -- you know, from our perspective, I don't

10   think discovery will be necessary but, you know, if the --

11   if the opposing -- if the claimants have a difference view,

12   we'll obviously coordinate in advance.

13          But if there's a difference of opinion, we'll --

14   we'll have a conference with Your Honor on the 19th; if

15   that's okay.

16          THE COURT:  And that's Finance America and Liberty

17   Home?

18          MR. SINGH:  Yes.  Numbers one and four in the --

19          THE COURT:  Wait one second, please.

20          MR. SINGH:  -- in the exhibit, Your Honor.

21      (Pause)

22          THE COURT:  All right.  Status conference on the

23   19th.

24          MR. SINGH:  And then as to the remaining

25   objections, Your Honor, what -- what we've included here,

Page 10

1    there are more than this that are contested, but what we've

2    included here on this initial list is everything above, all

3    of the claims objections that relate -- that have amounts in

4    dispute in excess of $100,000.

5              THE COURT:  Great.

6              MR. SINGH:  And so, you know, Your Honor, what we

7    would propose or request is to start scheduling some of

8    these, you know, hopefully one or two a month, subject to

9    clearing them with Your Honor in advance and your chambers

10   at the upcoming omnibus hearings; not on the November

11   hearing obviously.  We -- you know, that would just be

12   National Founders and the status conference.

13             But thereafter to start scheduling them and see if

14   we can also schedule a claims omnibus hearing and that's

15   really all we wanted to discuss with Your Honor and then we

16   would, you know, obviously send notice to the claimants, you

17   know, if and when their hearing is going to be scheduled as

18   we've been doing to date.

19             THE COURT:  All right.  Well, first, I thank you

20   for putting together the schedule.  I unfortunately was not

21   able to look at it until just, you know, a little while ago.

22             So what we will do is we will go through them, on

23   our end, and then reach out to you and see if you can't

24   start scheduling (indiscernible) to these, you know,

25   according to your --

Page 11

1          I appreciate that this is taking longer --

2    certainly longer than I would like and I'm sure longer than

3    any of you would like.

4          But we're doing what we can and we'll continue to

5    do so.

6          So we have -- what we'll be doing on the 19th,

7    we'll have the National Founders and then the other stuff,

8    the status on Finance America and Liberty and between now

9    and then we'll be in touch with you to try to map out a

10   schedule for the other -- the remaining over a hundred

11   thousand; all right?

12         MR. SINGH:  Yes.  Thank you very much, Judge.

13         THE COURT:  All right.  Good.

14         MR. SINGH:  Okay, Your Honor.

15         So then, moving along, on the agenda, I'll turn it

16   over.  We've got uncontested claims starting with various

17   objections filed by the Consumer Claims Trustee.

18         I'll turn it over to Mr. Levin.

19         THE COURT:  All right.  Fine.  Thank you.

20   Mr. Levin.

21      (Pause)

22         THE COURT:   All right.  Mr. Levin, are you

23   there?

24         MR. LEVIN:  Apologies.  On mute.  (Indiscernible)

25   problem.  I was trying to behave by being on mute and that's

Page 12

1    what happened.

2            Good morning.  This is Richard Levin, Jenner &

3    Block, LLP, for (indiscernible) consumer claims trustee

4    appearing for items two, three and four on the agenda which

5    are the twenty-ninth, thirtieth and thirty first omnibus

6    objections to proofs of claims.

7            So taking item two first, this is the Twenty-ninth

8    omnibus objection.  On this, Your Honor, we have received 12

9    responses; 1 formal and 11 informal.  They are listed on the

10   agenda.

11           Since there are quite a number, I'll take the

12   Court's guidance on whether you would like me to read them

13   into the record as well.

14           THE COURT:  No.  You have -- if we have the

15   adjourned responses with the -- on the agenda, that would be

16   (A) through -- (A) through (L)?

17           MR. LEVIN:  Yes.

18           THE COURT:  All right.  So we can just incorporate

19   that.  I don't think there's any need for you to lay it out

20   on the -- on the record.

21           MR. LEVIN:  And there was one proof of claim as to

22   which we withdrew the objection.  That's item (m) on the

23   agenda.

24           THE COURT:  All right.

25           MR. LEVIN:  So except with respect to those 13

Page 13

1    claims, we ask that the objections be granted as there's

2    been no opposition other than with respect to those 13.

3            THE COURT:  Your request is granted.  You'll

4    please submit the order.

5            MR. LEVIN:  We will do so.

6            Item three, Consumer Claims Trustee's thirtieth

7    omnibus objection, we received only two --

8            THE COURT:  I'm sorry.  I'm sorry, Mr. Levin.  Did

9    you say thirtieth?

10           MR. LEVIN:  Thirtieth, 3-0.

11           THE COURT:  Yes.  Thank you.

12           MR. LEVIN:    That's item three on the agenda.

13           THE COURT:  Yes.

14           MR. LEVIN:  We've received two informal responses

15    listed on the agenda, items (A) and (B) and we have

16    withdrawn the objection as to one claim and that is item (C)

17    on the agenda and except with respect to those three, we've

18    received no responses and the objection is uncontested and

19    we ask that it be granted.

20           THE COURT:  It's granted as requested.  You'll

21    submit the order, please.

22           MR. LEVIN:  We will do so.

23           Item four on the agenda, the Consumer Claims

24    Trustee's thirty-first omnibus objections.  We have received

25    no responses and so we ask that this objection be granted in

Page 14

1    full.

2              THE COURT:  Your request is granted.  You'll

3    submit the order, please.

4              MR. LEVIN:  We will do so.

5              With that, Your Honor, I have nothing further on

6    the agenda and ask that I be excused.

7              THE COURT:  Yes.  Thank you very much for dialing

8    in.  And, again, sorry for keeping you waiting.

9              MR. LEVIN:  Thank you, Your Honor.  Bye.

10             MR. SINGH:  Your Honor, my -- this is

11   Sunny Singh.

12             My colleague, Cliff Sonkin, is going to handle the

13   next couple of items.

14             THE COURT:  All right.  Mr. Sonkin.

15             MR. SONKIN:  Good morning, Your Honor.

16             This is Cliff Sonkin of Weil, Gotshal and Manges

17   on behalf of the plan administrator.

18             The next item on the agenda, item number five, is

19   the sixty-third omnibus objections to proofs of claim at ECF

20   2840.

21             The sixty-third omnibus objection is filed jointly

22   with the consumer representative and seeks to disallow and

23   expunge 45 consumer claims.

24             The estate representatives and the plan

25   administrator have received four filed responses and nine

Page 15

1    additional claims -- nine additional informal responses; two

2    of which are from one party.

3                Those responses are listed on the agenda.  I can

4    read them into the record if you would like.

5                THE COURT:  No, there's no need to.  Just which --

6    on the agenda, as far as the adjourned informal responses,

7    we have (E) through (L).  Which is -- which respondent filed

8    the multiple responses?

9                MR. SONKIN:  That would be Anna and James Bowling

10   (ph), Your Honor.

11               THE COURT:  All right.  Thank you.  Thank you.

12               MR. SONKIN:  So, except with respect to the 13

13   adjourned responses to date, to a date to be determined, we

14   respectfully ask that the Court sustain the objection and

15   order that the remaining claims be disallowed and expunged.

16               THE COURT:  Your request is granted.  You'll

17   submit the order, please.

18               MR. SONKIN:  Thank you, Your Honor.

19               THE COURT:  Thank you.

20               MR. SONKIN:  The next item on the agenda is the

21   sixty-fourth omnibus objection.  That seeks to disallow and

22   expunge 14 consumer claims.

23               The plan administrator received only a single

24   informal response to this matter.

25               The plan administrator has adjourned a hearing on

Page 16

1    the matter to a date to be determined.

2            Other than that one adjourned claim, the objection

3    as to the remaining 13 claims can proceed uncontested.

4            The plan administrator respectfully asks the Court

5    to sustain the objection and order the remaining claims

6    disallowed and expunged.

7            THE COURT:  Your requested is granted.  You'll

8    submit the order, please.

9            MR. SONKIN:  Thank you, Your Honor.

10           I believe that's everything regarding the claim

11   objections from the plan administrator.

12           With that, I'd like to cede the virtual podium to

13   my colleague, David Hill.

14           THE COURT:  All right.  Thank you.  Mr. Hill.

15           MR. HILL:  Good morning, Your Honor.

16           David Hill on behalf of Weil, Gotshal & Manges for

17   the plan administrator.

18           Your Honor, we have the plan administrator's

19   seventh omnibus motion to enforce the plan injunction, ECF

20   number 2873.

21           We -- there are seven litigation parties that were

22   contained on this and, similar to the other -- the previous

23   motions brought by the plan administrator to enforce the

24   omnibus -- or to enforce the plan injunction, this just

25   seeks to enforce the plan injunction against those seven

1    parties who are maintaining litigation despite the

2    injunction.

3            We -- these parties were provided with notice

4    today.  We received no objections and no responses.

5            We would therefore ask that the Court enter the

6    omnibus motion against those parties and move to enforce.

7            THE COURT:  Your request is granted.  You'll

8    submit the order, please.

9            MR. HILL:  Thank you, Your Honor.

10            THE COURT:   Thank you.

11            MR. HILL:  I believe, Your Honor, I'm turning the

12    podium back over to my colleague, Mr. Sonkin.

13            THE COURT:  Thank you.

14            MR. SINGH:  Your Honor, actually it's going to be

15    me.  It's Sunny Singh.  Sorry for the hot potato mic here.

16    We just had a number of matters on, Judge, that we -- we're

17    working amongst the various Weil attorneys.

18            THE COURT:  No problem.

19            MR. SINGH:  Excuse me.

20            Judge, we're on -- now we're onto contested items.

21    Number eight is the plan administrator's forty-ninth omnibus

22    objections to claim.  Specifically going forward with

23    respect to the proof of claim filed by Ms. Pefley and her

24    objection.  It's at ECF 2394 and the claim, in particular,

25    Your Honor, is claim number 22049.

Page 18

1         I think Ms. Pefley may be on the phone.  I thought

2    I saw her in the tracker here.  But I don't see her now.

3    She may have been on earlier.

4         UNIDENTIFIED SPEAKER:  She's having some -- she's

5    having some issues getting on.

6         MR. SINGH:  Oh.

7         THE COURT:  All right.  All right.  We'll put her

8    at second call then or we'll --

9         MR. SINGH:  Okay.

10        THE COURT:  -- get her when -- when she's able to

11   dial in.  That's fine.

12        MR. SINGH:  Okay, Your Honor.  So I will continue

13   on.

14        THE COURT:  Okay.

15        MR. SINGH:  So then the next matter is the plan

16   administrator's sixth omnibus motion to enforce the plan

17   injunction.

18        As Your Honor noted, there was the Sharma

19   objection which we'll -- which we'll put to the end per Your

20   Honor's instructions.

21        THE COURT:  Right.

22        MR. SINGH:  So then the other response that does

23   relate to the sixth omnibus objection that's going forward

24   today is the response of Ms. Hilda Hutchinson.  Her response

25   is filed at ECF 2748.  She also filed a supplement at ECF

Page 19

1    2877.

2            I believe she's also on the phone.  So I think if

3    it's okay with Your Honor, we can proceed with this -- with

4    this particular matter.

5            THE COURT:  All right.  We may -- no, actually

6    what -- hold on one second.

7            MR. SINGH:  Sure.

8        (Pause)

9            THE COURT:  No.  Let's just move on.  Let's do

10   Dezihan and Browder, please.

11           MR. SINGH:  Okay.  So skip Ms. Hutchinson, Your

12   Honor?

13           THE COURT:  Yeah.  Just for now.  Yeah.

14           MR. SINGH:  Understood.  Okay.

15           So we are going to go to I think it's Mr.

16   Dezihan's motion --

17           THE COURT:  Yes.

18           MR. SINGH:  -- and I believe he is on the phone.

19           I'll let him -- I will cede the podium to him and

20   my colleague, Cliff Sonkin, will handle any response for the

21   plan administrator.

22           MR. DEZIHAN:  Good morning, Your Honor.  This is

23   Burton Dezihan.

24           THE COURT:  Mr. Dezihan.

25           MR. DEZIHAN:  All right.  I had a -- don't know

Page 20

1  how you want to proceed.  But I actually had a couple

2  things.

3       On the July -- it should be on the -- yeah, on my

4  July 23rd hearing, when you were talking with Mr. Taylor, a

5  couple times my name is mentioned in conjunction with their

6  case and I just wanted for the record to be notified that I

7  have no part of their claim.  If I heard correctly, my name

8  is mentioned at least twice.

9       THE COURT:  I -- so noted.  If that was done, it

10  was done -- that's certainly an error on my part.

11       MR. DEZIHAN:  Okay.  And the second motion that I

12  have also was a subpoena was submitted and received by

13  Ditech Holding Corporation for records pertaining to my

14  case.  And continuously, up until this time, I've received

15  notification that there was no validation of my claim.  And

16  I actually just received a couple weeks ago an escrow check

17  for back pay or back payment that up until this time if I

18  hadn't filed against this, I probably would have never

19  received.

20       So because Ditech has to date not responded to

21  subpoena requests, I'm requested a directed payment from

22  them in the amount of the claim.

23     (Pause)

24       THE COURT:  All right.  Mr. Sonkin.

25       MR. SONKIN:  Your Honor, for the record, this is

Page 21

1   Cliff Sonkin of Weil, Gotshal & Manges.

2          From the plan administrator's reading of

3   Mr. Dezihan's claim, his request for -- for additional was

4   not included in any of these pleadings.

5          His request for -- his second request seemed to be

6   related to notification regarding the scheduling of his

7   claim.

8          So, in that respect, I don't feel completely

9   confident speaking to what has or has not been received

10  outside of that matter.

11         THE COURT:  All right.  So, again, Mr. Dezihan,

12  what is it that you'd like today?

13         MR. DEZIHAN:  Pardon me.

14         THE COURT:  Like to accomplish?  Well, I'm just

15  trying to understand.  In your motion to clarify, you

16  clarified that you're not part of that claim that I, you

17  know, confused the thing; confused the situation, probably

18  by using your name.

19         And I'm just not sure what else it is you want to

20  resolve today.

21         MR. DEZIHAN:  Oh, I had also properly served a

22  subpoena request for records.

23         THE COURT:  No but -- excused me.  That -- but you

24  didn't put anything in the Court today with respect to that.

25         MR. DEZIHAN:  Actually I --

Page 22

| | |
|---|---|
| 1 | THE COURT:  You have (indiscernible) -- |
| 2 | MR. DEZIHAN:  Actually I was supposed to -- there |
| 3 | actually was supposed to have been heard back in September |
| 4 | but when the Court did a continuance, I didn't resubmit |
| 5 | anything else. |
| 6 | THE COURT:  Okay.  Well, then, we -- we haven't |
| 7 | looked at your claim yet.  We haven't -- |
| 8 | MR. DEZIHAN:  Okay. |
| 9 | THE COURT:  -- we haven't addressed the merits; is |
| 10 | that correct, Mr. Sonkin? |
| 11 | MR. SONKIN:  That is correct. |
| 12 | THE COURT:  Somebody -- |
| 13 | MR. SONKIN:  So we have not addressed the merits |
| 14 | of Mr. Dezihan's claims.  From my understanding, we had -- |
| 15 | Mr. Dezihan is scheduled or has put in about six claims and |
| 16 | recently we've spoken with Mr. Dezihan and been able to put |
| 17 | forward a stipulation to consolidate them into a single |
| 18 | claim. |
| 19 | That stipulation is currently in front of Your |
| 20 | Honor but has not been entered and that last -- |
| 21 | THE COURT:  Is the next one -- I'm sorry.  You |
| 22 | folks submitted that and that's just something that we have |
| 23 | here? |
| 24 | MR. SONKIN:  Correct.  I believe the ECF number |
| 25 | for that is 28 -- no.  I'm sorry.  The claim number is 2844. |

Page 23

```
 1              THE COURT:  All right.

 2              MR. SONKIN:  I can find the ECF number for you

 3     shortly.

 4              But that's submitted.  It consolidates all six of

 5     the claims into a single claim essentially and that single

 6     claim has not yet been addressed.

 7              THE COURT:  All right.  So, Mr. Dezihan, when we

 8     address the claim, then you can raise these other matters.

 9              MR. DEZIHAN:  Okay.

10              THE COURT:  It -- to the extent there are related

11     to the claim.

12              MR. DEZIHAN:  Okay.  That's fair.

13              But I also received notification with regards to

14     ECF 1632.  It was dated October 23rd, 2020.  And I want to

15     make sure that that is resolved also with the combination or

16     the inclusion of the claim 2884.

17              THE COURT:  Mr. Sonkin.

18              MR. SONKIN:  Can you repeat that number,

19     Mr. Dezihan?

20              MR. DEZIHAN:  Yeah.  UCF 1632 and that was sent by

21     Sunny Singh.  And this was dated October 23rd and I just

22     want to make sure that this is included in the record with

23     the combining of all the claims under 2884.

24              MS. TWOMEY:  Your Honor, if I may.  This is

25     Tara Twomey, the Consumer Claims Trustee.
```

Page 24

1          I believe what Mr. Dezihan is referring to is the

2     letter, the status conference letter, that was served on a

3     number of the claimants that just asks for the status

4     conference that you had earlier today and I believe that all

5     Mr. Dezihan's claims are addressed in the stipulation --

6     they're consolidated in the stipulation.  There won't be

7     anything left over except for the one claim that is

8     identified in that stipulation as the remaining live claim.

9          THE COURT:  All right.  Thank you.  All right.

10         So, Mr. Dezihan, I think that we clarified that.

11    So we still have your claims to deal with.  They've all been

12    consolidated into one claim --

13         MR. DEZIHAN:  Okay.

14         THE COURT:  -- and, you know, we'll eventually be

15    scheduling a hearing; all right?

16         MR. DEZIHAN:  No problem.  I just wanted to make

17    sure we're all on the same page.

18         THE COURT:  Terrific.  Well, thanks very much.

19         MR. DEZIHAN:  That's all I have, Your Honor.

20         THE COURT:  All right.  Thank you.  You're

21    excused.  Thank you again for calling in.

22         MR. DEZIHAN:  Thank you.

23         THE COURT:  Okay.

24         MR. SINGH:  Okay.  Your Honor, back to the agenda.

25    Sunny Singh.  That takes us to Mr. Browder's motion, item

Page 25

1    number 11 of the agenda  for relief from the automatic stay,

2    ECF 2814.

3              THE COURT:  All right.

4              MR. SINGH:  Mr. Hill from my office is going to

5    handle the response.

6              I don't know if Mr. Browder is on the phone.  I

7    thought I saw him earlier but now I'm not seeing him on the

8    dashboard.

9              THE COURT:  Ms. Rodriquez, do you have any insight

10   on that?

11             MS. RODRIGUEZ:  I never saw him on the dashboard.

12             MR. SINGH:  Oh, I apologize.  I may be mistaken,

13   Ms. Rodriguez.  I would go with her word, Your Honor, not

14   mine.

15             MS. RODRIGUEZ:  I never saw him on there.  I can

16   check --

17             THE COURT:  All right.

18             MS. RODRIGUEZ:  -- and see if he even registered.

19   If you --

20             THE COURT:  No, no, no.  It's all right.

21             MR. RODRIGUEZ:  Okay.

22             THE COURT:  It's okay.  Mr. Hill, why don't you

23   proceed?

24             MR. HILL:  Good morning, Your Honor.  David Hill,

25   Weil Gotshal on behalf of the plan administrator.

Page 26

1          Your Honor, we did send Mr. Dezihan -- or, excuse

2    me, not Mr. Dezihan, Mr. Browder an email to an email

3    address that he had previously corresponded with us on

4    Tuesday, giving him Your Honor's information and emergency

5    order 543 regarding how to dial into the hearing.

6          So we did provide him with notice that today's

7    hearing was -- was going forward and information on how to

8    dial in.

9          THE COURT:  All right.

10         MR. HILL:  If, Your Honor, we're -- we're happy to

11   proceed with our response to his -- his motion, if that --

12   if that's the Court's preference.

13         THE COURT:  Well, let's put it on second call and

14   see if he dials in.

15         So that brings us back to where we were -- where

16   we were before.

17         MR. SINGH:  Correct, Judge.

18         THE COURT:  Mr. Singh.

19         MR. SINGH:  Yeah.  If you're going back to

20   start --

21         THE COURT:  We can start with Hutchinson --

22         MR. SINGH:  Right.  You've got

23   Ms. Hutchinson and then also Ms. Pefley, where the two that

24   we moved and then we've got the Sharmas.  I think those are

25   the three that are left.

Page 27

1           THE COURT:  All right.  Well, why don't we -- if

2    Ms. Hutchinson is on, why don't we do that?

3           MR. SINGH:  Certainly, Your Honor.

4           So from the plan administrator's perspective, Your

5    Honor, this is just a motion to enforce the plan injunction.

6    I think the facts here -- Judge, she was inadvertently not

7    removed from Your Honor's order the last time because a

8    response had been submitted but just not docketed due to an

9    office error at Weil.

10          But, you know, we promptly notified the Court.  So

11   the -- the order that was entered by the Court is not

12   effective as to Ms. Hutchinson so that we could have this

13   hearing.

14          And I think the facts, from our perspective,

15   Judge, are pretty straightforward.  There is a  pending New

16   York State Court action that was commenced by

17   Ms. Hutchinson that seeks monetary relief, amongst other

18   relief.  And, solely as to the monetary relief as against

19   Ditech, there are a number of other defendants that she has

20   named there.

21          Your Honor, we submit that the plan injunction

22   applies, which essentially replaced the automatic stay,

23   which she was complying with prior to confirmation and that,

24   you know, Ms. Hutchinson should proceed through the claims

25   process with Ms. Twomey and her team as a borrower or a

Page 28

1    claim.

2            Your Honor, I think there is some issues about, or

3    objections that Ms. Hutchinson has raised about whether she

4    was noticed of or properly received notice of the plan

5    injunction and confirmation and we've laid out in the

6    papers, Judge, and filed the affidavit by EPIC and

7    Mr. Conklin's on the phone as well in case there's any

8    questions, that made it clear that, you know, we've been

9    sort of serving the same address that she has on file that

10   was also included in her proof of claim and that no sort of

11   rejection or package  undeliverable was -- was received.

12           So, you know, we believe it's been properly

13   noticed and, you know, at this point, Your Honor, I'm not

14   sure we need to debate a lot about the notice either.  I

15   mean, she's here.  The plan injunction applies.

16           You know, she submitted a proof of claim and all

17   we're trying to do is -- is have her dismiss the state court

18   action as it seeks monetary relief against Ditech and allow,

19   you know, that process -- or her to pursue her claim in the

20   bankruptcy process and through the consumer bar fund that

21   was created.

22           And as to other issues against third parties,

23   obviously, we have no issue there and she can continue to

24   pursue third parties if she wishes.

25           THE COURT:  All right.  Ms. Hutchinson --

Page 29

1              MS. HUTCHINSON:  Your Honor -- yes, Your Honor.

2    Good morning.

3              Hilda Hutchinson, pro se.

4              First, I would like to object.  I respectfully

5    object.  I respectfully request this Court to strike from

6    the record and from this action the declaration of

7    Richard W. Slack.  His last name is spelled S-L-A-C-K.

8    Attached as Exhibit 1 to the plan administrator's reply with

9    all attached exhibits and exhibits to affidavit of service

10   of Tim C-O-N-K-I-L-N, for the following reasons.

11             The plan administrator's reply, docket number

12   2917, on page three, in part states:  in support of reply,

13   the plan administrator submits a declaration of

14   Richard W. Slack, as counsel for the plan administrator,

15   attached as Exhibit 1.

16             Whereas, the declaration of Richard W. Slack do

17   not support the plan administrator's reply.  To -- to0 be

18   more precise, Richard W. Slack, his last name is spelled

19   S-L-A-C-K, declare, under the penalty of perjury, in

20   paragraph two, I submit this declaration in further support

21   of the motion -- in further support of the plan

22   administrator's sixth omnibus motion to enforce the plan

23   injunction and confirmation or the motion.

24             Based on my understanding, CPLR 2214(a) requires a

25   notice of motion, amount of (indiscernible) specified as

Page 30

1    supportive papers upon the -- upon which the motion is

2    based.

3             For the first time, on October 26, 2020, at 10:07

4    p.m., plan administrator revealed and filed declaration of

5    Richard W. Slack, which is an additional document for the

6    original motion filed July 8, 2020, not a declaration that

7    supports the plan administrator reply as the plan

8    administrator stated.

9             I reviewed declaration of Richard W. Slack where

10   he declare, under the penalty of perjury, in paragraph

11   three, attach hereto Exhibit -- Exhibit A, is a true and

12   correct copy of the April 21st, 2015 complaint filed by

13   Hilda Hutchinson in Hutchinson versus Greentree, LLC, index

14   number 5047432015.

15            Exhibit A that is attached to Richard W. Slack's

16   declaration is not true and correct complaint for index

17   number 5047432015.  It is completely false.  It it not

18   certified.  It is not authenticated.  No foundation and not

19   pursuant to CPLR rules.

20            Richard W. --

21            THE COURT:  Wait a minute.  Wait -- excuse me.

22   Excuse me.  Excuse me.

23            He attached your complaint?

24            MS. HUTCHINSON:  Yes.  He -- it's not my

25   (indiscernible).

Page 31

1           THE COURT:  All right.  You're not telling me you

2    have an objection to his attaching your complaint?

3           MS. HUTCHINSON:  I have an objection that that is

4    not the complaint.  That -- that's a false document.

5           The complaint for the case that he is -- that the

6    plan administrator is mentioning in their reply paper, has

7    114 paragraphs; that -- what he attached as Exhibit A has 49

8    paragraphs.

9           If you -- if you review his Exhibit B, Exhibit B

10   that's attached to his declaration, it shows in the lower

11   corner, docket number 1.  It says summons plus complaint was

12   filed together May 4, 2015.

13          What he attaches is -- it's a complaint with 49

14   paragraphs.  That is not the complaint for that index

15   number.

16          In addition, affidavit of service by Tim Corlin

17   (sic) do not swear or declare that the deponent service

18   Hilda Hutchinson, me, the plan injunction and confirmation

19   order or any required notice to advise me about Section 10.5

20   of the plan injunction.

21          Instead, Tim Cornin (six) affidavit was prepared

22   solely for this action.  In line two, he states -- he

23   stated, I caused to be served; and he lists various notices.

24   But he did not list that he served me any plan injunction or

25   any prior notice prior to the Plan administrator bringing

1    this motion.

2            Plan administrator brought motion docket 2656

3    lists me as litigant party number 16 for stay action with

4    New York Supreme Court Appellate Division, Second

5    Department, docket number 201811 (indiscernible) 4.

6            THE COURT:  Excuse me.  Excuse me.

7            MS. HUTCHINSON:  So --

8            THE COURT:  Ms. Hutchinson, excuse me.  Look.

9            MS. HUTCHINSON:  Yes.

10           THE COURT:  You -- what you're doing now in laying

11   all of this stuff out is not really helpful to me because

12   you're --

13           MS. HUTCHINSON:  Okay.

14           THE COURT:  -- zipping along -- you're zipping

15   along.  I understand what you're saying in part is that they

16   didn't --

17           MS. HUTCHINSON:  Okay.

18           THE COURT:  -- have the -- they don't have the

19   correct document attached to the reply declaration, right?

20           So if you're looking at the reply declaration,

21   right, and there are a number of exhibits.

22           MS. HUTCHINSON:  Yes.  Yes, that's -- the

23   declaration.

24           THE COURT:  And you're -- and so, excuse me, and

25   so what you are saying is that the information in their

Page 33

1    reply is inaccurate.

2              MS. HUTCHINSON:  Their reply is -- their reply is

3    inaccurate.  All the documents attached that -- the document

4    attached is false document.  It's not correct document.

5              They attached -- they attached the proof of claim

6    and on the proof of claim form -- because my understanding

7    is they brought this motion saying that I -- I have a

8    pending motion solely for monetary damages against the

9    Debtor and that they gave me notice telling me to withdraw

10   that.

11             But they did not submit any evidence to support

12   their motion that -- that what is the amount of the value

13   that I'm asking for because, in the proof of claim, where it

14   asks how much are you claiming, no value amount is stated

15   there.

16             They did not attach a complaint.  The case that

17   they mention in their motion is the case with the Appellate

18   Division.  They did not submit --

19             THE COURT:  No.  Well --

20             MS. HUTCHINSON:  -- any complaint --

21             THE COURT:  -- let me -- hold it.  Ms. Hutchinson.

22   Ms. Hutchinson.

23             MS. HUTCHINSON:  Uh-huh.

24             THE COURT:  What the Debtor is saying, let's try

25   to cut through this, right?

Page 34

```
 1              The Debtor is saying, look.  You filed a claim in

 2      the case, right?  And that claim should get resolved through

 3      the claims allowance process that's been set up under the

 4      plan.  And they're not taking, as far as I understand, right

 5      now, they're not taking issue with what's in the claim.

 6      They're not saying you don't have -- you don't have a claim.

 7              What they --

 8              MS. HUTCHINSON:  They did, Your Honor.  They filed

 9      an --

10              THE COURT:  -- (indiscernible) -- excuse.  Excuse

11      me.  Excuse me.  Let me just finish.

12              Right?  And then I'm going to ask the Debtor to

13      tell me whether or not what I'm saying is accurate.

14              What they're saying is, look, there's a lawsuit

15      that was pending at the time the case was filed.  The

16      automatic stay applied to that; now the plan injunction

17      provides -- applies to it.

18              And what they're saying is, in that, to the extent

19      that you're asking for money damages from them, not from

20      anybody else, only from them, right?  They're saying the

21      injunction prevents you from doing that but you can go and

22      you can assert your rights under the claims allowance

23      provisions, under that provision.

24              Now, Mr. Sonkin, is my summary accurate?

25              MR. SINGH:  Yes, Your Honor.  Mr. Singh.  Yes.
```

Page 35

1    That is accurate.

2            THE COURT:  Oh, Mr. Singh.  Okay.

3            MR. SINGH:  Yep.

4            THE COURT:  All right.  So, Ms. Hutchinson, right,

5    to the extent that you're concerned that -- that this is an

6    attack on your claim, it's not what's going on here.

7            All they're saying is you can't bring the monetary

8    claim against them in the state court.  You can assert a

9    claim in the bankruptcy court.  That's what they're saying.

10   That's the essence of what they're saying.

11           And in asking me to enforce the injunction,

12   they're just saying, look.  We sent you notices throughout

13   the course of the case to the addresses -- to the address

14   that you gave us.  We did all of that.

15           So you should have gotten -- there's no reason to

16   think you didn't get notice of the injunction and the other

17   issues that relates to the injunction in the plan, right?

18           And so they're saying that way we should enjoin --

19   you shouldn't be allowed to continue to pursue them for

20   damages in state court but you have the right to assert your

21   claim in bankruptcy court, right?

22           Do you have a different understanding of what

23   they're asking for?

24           MS. HUTCHINSON:  Yes, Your Honor.

25           First of all, my -- my case in the Supreme -- my

Page 36

1    case in the lower court, I seek relief if -- according to --

2    based on my affidavit that I submitted, I seek relief for

3    the Debtor (indiscernible) and misrepresentation and

4    omission and I seek relief for them to -- a permanent

5    injunction for them to stop making misrepresentation.  I

6    seek relief for them to close out the unauthorized account

7    in my name.

8              I seek an order -- I did not -- there's nothing in

9    my thing where I requested an amount.

10             Section 10.6 of the plan,  upon my information and

11   belief, said that the Debtor -- that claims do not get

12   discharged for wilful omission or false misrepresentation.

13             In the motion papers that the plan administrator

14   filed, they said that how I can go after some other funds

15   that they set aside but the claim, consumer claims, filed

16   objection to the proof of claim; to the proof of claim on

17   the ECF 2748.  No --

18             THE COURT:  Yeah.  But --

19             MS. HUTCHINSON:  Uh-huh.

20             THE COURT:  No but wait, excuse me.  But there's

21   an objection, right, and it's going to have to be resolved;

22   is that right?  Who's on for the consumer trust, please?

23             MS. TWOMEY:  Your Honor, this is Tara Twomey.

24   That's correct.  There's an objection pending to her claims.

25             THE COURT:  All right.  So, Ms. Hutchinson, your

Page 37

1   claim -- the -- you filed the claim in the case as you

2   should.  It hasn't been -- there's an objection filed.  It

3   hasn't been resolved and there'll be an opportunity for a

4   hearing on it.

5           MS. HUTCHINSON:  So --

6           THE COURT:  And -- now, Mr. Singh.  Mr. Singh, as

7   all of this relates to the state court litigation, right, is

8   the -- the Debtor is not challenging, through this motion,

9   Ms. Hutchinson's rights to seek injunctive relief there; is

10  that correct?

11          MR. SINGH:  That's correct, Judge.  It's just as

12  to the monetary relief.

13          THE COURT:  Thank you.  Right.

14          And, so, Ms.  Hutchinson, you have those claims as

15  it relates to the injunction and -- such as you've raised in

16  state court.  You just -- they're asking me to enjoin you

17  consistent with 10.5 of the plan from pursuing any monetary

18  damages against them and their rationale is that the place

19  to get that done is in the state court, where you've already

20  started doing that.

21          So that's where we are, right?  And do you have a

22  different understanding?

23          MS. HUTCHINSON:  My understanding is my claim

24  against the Debtor are non-dischargeable because it's for

25  the Debtor wilful omission and false representation.  It's

Page 38

1    not --

2            THE COURT:  Right.

3            MS. HUTCHINSON:  -- request a dollar amount from

4    the Debtor.  I requested that the Debtor close and remove

5    the unauthorized account from my name.  I did -- I am not a

6    borrower with the Debtor.  I never received any money from

7    the Debtor.  I do not have a contract with the Debtor.

8            So if the Debtor is willing today to grant me the

9    request in my cross-motion that -- that I am not a borrower

10   with them.  I do not have a loan with them and I submitted

11   all the evidence to support.  They did not object to any of

12   the evidence that I submitted.

13           They did not submit any evidence to show the

14   motion to support, the motion that they served me any notice

15   of any plan injunction.  They did not submit any evidence to

16   prove that my case in the Appellate Division is for any

17   dollar amount against them.

18           They did not -- they did not reject --

19           THE COURT:  Look.  Look, wait a second.  Wait.

20   Ms. Hutchinson, you are seeking damages against them in the

21   Appellate Division, correct?

22           MS. HUTCHINSON:  What I'm seeking against them is

23   (indiscernible) --

24           THE COURT:  No, no, no, no.  Just answer -- excuse

25   me, answer my question, please.  Are you seeking monetary

Page 39

1   damages against the Debtor?

2           MS. HUTCHINSON:  Your Honor, I'm not a lawyer.

3   I'm not a judge.  I filed my complaint and I just said what

4   they did to me.  They created this account in my name.

5           THE COURT:  Yeah.

6           MS. HUTCHINSON:  I request that account to be

7   closed.  I request for them to stop saying that I -- I am a

8   -- I have a contractual obligation to this account when all

9   the evidence proved that I do not have a contractual

10  obligation to that account; whether it leads to money, I do

11  not know.  I'm not a judge and I'm not an experience lawyer.

12  I just basically wrote what they did and what I did.

13          THE COURT:  Yeah.  Okay.

14          MS. HUTCHINSON:  Even if --

15          THE COURT:  Well, under the --

16          MS. HUTCHINSON:  -- (indiscernible) that I --

17          THE COURT:  (indiscernible) then -- excuse me.

18  Then I'm going to help you, not help you.  I'm going to

19  address this this way.

20          To the extent you're seeking monetary relief

21  against them, in the state court, right, you're enjoined

22  from doing it.  You can't continue to do it.

23          Any other relief you want from them, as it relates

24  to affirmative relief from an injunction et cetera that

25  you're asking for, that's not subject to the injunction and

1    thus it's -- they're not entitled to the -- to relief under

2    10.5 as it relates to those matters.

3              So I'm going to sustain their objection and their

4    request for relief as against you.  You have an opportunity

5    to file the claim.  You have filed the claim.  It's the

6    subject of an objection and that objection will be dealt

7    with.

8              And to the extent that you have issues with that,

9    you can take it up with Ms. Twomey informally or, if there's

10   a formal objection filed, you know, do that in a formal way.

11             So that's how we're going to resolve this aspect

12   of the Debtor's motion, excuse me, the Debtor's request for

13   enforcement of the plan injunction.  Okay?

14             So, most respectfully, Ms. Hutchinson, your

15   objection is overruled and I'm granting the relief I've just

16   set forth on the record.  All right?

17             MS. HUTCHINSON:  And what about the cross-motion?

18             THE COURT:  Denied.

19             MS. HUTCHINSON:  Okay.

20             THE COURT:  All right?  Thank you.

21             MR. SINGH:  Your Honor, the -- thank you, Your

22   Honor.

23             The next item on the agenda, I think if we can go

24   back to Ms. Pefley.

25             THE COURT:  All right.  Is Ms. Pefley on?

Page 41

1          MR. SINGH:  I'll try to see if she is joined.  I

2    do see her on, Your Honor.

3          MS. PEFLEY:  Yes.

4          MR. SINGH:  Okay.

5          THE COURT:  Oh, great.  Good morning.

6          MS. PEFLEY:  Good morning.

7          THE COURT:  All right.  Go ahead.

8          MR. SINGH:  Your Honor, if I could just set the --

9    again, it's Sunny Singh for the plan administrator.  If I

10   could just lay out the plan administrator's position with

11   respect to this claim.

12         Your Honor, I think this is pretty

13   straightforward.

14         Ms. Pefley has asserted a claim in the amount of

15   $90 million and I think really the only issue before the

16   Court is quite narrow.

17         The claim has been asserted as a priority claim

18   under Section 507(A)(3) of the Bankruptcy Code.  It's a

19   litigation-related claim.

20         And, Your Honor, our position is quite simply that

21   it's not a priority claim under 507(A)(3) which relates to

22   involuntary Chapter 11 cases and, you know, what's referred

23   to colloquially as gap claims during that period between the

24   involuntary and when an order for relief is granted.

25         As Your Honor is aware, there -- you know, this

1    was not an involuntary case.  It was a voluntary case

2    commenced by the Debtor so those provisions simply are

3    inapplicable.

4           Your Honor, we're not taking any position or view

5    of -- as to Ms. Pefley's claim insofar as it would be

6    asserted as a borrower pre-petition unsecured claim.  You

7    know, that's obviously -- Ms. Twomey as the consumer

8    representative, still main, and she'll address that claim in

9    due course.

10          But, Your Honor, it's really the narrow relief

11   that we seek is to reclassify the claim or disallow it to

12   the extent it's asserted as a priority claim under

13   507(A)(3).  You know, Ms. Pefley can continue to prosecute

14   it as a general unsecured claim against the consumer

15   borrower funds that have have been made available under the

16   plan and, of course, Your Honor can appreciate it, it's a

17   quite a significant dollar amount in the $90 million, which,

18   you know, until it's addressed and stricken from the

19   priority bucket, you know, the plan administrator has to

20   reserve for that claim which -- which delays significantly

21   distributions to term loan lenders.

22          So, Judge, that's the narrow relief we're seeking.

23   We're not looking to get into the merits of the claim beyond

24   that it simply is not, by definition, a priority claim under

25   507(A)(3) because this is a voluntary not an involuntary

Page 43

1   case.

2           THE COURT:  Right.  Now, Ms. Pefley --

3           MS. PEFLEY:  Yes.

4           THE COURT:  --  your claim arises out of the

5   litigation that was pending prior to the filing of the

6   bankruptcy case and all the litigation that you've had with

7   the Debtors in Florida and I've got your papers, the -- your

8   reply and I'm well aware of the allegations and the -- your

9   track record in Florida and I don't mean that in a negative

10  way at all.  But you've had a number of matters and you've

11  had some success in the -- in those courts as it relates to

12  the Debtor and sometimes not so successful.

13          But you understand, please, that when you filed

14  your claim, what you did is you checked the box that showed

15  that asserted was a claim, a priority claim, under

16  507(A)(3).  That was something you did.  You indicated that

17  it was a litigation claim and you thought it was a priority

18  claim.

19          And I can tell you that your pre-petition claim,

20  just as a matter of bankruptcy law, right, you can assume

21  the -- your claim is valid, right?  I'm not suggesting it's

22  valid but, just for the purposes of our discussion, because

23  as Ms. Singh said, they're not challenging the dollar amount

24  of the claim right now.  And that may be something that the

25  -- gets looked at later on.

Page 44

1          It's really just a question of whether its

2     entitled to this priority.  And the priority only arises

3     when you have an involuntary bankruptcy case and, as you

4     know, this case was not -- the case -- well, the case is a

5     lot of things but an involuntary filing, it was not.

6          And, so, under 507(A)(3), just by definition,

7     based upon the way that the courts have looked at 507(A)(3),

8     and what's provided in the statute, your claim is not

9     entitled to Section 507(A)(3) priority.  Just as a matter of

10    law.

11         As the Debtor correctly notes that under Section

12    507(A)(3), under the Bankruptcy Code, it provides a third

13    priority for unsecured claims arising under Section 503(F)

14    of the Code.

15         And that 502(F) provides that in an involuntary

16    case, the creditor may be entitled to a claim that arose in

17    the ordinary course of the Debtor's business or financial

18    affairs after the commencement of the case but before the

19    earlier of the appointment of a trustee in the order for

20    relief.  That's at 11 U.S.C. Section 502.

21         Now, you have an unsecured claim.  So you have

22    part of it.  So you meet part of that definition but you

23    don't meet the second part, right?  Because your claim did

24    not arise in the ordinary course of the Debtor's business

25    after the commencement of an involuntary case.

Page 45

1            And so that -- and for that reason, your claim

2     doesn't qualify for the treatment under 507(A)(3).  It's not

3     what we refer to as a gap claim.

4            And so 507 -- 502(F) was intended to protect

5     creditors who deal with an involuntary debtor during the gap

6     period, such as lessors, trade creditors and similar

7     parties.  See, In Re. Howrey, LLP, 534 B.R. 374 at 375.  And

8     that court is citing to In Re. Hanson Industries, Inc., 90

9     B.R. 405 at 413.

10           Gap claims can be allowed when there is -- only

11    when there is an involuntary bankruptcy case.  And that's In

12    Re. V.W.G.K. Restaurant, Inc., 20 Fed. at 733 at 734.

13    That's a Ninth Circuit Court of Appeals, 2001.

14           So, Ms. Pefley, because --

15           MS. PEFLEY:  Yes.

16           THE COURT:  -- this case was not a -- not an

17    involuntary case, right, by definition, you're not entitled

18    to a priority claim under Section 507(A)(3).

19           Also there's nothing in your claim -- yours is a

20    pre-petition claim.  And so there's no basis for according

21    it any priority.  You've got your claim.  You can -- have

22    the right to assert it as is set forth under the plan, the

23    right set forth in under the plan to assert it against the

24    fund that's been set up for consumer creditors like

25    yourself.

Page 46

1             But, again, that's not what's in front of me

2    today.  All that's in front of me is whether or not your

3    claim is a priority claim and, as I said, I reviewed all

4    your papers and my -- I find that it's not a priority claim;

5    all right?

6             MS. PEFLEY:  Thank you, Your Honor.

7             THE COURT:  All right.  Thank you very much.

8    Ms. Singh --

9             MS. PEFLEY:  Thank you.

10            THE COURT:  -- you'll submit an order.

11            MR. SINGH:  Right.  Yes.

12            THE COURT:  All right.  Very good.  Thank you.

13            MR. SINGH:  We will.  Thank you, Your Honor.

14   Thank you, Ms. Pefley.

15            So, Your Honor, that brings us -- so I think we've

16   got two matters left for today now.  It's Mr. Browder and

17   then also the plan administrator's injunction motion as it

18   relates to the Sharmas.

19            THE COURT:  Yeah.  So what --

20            MR. SINGH:  I don't --

21            THE COURT:  -- I'd like to do --

22            MR. SINGH:  Sorry, Your Honor.

23            MS. PEFLEY:  May I be excused from the Court,

24   please?

25            THE COURT:  Yes.  Ms. Pefley, again, thank you for

Page 47

1     dialing in.  Yes, you are excused.

2              MS. PEFLEY:  Thank you.

3              THE COURT:  Sure.  Okay.  So, Mr. Singh, my

4     understanding is that Mr. Browder never -- did not register

5     for this.  I'd like to go forward.  I have all the papers.

6              I'll hear from the plan administrator as it

7     relates to Mr. Browder's stay relief motion.

8              MR. SINGH:  Understood.  Thank you, Your Honor.

9              Mr. Hill will present on behalf of the plan

10    administrator.

11             THE COURT:  All right.  Mr. Hill.

12             MR. HILL:  Yes, Your  Honor.  David Hill, Weil

13    Gotshal on behalf of the plan administrator.

14             Your Honor, Mr. Browder's filed his -- his motion

15    for -- what he styled as an emergency motion for lift stay

16    and that is at ECF 2814.

17             The plan administrator is a bit, not confused, but

18    it is -- Mr. Browder is a bit inconsistent in what he seeks

19    and what he pleads.

20             From our understanding of it, he seeks a lift stay

21    to pursue an outside litigation in the district court of

22    Iowa in order to seek relief, both monetary and non-monetary

23    against Ditech.

24             Mr. Browder is a bit inconsistent with that.  He

25    frames it -- he refers to the Iowa action as an ejectment

Page 48

1    action and there are references in  pleadings that Ditech is

2    (a) seeking money from him and (b) seeking to eject him from

3    his home.

4          Your Honor, as you saw in our response, neither of

5    these is true.  Based on the caption of the case, which is

6    included in his motion, and the pleadings which we've

7    attached, Mr. Browder is the plaintiff in that case and is

8    seeking monetary and other relief against Ditech.

9          Moreover, Your Honor, Ditech did not file a

10   counter claim or seek any kind of monetary relief from him

11   in that action.

12         And, thirdly, Your Honor, the case was dismissed

13   with prejudice by the district court in Iowa.  And we

14   attached that order to our pleadings -- or to our response

15   as well.

16         And, moreover, Mr. Browder, in violation of the

17   injunction, in January of 2020, moved to set aside the

18   dismissal with prejudice by the Iowa District Court which

19   was denied.

20         So, Your Honor, that case is -- has been dismissed

21   with prejudice and Mr. Browder has not appealed.  Obviously,

22   the appeal require -- our position would be the appeal would

23   also violate the injunction.  But, in any event, he has not

24   done so and the time period for him to appeal has lapsed.

25         So, he also references an ejection action.  To the

Page 49

1    extent that that refers to a third party, we don't -- that

2    would not involve Ditech and we would not take a position on

3    it.

4            But to the extent he seeks it to lift it, as

5    against Ditech, that's where the basis of our objection

6    comes in.

7            Relatedly, Your Honor, although this is not -- the

8    automatic stay is not what is applicable here, it is the

9    plan injunction, he does move to lift under the Sonnax

10   Factors and discusses them.

11           But, Your Honor, as we noted in our response to

12   Mr. Browder's relief, the Sonnax Factors entirely weigh on

13   denial of Mr. Browder's motion.

14           For example, the first one is, if a verdict or a

15   judgment has been reached that would lift the stay, Your

16   Honor, the case has been dismissed with prejudice and the

17   action terminated.

18           And, especially, two of them, Your Honor, the

19   tenth Sonnax Factor which is the judicial economy and the

20   balance of harms on the stay also entirely favor the plan

21   administrator.  There is no judicial economy in allowing

22   Mr. Browder to continue with his action that has been

23   dismissed with prejudice in Iowa and it incurs significant

24   expense and time for the plan administrator and the wind

25   down estates to deal with these multiple actions.

Page 50

1           This is especially so when Mr. Browder has filed

2    not only one proof of claim but twelve proofs of claim in

3    the bankruptcy process.  Although his proofs of claim have

4    been objected to, and a hearing was heard in March on

5    whether or not to allow them to continue, this Court has not

6    yet ruled on it.

7           But to the extent that Mr. Browder does have any

8    valid claims, the proper proceedings is, as this Court found

9    the -- the proofs of claim process.

10          So because Mr. Browder has not made a showing

11   under the Sonnax Factors for the lift of the stay or for the

12   modification of the permanent injunction, and the simply

13   judicial reality that his -- that the case that he seeks to

14   lift, either doesn't exist or has been dismissed with

15   prejudice.

16          We therefore Your Honor ask that his motion be

17   denied.

18          THE COURT:  I've had an opportunity to review

19   Mr. Browder's papers as well as the papers submitted -- the

20   reply papers submitted on behalf of the joint administrator.

21          I find that there are no grounds for granting

22   Mr. Browder the relief he is asking for.  Most significantly

23   I think the facts set forth in the document annexed to the

24   reply demonstrate that there is no action pending in Iowas.

25   There has been an action that had been commenced in a state

1    court and then removed to the Iowa District Court and that

2    action has been dismissed with prejudice by that court.  So

3    there is no pending separate action against Ditech for which

4    we would be granting a stay relief.  We agree with the plan

5    administrator's assessment of -- as it relates to the

6    pendency of the claim -- the pendency of the action; excuse

7    me.

8              We also agree with plan administrator's review and

9    assessment in the application of the Sonnax Factors in this

10   matter.

11             So for those reason, I find that there -- Mr.

12   Browder has failed to establish grounds to obtain stay

13   relief.  His motion for stay relief is denied.

14             And I would ask Mr. Hill that you settle an order

15   to that effect, please.

16             MR.  HILL:  Yes, Your Honor.  We will do so.

17             THE COURT:  All right.  Thank you.  Okay.

18             MR. SLACK:  Your Honor, Richard Slack for the plan

19   administrator.

20             THE COURT:  Yes.

21             MR. SLACK:  The last matter I believe that's on is

22   the Sharma matter which is number nine on the agenda and it

23   relates to the plan administrator's sixth omnibus motion to

24   enforce the plan injunction.

25             So would you like us to proceed?

1             THE COURT:  Yes, please.  And do we have -- do we

2    have counsel for the Sharmas on?

3             MR. RIELA:  yes, Your Honor.  This is

4    Michael Riela, Tannenbaum Helpern for the Sharms.

5             THE COURT:  Oh, thank you.  Okay.

6             MR. SLACK:  So, again, Your Honor, Richard Slack

7    from Weil Gotshal and Manges for the plan administrator.

8             Your Honor, in their objection, the Sharmas do not

9    dispute that they've filed counter claims for affirmative

10   monetary relief against Ditech in the Illinois State Court

11   in response to a foreclosure action.

12            And although the actual counter claims were filed

13   post effective date, the mortgage at issue here was entered

14   into, one, pre-petition, and it contained very typical

15   provisions that anticipate, you know, a possible foreclosure

16   action, you know, if the borrowers, here the Sharmas,

17   defaulted.

18            So the issue on this particular motion is the

19   timing of the claim here.  If a claim, as that term is used

20   under the Bankruptcy Code, arose, you know, it would be

21   considered a contingent or unmatured claim under the Code,

22   pre-effective date, then there really is no dispute that the

23   plan injunction applies.

24            So this is a timing issue today as to whether a

25   claim existed pre-effective date.  And if it did, then the

1    proper way of dealing with that claim would have been to

2    file a proof of claim in the bankruptcy on a contingent

3    claim.  And that, again, frames the dispute.

4         Here, I think the facts make a difference, and

5    they're brief but important.  As I said, in November of

6    2007, the Sharmas entered into a note and mortgage as

7    security for their property in Illinois.  That mortgage has

8    specific provisions, again very typical.  They talk about

9    the potential for bringing a foreclosure action and certain

10   procedures that need to go into filing a foreclosure action

11   or other remedies.  Again, pretty typical.

12        And what's interesting, though, Your Honor, is

13   after that mortgage was entered into in 2007, you jump a

14   long way.  You jump to April of 2019.  And that's really

15   when the dispute here arose, because at that point, the

16   Sharmas were delinquent on the mortgage.  And just to make

17   sure we're all sort of thinking of the time frame here, in

18   April of 2019, it's long before the effective date.  At that

19   time, as I'll get into, the Court is providing notice of the

20   bar date, the extended bar date, etcetera.  So this dispute

21   actually arises in April 2019.

22        And over the next couple of months after there's a

23   delinquency in April of 2019, Ditech sent a number of

24   notices of the delinquency, and those are attached to my

25   declaration that was submitted with our reply.  And just to

1    give you an example, because again I think it's important

2    here, one of the notices that was sent in May of 2019 by

3    Ditech informed the Sharmas that, "If you do not respond to

4    your lenders' notices to you regarding past due payments,

5    your lender may refer your loan to foreclosure in accordance

6    with you mortgage loan documents and applicable law."

7            So there was actually a dispute, and the prospect

8    and potential of a foreclosure action was real indefinite,

9    all the way back in April 2000 -- April, May 2019.  And of

10   course, during this --

11           THE COURT:  I'm sorry to -- I apologize for

12   interrupting you.

13           MR. SLACK:  No, that's okay.

14           THE COURT:  Why is that significant?  Let me ask -

15   -

16           MR. SLACK:  It's -- yeah.

17           THE COURT:  Go ahead.  Go ahead.  I apologize.  Go

18   ahead.

19           MR. SLACK:  So the reason it's significant, Your

20   Honor, is it's our view that that claim, that dispute arose

21   prepetition.  And so even though much of the briefing that

22   we have in our briefs, you know, discusses the Ogle line,

23   which I'm going to get to, and the ResCap line.  And we

24   think those cases completely support that this is a

25   prepetition, and in fact, pre-effective date claim.

Page 55

1            The Court, we believe, doesn't even need to reach

2       those cases, because here you had a live dispute.  The

3       claim, essentially, had already been, you know -- at that

4       time, you had a contingent or unmatured claim arising out of

5       that dispute.  So anybody who had a dispute with the debtor

6       at that time, you know, should have filed a proof of claim

7       with respect to any claim or matter arising out of that

8       dispute.

9            So our view is there's two separate routes that

10      the Court can take to finding that this is a pre-effective

11      date claim that is governed by the plan injunction.  One is

12      there was just a dispute, everybody knew it, at that time,

13      there should have been a proof of claim filed because the

14      claim arose pre-effective date.  The second, which I'll get

15      to, Your Honor, and again we briefed extensively, was the

16      Ogle and ResCap line of cases, which say that -- you know,

17      that that claim dates back all the way to the time that the

18      mortgage was entered into prepetition.

19            THE COURT:  All right.

20            MR. SLACK:  So, Your Honor, at the time in April

21      or May of 2019, the Sharmas received actual notice of the

22      bar date and the extended bar date, and we included the

23      declaration of Tim Conklin of Epiq, demonstrating that the

24      Sharmas received actual notice.  And the bar date notice

25      here also informed the Sharmas that they would have to file

Page 56

1      a proof of claim if they had a claim, as that term again is

2      defined under the Bankruptcy Code, including a contingent or

3      unmatured claim.

4            So those notices are -- the proof of claim notice,

5      for example, is at ECF 142.  The notice of extended consumer

6      borrower deadline is at ECF 586.  And, you know, in mid-

7      2019, again, the Sharmas both received notice of the bar

8      date, and the extended consumer bar date, were informed that

9      they had to file proofs of claim for any contingent or

10     unmatured claim, specifically and expressly, and were well

11     aware that they were in default on the mortgage and that

12     foreclosure was an option if they didn't bring their

13     mortgage current.

14            THE COURT:  And so what they should have done is

15     at that point filed a claim, but a damage claim, based upon

16     the possibility that in foreclosing the mortgage that Ditech

17     would do it in a defective way?

18            MR. SLACK:  Yeah.  So, Your Honor, that -- I

19     caught the intonation in your voice, but you're actually

20     exactly right.  The way the Bankruptcy, you know, Code, I

21     think, works in this situation is exactly that.  That if you

22     have a --

23            THE COURT:  Well, let me -- wait, wait, wait.  And

24     I apologize for interrupting you.

25            MR. SLACK:  Yeah.  That's okay.

Page 57

1          THE COURT:  Supposing the default didn't occur

2     until post-confirmation.

3          MR. SLACK:  I think in that case, you'd be in a

4     situation, which I'm about to argue, under Ogle and ResCap.

5     So the result would be the same, but you wouldn't have sort

6     of this dual track.  You'd have to rely solely on the Ogle

7     and ResCap line, which says that where you have a mortgage

8     or a contract like this, that a claim arising out of that

9     prepetition contract is, in fact, a prepetition claim.

10          And so moving there --

11          THE COURT:  I'm sorry.  I'm sorry to interrupt you

12     again.

13          MR. SLACK:  Okay.

14          THE COURT:  So two years from now, somebody

15     defaults, who is a consumer -- you know, borrower at the

16     time, a mortgagee at the time, you're saying that if the

17     creditors don't file contingent claims alleging -- a

18     contingent claim to address the potential breach of contract

19     on the part of Ditech, as it relates to a foreclosure,

20     they're barred now from -- that they are now barred from

21     asserting that, even if this foreclosure action doesn't

22     start for five years.

23          MR. SLACK:  Yes, Your Honor.  That is what we

24     believe that --

25          THE COURT:  Now, now, now, I'm sorry to interrupt

Page 58

1    you.  Now, when those claims get filed, and Mr. Singh is now

2    looking at all of these contingent claims, how do they get

3    resolved in the bankruptcy case?

4          MR. SLACK:  So, Your Honor, like any unmatured or

5    contingent claim, if they haven't matured at the time that

6    the claims are resolved, you know, they get resolved as a

7    zero.  So, you know, I think that what you have is just like

8    any contingent or any unmatured claims.  And of course, the

9    Bankruptcy Code defines claim broadly, and defines it to be

10   an unmatured or contingent claim, precisely to give the

11   debtor a fresh start as to monetary claim.

12         So there would be no problem using those kinds of

13   defenses as -- those kinds of things as set-offs, for

14   example, Your Honor, or defenses to the action.  And when

15   you look at the ResCap case, which is right on point, ResCap

16   makes that clear.  So there's still utility in those

17   arguments, because you can, again, use them as set off.  You

18   can use them as defenses.  But with respect to damage

19   claims, Your Honor, I think you have it exactly right, that

20   you have to file a contingent or a matured claim.  And if

21   it's not -- if it hasn't arisen at the time that the claims

22   are resolved, then you would have a zero on those claims.

23         THE COURT:  And so what the debtor would have had

24   to have done would be to what, bring it -- I guess -- it's

25   not really estimation.  You're just objecting and saying

Page 59

1    there is no claim, or there's no (indiscernible).

2           MR. SLACK:  Yes, Your Honor.  That's exactly --

3    again, that's exactly right.  And again, I point out, and I

4    know it's obvious, and I know I've said it, but you know,

5    that is the whole idea of defining a claim is including an

6    unmatured claim.  By definition, that unmatured claim, and

7    it could be any type of unmatured or contingent claim.  The

8    triggering action may not take place, but you still have to

9    file a proof of claim.  And at some point, that claim gets

10   resolved.

11          THE COURT:  And in our case, if -- well, I guess

12   in our case, you'd be saying had a claim been filed -- well,

13   let's assume a claim had been filed.

14          MR. SLACK:  Right.

15          THE COURT:  Right?  Okay?  Now, once the debtor

16   started the foreclosure -- what would have happened?  So the

17   claim gets filed.  It's filed as a contingent claim.

18          MR. SLACK:  Right.

19          THE COURT:  And now the foreclosure action is

20   going forward.  And how would you resolve that -- the

21   contingent claim?  Or would you just say, well, the

22   contingency may be resolved through the matter that's going

23   forward?  You wouldn't have to --

24          MR. SLACK:  So Your Honor, I think the -- your

25   question is a good one.  But the Bankruptcy Court has the

1    tools to do that, and in one of a couple of different ways.

2         So if there was -- if there had been a claim

3    filed, and so now you had a separate action, the Court would

4    be able to have that action potentially go forward.  But

5    quite frankly, it could do one of two things.  It could

6    resolve that issue independently, much like you could in any

7    situation as to whether or not there are attorney's fees or

8    other monetary claims that, you know, that the Sharmas had

9    against the debtors at that time -- the reorganized debtors.

10   Or the Court could, you know, agree to let that get

11   processed in the other court and come back to Your Honor

12   after that process ends.

13        But Your Honor would have the tools of the

14   Bankruptcy Court to resolve that.

15        THE COURT:  And so -- and they would come back, if

16   that was the route that was taken, you're saying then that

17   would be -- that would just be -- you would be saying it's a

18   prepetition claim.

19        MR. SLACK:  So that's correct, Your Honor.  We

20   would take the position in this case, because of the Ogle

21   and ResCap line of cases in the Second Circuit, which we

22   think are crystal clear, that that's exactly right.  That

23   that is -- that it is a prepetition claim here, and, you

24   know, would be resolved the way other prepetition claims are

25   resolved.

Page 61

1              THE COURT:  All right.  Now, in ResCap, the

2     District Court -- it seemed to me at least, the District

3     Court focused a bit on the fact that the claimants involved

4     in that litigation had a lot of notice that their claims --

5     that whatever claims -- whatever rights that could be

6     asserted against him, that the estate was preserving all of

7     that?  I think the Judge talked about the plan supplement,

8     and other instances -- or other documents, I think, in which

9     it was very clear that that was the case.

10             Now, I appreciate that here, I think as you've

11     already indicated, you believe that it was very clear that

12     there was a dispute, that there was a live dispute, given

13     the situation as it existed among the parties.

14             But just from a bigger perspective -- a broader

15     perspective, and obviously -- not obviously, but I have no

16     reason to think you would know why the District Court

17     focused on that.  But from your perspective, is that really

18     significant for the extent to which the -- I'm sorry to

19     interrupt you -- the extent to which something is left in --

20     you know, put in the plan to say, "Hey, beware.  If you

21     don't do what you're supposed to do, you know, we're

22     preserving all our rights to, you know, to sue you."  But if

23     you don't have that, it's not -- it doesn't undermine the

24     ResCap rationale?

25             MR. SLACK:  I think that's right, Your Honor.  I

Page 62

1    think that it's much like we're arguing here.  And I think,

2    again, you have it right on the nose.  I think it's

3    unnecessary.  I think under the Ogle and ResCap line of

4    cases, if you have a prepetition contract, if it's clear

5    from that contract that if you don't pay your mortgage, that

6    you're going to have a foreclosure.  And therefore, any

7    dispute arising from that, you know, relates back to the

8    prepetition time.  I think that's all that's absolutely

9    required.

10           But much like here, you had circumstances in

11   ResCap, which I think make it easier to get there, because

12   as you said in ResCap, there were certain disclosures.  Just

13   as here, you know, pre-effective date, the dispute had

14   already arisen.  There were actual notifications of

15   delinquency, talking about foreclosure back in, you know,

16   April and May of 2019.

17           So I think that those things are unnecessary, but

18   they sort of give comfort that, you know, there's actual

19   justice that's being done.  And we think there is, in fact,

20   justice, both in the rule, and in the fact that this dispute

21   was -- didn't just come after the effective date.  It had

22   been there a very long time, and the parties had been

23   communicating about it.

24           THE COURT:  All right.

25           MR. SLACK:  So Your Honor --

Page 63

1          THE COURT:  I didn't mean -- I'm sorry.  Go ahead.

2          MR. SLACK:  I was going to say, just a couple of

3    other things, which I think -- you know, I'd like to

4    address.  I know I've been going a little bit.  And that is,

5    you know, I've talked about the Ogle and, you know, ResCap

6    line, and again, we think ResCap is sort of right on point.

7          You know, but the arguments here that are, you

8    know, made by the Sharmas, and I'd like to, you know,

9    address those very quickly.  They essentially make two

10   arguments.  First, you know, they argue that their claim for

11   attorney's fees arises out of a state statute rather than a

12   contract, and therefore, it's somehow not captured by the

13   Ogle ResCap line of cases.

14         And with respect to that argument, you know, I

15   point out, because I think it's important.  There's no

16   authority, there's no case that they've cited that makes

17   that distinction, and with good reason.  You know, that

18   proposed distinction really is factually illogical, because

19   without the mortgage contract and the foreclosure action,

20   there wouldn't be any statutory claim here.  So they're all

21   wrapped up together.

22         And because of that, it's not surprising that

23   several courts, you know, including the Eastern District

24   Bankruptcy Court, have rejected precisely the distinction

25   that the Sharmas are trying to make between statutory and

Page 64

1      contractual claims that arise out of a contract.

2             We cite in our brief the Ruben case.  Again,

3      that's an Eastern District case.  And that case specifically

4      holds that although the facts of both Ogle and Travelers,

5      which is another case like Ogle, involve prepetition

6      contracts upon with the claim to attorney's fees was based,

7      the holdings of those cases also extend the claims for

8      attorney's fees and costs, which are based upon statue,

9      couldn't be clearer.

10            We cited another case from outside the Second

11     Circuit, from the Bankruptcy Court from the District of

12     Massachusetts, making that same point.  So again, we don't

13     think that that distinction has any legs under the Ogle and

14     Res Cap line.  And again, just to reiterate, we don't think

15     we have to get to the Ogle and Res Cap line for the reasons

16     that I said, because the dispute arose pre-effective date

17     here, and folks could have protected themselves.

18            Your Honor, the other argument that the Sharmas

19     urged the Court, you know, to adopt is the Ybarra rule,

20     which stems from the Ninth Circuit case In re Ybarra.  And

21     that rule holds that claims for attorney's fees and costs

22     incurred post-petition are not discharged, where post-

23     petition, the debtor voluntarily commences litigation or

24     otherwise voluntarily returns to the fray.

25            And again, in Res Cap, that Ybarra rule was

Page 65

1    rejected, and the District Court, I think, in our view very

2    wisely, recognized that the Ybarra rule is not rooted in any

3    kind of statutory interpretation, but policy considerations,

4    and that based on the Second Circuit's decision in Ogle,

5    that it was inconsistent with both the Bankruptcy Code and

6    what the Second Circuit has interpreted the Bankruptcy Code

7    as.

8               So again, we think that Res Cap, and the reasoning

9    of Res Cap, should be adopted by this court.  So with that,

10   Your Honor, unless you have any further questions, I'll

11   reserve being able to take the couple of minutes for a

12   rebuttal, if possible.  But other than that, I've concluded.

13   Thank you.

14              THE COURT:  All right.  Thank you.  Mr. Riela.  I

15   apologize if I didn't get the name.

16              MR. RIELA:  Sure, it's Riela.

17              THE COURT:  Mr. Riela, I apologize.

18              MR. RIELA:  No, no problem at all.  Most folks do

19   much worse.  So I appreciate that.

20              Your Honor, I have a few points that I'll

21   summarize quickly, and then I'll go into in a little bit

22   more detail.  First, I think with respect to the timing and

23   the basis for the claim, it may just be worthwhile to very

24   briefly summarize what that is.  The effective date of the

25   plan in this case was September 30th of 2019.  The

Page 66

1    foreclosure action was filed eight days later on October the

2    8th.

3           The basis for the counterclaim for attorney's

4    fees, as Mr. Slack mentioned, and as we said in our papers

5    as well, is not anything in the prepetition note or the

6    mortgage, but rather a provision of the Illinois mortgage

7    foreclosure law that says that the state court may award

8    reasonable attorney's fees and costs to a Defendant who

9    prevails in a motion, in an affirmative defense, or a

10   counterclaim, or in the foreclosure action.

11          I kind of view that as a consumer protection

12   statute.  Basically that there's an improper foreclosure

13   action, the State of Illinois gives mortgage foreclosure

14   defendants a way to at least get made whole, at least with

15   respect to the attorney's fees and costs.

16          In our counterclaims, the Sharmas basically are

17   saying that Ditech had instituted the foreclosure action

18   improperly, because first it violated a couple of provisions

19   of the note, specifically paragraphs 20 and 22 with respect

20   to notice and other issues, and that there is also a claim

21   that Ditech failed to abide by Consumer Financial Protection

22   Bureau regulation that we mentioned in our papers.

23          Now, obviously, that is not an issue for --

24          THE COURT:  I'm sorry to interrupt you.

25          MR. RIELA:  Sure.

Page 67

1            THE COURT:  It's a question for you.

2            MR. RIELA:  Of course.

3            THE COURT:  In your papers, you state, among other

4    things, the objection, I think it's around paragraphs 16

5    through 18, you contend that we should deny the motion as to

6    your clients, because the counterclaims arise under the

7    Illinois mortgage foreclosure law and Illinois Rule 137, and

8    not under the terms of the note and mortgage.

9            MR. RIELA:  Correct.

10            THE COURT:  In Counts I and II, right, in the

11    counterclaims, right, they are based upon provisions in the

12    mortgage.  Right?  So -- and so let's start there.

13            MR. RIELA:  Sure.

14            THE COURT:  Why is that not under the terms of the

15    note and mortgage?

16            MR. RIELA:  Well, I believe the note and mortgage

17    do set forth requirements that Ditech or any servicer was

18    supposed to follow before bringing an action.  I do not see

19    anything in the note or mortgage that specifically provides

20    for costs shifting between the servicer and the borrower, if

21    the borrower were to prevail in a foreclosure action.

22            This is not like an indemnification agreement,

23    like you see in the Olen case in the Second Circuit and the

24    like.  Basically, yes, it's a breach of provisions of the

25    contract.  But I do not believe that the contracts, unless I

Page 68

1    missed it somewhere, they do not provide for any contractual

2    right of the Sharmas to get attorney's fees from Ditech.

3    That right comes under the statute.

4            THE COURT:  Forgive me.  I know -- so you're

5    saying that the breach of the contract under Sections 20 and

6    22, that they're breaches, that you're entitled to get

7    attorney's fees, right?  But the source is state law, and

8    not the agreement?

9            MR. RIELA:  Right.  The source of a claim for --

10   the counterclaim for attorney's fees is the state statute.

11   So again, there is a breach of the contract under those two

12   sections, as well as a CFPB regulation.

13           And I think really where the issue really -- the

14   rubber meets the road, so to speak, and where I think Ogle,

15   Res Cap, and a host of other cases that were decided within

16   this circuit dealing with contract claims, is the question

17   of a claim arising under a contract is basically an

18   extension or a subsidiary of the issue of whether the

19   parties fairly contemplated the claim at the time that the

20   contract was entered into.  And there's certainly a bunch of

21   cases, indemnification agreement.  Res Cap dealt with

22   attorney's fees provisions based on violation of a covenant

23   not to sue and other issues.

24           Those are contracts where the parties have

25   specifically bargained for a right of action.  And one of

Page 69

1    those parties, then, asserted that contractual right of

2    action, albeit either post-petition or after the effective

3    date, depending on the case.

4        Here, we have a contract, and not just any kind of

5    contract where you would normally have two sophisticated

6    parties with relatively equal bargaining powers sitting at a

7    table and negotiating terms.  This is a note and mortgage.

8    It's take it or leave it.

9        So that -- the contract, given the providence of

10   it, it's not surprising that there is no contractual right

11   of the Sharmas to bring a counterclaim for attorney's fees

12   if Ditech were to have instituted an improper foreclosure

13   action.  And I think that's really where the biggest

14   distinguishing factor between Ogle and Res Cap, in our

15   cases.  Not least with respect to Ogle, Ogle dealt with --

16   did not deal with discharge at all.

17       In that case, the Second Circuit held that an

18   unsecured creditor was entitled to recover post-petition

19   attorney's fees that were authorized by an enforceable

20   prepetition contract.  But that was a prepetition claim.

21   And I understand where the Res Cap district court, where Mr.

22   Slack is bringing that -- the rationale that the Ogle Court

23   used to get to that specific holding about the timing of

24   contracts.  But Ogle does not say anything about discharge.

25   Res Cap certainly does.

Page 70

1          But in that situation, Res Cap was a case in which

2     you had sophisticated banks and alternative lenders, who

3     were selling loans to Res Cap before the petition date.  Res

4     Cap bought these loans.  As Your Honor had mentioned, in the

5     Res Cap case, the debtor provided very specific notice to

6     the lenders saying, "Hey look, I may be suing you later on."

7     Specifically with respect to a sophisticated party, but even

8     an unsophisticated party would know, "Okay.  Well, wait a

9     second.  Somebody is going to sue me.  Maybe I should be

10    filing a proof of claim, or doing something to extend my

11    rights."  Here --

12          THE COURT:  Why -- excuse me, why wasn't that your

13    client?

14          MR. RIELA:  I'm sorry.

15          THE COURT:  Well, your client at the time was told

16    he was in default.  There were letters.

17          MR. RIELA:  Right.  They were in default, and I --

18    I'm sorry, go ahead.

19          THE COURT:  No, no.  I'm sorry.  You go ahead.

20          MR. RIELA:  I'm sorry.  I didn't mean -- I didn't

21    want to interrupt you, Your Honor.

22          So I think the issue there, with respect to the

23    notices that were provided during the bankruptcy case, as

24    well as the note and mortgage in the first place, I think it

25    would be certainly fair to say that there was a

Page 71

1    contemplation that Ditech could institute a foreclosure

2    proceeding.  That, I think, would be clear.  Specific --

3    certainly if you were in default.

4         If I were in default, I would think, "Okay, Ditech

5    is going to institute a foreclosure proceeding."  Nowhere in

6    any of the notices, nor should we, I think, be charged with

7    fairly contemplating, though, in April, May, or any time

8    until October 8th, 2019, that Ditech would institute an

9    improper foreclosure proceeding.  And I think that is the

10   biggest issue here.

11        It goes to the point that Your Honor had made in

12   your discussion with Mr. Slack.  Okay, I -- the Sharmas know

13   that they -- there could be a foreclosure proceeding.

14   Should they be forced to file a proof of claim on the

15   indicia that maybe Ditech might not follow the rules in

16   commencing a foreclosure proceeding after the effective

17   date?

18        I think what Judge Glenn had said in the Res Cap

19   bankruptcy court case, the one that was reversed by the

20   District Court, he made the point about -- that the need to

21   have protective proofs of claim if the -- if what the

22   debtors here are seeking to do.  You'd be inundated with

23   protective proofs of claim.  And how do we deal with those?

24   I'd be having to seek three or four years from now

25   reconsideration of a proof of claim that I would have filed.

Page 72

1          Maybe the case would have been closed by the time

2     Ditech got around to filing the improper foreclosure action.

3     Not least, 1141(d) of the Bankruptcy Code says a discharge

4     occurs whether or not a proof of claim has been filed.  So

5     already, we're only dealing here with discharge.  I

6     understand the issues with respect to proof of claim, and

7     maybe we can get a slice of whatever pot of money there is.

8          But whether or not we filed a proof of claim, the

9     question -- the claim that would be dischargeable would have

10    arisen before the confirmation date, or I guess the

11    effective date, under 1141(d).

12         And there are a couple of other cases as well,

13    given where the Second Circuit had gone afterwards, I'm not

14    sure to what extent they're viable, but there is the

15    Bankruptcy Court's decision in two cases involving Texaco.

16    One, Texaco Inc. v. Board of Commissions of the LaFourche

17    Basin Levee District, which is at 254 B.R. 536 (Bankruptcy

18    SDNY, 2000) by Judge Hardin.  And also Texaco v. Wolverine

19    Exploration Company at 218 B.R. 1 (Bankruptcy, Southern

20    District of New York, 1998).

21         They were cited by Judge Glenn in the ResCap

22    bankruptcy case.  And what those cases said is that future

23    claims for possible future breaches of contracts do not

24    actually constitute claims under Section 1015 of the

25    Bankruptcy Code.  Its reliability asserted in the case is

Page 73

1   based on a breach of contract that occurred before

2   confirmation that a claim would need to be filed by -- in

3   the bankruptcy.  And confirmation of a plan of

4   reorganization discharged the debtor for its pre-

5   confirmation liabilities.

6          Now, I think those cases make a lot of sense,

7   specifically given what 1141(d) of the Bankruptcy Code says.

8   And I do not believe that either Ogle, ResCap, or any of the

9   other cases afterwards specifically denounced those -- the

10  Texaco line of cases.  To the extent that Your Honor

11  believes that those line of cases is correctly decided, I

12  think that would lead to our claim for attorney's fees not

13  being discharged, because again, these come from post-

14  effective date actions by the debtors.

15         Moving quickly through the Ybarra, returning to

16  the Fray line of cases.  The ResCap District Court kind of

17  made it sound like it was one, maybe two strange outlier

18  cases from the Ninth Circuit.  In fact, though, there are

19  other cases that came to the same conclusion.  We cited them

20  in our papers, but a few of them were Assure v. Vermont, In

21  re: SURE-SNAP, 983 F.2d 1015 (Eleventh Circuit, 1993); In

22  re: Hadden, 57 B.R. 187 (Bankruptcy, Western District of

23  Wisconsin, 1986); In re: Grynberg, 113 B.R. 709 (Bankruptcy

24  District of Colorado, 1990); and then Judge Glenn in the

25  ResCap bankruptcy decision that was reversed by the district

**Page 74**

1   courts.

2          So those cases basically came to the same

3   conclusion that the Ninth Circuit did in Segal and Ybarra

4   with respect returning to the fray.  And I think the

5   statutory basis, and I would respectfully submit that the

6   ResCap district court incorrectly decided that case, at

7   least with respect to the Ybarra matter, because I believe

8   that there is a statutory underpinning behind those cases.

9   And again, that's 1141(d) of the Bankruptcy Code, which says

10  that the confirmation of a plan discharges the debtor from

11  any debt that arose before the date of confirmation.

12          If a debtor were to return to the fray, I would

13  argue that that would be arising after the confirmation.

14  Decided that, at least could be a statutory basis for the

15  Ybarra rule.  I also believe that principles of equity also

16  favor the Sharmas here.  The estate here is trying to thwart

17  the counterclaims based on its own post-effective date

18  conduct.  Ditech has asserted that the Sharmas have

19  defaulted on the note, and certainly they can bring a

20  foreclosure action to do that.

21          But if they want to get the benefits of the

22  prepetition note and mortgage, it needs to follow the rules

23  in order to get those benefits.  If it doesn't follow the

24  rules, and that's really an issue again for the Illinois

25  State Court to decide, then as a matter of equity, at the

Page 75

```
 1   very least, the discharge injunction should not shield them
 2   from the consequences of doing so, particularly given that
 3   the Defendants here are not large banks or sophisticated
 4   lenders like you had in ResCap, or big companies like you
 5   had in the other cases that dealt with the contract claim
 6   issues.  We're dealing here with the family.
 7            Texaco v. Board of Commissioners for the LaFourche
 8   Basin Levee District, again at 254 B.R. 536, says that the
 9   consequence of a debtor's continuing to reap the benefits of
10   a contract that has neither assumed nor rejected, is that
11   the debtor must comply with all the obligations and burdens
12   of the contracts, just as though it had been assumed under
13   Section 365.
14            Now, I don't think that the note or mortgage was
15   assumed in this case, but certainly they are acting as
16   though -- that they're getting the benefit of the note and
17   mortgage.  And if they want to do that post-effective date,
18   they need to follow the rules, and they should not be
19   unshackled by a discharge injunction from the consequences
20   of them doing so potentially wrongly.
21            I mentioned already before my thought about the
22   ResCap District Court case being distinguishable, because
23   again, it dealt with a prepetition contract where there's
24   specific language that dealt with who pays what to whom if
25   something happens.  Again, in this situation, there is no
```

Page 76

1    provision in the note or mortgage that I saw that grants the

2    Sharmas the right to get attorney's fees from Ditech if it

3    instituted an improper foreclosure action.

4           To respond to one of your questions to Mr. Slack,

5    Your Honor, about what's the difference between a contract

6    claim and a tort claim, a contract claim and a statutory

7    claim.  I think the reason that there is a difference here

8    is that there are cases.  Certainly the ResCap, a district

9    court case, the Olen case from 20 years ago or so, deals

10   with claims arising out of a contract, and those arise at

11   the time that the contract was executed.

12          Here, again, I do not think these are contract

13   claims.  So then you look into the other tests that the

14   Second Circuit and others have applied in dealing with tort

15   claims, or claims arising out of a statute, such as the

16   conduct tests, the prepetition relationship test, or the

17   fair contemplation test.

18          And under at least some interpretations of those

19   tests, dischargeability hinges on some sort of prepetition

20   or pre-effective date conduct, such as a pre-effective date

21   toxic waste spill or defective products that were

22   manufactured prepetition.

23          There needs to be -- outside of the contract

24   sphere, there needs to be some action that occurred

25   prepetition if those tests are to yield to the answer that

Page 77

1    claims under a statute or torts are discharged.  I'll

2    mention real briefly with respect to the cases that the plan

3    administrator had cited in support of their arguments, and

4    there were two.  Rubin Family Irrevocable Stock Trust at 516

5    B.R. 221 (Bankruptcy, Eastern District of New York, 2014).

6            There, what the Court dealt with was not

7    discharge, but whether the right to attorney's fees and

8    costs that was set forth in a prepetition judgment is

9    allowable under 502.  So prepetition judgment versus a

10   prepetition contract.  And what the Court held in that case

11   is that a creditor could, indeed, assert an unsecured post-

12   petition claim for attorney's fees that arose out of

13   prepetition judgments under Section 502.  Again, not a word

14   in that case about discharge.

15           CD Realty Partners, the other case that was cited,

16   205 B.R. 651 out of the Bankruptcy Court of Massachusetts

17   (1997), did deal with discharge.  But I do not read the case

18   the same way that Mr. Slack does as the court saying, you

19   know, that you look at contract claims and statutory claims

20   in the same way.  In that situation, there was a claim that

21   was a hybrid.  It was both contractual and statutory.  It

22   was ERISA and another federal statute that regulated how an

23   employer needed to meet its contractual obligations to

24   provide pension benefits.

25           What the court there said is that the court agreed

1    with the non-debtor party in that litigation that not every

2    post-confirmation right to payment is a contingent claim.

3    The Court agreed with the non-debtor's argument there that

4    to be a contingent claim, a post-confirmation right to

5    payment must have some significant root in the pre-

6    confirmation past.

7            The court said there that the expansive definition

8    of claim and its legislative history surely points us in a

9    direction, but provides little indication as to how far we

10   should travel.

11           What the court did in that particular case is it

12   looked at the statute itself.  It actually analyzed the

13   statute to come to the conclusion that the claims were

14   discharged there under the statute.  It did not simply say,

15   okay, a contract claim is the same as a statutory claim, and

16   we're just going to go ahead and discharge the claim.

17   There's actually real analysis there.

18           And other than -- unless Your Honor has any other

19   questions, I think I've covered everything that I wanted to

20   mention.  If I need to respond to anything that Mr. Slack,

21   I'll be as brief as possible.

22           THE COURT:  All right.  That'll be fine.  Mr.

23   Slack?

24           MR. SLACK:  Just a couple of points, Your Honor.

25   So counsel had talked about, you know, policy.  And I think

1   policy is important here, Your Honor, in a couple of

2   respects.  First, whenever you have a plan, and whether

3   you're talking about this -- and I'm not talking about this

4   particular plan, but certainly it occurred in this

5   particular plan, people rely on the claims pool based on the

6   definitions in the Bankruptcy Code, and in particular the

7   contingent and unmatured.

8           And you know, so it's important, you know, that

9   there be that kind of consistency.  And I know that, again,

10  counsel talked about, you know, whether it comes up in the

11  discharge, this issue with Ogle and ResCap comes up in a

12  discharge or some other context, it's exactly the point,

13  Your Honor, is that the definition of claim is so important

14  and so fundamental, that this decision is important not just

15  to a plan injunction, but it also goes into automatic stay,

16  obviously, bar date orders, and other fundamental deadlines

17  of a bankruptcy.

18          So the definition of claim, when you had Ogle and

19  ResCap talking about the definition of a claim, and I really

20  should say Ogle in particular, you know, it's talking about

21  the definition of claim as a whole, not for any one purpose.

22  And so there's not one Ogle rule for discharge, and another

23  Ogle rule for other parts of the Code.  It's all

24  interpreting the same term, and it works the same way.

25          So when you try to distinguish Rubin, for example,

Page 80

1    where Rubin talks specifically about Ogle and Travelers and

2    prepetition contracts, it doesn't matter what context it

3    comes up, because the definition of claim, as encompassing

4    an unmatured and contingent claim, is the same.

5           The second point, Your Honor, is there were a

6    number of cases that were mentioned by counsel, the Texaco

7    cases, those are all pre-Ogle, and don't survive Ogle.  The

8    idea that, you know, of what the definition of a claim is,

9    and the fact that it includes a contingent and unmatured

10   claim was central to Ogle.  So we would posit that those

11   cases, you know, all pre-Ogle don't survive the Ogle line.

12   And what Ogle says is that as long as you have a contract

13   that fairly contemplates the kind of thing like a

14   foreclosure, or a litigation, that that is absolutely

15   sufficient under the law.

16          One other point, Your Honor, is, you know, I think

17   there was some confusion about your questioning about the

18   complaint itself.  Because if you look at the complaint

19   itself, and you look at what they've alleged as damages,

20   their claims are for damages, and they do have attorney's

21   fees in there, but they also claim damages.

22          So there are numerous -- and, you know, this is

23   obviously -- the complaint is attached to the papers, and

24   Your Honor can look at it.  But this clearly is a complaint

25   that seeks damages, monetary damages, as well as attorney's

Page 81

1    fees.  And all of those would, you know, what we believe

2    would be claims that are barred by the plan injunction.

3           And so, Your Honor, with that, unless you have any

4    further questions, you know, I'll complete my presentation.

5           THE COURT:  All right.  That's fine.

6           MR. RIELA:  (Indiscernible) any longer.  I just

7    wanted to say with respect to the Ogle case, and you'd be

8    able to see this on page 146 of that agreement here -- I'm

9    sorry, of that decision.  It says that a contingent claim

10   under the Code refers to obligations that will become due

11   upon the happening of a future event that was within the

12   actual or presumed contemplation of the parties at the time

13   the original relationship between the parties was created.

14   And it cites In re Manville Forest Products Corporation, 209

15   F.3d 125 (Second Circuit, 2000).

16          So certainly claim does have a very broad

17   definition.  I'm certainly not disputing that it does.  But

18   just like with the Court in CD Realty it said just because

19   the definition of claim is broad doesn't mean it includes

20   everything.  It needs to be in the actual or presumed

21   contemplation of the parties.  Is a foreclosure within the

22   contemplation of the parties?  Sure.  An improper

23   foreclosure?  I don't think so.  Thank you, Your Honor.

24          THE COURT:  Thank you.  All right.  Anything

25   further?

1          MR. SLACK:  The only thing I would say, Your

2     Honor, again, Richard Slack for the plan administrator, is

3     when you look at that case Ogle, and you look at the line of

4     cases after Ogle, what they say specifically is where you

5     have claims that arise out of a contract that are -- and the

6     contract talks about the precise kind of litigation, here a

7     foreclosure litigation, then all of the parties are on

8     notice.

9          And if you have claims arising out of that

10    foreclosure litigation, you know, nobody knows exactly what

11    claims are going to -- what specific causes of action.  But

12    if you have claims arising out of a foreclosure, that that

13    is within the contemplation of the parties.  And that's

14    ResCap, and that's Ogle, and the line of cases.

15         THE COURT:  Yeah, but it's -- but ResCap, the

16    claims, right, the damage claims that were being asserted,

17    right, were -- I guess where I'm having a little trouble

18    here is I think you're saying that the damages at issue

19    here, as it relates to -- that under the complaint, when you

20    were talking about looking at the claim, you're talking

21    about the counterclaims, is that right?

22         MR. SLACK:  That's right.  The counterclaims, Your

23    Honor.

24         THE COURT:  Okay.  Let's look at them.  Because if

25    you pull them up, and I'm looking at the second claim, but

1    if you look at the first as well -- are you able to get a

2    hold of them or --

3             MR. SLACK:  I have it, Your Honor.  It's in one of

4    the exhibits to --

5             THE COURT:  Yeah, no.  I've got it.  Thank you.

6    I've got it.  And, Mr. Riela, you have it?

7             MR. RIELA:  I do.

8             THE COURT:  Great.  Let's look at the second

9    counterclaim that's on page 8.  All right, and I look at it

10   and the allegations in it, and the breach -- the alleged

11   breaches of the failure to comply with Section 22, etcetera.

12   And then in 66, they say there's the direct and proximate

13   result of the breach, the incurred damages in the amount of

14   the payments (indiscernible) failed to make under the note,

15   etcetera.  And then the cite in 67 is to -- you have Section

16   15-1510.  That's the (indiscernible).

17            MR. SLACK:  That's correct.

18            THE COURT:  So, Mr. Riela, you are asking for

19   damages arising under the contract as it relates to -- in

20   paragraph 66, right?

21            MR. RIELA:  Correct.  So again, I -- I think

22   there's a distinction here, at least, that I believe is

23   important.  Yes.  We're asserting among -- along with the

24   CFPB regulation breach, the breach of both paragraph 20 and

25   22.

Page 84

1          When we get to the question, though, of what was

2     in the contemplation of the parties at the time of the

3     mortgage and note execution 13 years ago or so, was whether

4     there was any contemplation that there could be attorney's

5     fees or other kind of costs that could be brought against

6     Ditech for that, because it's not -- that is not in the

7     contract itself.

8          There are conditions precedent to what Ditech

9     needs to follow to have a proper foreclosure action, but

10    unlike ResCap, and Ogle -- not Ogle, but Olen, there's

11    nothing in the contract that spells out any kind of fee

12    shifting or anything along those lines, where it would be

13    very clear as to what the contemplation of the parties was.

14          THE COURT:  Okay.  But what you're saying is 67

15    addresses the attorney's fees and costs.  And you're saying

16    --

17          MR. RIELA:  Yes.

18          THE COURT:  -- well, look, when we entered the

19    agreement, it wouldn't be fair contemplation that maybe you

20    could say, well, look, you enter into a note and mortgage,

21    there's always a possibility there's going to be a

22    foreclosure.  All right?  But do I have to assume that -- or

23    really contemplate now and file a claim to protect against

24    an improper foreclosure?

25          MR. RIELA:  Right.

Page 85

1                    THE COURT:  Right?

2                    MR. RIELA:  Yes.

3                    THE COURT:  Well, 66 doesn't talk about the

4         improper foreclosure, does it?  What I'm trying to

5         understand, sure is it possible that there could be a breach

6         of paragraph 22?  I mean, why wouldn't that be within the

7         contemplation?

8                    MR. RIELA:  Yes.  I think it would be fair to say

9         that any kind of -- there's always going to be -- the breach

10        of any contract would be within the fair contemplation.

11        There are cases certainly that have said that.

12                    I think the difference, though, here is that --

13                    THE COURT:  I'm sorry.  I apologize.  I'm sorry

14        for interrupting you.

15                    MR. RIELA:  Sure, no.

16                    THE COURT:  So when we're talking about the

17        damages, what you're focused on then is just the attorney's

18        fees, and the cost -- the 15-1504?  Excuse me, 1510 damages.

19                    MR. RIELA:  Yes.

20                    THE COURT:  Claims.

21                    MR. RIELA:  I think, though -- yes.  Really, the

22        focus there is on the statutory right.  Yes.

23                    THE COURT:  All right.  So you don't disagree that

24        to the extent that damages are being sought in the

25        counterclaims, other than to the extent that they're being

Page 86

1    asserted under the statute, and then 137, that the

2    injunction would apply to the other damages, or any other

3    damage claim you would have.

4            MR. RIELA:  I think -- there would certainly be a

5    much better argument that any damages that are intrinsic to

6    the contract would be within the fair contemplation.  And I

7    could see, just speaking as the lawyer -- as a lawyer here -

8    - I could see that there would be a stronger basis to impose

9    a discharge injunction with respect to claims that are

10   intrinsic within the contract itself.  If that answers your

11   question.

12           THE COURT:  Yes, thank you.

13           MR. SLACK:  Your Honor --

14           THE COURT:  Yes.

15           MR. SLACK:  -- one point, if I might.

16           THE COURT:  Yes, please.

17           MR. SLACK:  So I think that line of questioning is

18   insightful and gets us about 99 percent of the way there,

19   because you know, if in fact, you know, as I think Your

20   Honor correctly posed, it's within the fair contemplation of

21   the parties, that somebody might not comply with paragraph

22   22.

23           What's going on here is that the failure to comply

24   with 22 and give that notice is precisely the same conduct

25   that they're arguing, you know, now allows them to get

1    statutory fees, you know, under the statute, and under, I

2    think, Rubin and that line of cases.

3            Once you get to the point where you say that that

4    kind of a claim, a claim arising out of failing to give

5    notice is within the fair contemplation, which I think it

6    is, and I think that's correct, then any claim, whether it's

7    statutory for fees or otherwise, also arises within the fair

8    contemplation of the parties.

9            And we think that's precisely, again, the line of

10   cases that we cited in Rubin, as well as consistent with

11   ResCap.  So that's all I had to say.  Thank you.

12           THE COURT:  All right.  Thank you.

13           All right.  First off, thanks very much for

14   spending as much talking about this as we have.  I found

15   this very, very useful.  I'll try to get this resolved as

16   quickly as possible.  All right?

17           (Chorus of thank you)

18           THE COURT:  Thank you all.  Thank you very much.

19   I think, Mr. Singh, I think that's -- is that --

20           MR. SINGH:  That's it, Your Honor.  We are done.

21           THE COURT:  Are we done?

22           MR. SINGH:  Yes.

23           THE COURT:  All right.  Great.  Well, thank you

24   again.

25           (Chorus of thank you)

Page 88

1           (Whereupon these proceedings were concluded at 1:22 PM)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    I N D E X

2                                              PAGE

3    Consumer Claims Trustee's Twenty-Ninth        13

4    Omnibus Objection to Proofs of Claim

5

6    Consumer Claims Trustee's Thirtieth Omnibus    13

7    Objection to Proofs of Claim

8

9    Consumer Claims Trustee's Thirty-First Omnibus  14

10   Objection to Proofs of Claim

11

12   Sixty-Third Omnibus Objection to              15

13   Proofs of Claim

14

15   Sixty-Fourth Omnibus Objection to             46

16   Proofs of Claim

17

18   Plan Administrators' Amended Seventh          17

19   Omnibus Motion to Enforce the Plan Injunction and

20   Confirmation Order

21

22   Forty-Ninth Omnibus Objection to Proofs of Claim  16

23

24   Plan Administrators' Sixth Omnibus Motion     39,40

25   to Enforce the Plan Injunction and

Page 90

1    Confirmation Order

2

3    Motion to Clarify filed by Burton Dezihan          24

4

5    Motion for Relief from Stay                    50,51

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 91

1                   C E R T I F I C A T I O N

2

3    We, Pamela Skaw and Jamie Gallagher, certify that the

4    foregoing transcript is a true and accurate record of the

5    proceedings.

6    Pamela Skaw          Digitally signed by Pamela Skaw
                          DN: cn=Pamela Skaw, o, ou,
                          email=digital@veritext.com, c=US
7    _____      Date: 2020.11.02 13:01:18 -05'00'

8    Pamela Skaw

9    Jamie                Digitally signed by Jamie Gallagher
                          DN: cn=Jamie Gallagher, o, ou,
10   Gallagher            email=digital@veritext.com, c=US
                          Date: 2020.11.02 13:02:19 -05'00'

11

12   Jamie Gallagher

13

14   Date:  October 30, 2020

15

16

17

18

19   Veritext Legal Solutions

20   330 Old Country Road

21   Suite 300

22   Mineola, NY 11501

23

24

25

**[& - 983]**                                                                 Page 1

**&**

**&**   4:2,12 5:1,10
5:11 6:1 12:2
16:16 21:1

**1**

**1**   12:9 29:8,15
31:11 72:19
**10.5**   31:19 37:17
40:2
**10.6**   36:10
**100,000**   10:4
**10004-1408**   1:15
**10017**   5:5
**10022**   5:13 6:4
**1015**   72:24 73:21
**10153-0119**   4:5
**10166**   6:11
**10281**   4:15
**11**   12:9 25:1 41:22
44:20
**113**   73:23
**114**   31:7
**1141**   72:3,11 73:7
74:9
**11501**   91:22
**11:00**   1:18
**12**   12:8
**125**   81:15
**12th**   9:5
**13**   12:25 13:2
15:12 16:3 84:3
89:3,6
**137**   67:7 86:1
**14**   15:22 89:9
**142**   56:5
**146**   81:8
**15**   89:12
**15-1504**   85:18
**15-1510**   83:16
**1510**   85:18
**16**   32:3 67:4 89:22
**1632**   23:14,20

**17**   89:18
**18**   67:5
**187**   73:22
**19-10412**   1:7 7:5
**1986**   73:23
**1990**   73:24
**19901**   5:20
**1993**   73:21
**1997**   77:17
**1998**   72:20
**19th**   8:15 9:4,14
9:23 11:6
**1:22**   88:1

**2**

**20**   45:12 66:19
68:5 76:9 83:24
**200**   4:14 6:10
**2000**   54:9 72:18
81:15
**2001**   45:13
**2007**   53:6,13
**2014**   77:5
**2015**   30:12 31:12
**201811**   32:5
**2019**   53:14,18,21
53:23 54:2,9
55:21 56:7 62:16
65:25 71:8
**2020**   1:17 23:14
30:3,6 48:17
91:14
**205**   77:16
**209**   81:14
**2149**   3:2
**218**   72:19
**21st**   30:12
**22**   66:19 68:6
83:11,25 85:6
86:22,24
**22049**   17:25
**221**   77:5
**2214**   29:24

**2394**   17:24
**23rd**   20:4 23:14
23:21
**24**   90:3
**254**   72:17 75:8
**26**   30:3
**2656**   3:5 32:2
**2744**   3:8
**2748**   18:25 36:17
**28**   22:25
**2814**   3:10 25:2
47:16
**2836**   2:9
**2837**   2:5
**2838**   2:13
**2840**   2:16 14:20
**2841**   2:19
**2844**   22:25
**2873**   2:23 16:20
**2877**   19:1
**2884**   23:16,23
**29**   1:17
**2917**   29:12

**3**

**3**   41:18,21 42:13
42:25 43:16 44:6
44:7,9,12 45:2,18
**3-0**   13:10
**30**   91:14
**300**   91:21
**30th**   65:25
**330**   91:20
**34th**   5:4
**365**   75:13
**374**   45:7
**375**   45:7
**39,40**   89:24
**3rd**   6:3

**4**

**4**   31:12 32:5
**405**   45:9
**413**   45:9

**45**   14:23
**46**   89:15
**49**   31:7,13

**5**

**50,51**   90:5
**502**   44:15,20 45:4
77:9,13
**503**   44:13
**5047432015**   30:14
30:17
**507**   41:18,21
42:13,25 43:16
44:6,7,9,12 45:2,4
45:18
**516**   77:4
**534**   45:7
**536**   72:17 75:8
**543**   26:5
**57**   2:1 73:22
**586**   56:6

**6**

**651**   77:16
**66**   83:12,20 85:3
**67**   83:15 84:14

**7**

**7028**   5:19
**709**   73:23
**733**   45:12
**734**   45:12
**767**   4:4
**780**   5:3

**8**

**8**   5:18 30:6 83:9
**8th**   66:2 71:8

**9**

**90**   41:15 42:17
45:8
**900**   5:12
**919**   6:3
**983**   73:21

**99** 86:18

**a**

**abide** 66:21
**able** 10:21 18:10
  22:16 60:4 65:11
  81:8 83:1
**absolutely** 62:8
  80:14
**accomplish** 21:14
**account** 36:6 38:5
  39:4,6,8,10
**accurate** 34:13,24
  35:1 91:4
**acting** 75:15
**action** 27:16
  28:18 29:6 31:22
  32:3 47:25 48:1
  48:11,25 49:17,22
  50:24,25 51:2,3,6
  52:11,16 53:9,10
  54:8 57:21 58:14
  59:8,19 60:3,4
  63:19 66:1,10,13
  66:17 67:18,21
  68:25 69:2,13
  72:2 74:20 76:3
  76:24 82:11 84:9
**actions** 49:25
  73:14
**actual** 52:12
  55:21,24 62:14,18
  81:12,20
**addition** 31:16
**additional** 15:1,1
  21:3 30:5
**address** 23:8 26:3
  28:9 35:13 39:19
  42:8 57:18 63:4,9
**addressed** 22:9,13
  23:6 24:5 42:18
**addresses** 35:13
  84:15

**adjourned** 12:15
  15:6,13,25 16:2
**admin** 2:19
**administrator**
  14:17,25 15:23,25
  16:4,11,17,23
  19:21 25:25 29:13
  29:14 30:4,7,8
  31:6,25 32:2
  36:13 41:9 42:19
  47:6,10,13,17
  49:21,24 50:20
  51:19 52:7 77:3
  82:2
**administrator's**
  16:18 17:21 18:16
  21:2 27:4 29:8,11
  29:17,22 41:10
  46:17 51:5,8,23
**administrators**
  2:21 3:4 89:18,24
**adopt** 64:19
**adopted** 65:9
**advance** 9:4,12
  10:9
**advise** 31:19
**advised** 8:20
**affairs** 44:18
**affidavit** 28:6
  29:9 31:16,21
  36:2
**affirmative** 39:24
  52:9 66:9
**agenda** 7:11,12,14
  11:15 12:4,10,15
  12:23 13:12,15,17
  13:23 14:6,18
  15:3,6,20 24:24
  25:1 40:23 51:22
**ago** 10:21 20:16
  76:9 84:3
**agree** 51:4,8
  60:10

**agreed** 77:25 78:3
**agreement** 67:22
  68:8,21 81:8
  84:19
**ahead** 41:7 54:17
  54:17,18 63:1
  70:18,19 78:16
**albeit** 69:2
**allegations** 43:8
  83:10
**alleged** 80:19
  83:10
**alleging** 57:17
**allow** 28:18 50:5
**allowable** 77:9
**allowance** 34:3,22
**allowed** 35:19
  45:10
**allowing** 49:21
**allows** 86:25
**alternative** 70:2
**amended** 2:21
  7:11 8:7,8 89:18
**america** 6:9 8:24
  9:16 11:8
**amount** 20:22
  29:25 33:12,14
  36:9 38:3,17
  41:14 42:17 43:23
  83:13
**amounts** 10:3
**analysis** 78:17
**analyzed** 78:12
**andrews** 6:8
**anna** 15:9
**annexed** 50:23
**answer** 38:24,25
  76:25
**answers** 86:10
**anticipate** 52:15
**anybody** 34:20
  55:5

**apologies** 11:24
**apologize** 7:3
  25:12 54:11,17
  56:24 65:15,17
  85:13
**appeal** 48:22,22
  48:24
**appealed** 48:21
**appeals** 45:13
**appearing** 12:4
**appellate** 32:4
  33:17 38:16,21
**applicable** 49:8
  54:6
**application** 51:9
**applied** 34:16
  76:14
**applies** 27:22
  28:15 34:17 52:23
**apply** 86:2
**appointment**
  44:19
**appreciate** 11:1
  42:16 61:10 65:19
**apprise** 9:7
**april** 30:12 53:14
  53:18,21,23 54:9
  54:9 55:20 62:16
  71:7
**argue** 57:4 63:10
  74:13
**arguing** 62:1
  86:25
**argument** 63:14
  64:18 78:3 86:5
**arguments** 58:17
  63:7,10 77:3
**arisen** 58:21
  62:14 72:10
**arises** 43:4 44:2
  53:21 63:11 87:7
**arising** 44:13 55:4
  55:7 57:8 62:7

68:17 74:13 76:10
76:15 82:9,12
83:19 87:4
**arose** 44:16 52:20
53:15 54:20 55:14
64:16 74:11 77:12
**aside** 36:15 48:17
**asking** 33:13
34:19 35:11,23
37:16 39:25 50:22
83:18
**asks** 16:4 24:3
33:14
**aspect** 40:11
**assert** 34:22 35:8
35:20 45:22,23
77:11
**asserted** 41:14,17
42:6,12 43:15
61:6 69:1 72:25
74:18 82:16 86:1
**asserting** 57:21
83:23
**assessment** 51:5,9
**assume** 43:20
59:13 84:22
**assumed** 75:10,12
75:15
**assure** 73:20
**attach** 30:11
33:16
**attached** 29:8,9
29:15 30:15,23
31:7,10 32:19
33:3,4,5,5 48:7,14
53:24 80:23
**attaches** 31:13
**attaching** 31:2
**attack** 35:6
**attorney** 5:2,11
6:9
**attorney's** 60:7
63:11 64:6,8,21

66:3,8,15 68:2,7
68:10,22 69:11,19
73:12 76:2 77:7
77:12 80:20,25
84:4,15 85:17
**attorneys** 4:3,13
17:17
**authenticated**
30:18
**authority** 63:16
**authorized** 69:19
**automatic** 25:1
27:22 34:16 49:8
79:15
**automatically** 8:3
**availability** 8:4
**available** 42:15
**avenue** 4:4 5:3,12
6:3,10
**award** 66:7
**aware** 41:25 43:8
56:11

**b**

**b** 1:21 13:15 31:9
31:9 48:2
**b.r.** 45:7,9 72:17
72:19 73:22,23
75:8 77:5,16
**back** 17:12 20:17
20:17 22:3 24:24
26:15,19 40:24
54:9 55:17 60:11
60:15 62:7,15
**bagby** 4:17
**balance** 49:20
**bankruptcy** 1:1
1:13,23 28:20
35:9,21 41:18
43:6,20 44:3,12
45:11 50:3 52:20
53:2 56:2,20 58:3
58:9 59:25 60:14
63:24 64:11 65:5

65:6 70:23 71:19
72:3,15,17,19,22
72:25 73:3,7,22
73:23,25 74:9
77:5,16 79:6,17
**banks** 70:2 75:3
**bar** 28:20 53:20
53:20 55:22,22,24
56:7,8 79:16
**bargained** 68:25
**bargaining** 69:6
**barred** 57:20,20
81:2
**based** 29:24 30:2
36:2 44:7 48:5
56:15 64:6,8 65:4
67:11 68:22 73:1
74:17 79:5
**basically** 39:12
66:12,16 67:24
68:17 74:2
**basin** 72:17 75:8
**basis** 2:4,8,12,16
2:19 45:20 49:5
65:23 66:3 74:5
74:14 86:8
**behalf** 7:9 14:17
16:16 25:25 47:9
47:13 50:20
**behave** 11:25
**belief** 36:11
**believe** 7:21 16:10
17:11 19:2,18
22:24 24:1,4
28:12 51:21 55:1
57:24 61:11 67:16
67:25 73:8 74:7
74:15 81:1 83:22
**believes** 73:11
**benefit** 75:16
**benefits** 74:21,23
75:9 77:24

**beth** 5:7
**better** 86:5
**beware** 61:20
**beyond** 42:23
**big** 75:4
**bigger** 61:14
**biggest** 69:13
71:10
**bit** 47:17,18,24
61:3 63:4 65:21
**block** 6:1 12:3
**board** 72:16 75:7
**borrower** 27:25
38:6,9 42:6,15
56:6 57:15 67:20
67:21
**borrowers** 52:16
**bought** 70:4
**bowling** 1:14 15:9
**box** 43:14
**breach** 57:18
67:24 68:5,11
73:1 83:10,13,24
83:24 85:5,9
**breaches** 68:6
72:23 83:11
**brief** 53:5 64:2
78:21
**briefed** 55:15
**briefing** 54:21
**briefly** 65:24 77:2
**briefs** 54:22
**bring** 35:7 56:12
58:24 69:11 74:19
**bringing** 31:25
53:9 67:18 69:22
**brings** 26:15
46:15
**broad** 81:16,19
**broader** 61:14
**broadly** 58:9
**brought** 16:23
32:2 33:7 84:5

browder  19:10
25:6 26:2 46:16
47:4,18,24 48:7
48:16,21 49:22
50:1,7,10,22
51:12
browder's  24:25
47:7,14 49:12,13
50:19
bucket  42:19
bunch  68:20
burdens  75:11
bureau  66:22
burton  3:7 6:19
19:23 90:3
business  44:17,24
bye  14:9

**c**

c  4:1 7:1 13:16
29:7,10,19 91:1,1
cadwalader  4:12
8:13
call  18:8 26:13
calling  24:21
cap  64:14,15,25
65:8,9 68:15,21
69:14,21,25 70:1
70:3,4,5 71:18
caption  48:5
captured  63:12
case  1:7 2:1 7:5,21
20:6,14 28:7 31:5
33:16,17 34:2,15
35:13,25 36:1
37:1 38:16 42:1,1
43:1,6 44:3,4,4,4
44:16,18,25 45:11
45:16,17 48:5,7
48:12,20 49:16
50:13 57:3 58:3
58:15 59:11,12
60:20 61:9 63:16
64:2,3,3,5,10,20

65:25 67:23 69:3
69:17 70:1,5,23
71:19 72:1,22,25
74:6 75:15,22
76:9,9 77:10,14
77:15,17 78:11
81:7 82:3
cases  41:22 54:24
55:2,16 60:21
62:4 63:13 64:7
68:15,21 69:15
72:12,15,22 73:6
73:9,10,11,16,18
73:19 74:2,8 75:5
76:8 77:2 80:6,7
80:11 82:4,14
85:11 87:2,10
caught  56:19
caused  31:23
causes  82:11
cd  77:15 81:18
cede  16:12 19:19
central  80:10
certain  53:9 62:12
certainly  11:2
20:10 27:3 68:20
69:25 70:25 71:3
74:19 75:15 76:8
79:4 81:16,17
85:11 86:4
certified  30:18
certify  91:3
cetera  39:24
cfpb  68:12 83:24
challenging  37:8
43:23
chambers  8:20
10:9
chapter  41:22
charged  71:6
check  20:16 25:16
checked  43:14

cherane  6:20
chorus  87:17,25
circuit  45:13
60:21 64:11,20
65:6 67:23 68:16
69:17 72:13 73:18
73:21 74:3 76:14
81:15
circuit's  65:4
circumstances
62:10
cite  64:2 83:15
cited  63:16 64:10
72:21 73:19 77:3
77:15 87:10
cites  81:14
citing  45:8
claim  2:4,8,12,15
2:18 3:1 6:2 12:21
13:16 14:19 16:2
16:10 17:22,23,24
17:25 20:7,15,22
21:3,7,16 22:7,18
22:25 23:5,6,8,11
23:16 24:7,8,12
28:1,10,16,19
33:5,6,13 34:1,2,5
34:6 35:6,8,9,21
36:15,16,16 37:1
37:1,23 40:5,5
41:11,14,17,17,19
41:21 42:5,6,8,11
42:12,14,20,23,24
43:4,14,15,15,17
43:18,19,21,24
44:8,16,21,23
45:1,3,18,19,20
45:21 46:3,3,4
48:10 50:2,2,3,9
51:6 52:19,19,21
52:25 53:1,2,3
54:20,25 55:3,4,6
55:7,11,13,14,17

56:1,1,3,4,9,10,15
56:15 57:8,9,18
58:5,9,10,11,20
59:1,5,6,6,7,9,9
59:12,13,17,17,21
60:2,18,23 63:10
63:20 64:6 65:23
66:20 68:9,17,19
69:20 70:10 71:14
71:21,23,25 72:4
72:6,8,9 73:2,12
75:5 76:6,6,6,7
77:12,20 78:2,4,8
78:15,15,16 79:13
79:18,19,21 80:3
80:4,8,10,21 81:9
81:16,19 82:20,25
84:23 86:3 87:4,4
87:6 89:4,7,10,13
89:16,22
claimants  9:11
10:16 24:3 61:3
claiming  33:14
claims  2:3,5,7,9
2:11,13,16,19 3:2
5:17 8:1,2 9:1,5
10:3,14 11:16,17
12:3,6 13:1,6,23
14:23 15:1,15,22
16:3,5 22:14,15
23:5,23,25 24:5
24:11 27:24 34:3
34:22 36:11,15,24
37:14 41:23 44:13
45:10 50:8 52:9
52:12 57:17 58:1
58:2,6,8,19,21,22
60:8,24 61:4,5
64:1,7,21 68:16
72:23,24 76:10,13
76:15,15 77:1,19
77:19 78:13 79:5
80:20 81:2 82:5,9

[claims - contracts]                                                                                                    Page 5

82:11,12,16,16
85:20 86:9 89:3,6
89:9
**clarified**  21:16
24:10
**clarify**  3:7 21:15
90:3
**clear**  28:8 58:16
60:22 61:9,11
62:4 71:2 84:13
**cleared**  8:20
**clearer**  64:9
**clearing**  10:9
**clearly**  80:24
**client**  70:13,15
**clients**  67:6
**cliff**  4:10 14:12,16
19:20 21:1
**close**  36:6 38:4
**closed**  39:7 72:1
**code**  41:18 44:12
44:14 52:20,21
56:2,20 58:9 65:5
65:6 72:3,25 73:7
74:9 79:6,23
81:10
**colleague**  14:12
16:13 17:12 19:20
**colleagues**  7:6
**colloquially**  41:23
**colorado**  73:24
**combination**
23:15
**combining**  23:23
**come**  60:11,15
62:21 73:13 78:13
**comes**  49:6 68:3
79:10,11 80:3
**comfort**  62:18
**commenced**  27:16
42:2 50:25
**commencement**
44:18,25

**commences**  64:23
**commencing**
71:16
**commissioners**
75:7
**commissions**
72:16
**communicated**
8:13
**communicating**
62:23
**companies**  75:4
**company**  72:19
**complaint**  30:12
30:16,23 31:2,4,5
31:11,13,14 33:16
33:20 39:3 80:18
80:18,23,24 82:19
**complete**  81:4
**completely**  21:8
30:17 54:24
**comply**  75:11
83:11 86:21,23
**complying**  27:23
**concerned**  35:5
**concluded**  65:12
88:1
**conclusion**  73:19
74:3 78:13
**conditions**  84:8
**conduct**  74:18
76:16,20 86:24
**conference**  2:1
7:21 9:3,7,14,22
10:12 24:2,4
**confident**  21:9
**confirmation**  2:22
3:5 27:23 28:5
29:23 31:18 57:2
72:10 73:2,3,5
74:10,11,13 78:2
78:4,6 89:20 90:1

**confused**  21:17,17
47:17
**confusion**  80:17
**conjunction**  20:5
**conklin**  6:18
55:23
**conklin's**  28:7
**connection**  7:4
**consequence**  75:9
**consequences**
75:2,19
**considerations**
65:3
**considered**  52:21
**consistency**  79:9
**consistent**  37:17
87:10
**consolidate**  22:17
**consolidated**  24:6
24:12
**consolidates**  23:4
**constitute**  72:24
**consumer**  2:3,5,7
2:9,11,13,16,19
3:2 5:17 6:2 11:17
12:3 13:6,23
14:22,23 15:22
23:25 28:20 36:15
36:22 42:7,14
45:24 56:5,8
57:15 66:11,21
89:3,6,9
**contained**  16:22
52:14
**contemplate**
84:23
**contemplated**
68:19
**contemplates**
80:13
**contemplating**
71:7

**contemplation**
71:1 76:17 81:12
81:21,22 82:13
84:2,4,13,19 85:7
85:10 86:6,20
87:5,8
**contend**  67:5
**contested**  7:16 8:1
10:1 17:20
**context**  79:12
80:2
**contingency**
59:22
**contingent**  52:21
53:2 55:4 56:2,9
57:17,18 58:2,5,8
58:10,20 59:7,17
59:21 78:2,4 79:7
80:4,9 81:9
**continuance**  22:4
**continue**  11:4
18:12 28:23 35:19
39:22 42:13 49:22
50:5
**continued**  8:3
**continuing**  75:9
**continuously**
20:14
**contract**  38:7 57:8
57:9,18 62:4,5
63:12,19 64:1
67:25 68:5,11,16
68:17,20 69:4,5,9
69:20 73:1 75:5
75:10,23 76:5,6
76:10,11,12,23
77:10,19 78:15
80:12 82:5,6
83:19 84:7,11
85:10 86:6,10
**contracts**  64:6
67:25 68:24 69:24
72:23 75:12 80:2

| | | | **d** |
|---|---|---|---|

**contractual** 39:8
39:9 64:1 68:1
69:1,10 77:21,23
**coordinate** 9:12
**coordination** 8:5
**copy** 30:12
**corlin** 31:16
**corner** 31:11
**cornin** 31:21
**corp** 7:5
**corporation** 1:7
20:13 81:14
**correct** 22:10,11
22:24 26:17 30:12
30:16 32:19 33:4
36:24 37:10,11
38:21 60:19 67:9
83:17,21 87:6
**correctly** 20:7
44:11 73:11 86:20
**corresponded**
26:3
**cost** 85:18
**costs** 64:8,21 66:8
66:15 67:20 77:8
84:5,15
**counsel** 8:13,21
29:14 52:2 78:25
79:10 80:6
**counter** 48:10
52:9,12
**counterclaim** 66:3
66:10 68:10 69:11
83:9
**counterclaims**
66:16 67:6,11
74:17 82:21,22
85:25
**country** 91:20
**counts** 67:10
**couple** 14:13 20:1
20:5,16 53:22
60:1 63:2 65:11

66:18 72:12 78:24
79:1
**course** 35:13 42:9
42:16 44:17,24
54:10 58:8 67:2
**court** 1:1,13 7:2
7:15,19 8:9,22
9:16,19,22 10:5
10:19 11:13,19,22
12:14,18,24 13:3
13:8,11,13,20
14:2,7,14 15:5,11
15:14,16,19 16:4
16:7,14 17:5,7,10
17:13,18 18:7,10
18:14,21 19:5,9
19:13,17,24 20:9
20:24 21:11,14,23
21:24 22:1,4,6,9
22:12,21 23:1,7
23:10,17 24:9,14
24:18,20,23 25:3
25:9,17,20,22
26:9,13,18,21
27:1,10,11,16
28:17,25 29:5
30:21 31:1 32:4,6
32:8,10,14,18,24
33:19,21,24 34:10
35:2,4,8,9,20,21
36:1,18,20,25
37:6,7,13,16,19
38:2,19,24 39:5
39:13,15,17,21
40:18,20,25 41:5
41:7,16 43:2,4
45:8,13,16 46:7
46:10,12,19,21,23
46:25 47:3,11,21
48:13,18 50:5,8
50:18 51:1,1,2,17
51:20 52:1,5,10
53:19 54:11,14,17

55:1,10,19 56:14
56:23 57:1,11,14
57:25 58:23 59:11
59:15,19,25 60:3
60:10,11,14,15
61:1,2,3,16 62:24
63:1,24 64:11,19
65:1,9,14,17 66:7
66:24 67:1,3,10
67:14 68:4 69:21
69:22 70:12,15,19
71:19,20 73:16
74:6,25 75:22
76:9 77:6,10,16
77:18,25,25 78:3
78:7,11,22 81:5
81:18,24 82:15,24
83:5,8,18 84:14
84:18 85:1,3,13
85:16,20,23 86:12
86:14,16 87:12,18
87:21,23
**court's** 8:4 12:12
26:12 72:15
**courts** 43:11 44:7
63:23 74:1
**covenant** 68:22
**covered** 78:19
**cplr** 29:24 30:19
**created** 28:21
39:4 81:13
**creditor** 2:5,9,13
2:16,19 3:2 44:16
69:18 77:11
**creditors** 45:5,6
45:24 57:17
**cross** 38:9 40:17
**crystal** 60:22
**current** 56:13
**currently** 22:19
**cut** 33:25

**d** 7:1 72:3,11 73:7
74:9 89:1
**damage** 56:15
58:18 82:16 86:3
**damages** 33:8
34:19 35:20 37:18
38:20 39:1 80:19
80:20,21,25,25
82:18 83:13,19
85:17,18,24 86:2
86:5
**dashboard** 25:8
25:11
**date** 8:20 10:18
15:13,13 16:1
20:20 52:13,22,25
53:18,20,20 54:25
55:11,14,22,22,24
56:8,8 62:13,21
64:16 65:24 69:3
70:3 71:17 72:10
72:11 73:14 74:11
74:17 75:17 76:20
76:20 79:16 91:14
**dated** 23:14,21
**dates** 55:17
**david** 4:7 16:13
16:16 25:24 47:12
**days** 66:1
**de** 5:20
**deadline** 56:6
**deadlines** 79:16
**deal** 24:11 45:5
49:25 69:16 71:23
77:17
**dealing** 53:1
68:16 72:5 75:6
76:14
**deals** 76:9
**dealt** 40:6 68:21
69:15 75:5,23,24
77:6

**debate** 28:14
**debt** 74:11
**debtor** 1:8 33:9
33:24 34:1,12
36:3,11 37:8,24
37:25 38:4,4,6,7,7
38:8 39:1 42:2
43:12 44:11 45:5
55:5 58:11,23
59:15 64:23 70:5
73:4 74:10,12
75:11 78:1
**debtor's** 40:12,12
44:17,24 75:9
78:3
**debtors** 4:3 7:10
8:4,15 43:7 60:9,9
71:22 73:14
**decide** 74:25
**decided** 68:15
73:11 74:6,14
**decision** 65:4
72:15 73:25 79:14
81:9
**declaration** 29:6
29:13,16,20 30:4
30:6,9,16 31:10
32:19,20,23 53:25
55:23
**declare** 29:19
30:10 31:17
**default** 56:11 57:1
70:16,17 71:3,4
**defaulted** 52:17
74:19
**defaults** 57:15
**defective** 56:17
76:21
**defendant** 66:8
**defendants** 27:19
66:14 75:3
**defense** 66:9

**defenses** 58:13,14
58:18
**defined** 56:2
**defines** 58:9,9
**defining** 59:5
**definition** 42:24
44:6,22 45:17
59:6 78:7 79:13
79:18,19,21 80:3
80:8 81:17,19
**definitions** 79:6
**delays** 42:20
**delinquency**
53:23,24 62:15
**delinquent** 53:16
**demonstrate**
50:24
**demonstrating**
55:23
**denial** 49:13
**denied** 40:18
48:19 50:17 51:13
**denounced** 73:9
**deny** 67:5
**department** 32:5
**depending** 69:3
**deponent** 31:17
**despite** 17:1
**detail** 65:22
**determined** 15:13
16:1
**dezihan** 3:7 6:19
19:10,22,23,24,25
20:11 21:11,13,21
21:25 22:2,8,15
22:16 23:7,9,12
23:19,20 24:1,10
24:13,16,19,22
26:1,2 90:3
**dezihan's** 19:16
21:3 22:14 24:5
**dial** 18:11 26:5,8

**dialed** 7:25
**dialing** 14:7 47:1
**dials** 26:14
**dietech** 7:5
**difference** 9:11,13
53:4 76:5,7 85:12
**different** 35:22
37:22 60:1
**direct** 83:12
**directed** 20:21
**direction** 78:9
**disagree** 85:23
**disallow** 14:22
15:21 42:11
**disallowed** 15:15
16:6
**discharge** 69:16
69:24 72:3,5 75:1
75:19 77:7,14,17
78:16 79:11,12,22
86:9
**dischargeability**
76:19
**dischargeable**
37:24 72:9
**discharged** 36:12
64:22 73:4,13
77:1 78:14
**discharges** 74:10
**disclosures** 62:12
**discovery** 9:10
**discuss** 7:23,24
10:15
**discusses** 49:10
54:22
**discussion** 43:22
71:12
**dismiss** 28:17
**dismissal** 48:18
**dismissed** 48:12
48:20 49:16,23
50:14 51:2

**dispute** 10:4 52:9
52:22 53:3,15,20
54:7,20 55:2,5,5,8
55:12 61:12,12
62:7,13,20 64:16
**disputing** 81:17
**distinction** 63:17
63:18,24 64:13
83:22
**distinguish** 79:25
**distinguishable**
75:22
**distinguishing**
69:14
**distributions**
42:21
**district** 1:2 47:21
48:13,18 51:1
61:2,2,16 63:23
64:3,11 65:1
69:21 71:20 72:17
72:20 73:16,22,24
73:25 74:6 75:8
75:22 76:8 77:5
**ditech** 1:7 20:13
20:20 27:19 28:18
47:23 48:1,8,9
49:2,5 51:3 52:10
53:23 54:3 56:16
57:19 66:17,21
67:17 68:2 69:12
71:1,4,8,15 72:2
74:18 76:2 84:6,8
**division** 32:4
33:18 38:16,21
**doc** 2:1,5,9,13,16
2:19,23 3:2,5,7,10
**docket** 8:17 29:11
31:11 32:2,5
**docketed** 27:8
**document** 30:5
31:4 32:19 33:3,4
33:4 50:23

**documents** 33:3
54:6 61:8
**doing** 10:18 11:4
11:6 32:10 34:21
37:20 39:22 70:10
75:2,20
**dollar** 38:3,17
42:17 43:23
**dover** 5:20
**dual** 57:6
**due** 27:8 42:9
54:4 81:10

**e**

**e** 1:21,21 4:1,1 7:1
7:1 15:7 89:1 91:1
**earlier** 18:3 24:4
25:7 44:19
**easier** 8:9 62:11
**eastern** 63:23
64:3 77:5
**ecf** 14:19 16:19
17:24 18:25,25
22:24 23:2,14
25:2 36:17 47:16
56:5,6
**economy** 49:19,21
**effect** 51:15
**effective** 27:12
52:13,22,25 53:18
54:25 55:10,14
62:13,21 64:16
65:24 69:2 71:16
72:11 73:14 74:17
75:17 76:20,20
**eight** 17:21 66:1
**either** 28:14 50:14
69:2 73:8
**eject** 48:2
**ejection** 48:25
**ejectment** 47:25
**eleventh** 73:21
**email** 26:2,2

**emergency** 26:4
47:15
**employer** 77:23
**encompassing**
80:3
**ends** 60:12
**enforce** 2:22 3:4
16:19,23,24,25
17:6 18:16 27:5
29:22 35:11 51:24
89:19,25
**enforceable** 69:19
**enforcement**
40:13
**enjoin** 35:18
37:16
**enjoined** 39:21
**enter** 17:5 84:20
**entered** 22:20
27:11 52:13 53:6
53:13 55:18 68:20
84:18
**entirely** 49:12,20
**entities** 9:2
**entitled** 40:1 44:2
44:9,16 45:17
68:6 69:18
**epic** 28:6
**epiq** 55:23
**equal** 69:6
**equity** 74:15,25
**erisa** 77:22
**error** 20:10 27:9
**escrow** 20:16
**especially** 49:18
50:1
**esq** 4:7,8,9,10,17
4:18 5:7,15 6:6,13
**essence** 35:10
**essentially** 23:5
27:22 55:3 63:9
**establish** 51:12

**estate** 14:24 61:6
74:16
**estates** 49:25
**estimation** 58:25
**et** 39:24
**etcetera** 53:20
83:11,15
**event** 48:23 81:11
**eventually** 24:14
**everybody** 8:17
55:12
**evidence** 33:11
38:11,12,13,15
39:9
**exactly** 56:20,21
58:19 59:2,3
60:22 79:12 82:10
**example** 49:14
54:1 56:5 58:14
79:25
**excess** 10:4
**excuse** 7:12 17:19
26:1 30:21,22,22
32:6,6,8,24 34:10
34:10,11 36:20
38:24 39:17 40:12
51:6 70:12 85:18
**excused** 14:6
21:23 24:21 46:23
47:1
**executed** 76:11
**execution** 84:3
**exhibit** 8:7,8 9:20
29:8,15 30:11,11
30:15 31:7,9,9
**exhibits** 29:9,9
32:21 83:4
**exist** 50:14
**existed** 52:25
61:13
**expansive** 78:7
**expense** 49:24

**experience** 39:11
**exploration** 72:19
**expressly** 56:10
**expunge** 14:23
15:22
**expunged** 15:15
16:6
**extend** 64:7 70:10
**extended** 53:20
55:22 56:5,8
**extension** 68:18
**extensively** 55:15
**extent** 23:10
34:18 35:5 39:20
40:8 42:12 49:1,4
50:7 61:18,19
72:14 73:10 85:24
85:25

**f**

**f** 1:21 44:13,15
45:4 91:1
**f.2d** 73:21
**f.3d** 81:15
**fact** 54:25 57:9
61:3 62:19,20
73:18 80:9 86:19
**factor** 49:19 69:14
**factors** 49:10,12
50:11 51:9
**facts** 27:6,14
50:23 53:4 64:4
**factually** 63:18
**failed** 51:12 66:21
83:14
**failing** 87:4
**failure** 83:11
86:23
**fair** 23:12 70:25
76:17 84:19 85:8
85:10 86:6,20
87:5,7
**fairly** 68:19 71:7
80:13

**false** 30:17 31:4
33:4 36:12 37:25
**family** 75:6 77:4
**far** 15:6 34:4 78:9
**favor** 49:20 74:16
**fed** 45:12
**federal** 77:22
**fee** 84:11
**feel** 21:8
**fees** 60:7 63:11
64:6,8,21 66:4,8
66:15 68:2,7,10
68:22 69:11,19
73:12 76:2 77:7
77:12 80:21 81:1
84:5,15 85:18
87:1,7
**fifth** 4:4
**file** 7:11 8:6,16
9:4 28:9 40:5 48:9
53:2 55:25 56:9
57:17 58:20 59:9
71:14 84:23
**filed** 3:7 8:7 11:17
14:21,25 15:7
17:23 18:25,25
20:18 28:6 30:4,6
30:12 31:12 34:1
34:8,15 36:14,15
37:1,2 39:3 40:5
40:10 43:13 47:14
50:1 52:9,12 55:6
55:13 56:15 58:1
59:12,13,17,17
60:3 66:1 71:25
72:4,8 73:2 90:3
**filing** 43:5 44:5
53:10 70:10 72:2
**finance** 6:9 8:24
9:16 11:8
**financial** 44:17
66:21

**find** 23:2 46:4
50:21 51:11
**finding** 55:10
**fine** 7:15 11:19
18:11 78:22 81:5
**finish** 34:11
**first** 2:11 7:20
10:19 12:5,7
13:24 29:4 30:3
35:25 49:14 63:10
65:22 66:18 70:24
79:2 83:1 87:13
89:9
**five** 14:18 57:22
**floor** 5:4
**florida** 43:7,9
**focus** 85:22
**focused** 61:3,17
85:17
**folks** 22:22 64:17
65:18
**follow** 8:10 67:18
71:15 74:22,23
75:18 84:9
**following** 29:10
**forced** 71:14
**foreclosing** 56:16
**foreclosure** 52:11
52:15 53:9,10
54:5,8 56:12
57:19,21 59:16,19
62:6,15 63:19
66:1,7,10,12,13
66:17 67:7,21
69:12 71:1,5,9,13
71:16 72:2 74:20
76:3 80:14 81:21
81:23 82:7,10,12
84:9,22,24 85:4
**foregoing** 91:4
**forest** 81:14
**forgive** 68:4

**form** 33:6
**formal** 12:9 40:10
40:10
**forth** 40:16 45:22
45:23 50:23 67:17
77:8
**forty** 3:1 17:21
89:22
**forward** 9:6 17:22
18:23 22:17 26:7
47:5 59:20,23
60:4
**found** 50:8 87:14
**foundation** 30:18
**founders** 4:13
8:14 10:12 11:7
**four** 9:18 12:4
13:23 14:25 71:24
**fourth** 2:18 15:21
89:15
**frame** 53:17
**frames** 47:25 53:3
**frankly** 60:5
**fray** 64:24 73:16
74:4,12
**fresh** 58:11
**front** 22:19 46:1,2
**full** 14:1
**fund** 28:20 45:24
**fundamental**
79:14,16
**funds** 36:14 42:15
**further** 14:5
29:20,21 65:10
81:4,25
**future** 72:22,23
81:11

---

**g**

**g** 7:1
**gallagher** 3:25
91:3,11
**gap** 41:23 45:3,5
45:10

**garrity** 1:22 7:3
**gautam** 5:11
**general** 42:14
**getting** 18:5 75:16
**give** 54:1 58:10
62:18 86:24 87:4
**given** 61:12 69:9
72:13 73:7 75:2
**gives** 66:13
**giving** 26:4
**glenn** 71:18 72:21
73:24
**go** 9:6 10:22 19:15
25:13 34:21 36:14
40:23 41:7 47:5
53:10 54:17,17,17
60:4 63:1 65:21
70:18,19 78:16
**goes** 71:11 79:15
**going** 7:6,7 10:17
14:12 17:14,22
18:23 19:15 25:4
26:7,19 34:12
35:6 36:21 39:18
39:18 40:3,11
54:23 59:20,22
62:6 63:2,4 70:9
71:5 78:16 82:11
84:21 85:9 86:23
**good** 7:2,8 11:13
12:2 14:15 16:15
19:22 25:24 29:2
41:5,6 46:12
59:25 63:17
**gotschal** 7:9
**gotshal** 4:2 14:16
16:16 21:1 25:25
47:13 52:7
**gotten** 35:15
**governed** 55:11
**grant** 38:8
**granted** 13:1,3,19
13:20,25 14:2

15:16 16:7 17:7
41:24
**granting** 40:15
50:21 51:4
**grants** 76:1
**great** 10:5 41:5
83:8 87:23
**green** 1:14 5:18
**greentree** 30:13
**grounds** 50:21
51:12
**grynberg** 73:23
**guc** 5:2
**guess** 58:24 59:11
72:10 82:17
**guidance** 12:12

**h**

**hadden** 73:22
**handle** 14:12
19:20 25:5
**hanson** 45:8
**happened** 12:1
59:16
**happening** 81:11
**happens** 75:25
**happy** 26:10
**hardin** 72:18
**harms** 49:20
**hear** 47:6
**heard** 8:2 20:7
22:3 50:4
**hearing** 7:12 8:16
10:11,14,17 15:25
20:4 24:15 26:5,7
27:13 37:4 50:4
**hearings** 10:10
**held** 69:17 77:10
**help** 39:18,18
**helpern** 5:10 52:4
**helpful** 32:11
**hereto** 30:11
**hey** 61:20 70:6

**hilda** 6:17 18:24
29:3 30:13 31:18
**hill** 4:7 16:13,14
16:15,16 17:9,11
25:4,22,24,24
26:10 47:9,11,12
47:12 51:14,16
**hinges** 76:19
**hirschtritt** 5:10
**history** 78:8
**hit** 8:16
**hold** 19:6 33:21
83:2
**holding** 1:7 7:5
20:13 69:23
**holdings** 64:7
**holds** 64:4,21
**home** 9:2,17 48:3
**hon** 1:22
**honor** 7:8,11,13
7:18,20,24 8:6,23
9:3,7,14,20,25
10:6,9,15 11:14
12:8 14:5,9,10,15
15:10,18 16:9,15
16:18 17:9,11,14
17:25 18:12,18
19:3,12,22 20:25
22:20 23:24 24:19
24:24 25:13,24
26:1,10 27:3,5,21
28:2,13 29:1,1
34:8,25 35:24
36:23 39:2 40:21
40:22 41:2,8,12
41:20,25 42:4,10
42:16 46:6,13,15
46:22 47:8,12,14
48:4,9,12,20 49:7
49:11,16,18 50:16
51:16,18 52:3,6,8
53:12 54:20 55:15
55:20 56:18 57:23

58:4,14,19 59:2
59:24 60:11,13,19
61:25 62:25 64:18
65:10,20 70:4,21
71:11 73:10 76:5
78:18,24 79:1,13
80:5,16,24 81:3
81:23 82:2,23
83:3 86:13,20
87:20
**honor's** 18:20
26:4 27:7
**hopefully** 10:8
**host** 68:15
**hot** 17:15
**howrey** 45:7
**huh** 33:23 36:19
**hundred** 11:10
**hunton** 6:8
**hutchinson** 6:17
18:24 19:11 26:21
26:23 27:2,12,17
27:24 28:3,25
29:1,3 30:13,13
30:24 31:3,18
32:7,8,9,13,17,22
33:2,20,21,22,23
34:8 35:4,24
36:19,25 37:5,14
37:23 38:3,20,22
39:2,6,14,16
40:14,17,19
**hutchinson's** 37:9
**hybrid** 77:21

**i**

**idea** 59:5 80:8
**identified** 24:8
**ii** 67:10
**illinois** 52:10 53:7
66:6,13 67:7,7
74:24
**illogical** 63:18

**important** 53:5
54:1 63:15 79:1,8
79:13,14 83:23
**impose** 86:8
**improper** 66:12
69:12 71:9 72:2
76:3 81:22 84:24
85:4
**improperly** 66:18
**inaccurate** 33:1,3
**inadvertently**
27:6
**inapplicable** 42:3
**included** 9:25
10:2 21:4 23:22
28:10 48:6 55:22
**includes** 80:9
81:19
**including** 56:2
59:5 63:23
**inclusion** 23:16
**inconsistent** 47:18
47:24 65:5
**incorporate** 12:18
**incorrectly** 74:6
**incurred** 64:22
83:13
**incurs** 49:23
**indefinite** 54:8
**indemnification**
67:22 68:21
**independently**
60:6
**index** 30:13,16
31:14
**indicated** 43:16
61:11
**indication** 78:9
**indicia** 71:15
**indiscernible**
10:24 11:24 12:3
22:1 29:25 30:25
32:5 34:10 36:3

38:23 39:16,17
59:1 81:6 83:14
83:16
**industries** 45:8
**informal** 12:9
13:14 15:1,6,24
**informally** 40:9
**information** 26:4
26:7 32:25 36:10
**informed** 54:3
55:25 56:8
**ingrid** 4:17
**initial** 10:2
**injunction** 2:22
3:5 16:19,24,25
17:2 18:17 27:5
27:21 28:5,15
29:23 31:18,20,24
34:16,21 35:11,16
35:17 36:5 37:15
38:15 39:24,25
40:13 46:17 48:17
48:23 49:9 50:12
51:24 52:23 55:11
75:1,19 79:15
81:2 86:2,9 89:19
89:25
**injunctive** 37:9
**insight** 25:9
**insightful** 86:18
**insofar** 42:5
**instances** 61:8
**institute** 71:1,5,8
**instituted** 66:17
69:12 76:3
**instructions** 18:20
**insufficient** 2:4,8
2:12
**intend** 8:16
**intended** 45:4
**interesting** 53:12
**interpretation**
65:3

**interpretations**
76:18
**interpreted** 65:6
**interpreting**
79:24
**interrupt** 57:11
57:25 61:19 66:24
70:21
**interrupting**
54:12 56:24 85:14
**intonation** 56:19
**intrinsic** 86:5,10
**inundated** 71:22
**involuntary** 41:22
41:24 42:1,25
44:3,5,15,25 45:5
45:11,17
**involve** 49:2 64:5
**involved** 61:3
**involving** 72:15
**iowa** 47:22,25
48:13,18 49:23
51:1
**iowas** 50:24
**irrevocable** 77:4
**issue** 7:24 28:23
34:5 41:15 52:13
52:18,24 60:6
66:23 68:13,18
70:22 71:10 74:24
79:11 82:18
**issues** 9:8 18:5
28:2,22 35:17
40:8 66:20 68:23
72:6 75:6
**item** 12:7,22 13:6
13:12,16,23 14:18
14:18 15:20 24:25
40:23
**items** 12:4 13:15
14:13 17:20

**j**

**james** 1:22 15:9
**jamie** 3:25 91:3
91:11
**january** 48:17
**jenner** 6:1 12:2
**jlg** 1:7
**joined** 41:1
**joint** 50:20
**jointly** 14:21
**jones** 5:1
**jr** 1:22
**judge** 1:23 7:3
8:11,17 11:12
17:16,20 26:17
27:6,15 28:6
37:11 39:3,11
42:22 61:7 71:18
72:18,21 73:24
**judgment** 49:15
77:8,9
**judgments** 77:13
**judicial** 49:19,21
50:13
**july** 20:3,4 30:6
**jump** 53:13,14
**justice** 62:19,20

**k**

**k** 29:7,10,19
**keeping** 7:3 14:8
**kind** 48:10 65:3
66:11 69:4 73:16
79:9 80:13 82:6
84:5,11 85:9 87:4
**kinds** 58:12,13
**knew** 55:12
**know** 8:2 9:1,5,9
9:10 10:6,8,11,16
10:17,21,24 19:25
21:17 24:14 25:6
27:10,24 28:8,12
28:13,16,19 39:11
40:10 41:22,25

42:7,13,18,19
44:4 52:15,16,20
54:22 55:3,6,16
56:6,20 57:15
58:6,7 59:4,4,4
60:8,10,24 61:16
61:20,21,22 62:7
62:13,15,18 63:3
63:4,5,5,7,8,8,10
63:14,17,23 64:19
68:4 70:8 71:12
77:19 78:25 79:8
79:8,9,10,20 80:8
80:11,16,22 81:1
81:4 82:10 86:19
86:19,25 87:1
**knows** 82:10
**kurth** 6:8

**l**

**l** 1:22 12:16 15:7
29:7,10,19
**lafourche** 72:16
75:7
**laid** 28:5
**language** 75:24
**lapsed** 48:24
**large** 75:3
**law** 43:20 44:10
54:6 66:7 67:7
68:7 80:15
**lawsuit** 34:14
**lawyer** 39:2,11
86:7,7
**lay** 12:19 41:10
**laying** 32:10
**lead** 73:12
**leads** 39:10
**leave** 69:8
**left** 24:7 26:25
46:16 61:19
**legal** 2:4,8,12
91:19

legislative  78:8
legs  64:13
lender  54:5
lenders  42:21
  54:4 70:2,6 75:4
lessors  45:6
letter  8:6 24:2,2
letters  70:16
levee  72:17 75:8
levin  6:6 11:18,20
  11:22,24 12:2,17
  12:21,25 13:5,8
  13:10,12,14,22
  14:4,9
levine  5:7
liabilities  73:5
liberty  4:14 9:2
  9:16 11:8
lift  47:15,20 49:4
  49:9,15 50:11,14
line  7:22 8:14
  31:22 54:22,23
  55:16 57:7 60:21
  62:3 63:6,13
  64:14,15 73:10,11
  73:16 80:11 82:3
  82:14 86:17 87:2
  87:9
lines  84:12
list  10:2 31:24
listed  12:9 13:15
  15:3
lists  31:23 32:3
litigant  32:3
litigation  16:21
  17:1 37:7 41:19
  43:5,6,17 47:21
  61:4 64:23 78:1
  80:14 82:6,7,10
little  8:9 10:21
  63:4 65:21 78:9
  82:17

live  24:8 55:2
  61:12
llc  30:13
llp  4:2,12 5:10 6:1
  6:8 12:3 45:7
loan  38:10 42:21
  54:5,6
loans  70:3,4
long  53:14,18
  62:22 80:12
longer  11:1,2,2
  81:6
look  10:21 32:8
  34:1,14 35:12
  38:19,19 58:15
  70:6 76:13 77:19
  80:18,19,24 82:3
  82:3,24 83:1,8,9
  84:18,20
looked  22:7 43:25
  44:7 78:12
looking  32:20
  42:23 58:2 82:20
  82:25
lot  28:14 44:5
  61:4 73:6
lower  31:10 36:1

**m**

m  12:22
main  42:8
maintaining  17:1
making  36:5
  64:12
manges  4:2 14:16
  16:16 21:1 52:7
manufactured
  76:22
manville  81:14
map  11:9
march  50:4
massachusetts
  64:12 77:16

matter  1:6 7:17
  8:21 15:24 16:1
  18:15 19:4 21:10
  43:20 44:9 51:10
  51:21,22 55:7
  59:22 74:7,25
  80:2
matters  7:16 8:23
  17:16 23:8 40:2
  43:10 46:16
matured  58:5,20
mean  28:15 43:9
  63:1 70:20 81:19
  85:6
meet  44:22,23
  77:23
meets  68:14
mention  33:17
  77:2 78:20
mentioned  20:5,8
  66:4,22 70:4
  75:21 80:6
mentioning  31:6
merits  9:6 22:9,13
  42:23
mic  17:15
michael  5:15 52:4
mid  56:6
million  41:15
  42:17
mine  25:14
mineola  91:22
minute  30:21
minutes  65:11
misclassified  3:2
misrepresentation
  36:3,5,12
missed  68:1
mistaken  25:12
modification
  50:12
monetary  27:17
  27:18 28:18 33:8

35:7 37:12,17
  38:25 39:20 47:22
  47:22 48:8,10
  52:10 58:11 60:8
  80:25
money  34:19 38:6
  39:10 48:2 72:7
month  10:8
months  53:22
morning  7:2,4,8
  12:2 14:15 16:15
  19:22 25:24 29:2
  41:5,6
mortgage  52:13
  53:6,7,13,16 54:6
  55:18 56:11,13,16
  57:7 62:5 63:19
  66:6,6,13 67:7,8
  67:12,15,16,19
  69:7 70:24 74:22
  75:14,17 76:1
  84:3,20
mortgagee  57:16
motion  2:21 3:4,7
  3:10 16:19 17:6
  18:16 19:16 20:11
  21:15 24:25 26:11
  27:5 29:21,22,23
  29:25 30:1,6 32:1
  32:2 33:7,8,12,17
  36:13 37:8 38:9
  38:14,14 40:12,17
  46:17 47:7,14,15
  48:6 49:13 50:16
  51:13,23 52:18
  66:9 67:5 89:19
  89:24 90:3,5
motions  16:23
move  7:13 17:6
  19:9 49:9
moved  26:24
  48:17

**moving** 11:15
57:10 73:15
**multiple** 15:8
49:25
**mute** 11:24,25

**n**

**n** 4:1 7:1 29:10,10
89:1 91:1
**name** 20:5,7 21:18
29:7,18 36:7 38:5
39:4 65:15
**named** 27:20
**narrow** 41:16
42:10,22
**national** 4:13 8:14
10:12 11:7
**necessary** 9:10
**need** 12:19 15:5
28:14 53:10 55:1
71:20 73:2 75:18
78:20
**needed** 77:23
**needs** 74:22 76:23
76:24 81:20 84:9
**negative** 43:9
**negotiating** 69:7
**neither** 48:4 75:10
**never** 20:18 25:11
25:15 38:6 47:4
**new** 1:2,15,15 4:5
4:15 5:5,13 6:4,11
27:15 32:4 72:20
77:5
**nine** 14:25 15:1
51:22
**ninth** 2:3 3:1 12:5
12:7 17:21 45:13
64:20 73:18 74:3
89:3,22
**non** 37:24 47:22
78:1,3
**normally** 69:5

**nose** 62:2
**note** 8:11 53:6
66:5,19 67:8,15
67:16,19 69:7
70:24 74:19,22
75:14,16 76:1
83:14 84:3,20
**noted** 18:18 20:9
49:11
**notes** 44:11
**notice** 10:16 17:3
26:6 28:4,14
29:25 31:19,25
33:9 35:16 38:14
53:19 55:21,24,24
56:4,5,7 61:4
66:20 70:5 82:8
86:24 87:5
**noticed** 28:4,13
**notices** 31:23
35:12 53:24 54:2
54:4 56:4 70:23
71:6
**notification** 20:15
21:6 23:13
**notifications**
62:14
**notified** 20:6
27:10
**november** 8:15
9:5 10:10 53:5
**number** 7:5,21
12:11 14:18 16:20
17:16,21,25 22:24
22:25 23:2,18
24:3 25:1 27:19
29:11 30:14,17
31:11,15 32:3,5
32:21 43:10 51:22
53:23 80:6
**numbers** 9:18
**numerous** 80:22

**ny** 4:5,15 5:5,13
6:4,11 91:22

**o**

**o** 1:21 7:1 29:10
91:1
**object** 29:4,5
38:11
**objected** 50:4
**objecting** 58:25
**objection** 2:4,8,12
2:15,18 3:1 8:12
8:14 12:8,22 13:7
13:16,18,25 14:21
15:14,21 16:2,5
17:24 18:19,23
31:2,3 36:16,21
36:24 37:2 40:3,6
40:6,10,15 49:5
52:8 67:4 89:4,7
89:10,12,15,22
**objections** 8:1
9:25 10:3 11:17
12:6 13:1,24
14:19 16:11 17:4
17:22 28:3
**obligation** 39:8,10
**obligations** 75:11
77:23 81:10
**obtain** 51:12
**obvious** 59:4
**obviously** 8:4,25
9:12 10:11,16
28:23 42:7 48:21
61:15,15 66:23
79:16 80:23
**occur** 57:1
**occurred** 73:1
76:24 79:4
**occurs** 72:4
**october** 1:17
23:14,21 30:3
66:1 71:8 91:14

**ny** 4:5,15 5:5,13

**office** 25:4 27:9
**offs** 58:13
**ogle** 54:22 55:16
57:4,6 60:20 62:3
63:5,13 64:4,5,13
64:15 65:4 68:14
69:14,15,15,22,24
73:8 79:11,18,20
79:22,23 80:1,7,7
80:10,11,11,12
81:7 82:3,4,14
84:10,10
**oh** 18:6 21:21
25:12 35:2 41:5
52:5
**okay** 7:12,19 9:15
11:14 18:9,12,14
19:3,11,14 20:11
22:6,8 23:9,12
24:13,23,24 25:21
25:22 32:13,17
35:2 39:13 40:13
40:19 41:4 47:3
51:17 52:5 54:13
56:25 57:13 59:15
70:8 71:4,12
78:15 82:24 84:14
**old** 91:20
**olen** 67:23 76:9
84:10
**omission** 36:4,12
37:25
**omnibus** 2:3,7,11
2:15,18,21 3:1,4
8:15 10:10,14
12:5,8 13:7,24
14:19,21 15:21
16:19,24 17:6,21
18:16,23 29:22
51:23 89:4,6,9,12
89:15,19,22,24
**once** 59:15 87:3

**[opinion - post]**                                                                    Page 14

opinion 9:13
opportunity 37:3
  40:4 50:18
opposing 8:5 9:11
opposition 13:2
option 56:12
order 2:22 3:5
  7:13 13:4,21 14:3
  15:15,17 16:5,8
  17:8 26:5 27:7,11
  31:19 36:8 41:24
  44:19 46:10 47:22
  48:14 51:14 74:23
  89:20 90:1
orders 8:2 79:16
ordinary 44:17,24
original 30:6
  81:13
outlier 73:17
outside 21:10
  47:21 64:10 76:23
overruled 40:15

**p**

p 4:1,1 7:1
p.m. 30:4
pachulski 5:1
package 28:11
page 24:17 29:12
  81:8 83:9 89:2
pamela 3:25 91:3
  91:8
panithobi 5:11
paper 31:6
papers 28:6 30:1
  36:13 43:7 46:4
  47:5 50:19,19,20
  66:4,22 67:3
  73:20 80:23
paragraph 29:20
  30:10 83:20,24
  85:6 86:21
paragraphs 31:7
  31:8,14 66:19

67:4
pardon 21:13
park 6:10
part 20:7,10
  21:16 29:12 32:15
  44:22,22,23 57:19
particular 17:24
  19:4 52:18 78:11
  79:4,5,6,20
particularly 75:2
parties 7:21,25
  8:10 16:21 17:1,3
  17:6 28:22,24
  45:7 61:13 62:22
  68:19,24 69:1,6
  81:12,13,21,22
  82:7,13 84:2,13
  86:21 87:8
partners 77:15
parts 79:23
party 15:2 32:3
  49:1 70:7,8 78:1
pause 9:21 11:21
  19:8 20:23
pay 20:17 62:5
payment 20:17,21
  78:2,5
payments 54:4
  83:14
pays 75:24
pefley 6:20 17:23
  18:1 26:23 40:24
  40:25 41:3,6,14
  42:13 43:2,3
  45:14,15 46:6,9
  46:14,23,25 47:2
pefley's 42:5
penalty 29:19
  30:10
pendency 51:6,6
pending 27:15
  33:8 34:15 36:24
  43:5 50:24 51:3

pension 77:24
people 79:5
percent 86:18
period 41:23 45:6
  48:24
perjury 29:19
  30:10
permanent 36:4
  50:12
perspective 9:9
  27:4,14 61:14,15
  61:17
pertaining 20:13
petition 42:6
  43:19 45:20 52:14
  64:22,23 69:2,18
  70:3 77:12
ph 15:10
phone 18:1 19:2
  19:18 25:6 28:7
place 37:18 59:8
  70:24
plaintiff 48:7
plan 2:21,22 3:4,5
  14:17,24 15:23,25
  16:4,11,17,18,19
  16:23,24,25 17:21
  18:15,16 19:21
  21:2 25:25 27:4,5
  27:21 28:4,15
  29:8,11,13,14,17
  29:21,22 30:4,7,7
  31:6,18,20,24,25
  32:2 34:4,16
  35:17 36:10,13
  37:17 38:15 40:13
  41:9,10 42:16,19
  45:22,23 46:17
  47:6,9,13,17 49:9
  49:20,24 51:4,8
  51:18,23,24 52:7
  52:23 55:11 61:7
  61:20 65:25 73:3

74:10 77:2 79:2,4
  79:5,15 81:2 82:2
  89:18,19,24,25
pleadings 8:9 9:4
  21:4 48:1,6,14
pleads 47:19
please 9:19 13:4
  13:21 14:3 15:17
  16:8 17:8 19:10
  36:22 38:25 43:13
  46:24 51:15 52:1
  86:16
plenty 8:18
plus 31:11
pm 88:1
podium 16:12
  17:12 19:19
point 28:13 53:15
  56:15 58:15 59:3
  59:9 63:6,15
  64:12 71:11,20
  79:12 80:5,16
  86:15 87:3
points 65:20 78:8
  78:24
policy 65:3 78:25
  79:1
pool 79:5
posed 86:20
posit 80:10
position 41:10,20
  42:4 48:22 49:2
  60:20
possibility 56:16
  84:21
possible 52:15
  65:12 72:23 78:21
  85:5 87:16
post 52:13 57:2
  64:22,22 69:2,18
  73:13 74:17 75:17
  77:11 78:2,4

pot 72:7
potato 17:15
potential 53:9
  54:8 57:18
potentially 60:4
  75:20
powers 69:6
pre 42:6 43:19
  45:20 52:14,22,25
  54:25 55:10,14
  62:13 64:16 73:4
  76:20,20 78:5
  80:7,11
precedent 84:8
precise 29:18 82:6
precisely 58:10
  63:24 86:24 87:9
preference 26:12
prejudice 48:13
  48:18,21 49:16,23
  50:15 51:2
prepared 31:21
prepetition 54:21
  54:25 55:18 57:9
  57:9 60:18,23,24
  62:4,8 64:5 66:5
  69:20,20 74:22
  75:23 76:16,19,22
  76:25 77:8,9,10
  77:13 80:2
present 6:16 47:9
presentation 81:4
preserving 61:6
  61:22
presumed 81:12
  81:20
pretty 27:15
  41:12 53:11
prevail 67:21
prevails 66:9
prevents 34:21
previous 16:22

previously 26:3
principles 74:15
prior 27:23 31:25
  31:25 43:5
priority 41:17,21
  42:12,19,24 43:15
  43:17 44:2,2,9,13
  45:18,21 46:3,4
pro 29:3
probably 20:18
  21:17
problem 7:18
  11:25 17:18 24:16
  58:12 65:18
procedures 8:2
  9:6 53:10
proceed 16:3 19:3
  20:1 25:23 26:11
  27:24 51:25
proceeding 71:2,5
  71:9,13,16
proceedings 50:8
  88:1 91:5
process 27:25
  28:19,20 34:3
  50:3,9 60:12
processed 60:11
products 76:21
  81:14
promptly 27:10
proof 12:21 17:23
  28:10,16 33:5,6
  33:13 36:16,16
  50:2 53:2 55:6,13
  56:1,4 59:9 70:10
  71:14,25 72:4,6,8
proofs 2:4,8,12,15
  2:18 3:1 12:6
  14:19 50:2,3,9
  56:9 71:21,23
  89:4,7,10,13,16
  89:22

proper 50:8 53:1
  84:9
properly 21:21
  28:4,12
property 53:7
propose 7:13 10:7
proposed 63:18
prosecute 42:13
prospect 54:7
protect 45:4 84:23
protected 64:17
protection 66:11
  66:21
protective 71:21
  71:23
prove 38:16
proved 39:9
provide 26:6 68:1
  77:24
provided 17:3
  44:8 70:5,23
providence 69:9
provides 34:17
  44:12,15 67:19
  78:9
providing 53:19
provision 34:23
  66:6 76:1
provisions 34:23
  42:2 52:15 53:8
  66:18 67:11,24
  68:22
proximate 83:12
pull 82:25
purpose 79:21
purposes 43:22
pursuant 30:19
pursue 28:19,24
  35:19 47:21
pursuing 37:17
put 18:7,19 21:24
  22:15,16 26:13
  61:20

putting 10:20

**q**

qualify 45:2
question 38:25
  44:1 59:25 67:1
  68:16 72:9 84:1
  86:11
questioning 80:17
  86:17
questions 28:8
  65:10 76:4 78:19
  81:4
quickly 63:9
  65:21 73:15 87:16
quite 12:11 41:16
  41:20 42:17 60:5

**r**

r 1:21 4:1 7:1 91:1
raise 23:8
raised 28:3 37:15
rationale 37:18
  61:24 69:22
reach 10:23 55:1
reached 49:15
read 12:12 15:4
  77:17
reading 21:2
real 54:8 77:2
  78:17
reality 50:13
really 7:20,23
  10:15 32:11 41:15
  42:10 44:1 52:22
  53:14 58:25 61:17
  63:18 68:13,13
  69:13 74:24 79:19
  84:23 85:21
realty 77:15 81:18
reap 75:9
reason 35:15 45:1
  51:11 54:19 61:16
  63:17 76:7

**reasonable** 66:8
**reasoning** 65:8
**reasons** 29:10
 64:15
**rebuttal** 65:12
**received** 12:8 13:7
 13:14,18,24 14:25
 15:23 17:4 20:12
 20:14,16,19 21:9
 23:13 28:4,11
 38:6 55:21,24
 56:7
**reclassify** 42:11
**recognized** 65:2
**reconsideration**
 71:25
**record** 12:13,20
 15:4 20:6,25
 23:22 29:6 40:16
 43:9 91:4
**records** 20:13
 21:22
**recover** 69:18
**refer** 45:3 54:5
**references** 48:1
 48:25
**referred** 41:22
**referring** 24:1
**refers** 47:25 49:1
 81:10
**regarding** 16:10
 21:6 26:5 54:4
**regards** 23:13
**register** 47:4
**registered** 25:18
**regulated** 77:22
**regulation** 66:22
 68:12 83:24
**reiterate** 64:14
**reject** 38:18
**rejected** 63:24
 65:1 75:10

**rejection** 28:11
**relate** 10:3 18:23
**related** 21:6 23:10
 41:19
**relatedly** 49:7
**relates** 35:17 37:7
 37:15 39:23 40:2
 41:21 43:11 46:18
 47:7 51:5,23
 57:19 62:7 82:19
 83:19
**relationship**
 76:16 81:13
**relatively** 69:6
**relevant** 8:8,8
**reliability** 72:25
**relief** 3:10 25:1
 27:17,18,18 28:18
 36:1,2,4,6 37:9,12
 39:20,23,24 40:1
 40:4,15 41:24
 42:10,22 44:20
 47:7,22 48:8,10
 49:12 50:22 51:4
 51:13,13 52:10
 90:5
**rely** 57:6 79:5
**remaining** 9:24
 11:10 15:15 16:3
 16:5 24:8
**remedies** 53:11
**remove** 38:4
**removed** 27:7
 51:1
**reorganization**
 73:4
**reorganized** 60:9
**repeat** 23:18
**replaced** 27:22
**reply** 8:16 29:8,11
 29:12,17 30:7
 31:6 32:19,20
 33:1,2,2 43:8

50:20,24 53:25
**representation**
 37:25
**representative**
 14:22 42:8
**representatives**
 14:24
**request** 9:3 10:7
 13:3 14:2 15:16
 17:7 21:3,5,5,22
 29:5 38:3,9 39:6,7
 40:4,12
**requested** 13:20
 16:7 20:21 36:9
 38:4
**requests** 20:21
**require** 48:22
**required** 31:19
 62:9
**requirements**
 67:17
**requires** 29:24
**res** 64:14,15,25
 65:8,9 68:15,21
 69:14,21,25 70:1
 70:3,3,5 71:18
**rescap** 54:23
 55:16 57:4,7
 58:15,15 60:21
 61:1,24 62:3,11
 62:12 63:5,6,13
 72:21 73:8,16,25
 74:6 75:4,22 76:8
 79:11,19 82:14,15
 84:10 87:11
**reserve** 42:20
 65:11
**resolve** 21:20
 40:11 59:20 60:6
 60:14
**resolved** 23:15
 34:2 36:21 37:3
 58:3,6,6,22 59:10

59:22 60:24,25
 87:15
**respect** 8:21,24
 12:25 13:2,17
 15:12 17:23 21:8
 21:24 41:11 55:7
 58:18 63:14 65:22
 66:15,19 69:15
 70:7,22 72:6 74:4
 74:7 77:2 81:7
 86:9
**respectfully** 15:14
 16:4 29:4,5 40:14
 74:5
**respects** 79:2
**respond** 54:3 76:4
 78:20
**responded** 20:20
**respondent** 15:7
**response** 15:24
 18:22,24,24 19:20
 25:5 26:11 27:8
 48:4,14 49:11
 52:11
**responses** 12:9,15
 13:14,18,25 14:25
 15:1,3,6,8,13 17:4
**restaurant** 45:12
**resubmit** 22:4
**result** 57:5 83:13
**return** 74:12
**returning** 73:15
 74:4
**returns** 64:24
**revealed** 30:4
**reversed** 71:19
 73:25
**review** 31:9 50:18
 51:8
**reviewed** 30:9
 46:3
**rich** 6:13

richard   4:9,18 6:6
  12:2 29:7,14,16
  29:18 30:5,9,15
  30:20 51:18 52:6
  82:2
riela   5:15 52:3,4
  65:14,16,16,17,18
  66:25 67:2,9,13
  67:16 68:9 70:14
  70:17,20 81:6
  83:6,7,18,21
  84:17,25 85:2,8
  85:15,19,21 86:4
right   7:2 8:22
  9:22 10:19 11:11
  11:13,19,22 12:18
  12:24 14:14 15:11
  16:14 18:7,7,21
  19:5,25 20:24
  21:11 23:1,7 24:9
  24:9,15,20 25:3
  25:17,20 26:9,22
  27:1 28:25 31:1
  32:19,21 33:25
  34:2,4,12,20 35:4
  35:4,17,20,21
  36:21,22,25 37:7
  37:13,21 38:2
  39:21 40:16,20,25
  41:7 43:2,20,21
  43:24 44:23 45:17
  45:22,23 46:5,7
  46:11,12 47:11
  51:17 55:19 56:20
  58:15,19 59:3,14
  59:15,18 60:22
  61:1,25 62:2,24
  63:6 65:14 67:10
  67:11,12 68:2,3,7
  68:9,25 69:1,10
  70:17 76:2 77:7
  78:2,4,22 81:5,24
  82:16,17,21,22

83:9,20 84:22,25
  85:1,22,23 87:12
  87:13,16,23
rights   34:22 37:9
  61:5,22 70:11
road   68:14 91:20
robert   6:13
rodriguez   25:11
  25:13,15,18,21
rodriquez   25:9
root   78:5
rooted   65:2
route   60:16
routes   55:9
rubber   68:14
ruben   64:2
rubin   77:4 79:25
  80:1 87:2,10
rule   62:20 64:19
  64:21,25 65:2
  67:7 74:15 79:22
  79:23
ruled   50:6
rules   30:19 71:15
  74:22,24 75:18

**s**

s   4:1 7:1 29:7,19
saw   18:2 25:7,11
  25:15 48:4 76:1
saying   32:15,25
  33:7,24 34:1,6,13
  34:14,18,20 35:7
  35:9,10,12,18
  39:7 57:16 58:25
  59:12 60:16,17
  66:17 68:5 70:6
  77:18 82:18 84:14
  84:15
says   31:11 57:7
  66:7 72:3 73:7
  74:9 75:8 80:12
  81:9

schedule   10:14,20
  11:10
scheduled   8:3
  10:17 22:15
scheduling   7:25
  8:15 10:7,13,24
  21:6 24:15
sdny   72:18
se   29:3
second   9:19 18:8
  19:6 20:11 21:5
  26:13 32:4 38:19
  44:23 55:14 60:21
  64:10 65:4,6
  67:23 69:17 70:9
  72:13 76:14 80:5
  81:15 82:25 83:8
section   31:19
  36:10 41:18 44:9
  44:11,13,20 45:18
  72:24 75:13 77:13
  83:11,15
sections   68:5,12
security   53:7
see   8:18,18 10:13
  10:23 18:2 25:18
  26:14 41:1,2 45:7
  67:18,23 81:8
  86:7,8
seeing   25:7
seek   36:1,2,4,6,8
  37:9 42:11 47:22
  48:10 71:24
seeking   38:20,22
  38:25 39:20 42:22
  48:2,2,8 71:22
seeks   14:22 15:21
  16:25 27:17 28:18
  47:18,20 49:4
  50:13 80:25
segal   74:3
selling   70:3

send   10:16 26:1
sense   73:6
sent   23:20 35:12
  53:23 54:2
separate   9:1,1,2
  51:3 55:9 60:3
september   22:3
  65:25
served   21:21 24:2
  31:23,24 38:14
service   29:9 31:16
  31:17
servicer   67:17,20
serving   28:9
set   34:3 36:15
  40:16 41:8 45:22
  45:23,24 48:17
  50:23 58:13,17
  67:17 77:8
settle   51:14
seven   16:21,25
seventh   2:21
  16:19 89:18
sharma   5:11 7:16
  18:18 51:22
sharmas   26:24
  46:18 52:2,8,16
  53:6,16 54:3
  55:21,24,25 56:7
  60:8 63:8,25
  64:18 66:16 68:2
  69:11 71:12 74:16
  74:18 76:2
sharms   52:4
she'll   42:8
shield   75:1
shifting   67:20
  84:12
shortly   23:3
show   38:13
showed   43:14
showing   50:10

shows  8:7 31:10
sic  31:17
side  8:5
significant  42:17
  49:23 54:14,19
  61:18 78:5
significantly
  42:20 50:22
similar  8:25 16:22
  45:6
simply  41:20 42:2
  42:24 50:12 78:14
singh  4:8 7:6,8,9
  7:18,20 8:23 9:18
  9:20,24 10:6
  11:12,14 14:10,11
  17:14,15,19 18:6
  18:9,12,15,22
  19:7,11,14,18
  23:21 24:24,25
  25:4,12 26:17,18
  26:19,22 27:3
  34:25,25 35:2,3
  37:6,6,11 40:21
  41:1,4,8,9 43:23
  46:8,11,13,20,22
  47:3,8 58:1 87:19
  87:20,22
single  15:23 22:17
  23:5,5
sitting  69:6
situation  21:17
  56:21 57:4 60:7
  61:13 70:1 75:25
  77:20
six  22:15 23:4
  31:21
sixth  3:4 18:16,23
  29:22 51:23 89:24
sixty  2:15,18
  14:19,21 15:21
  89:12,15

skaw  3:25 91:3,8
skip  19:11
slack  4:9 29:7,14
  29:16,18 30:5,9
  51:18,18,21 52:6
  52:6 54:13,16,19
  55:20 56:18,25
  57:3,13,23 58:4
  59:2,14,18,24
  60:19 61:25 62:25
  63:2 66:4 69:22
  71:12 76:4 77:18
  78:20,23,24 82:1
  82:2,22 83:3,17
  86:13,15,17
slack's  30:15
slice  72:7
snap  73:21
solely  27:18 31:22
  33:8 57:6
solow  4:18
solutions  91:19
somebody  22:12
  57:14 70:9 86:21
sonkin  4:10 14:12
  14:14,15,16 15:9
  15:12,18,20 16:9
  17:12 19:20 20:24
  20:25 21:1 22:10
  22:11,13,24 23:2
  23:17,18 34:24
sonnax  49:9,12,19
  50:11 51:9
sophisticated  69:5
  70:2,7 75:3
sorry  13:8,8 14:8
  17:15 22:21,25
  46:22 54:11 57:11
  57:11,25 61:18
  63:1 66:24 70:14
  70:18,19,20 81:9
  85:13,13

sort  28:9,10 53:17
  57:5 62:18 63:6
  76:19
sought  85:24
sound  73:17
source  68:7,9
southern  1:2
  72:19
speak  68:14
speaker  18:4
speaking  21:9
  86:7
specific  53:8
  69:23 70:5 71:2
  75:24 82:11
specifically  17:22
  56:10 64:3 66:19
  67:19 68:25 70:7
  73:7,9 80:1 82:4
specified  29:25
spelled  29:7,18
spells  84:11
spending  87:14
sphere  76:24
spill  76:21
spoken  22:16
stang  5:1
start  10:7,13,24
  26:20,21 57:22
  58:11 67:12
started  7:7 37:20
  59:16
starting  11:16
state  27:16 28:17
  35:8,20 37:7,16
  37:19 39:21 50:25
  52:10 63:11 66:7
  66:13 67:3 68:7
  68:10 74:25
stated  30:8 31:23
  33:14
states  1:1,13
  29:12 31:22

statue  64:8
status  7:21 9:3,7
  9:22 10:12 11:8
  24:2,3
statute  44:8 63:11
  66:12 68:3,10
  76:15 77:1,22
  78:12,13,14 86:1
  87:1
statutory  63:20
  63:25 65:3 74:5,8
  74:14 76:6 77:19
  77:21 78:15 85:22
  87:1,7
stay  3:10 25:1
  27:22 32:3 34:16
  47:7,15,20 49:8
  49:15,20 50:11
  51:4,12,13 79:15
  90:5
stems  64:20
stipulation  22:17
  22:19 24:5,6,8
stock  77:4
stop  36:5 39:7
straightforward
  27:15 41:13
strange  73:17
street  4:14
stricken  42:18
strike  29:5
stronger  86:8
stuff  11:7 32:11
styled  47:15
subject  8:4 10:8
  39:25 40:6
submit  13:4,21
  14:3 15:17 16:8
  17:8 27:21 29:20
  33:11,18 38:13,15
  46:10 74:5
submits  29:13

**submitted** 20:12
22:22 23:4 27:8
28:16 36:2 38:10
38:12 50:19,20
53:25

**subpoena** 20:12
20:21 21:22

**subsidiary** 68:18

**success** 43:11

**successful** 43:12

**sue** 61:22 68:23
70:9

**sufficient** 80:15

**suggesting** 43:21

**suing** 70:6

**suite** 5:19 91:21

**summarize** 65:21
65:24

**summary** 34:24

**summons** 31:11

**sunny** 4:8 7:9
14:11 17:15 23:21
24:25 41:9

**supplement** 18:25
61:7

**support** 29:12,17
29:20,21 33:11
38:11,14 54:24
77:3

**supportive** 30:1

**supports** 30:7

**supposed** 22:2,3
61:21 67:18

**supposing** 57:1

**supreme** 32:4
35:25

**sure** 11:2 19:7
21:19 23:15,22
24:17 28:14 47:3
53:17 65:16 66:25
67:13 72:14 73:21
81:22 85:5,15

**surely** 78:8

**surprising** 63:22
69:10

**survive** 80:7,11

**sustain** 15:14 16:5
40:3

**swear** 31:17

**syracuse** 5:10

**t**

**t** 91:1,1

**table** 69:7

**taft** 4:12

**take** 7:16 12:11
40:9 49:2 55:10
59:8 60:20 65:11
69:8

**taken** 60:16

**takes** 24:25

**talk** 53:8 85:3

**talked** 61:7 63:5
78:25 79:10

**talking** 20:4 62:15
79:3,3,19,20
82:20,20 85:16
87:14

**talks** 80:1 82:6

**tannenbaum** 5:10
52:4

**tara** 5:22 23:25
36:23

**taylor** 20:4

**team** 8:13 27:25

**tell** 34:13 43:19

**telling** 31:1 33:9

**tenth** 49:19

**term** 42:21 52:19
56:1 79:24

**terminated** 49:17

**terms** 67:8,14
69:7

**terrific** 24:18

**test** 76:16,17

**tests** 76:13,16,19
76:25

**texaco** 72:15,16
72:18 73:10 75:7
80:6

**thank** 10:19 11:12
11:19 13:11 14:7
14:9 15:11,11,18
15:19 16:9,14
17:9,10,13 24:9
24:20,21,22 37:13
40:20,21 46:6,7,9
46:12,13,14,25
47:2,8 51:17 52:5
65:13,14 81:23,24
83:5 86:12 87:11
87:12,17,18,18,23
87:25

**thanks** 24:18
87:13

**thing** 7:23 8:11
21:17 36:9 80:13
82:1

**things** 20:2 44:5
58:13 60:5 62:17
63:3 67:4

**think** 7:15,23 8:13
8:25 9:10 12:19
18:1 19:2,15
24:10 26:24 27:6
27:14 28:2 35:16
40:23 41:12,15
46:15 50:23 53:4
54:1,24 56:21
57:3 58:7,19
59:24 60:22 61:7
61:8,10,16,25
62:1,1,2,3,8,11,17
62:19 63:3,6,15
64:13,14 65:1,8
65:22 67:4 68:13
68:14 69:13 70:22
70:24 71:2,4,6,9

71:18 73:6,12
74:4 75:14 76:7
76:12 78:19,25
80:16 81:23 82:18
83:21 85:8,12,21
86:4,17,19 87:2,5
87:6,9,19,19

**thinking** 53:17

**third** 2:15 5:3,12
14:19,21 28:22,24
44:12 49:1 89:12

**thirdly** 48:12

**thirtieth** 2:7 12:5
13:6,9,10 89:6

**thirty** 2:11 12:5
13:24 89:9

**thought** 18:1 25:7
43:17 75:21

**thousand** 11:11

**three** 12:4 13:6,12
13:17 26:25 29:12
30:11 71:24

**thwart** 74:16

**tim** 6:18 29:10
31:16,21 55:23

**time** 8:18 20:14
20:17 27:7 30:3
34:15 48:24 49:24
53:17,19 55:4,6
55:12,17,20 57:16
57:16 58:5,21
60:9 62:8,22
68:19 70:15 71:7
72:1 76:11 81:12
84:2

**times** 20:5

**timing** 8:21 52:19
52:24 65:22 69:23

**to0** 29:17

**today** 17:4 18:24
21:12,20,24 24:4
38:8 46:2,16
52:24

today's 26:6
told 70:15
tomorrow 8:17
tools 60:1,13
tort 76:6,14
torts 77:1
touch 11:9
toxic 76:21
track 43:9 57:6
tracker 18:2
trade 45:6
transcribed 3:25
transcript 91:4
travel 78:10
travelers 64:4
  80:1
treatment 45:2
triggering 59:8
trouble 82:17
true 30:11,16 48:5
  91:4
trust 5:2 36:22
  77:4
trustee 5:17 6:2
  11:17 12:3 23:25
  44:19
trustee's 2:3,7,11
  13:6,24 89:3,6,9
try 11:9 33:24
  41:1 79:25 87:15
trying 11:25
  21:15 28:17 63:25
  74:16 85:4
tuesday 26:4
turn 11:15,18
turning 17:11
twelve 50:2
twenty 2:3 12:5,7
  89:3
twice 20:8
two 10:8 12:4,7
  13:7,14 15:1
  26:23 29:20 31:22

46:16 49:18 55:9
57:14 60:5 63:9
68:11 69:5 72:15
73:17 77:4
twomey 5:22
  23:24,25 27:25
  36:23,23 40:9
  42:7
type 59:7
typical 52:14 53:8
  53:11

## u

u.s. 1:23
u.s.c. 44:20
ucf 23:20
uh 33:23 36:19
unauthorized
  36:6 38:5
uncontested
  11:16 13:18 16:3
undeliverable
  28:11
undermine 61:23
underpinning
  74:8
understand 21:15
  32:15 34:4 43:13
  69:21 72:6 85:5
understanding
  22:14 29:24 33:6
  35:22 37:22,23
  47:4,20
understood 7:18
  19:14 47:8
unfortunately
  10:20
unidentified 18:4
united 1:1,13
unmatured 52:21
  55:4 56:3,10 58:4
  58:8,10 59:6,6,7
  79:7 80:4,9

unnecessary 62:3
  62:17
unsecured 2:5,9
  2:13 42:6,14
  44:13,21 69:18
  77:11
unshackled 75:19
unsophisticated
  70:8
upcoming 10:10
urged 64:19
use 58:17,18
useful 87:15
utility 58:16

## v

v 72:16,18 73:20
  75:7
v.w.g.k. 45:12
valid 43:21,22
  50:8
validation 20:15
value 33:12,14
various 8:1 11:16
  17:17 31:23
verdict 49:14
veritext 91:19
vermont 73:20
versus 30:13 77:9
viable 72:14
view 9:11 42:4
  54:20 55:9 65:1
  66:11
violate 48:23
violated 66:18
violation 48:16
  68:22
virtual 16:12
voice 56:19
voluntarily 64:23
  64:24
voluntary 42:1,25

## w

w 4:9 29:7,14,16
  29:18 30:5,9,15
  30:20
wait 9:19 30:21
  30:21 36:20 38:19
  38:19 56:23,23,23
  70:8
waiting 7:3 14:8
want 20:1 21:19
  23:14,22 39:23
  70:21 74:21 75:17
wanted 7:23,24
  10:15 20:6 24:16
  78:19 81:7
waste 76:21
way 35:18 39:19
  40:10 43:10 44:7
  53:1,14 54:9
  55:17 56:17,20
  60:24 66:14 77:18
  77:20 79:24 86:18
ways 60:1
we've 8:12 9:25
  10:1,18 11:16
  13:14,17 22:16
  26:24 28:5,8
  46:15 48:6
weeks 20:16
weigh 49:12
weil 4:2 7:9 14:16
  16:16 17:17 21:1
  25:25 27:9 47:12
  52:7
western 73:22
we're 26:10
wickersham 4:12
wilful 36:12 37:25
willing 38:8
wind 49:24
wisconsin 73:23
wisely 65:2

**wishes** 28:24
**withdraw** 33:9
**withdrawn** 13:16
**withdrew** 12:22
**wolverine** 72:18
**word** 25:13 77:13
**working** 17:17
**works** 56:21
  79:24
**worse** 65:19
**worthwhile** 65:23
**wrapped** 63:21
**wrongly** 75:20
**wrote** 39:12

| **x** |
|---|

**x** 1:4,9 89:1

| **y** |
|---|

**ybarra** 64:19,20
  64:25 65:2 73:15
  74:3,7,15
**yeah** 19:13,13
  20:3 23:20 26:19
  36:18 39:5,13
  46:19 54:16 56:18
  56:25 82:15 83:5
**years** 57:14,22
  71:24 76:9 84:3
**yep** 35:3
**yesterday** 8:7
**yield** 76:25
**york** 1:2,15,15 4:5
  4:15 5:5,13 6:4,11
  27:16 32:4 72:20
  77:5

| **z** |
|---|

**zero** 58:7,22
**ziehl** 5:1
**zipping** 32:14,14

UNITED STATES BANKRUPTCY COURT                    NOT FOR PUBLICATION
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x
*In re:*                                            :
                                                    :    Case No. 19-10412 (JLG)
                                                    :    Chapter 11
Ditech Holding Corporation, *et al.*,               :
                                                    :
                                          Debtors[1] :    (Jointly Administered)
                                                    :
-------------------------------------------------------- x

## MEMORANDUM DECISION AND ORDER GRANTING PLAN ADMINISTRATOR'S SIXTH OMNIBUS MOTION TO ENFORCE THE PLAN INJUNCTION AND CONFIRMATION ORDER [ECF NO. 2656] AS IT RELATES TO GAUTAM AND PANTHOBI SHARMA

**A P P E A R A N C E S :**

WEIL, GOTSHAL & MANGES, LLP
*Attorneys for Debtors*
767 Fifth Avenue
New York, New York 10153
<u>By:</u>    David Hill, Esq.
         Sunny Singh, Esq.
         Richard W. Slack, Esq.
         Cliff Sonkin, Esq.


TANNENBAUM HELPERN SYRACUSE & HIRSCHTRITT, LLP
*Attorneys for Gautam and Panthobi Sharma*
900 Third Avenue
New York, New York 10022
<u>By:</u>    Michael Riela, Esq.

---

[1]    The Wind Down Estates, along with the last four digits of their federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Wind Down Estates' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

**837**

**HON. JAMES L. GARRITY, JR.**
**U.S. BANKRUPTCY JUDGE**

## Introduction[2]

Section 10.5 of the Debtors' confirmed Plan[3] contains an injunction provision (the "Plan Injunction") which bars the holders of claims that arose prior to the Plan's Effective Date from "commencing, conducting or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind" against or affecting the Debtors. Gautam and Panthobi Sharma (the "Sharmas") are party to a Note and Mortgage relating to certain residential real property. Eight days after the Effective Date, Ditech Financial LLC ("Ditech") commenced an action against the Sharmas in Illinois state court to foreclose the Mortgage (the "Foreclosure Action"). In that action, the Sharmas are asserting counterclaims against Ditech for money damages occasioned by and arising out of Ditech's alleged breach of contract and foreclosure on the Mortgage (the "Counterclaims"). The Plan Administrator contends, and the Sharmas deny, that the Plan Injunction bars them from pursuing any claim for money damages against Ditech in the Foreclosure Action. The matter before the Court is the Plan Administrator's Sixth Omnibus Motion to Enforce the Plan Injunction and Confirmation Order (the "Motion").[4] The Plan Administrator filed a Reply to the Objection.[5] As relevant, through the Motion, the Plan Administrator seeks to enforce the Plan Injunction and enjoin the prosecution of the

---

[2]    Capitalized terms that are not defined in this section either are defined below, or have the meanings ascribed to them in the confirmed Plan.

[3]    Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and its Affiliated Debtors (ECF No. 1326) ("Plan"); Order Confirming Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and its Affiliated Debtors (the "Confirmation Order") [ECF No. 1404].

[4]    Plan Administrator's Sixth Omnibus Motion to Enforce the Plan Injunction and Confirmation Order [ECF No. 2656].

[5]    Plan Administrator's Reply to the Objection of Gautam and Panthobi Sharma To the Sixth Omnibus Motion to Enforce the Plan Injunction and Confirmation Order [ECF No. 2804]. The Declaration of Richard Slack (the "Slack Declaration") is annexed as Ex. 1 to the Reply.

Counterclaims.  The Sharmas object to the Motion.[6]  For the reasons stated herein, the Court

overrules the Objection and grants the Motion.

### Jurisdiction

A party invoking this Court's post-confirmation jurisdiction must demonstrate both (i)

that the matter has a "close nexus to the bankruptcy plan or proceeding, as when a matter affects

the interpretation, implementation, consummation, execution, or administration of the confirmed

plan or incorporated litigation trust agreement," *Penthouse Media Group v. Guccione (In re Gen.*

*Media, Inc.),* 335 B.R. 66, 73 (Bankr.S.D.N.Y.2005) (quoting *Binder v. Price Waterhouse &*

*Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 168-69 (3d Cir. 2004)); and (ii) that the plan

provides for the retention of jurisdiction over the dispute.  *Id.* (citing *Hosp. and Univ. Prop.*

*Damage Claimants v. Johns Manville Corp. (In re Johns–Manville Corp.*), 7 F.3d 32, 34 (2d

Cir.1993)).  *See also Cohen v. CDR Creances S.A.S.* (*In re Euro-Am. Lodging Corp.*)*,* 549 F.

App'x 52, 54 (2d Cir. 2014) ("A party may invoke the authority of the bankruptcy court to

exercise post-confirmation jurisdiction only if the matter has a close nexus to the bankruptcy

plan . . . and the plan provides for the retention of such jurisdiction . . . ") (internal citations

omitted) (summary order); *Ace Am. Ins. Co. v. State of Mich. Workers' Comp. Ins. Agency* (*In re*

*DPH Holdings Corp.*), 448 F. App'x 134, 137 (2d Cir. 2011) (summary order), *cert. denied*, 567

U.S. 935 (2012).  *See also Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009) (a

bankruptcy court retains post-confirmation jurisdiction to interpret and enforce its own orders).

---

[6]    Objection of Gautam and Panthobi Sharma to Plan Administrator's Sixth Omnibus Motion to Enforce the Plan
Injunction and Confirmation Order [ECF No. 2778] (the "Objection").

The Motion has a "close nexus" to the Plan, because the Plan Administrator seeks to enforce the Plan Injunction – a provision of the Plan – and the Confirmation Order, a prior order of the Court. *See, e.g.*, *In re Avaya Inc.*, No. 17-10089 (SMB), 2018 WL 4381524, at *3 (Bankr. S.D.N.Y. Sept. 12, 2018) (finding that motion to enforce Bar Date Order injunction and Discharge Injunction under confirmed plan had "close nexus" to plan.)  The Plan provides for the retention of jurisdiction over the dispute because under the Plan the Court retained jurisdiction "to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court[,]" (Plan, Art. XI § 11.1(g)), "to hear, adjudicate, decide, or resolve any and all matters related to Article X of the Plan, including, without limitation, the releases, discharge, exculpations, and injunctions issued thereunder." *Id.*, Art. XI § 11.1(n).   Accordingly, the Court has subject matter jurisdiction over the Motion.

## Background

On February 11, 2019, Ditech Holding Corporation (f/k/a Walter Investment Management Corp.) and certain of its affiliates (the "Debtors") filed petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in this Court.  They remained in possession of their business and assets as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On September 26, 2019, the Debtors confirmed their Plan, and on September 30, 2019 (the "Effective Date"), the Plan became

**840**

effective.[7]  Article X of the Plan addresses the "Effect Of Confirmation Of Plan."  Section 10.5

of the Plan contains the Plan's Injunction provisions.  As relevant, it states that

> [A]ll Entities who have held, hold, or may hold Claims against or Interests in the
> Debtors . . . are permanently enjoined, on and after the Effective Date, solely with
> respect to any Claims, Interests . . . from (i) commencing, conducting or
> continuing in any manner, directly or indirectly, any suit, action, or other
> proceeding of any kind (including, without limitation, any proceeding in a
> judicial, arbitral, administrative or other forum) against or affecting the Debtors . .
> . .

Plan, Art. X § 10.5(b).  It also provides that "[t]he injunctions in this Section 10.5 shall extend to

any successors of the Debtors (including the Wind Down Estates) . . . and their respective

property and interests in property."  *Id.* Art. X § 10.5(d). The Wind Down Estates and their

counsel reviewed pending litigations against the Debtors to identify litigations where, among

other things, (i) the parties to such litigations were, in fact, asserting pre-petition monetary

claims against the Debtors (as opposed to, for example, a defense to a foreclosure action), (ii) the

litigation against the relevant Debtors was active, and (iii) the counterparty was aware of the Plan

Injunction.  Motion ¶ 2.  The Wind Down Estates sent letters to approximately 565 litigants who

have filed claims for monetary damages against the Debtors to inform them of the Court's

confirmation of the Plan and the Plan Injunction and to request that they dismiss the monetary

claims subject to the Plan Injunction. *Id*. ¶ 3.[8]  Once informed of the Plan Injunction or after

follow-up communications, more than 400 parties voluntarily dismissed their monetary claims

against the Debtors. *Id.*  The correspondence notwithstanding, some parties (the "Litigation

Parties") either continued to actively pursue their monetary damages claims, affirmatively

---

[7]    Notice of (I) Entry of Order Confirming Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation
and its Affiliated Debtors, (II) Occurrence of Effective Date, and (III) Final Deadline for Filing Administrative
Expense Claims [ECF No. 1449].

[8]    *See* Motion Ex. 2 (sample of letter).

4

refused to dismiss them or have ignored repeated requests and refused to even respond to the

letters and emails notifying them of the Plan Injunction. *Id.* ¶ 4.

Gautam and Panthobi Sharma

The Sharmas are among the Litigation Parties. On November 16, 2007, Gautam and

Panthobi Sharma executed a promissory note (the "Note") and a mortgage (the "Mortgage") with

Bank of America, N.A., relating to residential real property located at 554 Bovidae Circle,

Naperville, Illinois. Objection ¶ 7. The Mortgage and the Note were subsequently modified

pursuant to a loan modification agreement that the parties executed in June 2018. *Id.*

On April 23, 2019, the Debtors defaulted under the Mortgage when a check for their

April Mortgage payment was not honored by the Sharmas' bank. The Mortgage provides that

upon default, "Lender at its option may require immediate payment in full of all sums secured by

this Security Instrument without further demand and may foreclose this Security Instrument by

judicial proceeding." *See* Mortgage ¶ 22.[9] On May 1, 2019, Ditech sent a notice to Mr. Sharma

regarding the delinquency of his mortgage account.[10] In that notice, Ditech advised him, among

other things, that the "[f]ailure to make a payment as described above may result in Ditech

exercising its contractual rights[,]" and that "[t]his notice does not preclude Ditech from pursuing

additional legal or equitable remedies available pursuant to applicable state or federal laws."

May 1 Notice. Ditech also informed the Sharmas that in sending the notice, it was acting as "a

debt collector . . . in an attempt to collect a debt." *Id.* On May 7, 2019, Ditech sent another

notice to Mr. Sharma regarding the delinquency of his mortgage account.[11] Without limitation,

---

[9] A copy of the Mortgage is annexed as Ex. A to the Complaint for Foreclosure (the "Complaint") which is annexed as Ex. A to the Objection.

[10] A copy of the notice (the "May 1 Notice") is annexed as Ex. C to the Slack Declaration.

[11] A copy of the notice (the "May 7 Notice") is annexed as Ex. D to the Slack Declaration.

**842**

in the "Frequently Asked Questions" section of the notice, Ditech advised Mr. Sharma, among

other things, that

> If you do not respond to your lender's notices to you regarding past due
> payments, your lender may refer your loan to foreclosure in accordance with your
> mortgage loan documents and applicable law.

May 7 Notice. On May 23, 2019, Ditech sent a notice to Mr. Sharma regarding the delinquency

of his mortgage account.[12]  In that notice, Ditech advised Mr. Sharma, among other things, that

"YOUR ACCOUNT IS OR WAS MORE THAN 30 DAYS PAST DUE . . . ." *Id.*

Bar Date

On February 22, 2019, the Court entered an order establishing a General Bar Date for

claims of April 1, 2019, at 5:00 p.m. (prevailing Eastern Time).[13]  In part, the order states that

the term "claim" is "as defined in Section 101(5) of the Bankruptcy Code."  As relevant, the

Court-approved "Notice of Deadlines Requiring Filing of Proofs of Claim" states that

> Under section 101(5) of the Bankruptcy Code and as used in this notice, the word
> "claim" means a right to (a) payment, whether or not such right is reduced to
> judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured,
> disputed, undisputed, legal, equitable, secured, or unsecured; or (b) a right to an
> equitable remedy for breach of performance if such breach gives rise to a right to
> payment, whether or not such right to an equitable remedy is reduced to
> judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured,
> or unsecured.

On May 2, 2019 (just after the Sharmas' payment default under the Mortgage), this Court

entered an order further extending the Bar Date for consumer borrower claims to June 3, 2019, at

5:00 p.m. (prevailing Eastern Time).[14]  Between May 3, 2019 and May 8, 2019, Epiq Corporate

---

[12]    A copy of the notice (the "May 23 Notice") is annexed as Ex. E to the Slack Declaration.

[13]    Order Establishing Deadline for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof [ECF No. 90].

[14]    Order Further Extending General Bar Date for Filing Proofs of Claim for Consumer Borrowers *Nunc Pro Tunc* [ECF No. 496].

Restructuring, LLC ("Epiq"), as the Debtors' noticing agent, sent notice of the extended Bar

Date to the Sharmas, by email and mail.  *See* Conklin Affidavit ¶ 2.[15]  In addition, between May

2019 and October 2019, Epiq provided the Sharmas with actual notice of the Ditech bankruptcy

proceedings by multiple mailings and emails.  *See* Conklin Affidavit.  Epiq's records do not

indicate that any mailing or email to the Sharmas was returned or bounced back as undelivered.

*Id.* ¶7.  The Sharmas did not file a proof of claim herein.

<u>The Foreclosure Action</u>

On October 8, 2019, eight days after the Effective Date, Ditech commenced the

Foreclosure Action against the Sharmas in the Circuit Court for the Eighteenth Judicial Circuit in

DuPage County – Wheaton, Illinois.  In its Complaint, Ditech asserts, among other things, that

the Sharmas are in default under the Mortgage because they failed to pay the required monthly

Mortgage installments due April 1, 2019 and thereafter. Complaint ¶ 3(J).  On March 10, 2020,

the Sharmas filed their Answer and Affirmative Defenses in the Foreclosure Action (the

"Sharma Answer").[16]  For their affirmative defenses, the Sharmas assert that prior to

commencing the Foreclosure Action, Ditech failed to provide them with written notices (i) called

for under sections 20 and 22 of the Mortgage (First and Second Affirmative Defenses); and (ii)

as required under both 12 C.F.R. § 1024.39(b), a Consumer Financial Protection Bureau

("CFPB") regulation, and the Federal Real Estate Settlement Procedures Act ("RESPA") (Third

Affirmative Defense).  *See* Sharma Answer at 3-9.  *See also* Objection ¶¶ 2, 10, 11.  On March

10, 2020, the Sharmas also filed the following Counterclaims against Ditech:

---

[15]    *See* Affidavit of Service of Tim Conklin, from Epiq, the Debtors' noticing agent, annexed as Ex. 2 to the Reply [ECF No. 2804].

[16]    A copy of the Sharmas Answer and Affirmative Defenses is annexed to the Objection as Ex. B.

**844**

Count I:        Breach of Contract Based on Section 20 of the Mortgage

Count II:       Breach of Contract Based on Section 22 of the Mortgage

Count III:      Violation of the Consumer Financial Protection Bureau
                Regulations:  Noncompliance with 12 C.F.R. § 1024.39

Count IV:       Violation of the Illinois Consumer Fraud Act: Breach of Contract
                Based [sic] Section 20 of the Mortgage

Count V:        Violation of the Illinois Consumer Fraud Act: Breach of Contract
                Based [sic] Section 22 of the Mortgage

Count VI:       Violation of the Illinois Consumer Fraud Act: Noncompliance with
                12 C.F.R. § 1024.39

*See* Counterclaims.[17] *See also* Objection ¶¶ 3, 13.  In the Counterclaims, the Sharmas seek two

forms of monetary damages from Ditech: (i) actual damages occasioned by the Ditech's alleged

breaches of the Mortgage and alleged violations of state law (e.g., Counterclaim ¶ 40 ),[18] and (ii)

attorneys' fees and other costs under 735 ILCS 5/15-1510 of the Illinois Mortgage Foreclosure

Law (e.g., Counterclaim ¶ 41.)[19]  That provision authorizes a state court to award reasonable

attorneys' fees and costs to a defendant in a foreclosure action who prevails in a motion, an

affirmative defense or counterclaim, or in the foreclosure action.[20]

---

[17]    A copy of the Counterclaims is annexed to the Objection as Ex. C.

[18]    Counterclaim ¶ 40 states, as follows:

> As a direct and proximate result of said breach, the Plaintiff caused GAUTAM SHARMA
> and PANTHOBI SHARMA to incur damages in an amount equal to the payments Plaintiff
> claims Defendants failed to pay under the Mortgage and/or Note, any and all fees,
> interests, costs, alleged by Plaintiff is due to it, including, but not necessarily limited to
> attorney's fees, property inspection costs/fees, court reporter fees, expenses and costs of
> litigation, as stated and alleged by Plaintiff in its Complaint; as well as Defendants' own
> fees, costs, expenses and attorney's fees relative to these proceedings.

[19]    Counterclaim ¶ 41 states, as follows:

> Pursuant to 735 ILCS 5/15-1510, the Plaintiff is liable to GUATAM SHARMA and PANTHOBI
> SHARMA for all fees, costs, and expenses incurred relative to these proceedings.

[20]    Section 5/15-1510 states, as follows:

**845**

<u>The Motion</u>

In the Motion**,** the Plan Administrator is seeking the entry of an order pursuant to sections 105(d), 524 and 1141 of the Bankruptcy Code and Rules 1015(c), 3020(d) and 9007 of the Federal Rules of Bankruptcy Procedure and the Confirmation Order, for authority to enforce the Plan Injunction.  The Plan Administrator seeks to (i) enforce the Plan Injunction by prohibiting the Litigation Parties from continuing prosecution of their monetary claims against the Debtors; (ii) permit the Plan Administrator on behalf of the Wind Down Estates to seek sanctions in the event that a Litigation Party continues its refusal to dismiss its monetary claims against the Debtors; and (iii) permit the Wind Down Estates, upon entry of the Proposed Order to file a notice (the "Enforcement Notice")[21] in each court before which a Litigation Party is asserting monetary claims against the Debtors, including a description of the order and the ability to seek sanctions.  Motion at ¶ 5.  Prior to the initial hearing on the Motion, eight Litigation Parties filed formal or informal objections to the Motion or requested that the hearing with respect to their matters be adjourned.  Seven of those Litigation Parties either have dismissed their claims or are

---

(a) The court may award reasonable attorney's fees and costs to the defendant who prevails in a motion, an affirmative defense or counterclaim, or in the foreclosure action. A defendant who exercises the defendant's right of reinstatement or redemption shall not be considered a prevailing party for purposes of this Section. Nothing in this subsection shall abrogate contractual terms in the mortgage or other written agreement between the mortgagor and the mortgagee or rights as otherwise provided in this Article which allow the mortgagee to recover attorney's fees and costs under subsection (b).

(b) Attorneys' fees and other costs incurred in connection with the preparation, filing or prosecution of the foreclosure suit shall be recoverable in a foreclosure only to the extent specifically set forth in the mortgage or other written agreement between the mortgagor and the mortgagee or as otherwise provided in this Article.

735 ILCS 5/15-1510 (2009).

[21]    A proposed form of Enforcement Notice is annexed as Ex. 5 to the Motion.

**846**

in negotiations with Debtors to dismiss their claims through consensual stipulations. The Sharmas' Objection is the only remaining objection to the Motion.

The Sharmas do not dispute that the Plan Injunction bars the prosecution of the Counterclaims for monetary relief if the claims arose prior to the Plan's Effective Date. They contend that the Motion must be denied with respect to them because (i) the Counterclaims for attorney's fees and costs arise under a state statute that applies to foreclosure actions (i.e., the Illinois Mortgage Foreclosure Law), and not under the terms of the Note and Mortgage, and (ii) Ditech's acts and omissions that gave rise to the Counterclaims for attorneys' fees and costs occurred after the Effective Date, when Ditech commenced the Foreclosure Action without first providing the notices that are required by RESPA, CFPB regulation and the Mortgage. Objection ¶ 5.

The Plan Administrator disputes those contentions. It asserts that Counts I, II, IV and V of the Counterclaims are breach of contract claims relating from the Mortgage, and that Counts III and VI explicitly arise out of the Foreclosure Action. Reply ¶ 13. Moreover, it maintains that claims arising out of prepetition contracts, whether purely contractual or statutory in nature, are prepetition claims, even if those claims are not asserted until after Plan confirmation. *Id.* ¶ 3. Thus, it argues that the Counterclaims seeking monetary relief are subject to the Plan Injunction. *Id.* ¶ 4.

The Court considers those matters below.

## Discussion

Section 10.5(b) of the Plan enjoins a holder of a "claim" from "commencing, conducting or continuing in any manner, directly or indirectly" any separate actions outside of the Bankruptcy Court seeking monetary relief against the Debtors. Under section 1.29 of the Plan,

**847**

the term "claim" has "the meaning set forth in section 101(5) of the Bankruptcy Code, as against

any Debtor."  *See* Plan, Art. I § 1.29.  Section 101(5) of the Bankruptcy Code defines "claim" to

include any

> right to payment, whether or not such right is reduced to judgment, liquidated,
> unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal,
> equitable, secured, or unsecured.

11 U.S.C. § 101(5)(A).  The term "claim" is "sufficiently broad to encompass any possible right

to payment."  *Mazzeo v. United States (In re Mazzeo),* 131 F.3d 295, 302 (2d Cir. 1997). A "right

to payment ... usually refer[s] to a right to payment recognized under state law." *Travelers*

*Casualty & Surety Co. of America v. Pacific Gas & Electric Co.,* 549 U.S. 443, 451 (2007)

(internal quotation marks and citation omitted).  "A claim will be deemed to have arisen pre-

petition if the relationship between the debtor and the creditor contained all of the elements

necessary to give rise to a legal obligation—a right to payment—under the relevant non-

bankruptcy law." *Olin Corp. v. Riverwood Int'l Corp. (In re Manville Forest Prods. Corp.)*, 209

F.3d 125, 129 (2d Cir.2000)  (internal quotation marks omitted).  Under the Bankruptcy Code a

"contingent" claim  "refers to obligations that will become due upon the happening of a future

event that was within the actual or presumed contemplation of the parties at the time the original

relationship between the parties was created."  *Ogle v. Fid. & Deposit Co. of Md.,* 586 F.3d 143,

146 (2d Cir.2009) (internal quotation marks omitted) (quoting *In re Manville Forest Prods.*

*Corp.,* 209 F.3d 125, 128–29 (2d Cir.2000)); *see also In re St. Vincent's Catholic Med. Ctrs.,*

440 B.R. 587, 602 (Bankr.S.D.N.Y.2010).

Courts apply the "fair contemplation" test to determine whether a claim exists for breach

of contract.  Contract claims arise upon the execution of an agreement.  *Pearl-Phil GMT (Far E.)*

*Ltd. v. Caldor Corp.*, 266 B.R. 575, 582 (S.D.N.Y. 2001) (the "Bankruptcy Court's conclusion is

848

supported by the clear weight of case law in this Circuit which recognizes that contract-based

bankruptcy claims arise at the time the contract is executed. For example, courts consistently

hold that a post-petition breach of a pre-petition contract gives rise only to a prepetition claim");

*In re Texaco Inc.*, No. 10-CV-8151 CS, 2011 WL 4526538, at *4 (S.D.N.Y. Sept. 28, 2011),

*aff'd sub nom. In re Texaco, Inc.,* 505 F. App'x 77 (2d Cir. 2012) ("Contract claims arise upon

execution of an agreement.")  As a matter of law, the breach of the Mortgage was within the

actual or presumed contemplation of the parties when the Sharmas executed the Note and

Mortgage.  *See In re Russell*, 193 B.R. 568, 571 (Bankr.S.D.Cal.1996) ("It is within the fair

contemplation of the parties entering into a contract that the other party may breach it, or have

made representations to induce the making of the contract. Thus, a contingent claim arises at that

point in time, although it may never mature.")  Moreover, here, the Sharmas' breach of the

Mortgage was fully within the parties contemplation as of the Bar Date because, at that time, the

Sharmas were in payment default under the Mortgage – and both the Sharmas and Ditech were

aware of the breach. The Sharmas were on notice that if they did not cure the default, Ditech

could seek to foreclose the Mortgage. As noted, the Mortgage provides that "[i]f the default is

not [timely] cured . . . Lender at its option may require immediate payment in full of all sums

secured by this Security Instrument without further demand and may foreclose this Security

Instrument by judicial proceeding."  Mortgage ¶ 22.  Moreover, prior to the Bar Date, in its

correspondence with the Sharmas in May of 2019, Ditech advised that it was a "debt collector"

seeking "to collect a debt," and notified the Sharmas that it was contemplating "refer[ing] your

loan to foreclosure in accordance with your mortgage loan documents and applicable law."

During the argument on the Motion, the Sharmas conceded that as of the Bar Date, it was within

the fair contemplation of the parties that Ditech could commence the Foreclosure Action, and

that in doing so, the Debtor could violate the notice requirements contained in sections 20 and 22

of the Mortgage, thereby giving rise to monetary compensatory damage claims for breach of

contract and violations of state law.  Thus, they concede that as of the Bar Date, they held a

contingent, unmatured claim for damages occasioned by Ditech's alleged breach of the

Mortgage.  *Cf. Rescap Liquidating Trust v. PHH Mortg. Corp. (In re Residential Capital, LLC*),

558 B.R. 77, 85-86 (S.D.N.Y. 2016) ("*Rescap II*") (stating "[t]he appellees do not dispute that

they contemplated that litigation related to the Contracts might arise when they executed the

Contracts with the protective Clauses, hence the inclusion of the provisions that enable the

appellees to claim attorney's fees in the event of contractual breach, or that provide for covenants

not to sue or forum selection clauses"), *rev'g and remanding* 541 B.R. 202 (Bankr. S.D.N.Y.

2015)("*Rescap I*"). The Sharmas had actual notice of the Bar Date but did not file a claim.

The Sharmas did not make the same concession with respect to the Counterclaims

seeking attorney's fees and other costs under the Illinois Mortgage Foreclosure Law.  It is settled

that prepetition contract-based claims for attorney's fees are deemed to arise upon execution of

the contract.  *See Ogle v. Fid. & Deposit Co. of Md.,* 586 F.3d 143, 147 (2d Cir.2009) (holding

that post-petition attorney's fees permitted under a pre-petition contract were properly a

contingent claim brought through a proof of claim and were "deemed to have arisen pre-

petition"); *see also Rescap II*, 558 B.R. at 85 (counterclaims for attorney's fees and costs under

the provisions of a prepetition contract were unsecured contingent claims that were within the

contemplation of the parties when they executed the contract).  The Sharmas contend that the

required elements necessary to give rise to a "right to payment" of attorney's fees and costs

under the Illinois Mortgage Foreclosure Law arose after the Effective Date, when Ditech

commenced the Foreclosure Action.  They say that is so because the Counterclaims for

**850**

attorney's fees and costs arise independently under state law, not out of the Note and Mortgage. Objection ¶¶ 20-22. The Court finds no merit in that argument.  As pled, the Counterclaims arise out of the Note and Mortgage, as the Sharmas seek damages stemming from and arising out of Ditech's alleged breach of contract and foreclosure on the Mortgage.  Counterclaims I, II, IV and V are breach of contract claims relating to the Mortgage. *See* Counterclaim I ¶¶ 21-26 (alleging breach of obligation to provide Notice of Grievance as required by § 20 of the Mortgage); Counterclaim II ¶¶ 48-52 (alleging breach of obligation to provide written notice of acceleration as required by § 22 of the Mortgage); Counterclaim IV ¶¶ 124-28 (alleging breach of obligation to provide Notice of Grievance as required by § 20 of the Mortgage); Counterclaim V ¶¶ 150-54 (alleging breach of obligation to provide Notice of Grievance as required by § 20 of the Mortgage).  Counterclaims III and VI stem from the Foreclosure Action.  As it was in the fair contemplation of the parties that Ditech could breach the notice provisions in sections 20 and 22 of the Mortgage, it follows that it was in the fair contemplation of the parties that the Sharmas could assert claims for compensatory damages under the Mortgage, as well as claims for attorney's fees and costs under the Illinois Mortgage Foreclosure Law.  That is especially so, because 735 ILCS 5/15-1510(a) applies solely to mortgage foreclosure actions. *See* 735 ILCS 5/15-1103 (2019) ("The authority of the court [to award attorney's fees and costs] continues during the entire pendency of the foreclosure and until disposition of all matters arising out of the foreclosure.")  It is irrelevant that the Sharmas are seeking attorney's fees and costs under state law, rather than under the terms of the Note and Mortgage.  The Plan Injunction bars the Sharmas from recovering monetary damages equally under the contract and under state law. *See In re Rubin Family Irrevocable Stock Trust*, 516 B.R. 221, 227 (Bankr. E.D.N.Y. 2014) ("Although the facts of both *Ogle* and *Travelers* involved pre-petition contracts upon which the

14

**851**

claim to attorney's fees was based, the holdings of those cases also extend to claims for attorney

fees' and costs which are based upon statute."); *In re CD Realty Partners,* 205 B.R. 651, 656–60

(Bankr. D. Mass. 1997) (finding that claims could have been fairly contemplated even though

"[t]he claim at issue is a hybrid, both contractual and statutory. It is rooted in the Debtor's and its

predecessor's contractual promises of pension benefits to their employees. But ERISA and the

MPPAA regulate and specify how an employer shall meet its contractual obligations to provide

pension benefits").[22]

Alternatively, the Sharmas contend that the Plan Injunction does not bar them from

asserting the state law counterclaims for attorney's fees and costs because in electing to sue the

Sharmas post Effective Date, Ditech has subjected itself to the strictures of the attorney's fees

provisions under state law, irrespective of its bankruptcy discharge.  As support, the Sharmas

---

[22]    In this light, the Sharmas misplace their reliance on cases discussing when regulatory and tort claims arise under the Bankruptcy Code.  *See* Objection ¶¶ 23-30.

Rule 137 of the Illinois Supreme Court Rules is the Illinois equivalent of Federal Rule of Civil Procedure 11. Neither the Sharma Answer and Affirmative Defenses, nor the Counterclaims refers to Rule 137.  Still, the Sharmas mention it throughout the Objection.  *See* Objection ¶¶ 3, 4, 6, 14, 18, 21, 28, 40.  Among other things, they argue that if the Court grants the Motion, it will effectively invalidate the powers afforded to the state court by Rule 137, and give mortgagees like Ditech freer rein to commence improper foreclosure actions.  Objection ¶ 18.  The Court disagrees.  Rule 137 "is designed to prohibit the abuse of the judicial process by claimants who make vexatious and harassing claims based upon unsupported allegations of fact or law."  *Peterson v. Randhava,* 313 Ill.App.3d 1, 7 (2000) (citing *Senese v. Climatemp, Inc.,* 289 Ill.App.3d 570, 581 (1997)); *see also Resurgence Capital, LLC v. Kuznar,* 2017 IL App (1st) 161853, ¶ 16  (The rule is intended "to discourage attorneys and parties from filing frivolous or false matters and asserting claims without any basis in law or fact, by penalizing those who engage in such wrongful conduct.") (citing *Baker v. Daniel S. Berger, Ltd.,* 323 Ill. App. 3d 956, 963 (2001)).  The rule is penal in nature and must be strictly construed.  It is not a fee shifting vehicle for the benefit of  prevailing parties. *Toland v. Davis,* 295 Ill.App.3d 652, 657 (1998).  *See also Peterson v. Randhava,* 313 Ill.App.3d at 6-7 ("The rule is not intended to penalize litigants and their attorneys merely because they were zealous, yet unsuccessful.")  A claim under Rule 137 must be brought in the action where the allegedly improper pleading is filed (Rule 137(b))  and arises when that pleading is filed. *Peterson v. Randhava,* 313 Ill.App.3d at 7 ("In deciding whether the imposition of sanctions is appropriate, the court must determine what was reasonable for the attorney or the signing party to believe at the time of filing, rather than engaging in hindsight.")  The Plan Injunction does not bar the application of Rule 137 in this matter.

rely on *Siegel v. Federal Home Loan Mortg. Corp.*, 143 F.3d 525 (9th Cir. 1998) and *Boeing*

*North American, Inc. v. Ybarra (In re Ybarra),* 424 F.3d 1018 (9th Cir.2005).  In those cases, the

Ninth Circuit determined that there was an exception to the discharge of attorney's fees when the

debtor elects to "return to the fray" in order to bring an action against a creditor after the debtor

receives its discharge in bankruptcy.  In part, the *Siegel* court stated that

> [The debtor] had been freed from the untoward effects of contracts he had entered
> into Freddie Mac could not pursue him further, nor could anyone else. He,
> however, chose to return to the fray and to use the contract as a weapon. It is
> perfectly just, and within the purposes of bankruptcy, to allow the same weapon
> to be used against him.

*Siegel*, 143 F.3d at 533 (citations omitted).  "In other words, while his bankruptcy did protect

him from the results of his past acts, including attorney's fees associated with those acts, it did

not give him carte blanche to go out and commence new litigation about the contract without

consequences."  *Id.* at 534.  In *In re Ybarra*, after filing a voluntary petition under chapter 11of

the Bankruptcy Code,[23] the debtor ("Ybarra") successfully vacated an order in the state court

dismissing an action she had filed against her employer (together with its successor, "Rockwell")

prior to filing for bankruptcy protection.  424 F.3d at 1020-21.  While the action was pending,

the bankruptcy court granted Ybarra a discharge in bankruptcy.  Ultimately Rockwell prevailed

in the litigation and the state court awarded it attorney's fees and costs (the "Fee Award").  *Id.* at

1021.  Rockwell sought leave in the bankruptcy court to enforce the Fee Award.  The bankruptcy

court granted the motion, but only to the extent of fees and costs that accrued after Ybarra filed

for bankruptcy.  In so ruling, the bankruptcy court relied on *Siegel*.  *Id.*  The Bankruptcy

Appellate Panel of the Ninth Circuit reversed, holding that the entire Fee Award was

encompassed in the discharge.  *Id.*  In reversing that judgment, the Ninth Circuit held that the

---

[23]    The case was later converted to one under Chapter 7 of the Bankruptcy Code.

fees and costs incurred post-petition were not discharged. In doing so, the circuit reaffirmed

"that claims for attorney fees and costs incurred post-petition are not discharged where post-

petition, the debtor voluntarily commences litigation or otherwise voluntarily 'return[s] to the

fray.'" *Id.* at 1026 (citing *Siegel*, 143 F.3d at 533-34). It found that

> [w]hether attorney fees and costs incurred through the continued prosecution of
> litigation initiated pre-petition may be discharged depends on whether the debtor
> has taken affirmative post-petition action to litigate a prepetition claim and has
> thereby risked the liability of these litigation expenses.

*Id.* It concluded "that by affirmatively reviving the state suit, Ybarra 'returned to the fray.' Thus,

under *Siegel,* Rockwell's claim for attorney fees and costs *incurred* post-petition was not

discharged in the bankruptcy." *Id.*

In support of their argument, the Sharmas also rely on this Court's decision in *Rescap I*.

As described by the district court, in that case, after the bar date, and the effective date of the

debtors' plan, the Rescap Liquidating Trust (the "Trust"), as debtors' successor, sued a number

of pre-petition lenders alleging breaches of various contracts among the parties. *Rescap II*, 558

B.R. at 84. The lenders asserted that the Trust's lawsuits breached certain provisions in the

contracts which purported to entitle each lender to seek damages in the form of attorney's fees

and costs. *Id.* at 79. The lenders filed counterclaims (the "Lender Counterclaims") to recover

those damages. *Id.* at 79-80. The Trust sought to enjoin the lenders from asserting the Lender

Counterclaims. It argued that the counterclaims were subject to the bankruptcy discharge and

the injunction provisions of the bar date order. In denying the motion, the bankruptcy court

found that the Lender Counterclaims were not prepetition claims subject to the bar date order and

bankruptcy discharge because they resulted from the voluntary post confirmation actions of the

Debtor and the Trust. *Id.* at 84-85. In part, the court adopted the "Ybarra rule." On appeal, the

district court reversed and remanded the case for proceedings consistent with its opinion.

**854**

Without limitation, the district court found that the Trust's reliance on the Ybarra Rule was "unpersuasive." *Id.* at 88. In doing so, the court found that the Ybarra rule "had never been relied upon in this Circuit prior to the Bankruptcy Court's Order in this case" and that the exception "is at odds with well-established Second Circuit precedent that looks to contract execution as the time of claim accrual, not to the act that caused the breach, let alone the character of, or intent associated with, that act." *Id.* (citations omitted). It also found that the fact that the rule "is not rooted in statutory interpretation, but policy considerations . . . further weighs against its adoption." *Id.* at 89. The court found that to be particularly so, given that the Second Circuit "has cautioned, '[e]xceptions to dischargeability are narrowly construed against the creditor's objections, and *confined to those plainly expressed in the Bankruptcy Code.*'" *Id.* (quoting *In re Furio*, 77 F.3d 622, 624 (2d Cir.1996)) (citations omitted). It concluded that "there is therefore no basis for reading an exception for 'voluntarily ... returning to the fray' into the Bankruptcy Code where there is otherwise no statutory support for the exception and the Court of Appeals has instructed that 'the term "claim" is sufficiently broad to encompass any possible right to payment.'" *Id.* (quoting *In re Mazzeo*, 131 F.3d 295, 302 (2d Cir. 1997)).

Nonetheless, the Sharmas urge the Court to adopt the rationale of *Siegel, Ybarra* and this Court's decision in *Rescap I* and find that in electing to sue the Sharmas post Effective Date, Ditech "returned to the fray" and, as such, is at risk for attorneys' fees and costs under Illinois Mortgage Foreclosure Law. They contend that the district court's criticism of *Ybarra* in *Rescap II* focused largely on Second Circuit precedent that looks to contract execution as of the time of accrual, while the Sharmas are not relying on the terms of their Mortgage for their Counterclaims. However, as previously discussed, the Court finds that distinction irrelevant, since the state law Counterclaims arise out of a breach of the Mortgage and were within the

contemplation of the parties. *See In re Rubin Family Irrevocable Stock Trust*, 516 B.R. 221

(Bankr. E.D.N.Y. 2014). The Sharmas contend that there is a sound basis for excepting those

Counterclaims from the discharge and Plan Injunction for the following reasons.

> *First*, enforcing the discharge in this type of situation would force creditors like
> the Sharmas to file contingent proofs of claim, which this Court in *Residential
> Capital* observed could clog the claims docket with (mostly) needless protective
> proofs of claim.

> *Second*, enforcing the discharge would give the estate leeway to file improper
> foreclosure actions after the Effective Date, which is against the public policy of
> Illinois law.

Objection ¶ 40. They say that by application of the Illinois Mortgage Foreclosure Law, plaintiffs

like Ditech, that file improper foreclosure actions may be burdened with the defendants'

attorney's fees and costs. They say that if the discharge were to apply here, the estate would

have freer rein to file improper foreclosure actions in Illinois. They maintain that this would

have the unintended consequence of rewarding Ditech's misconduct of (a) failing to abide by

conditions precedent in contracts it drafted, which should be construed against it, (b) failing to

abide by its obligation to provide notices under the CFPB regulation, and (c) prosecuting

foreclosure actions without a good faith basis. They contend that this is of particular concern

where the target of the foreclosure actions are consumers like the Sharmas, and not large,

sophisticated businesses. *Id.*

The Court finds no merit to those contentions and declines the Sharmas request to apply

the rationale of *Ybarra* and *Siegel* in this case. Turning first to the second point, the Sharmas

overstate that risk that the discharge of the claims under Illinois Mortgage Foreclosure Law will

reward litigation misconduct on Ditech's part. That is because, as Ditech concedes, the statutory

right to attorney's fees and costs can be used as defenses to Ditech's claims. Reply ¶ 16

("Pursuant to Sections 4.6 and 5.6 of the Plan, the Plan Administrator does not dispute that the

19

**856**

Sharmas retain the right to assert defenses in the Foreclosure Action . . .")  *See Rescap II*, 558 B.R. at 89 ("Moreover, the appellees overstate the risk that discharge of their contingent claims for attorney's fees would allow the Trust to engage in riskless litigation. The Trust concedes that the appellees' contractual rights to attorney's fees can be used as defenses or setoffs against the Trust's claims.")  As to the first point, it is not unfair for creditors like the Sharmas – who, prior to the Bar Date, are in default under their prepetition contracts and are on notice that the counterparty may commence litigation on account of the breach, to file a claim.  *Id.*  ("In this case, the Trust's litigation on the Contracts was entirely foreseeable, certainly within the appellees' contemplation at the time of Contract execution with the protective Clauses (a point the appellees do not dispute) and in fact presaged during the bankruptcy proceedings by the disclosure statement and the Plan Supplement.") The Plan Injunction bars them from recovering monetary damages from the Debtors arising out of its alleged breach of the Mortgage*.  See, e.g., Conway Hosp. Inc. v. Lehman Bros. Holdings Inc.*, 531 B.R. 339, 343 (S.D.N.Y. 2015).

## Conclusion

Based on the foregoing, the Court overrules the Objection and grants the Motion.

IT IS SO ORDERED.

Dated: New York, New York
November 30, 2020

/s/ *James L. Garrity, Jr.*
Hon. James L. Garrity, Jr.
U.S. Bankruptcy Judge

857

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Richard W. Slack
Sunny Singh

*Attorneys for the Plan Administrator*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X
                                                             :
**In re**                                                    :    **Chapter 11**
                                                             :
**DITECH HOLDING CORPORATION,** *et al.*,                    :    **Case No. 19-10412 (JLG)**
                                                             :
                              **Debtors.**[1]                :    **(Jointly Administered)**
                                                             :
-------------------------------------------------------------X

**REPLY OF PLAN ADMINISTRATOR IN SUPPORT OF**
**FIFTY-SECOND OMNIBUS OBJECTION WITH RESPECT TO CLAIMS OF**
**FINANCE OF AMERICA REVERSE LLC (CLAIM NOS. 21347 AND 60182)**
**AND LIBERTY HOME EQUITY SOLUTIONS, INC. (CLAIM NO. 60214)**

---

[1]    On September 26, 2019, the Court confirmed the *Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors* (ECF No. 1404) (the "**Third Amended Plan**"), which created the Wind Down Estates. The Wind Down Estates, along with the last four digits of their federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Wind Down Estates' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................1

BACKGROUND ..............................................................................................................3

JURISDICTION ..............................................................................................................7

REPLY ..........................................................................................................................7

    A.    Rule 12(b)(6) of the Federal Rules of Civil Procedure Is the Applicable Pleading Standard ........................................................................................ 7

    B.    The Extensions Do Not Constitute Postpetition Agreements ....................................... 9

           1.    The Plain Language of the Extensions Do Not Indicate Intent to Enter into Novel Contracts ........................................................................ 9

           2.    Lack of Court Approval of the Extensions Renders Them Unenforceable As Novel Postpetition Agreements ........................................ 14

    C.    Claims Based on Prepetition Agreements Give Rise to Prepetition Claims............... 17

    D.    Claims Are Not Otherwise Entitled to Administrative Priority................................. 21

    E.    In the Alternative, the Claims are Limited to the Reasonable Value Conferred Upon the Estates ........................................................................................ 23

CONCLUSION..............................................................................................................27

i

TO THE HONORABLE JAMES L. GARRITY JR.,

UNITED STATES BANKRUPTCY JUDGE:

The Plan Administrator,[1] on behalf of Ditech Holding Corporation (f/k/a Walter

Investment Management Corp.) and its debtor affiliates (excluding Reorganized RMS)

(collectively, the "**Wind Down Estates**") submits this omnibus reply (the "**Reply**") in support of

the *Fifty-Second Omnibus Objection to Proofs of Claim (Misclassified Claims)* (ECF No. 2186)

(the "**Fifty-Second Omnibus Objection**") and in response to *Liberty Home Equity Solutions,*

*Inc.'s Response to Fifty-Second Omnibus Objection to Proofs of Claim (Misclassified Claims)*

(ECF No. 2314) (the "**LHES Response**") filed on May 8, 2020 by Liberty Home Equity Solutions,

Inc. ("**LHES**") and *Finance of America Reverse LLC's Response to Fifty-Second Omnibus*

*Objection to Proofs of Claim (Misclassified Claims)* (ECF No. 2315) (the "**FoA Response**") filed

on May 8, 2020 by Finance of America Reverse LLC ("**FoA**") (the LHES Response and the FoA

Response collectively, the "**Responses**", and LHES and FoA collectively, the "**Claimants**").  The

Plan Administrator respectfully represents as follows:

### Preliminary Statement

1.      Claimants assert that simple short-form amendments extending the terms of

prepetition contracts created new postpetition contracts, giving rise to administrative expense

liability.  As explained below, Claimants' assertion is incorrect and not supported by case law.  It

is clear from the face of the Extensions (defined below) that the parties did not enter into new

contracts giving rise to the millions of dollars in postpetition liability asserted by Claimants.

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the
Fifty-Second Omnibus Objection or the Third Amended Plan, as applicable.

Indeed, the Extensions expressly state that they are extensions of the parties' existing prepetition contracts.

2.      Under existing case law in this Circuit, as recently confirmed by this Court,[2] damages based on prepetition contracts are contingent prepetition general unsecured claims, even if they occur postpetition.   Moreover, Claimants made a choice to continue to extend their prepetition agreements with the Debtors; they could have simply walked away upon termination of the contracts by their own terms but choose not to do so.   Claimants were not forced to do business with a chapter 11 debtor and should not be surprised now that their newly alleged but unproven postpetition breach claims are not entitled to administrative expense treatment.   As such, Claimants have failed to assert a plausible administrative expense claim.

3.      Even if Claimants could assert an administrative expense priority claim, it is well settled that the allowed amount of that claim may not exceed the reasonable value conferred on the Debtors during the chapter 11 cases.   The case law is clear that Claimants are not entitled to administrative treatment for breach of contract damages because a prepetition contract is not enforceable against the Debtors unless and until it is assumed.   The only benefit conferred on the Debtors' estates by the Claimants are the postpetition servicing fees paid by Claimants.   In exchange, Claimants have already received significant value from the Debtors' performance of the agreements and smooth transfer of the servicing relationship that is far in excess of the servicing fees paid to the Debtors.

---

[2]    *See Memorandum Decision and Order Granting Plan Administrator's Sixth Omnibus Motion to Enforce the Plan Injunction and Confirmation Order as It Relates to Gautam and Panthobi Sharma* (ECF No. 3034) (November 11, 2020) (the "**Sharma Order**").

2

**861**

## Background

4.      On November 17, 2008, LHES entered into an agreement with Debtor Reverse Mortgage Solutions, Inc. ("**RMS**") to subservice certain reverse mortgage loans; similarly, on March 18, 2011, FoA entered into an agreement with RMS to subservice certain reverse mortgage loans (each, a "**Prepetition Subservicing Agreement**," and collectively, the "**Prepetition Subservicing Agreements**").

5.      Over the course of several years, Claimants and the Debtors entered into multiple agreements extending the term of the Prepetition Subservicing Agreements (collectively, the "**Extensions**").  Prior to the Commencement Date (as defined below), the Debtors entered into eight (8) Extensions with FoA and seven (7) Extensions with LHES (collectively, the "**Prepetition Extension Agreements**").  The Debtors also entered into four (4) Extensions with FoA and two (2) Extensions with LHES after the Commencement Date (collectively, the "**Postpetition Extension Agreements**").  None of the Extensions altered the terms of the Prepetition Subservicing Agreements in any way except by extending the term of the Prepetition Subservicing Agreements.[3]

6.      On February 11, 2019 (the "**Commencement Date**"), the Debtors each

---

[3]   An example of an LHES Prepetition Extension Agreement and an FoA Prepetition Extension Agreement are attached hereto as **Exhibit A-1** and **Exhibit B-1** respectively. An example of an LHES Postpetition Extension Agreement and an FoA Postpetition Extension Agreement are attached hereto as **Exhibit A-2** and **Exhibit B-2** respectively.

Because the Prepetition Subservicing Agreements and the Extensions are referenced by the Claimants in the Responses and serve as the basis for the asserted administrative expense claims, the Court may consider those documents. *See, e.g., Bd. of Trs. of Ft. Lauderdale v. Mechel OAO*, 811 F. Supp. 2d 853, 865 (S.D.N.Y. 2011), *aff'd sub nom. Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012) (Court may consider "(1) documents attached to or incorporated by reference in the complaint, (2) documents integral to and relied upon in the complaint, even if not attached or incorporated by reference, (3) public disclosure documents required by law to be, and that have been, filed with the SEC, and (4) facts of which judicial notice properly may be taken."); *Flake v. Alper Holdings USA, Inc.* (*In re Alper Holdings USA, Inc.*), 398 B.R. 736, 748 (S.D.N.Y. 2008) ("The documents attached to the proofs of claim should be treated, for purposes of a motion to disallow claims, like documents that are attached to or relied upon in a complaint are treated on a Rule 12(b)(6) motion to dismiss") (citation omitted).

**862**

commenced with this Court a voluntary case under the Bankruptcy Code.

7.    RMS and Claimants entered into the Postpetition Extension Agreements that extended the Prepetition Subservicing Agreements through September 30, 2019, the Effective Date of the Debtors' Third Amended Plan.

8.    Neither the Prepetition Extension Agreements nor the Postpetition Extension Agreements altered the terms of the Prepetition Subservicing Agreements in any way other than extending the term.

9.    In accordance with their obligations under the Prepetition Subservicing Agreements, as extended by the Extensions, RMS continued to subservice reverse mortgage loans for Claimants through September 30, 2019.

10.    On April 25, 2019, FoA filed Claim No. 21347 against RMS in the amount of $54,085,624 as a general unsecured claim and an undetermined amount as an administrative expense claim under section 507(a)(2) of the Bankruptcy Code.  FoA acknowledges that the $54,085,624 amount relates to alleged prepetition breaches of its Prepetition Subservicing Agreement, but nonetheless attempted to reserve rights to assert an administrative expense claim for alleged postpetition breaches under that agreement.  *See* FoA Response ¶ 9.

11.    On September 22, 2019, the Debtors filed the Third Amended Plan (ECF No. 1326).  The Third Amended Plan provided that all executory contracts would be deemed rejected as of the Effective Date unless, among other things, "such contract or lease (i) was previously assumed or rejected by the Debtors pursuant to an order of the Bankruptcy Court; [or] (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto…".  Third Amended Plan § 8.1.  The Debtors did not list any of Claimants' Prepetition Subservicing Agreements or Extensions as contracts to be assumed.

12.    On September 26, 2019, the Court entered the *Order Confirming Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors* (ECF No. 1404).

13.    The Effective Date of the Third Amended Plan occurred on September 30, 2019. *See Notice of (I) Entry of Order Confirming Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors, (II) Occurrence of Effective Date, and (III) Final Deadline for Filing Administrative Expense Claims* (ECF No. 1449).

14.    In accordance with the Third Amended Plan, the Prepetition Subservicing Agreements or Extensions were not assumed by the Debtors and were deemed rejected as of the Effective Date.  Notably, Claimants acknowledge that the Prepetition Subservicing Agreements and Extensions were not assumed.  *See* LHES Response ¶ 9; FoA Response ¶ 11.

15.    From the Commencement Date through the Effective Date, Claimants continued to pay for the Debtors' postpetition performance under the Prepetition Subservicing Agreements.  To the Plan Administrator's knowledge and belief, the Debtors collected approximately $4,400,000 in postpetition fees from FoA, and approximately $110,000 in postpetition fees from LHES.

16.    On November 11, 2019, LHES filed Claim No. 60214, seeking $4,145,648.48 as an administrative expense claim.  *See* LHES Response ¶ 10.  LHES asserted damages on the basis of "post-petition failure to perform and other post-petition material breaches of the Subservicing Agreement" in five general categories: assignment errors, initial foreclosure errors, supplementary foreclosure errors, potential foreclosure errors, and potential assignment errors. *See* Claim No. 60214 at p. 5.

17.    Similarly, on November 11, 2019, FoA filed Claim No. 60182 (together

5

with Claim No. 60214 and Claim No. 21347, the "**Claims**"), seeking $375,832.07 as an administrative expense claim. FoA asserted damages on the basis of "post-petition failure to perform and other post-petition material breaches of the Subservicing Agreements" in three general categories: assignment errors, interest curtailment, and litigation errors. *See* Claim No. 60182 at pp. 4-5. FoA also now asserts an additional $14 million as an administrative expense for alleged but unspecified postpetition breaches of its Prepetition Subservicing Agreement. *See* FoA Response, ¶ 12.

18.    On April 17, 2020, the Plan Administrator filed the Fifty-Second Omnibus Objection, objecting to the Claims on the basis that they are misclassified administrative expense claims and are properly considered general unsecured claims.

19.    On May 8, 2020, Claimants filed the Responses, reasserting that they are entitled to administrative expense claims for damages arising under their respective Prepetition Subservicing Agreements. S*ee* LHES Response ¶ 15; FoA Response ¶ 17. Claimants allege that the damages are entitled to administrative expense priority because (i) the Postpetition Extension Agreements effectively transmogrify the Prepetition Subservicing Agreements into new postpetition contracts, and (ii) the damages arose during the postpetition period. *See* LHES Response ¶ 2; FoA Response ¶ 2. Though Claimants assert that "expenses include losses incurred by [Claimants] as a result of RMS' post-petition subservicing errors and other material post-petition breaches of the subservicing agreements for which LHES timely filed administrative expense claims," the Responses do not further specify what subservicing errors or other postpetition breaches occurred. LHES Response ¶ 1; FoA Response ¶ 1.

20.    Under the procedures established by the *Order Approving (I) Claim Objection Procedures and (II) Claim Hearing Procedures* ("**Claim Procedures Order**") (ECF

6

No. 1632), the filing of the Response caused an adjournment of the Fifty-Second Omnibus

Objection as to the Claim so that the Court may conduct a Sufficiency Hearing (as defined in the

Claim Procedures Order).

21.     The Plan Administrator maintains that, because the Claims arise under the

Prepetition Subservicing Agreements and thus are prepetition general unsecured claims, the Court

can grant the relief sought in the Fifty-Second Omnibus Objection as a matter of law for failure to

state a claim upon which relief can be granted.  If the Court does not dismiss the Claims at a

Sufficiency Hearing, the Plan Administrator requests that the Court set this matter for evidentiary

hearing following discovery.

## **Jurisdiction**

22.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§

157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before

this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## **Reply**

A.      **Rule 12(b)(6) of the Federal Rules of Civil Procedure Is the Applicable Pleading
        Standard**

23.     A filed proof of claim is "deemed allowed, unless a party in

interest…objects." 11 U.S.C. § 502(a).  If an objection refuting at least one of the claim's essential

allegations is asserted, the claimant has the burden to demonstrate the validity of the claim.  *See*

*Rozier v. Rescap Borrower Claims Tr. (In re Residential Cap., LLC)*, 15 Civ. 3248 (KPF), 2016

WL 796860, at *9 (S.D.N.Y. Feb. 22, 2016).  The burden of persuasion is on the holder of a proof

of claim to establish a valid claim against a debtor.  *Creamer v. Motors Liquidation Co. GUC Trust*

*(In re Motors Liquidation Co.)*, No. 12 Civ. 6074 (RJS), 2013 U.S. Dist. LEXIS 143957, at *12–

7

**866**

13 (S.D.N.Y. Sept. 26, 2013).

24.    Additionally, the Claim Procedures Order states that "[t]he legal standard of review that will be applied by the Court at a Sufficiency Hearing will be equivalent to the standard applied by the Court upon a motion to dismiss for failure to state a claim upon which relief can be granted." *See* Claim Procedures Order § 3(iv).a.

25.    Under Rule 12(b)(6) of the Federal Rules of Civil Procedure ("**Rule 12(b)(6)**"), as incorporated by Bankruptcy Rule 7012, a claim may be dismissed due to a "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  A dismissal under Rule 12(b)(6) may be based on the lack of a cognizable legal theory or on the absence of sufficient facts alleged under a cognizable legal theory.  *See Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008).  *See also Owens v. Textron Fin. Corp.*, No. 13 CV 5948 (VB), 2014 WL 3887181, at *4 (S.D.N.Y. July 14, 2014), *aff'd*, 590 F. App'x 83 (2d Cir. 2015) ("Moreover, because plaintiff has not identified any cognizable legal theory applicable here, the Court cannot reasonably infer defendant is liable under any such theory").  Although they may provide the framework for a complaint, legal conclusions need not be accepted as true, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft*, 556 U.S. at 678*; see also RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 394 (S.D.N.Y. 2009), *aff'd*, 387 F. App'x 72 (2d Cir. 2010).

26.    Furthermore, a claimant that asserts a priority claim bears the burden of establishing their entitlement to priority.  *See, e.g.*, *Supplee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.)*, 479 F.3d 167, 172 (2d Cir. 2007) ("The burden of proving entitlement to priority payment . . . rests with the party requesting it."); *In re Drexel Burnham Lambert Grp. Inc.*, 134 B.R. 482, 489 (Bankr. S.D.N.Y. 1991) ("The burden of establishing entitlement to priority

WEIL:\97749585\1\41703.0012

**867**

rests with the claimant and should only be granted under extraordinary circumstances") (quotation omitted).

27.     Here, Claimants have failed to meet their burden under Rule 12(b)(6) because the Extensions are not valid postpetition agreements entitled to administrative expense priority.  Thus, the Claims should be reclassified to prepetition general unsecured claims.

**B.      The Extensions Do Not Constitute Postpetition Agreements**

*1.      The Plain Language of the Extensions Do Not Indicate Intent to Enter into Novel Contracts*

28.     Claimants attempt to enhance the priority of their Claims by incorrectly asserting the Extensions are new postpetition contracts.  Claimants' assertion not only misrepresents the law, but also is illogical based on the facts of these cases.  Put simply, the plain language in the Extensions indicates that the parties merely extended the terms of performance during negotiations and the wind down of their relationship, not to enter into new subservicing contracts that could result in millions of dollars of postpetition liability.

29.     In order to create an enforceable contract, parties must agree to the material terms of their bargain and intend to be bound by their agreement.  "In determining the intent of the parties, the court has a duty to ascertain the intent as manifested in the language of the agreement. If the terms of the agreement are clear from the face of the document, the intent of the parties is found in the document" *In re Chateaugay Corp*., 116 B.R. 887, 902–03 (Bankr. S.D.N.Y. 1990) (internal quotations and citations omitted).

30.     Importantly, courts have held that extension agreements are modifications that do not indicate intent to enter into novel contracts capable of creating administrative expense liability.  For example, in *Bush Industries*, a claimant agreed to a contract modification reducing the amount of guaranteed payments to the claimant under a tri-party contract.  *See In re Bush*

9

*Indus., Inc.*, No. 05-CV-119S, 2006 WL 8455682, at *2 (W.D.N.Y. Mar. 29, 2006).  The claimant executed and returned the agreement immediately prior to the debtor's bankruptcy, but later attempted to revoke acceptance based on the fact the other two parties has not signed.  *See id*. Nevertheless, the claimant continued to accept payment and provide services without protest.  *See id*.  The claimant then filed an administrative expense claim against the debtor on the grounds that payment for his postpetition performance was insufficient.  *See id*.  Specifically, the claimant argued that the agreement reducing the amount of guaranteed payment was a new contract, and the new contract was unenforceable because it did not contain the signatures of each party.  *See id*.  The bankruptcy court disagreed, finding that the agreement was a modification rather than a new contract due to a clause allowing modification by an instrument "signed by the party against whom enforcement of any such amendment, supplement or modification is sought." *See id*.  Thus, the agreement was a modification that became effective when signed by the claimant.  *See id*.

31.    On appeal, the district court ruled that the bankruptcy court correctly relied only on the unambiguous documents presented and resolved the issue as a matter of law.  *See id*. at *4.  In analyzing the question of modification, the district court found that an agreement that restates contract provisions with no substantive changes, involves the same relationship among the same parties, contains clauses that state the parties' desire to amend and restate prior agreements, and merely adjusts the term of the agreement or the compensation, the agreement does not constitute a new contract.  *See id* at *5.  Furthermore, the district court found where underlying agreements permit amendment, supplementation, or modification in whole or in part, subsequent agreements will be considered modifications rather than new agreements.  *See id*.

32.    Similarly, in *Crystal Apparel*, the bankruptcy court analyzed postpetition extension agreements in the context of bankruptcy, specifically analyzing claims arising under

short extension letters as executory contracts subject to assumption or rejection or, alternatively,

new postpetition contracts subject to court approval. *See In re Crystal Apparel, Inc*., 220 B.R. 816

(Bankr. S.D.N.Y. 1998).   *Crystal Apparel* involved prepetition employment agreements that

included a "golden parachute" upon change of control. *Id*.  After the petition date, the debtors sent

a one-page letter to the employees (i) extending the terms of employment by one year,

(ii) increasing their salary by approximately 12%, and (iii) stating that "except as extended or

amended, all the other terms and conditions of your Employment Agreement shall remain in full

force and effect." *Id.* at 823.  The extension letters only referenced the prepetition employment

agreements and did not make explicit mention of the change of control provision. *Id.*  During the

course of the chapter 11 cases, the debtors sought approval of a management incentive program,

but did not seek approval of assumption of the prepetition employment agreements. *Id.*   In the

motion for approval of the management incentive program, the debtors noted that the employees

were entitled to one year of base salary upon termination, rather than the golden parachute

provision in the prepetition employment agreement. *Id.*   The debtors later decided to sell

substantially all of their assets to a buyer. *Id*.  The extension letters, as well as two new postpetition

severance agreements which provided for one year base compensation, were assigned to the buyer

pursuant to a sale order. *Id*. at 824, 827.  When the buyer terminated the employees and paid only

one year of base compensation to the employees rather than the higher severance under the

prepetition employment agreements, the employees filed administrative expense claims for the

deficit based on the extension letters. *Id*. at 827–28.

33.      In its decision, the court found that amendments to prepetition agreements

that only modify terms do not rise to the level of new contracts, but rather are subject to assumption

and rejection. *See id.* at 834 ("An alternative view of the Extension Letters is that they are simply

11

**870**

amendments to pre-petition Employment Agreements, modifying only the term of employment

and the salary. If this is the case, then Code § 365 dealing with executory contracts applies.").

Ultimately, the court ruled that, regardless of whether the extension letters were new contracts

(governed by section 363 of the Bankruptcy Code) or modifications to contracts (governed by

section 365 of the Bankruptcy Code), the term extension granted by the one-page extension letters

was enforceable, but the golden parachutes incorporated by reference only were not. *See id*. at

829.

34.     Here, the plain language in the Extensions is dispositive. Like the contracts

in *Bush Industries* and *Crystal Apparel*, the Extensions are among the same parties, incorporate

the Prepetition Subservicing Agreements by reference only, and contain clauses that explicitly

state the parties' desire to extend and restate prior agreements.

35.     At least twice in each one-page document totaling no more than six

paragraphs, each Extension clearly and unequivocally states that the Extension serves only to

extend the terms of the Prepetition Subservicing Agreements:

> WHEREAS, to allow the parties further time to negotiate and
> execute a new…Subservicing Agreement, the parties now desire to
> extend the [Prepetition Subservicing] Agreement . . .

*See, e.g.,* Ex. A-1, A-2, B-1, B-2. The plain language of the Extensions is clear that the purpose

of the Extensions was to allow additional time to negotiate and execute a *new* agreement, which

ultimately did not occur. It is illogical for Claimants to argue that the parties entered into new

agreements to allow for further new agreements.

36.     Each Extension also explicitly states that the purpose of all other Extensions

was to extend the term of the Prepetition Subservicing Agreements. *See id*. ("WHEREAS, the

[Prepetition Subservicing] Agreement ("Agreement") between the parties dated [] expired on [],

and the parties subsequently agreed to *extend* the Agreement for an additional term commencing

upon the expiration date of [] and expiring on []; and the parties *further agreed to extend* the

Agreement for further subsequent extensions") (emphasis added).    The short duration of the

extension periods also makes clear that the parties intended the Extensions to extend the

relationship only temporarily.

37.    Additionally, after the Commencement Date, the FoA Postpetition

Extension Agreements contains additional language that  clearly demonstrates that the Extensions

were not new agreements:

> Each of RMS and [FoA] have entered into this Extension Agreement
> ***solely to temporarily extend the term of the Agreement*** and do not
> intend this Extension Agreement or the transactions contemplated
> hereby to be, and this Extension Agreement and the transactions
> contemplated hereby shall not be construed to be or operate as, a
> novation, modification, or release of any of the obligations owing
> by RMS to [FoA] or in connection with the [Prepetition
> Subservicing] Agreement, all of which are hereby expressly
> preserved in their entirety . . .

Ex. B-1 (emphasis added).[4]

38.    Like the underlying contract in *Bush Industries*, the Prepetition

Subservicing Agreements specifically provide that they may be further extended upon the mutual

written agreement of the parties.

39.    Equally notable is what the Extensions exclude.    The Extensions fail to

provide any language detailing the rights and obligations under the subservicing relationship,

actions that constitute breach, notification of breach, indemnity, dispute resolution, or the

---

[4]    The non-inclusion of such language in the two LHES Postpetition Extension Agreements results merely from the
routine practice of the parties to use prior Extensions in their business relationship, and does not indicate an intent
to specifically exclude the provisions from nearly identical contracts.  *See, e.g., Nycal Corp. v. Inoco PLC*, 166
F.3d 1201 (2d Cir. 1998) ("any differences in the wording used in the three contemporaneous settlement
agreements can only be reasonably viewed as a consequence of the different relationships and dealings between
the respective companies and not as an indication of a different intent with respect to the Nycal-Inoco release.")
(internal quotations omitted).

**872**

treatment of claims arising under the agreement. Conversely, the parties negotiated each of these items in the Prepetition Subservicing Agreements and included explicit provisions. Claimants ask this Court to accept the unsupported and illogical conclusion that the one-page Extensions are equivalent to the 75-plus page Prepetition Subservicing Agreements, creating the same obligations and liability but on an administrative priority basis.

40.    The plain language of the Extensions is clear and unambiguous: the sole purpose of the Extensions was to extend the terms of the Prepetition Subservicing Agreements. Claimants' assertion that the Debtors intended to enter into novel subservicing agreements, under which they might accrue millions of dollars of administrative liability, does not comport with the explicit terms of the Extensions, is disingenuous, and should be rejected outright.

### 2. Lack of Court Approval of the Extensions Renders Them Unenforceable As Novel Postpetition Agreements

41.    Even if the Court agrees with Claimants that the Postpetition Extension Agreements are in fact postpetition contracts, Claimants would not be entitled to collect on an administrative priority basis because the parties did not obtain Court approval of the Extensions.

42.    Under section 363 of the Bankruptcy Code, transactions outside the ordinary course of business require notice to creditors, a hearing, and Court approval. *See, e.g., Crystal Apparel*, 220 B.R. at 829; *see also Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.)*, 78 F.3d 18, 25–26 (2nd Cir. 1996) (by "requiring the court to determine the reasonable necessity of the newly entered contract under § 503(b), Congress has insured some judicial control over the determination of what executory contracts will be granted administrative expense priority…[and] insured both similar treatment and similar procedural safeguards for these fundamentally similar obligations."). Transactions entered into by a debtor outside the ordinary course of business may be avoided if the transaction was not blessed by the court as being in the

14

WEIL:\97749585\1\41703.0012

best interests of the estate.

43.    For example, as an alternative to analyzing the extension letters in question as modifications, *Crystal Apparel* analyzed the agreements as new postpetition contracts.  *See Crystal Apparel*, 220 B.R. at 829.  In that analysis, the court found the extension of the term of performance within the ordinary course, but noted that the change of control provision was too significant to constitute an ordinary course transaction and required prior court approval:

> [W]ithout the Change of Control Payment provision incorporated into, but not actually described in the Extension Letters, the one year contract term was in the ordinary course of business in light of the size and complexity of the Debtors' businesses and the expected length of time the Chapter 11 cases would take until confirmation. This court concludes that *the only aspects* of the Extension Letters that were in the ordinary course of business were those providing for an increase in salary and for the extension of the employment term for one year. To the extent the Extension Letters incorporated the Change of Control Provision, they were out of the ordinary course of business of the Debtors as debtors in possession. Without court approval that provision of the Extension Letters is unenforceable and cannot give rise to an expense of administration.

*Id*. at 834 (emphasis original).

44.    In reaching its decision, the *Crystal Apparel* court reasoned that even where a transaction is one which a debtor might be expected to partake on occasion, "[s]ome transactions either by their size, nature or both are not within the day-to-day operations of a business and are therefore extraordinary."  *Id*. at 831.  If an event "is not a daily occurrence for any given corporation [or] might not even occur as often as once a year", the court may determine it is outside the ordinary course.  *Id*. at 831-832.  Even if the practice is "common outside of bankruptcy in the…industry, that does not mandate the conclusion that entering into a contract providing for such a payment is in the ordinary course of business for a Chapter 11…debtor."  *Id*. at 832.

45.    Additionally, the *Crystal Apparel* court noted that transactions that may affect the feasibility of a plan requires approval from the court:

**874**

> A debtor in possession which owns and manages a 1,000 unit apartment complex could not reasonably be expected to seek court approval for each lease transaction. Yet, a debtor owning a building with three store units will need to obtain court approval of a new lease because it is making a long-term commitment, the terms affect the feasibility of any plan.

*Id.* at 832-33.

46.    Even when analyzing the extension letters as amendments to prepetition contracts rather than as novel contracts, the *Crystal Apparel* court noted that it was "highly questionable whether this court would have permitted assumption…[of the] 'golden parachute' provisions since those provisions provided for payments greatly in excess of those available to the employees in the event of rejection." *Id*. at 835.

47.    The *Crystal Apparel* rational is applicable here. Entry into contracts as significant as the Prepetition Subservicing Agreements are not daily, or even yearly, occurrences for most businesses. Executing the Prepetition Subservicing Agreements required the assistance of counsel, months of ongoing negotiations, and numerous revisions before the parties agreed on the scope of liability. No reasonable party could consider entry into agreements resulting in millions of dollars in administrative expense liability to be a regular occurrence for the Debtors specifically or for chapter 11 debtors in general.

48.    Additionally, administrative expense liability in the magnitude asserted by the Claimants might reasonably call into question the feasibility of confirming or implementing the Third Amended Plan. The Debtors commenced these chapter 11 cases with the intent to dual-track a potential reorganization and a marketing process for the sale of all or substantially all of the Debtors' assets.[5] With such uncertainty as to the ultimate fate of these chapter 11 cases,

---

[5]    This Court, being familiar with the entire record of the chapter 11 cases, may take judicial notice of the docket,

WEIL:\97749585\1\41703.0012

incurring such substantial administrative expense exposure for new subservicing agreements when

the Debtors' businesses might be sold would have constrained the options the Debtors sought to

preserve, and further, the Debtors would not have foregone Court approval to risk the agreement

being unenforceable or avoidable.

49.     Therefore, regardless of whether the Extensions are or are not postpetition

contracts, the result is the same.  The Debtors did not—and in any event lacked the authority to—

enter into such significant agreements without the proper approval of this Court.  As in *Crystal*

*Apparel*, the provisions giving rise to such significant liability are either subject to rejection or are

avoidable for failure to obtain the proper approval under the Bankruptcy Code.  In either case, the

substantial liability asserted by Claimants is not a valid administrative expense.

## C.     Claims Based on Prepetition Agreements Give Rise to Prepetition Claims

50.     A debtor may only be required to pay in full any claims for breaches related

to an executory contract if (i) the debtor assumes such contract and is required to cure any defaults

under section 365 of the Bankruptcy Code, or (ii) the debtor rejects such contract and the resulting

claims meet the two-part test to be entitled to administrative expense priority under section 503(b)

of the Bankruptcy Code.  Claimants acknowledge that the Prepetition Subservicing Agreements

were not assumed.  *See* LHES Response ¶ 9; FoA Response ¶ 11.  Nor do the Claims meet the

two-part test to qualify as "actual, necessary costs and expenses of preserving the estate" under

section 503(b) of the Bankruptcy Code, which requires that administrative expense claims (i) arise

---

including all pleadings and other documents filed, all orders entered, all hearing transcripts, and all evidence and arguments made at the hearings held. *See, e.g., In re Advance Watch Co. Ltd.*, No. 15-12690 (MG), 2016 WL 323367, at *2 (Bankr. S.D.N.Y. Jan. 25, 2016); *In re: Residential Capital, LLC*, No. 12-12020 (MG), 2013 WL 12161584, at *1 (Bankr. S.D.N.Y. Dec. 11, 2013); *In re Am. Media, Inc.*, No. 10-16140(MG), 2010 WL 5483463, at *5 (Bankr. S.D.N.Y. Dec. 20, 2010).

Any reference to facts related to the Debtors' business, the Sale process, and confirmation of the Third Amended Plan are hereby incorporated by reference.

**876**

out of a postpetition transaction between the claimant and the debtor, and (ii) be supported by consideration supplied to and beneficial to the debtor in the operation of the business.  *See In re Enron Corp.*, 279 B.R. 695, 705 (Bankr. S.D.N.Y. 2002) (citing *Trs. of the Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir. 1986)).  Accordingly, the Claims resulting from the Prepetition Subservicing Agreements are general unsecured claims.

51.     The parties do not dispute that the Prepetition Subservicing Agreements were executory contracts under which the Debtors provided servicing in exchange for fees from Claimants.  Executory contracts for services, like all executory contracts, are subject to assumption or rejection.  *See, e.g., In re Hawker Beechcraft, Inc.*, 486 B.R. 264, 279 (Bankr. S.D.N.Y. 2013) (Support-plus agreements under which purchasers had reporting obligations in return for continuing support from debtor were executory contracts subject to rejection).

52.     The Third Amended Plan provided that all executory contracts not otherwise assumed would be rejected.  *See* Third Amended Plan, § 8.1(a).  Claimants admit that the Debtors did not assume the Prepetition Servicing Agreements.  *See* LHES Response ¶ 9; FoA Response ¶ 11.

53.     Rejection of executory contracts, and the resulting prepetition claim, is a cornerstone of the Bankruptcy Code.  *See In re AppliedTheory Corp.*, 312 B.R. 225, 235-236 (Bankr. S.D.N.Y. 2004) ("the ability to reject burdensome post-petition obligations is one of the most fundamental rights…under the Bankruptcy Code.") (internal citations omitted).  When a debtor-in-possession exercises its right to reject an executory contract either prior to plan confirmation or under a confirmed plan, the rejection is treated as occurring "immediately before the date of the filing of the petition." 11 U.S.C. § 365(g)(1).  "The Bankruptcy Code…specifically provides that such claim against the estate is treated as a pre-petition claim, thereby affording it

general unsecured status." *In re Old Carco LLC*, 424 B.R. 633, 639 (Bankr. S.D.N.Y. 2010) (internal citation omitted).

54.    Here, the Debtors rejected the Prepetition Subservicing Agreements, leaving Claimants with prepetition rejection damages claims.  The fact the events giving rise to liability occurred postpetition means only that the Claims were contingent, not that they are postpetition claims.  In these chapter 11 cases, this Court has reaffirmed clear Second Circuit case law:  even where events causing liability occur postpetition, claims based on un-assumed prepetition contracts are contingent prepetition claims.  *See* Sharma Order, at pp. 11, 13. ("Contract claims arise upon execution of the agreement…It is settled that prepetition contract-based claims for attorney's fees are deemed to arise upon execution of the contract."); *see also Rescap Liquidating Tr. v. PHH Mortg. Corp. (In re Residential Cap., LLC)*, 558 B.R. 77, 86 (S.D.N.Y. 2016) ("The appellees' claims for attorney's fees accrued at the time the Contracts were executed even though they remained contingent until the Trust allegedly breach the Contracts"); *Conway Hosp., Inc. v. Lehman Bros. Holdings Inc.*, 531 B.R. 339, 343 (S.D.N.Y. 2015) ("The relationship between Conway and LBSF therefore was created upon the signing of the…Agreement.  The fact that the Lehman bankruptcy—the relevant contingency—materialized post-petition does not transmogrify the claim into a post-petition claim, but merely means that the contingent claim moved closer to becoming liquidated"); *Ogle v. Fid. & Deposit Co. of Maryland*, 586 F.3d 143, 144 (2d Cir. 2009) ("an unsecured claim for post-petition fees, authorized by a valid pre-petition contract," is a contingent claim "deemed to have arisen pre-petition.") (citing *In re SNTL Corp.*, 571 F.3d 826, 844 (9th Cir. 2009); *In re Bradlees Stores, Inc.*, No. 02 CIV. 0896 (WHP), 2003 WL 76990, at *3 (S.D.N.Y. Jan. 9, 2003), *aff'd*, 78 F. App'x 166 (2d Cir. 2003) (holding that "the Second Circuit recognizes that contract-based bankruptcy claims are deemed to

arise at the time the contract is executed, and therefore a post-petition breach of a pre-petition contract gives rise solely to a pre-petition claim"); *Pearl-Phil GMT (Far E.) Ltd. v. Caldor Corp.*, 266 B.R. 575, 582 (S.D.N.Y. 2001) (the "Bankruptcy Court's conclusion is supported by the clear weight of case law in this Circuit which recognizes that contract-based bankruptcy claims arise at the time the contract is executed. For example, courts consistently hold that a post-petition breach of a pre-petition contract gives rise only to a prepetition claim").

55.     This Court also recently upheld well-established Second Circuit precedent applying the "fair contemplation test" in determining whether a claim exists for breach of contract. Sharma Order, at p. 11. The fair contemplation test dictates that a "contingent claim under the Code refers to obligations that will become due upon the happening of a future event that was within the actual or presumed contemplation of the parties at the time the original relationship between the parties was created." *Ogle*, 586 F.3d at 144 (citations and internal quotation marks omitted). Put simply, where parties contemplate the possibility of future breach in their contracts, as the Debtors and Claimants did here, such breaches are treated as contingent prepetition claims rather than postpetition claims. *See Residential Cap.*, 558 B.R. at 85-87; *see also In re Manville Forest Prod. Corp.*, 209 F.3d 125, 129 (2d Cir. 2000) (claims for indemnity arose pre-petition where "the terms of the indemnification agreements were so broad as to encompass all types of future liability"); *In re Chateaugay Corp.*, 944 F.2d 997, 1004 (2d Cir. 1991) ("In the context of contract claims, the Code's inclusion of 'unmatured' and 'contingent' claims is usually said to refer to obligations that will become due upon the happening of a future event that was 'within the actual or presumed contemplation of the parties at the time the original relationship between the parties was created.'") (internal citations omitted).

56.     The Claims here arise from alleged servicing errors under the Prepetition

20

Subservicing Agreements, as extended by the Extensions.  Though performance of the Prepetition

Subservicing Agreements extended beyond the Commencement Date, the obligations underlying

the Claims nevertheless arose prior to the bankruptcy, upon execution of the Prepetition

Subservicing Agreements.  Merely providing postpetition services on a prepetition contract does

not give rise to an administrative expense claim.  *See, e.g., Beneke Co. v. Econ. Lodging Sys., Inc.

(In re Econ. Lodging Sys., Inc.)*, 234 B.R. 691 (B.A.P. 6th Cir. 1999).  Accordingly, even if the

alleged errors occurred postpetition, the Claims would be, at most, contingent prepetition claims.

57.    Additionally, the possibility of postpetition servicing errors was certainly

within the Claimant's fair contemplation.  The Prepetition Subservicing Agreements contemplate

the possibility of servicing errors and establish procedures for dealing with errors, including

through indemnity provisions.  To the Plan Administrator's knowledge and belief, the Claimants

had access to the Debtors' records at all points, allowing the Claimants to see the status of borrower

accounts on a daily basis, including potential errors.

58.    Claimants had the ability to walk away and minimize their exposure, as the

term of the Prepetition Extension Agreements were set to expire shortly after the Commencement

Date.   Instead, the Claimants chose to enter into new Postpetition Extension Agreements

voluntarily.  The risk of subservicing errors in the postpetition period was within the fair

contemplation of the parties, and the fact that the Debtors received compensation for their services

does not transform the Claims into administrative expense claims.  Rather, under the Second

Circuit case law reaffirmed by this Court, the Claims are contingent prepetition claims, which are

not afford administrative expense priority under section 503(b)(1)(A) of the Bankruptcy Code.

**D.    Claims Are Not Otherwise Entitled to Administrative Priority**

59.    Claimants mistakenly assert that amounts due under the Prepetition

**880**

Services Agreements are entitled to administrative expense priority because the Prepetition Services Agreements and/or Extensions expired on their own terms prior to rejection and could not be rejected.  *See* LHES Response ¶ 2; FoA Response ¶ 2.  Claimants appear to confuse *timing* of rejection with the proper *treatment* of claims arising under prepetition contracts not assumed.

60.    In effect, it makes little difference whether the Debtors rejected the Prepetition Subservicing Agreements or they expired on their terms in the postpetition period. "The effect of rejection is that the *estate* does not become obligated on the contract…Thus, rejection is the equivalent of electing not to assume a contract".  *In re Old Carco LLC*, 424 B.R. at 639 (emphasis original); *see also In re A.C.E. Elevator Co.,* 347 B.R. 473, 483–84 (Bankr. S.D.N.Y. 2006) (finding when debtor did not reject an agreement postpetition and allowed the agreement to expire by its terms, employees' claim for delinquent contributions was not entitled to administrative priority).  Even if Claimants correctly assert that the Debtors were unable to reject the Extensions because they expired prior to the Effective Date, the Claims still arise under the Prepetition Subservicing Agreements *that were not assumed*.  Accordingly, the Claims are, at most, contingent prepetition general unsecured claims regardless of whether the Prepetition Subservicing Agreements and/or Extensions were deemed rejected or expired on their terms.

WEIL:\97749585\1\41703.0012

**881**

E.      **In the Alternative, the Claims are Limited to the Reasonable Value Conferred Upon the Estates**

61.      Claimants assert that any claims resulting from "operation [of the business] are entitled to payment prior to payment to creditors for whose benefit the continued operation of the business was allowed."   LHES Response ¶ 13; FoA Response ¶ 15 (internal quotations omitted).  However, Claimants do not accurately represent the law.  Section 503 of the Bankruptcy Code affords administrative expense priority only to claims that are "actual, necessary costs and expenses of preserving the estate."  11 U.S.C. 503(b)(1)(A).  Claims are considered actual and necessary costs only if such claims (i) arise out of a postpetition transaction between the claimant and the debtor, and (ii) the consideration supporting the claimant's right to payment was supplied to and beneficial to the debtor in the operation of the business.  *See Enron Corp.*, 279 B.R. at 705.

62.      The Second Circuit has long interpreted the "benefit to the estate" prong narrowly to preserve the estate as much as possible for prepetition creditors.  *See, e.g., In re Ames Dep't Stores, Inc.*, 306 B.R. 43, 54 (Bankr. S.D.N.Y. 2004) ("grants of administrative expense priority cut against the general goal in bankruptcy law to distribute limited debtor assets equally among similarly situated creditors, and thus [] statutory priorities, such as those resulting from administrative expense treatment, are narrowly construed.")  (citing *Amalgamated Ins. Fund*, 789 F.2d at 101); *Drexel Burnham Lambert*, 134 B.R. at 488 ("Strict construction of the terms 'actual' and 'necessary,' serves to keep administrative expenses at a minimum so as to preserve the estate for the benefit of all its creditors.").  In order to qualify as an administrative expense, there "must be a concrete, discernible benefit…speculative benefit or the mere potential for benefit is not enough to warrant an administrative claim priority."  *Enron Corp.*, 279 B.R. at 706.

63.      A chapter 11 debtor ordinarily has until plan confirmation to decide whether to assume or reject an executory contract.  11 U.S.C. § 365(d)(2).  "It is the clear policy of the

23

882

Bankruptcy Code to provide the debtor with breathing space following the filing of a bankruptcy petition, continuing until the confirmation of a plan, in which to assume or reject an executory contract." *Enron Corp.*, 279 B.R. at 702. Forcing debtors to pay for contracts not assumed runs contrary to the purpose of the Bankruptcy Code:

> Nor can a debtor be forced to comply with burdensome contractual obligations that may have formed part of the rationale for rejection in the first place…requiring a cure of defaults to *reject* a contract or lease would eliminate the Bankruptcy Code benefits provided to a debtor in allowing it to reject burdensome executory contracts and unexpired leases.

*Old Carco LLC*, 424 B.R. at 639 (internal citations and quotations omitted).

64.     The purpose of according priority "is fulfillment of the equitable principle of preventing unjust enrichment of the debtor's estate, rather than the compensation of the creditor for the loss to him." *Drexel Burnham Lambert*, 134 B.R. at 490 (citing *In re United Trucking Serv., Inc.*, 851 F.2d 159, 162 (6th Cir. 1988)). Thus, minimizing administrative expense claims to only those that are "actual" and "necessary" ensures that the value to creditors comports with Congressional intent, as "[a]ny priority given to one creditor is effected to the detriment of other creditors." *Old Carco*, 424 B.R. at 642.

65.     The court analyzed the scope of reasonable value provided to the estate in *AppliedTheory*. In *AppliedTheory*, executives provided postpetition services to the debtors and received their regular salaries throughout their postpetition tenure with the debtors, just as Claimants here received the continued benefit of the Debtors' services. *See id.* at 234. Nonetheless, the executives argued that they should be entitled to an administrative expense claim based on a salary continuation provision of the contracts upon their departure, *i.e.*, a severance. *See id.* at 228.

66.     In rejecting the executives' claim, the *AppliedTheory* court focused on the value provided to the estate.  The executives introduced proof that they provided valuable services to the estate, but failed to introduce proof sufficient to establish (i) that what they had already received was "less than a fair exchange for the work they performed during that time" and (ii) any nexus between the amount of compensation they were entitled to under the provision and the value of the services they provided.  *Id.* at 241.  The court noted that "the terms of the pre-petition contract do not determine the amount of the priority . . . nor does the contract become enforceable against the debtor in possession simply because it elects to receive benefits under the contract after the filing date."  *Id*. at 239 (citation omitted).  The court ultimately found that the "salary continuation . . . was not an indication of the value of their work; it was rather, in substance, a species of damages."  *Id*. at 240–41.

67.     Courts have concurred with the logic in *AppliedTheory*.  For instance, in *Dewey Freight Sys. Inc.*, the debtor performed under an executory contract to ship mail in the postpetition period prior to rejecting the contract, generating a receivable of approximately $18,000.  *See U.S. on Behalf of U.S. Postal Serv. v. Dewey Freight Sys., Inc.*, 31 F.3d 620, 622 (8th Cir. 1994).  When the debtor was no longer able to perform under the agreement, the counterparty was forced to find a more expensive replacement.  *Id*.  In response to the debtor's demand for payment of the $18,000, the counterparty argued that it was entitled to recoup the damages it suffered as a result of the debtor's failure to perform as an administrative expense.  In rejecting the argument, the Eighth Circuit found that a party is "entitled to a post-petition administrative claim only to the extent it has benefitted the debtor-in-possession in operating the business," and that the damages claim under executory contracts are "not of that nature." *Id*. at 624.

25

**884**

68.     Here, Claimants are seeking contract damages for un-assumed and, therefore, unenforceable, prepetition contracts, which is not permitted under bankruptcy law. *See* FoA Response at ¶ 3 ("an administrative expense claim for damages it has incurred resulting from RMS' post-petition servicing errors and other post-petition breaches of the subservicing agreements"); LHES Response at ¶ 3 (same). Claimants do not meet their burden of showing, nor do they even assert, that they did not receive reasonable value for the fees provided to the Debtors in the postpetition period.

69.     LHES asserts approximately $4.1 million as an administrative expense claim, which is approximately $4 million above what it paid the Debtors in postpetition fees. Similarly, FoA asserts approximately $14.4 million as an administrative expense, which is approximately $10 million above what it paid the Debtors in postpetition fees.

70.     Additionally, Claimants fail to account at all for the value provided to Claimants by the Debtors. Claimants received the fair value of the fees paid in the ordinary course of the Debtors' subservicing. The Debtors also provided significant benefit to Claimants by not immediately rejecting the Prepetition Subservicing Agreements on the Commencement Date. Migrating Claimants' account information to another servicer required significant time and effort. Although the Debtors had a statutory right to reject the Prepetition Subservicing Agreements much earlier in these cases, doing so would have placed both Claimants and reverse mortgage holders at significant risk of interrupted servicing and permanent loss of data. Instead, the Debtors worked with Claimants to test, reformat, and migrate data to a new subservicer, and continued performing ordinary subservicing activities during that process. The Claims do not deduct the value of the services provided by the Debtors, and Claimants' request for millions of dollars.

71.     Claimants now seek to use the Extensions to obtain a windfall. Contrary to

bankruptcy law, and to the detriments of other creditors, Claimants now attempt to collect substantial contract damages when the Debtors are no longer able to correct any alleged errors and after Claimants have received the benefit of a smooth transition to a new servicer. While Claimants may have provided value to the estates in the form of fees, Claimants have already received reasonable value in exchange for payment of such fees. Any benefit provided to the estates by compensation paid is simply not commensurate with the damages Claimants now assert. In the event that the Court determines that the Claims are allowable at all, the Court should find that the reasonable value of any benefit conferred to the Debtors postpetition has already been provided to Claimants via the Debtors' performance.

### Conclusion

72.    In sum, the Claims are contingent prepetition unsecured claims arising from alleged breaches under prepetition agreements that were never assumed by the Debtors. Claimants' argument that the Extensions transformed the Prepetition Subservicing Agreements into postpetition contracts does not accurately reflect the terms of the Extensions.

73.    In the event that the Court determines that the Extensions were novel contracts capable of giving rise to millions of dollars in liability, the lack of Bankruptcy Court approval of the Extensions prevents allowance as an administrative expense. Thus, Claimants have failed to state a claim for which they are entitled to relief as a matter of law, and the Court should overrule the Responses and reclassify the Claims as general unsecured claims.

WEIL:\97749585\1\41703.0012

**886**

WHEREFORE the Plan Administrator respectfully requests entry of an order denying the request for relief in the Claim and such other or further relief as is just.

Dated: December 11, 2020
New York, New York

/s/ Sunny Singh
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:   (212) 310-8000
Facsimile:    (212) 310-8007
Ray C. Schrock, P.C.
Richard W. Slack
Sunny Singh
*Attorneys for Plan Administrator*

**887**

## **Exhibit A-1**

Example of LHES Prepetition Extension Agreement

WEIL:\97749585\1\41703.0012

# Extension Of Agreement

For good and valuable consideration, the sufficiency of which is hereby acknowledged, this Extension Agreement is made by and between Reverse Mortgage Solutions, Inc. ("RMS") and Liberty Home Equity Solutions, Inc. ("Liberty") f/k/a Liberty Reverse Mortgage, Inc.

Whereas the Reverse Mortgage Subservicing Agreement ("Agreement") between the parties dated November 17, 2008 expired on November 17, 2013, the parties want to extend the Agreement and have the extension be effective as of November 17, 2013. Therefore, it is agreed that the Agreement is extended for an additional term of 3 (three) years commencing upon the expiration date of November 17, 2013 and shall now expire on November 17, 2016.

This extension shall be on all other terms and conditions as stated in the original Agreement.

This extension Agreement shall be binding upon and inure to the benefit of the parties, their successors, and subsidiaries.

Reverse Mortgage Solutions, Inc.

By: _____          9/7/16
Name: Christopher J. Mullins                              Date
Title: President

Liberty Home Equity Solutions, Inc.

By: _____          9-9-16
Name: Michael D. Kent                                        Date
Title: President

**889**

**<u>Exhibit A-2</u>**

Example of LHES Postpetition Extension Agreement

**Extension Agreement**

For good and valuable consideration, the sufficiency of which is hereby acknowledged, this Extension Agreement is made effective July 1, 2019 by and between Reverse Mortgage Solutions, Inc. ("RMS") and Liberty Home Equity Solutions, Inc. ("Liberty") f/k/a Liberty Reverse Mortgage, Inc.

WHEREAS, the Reverse Mortgage Subservicing Agreement ("Agreement") between the parties dated November 17, 2008 expired on November 17, 2013, and the parties subsequently agreed to extend the Agreement term through June 30, 2019.

WHEREAS, to allow the parties further time to negotiate and execute a new Reverse Mortgage Subservicing Agreement, the parties now desire to extend the Agreement through September 30, 2019.

NOW, THEREFORE, the parties agree that the Agreement shall be extended through September 30, 2019. Except as provided herein, this extension shall be on the same terms and conditions as stated in the original Agreement. This Extension Agreement shall be binding upon and inure to the benefit of the parties, their successors, and subsidiaries.


Reverse Mortgage Solutions, Inc.

By:

Name: Leslie Flynne

Title: SVP - Loan Servicing


Liberty Home Equity Solutions, Inc.

By:

Name: Michael D. Kent

Title: President

**891**

## **Exhibit B-1**

Example of FoA Prepetition Extension Agreement

## Extension Agreement

For good and valuable consideration, the sufficiency of which is hereby acknowledged, this Extension Agreement is made effective March 11, 2018 by and between Reverse Mortgage Solutions, Inc. ("RMS") and Finance of America Reverse LLC ("FAR") f/k/a Urban Financial Group, Inc.

WHEREAS, the Reverse Mortgage Subservicing Agreement ("Agreement") between the parties dated March 11, 2011 expires on March 11, 2018, and the parties subsequently agreed to extend the Agreement for an additional term of thirty days commencing upon the expiration date of March 11, 2018 and expiring on May 11, 2018.

Except as provided herein, this extension shall be on the same terms and conditions as stated in the original Agreement. This Extension Agreement shall be binding upon and inure to the benefit of the parties, their successors, and subsidiaries.


Reverse Mortgage Solutions, Inc.

By: _____

Name: Leslie J. Flynne

Title: Senior Vice President


Finance of America Reverse LLC

By: _____

Name:  Kathy Milligan

Title:  Chief Servicing Officer

**893**

**<u>Exhibit B-2</u>**

Example of FoA Postpetition Extension Agreement

**Extension Agreement**

For good and valuable consideration, the sufficiency of which is hereby acknowledged, this Extension Agreement is made effective as of August 16, 2019 by and between Reverse Mortgage Solutions, Inc. ("RMS") and Finance of America Reverse LLC ("FAR") f/k/a Urban Financial Group, Inc.

WHEREAS, the Reverse Mortgage Subservicing Agreement ("Agreement") between the parties dated March 18, 2011 expired on March 18, 2018, and the parties subsequently agreed to extend the Agreement for an additional term commencing upon the expiration date of March 18, 2018 and expiring on May 11, 2018; and the parties further agreed to extend the Agreement for further subsequent extensions commencing upon the expiration dates of May 11, 2018, June 30, 2018, August 30, 2018, October 31, 2018, November 30, 2018,  December 31, 2018, January 30, 2019, March 31, 2019, April 15, 2019, June 30, 2019, and August 31, 2019, respectively.

WHEREAS, to allow the parties further time to negotiate and execute an Amended and Restated Reverse Mortgage Subservicing Agreement, the parties now desire to extend the Agreement through September 30, 2019.

Except as provided herein, this extension shall be on the same terms and conditions as stated in the original Agreement.

Each of RMS and FAR have entered into this Extension Agreement solely to temporarily extend the term of the Agreement and do not intend this Extension Agreement or the transactions contemplated hereby to be, and this Extension Agreement and the transactions contemplated hereby shall not be construed to be or operate as, a novation, modification, or release of any of the obligations owing by RMS to FAR or in connection with the Agreement, all of which are hereby expressly preserved in their entirety.

This Extension Agreement shall be binding upon and inure to the benefit of the parties, their successors, and subsidiaries.


[Signature page to follow]

**895**

IN WITNESS WHEREOF, each of the undersigned parties has caused this Extension Agreement to be duly executed by a duly authorized representative, all as of the date first written above.

**Reverse Mortgage Solutions, Inc.**

By: _____

Name: Alan B. Clark

Title: Vice President, General Counsel


**Finance of America Reverse LLC**

By: _____

Name: Kathy Milligan

Title: Chief Servicing Officer

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 19-10412-jlg

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    DITECH HOLDING COPRORATION,

8

9          Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                 United States Bankruptcy Court

13                 One Bowling Green

14                 New York, NY  10004

15

16                 December 17, 2020

17                 11:33 AM

18

19

20

21   B E F O R E :

22   HON JAMES L. GARRITY

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  UNKNOWN

1    HEARING re ) Case Conference (Doc# 57)

2    continued from 3/14/2019 continued from 4/11/2019

3    continued from 5/14/2019 continued from 6/5/2019

4    continued from 6/11/2019 continued from 6/20/2019

5    continued from 10/10/2019 continued from 8/7/2019

6    continued from 8/28/2019 continued from 11/14/2019

7    continued from 12/12/2019 continued from 1/15/2020

8    continued from 2/13/2020 continued from 3/3 l /2020

9    continued from 4/22/2020 continued from 5/20/2020

10   continued from 6/17/2020 continued from 7/23/2020

11   continued from 8/27/2020 adj from 9/24/2020

12   continued from 10/29/2020 continued from 11/19/2020

13

14   HEARING re 2) Fifty-Second Omnibus Objection to Proofs of

15   Claim (Misclassified Claims)(Doc #2186)

16   Liberty Home Equity Solutions, Inc.'s Response (Doc #2314)

17   Finance of America Reverse LLC's Response (Doc #2315)

18   Adj from 5/20/2020 adj from 6/17/2020 adj from 7/23/2020 adj

19   from 8/27/2020 adj from 9/24/2020 adj from 10/29/2020 adj

20   from 11/19/2020

21

22   HEARING re 3)  Sixty-Fifth Omnibus Objection to Proofs of

23   Claim (Amended/Duplicative Claims)(Doc #2970)

24

25

**Page 3**

1   HEARING re 4)  Sixty-Sixth Omnibus Objection to Proofs of

2   Claim (No Basis Claims) (Doc #2971)

3

4   HEARING re Consumer Claims Trustees First Omnibus Objection

5   to Proofs of Claim (Insufficient Documentation Unsecured

6   Consumer Creditor Claims) (Doc #1962)

7   continued from 4/22/2020 adj from 5/20/2020

8   adj from 6/1 7 /2020 adj from 7/23/2020

9   adj from 8/27/2020 adj from 9/24/2020

10   adj from 10/29/2020 adj from 11/19/2020

11

12   HEARING re 6) Consumer Claims Trustees Tenth Omnibus

13   Objection to Proofs of Claim (Insufficient Documentation

14   Unsecured Consumer Creditor Claims) (Doc #1971)

15   continued from 4/22/2020 adj from 5/20/2020

16   adj from 6/17/2020 adj from 7/23/2020

17   adj from 8/27/2020 adj from 9/24/2020

18   adj from 10/29/2020 adj from 11/19/2020

19

20   HEARING re 7) Consumer Claims Trustees Eleventh Omnibus

21   Objection to Proofs of Claim (Insufficient Documentation

22   Unsecured Consumer Creditor Claims) (Doc #1972)

23   continued from 4/22/2020 adj from 5/20/2020

24   adj from 6/17/2020 adj from 7/23/2020

25   adj from 8/27/2020 adj from 9/24/2020

Page 4

1   adj from 10/29/2020 adj from 11/19/2020

2

3   HEARING re 8) Consumer Claims Trustees Twelfth Omnibus

4   Objection to Proofs of Claim (Insufficient Documentation

5   Unsecured Consumer Creditor Claims) (Doc #1973)

6   Response to Motion filed by Hilda Hutchinson. (Doc #2344)

7   adj from 4/22/2020 adj from 5/20/2020

8   adj from 6/17/2020 adj from 7/23/2020

9   adj from 8/27/2020 adj from 9/24/2020

10  adj from 10/29/2020 adj from 11/19/2020

11

12  HEARING re 9) Consumer Claims Trustees Thirteenth Omnibus

13  Objection to Proofs of Claim (Insufficient Documentation

14  Unsecured Consumer Creditor Claims) (Doc #1974)

15  continued from 4/22/2020 adj from 5/20/2020

16  adj from 6/17/2020 adj from 7/23/2020

17  adj from 8/27/2020 adj from 9/24/2020

18  adj from 10/29/2020 adj from 11/19/2020

19

20  HEARING re 10) Consumer Claims Trustees Fifteenth Omnibus

21  Objection to Proofs of Claim (Insufficient Documentation

22  Unsecured Consumer Creditor Claims) (Doc #2141)

23  continued from 5/20/2020 adj from 7/23/2020

24  adj from 8/27/2020 adj from 9/24/2020

25  adj from 10/29/2020 adj from 11/19/202

```
                                                        Page 5
 1    HEARING re 11) Consumer Claims Trustees Eighteenth Omnibus

 2    Objection to Proofs of Claim (Insufficient Documentation

 3    Unsecured Consumer Creditor Claims) (Doc #2316)

 4    continued from 6/17/2020 adj from 7/23/2020

 5    adj from 8/27/2020 adj from 9/24/2020

 6    adj from 10/29/2020 adj from 11/19/2020

 7

 8    HEARING re 12) Consumer Claims Trustees Twenty-second

 9    Omnibus Objection to Proofs of Claim (Insufficient

10    Documentation and Untimely Unsecured Consumer Creditor

11    Claims) (Doc #2320)

12    continued from 6/17/2020 adj from 7/23/2020

13    adj from 8/27/2020 adj from 9/24/2020

14    adj from 10/29/2020 adj from 11/19/2020

15

16    HEARING re 13) Consumer Claims Trustees Twenty-Fifth Omnibus

17    Objection to Proofs of Claim (Insufficient Legal Basis

18    Unsecured Consumer Creditor Claims) (Doc #2544)

19    continued from 7/23/2020 adj from 9/24/2020

20    adj from 10/29/2020 adj from I 1/19/2020

21

22    HEARING re 14) Consumer Claims Trustees Thirty Third Omnibus

23    Objection to Proofs of Claim  (Insufficient Documentation

24    Unsecured Consumer Creditor Claims)

25    (Doc #2950)
```

Page 6

1    HEARING re 15) Consumer Claims Trustees Thirty-Fourth

2    Omnibus Objection to Proofs of Claim (Insufficient Legal

3    Basis Unsecured Consumer Creditor Claims (Doc #2959)

4

5    HEARING re 16) Consumer Claims Trustees Thirty-Fifth Omnibus

6    Objection to Proofs of Claim (Satisfied or Released

7    Unsecured Consumer Creditor Claims) (Doc #2952)

8

9    HEARING re 17) Consumer Claims Trustees Thirty-Sixth Omnibus

10   Objection to Proofs of Claim (to Allow Classify Unsecured

11   Consumer Creditor Claims) (Doc #2953)

12

13   HEARING re 18) GUC Recovery Trust's Tenth Omnibus Objection

14   to Proofs of Claim (Paid/Satisfied Claims) (Doc #2973)

15

16   HEARING re 19) GUC Recovery Trusts Eleventh Omnibus

17   Objection to Proofs of Claim (No Liability Claims)

18    (Doc #2974)

19

20   HEARING re 20) GUC Recovery Trust's Twelfth Omnibus

21   Objection to Proofs of Claim (Duplicative and Amended and

22   Superseded Claims) (Doc #2975)

23

24

25

Page 7

1     HEARING re 21) GUC Recovery Trusts Thirteenth Omnibus

2     Objection to Proofs of Claim (Unliquidated Claims)

3     (Doc #2976)

4

5     HEARING re GUC Recovery Trusts Fourteenth Omnibus Objection

6     to Proofs of Claim (Modified Claims) (Doc #2977)

7

8     HEARING re 23) GUC Recovery Trusts Fifteenth Omnibus

9     Objection to Proofs of Claim (Modified Claims) (Doc #2978)

10

11    HEARING re 24) Plan Administrator for Entry of Order in Aid

12    of Execution of Third Amended Joint Chapter 11 Plan of

13    Ditech Holding Corporation and Its Affiliated Debtors (I)

14    Authorizing Plan Administrator to Return Unclaimed Borrower

15    Funds to Ascertained Borrowers, if Any, (II) Establishing

16    Procedures for Remaining Borrowers to Submit Requests for

17    Return of Unclaimed Borrower Funds, (III) Establishing

18    Special Deadline After Which Wind Down Estates Will Cease

19    Efforts to Locate Borrowers and to Return Unclaimed Borrower

20    Funds, and (IV) Granting Related Relief (Doc #2874)

21

22    HEARING re Thirty-Second Omnibus Claims Objection to Proofs

23    of Claim (No Basis Consumer Creditor Litigation Claims)

24    (Doc #1764)

25    Objection to Motion filed by Viatcheslav Strekalov.

```
                                                        Page 8

 1    (Doc #1831)

 2   Objection to Motion filed by Cynthia Settles

 3    (Doc #1833)

 4   Objection to Motion filed by Darryl Keith Browder. (

 5   Doc #1893)

 6   Objection to Motion filed by Dolores Yee.

 7    (Doc #1905)

 8   continued from 2/25/2020 continued from 4/22/2020

 9   adj from 6/17/2020 adj from 7/23/2020

10   adj from 8/27/2020 adj from 9/24/2020

11   adj from 10/29/2020 adj from 11/19/2020

12

13   HEARING re 26) Fifteenth Omnibus Claims Objection to Proofs

14   of Claim (No Basis Consumer Creditor Claims) (Doc #1747)

15   Objection to Motion filed by Suzanne Roberts. (Doc #1877)

16   Response to Motion filed by Richard S. Phelps. (Doc# 2154)

17   continued from 2/25/2020 adj from 3/31/2020

18   adj from 4/22/2020 adj from 5/20/2020

19   adj from 6/17/2020 adj from 7/23/2020

20   adj from 8/27/2020 adj from 9/24/2020

21   adj from 10/29/2020 adj from 11/19/2020

22

23

24

25
```

Page 9

1    HEARING re 27) GUC Recovery Trusts Objection to Classify the

2    Proof of Claim of the Geary Class Action Plaintiffs (Brian

3    and Connie Geary, Individually and on Behalf of Others

4    Similarly Situated) (Claim No. 20041) as a Consumer Creditor

5    Claim for Distribution, if any, From the Consumer Creditor

6    Recovery Cash Pool. (Doc #2972)

7

8    HEARING re 28) Cross-Motion to Classify as a General

9    Unsecured Claim (Doc #3037)

10

11   HEARING re Motion for Consideration filed by Mary J.

12   Farrier. (Doc #2797)

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

```
                                                    Page 10

 1   A P P E A R A N C E S :

 2

 3   WEIL, GOTSHAL & MANGES LLP

 4        Attorneys for the Debtors

 5        767 Fifth Avenue

 6        New York, NY 10153

 7

 8   BY:  SUNNY SINGH (TELEPHONICALLY)

 9        CLIFF SONKIN (TELEPHONICALLY)

10        ANGELINE HWANG (TELEPHONICALLY)

11

12   HUNTON ANDREWS KURTH

13        Attorneys for Finance of America; Liberty Home Equity

14        200 Park Avenue

15        New York, NY 10166

16

17   BY:  ROBERT RICH (TELEPHONICALLY)

18

19   JENNER BLOCK

20        Attorneys for Consumer Claims Trustee

21        919 Third Avenue

22        New York, NY 10022

23

24   BY:  RICHARD LEVIN (TELEPHONICALLY)

25
```

1   TARA TWOMEY (TELEPHONICALLY)

2        Consumer Claims Trustee

3        8 The Green, Suite 7028

4        Dover, DE 19901

5

6   PACHULSKI STANG ZIEHL & JONES LLP

7        Attorneys for GUC Trust

8        780 Third Avenue, 34th Floor

9        New York, NY 10017

10

11  BY:  BETH LEVINE (TELEPHONICALLY)

12

13  LOEB & LOEB LLP

14       Attorneys for State of DE, IL, MT and IA

15       345 Park Avenue

16       New York, NY 10154

17

18  BY:  VADIM RUBENSTEIN (TELEPHONICALLY)

19

20  NEW JERSEY OFFICE OF ATTORNEY GENERAL

21       Attorneys for NJ Unclaimed Property Administrator

22       25 Market Street

23       Trenton, NJ 08625

24

25  BY:  VALERIE HAMILTON (TELEPHONICALLY)

Page 12

```
1   INDIANA OFFICE OF ATTORNEY GENERAL

2        Attorneys for the State of Indiana

3        302 West Washington Street

4        Indianapolis, IN 46204

5

6   BY:  HEATHER CROCKETT (TELEPHONICALLY)

7

8   OHIO OFFICE OF ATTORNEY GENERAL

9        Attorneys for Ohio Department of  Commerce

10       615 W. Superior Avenue

11       Cleveland, OH 44113

12

13  BY:  ALISON ARCHER (TELEPHONICALLY)

14

15  MISSOURI STATE TREASURER'S OFFICE

16       Unclaimed Property Division

17       815 North Olive

18       Saint Louis, MO 63188

19

20  BY:  MARY LONG (TELEPHONICALLY)

21

22

23

24

25
```

Page 13

1    MINTZ LEVIN

2         Attorneys for Commonwealth of Massachusetts Office of

3         the Treasurer and Receiver General

4         122 West Street, Apartment 3Q

5         Brooklyn, NY 11222

6

7    BY:  KAITLIN WALSH (TELEPHONICALLY)

8

9    RICHARD PHELPS (TELEPHONICALLY)

10        Pro Se Claimant

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2            THE COURT:  All right, good morning.  It's Judge

3    Garrity.  I apologize for keeping you waiting.  We are here

4    this morning in Ditech Holding Corporation, Case Number 19-

5    10412.  We have a number of matters on our agenda this

6    morning.

7            Mr. Singh, are you on?

8            MR. SINGH:  Yes, I am here, Your Honor.  Good

9    morning, Your Honor.  Sunny Singh.  Can you hear me okay?

10           THE COURT:  I can, thank you.

11           MR. SINGH:  Great.  Your Honor, good morning.  As

12   you said, we do have a number of matters on the agenda that

13   was filed yesterday and a number of folks on the line.  What

14   I was -- what I'd like to propose, Your Honor, is we have a

15   quick status conference with respect to one of the matters.

16   Your Honor, we can address that quickly.  And then there's a

17   pretty long list of uncontested matters, and then we have

18   contested.  I'm happy to either go down the list of

19   uncontested or address the -- there was a motion in aid of

20   execution of the plan that relates to the unclaimed property

21   and I think most folks are probably on for that matter, or

22   many folks I should say.  So we can either address that

23   first -- however Your Honor would like to proceed is of

24   course fine with us.

25           THE COURT:  Well, you said you have the status on

Page 15

1    a particular matter?

2            MR. SINGH:  Yes, Your Honor.  We can start there.

3            THE COURT:  Yeah.  And then I think -- I'm sorry,

4    Mr. Singh.  I think what we should do -- I know we can move

5    very quickly through the uncontested matters.  So why don't

6    we do that.  And then we can get into the motion as relating

7    to the unclaimed funds.

8            MR. SINGH:  Perfect, Your Honor.  We'll do that.

9    So, Your Honor, the first status conference relates to the

10   claims that were filed by Liberty Home Equity Solutions and

11   Finance of America Reverse LLC.  Counsel from Hunton &

12   Williams is on the line, Your Honor.  And the plan

13   administrator did file a reply last week.  Again, this is

14   just a status conference for today.

15           Judge, I don't know if you've had a chance to

16   review the papers, but we think a preliminary or at least a

17   threshold issue here is whether this is -- these claims are

18   post-petition administrative claims where the claimants have

19   alleged that certain extension agreements constituted new

20   contracts and post-petition obligations, which is a position

21   opposed by the plan administrator.  And at least in our

22   pleading, we've sort of set out why we think, Your Honor,

23   based on the documents you can rule against that position.

24           We've conferred with counsel at a constructive

25   call where the parties agree as to process.  Our suggestion,

Page 16

1   Your Honor, would be that if the Court is available, that at

2   the January omnibus hearing we would be heard with respect

3   to the plan administrator's objection on file, which is

4   basically a motion to dismiss standard, as most of the

5   objections before you have been.

6          If Your Honor rules in our favor, the plan

7   administrator's favor, that should sort of resolve the

8   issue.  If there are open questions and Your Honor doesn't

9   rule in our favor and then we would have to get to evidence,

10  we would then come up with a discovery schedule, meet and

11  confer, and then request an evidentiary hearing from Your

12  Honor after that.  But we think in the first instance,

13  Judge, for purposes of judicial efficiency, it makes sense

14  to at least hear the motion to dismiss that's been filed by

15  the plan administrator so Your Honor could address that

16  issue.  And that could obviate the need for further

17  discovery depending on Your Honor's ruling.  Or it might

18  even at least limit it, for example.

19          So that's what we were thinking.  I'll of course

20  let Counsel address the Court.

21          THE COURT:  Okay.  Do the creditors wish to be

22  heard?

23          MR. RICH:  Yes.  Thank you, Your Honor.  This is

24  Robert Rich from Hunton Andrews Kurth, counsel for Finance

25  of America Reverse LLC and Liberty Home Equity Solutions,

Page 17

1    Inc.

2          What Counsel said is consistent with our

3    conversation.  We think it makes sense to schedule a hearing

4    on the legal issues, as you said, on a motion to dismiss

5    standard is fine.  And of course if we were successful on

6    that, we'd come back to the Court and ask for discovery,

7    which would be informed by that decision.

8          We didn't talk about a date.  I just heard Counsel

9    mention the January omnibus date.  If you could just share

10   what date that is, that would be helpful.

11         MR. SINGH:  Yes, Your Honor.  I believe we're on

12   for the last Thursday, which is January 28th.  The last

13   Thursday of January it should be.

14         THE COURT:  Yes, that's what I show.

15         MR. SINGH:  Yeah.  So we would propose, Your

16   Honor, to schedule the hearing for that date if that works

17   for Your Honor.

18         THE COURT:  All right.  Counsel, that works for

19   you?

20         MR. RICH:  Yes.  Is that at 11 A.M. like this

21   hearing?

22         THE COURT:  Yes.  Yes, that would be at 11:00.

23         MR. RICH:  Okay, yes.  That works.  Thank you.

24         THE COURT:  All right, terrific.  I've had a

25   chance to read the papers.  So I don't have any problem

Page 18

1    approaching it in the fashion that you folks have agreed to.

2    We'll adjourn it to 11:00 on the 28th, January 28th.  Okay?

3              MR. SINGH:  Thank you, Your Honor.

4              MR. RICH:  Thank you, Your Honor.

5              THE COURT:  Thank you.  All right, great.

6              MR. SINGH:  Your Honor, okay.  So then that takes

7    us to -- we do have a case conference on the calendar.  I

8    should have started with this, Your Honor.  I think we'll

9    address -- there has been a lot of activity as you can see

10   from what we've got on the docket today, but nothing other

11   than what we've got on today really to update the Court on.

12   You know, we're continuing to make progress through the

13   claims and coordinate with the GUC trustee and the consumer

14   representative.  But I think the main event today regarding

15   unclaimed property has been the primary focus of the plan

16   administrator over the past couple of weeks.

17             So unless Your Honor has any general questions, I

18   would propose to then go to the uncontested claim matters.

19             THE COURT:  I do not have any questions, so we can

20   get started.  Thank you.

21             MR. SINGH:  Okay.  Thank you, Your Honor.  I'm

22   going to turn it over to my colleague, Cliff Sonkin, who is

23   going to handle the first two objections that are filed by

24   the plan administrator, and then we'll transition to the

25   consumer representative and the GUC trustee's counsel.

Page 19

1           THE COURT:  All right, terrified.

2           MR. SONKIN:  Good morning, Your Honor.  This is

3    Cliff Sonkin of Weil Gotshal & Manges on behalf of the plan

4    administrator.

5           The next item on the agenda is the 65th Omnibus

6    Objection to proofs or claim filed at ECF 2970.  The 65th

7    Omnibus objection seeks to disallow and expunge ten claims

8    on the basis that the proofs of claim are duplicative of

9    other filings.  The plan administrator has not received any

10   responses regarding this objection.  And as such, the plan

11   administrator respectfully request that the Court sustain

12   the objection in order that the claim is disallowed and

13   expunged.

14          THE COURT:  I've reviewed the papers.  Is there

15   anyone else who would like to be heard?

16          There being no response, your request is granted.

17   Submit an order, please.

18          MR. SONKIN:  Okay.  Thank you, Your Honor.

19          The next item on the agenda is the 66th Omnibus

20   Objection at ECF 2971.  The 66th Omnibus Objection was filed

21   jointly with the GUC recovery trustee.  And the objection

22   seeks to disallow and expunge 19 claims on the basis that

23   the claims lack legal merit or sufficient documentation to

24   support the validity of the claims.

25          I did want to note for Your Honor that the

Page 20

1    objection initially was to 20 claims.  However, claim number

2    20880 was previously listed on the 58th Omnibus Objection.

3    Your Honor entered an order expunging that claim on July

4    11th at ECF 2688.  And therefore, the plan administrator

5    believes that further relief as to that claim is

6    unnecessary.

7            As there have been no other timely responses

8    received, the plan administrator respectfully requests that

9    the Court sustain the objection and the Court has the claims

10   disallowed and expunged.

11           THE COURT:  All right.  Were there any responses,

12   timely or otherwise?

13           MR. SONKIN:  We did have -- I believe there was

14   someone who was on the 58th who reached out to the GUC

15   trustee regarding claim number 20880.

16           THE COURT:  Oh, okay.  So the one that had -- I'm

17   sorry -- that had already been dealt with.

18           MR. SONKIN:  Correct.

19           THE COURT:  Oh, okay.  Is there anyone else who

20   would like to be heard?

21           I've reviewed the papers and find that based on

22   the undisputed facts you've established a right to the

23   relief requested.  Your request is granted.  You will submit

24   an order, please.

25           MR. SONKIN:  Okay.  Thank you, Your Honor.

Page 21

1                    THE COURT:  Thank you.

2                    MR. SONKIN:  I believe that is the plan

3          administrator's objections.  And with that, I'd like to cede

4          the virtual podium to the consumer representative.

5                    THE COURT:  All right.  Thank you.

6                    MR. LEVIN:  Good morning, Your Honor.  Richard

7          Levin, Jenner & Block LLP for the consumer claims trustee.

8                    THE COURT:  Mr. Levin.

9                    MR. LEVIN:  I'd like to in the interest of time --

10         everything that I'm going to discuss in a moment is on the

11         agenda, which is filed, so it's in the record.  So I'm going

12         to try to summarize and group these Agenda Items 5 through

13         13.  These are adjourned omnibus claim objections to about

14         10 or 11 individuals' claims who had asked for more time to

15         prepare responses.  Ms. Twomey, the consumer claims trustee,

16         agreed with those requests.  And in some cases asked for --

17         reminded the claimant a second time to provide the

18         information.

19                   As of October 24, none of these claimants had

20         provided the additional information to support their claims.

21         Ms. Twomey sent a letter dated October 24th to each of them.

22         None of them have responded.  And the letter made clear that

23         if they didn't respond, we would seek an order disallowing

24         their claims.

25                   And so that's what's on the calendar for Items 5

Page 22

1  through 13 on the agenda.  I've checked the hearing

2  dashboard.  It appears that none of these claimants are in

3  the courtroom, in the virtual courtroom.  Although if Your

4  Honor thinks it appropriate, I'd be happy to read each of

5  their names just so they can respond if they happen to be

6  here.  But otherwise -- I'm sorry.

7          THE COURT:  No, no, I'm sorry.  I interrupted you.

8  Please.

9          MR. LEVIN:  That's all right.  But otherwise, I

10 would ask all of these claims be disallowed.

11         THE COURT:  Is there anyone else on the phone who

12 would like to be heard with respect to these matters?

13         All right.  And there's a person who identifies

14 him or herself as M. Morris.  Is that one of the claimants,

15 Mr. Levin?

16         MR. LEVIN:  No, it is not, Your Honor.  No, it is

17 not.

18         THE COURT:  Okay, thank you.  All right.  Then

19 there being no response, the request is granted as it

20 relates to the claims that Mr. Levin has summarized on the

21 record just this moment.  And you'll submit appropriate

22 orders?

23         MR. LEVIN:  Yes, Your Honor, we will.

24         THE COURT:  Terrific.  Thank you.

25         MR. LEVIN:  The next item is the consumer claim

Page 23

1    trustee's 33rd Omnibus Objection.  We received informal

2    responses from four individuals listed on the agenda.  And

3    we have agreed to adjourn those to a date to be determined.

4    And we filed a notice of adjournment with respect to those,

5    Your Honor.  So with the exception of those four claimants,

6    we ask that the objection be granted and the remaining

7    claims be disallowed.

8              THE COURT:  Is there anyone else who would like to

9    be heard on this matter?

10             There being no response, your request is granted.

11   Please submit the order.

12             MR. LEVIN:  We will do so, Your Honor.  The next

13   item is the consumer claims trustee's 34th Omnibus

14   Objection.  Same situation.  We received two formal

15   responses and four informal responses and no responses for

16   the others.  We filed a notice of adjournment with respect

17   to those six claimants.  Actually, we filed also an amended

18   notice of adjournment this morning for the last on the list,

19   a claimant named (indiscernible).  No other responses, Your

20   Honor.

21             We ask that with the exception of these six who

22   have been adjourned, whose objections have been adjourned to

23   a date to be determined, that the claims be disallowed.

24             THE COURT:  Is there anyone else who would like to

25   be heard on this matter?

Page 24

1          There being no response, your request is granted.

2     You will submit the order, please.

3          MR. LEVIN:  Yes, we sill.  The next is the

4     consumer claim trustee's 35th Omnibus Objection.  We

5     received one informal response.  We filed a notice of

6     adjournment with respect to that claimant's claim.  And

7     except for that, we ask that all the other claims on this

8     omnibus objection be disallowed.

9          THE COURT:  Is there anyone else who would like to

10    be heard on this matter?

11         There being no response, your request is granted.

12         MR. LEVIN:  And finally, Item 17 on the agenda,

13    the consumer claim trustee's 36th Omnibus Objection.  We

14    have received no responses, formal or informal.  So we ask

15    that all the claims on this omnibus objection be disallowed.

16         THE COURT:  Is there anyone else who would like to

17    be heard on this matter?

18         There being no response --

19         MS. TWOMEY:  Yes.  Your Honor, this is the

20    consumer claims trustee.

21         Mr. Levin, these are our allow and classify

22    claims.  So these are claims that we are seeking to allow.

23         MR. LEVIN:  I apologize.  Yes.  These are not

24    objections per se, but they are allow and classify, allowing

25    to reduce the amount or if they were unliquidated, we

Page 25

1    determined an amount that they should be allowed for.  So we

2    gave notice to everybody on this list of the amounts that we

3    thought they should be allowed for, and none responded.

4              So we ask that the claims be allowed in the amount

5    specified in the 36th Omnibus Objection.

6              THE COURT:  All right.  Thank you, Ms. Twomey.

7    Anything else you'd like to add, Ms. Twomey?

8              MS. TWOMEY:  No, thank you, Your Honor.

9              THE COURT:  All right, thank you.  Is there anyone

10   else who would like to be heard?

11             Your request is granted.  Mr. Levin, you will

12   please submit the order.

13             MR. LEVIN:  We will.  Your Honor, that completes

14   our portion of the hearing until -- our portion of the

15   uncontested matters.  So I'll ceded the podium to the

16   counsel for the general unsecured -- the GUC trustee.

17             THE COURT:  Thank you.

18             MS. LEVINE:  Good morning, Your Honor.  It's Beth

19   Levine from Pachulski Stang Ziehl & Jones.  Can you hear me

20   all right?

21             THE COURT:  I can, thank you.

22             MS. LEVINE:  Thank you, Your Honor.  We are here

23   on the GUC Recovery Trust 10 through 15 omnibus objections

24   to claims which are items 8 through 23 on the agenda.

25             Turning first to the GUC Recover Trust's 10th

Page 26

1    Omnibus Objection to claims that were paid -- with respect

2    to paid and satisfied claims.  This objection is

3    uncontested.  We have received no formal or informal

4    objection.  And accordingly, we would respectfully request

5    that the Court enter an order expunging the disputed and

6    satisfied claims set forth on Schedule 1 to the proposed --

7            THE COURT:  Thank you.  Is there anyone else who

8    would like -- is there anyone else who would like to be

9    heard?

10           There being no response, your request is granted.

11   Please submit the order.

12           MS. LEVINE:  Will do so, Your Honor.  Thank you.

13           Next on the agenda is the GUC Recover Trust's 11th

14   Omnibus Objection to claims with respect to the liability

15   claims.

16           With respect to this objection, we did receive one

17   informal request by Roof Doctors of Carrollton Inc. and we

18   filed an adjournment with respect to that claim, which is at

19   ECF 2974.  We have not received any other filed or informal

20   responses.

21           And with that, Your Honor, we would -- other than

22   with respect to the adjourned claim, we would request that

23   the Court enter an order expunging the claims listed in the

24   GUC Trust's 11th Omnibus Objection.

25           THE COURT:  Is there anyone else who would like to

Page 27

1    be heard?

2              There being no response, your request is granted.

3    You'll submit the order, please.

4              MS. LEVINE:  Thank you, Your Honor.  We will.

5    Next is the GUC Trust's 12th Omnibus Objection to claims

6    with respect to duplicative and amended and superseded

7    claims.

8              Again, with respect to the 12th Omnibus Objection,

9    we've received no responses either formal or informal.  And

10   accordingly, we would request that the Court enter the order

11   expunging the (indiscernible) claims identified on the

12   schedule to the proposed orders.

13             THE COURT:  Is there anyone else who would like to

14   be heard?

15             There being no response, your request is granted.

16   You will please submit the order.

17             MS. LEVINE:  Will do so, Your Honor.  Thank you.

18             Next is the GUC Trust's 13th Omnibus Objection to

19   claims with respect to unliquidated claims.

20             We did receive a few filed responses with respect

21   to this objection from the Franchise Tax Board, the State of

22   Connecticut, and the Treasurer of Virginia.  And with

23   respect to each of those claims, we filed a notice of

24   adjournment at ECF 3075.  We have not received any other --

25   any informal objections and no other objections have been

Page 28

1    filed.

2              With that, Your Honor, we would request that the

3    Court enter an order expunging the unliquidated claims

4    listed on Schedule 1 to the proposed order with the

5    exception of the claims for which we've noticed an

6    adjournment.

7              THE COURT:  Is there anyone else who would like to

8    be heard on this matter?  There being no response, your

9    request is granted.  You will please submit the order.

10             MS. LEVINE:  Will do so, Your Honor.  Thank you

11   very much.

12             Next we have the GUC Recovery Trust's 14th Omnibus

13   Objection to proofs of claims with respect to modified

14   claims where we've sought to modify the claims either in

15   amount or classification.

16             With respect to this objection, we've not received

17   any informal responses, nor have any responses been filed on

18   the docket.  Accordingly, we respectfully request that the

19   Court enter an order modifying the claims as set forth in

20   the proposed claim (indiscernible) and Schedule 1 to the

21   proposed order.

22             THE COURT:  Is there anyone else who would like to

23   be heard?

24             There being no response, your request is granted.

25   You will submit the order, please.

Page 29

1          MS. LEVINE:  Will do so.

2          And finally, Your Honor, we have the GUC Recovery

3     Trust's 15th Omnibus Objection to claims, again, with

4     respect to modified claims.

5          We received two responses to this matter.  One

6     response which we filed.  The other was filed by Frenkel

7     Lambert Weiss.  And we filed a withdrawal with respect to

8     that claim.

9          In addition, Your Honor, with respect to -- we

10    received a response from Ms. Morris with respect to Claim

11    Number 20168.  Your Honor, we hadn't focused on that

12    response.  I know Ms. Morris is on the phone today, but we

13    would request an adjournment of the hearing with respect to

14    that claim so that we can review her response in greater

15    detail and reach out to her to see if we can come to a

16    resolution before involving the Court.

17         THE COURT:  All right.  Ms. Morris, would you --

18    I'm sorry.  I apologize.

19         MS. LEVINE:  That's fine.  Perhaps Ms. Morris

20    wants to speak at the moment before we conclude.

21         THE COURT:  All right.  Ms. Morris, would you like

22    to be heard?  Ms. Morris?

23         MS. MORRIS:  I'm sorry. That's fine with me.  I

24    will wait to hear back.

25         THE COURT:  All right, great.  Well, thank you for

                                                            Page 30

1    dialing in.  You are free to exit the hearing.

2             I will grant the relief requested except of course

3    with respect to the claim that has been withdrawn and Ms.

4    Morris' claim.  I think that's where you were headed, wasn't

5    it, Counsel?

6             MS. LEVINE:  That is exactly where I was headed,

7    Your Honor.  Thank you very much.  We will submit an order

8    to that effect.

9             THE COURT:  All right, great.  Terrific.  And

10   you'll reach out to Ms. Morris to see if you can work things

11   out?

12            MS. LEVINE:  Yes, we do.  And I understand that my

13   colleague reached out to her this morning just before the

14   hearing to tell her we were going to request an adjournment.

15   And we will be in touch with her.

16            THE COURT:  Terrific.  Thank you very much.

17            MS. LEVINE:  Thank you, Your Honor.  That brings

18   us to the end of the GUC Trust's omnibus claims objections,

19   and I will now cede the virtual podium to the contested

20   matters.

21            THE COURT:  Thank you.

22            Mr. Singh?

23            MR. SINGH:  Yes.  Thank you, Your Honor.  Sunny

24   Singh again for the record on behalf of the plan

25   administrator.  Your Honor, that then does bring us to the

Page 31

1    plan administrator's motion in aid of execution of the plan

2    relating to the unclaimed borrower funds.

3           Your Honor, what I'd like to do is sort of outline

4    for the Court where we are and the plan administrator's

5    intentions and goals with respect to the motion.  And I

6    don't intend to repeat everything in the papers, Your Honor,

7    but I think there are a few issues that do deserve

8    highlighting.  And then of course we do still have some

9    objections.  I am pleased to report, as you can see in the

10   agenda, that six of the objections have been resolved.  One

11   was a reservation of rights, so a total of five have been

12   withdrawn including the objection of the State of New Jersey

13   which was resolved following the filing of our reply.

14          So we do still have this matter still contested

15   because we still do have some states, as listed on the

16   agenda, that are going forward contested.  So of course Your

17   Honor would let them be heard after I can make some

18   introductory comments.  And then of course if the Court has

19   any questions.

20          THE COURT:  Okay, thank you.  Please go ahead.

21          MR. SINGH:  Okay.  Your Honor, I think as you can

22   probably glean from the motion, the purpose of the motion,

23   at least from the plan administrator's perspective, is very

24   straightforward.  The plan administrator wants to try to

25   return as much of the approximately $113 million that's

Page 32

1    ascribed as unclaimed funds as possible.  And these are

2    normal sort of things that occurred and funds that sort of

3    were unclaimed in the normal course of Ditech's operations

4    where, you know, checks were sent out but weren't cashed, a

5    borrower couldn't be located, et cetera.  Various reasons

6    why this happens.  But it is a normal part of Ditech's

7    business.

8              And, Your Honor, although the goal of the motion

9    we think is simple and straightforward and at this point

10   mostly procedural in nature, as I'm sure that Your Honor has

11   probably surmised, a lot of time, effort, thought, and

12   consultation among the key constituents has gone into the

13   motion and bringing the motion to the Court, in particular

14   to come up with the two-step process that we've suggested

15   and proposed.  And that includes, Your Honor, consultation

16   with the consumer claims trustee, a steering committee of

17   term loan lenders, and after the motion was filed, various

18   state unclaimed property agencies.

19             Your Honor, for months the plan administrator

20   investigated this issue, hired experts like Georgeson, and

21   considered the plan administrator's obligations under the

22   plan and the view of parties in interest.  And a few things

23   became clear during that process.

24             One, in the plan administrator's view, returning

25   the funds directly to the borrowers is consistent with and

Page 33

1    we believe required by the plan.  And I would note, Your

2    Honor, that no party in interest has disputed the plan

3    administrator's interpretation of the plan.

4          Two, if the issues identified in the papers

5    regarding allegations of constructive trust, tracing,

6    standing of the states, preemption, et cetera, Your Honor,

7    are litigated immediately out of the gate.  That would be an

8    extremely complex, expensive, and drawn out endeavor.  And

9    during that litigation, Judge, the borrowers would actually

10   not get their money back.  So we would be sort of sitting on

11   this cash, you know, fighting a huge fight amongst all the

12   parties, and not actually getting money back to the

13   borrowers, which is what the plan administrator believes the

14   plan requires and is also, frankly, the right thing to do.

15         So in consideration of these issues, Judge, the

16   plan administrator and its advisors came up with and

17   garnered the support of key stakeholders for a two-step

18   process, which is where we are today.

19         Step one, you know, that's the motion on file

20   before Your Honor and the relief requested today, which is

21   that the plan administrator seeks approval of a process that

22   it will undertake that's all outlined in the motion to try

23   to identify and contact the borrowers and get the funds back

24   to them directly.

25         And then step two, which is deferred, Your Honor,

Page 34

1    is if necessary the parties can litigate about what happens

2    to any funds that are not returned during Phase 1.

3            And Judge, you know, frankly we're not sure

4    exactly what Phase 2 looks like.  That's going to depend in

5    large part on how much of the money is returned.  Again, we

6    hope it's a lot, if not all of it.  What states are even

7    remaining and sort of what there is left at the end of Phase

8    1.  Which is, you know, 180 days to identify folks and then

9    time for them to cash their checks.  So we've got quite a

10   bit of time and facts that need to get developed before we

11   can get to Phase 2.

12           And, Your Honor, at the end of that there may even

13   be a way that the parties can settle the issues, especially

14   if the dollars and cents are smaller.  I don't know, and

15   we'll see what happens.  But the point is, Your Honor, that

16   the benefit of the two-step process is that we can defer

17   those difficult issues and start trying to get the money

18   back to the borrowers right away.  Something that, frankly,

19   nobody should fairly be complaining about.  And I don't

20   think -- and I know that at least the parties in interest,

21   the economic parties in interest in this case, the term loan

22   lenders, consumer representative, et cetera, no objections

23   as to that process that's been filed.

24           And, Your Honor, as I've said, we did consult with

25   the states following the filling of the motion.  Your Honor,

Page 35

1    13 states filed an objection.  Six of them have withdrawn.

2    The rest, you know, after receiving notice.  And we did have

3    conversations with many others who chose not to file

4    pleadings.  So they were provide notice with respect to the

5    motion but are, you know, in my view okay with going forward

6    with the two-step process as they haven't responded.

7              And, you know, the objections were resolved, Your

8    Honor, based upon, you know, following discussions, but also

9    based upon a revised order that we filed after we adjourned

10   the motion when it was originally scheduled for November so

11   we could continue to try to work out issues with the parties

12   who were responding.

13             And the revised order makes a couple of things

14   clear.  One, we've incorporated an express reservation of

15   rights with respect to Phase 2.  Everybody's rights with

16   respect to Phase 2 are preserved.  Two, we have withdrawn

17   the plan administrator's reservation of rights to seek to

18   charge any costs of the process against, you know, any

19   unclaimed funds that are not returned.  So that issue is off

20   the table.  And three, we've reduced the $100 minimum

21   threshold to $50, which is consistent, as you can see from

22   the chart that we filed summarizing the unclaimed property

23   laws in the various states, Your Honor, which is consistent

24   with the types of notices, et cetera, and the $50 threshold

25   that many of the states if not most of the states use.

Page 36

1           And we told the states, Judge, throughout the

2       process, if there is a way you think that the procedures can

3       be improved, you know, such as for example reducing the $100

4       minimum to $50, which we did.  You know, we were all ears.

5       The plan administrator was happy to consider those types of

6       changes to the process that are designed to increase the

7       likelihood that the funds would actually be returned to the

8       borrowers.

9           And, Your Honor, unfortunately, the seven states

10      that are still objecting -- and that includes four

11      represented by Loeb & Loeb where there is an omnibus

12      objection -- so four objections, seven states, you know, are

13      really not at all raising issues of that nature.  Rather,

14      it's a more fundamental issue where they are demanding that

15      we simply just turn over the funds to the states now and let

16      them address under their particular unclaimed property laws,

17      you know, what happens with that money.

18          And, Your Honor, the plan administrator doesn't

19      think that works for a number of reasons and would be

20      completely unfair and is entirely inconsistent we think with

21      the plan and the objectives of the motion and would force a

22      litigation of issues that are in our view properly reserved

23      for Phase 2.

24          Again, it's not what the plan says.  And giving

25      the money to the states who are in our view no more likely

Page 37

1    to find the borrowers and the plan administrator -- and

2    frankly we think actually our process is more efficient,

3    it's uniform, and will result in a greater likelihood that

4    the funds are returned.  But we don't think that's the right

5    answer.

6              Your Honor, I think one statement does require

7    being called out because I think it's telling in the Loeb

8    objection of possible or at least partial motivations here.

9    And they come right out and say this, Judge.  The 180-day,

10   quote, "delay" by our process prevents the states from using

11   the unclaimed property until the borrower is ultimately

12   located.  And I think that's an important point, Your Honor.

13   Because as you can see from the summary, that statement as

14   well as the summary that we included in our reply, all of

15   the states have discretion to use for general state purposes

16   funds that are not demanded to be returned where a borrower

17   doesn't show up or a person who is entitled to unclaimed

18   property doesn't show up.  Until that happens, the states

19   can just use the funds for general state purposes.

20             And that issue, Your Honor, was something that was

21   before Judge Conrad in the Drexel decision when he faced a

22   similar issue with unclaimed property.  And he said, look,

23   that's just not appropriate. That's not what the bankruptcy

24   code requires.  And, you know, that shouldn't be driving a

25   result that ignores the plan, that ignores the bankruptcy

Page 38

1    law and, frankly, ignores the plan administrator's judgement

2    here, that the right thing to do here is to find the

3    borrowers and we'll deal with Phase 2 and all those

4    difficult issues that we need to.

5            Your Honor, also, second, giving the states the

6    funds today, you know, their demands, a lot of assumptions

7    go into that demand on legal issues that, frankly, at the

8    end of the day if we were litigating here, the states are

9    the ones that will have the burden of proof to show that

10   there is a constructive trust if that's the path that we end

11   up.

12           And I think, Your Honor, there's a host of issues

13   that we've outlined in our reply.  Just a few of them that

14   are just very fundamental and, frankly in our view,

15   expensive.  But before you can even get to the issue of

16   constructive trust and tracing, there is a question of who

17   is the right party to assert a constructive trust.  Meaning,

18   do the states even have standing on the ultimate issue and

19   are the unclaimed property laws that they're insisting be

20   applied preempted by the Bankruptcy Code.

21           Now, the authority -- and, Your Honor, I don't

22   think unless the states really want to push this issue, I'm

23   not sure you need to decide this today.  But the authority

24   seriously suggests that actually, no, the unclaimed property

25   laws are not enforceable with respect to at least post-

Page 39

1    petition funds and as to pre-petition funds.  And we're only

2    talking about I think $2.7 million of funds that would have

3    actually, quote, unquote, escheated prepetition.  You know,

4    that's when sort of the dormancy period would have run.  You

5    know, they're just creditors with respect to those.  So

6    that's a real difficult and serious issue, Your Honor.

7             And then even if you can get past that and you

8    assume that the states are the right parties, there is the

9    issue of whether there is a constrictive trust as a legal

10   matter.  And then you have the factual exercise, which you

11   always have in constructive trust issues, is whether the

12   funds can be traced.  And that is not simple by any means.

13   It never is.  And I know that there's some back and forth in

14   the papers about this.  But I really would note for the

15   Court in that regard that although a vast -- or I should say

16   some, I don't actually know if a vast majority.  This

17   investigation is still ongoing by the plan administrator.

18   It's not simple -- may have started out in segregated

19   accounts.

20             In many cases when the checks were actually

21   issued, Your Honor, they were transferred to the debtor's

22   operating accounts and then moved out of those operating

23   accounts.  So they were pooled at a certain point in time.

24   So it's not as simple as, hey, we're just going to sort of

25   poll a segregated account and the money is still sitting

Page 40

1   there.  You know, I think that really oversimplifies the

2   issue.  And that's not going to be what the facts are going

3   to sort of yield at the end of the day.

4           But again, Your Honor, these are reasons why we

5   don't think it's appropriate for the states to just to come

6   in here and say, well, give us our allocable share, you

7   know, ignore all of these issues.  That's just not a

8   practical answer and, you know, really puts the cart before

9   the horse, and frankly would require the Court to rule on

10  these difficult, complex, and expensive issues.

11          I would also say, Your Honor, that some of the

12  states will just say -- or they may say today -- just carve

13  us out.  You know, again, I don't think that's fair, either.

14  If we carve out one state, that's a slippery slope.

15  Especially when you've got other states who withdrew their

16  objections or frankly didn't object at all because they

17  recognized we had a uniform process that's applicable to all

18  and everybody's rights as to Phase 2 are fully preserved.

19          So, Your Honor, I think for all of these reasons,

20  we think the two-step process that we've proposed is the

21  right answer.  It has the highest likelihood of getting

22  funds back to the borrowers.  It's consistent with the plan.

23  It has the highest likelihood of reducing the litigable

24  issues at the end of the day and the cost that everybody

25  will have to bear if we do go down that path of litigation.

Page 41

1    And frankly, Your Honor, we think it's fair.  And an

2    overwhelming majority of the constituents -- and I would say

3    I include there the majority of the states who either didn't

4    object to the motion or withdrew their objection -- agree

5    that this is the right way to proceed.

6           So, Your Honor, unless you have any questions for

7    me, that's the plan administrator's position and view with

8    respect to the motion and the responses that are still

9    outstanding.

10          I'm happy to turn the podium over and then respond

11   as appropriate to any objections.

12          THE COURT:  I think that would be fine.  I do not

13   have any questions for you at this time.

14          Who would like to start off for the states?

15          MR. RUBENSTEIN:  Good morning, Your Honor.  This

16   is Vadim Rubenstein from Loeb & Loeb.  If you don't mind, I

17   could proceed.

18          THE COURT:  That would be fine.  Thank you.

19          MR. RUBENSTEIN:  Thank you, Your Honor.  Vadim

20   Rubenstein with Loeb & Loeb.  We are counsel to the states

21   of Delaware, Illinois, Montana, and Iowa.  And I will refer

22   to them as the states.  With me on the phone are my

23   colleagues, Steve Rosenthal, Marc Cohen, and Alicia Clough.

24          The pro hac vice applications, Your Honor, were

25   filed within the last couple of weeks.  They can be found at

Page 42

1    Docket Numbers 3063, 3062, and 3045.

2          As Mr. Singh indicated, Your Honor, it is the

3    states' position that the unclaimed borrower funds do not

4    constitute property of the Debtor's estates.  And the

5    reasons for that are detailed in the motion.

6          And because those funds are not property of the

7    estates, we took the position that they should not be

8    administered by the plan administrator, but rather should be

9    turned over to the states in accordance with their

10   respective states' laws.

11          Nevertheless, as we point out in our objection, we

12   have been working cooperatively with the plan administrator

13   and we are appreciative of their efforts in revising the

14   proposed order and making some of the concessions that

15   they've made thus far.

16          And, Your Honor, after filing our objection and

17   considering the plan administrator's reply, the states have

18   determined not to press their objection to the process

19   generally.  And that process is reflected in the revised

20   proposed order that the plan administrator has filed.

21   Subject to a couple of exceptions.  And the exceptions I'm

22   going to discuss, frankly, Your Honor, are issues that we

23   have not been able to resolve with the plan administrator.

24   And had we been able to resolve these two issues, we would

25   have withdrawn our objection.  And those two issues, they

Page 43

1    both relate to the timing of the procedure.

2              And to put it bluntly, Your Honor, the plan

3    administrator is seeking too much time to complete the

4    process and to have the proposed -- and have not proposed in

5    the revised proposed order any particular deadline by which

6    it will proceed to Phase 2 with respect to the remaining

7    unclaimed borrower funds.

8              Your Honor, in particular Paragraph 8 and 9 of the

9    proposed order allow the plan administrator 90 days from the

10   entry of the proposed order to just first send out notice to

11   the borrowers and to publish notice in USA Today.  The

12   states do not understand why it should take that long.  And

13   along the same lines --

14             THE COURT:  Excuse me, Counsel.

15             MR. RUBENSTEIN:  Yes.

16             THE COURT:  Counsel, I'm sorry to interrupt you.

17   What's the document number that you're looking at?

18             MR. RUBENSTEIN:  I'm looking at the proposed

19   revised order that was filed on the docket, I believe it was

20   November 23rd.

21             MR. SINGH:  At ECF 3011.

22             MR. RUBENSTEIN:  It's ECF 3011, yes.

23             MR. SINGH:  Right.

24             THE COURT:  All right, thank you.

25             MR. SINGH: Sorry to interrupt, Your Honor.

Page 44

1          THE COURT:  That's all right.  Not a problem.

2    Just one second, please.  Okay, proceed.

3          MR. RUBENSTEIN:  Ready, Your Honor?

4          THE COURT:  Yes.  Go ahead, please.

5          MR. RUBENSTEIN:  And so they are giving themselves

6    90 days to just publish notice in the USA Today and to first

7    send out notice to the holders.  And, Your Honor, I'll

8    remind you that the plan was confirmed on September 30th --

9    actually went effective on September 20th, 2019.  Along the

10   same lines, Your Honor, they are asking for 180 days to

11   develop a process for Phase 2 in connection with how the

12   parties are going to resolve their disputes, which Mr. Singh

13   acknowledges are going to be very complicated.

14          And so, as the plan administrator explained in his

15   motion, the plan administrator has gone through a very

16   tedious and time-consuming process to reconcile this

17   information and has even established a database.  And

18   similarly, Your Honor, in the reply, the plan administrator

19   states that the plan administrator (indiscernible) develop

20   robust procedures for locating and notifying borrowers of

21   unclaimed borrower funds.

22          So as such, the plan administrator should be in a

23   position we believe at this point to send notice and to

24   publish within 30 days of entry of the order as opposed to

25   the 90 days that the plan administrator proposes.

Page 45

1          And in keeping with the same theme, the motion and

2     the proposed order do not address at all the timing of Phase

3     2.   That is the time when the plan administrator will seek

4     additional relief from the Court.

5          Now, in discussion with the states, we've been

6     proposed -- and, Your Honor, let me step back.   These were

7     9019 discussions, so I'm not going to discuss what was

8     proposed.   What I would tell you, Your Honor, is that we do

9     not believe that there should be an open-ended process and

10    we believe that these procedures should be in place way

11    before -- or at least a motion should be filed almost

12    concurrently with the time that the proposed timelines for

13    the Phase 1 is supposed to expire.   What we propose, Your

14    Honor -- Yes.

15          THE COURT:   I'm sorry, go ahead, Mr. Rubenstein.

16    What's your proposal?   Sorry.

17          MR. RUBENSTEIN:   What we propose is that the plan

18    administrator should be in a position to file a motion no

19    later than 15 days after conclusion of that Phase 1 process.

20          Your Honor, they've had I would say at this point

21    well over a year to consider what process they were going to

22    consider.   The plan administrator is asking for additional

23    time to do its due diligence, and we understand.   But, Your

24    Honor, based on the states' vast experience with this

25    location process -- this is what they're expert in -- we are

**Page 46**

1    comfortable that at the conclusion of the process, a

2    substantial portion of this $113 million worth of unclaimed

3    funds is going to remain.  And the process of going on to

4    Phase 2 should start much sooner than I guess I would say

5    the open-ended timeline that the Debtors have proposed in

6    their proposed order.

7              And, Your Honor, with respect to the substantive

8    issues that Mr. Singh has raised in terms of the steep --

9    you know, according to Mr. Singh, a steep climb that the

10   states will have in asserting their rights to the unclaimed

11   borrower funds, the only thing I would say at this point,

12   Your Honor, is that they are relying on two 1993 decisions

13   from the bankruptcy court level.  There is a decision from

14   2018 in the Southern District of New York that -- I'm sorry,

15   in the Southern District of Texas that comes to the

16   completely opposite conclusion.  And we understand this is

17   not the time to litigate this issue.  And we do anticipate

18   that it could essentially reach the Second Circuit in light

19   of the dollars involved.

20             So we would impress upon Your Honor to shorten the

21   timeline and to get the ball rolling on Phase 2 sooner

22   rather than later.  Thank you, Your Honor.

23             THE COURT:  Mr. Rubenstein, it just strikes me,

24   one, that just as you're acknowledging that there are

25   significant legal issues that would need to be resolved if

Page 47

1    you have to go into Phase 2.  And it just seems to me that

2    after Phase 1, you want to have an opportunity to discuss

3    all of those things.  Look, if what you're saying is -- if

4    what you believe or your clients believe might happen, which

5    is that this -- however well-intentioned the administrator

6    is in bringing this forward, in the end you're not going to

7    find a lot of people.  I think that's what you're saying.

8    And there's going to be a lot of money left over and you're

9    going to have to fight about it eventually.  Well, that

10   might impact how the parties agree to go about doing that.

11   It might give people an opportunity to kind of step back and

12   see if there is a better way to litigate it or a way to

13   litigate it in a way that you're able to do it in an

14   efficient and effective way.

15           But in any event, I understand what you're saying.

16   You'd like them to publish within 30 days, not 90, and you

17   would like there to be a firm deadline for the -- basically

18   for the end of Phase 1 and the beginning of Phase 2.  Is

19   that a fair summary?

20           MR. RUBENSTEIN:  Yes, Your Honor.  That's a fair

21   summary.  And I think that those discussions on Phase 2 can

22   begin proceeding far in advance of conclusion of Phase 1.

23           THE COURT:  All right.

24           MR. RUBENSTEIN:  And we're trying to -- and I

25   think the parties can work cooperatively to get that

Page 48

1    accomplished.  But right now the debtors have proposed an

2    open-ended process without a deadline to come to that Phase

3    2.  And we would like that to begin much sooner than

4    actually no time that's currently proposed.  Thank you, Your

5    Honor.

6              THE COURT:  Okay.  Thank you.

7              Are there any other state representatives who

8    would like to be heard on this matter?

9              MS. HAMILTON:  Your Honor, this is Valerie

10   Hamilton on behalf of the New Jersey Unclaimed Property

11   Administrator.  Mr. Singh is correct that we have resolved

12   our objection.  But it's also based on the fact that we --

13   New Jersey had filed a proof of claim earlier that had been

14   expunged.  That claim was expunged on the basis that -- in

15   part on the basis that there was no money, no evidence, and

16   they could not find any money that might be subject to the

17   claim.  And because we are going to defer those issues,

18   we've entered into a consent order with the Debtor and the

19   GUC trustee to sort of defer whether or not that claim might

20   need to be revived.  And I believe the Debtor has submitted

21   under Docket Number 3099 a notice of proposed order.

22              So I just wanted to reflect on the record that the

23   consent order is still pending, but based on this consent

24   order and the revised form of order that was submitted by

25   the plan administrator, that would resolve New Jersey's

Page 49

1    objection.

2             THE COURT:  All right.  Thank you.

3             Is there anyone else, any other state

4    representative who would like to be heard?

5             MS. CROCKETT:  Your Honor, this is Heather

6    Crockett on behalf of the State of Indiana.

7             THE COURT:  All right.

8             MS. CROCKETT:  With respect to our objection, what

9    Mr. Rubenstein from Loeb & Loeb mentioned about the

10   deadlines are (indiscernible).  I wanted to let the Court

11   know that I have received authority just this morning to

12   withdraw our claim -- withdraw our objection at this point

13   based upon the reservation of rights for the Phase 2

14   portion, but we will not further object to the Phase 1

15   portion.

16            THE COURT:  All right.  Thank you very much.

17            Is there anyone else?  Any other state

18   representative who would like to be heard?

19            MS. ARCHER:  Your Honor, this is Alison Archer

20   from the Ohio Attorney General's Office appearing on behalf

21   of the Ohio Department of Commerce.

22            THE COURT:  All right.

23            MS. ARCHER:  So it sounds like my counterparts are

24   a little further along than we are.  Ohio, to be honest,

25   until today still has reservations about the two-phase

1    process and we feel that it's unnecessary.  I think, Your

2    Honor, after hearing what others have said today, if the

3    timeline were to be shortened, they may be agreeable to

4    waiting to giving the plan administrator that opportunity.

5           Our basic position is that Ohio has been

6    administering unclaimed funds for many decades and they are

7    a well-oiled machine and know how to distribute.  The plan

8    administrator really only got us involved after they -- you

9    know, the plan has already -- Phase 1 has already been set

10   in motion.  And we just believe the Debtor has an obligation

11   to comply with applicable and non-bankruptcy law.  And Ohio

12   has reporting requirements that have not been complied with

13   for the past two years.  Prior to that, the Debtor was

14   reporting significant unclaimed funds to Ohio and they were

15   able to identify those buyers with last known addresses in

16   the State of Ohio.  So at the very least we think that the

17   Debtor should be -- or the plan administrator should be

18   required to comply with state law reporting requirements.

19          So that's where Ohio is at coming into this.  We

20   still have the same objections that the other states have in

21   regard to the timeline, the reporting that is not being

22   done.  And, frankly, we think the consulting with Georgeson

23   is just an unnecessary burden on the estate when the states

24   are already in a position to handle this procedure and

25   distribute these funds.

Page 51

1            THE COURT:  All right.

2            MS. ARCHER:  Yeah.  That's all, Your Honor.

3            THE COURT:  All right.  Thank you.

4            Any other state wish to be heard?

5            MS. LONG:  Your Honor, this is Mary Long for the

6    Missouri State Treasurer's Office, Unclaimed Property

7    Division.  Can you hear me all right?

8            THE COURT:  I can.  Thank you.

9            MS. LONG:  Thank you, sir.  I have to actually

10   echo what Ohio has said.  Missouri also has taken the

11   position that the plan administrator is responsible for

12   complying with the applicable law.  And in Missouri, we do

13   have a well-oiled machine and mechanism by which unclaimed

14   property is provided to the state.  And we are very good at

15   finding people.

16           The revised order that the plan administrator

17   submitted under 3011 is a great step in the right direction.

18   However, it doesn't go far enough.  Concerning issues for

19   Missouri, even in spite of all the information that's been

20   expressed to you today, center around, number one, the fact

21   that apparently there is at least $2.3 million or $2.7

22   million, as Mr. Singh stated, that could escheat that

23   apparently did not escheat.  We don't currently have

24   information how much of that if any of it goes to Missouri.

25           We have had conversations with counsel at Weil.

Page 52

1    They have been very professional and approachable, and we

2    are hopeful that they will provide the information that we

3    had discussed to them, which might alleviate a lot of

4    Missouri's concerns.

5           But a secondary issue is the fact that those

6    borrowers with unclaimed funds less than $50 basically are

7    left out in the cold in this process in Missouri's view.

8    Missouri, however, does have an ability to reach those

9    individuals, and we don't time out after 180 days.

10          So going into this hearing, we did have

11   reservations.  Based on the -- and we still have

12   reservations.  But based on the recent information given to

13   this Court, Missouri may review, especially once it gets the

14   information from Debtor's counsel, and it may be more open

15   to withdrawing its objection if that timeline for Phase 2 --

16   and for the reasons really basically that Mr. Rubenstein

17   expressed so articulately.

18          That's all I have, Your Honor.

19          THE COURT:  All right.  Thank you.  Anyone else

20   from the states like to be heard?

21          All right, there being no response, Mr. Singh, why

22   don't you --

23          MR. SINGH:  Yes.  Yes, Your Honor.  I'll address

24   the comments.  Thank you.

25          THE COURT:  Thank you.

Page 53

1          MR. SINGH:  Again, Sunny Singh on behalf of the

2    plan administrator for the record.

3          Your Honor, I would make sort of -- I'll take them

4    in turn.  There is the sort of request to shorten the notice

5    and the 180 day period altogether as I'm hearing.  And then

6    separately there is the request I think to put a sort of

7    finite timeline with respect to when Phase 2 will kick off.

8          Let me address the first one.  The plan

9    administrator is going to go as fast as possible.  We put 90

10   days in there because there are many borrowers whose

11   addresses we still don't know.  Your Honor, we need

12   Georgeson to go out and look.  We thought that having a 90-

13   day cushion -- it's not like we're just going to sit on our

14   hands.  I mean, we're ready to go here.  We do have a

15   database.  We've spent a lot of time and money already to

16   put this all together.  And we didn't just do that so we'll

17   sit on our hands for 90 or 180 days and only start getting

18   the process going at the end.

19         You know, we thought this amount of time made a

20   lot of sense in terms of the volume that we have to deal

21   with.  I mean, again, Judge, we're talking about 220,000

22   checks.  More than 220,000 checks in 50 states and other

23   locations.  I mean, this is not a simple endeavor, frankly.

24   I'm not even sure that 180 days is going to be enough.  And

25   that's why we think it's totally inappropriate to require

1    the plan administrator to tie our hands and sort of force us

2    to a process.

3          I think, Your Honor, based upon the record in

4    these cases, you know, we appear before you all the time.

5    We take Your Honor's orders and these processes -- and I can

6    assure you and I think you know the plan administrator takes

7    its obligations very seriously.  We are going to go as fast

8    as we can, but we need an amount of time so we're not in

9    violation of technical court orders because we haven't found

10   people or because, frankly, there is just a massive volume

11   of data and individuals that we need to find.

12          So I really -- you know, that's the reason we've

13   been rejecting shortening any of these periods, because all

14   they're going to do is create foot-faults, and we don't

15   think we need to impose those on ourselves because we intend

16   to go as fast as possible.

17          THE COURT:  Well, let me ask you.  I'm sorry to

18   interrupt you.

19          MR. SINGH:  Yes, sure.

20          THE COURT:  But let me just ask you, with respect

21   to -- so you're basically saying look, I want the 90 days.

22   I'm asking -- the plan administrator is asking for the 90

23   days just to -- out of an abundance of caution so that there

24   will be no default under the Court's order and that you'd

25   like the 180 days because that's a period you think you need

1    and you don't want to be tied to starting Phase 2.  Is that

2    -- or were you headed to talking --

3            MR. SINGH:  Yeah, that's right, Your Honor.  So we

4    don't want to be -- you know, so look, during the 180-day

5    period we'll publish notice within 90 days.  Look, if

6    theoretically people think it's more effective to do it on

7    display 45, I'm not really too bothered about publication of

8    notice.  It's really the actual notice that we're going to

9    get out to folks when we can find and locate their address.

10   And that may take up to the full 180-day period.  I mean,

11   we're sort of searching for these folks.  We've got the

12   database, but now we need to -- we know who is entitled the

13   money, now we need to actually find them based upon the

14   expert work that Georgeson is going to do and work with the

15   plan administrator.  So, you know, I'm not to fussed about

16   shortening the publication notice.  We've just sort of tied

17   it together.  It's really making sure that we get notice out

18   to the others.  And that may take the full 180-day process.

19           And, Your Honor, we may be before you -- you know,

20   look, if we're having great success, it's quite possible --

21   I know that some of the states are saying this is going to

22   be a failure.  The exact opposite could be happen.  We could

23   be having great success and say to Your Honor, you know

24   what, we need another 60 days and file another motion before

25   you.  I'm just not sure where this process is going to lead.

1           But I don't think anybody is prejudiced, for a

2      number of reasons.  One, the money is not going anywhere,

3      right?  The plan administrator has got the money.  So

4      whether the states are going to be entitled to get this to

5      the borrowers at the end of the day or not, the money is not

6      going anywhere. The only difference is we're holding the

7      money instead of them, which goes back to my original point

8      about that it's totally inappropriate for the states to be

9      using this as part of their general pool of funds for -- you

10     know, unrelated to unclaimed property and why it should stay

11     with the plan administrator.

12          And the other point made about, well, there's no

13     sort of set date in stone of Phase 2, the money is not going

14     anywhere.  We are here to listen.  Nobody is saying that

15     we're not going to take calls or ignore them and provide

16     information.  We're going to work with the states during

17     that process.  We're going to report.  We're not going to

18     report under the state's unclaimed property laws because we

19     don't think those are applicable.  We think those are

20     preempted, and no state has shown you why that's not other

21     than to just say I want you to comply with my law.  Well,

22     that's all well and good, but that's not the law in our

23     view.

24          We're going to file post effective date reports as

25     the plan administrator has been doing.  Those will have

1    reporting on how we're doing in the process.  If we can

2    provide -- you know, answer questions for states as we have

3    been doing, we will continue to do that.  But we just don't

4    think, Your Honor, that it's appropriate to tie our hands to

5    go at any particular pace, to file a motion in Phase 2, 15

6    days after Phase 1 is done.  Your Honor, after Phase 1 is

7    done, you know, I'm hopeful that we're not going to have to

8    file a motion and that maybe everybody can get together and

9    figure out a way to avoid a litigation.  So, you know, why

10   should we start before -- to sit here today, well before we

11   know what the facts are going to look like, how we're going

12   to address the litigation.  I mean, if people want to talk

13   to us about those issues during this and ideas they have,

14   again, we are here to listen.  We're not trying to shut

15   folks out.  But sort of forcing us to say, okay, you are

16   going to litigate this issue on X days after Phase 1, no

17   more extensions, Your Honor, I think is totally

18   inappropriate and unnecessary.  To me it, again, raises

19   alarm bells in my mind as to is that really the best

20   interest of the borrowers or are now we talking about the

21   interest of the states and using these funds for other

22   purposes?

23          And, you know, if the states are well-oiled

24   machines as they say they are with respect to returning

25   funds, well, we're happy to hear about ideas on that, too.

Page 58

1    So if they want to call us and say, look, this is what works

2    in our state, or this is what we do or, frankly, double down

3    the efforts and have the states looking for these people and

4    sending out their notices.  The money is there.  I mean,

5    once it's verified, the plan administrator will send the

6    cash out to the borrowers.

7          So again, Your Honor, for all these reasons I

8    really don't think that it's appropriate to tie the plan

9    administrator's hands at this point.  Everybody knows where

10   the court is.  If we're taking way too long, I'm sure

11   they'll file a motion or ask for a status conference and let

12   them be heard by you, Your Honor.  But I don't think that,

13   you know, forcing the plan administrator to set in stone

14   today a date to litigate issues and shorten the amount of

15   period when we've got a massive amount of checks is

16   appropriate or required.

17         I think two other points I would make --

18         THE COURT:  Wait, before you go there.

19         MR. SINGH:  Yes.  I'm sorry.  Go ahead, Your

20   Honor.

21         THE COURT:  That's all right.  So you've got a

22   process where you're saying I need 180 days to get all this

23   stuff out to people, right?  You know, this process should -

24   - I need that time.  And at the end of that 180 days, I may

25   find that I've given away all the money.  Not given it away,

1    found the borrowers, have been able to get the funds to them

2    or a substantial amount.  And I need to have the flexibility

3    to sort of figure out how best to go to Phase 2, and I need

4    some time.  And if these guys want to talk about it, we can

5    talk about it.  And I don't mean to suggest you're being

6    very casual about this, but I think that's what you're

7    saying generally speaking.

8              MR. SINGH:  Yes, Your Honor.  Absolutely, yes.

9              THE COURT:  All right.  So why can't we build into

10   the process a mechanism that, one, you'll keep the states in

11   the loop with the various reports, but also that as you get

12   close to the end of the 180 days, you're going to -- you

13   know, we need to have some sort of a -- whether it's a

14   status conference, something so that people can understand

15   what the thought process is.  And if you're then coming in

16   and saying I need another 200 days or whatever it is, you

17   know, people will have an opportunity to be heard.  It won't

18   be -- nothing would be set in stone, but there would be an

19   opportunity and, frankly, a requirement that you'd continue

20   to do what I think you guys have been doing, which is

21   reaching out and talking to the states who want to talk to

22   you.  And I think you've just said if there are ways that

23   you can do this in a collaborative manner, you'll do that.

24              But, look, I can appreciate from the states'

25   perspective.  One, I mean, they understand the money's not

Page 60

1    going any place.  But I think there's -- and there are

2    difficult issues of preemption and tracing and all of the

3    things that you've outlined.  They're certainly challenging

4    issues.  But isn't there a way that we can do this so that

5    the Phase 2 isn't just -- is just sort of out there, that we

6    have something more concrete at least as far as coming in,

7    reporting, and making a proposal.

8            MR. SINGH:  Yes, Your Honor.  I think that is a

9    great suggestion.  And as long as it's not tying our hands,

10   which I think what the states were suggesting, to litigate.

11           What I would suggest is, you know, we have the

12   quarterly reporting that's required by the plan.  And I

13   think this is in our order.  I need to just double check.

14   And if it's not, we can incorporate it.  That we will

15   include in there an update regarding sort of what's happened

16   since the last report with respect to unclaimed property.

17   And also what I think would be appropriate, Your Honor, is

18   30 days after the 180-day period is complete that the order

19   requires a status conference with the Court where we will

20   report on the progress made and at least the plan

21   administrator's thinking with respect to sort of how to

22   proceed for that point on so that states know that at least

23   within 30 days there will be a discussion, as you said, Your

24   Honor, and a report by the plan administrator formally of

25   the thinking and the issues.  But not a requirement, Judge,

Page 61

1    to file a motion or some other pleading to actually commence

2    the litigation.

3           I mean, we may say at that 30 days, Your Honor,

4    that that's the right answer at this point and we've come to

5    that conclusion.  But I just don't want to tie our hands

6    with respect to that.  So if, Your Honor, that would make

7    sense to you, we would be happy to do that.

8           THE COURT:  But I think it's got to be something

9    more to that.  And by that I mean it would be -- what I'm

10   envisioning is there would be a status report.  But what

11   you're going to indicate as part of the report is the nature

12   and the -- and you'll not disclose anything that's

13   confidential, of course -- but your discussions with the

14   states and your proposal or administrator's thinking is.

15   And I want it to be a situation where this is shared with

16   the states so the states have an opportunity when we get

17   together at the status conference to be fully informed

18   coming in so that they can meaningfully participate in that

19   type of conference.  Do you have any problem with that?

20          MR. SINGH:  No, Your Honor.  What I would suggest

21   then is why don't we include something that says within 30

22   days of the completion of the 180 days.  And we're going to

23   do this more formally.  But we have a requirement to meet

24   and confer with any states that want to meet and confer with

25   us about Phase 2.  And then following that 30 day meet and

Page 62

1    confer, whether the next omnibus hearing is, you know, we'll

2    have a status conference where the states can be informed

3    and people can come in and air that out with Your Honor and

4    update the Court.

5              MR. COHEN:  Your Honor, may I speak?

6              THE COURT:  Who is this?

7              MR. COHEN:  This is Marc Cohen at Loeb & Loeb in

8    Los Angeles, Your Honor, representing what Mr. Rubenstein

9    has defined as the states, the four states we're

10   representing.

11             THE COURT:  Yes, please, go ahead.

12             MR. COHEN:  So the way I read Your Honor's sort of

13   reasoned, Solomonic approach here is not necessarily

14   reflected by the plan administrator's Reponses.

15             I think what the Court is saying is that we all

16   have the same goals here and that the Court would urge a

17   more collaborative approach, not tied to 30 days after 180

18   days or quarterly reports or things that are formal that

19   sounds really very much like litigation primed rather than

20   let's fix this problem.  If we're trying to get the money

21   out to the borrowers and if it ultimately gets teed up that

22   a large amount of money is remaining, we'll figure out how

23   to proceed.

24             But I think in the meantime, whether it's the

25   notice period or what's happening during the 180-day period,

Page 63

1    it's a relatively small universe of states who are taking an

2    interest in what's happening here, Your Honor.  Why does it

3    have to be as formal as a status conference, which we should

4    have?  But why can't we get regular reports?  We've been

5    dealing pretty well, as was mentioned by someone.  The Weil

6    team has been extremely professional and they've moved

7    things when they feel it's reasonable to move things.  Why

8    can't we have a report -- not court-filed reports -- but

9    reports inter se between the plan administrator and

10   Georgeson on the one hand and the states that have an

11   interest in this on the other hand, say, every 30 days as to

12   what's happened, what's been discovered, what's remaining

13   out here, what are the next steps.  That doesn't mean that

14   it's going to lead to some ex parte motion, but just letting

15   us know what's going on and not waiting six months and then

16   a status conference 30 days thereafter to find out what's

17   going on.

18          So I think if I'm reading the Judge right, you're

19   looking for something more collaborative than that since

20   we're all proceeding in good faith to try to get the monies

21   out to as many borrowers as possible.

22          THE COURT:  Mr. Singh, why couldn't the plan

23   administrator put something like that together?

24          MR. SINGH:  Your Honor, I think that's fine.

25   We'll provide an informal report on a confidential basis to

1    the various states and consumer representative and the ad

2    hoc group of term lenders about, you know, what happened in

3    the prior 30 days in terms of status and updates.  And

4    again, you know, if people want to call us to talk about

5    those, that's fine.  And in addition to that, I would still

6    say we're also happy and find to do what I outlined earlier,

7    which is to do a formal meet and confer within 30 days of

8    conclusion of the 180-day period just to sort of talk about

9    Phase 2 and then come to Your Honor right after that and

10   figure it all out.  But that's not a problem, you know,

11   informal reporting from the plan administrator's

12   perspective.

13          THE COURT:  All right.  Mr. Cohen, that would

14   address your point?

15          MR. COHEN:  I think so.

16          THE COURT:  All right.

17          MR. COHEN:  I mean, I don't really want to be a

18   nudge, but I think it does address it, yes.

19          THE COURT:  Good.  Thank you.

20          Ms. Archer, do you wish to be heard?

21          MS. ARCHER:  Yes, please, Your Honor.  Again, this

22   is Alison Archer on behalf of Ohio.  I guess I kind of -- I

23   get the sense the wheels are already in motion for Phase 1

24   and that's the direction we're going.  Although I just

25   wanted to state for the record that Ohio does believe that

Page 65

1    it's unnecessary for the plan administrator to spend all

2    this time and resources searching for borrowers when we know

3    their last known address.

4            But if this is the way that it's going I -- there

5    was one other loose end that my client pointed out.  In the

6    proposed order, the plan administrator reduced from claims

7    of $100 down to claims under $50 that there's going to be no

8    effort to locate those borrowers.  And so from our

9    perspective, we're wondering why those funds couldn't be

10   turned over directly to the states to administer.

11           And again, this is not -- I mean, I kind of -- you

12   know, I do, I dispute that this is just a money grab on

13   behalf of the states.  And to be honest, I question the plan

14   administrators' motivation behind keeping the funds and

15   taking on this burden when the states, again, are already

16   set up to handle this.

17           But, you know, regardless, so I guess that's the

18   loose end that I wanted to point out is the funds under $50

19   that cumulatively obviously add up.  If we're not

20   undertaking -- if the plan administrator is not taking any

21   effort to locate those, could those funds then be turned

22   over to the states to handle and administer.

23           THE COURT:  Mr. Singh, what about that?

24           MR. SINGH:  No, Your Honor.  I don't think that

25   that's appropriate.  And I don't want to -- I think it's

Page 66

1    wrong to say we're not doing anything.  We're not formally

2    going to send a notice and reach out -- and a lot of these

3    checks are for, you know, cents or -- you know, we've sort

4    of discussed with the plan administrator what are we talking

5    about here.  And you're talking about I think it's over

6    40,000 checks or so for a de minimis amount.  And we're not

7    going to not give people the money if somebody shows up and

8    says, you know, I saw the publication notice.  And, frankly,

9    in a lot of situations, Judge, it could be very possible --

10   and we've discussed this with the plan administrator that,

11   you know, a check for a higher amount or a notice for a

12   higher amount goes out.  They respond.  We're going to

13   double-check the -- we're going to double-check the last --

14   you know, sort of the below 50 to see if they've got

15   anything else in there and sort of combine it and give it

16   back.

17          So it's not that we're not doing anything with

18   respect to the 50, it's that there's no affirmative notice.

19   Which I would note, by the way, Your Honor, is the same

20   threshold that applies in Ohio if you look at our chart,

21   which is the $50 and whether they're going to go out

22   formally.

23          But, again, it puts the whole cart before the

24   horse.  Those funds -- you know, in saying just give them to

25   Ohio or give them to the other states, they're assuming in

Page 67

1    that statement that this is not property of the estate that

2    should be distributed to in accordance with the plan,

3    frankly, to the term loan lenders.

4            So, again, I don't think that's appropriate.  And

5    if they want to have some sort of ruling earlier with

6    respect to the $50 or below, I don't think it would be

7    appropriate or necessary, but they're free to file a motion,

8    meet their burden, and say we should get those funds.  But

9    you don't get to just come in and ask for that.

10           THE COURT:  Hold it, hold it.  Wait, wait, wait.

11   Mr. Singh.

12           MR. SINGH:  yes, Your Honor.

13           THE COURT:  Wouldn't that then bring the whole

14   issue, the preemption and everything else before the Court?

15           MR. SINGH:  Yeah, that's sort of my whole point,

16   Judge, is that's why we should wait on the 50.  But if

17   people are saying, hey, we want to litigate that sooner.  I

18   don't want to do that, Your Honor.  I don't think it's

19   appropriate.  But that's my point.  By saying today give me

20   the below $50, they are bringing those issues to be forced

21   to litigate.

22           THE COURT:  I understand.  All right.  Is there

23   anyone else who would like to be heard?  Okay.

24           This is how I would like to proceed with respect

25   to this matter.  I do believe that under the plan, the plan

Page 68

1    administrator has an obligation to do this and to seek out

2    the borrowers who may have a right to the unclaimed funds.

3    And I am prepared to authorize the Phase 1 as Mr. Singh --

4    not Mr. Singh -- as the plan administrator has laid out and

5    as reflected in the modified procedures.

6              As to the below $50, while I understand the point

7    that Mr. Archer is raising, I am not going to direct the

8    plan administrator to turn over those funds, principally

9    because it would just bring forward and put in front of us

10   the issues, which, again, I think are potentially

11   complicated.  And I think it would defeat the purpose at

12   least at this point in moving this process forward.

13             So, most respectfully, I am overruling those

14   objections.  And to the extent that there was a request that

15   I direct the plan administrator to deliver the funds

16   associated with the below $50 claims, I most respectfully

17   deny the request.

18             What I would direct is, Mr. Singh, for you to work

19   with Mr. Cohen and his colleagues and the other

20   representatives of the other states, the states not

21   represented by Mr. Cohen and Mr. Rubenstein and their

22   colleagues, to work on language that should be put into the

23   order authorizing this process directly addressing the

24   reporting as you have outlined on the record and I think

25   which is consistent with what Mr. Cohen was asking for.

Page 69

1           And what I would ask you to do is to then check

2     with Ms. Rodriguez so that we can then figure out what the

3     date for the status conference should be and we can work

4     from there.

5           So the bottom line is I'm granting your motion to

6     the extent -- granting your motion in modified form as I've

7     set forth on the record today.  Does anyone have any

8     questions?  All right then --

9           MS. WALSH:  Your Honor --

10          THE COURT:  I'm sorry.

11          MS. WALSH:  I'm sorry.  Hi, this is Kaitlin Walsh

12    from Mintz Levin on behalf of the Commonwealth of

13    Massachusetts.  Just one comment.  We would just request

14    that we would be included in those negotiations for that

15    language regarding the reporting.

16          THE COURT:  Anyone on the call or any other taxing

17    authority that wants to be part of it, Mr. Singh, you will

18    welcome them into the group, correct?

19          MR. SINGH:  Of course, Your Honor.  Anybody --

20    what we'll do is prepare a revised form of order and share

21    it with all parties who responded, whether they withdrew

22    their objection (indiscernible) or not.  Of course, to let

23    the party look at it.

24          THE COURT:  All right, thank you.  I think that's

25    fine.  That addresses your concern, Ms. Walsh?

Page 70

1               MS. WALSH:  Yes.  Thank you, Your Honor.  Yes,

2     thank you.

3               THE COURT:  All right, great.  Sure.

4               Okay.  So, Mr. Singh, I think that we have

5     addressed this aspect of the matters on our first contested

6     matter?

7               MR. SINGH:  Yes, Your Honor.

8               THE COURT:  Is there anything else we need to --

9               MR. SINGH:  No, not with respect to that, Your

10     Honor.  I don't know if the states -- if you'd like to

11     excuse them or if anybody wants to stay on --

12               THE COURT:  Yeah.  I was just going to say, you're

13     all -- the states and others who had an interest in this

14     matter are welcome to stay on the call.  But if you so

15     choose, you are free to exit.  Thank you very much.

16               All right, thank you.

17               MR. SINGH:  Okay.  Thank you, Your Honor.  That

18     takes us then to the plan administrator's 32nd Omnibus

19     Objection with respect to Ms. Dolores Yee

20               .  That's matter number 25.  My colleague Angeline

21     Hwang, who is on the line, is going to handle that

22     objection, Your Honor.

23               THE COURT:  All right, thank you.

24               MS. HWANG:  Good afternoon, Your Honor.  Angeline

25     Hwang, Weil Gotshal & Manges on behalf of the plan

Page 71

1    administrator.  So as Mr. Singh said, Number 25 on the

2    agenda is the 32nd Omnibus Objection with respect to Ms.

3    Dolores Yee's claim.

4            Ms. Yee filed a response at ECF 1905 and the joint

5    reply of the plan administrator and the consumer

6    representative was filed at ECF 3070.

7            We did notify Ms. Yee that her claims will be

8    heard today and provided her with the instructions on how to

9    appear telephonically.  But as Your Honor may be aware, Ms.

10   Yee filed a notice of non-appearance at ECF 3083.  So I

11   believe she will not be appearing today.

12           THE COURT:  All right.  Yes, I am aware of that.

13   So you may proceed.

14           MS. HWANG:  Thank you, Your Honor.  I'll try to

15   keep it short.  So Ms. Yee filed two claims in these cases,

16   Claim Number 1584 and Claim Number 20292, asserting in the

17   aggregate a little over $1.1 million as secured, priority

18   and administrative expenses.

19           In the first instance, we believe these claims are

20   barred by the doctrine of res judicata.  As we laid out in

21   our papers, Ms. Yee has a long history of litigating

22   essentially the same allegations under the same set of

23   facts, and multiple course have considered the merits of her

24   claims and ruled against her.

25           In all litigation, Ms. Yee did not contest the

Page 72

1    fact that she failed to make payment on her mortgage, which

2    led to the ultimate foreclosure of the property.  And the

3    primary basis for her claims was that she believed the

4    various parties that were involved did not have standing to

5    foreclose on the property.  Her claims seem to have borne

6    out by the fact that she does not understand the rules of

7    Ditech's Specialized Loan Servicing and Select Portfolio

8    Servicing.  These parties were all at one point servicer of

9    Ms. Yee's mortgage.  As we detailed in our papers,

10   Specialized Loan Servicing was the servicer in 2012 that

11   issued the notice of default and intent to foreclose.  In

12   2014, Ditech became the servicer of the mortgage, and in

13   2017 the servicing was transferred from Ditech to Select

14   portfolio.

15          In the various litigation actions, the servicer at

16   the time on behalf of the Trust Bank of New York Mellon,

17   which held the beneficial interest in the deed of trust

18   securing the mortgage acted as the attorney-in-fact.  All

19   actions did not survive a motion to dismiss and all appeals

20   were also dismissed as well.

21          In the two bankruptcy cases that Ms. Yee filed,

22   Ms. Yee objected to the claims filed by the servicer at the

23   time based on the same lack of standing argument, and those

24   objections were overruled.

25          As noted by the district court of the Northern

Page 73

1    District of California, Ms. Yee occupied the property

2    without payment for more than six years and attempted to

3    avoid foreclosure through nonstop multijurisdictional

4    litigation.

5            Therefore, on that basis alone we believe Your

6    Honor can and should expunge the claims in their entirety.

7    However, we believe the claims can also be expunged because

8    Ms. Yee has failed to sufficiently plead facts supporting a

9    plausible claim.

10           As noted earlier, Ditech was the servicer of the

11   mortgage from 2014 to 2017.  Due to the multiple litigation

12   and appeals commenced by Ms. Yee, the actual foreclosure did

13   not occur until late 2019, after the servicing had been

14   turned over to Select Portfolio.  So Ditech was not the

15   entity that ultimately foreclosed on the property.  And

16   therefore, any claims regarding improper foreclosure do not

17   lie with Ditech, but the other servicer or the successor

18   servicer.

19           Further, with respect to the asserted

20   administrative expense claims, Ms. Yee does not state any

21   basis for the claim whatsoever in her papers.

22           If the claims are not expunged in entirety, the

23   plan administrator believes the claims should be

24   reclassified as unsecured consumer creditor claims subject

25   to further determination of their status as Section 363(o)

Page 74

1   claims and any recovery should be limited to the consumer

2   creditor reserve.

3           Unless Your Honor has any questions, we

4   respectfully request that the claims be expunged.

5           THE COURT:  I do not have any questions.  I had an

6   opportunity to review all of the papers that have been

7   submitted in connection with this motion.  I note that as

8   counsel has set forth, and it is fully set forth in the

9   papers, the claims that are being asserted have been the

10  subject of litigation, extensive litigation leading up to

11  commencement of these cases.  I think based upon the

12  undisputed facts that are set forth in basically laying out

13  the litigation, the various rulings of the courts, the plan

14  administrator has demonstrated Ms. Yee is barred by

15  (indiscernible) the doctrines of collateral estoppel and res

16  judicata from asserting these claims.  And for that reason,

17  the claims should be expunged.

18          In addition, as Counsel has indicated, Ms. Yee is

19  not able to state a plausible claim.  And as such, the claim

20  should be expunged by application of Rule 12(b)(6) of the

21  Federal Rules of Civil Procedure.

22          And finally, the administrative expense claim

23  should be expunged, that portion of the claims that should

24  be expunged, the administrative expense portion should be

25  expunged because the Debtor -- excuse me -- Ms. Yee has

Page 75

1   failed to state any basis for that claim.  So based upon my

2   review of the papers, I find that the plan administrator's

3   objection to the claim should be sustained.  The claim

4   should be expunged.  And you will please submit an order to

5   that effect.

6            MS. HWANG:  Thank you, Your Honor.  We'll do so.

7            THE COURT:  Thank you.

8            MS. HWANG:  Now I'll cede the podium to my

9   colleague, Mr. Singh, for the 26th item on the agenda.

10           THE COURT:  All right.

11           MR. SINGH:  Your Honor, thank you.  Again, Sunny

12  Singh, Weil Gotshal, on behalf of the plan administrator.

13  Next is the plan administrator's 15th omnibus objection

14  solely as it relates to various claims filed by Mr. Richard

15  Phelps.

16           Your Honor, I would note that I think Mr. Phelps

17  is on the line today and appeared.  So I can briefly

18  summarize --

19           MR. PHELPS:  I am here.

20           MR. SINGH:  Thank you, Mr. Phelps.

21           Your Honor, I can briefly just summarize the plan

22  administrator's position, and of course Mr. Phelps can be

23  heard.

24           Your Honor, these are seven claims asserting

25  $600,000 each, so totaling $4.2 million in the aggregate.

Page 76

1    We don't believe that the claims and the papers filed raise

2    any basis, supportable basis for a legal cause of action,

3    and they certainly don't allege why the claims are secured

4    as against the Debtors.

5          These all relate to a reverse mortgage that was

6    serviced formally by the Debtor, RMS.  And we think there's

7    essentially four arguments raised in the papers as to why

8    there may be a claim against RMS.

9          One, that RMS acted improperly when it prohibited

10   the Claimant from participating in the state tax deferral

11   program.  As we've outlined in the papers and is clear from

12   the documents governing the loan, that program created a

13   lien in favor of the state for unpaid taxes, which is a

14   violation of the mortgage.  So, you know, the plan -- excuse

15   me, RMS as the servicer took appropriate action as it was

16   permitted to do to make the payment and add the tax paid on

17   behalf of the claimant to the balance.

18         In addition, the claimant argues that the funds or

19   certain funds, you know, sort of costs that were incurred in

20   connection with foreclosure were not lent or transferred to

21   the claimant, but they did increase the mortgage balance.

22   Again, costs relating to foreclosure are allowed to be

23   included in the principal balance per the loan documents, so

24   we don't think that was inappropriate.

25         Third, the claimant alleges that RMS acted

Page 77

1    improperly by transferring the mortgage to another servicer.

2    Again, Your Honor, this is permitted by the mortgage in

3    accordance with the documents and the HUD program in

4    particular.  Your Honor, once the mortgage and ratio to the

5    balance of the loan to the value of the property reaches a

6    certain point, it can be assigned to HUD and their

7    servicers, which is what happened here in accordance with

8    the agreement.

9            And then finally, Your Honor, I think there's just

10   a general allegation, although nothing specific, that RMS

11   was acting improperly to collect its debt.  We don't believe

12   that there is any basis to support that or anything rising

13   to the level of wrongdoing or a claim.

14           And, Your Honor, I would just finally note,

15   similar to the last claim, that you were addressing, you

16   know, even if there was any basis here with respect to the

17   claim as to the merits certainly is not a secured

18   administrative or priority claim, and at the very least

19   should be recharacterized so that the plan administrator

20   doesn't need to reserve for, you know, $4.2 million of

21   asserted secured claims.  You know, the property secures not

22   the claimant's claims against RMS, but quite the opposite.

23   Your Honor, RMS -- or I should really say no longer RMS, but

24   the existing lender's claims against the borrower.

25           So, Your Honor, unless you have any questions,

Page 78

1     that summarizes our position.

2              THE COURT:  Okay, thank you.  I do not have any

3     questions.

4              Mr. Phelps, do you wish to be heard?

5              MS. PHELPS:  Yes, sir.  Yes, Your Honor.  I'll be

6     86 in September.  And my day job for 22 years was selling

7     calculators back in the sixties through the early eighties

8     to financial institutions.

9              I took a reverse mortgage because 9/11 kind of

10    wiped me out.  And I'm living on social security and a

11    little bit of retirement.  So in dealing with RMS, I, you

12    know, had a really good relationship.  I talked to two

13    different people, asked permission to take the Texas tax

14    deferral, and was given permission to do that.  There was a

15    balance because they had gone online and paid my taxes that

16    I was in arrears because the property that is in the reverse

17    mortgage is one acre, and there was two-and-a-half acres

18    that hadn't been paid, and I overlooked that.  To make a

19    long story longer, they gave me permission, and there was a

20    balance there that I owed RMS to pay it off.  But they also

21    gave me permission -- and they gave me -- you know, there is

22    evidence there that shows that they sent me a payment book.

23    And so that was around $150 or $160, whatever it was.  And

24    so then when they gave me permission to do the reverse

25    mortgage, I said, well, since I'm not ever going to have to

1    pay taxes again, can I spread this out over a two-year

2    period.  And they gave me permission to do that.  So that

3    reduced my monthly payment to them to pay this off to

4    $77.63.

5              And what they did, and I think very well planned,

6    was they let that ride for a long period of time, maybe a

7    year or so.  Because they gave me two years to pay it off.

8    And then one day I got a call from a lady by the name of Ms.

9    Fisher, said she was my -- I guess my customer agent.  And

10   we had a really nice visit.  And towards the end of the

11   visit, I said, Ms. Fisher, I want to thank you for helping

12   this senior, you know, with my cashflow and my taxes.  And

13   she said, what do you mean.  And I said, well, you let me

14   get into the Texas tax deferral for seniors.  And she said,

15   you can't do that.  And you don't forget conversations like

16   this.  And I said, wow, okay.  And she hung up.

17             And so I called the two people that had given me

18   permission.  They said don't worry about it, it's two

19   against one.  And I said, well, I am worried about it.  So

20   then they let it ride, and I decided not to worry about it I

21   guess.  And then all of the sudden it's over, you know,

22   $2,600 and they want it all paid immediately.  And I was

23   able to negotiate with Tanya Williams (indiscernible) to pay

24   it off at $334, which was my very limited social security

25   income.  And I was able to get that paid off.  So now

Page 80

1      they're all paid.

2              But in the meantime while that balance existed, I

3      got telephone calls, I had people walking onto the property.

4      Each time they were on the property with the exception of

5      one time, and you have all this evidence, there wasn't a car

6      there.  One time I was gone.  My wife called me and said

7      there's people on the property.  The second time she had the

8      car and I was trying to take a nap, and there's two guys

9      walking around my back yard.  And I'm going, you know, what

10     are you doing there.  Oh, well, we're here from Reverse

11     Mortgage Solutions because you defaulted.  And that's not to

12     mention the paper work I got that said you can walk away

13     from the property, et cetera, et cetera.

14             As a holder of this type of loan and a problem,

15     and you know you're being treated wrong.  But an attorney

16     won't take the case because you can't show loss of income.

17     So you're stuck with this.  I have accumulated ten years of

18     this abuse.  They charged my account for $1,700 when they

19     thought they were repo-ing it.  And the appraiser came out

20     and he said normally we do these for $500, $300 to $500, get

21     it appraised.  And he said all I'm doing is reverse mortgage

22     appraisals.  He said I'm really worried about our seniors.

23     And I said, well, so am I.

24             And so I appreciate the Court taking this

25     evidence, looking at it.  I can assure you that it's real.

Page 81

1    I'm in the trenches.  I've listened to this other testimony.

2    I've had so much of this stuff coming through here.  And

3    everybody and all the money that's involved is, you know,

4    has lost track of this program.  This program was intended

5    to help seniors, you know, live out their lives.  And when

6    it started it was like $20,000, $30,000 homes to help

7    seniors stay in their homes.

8            I have a good friend in the business that does

9    reverse mortgages in New Orleans.  And poor people or people

10   with low incomes, if you see ads now, they won't touch a

11   piece of property for less than at least maybe $300,000 to

12   $350,000.

13           I was abused.  I'm a heart patient.  It put me

14   into AFib.  But I'm kind of a fighter.  And there's right

15   and there's wrong.  And I remember the appraiser saying, you

16   know, I'm worried about this.  This is all I'm doing.  And

17   I've listened to all this other testimony about funds and

18   unclaimed and that.  And this program shouldn't be in the

19   private sector.  I took a loan license.  I had cards printed

20   to advise people.  I believe in the reverse mortgages.  But

21   in the private sector where there's so much greed, it's not

22   working.  And if it were administered by the Social

23   Security, which I hate to say because I've always been a

24   commission, independent person.  But it needs to be taken

25   out of the private sector.  They abuse it.

Page 82

1          They've -- you know, they transferred my mortgage.

2     As soon as they transferred to the other company and I

3     checked them out, they have an F rating by the Better

4     Business Bureau because when people want to settle their

5     loans, they don't settle them.  And in a reverse mortgage,

6     the interest and profit to the company continues to

7     accumulate.  And so the customer down in the ditch that's

8     being shot at, he's being abused.  And unless you're in that

9     $300,000 sector -- and I don't know anything about the

10    checks because I didn't get a check.  I had to pay money to

11    get into a reverse mortgage just to stay in my property.  So

12    I don't receive any income from that.  So I'm glad I'm not

13    in that.

14          But having said that and appreciating the

15    opportunity to speak for seniors that I know, thank you very

16    much, sir.

17          THE COURT:  Mr. Singh?

18          MR. SINGH:  Thank you, Your Honor.  I don't have

19    anything further to add than what's been said and what's in

20    our papers.

21          THE COURT:  Now Mr. Phelps, what is the evidence

22    that you have that relates to what you understood -- telling

23    you as far as your taxes and the deferral program?

24          MR. PHELPS:  Well, I have my two payments here.

25    And I've sent you everything that was involved because

Page 83

1   assuming Ms. Fisher hung up, I started keeping track of

2   everything.

3           THE COURT:  All right.  Well, I have gone through

4   the papers.  And it's clear that you have filed the seven

5   claims at the $600,000 per claim for a total of $4.2 million

6   and that you are asserting that they are secured claims.

7           Now earlier, and there was a third omnibus

8   objection to claims, and the first two of your claims,

9   Claims Number 2004 and 2005 were expunged, but they were

10  expunged on the basis that the claims had been amended and

11  superseded by the remaining claims, the remaining five

12  claims.  Those are the claims that are at issue here.

13          As I -- (indiscernible) -- and I think the plan

14  administrator I think summarized them fairly taking

15  principally four arguments for your claim.  And the first is

16  that you signed up for the tax deferral program with RMS's

17  consent, and that RMS acted improperly, when RMS paid

18  property taxes on the -- your behalf, that were deferred

19  under the tax deferral program.

20          The documents that have been submitted in support

21  of your contention don't support the -- your assertion that

22  RMS had consented entry into the tax deferral program.  And

23  the --

24          MR. SINGH:  No, Your Honor.  I'm sorry, go ahead.

25  I'm sorry.

Page 84

1          THE COURT:  I'm trying to issue a ruling here, and

2     if you have some questions when I'm done --

3          MR. SINGH:  Okay.

4          THE COURT:  -- I'm happy to hear from you, so

5     thank you.  And you have a deed of trust.  The deed of trust

6     prohibits the -- you from participating in a tax deferral

7     program, if the program creates a lien on the property.

8          And under the program, under the tax deferral

9     program that you participated in, there is in fact a lien

10    that arises on the property.  And so, based on the documents

11    that you've submitted, it shows that the deed of trust bars

12    you from participating in the tax deferral program.

13         The other thing is, the -- there is a letter in

14    the record that shows that RMS sent you a letter, that in

15    that letter, RMS explained that under the terms of the deed

16    of trust, that (indiscernible) participate in the tax

17    deferral program.

18         And so, the contention that RMS prohibited you

19    from participating in the tax deferral program, most

20    respectfully, I don't think you've demonstrated that.  I

21    don't think you've demonstrated that you could assert facts

22    that support that because it's deed of trust that expressly

23    allows the lenders to pay property taxes if the Claimant

24    fails to do so, and to add the amounts paid to the

25    outstanding balance of the amounts owed.

Page 85

1           And that RMS didn't prohibit you from

2      participating in the tax deferral program based upon the

3      deed of trust.  And the agreement and the papers to execute

4      it when you got the reverse mortgage, you were prohibited

5      from doing that.

6           So based upon that and in assessing this as I am,

7      whether or not your claim, you've demonstrated that you

8      could be successful, that you have a claim that is a

9      plausible claim and one that could be asserted plausibly

10     before the Court, as far as that aspect of your argument,

11     most respectfully, I find that you haven't demonstrated

12     that.

13          The next issue that I see is whether you, Mr.

14     Phelps, can demonstrate that RMS improperly increased the

15     balance on the reverse mortgage without distributing funds

16     that -- funds to you.  And you know, on this as well, I

17     think the documents that have been -- that you have

18     submitted demonstrate -- most respectfully demonstrate that

19     that's not correct.

20          Included in the documents that you've submitted is

21     an annual year-end statement for the year ending December

22     31, 2018.  That's with your proof of claim number 2361.  And

23     that statement, the 2018 statement shows that charges

24     described as the total principle amount to be paid to the

25     mortgager borrower in the amount of (indiscernible) dollars

Page 86

1    consisting of appraisal fees of $1,125 inspection fees of

2    $220 and other charges of $385, those are default related

3    expenses incurred by RMS.

4            And RMS, the deed of trust expressly authorizes

5    RMS to take reasonable actions to preserve the value of the

6    property and to add those expenses to the principle balance

7    of the reverse mortgage.  So that -- what we're talking

8    about there are expenses that RMS incurred.

9            And as under the agreement, the deed of trust, RMS

10   was entitled to add that to the balance of the reverse

11   mortgage.  You also contend, as in your papers, and as you

12   argued this afternoon, that RMS transferred the balance --

13   the servicing of your reverse mortgage to NOVAD, and that is

14   a servicer with an (indiscernible) from the Better Business

15   Bureau.

16           And you contend that NOVAD would or has or will

17   make your life more stressful, and that NOVAD does not close

18   out reverse mortgage loans to allow interest on such loans

19   to grow, that that's part of what you see their strategy to

20   be.

21           Now first, there aren't any facts to support what

22   you're saying.  And so, a lot of what you're arguing is

23   somewhat -- is speculative.  But the other issue, and I

24   think the one that's more problematic most respectfully for

25   you is that RMS was well within its rights to transfer the

Page 87

1   reverse mortgage to HUD.

2          And that's because the loan balance which had

3   arisen to $203,021.19 was one -- 101.43 percent of the

4   maximum amount of the claim allowed under the deed of trust

5   and the reverse mortgage.  And as such, the RMS was in its

6   rights to transfer the mortgage to HUD.  And it's HUD that

7   retained, to act as the servicer.

8          So there, again, most respectfully, I don't find

9   any merit and don't believe that you could plausibly assert

10  a claim that the RMS acted improperly when it transferred

11  the -- when it reached out to HUD.  And under the papers,

12  (indiscernible) exercise its rights to transfer the mortgage

13  to HUD and then HUD did what it did, and argue that RMS has

14  harassed you.

15         And as you had indicated, there are people who

16  were on your property, and that you recalled 15 times, at

17  least 15 times to collect the debt.  And it appears that

18  these calls were made between June the 14th, 2016 and

19  February 14, 2017.  That's about roughly an eight month

20  period.

21         Now we know that Congress enacted the Fair Debt

22  Collection Practices Act to protect consumers from abusive

23  collection practices.  And you believe that you're a victim

24  of that.  And what you need to be able to demonstrate is

25  that the RMS was acting as like an -- as a debt collector,

Page 88

1    that they sought to collect a debt from you, and that they

2    did so in violation of the Fair Debt Collection Practices

3    Act.

4            And most respectfully, I think assuming what you

5    have put forward here in your arguments, I don't think you

6    can state a plausible claim that they have done that.  And

7    so, most respectfully, I don't find any merit to that aspect

8    of your argument.

9            Now you also asked, you've made in your papers and

10   offered to settle the -- or your five claims, the five

11   remaining claims for a payment you propose is that you'd be

12   -- the RMS pay you $500,000 and provide you with clear title

13   to your residence within 90 days.

14           Now the plan administrator indicates in its reply

15   that they've considered the offer and they don't believe

16   that it is in the best interest of the estate or its

17   creditors to accept the offer.  And from their perspective,

18   the -- they argue that the offer is arbitrary and that it

19   doesn't reflect any reasoned damages, damage calculations

20   from the Claimant.

21           It's within their discretion to determine whether

22   or not to pursue a potential settlement of the matter.  The

23   plan administrator has determined that it will not do so.  I

24   frankly, based on the evidence here, I don't think there's

25   an error on the part of the plan administrator in coming to

Page 89

1        that conclusion.

2                So Mr. Phelps, based upon my review of your papers

3        and the applicable law, I most respectfully am going to

4        sustain the objections to the claims that the plan

5        administrator has made.  And I am directing that the -- your

6        five claims, the five remaining claims be expunged.  And

7        that is my ruling.

8                MR. PHELPS:  Well, sir, you asked for evidence.  I

9        have printed out statements with RMS for the payments of the

10       tax thing.  And we wouldn't have entered into that without,

11       you know, we're on a telephone.  This is -- you try to cross

12       your I's and your T's before you get it in writing.

13               I cross my I's and my T's and I have it in writing

14       with these payments.  And then, I have it where they refused

15       to take a check while I'm in the middle of this payout.

16       Wow.  You know, I can understand why people, you know, are

17       afraid to reverse mortgages now.  But so you're saying that

18       there's no settlement involved here at all?

19               THE COURT:  That's correct.  I'm saying that they

20       have not opted to engage in that.  I don't have the

21       authority to direct them to do that.  And based upon the

22       facts as I understand them and as I have reviewed on the

23       record, I don't believe that there would be a basis for them

24       to enter into that proposed settlement.  So most

25       respectfully --

Page 90

1          MR. PHELPS:  Yes sir, Your Honor, yes.  I just --

2    why would I -- I've got a collection of 10 years of

3    documentation.  And it's, you know, I've written up there.

4    I don't have an attorney because they don't show laws, but

5    if you can't see harassment and a person out here trying to

6    control their budget and being abused because of it, you

7    know, then the seniors in this country are in big trouble

8    because the appraiser who came out said that that was all he

9    was doing was re-pulling reverse mortgage property.  And if

10   just --

11          THE COURT:  All right.  Mr. Phelps, most

12   respectfully, I understand that and you had mentioned that

13   before.  I considered that in formulating my ruling.  And

14   so, again, most respectfully, I am going to sustain the

15   objection to the claims and expunge your claims.

16          MR. PHELPS:  Wow.

17          THE COURT:  And Mr. Singh, I would ask Mr. Singh

18   that you would please settle the order so that Mr. Phelps

19   has an opportunity to review it before it gets to me, okay?

20          MR. SINGH:  Yes, Your Honor.  Certainly.

21          THE COURT:  All right, thank you.  Mr. Phelps,

22   thank you very much for calling in.

23          MR. PHELPS:  Yes, thank you, Your Honor.

24          THE COURT:  All right.  Mr. Singh?

25          MR. SINGH:  Yes, Your Honor.  So that takes us

Page 91

1    next to the next tested matter, which I think is a recovery

2    trust motion, Item Number 27 of the agenda.  So I'll turn it

3    over to the Pachulski firm.

4             THE COURT:  Thank you.

5             MR. KAHN:  Hello, Your Honor.  This is Steve Kahn

6    of Pachulski Stang Ziehl & Jones for the GUC Trust on

7    Numbers 27 and 28.  And can the Court hear me all right?

8             THE COURT:  Yes, I can.  Thank you very much.

9             MR. KAHN:  Okay, thank you.  My computer's been

10   going in and out and I wasn't sure.  Item 27 is the GUC

11   Trust objection to classify the proof of claim of the Geary

12   Class Action Plaintiffs as a consumer creditor claim.  In

13   response to that at Number 28, the consumer trustee filed a

14   response at a cross motion to classify that same claim as a

15   general unsecured claim, so those -- these two matters are

16   in essence one.

17            And I don't want to repeat all that's in our

18   moving papers and in our reply, but that all of the

19   Claimants within the Geary Class Action are consumers who

20   granted security interests and property to secure debts

21   either originated, service consolidated or owned by the

22   Debtors and include 36b30 claims.

23            Now the Debtors are the ones who drafted the plan,

24   and drafted the definition of capital B Borrower in their

25   proposed second amended plan, and again, the same definition

Page 92

1      in the third amended plan, which was ultimately confirmed.

2              And subsequent to that, consistently treated the

3      Geary Class Action claim as a consumer creditor claim in

4      their confirmation briefs in support of the second amended

5      plan and the third amended plan.

6              And you even went so far in their confirmation

7      brief as to the third amended plan, to do an entire analysis

8      as to feasibility of that plan in funds available from the

9      consumer creditor trust for 363(o) claims that get paid at

10     100 cents prior to distributions to other consumer creditor

11     claims.

12             The problem or why we're here is there was no

13     definition of the term mortgage used in the definition of

14     borrowers.  And that definition is any individual as of the

15     commencement date who's current or former mortgage loan or

16     reverse mortgage was originated, sold, consolidated or owned

17     by one of the Debtors.

18             With that definition, the Debtors, as I said,

19     consistently have treated the Geary Class Action claim as a

20     consumer creditor claim.  And it was clearly the intent of

21     the plan to provide separate treatment to individual

22     borrowers and to separate them out from other general

23     unsecured claims or the claims of people in the business of

24     creating and servicing mortgages.

25             Now whether it's a car loan borrower or a home

Page 93

1    borrower, those consumers suffered the same harm from the

2    Debtors alleged (indiscernible).  And there's no logical

3    reason to exclude them at this time.  And it would violate

4    the spirit and the intent of the plan.

5              And I'll address also here our arguments in

6    opposition to the counter motion filed by the Consumer

7    Trustee.  And you know, it's clear that the plan should be

8    interpreted as would a contract, not a statute, as advanced

9    by the Consumer Trustee.

10             And this Court itself has held even in this case

11   that a plan is akin to a contract.  And here are several

12   cases also, you know, stating that the rules of

13   interpretation should therefore be that of a contract.

14   Under New York law, the cardinal principle for construction

15   and interpretation of contracts is that the intention of the

16   parties should control in that Courts should interpret

17   contracts to effect the general purpose of the contract.

18             With that in mind, I think the only sustainable

19   interpretation of the undefined term mortgage, which

20   comports with what Black's Law Dictionary has as its

21   principle definition of a mortgage should prevail in that

22   the class action, Geary Class Action should be deemed a

23   consumer creditor claim.

24             And you know, it can't be ignored that at least 99

25   percent of the class members were (indiscernible) borrowers,

Page 94

1    which our trust can simply not adjudicate.  So we -- for all

2    those reasons, I think the objection should be sustained and

3    the cross motion should be denied.

4              THE COURT:  All right.  Right.  Mr. Levin?  I'm

5    sorry.  Is Mr. Levin there?

6              MR. LEVIN:  Your Honor, I was and on mute.  I

7    apologize for that.

8              THE COURT:  Okay.  I think -- yes, okay.  You

9    don't -- you'd like to respond, I trust.

10             MR. LEVIN:  Yes, I would, but I understand that

11   Mr. Nobile, who represents the Gearys is on the line also

12   and he filed papers in support of the GUC Trustee's motion.

13   So if he would like to go, he should go before I do.

14             THE COURT:  All right, thank you.  Mr. Nobile?

15             MR. NOBILE:  Your Honor -- excuse me, Your Honor,

16   this is Jim Nobile.  Can you hear me okay?

17             THE COURT:  Yes, Mr. Nobile.  I can.  Thank you.

18             MR. NOBILE:  Okay, thank you.  Our position, Your

19   Honor, has been outlined in our papers, and largely it's in

20   opposition to the consumer representative's motion to

21   reclassify our claim as a general unsecured claim.  I don't

22   have a significant amount more to add than what Mr. Kahn

23   already argued, and other than what was stated in our

24   papers.

25             I would also point, in addition to those

Page 95

1    arguments, to the terminology in the plan itself as the plan

2    being the controlling document.  And that's -- I'm referring

3    to Document Number 1404-1 at Page 17 or Page 22 of 82,

4    depending upon how you look at it.

5            And in that document, the plan controls.  Yes,

6    there is some difference between the plan or conflict

7    between the plan and other documents with perhaps the

8    possible exception of the confirming order or where relevant

9    the Debtor in possession order.

10           And in looking over the Debtor in possession

11   order, we could discern no conflict with what the plan

12   stated.  So with that additional argument, Your Honor, we, I

13   wouldn't say support any attempt to reclassify from either

14   trust.  We're sort of in a pickle, I think both trusts are

15   pointing to the other as to the trust responsible for

16   ultimately handling our claim.

17           But I would say that we definitely oppose the

18   consumer representative's attempt to reclassify our claim as

19   a general unsecured claim under Class V.  The only other

20   thing I'll add is it was a little bit unclear to us what the

21   nature of the attempt to reclassify was, because in the

22   first part, it looked as if the consumer representative was

23   treating the claim solely as an individual claim of the

24   Gearys themselves, even though the claim I thought was very

25   clear and outlining that it was a class claim.

Page 96

1           And then, the second, you know, part of that had

2      more to do with the relief that was requested itself.  It

3      was unclear whether or not they were seeking an alternative

4      ruling, that it should be treated as a Class VI non-363(o)

5      claim.  And I'm not certain that we're opposing that at all.

6           I think that's probably for the vast majority of

7      the potential Claimants in this class.  That's probably

8      where they would fall.  So with those additional arguments

9      and with, you know, our I guess need for that slight

10     clarification on what the request for relief is, I'll

11     certainly turn over to Mr. Levin for his argument.  I

12     wouldn't mind, Your Honor, an opportunity to maybe rejoin

13     afterwards.

14           THE COURT:  Mr. Levin?

15           MR. LEVIN:  Thank you, Your Honor.  Let me just

16     clarify the point that Mr. Nobile raised at the end.  There

17     was an error in the notice of the opposition.  Some language

18     was supposed to be deleted and it wasn't, and that had to do

19     with seeking to classify the claim as a non-363(o) claim.

20           We are not seeking that relief here.  The only

21     cross motion was to classify the claim as a general

22     unsecured claim.  We thought that was just procedurally

23     better than simply opposing the GUC Trustee's motion to

24     classify this Class VI.  We'd get better clarity if the

25     Court ruled on a cross motion as well as the motion.

Page 97

1          So that's the only relief we're seeking today.  As

2     I -- as the opposition says at the end, we reserve rights

3     with respect to the 363(o) issue, with respect to the amount

4     or allowability of the claim.  And of course, with respect

5     to class certification.  So let me turn to that.

6          The GUC Trustee's motion and the Geary's support

7     of that motion operate on the premise that this claim is a

8     class claim in the bankruptcy.  We recognize that the

9     District Court had granted class certification in the pre-

10    bankruptcy litigation.  Although, that certification was

11    subject to a motion to decertify, which was stayed by the

12    filing of the bankruptcy.

13         Certification pre-bankruptcy does not

14    automatically create post-bankruptcy certification as a

15    class claim.  This claim has not been certified.  Mr. Nobile

16    has filed a motion to certify the class under Rule 7023.

17    And that is pending its -- on a separate hearing, and

18    depending on how this hearing comes out, we expect to oppose

19    that.

20         So the point is that we're talking not about the

21    Geary class and however many members there might be in the

22    class, we're talking about the claim of the Gearys.  Their

23    claim was a claim arising out of a car loan.  One other

24    preliminary remark, Your Honor.

25         The -- Mr. Nobile said in his support that the

Page 98

1    Consumer Claim Trustee had admitted the facts, and I want to

2    refer to our motion on Page 2, where we said for the

3    purposes of this opposition and cross motion, we do not

4    dispute the facts.  So I want the record to be clear on

5    that.  We're not necessarily admitting all of the facts.

6           So now going to the Geary's claim.  Their claim

7    allows out of a car loan.  The Class VI under the plan

8    defines -- I'm sorry.  Let me try that again.  Mr. Nobile is

9    right is that the plan is a controlling document.  So we

10   looked to the language in the plan to determine whether the

11   Geary's claim is a Class VI or a general unsecured claim.

12          Class VI comprises of consumer creditor claims.

13   Consumer creditor claims include claims asserted by those

14   who had a mortgage.  And I'll get to the definition of

15   mortgage in just a moment, but we believe there are two

16   reasons why the Geary's claim is not a consumer claim as

17   defined in the plan.

18          A consumer creditor claim is held by a borrower.

19   To be a -- and that's part of the definition.  And there's a

20   definition of borrower.  And borrower has two requirements.

21   First, a Claimant must have a mortgage or a reverse mortgage

22   and the Gearys do not.  There was a car loan, and a car loan

23   is not a mortgage or a reverse mortgage.

24          And second, the loan on the mortgage must have

25   been serviced by the Debtor.  And here, as the record shows,

Page 99

1    the loan was not serviced.  It was fully paid before Ditech

2    took over the platform from Citi Financial, the platform on

3    which the Geary's loan had previously been serviced.

4         So let me turn to the definition of mortgage.

5    That's what Mr. Kahn and Mr. Nobile addressed.  They're

6    right.  The plan does not expressly define mortgage, so we

7    looked to principles of contract interpretation.  I agree

8    that the purpose under New York law, the purpose of contract

9    interpretation is to determine the (indiscernible) of the

10   parties.

11        But those principles are the same principles as

12   used in statutory interpretation.  And our opposition, I

13   cited principles of statutory interpretation, whose purpose

14   is the same as contract interpretation, which is to discern

15   the drafter's intent based on the words they used, their

16   common or defined meaning, the context, and some principles

17   that are based on how language is used.

18        In fact, as far back as 1854, the New York Court

19   of Appeals said, "In the construction both of statutes and

20   contracts, the intent of the framers and parties is sought -

21   - first of all, is to be sought first of all in the words

22   and the language employed."  And that case is McCluskey v.

23   Cromwell, 11 N.Y. 593 at Page 601.

24        The Second Circuit has much more recently adopted

25   statutory construction principles in interpreting contracts.

Page 100

1    In the case of Rothstein v. American International Group 873

2    F.3d 1195 at Page 210-211, the Second Circuit said, "We

3    interpret -- we often interpret a word by the company it

4    keeps, the doctrine of (indiscernible)," which is the

5    principle that I cited in our opposition.

6        And the -- there's also a Second Circuit case,

7    1996, Taracorp v. NL Industries, 73 F.3d 738, 744-45, where

8    the Court said this principle of contract interpretation

9    parallels the principle that we use when interpreting

10   statutes to determine the intent of legislatures.

11       They say it's as we assume that the same words

12   have the same meaning in a given act and that the choice of

13   substantially different words to address analogous issues

14   signifies a different approach.  And here we're focusing on

15   the word mortgage.

16       My point in citing these case, Your Honor, is that

17   it is a red herring to say that we don't use statutory

18   construction principles.  The principles for (indiscernible)

19   statutes and contracts are the same.  And those are the

20   words you used the context in which they're used.

21       So let's turn to the context in which the word

22   mortgage is used in this case.  This Chapter 11 case

23   involved residential mortgages.  Residential mortgages

24   include real property and manufactured housing.  They don't

25   include transportation.

Page 101

1          You can look at the DIP financing motion, which we

2    cited in our papers, which defined mortgage and mortgage

3    loans with respect to only residential mortgages.  And the

4    order approving it incorporated those definitions as well.

5          The plan provided for a sale of the Debtor's

6    mortgages and reverse mortgage and mortgage servicing right

7    under the two stalking horse agreements.  The forward

8    stalking horse agreement and the reverse stalking horse

9    agreement, both of those documents, which the -- which were

10   incorporated into the plan used the term -- I'm sorry --

11   defined the term mortgage to mean residential mortgages.  It

12   did not include car loans.

13         So the whole context here and the principle of

14   construction of in pari materia means that you must take all

15   of these documents together in interpreting what is meant by

16   mortgage.  And here what is meant by mortgage is residential

17   mortgages, not car loans.

18         And frankly, this is consistent with the common

19   meaning of the term.  I know Mr. Kahn cited Black's Law

20   Dictionary.  If we go in that direction, I can cite

21   Dictionary.com and Wikipedia, both which define mortgage in

22   reference to real property.

23         But let me put it in more vernacular terms.  When

24   was the last time you hear somebody say, I'm getting a

25   mortgage on my car?  The term is just not used that way.  So

Page 102

1    we're talking about a loan that was not a mortgage loan.

2         Second, let me go onto servicing, whether this

3    loan was serviced.  As I noted and the Geary's freely admit,

4    the loan was fully paid before Ditech took over the platform

5    from Citi Financial.  There was nothing to service.  Whether

6    or not the Gearys have a claim based on something Ditech

7    did, that does not mean that the claim falls within the

8    definition of consumer creditor claim under the plan.

9         The fact is that people might have something in

10   their mind, but courts don't look in their minds to

11   determine meaning of a contract.  They look at the words

12   used.  And I'm focusing solely on the words used here.  And

13   that goes to the next point, which is that Mr. Kahn's

14   statement or Mr. Nobile's statement about what assumptions

15   the Debtors made during the case and during the confirmation

16   process.

17        Assumptions are not conclusions.  Conclusions are

18   driven by the language in the documents.  The fact that they

19   might've assumed that the Geary's claim was in Class VI does

20   not make it so.  And the fact that they did an analysis, a

21   financial analysis of the Geary's claim in their opposition

22   -- I'm sorry, in their reply to the Geary's opposition to

23   confirmation was specifically responding to a financial

24   analysis that the Geary's did in their opposition to plan

25   confirmation.

Page 103

1          So that shouldn't be taken as a standalone

2    confirmation that the Geary's claim is a Class VI claim.

3    More --

4          THE COURT:  I'm sorry, Mr. Levin, I apologize for

5    interrupting you.  I was having a little trouble hearing

6    you.  Just -- could you make that last point again?

7          MR. LEVIN:  Yeah --

8          THE COURT:  You were saying that the -- it's --

9    the assumption is not a conclusion and then it got a little

10   muddled, but please.

11          MR. LEVIN:  All right, great.  Thank you, Your

12   Honor.  Sorry for that.  Phones only go so far.  The fact

13   that it was an assumption does not make it so.  Mr. Kahn

14   noted that the -- in their reply to the Geary's opposition

15   to plan confirmation, that the Debtors did a financial

16   analysis assuming that the Geary's claim was a Class VI

17   claim.

18          Well, not only does that assumption not make it

19   so, but more specifically, that reply was responding to the

20   Geary's objection to confirmation in which the Gearys said,

21   if this is a Class VI claim, in fact, I should say the

22   Gearys asserted just asserted without support, this is a

23   Class VI claim.  And on that basis, the plan does not meet

24   the financial confirmation requirements, the Debtor would --

25   the Debtor was responding to that argument.

Page 104

1          And if a response like that were to cause a claim

2      to be classified, it would also cause it to be allowed.  And

3      yet, we know that arguments hypothetical or arguments based

4      on assumptions for a confirmation hearing do not determine

5      the status or allowability of claims.

6          So on that basis, Your Honor, we believe that the

7      language of the plan, the context in which it was used and

8      the meaning of these terms dictate that the Geary claim is a

9      general unsecured claim, not a consumer creditor Class VI

10     claim.

11          THE COURT:  And now, Mr. Levin, the argument that

12     they make, that Mr. Kahn and Mr. Nobile, also they raised

13     the fact, if there's any ambiguity, the -- that would be --

14     it should be -- the language should be construed against the

15     Debtor.  I think that is -- that's part of their argument.

16     Could you address that, please?

17          MR. LEVIN:  Yes, Your Honor --

18          THE COURT:  Or -- and I'm sorry to interrupt you -

19     - and if I've misstated it or you think I've got it wrong,

20     just -- you can correct me and then address it.

21          MR. LEVIN:  I think that's what Mr. Kahn is

22     saying.  The fact is, neither the GUC Trustee nor the

23     Consumer Claim Trustee nor the Gearys drafted the plan.  And

24     so, while the plan might be construed against the Debtor,

25     which might at this point be the (indiscernible) out of

Page 105

1   state, although it's a separate entity, it -- there's no

2   principle that would construe it against any of the three

3   parties to this contested matter.

4           THE COURT:  All right, thank you.  Anything

5   further, Mr. Levin?

6           MR. LEVIN:  No, thank you, Your Honor.

7           THE COURT:  Now let me just ask you, if I could

8   please, so let's assume for a moment that the -- your client

9   is successful in this matter.  And what you're -- what

10  ultimately, could you just refresh my recollection?

11  Ultimately, your ask, the ask by your Trustee, by your

12  colleague is to classify the class action claim as a general

13  unsecured claim?

14          MR. LEVIN:  Not exactly, Your Honor, because as I

15  said at the beginning, the class has not been certified in

16  this case.  The only claim we have before us is the claim of

17  the Gearys.  We're asking that --

18          THE COURT:  Okay.

19          MR. LEVIN:  -- the Geary's claim be classified as

20  a general unsecured claim.

21          THE COURT:  Okay.

22          MR. KAHN:  Your Honor, this is Steve Kahn.  Can I

23  address those issues?

24          THE COURT:  Yes, just give me one moment.  I'm

25  just (indiscernible).  Yeah, no problem.  Please go ahead.

Page 106

1            MR. KAHN:  Yes, on that last part of Mr. Levin,

2    actually, where he started and just ended is that this is a

3    claim only --

4            THE COURT:  I'm sorry, Mr. Kahn, Mr. Kahn, I'm

5    having a little trouble hearing you.

6            MR. KAHN:  Can you hear me better now?

7            THE COURT:  Yes, much better.  Thank you.

8            MR. KAHN:  Okay.  I'm sorry about that.  You know,

9    the argument that, oh, this is a claim of just the Gearys is

10   not correct.  And as we sit here today, there's been a

11   ruling in the District Court, where the underlying action

12   was pending, that the class is certified.  And the claim is

13   filed by Mr. and Mrs. Geary on behalf of themselves and all

14   other similarly situated claimants.

15           So until it is in essence de-certified, if the

16   Court were to deny a motion under 7023, it is a class

17   action.  And 99 percent of the claimants are borrowers who

18   gave us security interest in real property.  So you know,

19   and there's just no way the GUC Trust, under the very clear

20   and express terms of the plan have any authority to deal

21   with those claims.

22           On the second argument that the business of the

23   Debtors was real property mortgages, I -- you know, it was

24   primarily real property mortgages, but they obviously were

25   also servicing auto loans for some period of time.  I don't

Page 107

1    know how long or when it started and where it ended, but it

2    was not a line of business that, you know, at plan

3    confirmation time that was sought to be sold.  So I assume

4    they must've transferred that business away, you know, at an

5    earlier date.

6             Now the argument that the loan was not serviced by

7    Ditech really doesn't make sense to me.  There was a loan on

8    the books that was transferred from the original lender to

9    Ditech, and Ditech undertook collection efforts on that note

10   or on that loan, I should say.

11            The fact that the loan had been paid in full and

12   should've been off the books, but wasn't for whatever reason

13   doesn't alter the fact that once Ditech got it, you know,

14   they started you know, trying to get money out of the

15   Gearys.  So you know, the -- it was clearly serviced by

16   them.  And (indiscernible) --

17            THE COURT:  And I'm sorry, Mr. Kahn.  You're

18   saying it's clearly serviced by them because they sent --

19   and that's evidenced by the fact that they sent the letter?

20            MR. KAHN:  Well, that they said we are taking over

21   this loan.  That's what the letter said.  And then, they

22   sought to collect on the loan based on the information given

23   to them, which was obviously incorrect.  So you know,

24   servicing includes collecting funds on behalf of the

25   beneficiary.

Page 108

```
 1              So yes, I think it's circuitous to say that they

 2     did not.  So you know, on that basis, that doesn't serve as

 3     a sort of a defense here, I don't believe.  And then we get

 4     to interpretation of contracts.  And the, you know, overall

 5     focus in that regard is to, you know, what was the general

 6     purpose of the plan in terms of consumers who were

 7     segregated out, given special treatment as a separate class,

 8     and there was certainly no effort to -- well, if there

 9     should be two sub classes, one vehicle loans, one

10     residential loans.

11              The intent was to provide a separate fund for

12     those claims.  You know, if the -- this class action claim,

13     which is what it is, again, is made into a GUC claim and

14     it's all or 99 percent residential mortgages, we can't deal

15     with it.  That those are consumer creditor claims for

16     whatever they're worth.  And there's no reason to segregate

17     out the one percent that were car borrowers.  So it should

18     be adjudicated by the Consumer Creditor Trust.

19              THE COURT:  All right.  Anything further?

20              MR. KAHN:  No, Your Honor.  Not from me.  Sorry.

21              THE COURT:  Okay.  No problem.  Mr. Nobile?

22              MR. NOBILE:  Thank you, Your Honor.  I guess where

23     I'd want to start in response is that there's been no

24     objection to the allowance of the claim itself yet.  You

25     know, what we have before the Court is a request to, you
```

Page 109

1    know, find out which, you know, which bucket the money's

2    ultimately going to come from.

3            But as we stand here today, we have an allowed

4    claim on the books under the rules.  With respect to whether

5    we have a certified class or not, as we sit here today, as a

6    little confusing to me.  I don't believe in the case law

7    that I've reviewed that's been cited in our 7023 motion that

8    we are required necessarily to seek a re-certification of

9    the classes.

10           What the cases tend to say, and I'm sure Your

11   Honor knows, is that when looking to apply Rule 7023, one of

12   the factors that the Court will take a look at is whether or

13   not there's been a pre-filing certification.  And those that

14   -- those cases that have gone through that process stand in

15   good form generally, as the best candidates for applying

16   Rule 7023.

17           So I disagree, you know, wholeheartedly with the

18   notion that there is no de-certification or that some un --

19   or filed, whether or not some undecided decertification

20   request is somehow meaningful with regard to that.

21           The next thing I would say is that with regard to

22   the definition of the term mortgage, whether we're using

23   today's terminology or parlance or today's understanding or

24   not, I don't think there could be any real debate that the

25   term mortgage is susceptible to different meanings.  And

Page 110

1    each of those meanings are reasonable.

2             So under most states' contract law, including New

3    York's, when you have a term like that that is susceptible

4    to different meanings, it could be called by a court of law

5    as being ambiguous.  And if what we're dealing with is an

6    interpretation on the one part to force down the throat of

7    the other part, one meaning over the other, you have to find

8    out who did the drafting and who didn't.  And in this case,

9    we certainly did not do the drafting of the plan.  We did

10   not ask for it.  (indiscernible) --

11            THE COURT:  But Mr. Nobile, none of the parties to

12   this dispute drafted the plan.

13            MR. NOBILE:  No, Your Honor, but it is the Trustee

14   who is seeking to enforce it in one manner against the

15   rights of our claim.  So --

16            THE COURT:  But that doesn't -- okay, but what

17   does -- what follows from that as far as interpreting the

18   document?  I need to (indiscernible) --

19            MR. NOBILE:  What follows from --

20            THE COURT:  I'm sorry.

21            MR. NOBILE:  -- interpreting the document is I

22   guess so what we have is a party that was designated by the

23   Debtors to handle the funds contained in the trust.  Had

24   that Trustee not been appointed, it would be the Debtors who

25   would be seeking this interpretation, or not.  But I --

Page 111

1           THE COURT:  But wait.  Is it -- I'm sorry to

2    interrupt you, but is the movant originally the GUC Trust

3    was appointed, right?  It's the same issue, isn't it?

4    They're both appointed under the plan.

5           MR. NOBILE:  Correct.

6           THE COURT:  All right.  So it should be construed

7    against the consumer, the -- Mr. Levin's client, but in

8    favor of Mr. Kahn's client?  How does that work?

9           MR. NOBILE:  Well, I guess the way I see it is

10   you've got to -- for the sake of administration, you have

11   the convenience of having two different trusts appointed to

12   handle the funds that in other cases there may be not trust.

13   There may be a plan administrator that would effectively be

14   what was the Debtor in many Chapter 11 cases.

15           So with respect to how the plan is being

16   interpreted, I would argue that the Trustee stand

17   effectively in the shoes of the Debtor, when it comes to

18   plan interpretation.  At least that would be my argument.

19   So that would be my response to that, Your Honor.

20           THE COURT:  All right, thank you.

21           MR. NOBILE:  So with the understanding that you

22   have these potentials for ambiguity, you know, the corollary

23   at least under New York law is that they shouldn't be

24   resolved against the party who didn't draft it.  And then, I

25   would ultimately, Your Honor, conclude that -- the case was,

Page 112

1    you know, about a lot more than just residential mortgages.

2           I mean, I don't think we need to say a lot about

3    that, but there were a lot of different types of debt

4    involved in the case.  So to the extent we're dealing with

5    the servicing, if you will, of one obligation, in this case,

6    it was a car loan, but I don't think there can be any

7    meaningful debate that it was a consumer car loan.

8           I mean, this wasn't some business car loan.  And

9    you know, from that, I would -- 99 percent of the additional

10   members of these classes were residential mortgage loans.

11   So it kind of leaves me to wonder how we're going to deal

12   with the issue if there is a finding that there was no

13   servicing, which is wholly dependent upon one definition

14   that was never made part of the plan.  Or for that matter,

15   part of the FDCPA, which is the statute upon which all of

16   these claims are based.

17          It's taken out of looking at the papers filed by

18   the consumer representative out of RESPA, and it is wholly

19   dependent upon whether a payment would be made.  Well, of

20   course a payment wasn't made because there was no debt owed

21   in that particular instance.  But that's hardly an excuse

22   for suggesting that you didn't service the loan in the sense

23   that you were attempting to collect a debt because there's a

24   different set of definitions under the controlling statute,

25   which was the FDCPA.

Page 113

1              Again, an argument in our papers, Your Honor.  And

2      for all of those reasons, we oppose the consumer

3      representative's request.

4              THE COURT:  All right.  Thank you.  Mr. Levin,

5      anything further?

6              MR. LEVIN:  Yes, if you'll permit, Your Honor.  A

7      couple of brief points.  On the servicing point.  There were

8      no payments collected.  We referred to the definition of

9      servicing under RESPA, the Real Estate Settlement Procedures

10     Act.  Mr. Nobile says RESPA doesn't apply, which I think

11     confirms our point.

12             RESPA applies to mortgages.  This is not a

13     mortgage.  A car loan is not a mortgage, so we stand by our

14     position that Ditech did not service this loan.  Second, Mr.

15     Kahn made the point that the -- I think it was Mr. Kahn, yes

16     -- that the general purpose of the plan was to separate out

17     consumer claims from general unsecured claims.

18             But in fact, there are numerous consumer claims

19     that are in the general unsecured class, and I'd point

20     specifically to the Telephone Consumer Protection Act

21     claims.  Those claims, I don't know the exact number that

22     were filed, but there are filed claims in the record on

23     that.

24             And those are indisputably in the general

25     unsecured class.  So the separation here was not between

Page 114

1   consumers and non-consumers.  The separation was between

2   mortgage borrowers and others, other consumers.  And as I've

3   pointed out, the definition of mortgage doesn't include a

4   car loan.

5          Finally, Your Honor, I don't believe we have

6   evidence in the record that the -- Mr. Nobile's statement,

7   99 percent of the claims that he represents are -- arise out

8   of residential loans.  First of all, that assumes something

9   that is not yet true in this case, which is that he

10  represents them because there's been no class certification.

11         Here's the -- Geary's claim itself might be deemed

12  allowed, but the class certification is not deemed allowed

13  until there is an order under 7023.  And so, we're focusing

14  only on the Geary's claim.  That's all I have, Your Honor.

15  Thank you for the extra time.

16         THE COURT:  All right, thank you.  Anyone else

17  wish to be heard?

18         MR. KAHN:  Yeah --

19         MAN:  Yes -- okay, I'm sorry.

20         MR. KAHN:  -- this is Steve Kahn, yeah, on -- I'm

21  sorry, Your Honor.  This is Steve Kahn.  Mr. Levin's

22  citation to RESPA and saying that that deals only with

23  mortgages is not accurate.  It deals with loans secured by

24  real property.  And this is -- at least the Gearys loan is

25  secured by personal property.

1           So RESPA would not apply to it because it's not a

2    real estate loan.  And again, I think we have to look at the

3    claim as it stands at this time, and that it is filed on

4    behalf of the Gearys and all parties similarly situated.

5    And until it is, you know, found not to be a class action

6    claim, it is a class action claim that you know, Mr. Nobile

7    needs to pursue in order to obtain certification in the

8    bankruptcy court.

9           So and again, I think we have to look at what the

10   overall purpose of the contract was in terms of consumers.

11   Consumers are borrowers who gave a security interest and

12   property.  And there's no reason why there should be the

13   distinction made between real property and personal property

14   that's subject to that security interest.

15           THE COURT:  All right.  Anyone else?  Okay.  I'm

16   going to have to think about this a little bit, so I'll

17   adjourn this to our date in January.  And if I haven't ruled

18   on it by then, I will rule on it then.  Okay?

19           MR. NOBILE:  Yes, thank you, Your Honor.  And Ms.

20   Levine and I be excused?

21           THE COURT:  Yes, of course.  Thank you for dialing

22   in.

23           MR. NOBILE:  Thank you, Your Honor.

24           MR. LEVIN:  Your Honor, this is Mr. Levin.  I

25   would also ask to be excused from the hearing at this point.

Page 116

1          THE COURT:  Yes, Mr. Levin and Mr. Nobile, that's

2    fine.  And Ms. Twomey, if you also would like to leave.

3          MR. LEVIN:  Thank you, Your Honor.

4          MS. TWOMEY:  I'll stay on.

5          THE COURT:  All right, thank you.

6          MR. SINGH:  Thank you, Your Honor.  I think that

7    brings us, again, Sunny Singh for the record.  That brings

8    us to the last matter on today's calendar, Item 29 is the

9    motion for reconsideration by Ms. Farrier and David Hill

10   from the Weil team is handling that matter.

11         THE COURT:  All right, Mr. Hill?

12         MR. HILL:  Good afternoon, Your Honor.  David

13   Hill, Weil, Gotshal on behalf of the Debtor.  I feel like

14   I'm in a Verizon commercial, but can you hear me?

15         THE COURT:  Thank you, I can.

16         MR. HILL:  All right, Your Honor.  This is the

17   motion of Mary Farrier for consideration filed on the Docket

18   as ETF Number 2797.  When -- would it be helpful for Your

19   Honor to maybe level set where we're at in the case and

20   maybe a bit of the procedural history?  I believe Ms.

21   Farrier is on the phone under Ms. Chris (indiscernible)

22   dial-in.  We've made arrangements with her and with your

23   Chambers.

24         THE COURT:  Oh okay, thank you.  Yes, I think that

25   would be very helpful.

Page 117

1          MR. HILL:  Mr. Farrier, could you confirm that you

2   are on the phone before I proceed, just to make sure that I

3   have that right?

4          MS. FARRIER:  Yes, I'm here.  I'm on the phone.

5          THE COURT:  All right, terrific.  Proceed.

6          MR. HILL:  All right, thank you, Your Honor.  Your

7   Honor, this is the third instance where we've had Ms.

8   Farrier before the Court on various motions.  As a bit of

9   basic background, Ms. Farrier entered into a mortgage with

10   Green Tree Financial in 2013, which eventually became Ditech

11   in 2015.

12          The fundamental basis of Ms. Farrier's actions is

13   that Ms. Farrier alleges that Ditech sent her an erroneous

14   foreclosure letter in 2016 that triggered her to file a

15   personal bankruptcy in August of 2017.  And this is set

16   forth in a complaint that she filed in the Southern District

17   of Ohio, which we've referred to in our papers as the Ohio

18   action.

19          The Ohio action essentially alleges various

20   positive action against the Ohio bankruptcy court, the

21   bankruptcy trustee, and various other parties, including

22   Ditech, related to that foreclosure and bankruptcy

23   proceedings.

24          That action was placed on omnibus motion to

25   dismiss, which was the third omnibus motion to enforce the

Page 118

1    injunctive provisions of plan and confirmation order, which

2    we filed as ECF 1946.  Your Honor granted the motion at the

3    May 2020 omnibus hearing in a subsequent order ECF Number

4    2459.

5            Ms. Farrier previously filed in May of this year a

6    motion for consideration, and that's on the Docket as ECF

7    2337.  Therein, she sought what she referred to as

8    consideration, but the plan administrator interprets her

9    request to be the waiver of two mortgages that Ditech had

10   previously serviced, but had transferred to Shellpoint as of

11   January 2020.

12           So the Court heard what we refer to as the May

13   motion at the July 23rd, 2020 omnibus hearing and her motion

14   was denied and a subsequent written order ECF 3042.  Then

15   that brings us to the substantively identical motion, the

16   instant motion that we're dealing with here today.

17           Therein, Your Honor, Ms. Farrier requests again,

18   unspecified consideration that appears to be the waiver of

19   two mortgage balances.  Your Honor, as set forth in the

20   papers, not only is this substantively identical to the

21   motion -- the previous motions that she's brought before

22   this court, specifically the May motion, which this Court

23   denied.

24           The -- what she seeks is still not only barred by

25   res judicata per this Court's earlier rulings, but also the

Page 119

1   fundamental reality that Ditech does not own or service

2   either of her mortgages, that she would like waived, and has

3   not done so for more than almost a year at this juncture.

4          Ditech cannot waive or forgive payments on

5   mortgages it does not own or service.  And if Ms. Farrier

6   would refer to this as claims for monetary relief, as Your

7   Honor has previously found on multiple occasions, the only

8   proper mechanism for the seeking of monetary relief is the

9   filing of a proof of claim, which is not an issue in today's

10  case.

11         So Your Honor, fundamentally, we believe that Ms.

12  Farrier's motion is procedurally and substantively improper.

13  And we would ask Your Honor to dismiss it.  I'm happy to ask

14  any questions, Your Honor -- or to answer any questions Your

15  Honor may have.  And if you'd like to hear from Ms. Farrier

16  first, that's certainly understandable.

17         THE COURT:  Right.  No, I think at this point, Ms.

18  Farrier?

19         MS. FARRIER:  Yes, I'm here.

20         THE COURT:  Okay, so Ms. Farrier, what you're

21  asking me to do is to order that -- you want me to order

22  that the balances on your mortgage are waived, so that you

23  would -- you know, you would have your home not encumbered

24  by the mortgages.  Is that right?

25         MS. FARRIER:  Your Honor, I think that's the least

Page 120

1   they can do for all of the problems that they caused me and

2   I'm still having.  They actually -- they -- he didn't

3   mention about the default letter that they sent me.  And the

4   Credit Bureau, where they sent false information to the

5   Credit Bureau, which destroyed my perfect credit that I had.

6   Now they want to escape through this Chapter 11.

7           WOMAN 1:  And yes, that is what I'm asking.

8           MS. FARRIER:  And that is what I'm asking.

9           THE COURT:  All right.  Now there are a couple of

10  problems with that, Ms. Farrier.  Most respectfully, one is

11  you've answered that before.  And I most respectfully denied

12  it before.  And the reason I denied it and part of the

13  reason most respectfully that I'll be denying it again is

14  that Ditech doesn't have -- doesn't control, doesn't own the

15  mortgage.

16          MS. FARRIER:  Okay, (indiscernible) --

17          THE COURT:  And so, I can't direct -- excuse me.

18  I'm sorry.  Let me finish.  So I can't direct them to do

19  something when they're not capable of doing it.

20          MS. FARRIER:  Okay, (indiscernible) --

21          THE COURT:  And that's all right.  To the extent

22  that what you're asking for is to assert claims against

23  them, well, what you need to do is you needed to file a

24  proof of claim in the case.  And if you've done that and you

25  can assert the claim, if you haven't done it, you haven't

Page 121

1    done it.

2         So that's where -- that -- at this point, you

3    know, one, I've already ruled on this once, and most

4    respectfully, I've ruled against you.  And second, and

5    that's really what we call the law of the case.

6         And second, they don't -- Ditech doesn't have --

7    doesn't own, doesn't control the mortgage.  Now you wanted

8    to say some things, and please do.

9         MS. FARRIER:  Okay.  Well, who do service the --

10   who do own the mortgage, if Ditech doesn't own it?  When I

11   put my claim in, Ditech did own the mortgage.  Ditech is the

12   one that sent my information to the Credit Bureau.  They

13   (indiscernible) bad information to the Credit Bureau.  And

14   they also sent me this default letter.  Ditech made

15   (indiscernible) --

16        THE COURT:  Okay, but now -- okay, but, and I'm

17   going to hear from Mr. Hill.  If what you're saying is that

18   when Ditech was servicing the mortgage, they did -- they

19   injured you, well then maybe you have a claim that you can

20   assert against Ditech.

21        But the remedy is -- that you can get from this

22   Court as it relates to your request does not include my

23   issuing an order waiving your mortgages.  Right?  Because

24   they don't -- first, they don't have them, but second, you

25   borrowed the money, you had the money and there's no basis

Page 122

1   for waiving the mortgage, no basis that I'd be familiar

2   with.

3           MS. FARRIER:  Okay.  Your Honor --

4           THE COURT:  But let me just hear from Mr. Hill for

5   a second, just so I can make sure that my understanding of

6   the facts is correct.  Mr. Hill?

7           MR. HILL:  Yes, Your Honor.  David Hill on behalf

8   of the Debtors.  Your Honor, your understanding of the facts

9   is entirely correct.  I think to correct a misunderstanding,

10  if Ms. Farrier is asserting that Ditech had the mortgage in

11  2016, that would be correct.

12          Your Honor, as set forth in our papers and as

13  acknowledge by Ms. Farrier in her various motions, her

14  mortgage and loans were transferred to Shellpoint, a new

15  residential in November of 2019 and January of 2020.

16          So to the extent that she is aware in her own

17  pleadings, that those are the entities that now hold her

18  mortgage loans.  So Your Honor's understanding of the facts

19  is entirely correct.

20          MS. FARRIER:  But Your Honor, they never answered,

21  do they receive any money from the servicing company that

22  they transferred it to?  They never told me that they sold

23  it.  They told me they transferred it to a servicing company

24  that, when a servicing company collects money for Ditech.

25          Now do the servicing company own my mortgages now?

Page 123

1   Or is Ditech getting any money from the servicing company?

2   That's where I want answers.

3           THE COURT:  Mr. Hill?  Okay.  Mr. Hill?

4           MR. HILL:  Your Honor, David Hill on behalf of the

5   Debtors.  My understanding is that her mortgages were

6   transferred as part of the sale, the forward transaction

7   process.  Based on our review of the materials that were

8   sent to Ms. Farrier and the circumstances, that her loans

9   were in no way special, that the only compensation received

10   was as approved by this Court under the sale transaction

11   through the plan.

12           THE COURT:  So in other words, Ms. Farrier, what

13   happened is, Ditech got out of the business of servicing the

14   mortgages, at least with respect to mortgage and yours, and

15   other people's mortgages and (indiscernible) of that.  And

16   yeah, they were compensated because under the plan, the

17   bankruptcy plan, they were paid something for that, but

18   they're not getting paid anything now on account of your

19   payments.  Is that correct, Mr. Hill?

20           MR. HILL:  Your Honor, David Hill on behalf of the

21   Debtors.  I would have to defer to one of my bankruptcy

22   colleagues on the specifics, but I am not aware of any

23   ongoing payments.  But again, I think maybe Mr. Singh or one

24   of my bankruptcy colleagues would be better positioned to

25   answer that question on the mechanics of the -- of

Page 124

1    (indiscernible) --

2          MR. SINGH:  Yes.  Your Honor, Sunny Singh.  I'm

3    happy to confirm.  We are no longer, you know, we're not

4    receiving -- Ditech estate is not receiving any funds on

5    account of this mortgage or any other mortgage.

6          THE COURT:  Okay.  So that's kind of -- that's

7    where we are, Ms. Farrier, in that --

8          MS. FARRIER:  So you're not receiving any money?

9    Is that what he said, Your Honor?  I'm sorry.

10          THE COURT:  That's correct.

11          MS. FARRIER:  They're (indiscernible) --

12          THE COURT:  They're not receiving (indiscernible).

13          MS. FARRIER:  Okay, well, you mentioned that they

14    did receive money when they went into this bankruptcy.

15          THE COURT:  Yeah --

16          MS. FARRIER:  So my claim was already in.  So why

17    didn't they give me some consideration then?

18          THE COURT:  Well, if you have a claim on file,

19    then in the fullness of time, the claim will be reviewed.

20    And if there's merit to it, you will, as a creditor in the

21    estate, would have an opportunity to share in the funds that

22    were set aside to pay claims, if you've done that.

23          MS. FARRIER:  Okay.

24          THE COURT:  You cannot -- no, no, no, let me

25    finish now.  And what's hard for me, Ms. Farrier is, I just

Page 125

1    -- let's just focus on this.  Right.  You can't -- your

2    request that you be given leave to have me rule that your

3    mortgages are waived, right, that there's no authority for

4    that, right?

5           And it doesn't matter how much they got paid, all

6    right, or what the circumstances were.  So that's the first

7    thing.  And the second thing, again, most respectfully, is

8    that we've been down this road now once before.  And as I

9    said, I looked at it back the first time.  And for the same

10   reasons that I'm most respectfully telling you that there's

11   no merit to your claim, those are the reasons I found

12   before.

13          So we've done this once before.  That's part of

14   the ruling.  But the other part is, even if we hadn't, and

15   most respectfully, there's no basis for either in under the

16   substantive law or the procedural law, to grant you the --

17   your request that you're making here.

18          MS. FARRIER:  Okay, Your Honor.

19          THE COURT:  And so, for that reason --

20          WOMAN 1:  (indiscernible) --

21          THE COURT:  Go ahead.

22          MS. FARRIER:  Okay, well, what about the attempted

23   theft?  Because what they did, they took over six months.

24   So I --

25          THE COURT:  No, no, no, no, Ms. --

Page 126

1          MS. FARRIER:  I want to -- they --

2          THE COURT:  No --

3          MS. FARRIER:  (indiscernible) --

4          THE COURT:  And excuse me, excuse me, excuse me.

5     (indiscernible) let me be clear --

6          MS. FARRIER:  They (indiscernible) mention to the

7     credibility (indiscernible) default letter --

8          THE COURT:  Yeah, so (indiscernible) --

9          MS. FARRIER:  That's attempted theft.

10         THE COURT:  Okay.  Yeah, okay.  So what I'm going

11    to do, and this is how we're going to end our hearing, all

12    right, what I've told you is that there is no basis in law

13    or in fact for me to order the -- that the mortgages on your

14    property be waived or forgiven or whatever -- however you

15    want to term it, right?  There is no basis.  You're not

16    entitled to the relief.  And most respectfully, I deny it.

17         To the extent that you think that you have been

18    injured, right, you can -- and you have filed a claim in the

19    case, that claim will be resolved in the fullness of time.

20    If you didn't file a claim, well, then you're going to have

21    a problem potentially.  But that's not -- none of that's in

22    front of me right now.

23         All I'm telling you is as you are asking me a

24    series of questions about this is what they did when they

25    were servicing it or not did and did or didn't do, those

Page 127

1    matters are not in front of me.  What is in front of me is

2    the request that you've made, the request for consideration

3    that you've now filed again.  And I most respectfully deny

4    it.

5           And that's how we're going to finish as it relates

6    to your matter, and addresses, I think, all of the matters

7    that are on the calendar this -- today.  And what I ask Mr.

8    Hill is that you will please settle an order denying the

9    request for relief --

10          MS. FARRIER:  But Judge.

11          THE COURT:  -- so that -- excuse me -- so that Ms.

12   Farrier has an opportunity to see it before it gets

13   submitted to me.  All right?  (indiscernible) --

14          MR. HILL:  Your Honor --

15          MS. FARRIER:  I'd just like to ask you something,

16   Your Honor.  Could this judgment be set aside until the

17   Justice Department investigates the attempted theft --?

18          THE COURT:  Yeah, no.  It can't.  So if you're

19   asking me -- excuse me -- you're asking me to --

20          MS. FARRIER:  Yes sir.

21          THE COURT:  -- (indiscernible) off on my -- excuse

22   me.  You're asking me to hold off on my ruling until you're

23   able to get to the Justice Department and ask them to do an

24   investigation.  (indiscernible) --

25          MS. FARRIER:  Yeah, just set aside --

Page 128

```
 1              THE COURT:  Excuse me.

 2              MS. FARRIER:  -- until the Justice Department give

 3    a decision.

 4              THE COURT:  Yeah, no.  Most respectfully, no.  No

 5    --

 6              MR. HILL:  Your Honor --

 7              THE COURT:  Mr. Hill?

 8              MR. HILL:  Your Honor, this is David Hill again on

 9    behalf of the plan administrator.  Your Honor, I would just

10    like to clarify with Your Honor that for -- I think because

11    Mrs. Farrier is a pro se litigant, that when you refer to

12    settling an order with her, it is not that she agrees with

13    Your Honor's decision, but rather that what we will propose

14    accurately reflects what Your Honor has decided today.

15              THE COURT:  Well, yes.  And at the end of the day,

16    I'm the one who signs the order.  It's my order and if I

17    think it needs to be revised, I'll do that.  But yes, your

18    point's well taken.  What I'm asking you to do is to make

19    sure Ms. Farrier has an opportunity to see the proposed

20    order so that if she has an objection, she can voice the

21    objection in writing to the Court.  And then, I will get the

22    proposed order and determine what the terms of the order

23    should be.  But yes, thank you, Mr. Hill, for that

24    clarification.

25              MR. HILL:  Yes, Your Honor.  We will do so.
```

Page 129

```
 1              THE COURT:  (indiscernible).

 2              MR. HILL:  Thank you.

 3              THE COURT:  Thank you.  Mr. Singh, I think that's

 4   the end of our calendar.  Is that correct?

 5              MR. SINGH:  Yes, Your Honor.  Thank you very much.

 6   We appreciate the time.

 7              THE COURT:  Right.  And thank you Mr. Hill or

 8   whoever arranged it, to make sure that everybody was able to

 9   dial in and that Ms. Farrier would be able to get access to

10   the hearing as to -- at the good offices of your firm.  So

11   thank you.  All right, thank you all very much.

12              MR. SINGH:  Thank you, Your Honor.

13              (Whereupon these proceedings were concluded at

14   2:36 PM)

15

16

17

18

19

20

21

22

23

24

25
```

Page 130

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

6   Sonya Ledanski            Digitally signed by Sonya Ledanski Hyde
                              DN: cn=Sonya Ledanski Hyde, o, ou,
                              email=digital@veritext.com, c=US
7   Hyde                      Date: 2020.12.18 15:30:08 -05'00'

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  December 18, 2020

**[& - 26th]**                                                                          Page 1

## &

**&**   10:3 11:6,13
  15:11 19:3 21:7
  25:19 36:11 41:16
  41:20 49:9 62:7
  70:25 91:6

## 0

**08625**   11:23

## 1

**1**   26:6 28:4,20
  34:2,8 45:13,19
  47:2,18,22 49:14
  50:9 57:6,6,16
  64:23 68:3 120:7
  125:20
**1,125**   86:1
**1,700**   80:18
**1.1**   71:17
**1/15/2020**   2:7
**1/19/2020**   5:20
**10**   4:20 21:14
  25:23 90:2
**10/10/2019**   2:5
**10/29/2020**   2:12
  2:19 3:10,18 4:1
  4:10,18,25 5:6,14
  5:20 8:11,21
**100**   35:20 36:3
  65:7 92:10
**10004**   1:14
**10017**   11:9
**10022**   10:22
**101.43**   87:3
**10153**   10:6
**10154**   11:16
**10166**   10:15
**10412**   14:5
**10th**   25:25
**11**   5:1 7:12 17:20
  21:14 99:23
  100:22 111:14
  120:6

**11/14/2019**   2:6
**11/19/202**   4:25
**11/19/2020**   2:12
  2:20 3:10,18 4:1
  4:10,18 5:6,14
  8:11,21
**11222**   13:5
**113**   31:25 46:2
**11501**   130:23
**1195**   100:2
**11:00**   17:22 18:2
**11:33**   1:17
**11th**   20:4 26:13
  26:24
**12**   5:8 74:20
**12/12/2019**   2:7
**122**   13:4
**12th**   27:5,8
**13**   5:16 21:13 22:1
  35:1
**13th**   27:18
**14**   5:22 87:19
**1404-1**   95:3
**14th**   28:12 87:18
**15**   6:1 25:23 45:19
  57:5 87:16,17
**150**   78:23
**1584**   71:16
**15th**   29:3 75:13
**16**   6:5
**160**   78:23
**17**   1:16 6:9 24:12
  95:3
**1747**   8:14
**1764**   7:24
**18**   6:13 130:25
**180**   34:8 37:9
  44:10 52:9 53:5
  53:17,24 54:25
  55:4,10,18 58:22
  58:24 59:12 60:18
  61:22 62:17,25
  64:8

**1831**   8:1
**1833**   8:3
**1854**   99:18
**1877**   8:15
**1893**   8:5
**19**   6:16 14:4 19:22
**19-10412**   1:3
**1905**   8:7 71:4
**1946**   118:2
**1962**   3:6
**1971**   3:14
**1972**   3:22
**1973**   4:5
**1974**   4:14
**19901**   11:4
**1993**   46:12
**1996**   100:7

## 2

**2**   2:14 34:4,11
  35:15,16 36:23
  38:3 40:18 43:6
  44:11 45:3 46:4
  46:21 47:1,18,21
  48:3 49:13 52:15
  53:7 55:1 56:13
  57:5 59:3 60:5
  61:25 64:9 98:2
**2,600**   79:22
**2.3**   51:21
**2.7**   39:2 51:21
**2/13/2020**   2:8
**2/25/2020**   8:8,17
**20**   6:20 20:1
**20,000**   81:6
**200**   10:14 59:16
**2004**   83:9
**20041**   9:4
**2005**   83:9
**2012**   72:10
**2013**   117:10
**2014**   72:12 73:11
**2015**   117:11

**2016**   87:18 117:14
  122:11
**20168**   29:11
**2017**   72:13 73:11
  87:19 117:15
**2018**   46:14 85:22
  85:23
**2019**   44:9 73:13
  122:15
**2020**   1:16 2:8 3:8
  118:3,11,13
  122:15 130:25
**20292**   71:16
**203,021.19**   87:3
**20880**   20:2,15
**20th**   44:9
**21**   7:1
**210-211**   100:2
**2141**   4:22
**2154**   8:16
**2186**   2:15
**22**   78:6 95:3
**220**   86:2
**220,000**   53:21,22
**23**   7:8 25:24
**2314**   2:16
**2315**   2:17
**2316**   5:3
**2320**   5:11
**2337**   118:7
**2344**   4:6
**2361**   85:22
**23rd**   43:20 118:13
**24**   7:11 21:19
**2459**   118:4
**24th**   21:21
**25**   11:22 70:20
  71:1
**2544**   5:18
**26**   8:13
**2688**   20:4
**26th**   75:9

**[27 - accomplished]** Page 2

| | | | |
|---|---|---|---|
| **27** 9:1 91:2,7,10 | **3075** 27:24 | **500** 80:20,20 | 4:24 5:5,13 8:10 |
| **2797** 9:12 116:18 | **3083** 71:10 | **500,000** 88:12 | 8:20 |
| **28** 9:8 91:7,13 | **3099** 48:21 | **57** 2:1 | **8/28/2019** 2:6 |
| **2874** 7:20 | **30th** 44:8 | **58th** 20:2,14 | **8/7/2019** 2:5 |
| **28th** 17:12 18:2,2 | **31** 85:22 | **593** 99:23 | **815** 12:17 |
| **29** 116:8 | **32nd** 70:18 71:2 | | **82** 95:3 |
| **2950** 5:25 | **330** 130:21 | **6** | **86** 78:6 |
| **2952** 6:7 | **334** 79:24 | **6** 3:8,12,16 74:20 | **873** 100:1 |
| **2953** 6:11 | **33rd** 23:1 | **6/11/2019** 2:4 | **9** |
| **2959** 6:3 | **345** 11:15 | **6/17/2020** 2:10,18 | |
| **2970** 2:23 19:6 | **34th** 11:8 23:13 | 3:24 4:8,16 5:4,12 | **9** 4:12 43:8 |
| **2971** 3:2 19:20 | **350,000** 81:12 | 8:9,19 | **9/11** 78:9 |
| **2972** 9:6 | **35th** 24:4 | **6/20/2019** 2:4 | **9/24/2020** 2:11,19 |
| **2973** 6:14 | **363** 73:25 92:9 | **6/5/2019** 2:3 | 3:9,17,25 4:9,17 |
| **2974** 6:18 26:19 | 96:4,19 97:3 | **60** 55:24 | 4:24 5:5,13,19 |
| **2975** 6:22 | **36b30** 91:22 | **600,000** 75:25 | 8:10,20 |
| **2976** 7:3 | **36th** 24:13 25:5 | 83:5 | **90** 43:9 44:6,25 |
| **2977** 7:6 | **385** 86:2 | **601** 99:23 | 47:16 53:9,12,17 |
| **2978** 7:9 | **3q** 13:4 | **615** 12:10 | 54:21,22 55:5 |
| **2:36** 129:14 | **4** | **63188** 12:18 | 88:13 |
| **3** | **4** 3:1 | **65th** 19:5,6 | **9019** 45:7 |
| | **4.2** 75:25 77:20 | **66th** 19:19,20 | **919** 10:21 |
| **3** 2:22 | 83:5 | **7** | **99** 93:24 106:17 |
| **3/14/2019** 2:2 | **4/11/2019** 2:2 | | 108:14 112:9 |
| **3/3** 2:8 | **4/22/2020** 2:9 3:7 | **7** 3:8,20 | 114:7 |
| **3/31/2020** 8:17 | 3:15,23 4:7,15 8:8 | **7/23/2020** 2:10,18 | **a** |
| **30** 44:24 47:16 | 8:18 | 3:8,16,24 4:8,16 | |
| 60:18,23 61:3,21 | **40,000** 66:6 | 4:23 5:4,12,19 8:9 | **a.m.** 17:20 |
| 61:25 62:17 63:11 | **44113** 12:11 | 8:19 | **ability** 52:8 |
| 63:16 64:3,7 | **45** 55:7 | **7023** 97:16 106:16 | **able** 42:23,24 |
| **30,000** 81:6 | **46204** 12:4 | 109:7,11,16 | 47:13 50:15 59:1 |
| **300** 80:20 130:22 | **5** | 114:13 | 74:19 79:23,25 |
| **300,000** 81:11 | | **7028** 11:3 | 87:24 127:23 |
| 82:9 | **5** 21:12,25 | **73** 100:7 | 129:8,9 |
| **3011** 43:21,22 | **5/14/2019** 2:3 | **738** 100:7 | **absolutely** 59:8 |
| 51:17 | **5/20/2020** 2:9,18 | **744-45** 100:7 | **abundance** 54:23 |
| **302** 12:3 | 3:7,15,23 4:7,15 | **767** 10:5 | **abuse** 80:18 81:25 |
| **3037** 9:9 | 4:23 8:18 | **77.63.** 79:4 | **abused** 81:13 82:8 |
| **3042** 118:14 | **50** 35:21,24 36:4 | **780** 11:8 | 90:6 |
| **3045** 42:1 | 52:6 53:22 65:7 | **8** | **abusive** 87:22 |
| **3062** 42:1 | 65:18 66:14,18,21 | | **accept** 88:17 |
| **3063** 42:1 | 67:6,16,20 68:6 | **8** 4:3 11:3 25:24 | **access** 129:9 |
| **3070** 71:6 | 68:16 | 43:8 | **accomplished** |
| | | **8/27/2020** 2:11,19 | 48:1 |
| | | 3:9,17,25 4:9,17 | |

| | | | |
|---|---|---|---|
| **account** 39:25 80:18 123:18 124:5 | **additional** 21:20 45:4,22 95:12 96:8 112:9 | 19:11 20:4,8 30:25 31:24 32:19 33:13,16,21 36:5 | **afib** 81:14 **afraid** 89:17 **afternoon** 70:24 |
| **accounts** 39:19,22 39:23 | **address** 14:16,19 14:22 16:15,20 | 36:18 37:1 39:17 42:8,12,20,23 | 86:12 116:12 **agencies** 32:18 |
| **accumulate** 82:7 | 18:9 36:16 45:2 | 43:3,9 44:14,15 | **agenda** 14:5,12 |
| **accumulated** 80:17 | 52:23 53:8 55:9 57:12 64:14,18 | 44:18,19,22,25 45:3,18,22 47:5 | 19:5,19 21:11,12 22:1 23:2 24:12 |
| **accurate** 114:23 130:4 | 65:3 93:5 100:13 104:16,20 105:23 | 48:11,25 50:4,8 50:17 51:11,16 | 25:24 26:13 31:10 31:16 71:2 75:9 |
| **accurately** 128:14 | **addressed** 70:5 99:5 | 53:2,9 54:1,6,22 55:15 56:3,11,25 | 91:2 **agent** 79:9 |
| **acknowledge** 122:13 | **addresses** 50:15 53:11 69:25 127:6 | 58:5,13 60:24 63:9,23 65:1,6,20 | **aggregate** 71:17 75:25 |
| **acknowledges** 44:13 | **addressing** 68:23 77:15 | 66:4,10 68:1,4,8 68:15 71:1,5 | **agree** 15:25 41:4 47:10 99:7 |
| **acknowledging** 46:24 | **adjourn** 18:2 23:3 115:17 | 73:23 74:14 75:12 77:19 83:14 88:14 | **agreeable** 50:3 **agreed** 18:1 21:16 |
| **acre** 78:17 | **adjourned** 21:13 | 88:23,25 89:5 | 23:3 |
| **acres** 78:17 | 23:22,22 26:22 | 111:13 118:8 | **agreement** 77:8 |
| **act** 87:7,22 88:3 100:12 113:10,20 | 35:9 | 128:9 | 85:3 86:9 101:8,9 |
| **acted** 72:18 76:9 | **adjournment** 23:4 23:16,18 24:6 | **administrators'** 65:14 | **agreements** 15:19 101:7 |
| 76:25 83:17 87:10 | 26:18 27:24 28:6 | **administrator's** 16:3,7 21:3 31:1,4 | **agrees** 128:12 |
| **acting** 77:11 87:25 | 29:13 30:14 | 31:23 32:21,24 | **ahead** 31:20 44:4 |
| **action** 9:2 76:2,15 | **adjudicate** 94:1 **adjudicated** | 33:3 35:17 38:1 41:7 42:17 58:9 | 45:15 58:19 62:11 83:24 105:25 |
| 91:12,19 92:3,19 93:22,22 105:12 | 108:18 | 60:21 61:14 62:14 | 125:21 |
| 106:11,17 108:12 | **administer** 65:10 65:22 | 64:11 70:18 75:2 | **aid** 7:11 14:19 |
| 115:5,6 117:18,19 117:20,24 | **administered** 42:8 81:22 | 75:13,22 **admit** 102:3 | 31:1 **air** 62:3 |
| **actions** 72:15,19 | **administering** | **admitted** 98:1 | **akin** 93:11 |
| 86:5 117:12 | 50:6 | **admitting** 98:5 | **alarm** 57:19 |
| **activity** 18:9 | **administration** | **adopted** 99:24 | **alicia** 41:23 |
| **actual** 55:8 73:12 | 111:10 | **ads** 81:10 | **alison** 12:13 49:19 |
| **ad** 64:1 | **administrative** | **advance** 47:22 | 64:22 |
| **add** 25:7 65:19 | 15:18 71:18 73:20 | **advanced** 93:8 | **allegation** 77:10 |
| 76:16 82:19 84:24 | 74:22,24 77:18 | **advise** 81:20 | **allegations** 33:5 |
| 86:6,10 94:22 | **administrator** | **advisors** 33:16 | 71:22 |
| 95:20 | 7:11,14 11:21 | **affiliated** 7:13 | **allege** 76:3 |
| **addition** 29:9 64:5 | 15:13,21 16:15 | **affirmative** 66:18 | **alleged** 15:19 93:2 |
| 74:18 76:18 94:25 | 18:16,24 19:4,9 | | **alleges** 76:25 |
| | | | 117:13,19 |

alleviate 52:3
allocable 40:6
allow 6:10 24:21
24:22,24 43:9
86:18
allowability 97:4
104:5
allowance 108:24
allowed 25:1,3,4
76:22 87:4 104:2
109:3 114:12,12
allowing 24:24
allows 84:23 98:7
alter 107:13
alternative 96:3
altogether 53:5
ambiguity 104:13
111:22
ambiguous 110:5
amended 2:23
6:21 7:12 23:17
27:6 83:10 91:25
92:1,4,5,7
america 2:17
10:13 15:11 16:25
american 100:1
amount 24:25
25:1,4 28:15
53:19 54:8 58:14
58:15 59:2 62:22
66:6,11,12 85:24
85:25 87:4 94:22
97:3
amounts 25:2
84:24,25
analogous 100:13
analysis 92:7
102:20,21,24
103:16
andrews 10:12
16:24
angeles 62:8

angeline 10:10
70:20,24
annual 85:21
answer 37:5 40:8
40:21 57:2 61:4
119:14 123:25
answered 120:11
122:20
answers 123:2
anticipate 46:17
anybody 56:1
69:19 70:11
apartment 13:4
apologize 14:3
24:23 29:18 94:7
103:4
apparently 51:21
51:23
appeals 72:19
73:12 99:19
appear 54:4 71:9
appearance 71:10
appeared 75:17
appearing 49:20
71:11
appears 22:2
87:17 118:18
applicable 40:17
50:11 51:12 56:19
89:3
application 74:20
applications
41:24
applied 38:20
applies 66:20
113:12
apply 109:11
113:10 115:1
applying 109:15
appointed 110:24
111:3,4,11
appraisal 86:1

appraisals 80:22
appraised 80:21
appraiser 80:19
81:15 90:8
appreciate 59:24
80:24 129:6
appreciating
82:14
appreciative
42:13
approach 62:13
62:17 100:14
approachable
52:1
approaching 18:1
appropriate 22:4
22:21 37:23 40:5
41:11 57:4 58:8
58:16 60:17 65:25
67:4,7,19 76:15
approval 33:21
approved 123:10
approving 101:4
approximately
31:25
arbitrary 88:18
archer 12:13
49:19,19,23 51:2
64:20,21,22 68:7
aren't 86:21
argue 87:13 88:18
111:16
argued 86:12
94:23
argues 76:18
arguing 86:22
argument 72:23
85:10 88:8 95:12
96:11 103:25
104:11,15 106:9
106:22 107:6
111:18 113:1

arguments 76:7
83:15 88:5 93:5
95:1 96:8 104:3,3
arisen 87:3
arises 84:10
arising 97:23
arranged 129:8
arrangements
116:22
arrears 78:16
articulately 52:17
ascertained 7:15
ascribed 32:1
aside 124:22
127:16,25
asked 21:14,16
78:13 88:9 89:8
asking 44:10
45:22 54:22,22
68:25 105:17
119:21 120:7,8,22
126:23 127:19,19
127:22 128:18
aspect 70:5 85:10
88:7
assert 38:17 84:21
87:9 120:22,25
121:20
asserted 73:19
74:9 77:21 85:9
98:13 103:22,22
asserting 46:10
71:16 74:16 75:24
83:6 122:10
assertion 83:21
assessing 85:6
assigned 77:6
associated 68:16
assume 39:8
100:11 105:8
107:3
assumed 102:19

**assumes** 114:8

**assuming** 66:25
83:1 88:4 103:16

**assumption** 103:9
103:13,18

**assumptions** 38:6
102:14,17 104:4

**assure** 54:6 80:25

**attempt** 95:13,18
95:21

**attempted** 73:2
125:22 126:9
127:17

**attempting**
112:23

**attorney** 11:20
12:1,8 49:20
72:18 80:15 90:4

**attorneys** 10:4,13
10:20 11:7,14,21
12:2,9 13:2

**august** 117:15

**authority** 38:21
38:23 49:11 69:17
89:21 106:20
125:3

**authorize** 68:3

**authorizes** 86:4

**authorizing** 7:14
68:23

**auto** 106:25

**automatically**
97:14

**available** 16:1
92:8

**avenue** 10:5,14,21
11:8,15 12:10

**avoid** 57:9 73:3

**aware** 71:9,12
122:16 123:22

**b**

**b** 1:21 74:20
91:24

**back** 17:6 29:24
33:10,12,23 34:18
39:13 40:22 45:6
47:11 56:7 66:16
78:7 80:9 99:18
125:9

**background**
117:9

**bad** 121:13

**balance** 76:17,21
76:23 77:5 78:15
78:20 80:2 84:25
85:15 86:6,10,12
87:2

**balances** 118:19
119:22

**ball** 46:21

**bank** 72:16

**bankruptcy** 1:1
1:12,23 37:23,25
38:20 46:13 50:11
72:21 97:8,10,12
97:13,14 115:8
117:15,20,21,22
123:17,21,24
124:14

**barred** 71:20
74:14 118:24

**bars** 84:11

**based** 15:23 20:21
35:8,9 45:24
48:12,23 49:13
52:11,12 54:3
55:13 72:23 74:11
75:1 84:10 85:2,6
88:24 89:2,21
99:15,17 102:6
104:3 107:22
112:16 123:7

**basic** 50:5 117:9

**basically** 16:4
47:17 52:6,16
54:21 74:12

**basis** 3:2 5:17 6:3
7:23 8:14 19:8,22
48:14,15 63:25
72:3 73:5,21 75:1
76:2,2 77:12,16
83:10 89:23
103:23 104:6
108:2 117:12
121:25 122:1
125:15 126:12,15

**bear** 40:25

**beginning** 47:18
105:15

**behalf** 9:3 19:3
30:24 48:10 49:6
49:20 53:1 64:22
65:13 69:12 70:25
72:16 75:12 76:17
83:18 106:13
107:24 115:4
116:13 122:7
123:4,20 128:9

**believe** 17:11
20:13 21:2 33:1
43:19 44:23 45:9
45:10 47:4,4
48:20 50:10 64:25
67:25 71:11,19
73:5,7 76:1 77:11
81:20 87:9,23
88:15 89:23 98:15
104:6 108:3 109:6
114:5 116:20
119:11

**believed** 72:3

**believes** 20:5
33:13 73:23

**bells** 57:19

**basic** 50:5 117:9

**beneficial** 72:17

**beneficiary**
107:25

**benefit** 34:16

**best** 57:19 59:3
88:16 109:15

**beth** 11:11 25:18

**better** 47:12 82:3
86:14 96:23,24
106:6,7 123:24

**big** 90:7

**bit** 34:10 78:11
95:20 115:16
116:20 117:8

**black's** 93:20
101:19

**block** 10:19 21:7

**bluntly** 43:2

**board** 27:21

**book** 78:22

**books** 107:8,12
109:4

**borne** 72:5

**borrowed** 121:25

**borrower** 7:14,17
7:19 31:2 32:5
37:11,16 42:3
43:7 44:21 46:11
77:24 85:25 91:24
92:25 93:1 98:18
98:20,20

**borrowers** 7:15
7:16,19 32:25
33:9,13,23 34:18
36:8 37:1 38:3
40:22 43:11 44:20
52:6 53:10 56:5
57:20 58:6 59:1
62:21 63:21 65:2
65:8 68:2 92:14
92:22 93:25
106:17 108:17
114:2 115:11

**bothered** 55:7
**bottom** 69:5
**bowling** 1:13
**brian** 9:2
**brief** 92:7 113:7
**briefly** 75:17,21
**briefs** 92:4
**bring** 30:25 67:13
68:9
**bringing** 32:13
47:6 67:20
**brings** 30:17
116:7,7 118:15
**brooklyn** 13:5
**brought** 118:21
**browder** 8:4
**bucket** 109:1
**budget** 90:6
**build** 59:9
**burden** 38:9
50:23 65:15 67:8
**bureau** 82:4 86:15
120:4,5 121:12,13
**business** 32:7 81:8
82:4 86:14 92:23
106:22 107:2,4
112:8 123:13
**buyers** 50:15

**c**

**c** 10:1 14:1 130:1
130:1
**calculations** 88:19
**calculators** 78:7
**calendar** 18:7
21:25 116:8 127:7
129:4
**california** 73:1
**call** 15:25 58:1
64:4 69:16 70:14
79:8 121:5
**called** 37:7 79:17
80:6 110:4

**calling** 90:22
**calls** 56:15 80:3
87:18
**candidates** 109:15
**can't** 59:9 63:4,8
79:15 80:16 90:5
93:24 108:14
120:17,18 125:1
127:18
**capable** 120:19
**capital** 91:24
**car** 80:5,8 92:25
97:23 98:7,22,22
101:12,17,25
108:17 112:6,7,8
113:13 114:4
**cardinal** 93:14
**cards** 81:19
**carrollton** 26:17
**cart** 40:8 66:23
**carve** 40:12,14
**case** 1:3 2:1 14:4
18:7 34:21 80:16
93:10 99:22 100:1
100:6,16,22,22
102:15 105:16
109:6 110:8
111:25 112:4,5
114:9 116:19
119:10 120:24
121:5 126:19
**cases** 21:16 39:20
54:4 71:15 72:21
74:11 93:12
109:10,14 111:12
111:14
**cash** 9:6 33:11
34:9 58:6
**cashed** 32:4
**cashflow** 79:12
**casual** 59:6
**cause** 76:2 104:1
104:2

**caused** 120:1
**caution** 54:23
**cease** 7:18
**cede** 21:3 30:19
75:8
**ceded** 25:15
**center** 51:20
**cents** 34:14 66:3
92:10
**certain** 15:19
39:23 76:19 77:6
96:5
**certainly** 60:3
76:3 77:17 90:20
96:11 108:8 110:9
119:16
**certification** 97:5
97:9,10,13,14
109:8,13,18
114:10,12 115:7
**certified** 97:15
105:15 106:12,15
109:5 130:3
**certify** 97:16
**cetera** 32:5 33:6
34:22 35:24 80:13
80:13
**challenging** 60:3
**chambers** 116:23
**chance** 15:15
17:25
**changes** 36:6
**chapter** 7:12
100:22 111:14
120:6
**charge** 35:18
**charged** 80:18
**charges** 85:23
86:2
**chart** 35:22 66:20
**check** 60:13 66:11
66:13,13 69:1
82:10 89:15

**checked** 22:1 82:3
**checks** 32:4 34:9
39:20 53:22,22
58:15 66:3,6
82:10
**choice** 100:12
**choose** 70:15
**chose** 35:3
**chris** 116:21
**circuit** 46:18
99:24 100:2,6
**circuitous** 108:1
**circumstances**
123:8 125:6
**citation** 114:22
**cite** 101:20
**cited** 99:13 100:5
101:2,19 109:7
**citi** 99:2 102:5
**citing** 100:16
**civil** 74:21
**claim** 2:15,23 3:2
3:5,13,21 4:4,13
4:21 5:2,9,17,23
6:2,6,10,14,17,21
7:2,6,9,23 8:14
9:2,4,5,9 18:18
19:6,8,12 20:1,3,5
20:15 21:13 22:25
24:4,6,13 26:18
26:22 28:20 29:8
29:10,14 30:3,4
48:13,14,17,19
49:12 71:3,16,16
73:9,21 74:19,19
74:22 75:1,3,3
76:8 77:13,15,17
77:18 83:5,15
85:7,8,9,22 87:4
87:10 88:6 91:11
91:12,14,15 92:3
92:3,19,20 93:23
94:21,21 95:16,18

95:19,23,23,24,25
96:5,19,19,21,22
97:4,7,8,15,15,22
97:23,23 98:1,6,6
98:11,11,16,16,18
102:6,7,8,19,21
103:2,2,16,17,21
103:23 104:1,8,9
104:10,23 105:12
105:13,16,16,19
105:20 106:3,9,12
108:12,13,24
109:4 110:15
114:11,14 115:3,6
115:6 119:9
120:24,25 121:11
121:19 124:16,18
124:19 125:11
126:18,19,20
**claimant** 13:10
21:17 23:19 76:10
76:17,18,21,25
84:23 88:20 98:21
**claimants** 15:18
21:19 22:2,14
23:5,17 91:19
96:7 106:14,17
**claimant's** 24:6
77:22
**claims** 2:15,23 3:2
3:4,6,12,14,20,22
4:3,5,12,14,20,22
5:1,3,8,11,16,18
5:22,24 6:1,3,5,7
6:9,11,14,17,22
7:2,6,9,22,23 8:13
8:14 10:20 11:2
15:10,17,18 18:13
19:7,22,23,24
20:1,9 21:7,14,15
21:20,24 22:10,20
23:7,13,23 24:7
24:15,20,22,22

25:4,24 26:1,2,6
26:14,15,23 27:5
27:7,11,19,19,23
28:3,5,13,14,14
28:19 29:3,4
30:18 32:16 65:6
65:7 68:16 71:7
71:15,19,24 72:3
72:5,22 73:6,7,16
73:20,22,23,24
74:1,4,9,16,17,23
75:14,24 76:1,3
77:21,22,24 83:5
83:6,8,8,9,10,11
83:12,12 88:10,11
89:4,6,6 90:15,15
91:22 92:9,11,23
92:23 98:12,13,13
104:5 106:21
108:12,15 112:16
113:17,17,18,21
113:21,22 114:7
119:6 120:22
124:22
**clarification**
96:10 128:24
**clarify** 96:16
128:10
**clarity** 96:24
**class** 9:2 91:12,19
92:3,19 93:22,22
93:25 95:19,25
96:4,7,24 97:5,8,9
97:15,16,21,22
98:7,11,12 102:19
103:2,16,21,23
104:9 105:12,15
106:12,16 108:7
108:12 109:5
113:19,25 114:10
114:12 115:5,6
**classes** 108:9
109:9 112:10

**classification**
28:15
**classified** 104:2
105:19
**classify** 6:10 9:1,8
24:21,24 91:11,14
96:19,21,24
105:12
**clear** 21:22 32:23
35:14 76:11 83:4
88:12 93:7 95:25
98:4 106:19 126:5
**clearly** 92:20
107:15,18
**cleveland** 12:11
**client** 65:5 105:8
111:7,8
**clients** 47:4
**cliff** 10:9 18:22
19:3
**climb** 46:9
**close** 59:12 86:17
**clough** 41:23
**code** 37:24 38:20
**cohen** 41:23 62:5
62:7,7,12 64:13
64:15,17 68:19,21
68:25
**cold** 52:7
**collaborative**
59:23 62:17 63:19
**collateral** 74:15
**colleague** 18:22
30:13 70:20 75:9
105:12
**colleagues** 41:23
68:19,22 123:22
123:24
**collect** 77:11
87:17 88:1 107:22
112:23
**collected** 113:8

**collecting** 107:24
**collection** 87:22
87:23 88:2 90:2
107:9
**collector** 87:25
**collects** 122:24
**combine** 66:15
**come** 16:10 17:6
29:15 32:14 37:9
40:5 48:2 61:4
62:3 64:9 67:9
109:2
**comes** 46:15
97:18 111:17
**comfortable** 46:1
**coming** 50:19
59:15 60:6 61:18
81:2 88:25
**commence** 61:1
**commenced** 73:12
**commencement**
74:11 92:15
**comment** 69:13
**comments** 31:18
52:24
**commerce** 12:9
49:21
**commercial**
116:14
**commission** 81:24
**committee** 32:16
**common** 99:16
101:18
**commonwealth**
13:2 69:12
**company** 82:2,6
100:3 122:21,23
122:24,25 123:1
**compensated**
123:16
**compensation**
123:9

**complaining**
34:19
**complaint** 117:16
**complete** 43:3
60:18
**completely** 36:20
46:16
**completes** 25:13
**completion** 61:22
**complex** 33:8
40:10
**complicated**
44:13 68:11
**complied** 50:12
**comply** 50:11,18
56:21
**complying** 51:12
**comports** 93:20
**comprises** 98:12
**computer's** 91:9
**concern** 69:25
**concerning** 51:18
**concerns** 52:4
**concessions** 42:14
**conclude** 29:20
111:25
**concluded** 129:13
**conclusion** 45:19
46:1,16 47:22
61:5 64:8 89:1
103:9
**conclusions**
102:17,17
**concrete** 60:6
**concurrently**
45:12
**confer** 16:11
61:24,24 62:1
64:7
**conference** 2:1
14:15 15:9,14
18:7 58:11 59:14
60:19 61:17,19

62:2 63:3,16 69:3
**conferred** 15:24
**confidential** 61:13
63:25
**confirm** 117:1
124:3
**confirmation** 92:4
92:6 102:15,23,25
103:2,15,20,24
104:4 107:3 118:1
**confirmed** 44:8
92:1
**confirming** 95:8
**confirms** 113:11
**conflict** 95:6,11
**confusing** 109:6
**congress** 87:21
**connecticut** 27:22
**connection** 44:11
74:7 76:20
**connie** 9:3
**conrad** 37:21
**consent** 48:18,23
48:23 83:17
**consented** 83:22
**consider** 36:5
45:21,22
**consideration**
9:11 33:15 116:17
118:6,8,18 124:17
127:2
**considered** 32:21
71:23 88:15 90:13
**considering** 42:17
**consistent** 17:2
32:25 35:21,23
40:22 68:25
101:18
**consistently** 92:2
92:19
**consisting** 86:1
**consolidated**
91:21 92:16

**constituents**
32:12 41:2
**constitute** 42:4
**constituted** 15:19
**constrictive** 39:9
**construction**
93:14 99:19,25
100:18 101:14
**constructive**
15:24 33:5 38:10
38:16,17 39:11
**construe** 105:2
**construed** 104:14
104:24 111:6
**consult** 34:24
**consultation**
32:12,15
**consulting** 50:22
**consumer** 3:4,6
3:12,14,20,22 4:3
4:5,12,14,20,22
5:1,3,8,10,16,18
5:22,24 6:1,3,5,7
6:9,11 7:23 8:14
9:4,5 10:20 11:2
18:13,25 21:4,7
21:15 22:25 23:13
24:4,13,20 32:16
34:22 64:1 71:5
73:24 74:1 91:12
91:13 92:3,9,10
92:20 93:6,9,23
94:20 95:18,22
98:1,12,13,16,18
102:8 104:9,23
108:15,18 111:7
112:7,18 113:2,17
113:18,20
**consumers** 87:22
91:19 93:1 108:6
114:1,1,2 115:10
115:11

**consuming** 44:16
**contact** 33:23
**contained** 110:23
**contend** 86:11,16
**contention** 83:21
84:18
**contest** 71:25
**contested** 14:18
30:19 31:14,16
70:5 105:3
**context** 99:16
100:20,21 101:13
104:7
**continue** 35:11
57:3 59:19
**continued** 2:2,2,3
2:3,4,4,5,5,6,6,7,7
2:8,8,9,9,10,10,11
2:12,12 3:7,15,23
4:15,23 5:4,12,19
8:8,8,17
**continues** 82:6
**continuing** 18:12
**contract** 93:8,11
93:13,17 99:7,8
99:14 100:8
102:11 110:2
115:10
**contracts** 15:20
93:15,17 99:20,25
100:19 108:4
**control** 90:6 93:16
120:14 121:7
**controlling** 95:2
98:9 112:24
**controls** 95:5
**convenience**
111:11
**conversation** 17:3
**conversations**
35:3 51:25 79:15
**cooperatively**
42:12 47:25

coordinate 18:13
coproration 1:7
corollary 111:22
corporation 7:13
14:4
correct 20:18
48:11 69:18 85:19
89:19 104:20
106:10 111:5
122:6,9,9,11,19
123:19 124:10
129:4
cost 40:24
costs 35:18 76:19
76:22
couldn't 32:5
63:22 65:9
counsel 15:11,24
16:20,24 17:2,8
17:18 18:25 25:16
30:5 41:20 43:14
43:16 51:25 52:14
74:8,18
counter 93:6
counterparts
49:23
country 90:7
130:21
couple 18:16
35:13 41:25 42:21
113:7 120:9
course 14:24
16:19 17:5 30:2
31:8,16,18 32:3
61:13 69:19,22
71:23 75:22 97:4
112:20 115:21
court 1:1,12 14:2
14:10,25 15:3
16:1,20,21 17:6
17:14,18,22,24
18:5,11,19 19:1
19:11,14 20:9,9

20:11,16,19 21:1
21:5,8 22:7,11,18
22:24 23:8,24
24:9,16 25:6,9,17
25:21 26:5,7,23
26:25 27:10,13
28:3,7,19,22
29:16,17,21,25
30:9,16,21 31:4
31:18,20 32:13
39:15 40:9 41:12
41:18 43:14,16,24
44:1,4 45:4,15
46:13,23 47:23
48:6 49:2,7,10,16
49:22 51:1,3,8
52:13,19,25 54:9
54:17,20 58:10,18
58:21 59:9 60:19
61:8 62:4,6,11,15
62:16 63:8,22
64:13,16,19 65:23
67:10,13,14,22
69:10,16,24 70:3
70:8,12,23 71:12
72:25 74:5 75:7
75:10 78:2 80:24
82:17,21 83:3
84:1,4 85:10
89:19 90:11,17,21
90:24 91:4,7,8
93:10 94:4,8,14
94:17 96:14,25
97:9 99:18 100:8
103:4,8 104:11,18
105:4,7,18,21,24
106:4,7,11,16
107:17 108:19,21
108:25 109:12
110:4,11,16,20
111:1,6,20 113:4
114:16 115:8,15
115:21 116:1,5,11

116:15,24 117:5,8
117:20 118:12,22
118:22 119:17,20
120:9,17,21
121:16,22 122:4
123:3,10,12 124:6
124:10,12,15,18
124:24 125:19,21
125:25 126:2,4,8
126:10 127:11,18
127:21 128:1,4,7
128:15,21 129:1,3
129:7
courtroom 22:3,3
courts 74:13
93:16 102:10
court's 54:24
118:25
create 54:14
97:14
created 76:12
creates 84:7
creating 92:24
credibility 126:7
credit 120:4,5,5
121:12,13
creditor 3:6,14,22
4:5,14,22 5:3,10
5:18,24 6:3,7,11
7:23 8:14 9:4,5
73:24 74:2 91:12
92:3,9,10,20
93:23 98:12,13,18
102:8 104:9
108:15,18 124:20
creditors 16:21
39:5 88:17
crockett 12:6 49:5
49:6,8
cromwell 99:23
cross 9:8 89:11,13
91:14 94:3 96:21
96:25 98:3

cumulatively
65:19
current 92:15
currently 48:4
51:23
cushion 53:13
customer 79:9
82:7
cynthia 8:2

**d**

d 14:1
damage 88:19
damages 88:19
darryl 8:4
dashboard 22:2
data 54:11
database 44:17
53:15 55:12
date 17:8,9,10,16
23:3,23 56:13,24
58:14 69:3 92:15
107:5 115:17
130:25
dated 21:21
david 116:9,12
122:7 123:4,20
128:8
day 37:9 38:8
40:3,24 53:5,13
55:4,10,18 56:5
60:18 61:25 62:25
64:8 78:6 79:8
128:15
days 34:8 43:9
44:6,10,24,25
45:19 47:16 52:9
53:10,17,24 54:21
54:23,25 55:5,24
57:6,16 58:22,24
59:12,16 60:18,23
61:3,22,22 62:17
62:18 63:11,16
64:3,7 88:13

de   11:4,14 66:6
  106:15 109:18
deadline   7:18
  43:5 47:17 48:2
deadlines   49:10
deal   38:3 53:20
  106:20 108:14
  112:11
dealing   63:5
  78:11 110:5 112:4
  118:16
deals   114:22,23
dealt   20:17
debate   109:24
  112:7
debt   77:11 87:17
  87:21,25 88:1,2
  112:3,20,23
debtor   1:9 48:18
  48:20 50:10,13,17
  74:25 76:6 95:9
  95:10 98:25
  103:24,25 104:15
  104:24 111:14,17
  116:13
debtors   7:13 10:4
  46:5 48:1 76:4
  91:22,23 92:17,18
  93:2 102:15
  103:15 106:23
  110:23,24 122:8
  123:5,21
debtor's   39:21
  42:4 52:14 101:5
debts   91:20
decades   50:6
december   1:16
  85:21 130:25
decertification
  109:19
decertify   97:11
decide   38:23

decided   79:20
  128:14
decision   17:7
  37:21 46:13 128:3
  128:13
decisions   46:12
deed   72:17 84:5,5
  84:11,15,22 85:3
  86:4,9 87:4
deemed   93:22
  114:11,12
default   54:24
  72:11 86:2 120:3
  121:14 126:7
defaulted   80:11
defeat   68:11
defense   108:3
defer   34:16 48:17
  48:19 123:21
deferral   76:10
  78:14 79:14 82:23
  83:16,19,22 84:6
  84:8,12,17,19
  85:2
deferred   33:25
  83:18
define   99:6
  101:21
defined   62:9
  98:17 99:16 101:2
  101:11
defines   98:8
definitely   95:17
definition   91:24
  91:25 92:13,13,14
  92:18 93:21 98:14
  98:19,20 99:4
  102:8 109:22
  112:13 113:8
  114:3
definitions   101:4
  112:24

delaware   41:21
delay   37:10
deleted   96:18
deliver   68:15
demand   38:7
demanded   37:16
demanding   36:14
demands   38:6
demonstrate
  85:14,18,18 87:24
demonstrated
  74:14 84:20,21
  85:7,11
denied   94:3
  118:14,23 120:11
  120:12
deny   68:17 106:16
  126:16 127:3
denying   120:13
  127:8
department   12:9
  49:21 127:17,23
  128:2
depend   34:4
dependent   112:13
  112:19
depending   16:17
  95:4 97:18
described   85:24
deserve   31:7
designated   110:22
designed   36:6
destroyed   120:5
detail   29:15
detailed   42:5 72:9
determination
  73:25
determine   88:21
  98:10 99:9 100:10
  102:11 104:4
  128:22
determined   23:3
  23:23 25:1 42:18

88:23
develop   44:11,19
developed   34:10
dial   116:22 129:9
dialing   30:1
  115:21
dictate   104:8
dictionary   93:20
  101:20
dictionary.com
  101:21
didn't   17:8 21:23
  40:16 41:3 53:16
  82:10 85:1 110:8
  111:24 112:22
  120:2 124:17
  126:20,25
difference   56:6
  95:6
different   78:13
  100:13,14 109:25
  110:4 111:11
  112:3,24
difficult   34:17
  38:4 39:6 40:10
  60:2
diligence   45:23
dip   101:1
direct   68:7,15,18
  89:21 120:17,18
directing   89:5
direction   51:17
  64:24 101:20
directly   32:25
  33:24 65:10 68:23
disagree   109:17
disallow   19:7,22
disallowed   19:12
  20:10 22:10 23:7
  23:23 24:8,15
disallowing   21:23
discern   95:11
  99:14

[disclose - either]                                                                                 Page 11

**disclose** 61:12
**discovered** 63:12
**discovery** 16:10
  16:17 17:6
**discretion** 37:15
  88:21
**discuss** 21:10
  42:22 45:7 47:2
**discussed** 52:3
  66:4,10
**discussion** 45:5
  60:23
**discussions** 35:8
  45:7 47:21 61:13
**dismiss** 16:4,14
  17:4 72:19 117:25
  119:13
**dismissed** 72:20
**display** 55:7
**dispute** 65:12
  98:4 110:12
**disputed** 26:5
  33:2
**disputes** 44:12
**distinction** 115:13
**distribute** 50:7,25
**distributed** 67:2
**distributing** 85:15
**distribution** 9:5
**distributions**
  92:10
**district** 1:2 46:14
  46:15 72:25 73:1
  97:9 106:11
  117:16
**ditch** 82:7
**ditech** 1:7 7:13
  14:4 72:12,13
  73:10,14,17 99:1
  102:4,6 107:7,9,9
  107:13 113:14
  117:10,13,22
  118:9 119:1,4

120:14 121:6,10
  121:11,11,14,18
  121:20 122:10,24
  123:1,13 124:4
**ditech's** 32:3,6
  72:7
**division** 12:16
  51:7
**doc** 2:1,15,16,17
  2:23 3:2,6,14,22
  4:5,6,14,22 5:3,11
  5:18,25 6:3,7,11
  6:14,18,22 7:3,6,9
  7:20,24 8:1,3,5,7
  8:14,15,16 9:6,9
  9:12
**docket** 18:10
  28:18 42:1 43:19
  48:21 116:17
  118:6
**doctors** 26:17
**doctrine** 71:20
  100:4
**doctrines** 74:15
**document** 43:17
  95:2,3,5 98:9
  110:18,21
**documentation**
  3:5,13,21 4:4,13
  4:21 5:2,10,23
  19:23 90:3
**documents** 15:23
  76:12,23 77:3
  83:20 84:10 85:17
  85:20 95:7 101:9
  101:15 102:18
**doesn't** 16:8
  36:18 37:17,18
  51:18 63:13 77:20
  88:19 107:7,13
  108:2 110:16
  113:10 114:3
  120:14,14,14

121:6,7,7,10
  125:5
**doing** 47:10 56:25
  57:1,3 59:20 66:1
  66:17 80:10,21
  81:16 85:5 90:9
  120:19
**dollars** 34:14
  46:19 85:25
**dolores** 8:6 70:19
  71:3
**don't** 15:5,15
  17:25 31:6 34:14
  34:19 37:4 38:21
  39:16 40:5,13
  41:16 51:23 52:9
  52:22 53:11 54:14
  55:1,4 56:1,19
  57:3 58:8,12 59:5
  61:5,21 64:17
  65:24,25 67:4,6,9
  67:18,18 70:10
  76:1,3,24 77:11
  79:15,18 82:5,9
  82:12,18 83:21
  84:20,21 87:8,9
  88:5,7,15,24
  89:20,23 90:4,4
  91:17 94:9,21
  100:17,24 102:10
  106:25 108:3
  109:6,24 112:2,6
  113:21 114:5
  121:6,24,24
**dormancy** 39:4
**double** 58:2 60:13
  66:13,13
**dover** 11:4
**draft** 111:24
**drafted** 91:23,24
  104:23 110:12
**drafter's** 99:15

**drafting** 110:8,9
**drawn** 33:8
**drexel** 37:21
**driven** 102:18
**driving** 37:24
**due** 45:23 73:11
**duplicative** 2:23
  6:21 19:8 27:6

---

**e**

**e** 1:21,21 10:1,1
  14:1,1 130:1
**earlier** 48:13 64:6
  67:5 73:10 83:7
  107:5 118:25
**early** 78:7
**ears** 36:4
**ecf** 19:6,20 20:4
  26:19 27:24 43:21
  43:22 71:4,6,10
  118:2,3,6,14
**echo** 51:10
**economic** 34:21
**ecro** 1:25
**effect** 30:8 75:5
  93:17
**effective** 44:9
  47:14 55:6 56:24
**effectively** 111:13
  111:17
**efficiency** 16:13
**efficient** 37:2
  47:14
**effort** 32:11 65:8
  65:21 108:8
**efforts** 7:19 42:13
  58:3 107:9
**eight** 87:19
**eighteenth** 5:1
**eighties** 78:7
**either** 14:18,22
  27:9 28:14 40:13
  41:3 91:21 95:13
  119:2 125:15

eleventh   3:20 6:16
employed   99:22
enacted   87:21
encumbered
   119:23
endeavor   33:8
   53:23
ended   45:9 46:5
   48:2 106:2 107:1
enforce   110:14
   117:25
enforceable   38:25
engage   89:20
enter   26:5,23
   27:10 28:3,19
   89:24
entered   20:3
   48:18 89:10 117:9
entire   92:7
entirely   36:20
   122:9,19
entirety   73:6,22
entities   122:17
entitled   37:17
   55:12 56:4 86:10
   126:16
entity   73:15 105:1
entry   7:11 43:10
   44:24 83:22
envisioning   61:10
equity   2:16 10:13
   15:10 16:25
erroneous   117:13
error   88:25 96:17
escape   120:6
escheat   51:22,23
escheated   39:3
especially   34:13
   40:15 52:13
essence   91:16
   106:15
essentially   46:18
   71:22 76:7 117:19

established   20:22
   44:17
establishing   7:15
   7:17
estate   50:23 67:1
   88:16 113:9 115:2
   124:4,21
estates   7:18 42:4
   42:7
estoppel   74:15
et   32:5 33:6 34:22
   35:24 80:13,13
etf   116:18
event   18:14 47:15
eventually   47:9
   117:10
everybody   25:2
   40:24 57:8 58:9
   81:3 129:8
everybody's
   35:15 40:18
evidence   16:9
   48:15 78:22 80:5
   80:25 82:21 88:24
   89:8 114:6
evidenced   107:19
evidentiary   16:11
ex   63:14
exact   55:22
   113:21
exactly   30:6 34:4
   105:14
example   16:18
   36:3
exception   23:5,21
   28:5 80:4 95:8
exceptions   42:21
   42:21
exclude   93:3
excuse   43:14
   70:11 74:25 76:14
   94:15 112:21
   120:17 126:4,4,4

127:11,19,21
   128:1
excused   115:20,25
execute   85:3
execution   7:12
   14:20 31:1
exercise   39:10
   87:12
existed   80:2
existing   77:24
exit   30:1 70:15
expect   97:18
expense   73:20
   74:22,24
expenses   71:18
   86:3,6,8
expensive   33:8
   38:15 40:10
experience   45:24
expert   45:25
   55:14
experts   32:20
expire   45:13
explained   44:14
   84:15
express   35:14
   106:20
expressed   51:20
   52:17
expressly   84:22
   86:4 99:6
expunge   19:7,22
   73:6 90:15
expunged   19:13
   20:10 48:14,14
   73:7,22 74:4,17
   74:20,23,24,25
   75:4 83:9,10 89:6
expunging   20:3
   26:5,23 27:11
   28:3
extension   15:19

extensions   57:17
extensive   74:10
extent   68:14 69:6
   112:4 120:21
   122:16 126:17
extra   114:15
extremely   33:8
   63:6

f

f   1:21 82:3 130:1
f.3d   100:2,7
faced   37:21
fact   48:12 51:20
   52:5 72:1,6,18
   84:9 99:18 102:2
   102:18,20 103:12
   103:21 104:13,22
   107:11,13,19
   113:18 126:13
factors   109:12
facts   20:22 34:10
   40:2 57:11 71:23
   73:8 74:12 84:21
   86:21 89:22 98:1
   98:4,5 122:6,8,18
factual   39:10
failed   72:1 73:8
   75:1
fails   84:24
failure   55:22
fair   40:13 41:1
   47:19,20 87:21
   88:2
fairly   34:19 83:14
faith   63:20
fall   96:8
falls   102:7
false   120:4
familiar   122:1
far   42:15 47:22
   51:18 60:6 82:23
   85:10 92:6 99:18
   103:12 110:17

**farrier** 9:12 116:9
  116:17,21 117:1,4
  117:8,9,13 118:5
  118:17 119:5,15
  119:18,19,20,25
  120:8,10,16,20
  121:9 122:3,10,13
  122:20 123:8,12
  124:7,8,11,13,16
  124:23,25 125:18
  125:22 126:1,3,6
  126:9 127:10,12
  127:15,20,25
  128:2,11,19 129:9
**farrier's** 117:12
  119:12
**fashion** 18:1
**fast** 53:9 54:7,16
**faults** 54:14
**favor** 16:6,7,9
  76:13 111:8
**fdcpa** 112:15,25
**feasibility** 92:8
**february** 87:19
**federal** 74:21
**feel** 50:1 63:7
  116:13
**fees** 86:1,1
**fifteenth** 4:20 7:8
  8:13
**fifth** 2:22 5:16 6:5
  10:5
**fifty** 2:14
**fight** 33:11 47:9
**fighter** 81:14
**fighting** 33:11
**figure** 57:9 59:3
  62:22 64:10 69:2
**file** 15:13 16:3
  33:19 35:3 45:18
  55:24 56:24 57:5
  57:8 58:11 61:1
  67:7 117:14

120:23 124:18
  126:20
**filed** 4:6 7:25 8:2
  8:4,6,15,16 9:11
  14:13 15:10 16:14
  18:23 19:6,20
  21:11 23:4,16,17
  24:5 26:18,19
  27:20,23 28:1,17
  29:6,6,7 32:17
  34:23 35:1,9,22
  41:25 42:20 43:19
  45:11 48:13 63:8
  71:4,6,10,15
  72:21,22 75:14
  76:1 83:4 91:13
  93:6 94:12 97:16
  106:13 109:19
  112:17 113:22,22
  115:3 116:17
  117:16 118:2,5
  126:18 127:3
**filing** 31:13 42:16
  97:12 109:13
  119:9
**filings** 19:9
**filling** 34:25
**finally** 24:12 29:2
  74:22 77:9,14
  114:5
**finance** 2:17
  10:13 15:11 16:24
**financial** 78:8
  99:2 102:5,21,23
  103:15,24 117:10
**financing** 101:1
**find** 20:21 37:1
  38:2 47:7 48:16
  54:11 55:9,13
  58:25 63:16 64:6
  75:2 85:11 87:8
  88:7 109:1 110:7

**finding** 51:15
  112:12
**fine** 14:24 17:5
  29:19,23 41:12,18
  63:24 64:5 69:25
  116:2
**finish** 120:18
  124:25 127:5
**finite** 53:7
**firm** 47:17 91:3
  129:10
**first** 3:4 14:23
  15:9 16:12 18:23
  25:25 43:10 44:6
  53:8 70:5 71:19
  83:8,15 86:21
  95:22 98:21 99:21
  99:21 114:8
  119:16 121:24
  125:6,9
**fisher** 79:9,11
  83:1
**five** 31:11 83:11
  88:10,10 89:6,6
**fix** 62:20
**flexibility** 59:2
**floor** 11:8
**focus** 18:15 108:5
  125:1
**focused** 29:11
**focusing** 100:14
  102:12 114:13
**folks** 14:13,21,22
  18:1 34:8 55:9,11
  57:15
**following** 31:13
  34:25 35:8 61:25
**follows** 110:17,19
**foot** 54:14
**force** 36:21 54:1
  110:6
**forced** 67:20

**forcing** 57:15
  58:13
**foreclose** 72:5,11
**foreclosed** 73:15
**foreclosure** 72:2
  73:3,12,16 76:20
  76:22 117:14,22
**foregoing** 130:3
**forget** 79:15
**forgive** 119:4
**forgiven** 126:14
**form** 48:24 69:6
  69:20 109:15
**formal** 23:14
  24:14 26:3 27:9
  62:18 63:3 64:7
**formally** 60:24
  61:23 66:1,22
  76:6
**former** 92:15
**formulating** 90:13
**forth** 26:6 28:19
  39:13 69:7 74:8,8
  74:12 117:16
  118:19 122:12
**forward** 31:16
  35:5 47:6 68:9,12
  88:5 101:7 123:6
**found** 41:25 54:9
  59:1 115:5 119:7
  125:11
**four** 23:2,5,15
  36:10,12 62:9
  76:7 83:15
**fourteenth** 7:5
**fourth** 6:1
**framers** 99:20
**franchise** 27:21
**frankly** 33:14
  34:3,18 37:2 38:1
  38:7,14 40:9,16
  41:1 42:22 50:22
  53:23 54:10 58:2

59:19 66:8 67:3
88:24 101:18
**free**   30:1 67:7
70:15
**freely**   102:3
**frenkel**   29:6
**friend**   81:8
**front**   68:9 126:22
127:1,1
**full**   55:10,18
107:11
**fullness**   124:19
126:19
**fully**   40:18 61:17
74:8 99:1 102:4
**fund**   108:11
**fundamental**
36:14 38:14
117:12 119:1
**fundamentally**
119:11
**funds**   7:15,17,20
15:7 31:2 32:1,2
32:25 33:23 34:2
35:19 36:7,15
37:4,16,19 38:6
39:1,1,2,12 40:22
42:3,6 43:7 44:21
46:3,11 50:6,14
50:25 52:6 56:9
57:21,25 59:1
65:9,14,18,21
66:24 67:8 68:2,8
68:15 76:18,19
81:17 85:15,16
92:8 107:24
110:23 111:12
124:4,21
**further**   16:16
20:5 49:14,24
73:19,25 82:19
105:5 108:19
113:5

**fussed**   55:15

**g**

**g**   14:1
**garnered**   33:17
**garrity**   1:22 14:3
**gate**   33:7
**geary**   9:2,3 91:11
91:19 92:3,19
93:22 97:21 104:8
106:13
**gearys**   94:11
95:24 97:22 98:22
102:6 103:20,22
104:23 105:17
106:9 107:15
114:24 115:4
**geary's**   97:6 98:6
98:11,16 99:3
102:3,19,21,22,24
103:2,14,16,20
105:19 114:11,14
**general**   9:8 11:20
12:1,8 13:3 18:17
25:16 37:15,19
56:9 77:10 91:15
92:22 93:17 94:21
95:19 96:21 98:11
104:9 105:12,20
108:5 113:16,17
113:19,24
**generally**   42:19
59:7 109:15
**general's**   49:20
**georgeson**   32:20
50:22 53:12 55:14
63:10
**getting**   33:12
40:21 53:17
101:24 123:1,18
**give**   40:6 47:11
66:7,15,24,25
67:19 105:24
124:17 128:2

**given**   52:12 58:25
58:25 78:14 79:17
100:12 107:22
108:7 125:2
**giving**   36:24 38:5
44:5 50:4
**glad**   82:12
**glean**   31:22
**go**   14:18 18:18
31:20 38:7 40:25
44:4 45:15 47:1
47:10 51:18 53:9
53:12,14 54:7,16
57:5 58:18,19
59:3 62:11 66:21
83:24 94:13,13
101:20 102:2
103:12 105:25
125:21
**goal**   32:8
**goals**   31:5 62:16
**goes**   51:24 56:7
66:12 102:13
**going**   18:22,23
21:10,11 30:14
31:16 34:4 35:5
39:24 40:2,2
42:22 44:12,13
45:7,21 46:3,3
47:6,8,9 48:17
52:10 53:9,13,18
53:24 54:7,14
55:8,14,21,25
56:2,4,6,13,15,16
56:17,17,24 57:7
57:11,11,16 59:12
60:1 61:11,22
63:14,15,17 64:24
65:4,7 66:2,7,12
66:13,21 68:7
70:12,21 78:25
80:9 89:3 90:14
91:10 98:6 109:2

112:11 115:16
121:17 126:10,11
126:20 127:5
**good**   14:2,8,11
19:2 21:6 25:18
41:15 51:14 56:22
63:20 64:19 70:24
78:12 81:8 109:15
116:12 129:10
**gotshal**   10:3 19:3
70:25 75:12
116:13
**governing**   76:12
**grab**   65:12
**grant**   30:2 125:16
**granted**   19:16
20:23 22:19 23:6
23:10 24:1,11
25:11 26:10 27:2
27:15 28:9,24
91:20 97:9 118:2
**granting**   7:20
69:5,6
**great**   14:11 18:5
29:25 30:9 51:17
55:20,23 60:9
70:3 103:11
**greater**   29:14
37:3
**greed**   81:21
**green**   1:13 11:3
117:10
**group**   21:12 64:2
69:18 100:1
**grow**   86:19
**guc**   6:13,16,20 7:1
7:5,8 9:1 11:7
18:13,25 19:21
20:14 25:16,23,25
26:13,24 27:5,18
28:12 29:2 30:18
48:19 91:6,10
94:12 96:23 97:6

104:22 106:19
108:13 111:2
**guess**  46:4 64:22
65:17 79:9,21
96:9 108:22
110:22 111:9
**guys**  59:4,20 80:8

**h**

**hac**  41:24
**hadn't**  29:11
78:18 125:14
**half**  78:17
**hamilton**  11:25
48:9,10
**hand**  63:10,11
**handle**  18:23
50:24 65:16,22
70:21 110:23
111:12
**handling**  95:16
116:10
**hands**  53:14,17
54:1 57:4 58:9
60:9 61:5
**happen**  22:5 47:4
55:22
**happened**  60:15
63:12 64:2 77:7
123:13
**happening**  62:25
63:2
**happens**  32:6 34:1
34:15 36:17 37:18
**happy**  14:18 22:4
36:5 41:10 57:25
61:7 64:6 84:4
119:13 124:3
**harassed**  87:14
**harassment**  90:5
**hard**  124:25
**harm**  93:1
**hate**  81:23

**haven't**  35:6 54:9
85:11 115:17
120:25,25
**headed**  30:4,6
55:2
**hear**  14:9 16:14
25:19 29:24 51:7
57:25 84:4 91:7
94:16 101:24
106:6 116:14
119:15 121:17
122:4
**heard**  16:2,22
17:8 19:15 20:20
22:12 23:9,25
24:10,17 25:10
26:9 27:1,14 28:8
28:23 29:22 31:17
48:8 49:4,18 51:4
52:20 58:12 59:17
64:20 67:23 71:8
75:23 78:4 114:17
118:12
**hearing**  2:1,14,22
3:1,4,12,20 4:3,12
4:20 5:1,8,16,22
6:1,5,9,13,16,20
7:1,5,8,11,22 8:13
9:1,8,11 16:2,11
17:3,16,21 22:1
25:14 29:13 30:1
30:14 50:2 52:10
53:5 62:1 97:17
97:18 103:5 104:4
106:5 115:25
118:3,13 126:11
129:10
**heart**  81:13
**heather**  12:6 49:5
**held**  72:17 93:10
98:18
**hello**  91:5

**help**  81:5,6
**helpful**  17:10
116:18,25
**helping**  79:11
**here's**  114:11
**herring**  100:17
**hey**  39:24 67:17
**he's**  82:8
**hi**  69:11
**higher**  66:11,12
**highest**  40:21,23
**highlighting**  31:8
**hilda**  4:6
**hill**  116:9,11,12
116:13,16 117:1,6
121:17 122:4,6,7
122:7 123:3,3,4,4
123:19,20,20
127:8,14 128:6,7
128:8,8,23,25
129:2,7
**hired**  32:20
**history**  71:21
116:20
**hoc**  64:2
**hold**  67:10,10
122:17 127:22
**holder**  80:14
**holders**  44:7
**holding**  1:7 7:13
14:4 56:6
**home**  2:16 10:13
15:10 16:25 92:25
119:23
**homes**  81:6,7
**hon**  1:22
**honest**  49:24
65:13
**honor**  14:8,9,11
14:14,16,23 15:2
15:8,9,12,22 16:1
16:6,8,12,15,23
17:11,16,17 18:3

18:4,6,8,17,21
19:2,18,25 20:3
20:25 21:6 22:4
22:16,23 23:5,12
23:20 24:19 25:8
25:13,18,22 26:12
26:21 27:4,17
28:2,10 29:2,9,11
30:7,17,23,25
31:3,6,17,21 32:8
32:10,15,19 33:2
33:6,20,25 34:12
34:15,24,25 35:8
35:23 36:9,18
37:6,12,20 38:5
38:12,21 39:6,21
40:4,11,19 41:1,6
41:15,19,24 42:2
42:16,22 43:2,8
43:25 44:3,7,10
44:18 45:6,8,14
45:20,24 46:7,12
46:20,22 47:20
48:5,9 49:5,19
50:2 51:2,5 52:18
52:23 53:3,11
54:3 55:3,19,23
57:4,6,17 58:7,12
58:20 59:8 60:8
60:17,24 61:3,6
61:20 62:3,5,8
63:2,24 64:9,21
65:24 66:19 67:12
67:18 69:9,19
70:1,7,10,17,22
70:24 71:9,14
73:6 74:3 75:6,11
75:16,21,24 77:2
77:4,9,14,23,25
78:5 82:18 83:24
90:1,20,23,25
91:5 94:6,15,15
94:19 95:12 96:12

96:15 97:24
100:16 103:12
104:6,17 105:6,14
105:22 108:20,22
109:11 110:13
111:19,25 113:1,6
114:5,14,21
115:19,23,24
116:3,6,12,16,19
117:6,7 118:2,17
118:19 119:7,11
119:13,14,15,25
122:3,7,8,12,20
123:4,20 124:2,9
125:18 127:14,16
128:6,8,9,10,14
128:25 129:5,12
**honor's**  16:17
54:5 62:12 122:18
128:13
**hope**  34:6
**hopeful**  52:2 57:7
**horse**  40:9 66:24
101:7,8,8
**host**  38:12
**housing**  100:24
**hud**  77:3,6 87:1,6
87:6,11,13,13
**huge**  33:11
**hung**  79:16 83:1
**hunton**  10:12
15:11 16:24
**hutchinson**  4:6
**hwang**  10:10
70:21,24,25 71:14
75:6,8
**hyde**  9:25 130:3,8
**hypothetical**
104:3

**i**

**ia**  11:14
**ideas**  57:13,25

**identical**  118:15
118:20
**identified**  27:11
33:4
**identifies**  22:13
**identify**  33:23
34:8 50:15
**ignore**  40:7 56:15
**ignored**  93:24
**ignores**  37:25,25
38:1
**ii**  7:15
**iii**  7:17
**il**  11:14
**illinois**  41:21
**immediately**  33:7
79:22
**impact**  47:10
**important**  37:12
**impose**  54:15
**impress**  46:20
**improper**  73:16
119:12
**improperly**  76:9
77:1,11 83:17
85:14 87:10
**improved**  36:3
**inappropriate**
53:25 56:8 57:18
76:24
**inc.'s**  2:16
**include**  41:3
60:15 61:21 91:22
98:13 100:24,25
101:12 114:3
121:22
**included**  37:14
69:14 76:23 85:20
**includes**  32:15
36:10 107:24
**including**  31:12
110:2 117:21

**income**  79:25
80:16 82:12
**incomes**  81:10
**inconsistent**  36:20
**incorporate**  60:14
**incorporated**
35:14 101:4,10
**incorrect**  107:23
**increase**  36:6
76:21
**increased**  85:14
**incurred**  76:19
86:3,8
**independent**
81:24
**indiana**  12:1,2
49:6
**indianapolis**  12:4
**indicate**  61:11
**indicated**  42:2
74:18 87:15
**indicates**  88:14
**indiscernible**
23:19 27:11 28:20
44:19 49:10 69:22
74:15 79:23 83:13
84:16 85:25 86:14
87:12 93:2,25
99:9 100:4,18
104:25 105:25
107:16 110:10,18
116:21 120:16,20
121:13,15 123:15
124:1,11,12
125:20 126:3,5,6
126:7,8 127:13,21
127:24 129:1
**indisputably**
113:24
**individual**  92:14
92:21 95:23
**individually**  9:3

**individuals**  23:2
52:9 54:11
**individuals'**  21:14
**industries**  100:7
**informal**  23:1,15
24:5,14 26:3,17
26:19 27:9,25
28:17 63:25 64:11
**information**  21:18
21:20 44:17 51:19
51:24 52:2,12,14
56:16 107:22
120:4 121:12,13
**informed**  17:7
61:17 62:2
**ing**  80:19
**initially**  20:1
**injunctive**  118:1
**injured**  121:19
126:18
**insisting**  38:19
**inspection**  86:1
**instance**  16:12
71:19 112:21
117:7
**instant**  118:16
**institutions**  78:8
**instructions**  71:8
**insufficient**  3:5,13
3:21 4:4,13,21 5:2
5:9,17,23 6:2
**intend**  31:6 54:15
**intended**  81:4
**intent**  72:11 92:20
93:4 99:15,20
100:10 108:11
**intention**  93:15
**intentioned**  47:5
**intentions**  31:5
**inter**  63:9
**interest**  21:9
32:22 33:2 34:20
34:21 57:20,21

63:2,11 70:13
72:17 82:6 86:18
88:16 106:18
115:11,14
**interests** 91:20
**international**
100:1
**interpret** 93:16
100:3,3
**interpretation**
33:3 93:13,15,19
99:7,9,12,13,14
100:8 108:4 110:6
110:25 111:18
**interpreted** 93:8
111:16
**interpreting**
99:25 100:9
101:15 110:17,21
**interprets** 118:8
**interrupt** 43:16
43:25 54:18
104:18 111:2
**interrupted** 22:7
**interrupting**
103:5
**introductory**
31:18
**investigated**
32:20
**investigates**
127:17
**investigation**
39:17 127:24
**involved** 46:19
50:8 72:4 81:3
82:25 89:18
100:23 112:4
**involving** 29:16
**iowa** 41:21
**isn't** 60:4,5 111:3
**issue** 15:17 16:8
16:16 32:20 35:19

36:14 37:20,22
38:15,18,22 39:6
39:9 40:2 46:17
52:5 57:16 67:14
83:12 84:1 85:13
86:23 97:3 111:3
112:12 119:9
**issued** 39:21
72:11
**issues** 17:4 31:7
33:4,15 34:13,17
35:11 36:13,22
38:4,7,12 39:11
40:7,10,24 42:22
42:24,25 46:8,25
48:17 51:18 57:13
58:14 60:2,4,25
67:20 68:10
100:13 105:23
**issuing** 121:23
**item** 19:5,19
22:25 23:13 24:12
75:9 91:2,10
116:8
**items** 21:12,25
25:24
**it's** 14:2 21:11
25:18 34:6 36:24
37:3,7 39:24 40:5
40:22 41:1 43:22
48:12 50:1 53:13
53:25 55:6,8,17
55:20 56:8 57:4
58:5,8 59:13 60:9
60:14 61:8 62:24
63:1,7,14 65:1,4
65:25 66:5,17,18
67:18 79:18,21
80:25 81:21 83:4
84:22 87:6 88:21
90:3 92:25 93:7
94:19 100:11
103:8 105:1

107:18 108:1,14
111:3 112:17
115:1 128:16
**iv** 7:20
**i'd** 14:14 21:3,9
22:4 31:3 108:23
113:19 122:1
127:15
**i'll** 16:19 25:15
44:7 52:23 53:3
71:14 75:8 78:5
91:2 93:5 95:20
96:10 98:14
115:16 116:4
120:13 128:17
**i'm** 14:18 15:3
18:21 20:16 21:10
21:11 22:6,7
29:18,23 32:10
38:22 41:10 42:21
43:16,18 45:7,15
46:14 53:5,24
54:17,22 55:7,15
55:25 57:7 58:10
58:19 61:9 63:18
69:5,10,11 78:10
78:25 80:9,21,22
81:1,13,14,16,16
82:12,12 83:24,25
84:1,2,4 89:15,19
94:4 95:2 96:5
98:8 101:10,24
102:22 103:4
104:18 105:24
106:4,4,8 107:17
109:10 110:20
111:1 114:19,20
115:15 116:14
117:4,4 119:13,19
120:2,7,8,18
121:16 124:2,9
125:10 126:10,23
128:16,18

**i's** 89:12,13
**i've** 17:24 19:14
20:21 22:1 34:24
58:25 69:6 81:1,2
81:17,23 82:25
90:2,3 104:19,19
109:7 114:2 121:3
121:4 126:12

---
**j**
---

**j** 9:11
**james** 1:22
**january** 16:2 17:9
17:12,13 18:2
115:17 118:11
122:15
**jenner** 10:19 21:7
**jersey** 11:20 31:12
48:10,13
**jersey's** 48:25
**jim** 94:16
**jlg** 1:3
**job** 78:6
**joint** 7:12 71:4
**jointly** 19:21
**jones** 11:6 25:19
91:6
**judge** 1:23 14:2
15:15 16:13 33:9
33:15 34:3 36:1
37:9,21 53:21
60:25 63:18 66:9
67:16 127:10
**judgement** 38:1
**judgment** 127:16
**judicata** 71:20
74:16 118:25
**judicial** 16:13
**july** 20:3 118:13
**juncture** 119:3
**june** 87:18
**justice** 127:17,23
128:2

| k | | | |
|---|---|---|---|
| **kahn** 91:5,5,9 | 80:9,15 81:3,5,16 | **lead** 55:25 63:14 | 27:4,17 28:10 |
| 94:22 99:5 101:19 | 82:1,9,15 85:16 | **leading** 74:10 | 29:1,19 30:6,12 |
| 103:13 104:12,21 | 87:21 89:11,16,16 | **leave** 116:2 125:2 | 30:17 115:20 |
| 105:22,22 106:1,4 | 90:3,7 93:7,12,24 | **leaves** 112:11 | **levin's** 111:7 |
| 106:4,6,8 107:17 | 96:1,9 101:19 | **led** 72:2 | 114:21 |
| 107:20 108:20 | 104:3 106:8,18,23 | **ledanski** 9:25 | **liability** 6:17 |
| 113:15,15 114:18 | 107:1,2,4,13,14 | 130:3,8 | 26:14 |
| 114:20,20,21 | 107:15,23 108:2,4 | **left** 34:7 47:8 52:7 | **liberty** 2:16 10:13 |
| **kahn's** 102:13 | 108:5,12,25 109:1 | **legal** 5:17 6:2 17:4 | 15:10 16:25 |
| 111:8 | 109:1,17 111:22 | 19:23 38:7 39:9 | **license** 81:19 |
| **kaitlin** 13:7 69:11 | 112:1,9 113:21 | 46:25 76:2 130:20 | **lie** 73:17 |
| **keep** 59:10 71:15 | 115:5,6 119:23 | **legislatures** | **lien** 76:13 84:7,9 |
| **keeping** 14:3 45:1 | 121:3 124:3 | 100:10 | **life** 86:17 |
| 65:14 83:1 | **known** 50:15 65:3 | **lender** 107:8 | **light** 46:18 |
| **keeps** 100:4 | **knows** 58:9 | **lenders** 32:17 | **likelihood** 36:7 |
| **keith** 8:4 | 109:11 | 34:22 64:2 67:3 | 37:3 40:21,23 |
| **key** 32:12 33:17 | **kurth** 10:12 16:24 | 84:23 | **limit** 16:18 |
| **kick** 53:7 | | **lender's** 77:24 | **limited** 74:1 79:24 |
| **kind** 47:11 64:22 | l | **lent** 76:20 | **line** 14:13 15:12 |
| 65:11 78:9 81:14 | **l** 1:22 2:8 3:8 | **letter** 21:21,22 | 69:5 70:21 75:17 |
| 112:11 124:6 | **l7/2020** 3:16 | 84:13,14,15 | 94:11 107:2 |
| **know** 15:4,15 | **lack** 19:23 72:23 | 107:19,21 117:14 | **lines** 43:13 44:10 |
| 18:12 29:12 32:4 | **lady** 79:8 | 120:3 121:14 | **list** 14:17,18 23:18 |
| 33:11,19 34:3,8 | **laid** 68:4 71:20 | 126:7 | 25:2 |
| 34:14,20 35:2,5,7 | **lambert** 29:7 | **letting** 63:14 | **listed** 20:2 23:2 |
| 35:8,18 36:3,4,12 | **language** 68:22 | **let's** 62:20 100:21 | 26:23 28:4 31:15 |
| 36:17 37:24 38:6 | 69:15 96:17 98:10 | 105:8 125:1 | **listen** 56:14 57:14 |
| 39:3,5,13,16 40:1 | 99:17,22 102:18 | **level** 46:13 77:13 | **listened** 81:1,17 |
| 40:7,8,13 46:9 | 104:7,14 | 116:19 | **litigable** 40:23 |
| 49:11 50:7,9 | **large** 34:5 62:22 | **levin** 10:24 13:1 | **litigant** 128:11 |
| 53:11,19 54:4,6 | **largely** 94:19 | 21:6,7,8,9 22:9,15 | **litigate** 34:1 46:17 |
| 54:12 55:4,12,15 | **late** 73:13 | 22:16,20,23,25 | 47:12,13 57:16 |
| 55:19,21,23 56:10 | **law** 38:1 50:11,18 | 23:12 24:3,12,21 | 58:14 60:10 67:17 |
| 57:2,7,9,11,23 | 51:12 56:21,22 | 24:23 25:11,13 | 67:21 |
| 58:13,23 59:13,17 | 89:3 93:14,20 | 69:12 94:4,5,6,10 | **litigated** 33:7 |
| 60:11,22 62:1 | 99:8 101:19 109:6 | 96:11,14,15 103:4 | **litigating** 38:8 |
| 63:15 64:2,4,10 | 110:2,4 111:23 | 103:7,11 104:11 | 71:21 |
| 65:2,12,17 66:3,3 | 121:5 125:16,16 | 104:17,21 105:5,6 | **litigation** 7:23 |
| 66:8,11,14,24 | 126:12 | 105:14,19 106:1 | 33:9 36:22 40:25 |
| 70:10 76:14,19 | **laws** 35:23 36:16 | 113:4,6 115:24,24 | 57:9,12 61:2 |
| 77:16,20,21 78:12 | 38:19,25 42:10 | 116:1,3 | 62:19 71:25 72:15 |
| 78:21 79:12,21 | 56:18 90:4 | **levine** 11:11 25:18 | 73:4,11 74:10,10 |
| | **laying** 74:12 | 25:19,22 26:12 | 74:13 97:10 |

| | | | |
|---|---|---|---|
| **little** 49:24 71:17 78:11 95:20 103:5 103:9 106:5 109:6 115:16 | **longer** 77:23 78:19 124:3 | **manufactured** 100:24 | **meanings** 109:25 110:1,4 |
| **live** 81:5 | **look** 37:22 47:3 53:12 54:21 55:4 55:5,20 57:11 58:1 59:24 66:20 69:23 95:4 101:1 102:10,11 109:12 115:2,9 | **marc** 41:23 62:7 | **means** 39:12 101:14 |
| **lives** 81:5 | | **market** 11:22 | **meant** 101:15,16 |
| **living** 78:10 | | **mary** 9:11 12:20 51:5 116:17 | **mechanics** 123:25 |
| **llc** 15:11 16:25 | | **massachusetts** 13:2 69:13 | **mechanism** 51:13 59:10 119:8 |
| **llc's** 2:17 | | **massive** 54:10 58:15 | **meet** 16:10 61:23 61:24,25 64:7 67:8 103:23 |
| **llp** 10:3 11:6,13 21:7 | | **materia** 101:14 | |
| **loan** 32:17 34:21 67:3 72:7,10 76:12,23 77:5 80:14 81:19 87:2 92:15,25 97:23 98:7,22,22,24 99:1,3 102:1,1,3,4 107:6,7,10,11,21 107:22 112:6,7,8 112:22 113:13,14 114:4,24 115:2 | **looked** 95:22 98:10 99:7 125:9 | **materials** 123:7 | **mellon** 72:16 |
| | **looking** 43:17,18 58:3 63:19 80:25 95:10 109:11 112:17 | **matter** 1:5 14:21 15:1 23:9,25 24:10,17 28:8 29:5 31:14 39:10 48:8 67:25 70:6 70:14,20 88:22 91:1 105:3,9 112:14 116:8,10 125:5 127:6 | **members** 93:25 97:21 112:10 |
| | **looks** 34:4 | | **mention** 17:9 80:12 120:3 126:6 |
| | **loop** 59:11 | | **mentioned** 49:9 63:5 90:12 124:13 |
| | **loose** 65:5,18 | | **merit** 19:23 87:9 88:7 124:20 125:11 |
| | **los** 62:8 | | |
| | **loss** 80:16 | | |
| | **lost** 81:4 | **matters** 14:5,12 14:15,17 15:5 18:18 22:12 25:15 30:20 70:5 91:15 127:1,6 | **merits** 71:23 77:17 |
| **loans** 82:5 86:18 86:18 101:3,12,17 106:25 108:9,10 112:10 114:8,23 122:14,18 123:8 | **lot** 18:9 32:11 34:6 38:6 47:7,8 52:3 53:15,20 66:2,9 86:22 112:1,2,3 | | **middle** 89:15 |
| | | | **might've** 102:19 |
| | | **maximum** 87:4 | **million** 31:25 39:2 46:2 51:21,22 71:17 75:25 77:20 83:5 |
| | **louis** 12:18 | **mccluskey** 99:22 | |
| **locate** 7:19 55:9 65:8,21 | **low** 81:10 | **mean** 53:14,21,23 55:10 57:12 58:4 59:5,25 61:3,9 63:13 64:17 65:11 79:13 101:11 102:7 112:2,8 | |
| **located** 32:5 37:12 | **m** | | **mind** 41:16 57:19 93:18 96:12 102:10 |
| **locating** 44:20 | **m** 22:14 | | |
| **location** 45:25 | **machine** 50:7 51:13 | | **minds** 102:10 |
| **locations** 53:23 | **machines** 57:24 | **meaning** 38:17 99:16 100:12 101:19 102:11 104:8 110:7 | **mineola** 130:23 |
| **loeb** 11:13,13 36:11,11 37:7 41:16,16,20,20 49:9,9 62:7,7 | **main** 18:14 | | **minimis** 66:6 |
| | **majority** 39:16 41:2,3 96:6 | | **minimum** 35:20 36:4 |
| | **making** 42:14 55:17 60:7 125:17 | **meaningful** 109:20 112:7 | **mintz** 13:1 69:12 |
| **logical** 93:2 | **man** 114:19 | | **misclassified** 2:15 |
| **long** 12:20 14:17 43:12 51:5,5,9 58:10 60:9 71:21 78:19 79:6 107:1 | **manges** 10:3 19:3 70:25 | **meaningfully** 61:18 | **missouri** 12:15 51:6,10,12,19,24 52:8,13 |
| | **manner** 59:23 110:14 | | |

**missouri's** 52:4,7
**misstated** 104:19
**misunderstanding** 122:9
**mo** 12:18
**modified** 7:6,9 28:13 29:4 68:5 69:6
**modify** 28:14
**modifying** 28:19
**moment** 21:10 22:21 29:20 98:15 105:8,24
**monetary** 119:6,8
**money** 33:10,12 34:5,17 36:17,25 39:25 47:8 48:15 48:16 53:15 55:13 56:2,3,5,7,13 58:4 58:25 62:20,22 65:12 66:7 81:3 82:10 107:14 121:25,25 122:21 122:24 123:1 124:8,14
**money's** 59:25 109:1
**monies** 63:20
**montana** 41:21
**month** 87:19
**monthly** 79:3
**months** 32:19 63:15 125:23
**morning** 14:2,4,6 14:9,11 19:2 21:6 23:18 25:18 30:13 41:15 49:11
**morris** 22:14 29:10,12,17,19,21 29:22,23 30:10
**morris'** 30:4
**mortgage** 72:1,9 72:12,18 73:11

76:5,14,21 77:1,2 77:4 78:9,17,25 80:11,21 82:1,5 82:11 85:4,15 86:7,11,13,18 87:1,5,6,12 90:9 92:13,15,16 93:19 93:21 98:14,15,21 98:21,23,23,24 99:4,6 100:15,22 101:2,2,6,6,11,16 101:16,21,25 102:1 109:22,25 112:10 113:13,13 114:2,3 117:9 118:19 119:22 120:15 121:7,10 121:11,18 122:1 122:10,14,18 123:14 124:5,5
**mortgager** 85:25
**mortgages** 81:9 81:20 89:17 92:24 100:23,23 101:3,6 101:11,17 106:23 106:24 108:14 112:1 113:12 114:23 118:9 119:2,5,24 121:23 122:25 123:5,14 123:15 125:3 126:13
**motion** 4:6 7:25 8:2,4,6,15,16 9:8 9:11 14:19 15:6 16:4,14 17:4 31:1 31:5,22,22 32:8 32:13,13,17 33:19 33:22 34:25 35:5 35:10 36:21 41:4 41:8 42:5 44:15 45:1,11,18 50:10 55:24 57:5,8

58:11 61:1 63:14 64:23 67:7 69:5,6 72:19 74:7 91:2 91:14 93:6 94:3 94:12,20 96:21,23 96:25,25 97:6,7 97:11,16 98:2,3 101:1 106:16 109:7 116:9,17 117:24,25 118:2,6 118:13,13,15,16 118:21,22 119:12
**motions** 117:8 118:21 122:13
**motivation** 65:14
**motivations** 37:8
**movant** 111:2
**move** 15:4 63:7
**moved** 39:22 63:6
**moving** 68:12 91:18
**mt** 11:14
**muddled** 103:10
**multijurisdictio...** 73:3
**multiple** 71:23 73:11 119:7
**must've** 107:4
**mute** 94:6

**n**

**n** 10:1 14:1 130:1
**n.y.** 99:23
**name** 79:8
**named** 23:19
**names** 22:5
**nap** 80:8
**nature** 32:10 36:13 61:11 95:21
**necessarily** 62:13 98:5 109:8
**necessary** 34:1 67:7

**need** 16:16 34:10 38:4,23 46:25 48:20 53:11 54:8 54:11,15,25 55:12 55:13,24 58:22,24 59:2,3,13,16 60:13 70:8 77:20 87:24 96:9 110:18 112:2 120:23
**needed** 120:23
**needs** 81:24 115:7 128:17
**negotiate** 79:23
**negotiations** 69:14
**neither** 104:22
**never** 39:13 112:14 122:20,22
**nevertheless** 42:11
**new** 1:2,14 10:6 10:15,22 11:9,16 11:20 15:19 31:12 46:14 48:10,13,25 72:16 81:9 93:14 99:8,18 110:2 111:23 122:14
**nice** 79:10
**nj** 11:21,23
**nl** 100:7
**nobile** 94:11,14 94:15,16,17,18 96:16 97:15,25 98:8 99:5 104:12 108:21,22 110:11 110:13,19,21 111:5,9,21 113:10 115:6,19,23 116:1
**nobile's** 102:14 114:6
**non** 50:11 71:10 96:4,19 114:1

[nonstop - opposite]                                                        Page 21

nonstop 73:3
normal 32:2,3,6
normally 80:20
north 12:17
northern 72:25
note 19:25 33:1
    39:14 66:19 74:7
    75:16 77:14 107:9
noted 72:25 73:10
    102:3 103:14
notice 23:4,16,18
    24:5 25:2 27:23
    35:2,4 43:10,11
    44:6,7,23 48:21
    53:4 55:5,8,8,16
    55:17 62:25 66:2
    66:8,11,18 71:10
    72:11 96:17
noticed 28:5
notices 35:24 58:4
notify 71:7
notifying 44:20
notion 109:18
novad 86:13,16
    86:17
november 35:10
    43:20 122:15
nudge 64:18
number 14:4,5,12
    14:13 20:1,15
    29:11 36:19 43:17
    48:21 51:20 56:2
    70:20 71:1,16,16
    83:9 85:22 91:2
    91:13 95:3 113:21
    116:18 118:3
numbers 42:1
    91:7
numerous 113:18
ny 1:14 10:6,15,22
    11:9,16 13:5
    130:23

**o**

o 1:21 14:1 73:25
    92:9 96:4,19 97:3
    130:1
object 40:16 41:4
    49:14
objected 72:22
objecting 36:10
objection 2:14,22
    3:1,4,13,21 4:4,13
    4:21 5:2,9,17,23
    6:2,6,10,13,17,21
    7:2,5,9,22,25 8:2
    8:4,6,13,15 9:1
    16:3 19:6,7,10,12
    19:20,20,21 20:1
    20:2,9 23:1,6,14
    24:4,8,13,15 25:5
    26:1,2,4,14,16,24
    27:5,8,18,21
    28:13,16 29:3
    31:12 35:1 36:12
    37:8 41:4 42:11
    42:16,18,25 48:12
    49:1,8,12 52:15
    69:22 70:19,22
    71:2 75:3,13 83:8
    90:15 91:11 94:2
    103:20 108:24
    128:20,21
objections 16:5
    18:23 21:3,13
    23:22 24:24 25:23
    27:25,25 30:18
    31:9,10 34:22
    35:7 36:12 40:16
    41:11 50:20 68:14
    72:24 89:4
objectives 36:21
obligation 50:10
    68:1 112:5
obligations 15:20
    32:21 54:7

obtain 115:7
obviate 16:16
obviously 65:19
    106:24 107:23
occasions 119:7
occupied 73:1
occur 73:13
occurred 32:2
october 21:19,21
offer 88:15,17,18
offered 88:10
office 11:20 12:1
    12:8,15 13:2
    49:20 51:6
offices 129:10
oh 12:11 20:16,19
    80:10 106:9
    116:24
ohio 12:8,9 49:20
    49:21,24 50:5,11
    50:14,16,19 51:10
    64:22,25 66:20,25
    117:17,17,19,20
oiled 50:7 51:13
    57:23
okay 14:9 16:21
    17:23 18:2,6,21
    19:18 20:16,19,25
    22:18 31:20,21
    35:5 44:2 48:6
    57:15 67:23 70:4
    70:17 78:2 79:16
    84:3 90:19 91:9
    94:8,8,16,18
    105:18,21 106:8
    108:21 110:16
    114:19 115:15,18
    116:24 119:20
    120:16,20 121:9
    121:16,16 122:3
    123:3 124:6,13,23
    125:18,22 126:10
    126:10

old 130:21
olive 12:17
omnibus 2:14,22
    3:1,4,12,20 4:3,12
    4:20 5:1,9,16,22
    6:2,5,9,13,16,20
    7:1,5,8,22 8:13
    16:2 17:9 19:5,7
    19:19,20 20:2
    21:13 23:1,13
    24:4,8,13,15 25:5
    25:23 26:1,14,24
    27:5,8,18 28:12
    29:3 30:18 36:11
    62:1 70:18 71:2
    75:13 83:7 117:24
    117:25 118:3,13
once 52:13 58:5
    77:4 107:13 121:3
    125:8,13
ones 38:9 91:23
ongoing 39:17
    123:23
online 78:15
open 16:8 45:9
    46:5 48:2 52:14
operate 97:7
operating 39:22
    39:22
operations 32:3
opportunity 47:2
    47:11 50:4 59:17
    59:19 61:16 74:6
    82:15 90:19 96:12
    124:21 127:12
    128:19
oppose 95:17
    97:18 113:2
opposed 15:21
    44:24
opposing 96:5,23
opposite 46:16
    55:22 77:22

**opposition** 93:6
94:20 96:17 97:2
98:3 99:12 100:5
102:21,22,24
103:14
**opted** 89:20
**order** 7:11 19:12
19:17 20:3,24
21:23 23:11 24:2
25:12 26:5,11,23
27:3,10,16 28:3,4
28:9,19,21,25
30:7 35:9,13
42:14,20 43:5,9
43:10,19 44:24
45:2 46:6 48:18
48:21,23,24,24
51:16 54:24 60:13
60:18 65:6 68:23
69:20 75:4 90:18
95:8,9,11 101:4
114:13 115:7
118:1,3,14 119:21
119:21 121:23
126:13 127:8
128:12,16,16,20
128:22,22
**orders** 22:22
27:12 54:5,9
**original** 56:7
107:8
**originally** 35:10
111:2
**originated** 91:21
92:16
**orleans** 81:9
**outline** 31:3
**outlined** 33:22
38:13 60:3 64:6
68:24 76:11 94:19
**outlining** 95:25
**outstanding** 41:9
84:25

**overall** 108:4
115:10
**overlooked** 78:18
**overruled** 72:24
**overruling** 68:13
**oversimplifies**
40:1
**overwhelming**
41:2
**owed** 78:20 84:25
112:20
**owned** 91:21
92:16

**p**

**p** 10:1,1 14:1
**pace** 57:5
**pachulski** 11:6
25:19 91:3,6
**page** 95:3,3 98:2
99:23 100:2
**paid** 6:14 26:1,2
76:16 78:15,18
79:22,25 80:1
83:17 84:24 85:24
92:9 99:1 102:4
107:11 123:17,18
125:5
**paper** 80:12
**papers** 15:16
17:25 19:14 20:21
31:6 33:4 39:14
71:21 72:9 73:21
74:6,9 75:2 76:1,7
76:11 82:20 83:4
85:3 86:11 87:11
88:9 89:2 91:18
94:12,19,24 101:2
112:17 113:1
117:17 118:20
122:12
**paragraph** 43:8
**parallels** 100:9

**pari** 101:14
**park** 10:14 11:15
**parlance** 109:23
**part** 32:6 34:5
48:15 56:9 61:11
69:17 86:19 88:25
95:22 96:1 98:19
104:15 106:1
110:6,7 112:14,15
120:12 123:6
125:13,14
**parte** 63:14
**partial** 37:8
**participate** 61:18
84:16
**participated** 84:9
**participating**
76:10 84:6,12,19
85:2
**particular** 15:1
32:13 36:16 43:5
43:8 57:5 77:4
112:21
**parties** 15:25
32:22 33:12 34:1
34:13,20,21 35:11
39:8 44:12 47:10
47:25 69:21 72:4
72:8 93:16 99:10
99:20 105:3
110:11 115:4
117:21
**party** 33:2 38:17
69:23 110:22
111:24
**path** 38:10 40:25
**patient** 81:13
**pay** 78:20 79:1,3,7
79:23 82:10 84:23
88:12 124:22
**payment** 72:1
73:2 76:16 78:22
79:3 88:11 112:19

112:20
**payments** 82:24
89:9,14 113:8
119:4 123:19,23
**payout** 89:15
**pending** 48:23
97:17 106:12
**people** 47:7,11
51:15 54:10 55:6
57:12 58:3,23
59:14,17 62:3
64:4 66:7 67:17
78:13 79:17 80:3
80:7 81:9,9,20
82:4 87:15 89:16
92:23 102:9
**people's** 123:15
**percent** 87:3
93:25 106:17
108:14,17 112:9
114:7
**perfect** 15:8 120:5
**period** 39:4 53:5
54:25 55:5,10
58:15 60:18 62:25
62:25 64:8 79:2,6
87:20 106:25
**periods** 54:13
**permission** 78:13
78:14,19,21,24
79:2,18
**permit** 113:6
**permitted** 76:16
77:2
**person** 22:13
37:17 81:24 90:5
**personal** 114:25
115:13 117:15
**perspective** 31:23
59:25 64:12 65:9
88:17
**petition** 15:18,20
39:1,1

**phase** 34:2,4,7,11
  35:15,16 36:23
  38:3 40:18 43:6
  44:11 45:2,13,19
  46:4,21 47:1,2,18
  47:18,21,22 48:2
  49:13,14,25 50:9
  52:15 53:7 55:1
  56:13 57:5,6,6,16
  59:3 60:5 61:25
  64:9,23 68:3
**phelps** 8:16 13:9
  75:15,16,19,20,22
  78:4,5 82:21,24
  85:14 89:2,8 90:1
  90:11,16,18,21,23
**phone** 22:11
  29:12 41:22
  116:21 117:2,4
**phones** 103:12
**pickle** 95:14
**piece** 81:11
**place** 45:10 60:1
**placed** 117:24
**plaintiffs** 9:2
  91:12
**plan** 7:11,12,14
  14:20 15:12,21
  16:3,6,15 18:15
  18:24 19:3,9,10
  20:4,8 21:2 30:24
  31:1,1,4,23,24
  32:19,21,22,24
  33:1,2,3,13,14,16
  33:21 35:17 36:5
  36:18,21,24 37:1
  37:25 38:1 39:17
  40:22 41:7 42:8
  42:12,17,20,23
  43:2,9 44:8,14,15
  44:18,19,22,25
  45:3,17,22 48:25
  50:4,7,9,17 51:11

51:16 53:2,8 54:1
  54:6,22 55:15
  56:3,11,25 58:5,8
  58:13 60:12,20,24
  62:14 63:9,22
  64:11 65:1,6,13
  65:20 66:4,10
  67:2,25,25 68:4,8
  68:15 70:18,25
  71:5 73:23 74:13
  75:2,12,13,21
  76:14 77:19 83:13
  88:14,23,25 89:4
  91:23,25 92:1,5,5
  92:7,8,21 93:4,7
  93:11 95:1,1,5,6,7
  95:11 98:7,9,10
  98:17 99:6 101:5
  101:10 102:8,24
  103:15,23 104:7
  104:23,24 106:20
  107:2 108:6 110:9
  110:12 111:4,13
  111:15,18 112:14
  113:16 118:1,8
  123:11,16,17
  128:9
**planned** 79:5
**platform** 99:2,2
  102:4
**plausible** 73:9
  74:19 85:9 88:6
**plausibly** 85:9
  87:9
**plead** 73:8
**pleading** 15:22
  61:1
**pleadings** 35:4
  122:17
**please** 19:17
  20:24 22:8 23:11
  24:2 25:12 26:11
  27:3,16 28:9,25

31:20 44:2,4
  62:11 64:21 75:4
  90:18 103:10
  104:16 105:8,25
  121:8 127:8
**pleased** 31:9
**pm** 129:14
**podium** 21:4
  25:15 30:19 41:10
  75:8
**point** 32:9 34:15
  37:12 39:23 42:11
  44:23 45:20 46:11
  49:12 56:7,12
  58:9 60:22 61:4
  64:14 65:18 67:15
  67:19 68:6,12
  72:8 77:6 94:25
  96:16 97:20
  100:16 102:13
  103:6 104:25
  113:7,11,15,19
  115:25 119:17
  121:2
**pointed** 65:5
  114:3
**pointing** 95:15
**points** 58:17
  113:7
**point's** 128:18
**poll** 39:25
**pool** 9:6 56:9
**pooled** 39:23
**poor** 81:9
**portfolio** 72:7,14
  73:14
**portion** 25:14,14
  46:2 49:14,15
  74:23,24
**position** 15:20,23
  41:7 42:3,7 44:23
  45:18 50:5,24
  51:11 75:22 78:1

94:18 113:14
**positioned** 123:24
**positive** 117:20
**possession** 95:9
  95:10
**possible** 32:1 37:8
  53:9 54:16 55:20
  63:21 66:9 95:8
**post** 15:18,20
  38:25 56:24 97:14
**potential** 88:22
  96:7
**potentially** 68:10
  126:21
**potentials** 111:22
**practical** 40:8
**practices** 87:22,23
  88:2
**pre** 39:1 97:9,13
  109:13
**preempted** 38:20
  56:20
**preemption** 33:6
  60:2 67:14
**prejudiced** 56:1
**preliminary**
  15:16 97:24
**premise** 97:7
**prepare** 21:15
  69:20
**prepared** 68:3
**prepetition** 39:3
**preserve** 86:5
**preserved** 35:16
  40:18
**press** 42:18
**pretty** 14:17 63:5
**prevail** 93:21
**prevents** 37:10
**previous** 118:21
**previously** 20:2
  99:3 118:5,10
  119:7

primarily 106:24
primary 18:15
72:3
primed 62:19
principal 76:23
principally 68:8
83:15
principle 85:24
86:6 93:14,21
100:5,8,9 101:13
105:2
principles 99:7,11
99:11,13,16,25
100:18,18
printed 81:19
89:9
prior 50:13 64:3
92:10
priority 71:17
77:18
private 81:19,21
81:25
pro 13:10 41:24
128:11
probably 14:21
31:22 32:11 96:6
96:7
problem 17:25
44:1 61:19 62:20
64:10 80:14 92:12
105:25 108:21
126:21
problematic
86:24
problems 120:1
120:10
procedural 32:10
116:20 125:16
procedurally
96:22 119:12
procedure 43:1
50:24 74:21

procedures 7:16
36:2 44:20 45:10
68:5 113:9
proceed 14:23
41:5,17 43:6 44:2
60:22 62:23 67:24
71:13 117:2,5
proceeding 47:22
63:20
proceedings
117:23 129:13
130:4
process 15:25
32:14,23 33:18,21
34:16,23 35:6,18
36:2,6 37:2,10
40:17,20 42:18,19
43:4 44:11,16
45:9,19,21,25
46:1,3 48:2 50:1
52:7 53:18 54:2
55:18,25 56:17
57:1 58:22,23
59:10,15 68:12,23
102:16 109:14
123:7
processes 54:5
professional 52:1
63:6
profit 82:6
program 76:11,12
77:3 81:4,4,18
82:23 83:16,19,22
84:7,7,8,9,12,17
84:19 85:2
progress 18:12
60:20
prohibit 85:1
prohibited 76:9
84:18 85:4
prohibits 84:6
proof 9:2 38:9
48:13 85:22 91:11

119:9 120:24
proofs 2:14,22 3:1
3:5,13,21 4:4,13
4:21 5:2,9,17,23
6:2,6,10,14,17,21
7:2,6,9,22 8:13
19:6,8 28:13
proper 119:8
properly 36:22
property 11:21
12:16 14:20 18:15
32:18 35:22 36:16
37:11,18,22 38:19
38:24 42:4,6
48:10 51:6,14
56:10,18 60:16
67:1 72:2,5 73:1
73:15 77:5,21
78:16 80:3,4,7,13
81:11 82:11 83:18
84:7,10,23 86:6
87:16 90:9 91:20
100:24 101:22
106:18,23,24
114:24,25 115:12
115:13,13 126:14
proposal 45:16
60:7 61:14
propose 14:14
17:15 18:18 45:13
45:17 88:11
128:13
proposed 26:6
27:12 28:4,20,21
32:15 40:20 42:14
42:20 43:4,4,5,9
43:10,18 45:2,6,8
45:12 46:5,6 48:1
48:4,21 65:6
89:24 91:25
128:19,22
proposes 44:25

protect 87:22
protection 113:20
provide 21:17
52:2 56:15 57:2
63:25 88:12 92:21
108:11
provided 21:20
35:4 51:14 71:8
101:5
provisions 118:1
publication 55:7
55:16 66:8
publish 43:11
44:6,24 47:16
55:5
pulling 90:9
purpose 31:22
68:11 93:17 99:8
99:8,13 108:6
113:16 115:10
purposes 16:13
37:15,19 57:22
98:3
pursue 88:22
115:7
push 38:22
put 43:2 53:6,9,16
63:23 68:9,22
81:13 88:5 101:23
121:11
puts 40:8 66:23

**q**

quarterly 60:12
62:18
question 38:16
65:13 123:25
questions 16:8
18:17,19 31:19
41:6,13 57:2 69:8
74:3,5 77:25 78:3
84:2 119:14,14
126:24

| | | | |
|---|---|---|---|
| **quick** 14:15 | 120:12,13 125:19 | **recovery** 6:13,16 | **relationship** |
| **quickly** 14:16 | **reasonable** 63:7 | 6:20 7:1,5,8 9:1,6 | 78:12 |
| 15:5 | 86:5 110:1 | 19:21 25:23 28:12 | **relatively** 63:1 |
| **quite** 34:9 55:20 | **reasoned** 62:13 | 29:2 74:1 91:1 | **released** 6:6 |
| 77:22 | 88:19 | **red** 100:17 | **relevant** 95:8 |
| **quote** 37:10 39:3 | **reasons** 32:5 | **reduce** 24:25 | **relief** 7:20 20:5,23 |

**r**

**r** 1:21 10:1 14:1
130:1
**raise** 76:1
**raised** 46:8 76:7
96:16 104:12
**raises** 57:18
**raising** 36:13 68:7
**rating** 82:3
**ratio** 77:4
**reach** 29:15 30:10
46:18 52:8 66:2
**reached** 20:14
30:13 87:11
**reaches** 77:5
**reaching** 59:21
**read** 17:25 22:4
62:12
**reading** 63:18
**ready** 44:3 53:14
**real** 39:6 80:25
100:24 101:22
106:18,23,24
109:24 113:9
114:24 115:2,13
**reality** 119:1
**really** 18:11 36:13
38:22 39:14 40:1
40:8 50:8 52:16
54:12 55:7,8,17
57:19 58:8 62:19
64:17 77:23 78:12
79:10 80:22 107:7
121:5
**reason** 54:12
74:16 93:3 107:12
108:16 115:12

36:19 40:4,19
42:5 52:16 56:2
58:7 94:2 98:16
113:2 125:10,11
**recalled** 87:16
**receive** 26:16
27:20 82:12
122:21 124:14
**received** 19:9 20:8
23:1,14 24:5,14
26:3,19 27:9,24
28:16 29:5,10
49:11 123:9
**receiver** 13:3
**receiving** 35:2
124:4,4,8,12
**recharacterized**
77:19
**reclassified** 73:24
**reclassify** 94:21
95:13,18,21
**recognize** 97:8
**recognized** 40:17
**recollection**
105:10
**reconcile** 44:16
**reconsideration**
116:9
**record** 21:11
22:21 30:24 48:22
53:2 54:3 64:25
68:24 69:7 84:14
89:23 98:4,25
113:22 114:6
116:7 130:4
**recover** 25:25
26:13

**reduced** 35:20
65:6 79:3
**reducing** 36:3
40:23
**refer** 41:21 98:2
118:12 119:6
128:11
**reference** 101:22
**referred** 113:8
117:17 118:7
**referring** 95:2
**reflect** 48:22
88:19
**reflected** 42:19
62:14 68:5
**reflects** 128:14
**refresh** 105:10
**refused** 89:14
**regard** 39:15
50:21 108:5
109:20,21
**regarding** 18:14
19:10 20:15 33:5
60:15 69:15 73:16
**regardless** 65:17
**regular** 63:4
**rejecting** 54:13
**rejoin** 96:12
**relate** 43:1 76:5
**related** 7:20 86:2
117:22
**relates** 14:20 15:9
22:20 75:14 82:22
121:22 127:5
**relating** 15:6 31:2
76:22

30:2 33:20 45:4
96:2,10,20 97:1
119:6,8 126:16
127:9
**relying** 46:12
**remain** 46:3
**remaining** 7:16
23:6 34:7 43:6
62:22 63:12 83:11
83:11 88:11 89:6
**remark** 97:24
**remedy** 121:21
**remember** 81:15
**remind** 44:8
**reminded** 21:17
**repeat** 31:6 91:17
**reply** 15:13 31:13
37:14 38:13 42:17
44:18 71:5 88:14
91:18 102:22
103:14,19
**repo** 80:19
**reponses** 62:14
**report** 31:9 56:17
56:18 60:16,20,24
61:10,11 63:8,25
**reporting** 50:12
50:14,18,21 57:1
60:7,12 64:11
68:24 69:15
**reports** 56:24
59:11 62:18 63:4
63:8,9
**representative**
18:14,25 21:4
34:22 49:4,18
64:1 71:6 95:22

112:18

**representatives** 48:7 68:20

**representative's** 94:20 95:18 113:3

**represented** 36:11 68:21

**representing** 62:8 62:10

**represents** 94:11 114:7,10

**request** 16:11 19:11,16 20:23 22:19 23:10 24:1 24:11 25:11 26:4 26:10,17,22 27:2 27:10,15 28:2,9 28:18,24 29:13 30:14 53:4,6 68:14,17 69:13 74:4 96:10 108:25 109:20 113:3 118:9 121:22 125:2,17 127:2,2 127:9

**requested** 20:23 30:2 33:20 96:2

**requests** 7:16 20:8 21:16 118:17

**require** 37:6 40:9 53:25

**required** 33:1 50:18 58:16 60:12 109:8

**requirement** 59:19 60:25 61:23

**requirements** 50:12,18 98:20 103:24

**requires** 33:14 37:24 60:19

**res** 71:20 74:15 118:25

**reservation** 31:11 35:14,17 49:13

**reservations** 49:25 52:11,12

**reserve** 74:2 77:20 97:2

**reserved** 36:22

**residence** 88:13

**residential** 100:23 100:23 101:3,11 101:16 108:10,14 112:1,10 114:8 122:15

**resolution** 29:16

**resolve** 16:7 42:23 42:24 44:12 48:25

**resolved** 31:10,13 35:7 46:25 48:11 111:24 126:19

**resources** 65:2

**respa** 112:18 113:9,10,12 114:22 115:1

**respect** 14:15 16:2 22:12 23:4,16 24:6 26:1,14,16 26:18,22 27:6,8 27:19,20,23 28:13 28:16 29:4,7,9,10 29:13 30:3 31:5 35:4,15,16 38:25 39:5 41:8 43:6 46:7 49:8 53:7 54:20 57:24 60:16 60:21 61:6 66:18 67:6,24 70:9,19 71:2 73:19 77:16 97:3,3,4 101:3 109:4 111:15 123:14

**respectfully** 19:11 20:8 26:4 28:18 68:13,16 74:4

84:20 85:11,18 86:24 87:8 88:4,7 89:3,25 90:12,14 120:10,11,13 121:4 125:7,10,15 126:16 127:3 128:4

**respective** 42:10

**respond** 21:23 22:5 41:10 66:12 94:9

**responded** 21:22 25:3 35:6 69:21

**responding** 35:12 102:23 103:19,25

**response** 2:16,17 4:6 8:16 19:16 22:19 23:10 24:1 24:5,11,18 26:10 27:2,15 28:8,24 29:6,10,12,14 52:21 71:4 91:13 91:14 104:1 108:23 111:19

**responses** 19:10 20:7,11 21:15 23:2,15,15,15,19 24:14 26:20 27:9 27:20 28:17,17 29:5 41:8

**responsible** 51:11 95:15

**rest** 35:2

**result** 37:3,25

**retained** 87:7

**retirement** 78:11

**return** 7:14,17,19 31:25

**returned** 34:2,5 35:19 36:7 37:4 37:16

**returning** 32:24 57:24

**reverse** 2:17 15:11 16:25 76:5 78:9,16,24 80:10 80:21 81:9,20 82:5,11 85:4,15 86:7,10,13,18 87:1,5 89:17 90:9 92:16 98:21,23 101:6,8

**review** 15:16 29:14 52:13 74:6 75:2 89:2 90:19 123:7

**reviewed** 19:14 20:21 89:22 109:7 124:19

**revised** 35:9,13 42:19 43:5,19 48:24 51:16 69:20 128:17

**revising** 42:13

**revived** 48:20

**rich** 10:17 16:23 16:24 17:20,23 18:4

**richard** 8:16 10:24 13:9 21:6 75:14

**ride** 79:6,20

**right** 14:2 17:18 17:24 18:5 19:1 20:11,22 21:5 22:9,13,18 25:6,9 25:20 29:17,21,25 30:9 33:14 34:18 37:4,9 38:2,17 39:8 40:21 41:5 43:23,24 44:1 47:23 48:1 49:2,7 49:16,22 51:1,3,7 51:17 52:19,21 55:3 56:3 58:21 58:23 59:9 61:4

63:18 64:9,13,16
67:22 68:2 69:8
69:24 70:3,16,23
71:12 75:10 81:14
83:3 90:11,21,24
91:7 94:4,4,14
98:9 99:6 101:6
103:11 105:4
108:19 111:3,6,20
113:4 114:16
115:15 116:5,11
116:16 117:3,5,6
119:17,24 120:9
120:21 121:23
125:1,3,4,6
126:12,15,18,22
127:13 129:7,11
**rights** 31:11 35:15
35:15,17 40:18
46:10 49:13 86:25
87:6,12 97:2
110:15
**rising** 77:12
**rms** 76:6,8,9,15
76:25 77:10,22,23
77:23 78:11,20
83:17,17,22 84:14
84:15,18 85:1,14
86:3,4,5,8,9,12,25
87:5,10,13,25
88:12 89:9
**rms's** 83:16
**road** 125:8 130:21
**robert** 10:17
16:24
**roberts** 8:15
**robust** 44:20
**rodriguez** 69:2
**rolling** 46:21
**roof** 26:17
**rosenthal** 41:23
**rothstein** 100:1

**roughly** 87:19
**rubenstein** 11:18
41:15,16,19,20
43:15,18,22 44:3
44:5 45:15,17
46:23 47:20,24
49:9 52:16 62:8
68:21
**rule** 15:23 16:9
40:9 74:20 97:16
109:11,16 115:18
125:2
**ruled** 71:24 96:25
115:17 121:3,4
**rules** 16:6 72:6
74:21 93:12 109:4
**ruling** 16:17 67:5
84:1 89:7 90:13
96:4 106:11
125:14 127:22
**rulings** 74:13
118:25
**run** 39:4

**s**

**s** 8:16 10:1 14:1
**saint** 12:18
**sake** 111:10
**sale** 101:5 123:6
123:10
**satisfied** 6:6,14
26:2,6
**saw** 66:8
**saying** 47:3,7,15
54:21 55:21 56:14
58:22 59:7,16
62:15 66:24 67:17
67:19 81:15 86:22
89:17,19 103:8
104:22 107:18
114:22 121:17
**says** 36:24 61:21
66:8 97:2 113:10

**schedule** 16:10
17:3,16 26:6
27:12 28:4,20
**scheduled** 35:10
**se** 13:10 24:24
63:9 128:11
**searching** 55:11
65:2
**second** 2:14 5:8
7:22 21:17 38:5
44:2 46:18 80:7
91:25 92:4 96:1
98:24 99:24 100:2
100:6 102:2
106:22 113:14
121:4,6,24 122:5
125:7
**secondary** 52:5
**section** 73:25
**sector** 81:19,21,25
82:9
**secure** 91:20
**secured** 71:17
76:3 77:17,21
83:6 114:23,25
**secures** 77:21
**securing** 72:18
**security** 78:10
79:24 81:23 91:20
106:18 115:11,14
**see** 18:9 29:15
30:10 31:9 34:15
35:21 37:13 47:12
66:14 81:10 85:13
86:19 90:5 111:9
127:12 128:19
**seek** 21:23 35:17
45:3 68:1 109:8
**seeking** 24:22
43:3 96:3,19,20
97:1 110:14,25
119:8

**seeks** 19:7,22
33:21 118:24
**segregate** 108:16
**segregated** 39:18
39:25 108:7
**select** 72:7,13
73:14
**selling** 78:6
**send** 43:10 44:7
44:23 58:5 66:2
**sending** 58:4
**senior** 79:12
**seniors** 79:14
80:22 81:5,7
82:15 90:7
**sense** 16:13 17:3
53:20 61:7 64:23
107:7 112:22
**sent** 21:21 32:4
78:22 82:25 84:14
107:18,19 117:13
120:3,4 121:12,14
123:8
**separate** 92:21,22
97:17 105:1 108:7
108:11 113:16
**separately** 53:6
**separation** 113:25
114:1
**september** 44:8,9
78:6
**series** 126:24
**serious** 39:6
**seriously** 38:24
54:7
**serve** 108:2
**service** 91:21
102:5 112:22
113:14 119:1,5
121:9
**serviced** 76:6
98:25 99:1,3
102:3 107:6,15,18

118:10
servicer 72:8,10
   72:12,15,22 73:10
   73:17,18 76:15
   77:1 86:14 87:7
servicers 77:7
servicing 72:7,8
   72:10,13 73:13
   86:13 92:24 101:6
   102:2 106:25
   107:24 112:5,13
   113:7,9 121:18
   122:21,23,24,25
   123:1,13 126:25
set 15:22 26:6
   28:19 50:9 56:13
   58:13 59:18 65:16
   69:7 71:22 74:8,8
   74:12 112:24
   116:19 117:15
   118:19 122:12
   124:22 127:16,25
settle 34:13 82:4,5
   88:10 90:18 127:8
settlement 88:22
   89:18,24 113:9
settles 8:2
settling 128:12
seven 36:9,12
   75:24 83:4
share 17:9 40:6
   69:20 124:21
shared 61:15
shellpoint 118:10
   122:14
she's 118:21
shoes 111:17
short 71:15
shorten 46:20
   53:4 58:14
shortened 50:3
shortening 54:13
   55:16

shot 82:8
shouldn't 37:24
   81:18 103:1
   111:23
should've 107:12
show 17:14 37:17
   37:18 38:9 80:16
   90:4
shown 56:20
shows 66:7 78:22
   84:11,14 85:23
   98:25
shut 57:14
signed 83:16
significant 46:25
   50:14 94:22
signifies 100:14
signs 128:16
sill 24:3
similar 37:22
   77:15
similarly 9:4
   44:18 106:14
   115:4
simple 32:9 39:12
   39:18,24 53:23
simply 36:15 94:1
   96:23
singh 10:8 14:7,8
   14:9,11 15:2,4,8
   17:11,15 18:3,6
   18:21 30:22,23,24
   31:21 42:2 43:21
   43:23,25 44:12
   46:8,9 48:11
   51:22 52:21,23
   53:1,1 54:19 55:3
   58:19 59:8 60:8
   61:20 63:22,24
   65:23,24 67:11,12
   67:15 68:3,4,18
   69:17,19 70:4,7,9
   70:17 71:1 75:9

75:11,12,20 82:17
   82:18 83:24 84:3
   90:17,17,20,24,25
   116:6,7 123:23
   124:2,2 129:3,5
   129:12
sir 51:9 78:5
   82:16 89:8 90:1
   127:20
sit 53:13,17 57:10
   106:10 109:5
sitting 33:10
   39:25
situated 9:4
   106:14 115:4
situation 23:14
   61:15
situations 66:9
six 23:17,21 31:10
   35:1 63:15 73:2
   125:23
sixth 3:1 6:9
sixties 78:7
sixty 2:22 3:1
slight 96:9
slippery 40:14
slope 40:14
small 63:1
smaller 34:14
social 78:10 79:24
   81:22
sold 92:16 107:3
   122:22
solely 75:14 95:23
   102:12
solomonic 62:13
solutions 2:16
   15:10 16:25 80:11
   130:20
somebody 66:7
   101:24
somewhat 86:23

sonkin 10:9 18:22
   19:2,3,18 20:13
   20:18,25 21:2
sonya 9:25 130:3
   130:8
soon 82:2
sooner 46:4,21
   48:3 67:17
sorry 15:3 20:17
   22:6,7 29:18,23
   43:16,25 45:15,16
   46:14 54:17 58:19
   69:10,11 83:24,25
   94:5 98:8 101:10
   102:22 103:4,12
   104:18 106:4,8
   107:17 108:20
   110:20 111:1
   114:19,21 120:18
   124:9
sort 15:22 16:7
   31:3 32:2,2 33:10
   34:7 39:4,24 40:3
   48:19 53:3,4,6
   54:1 55:11,16
   56:13 57:15 59:3
   59:13 60:5,15,21
   62:12 64:8 66:3
   66:14,15 67:5,15
   76:19 95:14 108:3
sought 28:14 88:1
   99:20,21 107:3,22
   118:7
sounds 49:23
   62:19
southern 1:2
   46:14,15 117:16
speak 29:20 62:5
   82:15
speaking 59:7
special 7:18 108:7
   123:9

specialized  72:7
  72:10
specific  77:10
specifically
  102:23 103:19
  113:20 118:22
specifics  123:22
specified  25:5
speculative  86:23
spend  65:1
spent  53:15
spirit  93:4
spite  51:19
spread  79:1
stakeholders
  33:17
stalking  101:7,8,8
stand  109:3,14
  111:16 113:13
standalone  103:1
standard  16:4
  17:5
standing  33:6
  38:18 72:4,23
stands  115:3
stang  11:6 25:19
  91:6
start  15:2 34:17
  41:14 46:4 53:17
  57:10 108:23
started  18:8,20
  39:18 81:6 83:1
  106:2 107:1,14
starting  55:1
state  11:14 12:2
  12:15 27:21 31:12
  32:18 37:15,19
  40:14 48:7 49:3,6
  49:17 50:16,18
  51:4,6,14 56:20
  58:2 64:25 73:20
  74:19 75:1 76:10
  76:13 88:6 105:1

stated  51:22 94:23
  95:12
statement  37:6,13
  67:1 85:21,23,23
  102:14,14 114:6
statements  89:9
states  1:1,12
  31:15 33:6 34:6
  34:25 35:1,23,25
  35:25 36:1,9,12
  36:15,25 37:10,15
  37:18 38:5,8,18
  38:22 39:8 40:5
  40:12,15 41:3,14
  41:20,22 42:9,17
  43:12 44:19 45:5
  46:10 50:20,23
  52:20 53:22 55:21
  56:4,8,16 57:2,21
  57:23 58:3 59:10
  59:21 60:10,22
  61:14,16,16,24
  62:2,9,9 63:1,10
  64:1 65:10,13,15
  65:22 66:25 68:20
  68:20 70:10,13
states'  42:3,10
  45:24 59:24 110:2
state's  56:18
stating  93:12
status  14:15,25
  15:9,14 58:11
  59:14 60:19 61:10
  61:17 62:2 63:3
  63:16 64:3 69:3
  73:25 104:5
statute  93:8
  112:15,24
statutes  99:19
  100:10,19
statutory  99:12
  99:13,25 100:17

stay  56:10 70:11
  70:14 81:7 82:11
  116:4
stayed  97:11
steep  46:8,9
steering  32:16
step  32:14 33:17
  33:19,25 34:16
  35:6 40:20 45:6
  47:11 51:17
steps  63:13
steve  41:23 91:5
  105:22 114:20,21
stone  56:13 58:13
  59:18
story  78:19
straightforward
  31:24 32:9
strategy  86:19
street  11:22 12:3
  13:4
strekalov  7:25
stressful  86:17
strikes  46:23
stuck  80:17
stuff  58:23 81:2
sub  108:9
subject  42:21
  48:16 73:24 74:10
  97:11 115:14
submit  7:16 19:17
  20:23 22:21 23:11
  24:2 25:12 26:11
  27:3,16 28:9,25
  30:7 75:4
submitted  48:20
  48:24 51:17 74:7
  83:20 84:11 85:18
  85:20 127:13
subsequent  92:2
  118:3,14
substantial  46:2
  59:2

substantially
  100:13
substantive  46:7
  125:16
substantively
  118:15,20 119:12
success  55:20,23
successful  17:5
  85:8 105:9
successor  73:17
sudden  79:21
suffered  93:1
sufficient  19:23
sufficiently  73:8
suggest  59:5
  60:11 61:20
suggested  32:14
suggesting  60:10
  112:22
suggestion  15:25
  60:9
suggests  38:24
suite  11:3 130:22
summarize  21:12
  75:18,21
summarized
  22:20 83:14
summarizes  78:1
summarizing
  35:22
summary  37:13
  37:14 47:19,21
sunny  10:8 14:9
  30:23 53:1 75:11
  116:7 124:2
superior  12:10
superseded  6:22
  27:6 83:11
support  19:24
  21:20 33:17 77:12
  83:20,21 84:22
  86:21 92:4 94:12
  95:13 97:6,25

103:22
supportable  76:2
supporting  73:8
supposed  45:13
96:18
sure  32:10 34:3
38:23 53:24 54:19
55:17,25 58:10
70:3 91:10 109:10
117:2 122:5
128:19 129:8
surmised  32:11
survive  72:19
susceptible
109:25 110:3
sustain  19:11 20:9
89:4 90:14
sustainable  93:18
sustained  75:3
94:2
suzanne  8:15

t

t  130:1,1
table  35:20
take  43:12 53:3
54:5 55:10,18
56:15 78:13 80:8
80:16 86:5 89:15
101:14 109:12
taken  51:10 81:24
103:1 112:17
128:18
takes  18:6 54:6
70:18 90:25
talk  17:8 57:12
59:4,5,21 64:4,8
talked  78:12
talking  39:2 53:21
55:2 57:20 59:21
66:4,5 86:7 97:20
97:22 102:1
tanya  79:23

tara  11:1
taracorp  100:7
tax  27:21 76:10
76:16 78:13 79:14
83:16,19,22 84:6
84:8,12,16,19
85:2 89:10
taxes  76:13 78:15
79:1,12 82:23
83:18 84:23
taxing  69:16
team  63:6 116:10
technical  54:9
tedious  44:16
teed  62:21
telephone  80:3
89:11 113:20
telephonically
10:8,9,10,17,24
11:1,11,18,25
12:6,13,20 13:7,9
71:9
tell  30:14 45:8
telling  37:7 82:22
125:10 126:23
ten  19:7 80:17
tend  109:10
tenth  3:12 6:13
term  32:17 34:21
64:2 67:3 92:13
93:19 101:10,11
101:19,25 109:22
109:25 110:3
126:15
terminology  95:1
109:23
terms  46:8 53:20
64:3 84:15 101:23
104:8 106:20
108:6 115:10
128:22
terrific  17:24
22:24 30:9,16

117:5
terrified  19:1
tested  91:1
testimony  81:1,17
texas  46:15 78:13
79:14
thank  14:10 16:23
17:23 18:3,4,5,20
18:21 19:18 20:25
21:1,5 22:18,24
25:6,8,9,17,21,22
26:7,12 27:4,17
28:10 29:25 30:7
30:16,17,21,23
31:20 41:18,19
43:24 46:22 48:4
48:6 49:2,16 51:3
51:8,9 52:19,24
52:25 64:19 69:24
70:1,2,15,16,17
70:23 71:14 75:6
75:7,11,20 78:2
79:11 82:15,18
84:5 90:21,22,23
91:4,8,9 94:14,17
94:18 96:15
103:11 105:4,6
106:7 108:22
111:20 113:4
114:15,16 115:19
115:21,23 116:3,5
116:6,15,24 117:6
128:23 129:2,3,5
129:7,11,11,12
that's  16:14,19
17:14 21:25 22:9
29:19,23 30:4
31:25 33:19,22
34:4,23 37:4,12
37:23,23 38:10
39:4,6 40:2,7,13
40:14,17 41:7
44:1 47:7,20 48:4

50:19 51:2,19
52:18 53:25 54:12
54:25 55:3 56:20
56:22,22 58:21
59:6 60:12 61:4
61:12 63:24 64:5
64:10,24 65:17,25
67:4,15,16,19
69:24 70:20 80:11
81:3 82:7 85:19
85:22 86:19,24
87:2,19 89:19
91:17 95:2 96:6,7
97:1 98:19 99:5
104:15,21 107:19
107:21 109:7
112:21 114:14
115:14 116:1
118:6 119:16,25
120:21 121:2,5
123:2 124:6,6,10
125:6,13 126:9,21
126:21 127:5
129:3
theft  125:23 126:9
127:17
theme  45:1
theoretically  55:6
there's  14:16
22:13 38:12 39:13
47:8 56:12 60:1
65:7 66:18 76:6
77:9 80:7,8 81:14
81:15,21 88:24
89:18 93:2 98:19
100:6 104:13
105:1 106:10,19
108:16,23 109:13
112:23 114:10
115:12 121:25
124:20 125:3,10
125:15

| | | | |
|---|---|---|---|
| **they'll** 58:11 | 88:5,24 91:1 | 101:24 106:25 | **transferred** 39:21 |
| **they're** 38:19 39:5 | 93:18 94:2,8 | 107:3 114:15 | 72:13 76:20 82:1 |
| 45:25 54:14 60:3 | 95:14 96:6 104:15 | 115:3 124:19 | 82:2 86:12 87:10 |
| 66:21,25 67:7 | 104:19,21 108:1 | 125:9 126:19 | 107:4,8 118:10 |
| 80:1 99:5 100:20 | 109:24 112:2,6 | 129:6 | 122:14,22,23 |
| 108:16 111:4 | 113:10,15 115:2,9 | **timeline** 46:5,21 | 123:6 |
| 120:19 123:18 | 115:16 116:6,24 | 50:3,21 52:15 | **transferring** 77:1 |
| 124:11,12 | 119:17,25 122:9 | 53:7 | **transition** 18:24 |
| **they've** 42:15 | 123:23 126:17 | **timelines** 45:12 | **transportation** |
| 45:20 63:6 66:14 | 127:6 128:10,17 | **timely** 20:7,12 | 100:25 |
| 82:1 88:15 | 129:3 | **times** 87:16,17 | **treasurer** 13:3 |
| **thing** 33:14 38:2 | **thinking** 16:19 | **timing** 43:1 45:2 | 27:22 |
| 46:11 84:13 89:10 | 60:21,25 61:14 | **title** 88:12 | **treasurer's** 12:15 |
| 95:20 109:21 | **thinks** 22:4 | **today** 15:14 18:10 | **treasurer's** 51:6 |
| 125:7,7 | **third** 5:22 7:12 | 18:11,14 29:12 | **treated** 80:15 92:2 |
| **things** 30:10 32:2 | 10:21 11:8 76:25 | 33:18,20 38:6,23 | 92:19 96:4 |
| 32:22 35:13 47:3 | 83:7 92:1,5,7 | 40:12 43:11 44:6 | **treating** 95:23 |
| 60:3 62:18 63:7,7 | 117:7,25 | 49:25 50:2 51:20 | **treatment** 92:21 |
| 121:8 | **thirteenth** 4:12 | 57:10 58:14 67:19 | 108:7 |
| **think** 14:21 15:3,4 | 7:1 | 69:7 71:8,11 | **tree** 117:10 |
| 15:16,22 16:12 | **thirty** 5:22 6:1,5,9 | 75:17 97:1 106:10 | **trenches** 81:1 |
| 17:3 18:8,14 30:4 | 7:22 | 109:3,5 118:16 | **trenton** 11:23 |
| 31:7,21 32:9 | **thought** 25:3 | 127:7 128:14 | **triggered** 117:14 |
| 34:20 36:2,19,20 | 32:11 53:12,19 | **today's** 109:23,23 | **trouble** 90:7 |
| 37:2,4,6,7,12 | 59:15 80:19 95:24 | 116:8 119:9 | 103:5 106:5 |
| 38:12,22 39:2 | 96:22 | **told** 36:1 122:22 | **true** 114:9 130:4 |
| 40:1,5,13,19,20 | **three** 35:20 105:2 | 122:23 126:12 | **trust** 11:7 25:23 |
| 41:1,12 47:7,21 | **threshold** 15:17 | **total** 31:11 83:5 | 33:5 38:10,16,17 |
| 47:25 50:1,16,22 | 35:21,24 66:20 | 85:24 | 39:9,11 72:16,17 |
| 53:6,25 54:3,6,15 | **throat** 110:6 | **totaling** 75:25 | 84:5,5,11,16,22 |
| 54:25 55:6 56:1 | **thursday** 17:12,13 | **totally** 53:25 56:8 | 85:3 86:4,9 87:4 |
| 56:19,19 57:4,17 | **tie** 54:1 57:4 58:8 | 57:17 | 91:2,6,11 92:9 |
| 58:8,12,17 59:6 | 61:5 | **touch** 30:15 81:10 | 94:1,9 95:14,15 |
| 59:20,22 60:1,8 | **tied** 55:1,16 62:17 | **traced** 39:12 | 106:19 108:18 |
| 60:10,13,17 61:8 | **time** 21:9,14,17 | **tracing** 33:5 38:16 | 110:23 111:2,12 |
| 62:15,24 63:18,24 | 32:11 34:9,10 | 60:2 | **trust's** 6:13,20 |
| 64:15,18 65:24,25 | 39:23 41:13 43:3 | **track** 81:4 83:1 | **trustee** 10:20 11:2 |
| 66:5 67:4,6,18 | 44:16 45:3,12,23 | **transaction** 123:6 | 18:13 19:21 20:15 |
| 68:10,11,24 69:24 | 46:17 48:4 52:9 | 123:10 | 21:7,15 24:20 |
| 70:4 74:11 75:16 | 53:15,19 54:4,8 | **transcribed** 9:25 | 25:16 32:16 48:19 |
| 76:6,24 77:9 79:5 | 58:24 59:4 65:2 | **transcript** 130:4 | 91:13 93:7,9 98:1 |
| 83:13,14 84:20,21 | 72:16,23 79:6 | **transfer** 86:25 | 104:22,23 105:11 |
| 85:17 86:24 88:4 | 80:4,5,6,7 93:3 | 87:6,12 | 110:13,24 111:16 |

117:21
trustees  3:4,12,20
  4:3,12,20 5:1,8,16
  5:22 6:1,5,9
trustee's  18:25
  23:1,13 24:4,13
  94:12 96:23 97:6
trusts  6:16 7:1,5,8
  9:1 95:14 111:11
trust's  25:25
  26:13,24 27:5,18
  28:12 29:3 30:18
try  21:12 31:24
  33:22 35:11 63:20
  71:14 89:11 98:8
trying  34:17
  47:24 57:14 62:20
  80:8 84:1 90:5
  107:14
turn  18:22 36:15
  41:10 53:4 68:8
  91:2 96:11 97:5
  99:4 100:21
turned  42:9 65:10
  65:21 73:14
turning  25:25
twelfth  4:3 6:20
twenty  5:8,16
two  18:23 23:14
  29:5 32:14 33:4
  33:17,25 34:16
  35:6,16 40:20
  42:24,25 46:12
  49:25 50:13 58:17
  71:15 72:21 78:12
  78:17 79:1,7,17
  79:18 80:8 82:24
  83:8 91:15 98:15
  98:20 101:7 108:9
  111:11 118:9,19
twomey  11:1
  21:15,21 24:19
  25:6,7,8 116:2,4

tying  60:9
type  61:19 80:14
types  35:24 36:5
  112:3
t's  89:12,13

### u

u.s.  1:23
ultimate  38:18
  72:2
ultimately  37:11
  62:21 73:15 92:1
  95:16 105:10,11
  109:2 111:25
un  109:18
unclaimed  7:14
  7:17,19 11:21
  12:16 14:20 15:7
  18:15 31:2 32:1,3
  32:18 35:19,22
  36:16 37:11,17,22
  38:19,24 42:3
  43:7 44:21 46:2
  46:10 48:10 50:6
  50:14 51:6,13
  52:6 56:10,18
  60:16 68:2 81:18
unclear  95:20
  96:3
uncontested
  14:17,19 15:5
  18:18 25:15 26:3
undecided  109:19
undefined  93:19
underlying
  106:11
understand  30:12
  43:12 45:23 46:16
  47:15 59:14,25
  67:22 68:6 72:6
  89:16,22 90:12
  94:10
understandable
  119:16

understanding
  109:23 111:21
  122:5,8,18 123:5
understood  82:22
undertake  33:22
undertaking
  65:20
undertook  107:9
undisputed  20:22
  74:12
unfair  36:20
unfortunately
  36:9
uniform  37:3
  40:17
united  1:1,12
universe  63:1
unknown  1:25
unliquidated  7:2
  24:25 27:19 28:3
unnecessary  20:6
  50:1,23 57:18
  65:1
unpaid  76:13
unquote  39:3
unrelated  56:10
unsecured  3:5,14
  3:22 4:5,14,22 5:3
  5:10,18,24 6:3,7
  6:10 9:9 25:16
  73:24 91:15 92:23
  94:21 95:19 96:22
  98:11 104:9
  105:13,20 113:17
  113:19,25
unspecified
  118:18
untimely  5:10
update  18:11
  60:15 62:4
updates  64:3
urge  62:16

usa  43:11 44:6
use  35:25 37:15
  37:19 100:9,17

### v

v  95:19 99:22
  100:1,7
vadim  11:18
  41:16,19
valerie  11:25 48:9
validity  19:24
value  77:5 86:5
various  32:5,17
  35:23 59:11 64:1
  72:4,15 74:13
  75:14 117:8,19,21
  122:13
vast  39:15,16
  45:24 96:6
vehicle  108:9
verified  58:5
veritext  130:20
verizon  116:14
vernacular
  101:23
vi  96:4,24 98:7,11
  98:12 102:19
  103:2,16,21,23
  104:9
viatcheslav  7:25
vice  41:24
victim  87:23
view  32:22,24
  35:5 36:22,25
  38:14 41:7 52:7
  56:23
violate  93:3
violation  54:9
  76:14 88:2
virginia  27:22
virtual  21:4 22:3
  30:19
visit  79:10,11

**voice**  128:20
**volume**  53:20
  54:10

---
**w**
---

**w**  12:10
**wait**  29:24 58:18
  67:10,10,10,16
  111:1
**waiting**  14:3 50:4
  63:15
**waive**  119:4
**waived**  119:2,22
  125:3 126:14
**waiver**  118:9,18
**waiving**  121:23
  122:1
**walk**  80:12
**walking**  80:3,9
**walsh**  13:7 69:9
  69:11,11,25 70:1
**want**  19:25 38:22
  47:2 54:21 55:1,4
  56:21 57:12 58:1
  59:4,21 61:5,15
  61:24 64:4,17
  65:25 67:5,17,18
  79:11,22 82:4
  91:17 98:1,4
  108:23 119:21
  120:6 123:2 126:1
  126:15
**wanted**  48:22
  49:10 64:25 65:18
  121:7
**wants**  29:20 31:24
  69:17 70:11
**washington**  12:3
**wasn't**  30:4 80:5
  91:10 96:18
  107:12 112:8,20
**way**  34:13 36:2
  41:5 45:10 47:12
  47:12,13,14 57:9

58:10 60:4 62:12
  65:4 66:19 101:25
  106:19 111:9
  123:9
**ways**  59:22
**week**  15:13
**weeks**  18:16 41:25
**weil**  10:3 19:3
  51:25 63:5 70:25
  75:12 116:10,13
**weiss**  29:7
**welcome**  69:18
  70:14
**went**  44:9 92:6
  124:14
**weren't**  32:4
**west**  12:3 13:4
**we'd**  17:6 96:24
**we'll**  15:8 18:2,8
  18:24 34:15 38:3
  53:16 55:5 62:1
  62:22 63:25 69:20
  75:6
**we're**  17:11 18:12
  34:3 39:1,24
  47:24 53:13,14,21
  54:8 55:8,11,20
  56:6,15,16,17,17
  56:24 57:1,7,11
  57:14,25 58:10
  61:22 62:9,20
  63:20 64:6,24
  65:9,19 66:1,1,6
  66:12,13,17 80:10
  86:7 89:11 92:12
  95:14 96:5 97:1
  97:20,22 98:5
  100:14 102:1
  105:17 109:22
  110:5 112:4,11
  114:13 116:19
  118:16 124:3
  126:11 127:5

**we've**  15:22,24
  18:10,11 27:9
  28:5,14,16 32:14
  34:9 35:14,20
  38:13 40:20 45:5
  48:18 53:15 54:12
  55:11,16 58:15
  61:4 63:4 66:3,10
  76:11 116:22
  117:7,17 125:8,13
**whatsoever**  73:21
**what's**  21:25
  43:17 45:16 60:15
  62:25 63:2,12,12
  63:12,15,16 82:19
  82:19 124:25
**wheels**  64:23
**wholeheartedly**
  109:17
**wholly**  112:13,18
**who's**  92:15
**wife**  80:6
**wikipedia**  101:21
**williams**  15:12
  79:23
**wind**  7:18
**wiped**  78:10
**wish**  16:21 51:4
  64:20 78:4 114:17
**withdraw**  49:12
  49:12
**withdrawal**  29:7
**withdrawing**
  52:15
**withdrawn**  30:3
  31:12 35:1,16
  42:25
**withdrew**  40:15
  41:4 69:21
**woman**  120:7
  125:20
**wonder**  112:11

**wondering**  65:9
**won't**  59:17 80:16
  81:10
**word**  100:3,15,21
**words**  99:15,21
  100:11,13,20
  102:11,12 123:12
**work**  30:10 35:11
  47:25 55:14,14
  56:16 68:18,22
  69:3 80:12 111:8
**working**  42:12
  81:22
**works**  17:16,18
  17:23 36:19 58:1
**worried**  79:19
  80:22 81:16
**worry**  79:18,20
**worth**  46:2 108:16
**wouldn't**  67:13
  89:10 95:13 96:12
**wow**  79:16 89:16
  90:16
**writing**  89:12,13
  128:21
**written**  90:3
  118:14
**wrong**  66:1 80:15
  81:15 104:19
**wrongdoing**
  77:13

---
**x**
---

**x**  1:4,10 57:16

---
**y**
---

**yard**  80:9
**yeah**  15:3 17:15
  51:2 55:3 67:15
  70:12 103:7
  105:25 114:18,20
  123:16 124:15
  126:8,10 127:18
  127:25 128:4

| | |
|---|---|
| **year**  45:21 79:1,7 85:21,21 118:5 119:3 | 120:11,24 124:22 127:2,3 |
| | **z** |
| **years**  50:13 73:2 78:6 79:7 80:17 90:2 | **ziehl**  11:6 25:19 91:6 |
| **yee**  8:6 70:19 71:4 71:7,10,15,21,25 72:21,22 73:1,8 73:12,20 74:14,18 74:25 | |
| **yee's**  71:3 72:9 | |
| **yesterday**  14:13 | |
| **yield**  40:3 | |
| **york**  1:2,14 10:6 10:15,22 11:9,16 46:14 72:16 93:14 99:8,18 111:23 | |
| **york's**  110:3 | |
| **you'd**  25:7 47:16 54:24 59:19 70:10 88:11 94:9 119:15 | |
| **you'll**  22:21 27:3 30:10 59:10,23 61:12 113:6 | |
| **you're**  43:17 46:24 47:3,6,7,8 47:13,15 54:21 58:22 59:5,6,12 59:15 61:11 63:18 66:5 70:12 80:15 80:17 82:8 86:22 86:22 87:23 89:17 105:9 107:17 119:20 120:22 121:17 124:8 125:17 126:15,20 127:18,19,22,22 | |
| **you've**  15:15 20:22 40:15 58:21 59:22 60:3 84:11 84:20,21 85:7,20 88:9 111:10 | |

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   CASE NO. 19-10412-jlg

4   - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   DITECH HOLDING CORPORATION,

8

9         Debtors.

10  - - - - - - - - - - - - - - - x

11

12                  U.S. Bankruptcy Court

13                  One Bowling Green

14                  New York, New York   10004

15

16                  January 28, 2021

17                  11:26 AM

18

19  B E F O R E :

20  HON. JAMES L. GARRITY, JR.

21  U.S. BANKRUPTCY JUDGE

22

23

24

25  ECRO:  Unknown

Page 2

1    HEARING RE Case Conference (Doc #57)

2

3    HEARING RE Sixty-Seventh Omnibus Objection to Proofs of

4    Claim (No Basis Consumer Creditor Claims) (Doc #3121)

5

6    HEARING RE Sixty-Eighth Omnibus Objection to Proofs of Claim

7    (No Basis Consumer Creditor Admin Claims) (Doc #3122)

8

9    HEARING RE Sixty-Ninth Omnibus Objection to Proofs of Claim

10   (Modified Consumer Creditor Claims) (Doc #3123); Response to

11   Motion filed by Jina McHargue (Doc #3192)

12

13   HEARING RE Seventieth Omnibus Objection to Proofs of Claim

14   (No Basis Claims) (Doc #3130)

15

16   HEARING RE Seventh-First Omnibus Objection to Proofs of

17   Claim (Misclassified Claims) (Doc #3131)

18

19   HEARING RE Motion of Plan Administrator Pursuant to Section

20   7.6 of Third Amended Joint Chapter 11 Plan of Ditech Holding

21   Corporation and Its Affiliated Debtors to Estimate for

22   Reserve Purposes the Priority Amount Asserted in Proof of

23   Claim No. 22049 Filed by Claimant Cherane Pefley (Doc #3120)

24

25   HEARING RE Fifty-Second Omnibus Objection to Proofs of Claim

Page 3

1    (Misclassified Claims) (Doc #2186); Liberty Home Equity

2    Solutions, Inc.'s Response (Doc #2314); Finance of America

3    Reverse LLC's Response (Doc #2315)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sheila Orms

Page 4

1    A P P E A R A N C E S :

2

3    HUNTON ANDREWS KURTH

4         Attorneys for Finance of America

5         200 Park Avenue

6         New York, NY  10166

7

8    BY:  ROBERT RICH, ESQ. (TELEPHONICALLY)

9

10   WEIL GOTSHAL

11        Attorneys for Debtors

12        1395 Brickell Avenue

13        Miami, FL  33131

14

15   BY:  NATHALIE SOSA, ESQ. (TELEPHONICALLY)

16

17   WEIL GOTSHAL

18        Attorneys for Debtors

19        767 Fifth Avenue

20        New York, NY  10153

21

22   BY:  SUNNY SINGH, ESQ.  (TELEPHONICALLY)

23        RICHARD SLACK, ESQ. (TELEPHONICALLY)

24        CLIFF SONKIN, ESQ. (TELEPHONICALLY)

25

Page 5

```
 1    PACHULSKI STANG ZIEHL & JONES

 2          Attorneys for GUC Trust

 3          10100 Santa Monica Blvd.

 4          Los Angeles, CA  90067

 5

 6    BY:  STEVEN KAHN, ESQ. (TELEPHONICALLY)

 7

 8    PACHULSKI STANG ZIEHL & JONES

 9          Attorneys for GUC Trust

10          780 Third Avenue

11          34th Floor

12          New York, NY  10017

13

14    BY:  BETH LEVINE, ESQ. (TELEPHONICALLY)

15

16    PACHULSKI STANG ZIEHL & JONES

17          Attorneys for GUC Trust

18          919 N. Market Street

19          Wilmington, DE  19801

20

21    BY:  MARY CALOWAY, ESQ. (TELEPHONICALLY)

22

23

24

25
```

1    ATTORNEY AT LAW

2        Attorneys for Consumer Claims Trustee

3        8 The Green

4        Suite 7028

5        Dover, DE  19901

6

7    BY:  TARA TWOMEY, ESQ. (TELEPHONICALLY)

8

9    ALSO APPEARING TELEPHONICALLY:

10   CHRISTOPHER STAUBLE, WEIL GOTSHAL

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 7

1                      P R O C E E D I N G S

2            THE COURT:  All right.  Good morning, this is

3    Judge Garrity and we are here this morning in Ditech Holding

4    Corporation, Case No. 19-10412.  I apologize for the delay

5    in getting started.

6            Mr. Singh, will you be leading us off here?

7            MR. SINGH:  Yes, good morning, Your Honor, Sunny

8    Singh, Weil Gotshal on behalf of the plan administrator.

9            Your Honor, we did file an agenda this morning for

10   today's hearing and we have a number of omnibus uncontested

11   claims objections and then we have a -- one contested claims

12   matter relating to Liberty Harbor and Finance of America.

13           So if it's okay with Your Honor, I'd propose to

14   just proceed down the order of the agenda.

15           THE COURT:  That would be fine, thank you very

16   much.

17           MR. SINGH:  Thank you, Your Honor.  So for the

18   first few matters, I'm going to turn it over to my

19   colleague, Nathalie Sosa who's on the line to present to

20   Your Honor.

21           Your Honor, we have filed a pro hoc vitae

22   application for Ms. Sosa and paid the fee.  The order just

23   hasn't been entered yet, which -- so I'd respectfully

24   request Your Honor that she be permitted to present to Your

25   Honor.

Page 8

1          THE COURT:  Your request is granted.  Ms. Sosa.

2          MS. SOSA:  Nathalie Sosa on behalf of Weil Gotshal

3    Manges, on behalf of the plan administrator.  I am going to

4    begin with the seventieth omnibus objection to the proofs of

5    claim.  That is ECF 3130.

6          THE COURT:  All right.

7          MR. SINGH:  And these were -- thank you, Your

8    Honor.  These were 44 creditor client claims asserting

9    secured administrative or priority status.  We have one

10   adjourned claim that is the one that was filed on behalf of

11   U&H Properties, Inc., Claim No. 21280.

12          Based on the review of these claims and

13   documentation provided with respect to the claims, as well

14   as the debtor's books and records we determined in each case

15   that there was no evidence to support the validity of the no

16   basis claims in the amounts asserted.  That the no basis

17   claims had already been paid in full or otherwise satisfied

18   and that there was in position documentation submitted to

19   support the validity of the claims and/or the no basis claim

20   was filed after the applicable bar date.

21          So other than the one adjourned claim, that was

22   21280 on behalf of U&H Properties, the objection as to the

23   remaining 43 claims proceeds uncontested and we ask the

24   Court to sustain the objection and order those 43 claims

25   disallowed and expunged.

Page 9

```
 1              THE COURT:  I've reviewed the omnibus objection

 2    and find that the facts submitted in support of the

 3    objection substantiate the merits of the objection.  And

 4    we're talking about the seventieth omnibus, No. 3130?

 5              MS. SOSA:  Yes, Your Honor.

 6              THE COURT:  Right, okay.  As I said, I've gone

 7    through that.  The objection is sustained, except as to UMH

 8    -- U&H Properties which you are adjourning; is that right?

 9              MS. SOSA:  That's correct, Your Honor, thank you.

10              THE COURT:  All right.  Thank you.  I'm having a

11    little trouble hearing you.

12              MS. SOSA:  My apologies, Your Honor.  Is this a

13    little better?

14              THE COURT:  Yeah, that's better.  No apologies

15    needed, it's just -- so are we going to go back to the

16    agenda now, the number 2, the 67?

17              MR. SINGH:  Yes, Your Honor, Sunny Singh, my

18    apologies, I screwed up the presentation.  Mr. Sonkin was

19    going to present the first three omnibus objections.  I

20    apologize, I got my order mixed up and put Ms. Sosa up

21    first.

22              THE COURT:  Not a problem.

23              MR. SINGH:  So, Judge, why don't we go back and

24    Mr. Sonkin is on, he'll do the 67th and this way we'll sort

25    of be on track for the omnibus order, I apologize.
```

Page 10

1          THE COURT:  That'll be fine.  That'd be terrific,

2    thank you very much.

3          MR. SINGH:  Okay.  Thank you.

4          MR. SONKIN:  Good morning, Your Honor.  This is

5    Cliff Sonkin of Weil Gotshal and Manges on behalf of the

6    plan administrator.

7          So the next item on the agenda is the 67th omnibus

8    objection and that's at ECF No. 3121.  The 69th (sic)

9    omnibus was filed jointly with the consumer representative

10   and seeks to allow -- to disallow, sorry, and expunge 26

11   consumer claims on the basis that the claims lack merit,

12   based on review of the books and records.

13         The plan administrator received three informal

14   responses to the objection.  One from Deborah Thomas (ph),

15   one from Carolyn Ray (ph), and one from Brooken Dazihan

16   (ph).  The notices of adjournment have been filed with

17   regards to these three claims at ECF No. 3194.  And except

18   with respect to the three matters, which have been adjourned

19   to a date to be determined, the plan administrator

20   respectfully requests that the Court sustain the objection

21   and order the remaining claims disallowed, expunged.

22         THE COURT:  I've reviewed the objection.  I grant

23   the -- I sustain the objection.  I grant the relief

24   requested and you'll submit an order, please.

25         MR. SONKIN:  Thank you, Your Honor, will do.

Page 11

1          THE COURT:  Thank you.

2          MR. SONKIN:  The next item on the agenda is the

3   68th omnibus objection to proof of claims which was filed at

4   30 -- ECF 3122, which seeks to disallow and expunge four

5   consumer admin claims also on the basis that they lack

6   merit, based on a review of the books and records.  The plan

7   administrator has not received any responses regarding this

8   omnibus objection.  And as such, respectfully requests that

9   the Court sustain the objection and order the claims

10  disallowed and expunged.

11         THE COURT:  Your request is granted, you'll submit

12  the order, please.

13         MR. SONKIN:  Thank you, Your Honor.

14         And then the next item on the agenda is the 69th

15  omnibus objection, which was filed at ECF 3123.

16         This objection seeks to reduce through class --

17  and allow five consumer claims on the basis that the

18  asserted priority amounts were incorrectly calculated or

19  improperly classified.

20         We received two responses to the objection, one

21  formal and one informal.  Notices of adjournment have been

22  filed with regards to the two claims at ECF No. 3195.

23         So except with respect to those two adjourned

24  matters, which have been adjourned to a date to be

25  determined, the plan administrator respectfully requests

Page 12

1    that the Court sustain the objection and enter the order.

2           THE COURT:  Your request is granted, I sustain the

3    objection, you'll submit the order please.

4           MR. SONKIN:  Thank you, Your Honor.  So I'm going

5    to -- I would like to turn the virtual podium back over to

6    my colleague, Ms. Sosa, to handle the 71st omnibus

7    objection.

8           THE COURT:  That would be fine, thank you.  Ms.

9    Sosa.

10          MR. SONKIN:  Thank you.

11          MS. SOSA:  Thank you, Your Honor.

12          The 71st omnibus objection can be found at ECF No.

13   3131.  And these were three claims asserting secured or

14   administrative status.  And again, based on review of these

15   claims as well as documentation that was provided and the

16   debtor's books and records, we determined that these were

17   improperly classified as either secured or administrative

18   expense claims.  And we ask the Court to sustain the

19   objection and order the claims reclassified as general

20   unsecured claims.

21          THE COURT:  I've reviewed the objection, I sustain

22   it and grant the request -- the relief request, if you'd

23   please submit the order.

24          MS. SOSA:  Will do, Your Honor, thank you.  And I

25   will pass the virtual podium back to Mr. Singh.

Page 13

```
1              THE COURT:  Mr. Singh.
2              MR. SINGH:  Thank you, Your Honor.  The next item
3    on the agenda, the next matter is the plan administrator's
4    motion pursuant to Section 7.6 of the Third Amended plan for
5    estimation for reserve purposes of the priority portion of
6    Claim No. 22049 asserted by Ms. Cherane Pefley.
7              Your Honor may recall this motion.  You actually
8    addressed the merits of the motion -- of the claim at a
9    prior hearing where a $90 million amount that was asserted
10   as a priority claim, as a priority GAP claim, as you recall,
11   Your Honor, Your Honor sustained the plan administrator's
12   objection to reclassify that or disallow that piece, but
13   allow her to continue to prosecute the consumer creditor
14   piece of the claim and with the consumer creditor
15   representative.
16             Your Honor, this motion really addresses a
17   technical issue.  Under the plan, the plan administrator is
18   required to reserve until there has been a final order with
19   respect to a particular claim.  But because this -- the
20   prior relief the Court granted was reclassifying, it's
21   arguable, although we don't think it's correct, but
22   certainly arguable based upon some of the authority that the
23   Court's order reclassifying the claim was not a final order,
24   and therefore the plan administrator is required to continue
25   to maintain a significant reserve of $90 million.
```

Page 14

1              So all we're seeking here, Your Honor, is an order

2      that says we don't have to maintain that reserve, either

3      because you know, that was a final order that Your Honor

4      previously entered, or because under the relevant standard

5      for estimation, you know, likelihood of merits, et cetera,

6      this claim is not going to be a priority claim.  So it would

7      release the $90 million available for distribution.

8              Your Honor, we're not seeking to prejudice Ms.

9      Pefley or the consumer creditor representative as to the

10     merits of the consumer creditor claim.  This again only

11     deals with the priority portion of the claim.  And has no

12     impact whatsoever on that remaining balance, which is really

13     where this claim belongs and needs to be addressed in the

14     consumer creditor bucket.

15             Your Honor, we did serve the motion both by mail

16     and e-mail on Ms. Pefley.  Have not heard from her and are

17     not aware of any response or objection with respect to this

18     motion.  In addition, I would note, Your Honor, there was no

19     attempt at an appeal taken from Your Honor's prior ruling,

20     so the ones -- you know, there isn't a sort of outstanding

21     appeal or anything that she expects to do there.

22             So, Your Honor, that's where we are with this and

23     I'm, of course, happy to answer any questions.  But we would

24     request that this order be entered and the plan

25     administrator be permitted to not reserve that $90 million.

1          THE COURT:  Right.  I guess my only question is

2    this and I don't have any problem with the nature of the

3    request.  I certainly understand why you're making it.

4          If what we determine, if what I determine is that

5    I would estimate the claim for purposes of the plan

6    administrator and you're asking it to be estimated at what

7    value?

8          MR. SINGH:  At zero for the priority piece, Your

9    Honor.

10          THE COURT:  Right, for the priority piece.

11          MR. SINGH:  Right.

12          THE COURT:  But we're going to expressly provide

13    that that estimation is what, is not binding as it relates

14    to the consumer piece?

15          MR. SINGH:  Correct.

16          THE COURT:  Because if I'm estimated it -- I'm

17    sorry?

18          MR. SINGH:  That's correct, Your Honor.  We're

19    only asking you to estimate that no portion is a priority

20    claim.  So you're not addressing the merits of the claim

21    itself in the proposed order, Your Honor.

22          THE COURT:  Okay.

23          MR. SINGH:  It's only that it's estimated at zero

24    for purposes of the priority and based upon that, Your

25    Honor, I think I understand what you're getting at --

Page 16

1          THE COURT:  Yes.

2          MR. SINGH:  -- and the fair concern is, you know,

3   are you somehow prejudicing either Ms. Pefley or the

4   consumer creditor representative through the estimation.

5          And I think the answer is no because you're only

6   estimating whether any piece of it is priority, which really

7   shouldn't address the merits of the claim that's asserted.

8          THE COURT:  No, and I think that's right.  And so

9   with that and we just make sure it's clearly set forth in

10  the order, I grant the motion and we'll estimate the claim

11  for priority purposes at zero.  So in order to address the

12  plan administrator's legitimate concerns with respect to be

13  compliant with what's in the plan as it relates to reserving

14  for administrative expense claims.  And you'll submit the

15  order, please.

16         MR. SINGH:  Yes.  Thank you, Your Honor.  We'll

17  take another look at the order.  I think we had that

18  reservation of rights in there, we'll make sure we take

19  another look and, of course, we'll show it to Ms. Twommey.

20         THE COURT:  All right.  I've got to apologize, I

21  hadn't had a chance to look at the order before the hearing,

22  so.

23         MR. SINGH:  No, no problem, Your Honor.  It's not

24  fresh in my mind either.  We'll make sure it's in there in

25  case it's not.  But I think we were trying to go out of our

Page 17

1    way --

2             THE COURT:  All right.

3             MR. SINGH:  -- to make sure.  We didn't intend to

4    prejudice her, of course.

5             THE COURT:  Yeah, no, no, no, I appreciate that.

6             MR. SINGH:  Yeah.

7             THE COURT:  Very good.

8             MR. SINGH:  Okay.  Thank you, Your Honor, that's

9    really appreciated very important relief.

10            So, Your Honor, that brings us to the only

11   contested matter for today, which is the plan

12   administrator's 52nd omnibus objections to certain proofs of

13   claim that we sought to reclassify.

14            There's two claims, Your Honor, that are at issue.

15   It's the Liberty Home Equity Solutions' claims, as well as

16   the Finance of America Reverse LLC's claims.

17            Your Honor may recall, you know, we've discussed

18   these at a status conference before.  While obviously

19   they're different claimants and different agreements, they

20   are represented by the same counsel who's on the line, but

21   also because the issues are pretty much identical, Your

22   Honor, I think for efficiency purposes it was discussed that

23   we would go forward today with these claims on a motion to

24   dismiss standard.

25            The plan administrator's view is that, you know,

Page 18

1    Your Honor can dismiss these claims based upon the filed

2    claims and pleadings and arguments we'll talk about today.

3    But if, you know, that was not the case and we needed to

4    have discovery or evidence, et cetera, you know, the matter

5    would be adjourned and the parties would confer on some sort

6    of discovery schedule and return back to Your Honor for

7    whatever else needed to be addressed.

8            THE COURT:  All right.  That's fine.

9            MR. SINGH:  Thank you, Your Honor.

10           Yep, so, Your Honor, from the plan administrator's

11   perspective, you know, we think -- just to sort of summarize

12   the facts, the basic facts of the two claims.  Finance of

13   America, you know, both parties were both Finance of America

14   and Liberty Home had prepetition agreements, sets of

15   agreements with RMS, Reverse Mortgage Solutions, one of the

16   debtors in these Chapter 11 cases.

17           RMS was the servicer on various reverse mortgage

18   loans that were loaned by Finance of America or Liberty Home

19   pursuant to those prepetition contracts.

20           Those agreements at various points were all set to

21   expire, you know, on their term during the case.  The

22   parties entered into extensions of the terms of the

23   prepetition contracts.

24           Specifically, Your Honor, we entered into four --

25   RMS entered into four post-petition extensions during the

Page 19

1    case and Liberty Home entered into two post-petition

2    extensions during the case.  And we provided, Your Honor,

3    the forms of those extensions were attached to the plan

4    administrator's objection.

5            With respect to Finance of America the debtors

6    collected approximately $4.4 million in post-petition fees

7    and Finance of America is asserting $14 million for alleged

8    breaches that occurred during the post-petition, but pre-

9    rejection period.

10           And with respect to Liberty Home, the debtors

11   collected about $100,000 in post-petition fees, and the

12   assertion by Liberty Home a similar breach of contract post-

13   petition is the 4.15 -- is $4.15 million.

14           Your Honor, and just -- I think you know this from

15   the papers, but just to be clear, you know, the only amounts

16   we're really talking about, or the period we're talking

17   about is post-petition, so post-filing and pre-rejection is

18   essentially the effective date.

19           So essentially the post-petition period which is

20   when the parties were engaged and Finance of America and

21   Liberty Home are not sort of seeking anything beyond the

22   post-effective date damages.  They're alleging that during

23   that post-petition period RMS sort of failed to comply with

24   the contract and caused various losses, damages, et cetera

25   and that those losses and damages during that period should

Page 20

1    be afforded administrative expense priority treatment.

2    These contracts were not assumed, Your Honor, I think

3    there's no dispute about that.

4              So, Your Honor, a couple of things.  Obviously

5    Your Honor knows the legal standard well, you know, the

6    administrative expense claims are narrowly construed.  The

7    claimants are here, they bear the burden of proof to

8    satisfy, you know, we believe a two part test, they need a

9    transaction with the estate and real and actual benefit.

10             And I'll come back to this a little bit, Your

11   Honor, but you don't get an admin claim for a creditor's

12   loss.  Typically the rule is, right, everything is

13   prepetition, you can't have an admin claim on a prepetition

14   contract for the creditor's loss.  It's only the benefit to

15   the estate so as to prevent a windfall to the debtors.

16             So how did the claimants try to argue that they

17   don't have, you know, that they get an admin claim on a

18   rejected contract.

19             So first they say well, these are new contracts,

20   right, we entered into post-petition agreements, these one

21   pagers that continue to extend the relationship between the

22   parties.  Those are all constitute new post-petition

23   agreements, and therefore, when you have a post-petition

24   contract and all the authority the plan administrator has

25   cited about a prepetition contract sort of continuing during

Page 21

1    this pre -- post-petition pre-rejection phase and, you know,

2    foreseeability, et cetera, all the issues that Your Honor is

3    familiar with and wrote about in the Sharma decision are not

4    applicable.

5         We've got a new contract and therefore, everything

6    is post-petition and we get a hundred cent administrative

7    expense claims.  But, Your Honor, if you look at the

8    agreements and you look at -- and the plan administrator's

9    arguments that we've summarized and the case law, right, I

10   mean, there is a couple of cases that is right on point

11   here, that's just not accurate.

12        You know, the one page extension agreements on

13   their face, they all say we are extending the existing post-

14   petition agreements.  They don't have any of the other terms

15   that you would see --

16        THE COURT:  And I'm sorry, you said -- I'm sorry,

17   Mr. Singh.

18        MR. SINGH:  Yes, Judge.

19        THE COURT:  You're extending the existing

20   prepetition agreements, right?

21        MR. SINGH:  Oh, yes, I'm sorry, I misspoke, I said

22   post-petition, I apologize, Your Honor.

23        THE COURT:  That's what I thought you said.  Okay.

24   All right.

25        MR. SINGH:  Yes, thank you for correcting me,

Page 22

1    Judge.

2              They're extending the prepetition, you know,

3    contracts of the parties.  These are the one pagers, they

4    refer to the prepetition contracts, they actually say in

5    them we are extending those agreements.  They don't have any

6    of the other terms, you know, that you would expect to see

7    in a servicing contract.  And, Your Honor, the servicing

8    contracts were not made available to you because they were

9    confidential.  Frankly, you know, they weren't filed with

10   the proof of claim, and to respect the confidentiality

11   issues, we don't think you need to sort of take a look at

12   them, but they're very clear that there's no other terms

13   being incorporated.

14             And if you read the Crystal Apparel decision and

15   you read the Bush Industries decision, you know, that's

16   exactly what they say.  They say extensions, these are not

17   new contracts, you know, similar situations where you've got

18   an extension of an existing prepetition contract.  You know,

19   that is not sort of converting the entire prepetition

20   obligation in relationship between the parties into a post-

21   petition administrative expense obligation.

22             And actually, Crystal Apparel even goes a little

23   bit further and says, you know, even if you -- even if these

24   were somehow new contracts, you know, the bankruptcy court

25   would have been required to approve them as outside of the

Page 23

1      ordinary course.

2              You know, converting a prepetition liability into

3      post is absolutely something that requires Court approval,

4      even if in the ordinary course as to some of those issues,

5      you know, the businesses would have been doing those on a

6      regular basis within the industry, it's sort of the familiar

7      test we all know, because it's going to upset the apple

8      cart, right.

9              And, Your Honor, to think about this, it's a full

10     context.  There are -- RMS all it had was servicing

11     agreements, that's what we did, that was our business.  So

12     if we were going to convert one of those or two of those

13     here into post-petition obligations for breaches, there's

14     really no reason why, you know, we wouldn't have converted

15     or, Your Honor, you know, sort of this going up a slippery

16     slope where others, you know, would also not have been

17     converted because that -- and that really would upset the

18     sort of apple cart in terms of feasibility in the plan and

19     estimating administrative expense claims and fairness to

20     creditors.

21             So I think, you know, based upon those two issues,

22     I mean we don't think on their face these extensions are new

23     post-petition contracts.  And even if they were, they're

24     void as post-petition contracts because, Your Honor, they

25     were not Court approved.

Page 24

1          THE COURT:  Let me -- I'm sorry to interrupt you,

2     Mr. Singh, I'm sorry to interrupt you.

3          Let me just ask you a question.  In Crystal what

4     you had, right, was that you had a situation where there

5     were a number of individuals who had employment agreements

6     and there was in the agreement, there was a -- there were

7     provisions that directly address severance, and maybe the

8     severance payment would be a year or something like that.

9          There were a couple of folks who had other

10    agreements, additional agreements, the -- what the Court

11    referred to as the golden parachute agreements.  Am I

12    remembering that right?

13         MR. SINGH:  Exactly, Judge, yes, you are.

14         THE COURT:  Okay.  And then post-petition what the

15    debtor did is it said, look, I'm going to continue to

16    perform under your prepetition contracts, but the debtor

17    didn't address the parachutes, the parachute agreements; is

18    that right?

19         MR. SINGH:  That's right.

20         THE COURT:  Right.  And then what the bankruptcy

21    court determined in the first go around is that the -- it

22    was Judge Abram rejected the claim, the claims that were

23    asserted under the parachute agreements and determined that

24    I guess what she was -- she determined is that they weren't

25    part of the agreements that were being performed post-

Page 25

```
 1    petition and they were out of the ordinary course and so the

 2    debtor couldn't have entered into them post-petition.  And

 3    that on appeal before the remand, the Court questioned

 4    whether or not the bankruptcy court had properly analyzed

 5    the ordinary course aspect of it.

 6              Is that -- am I remembering that correctly?

 7              MR. SINGH:  That -- yes, you are, Your Honor.  She

 8    effectively sort of treated them as two separate obligations

 9    under --

10              THE COURT:  Right.

11              MR. SINGH:  -- yes, that's correct.

12              THE COURT:  Right.  And so then when the Court

13    took another look at them, what the Court determined again

14    was that they were not part of expressly dealt with in the

15    post-petition and that the -- and again, the Court

16    determined that the debtor could not have entered into those

17    agreements in the ordinary course given the -- you know, the

18    amount of severance, et cetera; is that right?

19              MR. SINGH:  Yes, Judge.

20              THE COURT:  And so -- I think -- so what you're

21    saying is here, there definitely -- you're saying they're

22    not post-petition agreements because you look at the plain

23    language of the extensions and they're not part of it,

24    they're just -- the -- I'm sorry, the extensions provide

25    very clearly that they're not intended to be new agreements.
```

Page 26

```
 1    The extensions contemplate that maybe there will be

 2    agreements in the future, but they're not, and they're not

 3    novations, et cetera.  So they're not new agreements.

 4            And the alternative argument is even if you wanted

 5    to look at that and say well, they intended to do that, or

 6    you could interpret it to say that they are new agreements,

 7    the debtor never got authorization to enter into the

 8    agreements.  And these are not ordinary course agreements,

 9    given where the status of where the case was at post-

10    petition, the fact that they were moving towards selling the

11    assets, et cetera, and that to enter into an agreement post-

12    petition that might have the kind of potential for damage

13    claims that have been asserted, that's just not something

14    they could have done in the ordinary course.

15            MR. SINGH:  That's exactly right, Your Honor,

16    that's exactly our argument.  And it is, as you note, Judge,

17    in the alternative because I think, you know, if you really

18    do --

19            THE COURT:  Yes, yes.

20            MR. SINGH:  -- look at the first piece, you really

21    don't need to get to were they ordinary course, were they

22    not.  I mean, I think that both issues go in the plan

23    administrator's favor.  But, you know, they're plain on

24    their face these agreements that these were not new

25    agreements, they were extensions.
```

1          And, Your Honor, I mean, not that you even need to

2    go there but it's pretty typical.  I mean in a lot of

3    situations when you have contracts expiring, parties to give

4    the debtor additional time to assume or reject or frankly to

5    have a smooth either transition or continued dialogue, you

6    know, these types of extension agreements and Courts have

7    considered them happen, right, in Chapter 11 matters to give

8    folks additional time.

9          I mean, I think if you were all of a sudden -- you

10   know, that situation was converted to well every time you do

11   that, you've all of a sudden sort of opened yourself up to

12   administrative expense claims, I think that would be very

13   inconsistent with Chapter 11 practice.  But certainly

14   specifically what the intention of the parties was here.

15          THE COURT:  Right.  And I understand that and I

16   understand the arguments in the alternative --

17          MR. SINGH:  Right.

18          THE COURT:  -- I just wanted to make sure I was

19   clear --

20          MR. SINGH:  Your Honor, you've got it exactly

21   right.  You've got it exactly right as to the plan

22   administrator's position.

23          THE COURT:  Okay.  And I interrupted you because -

24   - I interrupted you because you were --

25          MR. SINGH:  No, that's totally fine, Your Honor.

Page 28

1    So really what does that mean, right, so in our view these

2    are not post-petition agreements.

3            THE COURT:  Right.

4            MR. SINGH:  So now what happens, what do we do?

5    So we think, Your Honor, where you are or where the

6    claimants are is these are prepetition contracts, executory

7    contracts that were continued, you know, that were sort of

8    ongoing, unassumed during the post-petition period.

9            The debtor was performing, it was paid a servicing

10   fee and now there's an allegation of damages that occurred

11   during that post-petition period.  And we think the case law

12   is very clear and really starts with -- it includes Your

13   Honor's Sharma decision that we cited, as well as the

14   authority that you cited there that says, look, you've got a

15   prepetition contract with the party with a debtor, damages

16   arising from that continue to be prepetition, particularly

17   if they're breach damages, because that's all foreseeable at

18   the time you execute the agreement.

19           Administrative expenses are narrowly construed and

20   it would be inconsistent with that authority to say well,

21   all of a sudden because you've got a breach allegation that

22   for something that happened post-petition that, you know,

23   all of those claims for breach become post-petition

24   administrative expense claims.  That's just not the rule.

25           What they do get, right, and so that, you know,

Page 29

1    sort of not unfair to the claimant, if you did confer a

2    benefit on the estate during the post-petition period,

3    that's the analysis, you had an inducement by the debtor and

4    there was conference of a benefit, a specific concrete

5    benefit to the estate.

6            And again, Your Honor, the law is not that it's --

7    you know, if you confer a benefit on the estate as the

8    claimant suggests, then all of a sudden everything under the

9    contract as long as I get like an ounce of benefit in there,

10   I can allege all -- you know, $15 million here or more for

11   breach because I've conferred a benefit and therefore,

12   everything is now administrative.  No.

13           It's only to the extent of that limited benefit

14   that you can get an administrative expense claim.  And the

15   Enron decision they cite says exactly that, where the Court

16   goes through -- this was sort of the case in the contracts

17   where the contract counterparty was reserving space, you

18   know, for pipeline.  And the Court said well the only -- you

19   know, you didn't actually do anything, so you don't get an

20   administrative expense claim for that.  And there was two

21   instances specific where, you know, the debtor sort of

22   called upon you to provide services for those two instances,

23   they're willing to pay you and you get an admin claim, but

24   not for everything under the contract.  That would really be

25   inconsistent with the authority.

Page 30

1           So, Your Honor, you know, from our perspective,

2     you know, that's the law.  That contract is not enforceable

3     against the estate, you know, during that pre-rejection --

4     post-petition pre-rejection period.  And all they get at

5     most is the value of the benefit conferred on the estate,

6     which I submit to Your Honor is the fees, $4.4 million and

7     $100,000.  That's the best case scenario they can get, Your

8     Honor.

9           And I'm not offering that up, but what I'm saying

10    is that's the best case scenario what they can get, and we

11    submit that, you know, they've gotten sort of compensated

12    and the estate has not been unjustly enriched, and there's

13    been no allegation, right, that there was an unjust

14    enrichment to the estate for whatever reason based upon the

15    claimant's actions here.

16          They haven't complained that those fees were

17    unfair.  They're just saying, look, our breach claims all of

18    a sudden should be treated as administrative expense claims.

19          Your Honor, one other factual point I'd like to

20    note with respect to all of this.  You know, in a lot of

21    situations you might hear -- or you might hear here

22    unfairness, right, there's unfairness because we were locked

23    in with the debtor, we couldn't do anything, and now they

24    breach so they've caused all these damages, and you know, we

25    couldn't have terminated if we wanted.

Page 31

```
 1              Well, the facts here are very different, right.
 2   This -- these contracts expired on their own terms during
 3   the post-petition period, but for these extension
 4   agreements.  Nobody forced the claimants to extend to do
 5   business with the debtor, nobody put a gun to their head.
 6   They actually had more optionality than any other executory
 7   contract counterparty, they could've just said, you know, we
 8   don't want to do business with the debtor.
 9              There's nothing that would have required us to
10   extend those agreements, but they chose to do these
11   extension agreements and they shouldn't be surprised now
12   that sort of the repercussion of those extension agreements
13   was that if you had damages alleged, et cetera, those would
14   be prepetition, that's the law, and you only get an admin
15   claim for the benefit conferred, specific benefit conferred
16   on the estate, they haven't alleged otherwise.
17              Your Honor, that's -- I'm happy to answer any
18   other questions, and of course if it's okay with Your Honor
19   I'd like to reserve time for any rebuttal, but that's the
20   plan administrator's argument.
21              THE COURT:  Right, no, I don't have any questions
22   about that, but just refresh my recollection please, and
23   these are contract claims.  If it was a tort claim, if the
24   post-petition the debtor had done something that gave rise
25   to an injury, a tort action, would that be entitled to
```

Page 32

1    administrative expense priority?

2              MR. SINGH:  Yes, Your Honor, that would but --

3              THE COURT:  And I appreciate that's not what you

4    have, but -- I'm sorry to interrupt you.

5              MR. SINGH:  I'm sorry, Your Honor, I thought you

6    were finished.  Your Honor, yes, that would be -- if there

7    was a tort, you know, that would be an administrative

8    expense claim.  But there's a specific, you know, the

9    Supreme Court created exception under the Redding line of

10   cases that sort of, you know, there's a presumption that

11   when you have a tort on the -- I think Redding, my

12   recollection was there was, you know, a fire, you know, at

13   one of the facilities that was owned by the debtor and

14   people were injured.  And the argument was well, there's no

15   benefit conferred on the estate, you know, from these

16   individuals.  And I think the Supreme Court in Redding made

17   a specific exception for tort cases and said, well, you

18   know, that just isn't right, that's unfair, that's

19   inequitable, et cetera and there's going to be a presumption

20   of benefit to the estate in those situations, so people

21   aren't harmed from the ongoing operation.

22             But that's a tort that's very different, in that

23   the specific Supreme Court created exception to the ordinary

24   benefit conferred standard that's required under Second

25   Circuit, and I would say, you know, pretty much across the

Page 33

1    country (indiscernible) how you get an admin claim normally,

2    especially with respect to an existing contract.

3              THE COURT:  All right.  Thank you.

4              MR. SINGH:  Thank you, Your Honor.

5              THE COURT:  Mr. Rich.

6              MR. RICH:  Thank you, Your Honor.  May it please

7    the Court, Robert Rich, Hunton Andrews Kurth LLP on behalf

8    of Finance America Reverse LLC and Liberty Home Equity

9    Solutions, Inc.

10             Counsel spent a lot of time talking about the

11   post-petition agreements, but I want to start by talking

12   about how administrative claims are treated with respect to

13   prepetition agreements, because I think that alone resolves

14   the issue today.

15             It cannot be the case, as the plain administrator

16   argues, that the debtor's post-petition but pre-rejection

17   breach of an executory contract can never give rise to an

18   administrative claim.

19             Were that the rule, debtors would be able to force

20   contract counterparties to perform under a contract post-

21   petition while the debtors freely breach that contract prior

22   to assumption or rejection, without creating any

23   administrative claim liability.

24             Without the rule, there would be no incentive for

25   a debtor to ever reject a contract until the end of the

Page 34

1    case, since they would know their failure to perform would

2    always be rendered a general unsecured claim.

3            And it isn't the rule.  In fact, the Second

4    Circuit in Unishops which we've cited in our brief states

5    that it's settled law that a claim arising under an

6    executory contract is entitled to administrative priority if

7    assumed, or if the debtor receives benefits under it.  Some

8    courts say that they ratify it.

9            In other words, if the debtor continues to receive

10   the benefits under a contract it must also bear the burdens

11   or obligations imposed under the contract.  That's a quote

12   from this Court's decision in Texaco, 254 B.R. 536, 2000

13   case.

14           And that case involved an oil lease, and there was

15   a dispute about whether that lease was assumed or rejected.

16   But the Court said it doesn't matter for purposes of

17   determining administrative claim priority.

18           If the debtor continued to operate and derive all

19   the economic benefit from the lease, then it retained all

20   the obligations and burdens under a lease.  In that case,

21   the burdens were clean-up costs, certainly wasn't something

22   that benefitted the estate.  Because when you're looking at

23   prepetition contracts, when you're looking at the benefit,

24   you look at it at the time of the contract.

25           At the time of the contract does this transaction

Page 35

1    benefit the estate.  That's how the Courts look at request

2    to enter into post-petition contracts generally when brought

3    to court's attention for approval.

4          And the debtor in Texaco made an argument very

5    similar to the argument being made right here by the plan

6    administrator, that clean-up costs fall within the fair

7    contemplation of the prepetition agreement.

8          But the Court found that it was utterly

9    unrealistic to say that claims for breach of this

10   obligation, when arising out of post-petition actions by the

11   debtor could be deemed to be prepetition claims.

12         Now here, the debtors ratified the subservicing

13   agreement pursuant to which we've asserted our claims.  They

14   could have rejected them at the outset of the case.  Instead

15   they made the determination that it was worth performing

16   under the agreement and earning servicing fees throughout

17   the Chapter 11.  And so they have to bear the burden of

18   performing in accordance with that agreement.

19         None of the cases cited by the plan administrator

20   involve a situation where the debtor ratified and accepted

21   benefits under a prepetition executory contract prior to

22   rejection.

23         I know counsel cited Your Honor's recent decision,

24   the Sharma decision, where the borrower raised counterclaims

25   in a foreclosure action that was commenced post-

Page 36

1    confirmation.  But that involved a mortgage loan, not an

2    executory contract that the debtor would have ratified

3    accepted performance.

4             The same with the Ogle v Fidelity Deposit Co., a

5    Merrill case, which that one involved charity bonds.  The

6    ratification issue comes up a lot in retail bankruptcy

7    cases.  A lot of times there's a substantial amount of

8    prepetition purchase order, these are prepetition contracts

9    for goods to be delivered post-petition.

10            And as Courts regularly recognize, if the Court --

11   if the debtors still want the goods and accept them, then

12   those are administrative claims to pay those invoices.

13            Now, the plan administrator --

14            THE COURT:  I'm sorry, I apologize, Mr. Rich, I

15   apologize for interrupting you.

16            You say that the agreement was ratified.  What do

17   you mean by that, and I didn't see the -- and I don't

18   remember seeing that argument in your papers, I'm not saying

19   it's not there, but when you say it's ratified, what do you

20   mean?

21            MR. RICH:  I mean that the debtor voluntarily

22   accepted performance.  And here, the debtors they wanted to

23   service, they continued servicing, they continued accepting

24   payment under these contracts.  Like a purchase order where

25   the debtor, you know, they desire to take the goods, instead

Page 37

1   of canceling the purchase order.

2          THE COURT:  What -- excuse me.  I'm sorry to

3   interrupt you.  What's the difference or is there a

4   difference between ratifying an agreement and assuming the

5   agreement?

6          MR. RICH:  Well, when you ratify the agreement

7   you're not assuming all the obligations going forward,

8   you're just -- you're assuming the burdens while you're --

9   for the period while you're accepting the benefit.  And it's

10  valuable to a debtor, I'm sure it was valuable here as they

11  were, you know, going forward with the Chapter 11 case, made

12  the business decision that we want to continue servicing

13  these loans in exchange for our fee.  We could have rejected

14  it, and we could have stopped our servicing obligations, but

15  they decided there was a net benefit to the estate by doing

16  so.

17          Once they made that decision --

18          THE COURT:  Well, wait, excuse me, they didn't

19  force the -- the debtor didn't force themselves on your

20  client and the other thing is, the Unishops ratification

21  case, the cases you cite, Unishops and Texaco, are you

22  saying that -- are those cases in which the Court said your

23  post-petition actions ratified the agreement?  And maybe I -

24  - excuse me, excuse me, if my focus on this is misplaced,

25  just let me know.  I'm just trying to make sure I understand

Page 38

1      the argument.

2              MR. RICH:  No, Your Honor, I don't think it's

3      misplaced.  I'm using the term ratified.  I think in those

4      decisions you'll see that the term -- the term they use is

5      typically the debtor accepted benefits under the agreement,

6      you know, voluntarily chose to accept benefits or continued

7      performing.  You know, and I'm using the term ratified.

8      But, yes, both those -- in those cases, that is what

9      happened I believe in the first case, the Unishops case,

10     there was an employment agreement and they continued to have

11     that person employed and continued rendering services.

12             In Texaco it was an oil lease, but yeah, the point

13     is that they're accepting the performance and my analogy to

14     (indiscernible) involving purchase orders is because there

15     were a couple of cases cited by the plan administrator in

16     support of his position, and I wanted to distinguish those.

17             Because the two cases he cites Calder (ph) and

18     Bradley Stores (ph) were purchase order cases, but the

19     debtor canceled the purchase orders, meaning they didn't

20     accept performance under those contracts.  And that's why

21     the Court in those cases held that they're not

22     administrative claims.  It's completely different from --

23     you know, from those types of cases where the debtor says,

24     no, we want those goods, send them, we'll perform, even pre-

25     assumption or rejection.  And so that was the point I was

Page 39

1    making on those.

2           And so we submit that that resolved the legal

3    question today.  There's no dispute that the debtors

4    performed and accepted performance under subservicing

5    agreements pending assumption and rejection.

6           We've asserted claims for post-petition --

7           THE COURT:  Excuse me, excuse me, so the debtors

8    performed, by that you mean, you said, RMS continued to

9    service the loans, right?

10          MR. RICH:  Yes.  Continued to service and accept

11   the fees.

12          THE COURT:  Right.

13          MR. RICH:  And, Your Honor --

14          THE COURT:  Excuse me.  And that they accepted

15   performance, I'm sorry, that they accepted performance, what

16   does that mean?

17          MR. RICH:  It means that they accepted the fees

18   that, you know, they were being paid fees for doing this

19   performance and they accepted it.  And I think they very

20   well did, you know -- it did it in some ways force us as far

21   as the prepetition agreements go to continue this

22   arrangement.

23          Had we said, you know, had we said you know what,

24   you know, you're in bankruptcy, we want to go -- we're going

25   to go with a different servicer, don't service anymore,

Page 40

1   we're not going to pay you.  The first thing we were going

2   to get hit with was a breach of contract claim because, you

3   know, courts recognize just because a party's in bankruptcy

4   doesn't let us get out of the contract, you know, pending

5   that assumption and rejection.

6           So I strongly disagree with the notion that, you

7   know, we were sort of -- could have just left this

8   arrangement at any time that we wanted.

9           I do want to address the post-petition agreement

10  issue, you know, I think that --

11          THE COURT:  Sure.

12          MR. RICH:  -- for the reasons that I said that the

13  Court finds that, you know, these are just continuations of

14  a prepetition agreement it's still administrative priority.

15  So we don't feel that the Court needs to get to this, but

16  even if a post-petition breach of a prepetition contract

17  could never be an administrative claim, as the plan

18  administrator argues, most of our claims are under these

19  post-petition extension agreements.

20          I don't think there's any dispute that breach of a

21  post-petition contract is entitled to administrative

22  priority.  We've cited some cases, and I didn't hear

23  anything to that.

24          I want to address the two arguments that counsel

25  made in support of the contention that even -- that claims

1    under these extension agreements were not entitled to

2    priority.  First is the argument that they were not --

3              THE COURT:  I'm sorry, I'm sorry, I'm sorry, Mr.

4    Rich, I apologize.  What you're saying, the -- when you're

5    talking about the post-petition -- the performance under the

6    agreement and you said I've already talked about those

7    cases, that's Unishop and those cases?

8              MR. RICH:  No, I think we just -- I don't have it

9    at my fingertips, we just cited some cases just for the

10   general proposition that breach of a post-petition contract

11   is entitled to administrative priority.

12             I didn't think --

13             THE COURT:  Oh, oh, I'm sorry, I'm sorry.  Breach

14   of a post-petition contract, okay, I'm sorry, go ahead.

15             MR. RICH:  Yeah, I was just using that as the

16   starting point.  And --

17             THE COURT:  Sure.

18             MR. RICH:  -- the plan administrator's first

19   argument for why that doesn't apply here is because the

20   extension agreements are not actual contracts, right.  He

21   says these are just short, you know, one pagers that should

22   be considered part of the prepetition agreements, not

23   standalone contracts.

24             But when a contract rises is a matter of

25   applicable non-bankruptcy law.  And state law makes very

Page 42

1    clear that a modification to material terms of the contract,

2    such as the term, the contract term itself constitutes a new

3    agreement.

4          And whether that, you know, that new modification

5    simply incorporates terms by reference, which they do here,

6    you know, in another agreement or actually restates all

7    those terms in some long document, isn't of any consequence.

8          And the two cases cited by the plan administrator

9    don't hold otherwise.  Now, I'd like to talk about those.

10         The first is the Bush Industries --

11         THE COURT:  Well, let me just ask you, I'm sorry

12   to interrupt you.  You've got two extensions that say these

13   aren't new agreements.  And the State of Delaware, and New

14   York State law that you cited to in looking at those cases I

15   don't think they support the proposition that if I'm

16   modifying the agreements and I expressly state that it's not

17   a new agreement, and that it's not a novation, et cetera,

18   that that nonetheless is a new agreement.

19         I didn't read those cases that way, and if I've

20   misread them, just let me know and I'll look -- of course,

21   I'll look at them again.  I understand the argument, you

22   looked to state law, I just didn't think the cases you've

23   cited support the proposition that when the language in the

24   modification expressly addresses that it's -- whether it's a

25   new agreement and says it's not a new agreement, that that

Page 43

1    somehow can be treated -- it could be interpreted to mean

2    that it is a new agreement.

3            MR. RICH:  Uh-huh.  No, Your Honor, I believe

4    those cases do hold that a modification is a new agreement.

5    I don't think you can change the legal, you know,

6    characterization of a contract, you know, just by the terms

7    of the contract itself.

8            You know, candidly --

9            THE COURT:  No, no, wait, I'm sorry.  Wait, wait,

10   Mr. Rich, again I apologize for interrupting you, and I know

11   it's hard over the phone, so again I apologize.

12           You're saying that if you are party to an

13   agreement with a counterparty, you agree to modify the

14   agreement, but you expressly state, look, we're modifying

15   the existing agreement, this is not a new agreement, that

16   state law supports the proposition that that is a new

17   agreement?  Notwithstanding the --

18           MR. RICH:  Yes.

19           THE COURT:  -- terms of the agreement?  Okay.

20           MR. RICH:  Yeah.  Yes, I think that under New York

21   and Delaware law, you know, that is the rule, that you can

22   incorporate the terms, but that the modification does itself

23   constitute a new -- a newly formed agreement, newly formed

24   meeting of the minds of the parties.

25           And candidly when we wrote the brief, I didn't

Page 44

1    think that this was necessarily going to be the -- something

2    that was in much dispute and, you know, but there are a

3    number of other cases in New York and Delaware that would

4    support that, you know, a modification to a material term is

5    a new contract.

6          Otherwise, you know, parties would be able to come

7    up with any agreement and just say we're modifying some

8    prior agreement, and that would never be a new contract.

9    You know, that doesn't seem right to me and I don't think it

10   is under the case law.

11         THE COURT:  Well, except that if you're talking

12   about the significance -- I mean, you know, as you point

13   out, the general proposition of breach of a post-petition

14   agreement gives rise to administrative expense claim.  That

15   certainly has very significant impact.

16         MR. RICH:  It does.  I think --

17         THE COURT:  You -- I think what you're saying is,

18   irrespective of what's in the agreement that purports to

19   modify a prepetition agreement irrespective of the terms of

20   that, any modification of a prepetition agreement that

21   arises -- that occurs post-petition makes it a post-petition

22   agreement.  Irrespective of the --

23         MR. RICH:  Yes.

24         THE COURT:  -- terms of the agreement.  Okay.

25         MR. RICH:  I think if it's a modification of

Page 45

1    material terms, such that it is a new contract under state

2    law, then yes, that would make it a new contract, you know,

3    in whatever period you're in.  If you're post-petition and

4    you do that, I would submit that that's a post-petition

5    contract at that point.

6           THE COURT:  And it's a modification -- I think you

7    said a modification of the material term.  What was the --

8    what's the modification of the material terms here?

9           MR. RICH:  Here, it would be the term of the

10   contract.  Without this modification, the contract goes

11   away, I mean, it's over.  And so I think it, you know, in

12   some ways is extremely material.  It's the entire -- you

13   know, continuation of the entire contract --

14          THE COURT:  Got it.

15          MR. RICH:  -- for --

16          THE COURT:  Okay.

17          MR. RICH:  So let me talk about the two cases the

18   plan administrator cites.  The first was Bush Industry, that

19   case involved a tri-party agreement.  And the issue was

20   whether the agreement, whether a new agreement, a

21   modification agreement it was signed by only one of the

22   parties.

23          The issue was whether that was a modification to

24   the old agreement, or if that was a new agreement.  And that

25   characterization was significant under the particular facts

Page 46

1    of that case, because the old agreement provided that it

2    could be modified on -- it could -- modified by a writing

3    signed by only one party.  And so it was not a modification,

4    it would need to be signed by all the parties to be binding,

5    just as normally is the case when you're entering a

6    contract.

7            But the opinion did not address the issue of

8    whether the modification itself is considered to be a new

9    meeting of the minds, new contract.  That just wasn't the

10   issue.

11           The issue was whether this modification, whether

12   you consider it a new contract or not, falls within that

13   language that allows a modification by only one party.

14           And the other case, the Crystal Apparel case, I

15   know we spent some time talking about, prepetition

16   employment agreements with the golden parachute, the

17   claimant argued that the extension agreement was just part

18   of the prepetition agreement rather than a standalone new

19   contract that required approval.

20           The Court did not hold either way, rather it held

21   that whether the agreement was a separate contract or merely

22   part of the old prepetition contract didn't change the

23   outcome here.  Specifically because the debtor didn't, what

24   I call ratify or accept performance under the new agreement.

25           In fact --

Page 47

```
1              THE COURT:  Well, they accepted performance of the
2      -- certainly accepted the performance of the executives.
3              MR. RICH:  Right.  But I believe in that case, I
4      think that the debtor specifically sought Court approval of
5      the provisions that were at issue and hadn't at that point,
6      you know, accepted them or ratified them.  In fact, they
7      were challenging them.
8              THE COURT:  Uh-huh.  Okay.
9              MR. RICH:  The second argument that the extensions
10     are not ordinary course and so bankruptcy court approval is
11     required else they're void.
12             I mean, we would -- again, we don't need to get to
13     this issue, but if we do, the entry into subservicing
14     agreements is purely ordinary course here.  We -- I think
15     that's beyond the scope of a sufficiency hearing, but if we
16     had to make a factual record we would after appropriate
17     discovery.  And there are a lot of things the docket would
18     point to, that in my view, make very clear that this was
19     ordinary course.
20             The debtor's contract schedules with hundreds of
21     servicing and subservicing agreements, including RMS'
22     schedules.  The disclosure statement identifies that one of
23     RMS' primary functions is the subservice loan portfolios for
24     the benefit of third party credit owners or reverse loans,
25     that's exactly what they were doing here.
```

Page 48

1          First day declaration states that RMS primarily

2     focuses on servicing and subservicing, reverse mortgage

3     loans, so you know, we would submit that, you know, entry

4     into these type of post-petition extension agreements is

5     ordinary course and it would make that record if we needed

6     to.

7          THE COURT:  All right.  But you did raise it in

8     your footnote.

9          MR. RICH:  We did raise it, yes, sir.

10         THE COURT:  Right, okay.

11         MR. RICH:  So with that, you know, unless the

12    Court has more questions, Finance of America and Liberty

13    respectfully request that the Court deny the omnibus

14    objection to their administrative priority claims.

15         THE COURT:  All right.  Thank you.  Mr. Singh.

16         MR. SINGH:  Thank you, Your Honor.  Your Honor,

17    I'll be brief.

18         Addressing -- I'll go in the order that counsel

19    went, so addressing first the issue, the legal issue raised

20    about well if you have a post-petition breach, you know,

21    that I think what I'm hearing is essentially -- regardless,

22    put aside the extension agreements and no matter what, the

23    post-petition breach because the debtor was accepting fees

24    have to be treated as hundred cent claims.

25         And, Your Honor, I think if that's right that has

Page 49

1   huge implications for Chapter 11 practice, because

2   particularly in this case, forget Chapter 11 practice, just

3   focus on RMS, we were parties -- this is what RMS did,

4   right, it's a servicer of the loan.

5           And so essentially what counsel is saying is any

6   time somebody on that -- you know, on a servicing agreement

7   alleges a breach, even though the debtor didn't assume the

8   contract, if that breach occurred post-petition pre-

9   rejection, those are all administrative expense claims.

10          And, Your Honor, I think that would be a huge

11  impact on this debtor, the feasibility of the plan at the

12  time, and certainly at the time of confirmation when Your

13  Honor considered those issues.  And certainly the

14  expectations and fairness to the parties of the bankruptcy

15  process.

16          Right, I mean, the cases that we've cited and the

17  case law in Sharma, et cetera that Your Honor relied on, all

18  sort of goes to the issue of creditor fairness.  You know

19  why is -- why are administrative expenses and priorities

20  narrowly construed?  Well, that's because, you know, another

21  dollar to an administrative priority creditor is another

22  dollar that doesn't go to another creditor, right, it's not

23  just sort of a debtor engaging in normal business practice

24  and it has no implications.  It has implications throughout

25  the entire bankruptcy sort of picture for all of the various

Page 50

1    creditors.

2            And that's why, I think, Your Honor, that's not

3    the rule.  I mean, frankly, you know, when counsel says it

4    can't be the rule that a -- you know, a debtor can sort of,

5    you know, breach a contract post-petition and not be held

6    responsible, well, I submit, Your Honor, that is the rule.

7            And I'm not saying, you know, an intentional

8    breach or fraud or tort or some sort of exceptions that are

9    there, you know, where lines are drawn.  This is sort of

10   ordinary course, parties engaging in transactions, you know,

11   the debtor servicing, and now you've got a breach, you know,

12   sort of a run of the mill breach claim under a contract.

13           And, Your Honor, the law is that you can't have an

14   administrative expense treatment for that breach.  What you

15   get is an administrative expense claim for the benefit

16   conferred.

17           Now, it's a little awkward here, Judge, because in

18   a lot of the cases that both sides cite and that, you know,

19   we're all sort of familiar with, you've got a situation

20   where, you know, somebody's providing a service or somebody

21   is providing a good to the debtor, so it's easy to say,

22   well, you know, did the debtor accept that good or did the

23   debtor not accept that good, or did the debtor accept that

24   service or did the debtor not accept that service.

25           And you can say, well, yeah, you did and so for

1    that particular service, you know, estate you pay as an

2    admin claim or for that particular good, and the rest of it

3    is prepetition.  Here, it's a little -- it's sort of

4    flipped, right, because RMS is the service provider, and so

5    RMS collects fees in exchange for services it provides.

6            But I don't think that changes the law, Judge.  I

7    mean, I think the law continues to be, even in that

8    situation that you get -- that you, claimant, can have an

9    admin claim for the benefit conferred.  And here, you know,

10   the only benefit -- and, you know, they haven't sort of even

11   alleged this in specificity is, you know, there were fees

12   paid, and so we think they've been satisfied, you know, sort

13   of gotten their consideration for those fees but that's

14   really it.

15           And the cases that counsel cited, right, Unishop

16   and Texaco, I'm glad he raised those because I meant to

17   raise them in the beginning, but I want to come back to

18   them.

19           Unishop, Your Honor, let's start there, that's a

20   Bankruptcy Act case, right, I mean, it doesn't even talk

21   about the applicable two part standard of administrative

22   expenses.  It just says, you know, the debtor is responsible

23   if it gets a benefit, you know, to the debtor.

24           And I think as Your Honor knows, the

25   administrative expense standard has largely changed since

Page 52

1    then.  I mean, you've got Second Circuit decisions in

2    McFarland and so on and so on that say, no, it's a two part

3    analysis, we construe administrative expenses very narrowly.

4            And so Unishop really is not really relevant here

5    at all to this issue.  It's an Act case, and it's not like

6    we don't have tons and tons of authority under the

7    Bankruptcy Code for how you deal with administrative

8    expenses, and how you deal with this specific issue.

9            The next case counsel talked about was Texaco.

10   Your Honor, I read this case a bunch of times, including

11   late last night, very confusing and long drawn out

12   procedural history that Judge Harding goes through in

13   painful detail, because there was a number of issues going

14   on there.

15           But I don't think the debtor -- first of all, the

16   issue was more about whether certain claims were discharged

17   under the debtor's plan and what type of notice was given to

18   counterparties about assumption, was it even appropriate, et

19   cetera.  And so really that case turned on the merits of --

20   or sort of -- or on the equities and not necessarily on this

21   particular issue of, you know, do you get an admin claim for

22   post-petition pre-rejection damages.

23           There was an issue on whether the contracts were

24   rejected at all because they may not have even been

25   executory.  But the issue that the Court was focused on

Page 53

1    there was post-effective date, you know, for ten years or so

2    the debtor performed or, you know, got billions of dollars

3    in revenues in Texaco from the leases, the ground leases

4    that were at issue and then were saying, you know, I don't

5    have to comply because I left these behind in bankruptcy.

6           Very different than what we're talking about here,

7    Judge.  And, you know, counsel says we don't have authority.

8    I submit we do have authority, right on point.  Look at

9    Crystal Apparel, look at Bush Industries.  I mean Crystal

10   Apparel pretty much exactly what happened here, right.

11          You've got an extension agreement of a prepetition

12   contract, and the counterparty in that case it was

13   individuals who had their employment agreements extended.

14   In this case, it's the claimants here who have their

15   servicing agreements, you know, the time period extended,

16   saying well, you know look, that means that you have now

17   sort of converted, you know, that you've converted my

18   prepetition claim under the parachutes and here's sort of,

19   you know, breach claims under the contract, you've converted

20   those to admin.  Well, that's just not right.  I mean

21   Crystal Apparel says no, that's not what happened.

22          And the other cases Enron, for example, you know,

23   it's cited by the claimants and we cite it as well, where

24   it's very clear, you know, there's a contract that says that

25   the sort of creditor in Enron was going to reserve pipeline

Page 54

1   space and storage, et cetera for the debtor.  They did that

2   and said well, that's an admin claim because we had an

3   ongoing contract, you didn't reject it, you did some things

4   to sort of induce me to continue to stay on, you suggested

5   you were going to keep it.

6           And the Court says well, no, you only get an admin

7   claim for the benefit conferred.  It's very specific and

8   there was a few instances where the debtor used it, you get

9   paid for that and that's it.

10          So, Your Honor, I submit that, you know, the cases

11  cited by the other side are not applicable, ours are, and

12  they're very clear in terms of what the current state of the

13  law is on this issue.  And, you know, I think if the

14  claimants are correct here, that has large scale

15  implications, not only for these claims, but for anybody

16  where we, RMS, or any of the other debtors continue to

17  service contracts during the post-petition period and then

18  ultimately rejected those contracts, because what counsel's

19  saying is, we should've been -- you know, we're held

20  responsible, right, we're sort of -- we have to continue to

21  perform our end of the bargain and be responsible for breach

22  claims.  Well, that's just not the law.

23          Your Honor, to the issue of whether these were new

24  agreements --

25          THE COURT:  I'm sorry, Mr. Singh --

Page 55

```
 1              MR. SINGH:  Yes.

 2              THE COURT:  -- I apologize.  I just want to go

 3    back to one thing.  The benefit conferred, so you're saying

 4    they would get an administrative claim for any benefit that

 5    they conferred on the estate.

 6              MR. SINGH:  Correct.

 7              THE COURT:  Right?

 8              MR. SINGH:  The maximum claim, yep.

 9              THE COURT:  Right.  Here they pay the fee, they

10    pay the servicing fee.  And are you -- so that is the

11    benefit that they conferred on the estate?

12              MR. SINGH:  That's right, Your Honor.

13              THE COURT:  And you would say, well, you got

14    services for that, so that you don't get a claim for -- what

15    do you just --

16              MR. SINGH:  Yeah, let me be specific --

17              THE COURT:  If you could --

18              MR. SINGH:  -- Your Honor.

19              THE COURT:  Yes.

20              MR. SINGH:  What we're saying is, the maximum

21    benefit that they can -- they could have conferred here are

22    the payment of these fees, which aggregate to about four and

23    a half million dollars, I'm just combining them for this

24    discussion.

25              THE COURT:  Right.
```

Page 56

1          MR. SINGH:  It would be, you know, per claimant of

2      course.  That's the maximum benefit that they have

3      conferred.

4          Now -- so that's the maximum they are sort of

5      allowed to recover.  Now you look at well, was the estate

6      unjustly enriched, right, I mean, that's the standard for an

7      administrative expense.  You're not looking at was the

8      counterparty damaged, right, through the relationship,

9      you're looking at there shouldn't have been unjust

10     enrichment.  And there's been no allegation of unjust

11     enrichment --

12         THE COURT:  Right.

13         MR. SINGH:  -- by saying, you know, hey, you've

14     got these fees, you didn't perform any services, et cetera,

15     and I should get my money back or set off or something.

16     There's just no allegation of that.

17         So what I'm saying, Your Honor, is they continued

18     to get services performed during the case, they -- which

19     permitted a smooth transition at the end of the case, you

20     know, the RMS contract was transitioned to a third party and

21     these things are not simple to transition as I think Your

22     Honor knows from your experience in these cases and

23     generally.

24         So they got those benefits already, and it's up to

25     them, they have the burden.  They haven't alleged that they

Page 57

1    didn't get, you know, reasonable compensation or that they

2    didn't get, you know, that the estate was unfairly

3    compensated here.  And so I submit that that's all been

4    satisfied.  So there's no -- you know, there is no admin

5    claim as a result.

6            THE COURT:  Got it.  Okay.  Thank you.

7            MR. SINGH:  Thank you, Your Honor.

8            Your Honor, then just really quickly on, you know,

9    to the other issue on whether this is a new contract or, you

10   know, these extensions are a new contract or not.  I think

11   the back and forth between Your Honor and counsel really --

12   and the questions you had were the same ones I was jotting

13   down as the conversation was happening.

14           But, you know, state law saying that, you know,

15   even if the agreement says it's not a new contract, but that

16   somehow could be a new contract notwithstanding what the

17   parties said, Your Honor is looking to determine or what's

18   being asked is to determine the intention of the parties.

19   You know, did the parties intend to enter into a new

20   contract.

21           I mean, how you can't take into -- you know, sort

22   of the face of the agreements really should be the end and

23   beginning of end of the sort of the analysis.  They say

24   these are not new contracts.

25           And, Your Honor, I think your questions also --

1    it's not just -- you really hit on this, it's not just state

2    law that's implicated here, you have to put the bankruptcy

3    umbrella and context over it, right.

4         I mean, if these are new contracts, that's a huge

5    implication as I've been talking about for all creditors and

6    this estate generally, because now, you know, the bankruptcy

7    overlay of, okay, is this treated as an administrative

8    expense claim versus it is treated as a prepetition expense

9    claim is huge.

10        And so, you know, the parties weren't just sort of

11   entering into these types of extensions in a non-bankruptcy

12   context, it was within the overlay of Chapter 11 and, of

13   course, we were taking into consideration what would be the

14   impact of these claims.  And to say that, you know, that

15   that's all sort of irrelevant and the Court doesn't need to

16   address that, Your Honor, I submit is just incorrect.

17        Your Honor, in terms of, you know, were there

18   material modifications, you know, does just changing the

19   term or extending the term constitute a material

20   modification, again, Your Honor, I think you can just look

21   at the agreements, right.

22        All we did was extend the dates.  The parties

23   agreed to extend the dates.  There's no change in the amount

24   of the fee, there's no change to the indemnification,

25   there's no change to the performance obligations of the

Page 59

1    party.  There's no change to reporting, I mean, nothing,

2    literally nothing has changed.

3            You know, these extension agreements which were

4    forms from the prepetition agreements, the parties said, all

5    right, let's go out another three months, let's go out

6    another month, whatever, and they signed those.

7            How that can be a new contract, Your Honor, even

8    under the state law analysis if you were to ignore

9    bankruptcy, which I submit, you know, the context of

10   bankruptcy which I don't think you can, Your Honor, I just

11   don't see it.

12           And then the final point, Your Honor, just in

13   terms of, you know, what's fair or not fair and counsel made

14   the point, well, you know, if we had just stopped performing

15   the debtor would have hit us with a motion to enforce the

16   automatic stay.

17           Well, not really, Judge, right, because the facts

18   are different here.  If you've got a situation where the

19   contract hasn't expired by its own terms, and truly is

20   executory during the prepetition sort of during the post-

21   petition pre-rejection period, I agree with counsel, right.

22   The counterparty can't terminate, they have to perform, and

23   the debtor has the ability to enforce performance by virtue

24   of the automatic stay.  But those weren't the facts here.

25           These contracts but for these extension

Page 60

1    agreements, the prepetition contracts expired pursuant to

2    their own terms.  So there was nothing that required the

3    claimants to continue to do business with the debtor.  They

4    didn't have to execute these extension agreements.  They

5    weren't subject to that, you know, line of law until they

6    executed these extension agreements, right.  They could have

7    said, I mean literally they could have said I'm not

8    extending and the debtor can't sue for breach for a non-

9    extended term of a contract.  We can't enforce the automatic

10   stay if the contract expired pursuant to its own terms and

11   say, no, you have to continue for some reason or another.

12           So I really just disagree with sort of the

13   statement that were made about, you know, we were forcing

14   them along, or you know, we would have done to X, Y or Z to

15   them, and you know, this is unfair.  I just don't see that,

16   Your Honor.

17           Your Honor, I think that's -- I think I covered

18   all the points I had.  Of course, I'm happy to answer any

19   other -- any further questions the Court may have.

20           THE COURT:  No, I don't have any other questions.

21   Mr. Rich?

22           MR. RICH:  Yeah, if I could just -- this is Robert

23   Rich, Hunton Andrews Kurth on behalf of the claimants.  If I

24   could just very, very briefly just -- I just wanted to

25   address three quick points.

Page 61

1          One is, the -- just that last point from counsel

2     about well, you know, these were extension agreements, so we

3     weren't forced to perform.  Well, you know, of course --

4     that argument only applies to the period after those

5     extension agreements were signed, right, so there was

6     clearly at least some period where we had some -- we had a

7     prepetition agreement where they could have enforced it on

8     us and I submit probably would if we were to have told them

9     to stop servicing.

10          The bigger point is the benefit, you know,

11     conferred on the estate.  I think the point here is that

12     when you look at the benefit conferred on the estate, you

13     have to look at it at the time of the contract.  You can't

14     just go back, that's why all the cases I've cited state

15     that, you know, you have to accept the benefits and the

16     burdens if you accept performance under these contracts.

17          You look at the time of the contract to see if

18     that confers a benefit to the estate.  Here, you know, the

19     debtor has determined that it was worth performing.

20     Otherwise, the debtors in bankruptcy if they --

21     counterparties that enter into agreements with a debtor in

22     possession, you can know that, you know, that those -- the

23     obligations thereunder have to be honored.  And if they're

24     not, they're administrative claims.

25          Under the plan administrator's theory, you would

Page 62

1     always be able to go back and, you know, determine later

2     well, you know, actually that provision wasn't any good, it

3     actually didn't provide a benefit to the estate, so you

4     can't enforce that part of the contract.  And that can't be

5     the case.

6             And finally, it's just quickly to address the

7     point about the new contract issue, the modification.  I

8     heard counsel say that, you know, we're just going out

9     another month, you know, how could that be a new agreement.

10            Well, we could have effectuated the same exact

11    thing by just taking the form of our old full servicing

12    agreement, change -- you know, changing the term to kick it

13    out a few months, and then signing a whole new servicing

14    agreement for that period.

15            Instead, they used the short form, right, they did

16    a one pager that said, okay, incorporate all those other

17    terms and we're extending it, you know, one month or two

18    months, based on the terms in that agreement.

19            I think it would be -- you know, it sounds like

20    there wouldn't be any dispute if we signed the whole

21    agreement again and just changed that term, that that's a

22    new agreement.  And I think it's taking form over substance

23    to say well, because they used the short form one pager that

24    incorporated terms then it's a different -- then it's, you

25    know, not a meeting of the minds, not a new meeting of the

Page 63

1    minds, that it's something else.

2            Those are the points I wanted to make, thank you,

3    Your Honor.

4            THE COURT:  All right.  So what you're saying then

5    is prepetition you were -- I can't -- and forgive me, I

6    can't remember which entity is, the contract that was

7    entered into I think in 2011, is that right, is --

8            MR. RICH:  Yes, I believe that was for Finance of

9    America, uh-huh.

10           THE COURT:  Yeah, March of 2011, right?

11           MR. RICH:  I believe that's correct.

12           THE COURT:  So you talk about that -- okay.  You

13   talk about that as being the agreement that we're talking

14   about, but that was extended a number of times prepetition.

15           So were these extensions a new contract?

16           MR. RICH:  Yes, I think they were, I don't think

17   it makes any difference for today's analysis, because those

18   were all prepetition.  You know, whether -- you know,

19   whether they made an agreement on one date or another isn't

20   -- is going to impact the analysis today.

21           THE COURT:  All right.  Okay.

22           All right.  Mr. Sing, anything further?

23           MR. SINGH:  Your Honor, I just want to clarify one

24   point.  I think counsel or maybe -- I just want to make sure

25   I'm being clear to the Court, because I think what counsel

Page 64

```
 1    said about, you know, benefits and burdens point, I just

 2    want to be clear.

 3             Your Honor, if these were -- if a debtor enters

 4    into a new contract, you know, truly a new contract, not the

 5    situation here with a counterparty, then I agree, we have to

 6    perform and any breach, you know, to that new contract with

 7    a third party to sort of encourage them to do business with

 8    the debtor, then I agree with counsel.

 9             I'm not disagreeing with him that that is a, you

10    know, hundred cent claim for breach.  My point is, these are

11    not new contracts, and so where you are is a situation where

12    you've got a prepetition contract, and prepetition contract

13    counterparties are very -- treated very differently than a

14    new third party or a new contract with somebody that truly

15    has entered into post-petition.

16             Prepetition you fall into the analysis we've been

17    talking about and benefit conferred, Your Honor.  So I

18    wanted to just make sure that at least the Court understood

19    and was clear as to what the plan administrator's position

20    is and that, you know, we don't think we're in a new

21    contract world.  If we were, then I agree, you know, we've

22    got a bigger problem, we can't just say, you know, sort of

23    in hindsight, you know, we don't feel like that we got a

24    benefit conferred and, you know, we can sort of do our job

25    bad, et cetera.  But that's just not the world we're in.
```

Page 65

1           This situation to us is very clearly a prepetition

2    relationship, prepetition contractual relationship with a

3    creditor that's treated very differently under the Code and

4    has a very different standard of what is administrative

5    expense, and truly going out with a new third party and

6    entering into a contract with that new third party where,

7    you know, I agree you do have to sort of deal with all the

8    benefits and burdens.  But that's just not the situation

9    that we're in.

10          And, Your Honor, finally I would just say, you

11   know, in terms of were these extensions new contracts or

12   not, well, yeah, we could have -- you know, we could have --

13   the parties could have sort of literally written out a new

14   contract but we didn't.  Right, so those are just not the

15   facts, those would be different facts, we didn't.  We did

16   one page extensions that expressly say these are not new

17   contracts.

18          So, Your Honor, I'll leave it at that, right.

19   Yes, the facts could be different and we'd be having a

20   different conversation, but those are not the facts.  The

21   facts are we did these extensions and they say these are not

22   new agreements.

23          So, Your Honor, I'll leave it at that and I'm

24   probably starting to repeat myself, but I did want to just

25   make those two final points, thank you.

Page 66

1            THE COURT:  All right.  That's fine.  So I need to

2    think on this, we'll adjourn it until the next omnibus, but

3    I expect to have a ruling before then.  So thank you all

4    very much for the amount of time that you were able to spend

5    with me this morning or now into the afternoon on this.

6            And I think, Mr. Singh, I think we're done; is

7    that right?

8            MR. SINGH:  Yes, Judge, we are done, thank you

9    very much.

10            THE COURT:  Thank you.

11            MR. RICH:  Thank you, Your Honor.

12    (Proceedings concluded at 12:45 p.m.)

13                    * * * * *

14

15

16

17

18

19

20

21

22

23

24

25

1                    I N D E X

2

3                  R U L I N G S

4    Sixty-Seventh Omnibus Objection to Proofs of        10

5    Claim (No Basis Consumer Creditor Claims)

6    (Doc #3121)

7

8    Sixty-Eighth Omnibus Objection to Proofs of         11

9    Claim (No Basis Consumer Creditor Admin Claims)

10   (Doc #3122)

11

12   Sixty-Ninth Omnibus Objection to Proofs of          12

13   Claim (Modified Consumer Creditor Claims)

14   (Doc #3123); Response to Motion filed by

15   Jina McHargue (Doc #3192)

16

17   Seventieth Omnibus Objection to Proofs of           9

18   Claim (No Basis Claims) (Doc #3130)

19

20   Seventh-First Omnibus Objection to Proofs of        12

21   Claim (Misclassified Claims) (Doc #3131)

22

23   Motion of Plan Administrator Pursuant to            16

24   Section 7.6 of Third Amended Joint Chapter 11

25   Plan of Ditech Holding Corporation and Its

Page 68

1    Affiliated Debtors to Estimate for Reserve

2    Purposes the Priority Amount Asserted in

3    Proof of Claim No. 22049 Filed by Claimant

4    Cherane Pefley (Doc #3120)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 69

1                        CERTIFICATE

2    I, Sheila G. Orms, certify that the foregoing is a true and

3    accurate transcript from the official electronic sound

4    recording.

5    Shelia Orms          Digitally signed by Shelia Orms
                          DN: cn=Shelia Orms, o, ou,
                          email=digital@veritedt.com, c=US
6    _____  Date: 2021.01.29 16:36:13 -05'00'

7    SHEILA ORMS, APPROVED TRANSCRIBER

8

9    DATED:   January 29, 2021

10

11

12

13

14

15   Veritext Legal Solutions

16   330 Old Country Road

17   Suite 300

18   Mineola, NY 11501

19

20

21

22

23

24

25

| | | | |
|---|---|---|---|
| **&** | **29** 69:9 | **780** 5:10 | **addresses** 13:16 |
| **&** 5:1,8,16 | **3** | **8** | 42:24 |
| **1** | **30** 11:4 | **8** 6:3 | **addressing** 15:20 |
| | **300** 69:17 | **9** | 48:18,19 |

**&**

**&** 5:1,8,16

**1**

**10** 67:4
**100,000** 19:11
 30:7
**10004** 1:14
**10017** 5:12
**10100** 5:3
**10153** 4:20
**10166** 4:6
**11** 2:20 18:16 27:7
 27:13 35:17 37:11
 49:1,2 58:12 67:8
 67:24
**11501** 69:18
**11:26** 1:17
**12** 67:12,20
**12:45** 66:12
**1395** 4:12
**14** 19:7
**15** 29:10
**16** 67:23
**19-10412** 1:3 7:4
**19801** 5:19
**19901** 6:5

**2**

**2** 9:16
**200** 4:5
**2000** 34:12
**2011** 63:7,10
**2021** 1:16 69:9
**21280** 8:11,22
**2186** 3:1
**22049** 2:23 13:6
 68:3
**2314** 3:2
**2315** 3:3
**254** 34:12
**26** 10:10
**28** 1:16

**29** 69:9

**3**

**30** 11:4
**300** 69:17
**3120** 2:23 68:4
**3121** 2:4 10:8 67:6
**3122** 2:7 11:4
 67:10
**3123** 2:10 11:15
 67:14
**3130** 2:14 8:5 9:4
 67:18
**3131** 2:17 12:13
 67:21
**3192** 2:11 67:15
**3194** 10:17
**3195** 11:22
**330** 69:16
**33131** 4:13
**34th** 5:11

**4**

**4.15** 19:13,13
**4.4** 19:6 30:6
**43** 8:23,24
**44** 8:8

**5**

**52nd** 17:12
**536** 34:12
**57** 2:1

**6**

**67** 9:16
**67th** 9:24 10:7
**68th** 11:3
**69th** 10:8 11:14

**7**

**7.6** 2:20 13:4
 67:24
**7028** 6:4
**71st** 12:6,12
**767** 4:19

**780** 5:10

**8**

**8** 6:3

**9**

**9** 67:17
**90** 13:9,25 14:7,25
**90067** 5:4
**919** 5:18

**a**

**ability** 59:23
**able** 33:19 44:6
 62:1 66:4
**abram** 24:22
**absolutely** 23:3
**accept** 36:11 38:6
 38:20 39:10 46:24
 50:22,23,23,24
 61:15,16
**accepted** 35:20
 36:3,22 38:5 39:4
 39:14,15,17,19
 47:1,2,6
**accepting** 36:23
 37:9 38:13 48:23
**accurate** 21:11
 69:3
**act** 51:20 52:5
**action** 31:25
 35:25
**actions** 30:15
 35:10 37:23
**actual** 20:9 41:20
**addition** 14:18
**additional** 24:10
 27:4,8
**address** 16:7,11
 24:7,17 40:9,24
 46:7 58:16 60:25
 62:6
**addressed** 13:8
 14:13 18:7

**addresses** 13:16
 42:24
**addressing** 15:20
 48:18,19
**adjourn** 66:2
**adjourned** 8:10
 8:21 10:18 11:23
 11:24 18:5
**adjourning** 9:8
**adjournment**
 10:16 11:21
**admin** 2:7 11:5
 20:11,13,17 29:23
 31:14 33:1 51:2,9
 52:21 53:20 54:2
 54:6 57:4 67:9
**administrative**
 8:9 12:14,17
 16:14 20:1,6 21:6
 22:21 23:19 27:12
 28:19,24 29:12,14
 29:20 30:18 32:1
 32:7 33:12,18,23
 34:6,17 36:12
 38:22 40:14,17,21
 41:11 44:14 48:14
 49:9,19,21 50:14
 50:15 51:21,25
 52:3,7 55:4 56:7
 58:7 61:24 65:4
**administrator**
 2:19 7:8 8:3 10:6
 10:13,19 11:7,25
 13:17,24 14:25
 15:6 20:24 33:15
 35:6,19 36:13
 38:15 40:18 42:8
 45:18 67:23
**administrator's**
 13:3,11 16:12
 17:12,25 18:10
 19:4 21:8 26:23
 27:22 31:20 41:18

61:25 64:19
**affiliated** 2:21
68:1
**afforded** 20:1
**afternoon** 66:5
**agenda** 7:9,14
9:16 10:7 11:2,14
13:3
**aggregate** 55:22
**agree** 43:13 59:21
64:5,8,21 65:7
**agreed** 58:23
**agreement** 24:6
26:11 28:18 35:7
35:13,16,18 36:16
37:4,5,6,23 38:5
38:10 40:9,14
41:6 42:3,6,17,18
42:25,25 43:2,4
43:13,14,15,15,17
43:19,23 44:7,8
44:14,18,19,20,22
44:24 45:19,20,20
45:21,24,24 46:1
46:17,18,21,24
49:6 53:11 57:15
61:7 62:9,12,14
62:18,21,22 63:13
63:19
**agreements** 17:19
18:14,15,20 20:20
20:23 21:8,12,14
21:20 22:5 23:11
24:5,10,10,11,17
24:23,25 25:17,22
25:25 26:2,3,6,8,8
26:24,25 27:6
28:2 31:4,10,11
31:12 33:11,13
39:5,21 40:19
41:1,20,22 42:13
42:16 46:16 47:14
47:21 48:4,22

53:13,15 54:24
57:22 58:21 59:3
59:4 60:1,4,6 61:2
61:5,21 65:22
**ahead** 41:14
**allegation** 28:10
28:21 30:13 56:10
56:16
**allege** 29:10
**alleged** 19:7 31:13
31:16 51:11 56:25
**alleges** 49:7
**alleging** 19:22
**allow** 10:10 11:17
13:13
**allowed** 56:5
**allows** 46:13
**alternative** 26:4
26:17 27:16
**amended** 2:20
13:4 67:24
**america** 3:2 4:4
7:12 17:16 18:13
18:13,18 19:5,7
19:20 33:8 48:12
63:9
**amount** 2:22 13:9
25:18 36:7 58:23
66:4 68:2
**amounts** 8:16
11:18 19:15
**analogy** 38:13
**analysis** 29:3 52:3
57:23 59:8 63:17
63:20 64:16
**analyzed** 25:4
**andrews** 4:3 33:7
60:23
**angeles** 5:4
**answer** 14:23 16:5
31:17 60:18
**anybody** 54:15

**anymore** 39:25
**apologies** 9:12,14
9:18
**apologize** 7:4 9:20
9:25 16:20 21:22
36:14,15 41:4
43:10,11 55:2
**apparel** 22:14,22
46:14 53:9,10,21
**appeal** 14:19,21
25:3
**appearing** 6:9
**apple** 23:7,18
**applicable** 8:20
21:4 41:25 51:21
54:11
**application** 7:22
**applies** 61:4
**apply** 41:19
**appreciate** 17:5
32:3
**appreciated** 17:9
**appropriate**
47:16 52:18
**approval** 23:3
35:3 46:19 47:4
47:10
**approve** 22:25
**approved** 23:25
69:7
**approximately**
19:6
**arguable** 13:21,22
**argue** 20:16
**argued** 46:17
**argues** 33:16
40:18
**argument** 26:4,16
31:20 32:14 35:4
35:5 36:18 38:1
41:2,19 42:21
47:9 61:4

**arguments** 18:2
21:9 27:16 40:24
**arises** 44:21
**arising** 28:16 34:5
35:10
**arrangement**
39:22 40:8
**aside** 48:22
**asked** 57:18
**asking** 15:6,19
**aspect** 25:5
**asserted** 2:22 8:16
11:18 13:6,9 16:7
24:23 26:13 35:13
39:6 68:2
**asserting** 8:8
12:13 19:7
**assertion** 19:12
**assets** 26:11
**assume** 27:4 49:7
**assumed** 20:2
34:7,15
**assuming** 37:4,7,8
**assumption** 33:22
38:25 39:5 40:5
52:18
**attached** 19:3
**attempt** 14:19
**attention** 35:3
**attorney** 6:1
**attorneys** 4:4,11
4:18 5:2,9,17 6:2
**authority** 13:22
20:24 28:14,20
29:25 52:6 53:7,8
**authorization**
26:7
**automatic** 59:16
59:24 60:9
**available** 14:7
22:8
**avenue** 4:5,12,19
5:10

**aware** 14:17
**awkward** 50:17

**b**

**b** 1:19
**b.r.** 34:12
**back** 9:15,23 12:5
12:25 18:6 20:10
51:17 55:3 56:15
57:11 61:14 62:1
**bad** 64:25
**balance** 14:12
**bankruptcy** 1:1
1:12,21 22:24
24:20 25:4 36:6
39:24 40:3 41:25
47:10 49:14,25
51:20 52:7 53:5
58:2,6,11 59:9,10
61:20
**bar** 8:20
**bargain** 54:21
**based** 8:12 10:12
11:6 12:14 13:22
15:24 18:1 23:21
30:14 62:18
**basic** 18:12
**basis** 2:4,7,14
8:16,16,19 10:11
11:5,17 23:6 67:5
67:9,18
**bear** 20:7 34:10
35:17
**beginning** 51:17
57:23
**behalf** 7:8 8:2,3
8:10,22 10:5 33:7
60:23
**believe** 20:8 38:9
43:3 47:3 63:8,11
**belongs** 14:13
**benefit** 20:9,14
29:2,4,5,7,9,11,13
30:5 31:15,15

32:15,20,24 34:19
34:23 35:1 37:9
37:15 47:24 50:15
51:9,10,23 54:7
55:3,4,11,21 56:2
61:10,12,18 62:3
64:17,24
**benefits** 34:7,10
35:21 38:5,6
56:24 61:15 64:1
65:8
**benefitted** 34:22
**best** 30:7,10
**beth** 5:14
**better** 9:13,14
**beyond** 19:21
47:15
**bigger** 61:10
64:22
**billions** 53:2
**binding** 15:13
46:4
**bit** 20:10 22:23
**blvd** 5:3
**bonds** 36:5
**books** 8:14 10:12
11:6 12:16
**borrower** 35:24
**bowling** 1:13
**bradley** 38:18
**breach** 19:12
28:17,21,23 29:11
30:17,24 33:17,21
35:9 40:2,16,20
41:10,13 44:13
48:20,23 49:7,8
50:5,8,11,12,14
53:19 54:21 60:8
64:6,10
**breaches** 19:8
23:13
**brickell** 4:12

**brief** 34:4 43:25
48:17
**briefly** 60:24
**brings** 17:10
**brooken** 10:15
**brought** 35:2
**bucket** 14:14
**bunch** 52:10
**burden** 20:7
35:17 56:25
**burdens** 34:10,20
34:21 37:8 61:16
64:1 65:8
**bush** 22:15 42:10
45:18 53:9
**business** 23:11
31:5,8 37:12
49:23 60:3 64:7
**businesses** 23:5

**c**

**c** 4:1 7:1
**ca** 5:4
**calculated** 11:18
**calder** 38:17
**call** 46:24
**called** 29:22
**caloway** 5:21
**canceled** 38:19
**canceling** 37:1
**candidly** 43:8,25
**carolyn** 10:15
**cart** 23:8,18
**case** 1:3 2:1 7:4
8:14 16:25 18:3
18:21 19:1,2 21:9
26:9 28:11 29:16
30:7,10 33:15
34:1,13,14,20
35:14 36:5 37:11
37:21 38:9,9
44:10 45:19 46:1
46:5,14,14 47:3
49:2,17 51:20

52:5,9,10,19
53:12,14 56:18,19
62:5
**cases** 18:16 21:10
32:10,17 35:19
36:7 37:21,22
38:8,15,17,18,21
38:23 40:22 41:7
41:7,9 42:8,14,19
42:22 43:4 44:3
45:17 49:16 50:18
51:15 53:22 54:10
56:22 61:14
**caused** 19:24
30:24
**cent** 21:6 48:24
64:10
**certain** 17:12
52:16
**certainly** 13:22
15:3 27:13 34:21
44:15 47:2 49:12
49:13
**certificate** 69:1
**certify** 69:2
**cetera** 14:5 18:4
19:24 21:2 25:18
26:3,11 31:13
32:19 42:17 49:17
52:19 54:1 56:14
64:25
**challenging** 47:7
**chance** 16:21
**change** 43:5 46:22
58:23,24,25 59:1
62:12
**changed** 51:25
59:2 62:21
**changes** 51:6
**changing** 58:18
62:12
**chapter** 2:20
18:16 27:7,13

35:17 37:11 49:1
49:2 58:12 67:24
**characterization**
43:6 45:25
**charity** 36:5
**cherane** 2:23 13:6
68:4
**chose** 31:10 38:6
**christopher** 6:10
**circuit** 32:25 34:4
52:1
**cite** 29:15 37:21
50:18 53:23
**cited** 20:25 28:13
28:14 34:4 35:19
35:23 38:15 40:22
41:9 42:8,14,23
49:16 51:15 53:23
54:11 61:14
**cites** 38:17 45:18
**claim** 2:4,6,9,13
2:17,23,25 8:5,10
8:11,19,21 13:6,8
13:10,10,14,19,23
14:6,6,10,11,13
15:5,20,20 16:7
16:10 17:13 20:11
20:13,17 22:10
24:22 29:14,20,23
31:15,23 32:8
33:1,18,23 34:2,5
34:17 40:2,17
44:14 50:12,15
51:2,9 52:21
53:18 54:2,7 55:4
55:8,14 57:5 58:8
58:9 64:10 67:5,9
67:13,18,21 68:3
**claimant** 2:23
29:1,8 46:17 51:8
56:1 68:3
**claimant's** 30:15

**claimants** 17:19
20:7,16 28:6 31:4
53:14,23 54:14
60:3,23
**claims** 2:4,7,10,14
2:17 3:1 6:2 7:11
7:11 8:8,12,13,16
8:17,19,23,24
10:11,11,17,21
11:3,5,9,17,22
12:13,15,18,19,20
16:14 17:14,15,16
17:23 18:1,2,12
20:6 21:7 23:19
24:22 26:13 27:12
28:23,24 30:17,18
31:23 33:12 35:9
35:11,13 36:12
38:22 39:6 40:18
40:25 48:14,24
49:9 52:16 53:19
54:15,22 58:14
61:24 67:5,9,13
67:18,21
**clarify** 63:23
**class** 11:16
**classified** 11:19
12:17
**clean** 34:21 35:6
**clear** 19:15 22:12
27:19 28:12 42:1
47:18 53:24 54:12
63:25 64:2,19
**clearly** 16:9 25:25
61:6 65:1
**client** 8:8 37:20
**cliff** 4:24 10:5
**code** 52:7 65:3
**colleague** 7:19
12:6
**collected** 19:6,11
**collects** 51:5

**combining** 55:23
**come** 20:10 44:6
51:17
**comes** 36:6
**commenced** 35:25
**compensated**
30:11 57:3
**compensation**
57:1
**complained** 30:16
**completely** 38:22
**compliant** 16:13
**comply** 19:23
53:5
**concern** 16:2
**concerns** 16:12
**concluded** 66:12
**concrete** 29:4
**confer** 18:5 29:1,7
**conference** 2:1
17:18 29:4
**conferred** 29:11
30:5 31:15,15
32:15,24 50:16
51:9 54:7 55:3,5
55:11,21 56:3
61:11,12 64:17,24
**confers** 61:18
**confidential** 22:9
**confidentiality**
22:10
**confirmation** 36:1
49:12
**confusing** 52:11
**consequence** 42:7
**consider** 46:12
**consideration**
51:13 58:13
**considered** 27:7
41:22 46:8 49:13
**constitute** 20:22
43:23 58:19

**constitutes** 42:2
**construe** 52:3
**construed** 20:6
28:19 49:20
**consumer** 2:4,7
2:10 6:2 10:9,11
11:5,17 13:13,14
14:9,10,14 15:14
16:4 67:5,9,13
**contemplate** 26:1
**contemplation**
35:7
**contention** 40:25
**contested** 7:11
17:11
**context** 23:10
58:3,12 59:9
**continuation**
45:13
**continuations**
40:13
**continue** 13:13,24
20:21 24:15 28:16
37:12 39:21 54:4
54:16,20 60:3,11
**continued** 27:5
28:7 34:18 36:23
36:23 38:6,10,11
39:8,10 56:17
**continues** 34:9
51:7
**continuing** 20:25
**contract** 19:12,24
20:14,18,24,25
21:5 22:7,18
28:15 29:9,17,24
30:2 31:7,23 33:2
33:17,20,20,21,25
34:6,10,11,24,25
35:21 36:2 40:2,4
40:16,21 41:10,14
41:24 42:1,2 43:6
43:7 44:5,8 45:1,2

[contract - decisions]                                                    Page 5

45:5,10,10,13
46:6,9,12,19,21
46:22 47:20 49:8
50:5,12 53:12,19
53:24 54:3 56:20
57:9,10,15,16,20
59:7,19 60:9,10
61:13,17 62:4,7
63:6,15 64:4,4,6
64:12,12,14,21
65:6,14
**contracts**  18:19
18:23 20:2,19
22:3,4,8,17,24
23:23,24 24:16
27:3 28:6,7 29:16
31:2 34:23 35:2
36:8,24 38:20
41:20,23 52:23
54:17,18 57:24
58:4 59:25 60:1
61:16 64:11 65:11
65:17
**contractual**  65:2
**conversation**
57:13 65:20
**convert**  23:12
**converted**  23:14
23:17 27:10 53:17
53:17,19
**converting**  22:19
23:2
**corporation**  1:7
2:21 7:4 67:25
**correct**  9:9 13:21
15:15,18 25:11
54:14 55:6 63:11
**correcting**  21:25
**correctly**  25:6
**costs**  34:21 35:6
**could've**  31:7
**counsel**  17:20
33:10 35:23 40:24

48:18 49:5 50:3
51:15 52:9 53:7
57:11 59:13,21
61:1 62:8 63:24
63:25 64:8
**counsel's**  54:18
**counterclaims**
35:24
**counterparties**
33:20 52:18 61:21
64:13
**counterparty**
29:17 31:7 43:13
53:12 56:8 59:22
64:5
**country**  33:1
69:16
**couple**  20:4 21:10
24:9 38:15
**course**  14:23
16:19 17:4 23:1,4
25:1,5,17 26:8,14
26:21 31:18 42:20
47:10,14,19 48:5
50:10 56:2 58:13
60:18 61:3
**court**  1:1,12 7:2
7:15 8:1,6,24 9:1
9:6,10,14,22 10:1
10:20,22 11:1,9
11:11 12:1,2,8,18
12:21 13:1,20
15:1,10,12,16,22
16:1,8,20 17:2,5,7
18:8 21:16,19,23
22:24 23:3,25
24:1,10,14,20,21
25:3,4,10,12,12
25:13,15,20 26:19
27:15,18,23 28:3
29:15,18 31:21
32:3,9,16,23 33:3
33:5,7 34:16 35:8

36:10,14 37:2,18
37:22 38:21 39:7
39:12,14 40:11,13
40:15 41:3,13,17
42:11 43:9,19
44:11,17,24 45:6
45:14,16 46:20
47:1,4,8,10 48:7
48:10,12,13,15
52:25 54:6,25
55:2,7,9,13,17,19
55:25 56:12 57:6
58:15 60:19,20
63:4,10,12,21,25
64:18 66:1,10
**court's**  13:23
34:12 35:3
**courts**  27:6 34:8
35:1 36:10 40:3
**covered**  60:17
**created**  32:9,23
**creating**  33:22
**credit**  47:24
**creditor**  2:4,7,10
8:8 13:13,14 14:9
14:10,14 16:4
49:18,21,22 53:25
65:3 67:5,9,13
**creditor's**  20:11
20:14
**creditors**  23:20
50:1 58:5
**crystal**  22:14,22
24:3 46:14 53:9,9
53:21
**current**  54:12

**d**

**d**  7:1 67:1
**damage**  26:12
**damaged**  56:8
**damages**  19:22,24
19:25 28:10,15,17
30:24 31:13 52:22

**date**  8:20 10:19
11:24 19:18,22
53:1 63:19
**dated**  69:9
**dates**  58:22,23
**day**  48:1
**dazihan**  10:15
**de**  5:19 6:5
**deal**  52:7,8 65:5
**deals**  14:11
**dealt**  25:14
**deborah**  10:14
**debtor**  24:15,16
25:2,16 26:7 27:4
28:9,15 29:3,21
30:23 31:5,8,24
32:13 33:25 34:7
34:9,18 35:4,11
35:20 36:2,21,25
37:10,19 38:5,19
38:23 46:23 47:4
48:23 49:7,11,23
50:4,11,21,22,23
50:23,24 51:22,23
52:15 53:2 54:1,8
59:15,23 60:3,8
61:19,21 64:3,8
**debtor's**  8:14
12:16 33:16 47:20
52:17
**debtors**  1:9 2:21
4:11,18 18:16
19:5,10 20:15
33:19,21 35:12
36:11,22 39:3,7
54:16 61:20 68:1
**decided**  37:15
**decision**  21:3
22:14,15 28:13
29:15 34:12 35:23
35:24 37:12,17
**decisions**  38:4
52:1

[declaration - execute]                                                          Page 6

declaration 48:1
deemed 35:11
definitely 25:21
delaware 42:13
  43:21 44:3
delay 7:4
delivered 36:9
deny 48:13
deposit 36:4
derive 34:18
desire 36:25
detail 52:13
determination
  35:15
determine 15:4,4
  57:17,18 62:1
determined 8:14
  10:19 11:25 12:16
  24:21,23,24 25:13
  25:16 61:19
determining
  34:17
dialogue 27:5
difference 37:3,4
  63:17
different 17:19,19
  31:1 32:22 38:22
  39:25 53:6 59:18
  62:24 65:4,15,19
  65:20
differently 64:13
  65:3
directly 24:7
disagree 40:6
  60:12
disagreeing 64:9
disallow 10:10
  11:4 13:12
disallowed 8:25
  10:21 11:10
discharged 52:16
disclosure 47:22

discovery 18:4,6
  47:17
discussed 17:17
  17:22
discussion 55:24
dismiss 17:24
  18:1
dispute 20:3
  34:15 39:3 40:20
  44:2 62:20
distinguish 38:16
distribution 14:7
district 1:2
ditech 1:7 2:20
  7:3 67:25
doc 2:1,4,7,10,11
  2:14,17,23 3:1,2,3
  67:6,10,14,15,18
  67:21 68:4
docket 47:17
document 42:7
documentation
  8:13,18 12:15
doing 23:5 37:15
  39:18 47:25
dollar 49:21,22
dollars 53:2 55:23
dover 6:5
drawn 50:9 52:11

e

e 1:19,19 4:1,1 7:1
  7:1 14:16 67:1
earning 35:16
easy 50:21
ecf 8:5 10:8,17
  11:4,15,22 12:12
economic 34:19
ecro 1:25
effective 19:18,22
  53:1
effectively 25:8
effectuated 62:10

efficiency 17:22
eighth 2:6 67:8
either 12:17 14:2
  16:3,24 27:5
  46:20
electronic 69:3
employed 38:11
employment 24:5
  38:10 46:16 53:13
encourage 64:7
enforce 59:15,23
  60:9 62:4
enforceable 30:2
enforced 61:7
engaged 19:20
engaging 49:23
  50:10
enriched 30:12
  56:6
enrichment 30:14
  56:10,11
enron 29:15 53:22
  53:25
enter 12:1 26:7,11
  35:2 57:19 61:21
entered 7:23 14:4
  14:24 18:22,24,25
  19:1 20:20 25:2
  25:16 63:7 64:15
entering 46:5
  58:11 65:6
enters 64:3
entire 22:19 45:12
  45:13 49:25
entitled 31:25
  34:6 40:21 41:1
  41:11
entity 63:6
entry 47:13 48:3
equities 52:20
equity 3:1 17:15
  33:8

especially 33:2
esq 4:8,15,22,23
  4:24 5:6,14,21 6:7
essentially 19:18
  19:19 48:21 49:5
estate 20:9,15
  29:2,5,7 30:3,5,12
  30:14 31:16 32:15
  32:20 34:22 35:1
  37:15 51:1 55:5
  55:11 56:5 57:2
  58:6 61:11,12,18
  62:3
estimate 2:21 15:5
  15:19 16:10 68:1
estimated 15:6,16
  15:23
estimating 16:6
  23:19
estimation 13:5
  14:5 15:13 16:4
et 14:5 18:4 19:24
  21:2 25:18 26:3
  26:11 31:13 32:19
  42:17 49:17 52:18
  54:1 56:14 64:25
evidence 8:15
  18:4
exact 62:10
exactly 22:16
  24:13 26:15,16
  27:20,21 29:15
  47:25 53:10
example 53:22
exception 32:9,17
  32:23
exceptions 50:8
exchange 37:13
  51:5
excuse 37:2,18,24
  37:24 39:7,7,14
execute 28:18
  60:4

[executed - future]                                                                      Page 7

executed  60:6
executives  47:2
executory  28:6
   31:6 33:17 34:6
   35:21 36:2 52:25
   59:20
existing  21:13,19
   22:18 33:2 43:15
expect  22:6 66:3
expectations
   49:14
expects  14:21
expense  12:18
   16:14 20:1,6 21:7
   22:21 23:19 27:12
   28:24 29:14,20
   30:18 32:1,8
   44:14 49:9 50:14
   50:15 51:25 56:7
   58:8,8 65:5
expenses  28:19
   49:19 51:22 52:3
   52:8
experience  56:22
expire  18:21
expired  31:2
   59:19 60:1,10
expiring  27:3
expressly  15:12
   25:14 42:16,24
   43:14 65:16
expunge  10:10
   11:4
expunged  8:25
   10:21 11:10
extend  20:21 31:4
   31:10 58:22,23
extended  53:13,15
   60:9 63:14
extending  21:13
   21:19 22:2,5
   58:19 60:8 62:17

extension  21:12
   22:18 27:6 31:3
   31:11,12 40:19
   41:1,20 46:17
   48:4,22 53:11
   59:3,25 60:4,6
   61:2,5
extensions  18:22
   18:25 19:2,3
   22:16 23:22 25:23
   25:24 26:1,25
   42:12 47:9 57:10
   58:11 63:15 65:11
   65:16,21
extent  29:13
extremely  45:12

f

f  1:19
face  21:13 23:22
   26:24 57:22
facilities  32:13
fact  26:10 34:3
   46:25 47:6
facts  9:2 18:12,12
   31:1 45:25 59:17
   59:24 65:15,15,19
   65:20,21
factual  30:19
   47:16
failed  19:23
failure  34:1
fair  16:2 35:6
   59:13,13
fairness  23:19
   49:14,18
fall  35:6 64:16
falls  46:12
familiar  21:3 23:6
   50:19
far  39:20
favor  26:23
feasibility  23:18
   49:11

fee  7:22 28:10
   37:13 55:9,10
   58:24
feel  40:15 64:23
fees  19:6,11 30:6
   30:16 35:16 39:11
   39:17,18 48:23
   51:5,11,13 55:22
   56:14
fidelity  36:4
fifth  4:19
fifty  2:25
file  7:9
filed  2:11,23 7:21
   8:10,20 10:9,16
   11:3,15,22 18:1
   22:9 67:14 68:3
filing  19:17
final  13:18,23
   14:3 59:12 65:25
finally  62:6 65:10
finance  3:2 4:4
   7:12 17:16 18:12
   18:13,18 19:5,7
   19:20 33:8 48:12
   63:8
find  9:2
finds  40:13
fine  7:15 10:1
   12:8 18:8 27:25
   66:1
fingertips  41:9
finished  32:6
fire  32:12
first  2:16 7:18
   9:19,21 20:19
   24:21 26:20 38:9
   40:1 41:2,18
   42:10 45:18 48:1
   48:19 52:15 67:20
five  11:17
fl  4:13

flipped  51:4
floor  5:11
focus  37:24 49:3
focused  52:25
focuses  48:2
folks  24:9 27:8
footnote  48:8
force  33:19 37:19
   37:19 39:20
forced  31:4 61:3
forcing  60:13
foreclosure  35:25
foregoing  69:2
foreseeability
   21:2
foreseeable  28:17
forget  49:2
forgive  63:5
form  62:11,15,22
   62:23
formal  11:21
formed  43:23,23
forms  19:3 59:4
forth  16:9 57:11
forward  17:23
   37:7,11
found  12:12 35:8
four  11:4 18:24
   18:25 55:22
frankly  22:9 27:4
   50:3
fraud  50:8
freely  33:21
fresh  16:24
full  8:17 23:9
   62:11
functions  47:23
further  22:23
   60:19 63:22
future  26:2

[g - industries]                                                                              Page 8

| g | granted 8:1 11:11 | home 3:1 17:15 | hundreds 47:20 |
|---|---|---|---|

**g** 7:1 67:3 69:2
**gap** 13:10
**garrity** 1:20 7:3
**general** 12:19
  34:2 41:10 44:13
**generally** 35:2
  56:23 58:6
**getting** 7:5 15:25
**give** 27:3,7 33:17
**given** 25:17 26:9
  52:17
**gives** 44:14
**glad** 51:16
**go** 9:15,23 16:25
  17:23 24:21 26:22
  27:2 39:21,24,25
  41:14 48:18 49:22
  55:2 59:5,5 61:14
  62:1
**goes** 22:22 29:16
  45:10 49:18 52:12
**going** 7:18 8:3
  9:15,19 12:4 14:6
  15:12 23:7,12,15
  24:15 32:19 37:7
  37:11 39:24 40:1
  40:1 44:1 52:13
  53:25 54:5 62:8
  63:20 65:5
**golden** 24:11
  46:16
**good** 7:2,7 10:4
  17:7 50:21,22,23
  51:2 62:2
**goods** 36:9,11,25
  38:24
**gotshal** 4:10,17
  6:10 7:8 8:2 10:5
**gotten** 30:11
  51:13
**grant** 10:22,23
  12:22 16:10

**granted** 8:1 11:11
  12:2 13:20
**green** 1:13 6:3
**ground** 53:3
**guc** 5:2,9,17
**guess** 15:1 24:24
**gun** 31:5

**h**

**half** 55:23
**handle** 12:6
**happen** 27:7
**happened** 28:22
  38:9 53:10,21
**happening** 57:13
**happens** 28:4
**happy** 14:23
  31:17 60:18
**harbor** 7:12
**hard** 43:11
**harding** 52:12
**harmed** 32:21
**he'll** 9:24
**head** 31:5
**hear** 30:21,21
  40:22
**heard** 14:16 62:8
**hearing** 2:1,3,6,9
  2:13,16,19,25
  7:10 9:11 13:9
  16:21 47:15 48:21
**held** 38:21 46:20
  50:5 54:19
**hey** 56:13
**hindsight** 64:23
**history** 52:12
**hit** 40:2 58:1
  59:15
**hoc** 7:21
**hold** 42:9 43:4
  46:20
**holding** 1:7 2:20
  7:3 67:25

**home** 3:1 17:15
  18:14,18 19:1,10
  19:12,21 33:8
**hon** 1:20
**honor** 7:7,9,13,17
  7:20,21,24,25 8:8
  9:5,9,12,17 10:4
  10:25 11:13 12:4
  12:11,24 13:2,7
  13:11,11,16 14:1
  14:3,8,15,18,22
  15:9,18,21,25
  16:16,23 17:8,10
  17:14,17,22 18:1
  18:6,9,10,24 19:2
  19:14 20:2,4,5,11
  21:2,7,22 22:7
  23:9,15,24 25:7
  26:15 27:1,20,25
  28:5 29:6 30:1,6,8
  30:19 31:17,18
  32:2,5,6 33:4,6
  38:2 39:13 43:3
  48:16,16,25 49:10
  49:13,17 50:2,6
  50:13 51:19,24
  52:10 54:10,23
  55:12,18 56:17,22
  57:7,8,11,17,25
  58:16,17,20 59:7
  59:10,12 60:16,17
  63:3,23 64:3,17
  65:10,18,23 66:11
**honor's** 14:19
  28:13 35:23
**honored** 61:23
**huge** 49:1,10 58:4
  58:9
**huh** 43:3 47:8
  63:9
**hundred** 21:6
  48:24 64:10

**hundreds** 47:20
**hunton** 4:3 33:7
  60:23

**i**

**identical** 17:21
**identifies** 47:22
**ignore** 59:8
**impact** 14:12
  44:15 49:11 58:14
  63:20
**implicated** 58:2
**implication** 58:5
**implications** 49:1
  49:24,24 54:15
**important** 17:9
**imposed** 34:11
**improperly** 11:19
  12:17
**inc.'s** 3:2
**incentive** 33:24
**includes** 28:12
**including** 47:21
  52:10
**inconsistent** 27:13
  28:20 29:25
**incorporate** 43:22
  62:16
**incorporated**
  22:13 62:24
**incorporates** 42:5
**incorrect** 58:16
**incorrectly** 11:18
**indemnification**
  58:24
**indiscernible** 33:1
  38:14
**individuals** 24:5
  32:16 53:13
**induce** 54:4
**inducement** 29:3
**industries** 22:15
  42:10 53:9

industry 23:6
  45:18
inequitable 32:19
informal 10:13
  11:21
injured 32:14
injury 31:25
instances 29:21
  29:22 54:8
intend 17:3 57:19
intended 25:25
  26:5
intention 27:14
  57:18
intentional 50:7
interpret 26:6
interpreted 43:1
interrupt 24:1,2
  32:4 37:3 42:12
interrupted 27:23
  27:24
interrupting
  36:15 43:10
invoices 36:12
involve 35:20
involved 34:14
  36:1,5 45:19
involving 38:14
irrelevant 58:15
irrespective 44:18
  44:19,22
issue 13:17 17:14
  33:14 36:6 40:10
  45:19,23 46:7,10
  46:11 47:5,13
  48:19,19 49:18
  52:5,8,16,21,23
  52:25 53:4 54:13
  54:23 57:9 62:7
issues 17:21 21:2
  22:11 23:4,21
  26:22 49:13 52:13

item 10:7 11:2,14
  13:2
i'm 55:23

**j**

james 1:20
january 1:16 69:9
jina 2:11 67:15
jlg 1:3
job 64:24
joint 2:20 67:24
jointly 10:9
jones 5:1,8,16
jotting 57:12
jr 1:20
judge 1:21 7:3
  9:23 21:18 22:1
  24:13,22 25:19
  26:16 50:17 51:6
  52:12 53:7 59:17
  66:8

**k**

kahn 5:6
keep 54:5
kick 62:12
kind 26:12
know 14:3,5,20
  16:2 17:17,25
  18:3,4,11,13,21
  19:14,15 20:5,8
  20:17 21:1,12
  22:2,6,9,15,17,18
  22:23,24 23:2,5,7
  23:14,15,16,21
  25:17 26:17,23
  27:6,10 28:7,22
  28:25 29:7,10,18
  29:19,21 30:1,2,3
  30:11,20,24 31:7
  32:7,8,10,12,12
  32:15,18,25 34:1
  35:23 36:25 37:11
  37:25 38:6,7,23
  39:18,20,23,23,24

40:3,4,7,10,13
  41:21 42:4,6,20
  43:5,6,8,10,21
  44:2,4,6,9,12 45:2
  45:11,13 46:15
  47:6 48:3,3,11,20
  49:6,18,20 50:3,4
  50:5,7,9,10,11,18
  50:20,22 51:1,9
  51:10,11,12,22,23
  52:21 53:1,2,4,7
  53:15,16,17,19,22
  53:24 54:10,13,19
  56:1,13,20 57:1,2
  57:4,8,10,14,14
  57:19,21 58:6,10
  58:14,17,18 59:3
  59:9,13,14 60:5
  60:13,14,15 61:2
  61:3,10,15,18,22
  61:22 62:1,2,8,9
  62:12,17,19,25
  63:18,18 64:1,4,6
  64:10,20,21,22,23
  64:24 65:7,11,12
knows 20:5 51:24
  56:22
kurth 4:3 33:7
  60:23

**l**

l 1:20 67:3
lack 10:11 11:5
language 25:23
  42:23 46:13
large 54:14
largely 51:25
late 52:11
law 6:1 21:9 28:11
  29:6 30:2 31:14
  34:5 41:25,25
  42:14,22 43:16,21
  44:10 45:2 49:17
  50:13 51:6,7

54:13,22 57:14
  58:2 59:8 60:5
leading 7:6
lease 34:14,15,19
  34:20 38:12
leases 53:3,3
leave 65:18,23
left 40:7 53:5
legal 20:5 39:2
  43:5 48:19 69:15
legitimate 16:12
levine 5:14
liability 23:2
  33:23
liberty 3:1 7:12
  17:15 18:14,18
  19:1,10,12,21
  33:8 48:12
likelihood 14:5
limited 29:13
line 7:19 17:20
  32:9 60:5
lines 50:9
literally 59:2 60:7
  65:13
little 9:11,13
  20:10 22:22 50:17
  51:3
llc 33:8
llc's 3:3 17:16
llp 33:7
loan 36:1 47:23
  49:4
loaned 18:18
loans 18:18 37:13
  39:9 47:24 48:3
locked 30:22
long 29:9 42:7
  52:11
look 16:17,19,21
  21:7,8 22:11
  24:15 25:13,22
  26:5,20 28:14

30:17 34:24 35:1
42:20,21 43:14
53:8,9,16 56:5
58:20 61:12,13,17
**looked** 42:22
**looking** 34:22,23
42:14 56:7,9
57:17
**los** 5:4
**loss** 20:12,14
**losses** 19:24,25
**lot** 27:2 30:20
33:10 36:6,7
47:17 50:18

**m**

**mail** 14:15,16
**maintain** 13:25
14:2
**making** 15:3 39:1
**manges** 8:3 10:5
**march** 63:10
**market** 5:18
**mary** 5:21
**material** 42:1
44:4 45:1,7,8,12
58:18,19
**matter** 1:5 7:12
13:3 17:11 18:4
34:16 41:24 48:22
**matters** 7:18
10:18 11:24 27:7
**maximum** 55:8,20
56:2,4
**mcfarland** 52:2
**mchargue** 2:11
67:15
**mean** 21:10 23:22
26:22 27:1,2,9
28:1 36:17,20,21
39:8,16 43:1
44:12 45:11 47:12
49:16 50:3 51:7
51:20 52:1 53:9

53:20 56:6 57:21
58:4 59:1 60:7
**meaning** 38:19
**means** 39:17
53:16
**meant** 51:16
**meeting** 43:24
46:9 62:25,25
**merely** 46:21
**merit** 10:11 11:6
**merits** 9:3 13:8
14:5,10 15:20
16:7 52:19
**merrill** 36:5
**miami** 4:13
**mill** 50:12
**million** 13:9,25
14:7,25 19:6,7,13
29:10 30:6 55:23
**mind** 16:24
**minds** 43:24 46:9
62:25 63:1
**mineola** 69:18
**misclassified** 2:17
3:1 67:21
**misplaced** 37:24
38:3
**misread** 42:20
**misspoke** 21:21
**mixed** 9:20
**modification** 42:1
42:4,24 43:4,22
44:4,20,25 45:6,7
45:8,10,21,23
46:3,8,11,13
58:20 62:7
**modifications**
58:18
**modified** 2:10
46:2,2 67:13
**modify** 43:13
44:19

**modifying** 42:16
43:14 44:7
**money** 56:15
**monica** 5:3
**month** 59:6 62:9
62:17
**months** 59:5
62:13,18
**morning** 7:2,3,7,9
10:4 66:5
**mortgage** 18:15
18:17 36:1 48:2
**motion** 2:11,19
13:4,7,8,16 14:15
14:18 16:10 17:23
59:15 67:14,23
**moving** 26:10

**n**

**n** 4:1 5:18 7:1
67:1,3
**narrowly** 20:6
28:19 49:20 52:3
**nathalie** 4:15 7:19
8:2
**nature** 15:2
**necessarily** 44:1
52:20
**need** 20:8 22:11
26:21 27:1 46:4
47:12 58:15 66:1
**needed** 9:15 18:3
18:7 48:5
**needs** 14:13 40:15
**net** 37:15
**never** 26:7 33:17
40:17 44:8
**new** 1:2,14,14 4:6
4:20 5:12 20:19
20:22 21:5 22:17
22:24 23:22 25:25
26:3,6,24 42:2,4
42:13,13,17,18,25
42:25 43:2,4,15

43:16,20,23 44:3
44:5,8 45:1,2,20
45:24 46:8,9,12
46:18,24 54:23
57:9,10,15,16,19
57:24 58:4 59:7
62:7,9,13,22,25
63:15 64:4,4,6,11
64:14,14,20 65:5
65:6,11,13,16,22
**newly** 43:23,23
**night** 52:11
**ninth** 2:9 67:12
**non** 41:25 58:11
60:8
**normal** 49:23
**normally** 33:1
46:5
**note** 14:18 26:16
30:20
**notice** 52:17
**notices** 10:16
11:21
**notion** 40:6
**notwithstanding**
43:17 57:16
**novation** 42:17
**novations** 26:3
**number** 7:10 9:16
24:5 44:3 52:13
63:14
**ny** 4:6,20 5:12
69:18

**o**

**o** 1:19 7:1
**objection** 2:3,6,9
2:13,16,25 8:4,22
8:24 9:1,3,3,7
10:8,14,20,22,23
11:3,8,9,15,16,20
12:1,3,7,12,19,21
13:12 14:17 19:4
48:14 67:4,8,12

67:17,20
objections   7:11
9:19 17:12
obligation   22:20
22:21 35:10
obligations   23:13
25:8 34:11,20
37:7,14 58:25
61:23
obviously   17:18
20:4
occurred   19:8
28:10 49:8
occurs   44:21
offering   30:9
official   69:3
ogle   36:4
oh   21:21 41:13,13
oil   34:14 38:12
okay   7:13 9:6
10:3 15:22 17:8
21:23 24:14 27:23
31:18 41:14 43:19
44:24 45:16 47:8
48:10 57:6 58:7
62:16 63:12,21
old   45:24 46:1,22
62:11 69:16
omnibus   2:3,6,9
2:13,16,25 7:10
8:4 9:1,4,19,25
10:7,9 11:3,8,15
12:6,12 17:12
48:13 66:2 67:4,8
67:12,17,20
once   37:17
ones   14:20 57:12
ongoing   28:8
32:21 54:3
opened   27:11
operate   34:18
operation   32:21

opinion   46:7
optionality   31:6
order   7:14,22
8:24 9:20,25
10:21,24 11:9,12
12:1,3,19,23
13:18,23,23 14:1
14:3,24 15:21
16:10,11,15,17,21
36:8,24 37:1
38:18 48:18
orders   38:14,19
ordinary   23:1,4
25:1,5,17 26:8,14
26:21 32:23 47:10
47:14,19 48:5
50:10
orms   3:25 69:2,7
ounce   29:9
outcome   46:23
outset   35:14
outside   22:25
outstanding   14:20
overlay   58:7,12
owned   32:13
owners   47:24

**p**

p   4:1,1 7:1
p.m.   66:12
pachulski   5:1,8
5:16
page   21:12 65:16
pager   62:16,23
pagers   20:21 22:3
41:21
paid   7:22 8:17
28:9 39:18 51:12
54:9
painful   52:13
papers   19:15
36:18
parachute   24:11
24:17,23 46:16

parachutes   24:17
53:18
park   4:5
part   20:8 24:25
25:14,23 41:22
46:17,22 51:21
52:2 62:4
particular   13:19
45:25 51:1,2
52:21
particularly
28:16 49:2
parties   18:5,13,22
19:20 20:22 22:3
22:20 27:3,14
43:24 44:6 45:22
46:4 49:3,14
50:10 57:17,18,19
58:10,22 59:4
65:13
party   28:15 43:12
45:19 46:3,13
47:24 56:20 59:1
64:7,14 65:5,6
party's   40:3
pass   12:25
pay   29:23 36:12
40:1 51:1 55:9,10
payment   24:8
36:24 55:22
pefley   2:23 13:6
14:9,16 16:3 68:4
pending   39:5 40:4
people   32:14,20
perform   24:16
33:20 34:1 38:24
54:21 56:14 59:22
61:3 64:6
performance   36:3
36:22 38:13,20
39:4,15,15,19
41:5 46:24 47:1,2
58:25 59:23 61:16

performed   24:25
39:4,8 53:2 56:18
performing   28:9
35:15,18 38:7
59:14 61:19
period   19:9,16,19
19:23,25 28:8,11
29:2 30:4 31:3
37:9 45:3 53:15
54:17 59:21 61:4
61:6 62:14
permitted   7:24
14:25 56:19
person   38:11
perspective   18:11
30:1
petition   18:25
19:1,6,8,11,13,17
19:19,23 20:20,22
20:23 21:1,6,14
21:22 22:21 23:13
23:23,24 24:14
25:1,2,15,22
26:10,12 28:2,8
28:11,22,23 29:2
30:4 31:3,24
33:11,16,21 35:2
35:10 36:9 37:23
39:6 40:9,16,19
40:21 41:5,10,14
44:13,21,21 45:3
45:4 48:4,20,23
49:8 50:5 52:22
54:17 59:21 64:15
ph   10:14,15,16
38:17,18
phase   21:1
phone   43:11
picture   49:25
piece   13:12,14
15:8,10,14 16:6
26:20

[pipeline - ratified]                                                         Page 12

pipeline  29:18
  53:25
plain  25:22 26:23
  33:15
plan  2:19,20 7:8
  8:3 10:6,13,19
  11:6,25 13:3,4,11
  13:17,17,24 14:24
  15:5 16:12,13
  17:11,25 18:10
  19:3 20:24 21:8
  23:18 26:22 27:21
  31:20 35:5,19
  36:13 38:15 40:17
  41:18 42:8 45:18
  49:11 52:17 61:25
  64:19 67:23,25
pleadings  18:2
please  10:24
  11:12 12:3,23
  16:15 31:22 33:6
podium  12:5,25
point  21:10 30:19
  38:12,25 41:16
  44:12 45:5 47:5
  47:18 53:8 59:12
  59:14 61:1,10,11
  62:7 63:24 64:1
  64:10
points  18:20
  60:18,25 63:2
  65:25
portfolios  47:23
portion  13:5
  14:11 15:19
position  8:18
  27:22 38:16 64:19
possession  61:22
post  18:25 19:1,6
  19:8,11,12,17,17
  19:19,22,23 20:20
  20:22,23 21:1,6
  21:13,22 22:20

23:3,13,23,24
  24:14,25 25:2,15
  25:22 26:9,11
  28:2,8,11,22,23
  29:2 30:4 31:3,24
  33:11,16,20 35:2
  35:10,25 36:9
  37:23 39:6 40:9
  40:16,19,21 41:5
  41:10,14 44:13,21
  44:21 45:3,4 48:4
  48:20,23 49:8
  50:5 52:22 53:1
  54:17 59:20 64:15
potential  26:12
practice  27:13
  49:1,2,23
pre  19:8,17 21:1,1
  30:3,4 33:16
  38:24 49:8 52:22
  59:21
prejudice  14:8
  17:4
prejudicing  16:3
prepetition  18:14
  18:19,23 20:13,13
  20:25 21:20 22:2
  22:4,18,19 23:2
  24:16 28:6,15,16
  31:14 33:13 34:23
  35:7,11,21 36:8,8
  39:21 40:14,16
  41:22 44:19,20
  46:15,18,22 51:3
  53:11,18 58:8
  59:4,20 60:1 61:7
  63:5,14,18 64:12
  64:12,16 65:1,2
present  7:19,24
  9:19
presentation  9:18
presumption
  32:10,19

pretty  17:21 27:2
  32:25 53:10
prevent  20:15
previously  14:4
primarily  48:1
primary  47:23
prior  13:9,20
  14:19 33:21 35:21
  44:8
priorities  49:19
priority  2:22 8:9
  11:18 13:5,10,10
  14:6,11 15:8,10
  15:19,24 16:6,11
  20:1 32:1 34:6,17
  40:14,22 41:2,11
  48:14 49:21 68:2
pro  7:21
probably  61:8
  65:24
problem  9:22
  15:2 16:23 64:22
procedural  52:12
proceed  7:14
proceedings
  66:12
proceeds  8:23
process  49:15
proof  2:22 11:3
  20:7 22:10 68:3
proofs  2:3,6,9,13
  2:16,25 8:4 17:12
  67:4,8,12,17,20
properly  25:4
properties  8:11
  8:22 9:8
propose  7:13
proposed  15:21
proposition  41:10
  42:15,23 43:16
  44:13
prosecute  13:13

provide  15:12
  25:24 29:22 62:3
provided  8:13
  12:15 19:2 46:1
provider  51:4
provides  51:5
providing  50:20
  50:21
provision  62:2
provisions  24:7
  47:5
purchase  36:8,24
  37:1 38:14,18,19
purely  47:14
purports  44:18
purposes  2:22
  13:5 15:5,24
  16:11 17:22 34:16
  68:2
pursuant  2:19
  13:4 18:19 35:13
  60:1,10 67:23
put  9:20 31:5
  48:22 58:2

q

question  15:1
  24:3 39:3
questioned  25:3
questions  14:23
  31:18,21 48:12
  57:12,25 60:19,20
quick  60:25
quickly  57:8 62:6
quote  34:11

r

r  1:19 4:1 7:1 67:3
raise  48:7,9 51:17
raised  35:24
  48:19 51:16
ratification  36:6
  37:20
ratified  35:12,20
  36:2,16,19 37:23

38:3,7 47:6
**ratify** 34:8 37:6
  46:24
**ratifying** 37:4
**ray** 10:15
**read** 22:14,15
  42:19 52:10
**real** 20:9
**really** 13:16 14:12
  16:6 17:9 19:16
  23:14,17 26:17,20
  28:1,12 29:24
  51:14 52:4,4,19
  57:8,11,22 58:1
  59:17 60:12
**reason** 23:14
  30:14 60:11
**reasonable** 57:1
**reasons** 40:12
**rebuttal** 31:19
**recall** 13:7,10
  17:17
**receive** 34:9
**received** 10:13
  11:7,20
**receives** 34:7
**reclassified** 12:19
**reclassify** 13:12
  17:13
**reclassifying**
  13:20,23
**recognize** 36:10
  40:3
**recollection** 31:22
  32:12
**record** 47:16 48:5
**recording** 69:4
**records** 8:14
  10:12 11:6 12:16
**recover** 56:5
**redding** 32:9,11
  32:16

**reduce** 11:16
**refer** 22:4
**reference** 42:5
**referred** 24:11
**refresh** 31:22
**regarding** 11:7
**regardless** 48:21
**regards** 10:17
  11:22
**regular** 23:6
**regularly** 36:10
**reject** 27:4 33:25
  54:3
**rejected** 20:18
  24:22 34:15 35:14
  37:13 52:24 54:18
**rejection** 19:9,17
  21:1 30:3,4 33:16
  33:22 35:22 38:25
  39:5 40:5 49:9
  52:22 59:21
**relates** 15:13
  16:13
**relating** 7:12
**relationship**
  20:21 22:20 56:8
  65:2,2
**release** 14:7
**relevant** 14:4 52:4
**relied** 49:17
**relief** 10:23 12:22
  13:20 17:9
**remaining** 8:23
  10:21 14:12
**remand** 25:3
**remember** 36:18
  63:6
**remembering**
  24:12 25:6
**rendered** 34:2
**rendering** 38:11
**repeat** 65:24

**repercussion**
  31:12
**reporting** 59:1
**representative**
  10:9 13:15 14:9
  16:4
**represented** 17:20
**request** 7:24 8:1
  11:11 12:2,22,22
  14:24 15:3 35:1
  48:13
**requested** 10:24
**requests** 10:20
  11:8,25
**required** 13:18,24
  22:25 31:9 32:24
  46:19 47:11 60:2
**requires** 23:3
**reservation** 16:18
**reserve** 2:22 13:5
  13:18,25 14:2,25
  31:19 53:25 68:1
**reserving** 16:13
  29:17
**resolved** 39:2
**resolves** 33:13
**respect** 8:13 10:18
  11:23 13:19 14:17
  16:12 19:5,10
  22:10 30:20 33:2
  33:12
**respectfully** 7:23
  10:20 11:8,25
  48:13
**response** 2:10 3:2
  3:3 14:17 67:14
**responses** 10:14
  11:7,20
**responsible** 50:6
  51:22 54:20,21
**rest** 51:2
**restates** 42:6

**result** 57:5
**retail** 36:6
**retained** 34:19
**return** 18:6
**revenues** 53:3
**reverse** 3:3 17:16
  18:15,17 33:8
  47:24 48:2
**review** 8:12 10:12
  11:6 12:14
**reviewed** 9:1
  10:22 12:21
**rich** 4:8 33:5,6,7
  36:14,21 37:6
  38:2 39:10,13,17
  40:12 41:4,8,15
  41:18 43:3,10,18
  43:20 44:16,23,25
  45:9,15,17 47:3,9
  48:9,11 60:21,22
  60:23 63:8,11,16
  66:11
**richard** 4:23
**right** 7:2 8:6 9:6,8
  9:10 15:1,10,11
  16:8,20 17:2 18:8
  20:12,20 21:9,10
  21:20,24 23:8
  24:4,12,18,19,20
  25:10,12,18 26:15
  27:7,15,17,21,21
  28:1,3,25 30:13
  30:22 31:1,21
  32:18 33:3 35:5
  39:9,12 41:20
  44:9 47:3 48:7,10
  48:15,25 49:4,16
  49:22 51:4,15,20
  53:8,10,20 54:20
  55:7,9,12,25 56:6
  56:8,12 58:3,21
  59:5,17,21 60:6
  61:5 62:15 63:4,7

Page 14

63:10,21,22 65:14
65:18 66:1,7
**rights**  16:18
**rise**  31:24 33:17
  44:14
**rises**  41:24
**rms**  18:15,17,25
  19:23 23:10 39:8
  47:21,23 48:1
  49:3,3 51:4,5
  54:16 56:20
**road**  69:16
**robert**  4:8 33:7
  60:22
**rule**  20:12 28:24
  33:19,24 34:3
  43:21 50:3,4,6
**ruling**  14:19 66:3
**run**  50:12

**s**

**s**  4:1 7:1 67:3
**santa**  5:3
**satisfied**  8:17
  51:12 57:4
**satisfy**  20:8
**saying**  25:21,21
  30:9,17 36:18
  37:22 41:4 43:12
  44:17 49:5 50:7
  53:4,16 54:19
  55:3,20 56:13,17
  57:14 63:4
**says**  14:2 22:23
  28:14 29:15 38:23
  41:21 42:25 50:3
  51:22 53:7,21,24
  54:6 57:15
**scale**  54:14
**scenario**  30:7,10
**schedule**  18:6
**schedules**  47:20
  47:22

**scope**  47:15
**screwed**  9:18
**second**  2:25 32:24
  34:3 47:9 52:1
**section**  2:19 13:4
  67:24
**secured**  8:9 12:13
  12:17
**see**  21:15 22:6
  36:17 38:4 59:11
  60:15 61:17
**seeing**  36:18
**seeking**  14:1,8
  19:21
**seeks**  10:10 11:4
  11:16
**selling**  26:10
**send**  38:24
**separate**  25:8
  46:21
**serve**  14:15
**service**  36:23 39:9
  39:10,25 50:20,24
  50:24 51:1,4
  54:17
**servicer**  18:17
  39:25 49:4
**services**  29:22
  38:11 51:5 55:14
  56:14,18
**servicing**  22:7,7
  23:10 28:9 35:16
  36:23 37:12,14
  47:21 48:2 49:6
  50:11 53:15 55:10
  61:9 62:11,13
**set**  16:9 18:20
  56:15
**sets**  18:14
**settled**  34:5
**seventh**  2:3,16
  67:4,20

**seventieth**  2:13
  8:4 9:4 67:17
**severance**  24:7,8
  25:18
**sharma**  21:3
  28:13 35:24 49:17
**sheila**  3:25 69:2,7
**short**  41:21 62:15
  62:23
**should've**  54:19
**show**  16:19
**sic**  10:8
**side**  54:11
**sides**  50:18
**signed**  45:21 46:3
  46:4 59:6 61:5
  62:20
**significance**  44:12
**significant**  13:25
  44:15 45:25
**signing**  62:13
**similar**  19:12
  22:17 35:5
**simple**  56:21
**simply**  42:5
**sing**  63:22
**singh**  4:22 7:6,7,8
  7:17 8:7 9:17,17
  9:23 10:3 12:25
  13:1,2 15:8,11,15
  15:18,23 16:2,16
  16:23 17:3,6,8
  18:9 21:17,18,21
  21:25 24:2,13,19
  25:7,11,19 26:15
  26:20 27:17,20,25
  28:4 32:2,5 33:4
  48:15,16 54:25
  55:1,6,8,12,16,18
  55:20 56:1,13
  57:7 63:23 66:6,8
**sir**  48:9

**situation**  24:4
  27:10 35:20 50:19
  51:8 59:18 64:5
  64:11 65:1,8
**situations**  22:17
  27:3 30:21 32:20
**sixty**  2:3,6,9 67:4
  67:8,12
**slack**  4:23
**slippery**  23:15
**slope**  23:16
**smooth**  27:5
  56:19
**solutions**  3:2
  17:15 18:15 33:9
  69:15
**somebody**  49:6
  50:20 64:14
**somebody's**  50:20
**sonkin**  4:24 9:18
  9:24 10:4,5,25
  11:2,13 12:4,10
**sorry**  10:10 15:17
  21:16,16,21 24:1
  24:2 25:24 32:4,5
  36:14 37:2 39:15
  41:3,3,3,13,13,14
  42:11 43:9 54:25
**sort**  9:24 14:20
  18:5,11 19:21,23
  20:25 22:11,19
  23:6,15,18 25:8
  27:11 28:7 29:1
  29:16,21 30:11
  31:12 32:10 40:7
  49:18,23,25 50:4
  50:8,9,12,19 51:3
  51:10,12 52:20
  53:17,18,25 54:4
  54:20 56:4 57:21
  57:23 58:10,15
  59:20 60:12 64:7
  64:22,24 65:7,13

sosa 4:15 7:19,22
  8:1,2,2 9:5,9,12
  9:20 12:6,9,11,24
sought 17:13 47:4
sound 69:3
sounds 62:19
southern 1:2
space 29:17 54:1
specific 29:4,21
  31:15 32:8,17,23
  52:8 54:7 55:16
specifically 18:24
  27:14 46:23 47:4
specificity 51:11
spend 66:4
spent 33:10 46:15
standalone 41:23
  46:18
standard 14:4
  17:24 20:5 32:24
  51:21,25 56:6
  65:4
stang 5:1,8,16
start 33:11 51:19
started 7:5
starting 41:16
  65:24
starts 28:12
state 41:25 42:13
  42:14,16,22 43:14
  43:16 45:1 54:12
  57:14 58:1 59:8
  61:14
statement 47:22
  60:13
states 1:1 34:4
  48:1
status 8:9 12:14
  17:18 26:9
stauble 6:10
stay 54:4 59:16,24
  60:10

steven 5:6
stop 61:9
stopped 37:14
  59:14
storage 54:1
stores 38:18
street 5:18
strongly 40:6
subject 60:5
submit 10:24
  11:11 12:3,23
  16:14 30:6,11
  39:2 45:4 48:3
  50:6 53:8 54:10
  57:3 58:16 59:9
  61:8
submitted 8:18
  9:2
subservice 47:23
subservicing
  35:12 39:4 47:13
  47:21 48:2
substance 62:22
substantial 36:7
substantiate 9:3
sudden 27:9,11
  28:21 29:8 30:18
sue 60:8
sufficiency 47:15
suggested 54:4
suggests 29:8
suite 6:4 69:17
summarize 18:11
summarized 21:9
sunny 4:22 7:7
  9:17
support 8:15,19
  9:2 38:16 40:25
  42:15,23 44:4
supports 43:16
supreme 32:9,16
  32:23

sure 16:9,18,24
  17:3 27:18 37:10
  37:25 40:11 41:17
  63:24 64:18
surprised 31:11
sustain 8:24 10:20
  10:23 11:9 12:1,2
  12:18,21
sustained 9:7
  13:11

             t

take 16:17,18
  22:11 36:25 57:21
taken 14:19
talk 18:2 42:9
  45:17 51:20 63:12
  63:13
talked 41:6 52:9
talking 9:4 19:16
  19:16 33:10,11
  41:5 44:11 46:15
  53:6 58:5 63:13
  64:17
tara 6:7
technical 13:17
telephonically 4:8
  4:15,22,23,24 5:6
  5:14,21 6:7,9
ten 53:1
term 18:21 38:3,4
  38:4,7 42:2,2 44:4
  45:7,9 58:19,19
  60:9 62:12,21
terminate 59:22
terminated 30:25
terms 18:22 21:14
  22:6,12 23:18
  31:2 42:1,5,7 43:6
  43:19,22 44:19,24
  45:1,8 54:12
  58:17 59:13,19
  60:2,10 62:17,18
  62:24 65:11

terrific 10:1
test 20:8 23:7
texaco 34:12 35:4
  37:21 38:12 51:16
  52:9 53:3
thank 7:15,17 8:7
  9:9,10 10:2,3,25
  11:1,13 12:4,8,10
  12:11,24 13:2
  16:16 17:8 18:9
  21:25 33:3,4,6
  48:15,16 57:6,7
  63:2 65:25 66:3,8
  66:10,11
that'd 10:1
theory 61:25
thereunder 61:23
thing 37:20 40:1
  55:3 62:11
things 20:4 47:17
  54:3 56:21
think 13:21 15:25
  16:5,8,17,25
  17:22 18:11 19:14
  20:2 22:11 23:9
  23:21,22 25:20
  26:17,22 27:9,12
  28:5,11 32:11,16
  33:13 38:2,3
  39:19 40:10,20
  41:8,12 42:15,22
  43:5,20 44:1,9,16
  44:17,25 45:6,11
  47:4,14 48:21,25
  49:10 50:2 51:6,7
  51:12,24 52:15
  54:13 56:21 57:10
  57:25 58:20 59:10
  60:17,17 61:11
  62:19,22 63:7,16
  63:16,24,25 64:20
  66:2,6,6

**third** 2:20 5:10
13:4 47:24 56:20
64:7,14 65:5,6
67:24
**thomas** 10:14
**thought** 21:23
32:5
**three** 9:19 10:13
10:17,18 12:13
59:5 60:25
**time** 27:4,8,10
28:18 31:19 33:10
34:24,25 40:8
46:15 49:6,12,12
53:15 61:13,17
66:4
**times** 36:7 52:10
63:14
**today** 17:11,23
18:2 33:14 39:3
63:20
**today's** 7:10 63:17
**told** 61:8
**tons** 52:6,6
**tort** 31:23,25 32:7
32:11,17,22 50:8
**totally** 27:25
**track** 9:25
**transaction** 20:9
34:25
**transactions**
50:10
**transcribed** 3:25
**transcriber** 69:7
**transcript** 69:3
**transition** 27:5
56:19,21
**transitioned**
56:20
**treated** 25:8 30:18
33:12 43:1 48:24
58:7,8 64:13 65:3

**treatment** 20:1
50:14
**tri** 45:19
**trouble** 9:11
**true** 69:2
**truly** 59:19 64:4
64:14 65:5
**trust** 5:2,9,17
**trustee** 6:2
**try** 20:16
**trying** 16:25
37:25
**turn** 7:18 12:5
**turned** 52:19
**two** 11:20,22,23
17:14 18:12 19:1
20:8 23:12,21
25:8 29:20,22
38:17 40:24 42:8
42:12 45:17 51:21
52:2 62:17 65:25
**twomey** 6:7
**twommey** 16:19
**type** 48:4 52:17
**types** 27:6 38:23
58:11
**typical** 27:2
**typically** 20:12
38:5

### u

**u** 67:3
**u&h** 8:11,22 9:8
**u.s.** 1:12,21
**uh** 43:3 47:8 63:9
**ultimately** 54:18
**umbrella** 58:3
**umh** 9:7
**unassumed** 28:8
**uncontested** 7:10
8:23
**understand** 15:3
15:25 27:15,16
37:25 42:21

**understood** 64:18
**unfair** 29:1 30:17
32:18 60:15
**unfairly** 57:2
**unfairness** 30:22
30:22
**unishop** 41:7
51:15,19 52:4
**unishops** 34:4
37:20,21 38:9
**united** 1:1
**unjust** 30:13 56:9
56:10
**unjustly** 30:12
56:6
**unknown** 1:25
**unrealistic** 35:9
**unsecured** 12:20
34:2
**upset** 23:7,17
**use** 38:4
**utterly** 35:8

### v

**v** 36:4
**validity** 8:15,19
**valuable** 37:10,10
**value** 15:7 30:5
**various** 18:17,20
19:24 49:25
**veritext** 69:15
**versus** 58:8
**view** 17:25 28:1
47:18
**virtual** 12:5,25
**virtue** 59:23
**vitae** 7:21
**void** 23:24 47:11
**voluntarily** 36:21
38:6

### w

**wait** 37:18 43:9,9
43:9

**want** 31:8 33:11
36:11 37:12 38:24
39:24 40:9,24
51:17 55:2 63:23
63:24 64:2 65:24
**wanted** 26:4
27:18 30:25 36:22
38:16 40:8 60:24
63:2 64:18
**way** 9:24 17:1
42:19 46:20
**ways** 39:20 45:12
**we've** 17:17 21:5
21:9 34:4 35:13
39:6 40:22 49:16
64:16,21
**weil** 4:10,17 6:10
7:8 8:2 10:5
**went** 48:19
**whatsoever** 14:12
**willing** 29:23
**wilmington** 5:19
**windfall** 20:15
**words** 34:9
**world** 64:21,25
**worth** 35:15 61:19
**writing** 46:2
**written** 65:13
**wrote** 21:3 43:25

### x

**x** 1:4,10 60:14
67:1

### y

**y** 60:14
**yeah** 9:14 17:5,6
38:12 41:15 43:20
50:25 55:16 60:22
63:10 65:12
**year** 24:8
**years** 53:1
**yep** 18:10 55:8
**york** 1:2,14,14 4:6
4:20 5:12 42:14

| 43:20 44:3 |
| --- |
| **z** |

**z**  60:14
**zero**  15:8,23
  16:11
**ziehl**  5:1,8,16

Peter S. Partee, Sr.
Robert A. Rich
**HUNTON ANDREWS KURTH LLP**
200 Park Avenue
New York, New York 10166
(212) 309-1000
ppartee@huntonak.com
rrich2@huntonak.com

*Attorneys for Finance of America Reverse LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| | ) Case No. 19-10412 (JLG) |
| DITECH HOLDING CORPORATION, *et al.*,[1] | ) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) |

## NOTICE OF APPEAL

**PLEASE TAKE NOTICE** that Finance of America Reverse LLC ("FAR"), by and

through its undersigned counsel, hereby appeals to the United States District Court for the

Southern District of New York from the *Memorandum Decision and Order Sustaining the Fifty-*

*Second Omnibus Objection to Proofs of Claim (Misclassified Claims) with Respect to Claims of*

*Liberty Home Equity Solutions, Inc. and Finance of America Reverse LLC* (ECF No. 3741)

entered in the above-captioned action on October 21, 2021, a copy of which is attached hereto as

**Exhibit 1**.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837).

**1147**

**PLEASE TAKE FURTHER NOTICE** that a completed Form 417A is attached hereto as **Exhibit 2**, and that FAR has identified the parties to the order appealed from and the names of their respective attorneys on **Exhibit 3**.

Dated: November 3, 2021
      New York, New York

By:    */s/ Peter S. Partee, Sr.*
       Peter S. Partee, Sr.
       Robert A. Rich
       **HUNTON ANDREWS KURTH LLP**
       200 Park Avenue
       New York, New York 10166
       (212) 309-1000
       ppartee@huntonak.com
       rrich2@huntonak.com

       *Counsel to Finance of America Reverse LLC*

**1148**

## EXHIBIT 1

## Memorandum Decision and Order

UNITED STATES BANKRUPTCY COURT        NOT FOR PUBLICATION
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x

In re:                         :     Case No. 19-10412 (JLG)
                            :     Chapter 11
Ditech Holding Corporation, *et al.*,      :
                            :
                Debtors.[1]     :     (Jointly Administered)

------------------------------------------------------- x

## MEMORANDUM DECISION AND ORDER SUSTAINING THE FIFTY-SECOND OMNIBUS OBJECTION TO PROOFS OF CLAIM (MISCLASSIFIED CLAIMS) WITH RESPECT TO CLAIMS OF LIBERTY HOME EQUITY SOLUTIONS, INC. AND FINANCE OF AMERICA REVERSE LLC

**A P P E A R A N C E S :**

WEIL, GOTSHAL & MANGES LLP
*Attorneys for the Plan Administrator*
767 Fifth Avenue
New York, New York 10153
By:    Ray C. Schrock, P.C.
       Richard W. Slack, Esq.
       Sunny Singh, Esq.

HUNTON ANDREWS KURTH LLP
*Attorneys for Liberty Home Equity Solutions, Inc. and*
*Finance of America Reverse LLC*
200 Park Avenue
New York, New York 10166
By:    Peter S. Partee, Sr., Esq.
       Robert A. Rich, Esq.

---

[1]     The confirmation of the Debtors' Third Amended Plan (as defined below) created the Wind Down Estates. The Wind Down Estates, along with the last four digits of their federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Wind Down Estates' principal offices are located at 2600 South Shore Blvd., Suite 300, League City, TX 77573. References to "ECF No. __" herein are to documents filed in the electronic docket in these jointly administered cases under Case No. 19-10412 (the "Chapter 11 Cases").

**HON. JAMES L. GARRITY, JR.**
**U.S. BANKRUPTCY JUDGE**

**Introduction**[2]

Liberty Home Equity Solutions, Inc. ("LHES") and Finance of America Reverse LLC

("FoA") filed administrative expense claims against Reverse Mortgage Solutions, Inc. ("RMS")

in these Chapter 11 Cases in the sums of $4,145,648.48 and approximately $14 million,

respectively (collectively, the "Subservicing Administrative Expense Claims").[3] In its Fifty-

Second Omnibus Claim Objection (the "Objection"),[4] the Plan Administrator, on behalf of the

Wind Down Estates, seeks to reclassify those claims as General Unsecured Claims. LHES and

FoA each responded in opposition to the Objection, and in support of their claims (collectively,

the "Responses").[5] The Plan Administrator filed a single reply to the Responses (the "Reply").[6]

Pursuant to the Claims Procedures Order,[7] the Court conducted a Sufficiency Hearing on the

Subservicing Administrative Expense Claims, at which time counsel for the Plan Administrator

and counsel for LHES and FoA were heard by the Court. The legal standard of review at a

---

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Objection or the Third Amended Plan, as applicable.

[3]   *See* Proof of Claim No. 60214 ("LHES Administrative Expense Claim"); Proof of Claim No. 60182 (asserting an administrative claim of $375,832.07) (together, the "FoA Administrative Expense Claim").

[4]   *See Fifty-Second Omnibus Objection to Proofs of Claim (Misclassified Claims)* [ECF No. 2186].

[5]   *See Finance of America Reverse LLC's Response to Fifty-Second Omnibus Objection to Proofs of Claim (Misclassified Claims)* [ECF No. 2315] (the "FoA Response");*Liberty Home Equity Solutions Inc.'s Response to Fifty-Second Omnibus Objection to Proofs of Claim (Misclassified Claims)* [ECF No. 2314] (the "LHES Response"). LHES and FoA are represented by the same counsel and make essentially identical arguments in their respective Responses to the Objection. Moreover, as noted below, the Plan Administrator filed a single reply to the Responses. The Court will consider the Objection to the LHES and FoA claims together.

[6]   *See Reply of Plan Administrator in Support of Fifty-Second Omnibus Objection with Respect to Claims of Finance of America Reverse LLC (Claim Nos. 21347 and 60182) and Liberty Home Equity Solutions, Inc. (Claim No. 60214)* [ECF No. 3076].

[7]   *See Order Approving (I) Claim Objection Procedures and (II) Claim Hearing Procedures* [ECF No. 1632] (the "Claims Procedures Order").

**1151**

Sufficiency Hearing is equivalent to the standard applied to a motion to dismiss a complaint for failure to state a claim upon which relief may be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule 12(b)(6)").[8]

For the reasons stated herein, the Court finds that LHES and FoA have not met their burden of demonstrating plausible grounds for according their claims administrative expense priority under the Bankruptcy Code. Accordingly, as a matter of law, the Court sustains the Objection and reclassifies the LHES Administrative Expense Claim and the FoA Administrative Expense Claim as General Unsecured Claims.

## Jurisdiction

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 1334(a) and 157(a) and the *Amended Standing Order of Reference* dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Background

### The Chapter 11 Cases

On February 11, 2019 (the "Petition Date"), Ditech Holding Corporation (f/k/a Walter Investment Management Corp.) and certain of its affiliates ("Debtors") filed petitions for relief under chapter 11 of the Bankruptcy Code in this Court. Thereafter, the Debtors remained in possession and control of their business and assets as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On February 22, 2019, the Court entered an order fixing April 1, 2019 at 5:00 p.m. (prevailing Eastern Time) as the deadline for each person or entity, not including governmental units (as defined in section 101(27) of the Bankruptcy Code)

---

[8]     *See* Claims Procedures Order ¶ 3(iv)(a). Rule 12(b)(6) is incorporated herein by Rule 7012 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**1152**

to file a proof of claim in the Debtors' Chapter 11 Cases (the "General Bar Date").[9] The Court

extended the General Bar Date for consumer borrowers, twice, and ultimately to June 3, 2019 at

5:00 p.m. (prevailing Eastern Time).[10]

On September 26, 2019, the Debtors confirmed their Third Amended Plan, and on

September 30, 2019, that plan became effective (the "Effective Date").[11] In the Confirmation

Order, the Court set the deadline for the filing of administrative expense claims as October 31,

2019. The Plan Administrator is a fiduciary appointed under the Third Amended Plan who is

charged with the duty of winding down, dissolving and liquidating the Wind Down Estates. *See*

Third Amended Plan, ¶¶ 1.130, 1.184, 1.186. Among other things, the Third Amended Plan

authorizes the Plan Administrator, on behalf of each of the Wind Down Estates, to object to

Administrative Expense Claims. *See id.*, ¶ 7.1.

**The Subservicing Agreements**

As of the Petition Date, RMS was party to certain reverse mortgage subservicing

agreements with LHES and FoA. Pursuant to those agreements, RMS subserviced reverse

mortgage loans for LHES and FoA, as the owner and/or the named servicer of those loans, in

exchange for subservicing fees and other consideration. LHES Response ¶ 5; FoA Response ¶ 5.

The relevant agreements (collectively, the "Subservicing Agreements") are as follows:

---

[9]    *See Order Establishing Deadline for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* [ECF No. 90].

[10]    *See Order Further Extending General Bar Date for Filing Proofs of Claim for Consumer Borrowers Nunc Pro Tunc* [ECF No. 496].

[11]    *See Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and its Affiliated Debtors* [ECF No. 1326] (the "Third Amended Plan"); *Order Confirming Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and its Affiliated Debtors* [ECF No. 1404] (the "Confirmation Order"); *Notice of (I) Entry of Order Confirming Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and its Affiliated Debtors, (II) Occurrence of Effective Date, and (III) Final Deadline for Filing Administrative Expense Claims* [ECF No. 1449].

**1153**

LHES

Reverse Mortgage Subservicing Agreement, dated as of November 17, 2008 (the "LHES November 2008 Agreement").

FoA

Reverse Mortgage Subservicing Agreement, dated as of March 18, 2011 (the "FoA March 2011 Agreement");

Reverse Mortgage Subservicing Agreement, dated as of December 12, 2017 (the "FoA December 2017 Agreement"); and

Reverse Mortgage Subservicing Agreement, dated as of October 4, 2018 (the "FoA October 2018 Agreement").

By their terms, the LHES November 2008 Agreement and the FoA March 2011

Agreement were scheduled to expire in November 2013 and March 2018, respectively. Prior to

the Petition Date (i.e., February 11, 2019), pursuant to a series of agreements (collectively, the

"Prepetition Extension Agreements"), the parties extended the expiration dates of both

agreements – without altering the other terms and conditions of the agreements. LHES Response

¶¶ 6-7; FoA Response ¶¶ 6-8.  As of the Petition Date, those agreements were in effect, and

pursuant to the Prepetition Extension Agreements, their termination dates had been extended to

March 31, 2019. LHES Response ¶ 6; FoA Response ¶ 7. Post-petition, under those agreements,

RMS subserviced the covered reverse mortgage loans, and LHES/FoA paid RMS subservicing

fees post-petition, through March 31, 2019.  LHES Response ¶¶ 6-7; FoA Response ¶¶ 7-8.

Thereafter, RMS entered into a series of agreements with LHES and FoA, respectively

(collectively, the "Post-Petition Extension Agreements") pursuant to which the parties extended

the expiration dates of the LHES November 2008 Agreement and the FoA March 2011

Agreement ultimately through September 30, 2019, again, without altering the other terms and

conditions of the agreements. LHES Response ¶ 7; FoA Response ¶ 8.

5

**1154**

Pursuant to the Post-Petition Extension Agreements, RMS continued to subservice the covered reverse mortgage loans, and LHES/FoA continued to pay RMS subservicing fees, from April 1, 2019 through September 30, 2019. LHES Response ¶ 7; FoA Response ¶ 8. Separately, the FoA December 2017 Agreement and the FoA October 2018 Agreement (collectively with the FoA March 11 Agreement, the "FoA Subservicing Agreements") each have a one-month term subject to FoA's monthly renewal option. FoA exercised its renewal option under both agreements, prepetition and post-petition through February 2019 and September 2019, respectively, but otherwise on the same terms and conditions stated in the agreements. FoA Response ¶ 6. RMS subserviced the reverse mortgage loans, and FoA paid RMS a subservicing fee, through the prepetition and post-petition periods covered by those agreements, in accordance with the terms of those agreements. *Id.*

To summarize, prior to the Petition Date, the Debtors entered into eight (8) Prepetition Extension Agreements with FoA and seven (7) Prepetition Extension Agreements with LHES. The Debtors also entered into four (4) Post-Petition Extension Agreements with FoA and two (2) Post-Petition Extension Agreements with LHES. LHES Response ¶¶ 5-7;  FoA Response ¶¶ 7-8. None of those agreements (collectively, the "Extension Agreements") altered the terms of the Subservicing Agreements in any way except by extending the termination date of each such agreement.[12]

---

[12]    The Court more fully describes the LHES November 2008 Agreement and the FoA March 2011 Agreement below.

LHES

> The initial term of the LHES November 2008 Agreement was three years and it automatically renewed for an additional two years through November 17, 2013. LHES Response ¶ 6. In 2013, LHES and RMS entered into one or more agreements pursuant to which they extended the term of the LHES November 2008 Agreement through March 31, 2019, but otherwise on the same terms and conditions stated in the agreement (the "LHES Prepetition Extension Agreements"). *Id.* Thus,

**1155**

Under the Third Amended Plan, the Debtors sold their reverse mortgage business to the

Reverse Buyer. The Debtors consummated the sale on September 30, 2019. The Subservicing

Agreements expired on or before the Effective Date, and RMS did not assign any of those

agreements to the Reverse Buyer. The Third Amended Plan provides for the assumption of all

executory contracts listed by the Debtors on an assumption notice or on the Assumption

Schedule. All other executory contracts of the Debtors are deemed rejected as of the Effective

Date unless such executory contracts previously expired or terminated pursuant to its own terms

---

as of the Petition Date, RMS and LHES were party to the LHES November 2008 Agreement, as
extended through March 31, 2019.

After the Petition Date, RMS subserviced the reverse mortgage loans, and LHES paid RMS
subservicing fees, through March 31, 2019, in accordance with the terms of the LHES November
2008 Agreement, as extended by the LHES Prepetition Extension Agreements. Thereafter, LHES
and RMS entered into two agreements further extending the term of the LHES November 2008
Agreement through June 30, 2019 and September 30, 2019, respectively (the "LHES Post-Petition
Extension Agreements"). Thus, post-petition, RMS subserviced the reverse mortgage loans, and
LHES paid RMS a subservicing fee, from April 1, 2019 through September 30, 2019, in
accordance with the terms of the LHES November 2008 Agreement, as extended by the LHES
Post-Petition Extension Agreements.

FoA

The initial term of the FoA March 2011 Agreement was five years and it automatically renewed
for an additional two years through March 18, 2018. FoA Response ¶ 5. In 2018, FoA and RMS
entered into the first of seven prepetition agreements pursuant to which the parties ultimately
extended the term of the FoA March 2011 Agreement through March 31, 2019, on the same terms
and conditions stated in the FoA March 2011 Agreement (the "FoA Prepetition Extension
Agreements"). *Id.* ¶ 7. RMS subserviced the covered reverse mortgage loans, and FoA paid RMS
subservicing fees, through March 31, 2019 in accordance with the FoA Prepetition Extension
Agreements. *Id.* After the Petition Date, FoA and RMS entered into four agreements that
collectively further extended the term of the FoA March 2011 Agreement through September 30,
2019 (the "FoA Post-Petition Extension Agreements"). The FoA Post-Petition Extension
Agreements are dated as of March 29, 2019, April 15, 2019, June 30, 2019, and August 16, 2019,
respectively. RMS subserviced the covered reverse mortgage loans, and FoA paid RMS a
subservicing fee, from April 1, 2019 through September 30, 2019 in accordance with the terms of
the FoA March 2011 Agreement, as extended by the FoA Post-Petition Extension Agreements. *Id.*
¶ 8.

The FoA December 2017 Agreement and the FoA October 2018 Agreement each have one-month
terms subject to FoA's monthly renewal option. FoA exercised its monthly renewal option through
February 2019 and through September 2019 under the respective agreements, but otherwise on the
same terms and conditions stated in the agreements. *Id.* ¶ 6. RMS subserviced the reverse
mortgage loans, and FoA paid RMS a subservicing fee, through the pre- and post- petition periods
covered by the FoA December 2017 Agreement and FoA October 18, 2019 Agreement, in
accordance with the terms of those agreements.

**1156**

or by agreement of the parties. *See* Third Amended Plan, ¶ 8.1. The Debtors did not assume the Subservicing Agreements under the Third Amended Plan, or otherwise.

**The LHES and FoA Claims**

LHES Administrative Expense Claim

On November 11, 2019, LHES timely filed the LHES Administrative Expense Claim in the amount of $4,145,648.48, plus other amounts to be determined, for damages resulting from RMS' alleged post-petition subservicing errors and other material alleged post-petition breaches of the LHES November 2008 Agreement. LHES Administrative Expense Claim at 2; LHES Response ¶ 10. LHES does not claim any damages resulting from any purported rejection of that agreement, or for any breach of the agreement that may have occurred after the Effective Date. LHES Response ¶ 10.

FoA Claim Administrative Expense Claim

On November 11, 2019, FoA timely filed the FoA Administrative Expense Claim in the amount of $375,832.07, plus other amounts to be determined, for damages resulting from RMS' alleged post-petition subservicing errors and other alleged material post-petition breaches of the FoA Subservicing Agreements. FoA Response ¶ 12.[13] FoA has since quantified its realized and unrealized losses resulting from RMS' alleged post-petition subservicing errors and other alleged material post-petition breaches in the approximate amount of $14 million, plus other amounts to be determined. *Id.* FoA does not claim any damages resulting from any purported rejection of the

---

[13]    On April 25, 2019, FoA timely filed Proof of Claim No. 21347 ("Claim No. 21347") in the Chapter 11 Cases in the amount of $54,085,624, plus other amounts to be determined, as a general unsecured claim and an undetermined amount as an administrative expense claim under section 507(a)(2), for damages resulting from RMS' alleged subservicing errors and other alleged material breaches of the FoA Subservicing Agreements. In that claim, FoA expressly reserved the right to assert administrative expense priority claims at the appropriate time for any damages resulting from RMS' subservicing errors and other material breaches of the FoA Subservicing Agreements occurring after the Petition Date. FoA acknowledges that the $54,085,624 amount is based on alleged prepetition breaches of the FoA Subservicing Agreements. That claim is not at issue herein.

**1157**

agreements, or for any breaches of the agreements that may have occurred after the Effective
Date.

**The Claims Procedures Order**

On November 19, 2019, the Court entered the Claims Procedures Order. Under that
order, the Plan Administrator is authorized to file Omnibus Objections seeking reduction,
reclassification, or disallowance of claims on the grounds set forth in Bankruptcy Rule 3007(d)
and additional grounds set forth in the Claims Procedures Order. *See* Claims Procedures Order ¶
2(i)(a)-(h). A properly filed and served response to an objection gives rise to a "Contested
Claim" that will be resolved at a Claim Hearing. *Id.* ¶ 3(iv). The Plan Administrator has the
option of scheduling the Claim Hearing as either a "Merits Hearing" or a "Sufficiency Hearing."
*Id.* ¶ 3(iv)(a), (b). A "Merits Hearing" is an evidentiary hearing on the merits of a Contested
Claim. A "Sufficiency Hearing" is a non-evidentiary hearing to address whether the Contested
Claim states a claim for relief against the Debtors. The legal standard of review that will be
applied by the Court at a Sufficiency Hearing is equivalent to the standard applied by the Court
upon a motion to dismiss for failure to state a claim upon which relief can be granted under Rule
12(b)(6). *Id.* ¶ 3(iv)(a).

**The Objection**

In the Objection, the Plan Administrator seeks to reclassify the Subservicing
Administrative Expense Claims to General Unsecured Claims. As support for the Objection, the
Plan Administrator contends that it has examined each of those claims, the documents submitted
in support of the claims and the Debtors' books and records and has determined that the claims
are improperly classified as administrative expense claims. Objection ¶ 13. It says that is so

**1158**

because they are damage claims arising from the rejection of prepetition contracts in these

Chapter 11 Cases and, as such, are properly classified as general unsecured claims. *Id.*

## Applicable Legal Standards

Section 503(b) of the Bankruptcy Code provides that "[a]fter notice and a hearing,

there shall be allowed, administrative expenses. . . including the actual, necessary costs and

expenses of preserving the estate. . ." 11 U.S.C. § 503(b). This administrative expense priority is

based on the premise that the operation of the business during the bankruptcy case benefits

prepetition creditors; therefore, any claims that result from that operation are entitled to payment

prior to payment to "creditors for whose benefit the continued operation of the business was

allowed." LHES Response ¶ 13; FoA Response ¶ 15 (citing *Cramer v. Mammoth Mart, Inc. (In*

*re Mammoth Mart, Inc.)*, 536 F.2d 950, 954 (1st Cir. 1976)). Agreements entered into by the

debtor-in-possession and supported by consideration beneficial to the debtor-in-possession, are

actual and necessary to preserve the estate, and therefore a claim for damages arising from a

debtor-in-possession's breach of a post-petition agreement gives rise to an administrative

expense claim for the full amount of the damages provided for in the contract. *See Nostas*

*Assocs. v. Costich (In re Klein Sleep Products, Inc.)*, 78 F.3d 18, 26 (2d Cir. 1996)

("[P]ostpetition claims ... arising, for example, . . . from contracts entered into by the trustee or

debtor-in-possession are entitled to administrative expense priority."); *GATX Leasing Corp. v.*

*Airlift Int'l, Inc. (In re Airlift Int'l, Inc.)*, 761 F.2d 1503, 1509 (11th Cir. 1985) (holding that

breach of post-petition contract gives rise to an administrative expense claim under section

503(b)). A claimant that asserts a priority claim bears the burden of establishing its entitlement to

priority. *See, e.g.*, *Supplee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.)*, 479 F.3d 167,

172 (2d Cir. 2007) ("The burden of proving entitlement to priority payment . . . rests with the

**1159**

party requesting it."); *In re Drexel Burnham Lambert Grp. Inc.*, 134 B.R. 482, 489 (Bankr.

S.D.N.Y. 1991) ("The burden of establishing entitlement to priority rests with the claimant and

should only be granted under extraordinary circumstances") (citation omitted).

In filing the Objection, the Plan Administrator initiated a contested matter. *See* Fed.

R. Bankr. P. 3007 advisory committee's note ("[t]he contested matter initiated by an objection to

a claim is governed by Rule 9014. . ."). *See also In re Tender Loving Care Health Servs., Inc.*,

562 F.3d 158, 162 (2d Cir. 2009) (stating that "when a debtor files an objection to a claim, the

objection has initiated a contested matter"). Bankruptcy Rule 9014 governs contested matters.

The rule does not explicitly provide for the application of Bankruptcy Rule 7012. However,

Bankruptcy Rule 9014 provides that a bankruptcy court "may at any stage in a particular matter

direct that one or more of the other Rules in Part VII shall apply." Fed. R. Bankr. P. 9014. The

Court did so here. Under the Claims Procedures Order, the legal standard of review the Court

applies at a Sufficiency Hearing is equivalent to the standard applied by the Court under Rule

12(b)(6) on a motion to dismiss for failure to state a claim upon which relief could be granted.

*See* Claims Procedures Order ¶ 3(iv)(a). *See also In re 20/20 Sport, Inc.*, 200 B.R. 972, 978

(Bankr. S.D.N.Y. 1996) ("In bankruptcy cases, courts have traditionally analogized a creditor's

claim to a civil complaint [and] a trustee's objection to an answer. . . ").

In applying Rule 12(b)(6) to the Subservicing Administrative Expense Claims, the Court

assesses the sufficiency of the facts alleged in support of the claims in light of the pleading

requirements under Rule 8(a) of the Federal Rules of Civil Procedure.[14] Rule 8(a)(2) states that a

claim for relief must contain "a short and plain statement of the claim showing that the pleader is

entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). To meet that standard, the claims "must contain

---

[14] Rule 8 is made applicable herein pursuant to Bankruptcy Rule 7008.

sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."

*Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) ("*Iqbal*") (citations omitted); *accord Bell Atlantic*

*Corp. v. Twombly,* 550 U.S. 544, 570 (2007) ("*Twombly*"). "A claim has facial plausibility when

the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *accord Twombly*, 550

U.S. at 570. To satisfy Rule 12(b)(6), the "pleadings must create the possibility of a right to relief

that is more than speculative." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183

(2d Cir. 2008) (citation omitted). In considering whether that standard is met for a particular

claim, the court must assume the truth of all material facts alleged in support of the claim and

draw all reasonable inferences in the claimant's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund,*

*Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). However, the court "need not accord 'legal conclusions,

deductions or opinions that are couched as factual allegations . . . a presumption of

truthfulness.'" *Hunt v. Enzo Biochem, Inc.*, 530 F.Supp.2d 580, 591 (S.D.N.Y. 2008) (quoting *In*

*re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007)). In short, "[i]n ruling on a motion

pursuant to Fed. R. Civ. P. 12(b)(6), the duty of a court is merely to assess the legal feasibility of

the complaint, not to assay the weight of the evidence which might be offered in support

thereof." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2d Cir. 2010) (citation and

internal quotation marks omitted).[15]

---

[15]   In support of the Objection, the Plan Administrator provides representative samples of Prepetition and Post-Petition Extension Agreements. *See* Reply Exs. A-1, A-2, B-1 and B-2. Because the Subservicing Agreements and the Prepetition and Post-Petition Extension Agreements are referenced by LHES and FoA in the Responses and serve as the bases for their claims, the Court may consider those documents in resolving the Objection. *See, e.g., Bd. of Trs. of Ft. Lauderdale v. Mechel OAO*, 811 F. Supp. 2d 853, 865 (S.D.N.Y. 2011), *aff'd sub nom. Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012) (Court may consider "(1) documents attached to or incorporated by reference in the complaint, (2) documents integral to and relied upon in the complaint, even if not attached or incorporated by reference, (3) public disclosure documents required by law to be, and that have been, filed with the SEC, and (4) facts of which judicial notice properly may be taken."); *Flake v. Alper Holdings USA, Inc.* (*In re Alper Holdings USA, Inc.)*, 398 B.R. 736, 748 (S.D.N.Y. 2008) ("The documents attached to the proofs of claim should be

**1161**

### Discussion

LHES and FoA maintain that the Subservicing Agreements are not the operative

documents for calculating their claims. They contend that under state law, each Extension

Agreement is a new subservicing agreement among RMS and LHES or FoA. LHES Response ¶¶

15-16; FoA Response ¶¶ 17-18.  The LHES and FoA Administrative Expense Claims consist of

(i) subservicing damage claims arising under the Post-Petition Extension Agreements, and (ii)

subservicing damage claims arising under the Prepetition Extension Agreements during the post-

petition period of February 11, 2019 through March 31, 2019. LHES and FoA contend that the

Post-Petition Extension Agreements are not executory contracts, and that the Prepetition

Extension Agreements expired by their terms post-petition prior to the Effective Date. They

assert that the Court should overrule the Objection because they are not seeking damages under

rejected executory contracts and, as a matter of law, their claims are entitled to administrative

priority status under section 503(b) of the Bankruptcy Code.

The Plan Administrator disputes those contentions. The Court considers those matters

below.

**Whether the Damage Claims Arising Under
the Post-Petition Extension Agreements are
Entitled to Administrative Expense Priority**

The Post-Petition Extension Agreements are "on the same terms and conditions as stated

in the original [Subservicing] Agreement[s]," except that each agreement extends the expiration

---

treated, for purposes of a motion to disallow claims, like documents that are attached to or relied upon in a
complaint are treated on a Rule 12(b)(6) motion to dismiss") (citation omitted).

date of the original agreement. *See* Reply, Exs. A-1;[16] B-1.[17] LHES and FoA assert that under

applicable state law, by reason of the modifications to the termination dates under the

Subservicing Agreements, the Post-Petition Extension Agreements are new, post-petition

contracts between RMS, as debtor-in-possession, and FoA and LHES, respectively, that

supersede and replace the Subservicing Agreements and that RMS was authorized to execute in

---

[16]  The final Post-Petition Extension Agreement between LHES and RMS states, in part, as follows:

> WHEREAS, the Reverse Mortgage Subservicing Agreement ("Agreement") between the parties dated November 17, 2008 expired on November 17, 2013, and the parties subsequently agreed to extend the agreement through June 30, 2019.

> WHEREAS, to allow the parties further time to negotiate and execute a new Reverse Mortgage Subservicing Agreement, the parties now desire to extend the Agreement through September 30, 2019.

> NOW THEREFORE, the parties agree that the Agreement shall be extended through September 30, 2019. Except as provided herein, this extension shall be on the same terms and conditions as stated in the original Agreement. This Extension Agreement shall be binding upon and inure to the benefit of the parties, their successors, and subsidiaries.

Reply, Ex. A-2.

[17]  The August 16, 2019 Post-Petition Extension Agreement between FoA and RMS states, as follows:

> WHEREAS, the Reverse Mortgage Subservicing Agreement ("Agreement") between the parties dated March 18, 2011 expired on March 18, 2018, and the parties subsequently agreed to extend the Agreement for an additional term commencing upon the expiration date of March 18, 2018 and expiring on May 11, 2018; and the parties further agreed to extend the Agreement for further subsequent extensions commencing upon the expiration dates of May 11, 2018, June 30, 2018, August 30, 2018, October 31, 2018, November 30, 2018, December 31, 2018, January 30, 2019, March 31, 2019, April 15, 2019, June 30, 2019, and August 31, 2019, respectively.

> WHEREAS, to allow the parties further time to negotiate and execute an Amended and Restated Reverse Mortgage Subservicing Agreement, the parties now desire to extend the Agreement through September 30, 2019.

> Except as provided herein, this extension shall be on the same terms and conditions as stated in the original Agreement.

> Each of RMS and [FoA] have entered into this Extension Agreement solely to temporarily extend the term of the Agreement and do not intend this Extension Agreement or the transactions contemplated hereby to be, and this Extension Agreement and the transactions contemplated hereby shall not be construed to be or operate as, a novation, modification, or release of any of the obligations owing by RMS to FAR or in connection with the Agreement, all of which are hereby expressly preserved in their entirety.

Reply, Ex. B-2.

**1163**

the ordinary course of its business pursuant to section 363(c) of the Bankruptcy Code. LHES
Response ¶¶ 15-16 and 16 n.5; LHES Response ¶¶ 17-18 and 18 n.5. They also contend that the
Post-Petition Extension Agreements are supported by consideration beneficial to RMS, including
in the form of subservicing fee rights, and that RMS continued to subservice mortgage loans
covered by the Post-Petition Extension Agreements and to accept its subservicing fee through the
end of the term of each Post-Petition Extension Agreement. LHES Response ¶¶ 6, 20; FoA
Response ¶ 18, 22. Accordingly, LHES and FoA contend that their timely filed administrative
expense claims for damages resulting from RMS' alleged subservicing errors and other alleged
material breaches of the Post-Petition Extension Agreements are entitled to administrative
expense priority. LHES Response ¶ 18; FoA Response ¶ 20. In making this argument they assert
that the Plan Administrator mistakenly contends that they are claiming damages under a rejected
contract. LHES Response ¶ 17; FoA Response ¶ 19 (citing Objection, Ex. A). They correctly
note that contracts entered post-petition are not subject to assumption or rejection because they
are not executory contracts "of the debtor." 11 U.S.C. § 365(a). *See In re Leslie Fay Companies,
Inc.*, 168 B.R. 294, 300 (Bankr. S.D.N.Y. 1994) ("[C]ontracts … entered into postpetition are not
subject to rejection under section 365."); *In re Airport Executive Center, Ltd.*, 138 B.R. 628, 629
(Bankr. M.D. Fla. 1992) ("[Section 365(a)] applies to leases which exist prepetition, and not
those which are entered into post-petition"); *In re IML Freight, Inc.,* 37 B.R. 556, 559 (Bankr. D.
Utah 1984) ("The post-petition agreements entered into between the Trustee for the estate and
the Unions were not executory contracts of the debtor and therefore are not subject to Section
365 of the Code.").

**1164**

To create an enforceable contract the parties must agree to the material terms of the

bargain and intend to be bound by their agreement. *Tractebel Energy Mktg., Inc. v. AEP Power*

*Mktg., Inc.,* 487 F.3d 89, 98 (2d Cir. 2007) (holding that where "the parties have agreed on

all material terms of the contract and clearly manifested their intent to be bound by those terms. .

. the contract will be enforced."); *Slatt v. Slatt*, 64 N.Y.2d 966, 967 (1985) ("Where the intention

of the parties is clearly and unambiguously set forth, effect must be given to the intent as

indicated by the language used"); *Kasowitz, Benson, Torres & Friedman, LLP v. Reade,* 98

A.D.3d 403, 404 (2012), *aff'd,* 20 N.Y.3d 1082 (2013) ("To establish the existence of an

enforceable agreement, a plaintiff must establish an offer, acceptance of the offer, consideration,

mutual assent, and an intent to be bound") (citation omitted). "In determining the intent of the

parties, the court has a duty to ascertain the intent as manifested in the language of the

agreement. If the terms of the agreement are clear from the face of the document, the intent of

the parties is found in the document." *In re Chateaugay Corp.*, 116 B.R. 887, 902–03 (Bankr.

S.D.N.Y. 1990) (citations omitted). But "'where the language used is susceptible to differing

interpretations, each of which may be said to be as reasonable as another,' then the interpretation

of the contract becomes a question of fact ... and extrinsic evidence of the parties' intent properly

is admissible." *Bourne v. Walt Disney Co.,* 68 F.3d 621, 629 (2d Cir. 1995) (citations

omitted); *see also Ruttenberg v. Davidge Data Sys. Corp.*, 215 A.D.2d 191, 192 (1st Dep't 1995)

("Where a contract is straightforward and unambiguous, its interpretation presents a question of

law for the court to be made without resort to extrinsic evidence").

Here, the Plan Administrator contends that the Court can determine, as a matter of law,

that the Extension Agreements are not new subservicing agreements because it is clear on the

face of each such agreement that the purpose of the agreement merely was to extend the

16

**1165**

termination date of the subject Servicing Agreement, while post-petition, the parties negotiated

the terms of a new agreement. Reply ¶ 35. The Plan Administrator maintains that the plain

language of the Extension Agreements is clear and unambiguous that in executing those

agreements, either before or after the Petition Date, the parties did not intend to enter into new

subservicing agreements and in executing the Extension Agreements, they did not do so. Reply ¶

40.

   The LHES and FoA Post-Petition Extension Agreements are governed by Delaware and

New York law, respectively. Under Delaware law, "[a] new contract. . . does not destroy the

obligation of the former agreement, except as it is inconsistent therewith, unless it is shown that

the parties intended the new contract to supersede the old contract entirely." *Lee Builders v.*

*Wells,* 92 A.2d 710, 715 (Del.Ch.1952), *rev'd on other grounds,* 99 A.2d 620 (Del.1953).

"Whether the parties to a contract intended a new contract to supersede an old one, whether

partially or entirely, depends on their intent." *Haft v. Dart Grp. Corp.,* 841 F. Supp. 549, 568 (D.

Del. 1993) (internal citations omitted). The intent of the parties "must be ascertained from the

language of the contract." *Id.* at 564; *see also Citadel Holding Corp. v. Roven*, 603 A.2d 818,

822 (Del. 1992) ("It is an elementary canon of contract construction that the intent of the parties

must be ascertained from the language of the contract. Only when there are ambiguities may a

court look to collateral circumstances."). Likewise, New York law is clear that "the objective of

contract interpretation is to give effect to the *expressed* intentions of the parties, '[t]he best

evidence of what parties to a written agreement intend is what they say in their writing,'. . .

'Thus, a written agreement that is complete, clear and unambiguous on its face must be

[interpreted] according to the plain meaning of its terms,' 'without the aid of extrinsic

evidence.'" *Law Debenture Tr. Co. of New York v. Maverick Tube Corp.,* 595 F.3d 458, 467–68

**1166**

(2d Cir. 2010) (internal citations omitted). *See, e.g., Network Publishing Corp. v. Shapiro,* 895

F.2d 97, 99 (2d Cir.1990) ("[w]e must consider the words [of a contract] themselves for they are

always the most important evidence of the parties' intention" (internal quotation marks

omitted)); *Bailey v. Fish & Neave,* 8 N.Y.3d 523, 528 (2007)("[w]here the language is clear,

unequivocal and unambiguous, the contract is to be interpreted by its own language").

The case of *In re Bush Indus., Inc*., No. 05-CV-119S, 2006 WL 8455682 (W.D.N.Y.

Mar. 29, 2006) is instructive in construing the Extension Agreements at issue herein. There, the

claimant ("Hain") was party to a prepetition consulting agreement (the "Consulting Agreement")

with the debtor ("Bush") and the debtor's wholly owned subsidiary ("Color Works"). *Id.* at *1.

Prepetition, Hain executed an agreement to reduce his guaranteed payments under the Consulting

Agreement. *Id.* Five months after Bush filed for bankruptcy, Hain notified Bush that the

agreement was null and void because Bush and Color Works had not executed the agreement. *Id.*

at *2. Nonetheless, Hain accepted the payments called for under the new agreement and filed an

administrative expense claim equal to the difference between the amounts that he was paid under

the new agreement and the amounts he would have been paid under the Consulting Agreement.

*Id.* Hain argued that the agreement reducing the amount of guaranteed payment was a new

contract that was unenforceable because it did not contain the signatures of each party to the

agreement. *See id*. The bankruptcy court disagreed, finding that the agreement was a

modification rather than a new contract due to a clause allowing modification by an instrument

"signed by the party against whom enforcement of any such amendment, supplement or

modification is sought." *Id*. Thus, the agreement was a modification that became effective when

signed by the claimant. *See id*. On appeal, the district court ruled that the bankruptcy court

correctly relied only on the unambiguous documents presented and resolved the issue as a matter

of law. *See id*. at *4. In analyzing the question of modification, the district court found, in

substance, that an agreement that restates contract provisions with no substantive changes,

involves the same relationship among the same parties, contains clauses that state the parties'

desire to amend and restate prior agreements, and merely adjusts the term of the agreement or the

compensation, does not constitute a new contract. *See id* at *5. Furthermore, the district court

found where underlying agreements permit amendment, supplementation, or modification in

whole or in part, subsequent agreements will be considered modifications rather than new

agreements. *See id*.

Applying the settled rules of contract construction to the Post-Petition Extension

Agreements, and the teachings of *Bush,* the Court finds, as a matter of law, that in executing the

Extension Agreements, RMS was not entering into new agreements with LHES or FoA, and that

those agreements do not supersede and replace the Subservicing Agreements. The plain,

unambiguous language of the Post-Petition Extension Agreements is clear that they are not

"new" post-petition agreements among RMS, as debtor in possession and LHES or FoA. Both

agreements speak only of "extending" the original agreements "on the same terms and conditions

as stated in the original [Subservicing] Agreement[s]." *Supra* n.16, 17.[18] Moreover, the parties

tacitly acknowledge that the Extension Agreements are not new agreements among the parties

because they agreed to extend the termination dates of the agreements "to allow the parties

further time to negotiate and execute a new Reverse Mortgage Subservicing Agreement." *Supra*

n.16, 17. Further, the FoA Post-Petition Extension Agreement provides that it "shall not be

construed to be or operate as, a novation, modification, or release of any of the obligations owing

---

[18]    The Prepetition Extension Agreements contain similar language. *See* Reply, Ex. A-1 (LHES Prepetition
Extension Agreement) ("This extension shall be on all other terms and conditions as stated in the original
Agreement."); *Id*., Ex. B-1 (FoA Prepetition Extension Agreement) ("Except as provided herein, this extension shall
be on the same terms and conditions as stated in the original Agreement.").

**1168**

by RMS to [FoA] or in connection with the [FoA November 2011] Agreement, all of which are hereby expressly preserved in their entirety." *Supra* n.17.[19] Finally, the extensions fail to address, at all, the rights and obligations under the subservicing relationship that constitute breach, notification of breach, indemnity, dispute resolution, or the treatment of claims arising under the agreement. Thus, like the agreement at issue in *Bush,* the Post-Petition Extension Agreements merely (i) restate the provisions of the applicable Subservicing Agreement with no substantive changes, (ii) involve the same relationship among the same parties, and (iii) state the parties' intention to extend terms of the subject Subservicing Agreements. Accordingly, those agreements do not constitute new contracts. *See United States Aviation Underwriters, Inc. v. Preservatrice-Fonciere Compagnies D'Assurance*, No. 83 CIV. 3935 (GLG), 1986 WL 3779, at *2 (S.D.N.Y. Mar. 21, 1986) (noting that renewal of the contract was viewed "as an extension of the original [contract], not a new contract"), *aff'd sub nom. U.S. Aviation v. Preservatrice-Fonciere*, 801 F.2d 391 (2d Cir. 1986); *In re Country Club Ests. at Aventura Maint. Ass'n, Inc.*, 227 B.R. 565, 567–68 (Bankr. S.D. Fla. 1998) (noting that the automatically renewed service agreement on the same terms of the original agreement was not a new post-petition contract, "but rather a mere continuation of [the] parties' executory, prepetition agreement.").

---

[19]    The non-inclusion of such language in the two LHES Post-petition Extension Agreements does not undermine this analysis. The Plan Administrator asserts that the failure to include that language in the LHES documents is a consequence of the parties' routine practice of using prior extensions in their business relationship, not their intent to exclude the provisions from nearly identical contracts. *See* Reply ¶ 37 n.4 (citing *Nycal Corp. v. Inoco PLC*, 166 F.3d 1201 (2d Cir. 1998) ("any differences in the wording used in the three contemporaneous settlement agreements can only be reasonably viewed as a consequence of the different relationships and dealings between the respective companies and not as an indication of a different intent with respect to the Nycal-Inoco release.") (internal quotations omitted). The Court credits that contention.

**1169**

**Whether the Damage Claims Resulting From RMS'**
**Post-Petition Breach of the Subservicing Agreements**
**are Entitled to Administrative Expense Priority**

LHES and FoA contend that their damage claims resulting from RMS' post-petition

breach of the Subservicing Agreements, as extended by the Prepetition Extension Agreements

are entitled to administrative expense priority under section 507(a)(2) of the Bankruptcy Code.

They maintain that is so because a debtor's post-petition obligations under a prepetition contract

that has not yet been assumed or rejected will give rise to administrative expense claims where

the debtor-in possession continues to perform under such contract and receive the benefits

thereunder. LHES Response ¶ 19; FoA Response ¶ 21. They assert that RMS elected to continue

subservicing reverse mortgage loans under the LHES and FoA Prepetition Extension

Agreements on a post-petition basis and accepted the post-petition subservicing fees paid in

exchange for its performance under those contracts through March 31, 2019.  Accordingly,

LHES and FoA maintain their respective timely filed administrative expense claims for damages

resulting from RMS' post-petition subservicing errors and other material post-petition breaches

of the Prepetition Extension Agreements are entitled to administrative expense priority. LHES

Response ¶ 20; FoA Response ¶ 22.

The Bankruptcy Code determines when claims arise. *See, e.g., Pearl-Phil GMT (Far*

*East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 581 (S.D.N.Y. 2000) ("[I]t is well settled that the

Bankruptcy Code governs *when* a claim arises."). Section 101(5) of the Bankruptcy Code defines

"claim" to include any

> [R]ight to payment, whether or not such right is reduced to judgment, liquidated,
> unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal,
> equitable, secured, or unsecured; . . .

**1170**

11 U.S.C. § 101(5)(A). That term "is sufficiently broad to encompass any possible right to payment." *Mazzeo v. United States (In re Mazzeo),* 131 F.3d 295, 302 (2d Cir. 1997). *See also United States v. LTV Corp. (In re Chateaugay Corp.),* 944 F.2d 997, 1003 (2d Cir. 1991) (noting that as defined, the term "claim" "contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case.") (quoting H.R. Rep. No. 95-595 at 300 (1978), reprinted in U.S. Code Cong. & Admin. News 5787, 5963, 6266). For these purposes, "[a] 'contingent' claim . . . refers 'to obligations that will become due upon the happening of a future event that was within the actual or presumed contemplation of the parties at the time the original relationship between the parties was created.'" *Ogle v. Fid. & Deposit Co. of Md.,* 586 F.3d 143, 146 (2d Cir.2009) (quoting *In re Manville Forest Prods. Corp.,* 209 F.3d 125, 128–29 (2d Cir. 2000)); *see also In re St. Vincent's Catholic Med. Ctrs.,* 440 B.R. 587, 602 (Bankr.S.D.N.Y.2010).

Claims based on un-assumed prepetition contracts are contingent prepetition claims that arise upon the execution of the contract. S*ee Ogle v. Fid. & Deposit Co. of Maryland*, 586 F.3d at 147 ("an unsecured claim for post-petition fees, authorized by a valid pre-petition contract," is a contingent claim "deemed to have arisen pre-petition.") (citing *In re SNTL Corp.*, 571 F.3d 826, 844 (9th Cir. 2009)); *Rescap Liquidating Tr. v. PHH Mortg. Corp. (In re Residential Cap., LLC)*, 558 B.R. 77, 86 (S.D.N.Y. 2016) ("The appellees' claims for attorney's fees accrued at the time the Contracts were executed even though they remained contingent until the Trust allegedly breached the Contracts"); *Conway Hosp., Inc. v. Lehman Bros. Holdings Inc.*, 531 B.R. 339, 343 (S.D.N.Y. 2015) ("The relationship between Conway and LBSF therefore was created upon the signing of the…Agreement. The fact that the Lehman bankruptcy—the relevant contingency— materialized post-petition does not transmogrify the claim into a post-petition claim, but merely

**1171**

means that the contingent claim moved closer to becoming liquidated"). *See also In re Bradlees Stores, Inc.*, No. 02 CIV. 0896 (WHP), 2003 WL 76990, at *3 (S.D.N.Y. Jan. 9, 2003), *aff'd*, 78 F. App'x 166 (2d Cir. 2003) (holding that "the Second Circuit recognizes that contract-based bankruptcy claims are deemed to arise at the time the contract is executed, and therefore a post-petition breach of a pre-petition contract gives rise solely to a pre-petition claim"); *Pearl-Phil GMT (Far E.) Ltd. v. Caldor Corp.*, 266 B.R. at 582 (finding that the "Bankruptcy Court's conclusion is supported by the clear weight of case law in this Circuit which recognizes that contract-based bankruptcy claims arise at the time the contract is executed. For example, courts consistently hold that a post-petition breach of a pre-petition contract gives rise only to a pre-petition claim").[20]

Where parties contemplate the possibility of future breach in their contracts, such breaches are treated as contingent prepetition claims rather than post-petition claims. *See In re Residential Cap., LLC*, 558 B.R. at 85-87; *see also In re Manville Forest Prod. Corp.*, 209 F.3d 125, 129 (2d Cir. 2000) (claims for indemnity arose prepetition where "the terms of the indemnification agreements were so broad as to encompass all types of future liability"); *In re*

---

[20]    The Court held as much in these Chapter 11 Cases in granting the Debtors' motion to enforce the Plan Injunction contained in the Third Amended Plan to enjoin Gautam and Panthobi Sharma (the "Sharmas") from prosecuting counterclaims seeking monetary relief against the Debtors in Illinois state court. *See Memorandum Decision and Order Granting Plan Administrator's Sixth Omnibus Motion to Enforce the Plan Injunction and Confirmation Order as it Relates to Gautam and Panthobi Sharma* [ECF No. 3034] (Nov. 30, 2020). The Sharmas were parties to a prepetition mortgage and note that had been assigned to Ditech. After confirmation of the Third Amended Plan, Ditech brought a foreclosure action based on the mortgage. The Sharmas asserted counterclaims in that action seeking monetary relief, principally attorneys' fees and costs, alleging under both contract and Illinois statutory law that Ditech failed to give proper notice of the foreclosure and therefore the foreclosure was invalid. *Id.* at 7-8. It was undisputed that the Sharmas asserted counterclaims for monetary relief against Ditech, and that those counterclaims for monetary relief would be covered by the Plan Injunction if the claims arose prior to the Effective Date of the Plan. *Id.* The sole issue before the Court was when those claims arose. Relying on the precedent cited above, the Court found that the counterclaims were subject to the injunction, reasoning, in part, that "[c]ontract claims arise upon execution of the agreement…It is settled that prepetition contract based claims for attorney's fees are deemed to arise upon execution of the contract." *Id.* at 13 (citations omitted).

*Chateaugay Corp.*, 944 F.2d at 1004 ("In the context of contract claims, the Code's inclusion of

'unmatured' and 'contingent' claims is usually said to refer to obligations that will become due

upon the happening of a future event that was 'within the actual or presumed contemplation of

the parties at the time the original relationship between the parties was created.'") (internal

citations omitted). The Subservicing Agreements contemplate the possibility of servicing errors

and establish procedures for dealing with errors, including through indemnity provisions.  The

risk of subservicing errors in the post-petition period was within the fair contemplation of the

parties, and the fact that the Debtors received compensation for their services does not transform

the claims into administrative expense claims. Rather, under Second Circuit case law, the claims

are contingent prepetition claims, which are not afforded administrative expense priority under

section 503(b)(1)(A) of the Bankruptcy Code.[21]

The Subservicing Agreements were executory contracts under which the Debtors

provided servicing in exchange for fees from LHES and FoA. Executory contracts for services,

like all executory contracts, are subject to assumption or rejection. *See, e.g., In re Hawker

Beechcraft, Inc.*, 486 B.R. 264, 279 (Bankr. S.D.N.Y. 2013) (Support-plus agreements under

which purchasers had reporting obligations in return for continuing support from debtor were

---

[21]    In support of their contention that their claims arose post-petition under the Servicing Agreements, as extended
by the Prepetition Extension Agreements, FoA and LHES rely on: *Zelin v. Unishops, Inc. (In re Unishops, Inc.)*, 553
F.2d 305, 308 (2d Cir. 1977) ("It is settled law that a claim arising under an executory contract is entitled to priority
if the trustee or debtor in possession elects to assume the contract *or* if he receives benefits under it.") (emphasis
added); *In re Enron Corp.*, 279 B.R. 79, 87 (Bankr. S.D.N.Y. 2002) ("With respect to an executory contract, the
focus is on whether the debtor used the nondebtor's property in the ordinary course of its business, and continued to
receive and accept the nondebtor's performance."); *Texaco Inc. v. Bd. Of Commissioners for the LaFourche Basin
Levee Dist. (In re Texaco Inc.)*, 254 B.R. 536, 556 (Bankr. S.D.N.Y. 2000) ("As long as the debtor continues to
receive benefits under such contract it must also bear the burdens or obligations imposed under the contract."); *In re
Yonkers Hamilton Sanitarium Inc.*, 22 B.R. 427, 435 (Bankr. S.D.N.Y. 1982) (same); *In re Shoppers Paradise, Inc.*,
8 B.R. 271, 279 (Bankr. S.D.N.Y. 1980) ("Even where court approval was not obtained the debtor-in-possession
may be deemed to have adopted the contract or lease where it received benefits and when the issue presented is
whether or not such benefits should be entitled to an administration expense claim."). *See* LHES Response ¶ 19;
FoA Response ¶ 21. FoA and LHES misplace their reliance on those cases. All of them pre-date the Second
Circuit's clear direction that claims based upon un-assumed prepetition contracts are contingent prepetition claims
that arise upon the execution of the contract. Thus, in that regard, they have no precedential value.

1173

executory contracts subject to rejection). Where a debtor-in-possession exercises its right to

reject an executory contract either prior to plan confirmation or under a confirmed plan, the

rejection is treated as occurring "immediately before the date of the filing of the petition." 11

U.S.C. § 365(g)(1). "The Bankruptcy Code… specifically provides that such claim against the

estate is treated as a pre-petition claim, thereby affording it general unsecured status." *In re Old*

*Carco LLC*, 424 B.R. 633, 639 (Bankr. S.D.N.Y. 2010) (internal citation omitted).

The Third Amended Plan provided that all executory contracts not otherwise assumed

would be rejected. *See* Third Amended Plan, ¶ 8.1(a). The Debtors did not assume the

Subservicing Agreements. *See* LHES Response ¶ 9; FoA Response ¶ 11. LHES and FoA note

that the terms of the LHES November 2008 Agreement and FoA Subservicing Agreements (as

extended by the Prepetition Extension Agreements) expired at the end of March 2019, well

before the Effective Date. They assert that those agreements never were assumed or rejected

under the terms of the Third Amended Plan. LHES and FoA do not assert claims resulting from

any failure by RMS to perform after the Effective Date, which they say is the earliest date the

Prepetition Subservicing Agreements could have been rejected under the Third Amended Plan.

Thus, they contend they are not asserting rejection damages claims that would be deemed to have

occurred prepetition under section 365(g) of the Bankruptcy Code. LHES Response ¶ 22; FoA

Response ¶ 24. The Court finds no merit to that contention. "The effect of rejection is that the

*estate* does not become obligated on the contract…Thus, rejection is the equivalent of electing

not to assume a contract." *In re Old Carco LLC*, 424 B.R. at 639; *see also In re A.C.E. Elevator*

*Co.,* 347 B.R. 473, 483–84 (Bankr. S.D.N.Y. 2006) (finding when debtor did not reject an

agreement post-petition and allowed the agreement to expire by its terms, employees' claim for

delinquent contributions was not entitled to administrative priority). Even though the Debtors

**1174**

were unable to reject the Prepetition and Post-Petition Extension Agreements because they expired prior to the Effective Date, the Claims still arise under the Subservicing Agreements and the Debtors did not assume those agreements. Accordingly, the Claims are, at most, contingent prepetition general unsecured claims regardless of whether the Subservicing Agreements and/or the Prepetition and Post-Petition Extension Agreements were deemed rejected or expired on their terms.

### Conclusion

Based on the foregoing, the Court sustains the Debtors' Objection to the LHES and FoA Administrative Expense Claims[22] and reclassifies them as General Unsecured Claims.[23]

IT IS SO ORDERED.

Dated: New York, New York
        October 21, 2021

/s/ *James L. Garrity, Jr.*

Hon. James L. Garrity, Jr.
U.S. Bankruptcy Judge

---

[22]   To be clear, to the extent that FoA is asserting administrative expense claims in Claim No. 21347, those claims are reclassified as General Unsecured Claims.

[23]   In support of the Objection, the Plan Administrator also asserted that (i) even if the Court found that the Post-Petition Extension Agreements are in fact post-petition contracts (i) LHES and FoA would not be entitled to collect on an administrative priority basis because the parties did not obtain Court approval of the extensions (*see* Reply ¶¶ 41-49); and (ii) the claims would be limited to the reasonable value conferred upon the estates. *Id*. ¶¶ 61-71. The Court need not, and does not, address those arguments.

**1175**

## EXHIBIT 2

**Notice of Appeal and Statement of Election**

Official Form 417A (12/18)

[Caption as in Form 416A, 416B, or 416D, as appropriate]

## NOTICE OF APPEAL AND STATEMENT OF ELECTION

### Part 1: Identify the appellant(s)

1. Name(s) of appellant(s):
   Finance of America Reverse LLC

2. Position of appellant(s) in the adversary proceeding or bankruptcy case that is the subject of this appeal:

   For appeals in an adversary proceeding.
   ❏ Plaintiff
   ❏ Defendant
   ❏ Other (describe) _____

   For appeals in a bankruptcy case and not in an adversary proceeding.
   ❏ Debtor
   ■ Creditor
   ❏ Trustee
   ❏ Other (describe) _____

### Part 2:  Identify the subject of this appeal

1. Describe the judgment, order, or decree appealed from: Memorandum Decision and Order Sustaining the Fifty-Second Omnibus Objection to Proofs of  Claim (Misclassified Claims) with Respect to Claims of Liberty Home Equity Solutions, Inc. and Finance of America Reverse LLC

2. State the date on which the judgment, order, or decree was entered:  October 21, 2021

### Part 3: Identify the other parties to the appeal

List the names of all parties to the judgment, order, or decree appealed from and the names, addresses, and telephone numbers of their attorneys (attach additional pages if necessary):  **Please see Exhibit 3.**

1. Party: _____    Attorney: _____
   _____
   _____
   _____

2. Party: _____    Attorney: _____
   _____
   _____
   _____

**1177**

## Part 4: Optional election to have appeal heard by District Court (applicable only in certain districts)

If a Bankruptcy Appellate Panel is available in this judicial district, the Bankruptcy Appellate Panel will hear this appeal unless, pursuant to 28 U.S.C. § 158(c)(1), a party elects to have the appeal heard by the United States District Court.  If an appellant filing this notice wishes to have the appeal heard by the United States District Court, check below.  Do not check the box if the appellant wishes the Bankruptcy Appellate Panel to hear the appeal.        **Not applicable**

❑   Appellant(s) elect to have the appeal heard by the United States District Court rather than by the Bankruptcy Appellate Panel.


## Part 5: Sign below

 /s/Peter S. Partee, Sr.                                                                Date: November 3, 2021
Signature of attorney for appellant(s) (or appellant(s)
if not represented by an attorney)

Name, address, and telephone number of attorney
(or appellant(s) if not represented by an attorney):
 Peter S. Partee, Sr. & Robert A. Rich
 Hunton Andrews Kurth LLP
 200 Park Avenue
 New York, NY 10166 (212-309-1000)

*Counsel for Finance of America Reverse LLC*


Fee waiver notice: If appellant is a child support creditor or its representative and appellant has filed the form specified in § 304(g) of the Bankruptcy Reform Act of 1994, no fee is required.


[**Note to inmate filers:**  If you are an inmate filer in an institution and you seek the timing benefit of Fed. R. Bankr. P. 8002(c)(1), complete Director's Form 4170 (Declaration of Inmate Filing) and file that declaration along with the Notice of Appeal.]

## EXHIBIT 3

**Parties and Respective Attorneys**

| Party | Attorneys |
|---|---|
| Appellant<br><br>Finance of America Reverse LLC | Peter S. Partee, Sr.<br>Robert A. Rich<br>HUNTON ANDREWS KURTH LLP<br>200 Park Avenue<br>New York, NY 10166<br>(212) 309-1000<br>ppartee@huntonak.com<br>rrich2@huntonak.com |
| Appellee<br><br>Mortgage Winddown LLC (f/k/a Ditech PA LLC) as Plan Administrator appointed pursuant to the *Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and its Affiliated Debtors* | Ray C. Schrock, P.C.<br>Richard W. Slack<br>Sunny Singh<br>WEIL, GOTSHAL & MANGES LLP<br>767 Fifth Avenue<br>New York, NY 10153<br>(212) 310-8000<br>ray.schrock@weil.com<br>richard.slack@weil.com<br>sunny.singh@weil.com |

**1179**

# EXHBIT 4

**Civil Cover Sheet**

JS 44C/SDNY
REV.
10/01/2020

**CIVIL COVER SHEET**

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

| PLAINTIFFS | DEFENDANTS |
|---|---|
| Finance of America Reverse LLC | Mortgage Winddown LLC (f/k/a Ditech PA LLC) as Plan Administrator appointed pursuant to the Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and its Affiliated Debtors |

| ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER | ATTORNEYS (IF KNOWN) |
|---|---|
| Peter S. Partee, Sr. and Robert A. Rich Hunton Andrews Kurth LLP, 200 Park Ave, New York, NY 10166 (212) 309-1000 | Ray C. Schrock, P.C., Richard W. Slack, and Sunny Singh Weil, Gotshal & Manges LLP, 767 Fifth Ave, New York, NY 10153 (212) 310-8000 |

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

28 U.S.C. § 158 - Appeal in a bankruptcy case

Has this action, case, or proceeding, or one essentially the same been previously filed in SDNY at any time? No [ ] Yes [x]    Judge Previously Assigned

If yes, was this case  Vol. [ ]  Invol. [ ]  Dismissed. No [ ] Yes [ ]  If yes, give date _____  & Case No. _____

IS THIS AN INTERNATIONAL ARBITRATION CASE?    No [x]    Yes [ ]

*(PLACE AN [x] IN ONE BOX ONLY)*    NATURE OF SUIT

| TORTS | ACTIONS UNDER STATUTES |
|---|---|

| CONTRACT | PERSONAL INJURY | PERSONAL INJURY/ | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110  INSURANCE | [ ] 310 AIRPLANE | [ ] 367 HEALTHCARE/ PHARMACEUTICAL PERSONAL INJURY/PRODUCT LIABILITY | [ ] 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881 | [x] 422 APPEAL 28 USC 158 | [ ] 375 FALSE CLAIMS |
| [ ] 120  MARINE | [ ] 315 AIRPLANE PRODUCT LIABILITY | | | [ ] 423 WITHDRAWAL 28 USC 157 | [ ] 376 QUI TAM |
| [ ] 130  MILLER ACT | [ ] 320 ASSAULT, LIBEL & SLANDER | [ ] 365 PERSONAL INJURY PRODUCT LIABILITY | [ ] 690 OTHER | | [ ] 400 STATE REAPPORTIONMENT |
| [ ] 140  NEGOTIABLE INSTRUMENT | [ ] 330 FEDERAL EMPLOYERS' LIABILITY | [ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY | | | [ ] 410 ANTITRUST |
| [ ] 150  RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT | [ ] 340 MARINE | | PROPERTY RIGHTS | | [ ] 430 BANKS & BANKING |
| [ ] 151  MEDICARE ACT | [ ] 345 MARINE PRODUCT LIABILITY | PERSONAL PROPERTY | [ ] 820 COPYRIGHTS   [ ] 880 DEFEND TRADE SECRETS ACT | | [ ] 450 COMMERCE |
| [ ] 152  RECOVERY OF DEFAULTED STUDENT LOANS (EXCL VETERANS) | [ ] 350 MOTOR VEHICLE | [ ] 370 OTHER FRAUD | [ ] 830 PATENT | | [ ] 460 DEPORTATION |
| | [ ] 355 MOTOR VEHICLE PRODUCT LIABILITY | [ ] 371 TRUTH IN LENDING | [ ] 835 PATENT-ABBREVIATED NEW DRUG APPLICATION | | [ ] 470 RACKETEER INFLU-ENCED & CORRUPT ORGANIZATION ACT (RICO) |
| [ ] 153  RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS | [ ] 360 OTHER PERSONAL INJURY | | [ ] 840 TRADEMARK | | [ ] 480 CONSUMER CREDIT |
| [ ] 160  STOCKHOLDERS SUITS | [ ] 362 PERSONAL INJURY - MED MALPRACTICE | [ ] 380 OTHER PERSONAL PROPERTY DAMAGE | SOCIAL SECURITY | | [ ] 485 TELEPHONE CONSUMER PROTECTION ACT |
| [ ] 190  OTHER CONTRACT | | [ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY | [ ] 861 HIA (1395ff) | | |
| [ ] 195  CONTRACT PRODUCT LIABILITY | | | [ ] 862 BLACK LUNG (923) | | [ ] 490  CABLE/SATELLITE TV |
| [ ] 196 FRANCHISE | | LABOR | [ ] 863 DIWC/DIWW (405(g)) | | [ ] 850 SECURITIES/ COMMODITIES/ EXCHANGE |
| | PRISONER PETITIONS | [ ] 710 FAIR LABOR STANDARDS ACT | [ ] 864 SSID TITLE XVI | | |
| | [ ] 463 ALIEN DETAINEE | [ ] 720 LABOR/MGMT RELATIONS | [ ] 865 RSI (405(g)) | | [ ] 890 OTHER STATUTORY ACTIONS |
| | [ ] 510 MOTIONS TO VACATE SENTENCE 28 USC 2255 | [ ] 740 RAILWAY LABOR ACT | | | [ ] 891 AGRICULTURAL ACTS |
| REAL PROPERTY | ACTIONS UNDER STATUTES | [ ] 751 FAMILY MEDICAL LEAVE ACT (FMLA) | FEDERAL TAX SUITS | | [ ] 893 ENVIRONMENTAL MATTERS |
| | [ ] 530 HABEAS CORPUS | | [ ] 870 TAXES (U.S. Plaintiff or Defendant) | | [ ] 895 FREEDOM OF INFORMATION ACT |
| [ ] 210  LAND CONDEMNATION | CIVIL RIGHTS | [ ] 535 DEATH PENALTY | [ ] 790 OTHER LABOR LITIGATION | | |
| [ ] 220  FORECLOSURE | [ ] 440  OTHER CIVIL RIGHTS (Non-Prisoner) | [ ] 540 MANDAMUS & OTHER | [ ] 791 EMPL RET INC SECURITY ACT (ERISA) | [ ] 871 IRS-THIRD PARTY 26 USC 7609 | [ ] 896 ARBITRATION |
| [ ] 230  RENT LEASE & EJECTMENT | [ ] 441 VOTING | | | | [ ] 899 ADMINISTRATIVE PROCEDURE ACT/REVIEW OR APPEAL OF AGENCY DECISION |
| [ ] 240  TORTS TO LAND | [ ] 442 EMPLOYMENT | PRISONER CIVIL RIGHTS | IMMIGRATION | | |
| [ ] 245  TORT PRODUCT LIABILITY | [ ] 443 HOUSING/ ACCOMMODATIONS | [ ] 550 CIVIL RIGHTS | [ ] 462 NATURALIZATION | | [ ] 950 CONSTITUTIONALITY OF STATE STATUTES |
| [ ] 290  ALL OTHER REAL PROPERTY | [ ] 445 AMERICANS WITH DISABILITIES - EMPLOYMENT | [ ] 555 PRISON CONDITION | [ ] 465 OTHER IMMIGRATION ACTIONS | | |
| | [ ] 446  AMERICANS WITH DISABILITIES -OTHER | [ ] 560 CIVIL DETAINEE CONDITIONS OF CONFINEMENT | | | |
| | [ ] 448 EDUCATION | | | | |

*Check if demanded in complaint:*

[ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $_____   OTHER _____

*Check YES only if demanded in complaint*
JURY DEMAND: [ ] YES [x] NO

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y. AS DEFINED BY LOCAL RULE FOR DIVISION OF BUSINESS 13?
IF SO, STATE:

JUDGE _____   DOCKET NUMBER _____

NOTE: You must also submit at the time of filing the Statement of Relatedness form (Form IH-32).

**1181**

*(PLACE AN  x  IN ONE BOX ONLY)*                                                    **ORIGIN**

[X] 1  Original
        Proceeding

[ ] 2  Removed from
        State Court

    a. [ ] all parties represented

    b. [ ] **At least one party
            is pro se.**

[ ] 3  Remanded
        from
        Appellate
        Court

[ ] 4  Reinstated or
        Reopened

[ ] 5  Transferred from
        (Specify District)

[ ] 6  Multidistrict
        Litigation
        (Transferred)

[ ] 7  Appeal to District
        Judge from
        Magistrate Judge

[ ] 8  Multidistrict Litigation (Direct File)

*(PLACE AN  x  IN ONE BOX ONLY)*          **BASIS OF JURISDICTION**                 *IF DIVERSITY, INDICATE
                                                                                    CITIZENSHIP BELOW.*

[ ] 1  U.S. PLAINTIFF     [ ] 2  U.S. DEFENDANT     [X] 3  FEDERAL QUESTION     [ ] 4  DIVERSITY
                                                            (U.S. NOT A PARTY)

**CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)**

(Place an [X] in one box for Plaintiff and one box for Defendant)

|  | PTF | DEF |  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ] 1 | [ ] 1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 3 | [ ] 3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ] 5 | [ ] 5 |
| CITIZEN OF ANOTHER STATE | [ ] 2 | [ ] 2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ] 4 | [ ] 4 | FOREIGN NATION | [ ] 6 | [ ] 6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)

Finance of America Reverse LLC
8023 E 63rd Pl #700
Tulsa, OK 74133
County of Tulsa

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

Mortgage Winddown LLC (f/k/a Ditech PA LLC), as Plan Administrator appointed pursuant to the Third
Amended Joint Chapter 11 Plan of Ditech Holding Corporation and its Affiliated Debtors
1100 Virginia Drive, Suite 100
Fort Washington, Pennsylvania 19034
County of Montgomery

DEFENDANT(S) ADDRESS UNKNOWN
REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN
THE RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

**COURTHOUSE ASSIGNMENT**

I hereby certify that this case should be assigned to the courthouse indicated below pursuant to Local Rule for Division of Business 18, 20 or 21.

Check one:   THIS ACTION SHOULD BE ASSIGNED TO:     [ ] WHITE PLAINS     [x] MANHATTAN

DATE  11/3/21            /s/ Peter S. Partee, Sr.
                     SIGNATURE OF ATTORNEY OF RECORD

RECEIPT #

ADMITTED TO PRACTICE IN THIS DISTRICT
[ ] NO
[x] YES (DATE ADMITTED  Mo. __June__  Yr. _2007_ )
Attorney Bar Code # 4484234

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

Ruby J. Krajick, Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)                                          **1182**

| United States Bankruptcy Court for the Southern District of New York | |
|---|---|
| **Name of Debtor:** Reverse Mortgage Solutions, Inc. | **For Court Use Only** |
| | Claim Number: 0000021347 |
| **Case Number:** 19-10422 | File Date: 04/25/2019 13:02:20 |

# Proof of Claim (Official Form 410)

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. With the exception of 503(b)(9), do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

**04/16**

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Name of the current creditor (the person or entity to be paid for this claim): Finance of America Reverse LLC

Other names the creditor used with the debtor: Urban Financial

**2. Has this claim been acquired from someone else?** ☒ No ☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?** Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| Name: Finance of America Reverse LLC | Name: |
| Address: Attn: Karen C. Tankersley, Esq. | Address: |
| 909 Lake Carolyn Parkway, Suite 1550 | |
| City: Irving | City: |
| State: TX  ZIP Code: 75039 | State:  ZIP Code: |
| Country (if International): | Country (if International): |
| Phone: 972.999.1840 | Phone: |
| Email: ktankersley@financeofamerica.com | Email: |

| **4. Does this claim amend one already filed?** | **5. Do you know if anyone else has filed a proof of claim for this claim?** |
|---|---|
| ☒ No | ☒ No |
| ☐ Yes. | ☐ Yes. |
| Claim number on court claims register (if known) _____ | Who made the earlier filing? |
| Filed on _____ | _____ |
| MM / DD / YYYY | |

Page 1 of 3

**1183**

**6. Do you have any number you use to identify the debtor?**

☒ No

☐ Yes.
Last 4 digits of the debtor's account or any number you use to identify the debtor:

____ ____ ____ ____

**7. How much is the claim?**

$ 54,085,623.66 _____ unliquidated

**Does this amount include interest or other charges?**

☒ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c). Limit disclosing information that is entitled to privacy, such as health care information.

Other Basis
_____
see attachment

---

**9. Is all or part of the claim secured?**

☒ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe:

_____

**Basis for perfection:**

_____

Attach redacted copies of documents, if any, that show evidence of perfection of security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property: $_____

Amount of the claim that is secured: $_____

Amount of the claim that is unsecured: $_____
(The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any
default as of the date of the petition: $_____

**Annual Interest Rate** (when case was filed) _____ %
☐ Fixed ☐ Variable

**10. Is this claim based on a lease?**

☒ No

☐ Yes. **Amount necessary to cure any default as of the date of petition.**

$_____

**11. Is this claim subject to a right of setoff?**

☒ No

☐ Yes. Identify the property:

_____

---

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

☐ No

☒ Yes. *Check one:*

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).

☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).

☒ Other. Specify subsection of 11 U.S.C. § 507 (a) ( 507(a)(2) ) that applies.

* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

**Amount entitled to priority**

$_____

$_____

$_____

$_____

$_____

$ 0.00
_____

---

**13. Does this claim qualify as an Administrative Expense under 11 U.S.C. § 503(b)(9)?**

☒ No

☐ Yes. **Amount that qualifies as an Administrative Expense under 11 U.S.C. § 503(b)(9):** $_____

**1184**

| Part 3: | Sign Below |
|---------|-----------|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☒ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other co-debtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

*Kathleen Marie Milligan*                                     04/25/2019 13:02:20
_____        _____
Signature                                                      Date

**Provide the name and contact information of the person completing and signing this claim:**

Name     Kathleen Marie Milligan

Address    Chief Servicing Officer

           Finance of America Reverse LLC

           909 Lake Carolyn Parkway, Suite 1550

City       Irving

State     TX                   Zip   75039

Country (in international)   USA

Phone    972 999 1840

Email    kmilligan@financeofamerica.com

**1185**

**United States Bankruptcy Court for the Southern District of New York**
**Ditech Holding Corporation Claims Processing Center**
**c/o Epiq Corporate Restructuring, LLC**
**P.O. Box 4421**
**Beaverton, OR 97076-4421**

**Name of Debtor:** Reverse Mortgage Solutions. Inc.
**Case Number:** 19-10422

**For Court Use Only**

# Proof of Claim (Official Form 410)

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. With the exception of claims under 503(b)(9), do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.
Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.
A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.
Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Name of the current creditor (the person or entity to be paid for this claim): ___Finance of America Reverse LLC___

Other names the creditor used with the debtor: ___Urban Financial of America; Urban Financial Group, Inc.___

**2. Has this claim been acquired from someone else?** ☒ No ☐ Yes. ___From whom?___

**3. Where should notices and payments to the creditor be sent?** Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

Finance of America Reverse LLC
Attn: Karen C. Tankersley, Esq.
909 Lake Carolyn Parkway, Suite 1550
Irving, TX 75039
ktankersley@financeofamerica.com

with a copy to:

Finance of America Reverse LLC
c/o HuntonAndrews Kurth LLP
Attn: Peter S. Partee, Sr. , Esq., Robert A. Rich, Esq., and Michael S. Legge, Esq.
200 Park Avenue
New York, NY 10166
(212) 309-1132
ppartee@huntonak.com
rrich2@huntonak.com
mlegge@huntonak.com

**Where should payments to the creditor be sent?**
(if different)

Name ___

Number   Street ___

City          State          ZIP Code

Country (if International): ___

Contact phone: ___

Contact email: ___

**4. Does this claim amend one already filed?**

☒ No

☐ Yes.  Claim number on court claims register (if known) ___

Filed on ___
                MM  /  DD  /  /YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☒ No

☐ Yes. Who made the earlier filing?

___

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☒ No

☐ Yes

Last 4 digits of the debtor's account or any number you use to identify the debtor:

___

**7. How much is the claim?**

$ _Not less than $54,085,623.66_

**Does this amount include interest or other charges?**

☒ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c). Limit disclosing information that is entitled to privacy, such as health care information.

See Attachment ___

**1186**

| | required by Bankruptcy Rule 3001(c)(2)(A). | |
|---|---|---|

| **9. Is all or part of the claim secured?** | **10. Is this claim based on a lease?** | **11. Is this claim subject to a right of setoff?** |
|---|---|---|
| ☒ No | ☒ No | ☒ No |
| ☐ Yes. The claim is secured by a lien on property. **Nature of property:** | ☐ Yes. **Amount necessary to cure any default as of the date of petition.** | ☐ Yes. Identify the property: |
| ☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim. Attachment* (official Form 410-A) with this *Proof of Claim* | $ _____ | _____ |

☐ Motor vehicle

☐ Other. Describe:

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $
**Amount of the claim that is secured:** $ _____

**Amount of the claim that is unsecured:** $ _____

(The sum of the secured and unsecured amounts should match the amount in line 7.)
**Amount necessary to cure any default as of the date of the petition:** $ _____

**Annual Interest Rate** (when case was filed) %
☐         Fixed ☐ Variable

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

☐ No

☒ Yes. *Check one:*

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).

☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).

☐ Contributions to an employee benefit plan. 11 U.S.C § 507(a)(5).

☒ Other. Specify subsection of 11 U.S.C. § 507 (a)(__) that applies. **§507(a)(2)**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

**Amount entitled to priority**

$ _____

$ _____

$ _____

$ _____

$ _____

$ TBD _____

* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

| **13. Does this claim qualify as an Administrative Expense under 11 U.S.C. § 503(b)(9)?** |
|---|
| ☒ No |
| ☐ Yes. Amount that qualifies as an Administrative Expense under 11 U.S.C. § 503(b)(9): $ _____ |

| **Part 3:** | **Sign Below** |
|---|---|

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☒ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other co-debtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   04/25/2019
                   MM / DD / YYYY

*DocuSigned by:*
*Kathleen Marie Milligan*
4EC05415D808494...
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Kathleen Marie Milligan _____ |
|---|---|
| | First name       Middle name       Last name |
| Title | Chief Servicing Officer _____ |
| Company | Finance of America Reverse LLC _____ |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |

**1187**

| | |
|---|---|
| Address | 909 Lake Carolyn Parkway, Suite 1550 |
| | Number                    Street |
| | Irving, TX 75039 |
| | City                        State              Zip Code |

Contact Phone  972.999.1840                    Email  kmilligan@financeofamerica.com

**1188**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| REVERSE MORTGAGE SOLUTIONS, INC., | ) | Case No. 19-10422 (JLG) |
| | ) | |
| Debtor. | ) | |
| | ) | |

## ATTACHMENT TO PROOF OF CLAIM OF
## FINANCE OF AMERICA REVERSE LLC

Finance of America Reverse LLC f/k/a Urban Financial of America ("FoA") submits this proof of claim (the "Proof of Claim") in the above-captioned bankruptcy case of Reverse Mortgage Solutions, Inc. ("RMS," together with its affiliated debtors, the "Debtors").

### The Parties

1.      FoA is a financial services company with its principal place of business in Tulsa, Oklahoma.

2.      RMS is a financial services company with its principal place of business in Houston, Texas. On February 11, 2019 (the "Petition Date"), RMS and its affiliated Debtors filed voluntary petitions for relief under chapter 11 of Title 11 of the United Stated Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York. Prior to the Petition Date, the Debtors' business consisted of originating, servicing and subservicing mortgage loans and reverse mortgage loans.

## The Subservicing Agreements

3.      FoA and RMS are parties to the following agreements (collectively, the "Subservicing Agreements")[1]:

- Reverse Mortgage Subservicing Agreement, dated as of October 4, 2018, by and between RMS and FoA (the "Oct 4th Agreement");

- Reverse Mortgage Subservicing Agreement, dated as of December 12, 2017, by and between RMS and FoA (the "Dec 12th Agreement"); and

- Reverse Mortgage Subservicing Agreement, dated as of March 18, 2011, by and between RMS and FoA (f/k/a Urban Financial Group, Inc.) (as extended from time to time, including pursuant to that certain Extension Agreement dated January 30, 2019, the "Mar 18th Agreement").

4.      Pursuant to the Subservicing Agreements, RMS subservices certain reverse mortgage loans of which FoA is the owner and/or the named servicer.

5.      Specifically, RMS is obligated to perform, observe and discharge all of the duties, agreements, covenants and obligations of FoA as servicer under the underlying Service Agreements,[2] with the proper care and level of service required to meet applicable Servicing Standards. *See* Subservicing Agreements, § 3.1(a). The functions required to be performed by RMS include without limitation:

- i.   handling Foreclosure and other types of Litigation relating to specific Mortgage Loans (unless FoA elects to handle any such Litigation directly). Subservicing Agreements, §§ 3.1(b)(i), 3.7(d);

---

[1] The Subservicing Agreements contain sensitive business information and will be made available upon reasonable written request to Hunton Andrews Kurth LLP at the address for notices set forth below and subject to appropriate confidentiality protection.

[2] Terms herein with an initial capital not required by standard capitalization rules are defined terms, and each such term not parenthetically defined herein shall have the meaning assigned to it in the applicable Subservicing Agreement.

**1190**

ii.    taking all action necessary under applicable FHA Insurance Contracts[3] to ensure that FoA receives available insurance proceeds from the FHA, HUD and any other entity that insures or guarantees all or part of the risk of loss on a Mortgage Loan (an "Insurer").  Oct 4th and Dec 12th Agreements, §§ 3.6(a)(vii), 3.7(b), Mar 18th Agreement, §§ 3.6(a)(xviii), 3.7(b);

iii.   making all required Advances (including without limitation customary Advances for property preservation and foreclosure expenses) under the Mortgage Documents.  Oct 4th and Dec 12th Agreements, §§ 3.6(a)(xv), 3.8(a), Mar 18th Agreement, §§ 3.6(a)(xiii), 3.8(a);

iv.    minimizing amounts for which FoA may be responsible under the Subservicing Agreements and the Servicing Agreements, including without limitation by maximizing eligible reimbursements for Advances. Subservicing Agreements, § 3.7(b);

v.     assigning Mortgage Loans to HUD when such Mortgage Loans become eligible for assignment.  Oct 4th and Dec 12th Agreements, § 3.11, Mar 18th Agreement, § 3.13;

vi.    disbursing, receiving and properly accounting for payments, debits and credits on Mortgage Loans.  Subservicing Agreements, § 3.6(a)(ii);

vii.   maintaining required fire, flood and hazard insurance on Mortgaged Properties. Oct 4th and Dec 12th Agreements, § 3.6(a)(xii), Mar 18th Agreement, § 3.6(a)(x);

viii.  arranging inspections for Mortgaged Properties in accordance with Applicable Requirements,[4] and using commercially reasonable efforts to secure and maintain vacant or abandoned Mortgaged Properties ("Inspection and Maintenance Obligations").  Oct 4th and Dec 12th Agreement, § 3.6(a)(xiv), Mar 18th Agreement, § 3.6(a)(xii);

ix.    timely remitting all amounts (including without limitation servicing fees) required to be remitted to FoA, investors, and any appropriate parties in accordance with Applicable Requirements.  Subservicing Agreements, § 3.8(f); and

---

[3] "FHA Insurance Contract" means, with respect to any Mortgage Loan, the related insurance policy granted by the Federal Housing Administration (the "FHA) under the National Housing Act, which insures against default risk for the benefit of the applicable lender or investor.

[4] "Applicable Requirements" includes, without limitation, with respect to the Mortgage Loans and servicing, (a) all of FoA's contractual obligations under the Mortgage Documents, (b) all of FoA's contractual requirements under any agreements with an Insurer or Investor (including without limitation the Servicing Agreements, (c) procedures described in HUD's servicing guides and in Fannie Mae selling guides; (d) all applicable laws, (e) all applicable regulations including FHA regulations, (f) prudent mortgage banking standards, and (g) FoA directives.

**1191**

x.  indemnifying FoA for all losses, including without limitation attorneys' fees, resulting from RMS' breach of the representations, warranties, and/or covenants in the Subservicing Agreements, and for RMS' failure to perform any of its duties under the Subservicing Agreements in any material respect. Subservicing Agreements, §§ 3.7, 10.1.

## The Claims

6.      FoA holds claims against RMS for any and all damages arising as a result of RMS' failure to perform and other material breaches of the Subservicing Agreements, known or unknown, that have occurred or may occur, including without limitation damages resulting from: (i) mishandled Litigation; (ii) failure to maximize recoveries on FHA Insurance Contracts, including without limitation by incurring Curtailment Loss (as defined below); (iii) failure to maximize eligible reimbursements for Advances, including without limitation by incurring Ineligible Expenses (defined below); (iv) failure to properly effectuate assignment of eligible Mortgage Loans to HUD; (v) unpaid servicing fees and other amounts due to FoA; (vi) improper accounting; (vii) failure to maintain proper insurance on Mortgaged Properties; (viii) failure to fulfill Inspection and Maintenance Obligations; (ix) claims asserted against FoA resulting from RMS' failure to perform under the Subservicing Agreements and FoA's related legal fees and expenses; (x) RMS' breaches of representations, warranties, and covenants under the Subservicing Agreements; and (xi) fees and other costs associated with the termination of the Subservicing Agreements and transfer of servicing obligations from RMS to FoA or a third-party servicer.  Certain specific categories of FoA's known claims against RMS are further described below.

7.      Curtailment Loss.   Under FHA Insurance Contracts and Applicable Requirements, if a servicer fails to initiate a foreclosure process within the specified period of time following a borrower default, the servicer is subject to interest curtailment, meaning the

servicer will forfeit any claim against the FHA (or other applicable Insurer) for interest that would otherwise accrue after the date of the missed deadline ("Interest Curtailment"). FoA has incurred Interest Curtailment losses as a result of RMS' failure to timely initiate foreclosure proceedings following borrower default on a number of Mortgage Loans.

8. Ineligible Expenses. Certain expenses incurred or accrued by RMS in connection with Mortgage Loans are ineligible for reimbursement due to errors or mistakes by RMS ("Ineligible Expenses"). The Ineligible Expenses consist of servicing-related expenditures (such as foreclosure attorney fees and inspections) incurred by RMS that were recoverable from third-parties, typically the borrower, but for which RMS failed to recover due to RMS' own failure to comply with the applicable Subservicing Agreement or other Applicable Requirement.

9. Assignment Errors. Pursuant to the Subservicing Agreements, in the event that the Principal Balance of a Mortgage Loan reaches a certain threshold, and the Mortgage Loan is not due and payable, RMS "shall assign such Mortgage Loan to HUD." Mar 18th Agreement § 3.13; Oct 4th and Dec 12th Agreements § 3.11. RMS' failure to properly comply with these assignment provisions (an "Assignment Error") has led to loan losses, an inability to maximize FoA's entitlement to recovery under FHA insurance, and an increase in FoA's balance sheet risk and carrying costs.

10. Litigation Errors. RMS is responsible for handling Foreclosure and other types of Litigation relating to specific Mortgage Loans unless FoA elects otherwise. Subservicing Agreements, § 3.7(d). RMS must promptly notify FoA of any third party claims relating to a Mortgage Loan so that FoA may manage its overall litigation risk. *Id*., § 10.1. RMS has (i) negligently managed certain Litigation relating to the Mortgage Loans and (ii) failed to properly

notify FoA of the existence of certain Litigation, which at times has resulted in judgments against FoA (collectively, "Litigation Errors")

11.    The foregoing descriptions are illustrative and not exhaustive.

## Quantification of Known Claims

12.    FoA hereby asserts a claim against RMS in the amount of $54,085,623.66 (the "Claim Amount"), plus other amounts to be determined after appropriate discovery and investigation, as a result of RMS's failure to perform and other material breaches of the Subservicing Agreements.  Annexed hereto as **Exhibit 1** is a spreadsheet which sets forth the calculation of the Claim Amount (the "Claim Summary").  The categories set forth in the Clam Summary are further described below.

13.    Category 1: Make Whole Requests - $1,359,699.18 (238 Mortgage Loans).  In the ordinary course of business, FoA provided RMS, approximately twice per month, with make whole requests ("MWRs") for losses realized by FoA on liquidated Mortgage Loans.  Amounts identified on MWRs reflect losses resulting from RMS' failure to perform under the Subservicing Agreements, including without limitation on account of Interest Curtailment, Ineligible Expenses, Assignment Errors and Litigation Errors.  FoA has provided RMS with MWRs for $1,359,699.18 in losses relating to 238 Mortgage Loans.  The reason for the reimbursement request with respect to each individual Mortgage Loan is set forth in the applicable MWRs, which upon information and belief are in the Debtor's possession and also are available upon reasonable written request to Hunton Andrews Kurth LLP at the address for notices set forth below and subject to appropriate confidentiality protection.  The MWRs have not been paid as of the hereof.

14. <u>Category 2: ARGO - $5,093,401.16 (266 Mortgage Loans)</u>. RMS periodically has provided FoA with a report (the "<u>ARGO</u>") identifying Mortgage Loans on which FoA has incurred Interest Curtailment losses as a result of RMS' failure to timely commence enforcement actions. The most recent ARGO received by FoA from RMS lists Interest Curtailment as of September 30, 2018.[5] FoA has calculated Interest Curtailment losses through April 1, 2019 in the amount of $5,093,401.16 in connection with 266 Mortgage Loans listed in the ARGO that remain unliquidated (and, therefore, are not captured in the MWRs described above). Interest Curtailment on these Mortgage Loans is continuing and will continue until the Mortgage Loans are liquidated, and FoA asserts a claim for all accruing Interest Curtailment.

15. <u>Category 3: Active Buyout (ABO) - $6,619,304.54 (1,079 Mortgage Loans)</u>. FoA has invoiced RMS for $6,619,304.54 in losses incurred as a result of RMS' Assignment Errors with respect to 1,079 liquidated Mortgage Loans. These Mortgage Loans have been assigned to HUD, but were not assigned timely by RMS. FoA would not have incurred these losses had RMS timely assigned the Mortgage Loans as required under the Subservicing Agreements.

16. <u>Category 4: Other Claims on Liquidated Mortgage Loans - $3,487,965.20 (609 Mortgage Loans)</u>. This category includes FoA's losses of $3,487,965.20 on 609 liquidated Mortgage Loans not already included in the categories above. This category includes several subcategories as indicated on the Claim Summary. The first subcategory involves defaulted Mortgage Loans for which FoA (itself or through RMS) acquired the underlying property ("<u>REO</u>"), but which REO has not yet been sold to a third party. For this subcategory, FoA calculates its loss based on the appraisal value of the REO, and attributes to RMS losses above historical averages. The second subcategory involves REO which already has been sold. For

---

[5] FoA intends to submit a Bankruptcy Rule 2004 request for the most recently updated ARGO to the extent not provided by RMS.

**1195**

this subcategory, FoA has calculates its loss after accounting for sale proceeds, and attributes to RMS losses above historical averages. The third subcategory involves Mortgage Loans that have been assigned to HUD and are not in default. All losses incurred by FoA in connection with the Mortgage Loans in this subcategory are attributed to RMS. The foregoing subcategories are further broken down into "Pre" (i.e. incurred prior to the Petition Date) and "Post" (i.e. incurred on or after Petition Date) line items.

17. <u>Category 5: Assignment Errors /Approved Assignments - $2,954,777.07 (421 Mortgage Loans)</u>. This category includes losses of $2,954,777.07 attributable to RMS' Assignment Error in connection with 421 Mortgage Loans not already included in the above categories. RMS failed to timely assign these Mortgage Loans to HUD once they became eligible for assignment. The applicable borrowers have since defaulted on the Mortgage Loans. FoA's loss is calculated as of the time FoA approved assignment of the Mortgage Loans to HUD.

18. <u>Category 6: Assignment Errors /Declined Assignments - $7,979,005.04 (589 Mortgage Loans)</u>. This category includes losses of $7,979,005.04 attributable to RMS' Assignment Error in connection with 589 Mortgage Loans not already included in the above categories. RMS failed to timely assign these Mortgage Loans to HUD once they became eligible for assignment. The applicable borrowers have since defaulted on the Mortgage Loans. In an attempt to mitigate damages caused by RMS' Assignment Error, FoA subsequently determined not to assign these Mortgage Loans to HUD, opting instead to keep the Mortgage Loans rather than realize the loss caused by the Assignment Error. FoA's loss is calculated as of the time FoA made the determination not to assign the applicable Mortgage Loan to HUD.

**1196**

19.     Category 7: Assignment Errors /No Decision – $182,265.00 (12 Mortgage Loans). This category includes losses of $182,265.00 attributable to RMS' Assignment Error in connection with 12 Mortgage Loans not already included in the above categories. RMS failed to timely assign these Mortgage Loans to HUD once they became eligible for assignment. The applicable borrowers have since defaulted on the Mortgage Loans. FoA has not yet made a determination as to whether to assign these Mortgage Loans following the Assignment Error. The loss is calculated as of March 2019.

20.     Category 8: Puerto Rico REO – $423,820.29 (46 Mortgage Loans). This category involves REO located in Puerto Rico and includes losses of $423,820.29 in connection with 46 Mortgage Loans not already included in the above categories. The loss calculation for this category is similar to Category 4, except that the REO is located in Puerto Rico. FoA calculates its loss based on the appraisal value (for REO not yet sold) or sale proceeds (for REO sold) and attributes to RMS losses above the historical average with respect to Mortgage Loans for properties located in Puerto Rico.

21.     Category 9: Puerto Rico Property Preservation Claims - $8,326,835.83 (51 Mortgage Loans). This category includes losses of $8,326,835.83 in connection with 51 Mortgage Loans not included in the above categories, and for which the Mortgaged Properties are located in Puerto Rico. RMS' failure to fulfill its Inspection and Maintenance Obligations with respect to Mortgaged Properties located in Puerto Rico has been particularly egregious. The Mortgaged Properties securing the Mortgage Loans in this category have been abandoned or otherwise left vacant for months or even years, and yet RMS has failed to properly inspect, maintain or otherwise preserve the value of these properties. In the instances where RMS has arranged any maintenance or inspection, a substantial portion of the related expenses have been

determined to be Ineligible Expenses. FoA calculates its loss as the amount of the unpaid principal balance with respect to the Mortgage Loans in this category.

22. <u>Category 10: Litigation Errors</u> - $17,658,550. This category includes losses of $17,658,550 in connection with known RMS Litigation Errors. As set forth above, RMS is required to promptly notify FoA of Litigation issues, and RMS is responsible for handling Foreclosure and other types of Litigation relating to specific Mortgage Loans unless FoA elects otherwise.

23. RMS has failed to notify FoA of numerous Litigation issues. For example, in the case of *Finance of America v. Hopken*, which RMS litigated in the name of FoA, RMS allowed the case to proceed to a jury prior to providing any notice to FoA. The result was a jury verdict awarding damages against FoA, including exemplary damages in the amount of $200,000. *See Finance of America Reverse LLC v Hopken*, Case No. DC1616418, 2019 WL 259771 (Tex. Dist. Jan. 04, 2019). The *Hopken* case now is being handled by FoA and is under appeal.

24. RMS also has mishandled ongoing Litigation. For example, in certain instances RMS has failed to appear at court hearings and/or allowed default judgments to be entered in ongoing Litigation. In a number of Foreclosure actions, borrowers or other parties have asserted counterclaims and other claims relating to alleged servicing errors or other actions taken by RMS. FoA has incurred substantial legal and other expenses in connection with Litigation mishandled by RMS, which expenses are expressly made part of this Proof of Claim.

25. Certain of the known cases in which Litigation Errors have occurred are identified on the schedule annexed hereto as **<u>Exhibit 2</u>**. FoA's total loss attributable to Litigation Errors currently is unknown, but has been estimated as the unpaid principal balance of the Mortgage Loans that relate to the mishandled Litigation. In many instances, losses may exceed the unpaid

principal balance of the respective Mortgage Loans. FoA reserves the right to assert such claims as and when they become known.

26. The foregoing categories are not exhaustive. Losses resulting from RMS' failure to perform and other material breaches of the Subservicing Agreements are continuing, and therefore the full amount of FoA's claims against RMS likely will exceed the amounts set forth above and in the Claim Summary.

## Supporting Documents

27. The documents upon which the claims are based are voluminous and, upon information and belief, are in the Debtors' possession. Additional supporting documentation will be provided to the Debtors or their representatives and to other appropriate parties-in-interest upon reasonable written request to Hunton Andrews Kurth LLP at the address for notices set forth below and subject to appropriate confidentiality protection.

## No Judgment

28. No judgment has been rendered on the claims set forth in this Proof of Claim.

## No Setoff

29. The claims set forth in this Proof of Claim are not subject to any valid setoff or counterclaim by the Debtors; *provided however* that FoA expressly reserves and does not waive any setoff or recoupment rights that it possesses.

## Administrative Expense Claims

30. This Proof of Claim is without prejudice to claims, if any, that FoA has or may have for payment of any administrative expense allowable under section 503(b) of the Bankruptcy Code or otherwise with respect to any transaction, whether or not such amounts are

included in this Proof of Claim, and FoA expressly reserves its rights to file such claim or any similar claim at an appropriate time.

## Additional Proofs of Claim

31.     This Proof of Claim is filed without prejudice to the filing by FoA of additional proofs of claim with respect to any other liability or indebtedness of the Debtors.   FoA specifically preserves all of its procedural and substantive defenses and rights with respect to any claim that may be asserted against FoA by the Debtors or any other party in interest in the Debtors' bankruptcy cases, or any other person or entity whatsoever.

## Notices

32. All notices and distributions in respect of this Proof of Claim should be forwarded to:

> Karen C. Tankersley, Esq.
> Finance of America Holdings LLC
> 909 Lake Carolyn Parkway, Suite 1550
> Irving, Texas 75039
> ktankersley@financeofamerica.com

With a copy to:

> Peter S. Partee, Sr., Esq.
> Robert A. Rich, Esq.
> Michael S. Legge, Esq.
> **HUNTON ANDREWS KURTH LLP**
> 200 Park Avenue
> New York, New York 10166
> ppartee@huntonak.com
> rrich2@huntonak.com
> mlegge@huntonak.com

## No Waiver

33.     The filing of this Proof of Claim is not and should not be construed to be: (i) a waiver or release of FoA's rights against any other entity or person liable for all or part of any

**1200**

claim described herein; (ii) a waiver of the right to seek to have the reference withdrawn with respect to (a) the subject matter of these claims, (b) any objection or other proceedings commenced with respect thereto, or (c) any other proceedings commenced in this case against or otherwise involving FoA; (iii) a waiver of any right to the subordination, in favor of FoA, of indebtedness or liens held by other creditors of the Debtors; or (iv) an election of remedy which waives or otherwise affects any other remedy of FoA.

### Reservation of Rights

34.     This Proof of Claim is filed with full reservation of rights, including the right to assert additional, supplementary and/or amended proofs of claim and requests for administrative expense reimbursements based on events, information and/or documents obtained from the Debtors or others through discovery or otherwise.  Without in any way limiting the foregoing, FoA reserves its right to assert any claim it may have against the Debtors, or against any other party or property other than the Debtors and their estates.  This Proof of Claim is conditional only and is not intended, nor should it be construed, as FoA's consent to jurisdiction in the Southern District of New York, or as a waiver of FoA's right to a trial by jury in any action or proceeding.

**1201**

**Exhibit 1**
**Claim Summary**

**Exhibit 2**

| Case Name[1] |
|---|
| Finance of America Reverse, LLC v. Celia A. Hopken |
| Finance of America Reverse, LLC v. Noreen Horn, as Personal Representative of the Estate of Samuel Horn, et al. |
| Eva Enriquez vs. FAR, et al. |
| City of Chicago vs. FAR (2703 Wilcox St.) |
| City of Chicago vs. FAR - 12253 S. LaSalle St., Chicago, IL 60628 |
| Mary Ann Sievers vs. Reverse Mortgage Solutions, Inc. |
| City of New Orleans vs. Andrea T. Lucas |
| Minnie Smith vs. Reverse Mortgage Solutions Inc. |
| Wilma McKinnon vs. Finance of America Reverse LLC; Reverse Mortgage Solutions |
| Harmony Township, Inc. vs. Carrie Lennon-Johnson, et al. |
| Elie Nassar vs. Reverse Mortgage Solutions, Finance of America Reverse, First National Bank |
| Urban Financial of America LLC v. Josephine Ross |
| Urban Financial REO, LLC vs Betty Atwood, et al. |
| City of Chicago v. Finance of America Reverse (2703 W. Wilcox St.) |
| Fareverse LLC I/L/T/N Finance of America Reverse LLC vs. Theodora Green, et al. |
| The Estate of Juan Rodriguez-Mojica and Josefina Morales-Asencio; Sujey Iris Rodriguez Rodriguez; Sulay Josephine Rodriguez Rodriguez; Luis Manuel Rodriguez Morales; Carmen E Rodriguez Figueroa vs. Urban Financial of America, LLC dba the Money House, Inc., Reverse Mortgage Solutions, Inc. and John Doe, Inc,, Insurers Richard Roe, Inc., Insurers |
| Finance of America Reverse LLC v. Robert L Taylor, Secretary of Housing and Urban Development, NYC Parking Violations Bureau, NYC Environmental Control Board and John Doe |
| Reverse Mortgage Solutions, Inc. and Finance of America Reverse f/k/a Urban Financial v. Country Insurance and Financial Services |
| Shirley Lolim and Samuel Q Lolim and Angela Lolim, husband and wife vs. Emma Diaz, Josue Gamayo, POD 2 at Monarch Lakes Property Owners Association, Inc., Monarch Lakes Property Owners Association, Inc., Mortgage Electronic Registration Systems, Inc., Advisors Mortgage Group, LLC and United States of America Secretary of Housing and Urban Development |

---

[1] This list is not exhaustive. FoA reserves the all rights to supplement this list of cases identified in this Exhibit 2.

| Case Name[1] |
|---|
| ESTATE OF DONALD KEITH THUM, Deceased v. REVERSE MORTGAGE SOLUTIONS, INC. |
| Bradley Johnson and The Estate of Sarah L Johnson vs. Finance of America Reverse, LLC |
| Urban Financial of America, LLC v. The Estate of Frances S Anggelis and Virginia Anggelis |
| FAREVERSE LLC I/L/T/N/ FINANCE OFAMERICAREVERCE LLC vs. ESTATE OF BERNICE R. WATSON,DECEASED, UNITED STATES OF AMERICA INTERNAL REVENUE SERVICE, NEW YORK STATE DEPARTMENT OF TAXATION AND FINANCE, SECRETARY OF HOUSING AND URBAN DEVELOPMENT |
| Estate of Robert Wegner; Estate of Merilyn Wegner |
| Service Master Clean Professional Restoration and Recovery Services vs. William Oertel as Executor of the Estate of Thomas Oertel and Reverse Mortgage Solutions, Inc. |
| Finance of America Reverse LLC vs. Nella pardo et al. |
| Finance of America reverse llc. Vs. Mary Louise Carlson |
| Urban Financial Group, Inc. vs. Vivian Sincoff - Nassau County 13-012787 |
| Urban financial Group, Inc. vs. Gisela Schmidt aka Gisela D. Schmidt |
| Finance of America Reverse, LLC v. Vazquez et al |
| Urban Financial of America, LLC v. De Jesus-Gines et al |

**United States Bankruptcy Court for New York-Southern District**
**Ditech Holding Corporation, Claims Processing Center**
**c/o Epiq Bankruptcy Solutions, LLC**
**P.O. Box 4421**
**Beaverton, OR 97076-4421**

| | |
|---|---|
| **Name of Debtor:** | Reverse Mortgage Solutions, Inc. |
| **Case Number:** | 19-10422 |

**For Court Use Only**

Claim Number: 0000060182

File Date: 11/11/2019 15:37:24

# ADMINISTRATIVE EXPENSE CLAIM

**04/16**

This form is for making an Administrative Expense claim for payment in a bankruptcy case.

**NOTE:  This form should be used only by claimants asserting an Administrative Expense arising on or after March 19, 2018 through and including December 31, 2018.  IT SHOULD NOT BE USED FOR CLAIMS ARISING PRIOR TO March 19, 2018, INCLUDING CLAIMS ARISING UNDER SECTION 503(b)(9) OF THE BANKRUPTCY CODE.  Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.  18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.  That date is on the notice of bankruptcy** (Form 309) **that you received.**

---

| **Part 1:** | **Identify the Claim** |
|---|---|

**1.   Who is the current creditor?**
Name of the current creditor (the person or entity to be paid for this claim):  Finance of America Reverse LLC

Other names the creditor used with the debtor:  Urban Financial

**2.   Has this claim been acquired from someone else?**   ☒ No  ☐ Yes.   From whom? _____

**3.   Where should notices and payments to the creditor be sent?** Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| Name     Finance of America Reverse LLC | Name     _____ |
| Address  Attn:  Karen C. Tankersley, Esq. | Address  _____ |
|          909 Lake Carolyn Parkway, Suite 1550 |          _____ |
| City     Irving | City     _____ |
| State    TX          ZIP Code  75039 | State    _____  ZIP Code  _____ |
| Country (if International):  _____ | Country (if International):  _____ |
| Phone:   972 999 1840 | Phone:   _____ |
| Email:   ktankersley@financeofamerica.com | Email:   _____ |

| **4. Does this claim amend one already filed?** | **5. Do you know if anyone else has filed a proof of claim for this claim?** |
|---|---|
| ☑ No | ☒ No |
| ☐ Yes. | ☐ Yes. |
|     Claim number on court claims register (if known) _____ |     Who made the earlier filing? |
|     Filed on _____ <br>             MM / DD / YYYY | _____ |

**1206**

**Part 2:**     **Give Information About the Claim**

**6. Do you have any number you use to identify the debtor?**

☒ No

☐ Yes.
Last 4 digits of the debtor's account or any number you use to identify the debtor:

\_\_\_\_ \_\_\_\_ \_\_\_\_ \_\_\_

**7. How much is the ADMINISTRATIVE EXPENSE CLAIM:**

$ 375,832.07

**Does this amount include interest or other charges?**

☒ No

☐ Yes.  Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Other Basis

see attachment

**Part 3**     **Sign Below**

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☒ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent.  Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other co-debtor.  Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    11/11/2019 15:37:24     *Kathleen Marie Milligan*

               MM / DD / YYYY       Signature

**Print the name of the person who is completing and signing this claim:**

Name     Kathleen Marie Milligan

        First name            Middle name            Last name

Title     Chief Servicing Officer

Company     Finance of America Reverse LLC

         Identify the corporate servicer as the company if the authorized agent is a servicer.

Address     909 Lake Carolyn Parkway, Suite 1550

         Number           Street

         Irving                 TX        75039

         City                 State        Zip Code

Contact Phone    972 999 1840        Email   kmilligan@financeofamerica.com

**1207**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| REVERSE MORTGAGE SOLUTIONS, INC., | ) | Case No. 19-10422 (JLG) |
| | ) | |
| Debtor. | ) | |
| | ) | |

## ATTACHMENT TO ADMINISTRATIVE EXPENSE
## CLAIM OF FINANCE OF AMERICA REVERSE LLC

Finance of America Reverse LLC f/k/a Urban Financial of America ("FoA") submits this administrative expense claim (this "Administrative Proof of Claim") in the above-captioned bankruptcy case of Reverse Mortgage Solutions, Inc. ("RMS"; together with its affiliated debtors, collectively, the "Debtors") in accordance with section 2.1 of the *Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors,* dated September 22, 2019 (the "Plan") [Docket No. 1326], section 22 of the *Order Confirming Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors* (the "Confirmation Order") [Docket No. 1404], and the *Notice of (I) Entry of Order Confirming Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors, (II) Occurrence of Effective Date, and (III) Final Deadline for Filing Administrative Expense Claims* [Docket No. 1449].

## The Parties

1.      FoA is a financial services company with its principal place of business in Tulsa, Oklahoma.

2.      RMS is a financial services company with its principal place of business in Houston, Texas.  On February 11, 2019 (the "Petition Date"), RMS and its affiliated Debtors filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code (the

**1208**

"Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York. Prior to the Petition Date, the Debtors' business consisted of originating, servicing and subservicing mortgage loans and reverse mortgage loans.

## **The Subservicing Agreements**

3.     FoA and RMS are parties to the following agreements (collectively, the "Subservicing Agreements")[1]:

- Reverse Mortgage Subservicing Agreement, dated as of October 4, 2018, by and between RMS and FoA (the "Oct 4th Agreement");

- Reverse Mortgage Subservicing Agreement, dated as of December 12, 2017, by and between RMS and FoA (the "Dec 12th Agreement"); and

- Reverse Mortgage Subservicing Agreement, dated as of March 18, 2011, by and between RMS and FoA (f/k/a Urban Financial Group, Inc.) (as extended from time to time, including pursuant to that certain Extension Agreement dated January 30, 2019, the "Mar 18th Agreement").

4.     Pursuant to the Subservicing Agreements, RMS subservices certain reverse mortgage loans of which FoA is the owner and/or the named servicer.

5.     Specifically, under the Subservicing Agreements, RMS is obligated to perform, observe and discharge all of the duties, agreements, covenants and obligations of FoA as servicer under the underlying Servicing Agreements,[2] with the proper care and level of service required to meet applicable Servicing Standards.  *See* Subservicing Agreements, § 3.1(a).  The functions required to be performed by RMS include without limitation:

- i.    handling Foreclosure and other types of Litigation relating to specific Mortgage Loans (unless FoA elects to handle any such Litigation directly). Subservicing Agreements, §§ 3.1(b)(i), 3.7(d);

---

[1] The Subservicing Agreements contain sensitive business information, are likely to be in possession of RMS and will be made available upon reasonable written request to Hunton Andrews Kurth LLP at the address for notices set forth below and subject to appropriate confidentiality protection.

[2] Terms herein with an initial capital not required by standard capitalization rules are defined terms, and each such term not parenthetically defined herein shall have the meaning assigned to it in the applicable Subservicing Agreement.

**1209**

ii. taking all action necessary under applicable FHA Insurance Contracts[3] to ensure that FoA receives available insurance proceeds from the FHA, HUD and any other entity that insures or guarantees all or part of the risk of loss on a Mortgage Loan (an "Insurer"). Oct 4th and Dec 12th Agreements, §§ 3.6(a)(vii), 3.7(b), Mar 18th Agreement, §§ 3.6(a)(xviii), 3.7(b);

iii. making all required Advances (including without limitation customary Advances for property preservation and foreclosure expenses) under the Mortgage Documents. Oct 4th and Dec 12th Agreements, §§ 3.6(a)(xv), 3.8(a), Mar 18th Agreement, §§ 3.6(a)(xiii), 3.8(a);

iv. minimizing amounts for which FoA may be responsible under the Subservicing Agreements and the Servicing Agreements, including without limitation by maximizing eligible reimbursements for Advances. Subservicing Agreements, § 3.7(b);

v. assigning Mortgage Loans to HUD when such Mortgage Loans become eligible for assignment. Oct 4th and Dec 12th Agreements, § 3.11, Mar 18th Agreement, § 3.13;

vi. disbursing, receiving and properly accounting for payments, debits and credits on Mortgage Loans. Subservicing Agreements, § 3.6(a)(ii);

vii. maintaining required fire, flood and hazard insurance on Mortgaged Properties. Oct 4th and Dec 12th Agreements, § 3.6(a)(xii), Mar 18th Agreement, § 3.6(a)(x);

viii. arranging inspections for Mortgaged Properties in accordance with Applicable Requirements,[4] and using commercially reasonable efforts to secure and maintain vacant or abandoned Mortgaged Properties ("Inspection and Maintenance Obligations"). Oct 4th and Dec 12th Agreement, § 3.6(a)(xiv), Mar 18th Agreement, § 3.6(a)(xii);

ix. timely remitting all amounts (including without limitation servicing fees) required to be remitted to FoA, investors, and any appropriate parties in accordance with Applicable Requirements. Subservicing Agreements, § 3.8(f); and

x. indemnifying FoA for all losses, including without limitation attorneys' fees, resulting from RMS' breach of the representations, warranties, and/or covenants in

---

[3] "FHA Insurance Contract" means, with respect to any Mortgage Loan, the related insurance policy granted by the Federal Housing Administration (the "FHA") under the National Housing Act, which insures against default risk for the benefit of the applicable lender or investor.

[4] "Applicable Requirements" includes, without limitation, with respect to the Mortgage Loans and servicing, (a) all of FoA's contractual obligations under the Mortgage Documents, (b) all of FoA's contractual requirements under any agreements with an Insurer or Investor (including without limitation the Servicing Agreements, (c) procedures described in HUD's servicing guides and in Fannie Mae selling guides, (d) all applicable laws, (e) all applicable regulations including FHA regulations, (f) prudent mortgage banking standards, and (g) FoA directives.

the Subservicing Agreements, and for RMS' failure to perform any of its duties under the Subservicing Agreements in any material respect. Subservicing Agreements, §§ 3.7, 10.1.

## The Claims

### A. Pre-petition Claims

6.      On April 25, 2019, FoA filed  proof of claim number 21347 (the "Proof of Claim"), for amounts arising from RMS's pre-petition failure to perform under the Subservicing Agreements and for other pre-petition material breaches of the Subservicing Agreements.

### B. Post-petition Claims

7.      As quantified below, FoA holds administrative claims against RMS for amounts arising from RMS's post-petition failure to perform and other post-petition material breaches of the Subservicing Agreements, known or unknown, that have occurred or may occur, including without limitation damages resulting from: (i) mishandled Litigation; (ii) failure to maximize recoveries on FHA Insurance Contracts, including without limitation by incurring Curtailment Loss (defined below); (iii) failure to maximize eligible reimbursements for Advances, including without limitation by incurring Ineligible Expenses (defined below); (iv) failure to properly effectuate assignment of eligible Mortgage Loans to HUD; (v) unpaid servicing fees and other amounts due to FoA; (vi) improper accounting; (vii) failure to maintain proper insurance on Mortgaged Properties; (viii) failure to fulfill Inspection and Maintenance Obligations; (ix) claims asserted against FoA resulting from RMS' failure to perform under the Subservicing Agreements and FoA's related legal fees and expenses; (x) RMS' breaches of representations, warranties and covenants under the Subservicing Agreements; and (xi) fees and other costs associated with the termination of the Subservicing Agreements and transfer of servicing obligations from RMS to FoA or a third-party servicer.

8.     RMS entered into the Subservicing Agreements in furtherance of its core business operations before the Petition Date, and continued to obtain subservicing fees and perform under the Subservicing Agreements following the Petition Date until the Subservicing Agreements were deemed rejected on the Effective Date of the Plan on September 30, 2019.  *See Supplemental Notice of Assumption of Executory Contracts and Unexpired Leases of Debtors and Removal of Executory Contracts and Unexpired Leases from Transferred Contracts Schedule (Reorganized RMS)* [Docket No. 1101].  RMS has performed, received payments and has otherwise relied upon the Subservicing Agreements in the ordinary course of its business following the Petition Date.  Consequently, by this Administrative Proof of Claim, FoA asserts an administrative expense claim for amounts owed to FoA stemming from RMS' post-petition performance under the Subservicing Agreements, which provided a substantial benefit to RMS's estate.

### Quantification of Known Administrative Expense Claims

9.     FoA hereby asserts a claim against RMS in the aggregate amount of $375,832.07, plus other amounts to be determined after appropriate discovery and investigation (the "Administrative Claim Amount"), as a result of RMS's post-petition failure to perform and other post-petition material breaches of the Subservicing Agreements.  The quantified portion of the Administrative Claim Amount is comprised as follows:

| Category of Claim | Post-petition Claim Amount |
|---|---|
| Assignment Error | $97,157.07 |
| Interest Curtailment | $174,554.00 |
| Litigation Errors | $104,121.00 |
| **Total:** | **$375,832.07** |

The categories of claims set forth above are further described below.

10.     Category 1: Assignment Error - $97,157.07 (255 Mortgage Loans).  Pursuant to the Subservicing Agreements, in the event that the Principal Balance of a Mortgage Loan reaches a

5

certain threshold, and the Mortgage Loan is not due and payable, RMS "shall assign such Mortgage Loan to HUD." Mar 18th Agreement § 3.13; Oct 4th and Dec 12th Agreements § 3.11. RMS' failure to properly comply with these assignment provisions (an "<u>Assignment Error</u>") has led to loan losses, an inability to maximize FoA's entitlement to recovery under FHA insurance, and an increase in FoA's balance sheet risk and carrying costs.

11.     This category includes known losses of $97,157.07 attributable to RMS' Assignment Error in connection with 255 Mortgage Loans, which are detailed in the chart below:

| Assignment Error | Number of Loans | Write-Off Amount |
|---|---|---|
| Failure to timely assign Mortgage Loan by March 1, 2019 | 85 | $46,644.54 |
| Failure to timely assign Mortgage Loan by April 1, 2019 | 65 | $18,462.39 |
| Failure to timely assign Mortgage Loan by May 1, 2019 | 50 | $15,823.73 |
| Failure to timely assign Mortgage Loan by June 1, 2019 | 23 | $7,615.90 |
| Failure to timely assign Mortgage Loan by July 1, 2019 | 21 | $5,503.94 |
| Failure to timely assign Mortgage Loan by August 1, 2019 | 7 | $1,987.60 |
| Failure to timely assign Mortgage Loan by September 1, 2019 | 4 | $1,118.97 |
| **Totals:** | **255** | **$97,157.07** |

12.     <u>Category 2: Interest Curtailment - $174,554.00 (4 Mortgage Loans)</u>.  Under FHA Insurance Contracts and Applicable Requirements, if a servicer fails to initiate a foreclosure process within the specified period of time following a borrower default, the servicer is subject to interest curtailment, meaning the servicer will forfeit any claim against the FHA (or other applicable Insurer) for interest that would otherwise accrue after the date of the missed deadline ("<u>Interest Curtailment</u>").  This category includes $174,554.00 in estimated Interest Curtailment as a result of RMS' failure to timely commence enforcement actions in connection with 4 Mortgage Loans.

1213

13.     Category 3: Litigation Errors - $104,121.00 (1 Mortgage Loan).   RMS is responsible for handling Foreclosure and other types of Litigation relating to specific Mortgage Loans unless FoA elects otherwise.  Subservicing Agreements, § 3.7(d).  RMS must promptly notify FoA of any third party claims relating to a Mortgage Loan so that FoA may manage its overall litigation risk.  *Id.*, § 10.1.  RMS has (i) negligently managed certain Litigation relating to the Mortgage Loans and (ii) failed to properly notify FoA of the existence of certain Litigation, which at times has resulted in judgments against FoA (collectively, "Litigation Errors").

14.     This category includes losses of $104,121.00 for known RMS Litigation Errors in connection with an action entitled *Wilmington Savings Fund Society FSB, as Trustee of Finance of America Structured Securities Acquisition Trust, 2018-HB1 v. Nelida Castillo Cruz aka Nilda Castillo,* Case No. FA2018-cv-01073.

15.     The foregoing categories are not exhaustive.  Losses resulting from RMS' post-petition failure to perform and other material breaches of the Subservicing Agreements are continuing, and therefore the full amount of FoA's claims against RMS likely will exceed the amounts set forth above.

## Supporting Documents

16.     The documents upon which the claims are based are voluminous and, upon information and belief, are in the Debtors' possession.  Additional supporting documentation will be provided to the Debtors or their representatives and to other appropriate parties-in-interest upon reasonable written request to Hunton Andrews Kurth LLP at the address for notices set forth below and subject to appropriate confidentiality protection.

1214

## No Judgment

17.    No judgment has been rendered on the claims set forth in this Administrative Proof of Claim.

## No Setoff

18.     The claims set forth in this Administrative Proof of Claim are not subject to any valid setoff or counterclaim by the Debtors; *provided however* that FoA expressly reserves and does not waive any setoff or recoupment rights that it possesses.

## Additional Proofs of Claim

19.    This Administrative Proof of Claim is filed without prejudice to the filing by FoA of additional proofs of claim with respect to any other liability or indebtedness of the Debtors, including payment of any rejection damages claims arising under section 365(g) of the Bankruptcy Code or otherwise with respect to any transaction, whether or not such amounts are included in this Administrative Proof of Claim, and FoA expressly reserves its rights to file, augment or supplement any such claim or any similar claim at an appropriate time.  FoA specifically preserves all of its procedural and substantive defenses and rights with respect to any claim that may be asserted against FoA by the Debtors or any other party in interest in the Debtors' bankruptcy cases, or any other person or entity whatsoever.

## Notices

20.    All notices and distributions in respect of this Administrative Proof of Claim should be forwarded to:

> Karen C. Tankersley, Esq.
> Finance of America Holdings LLC
> 909 Lake Carolyn Parkway, Suite 1550
> Irving, Texas 75039
> ktankersley@financeofamerica.com

With a copy to:

Peter S. Partee, Sr., Esq.
Robert A. Rich, Esq.
Michael S. Legge, Esq.
**HUNTON ANDREWS KURTH LLP**
200 Park Avenue
New York, New York 10166
ppartee@huntonak.com
rrich2@huntonak.com
mlegge@huntonak.com

## **No Waiver**

21.     The filing of this Administrative Proof of Claim is not and should not be construed to be: (i) a waiver or release of FoA's rights against any other entity or person liable for all or part of any claim described herein; (ii) a waiver of the right to seek to have the reference withdrawn with respect to (a) the subject matter of these claims, (b) any objection or other proceedings commenced with respect thereto, or (c) any other proceedings commenced in this case against or otherwise involving FoA; (iii) a waiver of any right to the subordination, in favor of FoA, of indebtedness or liens held by other creditors of the Debtors; or (iv) an election of remedy which waives or otherwise affects any other remedy of FoA.

## **Reservation of Rights**

22.     This Administrative Proof of Claim is filed with full reservation of rights, including the right to assert additional, supplementary and/or amended proofs of claim and requests for administrative expense reimbursements and rejection damages based on events, information and/or documents obtained from the Debtors or others through discovery or otherwise.  Without in any way limiting the foregoing, FoA reserves its right to assert any claim it may have against the Debtors or against any other party or property other than the Debtors and their estates.  This Administrative Proof of Claim is conditional only and is not intended, nor should it be construed, as FoA's consent to

1216

jurisdiction in the Southern District of New York, or as a waiver of FoA's right to a trial by jury in any action or proceeding.

084181.0000047 EMF_US 77372074v5

Hearing Date:  September 13, 2018, at 10:00 a.m. (prevailing Eastern Time)
Objection Deadline:  September 6, 2018, at 4:00 p.m. (prevailing Eastern Time)

Paul V. Shalhoub
Robin Spigel
Debra C. McElligott
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111

*Proposed Counsel for the Debtors and*
*Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Aralez Pharmaceuticals US Inc., <u>et al.</u>,[1] | : | Case No. 18-12425 (MG) |
| | : | |
| Debtors. | : | (Jointly Administered) |

-------------------------------------------------x

## DEBTORS' OMNIBUS MOTION #1 FOR ORDER:  (A) AUTHORIZING REJECTION OF CERTAIN EXECUTORY CONTRACTS *NUNC PRO TUNC* TO THE PETITION DATE; (B) AUTHORIZING REJECTION OF CERTAIN UNEXPIRED LEASES <u>EFFECTIVE AS OF AUGUST 31, 2018; AND (C) GRANTING RELATED RELIEF</u>

**PARTIES RECEIVING THIS OMNIBUS REJECTION MOTION SHOULD CONSULT <u>SCHEDULES 1</u> AND <u>2</u> ANNEXED TO THE PROPOSED ORDER ATTACHED AS EXHIBIT A TO THE MOTION TO DETERMINE WHETHER THEIR NAMES AND THEIR CONTRACTS OR LEASES ARE LISTED ON EITHER <u>SCHEDULE 1</u> OR <u>SCHEDULE 2</u>.**

---

[1]    The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal taxpayer identification number are as follows:  Aralez Pharmaceuticals Holdings Limited (5824); Aralez Pharmaceuticals Management Inc. (7166); POZEN Inc. (7552); Aralez Pharmaceuticals Trading DAC (1627); Aralez Pharmaceuticals US Inc. (6948); Aralez Pharmaceuticals R&D Inc. (9731); Halton Laboratories LLC (9342).  For the purposes of these chapter 11 cases, the Debtors' mailing address is:  400 Alexander Park Drive, Princeton, NJ 08540.

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

The debtors and debtors in possession in the above-captioned cases (collectively, the "**Debtors**") hereby move (the "**Motion**") for entry of an order, substantially in the form attached hereto as Exhibit A (the "**Order**"), pursuant to section 365(a) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 6006-1 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy Rules**"):  (a) authorizing the Debtors to reject certain executory contracts (each a "**Contract**," and collectively, the "**Contracts**") listed on Schedule 1 attached to the Order *nunc pro tunc* to August 10, 2018 (the "**Petition Date**"); (b) authorizing the Debtors to reject certain unexpired leases of real property (each a "**Lease**" and collectively, the "**Leases**") listed on Schedule 2 attached to the Order effective as of August 31, 2018; and (c) granting related relief.  In support of the Motion, the Debtors rely upon and incorporate by reference the *Declaration of Michael Kaseta in Support of Debtors' Omnibus Motion for Order:  (A) Authorizing Rejection of Certain Executory Contracts Nunc Pro Tunc to the Petition Date; (B) Authorizing Rejection of Certain Unexpired Leases Effective as of August 31, 2018; and (C) Granting Related Relief*, annexed hereto as Exhibit B, and respectfully represent as follows:

## BACKGROUND

1.      On the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are continuing in the possession of their respective properties and the management of their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  These chapter 11 cases have been consolidated for procedural purposes only.

**1219**

2.      On August 27, 2018, the United States Trustee for Region 2 appointed an official committee of unsecured creditors (the "**Committee**").  As of the date hereof, no trustee or examiner has been appointed in any of the Debtors' cases.

3.      Also on the Petition Date, Aralez Pharmaceuticals Inc., the direct or indirect parent company of the Debtors (the "**Parent**"), and the Debtors' affiliate, Aralez Pharmaceuticals Canada Inc. (collectively, the "**Canadian Debtors**"), commenced plenary restructuring proceedings in the Ontario Superior Court of Justice (Commercial List) under the *Companies' Creditors Arrangement Act* .  As of the date hereof, no restructuring proceedings for the Canadian Debtors have been filed in the United States, nor are the Debtors subject to any foreign insolvency proceedings.

4.      The events leading up to the Petition Date are set forth in the *Declaration of Michael Kaseta in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 4], which was filed with the Court on the Petition Date.

## JURISDICTION

5.      This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceedings pursuant to 28 U.S.C. § 157(b).  Venue of these cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The predicates for the relief requested herein are sections 365(a) of the Bankruptcy Code, Bankruptcy Rules 6006 and 9014, and Local Bankruptcy Rule 6006-1.

## CONTRACTS AND LEASES TO BE REJECTED

A.      **The Contracts**

6.      The Debtors' primary business is the acquisition, development and distribution of specialty pharmaceutical products, primarily in cardiovascular and other specialty areas.  The Debtors' main source of revenue is from the sale of branded and generic

- 3 -

**1220**

pharmaceutical products.  The Debtors historically employed a sales force to facilitate such sales.
In May 2018, the Debtors began winding down their commercial operations in the United States,
which included the elimination of their sales force in the United States.

7.      Prior to such time, the Debtors had offered a variety of services and
contracted with numerous vendors (the "**Contract Counterparties**") to facilitate their operations
and support their sales force in the United States.  The Debtors contracted with parties to, among
other things, advertise and market their products, provide their sales force with company cars,
and provide logistical support to their sales force.  However, the departure of the Debtors' sales
force and the winding down of the U.S. commercial operations obviated the need for such
services.  Since prior to the Petition Date, the Contract Counterparties have not been providing
services under their respective Contracts and the company cars were returned to the applicable
Contract Counterparty.  As a result, since at least the Petition Date, the Contracts identified by
the Debtors, with the assistance of their financial advisors, are no longer providing any benefit to
the Debtors and their estates and are burdensome thereto.  Accordingly, the Debtors seek to
reject the Contracts listed on Schedule 1 to the proposed Order *nunc pro tunc* to the Petition
Date.

**B.      The Leases**

**(i)      The Princeton Lease**

8.      Prior to the Petition Date, Debtor Aralez Pharmaceuticals US Inc.
("**APUS**"), as tenant, entered into that certain Lease Agreement, dated as of April 18, 2016, with
Witman Properties, L.L.C. and Alexander Road at Davanne, L.L.C., as landlords (together, the
"**Princeton Landlord**") (including any and all exhibits, supplements, and other documents, the
"**Princeton Lease**"), for the lease of premises located at 400 Alexander Park Drive, Princeton,
New Jersey (the "**Princeton Premises**").  Pursuant to the terms of the Princeton Lease, APUS

- 4 -

**1221**

provided a security deposit of $281,377.86 to the Princeton Landlord.  The initial term of the

Princeton Lease expires on October 31, 2027, unless terminated earlier pursuant to its terms.[2]

        **(ii)**      **The Radnor Lease**

      9.      Prior to the Petition Date, APUS,[3] as tenant, also entered into that certain

Lease, dated as of October 30, 2015, with Radnor Properties-555 LA, L.P., as landlord (the

"**Radnor Landlord**" and, together with the Princeton Landlord, the "**Landlords**") (including

any and all exhibits, supplements, and other documents, the "**Radnor Lease**"), for the lease of

premises located at 555 E. Lancaster Avenue, Suite 540, Radnor, Pennsylvania (the "**Radnor**

**Premises**" together with the Princeton Premises, the "**Premises**").  Pursuant to the terms of the

Radnor Lease, APUS provided a security deposit of $28,006.26 to the Radnor Landlord.  The

initial term of the Radnor Lease expires on April 30, 2021, unless terminated earlier pursuant to

its terms.[4]

      10.      On the Petition Date, the Debtors announced their intention to enter into

purchase agreements with two separate stalking horse purchasers to sell their main assets, which

includes substantially all of their assets in the United States.  The Debtors' commercial

operations in the United States are being wound down and they only have 22 employees

remaining in the United States.  As a result, the Debtors no longer have a need for the Premises

and they intend to vacate the Premises by August 31, 2018.[5]  The Debtors estimate that rejecting

---

[2]      Pursuant to the Princeton Lease, the term expires on the last day of the calendar month immediately
preceding the 10 year anniversary of its commencement.  The lease term commenced on February 1, 2017.

[3]      The Radnor Lease was assigned to Debtor Aralez Pharmaceuticals Management Inc. on October 12, 2016,
effective as of February 5, 2016.

[4]      Pursuant to the Radnor Lease, the initial term expires on the day immediately prior to the 62-month
anniversary of its commencement.  The lease term commenced on March 1, 2016.

[5]      Beginning September 1, 2018, the remaining employees in the U.S. either will work from home or out of
the Debtors' New York offices.

**1222**

the Leases will save at least $116,000 per month in rent and associated costs.  Absent rejection,

the Debtors would accrue unnecessary administrative expenses that have no benefits to them or

their estates.  Accordingly, the Debtors have determined in their business judgment that it is in

their and their estates' best interest to seek authority to reject the Leases.

## RELIEF REQUESTED

11.    By this Motion, the Debtors seek entry of the Order: (a) authorizing the

Debtors to reject the Contracts *nunc pro tunc* to the Petition Date; (b) authorizing the Debtors to

reject the Leases effective as of August 31, 2018; and (c) granting related relief.

## BASIS FOR RELIEF

**A.      Rejection of the Contracts and Leases Constitutes a
Sound Exercise of the Debtors' Reasonable Business Judgment.**

12.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a

debtor in possession, "subject to the court's approval, may assume or reject any executory

contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  "The purpose behind allowing

the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession

to use valuable property of the estate and to 'renounce title to and abandon burdensome

property.'"  In re Orion Pictures Corp., 4 F.3d 1095, 1098 (2d Cir. 1993); In re Republic

Airways, 547 B.R. 578, 582 (Bankr. S.D.N.Y. 2016); In re Grubb & Ellis Co., 2012 WL

1036071 at *4 (Bankr. S.D.N.Y March 27, 2012);  see also In re Ames Dept. Stores, Inc., 306

B.R. 43, 51-52 (Bankr. S.D.N.Y. 2004) ("The ability to reject provides the trustee or debtor-in-

possession with the means to relieve the estate of the duty to perform on burdensome obligations

at the expense of all of the estate's other creditors, and to avoid the incurrence of additional

administrative expenses which lack a corresponding benefit to the estate.").

**1223**

13.     The standard applied to determine whether the rejection of an executory

contract or unexpired lease should be authorized is the "business judgment" standard.  See In re

Old Carco LLC, 470 B.R. 688, 703 (S.D.N.Y. 2012) (business judgment standard "applies when

a Bankruptcy Court approves a debtor's assumption or rejection of a contract"); In re Republic

Airways, 547 B.R. at 582; In re Delta Airlines, Inc., 359 B.R. 468, 476 (Bankr. S.D.N.Y. 2006)

("By case law, the standard for deciding a motion to reject an executory contract under Section

365(a) is the business judgment rule[.]"); In re Enron Corp., No. 01 B 16034 (AJG), 2006 WL

898033, at *4 (Bankr. S.D.N.Y. Mar. 24, 2006) ("In determining whether to approve a [debtor's]

decision to reject such lease or contract, a court applies the 'business judgment' test which is met

if the rejection is beneficial to the estate."); In re Ames, 306 B.R. at 51.  The business judgment

standard requires a court to approve a debtor's business decision unless that decision is the

product of bad faith, whim, or caprice.  See, e.g., Westbury Real Estate Ventures, Inc. v.

Bradlees, Inc. (In re Bradlees Stores, Inc.), 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996).

Courts defer to a debtor's business judgment in rejecting an executory contract or unexpired

lease, and they generally will not second-guess a debtor's business judgment concerning

assumption or rejection.  See In re MF Global Holdings Ltd., 466 B.R. 239, 242 (Bankr.

S.D.N.Y. 2012); In re Balco Equities Ltd., Inc., 323 B.R. 85, 98 (Bankr. S.D.N.Y. 2005).

14.     Rejection of an executory contract or an unexpired lease is appropriate

where such rejection is beneficial to the debtors' estates.  See, e.g., In re Orion Pictures, 4 F.3d at

1098–99; In re Stable Mews Assocs., Inc., 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984).  Upon

finding that a debtor has exercised its sound business judgment, courts regularly approve a

request to reject under section 365(a) of the Bankruptcy Code.  See NLRB v. Bildisco &

Bildisco, 465 U.S. 513, 523 (1984) (recognizing the "business judgment" standard used to

**1224**

approve rejection of executory contracts); <u>In re Penn Traffic Co.</u>, 524 F.3d 373, 383 (2d Cir. 2008) (same); <u>see also</u> <u>Delta</u>, 359 B.R. at 476 (business judgment rule "basically means that if [rejection] makes sense for the debtor in the judgment of management, the motion to reject will be granted"); <u>Balco Equities</u>, 323 B.R. at 98 ("A court 'should defer to a debtor's decision that rejection of a contract would be advantageous unless the decision is so unreasonable that it could not be based on sound business judgment, but only on bad faith or whim.'") (quoting <u>In re Sundial Asphalt Co.</u>, 147 B.R. 72, 84 (Bankr. E.D.N.Y. 1992)).

15.     As set forth above and in the Kaseta Declaration, the Debtors believe that rejection of the Contracts and Leases is within their business judgment and is in the best interest of the Debtors' estates, their creditors and other parties in interest.  The Contracts and Leases are burdensome agreements, with certain of the agreements containing significant ongoing monetary obligations, and no corresponding benefits.

16.     Accordingly, rejection of the Contracts *nunc pro tunc* to the Petition Date and of the Leases effective as of August 31, 2018 is in the best interests of the Debtors, is appropriate under the circumstances, and reflects the Debtors' sound business judgment.

**B.     <u>Retroactive Rejection Is Appropriate</u>.**

17.     The Debtors respectfully submit that the rejection of the Contracts *nunc pro tunc* to the Petition Date, and rejection of the Leases effective as of August 31, 2018 is appropriate.

18.     Section 365 of the Bankruptcy Code does not address whether the Court may order rejection to be applied retroactively.  Courts have held, however, that a bankruptcy court may, in its discretion, authorize rejection retroactively to a date prior to entry of an order authorizing such rejection where the balance of equities favors such relief.  <u>See</u>, <u>e.g.</u>, <u>BP Energy</u>

Co. v. Bethlehem Steel Corp., No. 02 Civ. 64191 (NRB), 2002 WL 31548723, at *3 (S.D.N.Y.

Nov. 15, 2002) ("[W]e cannot conclude . . . that a bankruptcy court's assignment of a retroactive

rejection date falls outside of its authority when the balance of the equities favors this solution.");

In re Jamesway Corp., 179 B.R. 33, 38 (S.D.N.Y. 1995) ("[A] court can, where appropriate,

approve rejection retroactively."); see also In re Chi-Chi's, Inc., 305 B.R. 396, 399 (Bankr. D.

Del. 2004) ("Moreover, the court's power to grant retroactive relief is derived from the

bankruptcy court's equitable powers so long as it promotes the purposes of § 365(a).").

19.     Courts in this district have authorized the retroactive rejection of

executory contracts and unexpired leases.  See, e.g. In re Nine West Holdings, Inc., No. 18-

10947 (SCC) (Bankr. S.D.N.Y. May 16, 2018) [Docket No. 256] (authorizing retroactive

rejection); In re AOG Entertainment, Inc., No. 16-11090 (SMB) (Bankr. S.D.N.Y. Aug. 23,

2016) [Docket No. 342] (authorizing rejection of certain contracts *nunc pro tunc* to petition

date); In re Doral Fin. Corp., No. 15-10573 (SCC) (Bankr. S.D.N.Y. Apr. 1, 2015) [Docket No.

70] (same); In re Sbarro LLC, No. 14-10557 (MG) (Bankr. S.D.N.Y. Apr. 8, 2014) [Docket No.

141] (authorizing rejection of certain unexpired non-residential real property leases *nunc pro

tunc* to petition date); In re Patriot Coal Corp., No. 12-12900 (SCC) (Bankr. S.D.N.Y. Aug. 10,

2012) [Docket No. 405] (authorizing rejection of service agreements and an equipment lease

*nunc pro tunc* to date rejection motion was filed); In re Eastman Kodak Co., No. 12-10202

(ALG) (Bankr. S.D.N.Y. July 3, 2012) [Docket No. 1580] (authorizing rejection of various

executory contracts as of various dates prior to entry of order); In re Velo Holdings, Inc., No. 12-

11384 (MG) (Bankr. S.D.N.Y. Apr. 23, 2012) [Docket No. 83] (authorizing rejection of

employment contracts *nunc pro tunc* to petition date).

**1226**

20.     In light of the fact that: (a) none of the services under the Contracts have been used by the Debtors under the Contracts since prior to the Petition Date; (b) the Debtors are no longer in need of the Premises and will vacate the Premises by August 31, 2018; (c) the payments due under the Contracts and Leases are or may be unnecessary administrative expenses; and (d) there is a lack of any benefit to the Debtors and their estates with respect to all of the Contracts and Leases as of the proposed effective rejection dates, the balance of equities favors the relief requested.

21.     The Debtors request that any claim arising out of or relating to the rejection of the Contracts or Leases be filed with Prime Clerk LLC, the Debtors' retained claims agent, at Aralez Pharmaceuticals US Inc. Claims Processing Center, c/o Prime Clerk LLC, 850 Third Avenue, Suite 412, Brooklyn, New York 11232, no later than any claims bar date established in the Debtors' chapter 11 cases.

## RESERVATION OF RIGHTS

22.     Nothing herein shall be deemed a waiver of any rights or defenses of the Debtors, nor shall anything herein be deemed a waiver or admission as to the validity of any and all claims that arise by virtue of this Motion and/or any and all other claims arising under or related to the Contracts and/or Leases.

## NOTICE

23.     Notice of this Motion will be given to: (a) the United States Trustee for Region 2; (b) the Debtors' five (5) largest secured creditors on a consolidated basis; (c) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (d) counsel to the lenders under the Debtors' debtor in possession financing facility and under the Debtors' prepetition secured credit agreement; (e) the United States Attorney's Office for the Southern District of New York; (f) the Internal Revenue Service; (g) Revenue Commissioners (Ireland); (h) the

**1227**

United States Food and Drug Administration; (i) the Canada Revenue Agency as represented by the Department of Justice (Canada); (j) Health Canada; (k) the Landlords; (l) the Contract Counterparties; (m) proposed counsel to the Committee; and (n) those parties who have filed a notice of appearance in these cases as of the date of this Motion.  The Debtors submit that, under the circumstances, no other or further notice is required.

24.    No previous motion for the relief requested herein has been made to this or to any other court.

*[Remainder of This Page Intentionally Left Blank]*

- 11 -

**1228**

## <u>CONCLUSION</u>

WHEREFORE, the Debtors respectfully request the Court enter the proposed

Order, substantially in the form attached hereto as <u>Exhibit A</u>, granting the relief requested herein

and such other and further relief as the Court may deem just and proper.

Dated:  August 27, 2018
New York, New York

WILLKIE FARR & GALLAGHER LLP
*Proposed Counsel for the Debtors and
Debtors in Possession*


By: <u>/s/ Paul V. Shalhoub</u>
Paul V. Shalhoub
Robin Spigel
Debra C. McElligott

787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 728-8000
Facsimile:  (212) 728-8111

1229

## EXHIBIT A

**Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
In re:                                    :        Chapter 11
                                          :
Aralez Pharmaceuticals US Inc., et al.,[1]   :        Case No. 18-12425 (MG)
                                          :
                    Debtors.              :        (Jointly Administered)
------------------------------------------------------x

### OMNIBUS ORDER #1:  (A) AUTHORIZING REJECTION OF CERTAIN EXECUTORY CONTRACTS *NUNC PRO TUNC* TO THE PETITION DATE; (B) AUTHORIZING REJECTION OF CERTAIN UNEXPIRED LEASES EFFECTIVE AS OF AUGUST 31, 2018; AND (C) GRANTING RELATED RELIEF

Upon the motion dated August 27, 2018 (the "**Motion**")[2] of the debtors and debtors in possession in the above-captioned cases (the "**Debtors**") for entry of an order: (a) authorizing the Debtors to reject the Contracts *nunc pro tunc* to the Petition Date; (b) authorizing the Debtors to reject the Leases effective as of August 31, 2018; and (c) granting related relief; and upon consideration of the Motion and all pleadings related thereto, including the Declaration of Michael Kaseta filed in support of the Motion; and this Court having jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and this being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue of these cases and the Motion in this district being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that due and sufficient notice of the Motion has been given; and it appearing that no other or further notice need be provided; and upon the record of the hearing held on the Motion; and it appearing that the relief requested by the Motion

---

[1]     The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal taxpayer identification number are as follows:  Aralez Pharmaceuticals Holdings Limited (5824); Aralez Pharmaceuticals Management Inc. (7166); POZEN Inc. (7552); Aralez Pharmaceuticals Trading DAC (1627); Aralez Pharmaceuticals US Inc. (6948); Aralez Pharmaceuticals R&D Inc. (9731); Halton Laboratories LLC (9342).  For the purposes of these chapter 11 cases, the Debtors' mailing address is:  400 Alexander Park Drive, Princeton, NJ 08540.

[2]     Capitalized terms used but not defined herein have the meanings given to them in the Motion.

**1231**

is in the best interests of the Debtors, their estates, their creditors and other parties in interest;

and after due deliberation and sufficient cause appearing therefor, it is hereby

ORDERED, that:

1.      The Motion is granted to the extent set forth herein.

2.      The Contracts listed on Schedule 1 attached hereto are rejected pursuant to

section 365(a) of the Bankruptcy Code *nunc pro tunc* to the Petition Date (the "**Contract**

**Rejection Date**").

3.      The Leases listed on Schedule 2 attached hereto are rejected pursuant to

section 365(a) of the Bankruptcy Code effective as of August 31, 2018 (the "**Lease Rejection**

**Date**").

4.      The Debtors are not required to comply with any termination procedures

set forth in the Contracts or Leases, or any other documents related thereto.

5.      As of the Contract Rejection Date with respect to the Contracts, and the

Lease Rejection Date with respect to the Leases, the Debtors are relieved from any and all

payments or performance due under such Contracts and Leases incurred after such respective

dates; provided, however, that nothing herein shall constitute a determination of claims arising

from or related to the rejection of such Contracts and Leases filed in accordance with this Order,

in connection with which the Debtors' rights are reserved in full.

6.      Any proof of claim arising from the rejection of the Contracts or Leases

must be filed with Prime Clerk LLC, the Debtors' claims agent, at Aralez Pharmaceuticals US

Inc. Claims Processing Center, c/o Prime Clerk LLC, 850 Third Avenue, Suite 412, Brooklyn,

New York 11232 or as otherwise order by the Court, no later than any claims bar date

established in the Debtors' chapter 11 cases.

**1232**

7.      The Debtors are authorized to take all action necessary to effectuate the

relief granted in this Order.

8.      This Court shall retain jurisdiction to hear and determine all matters

arising from or related to this Order and the implementation, interpretation and/or enforcement

hereof.

Dated: September __, 2018
         New York, New York

_____
THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE

**1233**

## **SCHEDULE 1**

### **Schedule of Contracts to be Rejected**[1]

| Counterparties | Counterparty Address | Debtor(s) | Agreement Type |
|---|---|---|---|
| Emkay Inc. Trust | 805 West Thorndale Avenue, Itasca, IL 60143 | Aralez Pharmaceuticals US Inc. | Vehicle Lease Agreement, dated September 25, 2015 |
| Emkay Inc. | 805 West Thorndale Avenue, Itasca, IL 60143 | Aralez Pharmaceuticals US Inc. | Fleet Services Agreement dated September 25, 2015 |
| Grey Healthcare Group LLC | 200 Fifth Avenue, New York, NY 10010 Attn: Mark Suster<br><br>Greg Lewis Vogel Farina LLC 350 Springfield Ave. Summit, NJ 07091 | Pozen Inc.<br><br>Aralez Pharmaceuticals US Inc. | Master Advertising Services Agreement, dated August 26, 2015, and all work orders |
| ghg greyhealth group LLC (f/k/a Grey Healthcare Group LLC) | 200 Fifth Avenue, New York, NY 10010 | Aralez Pharmaceuticals US Inc. | Amendment No. 1 to Master Advertising Services Agreement, dated October 15, 2015 |
| Phoenix Marketing Solutions | 121 Chanlon Road, Ste. 300 New Providence, NJ 07974 Attn: Tracy Doyle | Pozen Inc. | Master Services Agreement and all statements of work |
| Poretta & Orr, Inc. | 450 East Street Doylestown, PA 18901 | Pozen Inc. | Master Services Agreement dated June 23, 2015, and all statements of work |

---

[1]    This schedule is intended to be inclusive of any amendments, supplements and/or modifications entered into from time to time in respect of any of the Contracts listed.

## SCHEDULE 2

**Schedule of Leases to be Rejected**

| Counterparties-Landlords and Address | Debtor | Leased Premises |
|---|---|---|
| Radnor Properties-555 LA, L.P.<br><br>c/o Brandywine Operating Partnership, L.P.<br>Attn: Jeff DeVuono<br>555 East Lancaster Avenue, Suite 100<br>Radnor, Pennsylvania 19087<br>(with a copy to: legal.notices@bdnreit.com) | Aralez Pharmaceuticals US Inc. | 555 E. Lancaster Avenue, Suite 540, Radnor, PA |
| Witman Properties, LLC<br><br>Alexander Road at Davanne, LLC<br><br>c/o Woodmont Properties<br>100 Passaic Avenue, Suite 240<br>Fairfield, New Jersey 07004 | Aralez Pharmaceuticals US Inc. | 400 Alexander Park Drive, West Windsor, NJ |

**1235**

## **EXHIBIT B**

**Declaration**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
In re:                                          :       Chapter 11
                                                :
Aralez Pharmaceuticals US Inc., <u>et al.</u>,[1]   :       Case No. 18-12425 (MG)
                                                :
                   Debtors.                     :       (Jointly Administered)
-------------------------------------------------------x

### DECLARATION OF MICHAEL KASETA
### IN SUPPORT OF DEBTORS' OMNIBUS MOTION #1 FOR ORDER:
### (A) AUTHORIZING REJECTION OF CERTAIN EXECUTORY
### CONTRACTS *NUNC PRO TUNC* TO THE PETITION DATE;
### (B) AUTHORIZING REJECTION OF CERTAIN UNEXPIRED LEASES
### <u>EFFECTIVE AS OF AUGUST 31, 2018; AND (C) GRANTING RELATED RELIEF</u>

I, Michael Kaseta, declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury that the

following is true and correct to the best of my knowledge and belief:

        1.        I am the Chief Financial Officer of Aralez Pharmaceuticals Inc., the direct

or indirect parent company of each of the above-captioned debtors and debtors in possession

(collectively, the "**Debtors**"), and an authorized representative of each of the Debtors.  I have

acted as the Chief Financial Officer since November 30, 2017.  As part of my employment and

service in such capacity, I have become familiar with the history, day-to-day operations, business

and financial affairs of the Debtors.

        2.        I submit this declaration in support of the *Debtors' Omnibus Motion #1 for*

*Order:  (A) Authorizing Rejection of Certain Executory Contracts Nunc Pro Tunc to the Petition*

*Date; (B) Authorizing Rejection of Certain Unexpired Leases Effective as of August 31, 2018;*

---

[1]      The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal taxpayer identification number are as follows:  Aralez Pharmaceuticals Holdings Limited (5824); Aralez Pharmaceuticals Management Inc. (7166); POZEN Inc. (7552); Aralez Pharmaceuticals Trading DAC (1627); Aralez Pharmaceuticals US Inc. (6948); Aralez Pharmaceuticals R&D Inc. (9731); Halton Laboratories LLC (9342).  For the purposes of these chapter 11 cases, the Debtors' mailing address is:  400 Alexander Park Drive, Princeton, NJ 08540.

*and (C) Granting Related Relief* (the "**Motion**"), which was filed with the Court concurrently herewith.[2]

3.      Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge and the knowledge I have acquired from those who report to me, consultation with other officers of the Debtors, my review of relevant documents, or my opinion based upon experience, knowledge and information concerning the Debtors' operations and financial condition.  I am duly authorized to submit this declaration.

4.      On May 8, 2018, the Debtors announced that they were discontinuing their commercial operations in the United States.  At or around that time, the Debtors eliminated their U.S. sales force.  Currently, 22 employees remain employed in the United States.

5.      Prior to the commencement of the wind down, and in the ordinary course of their business, the Debtors used the services of the Contract Counterparties to facilitate their operations and support their sales force.  The Debtors contracted with the Contract Counterparties to, among other things, advertise and market their products, provide their sales force with company cars and provide logistical support to their sales force.

6.      Since prior to the Petition Date, the Contract Counterparties have not been providing services to the Debtors.  Because the services provided under the Contracts are no longer necessary, the Debtors have determined that the ongoing obligations under the Contracts impose a financial burden on their estates while providing no benefit to the Debtors, their estates or their stakeholders.

7.      Also as a result of winding down their commercial operations in the United States, the Debtors are no longer in need of their leased premises in Radnor, Pennsylvania

---

[2]         Capitalized terms used but not defined herein have the meanings given to them in the Motion.

**1238**

and Princeton, New Jersey.  The Debtors intend to vacate each of the Premises by August 31,

2018.  The remaining employees in the U.S. either will work from home or out of the Debtors'

New York offices.

8.     By rejecting the Contracts and Leases, the Debtors estimate that they will

be able to achieve cost savings of approximately $116,000 per month.  Rejecting the Contracts

and Leases will thus prevent the Debtors from incurring unnecessary expenses.

9.     Accordingly, I believe that it is in the best interests of the Debtors and

their estates to reject the Contracts effective as of the Petition Date and to reject the Leases

effective as of August 31, 2018.

Dated: August 27, 2018
       New York, New York

/s/ Michael Kaseta
Michael Kaseta
Authorized Signatory for the Debtors

- 3 -

**1239**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x
In re:                                                     :        Chapter 11
                                                          :
Aralez Pharmaceuticals US Inc., <u>et al.</u>,[1]          :        Case No. 18-12425 (MG)
                                                          :
                        Debtors.                          :        (Jointly Administered)
-------------------------------------------------------x

### OMNIBUS ORDER #1:  (A) AUTHORIZING REJECTION OF CERTAIN EXECUTORY CONTRACTS *NUNC PRO TUNC* TO THE PETITION DATE; (B) AUTHORIZING REJECTION OF CERTAIN UNEXPIRED LEASES EFFECTIVE AS OF AUGUST 31, 2018; AND (C) GRANTING RELATED RELIEF

Upon the motion dated August 27, 2018 (the "Motion")[2] of the debtors and debtors in

possession in the above-captioned cases (the "Debtors") for entry of an order: (a) authorizing the

Debtors to reject the Contracts *nunc pro tunc* to the Petition Date; (b) authorizing the Debtors to

reject the Leases effective as of August 31, 2018; and (c) granting related relief; and upon

consideration of the Motion and all pleadings related thereto, including the Declaration of

Michael Kaseta filed in support of the Motion; and this Court having jurisdiction to consider the

Motion pursuant to 28 U.S.C. §§ 157 and 1334; and this being a core proceeding pursuant to 28

U.S.C. § 157(b); and venue of these cases and the Motion in this district being proper pursuant to

28 U.S.C. §§ 1408 and 1409; and it appearing that due and sufficient notice of the Motion has

been given; and it appearing that no other or further notice need be provided; and upon the

record of the hearing held on the Motion; and it appearing that the relief requested by the Motion

---

[1]       The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal taxpayer identification number are as follows:  Aralez Pharmaceuticals Holdings Limited (5824); Aralez Pharmaceuticals Management Inc. (7166); POZEN Inc. (7552); Aralez Pharmaceuticals Trading DAC (1627); Aralez Pharmaceuticals US Inc. (6948); Aralez Pharmaceuticals R&D Inc. (9731); Halton Laboratories LLC (9342).  For purposes of these chapter 11 cases, the Debtors' mailing address is Aralez Pharmaceuticals, c/o Prime Clerk LLC, P.O. Box 329003, Brooklyn, NY 11232.

[2]       Capitalized terms used but not defined herein have the meanings given to them in the Motion.

**1240**

is in the best interests of the Debtors, their estates, their creditors and other parties in interest; and after due deliberation and sufficient cause appearing therefor, it is hereby

ORDERED, that:

1.      The Motion is granted to the extent set forth herein.

2.      The Contracts listed on Schedule 1 attached hereto are rejected pursuant to section 365(a) of the Bankruptcy Code *nunc pro tunc* to the Petition Date (the "Contract Rejection Date").

3.      The Leases listed on Schedule 2 attached hereto are rejected pursuant to section 365(a) of the Bankruptcy Code effective as of August 31, 2018 (the "Lease Rejection Date").

4.      The Debtors are not required to comply with any termination procedures set forth in the Contracts or Leases, or any other documents related thereto.

5.      As of the Contract Rejection Date with respect to the Contracts, and the Lease Rejection Date with respect to the Leases, the Debtors are relieved from any and all payments or performance due under such Contracts and Leases incurred after such respective dates; provided, however, that nothing herein shall constitute a determination of claims arising from or related to the rejection of such Contracts and Leases filed in accordance with this Order, in connection with which the Debtors' rights are reserved in full.

6.      The Princeton Landlord is authorized to apply Letter of Credit No. 68124275, issued by Bank of America, N.A., in the amount of $281,377.86 against its rejection damages claim against APUS and the Parent resulting from the rejection of the Princeton Lease; provided, that the foregoing is without prejudice to the rights of the Official Committee of

1241

Unsecured Creditors and other parties in interest to challenge any rejection damages claim and seek appropriate remedies, if applicable.

7.     Any proof of claim arising from the rejection of the Contracts or Leases must be filed with Prime Clerk LLC, the Debtors' claims agent, at Aralez Pharmaceuticals US Inc. Claims Processing Center, c/o Prime Clerk LLC, 850 Third Avenue, Suite 412, Brooklyn, New York 11232 or as otherwise order by the Court, no later than any claims bar date established in the Debtors' chapter 11 cases.

8.     The Debtors are authorized to take all action necessary to effectuate the relief granted in this Order.

9.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to this Order and the implementation, interpretation and/or enforcement hereof.

**IT IS SO ORDERED.**

Dated:  September 14, 2018

          New York, New York

                                        _____/s/Martin Glenn_____

                                        MARTIN GLENN

                                        United States Bankruptcy Judge

- 3 -

**1242**

# SCHEDULE 1

## Schedule of Contracts Rejected[1]

| Counterparties | Counterparty Address | Debtor(s) | Agreement Type |
|---|---|---|---|
| Emkay Inc. Trust | 805 West Thorndale Avenue, Itasca, IL 60143 | Aralez Pharmaceuticals US Inc. | Vehicle Lease Agreement, dated September 25, 2015 |
| Emkay Inc. | 805 West Thorndale Avenue, Itasca, IL 60143 | Aralez Pharmaceuticals US Inc. | Fleet Services Agreement dated September 25, 2015 |
| Grey Healthcare Group LLC | 200 Fifth Avenue, New York, NY 10010 Attn: Mark Suster<br><br>Greg Lewis Vogel Farina LLC 350 Springfield Ave. Summit, NJ 07091 | Pozen Inc.<br><br>Aralez Pharmaceuticals US Inc. | Master Advertising Services Agreement, dated August 26, 2015, and all work orders |
| ghg greyhealth group LLC (f/k/a Grey Healthcare Group LLC) | 200 Fifth Avenue, New York, NY 10010 | Aralez Pharmaceuticals US Inc. | Amendment No. 1 to Master Advertising Services Agreement, dated October 15, 2015 |
| Phoenix Marketing Solutions | 121 Chanlon Road, Ste. 300 New Providence, NJ 07974 Attn: Tracy Doyle | Pozen Inc. | Master Services Agreement and all statements of work |
| Poretta & Orr, Inc. | 450 East Street Doylestown, PA 18901 | Pozen Inc. | Master Services Agreement dated June 23, 2015, and all statements of work |

---

1    This schedule is intended to be inclusive of any amendments, supplements and/or modifications entered into from time to time in respect of any of the Contracts listed.

**1243**

## SCHEDULE 2

### Schedule of Leases Rejected

| Counterparties-Landlords and Address | Debtor | Leased Premises |
|---|---|---|
| Radnor Properties-555 LA, L.P.<br><br>c/o Brandywine Operating Partnership, L.P.<br>Attn: Jeff DeVuono<br>555 East Lancaster Avenue, Suite 100<br>Radnor, Pennsylvania 19087<br>(with a copy to: legal.notices@bdnreit.com) | Aralez Pharmaceuticals US Inc. | 555 E. Lancaster Avenue, Suite 540, Radnor, PA |
| Witman Properties, LLC<br><br>Alexander Road at Davanne, LLC<br><br>c/o Woodmont Properties<br>100 Passaic Avenue, Suite 240<br>Fairfield, New Jersey 07004 | Aralez Pharmaceuticals US Inc. | 400 Alexander Park Drive, West Windsor, NJ |

**1244**

GARFUNKEL WILD, P.C.
111 Great Neck Road
Great Neck, New York 11021
Telephone: (516) 393-2200
Telefax: (516) 466-5964
Burton S. Weston
Afsheen A Shah

*Counsel for Debtors*
*And Debtors in Possession*

<table>
<tr><td></td><td>Hearing Date:</td><td>September 13, 2013 at 10:00 a.m.</td></tr>
<tr><td></td><td colspan="2">Objection Deadline: September 6, 2013 at 10:00 a.m</td></tr>
</table>

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

In re:

SOUND SHORE MEDICAL CENTER OF
WESTCHESTER, et al.,

                          Debtors.
------------------------------------------------------------x

Chapter 11 Case

Case No. 13- 22840 (RDD)

(Jointly Administered)

### DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTION 365 OF THE BANKRUPTCY CODE AUTHORIZING DEBTORS TO REJECT CERTAIN EXECUTORY CONTRACTS, *NUNC PRO TUNC*, TO THE DATE OF TERMINATION OR THE FILING DATE OF THIS MOTION, WHICHEVER IS EARLIER

Sound Shore Medical Center of Westchester ("**SSMC**"), and its debtor affiliates (each a

"**Debtor**" and together, the "**Debtors**") in the above chapter 11 cases (the "**Chapter 11 Cases**"),

hereby file this Motion (the "**Motion**") for the entry of an Order pursuant to Section 365 of

Bankruptcy Code, rejecting the executory contracts (the "**Executory Contracts**") set forth on

Exhibit A hereto. In support of the Motion, the Debtors respectfully represent as follows:

### SUMMARY OF RELIEF REQUESTED

1.     As set forth in more detail below, the Debtors have determined that the Debtors'

executory contracts (the "**Executory Contracts**") with Convergent Revenue Cycle Management

("**Convergent**") and Med-Metrix, LLC ("**Med-Metrix**") are no longer necessary for the Debtors

continued operations and do not provide any meaningful value or benefit to the Debtors and their

estates.  Details pertaining to the Executory Contracts sought to be rejected are identified and described

on Exhibit A hereto.  Accordingly, to avoid the accrual of any unnecessary administrative expenses

under the Executory Contracts, by this Motion, the Debtors seek entry of an order, substantially in the

form annexed hereto as Exhibit B (the "**Proposed Order**"), pursuant to Section 365(a) of Title 11,

United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**"), authorizing the Debtors to

reject the Executory Contracts, *nunc pro tunc*, as of the earlier of (i) the date on which the respective

agreement was terminated, or (ii) the filing of this Motion.

## JURISDICTION

2.      This Court has jurisdiction over this Motion under 28 U.S.C. § 1334. This is a core

proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding is proper pursuant

to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicate for the relief requested herein is Section 365(a) of the

Bankruptcy Code.

## BACKGROUND

4.      A significant portion of the Debtors' core business is focused around Sound Shore

Medical Center of Westchester ("**SSMC**").  SSMC is a not-for-profit 242-bed, community-based

teaching hospital offering primary, acute, emergency and long-term health care to the working

class residents of southern Westchester.  SSMC's affiliate, Mount Vernon Hospital ("**MVH**"), is

a voluntary, not-for-profit, 176-bed hospital located in Mount Vernon, New York.  MVH also

operates the Dorothea Hopfer School of Nursing, chartered by New York State since 1901.

Howe  Avenue  Nursing  Home  d/b/a  Helen  and  Michael  Schaffer  Extended  Care  Center

("**SECC**"), the third operating Debtor, is a 150-bed, comprehensive facility offering short-term

rehabilitation/sub-acute care, as well as skilled long-term care.  (SSMC, MVH and SECC are

sometimes collectively referred to as the "**Medical Centers**")

**1246**

5.     SSMC, MVH and SECC (with their affiliated Debtors) together comprise the Sound Shore Health System, Inc. ("**SSHS**" or the "**System**") which was formed in 1997 when the three affiliated healthcare institutions joined together to create one of the largest regional healthcare systems between New York City and Albany.  Today, the System provides a range of specialized services, including orthopedic surgery, behavioral health, pediatrics, OB/GYN, continuing care facilities, a nursing home and community care clinics providing primary care services for the indigent and uninsured.   Their affiliation with the New York College of Medicine also enables the Debtors to provide a teaching environment in multiple disciplines to their community and patients.

6.     As the largest "safety net" providers for southern Westchester County, the Medical Centers serve a disproportionate share of patients in the Medicaid and uninsured populations.  Annually, they are responsible for approximately 13,000 acute discharges, 55,000 emergency department visits and 60,000 indigent care clinic visits.

7.     Given the historical deterioration of the Debtors' financial condition and the pressing need to find a strategic partner, which has been recounted in detail to the Court, the Debtors entered into an asset purchase agreement with Montefiore Medical Center ("**MMC**") (the "**Purchase Agreement**") providing for the sale of all of their Owned Real Property, Furniture, Fixtures, Inventory, Assigned Contracts and related operating assets, which collectively comprise the Acquired Assets (all as therein defined).  MMC which will thereafter continue operations at the Debtors' former facilities under their own auspices.

## EXECUTORY CONTRACTS

3

**1247**

8.      The Debtors are currently undergoing a comprehensive review of their executory contracts to determine which contracts will be assumed and/or rejected.  Given the Debtors' intent to sell their assets to MMC, many of the Debtors' existing agreements and contracts will no longer be necessary to their continued operations pending such sale.  The Debtors will thus seek to reject those contracts that provide no meaningful value or benefit to the Debtors' estates.  As part of their ongoing review of the executory contracts, the Debtors have reviewed the Executory Contracts which are the subject of this Motion, and have determined, in the exercise of their sound business judgment, that continuing the Executory Contracts with Convergent and Med-Metrix would be burdensome and would provide no corresponding benefit or utility to the Debtors' estates.

9.      The Debtors' agreement with Convergent, covers collection services relating to third party accounts and their agreement with Med-Metrix is for software services.  The services covered by the Executory Contracts are no longer necessary for the Debtors' ongoing operations or the administration of the Debtors' estates.  Thus, maintaining the Executory Contracts would impose unnecessary costs and burdens upon the estates.  Indeed the services covered by the Executory Contracts have been largely included as part of other existing arrangements which have been routinely implemented by the Debtors.  The Debtors do not believe the Executory Contracts provide any meaningful benefit or value to the Debtors' estates.  Accordingly, the Debtors are seeking to reject the Executory Contracts.

**1248**

## RELIEF REQUESTED

10.     As set forth above, by this Motion, the Debtors seek authorization to reject the
Executory Contracts as of the earlier of (i) the date on which the respective agreement was
terminated, or (ii) the filing of this Motion.  A schedule detailing the Executory Contracts which are
sought to be rejected and the proposed effective dates of rejection of each Executory Contract is
attached hereto as Exhibit A.

## BASIS FOR RELIEF REQUESTED

11.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in
possession, "subject to the court's approval, may assume or reject any executory contract or unexpired
lease of the debtor." 11 U.S.C. § 365(a).  See, NLRB v. Bildisco & Bildisco, 465 U.S. 513, 521
(1984); see also, In re Lavigne, 114 F.3d 379, 386 (2d Cir. 1997).  The United States Court of Appeals
for the Second Circuit has stated that "[t]he purpose behind allowing the assumption or rejection of
executory contracts is to permit the debtor or debtor-in-possession to use valuable property of the estate
and to 'renounce title to and abandon burdensome property.'" Orion Pictures Corp. v. Showtime
Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1098 (2nd Cir. 1993) (quoting 2 Collier on
Bankruptcy 365.01[1] (15th ed. 1993)).

12.     In considering a motion to assume or reject a contract or lease, the court should
"... plac[e] itself in the position of the debtor or debtor-in-possession and determine[e] whether
assuming [or rejecting] the contract would be a good business decision or a bad one."  Id. at
1099.  "More exacting scrutiny would slow the administration of the debtor's estate and increase
its cost, interfere with the Bankruptcy Code's provision for private control of administration of
the estate, and threaten the court's ability to control a case impartially."  Richmond Leasing Co.
v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

5

**1249**

13.    Courts defer to a debtor's business judgment in rejecting an executory contract or unexpired lease, and upon finding that a debtor has exercised its sound business judgment, approve such rejection under section 365(a) of the Bankruptcy Code. See NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984) (recognizing the "business judgment" standard used to authorize rejection of executory contracts); Nostas Assocs v. Costich (In re Klein Sleep Products, Inc.), 78 F.3d 18, 25 (2nd Cir. 1996) (recognizing the "business judgment" standard used to authorize rejection of executory contracts); In re Minges, 602 F.2d 38, 42-43 (2nd Cir. 1979) (holding that the "business judgment" test is appropriate for determining when an executory contract can be rejected); In re Kong, 162 B.R. 86, 94-95 (Bankr EDNY 1993) (explaining that the business judgment standard requires only a demonstration that rejection will benefit the estate); In re Child World, Inc., 142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992).

14.    The "business judgment" standard is not a strict standard; it requires only a showing that either assumption or rejection of the executory contract or unexpired lease will benefit the debtor's estate. See In re Helm, 335 B.R. 528, 538 (Bankr. S.D.N.Y. 1996) ("To meet the business judgment test, the debtor in possession must 'establish that rejection will benefit the estate'") (citation omitted); In re Balco Equities, Inc., 323 B.R. 85, 99 (Bankr. S.D.N.Y. 2005) ("In determining whether the debtor has employed reasonable business discretion, the court for the most part must only determine that the rejection will likely benefit the estate.") (quoting G Survivor, 171 B.R. at 757)). Further, under the business judgment standard, "[a] debtor's decision to reject an executory contract must be summarily affirmed unless it is the product of 'bad faith, or whim or caprice'" In re TransWorld Airlines, Inc., 261 B.R. 103, 121 (Bankr. D. Del. 2001).

15.    As noted above, the Debtors have reviewed the Executory Contracts and have determined that they are no longer necessary or beneficial to the Debtors' ongoing business, and create unnecessary and burdensome expenses for the Debtors' estates.  In addition, the Debtors have determined that no meaningful value would be realized by the Debtors if the Executory Contracts were assumed and assigned to third parties.  Accordingly, it is in the best interests of the Debtors' estates to reject the Executory Contracts and avoid incurring additional unsecured or potential administrative claims relating to the Executory Contracts.  Rejection of the Executory Contracts and the attendant reduction in the estates' administrative costs thus reflects the Debtors' exercise of sound business judgment.

## NUNC PRO TUNC REJECTION

16.    It is well-established that a bankruptcy court has the authority to deem the rejection of an unexpired lease or executory contract retroactive to a date prior to the date of entry of an order approving the rejection. See In re At Home Corp., 392 F.3d 1064, 1070 (9th Cir. 2004); Thinking Machines Corp. v. Mellon Financial Servs. Corp. (In re Thinking Machines Corp.), 67 F.3d 1021, 1028 (1st Cir. 1995); In re Stonebridge Technologies, Inc., 430 F.3d 260, 273 (5th Cir. 2005); In re Jamesway Corp., 179 B.R. 33, 37-38 (Bankr. S.D.N.Y. 1995). Courts have authorized rejections of executory contracts and unexpired leases, including retroactive rejections, based on the equities of the circumstances. See Thinking Machines, 67 F.3d 1021 at 1028 (finding that, "[i]n the section 365 context, this means that bankruptcy courts may enter retroactive orders of approval, and should do so when the balance of the equities preponderates in favor of such remediation"). Courts have permitted retroactive rejection in other cases in this Circuit and elsewhere. See e.g., Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC, Adv. Pro. No. 08-01789 (BRL) (Bankr. S.D.N.Y. February 4, 2009).

2567628v.1

17.   The Debtors believe that expedited rejection of the Executory Contracts is necessary due to the dire financial condition of the Debtors and the need to reduce unnecessary administrative claims against their estates.   Expedited relief is appropriate under the circumstances herein since the Executory Contracts are no longer necessary for the Debtors' continued operations and any delays in rejection may lead to unnecessary costs and expenses for the Debtors' estates.

## NOTICE

18.   Notice of this Motion has been provided to all parties in interests in accordance with the Administrative Order Establishing Case Management and Scheduling Procedures (the "**Case Management Order**"), entered on June 4, 2013, notice of this Motion has been given to the parties identified on the General Service List and the Master Service List (as such terms are identified in the Case Management Order).   The Debtors submit that no other or further notice need be provided.

## NO PREVIOUS REQUEST

19.   No prior motion for the relief requested herein has been made to this or any other Court.

**WHEREFORE** the Debtors respectfully request the entry of an order, substantially in the form annexed hereto as Exhibit B, authorizing the Debtors to reject the Executory Contracts

2567628v.1

**1252**

and granting such other and further relief as the Court may deem just and proper.

Dated: July 30, 2013
       Great Neck, New York

                       GARFUNKEL WILD , P.C.
                       *Proposed Counsel for Debtors and Debtors in Possession*

                       By: _____
                       Burton S. Weston
                       Afsheen A. Shah
                       111 Great Neck Road
                       Great Neck, New York 11021
                       Telephone: (516) 393-2200
                       Facsimile: (516) 466-5964

2567628v.1

**1253**

**EXHIBIT A**
**REJECTED CONTRACTS**

| Contract Type | Date of Contract | Counterparty | Effective Date of Rejection |
|---|---|---|---|
| Collection Agreement | August 13, 2012 | Convergent Revenue Cycle Management | July 22, 2013 (date of termination) |
| Software Services | August 1, 2012 | Med Metrix LLC | July 22, 2013 (date of termination) |

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re:                                                           Chapter 11 Case
SOUND SHORE MEDICAL CENTER OF                                    Case No. 13- 22840 (RDD)
WESTCHESTER, et al.,

                            Debtors.                             (Jointly Administered)
------------------------------------------------------------x

## ORDER PURSUANT TO 11 USC § 365 APPROVING
## REJECTION OF EXECUTORY CONTRACTS

Upon the motion dated July 30, 2013 (the "Motion")[1] of Sound Shore Medical Center of

Westchester ("SSMC") and its affiliated debtors, as debtors in possession in the above captioned

chapter 11 cases (collectively, the "Debtors), for entry of an order pursuant to section 365(a) of

title 11, United States Code (the "Bankruptcy Code") and Rules 6006 and 9014 of the Federal

Rules of Bankruptcy Procedure, authorizing the Debtors to reject certain executory contracts, all

as more fully described in the Motion; and it appearing that the Court has jurisdiction to consider

this matter, and it further appearing that due and proper notice of the Motion has been given and

that no other or further notice need be provided; and it further appearing that the relief requested

in the Motion is necessary and is in the best interest of the Debtors, the Debtors' estates and their

creditors, and all parties in interest; and after due deliberation and good and sufficient cause

appearing therefor,

IT IS HEREBY ORDERED THAT:

1.    The Motion is granted to the extent set forth herein.

---

[1]    Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

2.    Pursuant to section 365(a) of the Bankruptcy Code, rejection of each of the Executory Contracts, as set forth herein (1) constitutes an exercise of sound business judgment by the Debtors, made in good faith and for valid business reasons, (2) is appropriate and necessary under the circumstances described in the Motion, and (3) is warranted and permissible under sections 105 and 365 of the Bankruptcy Code and Bankruptcy Rule 6006.

3.    Pursuant to section 365 of the Bankruptcy Code and Bankruptcy Rules 6006 and 9014, the rejection of the Executory Contracts listed on Exhibit A to the Motion and any related amendments and supplements thereto, is hereby authorized and approved, *nunc pro tunc*, effective upon the earlier of (i) the date on which the respective agreement was terminated or (ii) the filing of this Motion.

4.    This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Order.

Dated: September __, 2013
        White Plains, New York


_____
HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY COURT JUDGE

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

In re:                                                    Chapter 11 Case

SOUND SHORE MEDICAL CENTER OF                             Case No. 13- 22840 (RDD)
WESTCHESTER, et al.,

                              Debtors.                    (Jointly Administered)

-------------------------------------------------------------x

## ORDER PURSUANT TO 11 USC § 365 APPROVING
## REJECTION OF EXECUTORY CONTRACTS

Upon the motion dated July 30, 2013 (the "Motion")[1] of Sound Shore Medical Center of

Westchester ("SSMC") and its affiliated debtors, as debtors in possession in the above captioned

chapter 11 cases (collectively, the "Debtors), for entry of an order pursuant to section 365(a) of

title 11, United States Code (the "Bankruptcy Code") and Rules 6006 and 9014 of the Federal

Rules of Bankruptcy Procedure, authorizing the Debtors to reject the executory contracts with

Convergent Revenue Cycle Management ("Convergent") and Med-Metrix, LLC ("Med-Metrix"

and together with Convergent, the "Executory Contracts"), all as more fully described in the

Motion; and it appearing that the Court has jurisdiction to consider this matter, and it further

appearing that due and proper notice of the Motion has been given and that no other or further

notice need be provided; and there being no objections to the requested relief; and upon the

record of the hearing held by the Court on the Motion on September 13, 2013; and the Court

having found that the relief requested in the Motion is in the best interest of the Debtors, the

Debtors' estates and their creditors, and all parties in interest and a proper exercise of business

judgment; and after due deliberation and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

---

[1]        Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

2568223v.1                                                                              **1257**

1.      The Motion is granted.

2.      Pursuant to section 365(a) of the Bankruptcy Code, rejection of each of the Executory Contracts, as set forth herein (1) constitutes an exercise of sound business judgment by the Debtors, made in good faith and for valid business reasons, (2) is appropriate and necessary under the circumstances described in the Motion, and (3) is warranted and permissible under sections 105 and 365 of the Bankruptcy Code and Bankruptcy Rule 6006.

3.      Pursuant to section 365 of the Bankruptcy Code and Bankruptcy Rules 6006 and 9014, the rejection of the Executory Contracts listed on <u>Exhibit A</u> to the Motion and any related amendments and supplements thereto, is hereby authorized and approved, *nunc pro tunc*, effective upon the earlier of (i) the date on which the respective agreement was terminated or (ii) the filing of the Motion.

4.      This Order constitutes a separate order with respect to each Executory Contract.

5.      This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Order.

Dated: September 16, 2013
       White Plains, New York


       ___/s/Robert D. Drain_____
       HONORABLE ROBERT D. DRAIN
       UNITED STATES BANKRUPTCY COURT JUDGE

Andrew G. Dietderich
John J. Jerome
Michael H. Torkin
Mark U. Schneiderman
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone:    (212) 558-4000
Facsimile:    (212) 558-3588

Proposed Counsel to the Debtors and
Debtors in Possession

Pauline K. Morgan
Joseph M. Barry
YOUNG CONAWAY STARGATT &
TAYLOR, LLP
1270 Avenue of the Americas
Suite 2210
New York, New York 10020
Telephone:    (212) 332-8840
Facsimile:    (212) 332-8855

Proposed Counsel to the Debtors and Debtors
in Possession[1]

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| EASTMAN KODAK COMPANY, *et al.*,[2] | Case No. 12-10202 (ALG) |
| Debtors. | (Jointly Administered) |

### DEBTORS' MOTION FOR AN ORDER AUTHORIZING REJECTION OF CERTAIN EXECUTORY CONTRACT *NUNC PRO TUNC* TO JANUARY 31, 2012

Eastman Kodak Company ("**Kodak**"), on behalf of itself and its affiliated debtors

and debtors in possession in these chapter 11 cases (collectively, the "**Debtors**"), hereby submits

this motion (the "**Motion**") for entry of an order, substantially in the form attached hereto as

Exhibit A (the "**Proposed Order**"), authorizing the Debtors to (a) reject that certain executory

contract set forth on Exhibit 1 annexed to the Proposed Order (as more fully described below, the

---

[1]     All parties in interest with inquiries regarding this Motion should direct such inquiries to Young Conaway Stargatt & Taylor, LLP.

[2]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Eastman Kodak Company (7150); Creo Manufacturing America LLC (4412); Eastman Kodak International Capital Company, Inc. (2341); Far East Development Ltd. (2300); FPC Inc. (9183); Kodak (Near East), Inc. (7936); Kodak Americas, Ltd. (6256); Kodak Aviation Leasing LLC (5224); Kodak Imaging Network, Inc. (4107); Kodak Philippines, Ltd. (7862); Kodak Portuguesa Limited (9171); Kodak Realty, Inc. (2045); Laser-Pacific Media Corporation (4617); NPEC Inc. (5677); Pakon, Inc. (3462); and Qualex Inc. (6019).  The location of the Debtors' corporate headquarters is:  343 State Street, Rochester, NY 14650.

"**Contract**") effective as of the date hereof and (b) take such actions as may be necessary to implement and effectuate the rejection of the Contract. In support of this Motion, the Debtors respectfully represent and set forth as follows:

## Background

1.    On January 19, 2012 (the "**Petition Date**"), each of the Debtors filed a voluntary petition in this Court for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "**Bankruptcy Code**"). The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for appointment of a trustee or examiner has been made in these chapter 11 cases. On January 25, 2012, the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") appointed the Official Committee of Unsecured Creditors (the "**Creditors' Committee**") pursuant to section 1102 of the Bankruptcy Code.

2.    Founded in 1880 and long one of the world's leading material science companies, the Debtors and their non-Debtor affiliates operate an integrated global business involving a diverse collection of mature and growth businesses and an array of valuable intellectual property. In order to address a shortfall in liquidity in the United States, monetize non-strategic intellectual property, fairly resolve legacy liabilities and focus on their most valuable business lines, the Debtors commenced these chapter 11 cases.

3.    Additional factual background relating to the Debtors' businesses and the commencement of these chapter 11 cases is set forth in detail in the Declaration of Antoinette P. McCorvey Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First Day Pleadings dated January 18, 2012 [Docket No. 2].

01: 11763425.3

**1260**

## Facts Specific to the Relief Requested[3]

4.        Kodak is a party to a certain Sponsorship Agreement, dated October 5, 2000, by and among TrizecHahn Hollywood LLC ("TH"), as amended by (a) letter agreements dated (i) December 7, 2000, (ii) December 20, 2000, and (iii) January 30, 2001, (b) that certain Amendment of Sponsorship Agreement, dated February 23, 2004, by and among TH and Kodak, and (c) that certain Second Amendment to Agreement, dated September 1, 2011, by and among CIM/H&H Media L.P., as successor-in-interest to TH (the "**Counterparty**").  Among other things, in exchange for a significant annual fee, the Contract provides Kodak with certain naming rights and other promotional rights related to that certain mixed-use retail/entertainment complex located in Los Angeles, California at Hollywood and Highland, commonly known as the "Kodak Theatre."

## Jurisdiction

5.        The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  The statutory predicates for the relief requested herein are sections 105(a) and 365 of the Bankruptcy Code, rule 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and rule 9013-1 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**").

## Relief Requested

6.        By this Motion, the Debtors request entry of the Proposed Order, authorizing the Debtors to (a) reject the Contract effective as of the date hereof, and (b) take such

---

[3]    Any summary of or reference to the terms and conditions of the Contract provided in this Motion is for the Court's convenience.  To the extent any such summary or reference conflicts with the actual terms and conditions of the Contract, the actual terms and conditions of the Contract shall control.

actions as may be necessary to implement and effectuate the rejection of the Contract.[4]

**Basis for Relief**

A.    **Rejection of the Contract Reflects the Debtors' Sound Business Judgment.**

7.    Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may . . . reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  "This provision allows a trustee to relieve the bankruptcy estate of burdensome agreements which have not been completely performed." *Stewart Title Guar. Co.* v. *Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir. 1996) (citing *In re Murexco Petroleum, Inc.*, 15 F.3d 60, 62 (5th Cir. 1994)).

8.    The Debtors' rejection of an executory contract or unexpired lease is governed by the "business judgment" standard.  *See In re Orion Pictures Corp.*, 4 F.3d 1095, 1098-99 (2d Cir. 1993); *In re Enron Corp.*, Case No. 01-16034, 2006 WL 898033, at *4 (Bankr. S.D.N.Y. Mar. 24, 2006) ("In determining whether to approve a [debtor's] decision to reject such lease or contract, a court applies the 'business judgment' test which is met if the rejection is beneficial to the estate."); *In re Ames Dep't Stores, Inc.*, 306 B.R. 43, 51 (Bankr. S.D.N.Y. 2004); *see also NLRB* v. *Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (recognizing the "business judgment" standard used to approve rejection of executory contracts); *In re Klein Sleep Prods., Inc.*, 78 F.3d 18, 25 (2d Cir. 1996) (same).  The business judgment standard requires a court to approve a debtor's business decision unless that decision is the product of bad faith, whim or caprice.  *See Westbury Real Estate Ventures* v. *Bradlees, Inc.* (*In re Bradlees Stores, Inc.*), 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996), *appeal dismissed*,

---

[4]    The Debtors and their estates reserve any and all rights to assert that the Contract is not an executory contract, and nothing included in, or omitted from, this Motion shall impair, prejudice, waive or otherwise affect such rights.

210 B.R. 506 (S.D.N.Y. 1997).

9.      Rejection of an executory contract or an unexpired lease is appropriate where such rejection would benefit the estate. *See Orion Pictures Corp.*, 4 F.3d at 1098-99; *In re Stable Mews Assocs., Inc.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984). Upon finding that a debtor exercised its sound business judgment in determining that rejection of certain contracts or leases is in the best interests of its creditors and all parties in interest, a court should approve the rejection under section 365(a) of the Bankruptcy Code. *See In re Summit Land Co.*, 13 B.R. 310, 315 (Bankr. D. Utah 1981) (holding that absent extraordinary circumstances, court approval of a debtors' decision to assume or reject an executory contract "should be granted as a matter of course").

10.     The Debtors believe that rejection of the Contract effective as of the date hereof is well within the Debtors' business judgment, in furtherance of their efforts to preserve and maximize estate value, and in the best interests of their estates and creditors. The Debtors also believe that any continued expense in maintaining the Contract and attempting to market the Contract would likely outweigh, if not eclipse, any benefit in attempting to identify a potential acquirer of the Contract, and unnecessarily deplete assets of their estates to the detriment of their creditors. Under the Contract, Kodak pays a significant annual amount for, among other things, the naming rights related to the Kodak Theatre. The Debtors have evaluated the Contract in consultation with their professional advisors and determined that any benefit related to these rights likely does not exceed or equal the Debtors' costs associated with the Contract. In contrast, the Debtors' rejection of the Contract will represent a significant annual cost savings to the Debtors and their estates. Accordingly, the Debtors submit that rejection of the Contract represents a sound exercise of their business judgment and should therefore be approved.

01: 11763425.3

**B.      Deeming the Contract Rejected Effective as of the Date Hereof Is Appropriate.**

11.      The Debtors also respectfully submit that it is appropriate for the Court to deem the Contract rejected effective as of the date hereof.

12.      While section 365 of the Bankruptcy Code does not specifically address whether the Court may order rejection to be effective retroactively, many courts have held that bankruptcy courts may, in their discretion, authorize rejection retroactive to a date prior to entry of the order authorizing such rejection.  *See, e.g., Constant Ltd. P'ship* v. *Jamesway Corp.* (*In re Jamesway Corp.*), 179 B.R. 33, 36-37 (S.D.N.Y. 1995) (stating that section 365 does not include "restrictions as to the manner in which the court can approve rejection"); *BP Energy Co.* v. *Bethlehem Steel Corp.*, 2002 WL 31548723, at *3 (S.D.N.Y. Nov. 15, 2002) ("We cannot conclude . . . that a bankruptcy court's assignment of a retroactive rejection date falls outside of its authority when the balance of the equities favors this solution."); *In re Jamesway Corp.*, 179 B.R. 33 (S.D.N.Y. 1995) (same); *see also In re At Home Corp.*, 392 F.3d 1064, 1065-66 (9th Cir. 2004) (affirming bankruptcy court's approval of retroactive rejection), *cert. denied sub nom.  Pac. Shores Dev., LLC* v. *At Home Corp.*, 546 U.S. 814 (2005); *In re Thinking Machs., Corp.*, 67 F.3d 1021, 1028 (1st. Cir. 1995) ("bankruptcy courts may enter retroactive orders of approval, and should do so when the balance of equities preponderates in favor of such remediation"); *In re CCI Wireless, LLC*, 297 B.R. 133, 140 (D. Colo. 2003) (holding that "because section 365 does not, as a matter of law, prohibit selection of a retroactive date for rejection, the bankruptcy court has authority under section 365(d)(3) to set the effective date of rejection at least as early as the filing date of the motion to reject.").

13.      In this instance, the balance of the equities favors the relief requested herein.  Without a retroactive date of rejection, the Debtors will be potentially forced to incur unnecessary administrative charges for an agreement that likely does not provide a benefit to the

01: 11763425.3

**1264**

Debtors and their estates in excess of the costs associated therewith. Moreover, the Counterparty will not be unduly prejudiced if the rejection of the Contract is deemed effective as of the date hereof because counsel for the Counterparty will receive notice of this Motion via overnight delivery (and electronic mail). In addition, prior to the filing of this Motion, by letter dated January 30, 2012, counsel for the Counterparty notified the Debtors that it anticipated the Debtors would file a motion, the following day, to reject the Contract *nunc pro tunc*. In response, on the date hereof, the undersigned counsel for the Debtors contacted counsel to the Counterparty to advise counsel that the Debtors were in fact filing a motion to reject the Contract *nunc pro tunc* to January 31, 2012, and that the Counterparty should take all steps necessary to remove Kodak's naming rights associated with the theatre, including, without limitation, any signage. Therefore, the Debtors respectfully submit that it is fair and equitable for the Court to find that the Contract is rejected as of the date hereof.

14.     Courts in this district have previously granted relief similar to that requested herein. *See, e.g., In re AMR Corporation*, Case No. 11-15463 (Bankr. S.D.N.Y. Dec. 22, 2011) (order authorizing retroactive rejection of unexpired leases); *In re The Great Atl. & Pac. Tea Co.*, Case No. 10-24549 (Bankr. S.D.N.Y. May 2, 2011) (same); *In re BB Liquidating Inc. (f/k/a Blockbuster Inc.)*, Case No. 10-14997 (Bankr. S.D.N.Y. Oct. 21, 2010) (same); *In re The Reader's Digest Ass'n, Inc.*, Case No. 09-14326 (Bankr. S.D.N.Y. Sep. 17, 2009) (same). The Debtors submit that the present circumstances warrant similar relief in these chapter 11 cases.

## Notice

15.     Notice of this Motion has been provided to: (a) the United States Trustee for the Southern District of New York; (b) the agent under the prepetition revolving credit facility; (c) the indenture trustee for the prepetition 10.625% Senior Secured Notes due March

15, 2019; (d) the indenture trustee for the prepetition 9.75% Senior Secured Notes due March 1,

2018; (e) counsel to the Ad Hoc Committee of Holders of Senior Secured Notes; (f) proposed

counsel to the Creditors' Committee; (g) counsel to the agent under the proposed Debtor-In-

Possession Credit Agreement; (h) counsel to the Counterparty; and (i) all parties requesting

notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002.  The Debtors respectfully

submit that further notice of this Motion is neither required nor necessary.

### No Prior Request

16.    The Debtors have not previously sought the relief requested herein from

this or any other court.

*Remainder of page intentionally left blank*

01: 11763425.3

**1266**

WHEREFORE, the Debtors respectfully request that the Court (a) enter the

Proposed Order, authorizing the Debtors to (i) reject the Contract effective as of the date hereof,

and (ii) take such actions as may be necessary to implement and effectuate the rejection of the

Contract, and (b) grant such other and further relief as may be just and proper.

Dated:  January 31, 2012
       New York, New York

/s/ Pauline K. Morgan

Pauline K. Morgan
Joseph M. Barry
YOUNG CONAWAY STARGATT & TAYLOR, LLP
1270 Avenue of the Americas
Suite 2210
New York, New York 10020
Telephone:     (212) 332-8840
Facsimile:      (212) 332-8855

- and -

Andrew G. Dietderich
John J. Jerome
Michael H. Torkin
Mark U. Schneiderman
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:     (212) 558-4000
Facsimile:      (212) 558-3588

Proposed Counsel to the Debtors
and Debtors in Possession

01: 11763425.3

**1267**

**Hearing Date: February 15, 2012 at 11:00 a.m. (Eastern Time)**
**Objection Deadline: February 8, 2012 at 4:00 p.m. (Eastern Time)**

Andrew G. Dietderich
John J. Jerome
Michael H. Torkin
Mark U. Schneiderman
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone:    (212) 558-4000
Facsimile:    (212) 558-3588

Proposed Counsel to the Debtors and
Debtors in Possession

Pauline K. Morgan
Joseph M. Barry
YOUNG CONAWAY STARGATT &
TAYLOR, LLP[1]
1270 Avenue of the Americas
Suite 2210
New York, New York 10020
Telephone:    (212) 332-8840
Facsimile:    (212) 332-8855

Proposed Counsel to the Debtors and Debtors
in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| EASTMAN KODAK COMPANY, *et al.*,[2] | Case No. 12-10202 (ALG) |
| Debtors. | Jointly Administered |

## NOTICE OF HEARING ON DEBTORS' MOTION FOR
## AN ORDER AUTHORIZING REJECTION OF CERTAIN
## EXECUTORY CONTRACT *NUNC PRO TUNC* TO JANUARY 31, 2012

**PLEASE TAKE NOTICE** that a hearing on the Debtors' Motion for an Order

Authorizing Rejection of Certain Executory Contract *Nunc Pro Tunc* to January 31, 2012 (the

---

[1]    All parties in interest with inquiries regarding this Motion should direct such inquiries to Young Conaway Stargatt & Taylor, LLP

[2]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Eastman Kodak Company (7150); Creo Manufacturing America LLC (4412); Eastman Kodak International Capital Company, Inc. (2341); Far East Development Ltd. (2300); FPC Inc. (9183); Kodak (Near East), Inc. (7936); Kodak Americas, Ltd. (6256); Kodak Aviation Leasing LLC (5224); Kodak Imaging Network, Inc. (4107); Kodak Philippines, Ltd. (7862); Kodak Portuguesa Limited (9171); Kodak Realty, Inc. (2045); Laser-Pacific Media Corporation (4617); NPEC Inc. (5677); Pakon, Inc. (3462); and Qualex Inc. (6019).  The location of the Debtors' corporate headquarters is:  343 State Street, Rochester, NY 14650.

"**Motion**"), of Eastman Kodak Company, on behalf of itself and its affiliated debtors and debtors

in possession in these chapter 11 cases (collectively, the "**Debtors**"), will be held before the

Honorable Allan L. Gropper, in Room 617 of the United States Bankruptcy Court for the

Southern District of New York (the "**Bankruptcy Court**"), One Bowling Green, New York,

New York 10004, on **February 15**, **2012 at 11:00 a.m. (Eastern Time)**, or as soon thereafter as

counsel may be heard.

   **PLEASE TAKE FURTHER NOTICE** that any responses or objections to the

Motion (the "**Objections**") must be in writing, shall conform to the Federal Rules of Bankruptcy

Procedure and the Local Bankruptcy Rules for the Southern District of New York, and shall be

filed with the Bankruptcy Court (a) by registered users of the Bankruptcy Court's case filing

system, electronically in accordance with General Order M-399 (which can be found at

http://www.nysb.uscourts.gov) and (b) by all other parties in interest, on a 3.5 inch disk, in text-

searchable portable document format (PDF) (with a hard copy delivered directly to Chambers),

in accordance with the customary practices of the Bankruptcy Court and General Order M-399,

to the extent applicable, and served in accordance with General Order M-399 and on (a) counsel

for the Debtors, Sullivan & Cromwell LLP, 125 Broad Street, New York, New York, 10004,

Attn:  Andrew G. Dietderich, and Young Conaway Stargatt & Taylor, LLP, 1270 Avenue of the

Americas, Suite 2210, New York, New York 10020, Attn:  Pauline K. Morgan; (b) the Office of

the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor,

New York, New York 10004, Attn:  Brian Masumoto; (c) counsel to the agent under the

prepetition revolving credit facility, Shearman & Sterling LLP, 599 Lexington Avenue, New

York, New York 10022, Attn:  Susan Fennessey and Fredric Sosnick; (d) the indenture trustee

for the prepetition 10.625% Senior Secured Notes due March 15, 2019; (e) the indenture trustee

01: 11765610.1

**1269**

for the prepetition 9.75% Senior Secured Notes due March 1, 2018; (f) counsel to the Ad Hoc

Committee of Holders of Senior Secured Notes, Akin Gump Strauss Hauer & Feld LLP, One

Bryant Park, New York, New York 10036, Attn:  Michael S. Stamer; (g) proposed counsel to the

Official Committee of Unsecured Creditors, Milbank, Tweed, Hadley & M$^c$Cloy LLP, 1 Chase

Manhattan Plaza, New York, New York 10005, Attn:  Dennis F. Dunne; (h) counsel to Citicorp

North America, Inc., as agent for the Debtors' postpetition secured lenders, Davis Polk &

Wardwell LLP, 450 Lexington Avenue, New York, New York 10017, Attn:  Marshall S.

Huebner; and (i) all parties requesting notice in these chapter 11 cases pursuant to Bankruptcy

Rule 2002, so as to be received no later than **February 8, 2012 at 4:00 p.m. (Eastern Time)**

(the "**Objection Deadline**").

*Remainder of page intentionally left blank*

**PLEASE TAKE FURTHER NOTICE** that if no Objections are timely filed and served with respect to the Motion, the Debtors may, on or after the Objection Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Motion, which order may be entered with no further notice or opportunity to be heard.

Dated:  January 31, 2012                          /s/ Pauline K. Morgan
       New York, New York                     Pauline K. Morgan
                                      Joseph M. Barry
                                      YOUNG CONAWAY STARGATT &
                                      TAYLOR, LLP
                                      1270 Avenue of the Americas
                                      Suite 2210
                                      New York, New York 10020
                                      Telephone:    (212) 332-8854
                                      Facsimile:    (212) 332-8855

                                      - and -

                                      Andrew G. Dietderich
                                      John J. Jerome
                                      Michael H. Torkin
                                      Mark U. Schneiderman
                                      SULLIVAN & CROMWELL LLP
                                      125 Broad Street
                                      New York, New York  10004
                                      Telephone:    (212) 558-4000
                                      Facsimile:    (212) 558-3588

                                      Proposed Counsel to the Debtors and Debtors in
                                      Possession

01: 11765610.1

**1271**

# EXHIBIT A

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| EASTMAN KODAK COMPANY, *et al.*,[1] | Case No. 12-10202 (ALG) |
| Debtors. | (Jointly Administered) |

## ORDER AUTHORIZING REJECTION OF CERTAIN
## EXECUTORY CONTRACT *NUNC PRO TUNC* TO JANUARY 31, 2012

Upon the motion (the "**Motion**")[2] of Eastman Kodak Company, on behalf of itself

and its affiliated debtors and debtors in possession in these chapter 11 cases (collectively, the

"**Debtors**"), for entry of an order authorizing the Debtors to (a) reject the Contract effective as of

January 31, 2012, and (b) take such actions as may be necessary to implement and effectuate the

rejection of the Contract; and it appearing that this Court has jurisdiction to consider the Motion

pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that venue of these chapter 11 cases and

the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing

that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court having

determined that the relief requested in the Motion is in the best interests of the Debtors, their

estates, their creditors and other parties in interest; and it appearing that proper and adequate

notice of the Motion has been given and that no other or further notice is necessary; and after due

deliberation thereon; and good and sufficient cause appearing therefor;

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Eastman Kodak Company (7150); Creo Manufacturing America LLC (4412); Eastman Kodak International Capital Company, Inc. (2341); Far East Development Ltd. (2300); FPC Inc. (9183); Kodak (Near East), Inc. (7936); Kodak Americas, Ltd. (6256); Kodak Aviation Leasing LLC (5224); Kodak Imaging Network, Inc. (4107); Kodak Philippines, Ltd. (7862); Kodak Portuguesa Limited (9171); Kodak Realty, Inc. (2045); Laser-Pacific Media Corporation (4617); NPEC Inc. (5677); Pakon, Inc. (3462); and Qualex Inc. (6019). The location of the Debtors' corporate headquarters is: 343 State Street, Rochester, NY 14650.

[2] All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion.

01: 11763425.3

**1273**

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED as set forth herein.

2.      Pursuant to section 365 of the Bankruptcy Code and Bankruptcy Rule 6006, the Contract set forth on Exhibit 1 attached hereto is hereby rejected effective as of January 31, 2012.

3.      The Counterparty shall have until the date fixed by this Court in these chapter 11 cases pursuant to Bankruptcy Rule 3003(c)(3) to file any and all claims for damages arising from the Debtors' rejection of the Contract.

4.      Nothing in this Order shall impair, prejudice, waive or otherwise affect any rights of the Debtors and their estates to assert that any claims for damages arising from the Debtors' rejection of the Contract is limited to any remedies available under any applicable termination provisions of such Contract, or that any such claims are obligations of a third party, and not those of the Debtors or their estates.

5.      The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

6.      The requirements set forth in Local Rule 9013-1(b) are satisfied.

7.      The requirements set forth in Bankruptcy Rule 6004(a) are satisfied.

8.      This Order is immediately effective and enforceable, notwithstanding the possible applicability of Bankruptcy Rule 6004(h) or otherwise.

9.      The requirements set forth in Bankruptcy Rules 6006 and 9014 are satisfied.

01: 11763425.3

**1274**

10.     This Court retains jurisdiction with respect to all matters arising from or

related to the enforcement of this Order.

New York, New York
Date:  February [•], 2012

_____
Allan L. Gropper
United States Bankruptcy Judge

01: 11763425.3

**1275**

# EXHIBIT 1

**Contract**

| Counterparty | Contract |
|---|---|
| CIM/H&H Media L.P., as successor-in-interest to TrizecHahn Hollywood LLC<br>c/o KattenMuchinRosenman LLP<br>Attention: Thomas Leanse, Esq. and Jessica Mickelsen, Esq.<br>2029 Century Park East, Suite 2600<br>Los Angeles, CA 90067-3012<br>Email: thomas.leanse@kattenlaw.com<br>jessica.mickelsen@kattenlaw.com | Sponsorship Agreement, dated October 5, 2000, by and among TrizecHahn Hollywood LLC ("TH"), as amended by (a) letter agreements dated (i) December 7, 2000, (ii) December 20, 2000, and (iii) January 30, 2001, (b) that certain Amendment of Sponsorship Agreement, dated February 23, 2004, by and among TH and Kodak, and (c) that certain Second Amendment to Agreement, dated September 1, 2011, by and among CIM/H&H Media L.P., as successor-in-interest to TH |

0I: 11763425.3

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| EASTMAN KODAK COMPANY, *et al.*,[1] | Case No. 12-10202 (ALG) |
| Debtors. | (Jointly Administered) |

## ORDER AUTHORIZING REJECTION OF CERTAIN
## EXECUTORY CONTRACT *NUNC PRO TUNC* TO JANUARY 31, 2012

Upon the motion (the "**Motion**")[2] of Eastman Kodak Company, on behalf of itself

and its affiliated debtors and debtors in possession in these chapter 11 cases (collectively, the

"**Debtors**"), for entry of an order authorizing the Debtors to (a) reject the Contract effective as of

January 31, 2012, and (b) take such actions as may be necessary to implement and effectuate the

rejection of the Contract; and it appearing that this Court has jurisdiction to consider the Motion

pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that venue of these chapter 11 cases and

the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing

that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court having

determined that the relief requested in the Motion is in the best interests of the Debtors, their

estates, their creditors and other parties in interest; and it appearing that proper and adequate

notice of the Motion has been given and that no other or further notice is necessary; and after due

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Eastman Kodak Company (7150); Creo Manufacturing America LLC (4412); Eastman Kodak International Capital Company, Inc. (2341); Far East Development Ltd. (2300); FPC Inc. (9183); Kodak (Near East), Inc. (7936); Kodak Americas, Ltd. (6256); Kodak Aviation Leasing LLC (5224); Kodak Imaging Network, Inc. (4107); Kodak Philippines, Ltd. (7862); Kodak Portuguesa Limited (9171); Kodak Realty, Inc. (2045); Laser-Pacific Media Corporation (4617); NPEC Inc. (5677); Pakon, Inc. (3462); and Qualex Inc. (6019).  The location of the Debtors' corporate headquarters is:  343 State Street, Rochester, NY 14650.

[2]     All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion.

**1278**

deliberation thereon; and good and sufficient cause appearing therefor;

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED as set forth herein.

2.      Pursuant to section 365 of the Bankruptcy Code and Bankruptcy Rule 6006, the Contract set forth on Exhibit 1 is hereby rejected effective ~~as of January 31, 2012~~ **no later than the date hereof.**

3.      **The Court finds that the Contract is executory in that there are material obligations on both parties to the Contract that are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance by the other.  *See, e.g.*, *In re 375 Park Ave. Assoc., Inc.*, 182 B.R. 690, 697-98 (Bankr. S.D.N.Y. 1995).  The Debtors have exercised sound business judgment in the interest of the estate in rejecting the Contract.  *COR Route 5 Co. v. The Penn Traffic Co. (In re Penn Traffic Co.)*, 524 F.3d 373 (2d Cir. 2008).**

4.      The Counterparty shall have until the date fixed by this Court in these chapter 11 cases pursuant to Bankruptcy Rule 3003(c)(3) to file any and all claims for damages arising from the Debtors' rejection of the Contract, **or any request for payment of an alleged administrative expense in connection with the Contract.  The effective date of the rejection of the Contract for the purpose of assessing damages is reserved for trial or resolution subsequent to the filing of a proof of claim.**

5.      Nothing in this Order shall impair, prejudice, waive or otherwise affect any rights of the Debtors and their estates to assert that any claims for damages arising from the Debtors' rejection of the Contract are limited to any remedies available under any applicable termination provisions of such Contract, or that any such claims are obligations of a third party, and not those of the Debtors or their estates.

2

6.    The Debtors **and the Counterparty** are authorized and empowered to take all actions necessary to implement the relief granted in this Order.  **The Counterparty may but is not required to delay the removal of the signage associating the theatre with the Debtors, but any delay shall not delay the effective date of this order of rejection.**

7.    The requirements set forth in Local Rule 9013-1(b) are satisfied.

8.    The requirements set forth in Bankruptcy Rule 6004(a) are satisfied.

9.    This Order is immediately effective and enforceable, notwithstanding the possible applicability of Bankruptcy Rule 6004(h) or otherwise.

10.    The requirements set forth in Bankruptcy Rules 6006 and 9014 are satisfied.

11.    This Court retains jurisdiction with respect to all matters arising from or related to the enforcement of this Order.

New York, New York
Date:  February 15, 2012

/s/ Allan L. Gropper
UNITED STATES BANKRUPTCY JUDGE

SC1:3172039.9

**1280**

# **EXHIBIT 1**

## **Contract**

SC1:3172039.9

| Counterparty | Contract |
|---|---|
| CIM/H&H Media L.P., as successor-in-interest to TrizecHahn Hollywood LLC<br>c/o KattenMuchinRosenman LLP<br>Attention:  Thomas Leanse, Esq. and Jessica Mickelsen, Esq.<br>2029 Century Park East, Suite 2600<br>Los Angeles, CA 90067-3012<br>Email: thomas.leanse@kattenlaw.com<br>       jessica.mickelsen@kattenlaw.com | Sponsorship Agreement, dated October 5, 2000, by and among TrizecHahn Hollywood LLC ("TH"), as amended by (a) letter agreements dated (i) December 7, 2000, (ii) December 20, 2000, and (iii) January 30, 2001, (b) that certain Amendment of Sponsorship Agreement, dated February 23, 2004, by and among TH and Kodak, and (c) that certain Second Amendment to Agreement, dated September 1, 2011, by and among CIM/H&H Media L.P., as successor-in-interest to TH |

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Sunny Singh

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X
                                                             :
In re                                                        :    **Chapter 11**
                                                             :
**DITECH HOLDING CORPORATION**, *et al.*,                    :    **Case No. 19-[_____] (___)**
                                                             :
                            **Debtors.[1]**                  :    **(Joint Administration Pending)**
                                                             :
-------------------------------------------------------------X

**MOTION OF DEBTORS FOR INTERIM AND FINAL**
**ORDERS (I) AUTHORIZING DEBTORS TO CONTINUE**
**HONORING REVERSE ISSUER AND SERVICING OBLIGATIONS IN**
**THE ORDINARY COURSE AND GRANTING RELATED RELIEF,**
**(II) MODIFYING AUTOMATIC STAY ON A LIMITED BASIS TO FACILITATE**
**DEBTORS' ONGOING OPERATIONS, AND (III) SCHEDULING A FINAL HEARING**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Debtors' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

# TABLE OF CONTENTS

**Page**

Preliminary Statement ..................................................................................4

Background .................................................................................................8

Jurisdiction ................................................................................................9

Relief Requested ........................................................................................9

I. Overview of RMS's Obligations As MBS Issuer and Loan Servicer ...................10

    A.    RMS's Obligations as MBS Issuer ....................................................10

           1.    Ginnie Mae Buyouts ...............................................................10

           2.    Securitization Activities and Payments Related Thereto ..................11

    B.    RMS's Obligations as Loan Servicer .................................................13

           1.    Servicing Obligations In Connection With Performing Loans ...............13

           2.    Servicing Obligations In Connection With Non-Performing Loans .........15

                  a.    Foreclosure Sales ............................................................16

                  b.    REO Property Preservation and Disposition ...............................16

           3.    Curtailment .......................................................................18

           4.    Servicing Fees ....................................................................19

            5.    Servicer Advances ................................................................19

    C.    FHA Claims Process ....................................................................20

           1.    Performing Loan Claims ..........................................................21

           2.    Non-Performing Loan Claims .....................................................21

    D.    Critical Vendors ........................................................................22

    E.    Funding Ginnie Mae Buyout Obligations and Servicer Advances ................26

    F.    Indemnification Obligations ...........................................................27

    G.    Compliance and Regulatory Obligations .............................................28

    H.    Limited Relief from the Automatic Stay .............................................29

           1.    Foreclosure and Eviction Proceedings ........................................29

           2.    Borrower Bankruptcy Proceedings .............................................30

           3.    Actions Involving Amount, Validity, or Priority of Liens ....................33

    I.    Assurances of Future Performance ...................................................34

II. Applicable Authority .............................................................................36

A.    The Court Should Authorize the Debtors to (i) Honor Issuer and Servicer
Obligations in Ordinary Course of Business and (ii) to Honor Prepetition
and Postpetition Obligations Related Thereto ......................................................36

    a.    The Debtors' Activities Satisfy Ordinary Course of
Business Standard .......................................................36

    b.    The Court Should Authorize the Debtors to Sell the REO
Property Free and Clear ...............................................40

    c.    The Requested Relief, Including Payment of the Critical
Vendor Claims, is Both Necessary and Appropriate to
Conserve the Value of Debtors' Estates.......................................41

B.    The Court Should Grant the Limited Stay Relief Requested Herein
Pursuant to Section 362(d)(1) of the Bankruptcy Code ......................................42

C.    The Court Should Authorize the Debtors to Provide Ginnie Mae and
Fannie Mae Assurances of Future Performance ..................................................43

Scope of Motion....................................................................................................................49

Reservation of Rights ...........................................................................................................49

Debtors Have Satisfied Bankruptcy Rule 6003(b).................................................................50

Bankruptcy Rules 6004(a) and (h) .......................................................................................50

Notice ..................................................................................................................................51

**Exhibit A:**    Proposed Interim Order

    Schedule 1:    Ginnie Mae Assurance of Future Performance

    Schedule 2:    Fannie Mae Assurance of Future Performance

WEIL:\96914030\1\41703.0010

**1285**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Ditech Holding Corporation (f/k/a Walter Investment Management Corp.) and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" or the "**Company**"), respectfully represent as follows in support of this motion (the "**Motion**"):

## Preliminary Statement

1.      Reverse Mortgage Solutions, Inc. ("**RMS**"), a debtor in these chapter 11 cases, primarily focuses on servicing and subservicing reverse mortgage loans, the majority of which are home equity conversion mortgages ("**HECMs**") that are insured by the U.S. Department of Housing and Urban Development Federal Housing Administration (the "**FHA**").[2]  A HECM is a loan that allows homeowners to borrow money against the equity value of their homes.  Unlike traditional home equity loans, HECMs are non-recourse loans without a fixed term with balances increasing over time as interest and other fees are added to the borrowers' total obligations.

2.      A reverse mortgage borrower typically is not required to remit monthly mortgage payments.  Instead, the borrower receives cash in monthly installments, a lump sum or a line of credit up to a principal limit, which limit is calculated based on, among other things, the age of the borrower, the appraised value of the borrower's home, and the loan interest rate.  HECM loan borrowers must be age 62 or over and typically rely on the proceeds of such loan to fund their living expenses.  Indeed, the average age of borrowers under the HECM loans in RMS's portfolio is approximately seventy-five (75) years of age.  The loans generally become due and payable when one of the following events of default occur:  (i) the death of the borrower, (ii) the borrower

---

[2]      The remaining portion of loans that RMS services are proprietary reverse mortgage loans developed by certain lenders that are not insured by FHA.  Unless otherwise indicated, all references to "HECM," "mortgage loan," or "loan" are to reverse mortgage loans.

no longer utilizes the home as his or her principal residence, (iii) title to the property is transferred to a non-borrower, (iv) the borrower fails to meet other requirements of the loans, (*e.g.*, paying property taxes, insurance, and homeowner's association fees), or (v) the end of a deferral period for an eligible non-borrowing spouse.[3]

3.    Reverse mortgage loan servicing accounts for approximately 13% of the Debtors' revenue.[4] RMS performs servicing for mortgage loans that fall into two categories: (i) mortgage loans that RMS owns or owns the mortgage servicing rights and (ii) mortgage loans for which RMS performs servicing and subservicing for third-party owners of loans. RMS performs mortgage servicing primarily in accordance with the FHA servicing guidelines (the "**FHA Servicing Guidelines**"), which impose numerous obligations on qualified servicers such as RMS.[5] As of December 31, 2018, RMS serviced or subserviced approximately 88,000 loans with a total unpaid principal balance of approximately $17.1 billion.

4.    RMS sold virtually all of the loans that it originated to securitizations guaranteed by Ginnie Mae.[6] RMS now serves as an issuer of mortgage-backed securities ("**MBS**")

---

[3]    The due and payable status of a HECM may be deferred after the death of the last surviving borrower if an eligible non-borrowing spouse occupies the property as a principal residence and meets certain other FHA requirements. *See* Mortgagee Letter 2015-10, available at https://www.hud.gov/program_offices/housing/sfh/hecm/hecmml.

[4]    Although RMS exited the reverse mortgage origination business in early 2017, RMS continues to have ongoing obligations in connection with mortgage loans that it originated, such as funding subsequent borrower draws.

[5]    The FHA Servicing Guidelines include regulations promulgated in Part 206 of Chapter 24 of the Code of Federal Regulations, HUD Handbook 4330.1, and various Mortgagee Letters available at https://www.hud.gov/program_offices/housing/sfh/hecm/hecmml.

[6]    As used herein, "**Ginnie Mae**" means the Government National Mortgage Association. Ginnie Mae is a federal corporation within FHA, a federal agency, that guarantees investors in the securitizations the timely payment on mortgage-backed securities backed by federally insured or guaranteed loans (*e.g.*, loans insured by FHA, guaranteed by the Department of Veterans Affairs, or guaranteed the Department of Agriculture).

As used herein, "**Fannie Mae**" means the Federal National Mortgage Association. Fannie Mae is a government-sponsored enterprise chartered by Congress that buys and securitizes mortgage loans originated by mortgage lenders, thereby enabling such lenders quick access to liquidity fueled by market demand for residential mortgage backed securities.

WEIL:\96914030\1\41703.0010

in connection with such securitizations in accordance with the Ginnie Mae securitization guide (the "**Ginnie Mae Guide**"),[7] and those certain Master Servicing Agreements, dated as of March 6, 2014 (together with all Guarantee Agreements, MBS prospectus documents, cross default agreements, escrow agreements, Tri-Party agreement, corporate guaranty, acknowledgement agreement, supplements, addendums, amendments, and related agreements, the "**Ginnie Mae Servicing Agreements**" and, together with the Ginnie Mae Guide, the "**Ginnie Mae Agreements**"). Similar to the FHA Servicing Guidelines, the Ginnie Mae Agreements impose substantial obligations on qualified issuers of MBS such as RMS. RMS periodically issues securitizations to finance subsequent borrower draws and other amounts.

5.     Any disruptions to RMS's ability to perform under and comply with the FHA Servicing Guidelines and the Ginnie Mae Guide in the ordinary course—whether as an issuer of Ginnie Mae guaranteed securitizations or as a servicer—could lead to a catastrophic loss of value for the Debtors' estates, major disruption in the reverse mortgage securitization market, and a temporary loss of income for thousands of reverse mortgage borrowers, most of whom are senior citizens relying on such loan payments for essential living and medical expenses.

6.     Furthermore, if RMS fails to comply with the FHA Servicing Guidelines, it could face the possible termination of its servicing rights without compensation, which include the right to receive reimbursements from FHA. Such termination could result in the loss of future servicing fees, cause the loss of reimbursement of servicing advances by FHA to RMS of approximately $68 million, and create substantial harm to the Debtors' estates. Similarly, a failure to comply with the Ginnie Mae Guide may result in a default subject to the terms and conditions

---

[7]     The Ginnie Mae Guide is available at
https://www.ginniemae.gov/issuers/program_guidelines/Pages/mostrecentapms.aspx.

WEIL:\96914030\1\41703.0010

**1288**

of that certain Cross-Default Agreement, dated as of July 17, 2015 (the "**Cross-Default Agreement**"), pursuant to which the interests of both RMS and Ditech in the applicable underlying reverse and forward mortgage portfolios could be extinguished without compensation or any rights of reimbursement, and a default subject to the terms and conditions of Ginnie Mae Servicing Agreements.

7.      As a servicer and subservicer of Fannie Mae owned loans (collectively, the "**Fannie Mae Loans**"),[8] RMS must comply with the Fannie Mae Mortgage Selling and Servicing Contract, which includes that certain Servicing Guide: Fannie Mae Single Family and that certain Fannie Mae Reverse Mortgage Loan Servicing Manual (collectively, the "**Fannie Mae Servicing Guides**"), and RMS's obligations thereunder are secured pursuant to that certain Pledge and Security Agreement dated as of December 19, 2014 (the "**Fannie Mae Pledge Agreement**" and together with the Fannie Mae Mortgage Selling and Servicing Contract and the Fannie Mae Servicing Guides, together with all supplements, addendums, amendments, and related agreements, the "**Fannie Mae Agreements**").  The Fannie Mae Agreements generally provide that Fannie Mae can terminate servicers either at will or for cause, among other reasons.  Accordingly, if RMS does not honor its servicing or subservicing obligations with respect to the Fannie Mae loans, Fannie Mae may take the position that it has the right to unilaterally terminate RMS's servicing and/or subservicing rights, which could result in the loss of a significant portion of the Debtors' revenue.

8.      Further, if the relief requested is not granted, the Debtors will not be able to secure debtor in possession financing and administer these chapter 11 cases.  Approval of this

---

[8]      In addition to servicing and subservicing Fannie Mae Loans, RMS also acts as the REO property manager for HECMs guaranteed by Fannie Mae and held in the Mortgage Equity Conversion Asset Trust 2011-1 (the "**MECA**") and is responsible for, among other things, disposition of the related REO properties and remitting the sale proceeds (the "**MECA REO Sale Proceeds**") to the servicer under the MECA.

Motion and the ability to comply with and remain an approved servicer and subservicer with Ginnie Mae and Fannie Mae are conditions to the debtor in possession financing.

9.      It is imperative that the Debtors be permitted to continue to operate their business in the ordinary course of business without interruption.  If the relief requested herein is not granted, the Debtors' ability to administer their chapter 11 cases would be jeopardized.  The Debtors believe that the relief requested herein will preserve the value-maximizing reorganization transaction contemplated by the Restructuring Support Agreement (as defined herein).

## Background

10.      On the date hereof (the "**Commencement Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.

11.      Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

12.      The Debtors commenced these chapter 11 cases on a prearranged basis with the support of more than 75% of their term loan lenders, who have committed to support a value-maximizing chapter 11 plan that contemplates a debt-to-equity recapitalization transaction and provides for the simultaneous marketing of all or substantially all of the Debtors' assets to the extent such sale represents a higher or better value than the recapitalization transaction.  Consistent with their obligations under that certain Restructuring Support Agreement, dated as of February 8, 2019 (the "**Restructuring Support Agreement**"), the Debtors intend to file a

proposed plan of reorganization shortly hereafter and will seek to emerge from chapter 11 on an expedited timeframe.

13.     Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Gerald A. Lombardo Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York*, sworn to on the date hereof (the "**Lombardo Declaration**"), [9] which has been filed with the Court contemporaneously herewith and is incorporated herein by reference.

## Jurisdiction

14.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

15.     Through this Motion, pursuant to sections 105(a), 362, 363(c), 363(f) 364(d), 1107(a), and 1108 of the Bankruptcy Code and Bankruptcy Rules 4001, 6003, and 6004, the Debtors seek authority, but not direction, to continue in the ordinary course of business and consistent with past practices, to:

a.     (i) honor and fund the Ginnie Mae Buyout Obligations, (ii) continue their securitization activities, (iii) honor the Ginnie Mae Agreements; and (iv) remit the Ginnie Mae Commitment Fee, the Ginnie Mae Guaranty Fee, amounts due from Borrower Paydown (each as defined herein), and certain administrative fees arising from RMS's securitization activities;

b.     (i) honor the Servicing Obligations, including by continuing to perform under the Fannie Mae Agreements and honor their obligations under the

---

[9]     Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Lombardo Declaration.

MECA, (ii) honor and pay the Curtailment Obligations, (iii) collect and securitize the Servicing Fees, and (iv) remit the Servicer Advances (each as defined herein);

c.       continue assignment and claim reimbursement activities;

d.       continue to employ and pay prepetition claims of the Critical Vendors (as defined herein);

e.       continue honoring RMS's indemnification obligations to FHA in connection with defective loans;

f.       fulfill compliance and regulatory obligations; and

g.       provide assurances of future performance to Ginnie Mae and Fannie Mae.

16.       In addition, the Debtors request that the Court enter a standing order modifying the automatic stay in connection with foreclosure and eviction proceedings.

17.       A proposed form of order granting the relief requested herein on an interim basis is annexed hereto as **Exhibit A** (the "**Proposed Interim Order**").

## I.
## Overview of RMS's Obligations As MBS Issuer and Loan Servicer

### A.       RMS's Obligations as MBS Issuer

#### 1.       Ginnie Mae Buyouts

18.       Unlike Fannie Mae or Freddie Mac, Ginnie Mae does not issue, sell, or buy MBS, nor does it purchase mortgage loans.  Instead, Ginnie Mae guarantees MBS secured by mortgage loans that have been pooled and securitized by RMS as an approved issuer.  Specifically, Ginnie Mae guarantees RMS's timely payment of interest and repayment of RMS-issued MBS.

19.       As mentioned above, RMS has ongoing obligations (the "**Ginnie Mae Buyout Obligations**") as an issuer in connection with its previously securitized loans.  Such obligations include, among other things, repurchasing loans in accordance with the requirements of the Ginnie Mae Guide and the Ginnie Mae Agreements.  The Ginnie Mae Agreements require RMS to repurchase mortgage loans when the loans reach ninety-eight percent (98%) of the

maximum FHA claim amount (the "**MCA**"), which is generally the lesser of appraised value of the underlying property or the maximum principal amount for a one-unit dwelling that FHA can lawfully insure for forward mortgages in the geographical area as provided by Section 203(b)(2) of the National Housing Act.[10]  Upon repurchasing mortgage loans that reach ninety-eight percent (98%) of MCA, RMS is repaid in one of three ways:  (i) a borrower (or the borrower's heir) pays RMS the total amount owed under the mortgage loan, (ii) if the loan is a performing loan (*i.e.*, a loan that is not in default), FHA reimburses RMS upon RMS's filing of an assignment claim for such loan to FHA, or (iii) if the loan is a defaulted loan, RMS liquidates the loan and seeks reimbursement from FHA to the extent the liquidation proceeds do not satisfy the total obligations owed under the loan.  RMS's Ginnie Mae Buyout Obligations are between approximately $169 million and $183 million each month.

### 2.    Securitization Activities and Payments Related Thereto

20.    When borrowers make subsequent draws on their loans, RMS securitizes such draws into pools that are referred to as "tail securitizations."  In addition to securitizing the amount of borrower draws in each tail securitization, RMS securitizes mortgage insurance premiums, Servicing Fees, vendor payments, and interest payments that RMS makes on behalf of the borrowers or accrues to the loan.  RMS securitizes approximately $16 million to $26 million in new tail securitizations on a monthly basis.

21.    RMS is required to remit various fees to Ginnie Mae in connection with the aforementioned securitization activities.  First, RMS must obtain authority from Ginnie Mae to issue up to an authorized dollar amount of securities at any given point in time.  RMS typically

---

[10]    RMS also subservices loans in private securitizations (*i.e.*, securitizations that are not guaranteed by Ginnie Mae).

WEIL:\96914030\1\41703.0010

requests such authority annually or semi-annually. In connection with each application, RMS remits a commitment fee (the "**Ginnie Mae Commitment Fee**") based on the amount of the requested commitment. The Ginnie Mae Commitment Fee is automatically deducted from RMS's account at the time RMS's application is processed. RMS estimates that the Ginnie Mae Commitment Fees for 2019 will be approximately $60,000.

22.    Second, RMS is required to pay Ginnie Mae a guaranty fee (the "**Ginnie Mae Guaranty Fee**") on account of each security for which RMS is the issuer of record. The Ginnie Mae Guaranty Fee is computed by multiplying the aggregate principal balance of the guaranteed securities outstanding at the beginning of the monthly reporting period by the applicable annual rate divided by twelve (12). RMS remits approximately $360,000 in Ginnie Mae Guaranty Fees on a monthly basis.

23.    Third, RMS must pay certain administrative fees to two (2) Ginnie Mae-approved document custodians. Such document custodians (i) review the loan documentation submitted by RMS in connection with its securitizations, (ii) certify to Ginnie Mae that the loan documentation accurately represents the mortgages placed in such custodians' control, and (iii) maintain control of the loan documents over the life of the loan. Following the custodians' certification to Ginnie Mae, RMS delivers the securities to a settlement agent. If a document custodian determines that RMS submitted an incomplete loan package, RMS must also pay fees to post letters of credit in accordance with the Ginnie Mae Agreements. RMS remits between approximately $40,000 in such administrative fees on a monthly basis.

24.    RMS is required to remit the loan collections amounts related to the loans that RMS has securitized to the MBS investors.[11] Such amounts include borrower pay-offs, partial

---

[11]    RMS is also required remit Borrower Paydowns on account of loans that are not securitized.

1294

pay-downs, proceeds from the sale of REO Property (as defined herein), and claim payments (collectively, the "**Borrower Paydowns**").  RMS remits approximately $200 million of Borrower Paydowns on a monthly basis.

25.     RMS's failure to honor the Ginnie Mae Buyout Obligations and remit the aforementioned fees and Borrower Paydowns could result in a default under the Ginnie Mae Agreements, which could lead to RMS's loss of its status as an approved issuer.  A failure to honor such obligations may result in a default subject to the terms and conditions of the Cross-Default Agreement, which would have a detrimental effect on the Debtors' estates.

26.     Accordingly, the Debtors seek authority, but not direction, to (i) honor and fund the Ginnie Mae Buyout Obligations, (ii) continue their securitizing activities, (iii) honor the Ginnie Mae Agreements; and (iv) remit the Ginnie Mae Commitment Fee, the Ginnie Mae Guaranty Fee, amounts due from Borrower Paydowns, and certain administrative fees arising from RMS's securitization activities, in each case, in the ordinary course of business and consistent with past practices.

**B.      RMS's Obligations as Loan Servicer**

27.     RMS is obligated to perform a variety of servicing functions in its capacity as servicer and subservicer.  Such servicing functions differ depending on whether the loan is performing or whether the loan is in default.

**1.      Servicing Obligations In Connection With Performing Loans**

28.     When borrowers comply with the terms of their loan agreements, the underlying loans are characterized as performing loans.  RMS's servicing obligations in connection with such loans include (i) funding scheduled and unscheduled borrower draws, (ii) funding FHA mortgage insurance premiums; (iii) corresponding with borrowers regarding the status of their loans, (iv) monitoring and disbursing borrower's insurance loss draft funds,

(v) monitoring borrowers' timely payment of taxes and homeowner's insurance, (vi) monitoring borrowers' compliance with certain occupancy requirements, (vii) making other servicer advances, which are fully reimbursable from third-party investors, in accordance with the applicable servicing agreements, and (viii) remediating errors or lack of compliance with laws or regulations (collectively, the "**Performing Loan Servicing Obligations**").With respect to (i) above, RMS, in its role as servicer, funds on a monthly basis approximately $4 million on account of scheduled borrower draws and approximately $16 million on account of unscheduled borrower draws.  In connection with loans that RMS subservices, RMS receives cash to fund scheduled and unscheduled borrower draws directly from third-party owners of such loans.

29.    At any given point in time, the borrower on a performing loan may sell the mortgaged property for at least the lesser of the outstanding loan balance or the appraised value and remit the proceeds to RMS.

30.    RMS must perform the Performing Loan Servicing Obligations in accordance with the requirements set forth by FHA in the FHA Servicing Guidelines and by Fannie Mae under the Fannie Mae Agreements.  A failure to comply with the FHA Servicing Guidelines or the Fannie Mae Agreements, as applicable, may lead to a termination of RMS's servicing rights without compensation (which could include the loss of RMS's right to receive reimbursements from FHA, Fannie Mae or other third-party investors on account of RMS's advances) and a possible transfer of RMS's servicing rights to a third-party servicer and could trigger defaults under Ditech Financial LLC's obligations as a servicer of securitized loans that are Ginnie Mae guaranteed.  A failure to honor such obligations may result in a default subject to the terms and conditions of the Cross-Default Agreement, which would have a detrimental effect on the Debtors'

estates. Accordingly, the Debtors request authority to honor the Performing Loan Servicing Obligations in the ordinary course of business and consistent with past practices.

### 2.    Servicing Obligations In Connection With Non-Performing Loans

31.    A substantial portion of RMS's servicing activities arise in connection with loans that are in default (*i.e.*, non-performing loans). Such obligations differ based upon whether defaults can be cured by borrowers and may include (i) entering into, and performing under, existing repayment plans, and (ii) engaging in foreclosure activities (collectively, the "**Default Servicing Obligations**" and together with the Performing Loan Servicing Obligations, the "**Servicing Obligations**"). RMS generally assists borrowers in their efforts to cure defaults. For example, if a default arises from a borrower's failure to occupy the mortgaged property, RMS typically provides the borrower up to twelve (12) months to cure such default by resuming occupancy of the property. Moreover, if a default arises from a borrower's failure to remit the requisite tax payments or homeowner's insurance premiums to the relevant third parties, RMS remits such payments on the borrower's behalf and provides the borrower with an opportunity to repay RMS through an FHA defined repayment plan.

32.    In most instances, however, defaults are not cured (especially as the most common form of default is the death of the last surviving borrower). In those cases, FHA regulations, handbooks, and mortgagee letters (collectively, the "**FHA Guidelines**") provide the borrower or the borrower's heirs the option to (i) pay off the outstanding loan balance, (ii) sell the mortgaged property for at least 95% of the appraised value and remit the proceeds to RMS, or (iii) provide RMS with a deed in lieu of foreclosure, which conveys the borrower's title in the mortgaged property to RMS. If a loan is not paid off in one of these three ways, RMS forecloses on the mortgaged property to satisfy the outstanding loan obligations. RMS forecloses on approximately fifty-six percent (56%) of defaulted loans in its servicing portfolio.

WEIL:\96914030\1\41703.0010

**1297**

### a.    Foreclosure Sales

33.    Upon commencing the foreclosure process, RMS notifies borrowers of its intent to foreclose and carries out the foreclosure in accordance with the laws of the jurisdiction in which the property is located.    Counsel retained by RMS typically requests or schedules a foreclosure sale date, attends a foreclosure sale (the "**Foreclosure Sale**"), and enters a bid based on instructions provided by RMS and in accordance with the FHA Guidelines.    The property is subsequently transferred to the winning bidder through a foreclosure deed that is executed and recorded with the county recorder's office.    If the property is sold to a third party at a Foreclosure Sale, RMS obtains funds from the successful third-party buyer before the foreclosure deed is issued.

### b.    REO Property Preservation and Disposition

34.    To the extent that foreclosed properties are not sold to third parties at Foreclosure Sales and RMS is the successful bidder at the Foreclosure Sale, RMS may market and sells such property (commonly referred to as real estate owned property (collectively, "**REO Property**")) with the assistance of real estate brokers.[12]    Until REO Property is marketed and sold by RMS to third parties, REO Management Solutions, LLC ("**REO Management**"), a wholly owned Debtor subsidiary of RMS, maintains the REO Property through paying applicable taxes, insurance, homeowner's association fees, and property maintenance expenses.    Such payment amounts are added to the total debt of the applicable loan and ultimately submitted to FHA for reimbursement when the property is finally sold or at the end of the FHA allowable liquidation timeframe.    To the extent that the REO Property is owned by a third-party investor, RMS remits

---

[12]    Once a property is foreclosed upon, the title vests in the owner of the loan and the owner, in turn, markets and sells the property.  In most instances, however, the servicing agreements between RMS and loan owners provide that the servicer is responsible for marketing and selling the property on behalf of the owner.

WEIL:\96914030\1\41703.0010

the net proceeds from the sale of the REO Property to the third-party investor and submits an FHA claim on behalf of such owner.[13]    In certain circumstances, REO Management is retained exclusively to manage and liquidate REO Property owned and serviced by third-parties.  In these instances, REO Management remits the net proceeds from the sale of the REO Property to the third-party investor and remits documentation to support an FHA Claim to the third party servicer.

35.    In conjunction with consummating a sale of a REO Property to a third party, RMS is required to deliver marketable and insurable title.  In light of the commencement of these chapter 11 cases, certain title insurance companies, escrow agents, and related third parties may refuse to insure REO Properties, pass clear title to third-party purchasers, or otherwise perform functions necessary to facilitate the sale of the REO Property absent a Court order confirming RMS's authority to sell REO Property in the ordinary course of business.  If RMS is unable to sell REO Property due to an inability to deliver marketable and insurable title to third-party purchasers, such third-party purchasers may refuse to proceed with sale closings, which would significantly impair RMS's revenues and ability to repay the lenders under the Debtors' DIP Facility. Moreover, the value of REO Property becomes increasingly uncertain the longer such property remains on the market.  Thus, any delay to the sale of REO Property can lead to significant purchase price reductions.  To avoid substantial harm to the Debtors' estates, RMS must be able to provide title insurance companies, escrow agents, and related third parties with assurances that RMS can obtain and deliver marketable and insurable title without disruption.  Accordingly, the Debtors seek authority to continue selling, in their capacities as owners and/or servicers of loans, REO Property (i) on an "as is where is" basis and without any representation and warranties except

---

[13]    If REO Property relates to a HECM that has not been fully liquidated from a Ginnie Mae-guaranteed MBS, the REO Property is not owned by a third-party investor and the sale proceeds are remitted to the MBS investor.

for title, in the ordinary course of business, in their discretion and subject to their business judgment, and consistent with past practices, and (ii) free and clear of any and all liens and encumbrances (a) under section 363(f) of the Bankruptcy Code to the extent the Debtors own the REO Property, and (b) to the extent permitted pursuant to applicable non-bankruptcy law for REO property owned by third parties.

36.     RMS must perform the Default Servicing Obligations in accordance with the requirements set forth by FHA in the FHA Servicing Guidelines. As previously mentioned, a failure to comply with the FHA Servicing Guidelines and the Fannie Mae Agreements may lead to a termination of RMS's servicing rights without compensation and a possible transfer of RMS's servicing rights to a third-party servicer. Such a result would substantially harm the value of the Debtors' loan servicing operations and negatively impact the Debtors' estates, creditors, and parties in interest. A failure to honor such obligations may result in a default subject to the terms and conditions of the Cross-Default Agreement, which would have a detrimental effect on the Debtors' estates. Accordingly, the Debtors request authority to honor the Default Servicing Obligations in the ordinary course of business and consistent with past practices.

### 3.    Curtailment

37.     Debenture interest payable under FHA mortgage insurance contracts accrues on the total debt of a loan after it is deemed "due and payable" until a claim on account of such loan is reimbursed by FHA. Failure to meet any of the processing deadlines during the default, foreclosure, and claim cycles, may stop the accrual of debenture interest otherwise payable under an FHA claim. When such failure occurs, RMS is obligated to make the third-party investor or servicer whole for interest curtailed by FHA (the "**Curtailment Obligations**"). In certain instances, including with respect to the Fannie Mae Loans, failure to honor the Curtailment Obligations could lead to the termination of RMS's servicing rights without compensation and a

18

1300

possible transfer of RMS's servicing rights to a third-party servicer. To avoid this irreparable harm, the Debtors request authority, but not direction, to honor and pay the pre-and postpetition Curtailment Obligations in the ordinary course of business and consistent with past practices.

### 4.    Servicing Fees

38.    RMS earns servicing fees in connection with the Performing Loan Servicing Obligations and the Default Servicing Obligations. Such fees are either (i) equal to a specified percentage of the unpaid principal balance of the loans being serviced or (ii) a flat fee. In certain circumstances, RMS's fees also include interest income earned on the interest rate spread on securitized loans (the fees described herein are collectively referred to as the "**Servicing Fees**"). The Servicing Fees (excluding the fees described in (i)) are added to or are part of the borrowers' loan balances and may be eligible to be subsequently securitized by RMS. RMS accrues approximately $2.1 million in Servicing Fees on a monthly basis.

### 5.    Servicer Advances

39.    In connection with the Servicing Obligations, RMS must fund certain advances to protect and preserve the value of the underlying collateral. With respect to non-performing loans, a failure to fund such advances may lead to the imposition of tax liens on the mortgaged property, which would significantly hinder RMS's ability to liquidate the property through Foreclosure Sales or subsequent dispositions. The various advances remitted by RMS include the following:

a.    tax payments and home insurance premiums (the "**T&I Advances**");

b.    home owners association dues in super-lien states;

c.    fees and expenses to various servicing vendors (*e.g.*, property inspectors and maintenance contractors);

d.    fees and expenses associated with enforcement or judicial proceedings, including foreclosures, bankruptcies, evictions, or litigation actions; and

WEIL:\96914030\1\41703.0010

**1301**

     e.     costs to preserve foreclosed property prior to liquidation (items (a) through (e) collectively and with other similar payments, the "**Servicer Advances**").

40.     The Servicer Advances are added to the applicable loan balances and are generally reimbursed by FHA when RMS submits a claim for reimbursement. When performing Servicing Obligations as a servicer, RMS funds the Servicer Advances. When performing the Servicing Obligations as a subservicer, RMS receives the Servicer Advances from third-party investors of loans before remitting such funds to the requisite third parties. RMS remits approximately $12 million in Servicer Advances on a monthly basis in connection with its servicing and subservicing activities.

41.     Accordingly, the Debtors seek authority, but not direction, to (i) honor the Servicing Obligations, including by continuing to perform under the Fannie Mae Agreements and honor their obligations under the MECA, (ii) honor and pay the Curtailment Obligations, (iii) collect and securitize the Servicing Fees in accordance with the Ginnie Mae Agreements, and (iv) remit the Servicer Advances, in each case, in the ordinary course of business and consistent with past practices.

**C.    FHA Claims Process**

42.     RMS is entitled to submit claims for the assignment of performing loans and the reimbursement of Servicer Advances and various other expenses with FHA depending on whether the loans are performing or non-performing. RMS is required to submit these claims for all loans that it services and subservices. When RMS submits a claim for loans owned by third-party investors, FHA either remits the claim payment (a) directly to the third-party investors or (b) to RMS who subsequently remits the claim payment to the applicable third-party investors.

### 1.    Performing Loan Claims

43.    When a performing loan reaches ninety-eight percent (98%) of MCA, RMS may file a claim with FHA to assign the loan to FHA and receive up to one-hundred percent (100%) of the MCA.  For FHA to approve the loan assignment, RMS must submit documentation and evidence that a given loan is meeting all of FHA's performance requirements.  Such requirements include: (i) loan documents evidencing title free from defects, (ii) confirmation from taxing authorities that all tax payments are current, (iii) confirmation from insurance carriers that all insurance policies remain in effect and the relevant premiums have been paid, (iv) a certificate reflecting that home owners association dues (where applicable) are current, (v) evidence of death of any deceased co-borrower, and (vi) inspection certificates for any required repairs during the life of the loan.  Failure to meet any of the aforementioned requirements can impact the timing of FHA's approval of the loan assignment and claim payment.  The claims submission process takes, on average, six (6) months.

44.    Accordingly, the Debtors seek authority, but not direction, to submit loans for assignment and execute the applicable documentation in connection therewith and seek claim payments from FHA in the ordinary course of business consistent with past practices.

### 2.    Non-Performing Loan Claims

45.    FHA requires the loan owner to service all defaulted loans, a process that can take several years between default and ultimate liquidation.  As previously mentioned, the majority of defaulted loans in RMS's portfolio result in foreclosure and, to the extent that foreclosed properties are not sold to third parties through Foreclosure Sales, the properties become

WEIL:\96914030\1\41703.0010

REO Properties and are liquidated through sales facilitated by RMS.[14]  With respect to REO Property, RMS submits a reimbursement claim to FHA.  FHA typically reimburses RMS following a comprehensive due diligence process.

46.    The ultimate amount reimbursed by FHA depends on the timing of the sale. If RMS sells REO Property within six (6) months of acquiring the property by foreclosure or deed in lieu of foreclosure, or such additional time as provided by FHA, FHA reimburses RMS the difference between the outstanding loan balance and the purchase price of the property, including qualifying Servicer Advances.  If RMS sells REO Property after six (6) months of acquiring the property, FHA reimburses RMS the difference between the outstanding loan balance and the appraised value of the underlying property, but includes only qualifying Servicer Advances paid within six (6) months of acquiring the property.[15]Due to the potential for differential recovery, avoiding disruptions and delays in the REO Property sales process is essential to RMS's ability to recover one-hundred percent (100%) of the qualifying Servicer Advances.

47.    Accordingly, the Debtors seek authority, but not direction, to continue submitting reimbursement claims to FHA in the ordinary course of business and consistent with past practices.

### D.    Critical Vendors

48.    In connection with its general corporate and servicing and subservicing activities, RMS utilizes the services of numerous third-party vendors, service providers, and

---

[14]    RMS does not facilitate the liquidation of REO Property that results from Fannie Mae owned defaulted loans. Fannie Mae conducts its own marketing and sales for such property.  However, RMS handles disposition of REO Property for HECMs in the MECA.

[15]    In such circumstances, the appraisal value equals the value of an appraisal that is (i) no older than one-hundred and twenty (120) days at the end of marketable title and (ii) provided by an FHA approved appraiser.

professionals that are critical to operations (collectively, "**Critical RMS Vendors**").  The Critical

RMS Vendors perform a variety of necessary functions, including:

    a.    <u>Critical General Support Services</u>:  RMS relies on third-party vendors to (i) maintain the technology used to perform their loan servicing processes, (ii) operate call routing technology, which is used to route in excess of 15,000 customer calls per month and to direct workflow to service loans, (iii) manage loan records by facilitating efficient access to information relating to foreclosures, lien releases, and loss mitigation activities, (iv) provide title services, such as performing title searches, (v) package and securely deliver loan documents, and (vi) maintain customer correspondence through coordinating over 120,000 mailings to borrowers each month regarding loan balances, legal and regulatory notifications, and loss mitigation and foreclosure communications.

    b.    <u>Business Process Outsourcing</u>:  RMS outsources a significant portion of its Servicing Obligations to companies that are able to provide technology, labor, and expertise on a more cost-effective basis than if RMS were to perform such activities in-house.  Provision of services by these companies is a critical component of cost-structure for RMS's servicing business.

    c.    <u>Legal and Compliance Advisory Services</u>:  RMS utilizes third-party services and tools to maintain compliance with state and federal regulations supporting fees, loan products, and licensing.  Without this support, RMS risks violating such regulations and incurring penalties, which may include significant fines imposed by regulatory authorities.

    d.    <u>Loan Liquidation Vendors</u>:  RMS employs various professionals, including attorneys, appraisers, field service companies, realtors, and title companies, to meet the HECM servicing requirements imposed by FHA.  RMS's performance of these activities is required pursuant to the Ginnie Mae Guide, FHA Servicing Guidelines, FHA regulations and HECM Mortgagee Letters[16] to preserve property values and maximize the proceeds from the liquidation of the properties (collectively, the "**Loan Liquidation Vendors**").[17]

    49.    Expenses for the vendors included in categories (a) through (c) above are

paid directly by the Debtors and are generally part of RMS's corporate overhead.  Vendors

---

[16]    The HECM Mortgagee Letters are available at https://www.hud.gov/program_offices/housing/sfh/hecm/hecmml.

[17]    Substantially all payments made to Loan Liquidation Vendors are submitted to FHA for reimbursement.

**1305**

included in category (d), however, generally constitute Servicing Advances that are either prefunded by third-party investors or subject to reimbursement by FHA.

50.    Employing these specialized vendors is more cost-effective than performing such activities in-house; indeed, replacing certain of these vendors would not only be difficult and disruptive, but cost-prohibitive as well.  The Debtors have developed long-standing relationships with these vendors, which has enabled the Debtors to negotiate favorable pricing, credit terms, and priority scheduling.  Any failure to timely honor the Debtors' prepetition obligations to the Critical RMS Vendors could jeopardize these relationships, and any interruption of their services for even a short period of time would impair the Debtors' business operations and the value of these businesses.

51.    In light of the above, through this Motion and the Ditech OCB Motion, filed contemporaneously herewith, the Debtors request authority, but not direction, to continue to employ and pay the prepetition obligations of, in the Debtors' sole discretion, the Critical RMS Vendors and the Critical Ditech Vendors (as defined in the Ditech OCB Motion) (collectively, the "**Critical Vendors**").  The Debtors estimate that as of the Commencement Date, **approximately $52.5 million** in aggregate payments remain outstanding to the Critical Vendors.  Subject to Court approval, the Debtors seek to pay (a) up to **approximately $35 million** of such prepetition amounts to Critical Vendors during the first thirty (30) days of these chapter 11 cases, of which the Debtors expect **approximately $30.6 million** will either be prefunded or reimbursed to the Debtors and (b) up to **approximately $40 million** (inclusive of the interim amounts) of such prepetition amounts to Critical Vendors on a final basis.  Without the requested relief, the Critical Vendors may refuse to continue providing services to the Debtors postpetition or may impose unfavorable trade terms, such as cash in advance requirements, security deposits,

and/or restrictive trade credit and the Debtors may be in violation of the applicable servicing agreements.

52.    The Debtors propose to condition payment of the prepetition claims of Critical Vendors on the agreement of individual Critical Vendors to continue providing products and/or services to the Debtors pursuant to the parties' customary trade terms, practices, and programs (including credit limits, pricing, timing of payments, allowance, normal availability, and other applicable terms and programs) under which such Critical Vendors provided products and/or services to the Debtors prior to the Commencement Date (such terms, the "**Customary Trade Terms**"), or pursuant to such other trade practices and programs that are acceptable to the Debtors. Payment of a prepetition claim to any individual Critical Vendor shall be subject to the advance review and approval of the chief financial officer of the Company in consultation with the Debtors' management and AlixPartners LLP.  The Debtors reserve the right to negotiate new trade terms with any Critical Vendor as a condition to payment of any prepetition claim.

53.    If a Critical Vendor refuses to supply products and/or services to the Debtors on Customary Trade Terms (or such other terms as are agreed by the parties) following receipt of full or partial payment on its prepetition claim, the Debtors hereby seek authority, in their sole discretion and without further order of the Court, (i) to declare that any payments made to a Critical Vendor on account of such claim be deemed to have been in payment of then-outstanding (or subsequently accruing) postpetition claims of the Critical Vendor without further order of the Court or action by any person or entity and (ii) to take actions to recover or seek disgorgement of any payment made to such Critical Vendor on account of its prepetition claim to the extent that the payments exceeded the postpetition claims of the Critical Vendor, without

giving effect to any rights of setoff, recoupment, claims, provision for payment of reclamation or trust fund claims, or other defense.

54.     Promptly after entry of the Proposed Interim Order and weekly thereafter, the Debtors propose to provide counsel for any statutory committee appointed in these chapter 11 cases and the Office of the United States Trustee for the Southern District of New York with a schedule of all payments made to the Critical Vendors on account of prepetition claims in accordance with the terms of the Proposed Interim Order, which shall include the name and address of the Critical Vendor and the amount and date of the payment.

### E.     Funding Ginnie Mae Buyout Obligations and Servicer Advances

55.     RMS finances the Ginnie Mae Buyout Obligations and the Servicer Advances with cash borrowed under that certain (i) Master Repurchase Agreement, dated as of April 23, 2018, by and among Barclays Bank PLC, as purchase agent and RMS, as seller and (ii) Second Amended and Restated Master Repurchase Agreement, dated as of November 30, 2017 and effective as of December 5, 2018, between Credit Suisse First Boston Mortgage Capital LLC, as administrative agent, Credit Suisse AG, as committed buyer, Alpine Securitization Ltd, as buyer, Barclays Bank PLC, as a committed buyer and RMS, as seller, RMS REO CS, LLC, and RMS REO BRC, LLC (collectively, as amended, the "**Prepetition MRAs**" and such buyers, the "**Warehouse Lenders**").The Prepetition MRAs have an advance rate between eighty percent (80%) and eighty-five percent (85%) with respect to non-performing loans and between eighty-five percent (85%) and ninety percent (90%) with respect to performing loans, meaning that RMS can finance between eighty percent (80%) to ninety percent (90%) of the market value of the loan balance and must fund the remaining ten percent (10%) to twenty percent (20%) (referred to as a "haircut") with balance sheet cash.  RMS repays outstanding amounts owed under the Prepetition

WEIL:\96914030\1\41703.0010

MRAs with claim proceeds received from FHA, liquidation proceeds from the sale of REO Property, or when borrowers (or borrowers' heirs) repay their outstanding loan balance.[18]

56.    Contemporaneously herewith, the Debtors filed a motion (the "**DIP Motion**") seeking authority to, among other things, obtain up to $1.9 billion in warehouse financing and to obtain access to $1.9 billion in hedging capacity (the "**DIP Facility**"), that will refinance and replace the Prepetition MRAs.

### F.    Indemnification Obligations

57.    RMS continues to have ongoing indemnification obligations pursuant to the FHA Servicing Guidelines in connection with the loans that it originated prior to exiting the reverse mortgage loan origination business in early 2017.    When a loan defect has been identified and reported to FHA, FHA determines whether any indemnification obligations have been triggered by a loan originated by RMS.    If so, RMS is required to indemnify FHA for any losses that FHA incurs in connection with the defective loan.    If the defective loan was purchased from a third party, FHA will seek indemnification from the original loan originator.    As of the Commencement Date, RMS believes that approximately thirty (30) loans with an unpaid principal balance of approximately $6 million could require payments to FHA in connection with existing indemnification agreements.

---

[18]    In addition as set forth more fully in the DIP Motion, as of the Commencement Date, RMS was party to that certain Participation Interest Sale and Contribution Agreement, dated as of October 1, 2018 (the "**National Founders Participation Agreement**"), by and between RMS and RMS 2018-09, LLC, one of RMS's non-Debtor subsidiaries, as purchaser (the "**RMS SPV**"), and the related Reverse Mortgage Servicing Agreement of even date therewith (the "**National Founders Servicing Agreement**"), by and among RMS, the RMS SPV, and National Founders LP, as note purchaser (with its affiliates, "**National Founders**"), in connection with the related Note Purchase Agreement of even date therewith (the "**National Founders NPA**" and, along with each of the National Founders Participation Agreement and the National Founders Servicing Agreement, a "**National Founders Facility Agreement**" and, collectively, the "**National Founders Facility**" and, the non-Debtor parties thereof, the "**National Founders Facility Parties**"), by and between the RMS SPV, as issuer, and National Founders, as note purchaser.

58.     Accordingly, the Debtors seek authority, but not direction, to continue honoring RMS's indemnification obligations to FHA in connection with defective loans in the ordinary course of business and consistent with past practices.

### G.     Compliance and Regulatory Obligations

59.     RMS and certain of its affiliates are subject to state licensing requirements, including personal licenses, which licenses must be obtained, maintained, and renewed, as applicable, in the ordinary course.   In addition, RMS is subject to periodic state and federal regulatory exams and audits, which may carry certain costs and expenses.   Further, to the extent that RMS identifies, whether through internal or external audits, regulatory agencies, investors, client complaints, litigation, or other means, origination or servicing errors or lack of compliance with state or federal laws or regulations, RMS is obligated to remediate such errors or violations, as applicable.   Such remedial measures may require RMS (a) to make payments to borrowers (*e.g.*, in the form of reimbursements, refunds, and/or out-of-pocket expenses), (b) to forgive past due amounts and/or assessed but unpaid fees or other charges, (c) to pay fees, fines, and/or penalties, either directly to the applicable authority or through a Critical Vendor, (d) to incur and pay certain expenses, (e) to pay the costs and expenses of state and federal regulatory examinations, or (f) to take such other measures as may be required by, or agreed to with, state and federal regulators.   As part of such activities, RMS reviews and reconciles accounts that belong to borrowers that are either currently or previously debtors in bankruptcy cases filed under chapter 13 of the Bankruptcy Code.   As part of such reviews and reconciliations, RMS may waive amounts that are currently due on the borrower's account but are not collectible pursuant to the Bankruptcy Code or applicable non-bankruptcy law, or may perform other appropriate account adjustments.

60.     Through this Motion, the Debtors seek Court authority, but not direction, to continue in the ordinary course of business (a) to fulfill state licensing requirements and to pay

related obligations, (b) to submit to, and comply with state and federal regulatory exams and audits and to pay related obligations, costs, and expenses, and (c) to remediate errors and/or lack of compliance with laws or regulations, including by continuing (i) to make payments to borrowers (*e.g.*, in the form of reimbursements, refunds, and/or out-of-pocket expenses), (ii) to forgive past due amounts and/or assessed but unpaid fees or other charges, (iii) to pay fees, fines and/or penalties, either directly to the applicable authority or through a Critical Vendor, (iv) to incur and pay certain expenses, (v) to pay the costs and expenses of state and federal regulatory examinations, and (vi) to take such other measures as may be required by, or agreed to with, state and federal regulators.

### H.  Limited Relief from the Automatic Stay

### 1.  Foreclosure and Eviction Proceedings

61.   In its capacity as servicer or subservicer, RMS is currently party to approximately 6,000 judicial and non-judicial foreclosure proceedings and more than 600 eviction proceedings, which, as noted above, RMS seeks to proceed with in the ordinary course.  In such proceedings it is not uncommon for borrowers and tenants to raise claims, defenses and related counter-claims against RMS to preserve their respective interests in underlying property as owner or tenant.  However, such claims, cross-claims, third-party claims, and counter-claims, whether asserted by borrowers in foreclosure actions or by tenants in eviction actions and whether commenced prior to, on, or after the Commencement Date, are or may become subject to the automatic stay pursuant to section 362(a) of the Bankruptcy Code.  Requiring each of these parties to obtain stay relief in order to assert such counter-claims would likely add an unnecessary degree of complexity, costs, and delay to both the foreclosure process described herein and the administration of these chapter 11 cases.

WEIL:\96914030\1\41703.0010

**1311**

62.    The Debtors request that the Court enter a standing order modifying the stay imposed by section 362(a) of the Bankruptcy Code to allow borrowers, mortgagors, and lienholders (each, an "**Interested Party**") to assert and prosecute claims, cross-claims, third-party claims, and counter-claims related to judicial and non-judicial foreclosure and eviction proceedings brought by the Debtors to the limited extent such claims, cross-claims, third-party claims, and counterclaims, including the appeals of such, have the sole purpose of defending, unwinding, or otherwise enjoining or precluding any foreclosure or eviction, and do not have an adverse effect on any of the Debtors' assets.  Notwithstanding the foregoing, the Debtors request that absent further order of the Court, the automatic stay remain in full force and effect with respect to any and all other pending or future claims and counterclaims by Interested Parties, including with respect to (a) monetary relief of any kind or any nature against the Debtors, (b) claims of recoupment or setoff, (c) relief that if granted would affect the amount, validity, and/or priority of lien(s) on property owned or serviced by the Debtors, (d) relief that if granted would not terminate or preclude the prosecution and completion of a foreclosure or eviction, or (e) actions asserted in the form of a class action or collective action, and that, should there be any disagreements between or among any Interested Parties and/or the Debtors regarding whether any claims or counterclaims fall within the exception to the automatic stay approved by the Court, the Court retain exclusive jurisdiction to hear and resolve such disputes.

## 2.    Borrower Bankruptcy Proceedings

63.    Certain of the borrowers on loans serviced or subserviced by the Debtors have sought, or may seek during the pendency of these cases, bankruptcy protection under chapters 7, 11, 12, or 13 of the Bankruptcy Code (such borrowers, the "**Bankrupt Borrowers**").  In connection with such cases, from time to time, the Debtors file, or direct their counsel or agents to file, documents required by the Bankruptcy Code and Bankruptcy Rules, including proofs of

WEIL:\96914030\1\41703.0010

claims, notices of payment change, notices of postpetition fees, responses to notices of final cures,

motions to lift the automatic stay, and related amendments and appeals. Given the importance of

allowing Bankrupt Borrowers to timely prosecute their bankruptcy cases, as well as the

unnecessary degree of complexity and costs that would accrue against the Debtors' estates by

requiring Bankrupt Borrowers, trustees duly appointed under the Bankruptcy Code in a Bankrupt

Borrower's bankruptcy case (each, a "**Bankruptcy Trustee**"), or the United States Trustees

assigned to oversee such cases (each, a "**United States Trustee**"), to obtain stay relief with respect

to routine actions in the prosecution of such Bankrupt Borrower's bankruptcy case, the Debtors

believe that limited relief from the automatic stay is merited.

   64.  Accordingly, through this Motion, the Debtors request that the Court enter

a standing order modifying the automatic stay pursuant to the following terms and conditions:

    a.  except as set forth herein, and provided an action outlined below would not affect the value or validity of an asset or claim held by the Debtors, a Bankrupt Borrower, a Bankruptcy Trustee, or a United States Trustee shall be entitled:

      (i)  to assert or continue to assert an objection to a proof of claim, notice of payment change, notice of postpetition fee, expense, or charge, or response to notice of final cure (collectively, the "**Required Bankruptcy Documents**") filed by the Debtors in the Bankrupt Borrower's bankruptcy case;

      (ii)  to assert or continue to assert an objection to a motion to lift the automatic stay filed by the Debtors in the Bankrupt Borrower's bankruptcy case;

      (iii)  to assert appeals with respect to items (i) and (ii); and

      (iv)  to seek an accounting from the Debtors with respect to the Bankrupt Borrower's loan;

    b.  except as set forth herein, a Bankrupt Borrower shall be entitled:

WEIL:\96914030\1\41703.0010

(i)     to engage in court-supervised or court-authorized loss-mitigation programs regarding the Bankrupt Borrower's loan; and

(ii)    to engage in discussion with the Debtors and execute a modification of the Bankrupt Borrower's loan or otherwise discuss, enter into, and consummate settlements of claims and liens in accordance with the ordinary course of the Debtors' business and applicable law;

c.      absent further order of the Court, the automatic stay shall remain in full force and effect with respect to all the Bankrupt Borrower's, the Bankruptcy Trustee's, and the United States Trustee's direct claims, counterclaims, motions, or adversary proceedings:

(i)     for monetary relief of any kind and of any nature against the Debtors, with the exception of: (A) a reduction in the amount of arrearage listed on a proof of claim that would not affect the total amount of the claim; (B) an objection to the amount listed on a notice of payment change; or (C) an objection to the amount past due listed on a response to notice of final cure;

(ii)    for violation of any local, state, or federal statute or other law in connection with the origination of the Bankrupt Borrower's loan;

(iii)   for relief that if granted, would have an effect on the amount, validity, or priority of the Debtors' claim or lien against a Bankrupt Borrower or the property of the Bankrupt Borrower securing such claim or lien of the Debtors; or

(iv)    asserted in the form of a class action;

d.      absent further order of the Court, the automatic stay shall remain in full force and effect with respect to any party seeking to intervene to assert related claims against the Debtors or any class action or collective action brought by any Bankrupt Borrower on behalf of any other class of borrowers;

e.      with the sole exception of objections to Debtors' proofs of claim permitted by subsection (a)(i) above, and solely for purposes of reducing any such claim and not for the purpose of obtaining an affirmative recovery or award, under no circumstances shall a Bankrupt Borrower, a Bankruptcy Trustee, or a United States Trustee be entitled to recoup, setoff, or collect from the Debtors any judgment or award related to any direct claim or counterclaim

WEIL:\96914030\1\41703.0010

for which the automatic stay has been lifted by the terms of the Proposed Interim Order;

f.    the Debtors shall retain the right, upon appropriate motion and notice to any Bankrupt Borrower, Bankruptcy Trustee, or United States Trustee, to seek to impose any provision of section 362(a) of the Bankruptcy Code modified by the Proposed Interim Order, and to the extent such relief is sought, the Debtors will not object to such party's telephonic participation at any hearing on such motion;

g.    nothing set forth herein shall preclude or limit any Bankrupt Borrower, Bankruptcy Trustee, or United States Trustee from seeking relief from the automatic stay under section 362(a) of the Bankruptcy Code on appropriate motion and notice to the Debtors and parties in interest; and

h.    should there be any disagreements between the Debtors, a Bankrupt Borrower, a Bankruptcy Trustee, or a United States Trustee regarding whether any actions, claims, or counterclaims fall within the exception to the automatic stay approved by the Court, the Court shall retain exclusive jurisdiction to hear and resolve such dispute.

**3.    Actions Involving Amount, Validity, or Priority of Liens**

65.    The Debtors are often a party to actions involving the amount, validity, and/or priority of liens with respect to properties subject to mortgages owned or serviced by the Debtors (such actions, "**Title Disputes**").  Prosecuting such disputes allows the Debtors to clear title to the underlying property and thereby protect its rights and remedies with respect thereto.  Thus, for similar reasons of judicial economy and estate resources discussed above, the Debtors request that the Court enter a standing order modifying the automatic stay to allow Interested Parties to assert a defense, including the appeals of such, in Title Disputes.  Notwithstanding the foregoing, the Debtors request that absent further order of the Court, the automatic stay remain in full force and effect with respect to any and all other pending or future claims, cross-claims, third-party claims, and counterclaims against the Debtors, including with respect to (a) monetary relief of any kind or any nature against the Debtors, (b) relief that if granted would affect the amount, validity, and/or priority of lien(s) held by the Debtors, (c) actions for partition, eminent domain,

WEIL:\96914030\1\41703.0010

**1315**

or seizure of the property securing lien(s) held by the Debtors, (d) relief that is not necessary for the resolution of the Title Dispute, or (e) actions asserted in the form of a class action or collective action, and that, should there be any disagreements between or among any Interested Parties and/or the Debtors regarding whether any claims, cross-claims, third-party claims, or counterclaims fall within the exception to the automatic stay approved by the Court, the Court retain exclusive jurisdiction to hear and resolve such disputes.

## I.    Assurances of Future Performance

66.    Ginnie Mae has requested,[19] and the Debtors have agreed, subject to Court approval, to provide certain assurances regarding RMS's ability to continue honoring its obligations in accordance with the Ginnie Mae Guide during the pendency of these chapter 11 cases, as set forth on **Schedule 1** to the Proposed Interim Order.  In addition, Fannie Mae has requested, and the Debtors have agreed, subject to Court approval, to provide certain assurances regarding the Debtors' ability to service the Fannie Mae Loans during the course of these chapter 11 cases, including RMS's obligation to timely respond and pay HECM curtailment billings and perform its obligations in connection with the MECA, as set forth on **Schedule 2** to the Proposed Interim Order.

67.    The form of these assurances was negotiated at arms' length and with the assistance of independent counsel, and the Debtors believe they are fair and reasonable.  In addition, the Debtors' access to the DIP Facility is conditioned upon the Debtors' continued

---

[19]    In addition, on February 8, 2019, Ginnie Mae sent RMS a notice of violation ("**Notice of Violation**") stating that Ginnie Mae learned of certain actions, including the pending filing of these chapter 11 cases, that purportedly constitute a violation of the terms of the Ginnie Mae Guide.  The Notice of Violation outlined certain remedies available to Ginnie Mae as a result of RMS's actions, but advised RMS that Ginnie Mae would forbear from exercising remedies for a period of 125 days (the "**Forbearance Period**") provided that RMS otherwise complied with the terms set forth in the Notice of Violation, including complying with additional requests of Ginnie Mae during the Forbearance Period.

WEIL:\96914030\1\41703.0010

operations in the ordinary course. Thus, it is essential that the Debtors be authorized to provide such assurances to Ginnie Mae and Fannie Mae, respectively. The Debtors have every intention of maintaining their servicing and subservicing, and with respect to Ginnie Mae securitized loans, securitization-related operations in accordance with the standards and requirements set forth in the Ginnie Mae Agreements and Fannie Mae Agreements, as applicable.

68.      The Debtors request that any order entered by the Court approving the relief requested in this Motion also provide that all payments by the Debtors to Fannie Mae and to Ginnie Mae and to Ginnie Mae guaranteed MBS-investors (including, without limitation, requests for payments of principal and interest, Servicer Advances, and other servicing and subservicing related fees and claims) and the MECA REO Sale Proceeds shall be made free and clear of any lien, security interest, or other interest of any party, including, without limitation, any prepetition or postpetition lenders.

69.      The Debtors do not seek a determination as to the applicability, if any, of the automatic stay under section 362(a) of the Bankruptcy Code to requests by Ginnie Mae or Fannie Mae to the Debtors to honor their servicing-related and with respect to the Ginnie Mae securitized loans, securitization-related, commitments and obligations, including, without limitation, requests for payment of principal and interest, Servicer Advances, and other origination-related, servicing-related, and with respect to Ginnie Mae securitized loans, securitization-related, fees and claims, in each case to the extent provided under the relevant Ginnie Mae Agreements and Fannie Mae Agreements. Rather, the Debtors, Fannie Mae, and Ginnie Mae each reserve their rights with respect to this issue.

70.      If, and to the extent that, the automatic stay under section 362(a) of the Bankruptcy Code applies to requests by Ginnie Mae and Fannie Mae to the Debtors in connection

WEIL:\96914030\1\41703.0010

**1317**

with the Debtors' servicing, subservicing, and securitization commitments and obligations, the Debtors request that the Court modify the automatic stay to the limited extent necessary to allow Ginnie Mae and Fannie Mae to make such requests to the Debtors, including, without limitation, requests for payment of principal and interest, Servicer Advances, and with respect to Ginnie Mae securitized loans, securitization related, and other servicing and subservicing related fees and claims, in each case to the extent provided under the relevant Ginnie Mae Agreements and Fannie Mae Agreements; *provided*, *that*, Fannie Mae and Ginnie Mae reserve all rights to assert that they may exercise any and all rights available to them under their respective agreements notwithstanding the automatic stay.

## II.
## Applicable Authority

**A.     The Court Should Authorize the Debtors to (i) Honor Issuer and Servicer Obligations in Ordinary Course of Business and (ii) to Honor Prepetition and Postpetition Obligations Related Thereto**

71.     As set forth above, through this Motion, the Debtors seek authority, but not direction, to continue their securitization and servicing and subservicing activities in the ordinary course of business, and to honor and pay prepetition and postpetition obligations related thereto. The requested relief is both appropriate and necessary under section 105(a) of the Bankruptcy Code as it (i) falls squarely within sections 363(c)(1), 1107(a), and 1108 of the Bankruptcy Code, which, taken together, authorize a debtor in possession to use, sell, or lease property of the estate in the ordinary course of its business and (ii) protects and conserves the value of the Debtors' estates, including by providing invaluable comfort to parties doing business with the Debtors.

**a.     The Debtors' Activities Satisfy Ordinary Course of Business Standard**

72.     Section 363 of the Bankruptcy Code provides for a debtor's use, sale, or lease of property in either (a) the *ordinary course of business*, pursuant to section 363(c)(1) or

WEIL:\96914030\1\41703.0010

(b) outside the *ordinary course of business*, pursuant to section 363(b)(1). 11 U.S.C. §§ 363(b)(1), 363(c)(1). In particular, section 363(c)(1) of the Bankruptcy Code provides that:

> If the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204 or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

73.     By contrast, section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he Trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . ." 11 U.S.C. § 363(b)(1). In differentiating between ordinary and non-ordinary course transactions, section 363 "strike[s] a balance [between] allowing a business to continue its daily operations without excessive court or creditor oversight and protecting secured creditors and others from dissipation of the estate's assets." *Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997) (citing *In re Roth American, Inc.*, 975 F.2d 949, 952 (3d Cir. 1992)).

74.     Although not defined in the Bankruptcy Code, the term "ordinary course of business" has generally "been accepted to embrace the reasonable expectations of interested parties of the nature of transactions that the debtor would likely enter in the course of its normal, daily business." *Id.* (citations omitted). Courts in this district apply a two-part test to determine whether transactions are ordinary course. *Id.*; *see also In re Crystal Apparel, Inc.*, 207 B.R. 406, 409 (S.D.N.Y. 1997); *In re Dana Corp.*, 358 B.R. 567, 580 (Bankr. S.D.N.Y. 2006); *In re Coordinated Apparel, Inc.*, 179 B.R. 40, 43 (Bankr. S.D.N.Y. 1995); *In re Leslie Fay Companies, Inc.*, 168 B.R. 294, 304 (Bankr. S.D.N.Y. 1994); *In re Johns-Manville Corp.*, 60 B.R. 612, 616

(Bankr. S.D.N.Y. 1986). Under the two part test, transactions are ordinary course if they satisfy (i) the "creditor's expectation" or "vertical" test and (ii) the "industry wide" or "horizontal" test.

75.    "Under the vertical test, [a] court views [a] disputed transaction from the vantage point of a hypothetical creditor and inquires whether the transaction subjects a creditor to economic risks of a nature different from those [that] he accepted when he decided to enter into a contract with the debtor." *In re Lavigne*, 114 F.3d at 385 (citations omitted). Under the horizontal test, the inquiry "is whether, from an industry-wide perspective, the transaction is of the sort commonly undertaken by companies in that industry." *In re Dana Corp.*, 358 B.R. at 580 (citations omitted). In other words, the combined test is whether the transactions at issue are (i) of a kind that creditors would expect these specific Debtors to undertake in the day-to-day operations of their business and (ii) of a kind that similar businesses, here other reverse mortgage loan servicing and subservicing businesses, would undertake in the day-to-day operations of their businesses. *See In re Johns-Manville Corp.*, 60 B.R. at 616–18; *see also In re James A. Phillips, Inc.*, 29 B.R. 391, 394 (S.D.N.Y. 1983) ("The touchstone of 'ordinariness' is thus the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business.").

76.    Here, each of the activities for which the Debtors seek authorization to continue are consistent with both the Debtors' prepetition conduct and with customary practices in the reverse mortgage loan servicing industry, thereby satisfying both the vertical and horizontal tests. Indeed, a hypothetical creditor would expect that the Debtors would engage in securitization and servicing activities, and incur the related financial obligations, described in this Motion. Further, similar relief has been granted in the chapter 11 cases of numerous other mortgage originators, lenders, and/or servicers. *See, e.g.*, *In re Residential Capital, LLC*, No. 12-12020

(MG) (Bankr. S.D.N.Y. Jul. 25, 2012) [Docket No. 898] (authorizing debtors to, among other things, (i) process and fund prepetition mortgage loan commitments, (ii) continue brokerage, origination, and sale activities, (iii) perform under certain mortgage loan purchase and sale agreements, (iv) pay certain prepetition amounts due to critical origination vendors, and (v) honor mortgage loan repurchase obligations); *In re Residential Capital, LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. Jun. 15, 2012) [Docket No. 401] (authorizing debtors to continue, among other things, (i) service government sponsored loans, (ii) perform foreclosure activities related to certain GSE REOs, and (iii) pay certain prepetition amounts due to critical servicing vendors and foreclosure professionals); *In re Residential Capital, LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. Jun. 15, 2012) [Docket No. 402] (authorizing debtors to, among other things, continue to (i) service private label mortgage loans and (ii) engage in sales activities related to loans in foreclosure and REOs); *In re Thornburg Mortgage, Inc.*, No. 09-17787 (DWK) (Bankr. D. Md. May 6, 2009) [Docket No. 49] (authorizing debtors to, among other things, continue mortgage loan servicing, auditing, and fulfillment services in the ordinary course of business); *In re Am. Home Mortgage Holdings, Inc.*, Case No. 07-11047 (CSS) (Bankr. D. Del. Aug. 24, 2007) [Docket No. 358] (authorizing debtors to, among other things, (i) sell REOs in the ordinary course free and clear of any and all liens and encumbrances and (ii) continue funding servicing advances); *In re Aegis Mortgage Corp.*, Case No. 07-11119 (BLS) (Bankr. D. Del. Aug. 15, 2007) [Docket No. 35] (authorizing debtors to, among other things, (i) sell certain mortgage loans owned by the debtors, (ii) continue performing under existing subservicing agreements, and (iii) enter into new subservicing agreements); *In re Mortgage Lenders Network USA, Inc.*, Case No. 07-10146 (PJW) (Bankr. D. Del. Mar. 19, 2007) [Docket No. 304] (authorizing debtors to, among other things,

**1321**

(i) sell certain loans, (ii) honor certain loan commitments, and (iii) incur new servicing obligations in the ordinary course of business).

### b.   The Court Should Authorize the Debtors to Sell the REO Property Free and Clear

77.   Section 363(f) of the Bankruptcy Code provides that a debtor in: possession:

"may sell property . . . free and clear of any interest in such property of an entity other than the estate, only if

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a monetary satisfaction of such interest.

11 U.S.C. §363(f).

78.   At closing for the sales of REO Property, the Debtors are required to deliver marketable and insurable title free and clear of liens or encumbrances.  To convey marketable and insurable title to the prospective buyers at closing, the Debtors request authority to sell the REO Property free and clear of any lien or encumbrance either (a) under section 363(f) of the Bankruptcy Code to the extent the REO Property is owned by the Debtors or (b) to the extent permitted pursuant to applicable non-bankruptcy law for REO Property owned by third parties. The relief requested herein has been granted by other courts in a similar context. *See, e.g.*, *In re Residential Capital, LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. June 15, 2012) [Docket No. 402] (authorizing the debtors to sell property free and clear of liens and encumbrances in the ordinary

course); *In re Am. Home Mortg. Holdings, Inc.*, Case No. 07-11047 (CSS) (Bankr. D. Del. Aug. 24, 2007) [Docket No. 358] (confirming the debtors' authority to sell real estate owned or serviced by the debtors free and clear of liens and encumbrances in the ordinary course).

> **c.**     **The Requested Relief, Including Payment of the Critical Vendor Claims, is Both Necessary and Appropriate to Conserve the Value of Debtors' Estates**

79.     The Debtors, as debtors in possession operating their businesses pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, owe "fiduciary duties to the bankruptcy estate and must, among other things, protect and conserve property in [their] possession for the benefit of creditors and refrain from acting in a manner which could damage the estate, or hinder a successful reorganization of the business." *In re Ashley River Consulting, LLC*, Case No. 14-13406 (MG), 2015 WL 1540941, *8 (Bankr. S.D.N.Y. 2015) (citing *In re Ionosphere Clubs, Inc. (Ionosphere II)*, 113 B.R. 164, 169 (Bankr. S.D.N.Y. 1990) (internal quotations omitted)). As one court has recognized, "[i]mplicit in the duties of a Chapter 11 trustee or a debtor in possession as set out in Sections 1106 and 704 of the Bankruptcy Code is the duty of such a fiduciary to protect and preserve the estate, including an operating business's going-concern value." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Accordingly, the Court may, pursuant to section 105(a) of the Bankruptcy Code, "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]," including the protection and conservation of the Debtors' estates. 11 U.S.C. § 105(a).

80.     As this Court has previously explained, "[t]he ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept. It was articulated by the United States Supreme Court in *Miltenberger v. Logansport, C&S W.R. Co.*, 106 U.S. 286 (1882) and is commonly referred to as either the 'doctrine of necessity' or the 'necessity of payment' rule. This rule

recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay pre-petition claims where such payment is essential to the continued operation of the debtor." *In re Ionosphere Clubs, Inc. (Ionosphere I)*, 98 B.R. 174, 175–76 (Bankr. S.D.N.Y. 1989). The "doctrine of necessity" functions in a chapter 11 reorganization as a mechanism by which the Court can exercise its equitable power to allow payment of prepetition claims *necessary* to "facilitat[e] the continued operation and rehabilitation of the debtor." *Id.* at 176.

81.    The relief requested herein is necessary to allow the Debtors to conserve, enhance, and maximize the value of their estates for the benefit of all stakeholders and thereby fulfill their fiduciary duties. The Debtors' business (and the mortgage servicing industry in general) is a structural feedback loop whereby the cash that leaves the business (whether to pay prepetition claims of Critical Vendors or perform Servicing Functions and fulfill related prepetition obligations, including obligations to make Servicer Advances, etc.) directly influences the cash that comes into the business (whether from securitization activities, mortgage servicing fees, etc.). Without the uninterrupted payment of ordinary course prepetition obligations, the Debtors' revenue stream dries up and their going concern value is threatened. Accordingly, the prepetition payments contemplated herein are unequivocally necessary to facilitate the Debtors' continued operation and rehabilitation. Further, the limited non-monetary relief sought in association with these payments provides invaluable comfort to parties doing business with the Debtors—many of whom are lenders that cannot be compelled to continue lending to the Debtors postpetition—and therefore is necessary and appropriate under the circumstances.

## B.    The Court Should Grant the Limited Stay Relief Requested Herein Pursuant to Section 362(d)(1) of the Bankruptcy Code

82.    The Bankruptcy Code provides that the Court may grant stay relief "for cause, including the lack of adequate protection of an interest in property of such party in interest."

WEIL:\96914030\1\41703.0010

11 U.S.C. § 362(d)(1).  The Debtors respectfully submit that it is in the best interests of their estates to permit, pursuant to the terms set forth herein, borrowers and tenants to raise claims and defenses in foreclosure and eviction proceedings, to allow Bankrupt Borrowers to prosecute their bankruptcy cases, and for Title Disputes to be resolved because requiring each of these parties to obtain stay relief would likely add an unnecessary degree of complexity, costs, and delay to both the underlying procedures as well as the administration of these chapter 11 cases.  The Debtors believe that the limited stay relief requested herein will allow for an efficient and fair process with respect to foreclosures, tenant evictions, Bankrupt Borrowers, and Title Disputes, and thereby preserve the interests of the Debtors' estates.

### C.    The Court Should Authorize the Debtors to Provide Ginnie Mae and Fannie Mae Assurances of Future Performance

83.    As set forth above, through this Motion, the Debtors seek authority, but not direction, to continue to perform under the Ginnie Mae Agreements and Fannie Mae Agreements and to honor and pay prepetition obligations arising thereunder, as well as to provide Fannie Mae and Ginnie Mae with certain assurances related thereto.  The requested relief is narrowly tailored, appropriate, and necessary under section 105(a) of the Bankruptcy Code as it permits the Debtors to operate in the ordinary course, while avoiding the need to litigate the scope and extent of the automatic stay with respect to the Ginnie Mae Agreements and Fannie Mae Agreements.  Absent the relief requested, there are at least three grounds upon which the Debtors could potentially need to litigate the applicability of the automatic stay with Ginnie Mae and/or Fannie Mae:  (a) whether the Fannie Mae Agreements are, in whole or in part, safe harbored contracts under the Bankruptcy Code; (b) whether the National Housing Act exempts Ginnie Mae from the automatic stay; and (c) whether the Ginnie Mae and Fannie Mae are entitled to adequate assurance under the Bankruptcy Code.

WEIL:\96914030\1\41703.0010

84.    With respect to the first ground, the Bankruptcy Code provides that, in certain circumstances, counterparties to certain types of agreements are entitled to exercise remedies against the debtor's property, notwithstanding the automatic stay and the general rule that so-called "*ipso facto clauses*" are not enforceable.   Specifically, section 362(b)(7) of the Bankruptcy Code provides that the automatic stay does not preclude:

> the exercise by a repo participant or financial participant of any contractual right (as defined in section 559 of the Bankruptcy Code) under any security agreement or arrangement or other credit enhancement forming a part of or related to any repurchase agreement, or of any contractual right (as defined in section 559 of the Bankruptcy Code) to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such agreements, including any master agreement for such agreements.

11 U.S.C. § 362(b).  Section 559 of the Bankruptcy Code provides in the relevant part that:

> [t]he exercise of a contractual right of a repo participant or financial participant to cause the liquidation, termination, or acceleration of **a repurchase agreement because of a condition of the kind specified in section 365(e)(1) of this title shall not be stayed, avoided, or otherwise limited by operation of any provision of this title** or by order of a court or administrative agency in any proceeding under this title, unless, where the debtor is a stockbroker or securities clearing agency, such order is authorized under the provisions of the Securities Investor Protection Act of 1970 or any statute administered by the Securities and Exchange Commission.

11 U.S.C. § 559 (emphasis added).

85.    Section 101(47) of the Bankruptcy Code defines the term repurchase agreement, which definition also applies to a reverse repurchase agreement, as follows:

> (A)  . . .

(i)   an agreement, including related terms, which provides for the transfer of one or more certificates of deposit, mortgage related securities (as defined in section 3 of the Securities Exchange Act of 1934), mortgage loans, interests in mortgage related securities or mortgage loans, eligible bankers' acceptances, qualified foreign government securities (defined as a security that is a direct obligation of, or that is fully guaranteed by, the central government of a member of the Organization for Economic Cooperation and Development), or securities that are direct obligations of, or that are fully guaranteed by, the United States or any agency of the United States against the transfer of funds by the transferee of such certificates of deposit, eligible bankers' acceptances, securities, mortgage loans, or interests, with a simultaneous agreement by such transferee to transfer to the transferor thereof certificates of deposit, eligible bankers' acceptance, securities, mortgage loans, or interests of the kind described in this clause, at a date certain not later than 1 year after such transfer or on demand, against the transfer of funds;

(ii)   any combination of agreements or transactions referred to in clauses (i) and (iii);

(iii)   an option to enter into an agreement or transaction referred to in clause (i) or (ii);

(iv)   a master agreement that provides for an agreement or transaction referred to in clause (i), (ii), or (iii), together with all supplements to any such master agreement, without regard to whether such master agreement provides for an agreement or transaction that is not a repurchase agreement under this paragraph, except that such master agreement shall be considered to be a repurchase agreement under this paragraph only with respect to each agreement or transaction under the master agreement that is referred to in clause (i), (ii), or (iii); or

WEIL:\96914030\1\41703.0010

**1327**

> (v) any security agreement or arrangement or other credit enhancement related to any agreement or transaction referred to in clause (i), (ii), (iii), or (iv), including any guarantee or reimbursement obligation by or to a repo participant or financial participant in connection with any agreement or transaction referred to in any such clause, but not to exceed the damages in connection with any such agreement or transaction, measured in accordance with section 562 of this title; and
>
> (B) does not include a repurchase obligation under a participation in a commercial mortgage loan.

11 U.S.C. § 101(47).

86.     In *In re Am. Home Mortg., Inc.*, the Bankruptcy Court for the District of Delaware held, among other things, that the portion of a private contract that provided for the purchase and repurchase of mortgage loans, but not the portion that provided for the servicing of such loans, constituted a "repurchase agreement," as such term is defined in section 101(47) of the Bankruptcy Code, and that the "safe harbor" protections afforded under the Bankruptcy Code to "repurchase agreements" therefore applied.379 B.R. 503, 518 (Bankr. D. Del. 2008).  With respect to the servicing portion of the contract, the court found that such portion, as a matter of non-bankruptcy law, was severable from the repurchase agreement and was (a) not a repurchase agreement and (b) not a securities contract, and thus did not fall within any of the safe harbor provisions of the Bankruptcy Code.  *Id.* at 521–22.

87.     The Fannie Agreements contain similar loan purchase and repurchase obligations to the ones found to constitute a repurchase agreement in *In re Am. Home Mortg.*  In addition, Fannie Mae may assert, as they have in other cases, that the servicing, selling, and repurchasing portions of their agreements are integrated and cannot be severed from each other as a matter of non-bankruptcy law, making the entirety of their agreements terminable at will pursuant

WEIL:\96914030\1\41703.0010

to section 559 of the Bankruptcy Code. *See, e.g.*, *In re Residential Capital, LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. Jun. 5, 2012) [Docket No. 218] (reservation of rights in which Fannie Mae asserts that the underlying contract is "a single integrated contract that provides for both loan origination and loan servicing"). The Debtors do not concede that any portion of the Fannie Mae Agreements are repurchase agreements or that Fannie Mae itself is a "financial institution" entitled to the safe harbor protections of the Bankruptcy Code. At the outset of these cases the Debtors simply cannot incur the uncertainty and expense of litigating with Fannie Mae and thereby risk an adverse ruling on these pivotal issues, nor is it in the Debtors' economic interests to do so. Cooperation with Fannie Mae is essential to the Debtors' business.

88.    With respect to second ground, section 306(g) of the National Housing Act provides that

> No State or local law, and no Federal law (except Federal law enacted expressly in limitation of this subsection after the effective date of this sentence), shall preclude or limit the exercise by [Ginnie Mae] of (A) its power to contract with the issuer on the terms stated in the preceding sentence, (B) its rights to enforce any such contract with the issuer, or (C) its ownership rights as provided in the preceding sentence . . .

12 U.S.C. § 1721(g). Bankruptcy courts in other jurisdictions have interpreted this statute to mean that the automatic stay does not apply to Ginnie Mae when it is enforcing its contractual rights, including rights of termination. *See In re Whitcomb & Keller Morg. Co., Inc.*, 8 B.R. 83, 87 (Bankr. N.D. Ind. 1980) (finding that Ginnie Mae was not required to seek relief from the automatic stay prior to (a) terminating debtor's issuer status and (b) attempting to arrange the transfer of debtors' servicing obligations to another entity); *In re Commonwealth Mortg. Co., Inc.*, 145 B.R. 368 (Bankr. D. Mass. 1992) (holding that automatic stay does not apply to actions by Ginnie Mae to enforce its contract with debtor); *see also In re Am. Home Mortg., Inc.*, No. 07-

WEIL:\96914030\1\41703.0010

11047 (CSS) (Bankr. Del. Sept. 20, 207) [Docket No. 863] (as ordered stipulation by debtor agreeing not to contest that Ginnie Mae is not subject to automatic stay).

89.    With respect to the third ground, case law suggests that where a party to a contract has grounds for uncertainty as to the future performance of his or her counterparty, he or she can request that such counterparty provide adequate assurance of future performance. *See In re Metromedia Fiber Network, Inc.*, 335 B.R. 41, 50 (Bankr. S.D.N.Y. 2005) ("The requirement of adequate assurance . . . is based on a recognition that an essential element of any contract is performance . . . and that a continuing sense of reliance and security that the promised performance will be forthcoming when due, is an important feature of the bargain.") (internal quotations omitted). If such counterparty is a debtor in a case filed under the Bankruptcy Code and thereby a beneficiary of the automatic stay, the contract party may move to have the automatic stay lifted on the basis that such adequate assurance of future performance is lacking and the contract party accordingly wishes to terminate the contract. *See In re Lucre, Inc.*, 339 B.R. 648, 664 (Bankr. W.D. Mich. 2006) (decision lifting automatic stay to permit contract party subject to prepetition injunction to challenge injunction and cease performing pending debtor's decision to assume or reject contract).

90.    Accordingly, to address and consensually resolve each of the above potential grounds for litigation between the Debtors, Fannie Mae, and Ginnie Mae, the Debtors have agreed to continue to fulfill their securitization, and servicing obligations under the Ginnie Mae Agreements and Fannie Mae Agreements in the ordinary course and the Debtors have negotiated with Ginnie Mae and Fannie Mae the terms of the assurances set forth on **Schedules 1**, and **2** respectively, to the Proposed Interim Order (collectively, the "**Ginnie Mae and Fannie Mae Assurances**") to incentivize Ginnie Mae and Fannie Mae to support and work with the Debtors

during their restructuring.  The Ginnie Mae and Fannie Mae Assurances were negotiated at arms'
length and avoid the uncertainty, time, cost, and expense of litigating with each of Ginnie Mae and
Fannie Mae regarding the scope and/or applicability of the automatic stay.  The Debtors, in their
business judgment, believe that the Ginnie Mae and Fannie Mae Assurances are appropriate,
narrowly tailored, and essential under the circumstances.  The Ginnie Mae and Fannie Mae
Assurances should be approved as fair and reasonable and in the best interests of the estate.
Further, similar relief has been granted in the chapter 11 cases of other mortgage originators and
servicers.  *See, e.g., In re Residential Capital, LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. Jul. 25,
2012) [Docket No. 401] (granting assurance terms to Fannie Mae and Freddie Mac).

## Scope of Motion

91.    This Motion does not cover all aspects of the Debtors' businesses.  Whether
or not a business activity is described in this Motion, and whether or not the Debtors seek an order
with respect to the continuation of such activity, if the activity is of the nature of those that the
Debtors conduct in the ordinary course of business, the Debtors intend to continue to conduct such
activity after the Commencement Date pursuant to the authority granted to them by section 363(c)
of the Bankruptcy Code.  Absence of a description of a particular activity or request for specific
relief related to the Debtors' reverse mortgage business shall not limit the rights of the Debtors to
conduct their business and manage their assets in the ordinary course without prior Court approval.

## Reservation of Rights

92.    Nothing contained herein is intended or shall be construed as (i) an
admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' or any
appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim
against the Debtors; (iii) a waiver of any claims or causes of action which may exist against any
creditor or interest holder; or (iv) an approval, assumption, adoption, or rejection of any agreement,

WEIL:\96914030\1\41703.0010

contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

### Debtors Have Satisfied Bankruptcy Rule 6003(b)

93.    Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" before twenty-one (21) days after filing of the petition. As described above and in the Lombardo Declaration, the Debtors would suffer immediate and irreparable harm if the relief sought herein is not promptly granted. Accordingly, the Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003(b) is satisfied.

### Bankruptcy Rules 6004(a) and (h)

94.    To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances, and waive the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h). As explained above and in the Lombardo Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors. Accordingly, ample cause exists to justify finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

**1332**

## Notice

95.    Notice of this Motion has been provided to: (i) William K. Harrington, U.S. Department of Justice, Office of the U.S. Trustee, 201 Varick Street, Room 1006, New York, New York 10014 (Attn:  Greg M. Zipes and Benjamin J. Higgins) (the "**U.S. Trustee**"); (ii) the Debtors' five (5) largest secured creditors on a consolidated basis; (iii) the Debtors' forty (40) largest unsecured creditors on a consolidated basis; (iv) the Internal Revenue Service; (v) the United States Attorney's Office for the Southern District of New York; (vi) counsel to the Prepetition Term Loan Agent, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017 (Attn: Brian Resnick and Michelle M. McGreal); (vii) counsel to the Term Loan Ad Hoc Group, Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654 (Attn: Patrick J. Nash and Gregory F. Pesce); (viii)  Wilmington Savings Fund Society, FSB, as trustee under that certain Indenture for 9.0% Second Lien Senior Subordinated PIK Toggle Notes due 2024, 500 Delaware Avenue, Wilmington, Delaware 19801 (Attn: Corporate Trust, Walter Investment); (ix) counsel to the Second Lien Ad Hoc Group, Milbank, Tweed, Hadley & McCloy LLP, 2029 Century Park East, Los Angeles, California 90067 (Attn: Gregory A. Bray and Melainie K. Mansfield); (x) counsel to Barclays Bank PLC, as DIP Agent, and Barclays Capital Inc., as DIP Lender, Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, New York, New York 10036 (Attn: Sarah M. Ward, Mark A. McDermott, and Melissa Tiarks); (xi) counsel to Nomura Corporate Funding Americas, LLC, Alston & Bird LLP, 90 Park Avenue, 15th Floor, New York, New York 10016 (Attn: Karen Gelernt and Ronald Klein) and Jones Day, 250 Vesey Street, New York, New York 10281 (Attn: Ben Rosenblum); (xii) the Banks; (xiii) the Securities and Exchange Commission; (xiv) counsel to Fannie Mae, O'Melveny & Myers LLP, 400 South Hope Street, 18th Floor, Los Angeles, California 90071 (Attn: Stephen Warren, Jennifer Taylor and Darren Patrick); (xiv) counsel to Freddie Mac, McKool Smith PC, 600 Travis Street, Suite 7000, Houston, Texas

77002 (Attn:  Paul D. Moak); and (xv) U.S. Department of Housing and Urban Development, 451

Seventh St., SW, Room 9250, Washington, DC 20410 (Attn: Lisa Mulrain, Assistant General

Counsel, Office of General Counsel, Finance Division) (collectively, the "**Notice Parties**").  The

Debtors respectfully submit that no further notice is required.

96.    No previous request for the relief sought herein has been made by the

Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of interim and final orders

granting the relief requested herein and such other and further relief as the Court may deem just

and appropriate.

Dated: February 11, 2019
       New York, New York

/s/ Sunny Singh
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Sunny Singh

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

WEIL:\96914030\1\41703.0010

**1334**

**<u>Exhibit A</u>**

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------X
                       :

In re                      :      **Chapter 11**
                       :

**DITECH HOLDING CORPORATION,** *et al.*,  :      **Case No. 19-[_____] (___)**
                       :

          Debtors.[1]       :      **(Jointly Administered)**
                       :

---------------------------------------------------------------X

### INTERIM ORDER (I) AUTHORIZING DEBTORS TO CONTINUE HONORING REVERSE ISSUER AND SERVICING OBLIGATIONS IN THE ORDINARY COURSE AND GRANTING RELATED RELIEF, (II) MODIFYING AUTOMATIC STAY ON A LIMITED BASIS TO FACILITATE DEBTORS' ONGOING OPERATIONS, AND (III) SCHEDULING A FINAL HEARING

Upon the motion (the "**Motion**")[2] of Ditech Holding Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), pursuant to sections 105(a), 362, 363(c), 363(f), 1107(a), and 1108 of the Bankruptcy Code and Bankruptcy Rules 4001, 6003, and 6004, the Debtors request authority, but not direction, to (a) (i) honor and fund the Ginnie Mae Buyout Obligations, (ii) continue their securitization activities, (iii) honor the Ginnie Mae Agreements; and (iv) remit the Ginnie Mae Commitment Fee, the Ginnie Mae Guaranty Fee, amounts due from Borrower Paydown (each as defined below), and certain administrative fees arising from RMS's securitization activities; (b) (i) honor the Servicing Obligations, including by continuing to

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Debtors' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

perform under the Fannie Mae Agreements and honor their obligations under the MECA, (ii) honor and pay the Curtailment Obligations, (iii) collect and securitize the Servicing Fees, and (iv) remit the Servicer Advances; (c) continue assignment and claim reimbursement activities; (d) continue to employ and pay prepetition claims of the Critical Vendors; (e) continue honoring RMS's indemnification obligations to FHA in connection with defective loans; (f) fulfill compliance and regulatory obligations; and (g) provide assurances of future performance to Ginnie Mae and Fannie Mae, all as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to the Notice Parties, and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having reviewed the Motion; and the Court having held a hearing to consider the relief requested in the Motion on an interim basis (the "**Hearing**"); and upon the Lombardo Declaration, filed contemporaneously with the Motion, and the record of the Hearing; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates as contemplated by Bankruptcy Rule 6003, and is in the best interests of the Debtors, their estates, creditors, and all parties in interest; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

WEIL:\96914030\1\41703.0010

**1337**

1.      The Motion is granted on an interim basis to the extent set forth herein.

2.      The Debtors are authorized, but not directed, to continue in the ordinary course of business:

   a. (i) honor and fund the Ginnie Mae Buyout Obligations, (ii) continue their activities, (iii) honor the Ginnie Mae Agreements; and (iv) remit the Ginnie Mae Commitment Fee, the Ginnie Mae Guaranty Fee, amounts due from Borrower Paydown (each as defined below), and certain administrative fees arising from RMS's securitization activities;

   b. (i) honor the Servicing Obligations, including by continuing to perform under the Fannie Mae Agreements and honor their obligations under the MECA, (ii) honor and pay the Curtailment Obligations, (iii) collect and securitize the Servicing Fees, and (iv) remit the Servicer Advances (each as defined below);

   c. continue assignment and claim reimbursement activities;

   d. continue to employ and pay prepetition claims of the Critical Vendors;

   e. continue honoring their indemnification obligations to FHA in connection with defective loans;

   f. fulfill compliance and regulatory obligations; and

   g. provide assurances of future performance to Ginnie Mae and Fannie Mae.

3.      The Debtors are authorized, but not directed, to continue selling REO Property (i) on an "as is where is" basis and without any representation and warranties except for title, in the ordinary course of business, in their discretion and subject to their business judgment, and consistent with past practices, and (ii) free and clear of any and all liens and encumbrances (a) under section 363(f) of the Bankruptcy Code to the extent the Debtors own the REO Property, and (b) to the extent permitted pursuant to applicable non-bankruptcy law for REO Property owned by third parties.

WEIL:\96914030\1\41703.0010

**1338**

**Additional Relief Related to the Debtors' Businesses**

4.      The Debtors are authorized but not directed, to continue in the ordinary course of business (a) to fulfill state licensing requirements and to pay related obligations, (b) to submit to, and comply with, state and federal regulatory exams and audits and to pay related obligations, costs, and expenses, and (c) to remediate errors and/or lack of compliance with laws or regulations, including by continuing (i) to make payments to borrowers (*e.g.*, in the form of reimbursements, refunds, and/or out-of-pocket expenses), (ii) to forgive past due amounts and/or assessed but unpaid fees or other charges, (iii) to pay fees, fines, and/or penalties, either directly to the applicable authority or through a Critical Vendor, (iv) to incur and pay certain expenses, (v) to pay the costs and expenses of state and federal regulatory examinations, and (vi) to take such other measures as may be required by, or agreed to with, state and federal regulators.

**Critical Vendors**

5.      Pursuant to sections 105(a) and 363(c) of the Bankruptcy Code, the Debtors are authorized, but not directed, in the reasonable exercise of their business judgment, to pay some or all of the prepetition claims of the Critical Vendors, upon such terms and in the manner provided in this Order and the Motion and subject to the Management Approval Process (as defined herein); provided, that payments to Critical Vendors on account of prepetition claims shall not exceed $35 million during the first thirty (30) days following the Commencement Date; provided further, that payments to Critical Vendors on account of such prepetition claims may not be accelerated and shall be made only in the ordinary course in accordance with Customary Trade Terms.

6.      As used herein, the term "Management Approval Process" means the advance review and approval by the chief financial officer of the Company, following consultation with the Debtors' management and AlixPartners LLP, of any prepetition payment made to a Critical Vendor.

**1339**

7.      Promptly after entry of this Order and weekly thereafter, the Debtors shall provide counsel for any statutory committee appointed in the Debtors' cases, counsel to the Term Loan Lender Ad Hoc Group, and the Office of the United States Trustee for the Southern District of New York with a schedule of all payments made to the Critical Vendors on account of prepetition claims in accordance with the terms of this Order, which shall include the name and address of the Critical Vendor and the amount and date of the payment.

8.      If a Critical Vendor refuses to supply products and/or services to the Debtors on Customary Trade Terms (or such other terms as are agreed by the parties) following receipt of payment on its prepetition claim, then the Debtors may, upon notice to any statutory committee appointed in the Debtors' cases and without further order of the Court:

a.      Declare that any payments made to the Critical Vendor on account of such claim be deemed to have been in payment of then-outstanding (or subsequently accruing) postpetition claims of the Critical Vendor without further order of the Court or action by any person or entity; and

b.      Take actions to recover or seek disgorgement of any payment made to the Critical Vendor on account of its prepetition claim to the extent that the payments exceeded the postpetition claims of the Critical Vendor, without giving effect to any rights of setoff, recoupment, claims, provision for payment of reclamation or trust fund claims, or other defense.

9.      Under such circumstances, such Critical Vendor shall immediately repay to the Debtors any payment made to it on account of its prepetition claims to the extent that such payments exceed its postpetition claims, without giving effect to any rights of setoff, recoupment, claims, provision for payment of reclamation or trust fund claims, or other defense.

WEIL:\96914030\1\41703.0010

10. Nothing herein shall:

a. Constitute a waiver of the Debtors' rights to seek damages, disgorgement or other appropriate remedies against any breaching Critical Vendor;

b. Be construed to waive, limit, or in any way affect the Debtors' ability to dispute a claim of a Critical Vendor;

c. Be deemed an admission to the validity of the underlying obligation, including any payment made pursuant to this Order;

d. Be deemed to constitute an assumption or rejection of any executory contract or pre- or postpetition agreement between the Debtors and a Critical Vendor; or

e. Be deemed to require the Debtors to make any of the payments to the Critical Vendors authorized herein.

11. Notwithstanding entry of this Order, the Debtors' rights to enforce the automatic stay provision of section 362 of the Bankruptcy Code with respect to any creditor who demands payment of its prepetition claims as a condition to doing business with the Debtors postpetition are preserved.

## Limited Relief from Automatic Stay

*Borrower Foreclosure and Eviction Proceedings*

12. The stay imposed by section 362(a) of the Bankruptcy Code is hereby modified to allow borrowers, mortgagors, and lienholders (each, an "**Interested Party**") to assert and prosecute claims, cross-claims, third-party claims, and counter-claims related to judicial and non-judicial foreclosure and eviction proceedings brought by the Debtors to the limited extent such claims, cross-claims, third-party claims, and counterclaims, including the appeals of such, have the sole purpose of defending, unwinding, or otherwise enjoining or precluding any foreclosure or eviction, and do not have an adverse effect on any of the Debtors' assets.

WEIL:\96914030\1\41703.0010

13.     Absent further order of this Court, the automatic stay shall remain in full force and effect with respect to any and all other pending or future claims, cross-claims, third-party claims, and counterclaims by Interested Parties related to judicial and non-judicial foreclosure and eviction proceedings, including with respect to (a) monetary relief of any kind or any nature against the Debtors, (b) claims of recoupment or setoff, (c) relief that if granted would affect the amount, validity, and/or priority of lien(s) held by the Debtors, (d) relief that if granted would not terminate or preclude the prosecution and completion of a foreclosure or eviction, and (e) actions asserted in the form of a class action or collective action.

14.     Should there be any disagreements between or among any Interested Parties and/or the Debtors regarding whether any claims, cross-claims, third-party claims, or counterclaims fall within the exception to the automatic stay approved by this Court, this Court shall have exclusive jurisdiction to hear and resolve such disputes.

*Borrower Bankruptcy Proceedings*

15.     The automatic stay imposed by section 362(a) of the Bankruptcy Code applicable against a borrower who has sought, or may seek during the pendency of these cases, bankruptcy protection under chapters 7, 11, 12, or 13 of the Bankruptcy Code (each, a "**Bankrupt Borrower**"), is hereby modified pursuant to the following terms and conditions:

a.     except as set forth herein, and provided an action outlined below would not affect the value or validity of an asset or claim held by the Debtors, a Bankrupt Borrower, a Bankruptcy Trustee, or a United States Trustee shall be entitled:

(i)     to assert or continue to assert an objection to a proof of claim, notice of payment change, notice of postpetition fee, expense, or charge, or response to notice of final cure (collectively, the "**Required Bankruptcy Documents**") filed by the Debtors in the Bankrupt Borrower's bankruptcy case;

(ii)    to assert or continue to assert an objection to a motion to lift the automatic stay filed by the Debtors in the Bankrupt Borrower's bankruptcy case;

(iii)    to assert appeals with respect to items (i) and (ii); and

(iv)    to seek an accounting from the Debtors with respect to the Bankrupt Borrower's loan;

b.    except as set forth herein, a Bankrupt Borrower shall be entitled:

(v)    to engage in court-supervised or court-authorized loss-mitigation programs regarding the Bankrupt Borrower's loan; and

(vi)    to engage in discussion with the Debtors and execute a modification of the Bankrupt Borrower's loan or otherwise discuss, enter into, and consummate settlements of claims and liens in accordance with the ordinary course of the Debtors' business and applicable law;

c.    absent further order of this Court, the automatic stay shall remain in full force and effect with respect to all the Bankrupt Borrower's, the Bankruptcy Trustee's, and the United States Trustee's direct claims, counterclaims, motions, or adversary proceedings:

(vii)    for monetary relief of any kind and of any nature against the Debtors, with the exception of: (A) a reduction in the amount of arrearage listed on a proof of claim that would not affect the total amount of the claim; (B) an objection to the amount listed on a notice of payment change; or (C) an objection to the amount past due listed on a response to notice of final cure;

(viii)    for violation of any local, state, or federal statute or other law in connection with the origination of the Bankrupt Borrower's loan;

(ix)    for relief that if granted, would have an effect on the amount, validity, or priority of the Debtors' claim or lien against a Bankrupt Borrower or the property of the Bankrupt Borrower securing such claim or lien of the Debtors; or

(x)    asserted in the form of a class action;

d.    absent further order of this Court, the automatic stay shall remain in full force and effect with respect to any party seeking to intervene

WEIL:\96914030\1\41703.0010

to assert related claims against the Debtors or any class action or collective action brought by any Bankrupt Borrower on behalf of any other class of borrowers;

e.   with the sole exception of objections to Debtors' proofs of claim permitted by subsection (a)(i) above, and solely for purposes of reducing any such claim and not for the purpose of obtaining an affirmative recovery or award, under no circumstances shall a Bankrupt Borrower, a Bankruptcy Trustee, or a United States Trustee be entitled to recoup, setoff, or collect from the Debtors any judgment or award related to any direct claim or counterclaim for which the automatic stay has been lifted by the terms of this Order;

f.   the Debtors shall retain the right, upon appropriate motion and notice to any Bankrupt Borrower, Bankruptcy Trustee, or United States Trustee, to seek to impose any provision of section 362(a) of the Bankruptcy Code modified by this Order, and to the extent such relief is sought, the Debtors will not object to such party's telephonic participation at any hearing on such motion;

g.   nothing set forth herein shall preclude or limit any Bankrupt Borrower, Bankruptcy Trustee, or United States Trustee from seeking relief from the automatic stay under section 362(a) of the Bankruptcy Code on appropriate motion and notice to the Debtors and parties in interest; and

h.   should there be any disagreements between the Debtors, a Bankrupt Borrower, a Bankruptcy Trustee, or a United States Trustee regarding whether any actions, claims, or counterclaims fall within the exception to the automatic stay approved by the Court, the Court shall have exclusive jurisdiction to hear and resolve such dispute.

*Actions Involving Amount, Validity, or Priority of Liens*

16.   The automatic stay imposed by section 362(a) of the Bankruptcy Code applicable to actions involving the amount, validity, and/or priority of liens with respect to properties subject to mortgages owned or serviced by Ditech (such actions, "**Title Disputes**") is hereby modified to allow Interested Parties to assert a defense, including the appeals of such, in Title Disputes.

17.   Absent further order of this Court, the automatic stay shall remain in full force and effect with respect to any and all other pending or future claims, cross-claims, third-party

WEIL:\96914030\1\41703.0010

claims, and counterclaims against the Debtors, including with respect to (a) monetary relief of any kind or any nature against the Debtors, (b) relief that if granted would affect the amount, validity, and/or priority of lien(s) held by the Debtors, (c) actions for partition, eminent domain, or seizure of the property securing lien(s) held by the Debtors, (d) relief that is not necessary for the resolution of the Title Dispute, or (e) actions asserted in the form of a class action or collective action.

18.    Should there be any disagreements between or among any Interested Parties and/or the Debtors regarding whether any claims, cross-claims, third-party claims, or counterclaims fall within the exception to the automatic stay approved by this Court, this Court shall have exclusive jurisdiction to hear and resolve such disputes.

### Additional Relief Related to Ginnie Mae and Fannie Mae

19.    The Debtors are authorized to provide to Ginnie Mae and Fannie Mae assurances of future performance under the applicable Ginnie Mae Agreements and Fannie Mae Agreements, as applicable, on the terms and conditions set forth in **Schedules 1** and **2** to this Order and to comply therewith; *provided*, *that*, nothing herein, including the provision of such assurances, shall be deemed to constitute an assumption or rejection of any executory contract or prepetition or postpetition agreement between the Debtors and Ginnie Mae or Fannie Mae, as applicable.  The acceptance by Ginnie Mae and Fannie Mae of the assurances and related relief granted pursuant to this Order shall not be deemed to constitute consent by Ginnie Mae or Fannie Mae of the assumption and assignment of the Ginnie Mae Agreements or Fannie Mae Agreements or release the Debtors from any obligations under the Ginnie Mae Agreements or Fannie Mae Agreements.  Notwithstanding anything herein or in any order to the contrary, Ginnie Mae and Fannie Mae may seek additional assurance or modification to its grant of assurance provided

WEIL:\96914030\1\41703.0010

herein so as to provide different or additional assurances, without prejudice to the right of the Debtors or any other party in interest to contest any such addition or modification.

20.     For the avoidance of doubt, all payments by the Debtors to Ginnie Mae, Ginnie Mae-guaranteed MBS investors and Fannie Mae (including, without limitation, payments of principal and interest, Servicer Advances, and other servicing and subservicing related fees and claims, and with respect to the loans in Ginnie Mae sponsored securitizations (the "**Ginnie Securitized Loans**"), securitization related, escrows, fees and claims), and payments of the MECA REO Sale Proceeds shall be made free and clear of any lien, security interest, or other interest of any party, including, without limitation, any prepetition or postpetition lenders.  The principal, interest, and funds for the payment of property taxes and insurance premiums collected by RMS in connection with its performance of the Servicing Obligations and the MECA REO Sale Proceeds are not property of the Debtors estates under section 541 of the Bankruptcy Code, and no lien or other interest therein will be given by the Debtors to any party.

21.     Nothing in this Order constitutes a determination as to the applicability, if any, of the automatic stay under section 362(a) of the Bankruptcy Code to requests by Ginnie Mae or Fannie Mae to the Debtors to honor their servicing-related and with respect to the Ginnie Mae securitized loans, securitization-related, commitments and obligations, including, without limitation, requests for payment of principal and interest, Servicer Advances, and other origination-related, servicing-related, and with respect to Ginnie Mae securitized loans, securitization-related, fees and claims, in each case to the extent provided under the relevant Ginnie Mae Agreements and Fannie Mae Agreements.  Rather, the Debtors, Fannie Mae, and Ginnie Mae each reserve their rights with respect to this issue.

**1346**

22.    To the extent that the automatic stay under section 362(a) of the Bankruptcy Code applies to requests by Ginnie Mae and Fannie Mae that the Debtors honor their servicing-related, and with respect to Ginnie Securitized Loans, securitization-related, commitments and obligations, the automatic stay is hereby modified to the limited extent necessary to allow Ginnie Mae and Fannie Mae to make such requests to the Debtors, including, without limitation, requests for payment of Servicer Advances and other servicing-related, and with respect to Ginnie Securitized Loans, securitization-related, fees and claims, in each case to the extent provided under the relevant Ginnie Mae Agreements or Fannie Mae Agreements; *provided*, *that*, Fannie Mae and Ginnie Mae reserve all rights to assert that they may exercise any and all rights available to them under their respective agreements notwithstanding the automatic stay.

### **Other Relief**

23.    Nothing in the Motion or this Interim Order shall be deemed to authorize the Debtors to accelerate any payments not otherwise due prior to the date of the final hearing to consider the relief requested in the Motion (the "**Final Hearing**").

24.    Nothing contained in the Motion or this Interim Order, nor any payment made pursuant to the authority granted by this Interim Order, shall constitute or be construed as (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors; (iii) a waiver of any claims or causes of action which may exist against any creditor or interest holder; or (iv) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code.

WEIL:\96914030\1\41703.0010

**1347**

25.    Notwithstanding anything to the contrary contained herein or in the Motion, any payment, obligation or other relief authorized by this Order shall be subject to and limited by the requirements imposed on the Debtors under the terms of any interim and/or final order approving the *Debtors' Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 365, 503, 507, 546, 548, 555, 559, and 561 (A) Authorizing Debtors to Enter Into Repurchase Agreement Facilities, Servicer Advance Facilities and Related Documents; (B) Authorizing Debtors to Sell Mortgage Loans and Servicer Advance Receivables in the Ordinary Course of Business; (C) Granting Back-Up Liens and Superpriority Administrative Expense Claims; (D) Authorizing Use of Cash Collateral and Granting Adequate Protection; (E) Modifying the Automatic Stay; (F) Scheduling a Final Hearing; and (G) Granting Related Relief*, as may be amended or superseded from time to time, or any budget in connection therewith, entered by the Court in these chapter 11 cases.

26.    Nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

27.    Nothing herein shall be construed to limit the right of any governmental unit (as such term is defined in section 101(27) of the Bankruptcy Code) to take any action not subject to the automatic stay.

28.    The requirements of Bankruptcy Rule 6003(b) have been satisfied.

29.    Under the circumstances of these chapter 11 cases, notice of the Motion is adequate under Bankruptcy Rule 6004(a).

30.    Notwithstanding Bankruptcy Rule 6004(h), this Order shall be immediately effective and enforceable upon its entry.

WEIL:\96914030\1\41703.0010

**1348**

31.     The Final Hearing shall be held on _____, **2019, at _____ (Prevailing**

**Eastern Time)** and any objections or responses to the Motion shall be in writing, filed with the

Court, and served in accordance with the Case Management Order.

32.     This Interim Order is effective only from the date of entry through this

Court's disposition of the Motion on a final basis; provided that the Court's ultimate disposition

of the Motion on a final basis shall not impair or otherwise affect any action taken pursuant to this

Interim Order.

33.     The Debtors are authorized to take all action necessary to effectuate the

relief granted in this Interim Order.

34.     The Court shall retain jurisdiction to hear and determine all maters arising

from or related to the implementation, interpretation, and /or enforcement of this Order.

Dated: _____, 2019
          New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

WEIL:\96914030\1\41703.0010

**1349**

**Schedule 1**

**<u>Ginnie Mae Assurance of Future Performance</u>**

## Reverse Mortgage Solutions, Inc.
## Ginnie Mae Assurance of Future Performance[1]

1. RMS will provide Ginnie Mae staff and its designees with regular access to RMS's facilities, including reasonable access to the Debtors' books, records, and accounts, so as to allow Ginnie Mae to oversee RMS's performance of its securitization duties.

2. RMS will at all times maintain its securitization performance to the standards set forth in those certain Master Servicing Agreements dated as of March 6, 2014 (together with all Guaranty Agreements, MBS prospectus documents, cross default agreements, escrow agreements, Tri-Party agreement, corporate guaranty, acknowledgement agreement, supplements, addendums, amendments, and related agreements, the "**Ginnie Mae Servicing Agreements**" and, together with the Ginnie Mae securitization guidelines (the "**Ginnie Mae Guide**"), the "**Ginnie Mae Agreements**,") as well as to the following supplemental or existing standards:

   (a) RMS shall deliver custodial account reconciliations of all P&I accounts relating to Ginnie Mae-guaranteed loans via tapes to Ginnie Mae on or before the 15th day of the month immediately following the reconciliation period;

   (b) RMS shall provide Ginnie Mae with a copy of its key employee retention program and key employee incentive program and updates to form HUD 11702, as applicable;

   (c) RMS shall provide notice to Ginnie Mae of senior management departures and updates to form HUD 11702, as applicable, as required by the Ginnie Mae Agreements;

   (d) RMS shall provide Ginnie Mae with a report identifying the Critical Vendors for the Ginnie Mae-guaranteed MBS portfolio and access to a contact list of parties, as may be reasonably requested, (other than document custodians) to whom loan collateral documents have been or are delivered, including ancillary systems and location of any origination, credit, and servicing files, imaging and records stored in hard copy format;

   (e) RMS shall provide all reporting and other securitization information as requested by Ginnie Mae, including such additional reports that may be reasonably requested, as currently permitted under the Ginnie Mae Agreements;

   (f) RMS shall keep Ginnie Mae apprised of its ongoing compliance efforts, and will be entitled to apply for and obtain any extensions from Ginnie Mae, in Ginnie Mae's sole discretion, which extensions will not be withheld solely on the basis of RMS's bankruptcy proceedings. RMS may not seek extensions of the statutory requirement to obtain mortgage insurance or guaranty for pooled loans or

---

[1] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Ginnie Mae Agreements.

extensions of regulatory requirements.  A request to approve a transfer of issuer responsibility is not an extension request.

3.    RMS shall timely comply with the Ginnie Buyout Obligations set forth in the Ginnie Mae Agreements.

4.    RMS shall maintain response times to file requests as is current practice and RMS shall comply with the requisite timelines pursuant to the Ginnie Mae Agreements.

5.    RMS shall comply with all the terms and conditions outlined in the Ginnie Mae Notice of Violation dated as of February 8, 2019.

**Schedule 2**

**Fannie Mae Assurance of Future Performance**

**1353**

**Reverse Mortgage Solutions, Inc.**
**Fannie Mae Assurances of Future Performance**[1]

1.   RMS shall provide Fannie Mae staff with regular access to RMS facilities, including reasonable access to its books, records, and accounts, so as to allow Fannie Mae to oversee RMS's performance of its servicing duties.

2.   RMS shall at all times maintain its servicing performance to the standards set forth in that certain Servicing Guide: Fannie Mae Single Family and that certain Fannie Mae Reverse Mortgage Loan Servicing Manual (collectively, the "**Fannie Mae Servicing Guides**"), and RMS's obligations thereunder are secured pursuant to that certain Pledge and Security Agreement dated as of December 19, 2014 (the "**Fannie Mae Pledge Agreement**" and together with the Fannie Mae Mortgage Selling and Servicing Contract and the Fannie Mae Servicing Guides, together with all supplements, addendums, amendments, and related agreements, the "**Fannie Mae Agreements**").   In addition:

   (a)   RMS shall deliver to Fannie Mae the following information: (i) on a quarterly basis, a completed Mortgage Bank Financial Reporting Form, (ii) monthly financial statements, and (iii) weekly liquidity reporting, in each case, on the same timeframe as such reports were delivered immediately prior to the Commencement Date;

   (b)   RMS shall provide Fannie Mae with a copy of its key employee retention program and key employee incentive program;

   (c)   RMS shall at all times maintain staffing levels commensurate with the portfolio, including maintaining adequate staffing within the requisite servicing departments;

   (d)   RMS shall provide notice to Fannie Mae within two (2) business days (i) of senior management departures and/or (ii) the number of loans per employee falling below the level as of the date of the bankruptcy filing;

   (e)   RMS shall timely comply with all servicing action plans;

   (f)   RMS shall continue regularly scheduled engagements with Fannie Mae, such as the monthly performance reviews at the current participation level, including RMS senior management;

   (g)   RMS shall provide all reporting and other servicing information as reasonably requested by Fannie Mae, including such additional reports that may be requested, as currently permitted under the Fannie Mae Servicing Guide and/or the Reverse Mortgage Loan Servicing Manual;

---

[1]   Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Fannie Mae Agreements.

(h)    RMS shall keep Fannie Mae apprised of its ongoing compliance efforts, and will be entitled to apply for and obtain any extensions as it deems appropriate, which extensions will not be withheld solely on the basis of RMS's bankruptcy proceedings;

(i)    RMS must use best efforts to reduce the net population of loans in tax and insurance default, by ensuring that the percentage is on par or less than the book average as provided by Fannie Mae;

(j)    RMS shall timely respond to and resolve all requests for repurchase and "REO Gram" penalties for late reporting of loans entering "REO";

(k)    RMS shall deliver to Fannie Mae "End of Month Exception Reports" in a timely manner and keep reverse mortgage loans in the "eBoutique" reverse mortgage reporting system up to date and reconciled to the RMS system;

(l)    RMS shall remain responsible for the timely filing of FHA claims, including Initial and Supplemental claims; and

(m)    RMS shall remain responsible for timely response to and payment of HECM claim curtailment billings from Fannie Mae.

3.    RMS shall maintain response times to file requests (for servicing files) timely (within 30 days) as is current practice and RMS will comply with Fannie Mae timelines for appeal letters, identifying "impasse loans", and for supplying missing documents as well as timely addressing aged repurchase issues.

4.    RMS shall at all times continue to provide services as referenced in the Mortgage Equity Conversion Asset Trust 2011-1 Servicing Agreement dated as of May 1, 2011.  Such services to include: management and disposition of REO property and reviewing all FHA claims submitted by the servicer to ensure that any such claims were made in accordance with the FHA Handbook and the Servicing Agreement.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

In re                                              :      **Chapter 11**
                                                   :
**DITECH HOLDING CORPORATION**, *et al.*,          :      **Case No. 19-10412 (JLG)**
                                                   :
         Debtors.[1]                               :      **(Jointly Administered)**
                                                   :      Related Docket No. 10, 54, 187
------------------------------------------------------------X

## FINAL ORDER (I) AUTHORIZING
## DEBTORS TO CONTINUE HONORING REVERSE
## ISSUER AND SERVICING OBLIGATIONS IN THE ORDINARY COURSE
## AND GRANTING RELATED RELIEF AND (II) MODIFYING AUTOMATIC
## STAY ON A LIMITED BASIS TO FACILITATE DEBTORS' ONGOING OPERATIONS

Upon the motion dated February 11, 2019 (the "**Motion**")[2] of Ditech Holding

Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned

chapter 11 cases (collectively, the "**Debtors**"), pursuant to sections 105(a), 362, 363(c), 363(f),

1107(a), and 1108 of the Bankruptcy Code and Bankruptcy Rules 4001, 6003, and 6004, the

Debtors request authority, but not direction, to (a) (i) honor and fund the Ginnie Mae Buyout

Obligations, (ii) continue their securitization activities, (iii) honor the Ginnie Mae Agreements;

and (iv) remit the Ginnie Mae Commitment Fee, the Ginnie Mae Guaranty Fee, amounts due from

Borrower Paydown (each as defined below), and certain administrative fees arising from RMS's

securitization activities; (b) (i) honor the Servicing Obligations, including by continuing to

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Debtors' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

[2]    Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion. As used herein, the term "mortgage" and similar formulations include both mortgages and deeds of trust.

perform under the Fannie Mae Agreements and honor their obligations under the MECA, (ii) honor and pay the Curtailment Obligations, (iii) collect and securitize the Servicing Fees, and (iv) remit the Servicer Advances; (c) continue assignment and claim reimbursement activities; (d) continue to employ and pay prepetition claims of the Critical Vendors; (e) continue honoring RMS's indemnification obligations to FHA in connection with defective loans; (f) fulfill compliance and regulatory obligations; and (g) provide assurances of future performance to Ginnie Mae and Fannie Mae, all as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion and Final Hearing (defined below) having been provided to the Notice Parties as set forth in the affidavit of service filed with respect thereto [ECF No. 45], and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having reviewed the Motion; and the Court having held a hearing to consider the relief requested in the Motion on an interim basis on February 13, 2019 (the "**Interim Hearing**"); and the Court having entered an order granting the relief requested in the Motion on an interim basis [ECF No. 54] and scheduling a final hearing on the Motion for March 14, 2019 (the "**Final Hearing**"); and, if necessary, the Final Hearing having been held to consider the relief requested in the Motion on a final basis; and upon the Lombardo Declaration, filed contemporaneously with the Motion, and the record of the Interim Hearing and the Final Hearing; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the

2

**1357**

Motion is in the best interests of the Debtors, their estates, creditors, and all parties in interest; and

upon all of the proceedings had before the Court and after due deliberation and sufficient cause

appearing therefor,

## IT IS HEREBY ORDERED THAT:

1.      The Motion is granted on a final basis to the extent set forth herein.

2.      The Debtors are authorized, but not directed, to continue in the ordinary

course of business:

a.   (i) honor and fund the Ginnie Mae Buyout Obligations, (ii) continue their securitization activities, (iii) honor the Ginnie Mae Agreements; and (iv) remit the Ginnie Mae Commitment Fee, the Ginnie Mae Guaranty Fee, amounts due from Borrower Paydown, and certain administrative fees arising from RMS's securitization activities;

b.   (i) honor the Servicing Obligations, including by continuing to perform under the Fannie Mae Agreements and honor their obligations under the MECA, (ii) honor and pay the Curtailment Obligations, (iii) collect and securitize the Servicing Fees, and (iv) to make Servicer Advances;

c.   continue assignment and claim reimbursement activities;

d.   continue to make and/or accept certain incentive payments, concessions, or rebates to or from borrowers, lienholders, mortgagors, the heirs, estates, non-borrowing spouses, and other successors in interest of the foregoing, tenants, title companies, title insurers, purchasers from a tax sale or a foreclosure sale, or other parties with a claimed interest in the subject property or loan (each, an "**Interested Party**") with respect to foreclosures, evictions, short sales, heir payoffs, Title Disputes (as defined below), collection actions, loan payoffs, insurance disputes, replevins, and similar servicing related actions (collectively, the "**Loss Mitigation Payments**") and continue to enter into, and perform under existing, repayment, forbearance or deferment arrangements with Interested Parties to compromise or settle claims related to loans owned, serviced or subserviced by the Debtors, and including honoring all obligations related thereto that accrued in whole or part prior to the Commencement Date;

e.   continue to conduct foreclosures, short sales, heir payoffs, deeds in lieu of foreclosure, evictions, and similar actions, including to honor and to enter into settlements and other arrangements related thereto, including

3

on behalf of investors in accordance with the Debtors' existing servicing and subservicing obligations;

f.   continue to employ and pay prepetition claims of the Critical Vendors;

g.   continue honoring their indemnification obligations to FHA in connection with defective loans;

h.   fulfill compliance and regulatory obligations; and

i.   provide assurances of future performance to Ginnie Mae and Fannie Mae.

3.     The Debtors are authorized, but not directed, to continue selling REO Property (i) on an "as is where is" basis and without any representation and warranties except for title, in the ordinary course of business, in their discretion and subject to their business judgment, and consistent with past practices, and (ii) free and clear of any and all liens and encumbrances (a) under section 363(f) of the Bankruptcy Code to the extent the Debtors own the REO Property, and (b) to the extent permitted pursuant to applicable non-bankruptcy law for REO Property owned by third parties; *provided*, *that*, to the extent any lien, claim, or encumbrance exists on the property that is the subject of such sale, it shall attach to the proceeds realized from such sale.

**Additional Relief Related to the Debtors' Businesses**

4.     The Debtors are authorized but not directed, to continue in the ordinary course of business (a) to fulfill state licensing requirements and to pay related obligations, (b) to submit to, and comply with, state and federal regulatory exams and audits and to pay related obligations, costs, and expenses, and (c) to remediate errors and/or lack of compliance with laws or regulations, including by continuing (i) to make payments to borrowers (*e.g.*, in the form of reimbursements, refunds, and/or out-of-pocket expenses), (ii) to forgive past due amounts and/or assessed but unpaid fees or other charges, (iii) to pay fees, fines, and/or penalties, either directly to the applicable authority or through a Critical Vendor, (iv) to incur and pay certain expenses,

4

(v) to pay the costs and expenses of state and federal regulatory examinations, (vi) to take such other measures as may be required by, or agreed to with, state and federal regulators, and (vii) to perform any other adjustments to borrowers' accounts as part of the Debtors' compliance obligations.

5.     If, after the Commencement Date, a Specified Servicing Default (as defined below) under any Specified Agreement (as defined below) has occurred, then the Specified Counterparty (as defined below) under such Specified Agreement may, in accordance with the terms of such Specified Agreement and notwithstanding the automatic stay, issue a written notice declaring that such Specified Servicing Default has occurred and is continuing (a "**Specified Servicing Default Notice**"), to the Debtors and their counsel, the DIP Agent and its counsel, the U.S. Trustee, counsel to the official committee of unsecured creditors appointed in these chapter 11 cases (the "**Creditors' Committee**"), and counsel to the Consenting Term Lenders (collectively, the "**Specified Servicing Default Notice Parties**").  To be effective hereunder, any Specified Servicing Default Notice shall (i) specify that it is a "Specified Servicing Default Notice", (ii) identify and attach copies of the relevant Specified Agreement(s), and (iii) otherwise comply with the requirements for such notice under the applicable Specified Agreement.  If a Specified Servicing Default Notice has been delivered in accordance with this paragraph and the alleged Specified Servicing Default is not cured within the longer of (x) three (3) business days of the Specified Servicing Default Notice Parties' receipt of such Specified Servicing Default Notice and (y) the applicable cure, grace, or notice period set forth in the Specified Agreement, then, upon the running of such cure, grace or notice period, the Specified Counterparty may move for relief from the automatic stay in connection with such Specified Servicing Default, which such motion may be heard by this Court on an expedited basis (but in any event, no earlier than five (5) days after such motion is filed with this Court and served on the Specified Servicing Default Notice Parties) (a "**Lift Stay Motion**").  At any hearing on any Lift Stay Motion, the applicable

5

standards and burdens of proof and persuasion for relief from the automatic stay shall apply. Notwithstanding the automatic stay, solely to the extent necessary to effectuate its rights pursuant to this paragraph, and subject to the express terms of the applicable Specified Agreement, a Specified Counterparty may give notice to a Debtor in its servicing or servicing-related role pursuant to a Specified Agreement of the occurrence of any event, condition or default that, with the giving of notice, the passage of time, or both, would become a Specified Servicing Default.  For purposes of this paragraph:

    a.   "**Specified Agreement**" means any private servicing agreement, pooling and servicing agreement, or similar servicing agreement, in any such case, (x) permitting the securitization trustee, indenture trustee, or similar trustee party to such agreement (an "**MBS Trustee**") a right to terminate servicing for the private label mortgage loans placed in the securitization trust subject to such agreement and (y) under which a Debtor is performing a servicing or servicing-related role postpetition in accordance with the relief granted in this Order with respect to private label mortgage loans that have been securitized;

    b.   "**Specified Counterparty**" means the MBS Trustee party to such Specified Agreement; and

    c.   "**Specified Servicing Default**" means a failure by any Debtor to timely (i) make a Servicer Advance, or (ii) remit or make deposits of assets, in any such case of clause (i) or (ii), required to be made or remitted by such Debtor, in its servicing or servicing-related role, pursuant to any Specified Agreement, which failure has continued beyond any applicable cure, grace or notice period set forth in such Specified Agreement and as a result of which the Specified Counterparty under such Specified Agreement would otherwise have the current right (but for the effect of the automatic stay and the provisions of this paragraph) to terminate the applicable Debtor from such servicing or servicing related role pursuant to the terms of such Specified Agreement.

6.    For the avoidance of doubt, nothing herein nor the performance of the Debtors hereunder shall convert a prepetition debt to a postpetition administrative expense claim.

## Critical Vendors

7.    Pursuant to sections 105(a) and 363(c) of the Bankruptcy Code, the Debtors are authorized, but not directed, in the reasonable exercise of their business judgment, to pay some

6

or all of the prepetition claims of the Critical Vendors (each, a "**Critical Vendor Claim**"), upon such terms and in the manner provided in this Order and the Motion and subject to the Management Approval Process (as defined below); *provided*, that payments to Critical Vendors on account of prepetition claims shall not exceed $40 million during the chapter 11 cases; *provided*, *further*, that payments to Critical Vendors on account of such prepetition claims may not be accelerated and shall be made only in the ordinary course in accordance with Customary Trade Terms.

8.    As used herein, the term "**Management Approval Process**" means the advance review and approval by the chief financial officer of the Company, following consultation with the Debtors' management and AlixPartners, LLP (collectively, with the chief financial officer, the "**Vendor Council**"), of payment of a Critical Vendor Claim.  Twenty-four hours prior to any meeting of the Vendor Council to approve payment of any Critical Vendor Claim (the "**Review Period**"), the Debtors shall provide the Creditors' Committee's advisors with the following information:

a.  the summary schedules provided to the Vendor Council in connection with such proposed payments of Critical Vendor Claims; and

b.  a detailed listing of each such proposed payment of a Critical Vendor Claim, as well as supporting documentation, which listing and documentation shall be consistent with the form of information previously provided to the Creditors' Committee's advisors in connection with the previous payments of Critical Vendor Claims made by the Debtors.

During the Review Period, the Creditors' Committee may communicate with AlixPartners, LLP and the designated representatives of the Debtors in order to discuss the proposed payments of Critical Vendor Claims, it being understood, however, that the receipt of the above described information by the Creditors' Committee and its right to have communications with AlixPartners, LLP and the Debtors' representatives with respect thereto shall not (a) constitute grounds for the

Creditors' Committee to object to the payment of any Critical Vendor Claim or (b) grant any consent right to the Creditors' Committee to the payment of any Critical Vendor Claim.

9.    As soon as reasonably practicable following entry of this Order, the Debtors shall provide a list of potential Critical Vendors and potential Critical Vendor Claims to the Court and the U.S. Trustee (the "**Critical Vendors List**").  The Critical Vendors List shall not be publicly filed.  The Debtors shall not pay a claim as a Critical Vendor Claim unless such claim is set forth on the Critical Vendors List; provided, that the Debtors may update the Critical Vendors List from time to time with two business days' written notice and opportunity to object to the U.S. Trustee and the advisors to the Creditors' Committee.

10.    Promptly after entry of this Order and weekly thereafter, the Debtors shall provide counsel for the Creditors' Committee, counsel to the Term Loan Lender Ad Hoc Group, and the U.S. Trustee with a schedule of all payments made to the Critical Vendors on account of the Critical Vendor Claims in accordance with the terms of this Order, which shall include the name and address of the Critical Vendor and the amount and date of the payment.

11.    If a Critical Vendor refuses to supply products and/or services to the Debtors on Customary Trade Terms (or such other terms as are agreed by the parties) following receipt of payment on its prepetition claim, then the Debtors may, upon notice to the Creditors' Committee, and without further order of the Court:

a.    Declare that any payments made to the Critical Vendor on account of such claim be deemed to have been in payment of then-outstanding (or subsequently accruing) postpetition claims of the Critical Vendor without further order of the Court or action by any person or entity; and

b.    Take actions to recover or seek disgorgement of any payment made to the Critical Vendor on account of its prepetition claim to the extent that the payments exceeded the postpetition claims of the Critical Vendor, without giving effect to any rights of setoff,

8

**1363**

recoupment, claims, provision for payment of reclamation or trust fund claims, or other defense.

12.     Under such circumstances, such Critical Vendor shall immediately repay to the Debtors any payment made to it on account of its prepetition claims to the extent that such payments exceed its postpetition claims, without giving effect to any rights of setoff, recoupment, claims, provision for payment of reclamation or trust fund claims, or other defense.

13.     Nothing herein shall:

    a.    Constitute a waiver of the Debtors' rights to seek damages, disgorgement or other appropriate remedies against any breaching Critical Vendor;

    b.    Be construed to waive, limit, or in any way affect the Debtors' ability to dispute a claim of a Critical Vendor;

    c.    Be deemed an admission to the validity of the underlying obligation, including any payment made pursuant to this Order;

    d.    Be deemed to constitute an assumption or rejection of any executory contract or pre- or postpetition agreement between the Debtors and a Critical Vendor; or

    e.    Be deemed to require the Debtors to make any of the payments to the Critical Vendors authorized herein.

14.     Notwithstanding entry of this Order, the Debtors' rights to enforce the automatic stay provision of section 362 of the Bankruptcy Code with respect to any creditor who demands payment of its prepetition claims as a condition to doing business with the Debtors postpetition are preserved.

### Limited Relief from Automatic Stay

*Borrower Foreclosure, Eviction, and Related Proceedings*

15.     The stay imposed by section 362(a) of the Bankruptcy Code is hereby modified to allow Interested Parties to assert and prosecute claims, cross-claims, third-party claims, and counter-claims related to judicial and non-judicial foreclosure, eviction, replevin, and

WEIL:\96961928\1\41703.0010

**1364**

collection actions (each a "**Default Action**") brought by the Debtors to the limited extent such claims, cross-claims, third-party claims, and counterclaims, including the appeal and settlement of such, (a) have the sole purpose of defending, unwinding, or otherwise enjoining or precluding the relief sought by the Debtors in the Default Action, (b) are necessary for the resolution of such Default Action, (c) do not result in any order, judgment, or decree against the Debtors entitling any party to an award of money damages, including, without limitation, Interested Parties' attorneys' fees or costs, and (d) do not result in a claim against property of any Debtor's estate, other than as expressly allowed in Paragraph 19 below (collectively, the "**Permitted Default Actions**").

16.    Absent further order of this Court, the automatic stay shall remain in full force and effect with respect to any and all pending or future claims, cross-claims, third-party claims, and counterclaims by Interested Parties other than the Permitted Default Actions, including those with respect to (a) monetary relief of any kind or any nature against the Debtors, including, without limitation, Interested Parties' attorneys' fees or costs, (b) claims of recoupment or setoff, and (c) actions asserted in the form of a class action or collective action.

17.    For convenience, to avoid prejudice, or to expedite and economize, the claims described in Paragraph 15 above may proceed separately from any other claim that is stayed by the Bankruptcy Code.  Should there be any disagreements between or among any Interested Parties and/or the Debtors regarding whether any claims, cross-claims, third-party claims, or counterclaims fall within the exception to the automatic stay approved by this Court, this Court shall have exclusive jurisdiction to hear and resolve such disputes.

*Borrower Bankruptcy Proceedings*

18.    The automatic stay imposed by section 362(a) of the Bankruptcy Code applicable against a borrower (including any heir, non-borrowing spouse, estate, and/or other

10

**1365**

successor in interest) who has sought, or may seek during the pendency of these cases, bankruptcy protection under chapters 7, 11, 12, or 13 of the Bankruptcy Code (each, a "**Bankrupt Borrower**"), is hereby modified pursuant to the following terms and conditions:

    a.    except as set forth herein, a Bankrupt Borrower, a Bankruptcy Trustee, or a United States Trustee shall be entitled:

        (i)    to assert or continue to assert an objection to a proof of claim, notice of payment change, notice of postpetition fee, expense, or charge, or response to notice of final cure (collectively, the "**Required Bankruptcy Documents**") filed by the Debtors in the Bankrupt Borrower's bankruptcy case;

        (ii)    to assert or continue to assert an objection to a motion to lift the automatic stay filed by the Debtors in the Bankrupt Borrower's bankruptcy case;

        (iii)    to assert appeals with respect to items (i) and (ii); and

        (iv)    to seek an accounting from the Debtors with respect to the underlying reverse mortgage loan;

    b.    except as set forth herein, a Bankrupt Borrower shall be entitled:

        (i)    to engage in court-supervised or court-authorized loss-mitigation programs regarding the underlying reverse mortgage loan; and

        (ii)    to engage in discussion with the Debtors and enter into, and consummate settlements of claims and liens in accordance with the ordinary course of the Debtors' business and applicable law;

    c.    absent further order of this Court, the automatic stay shall remain in full force and effect with respect to all the Bankrupt Borrower's, the Bankruptcy Trustee's, and the United States Trustee's direct claims, counterclaims, motions, or adversary proceedings:[3]

        (i)    for monetary relief of any kind and of any nature against the Debtors, including, without limitation, attorneys' fees or

---

[3] United States Trustees have been included in this provision out of an abundance of caution. However, as referenced in Paragraph 30 of this Order, nothing herein shall be construed to limit the rights of the Office of the United States Trustee to take any action in these chapter 11 cases not subject to the automatic stay.

WEIL:\96961928\1\41703.0010

**1366**

costs, with the exception of adjustments resulting from objections permitted pursuant to Paragraph 18(a)(i) above;

(ii)    for violation of any local, state, or federal statute or other law in connection with the origination of the underlying reverse mortgage loan;

(iii)    asserted in the form of a class action;

d.    absent further order of this Court, the automatic stay shall remain in full force and effect with respect to (a) any party seeking to intervene in a Bankrupt Borrower's bankruptcy case to assert claims against the Debtors on behalf of itself or others (including, without limitation, a class of borrowers) and (b) any class action or collective action brought by any Bankrupt Borrower on behalf of any class;

e.    with the sole exception of objections to Debtors' proofs of claim permitted by subsection (a)(i) above, and solely for purposes of reducing any such claim and not for the purpose of obtaining an affirmative recovery or award, under no circumstances shall a Bankrupt Borrower, a Bankruptcy Trustee, or a United States Trustee be entitled to recoup, setoff, or collect from the Debtors any judgment or award related to any direct claim or counterclaim for which the automatic stay has been lifted by the terms of this Order;

f.    the Debtors shall retain the right, upon appropriate motion and notice to any Bankrupt Borrower, Bankruptcy Trustee, or United States Trustee, to seek to impose any provision of section 362(a) of the Bankruptcy Code modified by this Order, and to the extent such relief is sought, the Debtors will not object to such party's telephonic participation at any hearing on such motion;

g.    nothing set forth herein shall preclude or limit any Bankrupt Borrower, Bankruptcy Trustee, or United States Trustee from seeking relief from the automatic stay under section 362(a) of the Bankruptcy Code on appropriate motion and notice to the Debtors and parties in interest; and

h.    should there be any disagreements between the Debtors, a Bankrupt Borrower, a Bankruptcy Trustee, or a United States Trustee regarding whether any actions, claims, or counterclaims fall within the exception to the automatic stay approved by the Court, the Court shall have exclusive jurisdiction to hear and resolve such dispute.

WEIL:\96961928\1\41703.0010

**1367**

*Actions Involving Amount, Validity, or Priority of Liens*

19.     The automatic stay imposed by section 362(a) of the Bankruptcy Code applicable to actions involving the amount, validity, and/or priority of liens with respect to properties subject to mortgages owned or serviced by the Debtors (such actions, "**Title Disputes**")[4] is hereby modified to allow Interested Parties to defend and assert and prosecute claims, cross-claims, third-party claims, and counter-claims, including the appeal or settlement of such, in Title Disputes, to the limited extent such claims, cross-claims, third-party claims, and counterclaims (a) are necessary for the resolution of such Title Dispute and (b) do not result in any order, judgment, or decree against the Debtors entitling any party to an award of money damages including, without limitation, Interested Parties' attorneys' fees or costs (collectively, the "**Permitted Title Disputes**").

20.     Absent further order of this Court, the automatic stay shall remain in full force and effect with respect to any and all pending or future claims, cross-claims, third-party claims, and counterclaims against the Debtors other than Permitted Title Disputes, including those with respect to (a) monetary relief of any kind or any nature against the Debtors, including, without limitation, Interested Parties' attorneys' fees or costs, (b) actions for partition or criminal forfeiture or seizure of the property securing lien(s) held by the Debtors, (c) relief that is not necessary for the resolution of the Title Dispute, or (d) actions asserted in the form of a class action or collective action.

21.     For convenience, to avoid prejudice, or to expedite and economize, the claims described in Paragraph 19 above may proceed separately from any other claim that is stayed

---

[4]    These actions include quiet title suits, efforts by third parties to foreclose their liens, eminent domain and condemnation suits, corrective and reformation actions, disputes with home owners associations or common interest associations, code violation actions, tax sales, and other analogous causes of action.

**1368**

by the Bankruptcy Code. Should there be any disagreements between or among any Interested Parties and/or the Debtors regarding whether any claims, cross-claims, third-party claims, or counterclaims fall within the exception to the automatic stay approved by this Court, this Court shall have exclusive jurisdiction to hear and resolve such disputes.

### **Additional Relief Related to Ginnie Mae and Fannie Mae**

22.     The Debtors are authorized to provide to Ginnie Mae and Fannie Mae assurances of future performance under the applicable Ginnie Mae Agreements and Fannie Mae Agreements, as applicable, on the terms and conditions set forth in **Schedules 1** and **2** to this Order and to comply therewith; *provided*, *that*, nothing herein, including the provision of such assurances, shall be deemed to constitute an assumption or rejection of any executory contract or prepetition or postpetition agreement between the Debtors and Ginnie Mae or Fannie Mae, as applicable. The acceptance by Ginnie Mae and Fannie Mae of the assurances and related relief granted pursuant to this Order shall not be deemed to constitute consent by Ginnie Mae or Fannie Mae of the assumption and assignment of the Ginnie Mae Agreements or Fannie Mae Agreements or release the Debtors from any obligations under the Ginnie Mae Agreements or Fannie Mae Agreements. Notwithstanding anything herein or in any order to the contrary, Ginnie Mae and Fannie Mae may seek additional assurance or modification to its grant of assurance provided herein so as to provide different or additional assurances, without prejudice to the right of the Debtors or any other party in interest to contest any such addition or modification.

23.     For the avoidance of doubt, all payments by the Debtors to Ginnie Mae, Ginnie Mae-guaranteed MBS investors and Fannie Mae (including, without limitation, payments of principal and interest, Servicer Advances, and other servicing and subservicing related fees and claims, and with respect to the loans in Ginnie Mae sponsored securitizations (the "**Ginnie**

**Securitized Loans**"), securitization related, escrows, fees and claims), and payments of the MECA

REO Sale Proceeds shall be made free and clear of any lien, security interest, or other interest of

any party, including, without limitation, any prepetition or postpetition lenders. The principal,

interest, and funds for the payment of property taxes and insurance premiums collected by RMS

in connection with its performance of the Servicing Obligations and the MECA REO Sale

Proceeds are not property of the Debtors estates under section 541 of the Bankruptcy Code, and

no lien or other interest therein will be given by the Debtors to any party.

24.    Nothing in this Order constitutes a determination as to the applicability, if

any, of the automatic stay under section 362(a) of the Bankruptcy Code to requests by Ginnie Mae

or Fannie Mae to the Debtors to honor their servicing-related and with respect to the Ginnie Mae

securitized loans, securitization-related, commitments and obligations, including, without

limitation, requests for payment of principal and interest, Servicer Advances, and other

origination-related, servicing-related, and with respect to Ginnie Mae securitized loans,

securitization-related, fees and claims, in each case to the extent provided under the relevant Ginnie

Mae Agreements and Fannie Mae Agreements. Rather, the Debtors, Fannie Mae, and Ginnie Mae

each reserve their rights with respect to this issue. Without limiting the foregoing, in the event of

a failure by any Debtor to timely (i) make a Servicer Advance, or (ii) remit or deposit receipts of

the relevant mortgagee's assets, in any such case, required to be made or remitted by such Debtor,

in its servicing or servicing-related role, pursuant to any Fannie Mae Agreement, which failure has

continued beyond any applicable cure, grace or notice period set forth in such Fannie Mae

Agreement and as a result of which Fannie Mae under such Fannie Agreement would otherwise

have the current right (but for the effect of the automatic stay, to the extent applicable) to terminate

the applicable Debtor from such servicing or servicing related role pursuant to the terms of such

Fannie Mae Agreement, then Fannie Mae may elect to avail itself of procedures set forth in Paragraph 5 above, with respect to such failure.

25.    To the extent that the automatic stay under section 362(a) of the Bankruptcy Code applies to requests by Ginnie Mae and Fannie Mae that the Debtors honor their servicing-related, and with respect to Ginnie Securitized Loans, securitization-related, commitments and obligations, the automatic stay is hereby modified to the limited extent necessary to allow Ginnie Mae and Fannie Mae to make such requests to the Debtors, including, without limitation, requests for payment of Servicer Advances and other servicing-related, and with respect to Ginnie Securitized Loans, securitization-related, fees and claims, in each case to the extent provided under the relevant Ginnie Mae Agreements or Fannie Mae Agreements; *provided*, *that*, Fannie Mae and Ginnie Mae reserve all rights to assert that they may exercise any and all rights available to them under their respective agreements notwithstanding the automatic stay.

## **Other Relief**

26.    Nothing contained in the Motion or this Order, nor any payment made pursuant to the authority granted by this Order, shall constitute or be construed as (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors; (iii) a waiver of any claims or causes of action which may exist against any creditor or interest holder; or (iv) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code.

27.    Notwithstanding anything to the contrary contained herein or in the Motion, any payment, obligation or other relief authorized by this Order shall be subject to and limited by

16

**1371**

the requirements imposed on the Debtors under the terms of any interim and/or final order approving the *Debtors' Motion for Interim and Final Orders (A) Authorizing Debtors to Enter Into Repurchase Agreement Facilities, Servicer Advance Facilities and Related Documents; (B) Authorizing Debtors to Sell Mortgage Loans and Servicer Advance Receivables in the Ordinary Course of Business; (C) Granting Back-Up Liens and Superpriority Administrative Expense Claims; (D) Authorizing Use of Cash Collateral and Granting Adequate Protection; (E) Modifying the Automatic Stay; (F) Scheduling a Final Hearing; and (G) Granting Related Relief* [ECF No. 26], as may be amended or superseded from time to time, or any budget in connection therewith, entered by the Court in these chapter 11 cases.

28.    Nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

29.    Nothing herein shall be construed to limit the right of any governmental unit (as such term is defined in section 101(27) of the Bankruptcy Code) to take any action not subject to the automatic stay.

30.    Nothing herein shall be construed to narrow or limit any exception to the automatic stay under section 362(b) of the Bankruptcy Code applicable to the United States Trustee Program or any other governmental unit pursuant to any police and regulatory power.

31.    Under the circumstances of these chapter 11 cases, notice of the Motion is adequate under Bankruptcy Rule 6004(a).

32.    Notwithstanding Bankruptcy Rule 6004(h), this Order shall be immediately effective and enforceable upon its entry.

33.    The Debtors are authorized to take all action necessary to effectuate the relief granted in this Order.

17

**1372**

34.     The Court shall retain jurisdiction to hear and determine all maters arising

from or related to the implementation, interpretation, and /or enforcement of this Order.

Dated: March 20, 2019
        New York, New York

/s/ *James L. Garrity, Jr.*

HONORABLE JAMES L. GARRITY, JR.
UNITED STATES BANKRUPTCY JUDGE

WEIL:\96961928\1\41703.0010

**1373**

**Schedule 1**

**<u>Ginnie Mae Assurance of Future Performance</u>**

## Reverse Mortgage Solutions, Inc.
## Ginnie Mae Assurance of Future Performance[1]

1.  RMS will provide Ginnie Mae staff and its designees with regular access to RMS's facilities, including reasonable access to the Debtors' books, records, and accounts, so as to allow Ginnie Mae to oversee RMS's performance of its securitization duties.

2.  RMS will at all times maintain its securitization performance to the standards set forth in those certain Master Servicing Agreements dated as of March 6, 2014 (together with all Guaranty Agreements, MBS prospectus documents, cross default agreements, escrow agreements, Tri-Party agreement, corporate guaranty, acknowledgement agreement, supplements, addendums, amendments, and related agreements, the "**Ginnie Mae Servicing Agreements**" and, together with the Ginnie Mae securitization guidelines (the "**Ginnie Mae Guide**"), the "**Ginnie Mae Agreements**,") as well as to the following supplemental or existing standards:

    (a)  RMS shall deliver custodial account reconciliations of all P&I accounts relating to Ginnie Mae-guaranteed loans via tapes to Ginnie Mae on or before the 15th day of the month immediately following the reconciliation period;

    (b)  RMS shall provide Ginnie Mae with a copy of its key employee retention program and key employee incentive program and updates to form HUD 11702, as applicable;

    (c)  RMS shall provide notice to Ginnie Mae of senior management departures and updates to form HUD 11702, as applicable, as required by the Ginnie Mae Agreements;

    (d)  RMS shall provide Ginnie Mae with a report identifying the Critical Vendors for the Ginnie Mae-guaranteed MBS portfolio and access to a contact list of parties, as may be reasonably requested, (other than document custodians) to whom loan collateral documents have been or are delivered, including ancillary systems and location of any origination, credit, and servicing files, imaging and records stored in hard copy format;

    (e)  RMS shall provide all reporting and other securitization information as requested by Ginnie Mae, including such additional reports that may be reasonably requested, as currently permitted under the Ginnie Mae Agreements;

    (f)  RMS shall keep Ginnie Mae apprised of its ongoing compliance efforts, and will be entitled to apply for and obtain any extensions from Ginnie Mae, in Ginnie Mae's sole discretion, which extensions will not be withheld solely on the basis of RMS's bankruptcy proceedings.  RMS may not seek extensions of the statutory

---

[1]  Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Ginnie Mae Agreements.

requirement to obtain mortgage insurance or guaranty for pooled loans or extensions of regulatory requirements.  A request to approve a transfer of issuer responsibility is not an extension request.

3.      RMS shall timely comply with the Ginnie Buyout Obligations set forth in the Ginnie Mae Agreements.

4.      RMS shall maintain response times to file requests as is current practice and RMS shall comply with the requisite timelines pursuant to the Ginnie Mae Agreements.

5.      RMS shall comply with all the terms and conditions outlined in the Ginnie Mae Notice of Violation dated as of February 8, 2019.

2

**Schedule 2**

**<u>Fannie Mae Assurance of Future Performance</u>**

## Reverse Mortgage Solutions, Inc.
## Fannie Mae Assurances of Future Performance[1]

1.    RMS shall provide Fannie Mae staff with regular access to RMS facilities, including reasonable access to its books, records, and accounts, so as to allow Fannie Mae to oversee RMS's performance of its servicing duties.

2.    RMS shall at all times maintain its servicing performance to the standards set forth in that certain Servicing Guide: Fannie Mae Single Family and that certain Fannie Mae Reverse Mortgage Loan Servicing Manual (collectively, the "**Fannie Mae Servicing Guides**"), and RMS's obligations thereunder are secured pursuant to that certain Pledge and Security Agreement dated as of December 19, 2014 (the "**Fannie Mae Pledge Agreement**" and together with the Fannie Mae Mortgage Selling and Servicing Contract and the Fannie Mae Servicing Guides, together with all supplements, addendums, amendments, and related agreements, the "**Fannie Mae Agreements**").  In addition:

   (a)    RMS shall deliver to Fannie Mae the following information: (i) on a quarterly basis, a completed Mortgage Bank Financial Reporting Form, (ii) monthly financial statements, and (iii) weekly liquidity reporting, in each case, on the same timeframe as such reports were delivered immediately prior to the Commencement Date;

   (b)    RMS shall provide Fannie Mae with a copy of its key employee retention program and key employee incentive program;

   (c)    RMS shall at all times maintain staffing levels commensurate with the portfolio, including maintaining adequate staffing within the requisite servicing departments;

   (d)    RMS shall provide notice to Fannie Mae within two (2) business days (i) of senior management departures and/or (ii) the number of loans per employee falling below the level as of the date of the bankruptcy filing;

   (e)    RMS shall timely comply with all servicing action plans;

   (f)    RMS shall continue regularly scheduled engagements with Fannie Mae, such as the monthly performance reviews at the current participation level, including RMS senior management;

   (g)    RMS shall provide all reporting and other servicing information as reasonably requested by Fannie Mae, including such additional reports that may be requested, as currently permitted under the Fannie Mae Servicing Guide and/or the Reverse Mortgage Loan Servicing Manual;

---

[1]    Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Fannie Mae Agreements.

(h)  RMS shall keep Fannie Mae apprised of its ongoing compliance efforts, and will be entitled to apply for and obtain any extensions as it deems appropriate, which extensions will not be withheld solely on the basis of RMS's bankruptcy proceedings;

(i)  RMS must use best efforts to reduce the net population of loans in tax and insurance default, by ensuring that the percentage is on par or less than the book average as provided by Fannie Mae;

(j)  RMS shall timely respond to and resolve all requests for repurchase and "REO Gram" penalties for late reporting of loans entering "REO";

(k)  RMS shall deliver to Fannie Mae "End of Month Exception Reports" in a timely manner and keep reverse mortgage loans in the "eBoutique" reverse mortgage reporting system up to date and reconciled to the RMS system;

(l)  RMS shall remain responsible for the timely filing of FHA claims, including Initial and Supplemental claims; and

(m)  RMS shall remain responsible for timely response to and payment of HECM claim curtailment billings from Fannie Mae.

3.  RMS shall maintain response times to file requests (for servicing files) timely (within 30 days) as is current practice and RMS will comply with Fannie Mae timelines for appeal letters, identifying "impasse loans", and for supplying missing documents as well as timely addressing aged repurchase issues.

4.  RMS shall at all times continue to provide services as referenced in the Mortgage Equity Conversion Asset Trust 2011-1 Servicing Agreement dated as of May 1, 2011.  Such services to include: management and disposition of REO property and reviewing all FHA claims submitted by the servicer to ensure that any such claims were made in accordance with the FHA Handbook and the Servicing Agreement.

WEIL:\96961928\1\41703.0010

**1379**

**UNITED STATES BANKRUPTCY COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| <u>In re</u> | ) | Chapter 11 |
| | ) | |
| **Ditech Holding Corporation, et al.,** | ) | Case No.  19-10412 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## SCHEDULES OF ASSETS AND LIABILITIES FOR

### Reverse Mortgage Solutions, Inc.

### Case No: 19-10422

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
                                           :
In re                                      :        Chapter 11
                                           :
DITECH HOLDING CORPORATION, *et al.*,      :        Case No. 19-10412 (JLG)
                                           :
                    Debtors.[1]            :        (Jointly Administered)
                                           :
-------------------------------------------------------------X

### GLOBAL NOTES AND STATEMENTS OF LIMITATIONS, METHODOLOGY, AND DISCLAIMERS REGARDING THE DEBTORS' SCHEDULES OF ASSETS AND LIABILITIES AND STATEMENTS OF FINANCIAL AFFAIRS

Ditech Holding Corporation ("**Ditech**") and certain of its affiliates, as debtors and debtors in possession (collectively, the "**Debtors**" or the "**Company**"), are filing their respective Schedules of Assets and Liabilities (each, a "**Schedule**," and, collectively, the "**Schedules**") and Statements of Financial Affairs (each, a "**Statement**" or "**SOFA**" and, collectively, the "**Statements**" or "**SOFAs**") in the Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") pursuant to section 521 of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

These Global Notes and Statements of Limitations, Methodology, and Disclaimer Regarding the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs (collectively, the "**Global Notes**") pertain to, are incorporated by reference in, and comprise an integral part of all of the Schedules and Statements. The Global Notes are in addition to the specific notes set forth below with respect to particular Schedules and Statements (the "**Specific Notes**," and, together with the Global Notes, the "**Notes**"). These Global Notes should be referred to, and referenced in connection with, any review of the Schedules and Statements.

The Debtors' management prepared the Schedules and Statements with the assistance of their advisors and other professionals and have necessarily relied upon the efforts, statements, advice, and representations of personnel of the Debtors and the Debtors' advisors and other professionals.

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Mortgage Asset Systems, LLC (8148); REO Management Solutions, LLC (7787); Reverse Mortgage Solutions, Inc. (2274); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Debtors' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

1

The Schedules and Statements are unaudited and subject to potential adjustment. In preparing the Schedules and Statements, the Debtors relied on financial data derived from their books and records that was available at the time of preparation. The Debtors' management team and advisors have made reasonable efforts to ensure that the Schedules and Statements are as accurate and complete as possible under the circumstances; however, subsequent information or discovery may result in material changes to the Schedules and Statements, and inadvertent errors or omissions may exist. Notwithstanding any such discovery, new information, or errors or omissions, the Debtors do not undertake any obligation or commitment to update the Schedules and Statements, except as required under the Bankruptcy Code.

The Debtors reserve all rights to amend or supplement the Schedules and Statements from time to time, in all respects, as may be necessary or appropriate, including the right to dispute or otherwise assert offsets or defenses to any claim reflected on the Schedules and Statements as to amount, liability, classification, identity of debtor or to otherwise subsequently designate any claim as "disputed," "contingent," or "unliquidated." Furthermore, nothing contained in the Schedules, Statements, or Notes shall constitute a waiver of any of the Debtors' rights or an admission with respect to their chapter 11 cases, including, but not limited to, any issues involving objections to claims, substantive consolidation, equitable subordination, defenses, characterization or re-characterization of contracts and leases, assumption or rejection of contracts and leases under the provisions of chapter 3 of the Bankruptcy Code, causes of action arising under the provisions of chapter 5 of the Bankruptcy Code, or any other relevant applicable laws to recover assets or avoid transfers.

**The Schedules, Statements, and Notes should not be relied upon by any persons for information relating to current or future financial conditions, events, or performance of any of the Debtors.**

1. **Description of the Cases.** On February 11, 2019 (the "**Commencement Date**"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code. The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On February 13, 2019, the Bankruptcy Court entered an order authorizing the joint administration of these cases pursuant to Bankruptcy Rule 1015(b). On February 27, 2019, the United States Trustee for Region 2 (the "**U.S. Trustee**") appointed an official committee of unsecured creditors pursuant to section 1102(a)(1) of the Bankruptcy Code (the "**Creditors' Committee**").

2. **Basis of Presentation.** For financial reporting purposes, the Debtors historically prepare consolidated financial statements, which include information for Ditech and its affiliates. The Schedules and Statements are unaudited and reflect the Debtors' reasonable efforts to report certain financial information of each Debtor on an unconsolidated basis. These Schedules and Statements neither purport to represent financial statements prepared in accordance with Generally Accepted Accounting Principles in the United States ("**GAAP**"), nor are they intended to be fully reconciled with the financial statements of each Debtor.

The Debtors attempted to attribute the assets and liabilities, certain required financial

2

information, and various cash disbursements to the particular Debtor entity. However, because the Debtors' accounting systems, policies, and practices were developed for consolidated reporting purposes, rather than reporting by legal entity, it is possible that not all assets, liabilities or amounts of cash disbursements have been recorded with the correct legal entity on the Schedules and Statements. Accordingly, the Debtors reserve all rights to supplement and/or amend the Schedules and Statements in this regard.

Given, among other things, the uncertainty surrounding the valuation of certain assets and liabilities, a Debtor may report more assets than liabilities. Such report shall not constitute an admission that such Debtor was solvent on the Commencement Date or at any time before or after the Commencement Date. Likewise, a Debtor reporting more liabilities than assets shall not constitute an admission that such Debtor was insolvent at the Commencement Date or any time before or after the Commencement Date.

3. **Reporting Date.** The Debtors completed a normal fiscal close for the period ending January 31, 2019 (the "**Reporting Date**"). Consequently, to simplify the reporting, the reported asset values in Schedules A and B, with the exception of estimated cash balances, align with the asset values as of the Reporting Date, and the liability values in Schedules D, E, and F are as of the Commencement Date, adjusted for authorized payments under the First Day Orders (as defined below). Estimated cash balances presented in Schedule A reflect bank balances as of the Commencement Date.

4. **Current Values.** Other than estimated bank cash balances, the assets and liabilities of each Debtor are listed on the basis of the fair value of the asset or liability in the respective Debtor's accounting books and records. Unless otherwise noted, the fair value ascribed in the Debtor's books is reflected in the Schedules and Statements.

5. **Confidentiality.** There may be instances where certain information was not included due to the nature of an agreement between a Debtor and a third party, concerns about the confidential or commercially sensitive nature of certain information, or to protect the privacy of an individual. The omissions are limited to only what is necessary to protect the Debtor or a third party and will provide interested parties with sufficient information to discern the nature of the listing.

6. **Consolidated Entity Accounts Payable and Disbursement Systems.** As described in the Cash Management Motion,[2] the Debtors utilize an integrated, centralized cash management system in the ordinary course of business to collect, concentrate, and disburse funds generated by their operations (the "**Cash Management System**"). The Debtors utilize various data systems to maintain a consolidated accounts payable and disbursements system to pay operating and administrative expenses through various disbursement accounts. These systems serve as the means by which all Debtor payables are recorded and paid.

---

[2] *Motion of Debtors Requesting Authority to (I) Continue Using Existing Cash Management System, Bank Accounts, and Business Forms, (II) Implement Changes to the Cash Management System in the Ordinary Course of Business, (III) Continue Intercompany Transactions, (IV) Provide Administrative Expense Priority for Postpetition Intercompany Claims, (V) Extend Time to Comply with, or Seek Waiver of, 11 U.S.C. § 345(b), and (VI) Granting Related Relief* (ECF No. 4) (the "**Cash Management Motion**").

3

In the ordinary course of business, the Debtors engage in a variety of intercompany transactions (the "**Intercompany Transactions**") with other Debtor entities and non-Debtor affiliates that give rise to intercompany receivables and payables (the "**Intercompany Claims**"). Historically, Intercompany Claims are not required to be (and typically are not) settled by actual transfers of cash among the Debtors. Instead, the Debtors track all Intercompany Transactions in their accounting system, which concurrently are recorded on the applicable Debtor's balance sheets.

7. **Accuracy.** Although the Debtors have made reasonable efforts to file complete and accurate Schedules and Statements, inadvertent errors or omissions may exist. The Debtors reserve all rights to amend and/or supplement the Schedules and Statements as is necessary or appropriate. The financial information disclosed herein was not prepared in accordance with federal or state securities laws or other applicable non-bankruptcy law or in lieu of complying with any periodic reporting requirements thereunder. Persons and entities trading in or otherwise purchasing, selling, or transferring the claims against or equity interests in the Debtors should evaluate this financial information in light of the purposes for which it was prepared. The Debtors are not liable for and undertake no responsibility to indicate variations from securities laws or for any evaluations of the Debtors based on this financial information or any other information.

8. **Net Book Value of Assets.** In many instances, current market valuations are not maintained by or readily available to the Debtors. It would be prohibitively expensive, unduly burdensome, and an inefficient use of estate resources for the Debtors to obtain current market valuations for all assets. As such, wherever possible, unless otherwise indicated, net book values as of the Reporting Date are presented. When necessary, the Debtors have indicated that the value of certain assets is "Unknown" or "Undetermined." Amounts ultimately realized may vary materially from net book value (or other value so ascribed). Accordingly, the Debtors reserve all rights to amend, supplement, and adjust the asset values set forth in the Schedules and Statements. As applicable, fixed assets and leasehold improvement assets that fully have been depreciated or amortized, or were expensed for GAAP accounting purposes, have no net book value, and, therefore, are not included in the Schedules and Statements.

9. **Currency.** All amounts shown in the Schedules and Statements are in U.S. Dollars, unless otherwise indicated.

10. **Payment of Prepetition Claims Pursuant to First Day Orders.** Shortly after the Commencement Date, the Bankruptcy Court entered orders (the "**First Day Orders**") authorizing, but not directing, the Debtors to, among other things, pay certain prepetition (a) amounts necessary to continue servicing and origination of forward mortgage loans in the ordinary course; (b) amounts necessary to honor reverse issuer and servicing obligations in the ordinary course; (c) insurance obligations; (d) obligations to critical vendors used in connection with the origination and servicing activities; (e) employee wages, salaries, and related items, including employee benefit programs and supplemental workforce obligations; and (f) taxes and assessments. Where the Schedules and Statements list creditors and set forth the Debtors' scheduled amounts attributable to such claims, such

WEIL:\96975133\1\41703.0011

scheduled amounts reflect balances owed as of the Commencement Date.  To the extent any adjustments are necessary for any payments made on account of such claims following the commencement of these chapter 11 cases pursuant to the authority granted to the Debtors by the Bankruptcy Court under the First Day Orders, such adjustments have been included in the Schedules and Statements unless otherwise noted on the applicable Schedule or Statement.  The Debtors reserve the right to update the Schedules and Statements to reflect payments made pursuant to the First Day Orders that may not be represented in the attached Schedules and Statements.

11. **Other Paid Claims.**  To the extent the Debtors have reached any postpetition settlement with a vendor or other creditor, the terms of such settlement will prevail, supersede amounts listed in the Schedules and Statements, and shall be enforceable by all parties, subject to Bankruptcy Court approval.  To the extent the Debtors pay any of the claims listed in the Schedules and Statements pursuant to any orders entered by the Bankruptcy Court, the Debtors reserve all rights to amend and supplement the Schedules and Statements and take other action, such as filing claims objections, as is necessary and appropriate to avoid overpayment or duplicate payment for such liabilities.

12. **Setoffs.**  The Debtors routinely incur certain setoffs from suppliers in the ordinary course of business.  Setoffs in the ordinary course can result from various items including, but not limited to, pricing discrepancies, warranties, and other disputes between the Debtors and their suppliers.  These routine setoffs are consistent with the ordinary course of business in the Debtors' industry, and, therefore, can be particularly voluminous, unduly burdensome, and costly for the Debtors to regularly document.  Therefore, although such setoffs and other similar rights may have been accounted for when scheduling certain amounts, these ordinary course setoffs are not independently accounted for, and, as such, are excluded from the Schedules and Statements.  Any setoff of a prepetition debt to be applied against the Debtors is subject to the automatic stay and must comply with the Bankruptcy Code.

13. **Property and Equipment.**  Property and equipment are carried at cost.  The costs of additions, improvements and major replacements are capitalized, while maintenance and repairs are charged to expense as incurred.  Depreciation and amortization are recorded on a straight-line basis over the estimated useful lives of the related assets.  Leasehold improvements and assets under capital leases are amortized over the lesser of the remaining term of the lease or the useful life of the leased asset.  The property and equipment listed in these Schedules are presented without consideration of any mechanics' or other liens.

14. **Excluded Assets and Liabilities**.  Certain liabilities resulting from accruals, liabilities recognized in accordance with GAAP and/or estimates of long-term liabilities either are not payable at this time or have not yet been reported.  Therefore, they do not represent specific claims as of the Commencement Date and are not otherwise set forth in the Schedules. Additionally, certain deferred assets, charges, accounts or reserves recorded for GAAP reporting purposes only and certain assets with a net book value of zero are not included in the Schedules.  Excluded categories of assets and liabilities include, but are not limited to, deferred tax assets and liabilities, deferred income, deferred charges, self-insurance reserves, favorable lease rights and unfavorable lease liabilities.  Additionally, certain reverse loans

5

**1385**

and loans subject to repurchase from Ginnie Mae have also been excluded.  Other immaterial assets and liabilities may have been excluded.

15.    **Debtors' Reservation of Rights.**  Nothing contained in the Schedules, Statements, or Notes shall constitute a waiver of rights with respect to these chapter 11 cases, including, but not limited to, the following:

  a.  Any failure to designate a claim listed on the Schedules and Statements as "disputed," "contingent," or "unliquidated" does not constitute an admission by the Debtors that such amount is not "disputed," "contingent," or "unliquidated." The Debtors reserve the right to dispute and to assert setoff rights, counterclaims, and defenses to any claim reflected on its Schedules as to amount, liability, and classification, and to otherwise subsequently designate any claim as "disputed," "contingent," or "unliquidated."

  b.  The listing of a claim (a) on Schedule D as "secured," (b) on Schedule E as "priority," (c) on Schedule F as "unsecured priority," or (d) listing a contract or lease on Schedule G as "executory" or "unexpired" does not constitute an admission by the Debtors of the legal rights of the claimant, or a waiver of the Debtors' rights to recharacterize or reclassify such claim or contract pursuant to a schedule amendment, claim objection or otherwise.  Moreover, although the Debtors may have scheduled claims of various creditors as secured claims for informational purposes, no current valuation of the Debtors' assets in which such creditors may have a security interest has been undertaken.  Except as provided in an order of the Court, the Debtors reserve all rights to dispute and challenge the secured nature or amount of any such creditor's claims or the characterization of the structure of any transaction, or any document or instrument related to such creditor's claim.

  c.  In the ordinary course of their businesses, the Debtors may lease equipment from certain third-party lessors for use in the daily operation of their business.  Any such leases are set forth on Schedule G and any current amount due under such leases that were outstanding as of the Commencement Date is listed on Schedule F.  The property subject to any of such leases is not reflected in either Schedule A or Schedule B as either owned property or assets of the Debtor nor is such property reflected in the Debtor's Statement of Financial Affairs as property or assets of third parties within the control of the Debtor.  Nothing in the Schedules is or shall be construed as an admission or determination as to the legal status of any lease (including whether any lease is a true lease or a financing arrangement), and the Debtors reserve all rights with respect to any of such issues, including the recharacterization thereof.

  d.  The claims of individual creditors for, among other things, goods, products, services or taxes are listed as the amounts entered on the Debtors' books and records and may not reflect credits, allowances or other adjustments due from such creditors to the Debtors.  The Debtors reserve all of their rights with regard to such credits, allowances and other adjustments, including the right to assert claims

6

WEIL:\96975133\1\41703.0011

objections and/or setoffs with respect to the same.

e.  The Debtors' businesses are part of a complex enterprise.  Although the Debtors have exercised their reasonable efforts to ensure the accuracy of their Schedules and Statements, they nevertheless may contain errors and omissions.  The Debtors hereby reserve all of their rights to dispute the validity, status, and enforceability of any contracts, agreements, and leases set forth on the Schedules and Statements, and to amend and supplement the Schedules and Statements as necessary.

f.  The Debtors further reserve all of their rights, claims, and causes of action with respect to the contracts and agreements listed on the Schedules and Statements, including, but not limited to, the right to dispute and challenge the characterization or the structure of any transaction, document, and instrument related to a creditor's claim.

g.  Listing a contract or lease on the Schedules and Statements shall not be deemed an admission that such contract is an executory contract, such lease is an unexpired lease, or that either necessarily is a binding, valid, and enforceable contract.  The Debtors hereby expressly reserve the right to assert that any contract listed on the Schedules and Statements does not constitute an executory contract within the meaning of section 365 of the Bankruptcy Code, as well as the right to assert that any lease so listed does not constitute an unexpired lease within the meaning of section 365 of the Bankruptcy Code.

h.  To timely close the books and records of the Debtors as of the Commencement Date and to prepare such information on a legal entity basis, the Debtors were required to make certain estimates and assumptions that affect the reported amounts of assets and liabilities and reported revenue and expenses as of the Commencement Date.  The Debtors reserve all rights to amend the reported amounts of assets, liabilities, reported revenue and expenses to reflect changes in those estimates and assumptions.

16.  **Addresses of Employees.**  The Debtors have attempted to list each of their current employees' addresses as the Debtors' corporate address where reasonably possible to protect the privacy of the Debtors' employees.  The Debtors have served and will continue to serve all necessary notices, including notice of the claims bar date, to the actual address of each of the Debtors' employees.

17.  **Global Notes Control.**  In the event that the Schedules or Statements differ from any of the foregoing Global Notes, the Global Notes shall control.

WEIL:\96975133\1\41703.0011

**<u>Specific Notes with Respect to the Debtors' Schedules of Assets and Liabilities</u>**

1. **Schedules A/B**

   a. **Part 1.**  As set forth more fully in the Debtors' Cash Management Motion, the Debtors fund their operations through 16 operating accounts maintained by Ditech Financial LLC and Reverse Mortgage Solutions, Inc.  The Debtors also maintain approximately 1,200 custodial accounts maintained in the name of a Debtor whereby such Debtor merely holds the account (and the funds in it) in trust or as custodian for a third party. The balances in the custodial accounts are not reflected in Schedule A.

   b. **Part 2.**  Certain prepaid or amortized assets are listed in Part 2 in accordance with the Debtors' books and records.  The amounts listed in Part 2 do not necessarily reflect assets the Debtors will be able to collect or realize.  The amounts listed in Part 2 include, among other things, prepaid rent, prepaid IT maintenance, and prepaid employee benefits.

   The Debtors have numerous deposits with utility companies serving certain geographies with multiple facilities.  The carrying value of the deposits, as reflected in each of the Debtors' records, are listed in Part 2.

   The Debtors also maintain security deposits in connection with the Debtors' non-residential real property leases.  These deposits are included in the Schedules for the appropriate legal entity.

   Prepaid expenses primarily consist of cash in advance amounts paid to numerous vendors in connection with the Debtors' servicing operations.

   c. **Part 3.**  The Debtors' accounts receivable information includes receivables from the Debtors' customers, vendors, or other outside parties, which are calculated net of any amounts that, as of the Reporting Date, may be owed to such parties in the form of offsets or other price adjustments pursuant to the Debtors' customer programs and day-to-day operations or may, in the Debtors' opinion, be difficult to collect from such parties due to the passage of time or other circumstances.  The Debtors do not indicate the age of accounts receivables in these Schedules and Statements.  The accounts receivable balances in this section exclude intercompany related receivables. Intercompany balances are instead shown on the chart immediately following Part 3 of the Schedules.

   d. **Part 4.**  Any of the Debtors' ownership interests in subsidiaries are listed in Schedule A/B, Part 4, as undetermined amounts, because the fair market value of such interests is dependent on numerous variables and factors and may differ significantly from the net book value.

   e. **Part 7.**  The Debtors have identified owned office furniture, fixtures, and equipment. Actual realizable values may vary significantly when compared to net book values as

8

of the Reporting Date.

f.   **Part 9.**  Property leased by the Debtors is listed in Schedule G and is not listed in Part 9 of Schedule A/B.

g.   **Part 10.**  Part 10 identifies the various trademarks and licenses owned and maintained by the Debtors.  Part 10 also includes a best effort listing of the Debtors' registered internet domains and websites.  The act of not listing any specific domain or website is not a relinquishing of ownership.  Certain of the Debtors have customer information from ordinary course business activities which contains personally identifiable information.  Due to the need to protect confidential information and individual privacy, the Debtors have not furnished any customer lists on the Schedules.

As of the Reporting Date, the Debtors' books and records included balances for various intangible assets.  The Schedules may not reflect the book balances of intangible assets because they may not be reflective of realizable values**.**

h.   **Part 11.**

   i.   *Notes Receivable*.  The Notes Receivables reflected in the Schedules and Statements are primarily comprised of reverse mortgages purchased from Ginnie Mae[3] securities, newly-originated mortgage loans, and residual interests in securitized mortgage trusts.  These notes receivable are reflected at fair market value.

   ii.   *Other Property*.  Other property listed in the Debtors' Statements and Schedules primarily consists of real estate properties owned (or REO) by the Debtors that are in the process of disposition, and these assets are reflected at net realizable value.  Other property also includes loan origination derivative assets such as interest rate lock commitments with borrowers and other hedging instruments reflected at fair value.

   iii.   *Other contingent and unliquidated claims or causes of action of every nature*.  In the ordinary course of business, the Debtors may have accrued, or may subsequently accrue, certain rights to counterclaims, cross-claims, setoffs, and refunds with suppliers, among other claims.  Additionally, certain of the Debtors may be party to pending litigation in which the Debtors have asserted, or may assert, claims as plaintiffs, or counter-claims and/or cross-claims as defendants.

   Despite exercising their reasonable efforts to identify all known assets, the Debtors may not have listed all of their causes of action or potential causes

---

[3]   As used herein, "**Ginnie Mae**" means the Government National Mortgage Association.  Ginnie Mae is a federal corporation within the Department of Housing and Urban Development ("**HUD**"), a federal agency, that guarantees investors the timely payment of principal and interest on MBS backed by federally insured or guaranteed loans (*e.g.*, loans insured by the Federal Housing Administration (the "**FHA**"), guaranteed by the Department of Veterans Affairs, or guaranteed by the Department of Agriculture).

WEIL:\96975133\1\41703.0011

of action against third parties as assets in their Schedules, including, but not limited to, avoidance actions arising under chapter 5 of the Bankruptcy Code and actions under other relevant non-bankruptcy laws to recover assets. The Debtors reserve all of their rights with respect to any claims and causes of action they may have. Neither these Notes nor the Schedules shall be deemed a waiver of any such claims or causes of action or to prejudice or impair the assertion thereof in any way.

i.  **Part 12.** The accounts receivable balances in this section exclude intercompany related receivables. Intercompany balances are instead shown on the chart immediately following Part 3 of the Schedules.

2. **Schedule D.** The claims listed on Schedule D, as well as the guarantees of those claims listed on Schedule H, arose and were incurred on various dates. A determination of the date upon which each claim arose or was incurred would be unduly burdensome and cost prohibitive. Accordingly, not all such dates are included for each claim. To the best of the Debtors' knowledge, all claims listed on Schedule D arose, or were incurred before the Commencement Date. Except as otherwise agreed or stated pursuant to a stipulation, agreed order, or general order entered by the Bankruptcy Court that is or becomes final, the Debtors and their estates reserve their right to dispute and challenge the validity, perfection, or immunity from avoidance of any lien purported to be granted or perfected in any specific asset to a creditor listed on Schedule D of any Debtor and, subject to the foregoing limitations, note as follows: (a) although the Debtors may have scheduled claims of various creditors as secured claims for informational purposes, no current valuation of the Debtors' assets in which such creditors may have a lien has been undertaken; (b) the Debtors reserve all rights to dispute and challenge the secured nature of any creditor's claim or the characterization of the structure of any such transaction or any document or instrument related to such creditor's claim; and (c) the descriptions provided on Schedule D are intended to be a summary. Reference to the applicable loan agreements and related documents is necessary for a complete description of the collateral and the nature, extent, and priority of any liens.

Pursuant to the Interim DIP Order,[4] all amounts outstanding under the Debtors' Prepetition Warehouse Facilities (as defined in the Interim DIP Order) were refinanced, subject to customary challenge periods.

Except as specifically stated herein, real property lessors, equipment lessors, utility companies, and other parties which may hold security deposits or other security interests have not been listed on Schedule D. The Debtors have not listed on Schedule D any parties whose claims may be secured through rights of setoff, deposits, or advance payments posted by, or on behalf of, the Debtors, or judgment or statutory lien rights.

---

[4] *Interim Order (A) Authorizing Debtors to Enter Into Repurchase Agreement Facilities, Servicer Advance Facilities and Related Documents; (B) Authorizing Debtors to Sell Mortgage Loans and Servicer Advance Receivables in the Ordinary Course of Business; (C) Granting Back-Up Liens and Superpriority Administrative Expense Claims; (D) Authorizing Use of Cash Collateral and Granting Adequate Protection; (E) Modifying the Automatic Stay; (F) Scheduling a Final Hearing; and (G) Granting Related Relief* [ECF No. 53] (the "**Interim DIP Order**").

WEIL:\96975133\1\41703.0011

3. **Schedules E/F**

a. **Part 1.** The claims listed on Part I arose and were incurred on various dates. A determination of the date upon which each claim arose or was incurred would be unduly burdensome and cost prohibitive. Accordingly, no such dates are included for each claim listed on Part I. To the best of the Debtors' knowledge, all claims listed on Part I arose or were incurred before the Commencement Date. The Debtors have not listed any tax, wage, or wage-related obligations that the Debtors have paid pursuant to First Day Orders on Part I. The Debtors reserve their right to dispute or challenge whether creditors listed on Part I are entitled to priority claims under the Bankruptcy Code.

Claims owing to various taxing authorities to which the Debtors potentially may be liable are included on Part I. Certain of such claims, however, may be subject to ongoing audits and/or the Debtors may otherwise be unable to determine with certainty the amount of the remaining claims listed on Part I. Therefore, the Debtors have listed all such claims as contingent and unliquidated, pending final resolution of ongoing audits or other outstanding issues.

b. **Part 2.** The Debtors have exercised their reasonable efforts to list all liabilities on Part 2 of each applicable Debtor. As a result of the Debtors' consolidated operations, however, Part 2 for each Debtor should be reviewed in these cases for a complete understanding of the unsecured claims against the Debtors. Certain creditors listed on Part 2 may owe amounts to the Debtors, and, as such, the Debtors may have valid setoff and recoupment rights with respect to such amounts. The amounts listed on Part 2 may not reflect any such right of setoff or recoupment, and the Debtors reserve all rights to assert the same and to dispute and challenge any setoff and/or recoupment rights that may be asserted against the Debtors by a creditor. Additionally, certain creditors may assert mechanics', materialman's, or other similar liens against the Debtors for amounts listed on Part 2. The Debtors reserve their right to dispute and challenge the validity, perfection, and immunity from avoidance of any lien purported to be perfected by a creditor listed on Part 2 of any Debtor. In addition, certain claims listed on Part 2 may potentially be entitled to priority under 11 U.S.C. § 503(b)(9).

The Debtors have made reasonable efforts to include all unsecured creditors on Part 2 including, but not limited to, trade creditors, landlords, utility companies, consultants, and other service providers. The Debtors, however, believe that there are instances where creditors have yet to provide proper invoices for prepetition goods or services. While the Debtors maintain general accruals to account for these liabilities in accordance with GAAP, these amounts are estimates and have not been included on Part 2. The Debtors have included intercompany claim amounts in Part 2 estimated as of January 31, 2019.

The Debtors' accounting system tracks vendors using a number and unique name assigned to each vendor. Because many vendors service multiple business areas for the Debtors, there may be instances in which the same vendor has been assigned

11

multiple vendor numbers and variations of the vendor's name. For purposes of Part 2, the Debtors have not aggregated all claims of such vendors with multiple vendor numbers and/or names. Rather, the Debtors have separately listed the claims of such vendors under each vendor number and name and should not be construed as giving rise to duplicate claims to a vendor for the same services or goods delivered to a Debtor. Unless otherwise noted, the claims listed on Part 2 are based on the Debtors' books and records as of the Commencement Date. The Debtors have excluded workers' compensation claims from the Statements because the Debtors continue to honor their workers' compensation obligations in the ordinary course in accordance with the *Final Order (I) Authorizing Debtors to (A) Pay Employee Obligations, (B) Continue Employee Benefit Programs, (II) and Granting Related Relief* (ECF No. 207), entered on March 19, 2019.

Part 2 also contains information regarding pending litigation involving the Debtors. In certain instances, the relevant Debtor that is the subject of the litigation is unclear or undetermined. To the extent that litigation involving a particular Debtor has been identified, however, such information is included on that Debtor's Schedule E/F. The amounts for these potential claims are listed as undetermined and marked as contingent, unliquidated, and disputed in the Schedules. See Specific Note, SOFA 7 for a description of the litigation listed in Part 2.

Part 2 does not include certain balances including deferred liabilities, accruals, or reserves. Such amounts are, however, reflected on the Debtors' books and records as required in accordance with GAAP. Such accruals primarily represent estimates of liabilities and do not represent specific claims as of the Commencement Date.

The claims of individual creditors may not reflect credits and/or allowances due from creditors to the applicable Debtor. The Debtors reserve all of their rights with respect to any such credits and/or allowances, including the right to assert objections and/or setoffs or recoupments with respect to same.

The Bankruptcy Court has authorized the Debtors to pay, in their discretion, certain non-priority unsecured claims, pursuant to the First Day Orders. To the extent practicable, each Debtor's Schedule E/F is intended to reflect the balance as of the Commencement Date, adjusted for postpetition payments under some or all of the First Day Orders. Each Debtor's Schedule E/F will reflect some of the Debtor's payment of certain claims pursuant to the First Day Orders, and, to the extent an unsecured claim has been paid or may be paid, it is possible such claim is not included on Schedule E/F. Certain Debtors may pay additional claims listed on Schedule E/F during these chapter 11 cases pursuant to the First Day Orders and other orders of the Bankruptcy Court and the Debtors reserve all of their rights to update Schedule E/F to reflect such payments or to modify the claims register to account for the satisfaction of such claims. Additionally, Schedule E/F does not include potential rejection damage claims, if any, of the counterparties to executory contracts and unexpired leases that have been, or may be, rejected.

4. **Schedule G.** Although reasonable efforts have been made to ensure the accuracy of Schedule G regarding executory contracts and unexpired leases (collectively, the "**Agreements**"), the Debtors' review process of the Agreements is ongoing and inadvertent

WEIL:\96975133\1\41703.0011

errors, omissions, or over-inclusion may have occurred.  The Debtors may have entered into various other types of Agreements in the ordinary course of their businesses, such as indemnity agreements, supplemental agreements, amendments/letter agreements, and confidentiality agreements which may not be set forth in Schedule G.  In addition, as described in herein, certain confidential information has been omitted from Schedule G. Omission of a contract or agreement from Schedule G does not constitute an admission that such omitted contract or agreement is not an executory contract or unexpired lease.  Schedule G may be amended at any time to add any omitted Agreements.  Likewise, the listing of an Agreement on Schedule G does not constitute an admission that such Agreement is an executory contract or unexpired lease or that such Agreement was in effect on the Commencement Date or is valid or enforceable.  The Agreements listed on Schedule G may have expired or may have been modified, amended, or supplemented from time to time by various amendments, restatements, waivers, estoppel certificates, letters and other documents, instruments, and agreements which may not be listed on Schedule G.

Executory contracts for short-term service orders that are oral in nature have not been included in Schedule G.

Any and all of the Debtors' rights, claims and causes of action with respect to the Agreements listed on Schedule G are hereby reserved and preserved, and as such, the Debtors hereby reserve all of their rights to (a) dispute the validity, status, or enforceability of any Agreements set forth on Schedule G, (b) dispute or challenge the characterization of the structure of any transaction, or any document or instrument related to a creditor's claim, including, but not limited to, the Agreements listed on Schedule G, and (c) amend or supplement such Schedule as necessary.

Certain of the Agreements listed on Schedule G may have been entered into by or on behalf of more than one of the Debtors.  Additionally, the specific Debtor obligor(s) to certain of the Agreements could not be specifically ascertained in every circumstance.  In such cases, the Debtors have made reasonable efforts to identify the correct Debtor's Schedule G on which to list the Agreement.

5. **Schedule H.**  The Debtors are party to various debt agreements which were executed by multiple Debtors and other domestic subsidiaries.  The obligations of guarantors under prepetition secured credit agreements are noted on Schedule H for each individual Debtor. In the ordinary course of their businesses, the Debtors are involved in pending or threatened litigation and claims arising out of the conduct of their businesses.  Some of these matters may involve multiple plaintiffs and defendants, some or all of whom may assert cross-claims and counter-claims against other parties.  Because such claims are listed on each Debtor's Schedule F and SOFA Part 3, as applicable, they have not been set forth individually on Schedule H.  Furthermore, the Debtors may not have identified on Schedule H certain guarantees that are embedded in the Debtors' executory contracts, unexpired leases, secured financings, debt instruments, and other such agreements.  No claim set forth on the Schedules and Statements of any Debtor is intended to acknowledge claims of creditors that are otherwise satisfied or discharged by other Debtors or non-Debtors.  Due to their voluminous nature, and to avoid unnecessary duplication, the Debtors have not included on

13

Schedule H debts for which more than one Debtor may be liable if such debts were already reflected on Schedule E/F or Schedule G for the respective Debtors subject to such debt. To the extent these Notes include notes specific to Schedules D-G, such Notes also apply to the co-Debtors listed in Schedule H. To the extent there are guarantees connected with any joint ventures to which the Debtor may be a party, such agreements are not identified in the Debtors' Schedules. The Debtors reserve all of their rights to amend the Schedules to the extent that additional guarantees are identified or such guarantees are discovered to have expired or be unenforceable.

14

**1394**

## **Specific Notes With Respect to the Debtors' Statements of Financial Affairs**

1.    **SOFA 1.**  The income stated in the Debtors' response to SOFA 1 is consistent with the consolidated sales disclosed in compliance with GAAP.  The Debtors' fiscal year ends on the last day of each calendar year:

- **FY 2017**:  Comprised of 52 weeks ending December 31, 2017.

- **FY 2018**:  Comprised of 52 weeks ending December 31, 2018.

- **FY 2019**:  Comprised of 1 month ending January 31, 2019.

2.    **SOFA 3**.  The Debtors routinely transfer property, including money, title to properties, and mortgage servicing rights in the ordinary course of business.  In addition, the Debtors routinely make payments to borrowers for refunds, insurance proceeds, overages and other customer-related payments in the ordinary course of business.  These Schedules and Statements do not list such transfers of property made in the ordinary course of business operations as described in the Debtors' OCB Motions.[5]  As described in the Cash Management Motion, the Debtors utilize an integrated, centralized cash management system to collect, concentrate, and disburse funds generated by their operations.  The obligations of the Debtors are primarily paid by and through Ditech Financial LLC and Reverse Mortgage Solutions, Inc., notwithstanding that certain obligations may be obligations of one or more of the Debtors consistent with the Cash Management Motion.

The payments disclosed in SOFA 3 are based on payments made by the Debtors with payment dates from November 12, 2018 to February 11, 2018.  The actual dates that cash cleared the Debtors' bank accounts were not considered.  The Debtors' accounts payable system does not include the corresponding payment clear dates and compiling this data would have required a significant manual review of individual bank statements.  It is expected, however, that many payments included in SOFA 3 have payment clear dates that are the same as payment dates (*e.g.*, wires and other forms of electronic payments).  The response to SOFA 3 excludes disbursements or transfers listed on SOFA 4.  Amounts still owed to creditors will appear on the Schedules for each of the Debtors, as applicable.

All payments for services of any entities that provided consultation concerning debt counseling or restructuring services, relief under the Bankruptcy Code, or preparation of a petition in bankruptcy within one year immediately preceding the Commencement Date are listed on SOFA 11 and are not listed on SOFA 3.

---

[5]    *Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to Continue Origination and Servicing of Forward Mortgage Loans in Ordinary Course and Granting Related Relief, (II) Modifying Automatic Stay on a Limited Basis to Facilitate Debtors Ongoing Operations, and (III) Scheduling a Final Hearing* (ECF No. 9) and *Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to Continue Honoring Reverse Issuer and Servicing Obligations in the Ordinary Course and Granting Related Relief, (II) Modifying Automatic Stay on a Limited Basis to Facilitate Debtors Ongoing Operations, and (III) Scheduling a Final Hearing* (ECF No. 10) (together, the "**OCB Motions**").

WEIL:\96975133\1\41703.0011

3.    **SOFA 4.**  For purposes of the Schedules and Statements, the Debtors define insiders as (a) officers, directors, and anyone in control of a corporate debtor and their relatives; (b) general partners of a partnership debtor and their relatives; (c) affiliates of the debtor and insiders of such affiliates; (d) any managing agent of the debtor; and/or (e) individuals listed as insiders in the Debtors' KEIP Motion.[6]  The payroll-related amounts shown in response to this question for any salary, bonus or additional compensation, and/or severance payments are gross amounts that do not include reductions for amounts including employee tax or benefit withholdings.  To the extent that insiders receive benefits, such as car allowances, those payments have been included as expense reimbursements to the extent paid directly to the employee.  The Debtors also issue corporate-paid credit cards and reimburse direct business expenses incurred by insiders.  Such business expenses have not been included in SOFA 4.  Home addresses for directors, employees, and former employees identified as insiders have not been included in the Statements for privacy reasons.  Amounts still owed to creditors will appear on the Schedules for each of the Debtors, as applicable.

4.    **SOFA 5.**  The Debtors routinely manage and sell properties in foreclosure as described in the OCB Motions.  Such properties have not been included in SOFA 5.

5.    **SOFA 7.**  The Debtors are engaged in the business of originating, selling, and servicing residential real estate mortgage loans on behalf of the Debtors, their affiliates and other third party investors.  In the ordinary course of business and at any time, a number of the mortgage loans the Debtors service are delinquent and in default.  As part of the servicing function, the Debtors are required to commence foreclosure proceedings against certain borrowers and, if a foreclosure is not otherwise resolved, to complete the foreclosure sale of the mortgaged property (collectively, the "**Foreclosure Actions**").  The Debtors manage tens of thousands of Foreclosure Actions that were commenced either in the name of a Debtor or third party investor.  Such Foreclosure Actions are often contested, where the borrower-defendant contests the foreclosure by filing an answer and affirmative defenses, by seeking a temporary restraining order, or by filing counterclaims or cross-claims against a Debtor entity.  Furthermore, the Debtors manage hundreds of recovery and collection matters (collectively, the "**Recovery Actions**") on loans that they either own or service for third-party investors.  These are accounts where, for whatever reason, a Debtor or the third party investor has decided not to pursue foreclosure, but to pursue collection activity against the borrower-defendant.  Generally, the Foreclosure Actions and Recovery Actions commenced on behalf of the Debtors or third-party investors are not listed in the Schedules and Statements because these matters (a) are handled by third party law firms, (b) do not create an escalated litigation risk for the Debtors, and (c) do not give rise to claims against the Debtors.  Litigation that is listed in the Schedules and Statements includes commercial litigation, class action litigation, and other litigation matters managed by the Debtors' legal departments because of claims asserted by or against the Debtors for money damages (the "**Escalated Actions**").   The Debtors routinely track the Escalated Actions and the Escalated Actions described in response to SOFA 7 are the pending proceedings of which the Debtors are aware.

---

[6]    *Motion of Debtors For Entry of an Order Approving Key Employee Incentive Program* (ECF No. 228) (the "**KEIP Motion**").

16

The Debtors reserve all of their rights and defenses with respect to any and all listed Escalated Actions. The listing of any such suits and proceedings shall not constitute an admission by the Debtors of any liabilities or that the actions or proceedings were correctly filed against the Debtors or any affiliates of the Debtors. The Debtors also reserve their rights to assert that neither the Debtors nor any affiliate of the Debtors is an appropriate party to such actions or proceedings.

6.    **SOFA 9.**  The donations and/or charitable contributions listed in response to SOFA 9 represent payments made to third parties during the applicable timeframe that were recorded as such within the Debtors books and records.

7.    **SOFA 11.**  All payments for services of any entities that provided consultation concerning debt counseling or restructuring services, relief under the Bankruptcy Code, or preparation of a petition in bankruptcy within one year immediately preceding the Commencement Date are listed on that Debtor's response to SOFA 11. Additional information regarding the Debtors' retention of professional service firms is more fully described in individual retention applications and related orders. In addition, the Debtors have listed payments made to professionals retained by the Debtors but not payments made to advisors of postpetition lenders or other parties on account of any applicable fee arrangements.

8.    **SOFA 13.**  The Debtors routinely transfer property, including money, title to properties, and mortgage servicing rights in the ordinary course of business. These Schedules and Statements do not list transfers of property made in the ordinary course of business as described in the OCB Motions.

9.    **SOFA 16.**  In the ordinary course of business in connection with their origination and servicing businesses, the Debtors collect certain personally identifiable information ("**PII**"), including but not limited to, their customers' names, home address, social security numbers, and bank accounts. A list of categories of collected PII is included in the response to SOFA 16. The Debtors maintain a privacy policy regarding the use of PII.

10.    **SOFA 21.**  In the ordinary course of business, the Debtors utilize leased property as a function of their servicing business. Such leases are listed on the Debtors' Schedule G.

11.    **SOFA 25.**  The Debtors have used their reasonable efforts to identify the beginning and ending dates of all businesses in which the Debtors were a partner or owned five percent or more of the voting or equity securities within the six years immediately preceding the Commencement Date. In certain instances, however, the dissolution dates of certain entities that are no longer in existence were not readily available and, therefore, are not included in SOFA 25.

12.    **SOFA 26.**  The Debtors provided financial statements in the ordinary course of business to certain parties for business, statutory, credit, financing and other reasons. Recipients include, among others, regulatory agencies, financial institutions, investment banks, debtholders and their legal and financial advisors. Financial statements have also been provided to other parties as requested, subject to customary non-disclosure requirements

17

**1397**

where applicable.

13.   **SOFA 30.**  Any and all known disbursements to insiders of the Debtors have been listed in response to SOFA 4.

**1398**

Reverse Mortgage Solutions, Inc.                                    Case Number:        **19-10422**

## Schedule A/B: Assets — Real and Personal Property

| Part 1: | Cash and cash equivalents |
|---------|---------------------------|

1. **Does the debtor have any cash or cash equivalents?**

   ☐ No. Go to Part 2.
   ☑ Yes. Fill in the information below.

| General description | Type of account (if applicable) | Last 4 digits of account # (if applicable) | Current value of debtor's interest |
|---------------------|-------------------------------|------------------------------------------|-----------------------------------|

2. **Cash on hand**
   2.1

3. **Checking, savings, money market, or financial brokerage accounts (Identify all)**

| | General description | Type of account | Last 4 digits | Current value |
|------|---------------------|-----------------|---------------|---------------|
| 3.1 | TEXAS CAPITAL BANK | OPERATING | 1223 | $179,672 |
| 3.2 | TEXAS CAPITAL BANK | OPERATING | 0966 | $100,012 |
| 3.3 | WELLS FARGO BANK NA | OPERATING | 0415 | $24,660,531 |
| 3.4 | WELLS FARGO BANK NA | OPERATING | 0970 | $924,772 |
| 3.5 | WELLS FARGO BANK NA | OPERATING | 8212 | $49,568 |
| 3.6 | WELLS FARGO BANK NA | OPERATING | 4350 | $34,040 |
| 3.7 | WELLS FARGO BANK NA | OPERATING | 7250 | $6,694,254 |
| 3.8 | WELLS FARGO BANK NA | OPERATING | 3265 | $3,000 |

4. **Other cash equivalents (Identify all)**
   4.1

5. **Total of Part 1.**                                                                **$32,645,850**

   Add lines 2 through 4. Copy the total to line 80.

**1399**

**Reverse Mortgage Solutions, Inc.**                           Case Number:          **19-10422**

## Schedule A/B: Assets — Real and Personal Property

| Part 2: | Deposits and prepayments |
|---------|--------------------------|

6.  **Does the debtor have any deposits or prepayments?**

☐ No. Go to Part 3.

☑ Yes. Fill in the information below.

| General description | Current value of debtor's interest |
|---------------------|------------------------------------|

7.  **Deposits, including security deposits and utility deposits**
    Description, including name of holder of deposit

| | | |
|---|---|---|
| 7.1 | CENTRE GARDEN CITY, LLC.: LEASE- BUILDING | $16,404 |
| 7.2 | LENDINGTREE: MISC | $2,500 |
| 7.3 | NEWCOURSE: SECURITY DEPOSIT | $77,590 |

8.  **Prepayments, including prepayments on executory contracts, leases, insurance, taxes, and rent**
    Description, including name of holder of prepayment

| | | |
|---|---|---|
| 8.1 | PREPAID EXPENSES | $653,726 |

9.  **Total of Part 2**                                                              **$750,220**

Add lines 7 through 8. Copy the total to line 81.

**1400**

**Reverse Mortgage Solutions, Inc.**                                              **Case Number:**        **19-10422**

## Schedule A/B: Assets — Real and Personal Property

| Part 3: | Accounts receivable |
|---|---|

10. **Does the debtor have any accounts receivable?**

☐ No. Go to Part 4.

☑ Yes. Fill in the information below.

| General description | Face or requested amount | Doubtful or uncollectable | Current value of debtor's interest |
|---|---|---|---|

11. Accounts receivable

11a. 90 days old or less: _____ - _____ = _____

11b. Over 90 days old: _____ - _____ = _____

11c. All accounts receivable: $53,449,679 - $0 = $53,449,679

12. **Total of Part 3**                                                                                    $53,449,679

Current value on lines 11a + 11b = line 12. Copy the total to line 82.

In re: Ditech Holding Corporation, et al.,
Intercompany Balance Matrix
Based upon Balance Sheet dated 1/31/2019



Payable From

|  | DEBTOR ENTITIES | | | | | | | | | | | | | | NON-FILING ENTITIES | | | | | | Receivable Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ditech Holding Corporation |  | $ 1,597,411.89 |  |  |  |  |  |  |  | $ 36,067.00 |  | $ 154,204.70 | $ 59,952,805.73 |  |  |  |  |  |  |  | $ 61,740,489.32 |
| DF Insurance Agency LLC |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  | $ 6,622,517.01 |
| Ditech Financial LLC | $ 297,319,113.32 |  | $ 6,622,517.01 |  |  | $ 27.04 |  |  |  | $ 805.31 | $ 1,367,183.16 | $ 3,522,466.47 | $ 20,858,938.85 |  |  |  |  |  |  |  | $323,068,534.15 |
| Green Tree Credit LLC |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  | $      - |
| Green Tree Credit Solutions LLC |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  | $      - |
| Green Tree Insurance Agency of Nevada, Inc. |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  | $      - |
| Green Tree Investment Holdings III LLC |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  | $      - |
| Green Tree Servicing Corp. |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  | $      - |
| Marix Servicing LLC |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  | $      - |
| Mortgage Asset Systems, LLC | $   159,628.37 |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  | $    159,628.37 |
| REO Management Solutions, LLC |  |  |  |  |  |  |  |  |  |  |  | $ 7,668,402.04 |  |  |  |  |  |  |  |  | $ 7,668,402.04 |
| Reverse Mortgage Solutions, Inc. |  | $     5,087.40 |  |  |  |  |  |  |  | $ 803,910.46 |  |  |  |  | $ 420,037.66 |  |  | $ 811,998.82 |  |  | $ 2,041,034.34 |
| Walter Management Holding Company LLC |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  | $      - |
| Walter Reverse Acquisition LLC |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  | $      - |
| RMS 2018-09, LLC | $   278,457.00 |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  | $    278,457.00 |
| RMS REO BRC, LLC | $    68,183.00 |  |  |  |  |  |  |  |  |  |  |  | $ 32,341.49 |  |  |  |  |  |  |  | $    100,524.49 |
| RMS REO BRC II, LLC |  |  |  |  |  |  |  |  |  |  |  |  | $ 61,279.53 |  |  |  |  |  |  |  | $     61,279.53 |
| RMS REO CS, LLC | $    88,659.00 |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  | $     88,659.00 |
| Non-Residual Trusts |  |  | $ 32,949,630.35 |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  | $ 32,949,630.35 |
| Payable Total (Negative) | $(297,914,040.69) | $(1,602,499.29) | $ (39,572,147.36) | $   - | $   - | $ (27.04) | $   - | $   - | $(36,872.31) | $(2,171,093.62) | $(3,676,671.17) | $(88,573,767.64) | $   - | $   - | $(420,037.66) | $   - | $   - | $(811,998.82) | $   - | $   - | $      - |

**1402**

Reverse Mortgage Solutions, Inc.                                    Case Number:        **19-10422**

## Schedule A/B: Assets — Real and Personal Property

| Part 4: | Investments |
|---|---|

13. **Does the debtor own any investments?**

☐ No. Go to Part 5.

☑ Yes. Fill in the information below.

| General description | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|

14. **Mutual funds or publicly traded stocks not included in Part 1**

Name of fund or stock:

14.1

15. **Non-publicly traded stock and interests in incorporated and unincorporated businesses, including any interest in an LLC, partnership, or joint venture**

Name of entity:

| | | | |
|---|---|---|---|
| 15.1 | INVESTMENT IN SUBSIDIARY - MORTGAGE ASSET SYSTEMS, LLC (OWNERSHIP: 100.0%) | NET BOOK | Undetermined |
| 15.2 | INVESTMENT IN SUBSIDIARY - REO MANAGEMENT SOLUTIONS, LLC (OWNERSHIP: 100.0%) | NET BOOK | Undetermined |
| 15.3 | INVESTMENT IN SUBSIDIARY - RMS 2018-09, LLC (OWNERSHIP: 100.0%) | NET BOOK | Undetermined |
| 15.4 | INVESTMENT IN SUBSIDIARY - RMS REO BRC II, LLC (OWNERSHIP: 100.0%) | NET BOOK | Undetermined |
| 15.5 | INVESTMENT IN SUBSIDIARY - RMS REO BRC, LLC (OWNERSHIP: 100.0%) | NET BOOK | Undetermined |
| 15.6 | INVESTMENT IN SUBSIDIARY - RMS REO CS, LLC (OWNERSHIP: 100.0%) | NET BOOK | Undetermined |

16. **Government bonds, corporate bonds, and other negotiable and non-negotiable instruments not included in Part 1**

Describe:

16.1

17. **Total of Part 4**

Add lines 14 through 16. Copy the total to line 83.

| **Undetermined** |
|---|

**1403**

Reverse Mortgage Solutions, Inc.                                    Case Number:          **19-10422**

## Schedule A/B: Assets — Real and Personal Property

| **Part 5:** | **Inventory, excluding agriculture assets** |
| --- | --- |

18.  **Does the debtor own any inventory (excluding agriculture assets)?**

☑ No. Go to Part 6.

☐ Yes. Fill in the information below.

| General description | Date of the last physical inventory | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
| --- | --- | --- | --- | --- |

19.  **Raw materials**

19.1 _____    _____    _____    _____    _____

20.  **Work in progress**

20.1 _____    _____    _____    _____    _____

21.  **Finished goods, including goods held for resale**

21.1 _____    _____    _____    _____    _____

22.  **Other Inventory or supplies**

22.1 _____    _____    _____    _____    _____

23.  **Total of Part 5.**

Add lines 19 through 22. Copy the total to line 84.                                   _____

24.  **Is any of the property listed in Part 5 perishable?**

☐ No

☐ Yes

25.  **Has any of the property listed in Part 5 been purchased within 20 days before the bankruptcy was filed?**

☐ No

☐ Yes.    Book Value _____    Valuation method _____    Current value _____

26.  **Has any of the property listed in Part 5 been appraised by a professional within the last year?**

☐ No

☐ Yes

**1404**

Reverse Mortgage Solutions, Inc.                                    Case Number:        19-10422

## Schedule A/B: Assets — Real and Personal Property

| Part 6: | Farming and fishing-related assets (other than titled motor vehicles and land) |
|---------|---|

27.  **Does the debtor own or lease any farming and fishing-related assets (other than titled motor vehicles and land)?**

☑ No. Go to Part 7.

☐ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| 28. **Crops—either planted or harvested** | | | |
| 28.1 | | | |
| 29. **Farm animals** Examples: Livestock, poultry, farm-raised fish | | | |
| 29.1 | | | |
| 30. **Farm machinery and equipment** (Other than titled motor vehicles) | | | |
| 30.1 | | | |
| 31. **Farm and fishing supplies, chemicals, and feed** | | | |
| 31.1 | | | |
| 32. **Other farming and fishing-related property not already listed in Part 6** | | | |
| 32.1 | | | |

33.  **Total of Part 6.**

Add lines 28 through 32. Copy the total to line 85.

34.  **Is the debtor a member of an agricultural cooperative?**

☐ No

☐ Yes. Is any of the debtor's property stored at the cooperative?

☐ No

☐ Yes

35.  **Has any of the property listed in Part 6 been purchased within 20 days before the bankruptcy was filed?**

☐ No

☐ Yes.      Book Value _____   Valuation method _____   Current value _____

36.  **Is a depreciation schedule available for any of the property listed in Part 6?**

☐ No

☐ Yes

37.  **Has any of the property listed in Part 6 been appraised by a professional within the last year?**

☐ No

☐ Yes

**1405**

**Reverse Mortgage Solutions, Inc.**                                    **Case Number:**        **19-10422**

## Schedule A/B: Assets — Real and Personal Property

| Part 7: | Office furniture, fixtures, and equipment; and collectibles - detail |
|---|---|

**38.   Does the debtor own or lease any office furniture, fixtures, equipment, or collectibles?**

☐ No. Go to Part 8.

☑ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| **39.   Office furniture** | | | |
| 39.1    FURNITURE AND FIXTURES | $2,645 | NET BOOK | $2,645 |
| **40.   Office fixtures** | | | |
| 40.1 | | | |
| **41.   Office equipment, including all computer equipment and communication systems equipment and software** | | | |
| 41.1    COMPUTER HARDWARE | $17,586 | NET BOOK | $17,586 |
| 41.2    COMPUTER SOFTWARE | | NET BOOK | Undetermined |
| 41.3    OFFICE EQUIPMENT | $1,391 | NET BOOK | $1,391 |
| **42.   Collectibles** | | | |
| 42.1 | | | |

**43.   Total of Part 7**                                                                                    | $21,622 |

Add lines 39 through 42. Copy the total to line 86.

**44.   Is a depreciation schedule available for any of the property listed in Part 7?**

☐ No

☑ Yes

**45.   Has any of the property listed in Part 7 been appraised by a professional within the last year?**

☑ No

☐ Yes

Reverse Mortgage Solutions, Inc.                          Case Number:          **19-10422**

## Schedule A/B: Assets — Real and Personal Property

| **Part 8:** | **Machinery, equipment, and vehicles** |
|---|---|

46.  **Does the debtor own or lease any machinery, equipment, or vehicles?**

☑ No. Go to Part 9.

☐ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|

47.  **Automobiles, vans, trucks, motorcycles, trailers, and titled farm vehicles**

47.1 _____  _____  _____  _____

48.  **Watercraft, trailers, motors, and related accessories**
      Examples: Boats, trailers, motors, floating homes, personal watercraft, and fishing vessels

48.1 _____  _____  _____  _____

49.  **Aircraft and accessories**

49.1 _____  _____  _____  _____

50.  **Other machinery, fixtures, and equipment (excluding farm machinery and equipment)**

50.1 _____  _____  _____  _____

51.  **Total of Part 8**

Add lines 47 through 50. Copy the total to line 87.                        _____

52.  **Is a depreciation schedule available for any of the property listed in Part 8?**

☐ No

☐ Yes

53.  **Has any of the property listed in Part 8 been appraised by a professional within the last year?**

☐ No

☐ Yes

**1407**

Reverse Mortgage Solutions, Inc.                                      Case Number:        **19-10422**

## Schedule A/B: Assets — Real and Personal Property

| Part 9: | Real property - detail |
|---|---|

54.  **Does the debtor own or lease any real property?**

☐ No. Go to Part 10.

☑ Yes. Fill in the information below.

| Description and location of property<br>Include street address or other description such as<br>Assessor Parcel Number (APN), and type of property<br>(for example, acreage, factory, warehouse, apartment<br>or office building), if available. | Nature and extent<br>of debtor's<br>interest in<br>property | Net book value of<br>debtor's interest<br>(Where available) | Valuation method<br>used for current<br>value | Current value of<br>debtor's interest |
|---|---|---|---|---|

55.  **Any building, other improved real estate, or land which the debtor owns or in which the debtor has an interest**

| 55.1 | LEASEHOLD IMPROVEMENTS (: NOT AVAILABLE ) | | $3,142,560 | NET BOOK | $3,142,560 |
|---|---|---|---|---|---|

56.  **Total of Part 9**

|  |
|---|
| **$3,142,560** |

Add the current value on all Question 55 lines and entries from any additional sheets. Copy the total to line 88.

57.  **Is a depreciation schedule available for any of the property listed in Part 9?**

☐ No

☑ Yes

58.  **Has any of the property listed in Part 9 been appraised by a professional within the last year?**

☑ No

☐ Yes

**1408**

Reverse Mortgage Solutions, Inc.                                   Case Number:        **19-10422**

## Schedule A/B: Assets — Real and Personal Property

**Part 10:**     Intangibles and intellectual property - detail

59. **Does the debtor have any interests in intangibles or intellectual property?**

    ☐ No. Go to Part 11.

    ☑ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| **60. Patents, copyrights, trademarks, and trade secrets** | | | |
| 60.1 MORTGAGE ASSET SYSTEMS (LOGO)- REGISTRATION NUMBER 4463542 DATED 1/7/2014 | | UNKNOWN | Undetermined |
| 60.2 REO CENTRAL (LOGO)- REGISTRATION NUMBER 4365970 DATED 7/9/3013 | | UNKNOWN | Undetermined |
| 60.3 REO LEASING SOLUTIONS (LOGO)- REGISTRATION NUMBER 4236035 DATED 11/6/2012 | | UNKNOWN | Undetermined |
| 60.4 REO MANAGEMENT SOLUTIONS (LOGO)- REGISTRATION NUMBER 4362376 DATED 7/2/2013 | | UNKNOWN | Undetermined |
| 60.5 REVERSE MORTGAGE SOLUTIONS- REGISTRATION NUMBER N/A DATED 410/13/2015 | | UNKNOWN | Undetermined |
| 60.6 RM COMPASS- REGISTRATION NUMBER 3558675 DATED 31/6/2009 | | UNKNOWN | Undetermined |
| 60.7 RM NAVIGATOR- REGISTRATION NUMBER 3550915 DATED 12/23/2008 | | UNKNOWN | Undetermined |
| 60.8 RMS (LOGO)- REGISTRATION NUMBER 3523171 DATED 10/28/2008 | | UNKNOWN | Undetermined |
| 60.9 RMS (LOGO)- REGISTRATION NUMBER 4882946 DATED 1/5/2016 | | UNKNOWN | Undetermined |
| 60.10 S3 (LOGO)- REGISTRATION NUMBER 4192836 DATED 8/21/2012 | | UNKNOWN | Undetermined |
| 60.11 SECURITY 1 - FINDING YOUR FUTURE (LOGO)- REGISTRATION NUMBER 4875778 DATED 12/22/2015 | | UNKNOWN | Undetermined |
| 60.12 SECURITY 1 (LOGO)- REGISTRATION NUMBER 4875777 DATED 12/22/2015 | | UNKNOWN | Undetermined |
| 60.13 SECURITY 1 LENDING (LOGO)- REGISTRATION NUMBER 4651346 DATED 12/9/2014 | | UNKNOWN | Undetermined |
| 60.14 SECURITY 1 LENDING- REGISTRATION NUMBER 4651345 DATED 12/9/2014 | | UNKNOWN | Undetermined |
| 60.15 SECURITY 1- REGISTRATION NUMBER 4875769 DATED 10/22/2015 | | UNKNOWN | Undetermined |
| 60.16 SECURITY 1- REGISTRATION NUMBER N/A DATED 10/13/2015 | | UNKNOWN | Undetermined |
| 60.17 SPECIALTY SERVICING SOLUTIONS (LOGO)- REGISTRATION NUMBER 4304530 DATED 3/19/2013 | | UNKNOWN | Undetermined |
| **61. Internet domain names and websites** | | | |
| 61.1 FINANCINGLONGEVITY.COM | | N/A | Undetermined |

**1409**

Reverse Mortgage Solutions, Inc.                                    Case Number:        **19-10422**

## Schedule A/B: Assets — Real and Personal Property

**Part 10:**     Intangibles and intellectual property - detail

| | | | |
|---|---|---|---|
| 61.2 | FINANCINGLONGEVITY.INFO | N/A | Undetermined |
| 61.3 | FINANCINGLONGEVITY.NET | N/A | Undetermined |
| 61.4 | FINANCINGLONGEVITY.ORG | N/A | Undetermined |
| 61.5 | HERMIT-SP.COM | N/A | Undetermined |
| 61.6 | MASYSTEMS.CO | N/A | Undetermined |
| 61.7 | MASYSTEMS.COM | N/A | Undetermined |
| 61.8 | MASYSTEMSFTP.COM | N/A | Undetermined |
| 61.9 | MYREOCENTRAL.COM | N/A | Undetermined |
| 61.10 | MYREO-CENTRAL.COM | N/A | Undetermined |
| 61.11 | MYREOCENTRAL.NET | N/A | Undetermined |
| 61.12 | MYREVERSEMTGLOAN.COM | N/A | Undetermined |
| 61.13 | MYRMAPPS.COM | N/A | Undetermined |
| 61.14 | MYRMLOAN.COM | N/A | Undetermined |
| 61.15 | REO-CENTRAL.COM | N/A | Undetermined |
| 61.16 | REOCENTRALONLINE.COM | N/A | Undetermined |
| 61.17 | REO-CENTRALONLINE.COM | N/A | Undetermined |
| 61.18 | REOCENTRALONLINE.NET | N/A | Undetermined |
| 61.19 | REOCENTRALSITE.COM | N/A | Undetermined |
| 61.20 | REO-CENTRALSITE.COM | N/A | Undetermined |
| 61.21 | REOTOSELL.COM | N/A | Undetermined |
| 61.22 | REOTOSELL.NET | N/A | Undetermined |
| 61.23 | REVERSEMORTGAGESERVICING.NET | N/A | Undetermined |
| 61.24 | REVERSEMORTGAGESOLUTIONS.CO | N/A | Undetermined |
| 61.25 | REVMORTGAGES.NET | N/A | Undetermined |
| 61.26 | REVMORTGAGESOLUTIONS.COM | N/A | Undetermined |
| 61.27 | REVMORTGAGESOLUTIONS.NET | N/A | Undetermined |
| 61.28 | RMCOMPASS.COM | N/A | Undetermined |
| 61.29 | RMNAV.COM | N/A | Undetermined |
| 61.30 | RMNAV.NET | N/A | Undetermined |
| 61.31 | RMNAVIGATOR.COM | N/A | Undetermined |
| 61.32 | RMNAVIGATOR.NET | N/A | Undetermined |
| 61.33 | RMSHOMELOANS.COM | N/A | Undetermined |
| 61.34 | RMSINC.CO | N/A | Undetermined |
| 61.35 | RMSNAV.COM | N/A | Undetermined |

**1410**

Reverse Mortgage Solutions, Inc.                                   Case Number:        **19-10422**

## Schedule A/B: Assets — Real and Personal Property

**Part 10:**    Intangibles and intellectual property - detail

| | | | |
|---|---|---|---|
| 61.36 | RMSNAV.NET | N/A | Undetermined |
| 61.37 | RMSNAVIGATOR.COM | N/A | Undetermined |
| 61.38 | RMSNAVIGATOR.NET | N/A | Undetermined |
| 61.39 | SECURITYONELENDING.COM | N/A | Undetermined |
| 61.40 | THEREOCENTRAL.COM | N/A | Undetermined |
| 61.41 | THEREO-CENTRAL.COM | N/A | Undetermined |
| 61.42 | THEREVERSESPECIALISTS.COM | N/A | Undetermined |

62. **Licenses, franchises, and royalties**

62.1

63. **Customer lists, mailing lists, or other compilations**

63.1

64. **Other intangibles, or intellectual property**

| 64.1 | SERVICING RIGHTS, NET | $2,769,548 | NET BOOK | $2,769,548 |

65. **Goodwill**

65.1

66. **Total of Part 10**                                                                 **$2,769,548**

Add lines 60 through 65. Copy the total to line 89.

67. **Do your lists or records include personally identifiable information of customers (as defined in 11 U.S.C. §§ 101(41A) and 107)?**

☑ No
☐ Yes

68. **Is there an amortization or other similar schedule available for any of the property listed in Part 10?**

☑ No
☐ Yes

69. **Has any of the property listed in Part 10 been appraised by a professional within the last year?**

☑ No
☐ Yes

**1411**

Reverse Mortgage Solutions, Inc.                                    Case Number:        **19-10422**

## Schedule A/B: Assets — Real and Personal Property

**Part 11:**    **All other assets**

70.  **Does the debtor own any other assets that have not yet been reported on this form? Include all interests in executory contracts and unexpired leases not previously reported on this form.**

☐ No. Go to Part 12.

☑ Yes. Fill in the information below.

| General description | Current value of debtor's interest |
|---|---|

71.  **Notes receivable**
Description (include name of obligor)

| 71.1 | Owned loans Reverse Buy Out, Net | $1,010,304,984 |
|---|---|---|

72.  **Tax refunds and unused net operating losses (NOLs)**
Description (for example, federal, state, local)

72.1

73.  **Interests in insurance policies or annuities**

73.1

74.  **Causes of action against third parties (whether or not a lawsuit has been filed)**

| 74.1 | Potential action against the Department of Housing and Urban Development | Undetermined |
|---|---|---|

*Nature of claim: Collection of debenture interest*
*Amount requested: Not Available*

75.  **Other contingent and unliquidated claims or causes of action of every nature, including counterclaims of the debtor and rights to set off claims**

75.1

76.  **Trusts, equitable or future interests in property**

76.1

77.  **Other property of any kind not already listed Examples: Season tickets, country club membership**
Examples: Season tickets, country club membership

| 77.1 | FSI Non-Accrt Va Allw - REO | $1,293,050 |
|---|---|---|

**Reverse Mortgage Solutions, Inc.**                                    Case Number:        **19-10422**

## Schedule A/B: Assets — Real and Personal Property

| Part 11: | All other assets |
|---|---|

| General description | Current value of debtor's interest |
|---|---|

77.  **Other property of any kind not already listed Examples: Season tickets, country club membership**
       Examples: Season tickets, country club membership

| 77.2   Reverse Owned Buyouts | $15,665,412 |
|---|---|

78.  **Total of Part 11**
       Add lines 71 through 77. Copy the total to line 90.                    **$1,027,263,446**

79.  **Has any of the property listed in Part 11 been appraised by a professional within the last year?**

☑ No
☐ Yes

**1413**

Reverse Mortgage Solutions, Inc.                                    Case Number:        **19-10422**

# Schedule A/B: Assets — Real and Personal Property

**Part 12:**     **Summary**

In Part 12 copy all of the totals from the earlier parts of the form.

| Type of property | Current value of personal property | Current value of real property | Total of all property |
|---|---|---|---|
| 80. Cash, cash equivalents, and financial assets. Copy line 5, Part 1. | $32,645,850 | | |
| 81. Deposits and prepayments. Copy line 9, Part 2. | $750,220 | | |
| 82. Accounts receivable. Copy line 12, Part 3. | $53,449,679 | | |
| 83. Investments. Copy line 17, Part 4. | $0 | | |
| 84. Inventory. Copy line 23, Part 5. | $0 | | |
| 85. Farming and fishing-related assets. Copy line 33, Part 6. | $0 | | |
| 86. Office furniture, fixtures, and equipment; and collectibles. Copy line 43, Part 7. | $21,622 | | |
| 87. Machinery, equipment, and vehicles. Copy line 51, Part 8. | $0 | | |
| 88. Real property. Copy line 56, Part 9. | | $3,142,560 | |
| 89. Intangibles and intellectual property. Copy line 66, Part 10. | $2,769,548 | | |
| 90. All other assets. Copy line 78, Part 11. | $1,027,263,446 | | |
| 91. Total. Add lines 80 through 90 for each column. | a. $1,116,900,365 | b. $3,142,560 | |
| 92. **Total of all property on Schedule A/B. Lines 91a + 91b = 92.** | | | **$1,120,042,925** |

**1414**

**Reverse Mortgage Solutions, Inc.** | **Case Number:** | **19-10422**

## Schedule D: Creditors Who Have Claims Secured by Property

1. **Do any creditors have claims secured by debtor's property?**

   ☐ No. Check this box and submit page 1 of this form to the court with debtor's other schedules. Debtor has nothing else to report on this form.

   ☑ Yes. Fill in all of the information below.

### Part 1:    List Creditors Who Have Secured Claims

2. **List in alphabetical order all creditors who have secured claims. If a creditor has more than one secured claim, list the creditor separately for each claim.**

| Creditor's Name and Mailing Address, E-mail Address & An Account Number | Co-Interest | Insider | Co-Debtor | Date Claim was Incurred, Property Description, Lien & Co-Interest Creditor | C  U  D | Amount of Claim | Value of Collateral |
|---|---|---|---|---|---|---|---|
| **Secured Debt** | | | | | | | |
| **2.1** BARCLAYS BANK PLC ATTN: ELLEN KIERNAN BARCLAYS BANK PLC- MORTGAGE FINANCE 745 SEVENTH AVE; 4TH FLOOR NEW YORK, NY 10019 | ☐ | ☐ | ☑ | PROPERTY DESCRIPTION: RMS SECOND AMENDED AND RESTATED MASTER REPURCHASE AGREEMENT | ☐ ☑ ☐ | $340,846,274 | $445,811,205 |
| **2.2** CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH ATTN: MEGAN E KANE CREDIT SUISSE SERVICES (USA) LLC ONE MADISON AVE NEW YORK, NY 10010 | ☐ | ☐ | ☑ | PROPERTY DESCRIPTION: GUARANTOR TO THE SECOND AMENDED AND RESTATED CREDIT AGREEMENT | ☐ ☑ ☐ | $961,355,635 | |
| **2.3** CREDIT SUISSE FIRST BOSTON MORTGAGE CAPITAL LLC ATTN: MARGARET D DELLAFERA CREDIT SUISSE SERVICES (USA) LLC 11 MADISON AVE NEW YORK, NY 10010 | ☐ | ☐ | ☑ | PROPERTY DESCRIPTION: RMS MASTER REPURCHASE AGREEMENT | ☐ ☑ ☐ | $414,895,327 | $519,869,881 |

**1415**

**Reverse Mortgage Solutions, Inc.**                                    **Case Number:**    **19-10422**

## Schedule D: Creditors Who Have Claims Secured by Property

| | Creditor's Name and Mailing Address, E-mail Address & An Account Number | Co-Interest | Insider | Co-Debtor | Date Claim was Incurred, Property Description, Lien & Co-Interest Creditor | C  U  D | Amount of Claim | Value of Collateral |
|---|---|---|---|---|---|---|---|---|
| | **Secured Debt** | | | | | | | |
| 2.4 | WILMINGTON SAVINGS FUND SOCIETY, FSB ATTN: GEOFFREY J LEWIS WILMINGTON SAVINGS AND FUND SOCIETY 500 DELAWARE AVE WILMINGTON, DE 19801 | ☐ | ☐ | ☑ | PROPERTY DESCRIPTION: GUARANTOR TO THE SECOND LIEN NOTES INDENTURE | ☐ ☑ ☐ | $253,895,875 | |

**Secured Debt Total:**    **$1,970,993,111**

**1416**

**Reverse Mortgage Solutions, Inc.**                                        **Case Number:**        **19-10422**

## Schedule D: Creditors Who Have Claims Secured by Property

| Creditor's Name and Mailing Address, E-mail Address & An Account Number | Co-Interest | Insider | Co-Debtor | Date Claim was Incurred, Property Description, Lien & Co-Interest Creditor | C | U | D | Amount of Claim | Value of Collateral |
|---|---|---|---|---|---|---|---|---|---|
| **Liens** | | | | | | | | | |
| 2.5   COMMUNITY TRUST BANK<br>3838 OAK LAWN AVE<br>STE P-100<br>DALLAS, TX 75219 | ☐ | ☐ | ☐ | DATE: 9/9/2014<br><br>LIEN DESCRIPTION: UCC LIEN NO. 20143592995 | ☑ | ☑ | ☑ | | |
| 2.6   KONICA MINOLTA PREMIER FINANCE<br>PO BOX 35701<br>BILLINGS , MT | ☐ | ☐ | ☐ | DATE: 5/12/2015<br><br>LIEN DESCRIPTION: UCC LIEN NO. 20152022001 | ☑ | ☑ | ☑ | | |
| 2.7   NATIONAL FOUNDERS LP<br>824 NORTH MARKET STREET<br>SUITE 220<br>WILMINGTON, DE 19801 | ☐ | ☐ | ☐ | DATE: 10/2/2018<br><br>LIEN DESCRIPTION: UCC LIEN NO. 20186811570 | ☑ | ☑ | ☑ | | |
| 2.8   SUTTON FUNDING LLC<br>2711 CENTREVILLE ROAD<br>WILMINGTON, DE 19808 | ☐ | ☐ | ☐ | DATE: 10/19/2015<br><br>LIEN DESCRIPTION: UCC LIEN NO. 20154775218 | ☑ | ☑ | ☑ | | |

**1417**

**Reverse Mortgage Solutions, Inc.**                                                                    Case Number:        **19-10422**

## Schedule D: Creditors Who Have Claims Secured by Property

| Creditor's Name and Mailing Address, E-mail Address & An Account Number | Co-Interest | Insider | Co-Debtor | Date Claim was Incurred, Property Description, Lien & Co-Interest Creditor | C U D | Amount of Claim | Value of Collateral |
|---|---|---|---|---|---|---|---|

**Liens**

| 2.9 | TEXAS CAPITAL BANK, NATIONAL ASSOCIATION 2000 MCKINNEY AVE STE 700 DALLAS, TX 75201 | ☐ | ☐ | ☐ | DATE: 3/10/2014 <br><br> LIEN DESCRIPTION: UCC LIEN NO. 20140923060 | ☑ ☑ ☑ | | |

Liens Total: _____

**1418**

| Reverse Mortgage Solutions, Inc. | Case Number: | **19-10422** |
| --- | --- | --- |

## Schedule D: Creditors Who Have Claims Secured by Property

**Amount of Claim**

3.  **Total of the dollar amounts from Part 1, Column A, including the amounts from the Additional Page, if any.**     **$1,970,993,111**

**1419**

**Reverse Mortgage Solutions, Inc.**                                      Case Number:        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 1: | List All Creditors with PRIORITY Unsecured Claims |
|---------|---------------------------------------------------|

1. **Do any creditors have priority unsecured claims? (See 11 U.S.C. § 507).**

   ☐ No. Go to Part 2.

   ☑ Yes. Go to line 2.

2. **List in alphabetical order all creditors who have unsecured claims that are entitled to priority in whole or in part. If the debtor has more than 3 creditors with priority unsecured claims, fill out and attach the Additional Page of Part 1.**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Offset | Total Claim | Priority Amount |
|---|---|---|---|---|---|---|---|
| **Employee Severance** | | | | | | | |
| **2.1** EMPLOYEE SEVERANCE ADDRESS NOT PROVIDED | UNKNOWN | ☑ | ☐ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| | ACCOUNT NO.: NOT AVAILABLE | | | | | | |
| | Employee Severance Total: | | | | | **UNDETERMINED** | **UNDETERMINED** |

**1420**

**Reverse Mortgage Solutions, Inc.**                                          **Case Number:**        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 1:    List All Creditors with PRIORITY Unsecured Claims**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Offset | Total Claim | Priority Amount |
|---|---|---|---|---|---|---|---|

### Taxes and certain other debts owed to the government 507(a)(8)

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Offset | Total Claim | Priority Amount |
|---|---|---|---|---|---|---|---|
| 2.2  AL DEPT OF REV BUSINESS PRIVILEGE DIV<br>50 NORTH RIPLEY ST<br>MONTGOMERY, AL 36104 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.3  ALABAMA DEPARTMENT OF REVENUE<br>770 WASHINGTON AVE.<br>RSA PLAZA - SUITE 580<br>MONTGOMERY, AL 36104 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.4  ALABAMA MANUFACTURED HOUSING COMMISSION<br>350 S DECATUR ST<br>MONTGOMERY, AL 36104 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.5  ALDINE INDEPENDENT SCHOOL DISTRICT<br>14909 ALDINE WESTFIELD RD<br>HOUSTON, TX 77032 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.6  ARIZONA DEPARTMENT OF REVENUE<br>1600 W MONROE ST<br>PHOENIX, AZ 85038 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.7  ARKANSAS SECRETARY OF STATE<br>STATE CAPITOL<br>500 WOODLANE STREET, SUITE 256<br>LITTLE ROCK, AR 72201 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.8  BEXAR COUNTY TAX COLLECTOR<br>VISTA VERDE PLAZA BUILDING<br>233 N. PECOS LA TRINIDAD<br>SAN ANTONIO, TX 78207-3175 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.9  BOWIE COUNTY TAX ASSESSOR<br>122A PLAZA WEST<br>TEXARKANA, TX 75501 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.10  CADDO PARISH TAX COLLECTOR<br>501 TEXAS ST, RM 101<br>SHREVEPORT, LA 71101 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.11  CALIFORNIA BOARD OF EQUALIZATION<br>3321 POWER INN RD., STE. 210 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.12  CALIFORNIA SECRETARY OF STATE<br>1500 11TH STREET<br>SACRAMENTO, CA 95814 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.13  CALIFORNIA STATE FRANCHISE TAX BOARD<br>3321 POWER INN RD., SUITE 250<br>SACRAMENTO, CA 95826-3893 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |

**1421**

Reverse Mortgage Solutions, Inc.                                    Case Number:        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 1:**    **List All Creditors with PRIORITY Unsecured Claims**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Offset | Total Claim | Priority Amount |
|---|---|---|---|---|---|---|---|

### Taxes and certain other debts owed to the government 507(a)(8)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2.14 | CAMERON COUNTY TAX COLLECTOR<br>964 E. HARRISON<br>BROWNSVILLE, TX 78521 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ ✔ ☐ | | | ☐ | UNDETERMINED | UNDETERMINED |
| 2.15 | CITY OF MONTGOMERY LICENSING & REV DIV<br>25 WASHINGTON AVENUE - 3RD FLOOR<br>MONTGOMERY, AL 36104 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ ✔ ☐ | | | ☐ | UNDETERMINED | UNDETERMINED |
| 2.16 | CITY OF TAMPA<br>306 E. JACKSON STREET<br>TAMPA, FL 33602 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ ✔ ☐ | | | ☐ | UNDETERMINED | UNDETERMINED |
| 2.17 | CITY OF TUCSON<br>255 W ALAMEDA<br>CITY HALL, 1ST FLOOR<br>TUCSON, AZ 85701 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ ✔ ☐ | | | ☐ | UNDETERMINED | UNDETERMINED |
| 2.18 | CNMI TREASURER<br>DEPARTMENT OF COMMERCE<br>PO BOX 5795 CHRB<br>SAIPAN, MP 96950 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ ✔ ☐ | | | ☐ | UNDETERMINED | UNDETERMINED |
| 2.19 | CNMI TREASURER DEPARTMENT OF COMMERCE<br>CAPITOL HILL<br>SAIPAN, MP 96950 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ ✔ ☐ | | | ☐ | UNDETERMINED | UNDETERMINED |
| 2.20 | COBB COUNTY TAX COMMISSION<br>736 WHITLOCK AVE STE 1<br>MARIETTA, GA 30064 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ ✔ ☐ | | | ☐ | UNDETERMINED | UNDETERMINED |
| 2.21 | COLBERT COUNTY REVENUE COMMISSION<br>201 NORTH MAIN STREET<br>TUSCUMBIA, AL 35674 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ ✔ ☐ | | | ☐ | UNDETERMINED | UNDETERMINED |
| 2.22 | COLORADO BUREAU OF INVESTIGATION<br>690 KIPLING STREET STE 3000<br>DENVER, CO 80215 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ ✔ ☐ | | | ☐ | UNDETERMINED | UNDETERMINED |
| 2.23 | COLORADO SECRETARY OF STATE<br>1700 BROADWAY, STE. 200<br>DENVER, CO 80290 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ ✔ ☐ | | | ☐ | UNDETERMINED | UNDETERMINED |
| 2.24 | COLORADO UNIFORM CONSUMER CREDIT<br>1300 BROADWAY 6TH FL<br>DENVER, CO 80203 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ ✔ ☐ | | | ☐ | UNDETERMINED | UNDETERMINED |

Reverse Mortgage Solutions, Inc.                                        Case Number:        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 1: | List All Creditors with PRIORITY Unsecured Claims |
|---------|---------------------------------------------------|

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Offset | Total Claim | Priority Amount |
|---|---|---|---|---|---|---|---|
| **Taxes and certain other debts owed to the government 507(a)(8)** | | | | | | | |
| **2.25** CONNECTICUT DEPT OF REVENUE SERVICES<br>450 COLUMBUS BLVD<br>HARTFORD, CT 06103 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.26** CONNECTICUT SECRETARY OF STATE<br>30 TRINITY ST<br>HARTFORD, CT 06115-0470 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.27** DALLAS COUNTY TAX COLLECTOR<br>1201 ELM STREET, SUITE 2600<br>DALLAS, TX 75270 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.28** DAVIDSON COUNTY REGISTER<br>501 BROADWAY<br>NASHVILLE, TN 37203 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.29** DC DEPARTMENT OF CONSUMER AFFAIRS<br>1100 4TH STREET SW<br>WASHINGTON, DC 20024 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.30** DELAWARE DIVISION OF CORPORATIONS<br>401 FEDERAL STREET, 4<br>DOVER, DE 19901 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.31** DELAWARE SECRETARY OF STATE<br>401 FEDERAL ST., STE. 4<br>DOVER, DE 19901 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.32** DESOTO COUNTY TAX COLLECTOR<br>365 LOSHER STREET, STE 110<br>HERNANDO, MS 38632 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.33** DIST OF COLUMBIA OFFICE OF TAX & REVENUE<br>PO BOX 96166<br>WASHINGTON, DC 20090 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.34** DISTRICT OF COLUMBIA<br>OFFICE OF TAX & REVENUE<br>1101 4TH ST SW #270<br>WASHINGTON, DC 20024 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.35** EAST BATON ROUGE PARISH<br>CITY HALL, 2ND FLOOR<br>222 SAINT LOUIS STREET, ROOM 238<br>BATON ROUGE, LA 70802 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.36** FAYETTE COUNTY REVENUE COMMISSION<br>200 E. MAIN STREET<br>LEXINGTON, KY 40555 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |

**Reverse Mortgage Solutions, Inc.**                                      **Case Number:**        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 1:**    **List All Creditors with PRIORITY Unsecured Claims**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Offset | Total Claim | Priority Amount |
|---|---|---|---|---|---|---|---|
| **Taxes and certain other debts owed to the government 507(a)(8)** | | | | | | | |
| **2.37**  FLORIDA DEPARTMENT OF REVENUE<br>5050 WEST TENNESSEE STREET<br>TALLAHASSEE, FL 32399 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.38**  FLORIDA DEPT OF STATE, DIVISION OF CORPS<br>2661 EXECUTIVE CENTER CIR W<br>TALLAHASSEE, FL 32301 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.39**  FLORIDA SECRETARY OF STATE<br>R.A. GRAY BUILDING<br>500 SOUTH BRONOUGH STREET<br>TALLAHASSEE, FL 32399-0250 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.40**  GEORGIA DEPARTMENT OF BANKING & FINANCE<br>2990 BRANDYWINE ROAD, SUITE 200<br>ATLANTA, GA 30341-5565 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.41**  GEORGIA DEPARTMENT OF REVENUE<br>1800 CENTURY BOULEVARD<br>ATLANTA, GA 30345 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.42**  GEORGIA SECRETARY OF STATE<br>313 WEST TOWER<br>2 MARTIN LUTHER KING JR. DR.<br>ATLANTA, GA 30334-1530 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.43**  GIBSON COUNTY CLERK & MASTERS OFFICE<br>204 N COURT SQUARE B<br>TRENTON, TN 38382 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.44**  GIBSON COUNTY TRUSTEE<br>1 COURT SQUARE 102<br>TRENTON, TN 38382 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.45**  GUAM SECRETARY OF STATE<br>1240 ARMY DRIVE<br>BARRIGADA, GU 96913 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.46**  HARRIS COUNTY CLERK<br>201 CAROLINE, 3RD FLOOR<br>HOUSTON, TX 77210 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.47**  HAWAII DEPT OF COMMERCE & CONSUMER AFFAIRS<br>335 MERCHANTS STREET<br>HONOLULU, HI 96813 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.48**  HIDALGO COUNTY CLERKS OFFICE<br>100 N. CLOSNER<br>EDINBURG, TX 78539 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |

**Reverse Mortgage Solutions, Inc.**                                    **Case Number:**        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 1: | List All Creditors with PRIORITY Unsecured Claims |
| --- | --- |

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Offset | Total Claim | Priority Amount |
| --- | --- | --- | --- | --- | --- | --- | --- |

### Taxes and certain other debts owed to the government 507(a)(8)

| | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 2.49 | HILLSBOROUGH COUNTY TAX COLLECTOR ATTN: DOUG BELDEN 2506 N. FALKENBURG ROAD TAMPA, FL 33619 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.50 | HOUSTON COUNTY TAX COMMISSION 462 N. OATES ST., 5TH FLOOR DOTHAN, AL 36303 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.51 | IDAHO STATE TAX COMMISSION 800 PARK BLVD PLAZA IV BOISE, ID 83712-7742 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.52 | ILLINOIS SECRETARY OF STATE 213 STATE CAPITAL SPRINGFIELD, IL 62756 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.53 | INDIANA SECRETARY OF STATE 200 W. WASHINGTON STREET, SUITE 201 INDIANAPOLIX, IN 46204 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.54 | IOWA CONSUMER CREDIT ADMINISTRATOR HOOVER BLDG 1305 E WALNUT ST DES MOINES, IA 50319 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.55 | IOWA SECRETARY OF STATE 321 E. 12TH STREET DES MOINES, IA 50319 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.56 | JEFFERSON COUNTY CLERK 101 WEST BARRAQUE ST RM SUITE 101 PINE BLUFF, AR 71601 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.57 | JEFFERSON COUNTY TREASURER 716 RICHARD ARRINGTON JR. BLVD N BIRMINGHAM, AL 35203 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.58 | KANSAS SECRETARY OF STATE 120 SW 10TH AVENUE TOPEKA, KS 66612 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.59 | KENTUCKY DEPARTMENT OF REVENUE 6716 GRADE LANE, SUITE 910 LOUISVILLE, KY 40213-3439 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.60 | KENTUCKY SECRETARY OF STATE 700 CAPITOL AVENUE, SUITE 118 FRANKFORT, KY 40601 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |

Reverse Mortgage Solutions, Inc.                                Case Number:        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 1:**    **List All Creditors with PRIORITY Unsecured Claims**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Offset | Total Claim | Priority Amount |
|---|---|---|---|---|---|---|---|

### Taxes and certain other debts owed to the government 507(a)(8)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **2.61** KING COUNTY<br>500 FOURTH AVE, ROOM 600<br>SEATTLE, WA 98104-2387 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.62** KNOX COUNTY TRUSTEE<br>CITY COUNTY BUILDING<br>400 MAIN STREET<br>KNOXVILLE, TN 37902 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.63** LEE COUNTY TREASURER<br>201 W. JEFFERSON ST. B<br>TUPELO, MS 38804 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.64** LEXINGTON COUNTY TREASURER<br>212 SOUTH LAKE DRIVE, SUITE 201<br>LEXINGTON, SC 29072 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.65** LEXINGTON-FAYETTE URBAN CNTY. GOV'T<br>200 EAST MAIN STREET<br>LEXINGTON, KY 40507 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.66** LEXINGTON-FAYETTE URBAN COUNTY GOVT<br>DIVISION OF REVENUE<br>P.O. BOX 14058<br>LEXINGTON, KY 40512 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.67** LOUISIANA DEPT OF REVENUE & TAXATION<br>617 NORTH 3RD STREET<br>BATON ROUGE, LA 70802 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.68** LOUISIANA OFC OF FINANCIAL INSTITUTIONS<br>8585 ARCHIVES AVENUE<br>BATON ROUGE, LA 70809 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.69** LOUISIANA SECRETARY OF STATE<br>8585 ARCHIVES AVENUE<br>BATON ROUGE, LA 70809 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.70** MADISON COUNTY CLERK<br>100 NORTHSIDE SQUARE<br>HUNTSVILLE, AL 35801 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.71** MADISON COUNTY TREASURER<br>171 COBBLESTONE DRIVE<br>MADISON, MS 39110 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.72** MAINE SECRETARY OF STATE<br>148 STATE HOUSE STATION<br>AUGUSTA, ME 04333 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |

**1426**

Reverse Mortgage Solutions, Inc.                                    Case Number:        19-10422

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 1:**    List All Creditors with PRIORITY Unsecured Claims

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Offset | Total Claim | Priority Amount |
|---|---|---|---|---|---|---|---|

**Taxes and certain other debts owed to the government 507(a)(8)**

| | | C | U | D | Offset | Total Claim | Priority Amount |
|---|---|---|---|---|---|---|---|
| 2.73 MARIANA ISLANDS OFFICE OF THE GOVERNOR<br>1ST FLOOR DEPT OF COMMERCE BLDG.<br>CAPITAL HILL, CALLER BOX 10007<br>SAIPAN, MP 96950 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.74 MARYLAND DEPT OF ASSESSMENTS & TAXATION<br>301 W. PRESTON ST.<br>BALTIMORE, MD 21201-2395 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.75 MASSACHUSETTS DEPARTMENT OF REVENUE<br>200 ARLINGTON ST<br>CHELSEA, MA 02150 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.76 MASSACHUSETTS SECRETARY OF THE COMMONWEALTH<br>ONE ASHBURTON PLACE, 17TH FLOOR<br>BOSTON, MA 02108-1512 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.77 MASSACHUSETTS SECRETARY OF STATE<br>ONE ASHBURTON PLACE, ROOM 1717<br>BOSTON, MA 02108 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.78 MI DEPT - LICENSING & REGULATORY AFFAIRS<br>611 W. OTTAWA STREET<br>LANSING, MI 48909 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.79 MICHIGAN SECRETARY OF STATE<br>611 OTTAWA STREET<br>LANSING, MI 48909 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.80 MINNESOTA DEPARTMENT OF COMMERCE<br>85 - 7TH PLACE E STE 500<br>SAINT PAUL, MN 55101-2198 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.81 MINNESOTA DEPARTMENT OF REVENUE<br>MAIL STATION 1275<br>SAINT PAUL, MN 55145 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.82 MISSISSIPPI DEPARTMENT OF REVENUE<br>500 CLINTON CENTER DRIVE<br>CLINTON, MS 39056 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.83 MISSISSIPPI SECRETARY OF STATE<br>401 MISSISSIPPI STREET<br>JACKSON, MS 39201 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |

**1427**

**Reverse Mortgage Solutions, Inc.**                                    **Case Number:**        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 1:    List All Creditors with PRIORITY Unsecured Claims**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Offset | Total Claim | Priority Amount |
|---|---|---|---|---|---|---|---|

**Taxes and certain other debts owed to the government 507(a)(8)**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2.84 | MONTANA DEPARTMENT OF REVENUE<br>340 N LAST CHANCE GULCH<br>HELENA, MT 59604 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☐ | | | ☐ | UNDETERMINED | UNDETERMINED |
| 2.85 | MONTANA SECRETARY OF STATE<br>1301 E 6TH AVE<br>HELENA, MT 59601 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☐ | | | ☐ | UNDETERMINED | UNDETERMINED |
| 2.86 | MONTGOMERY COUNTY CLERK<br>101 SOUTH LAWRENCE STREET<br>MONTGOMERY, AL 36104 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☐ | | | ☐ | UNDETERMINED | UNDETERMINED |
| 2.87 | MONTGOMERY COUNTY TREASURER<br>755 ROANOKE ST 1B<br>CHRISTIANSBURG, VA 24073 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☐ | | | ☐ | UNDETERMINED | UNDETERMINED |
| 2.88 | NEBRASKA SECRETARY OF STATE<br>1445 K ST., SUITE 2300<br>LINCOLN, NE 68508 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☐ | | | ☐ | UNDETERMINED | UNDETERMINED |
| 2.89 | NEVADA BROKER ASSESSMENT<br>1830 COLLEGE PARKWAY, SUITE 100<br>CARSON CITY, NV 89706 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☐ | | | ☐ | UNDETERMINED | UNDETERMINED |
| 2.90 | NEVADA FINANCIAL INSTITUTIONS DIVISION<br>1830 COLLEGE PARKWAY, SUITE 100<br>CARSON CITY, NV 89706 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☐ | | | ☐ | UNDETERMINED | UNDETERMINED |
| 2.91 | NEVADA SECRETARY OF STATE<br>3301 MALIBOU AVENUE<br>PAHRUMP, NV 89048 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☐ | | | ☐ | UNDETERMINED | UNDETERMINED |
| 2.92 | NEVADA SERVICER<br>1830 COLLEGE PARKWAY, SUITE 100<br>CARSON CITY, NV 89706 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☐ | | | ☐ | UNDETERMINED | UNDETERMINED |
| 2.93 | NEW HAMPSHIRE DEPT OF REVENUE ADMIN<br>109 PLEASANT ST<br>CONCORD, NH 03301 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☐ | | | ☐ | UNDETERMINED | UNDETERMINED |
| 2.94 | NEW HAMPSHIRE SECRETARY OF STATE<br>107 NORTH MAIN STREET, ROOM 204<br>CONCORD, NH 03301 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☐ | | | ☐ | UNDETERMINED | UNDETERMINED |
| 2.95 | NEW JERSEY DIVISION OF TAXATION<br>50 BARRACK ST<br>TRENTON, NJ 08695 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☐ | | | ☐ | UNDETERMINED | UNDETERMINED |
| 2.96 | NEW JERSEY SECRETARY OF STATE<br>125 W STATE STREET<br>TRENTON, NJ 08608 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☐ | | | ☐ | UNDETERMINED | UNDETERMINED |

**1428**

**Reverse Mortgage Solutions, Inc.**                                    **Case Number:**        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 1: | List All Creditors with PRIORITY Unsecured Claims |
|---------|---------------------------------------------------|

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Offset | Total Claim | Priority Amount |
|---|---|---|---|---|---|---|---|
| **Taxes and certain other debts owed to the government 507(a)(8)** | | | | | | | |
| **2.97** NEW MEXICO SECRETARY OF STATE<br>325 DON GASPAR<br>SUITE 300<br>SANTA FE, NM 87501 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.98** NEW MEXICO TAXATION & REVENUE DEPARTMENT<br>1200 SOUTH ST. FRANCIS DRIVE<br>SANTA FE, NM 87502 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.99** NEW YORK CITY DEPARTMENT OF FINANCE<br>66 JOHN STREET, ROM 104<br>NEW YORK, NY 10038 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.100** NEW YORK DEPARTMENT OF FINANCE<br>NYS TAX DEPARTMENT, CORP. TAX PROCESSING<br>90 COHOES AVE<br>GREEN ISLAND, NY 12183-1515 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.101** NEW YORK DEPARTMENT OF STATE<br>1 COMMERCE PLAZA<br>99 WASHINGTON AVENUE<br>ALBANY, NY 10038 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.102** NEW YORK STATE DEPT OF FINANCIAL SVCS<br>BANKING DIVISION<br>ONE COMMERCE PLAZA<br>ALBANY, NY 12257 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.103** NORTH CAROLINA DEPARTMENT OF REVENUE<br>501 NORTH WILMINGTON STREET<br>RALEIGH, NC 27604 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.104** NORTH CAROLINA SECRETARY OF STATE<br>2 SOUTH SALISBURY STREET<br>RALEIGH, NC 27601-2903 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.105** NORTH DAKOTA SECRETARY OF STATE<br>600 BOULEVARD AVENUE<br>DEPT. 108<br>BISMARCK, ND 58505 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.106** NYC DEPARTMENT OF CONSUMER AFFAIRS<br>42 BROADWAY, 9TH FLOOR<br>NEW YORK, NY 10004 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |

**1429**

Reverse Mortgage Solutions, Inc.                                    Case Number:        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 1: | List All Creditors with PRIORITY Unsecured Claims |
|---------|---------------------------------------------------|

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Offset | Total Claim | Priority Amount |
|---|---|---|---|---|---|---|---|

### Taxes and certain other debts owed to the government 507(a)(8)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **2.107** OKLAHOMA COUNTY TREASURER<br>320 ROBERT S KERR ROOM 307<br>OKLAHOMA CITY, OK 73102 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.108** OKLAHOMA SECRETARY OF STATE<br>421 N.W. 13TH, SUITE 210<br>OKLAHOMA CITY, OK 73103 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.109** OKLAHOMA TAX COMMISSION,<br>FRANCHISE TAX<br>POST OFFICE BOX 26920<br>OKLAHOMA CITY, OK 73126 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.110** ORANGE COUNTY COMMISSIONER<br>THE HALL OF FINANCE<br>625 N ROSS ST BLDG 11, ROOM G58<br>SANTA ANA, CA 92702-1438 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.111** OREGON DEPT OF REVENUE<br>955 CENTER ST NE<br>SALEM, OR 97301-2501 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.112** OREGON SECRETARY OF STATE<br>255 CAPITOL STREET NE, SUITE 501<br>SALEM, OR 97310 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.113** PENNSYLVANIA DEPARTMENT OF<br>REVENUE<br>1846 BROOKWOOD ST<br>HARRISBURG, PA 17104 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.114** PIKE COUNTY TREASURER<br>200 E. BAY STREET<br>MAGNOLIA, MS 39652 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.115** PUERTO RICO SECRETARY OF STATE<br>CALLE SAN JOSE<br>SAN JUAN, PR 00901 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.116** PULASKI COUNTY CIRCUIT CLERK<br>401 W MARKHAM ST STE 100<br>LITTLE ROCK, AR 72201 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.117** RHODE ISLAND DIVISON OF TAXATION<br>ONE CAPITOL HILL, 1ST FLOOR<br>PROVIDENCE, RI 02908-5806 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.118** RHODE ISLAND SECRETARY OF STATE<br>148 WEST RIVER STREET<br>PROVIDENCE, RI 02904 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.119** RICHARDSON ISD TAX DEPARTMENT<br>970 SECURITY ROW<br>RICHARDSON, TX 75244 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |

**1430**

Reverse Mortgage Solutions, Inc.                                    Case Number:        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 1:**    **List All Creditors with PRIORITY Unsecured Claims**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C U D | Offset | Total Claim | Priority Amount |
|---|---|---|---|---|---|

**Taxes and certain other debts owed to the government 507(a)(8)**

| | | | | | |
|---|---|---|---|---|---|
| **2.120** RICHLAND COUNTY TREASURER<br>2020 HAMPTON ST<br>COLUMBIA, SC 29204 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.121** SAINT LOUIS COUNTY TREASURER<br>41 S CENTRAL AVENUE<br>ST. LOUIS, MO 63105 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.122** SAN DIEGO COUNTY OFFICE OF REVENUE<br>1600 PACIFIC HWY<br>SAN DIEGO, CA 92101 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.123** SAN DIEGO COUNTY TREASURER<br>1600 PACIFIC HWY<br>SAN DIEGO, CA 92101 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.124** SHELBY COUNTY AUDITOR<br>ATTN: DON ARMSTRONG<br>PROPERTY TAX COMMISSIONER<br>102 DEPOT STREET<br>COLUMBIANA, AL 35051 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.125** SHREVEPORT CITY REVENUE DIVISION<br>505 TRAVIS STREET<br>SHREVEPORT, LA 71101 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.126** SMITH COUNTY TAX COLLECTOR<br>1517 W FRONT STREET<br>TYLER, TX 75702 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.127** SOUTH CAROLINA CONSUMER FINANCE DIVISION<br>1205 PENDLETON ST., SUITE 306<br>COLUMBIA, SC 29201 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.128** SOUTH CAROLINA DEPARTMENT OF REVENUE<br>CORPORATE TAXABLE<br>COLUMBIA, SC 29214 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.129** SOUTH CAROLINA DEPT OF CONSUMER AFFAIRS<br>2221 DEVINE STREET #200<br>COLUMBIA, SC 29205 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.130** SOUTH DAKOTA DEPARTMENT OF REVENUE<br>445 E CAPITOL AVENUE<br>PIERRE, SD 57501 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☐ | ☐ | UNDETERMINED | UNDETERMINED |

**1431**

**Reverse Mortgage Solutions, Inc.**                          **Case Number:**        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 1:      List All Creditors with PRIORITY Unsecured Claims**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Offset | Total Claim | Priority Amount |
|---|---|---|---|---|---|---|---|

**Taxes and certain other debts owed to the government 507(a)(8)**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2.131 SOUTH DAKOTA SECRETARY OF STATE<br>CAPITOL BUILDING<br>500 EAST CAPITOL AVE.<br>PIERRE, SD 57501-5070 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.132 SPRING ISD TAX ASSESSOR COLLECTOR<br>16717 ELLA BLVD.<br>HOUSTON, TX 77090-4299 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.133 STATE OF COLORADO<br>1700 BROADWAY, SUITE 200<br>DENVER, CO 80290 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.134 STATE OF DELAWARE<br>820 N. FRENCH STREET<br>CARVEL STATE OFFICE BUILDING, 9TH FLOOR<br>WILMINGTON, DE 19801 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.135 STATE OF MAINE TREASURER<br>35 STATE HOUSE STATION<br>AUGUSTA, ME 04333 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.136 STATE OF MICHIGAN<br>2501 WOODLAKE CIR<br>OKEMOS, MI 48864 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.137 SUMNER COUNTY CLERK<br>355 BELVEDERE DRIVE N<br>GALLATIN, TN 37066 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.138 TARRANT COUNTY CLERK<br>TARRANT COUNTY - TAX COL<br>100 E WEATHERFORD STE 130<br>FORT WORTH, TX 76196 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.139 TENNESSEE DEPARTMENT OF REVENUE<br>ANDREW JACKSON STATE OFFICE BUILDING<br>500 DEADERICK ST.<br>NASHVILLE, TN 37242 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.140 TENNESSEE SECRETARY OF STATE<br>312 ROSA L PARKS AVENUE<br>NASHVILLE, TN 37243 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.141 TEXAS COMPTROLLER OF PUBLIC ACCOUNTS<br>111 E. 17TH ST<br>AUSTIN, TX 78774-0100 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |

**1432**

| Reverse Mortgage Solutions, Inc. | | Case Number: | 19-10422 |

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 1:**    List All Creditors with PRIORITY Unsecured Claims

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Offset | Total Claim | Priority Amount |
|---|---|---|---|---|---|---|---|

### Taxes and certain other debts owed to the government 507(a)(8)

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Offset | Total Claim | Priority Amount |
|---|---|---|---|---|---|---|---|
| 2.142  TEXAS PUBLIC UTILITY COMMISSION P.O. BOX 13326 AUSTIN, TX 78711-3326 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.143  TRENTON CITY TAX COLLECTOR 309 S COLLEGE STREET TRENTON, TN 38382 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.144  TULSA COUNTY TREASURER 500 SOUTH DENVER AVE STE 336 TULSA, OK 74103 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.145  UTAH DEPT OF FINANCIAL INSTUTIONS 324 SOUTH STATE STREET, SUITE 201 SALT LAKE CITY, UT 84111 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.146  UTAH DIVISION OF CORPORATIONS 160 EAST 300 SOUTH SALT LAKE CITY, UT 84111 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.147  UTAH STATE TAX COMMISSIONER 210 N 1950 W SALT LAKE CITY, UT 84134 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.148  VERMONT DEPARTMENT OF TAXES 133 STATE STREET MONTPELIER, VT 05633 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.149  VERMONT SECRETARY OF STATE 128 STATE STREET MONTPELIER, VT 05633 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.150  VIRGIN ISLANDS SECRETARY OF STATE 5049 KONGENS GADE ST. THOMAS, VI 00802 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.151  VIRGINIA SECRETARY OF STATE 1300 E MAIN STREET RICHMOND, VA 23219 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.152  VIRGINIA STATE CORPORATION COMMISSION 1300 E MAIN STREET RICHMOND, VA 23219 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| 2.153  WASHINGTON DEPARTMENT OF COMMERCE 1011 PLUM STREET OLYMPIA, WA 98504 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |

Reverse Mortgage Solutions, Inc.                                        Case Number:        19-10422

## Schedule E/F: Creditors Who Have Unsecured Claims

### Part 1:    List All Creditors with PRIORITY Unsecured Claims

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Offset | Total Claim | Priority Amount |
|---|---|---|---|---|---|---|---|
| **Taxes and certain other debts owed to the government 507(a)(8)** | | | | | | | |
| **2.154** WASHINGTON DEPARTMENT OF REVENUE<br>3315 S 23RD STREET<br>TACOMA, WA 98405 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.155** WASHINGTON SECRETARY OF STATE<br>416 SID SNYDER AVENUE SW<br>OLYMPIA, WA 98501 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.156** WASHOE COUNTY TREASURER<br>1001 E. 9TH STREET<br>D 140<br>RENO, NV 89512-2845 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.157** WEST VIRGINIA SECRETARY OF STATE<br>STATE CAPITAL BUILDING | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.158** WEST VIRGINIA TREASURY DEPARTMENT<br>ATTN: LEGAL DIVISION<br>1001 LEE STREET, EAST<br>CHARLESTON, WV 25301 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.159** WISCONSIN DEPARTMENT OF REVENUE<br>4822 MADISON YARDS WAY, NORTH TOWER<br>MADISON, WI 53705 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.160** WISCONSIN DEPT OF FINANCIAL INSTITUTIONS<br>4822 MADISON YARDS WAY, NORTH TOWER<br>MADISON, WI 53705 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.161** WISCONSON DEPT OF FINANCIAL INSTITUTIONS<br>201 W WASHINGTON AVE. SUITE 500<br>MADISON, WI 53703 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.162** WV DIVISION OF FINANCIAL INSTITUTIONS<br>900 PENNSYLVANIA AVE STE 306<br>CHARLESTON, WV 25302-3542 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| **2.163** WYOMING SECRETARY OF STATE<br>2020 CAREY AVENUE, 600<br>CHEYENNE, WY 82001 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ☐ | ☐ | UNDETERMINED | UNDETERMINED |
| Taxes and certain other debts owed to the government 507(a)(8) Total: | | | | | | UNDETERMINED | UNDETERMINED |

**Reverse Mortgage Solutions, Inc.**                                    **Case Number:**        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 1: | List All Creditors with PRIORITY Unsecured Claims |
|---------|---------------------------------------------------|

Total: All Creditors with PRIORITY Unsecured Claims                    UNDETERMINED    UNDETERMINED

**Reverse Mortgage Solutions, Inc.**                                    **Case Number:**      **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
|---|---|

3.    **List in alphabetical order all of the creditors with nonpriority unsecured claims. If the debtor has more than 6 creditors with nonpriority unsecured claims, fill out and attach the Additional Page of Part 2.**

| | Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|---|
| **Trade Payables** | | | | | | | | |
| 3.1 | 365 OPERATING COMPANY LLC<br>200 CONNECTICUT AVE STE 5A<br>NORWALK, CT 06854 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☐ | ☐ | ☐ | Trade Payable | ☐ | $14,069 |
| 3.2 | A.Z. & ASSOCIATES REAL ESTATE GROUP<br>13532 N 65TH AVE.<br>GLENDALE, AZ 85304 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.3 | ABACUS SOLUTIONS LLC<br>PO BOX 936122<br>ATLANTA, GA 31193 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☐ | ☐ | ☐ | Trade Payable | ☐ | $5,000 |
| 3.4 | ACE REALTY<br>520 W PALMDALE BLVD<br>SUITE J<br>PALMDALE, CA 93551 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.5 | ADAM HAYNES<br>8540 BAY DR.<br>SPRING HILL, FL 34606 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.6 | ALDRIDGE PITE LLP<br>PO BOX 935333<br>ATLANTA, GA 31193-5333 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☐ | ☐ | ☐ | Trade Payable | ☐ | $287 |
| 3.7 | ALL PRO ASSET SOLUTIONS INC<br>5473 LEE STREET, SUITE 201<br>LEHIGH ACRES, FL 33971 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.8 | ALLIED PRINTING RESOURCES<br>33 COMMERCE ROAD<br>CARLSTADT, NJ 07072 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☐ | ☐ | ☐ | Trade Payable | ☐ | $759 |
| 3.9 | ALMA IRIS ROA VARGAS<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.10 | ALONTI CAFE & CATERING<br>1210 W CLAY ST STE 17<br>HOUSTON, TX 77019 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☐ | ☐ | ☐ | Trade Payable | ☐ | $146 |

Reverse Mortgage Solutions, Inc.                                    Case Number:         19-10422

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:**    List All Creditors with NONPRIORITY Unsecured Claims

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Trade Payables** | | | | | | | |
| **3.11** AMERISTAR REALTORS, INC. ATTN: JENNIFER REESE 5222 CYPRESS CREEK PKWY SUITE 120 HOUSTON, TX 77069 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.12** ANA MARIE MADRIGAL NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.13** ANDREW JACK BETZ NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.14** ANNA CHRISTODOULOU NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.15** ANNE DEROCHE PROSPERIE NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.16** AREA WIDE REALTY CORP. 1545 S. 61ST COURT CICERO, IL 60804 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.17** AT BROKERS LLC 100 ENTERPRISE DRIVE SUITE 301 ROCKAWAY, NJ 07866 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.18** BAER & TIMBERLAKE P.C. PO BOX 18486 SUITE 100 OKLAHOMA CITY, OK 73154 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.19** BALTIMORE COUNTY CLERK OF THE CIRCUIT COURT 401 BOSLEY AVE. 2ND FLOOR TOWSON, MD 21204 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.20** BARBARA D HARE NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.21** BARBARA PASCAL NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |

Reverse Mortgage Solutions, Inc.                          Case Number:        19-10422

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Trade Payables** | | | | | | | |
| **3.22** BAREFOOT BAY WATER & SEWER<br>931 BAREFOOT BLVD 2<br>BAREFOOT BAY, FL 32976 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.23** BARRE CITY CLERK<br>BARRE CITY - TAX COLLECT<br>6 NORTH MAIN STREET, SUI<br>BARRE, VT 05641 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.24** BELEN COLVIN<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.25** BELL CARRINGTON & PRICE, LLC<br>TYLER S. GREGG<br>508 HAMPTON ST. SUITE 301<br>COLUMBIA, SC 29201 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.26** BENDETT & MCHUGH P.C.<br>270 FARMINGTON AVENUE<br>SUITE 151<br>FARMINGTON, CT 06032 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.27** BENTON COUNTY AUDITOR<br>BENTON CO. - AUDITOR/TRE<br>PO BOX 129<br>FOLEY, MN 56329 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.28** BERKSHIRE HATHAWAY HOME SERVICES FOX-ROACH REALTORS<br>BERKSHIRE HATHAWAY SPECIALTY INSURANCE<br>500 NORTHPARK TOWN CENTER<br>1100 ABERNATHY ROAD NE,<br>SUITE 1200<br>ATLANTA, GA 30328 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.29** BERLEY W BIRCHMORE<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.30** BEVERLY HUNT<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.31** BILLIE M OWEN<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |

**1438**

**Reverse Mortgage Solutions, Inc.**                                    **Case Number:**        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
|---|---|

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C U D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|

**Trade Payables**

| 3.32 | BLACK KNIGHT TECH SOL LLC INVOICE<br>PO BOX 842651<br>LOS ANGELES, CA 90084-2651 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☐ ☐ ☐ | Trade Payable | ☐ | $1,139 |
| 3.33 | BLOOMBERG FINANCE LP<br>PO BOX 416604<br>BOSTON, MA 02241-6604 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☐ ☐ ☐ | Trade Payable | ☐ | $538 |
| 3.34 | BOB QUALLS<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.35 | BOKA ENTERPRISES, INC.<br>26916 HIDDEN ACRES CT<br>MECHANICSVILLE, MD 20659 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.36 | BONNIE A KELLER<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.37 | BONNIE H TIGNOR<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.38 | BOROUGH OF HIGHLAND PARK<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.39 | BOROUGH OF MEDFORD LAKES TAX COLLECTOR<br>1 CABIN CIRCLE<br>MEDFORD LAKES, NJ 08055 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.40 | BP PETERMAN LAW GROUP, LLC<br>GENE R. HEYMAN<br>165 BISHOPS WAY, SUITE 100<br>BROOKFIELD, WI 53005 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.41 | BRADLEY ARANT BOULT CUMMINGS LLP<br>1819 5TH AVENUE NORTH<br>BIRMINGTON, AL 35203 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.42 | BRENTON WAYNE GILLIAM<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |

**Reverse Mortgage Solutions, Inc.**                                    **Case Number:**        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:**    **List All Creditors with NONPRIORITY Unsecured Claims**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Trade Payables** | | | | | | | |
| **3.43** BRETT NEAL<br>235 W INLET RD<br>OCEAN CITY, NJ 08226 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.44** BROOK STREET REALTY<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.45** BUFFALO COUNTY REGISTER OF DEEDS<br>BUFFALO COUNTY - TREASUR<br>PO BOX 1270<br>KEARNEY, NE 68848 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.46** BURKE COSTANZA & CARBERRY LLP<br>9191 BROADWAY<br>MERRVILLE, IN 46410 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.47** BUSINESS FORMS PLUS LLC<br>116 STAGECOACH CIRCLE<br>MILFORD, CT 06460 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☐ | ☐ | ☐ | Trade Payable | ☐ | $4,853 |
| **3.48** BUTTE COUNTY RECORDER<br>BUTTE COUNTY - TAX COLLE<br>25 COUNTY CENTER DRIVE S<br>OROVILLE, CA 95965 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.49** CAMBRIDGE HOMES REALTY<br>ATTN: BIBI GHANIE<br>477 MAIN ST<br>HACKENSACK, NJ 07601 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.50** CAMDEN COUNTY MUA<br>1645 FERRY AVE<br>CAMDEN, NJ 08104 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.51** CATHERINE TOOMEY WOLFE<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.52** CECILIA FINELLI<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.53** CELESTINA VARGAS PEREZ<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |

**1440**

**Reverse Mortgage Solutions, Inc.**                                    **Case Number:**        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:**     **List All Creditors with NONPRIORITY Unsecured Claims**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Trade Payables** | | | | | | | |
| 3.54 CELINK<br>COMPU-LINK CORPORATION<br>3900 CAPITAL CITY BLVD.<br>LANSING, MI 48906 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.55 CENTRE GARDEN CITY LLC<br>3910 RCA BOULEVARD SUITE 1015<br>PALM BEACH GARDENS, FL 33410 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☐ | ☐ | ☐ | Trade Payable | ☐ | $16,208 |
| 3.56 CERTIFIED LANGUAGES INTL<br>4800 SW MACADAM STE 400<br>PORTLAND, OR 97239 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☐ | ☐ | ☐ | Trade Payable | ☐ | $128 |
| 3.57 CHARLES HALEY AND JO HALEY<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.58 CHARLES MACKAY<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.59 CHICAGO LAND AGENCY SERVICES<br>1620 WEST BELMONT AVENUE<br>CHICAGO, IL 60657 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.60 CHICAGO TITLE INSURANCE COMPANY<br>ATTN: TRUST ACCOUNTING<br>601 RIVERSIDE AVE<br>JACKSONVILLE, FL 32204 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.61 CITY OF ALTAMONTE SPRINGS<br>225 NEWBURYPORT AVENUE<br>ALTAMONTE SPRINGS, FL 32701 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.62 CITY OF AUBURN<br>25 WEST MAIN ST<br>AUBURN, WA 98001 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.63 CITY OF BALTIMORE<br>DEPARTMENT OF FINANCE<br>200 HOLIDAY STREET<br>BALTIMORE, MD 21202 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |

**1441**

**Reverse Mortgage Solutions, Inc.**                                          **Case Number:**          **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:**    List All Creditors with NONPRIORITY Unsecured Claims

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C U D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|
| **Trade Payables** | | | | | |
| **3.64** CITY OF CAPE CORAL 1015 CULTURAL PARK BLVD CAPE CORAL, FL 33990 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.65** CITY OF CHICAGO 121 N LASALLE ST RM 700 CHICAGO, IL 60602 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.66** CITY OF CHICAGO HEIGHTS 1601 CHICAGO ROAD CHICAGO HEIGHTS, IL 60411 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.67** CITY OF COLLEGE PLACE 625 S COLLEGE AVE COLLEGE PLACE, WA 99324 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.68** CITY OF DELAND UT 120 S FLORIDA AVENUE DELAND, FL 32720 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.69** CITY OF ELROY 1717 OMAHA STREET ELROY, WI 53929 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.70** CITY OF FALL RIVER ONE GOVERNMENT CENTER, CODE ENFORCEMENT ATTN: GLENN HATHAWAY/BRENDA BEAUDRY FALL RIVER, MA 02722 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.71** CITY OF GREENVILLE NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.72** CITY OF JUNCTION CITY 794 WEST SHELBY STREET JUNCTION CITY, KY 40440 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.73** CITY OF NORTH MIAMI WATER AND SEWER 17011 NE 19TH AVE NORTH MIAMI BEACH, FL 33162 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.74** CITY OF OAKLAND 150 FRANK H OGAWA PLAZA SUITE 5342 OAKLAND, CA 94612 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |

**1442**

**Reverse Mortgage Solutions, Inc.**                                     **Case Number:        19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
| --- | --- |

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C U D | Basis For Claim | Offset | Amount of Claim |
| --- | --- | --- | --- | --- | --- |
| **Trade Payables** | | | | | |
| **3.75** CITY OF PERTH AMBOY 260 HIGH STREET PERTH AMBOY, NJ 08861 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.76** CITY OF PHILADELPHIA 1450 JOHN F KENNEDY BLVD PHILADELPHIA, PA 19407 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.77** CITY OF POMONA CALIFORNIA NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.78** CITY OF ROCKVILLE 111 MARYLAND AVENUE ROCKVILLE, MD 20850 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.79** CITY OF ST. CHARLES NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.80** CITY OF STAFFORD NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.81** CITY OF TAMPA 306 E. JACKSON STREET TAMPA, FL 33602 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.82** CITY OF WALLA WALLA 15 N 3RD AVE WALLA WALLA, WA 99362 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.83** CLARA E BINGHAM NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.84** COGNIZANT TECHNOLOGY SOLUTIONS 24721 NETWORK PLACE CHICAGO, IL 60673-1247 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ ☐ ☐ | Trade Payable | ☐ | $667,324 |
| **3.85** COLLEEN R HERBSTER NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |

**1443**

Reverse Mortgage Solutions, Inc.                                    Case Number:        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| **Part 2:** | **List All Creditors with NONPRIORITY Unsecured Claims** |
|---|---|

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C U D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|

### Trade Payables

| | | | | | | |
|---|---|---|---|---|---|---|
| 3.86 | COMCAST<br>PO BOX 60533<br>CITY OF INDUSTRY, CA 91716-0533 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☐ ☐ ☐ | Trade Payable | ☐ | $381 |
| 3.87 | COMMUNITY TITLE COMPANY,LLC<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.88 | CONRAD W SIMMONS & KAYE B SIMMONS<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.89 | CONSTANCE M. FORBES & DAVID L. FORBES<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.90 | CONTINENTAL REAL ESTATE SERVICES<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.91 | CORELOGIC TAX SERVICES LLC<br>PO BOX 200079<br>DALLAS, TX 75320 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☐ ☐ ☐ | Trade Payable | ☐ | $30,308 |
| 3.92 | COU OF MIAMI INC<br>4191 NW 107 AVE<br>DORAL, FL 33178 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.93 | COY T POWELL<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.94 | CREEKSIDE REALTY, INC.<br>24205-A NORTHWESTERN PIKE<br>P.O. BOX 1920<br>ROMNEY, WV 26757 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.95 | CROWN TITLE CORPORATION<br>1 SANFORD AVENUE<br>BALTIMORE, MD 21228 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.96 | CRYSTAL ROGERS<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |

**1444**

**Reverse Mortgage Solutions, Inc.**                                     **Case Number:**        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:**    **List All Creditors with NONPRIORITY Unsecured Claims**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C U D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|
| **Trade Payables** | | | | | |
| **3.97** CSM FORECLOSURE TRUSTEE CORPORATION 15W030 NORTH FRONTAGE ROAD BURR RIDGE, IL 60527 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.98** CT CORPORATION P.O. BOX 4349 CAROL STREAM, IL 60197-4349 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ ☐ ☐ | Trade Payable | ☐ | $154 |
| **3.99** CURTIS & SONS INC NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.100** DATAFOUNDRY PO BOX 730396 DALLAS, TX 75373-0396 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ ☐ ☐ | Trade Payable | ☐ | $5,390 |
| **3.101** DAVENA K BRECHBIEL NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.102** DC TREASURER 1100 4TH ST SW 5TH FL WASHINGTON, DC 20024 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.103** DEAN MORRIS LLP 1505 N 19TH ST MONROE, LA 71201 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.104** DELAWARE COUNTY RWD #11 NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.105** DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.106** DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (HUD) NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.107** DEPTFORD TOWNSHIP MUA 898 CATTELL RD WENONAH, NJ 08090 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |

**1445**

**Reverse Mortgage Solutions, Inc.**                                    **Case Number:**        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| **Part 2:** | **List All Creditors with NONPRIORITY Unsecured Claims** |
|---|---|

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C U D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|
| **Trade Payables** | | | | | |
| 3.108   DIAMOND B INVESTORS<br>548 GIBSON DRIVE<br>SUITE 200<br>ROSEVILLE, CA 95678 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.109   DIANE B MCWHIRTER, ATTORNEY<br>P.O. BOX 1646<br>WINTER PARK, FL 32790 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.110   DIANE C TERRY-BRUDER<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.111   DIANE M MUSOLF<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.112   DIANE PITTA<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.113   DINAH L WILLIAMS<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.114   DIRECTOR OF FINANCE<br>100 N. HOLLIDAY ST.<br>BALTIMORE, MD 21202 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.115   DOCSOLUTION, INC.<br>2316 SOUTHMORE<br>PASADENA, TX 77502 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.116   DON L CARTER & CAROL J CARTER<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.117   DONALD A DUPUIS & PATRICIA M DUPUIS<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.118   DONNA I HEATH<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |

**1446**

Reverse Mortgage Solutions, Inc.                                    Case Number:        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| **Part 2:** | **List All Creditors with NONPRIORITY Unsecured Claims** |
|---|---|

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|

### Trade Payables

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 3.119 DONNA K SCHMIEDERER<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.120 DONNA L MILLER<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.121 DONNA R PALMER<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.122 DOROTHY HOPKINS<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.123 DOUGLAS G. & KATHRYN D. KOHLER<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.124 DOUGLAS R AND SUSAN M BANKER<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.125 DSHS<br>1100 W. 49TH STREET<br>AUSTIN, TX 78756 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.126 EAN SERVICES LLC - SERVICING NATL C<br>PO BOX 402334<br>ATLANTA, GA 30384 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☐ | ☐ | ☐ | Trade Payable | ☐ | $1,429 |
| 3.127 EASTERN MUNICIPAL WATER DISTRICT<br>2270 TRUMBLE ROAD<br>PERRIS, CA 92572 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.128 ECKERT SEAMANS CHERIN & MELLOTT LLC<br>600 GRANT STREET 44TH FLOOR<br>PITTSBURGH, PA 15219 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☐ | ☐ | ☐ | Trade Payable | ☐ | $1,974 |
| 3.129 EDSON-NEIL INCORPORATED<br>PO BOX 270142<br>FLOWER MOUND, TX 75027 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☐ | ☐ | ☐ | Trade Payable | ☐ | $2,197 |

**1447**

Reverse Mortgage Solutions, Inc.                                    Case Number:        19-10422

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
| --- | --- |

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
| --- | --- | --- | --- | --- | --- | --- | --- |
| **Trade Payables** | | | | | | | |
| 3.130   EILEEN SHAPIRO NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.131   ELAINE ALFIERO NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.132   ELAINE K. COHEN NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.133   ELAINE MAYO NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.134   ELFANT WISSAHICKON REALTORS ATTN: MARY JO POTTS 7112 GERMANTOWN AVE PHILADELPHIA, PA 19119 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.135   EMMA FLORENCE WORRELL NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.136   EOI DIRECT 1880 W. JUDITH LANE SUITE 220 BOISE, ID 83705 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.137   ERA STATEWIDE REALTY 284 HIGHWAY 206 SUITE B HILLSBOROUGH, NJ 08844 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.138   ERNEST T KRAFT NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.139   ESTATE OF ALONZO MCLEOD NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.140   ESTATE OF ARLENE T BOYER NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |

**1448**

Reverse Mortgage Solutions, Inc.                                    Case Number:          **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
|---|---|

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C U D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|
| **Trade Payables** | | | | | |
| **3.141** ESTATE OF CATHERINE DIANE CROPPER<br>NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.142** ESTATE OF CATHRINE M. MELLO<br>NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.143** ESTATE OF EUSTACE R HARPER<br>NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.144** ESTATE OF GLORIA I PAULINO<br>NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.145** ESTATE OF HANAKO INADA<br>NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.146** ESTATE OF HAROLD DUBIN<br>NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.147** ESTATE OF HERBERT B STRONG<br>1183 CRESTON HATCHERY ROAD<br>KALISPELL, MT 59901 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☐ ☐ ☐ | Trade Payable | ☐ | $7,500 |
| **3.148** ESTATE OF HOWARD G. COMAN<br>NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.149** ESTATE OF INEZ OWENS<br>NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.150** ESTATE OF JAMES BARLOW<br>NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.151** ESTATE OF JAMILEH IBRAHIM KHALIL<br>NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.152** ESTATE OF JANET PACIOTTI<br>NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |

Reverse Mortgage Solutions, Inc.                                    Case Number:        19-10422

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:**    List All Creditors with NONPRIORITY Unsecured Claims

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C U D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|
| **Trade Payables** | | | | | |
| 3.153 ESTATE OF JEANETTE GIGLIOTTE NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.154 ESTATE OF LEON E ROSS NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.155 ESTATE OF MARION C ASHBURN NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.156 ESTATE OF MARK VENIT NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.157 ESTATE OF NANCY BURCH NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.158 ESTATE OF OPHELIA B HAYES NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.159 ESTATE OF PATRICIA L BLANE NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.160 ESTATE OF RICHARD HALL NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.161 ESTATE OF STEVEN F BOOSE NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.162 ESTATE OF SUSAN W. MCKENNA NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.163 EVA GLADNEY NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.164 EVELYN YOB ESTATE NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |

**1450**

Reverse Mortgage Solutions, Inc.                                    Case Number:        19-10422

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
|---|---|

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|

### Trade Payables

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| 3.165   FAIR LAWN WATER BILLING 8-01 FAIR LAWN AVENUE FAIR LAWN, NJ 07410 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.166   FEDERAL EXPRESS CORP PO BOX 94515 PALATINE, IL 60094-4515 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ☐ | ☐ | ☐ | Trade Payable | ☐ | $661 |
| 3.167   FIDELITY NATIONAL TITLE COMPANY 7565 MISSION VALLEY ROAD STE 100 SAN DIEGO, CA 92108 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.168   FIRST TITLE & ESCROW, INC. 15 W GUDE DRIVE SUITE 400 ROCKVILLE, MD 20850 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.169   FOUR SEASONS REALTY GROUP INC 4752 PLSGAH DRIVE CANTON, NC 28716 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.170   FRANCES T CLEVELAND & MARVIN D CLEVELAND JR NOT AVAILABLE | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.171   FRANCIS L REDER NOT AVAILABLE | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.172   FRANK J ROGAN NOT AVAILABLE | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.173   FRED R. VOORHEES NOT AVAILABLE | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.174   FRED SPIEGEL NOT AVAILABLE | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.175   FREDA JAMES NOT AVAILABLE | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |

Reverse Mortgage Solutions, Inc.                                Case Number:        19-10422

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
|---|---|

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C U D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|
| **Trade Payables** | | | | | |
| 3.176  FUSION REALTORS<br>FUSION REAL ESTATE INC<br>1029 COMMERCIAL ST<br>WATERLOO, IA 50702 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.177  GAIL LEE SNOW<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.178  GAIL WALDEN WARD<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.179  GALLOWAY JOHNSON<br>TOMPKINS BURR<br>1301 MCKINNEY ST #1400<br>HOUSTON, TX 77025 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☐ ☐ ☐ | Trade Payable | ☐ | $17,477 |
| 3.180  GARY L CORBELL<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.181  GARY M MATZ & LOUISE A MATZ<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.182  GEORGE L. DURHAM III<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.183  GEORGE M. CURTIN JR.<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.184  GLORIA D JONES<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.185  GLORIA E WEST<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.186  GLORIA GONZALEZ RAMOS<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |

**1452**

**Reverse Mortgage Solutions, Inc.**                                    **Case Number:**        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:**    List All Creditors with NONPRIORITY Unsecured Claims

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Trade Payables** | | | | | | | |
| 3.187   GLORIA J HOOPER<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.188   GLS LEGAL SERVICES. LLC<br>GENEVIEVE LOPEZ STIPES, ESQ.<br>P.O. BOX 367308<br>SAN JUAN, PR 00936-7308 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.189   GRAY ROBINSON, P.A<br>T.W. ANDERSON JR.<br>301 E. PINE STREET, SUITE 1400<br>ORLANDO, FL 32801 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.190   GREENBERG TRAURIG LLP<br>1750 TYSONS BLVD #1000<br>MCLEAN, VA 22102 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☐ | ☐ | ☐ | Trade Payable | ☐ | $11,954 |
| 3.191   GREGG & VALBY LLP<br>1700 WEST LOOP SOUTH, SUITE 200<br>HOUSTON, TX 77027 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.192   GUARDIAN ASSET MANAGEMENT (N)<br>KATIE CATHEY<br>2021 HARTEL STREET<br>LEVITTOWN, PA 19057 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.193   GULDI GROUP, LLC<br>PO BOX 298607<br>PEMBROKE PINES, FL 33029 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.194   GUY W RHODES<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.195   HALLIDAY & WATKINS, P.C.<br>376 E 400 S SUITE 300<br>SALT LAKE CITY, UT 84111 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.196   HEAVNER, BEYERS & MIHLAR LLC<br>111 E. MAIN ST.<br>DECATUR, IL 62523 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.197   HENRY G HYPOLITE<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |

**1453**

Reverse Mortgage Solutions, Inc.                                    Case Number:        19-10422

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
|---|---|

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Trade Payables** | | | | | | | |
| 3.198  HERBERT JACKSON<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.199  HERSCHEL C. ADCOCKJR.<br>ANGIE RABALAIS, BRANDY MAY<br>CASIE JENKINS, HERSCHEL<br>ADCOCK<br>13541 TIGER BEND RD<br>BATON ROUGE, LA 70817 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.200  HILDA M MURPHY<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.201  HOME ALLIANCE REALTY<br>ATTN: LISA LOPEZ<br>142 E. BAY AVE<br>MANAHAWKIN, NJ 08050 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.202  HOOK & LADDER REALTY OF<br>CENTRAL FLORIDA LLC<br>ATTN: WILLIAM HOWELL<br>49 N. EAST AVE<br>SARASOTA, FL 34237 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.203  HOUSE REAL ESTATE OF<br>OKLAHOMA, L.L.C.<br>506 E WYANDOTTE AVE<br>MCALESTER, OK 74501 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.204  HOVANES BEZERJIAN & KLARA<br>BEZERJIAN<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.205  HUGHES WATTERS &<br>ASKANASE, LLP<br>ASKANASE LLP 28TH FL<br>1201 LOUISIANA ST<br>HOUSTON, TX 77002 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.206  HUNTON & WILLIAMS LLP<br>PO BOX 405759<br>ATLANTA, GA 30384-5759 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☐ | ☐ | ☐ | Trade Payable | ☐ | $2,576 |
| 3.207  INDEPENDENCE REO<br>661 W GERMANTOWN PIKE<br>SUITE 210<br>PLYMOUTH MEETING, PA<br>19462 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |

**1454**

Reverse Mortgage Solutions, Inc.                                    Case Number:        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
|---|---|

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C U D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|
| **Trade Payables** | | | | | |
| 3.208  IRIS DELIA PUCHAHES LEBRON NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.209  IRON MOUNTAIN PO BOX 27128 NEW YORK, NY 10087-7128 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☐ ☐ ☐ | Trade Payable | ☐ | $6,597 |
| 3.210  JACK N VAN NESS NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.211  JAMES L VINCENT NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.212  JAMES RICHARD GREVE JR. & MARIA ANGELICA GREVE NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.213  JAMES W SULLIVAN NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.214  JANE J. ROSENTHAL NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.215  JANE V WOODBECK NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.216  JEAN P ODOM NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.217  JEANETTE C THOMAS NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.218  JEANNE E. OLLER NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.219  JEFFERY JAMES JACQUEZ NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |

**1455**

Reverse Mortgage Solutions, Inc.                                      Case Number:        19-10422

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:**   **List All Creditors with NONPRIORITY Unsecured Claims**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C U D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|
| **Trade Payables** | | | | | |
| 3.220   JESSIE I ELLIS<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.221   JESUS CINTRON ORTEGA<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.222   JIM MOFFITT<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.223   JLC REAL ESTATE GROUP LLC<br>P O BOX 275<br>WENONAH, NJ 08090 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.224   JO ELLEN MORRISON<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.225   JOAN DIANA HORN & LEW HORN<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.226   JOAN S SMITH<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.227   JOANNA J. ECONOMAKOS<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.228   JOHN A NOEL & ROSE M NOEL<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.229   JOHN D HAYS & JUDY A HAYS<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.230   JOHN D RITTS<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.231   JOHN E PHILLIPS<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |

Reverse Mortgage Solutions, Inc.

Case Number: **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
| --- | --- |

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C U D | Basis For Claim | Offset | Amount of Claim |
| --- | --- | --- | --- | --- | --- |
| **Trade Payables** | | | | | |
| 3.232 JOHN H BURKHARDT<br>NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.233 JOHN R VAN GILDER<br>NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.234 JOHN S COSTA & DONNA S COSTA<br>NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.235 JOHNNY GLENN BUMGARNER<br>NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.236 JOSEPH CRAIG KING III<br>NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.237 JOYCE E. GRANT<br>NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.238 JOYCE FLOWERS<br>NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.239 JPK, CAPITAL LTD<br>11512 WEST 183RD STREET<br>SUITE SE<br>ORLAND PARK, IL 60467 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.240 JUDITH PEABODY<br>NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.241 JUDY ANN SHULTZ ESTATE<br>NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.242 JUDY CUTLER<br>NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |

**1457**

**Reverse Mortgage Solutions, Inc.**                                 **Case Number:**          **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:**   **List All Creditors with NONPRIORITY Unsecured Claims**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Trade Payables** | | | | | | | |
| 3.243  JUDY KLENK CROSBIE<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.244  JUDY M BERRY & WILLIAM L BERRY<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.245  JULIA VIRGINIA SANTOS SANTOS<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.246  JUNE P BAILEY<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.247  KABAT CHAPMAN & OZMER LLP<br>171 17TH STREET NW SUITE 1550<br>ATLANTA, GA 30363 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☐ | ☐ | ☐ | Trade Payable | ☐ | $17,746 |
| 3.248  KARIN GISLINDE COLON<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.249  KATHRYN F. BOILEAU<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.250  KATHRYN L SMITH<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.251  KEESAL, YOUNG & LOGAN<br>LORI MULHALL<br>400 OCEANGATE<br>LONG BEACH, CA 90802 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.252  KELLER WILLIAMS REALTY THE MARKETPLACE<br>ATTN: LIBBY SOSINSKI-SOUILLIARD<br>455 COCHRAN ROAD<br>PITTSBURGH, PA 15228 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.253  KELLY ANN PUGH<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |

**1458**

**Reverse Mortgage Solutions, Inc.**                                      **Case Number:**      **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:**    **List All Creditors with NONPRIORITY Unsecured Claims**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C U D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|
| **Trade Payables** | | | | | |
| **3.254**  KENNEDY CONNECTION REALTORS<br>15255 S 94TH AVENUE 500<br>ORLAND PARK, IL 60462 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.255**  KESSLER & KEIRNAN, P.C.<br>3255 N. ARLINGTON HEIGHTS ROAD<br>SUITE 505<br>ARLINGTON HEIGHTS, IL 60004 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.256**  KIEFER REALTY PA<br>ATTN: SCOTT KIEFER<br>8720 SW HIGHWAY 200 12<br>OCALA, FL 34481 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.257**  KING COUNTY<br>500 FOURTH AVE, ROOM 600<br>SEATTLE, WA 98104-2387 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.258**  KUTAK ROCK LLP<br>PO BOX 30057<br>OMAHA, NE 68103-1157 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☐ ☐ ☐ | Trade Payable | ☐ | $67 |
| **3.259**  LANCASTER AREA SEWER AUTHORITY<br>130 CENTERVILLE ROAD<br>LANCASTER, PA 17603 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.260**  LARRY M STOKES<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.261**  LAW OFFICES OF LES ZIEVE<br>30 CORPORATE PARK STE 450<br>IRVINE, CA 92606 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.262**  LEODA REEVES<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.263**  LEU & OKUDA - LESTER LEU<br>LESTER LEU<br>222 MERCHANT STREET<br>THE MERCHANT HOUSE, MAIN FLR.<br>HONOLULU, HI 96813-2922 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |

**1459**

Reverse Mortgage Solutions, Inc.                                    Case Number:        19-10422

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:    List All Creditors with NONPRIORITY Unsecured Claims**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Trade Payables** | | | | | | | |
| **3.264** LINDA J. RIGG<br>PO BOX 5331<br>SUGARLOAF, CA 92386 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.265** LINDA JOHNSON<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.266** LINDA S SWISHER<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.267** LINEAR SETTLEMENT SERVICES, LLC<br>ATTN: GENERAL COUNSEL<br>127 JOHN CLARKE ROAD<br>FIRST FLOOR<br>MIDDLETOWN, RI 02842-7631 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.268** LISA R LONG<br>301 NE 100TH ST<br>SUITE 200<br>SEATTLE, WA 98125 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.269** LOIS M MURPHY & HENRY ELBERT MURPHY<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.270** LOUETTA L KING<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.271** LRES CORPORATION<br>ACCOUNTS RECEIVABLE<br>765 THE CITY DRIVE SOUTH,<br>STE 300, ATTN: HOA<br>ORANGE, CA 92868 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.272** LTS ACQUISITION CO, LLC<br>400 FELLOWSHIP ROAD<br>SUITE 250<br>MOUNT LAUREL, NJ 08054 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.273** LUIS R GARCIA & AMELIA M GARCIA<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |

**1460**

**Reverse Mortgage Solutions, Inc.**                                    **Case Number:**      **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:**      **List All Creditors with NONPRIORITY Unsecured Claims**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Trade Payables** | | | | | | | |
| **3.274** LYNN JACKSON SHULTZ & LEBRUN PC 110 N MINNESOTA AVE  STE 400 SIOUX FALLS, SD 57104 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☐ | ☐ | Trade Payable | ☐ | $86 |
| **3.275** LYNNE ADAMS NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.276** LYONS COMMERCIAL DATA 9711 WASHINGTONIAN BLVD STE 440 GAITHERSBURG, MD 20878 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☐ | ☐ | Trade Payable | ☐ | $265 |
| **3.277** MACKIE WOLF ZIENTZ & MANN PC 14160 N DALLAS PKWY 900 DALLAS, TX 75254 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.278** MADONNA M PORTICE NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.279** MARGARET DIANNE HILL NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.280** MARIAN ANDERSON NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.281** MARIE MCCORMICK 19110 ROCK CLIFF DRIVE ROCKY RIVER, OH 44116 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.282** MARIE V. BARON NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.283** MARLENE A FANELLI NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.284** MARLENE KATZ 729 SW FEDERAL HIGHWAY SUITE 100 STUART, FL 34994 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |

**1461**

Reverse Mortgage Solutions, Inc.                                    Case Number:        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
|---------|------------------------------------------------------|

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Trade Payables** | | | | | | | |
| **3.285** MARTIN LEIGH PC 2405 GRAND BOULEVARD STE 410 KANSAS CITY, MO 64108 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☐ | ☐ | Trade Payable | ☐ | $35 |
| **3.286** MARTINEZ AND TORRES LAW NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.287** MARTY'S REAL ESTATE NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.288** MARVO STRAKER NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.289** MARY JO CRITES NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.290** MARY KATHRYN FOX NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.291** MARY MCELVEEN MYERS NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.292** MARY O BEARDEN NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.293** MARYLAND REO REALTY 13978 BALTIMORE AVE LAUREL, MD 20707 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.294** MAURICE G. MURRAY NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.295** MCCABE WEISBERG & CONWAY 123 S BROAD ST SUITE 1400 PHILADELPHIA, PA 19109 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |

Reverse Mortgage Solutions, Inc.                                    Case Number:        19-10422

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
|---|---|

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C U D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|
| **Trade Payables** | | | | | |
| 3.296 MCCARTHY & HOLTHUS LLP 1770 4TH AVE SAN DIEGO, CA 92101 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.297 MERSCORP HOLDINGS INC 13059 COLLECTIONS CENTER DRIVE CHICAGO, IL 60693 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ ☐ ☐ | Trade Payable | ☐ | $2,512 |
| 3.298 MIAMI DADE COUNTY FLORIDA BOARD OF COUNTY COMMISSIONERS NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.299 MICHAEL B WALES 10572 SW FLEMING ROAD POWELL BUTTE, OR 97753 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ ☐ ☐ | Trade Payable | ☐ | $22,500 |
| 3.300 MICHAEL E. TRAVERS NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.301 MICHAEL JAMES CUMMINGS ESTATE NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.302 MICHAEL WILSON REALTY LLC NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.303 MICHELINA JANICE BROCATO NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.304 MICHELLE L. MARANSANI NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.305 MIDDLESEX COUNTY CLERK NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.306 MIDDLETOWN TOWNSHIP 1 KINGS HIGHWAY MIDDLETOWN, NJ 07748 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |

**Reverse Mortgage Solutions, Inc.**                                    **Case Number:**        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:**    **List All Creditors with NONPRIORITY Unsecured Claims**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|

### Trade Payables

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **3.307** MILLER WATSON & GEORGE PC NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.308** MILLICENT M KRYSZEWSKI NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.309** MINERVA PACHOT RIVERA NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.310** MONROE MUA NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.311** MORRIS LAND SURVEYING NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.312** MRG LEGAL SERVICES P.S.C. PMB 293 405 ESMERALDA AVE, STE 2 GUAYNABO, PR 00969 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.313** MULTNOMAH COUNTY RECORDER MULTNOMAH COUNTY TAX COL 501 SE HAWTHORNE BLVD 1 PORTLAND, OR 97214 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.314** NATIONAL FIELD REPRESENTATIVES INC 136 MAPLE AVENUE CLAREMONT, NH 03743 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.315** NATIONSTAR MORTGAGE HOLDINGS, INC. P O BOX 619098 DALLAS, TX 75261-9741 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.316** NELSON RE VENTURES INC 41183 ROSEDALE STREET INDIO, CA 92203 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.317** NEWMAN REALTY SERVICES, INC 1047 N CALIFORNIA AVENUE CHICAGO, IL 60622 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |

**1464**

Reverse Mortgage Solutions, Inc.                                    Case Number:        19-10422

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
|---|---|

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C U D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|
| **Trade Payables** | | | | | |
| 3.318 NICOLAS J VELOSO NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.319 NICOLE SOMMESE NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.320 NILDA CRUZ ZAYAS NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.321 NILSA PEREZ GUILFUCHI NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.322 NORMA W STEMLER NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.323 NOVITEX ENTERPRISE SOLUTIONS PO BOX 845801 DALLAS, TX 75284 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ ☐ ☐ | Trade Payable | ☐ | $26,591 |
| 3.324 OCBCC NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.325 O'CONNOR REAL ESTATE NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.326 O'DESS AND ASSOCIATES, S.C. NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.327 OFFICE DEPOT PO BOX 633211 CINCINNATI, OH 45263 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ ☐ ☐ | Trade Payable | ☐ | $2,898 |
| 3.328 OSCAR RENE MAZARIEGOS 11014 WILLWOOD DRIVE HOUSTON, TX 77072 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |

**1465**

Reverse Mortgage Solutions, Inc.                       Case Number:      **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
| --- | --- |

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
| --- | --- | --- | --- | --- | --- | --- | --- |
| **Trade Payables** | | | | | | | |
| 3.329   OUIDARITA GUILLARD FAISON <br> NOT AVAILABLE | UNKNOWN <br><br> ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.330   PARKER IBRAHIM & BERG <br> 270 DAVIDSON AVE <br> SOMERSET, NJ 08873 | UNKNOWN <br><br> ACCOUNT NO.: NOT AVAILABLE | ☐ | ☐ | ☐ | Trade Payable | ☐ | $3,798 |
| 3.331   PARTNERS ELECTRICAL SERVICES <br> 7303 WINDFERN RD STE 200 <br> HOUSTON, TX 77040 | UNKNOWN <br><br> ACCOUNT NO.: NOT AVAILABLE | ☐ | ☐ | ☐ | Trade Payable | ☐ | $861 |
| 3.332   PATRICIA A WILLIS <br> NOT AVAILABLE | UNKNOWN <br><br> ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.333   PATRICIA C STICKEL <br> NOT AVAILABLE | UNKNOWN <br><br> ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.334   PATRICIA D HECK <br> NOT AVAILABLE | UNKNOWN <br><br> ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.335   PATRICIA MCKAY <br> NOT AVAILABLE | UNKNOWN <br><br> ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.336   PATRICIA N BEECH <br> NOT AVAILABLE | UNKNOWN <br><br> ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.337   PAUL MCCOMB REALTY <br> ATTN: PAUL MCCOMB <br> 7530 E. CAMINO AMISTOSO <br> TUCSON, AZ 85750 | UNKNOWN <br><br> ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.338   PAULA N ESPOSITO <br> NOT AVAILABLE | UNKNOWN <br><br> ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.339   PENNSYLVANIA ELECTRIC COMPANY <br> NOT AVAILABLE | UNKNOWN <br><br> ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |

**1466**

Reverse Mortgage Solutions, Inc.                                        Case Number:        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| **Part 2:** | **List All Creditors with NONPRIORITY Unsecured Claims** |
|---|---|

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|

### Trade Payables

| | | C | U | D | | Offset | |
|---|---|---|---|---|---|---|---|
| **3.340** PLATINUM SERVICES LLC<br>168 W RIDGE PIKE 131<br>LIMERICK, PA 19468 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.341** PRECEDENT MANAGEMENT, LLC<br>7875 NW 12TH ST SUITE 110<br>DORAL, FL 33126 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.342** PRESTON E DYSON<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.343** PRISCILLA JANE HARRY<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.344** PROCHAMPS<br>2725 CENTER PLACE<br>MELBOURNE, FL 32940 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.345** PROTECH ELECTRIC LLC<br>FAZARD MOHAMMED<br>17 OLD TIMBER ROAD<br>MOUNT POCONO, PA 18344 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.346** PURCHASE POWER<br>PO BOX 371874<br>PITTSBURGH, PA 15250-7874 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☐ | ☐ | ☐ | Trade Payable | ☐ | $1,095 |
| **3.347** QUALITY RESEARCH SERVICES CORP<br>1999 N UNIVERSITY DR.<br>STE 202<br>CORAL SPRINGS, FL 33071 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.348** RAMON MARTINEZ<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.349** RANDALL S. MILLER & ASSOC. PLLC<br>43252 WOODWARD<br>SUITE 180<br>BLOOMFIELD HILLS, MI 48302 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.350** RE/MAX PRIME REAL ESTATE<br>238 W BALTIMORE AVE<br>CLIFTON HEIGHTS, PA 19018 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |

**1467**

**Reverse Mortgage Solutions, Inc.**                                    **Case Number:**          **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
| --- | --- |

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
| --- | --- | --- | --- | --- | --- | --- | --- |

### Trade Payables

| | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| **3.351** REAL ESTATE PROFESSIONALS, INC. 518 EASTERN BOULEVARD BALTIMORE, MD 21221 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.352** REALTY EXCHANGE 2203 S BIG BEND BLVD ST. LOUIS, MO 63117 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.353** REALTY SERVICES OF ILLINOIS 792 E RAND ROAD ARLINGTON HEIGHTS, IL 60004 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.354** REISENFELD & ASSOCIATES LPA LLC LLC 3962 RED BANK ROAD CINCINNATI, OH 45227 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.355** RELIABLE TAX DATA CORP 7229 HELSEM BED DALLAS, TX 75230 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☐ | ☐ | Trade Payable | ☐ | $647 |
| **3.356** REO INTEGRATION, INC. ATTN: KRIS RAMDAT 300 WHITE PLAINS RD FIRST FLOOR BRONX, NY 10473 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.357** REO REAL ESTATE 10 PIDGEON HILL DRIVE SUITE 100 STERLING, VA 20165 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.358** RICHARD PAUL BELL NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.359** RICHARD THAYER & ARLENE THAYER NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.360** RIVER REALTY SERVICES, INC 117 EXECUTIVE DRIVE SUITE 100 NEW WINDSOR, NY 12553 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.361** ROBERT E HUBER NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |

Reverse Mortgage Solutions, Inc.                                    Case Number:        19-10422

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:**    List All Creditors with NONPRIORITY Unsecured Claims

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Trade Payables** | | | | | | | |
| **3.362** ROBERT ENGERT<br>NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.363** ROBERT L. BLEDSOE SR. & ELLA MAE BLEDSOE<br>NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.364** ROBERT S. WRIGHT<br>NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.365** ROBERTA JEAN ANN HUNT<br>NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.366** ROBERTSON ANSCHUTZ & SCHNEID PL<br>6409 CONGRESS AVE STE 100<br>BOCA RATON, FL 33487 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☐ | ☐ | ☐ | Trade Payable | ☐ | $875 |
| **3.367** ROBIN RONAY<br>ATTN: ROBIN RONAY<br>PO BOX 3747<br>EUREKA, CA 95502 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.368** ROGERS TOWNSEND & THOMAS PC<br>100 EXECUTIVE CENTER DRIVE SUITE 210<br>COLUMBIA, SC 29210 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.369** RONALD A BOWKER & MARY L BOWKER<br>NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.370** RONALD J DEAVER SR.<br>NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.371** ROXANNE L PAINE<br>NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.372** RUBIN LUBLIN LLC<br>3145 AVALON RIDGE PLACE  STE 100<br>PEACHTREE CORNERS, GA 30071 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☐ | ☐ | ☐ | Trade Payable | ☐ | $43 |

**1469**

Reverse Mortgage Solutions, Inc.                                    Case Number:        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
|---|---|

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Trade Payables** | | | | | | | |
| 3.373 RUBY R ROCHON NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.374 RUTH H GOSS NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.375 RUTH RUHL, P.C. 12700 PARK CENTRAL DRIVE, SUITE 850 DALLAS, TX 75251 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.376 S&W GENERAL CONTRACTING, INC. NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.377 SACRAMENTO SUBURBAN WATER DISTRICT 3701 MARCONI AVE STE 100 SACRAMENTO, CA 95821 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.378 SALT LAKE COUNTY RECORDER NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.379 SAMBOR INVESTMENTS, LLC PO BOX 15013 PIKESVILLE, MD 21282-5013 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.380 SAMUEL TREJO NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.381 SANDRA COOPER NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.382 SANDRA J SAWYER NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.383 SANTA CLARA COUNTY CLERK-RECORDER SCC DTAC 70 W HEDDING ST 6TH FL, SAN JOSE, CA 95110 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |

**1470**

Reverse Mortgage Solutions, Inc.                                              Case Number:      19-10422

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:**      List All Creditors with NONPRIORITY Unsecured Claims

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Trade Payables** | | | | | | | |
| 3.384 SARPY COUNTY REGISTER OF DEEDS SARPY COUNTY - TREASURER 1210 GOLDEN GATE DR, 11 PAPILLION, NE 68046 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.385 SAUNDRA SMITH NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.386 SCHWABE WILLIAMSON & WYATT PC 1211 SW FIFTH AVE STE 500 PORTLAND, OR 97204-3795 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☐ | ☐ | Trade Payable | ☐ | $17,313 |
| 3.387 SCOTT D. RAMIREZ NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.388 SECRETARIO DE HACIENDA EDIFICIO INTENDENTE RAMIREZ 10 PASEO CONVADONGA SAN JUAN, PR 00901 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.389 SELECT MANAGEMENT GROUP, LLC 8522 EAST 61ST ST TULSA, OK 74133 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.390 SHAPIRO & ZIELKE LLP LOCKBOX STE775426 350E DEVON AVE ITASCA, IL 60143 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.391 SHAPIRO SCHWARTZ LLP LOCKBOX 775426 350 E DEVON AVE ITASCA, IL 60143 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.392 SHARON ALLMON GOLMON NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.393 SHARON LARUE JOHNSON JAMES NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |

**1471**

Reverse Mortgage Solutions, Inc.                                    Case Number:      **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:**    List All Creditors with NONPRIORITY Unsecured Claims

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Trade Payables** | | | | | | | |
| **3.394** SHIRLEY A SHAW NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.395** SHIRLEY J RAMSAY NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.396** SHIRLEY J STARKWEATHER NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.397** SINDEN HARUM 1503 WASHINGTON STREET WENATCHEE, WA 98801 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.398** SINGLE SOURCE PROPERTY SOLUTIONS LLC ATTN: GENERAL COUNSEL 1000 NOBLE ENERGY DRIVE SUITE 300 CANONSBURG, PA 15317 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.399** SIROTE & PERMUTT, P.C. STEVEN LEWIS 2311 HIGHLAND AVENUE SOUTH P.O. BOX 55509 BIRMINGHAM, AL 35255-5509 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.400** SNELL & WILMER LLP 400 E VAN BUREN STE 1900 PHOENIX, AZ 85004-2202 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☐ | ☐ | Trade Payable | ☐ | $12,104 |
| **3.401** SOLID NETWORKS LLC 13315 VETERANS MEMORIAL DR #408 HOUSTON, TX 77014 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☐ | ☐ | Trade Payable | ☐ | $936 |
| **3.402** SOOS CREEK 14616 SE 192ND ST. RENTON, WA 98058 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.403** SOUTH & ASSOCIATES P.C. ASHLEY DEEL P. O. BOX 800076 KANSAS CITY, MO 64180-0076 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |

Reverse Mortgage Solutions, Inc.                                      Case Number:        19-10422

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:    List All Creditors with NONPRIORITY Unsecured Claims**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Trade Payables** | | | | | | | |
| **3.404** ST. CLAIR COUNTY JUDGE OF PROBATE NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.405** STAFFORD TOWNSHIP STAFFORD TWP - COLLECTOR 260 EAST BAY AVENUE MANAHAWKIN, NJ 08050 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.406** STAR REALTY INC 15 E CHURCHVILLE RD STE 108 BEL AIR, MD 21014 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.407** STEPHEN J. & SHERYL L. PLATING NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.408** STEVEN S. GOZINSKY, ESQ 746 MERRICK ROAD BALDWIN, NY 11510 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.409** STEVENS & ASSOCIATES REALTORS 120 NILES-CORTLAND RD SE WARREN, OH 44484 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.410** SUSAN DAVIDSON-DALBERG NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.411** TERESA BENNETT 220 ELLSWORTH ST BRIDGEPORT, CT 06605 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.412** THE ALBA LAW GROUP 11350 MCCORMICK ROAD EP III SUITE 200 HUNT VALLEY, MD 21031 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.413** THE GEHEREN FIRM, P.C. BRITTNI GEHEREN 4828 ASHFORD DUNWOODY ROAD, 2ND FLOOR ATLANTA, GA 30338 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.414** THE ROSEMONT GROUP, LLC ATTN: TAMMY LOWNEY 635A E LOCUST ST MILWAUKEE, WI 53212 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |

**Reverse Mortgage Solutions, Inc.**                                     **Case Number:**        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
| --- | --- |

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
| --- | --- | --- | --- | --- | --- | --- | --- |

### Trade Payables

| | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 3.415 THE SOUTHEAST MORRIS COUNTY MUNICIPAL UTILITIES AUTHORITY P.O. BOX 16036 LEWISTON, ME 04243-9515 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.416 THOMAS J. SANGER NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.417 TOMAS LEBRON BAEZ & MINERVA CONCEPCION LOPEZ NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.418 TOSHIBA FINANCIAL SERVICES PO BOX 51043 LOS ANGELES, CA 90051-5343 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☐ | ☐ | Trade Payable | ☐ | $616 |
| 3.419 TOWN OF HEMPSTEAD 200 N. FRANKLIN STREET HEMPSTEAD, NY 11550 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.420 TOWN OF NORTH PROVIDENCE 2000 SMITH ST. NORTH PROVIDENCE, RI 02911 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.421 TOWNSHIP OF BURLINGTON 851 OLD YORK ROAD BURLINGTON, NJ 08016 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.422 TOWNSHIP OF NORTH BRUNSWICK 710 HERMANN ROAD NORTH BRUNSWICK, NJ 08902 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.423 TROUTMAN SANDERS LLP 600 PEACHTREE ST STE 5200 ATLANTA, GA 30308 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☐ | ☐ | Trade Payable | ☐ | $9,530 |
| 3.424 TRUSTEE CORPS 17100 GILLETTE AVE IRVINE, CA 92614 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| 3.425 TWIN OAKS REALTY 3353 DOUGLAS DR CRYSTAL, MN 55422 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |

Reverse Mortgage Solutions, Inc.                                    Case Number:        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Trade Payables** | | | | | | | |
| **3.426** U.S. LOAN SERVICING TRUST ACCOUNT 9670 W. TROPICANA STE.100 LAS VEGAS, NV 89147 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.427** UNITED PARCEL SERVICE INC LOCKBOX 577 CAROL STREAM, IL 60132-0577 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☐ | ☐ | Trade Payable | ☐ | $2,345 |
| **3.428** US BANK PO BOX 790428 ST. LOUIS, MO 63179-0428 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☐ | ☐ | Trade Payable | ☐ | $266 |
| **3.429** US DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.430** UTILITIES INC. OF FLORIDA 2335 SANDERS ROAD NORTHBROOK, IL 60062 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.431** VAN HORN REALTY, LLC ATTN: EDWARD VAN HORN 7434 S. US HIGHWAY 1 PORT ST LUCIE, FL 34952 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.432** VELTRI & ASSOCIATES,REALTORS 2400 ROUTE 88 POINT PLEASANT, NJ 08742 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.433** VENDOR CONNECT LLC 30 CORPORATE PARK SUITE 306 IRVINE, CA 92606 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☐ | ☐ | Trade Payable | ☐ | $225 |
| **3.434** VICTORIANO VELEZ VALENTIN HC 02 BOX 8914 LAS MARIAS, PR 00670 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.435** VILLAGE OF MOUNT PROSPECT 50 SOUTH EMERSON STREET MOUNT PROSPECT, IL 60056 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.436** VILLAGE REO DIVISION VILLAGE REALTY LTD 309 N. HIGH STREET MT. ORAB, OH 45154 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |

**1475**

**Reverse Mortgage Solutions, Inc.**                    **Case Number:**        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:**    **List All Creditors with NONPRIORITY Unsecured Claims**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Trade Payables** | | | | | | | |
| **3.437**  VIRGIN VALLEY WATER DISTRICT 500 RIVERDALE ROAD MESQUITE, NV 89027 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.438**  VIRGINIA M. CERMELJ NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.439**  WARGO & FRENCH LLP 999 PEACHTREE ST NE 26TH FLOOR ATLANTA, GA 30309 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☐ | ☐ | Trade Payable | ☐ | $2,783 |
| **3.440**  WASHINGTON COUNTY RECORDER NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.441**  WASHINGTON COUNTY TREASURER 1 GOVERNMENT CENTER PLACE SUITE B ABINGDON, VA 24210-8484 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.442**  WASHINGTON REALTY GROUP ATTN: JIM CLIFFORD 913 KINCAID AVE SUMNER, WA 98390 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.443**  WASHINGTON SUBURBAN SANITARY COMMISSION 14501 SWEITZER LANE LAUREL, MD 20707-5902 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.444**  WASHINGTON TOWNSHIP MUNICIPAL UTILITIES AUTHORITY NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.445**  WAYNE L. WHARTON NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.446**  WEICHERT REALTORS FIRST CHOICE 4206 LINGLESTOWN ROAD HARRISBURG, PA 17112 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |

**1476**

Reverse Mortgage Solutions, Inc.                                    Case Number:        19-10422

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:** List All Creditors with NONPRIORITY Unsecured Claims

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Trade Payables** | | | | | | | |
| **3.447** WELCOME HOME REALTY LISA S HARRELL 110 W WATER STREET EDENTON, NC 27932 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.448** WELLS FARGO BANK N.A WF 8113 PO BOX 1450 MINNEAPOLIS, MN 55485-8113 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☐ | ☐ | ☐ | Trade Payable | ☐ | $2,482 |
| **3.449** WEST MANHEIM TOWNSHIP 2412 BALTIMORE PIKE HANOVER, PA 17331 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.450** WHATCOM COUNTY AUDITOR WHATCOM COUNTY - TREASUR 311 GRAND AVE 104 BELLINGHAM, WA 98225 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.451** WILLIAM BERRY NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.452** WILLIAM E DANTONA JR NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.453** WILLIAM E KELLUM JR. NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.454** WILLIAM MCCOY JR NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.455** WILLIAMS MULLEN CLARK & DOBBINS PC 200 SOUTH 10TH ST STE 1600 RICHMOND, VA 23219 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☐ | ☐ | ☐ | Trade Payable | ☐ | $3,235 |
| **3.456** WINSLOW TOWNSHIP 125 SOUTH ROUTE 73 BRADDOCK, NJ 08037 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.457** WOODFORD R PEBBLES 29 ALLENS ALY RATON, NM 87740 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☐ | ☐ | Trade Payable | ☐ | UNDETERMINED |

**1477**

**Reverse Mortgage Solutions, Inc.**                                    Case Number:        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| **Part 2:** | **List All Creditors with NONPRIORITY Unsecured Claims** |
|---|---|

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C U D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|
| **Trade Payables** | | | | | |
| **3.458** WRIGHT FINLAY & ZAK<br>4665 MAC ARTHUR COURT<br>SUITE 280<br>NEWPORT BEACH, CA 92660 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.459** YAMHILL COUNTY CLERK<br>YAMHILL COUNTY - TAX COL<br>535 NE 5TH ST, RM.42<br>MCMINNVILLE, OR 97128 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.460** YOLANDA R BELTRAN<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Trade Payable | ☐ | UNDETERMINED |
| **3.461** ZIEVE BRODNAX & STEELE LLP<br>30 CORPORATE PARK STE 450<br>IRVINE, CA 92606 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☐ ☐ ☐ | Trade Payable | ☐ | $282 |

Trade Payables Total:        **$931,185**

**1478**

**Reverse Mortgage Solutions, Inc.**                                    Case Number:        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:**    **List All Creditors with NONPRIORITY Unsecured Claims**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C U D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|
| **Intercompany** | | | | | |
| **3.462**  DITECH FINANCIAL LLC 3000 BAYPORT DRIVE SUITE 985 TAMPA, FL 33607 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Intercompany Payable | ☐ | $20,858,939 |
| **3.463**  DITECH HOLDING CORPORATION 3000 BAYPORT DRIVE SUITE 985 TAMPA, FL 33607 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Intercompany Payable | ☐ | $59,952,806 |
| **3.464**  REO MANAGEMENT SOLUTIONS, LLC 3000 BAYPORT DRIVE SUITE 985 TAMPA, FL 33607 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Intercompany Payable | ☐ | $7,668,402 |
| **3.465**  RMS REO BRC II, LLC 3000 BAYPORT DRIVE SUITE 985 TAMPA, FL 33607 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Intercompany Payable | ☐ | $61,280 |
| **3.466**  RMS REO BRC, LLC 3000 BAYPORT DRIVE SUITE 985 TAMPA, FL 33607 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☐ ☐ | Intercompany Payable | ☐ | $32,341 |
| | | | **Intercompany Total:** | | **$88,573,768** |

**1479**

**Reverse Mortgage Solutions, Inc.**                                                     **Case Number:**        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:**     **List All Creditors with NONPRIORITY Unsecured Claims**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Escheated Checks** | | | | | | | |
| 3.467  ALABAMA STATE TREASURER UNCLAIMED PROPERTY DIVISION ATTN: CHAD WRIGHT, UCP DIRECTOR 100 NORTH UNION STREET ; RSA UNION BUILDING - SUITE 636 MONTGOMERY, AL 36104 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | | ✔ | | Escheatment Funds | ☐ | UNDETERMINED |
| 3.468  ALASKA DEPT OF REVENUE UNCLAIMED PROPERTY PROGRAM ATTN: RACHEL LEWIS, UNCLAIMED PROPERTY MANAGER 333 WILLOUGHBY AVENUE; 11TH FLOOR JUNEAU, AK 99801 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | | ✔ | | Escheatment Funds | ☐ | UNDETERMINED |
| 3.469  ARIZONA DEPARTMENT OF REVENUE UNCLAIMED PROPERTY UNIT ATTN: JODIE FORD, REPORTING CONTACT 1600 WEST MONROE; DIVISION CODE 10 PHOENIX, AZ 85007 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | | ✔ | | Escheatment Funds | ☐ | UNDETERMINED |
| 3.470  ARKANSAS AUDITOR OF STATE UNCLAIMED PROPERTY DIVISION ATTN: ANDREA LEA, AUDITOR OF STATE 1401 WEST CAPITOL AVENUE; SUITE 325 LITTLE ROCK, AR 72201 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | | ✔ | | Escheatment Funds | ☐ | UNDETERMINED |
| 3.471  BUREAU OF UNCLAIMED PROPERTY ATTN: BARBARA BENKOVIC, ASST. DIVISION MGR. HOLDER COMPLIANCE 101 N INDEPENDENCE MALL EAST REMITTANCE CONTROL, 2ND FLOOR; REFERENCE: LOCKBOX #053473 PHILADELPHIA , PA 19106 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | | ✔ | | Escheatment Funds | ☐ | UNDETERMINED |
| 3.472  COLORADO DEPARTMENT OF TREASURY UNCLAIMED PROPERTY DIVISION ATTN: PATTY WHITE, DIRECTOR 1580 LOGAN STREET; SUITE 500 DENVER, CO 80203 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | | ✔ | | Escheatment Funds | ☐ | UNDETERMINED |

**1480**

Reverse Mortgage Solutions, Inc.                                           Case Number:          19-10422

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:**     **List All Creditors with NONPRIORITY Unsecured Claims**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|

### Escheated Checks

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 3.473 | COMPTROLLER OF MARYLAND UNCLAIMED PROPERTY UNIT ATTN: MARCIA BRANNOCK, HOLDER COMPLIANCE SUPERVISOR 301 WEST PRESTON STREET BALTIMORE, MD 21201 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |
| 3.474 | DE OFFICE OF FINANCE AND TREASURY UNCLAIMED PROPERTY UNIT ATTN: GRACIE MUSHER, MANAGER 1101 4TH STREET, SW; SUITE 800W WASHINGTON, DC 20024 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |
| 3.475 | DEPARTMENT OF FINANCE OFFICE OF UNCLAIMED PROPERTY ATTN: DAVID GREGOR, STATE ESCHEATOR 820 NORTH FRENCH STREET; 8TH FLOOR WILMINGTON, DE 19801 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |
| 3.476 | DEPARTMENT OF THE STATE TREASURER UNCLAIMED PROPERTY DIVISION ATTN: MARK WULLIAM BRACKEN, ASSISTANT TREASURER ONE ASHBURTON PLACE; 12TH FLOOR BOSTON, MA 02108-1608 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |
| 3.477 | FLORIDA DEPARTMENT OF FINANCIAL SERVICES BUREAU OF UNCLAIMED PROPERTY ATTN: THOMAS EGLER, REPORTING SUPERVISOR LARSON BUILDING; 200 E GAINES STREET TALLAHASSEE, FL 32399-0358 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |

**1481**

**Reverse Mortgage Solutions, Inc.**                                           **Case Number:**       **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:**      **List All Creditors with NONPRIORITY Unsecured Claims**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Escheated Checks** | | | | | | | |
| 3.478  GEORGIA DEPARTMENT OF REVENUE UNCLAIMED PROPERTY PROGRAM ATTN: ANNA TOWNSEND, MANAGER 4125 WELCOME ALL ROAD; SUITE 701 ATLANTA, GA 30349 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |
| 3.479  ILLINOIS STATE TREASURER'S OFFICE UNCLAIMED PROPERTY DIVISION ATTN: ROXY HOLLENSTINE, DIRECTOR 1 WEST OLD STATE CAPITOL PLAZA; SUITE 400 SPRINGFIELD, IL 62701-1390 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |
| 3.480  INDIANA ATTONERY GENERAL'S OFFICE UNCLAIMED PROPERTY DIVISION ATTN: BECKY YUAN, DIRECTOR 35 SOUTH PARK BOULEVARD GREENWOOD , IN 46143 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |
| 3.481  KANSAS OFFICE OF THE STATE TREASURER UNCLAIMED PROPERTY DIVISION ATTN: RITA MOHR, DIRECTOR 900 SW JACKSON ST; SUITE 201 TOPEKA, KS 66612-1235 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |
| 3.482  KENTUCKY STATE TREASURER UNCLAIMED PROPERTY DIVISION ATTN: KATRINA STONER, MANAGER 1050 US HWY 127 S; SUITE 100 FRANKFORT, KY 40601 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |
| 3.483  LOUISIANA DEPARTMENT OF TREASURY UNCLAIMED PROPERTY DIVISION ATTN: KATHLEEN LOBELL, DIRECTOR OF UNCLAIMED PROPERTY 1051 N 3RD STREET; ROOM 150 BATON ROUGE, LA 70802 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |

Reverse Mortgage Solutions, Inc.                                    Case Number:        19-10422

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
| --- | --- |

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
| --- | --- | --- | --- | --- | --- | --- | --- |
| **Escheated Checks** | | | | | | | |
| **3.484** MAINE STATE TREASURER'S OFFICE UNCLAIMED PROPERTY ATTN: KRISTI CARLOW, DIRECTOR 39 STATE HOUSE STATION AUGUSTA, ME 04333-0039 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |
| **3.485** MICHIGAN DEPARTMENT OF TREASURY UNCLAIMED PROPERTY DIVISION ATTN: GONZALO LLANO, ADMINISTRATOR PO BOX 30756 LANSING, MI 48909 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |
| **3.486** MINNESOTA DEPARTMENT OF COMMERCE UNCLAIMED PROPERTY PROGRAM ATTN: ROBERT COMMODORE, DIRECTOR 85 7TH PLACE EAST ; SUITE 280 ST PAUL, MN 55101-2198 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |
| **3.487** MONTANA DEPARTMENT OF REVENUE UNCLAIMED PROPERTY ATTN: TAMMY PIPPIN, HOLDER SPECIALIST 340 NORTH LAST CHANCE GULCH HELENA, MT 59601 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |
| **3.488** NEBRAKA STATE TREASURER UNCLAIMED PROPERTY DIVISION ATTN: MEAGHAN AGUIRRE, DIRECTOR 809 P STREET LINCOLN, NE 68508-1390 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |
| **3.489** NEVADA OFFICE OF THE STATE TREASURER UNCLAIMED PROPERTY DIVISION ATTN: KELLI MARTIN, DEPUTY STATE TREASURER 555 E WASHINGTON AVE; SUITE 4200 LAS VEGAS, NV 89101-1070 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |

**1483**

**Reverse Mortgage Solutions, Inc.**                                          **Case Number:**        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:**    **List All Creditors with NONPRIORITY Unsecured Claims**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Escheated Checks** | | | | | | | |
| 3.490   NEW HAMPSHIRE TREASURY DEPARTMENT ABANDONED PROPERTY DIVISION ATTN: BRIAN REGAN, DIRECTOR 25 CAPITOL STREET; ROOM 205 CONCORD, NH 03301 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |
| 3.491   NEW JERSEY DEPARTMENT OF TREASURY UNCLAIMED PROPERTY DIVISION ATTN: STEVE HARRIS, ADMINISTRATOR REPORT SECTION; PO BOX 214 TRENTON, NJ 08625-0214 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |
| 3.492   NEW MEXICO TAXATION & REVENUE DEPT UNCLAIMED PROPERTY OFFICE ATTN: STEPHANIE DENNIS, UNCLAIMED PROPERTY SUPERVISOR MANUEL LUJAN BUILDING; 1200 SOUTH ST FRANCIS DRIVE SANTA FE, NM 87505 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |
| 3.493   NEW YORK STATE COMPTROLLER OFFICE OF UNCLAIMED FUNDS ATTN: JOHN HANSON, REPORTING SUPERVISOR 110 STATE STREET; REMITTANCE CONTROL, 2ND FLOOR ALBANY, NY 12236 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |
| 3.494   NORTH CAROLINA STATE TREASURER UNCLAIMED PROPERTY PROGRAM ATTN: BRENDA WILLIAMS, ADMINISTRATOR 3200 ATLANTIC AVENUE RALEIGH, NC 27604-1668 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |
| 3.495   NORTH DAKOTA DEPOART OF TRUST LANDS UNCLAIMED PROPERTY DIVISION ATTN: SUSAN DOLLINGER, ADMINISTATOR 1707 NORTH 9TH STREET BISMARCK, ND 58501 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |

**1484**

Reverse Mortgage Solutions, Inc.                                    Case Number:        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
| --- | --- |

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
| --- | --- | --- | --- | --- | --- | --- | --- |
| **Escheated Checks** | | | | | | | |
| 3.496 OFFICE OF MISSOURI STATE TREASURER DIVISION OF UNCLAIMED PROPERTY ATTN: SCOTT HARPER, DIRECTOR - UNCLAIMED PROPERTY 301 WEST HIGH STREET; ROOM 157 JEFFERSON CITY, MO 65101 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |
| 3.497 OFFICE OF STATE TREASURER UNCLAIMED PROPERTY DIVISION ATTN: JOHN YOUNGER, DIRECTOR OF UNCLAIMED PROPERTY 501 NORTH WEST STREET; SUITE 1101A JACKSON, MS 39201 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |
| 3.498 OFFICE OF THE LIEUTENANT GOVERNOR DIVISION OF BANKING & INSURANCE ATTN: SIMON MOHAMMED, EXAMINER CHARLOTTE AMALIE; NO. 5049 KONGENS GADE ST THOMAS, VI 00802 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |
| 3.499 OHIO DEPARTMENT OF COMMERCE DIVISION OF UNCLAIMED PROPERTY ATTN: BECKY YORK, REPORTING SUPERVISOR 77 SOUTH HIGH STREET; 20TH FLOOR COLUMBUS, OH 43215-6108 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |
| 3.500 OKLAHOMA STATE TREASURER UNCLAIMED PROPERTY DIVISION ATTN: KATHY JANES, ADMINISTRATOR 2300 N LINCOLN BLVD; ROOM 217 OKLAHOMA CITY, OK 73105 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |

**1485**

**Reverse Mortgage Solutions, Inc.**                                    **Case Number:**    **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:**    List All Creditors with NONPRIORITY Unsecured Claims

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Escheated Checks** | | | | | | | |
| **3.501** OREGON DEPARTMENT OF STATE LANDS UNCLAIMED PROPERTY ATTN: CAROLYN HARRIS, REPORTS COODINATOR 775 SUMMER STREET NE; STE 100 SALEM, OR 97301 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |
| **3.502** PR COMMISSIONER OF FINANCIAL INST. UNCLAIMED PROPERTY DIVISION ATTN: SALVA DORIS VALENTIN, UNCLAIMED PROPERTY SUPERVISOR 1492 PONCE DE LEON AVE; CENTRO EUROPA BUILDING, SUITE 6 SAN JUAN, PR 00907 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |
| **3.503** RHODE ISLAND OFFICE OF GENERAL TREASURER UNCLAIMED PROPERTY DIVISION ATTN: DAVID SALVATORE, MANAGER 50 SERVICE AVENUE WARWICK, RI 02886 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |
| **3.504** SOUTH CAROLINA STATE TREASURER'S OFFICE UNCLAIMED PROPERTY PROGRAM ATTN: LINDA GAMBLE, ASSISTANT STATE TREASURER WADE HAMPTON BUILDING ; 1200 SENATE STREET, ROOM 224 COLUMBIA, SC 29201 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |
| **3.505** SOUTH DAKOTA STATE TREASURER'S OFFICE UNCLAIMED PROPERTY DIVISION ATTN: LEE DEJABET, ADMINISTRATOR 500 E CAPITOL AVE; SUITE 212 PIERRE, SD 57501 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |
| **3.506** STATE CONTROLLER'S OFFICE UNCLAIMED PROPERTY DIVISION ATTN: BETTY T YEE, CONTROLLER 10600 WHITE ROCK ROAD; SUITE 141 RANCHO CORDOVA, CA 95670 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |

**1486**

Reverse Mortgage Solutions, Inc.                                              Case Number:        19-10422

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
| --- | --- |

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
| --- | --- | --- | --- | --- | --- | --- | --- |
| **Escheated Checks** | | | | | | | |
| **3.507** STATE OF HAWAII UNCLAIMED PROPERTY PROGRAM ATTN: SANDRA KAM, SUPERVISOR NO. 1 CAPITOL DISTRICT BUILDING; 250 SOUTH HOTEL STREET - ROOM 304 HONOLULU, HI 96813 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |
| **3.508** STATE TREASURER'S OFFICE UNCLAIMED PROPERTY PROGRAM ATTN: COZETTE WALTERS, ADMINISTRATOR 304 N 8TH STREET; SUITE 208 BOISE, ID 83702-5834 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |
| **3.509** TENNESSEE TREASURY DEPARTMENT UNCLAIMED PROPERTY DIVISION ATTN: JOHN GABRIEL, DIRECTOR 502 DEADERICK STREET NASHVILLE, TN 37243-0203 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |
| **3.510** TEXAS COMPTROLLER OF PUBLIC ACCOUNTS UNCLAIMED PROPERTY DIVISION ATTN: LARRY SCHILHABEL, HOLDER REPORTING SUPERVISOR 111 EAST 17TH STREET AUSTIN, TX 78774 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |
| **3.511** TREASURER OF GUAM UNCLAIMED PROPERTY DEPARTMENT ATTN: ROSITA T FEJERAN, TREASURER 590 SOUTH MARINE CORP DRIVE; SUITE 224 (TOG) TAMUNING, GU 96913 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |
| **3.512** TREASURER OF STATE UNCLAIMED PROPERTY DIVISION ATTN: KATHRYN FEHRING, COMPLAINCE OFFICER 800 WALNUT STREET; MAC N8200-071 DES MOINES, IA 50309 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |

Reverse Mortgage Solutions, Inc.                                    Case Number:        19-10422

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:**    **List All Creditors with NONPRIORITY Unsecured Claims**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Escheated Checks** | | | | | | | |
| 3.513  TREASURER, STATE OF CONNECTICUT UNCLAIMED PROPERTY DIVISION ATTN: MARIA GREENSLADE, ASSISTANT DEPUTY TREASURER PO BOX 150435 HARTFORD, CT 06115-0435 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |
| 3.514  UTAH STATE TREASURER UNCLAIMED PROPERTY DIVISION ATTN: DENNIS JOHNSTON, ADMINISTRATOR 350 NORTH STATE STREET; SUITE 180 SALT LAKE CITY, UT 84114 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |
| 3.515  VERMONT STATE TREASURER UNCLAIMED PROPERTY DIVISION ATTN: ALBERT LAPERLE 109 STATE STREET; 4TH FLOOR MONTPELIER, VT 05609-6200 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |
| 3.516  VIRGINIA DEPARTMENT OF THE TREASURY DIVISION OF UNCLAIMED PROPERTY ATTN: VICKI BRIDGEMAN, DIRECTOR PO BOX 2478 RICHMOND, VA 23218-2478 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |
| 3.517  WASHINGTON DEPARTMENT OF REVENUE UNCLAIMED PROPERTY SECTION ATTN: ERIN LOPEZ, UP OPERATIONS MANAGER PO BOX 24053 SEATTLE, WA 98124-1053 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |
| 3.518  WEST VIRGINIA STATE TREASURER'S OFFICE UNCLAIMED PROPERTY DIVISION ATTN: CAROLYN ATKISON, DEPUTY TREASURER 322 70TH ST SE CHARLESTON, WV 25304 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |
| 3.519  WISCONSIN DEPT OF REVENUE UNCLAIMED PROPERTY UNIT ATTN: MARY CALENTANI, ADMINISTRATOR 2135 RIMROCK ROAD MADISON, WI 53708 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☐ | ☑ | ☐ | Escheatment Funds | ☐ | UNDETERMINED |

**1488**

**Reverse Mortgage Solutions, Inc.**                                         Case Number:        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| **Part 2:** | **List All Creditors with NONPRIORITY Unsecured Claims** |
|---|---|

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C U D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|

### Escheated Checks

| 3.520 | WYOMING STATE TREASURER UNCLAIMED PROPERTY DIVISION ATTN: LACHELLE BRANT, DIRECTOR 2020 CAREY AVENUE; 3RD FLOOR CHEYENNE, WY 82002 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☐ ☑ ☐ | Escheatment Funds | ☐ | UNDETERMINED |

Escheated Checks Total:    **0**

**1489**

Reverse Mortgage Solutions, Inc.                                    Case Number:        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| **Part 2:** | **List All Creditors with NONPRIORITY Unsecured Claims** |
| --- | --- |

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
| --- | --- | --- | --- | --- | --- | --- | --- |

### Litigation

| | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 3.521 | 13220 CLR, LLC<br>ATTN: Y TIMOTHY CHAI<br>1375 EAST 9TH STREET, SUITE 2250<br>CLEVELAND, OH 44114 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| 3.522 | A.E. BROWN PROPERTY MAINTENANCE, LLC<br>SABIN R. MAXWELL<br>BOUCHARD, KLEINMAN & WRIGHT, P.A.,<br>799 MAMMOTH ROAD<br>MANCHESTER, NH 03104 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| 3.523 | AARON NULPH/DOVER GLEN DEVELOPMENT<br>34 1ST ST<br>ELLWOOD CITY, PA 16117 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.524 | ADAM PANKEN<br>21 LAUREL STREET<br>SOMERVILLE, MA 02143 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.525 | AINE KIRCHNER<br>2629 NEWMAN STREET<br>HOUSTON, TX 77098 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.526 | ALAN RANDS<br>1749 EAST 330TH SOUTH<br>ST. GEORGE, UT 84790 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.527 | ALEJANDRO CASTILLO<br>333 SW 184TH WAY<br>PEMBROKE PINES, FL 33029 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.528 | ALEJANDRO VENGARA (VERGARA)<br>33819 FALCON SPRING ST<br>HOCKLEY, TX 77447 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.529 | ALEXANDER MAESTRE<br>94 MULBERRY LANE<br>MILTON, NY 12547 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.530 | ALEXANDRE TCHOGORIAN<br>3819 NE 170 ST UNIT B-1<br>NORTH MIAMI BEACH, FL 33160 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |

**1490**

Reverse Mortgage Solutions, Inc.                                                      Case Number:          19-10422

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
|---|---|

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Litigation** | | | | | | | |
| 3.531 ALFREDO GONZALES 18439 RANCHERO RD HESPERIA, CA 92345 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| 3.532 ALMIRA BIGGS 3501 ACAPULCO DR MIRAMAR, FL 33023 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| 3.533 ALPHONSA LIVINGSTON 4030 ORCHARD HILL TER STONE MOUNTAIN, GA 30083 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| 3.534 ALTON TRAWICK PO BOX 7172 PMB 297 STATELINE, NV 89449 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| 3.535 ALVIN BUSH DAVID H. ABRAMS, ESQ. ATTORNEY FOR THE PLAINTIFF FLA. BAR NO.: 0692484 P.O. BOX 3298 TALLAHASSEE, FL 32315 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Litigation | ☐ | UNDETERMINED |
| 3.536 ALVIN JENKINS 815 E 118TH TER KANSAS CITY, MO 64131 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| 3.537 AMALIA COSTA, ET AL. MILDRED J. MICHALCZYK, ESQ. 16 WALNUT AVENUE EAST E. FARMINGDALE, NY 11735-3840 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Litigation | ☐ | UNDETERMINED |
| 3.538 AMANDA WERNER 3 LOGWOOD ST SOUTH BURLINGTON, VT 05403 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| 3.539 AMERICAN ADVISORS GROUP STEWART A SCHNEIDER HEIN SCHNEIDER & BOND, P.C. 147 N MERAMEC AVENUE ST LOUIS, MO 63105 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Litigation | ☐ | UNDETERMINED |
| 3.540 AMERICAN PORTFOLIO MORTGAGE COMPANY; CHICAGO TITLE INSURANCE COMPANY NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Litigation | ☐ | UNDETERMINED |

**1491**

**Reverse Mortgage Solutions, Inc.**　　　　　　　　　　　　　**Case Number:**　　**19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
|---|---|

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|

### Litigation

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 3.541 | AMY MADERE<br>1699 SW NISKEY COVE RD<br>ATLANTA, GA 30331 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.542 | AMY TUSSING<br>2566 W BECKER RD<br>GOWANDA, NY 14070 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.543 | ANA RUBIM (DOSSANTOS)<br>1435 PARKWOOD ST<br>CLEARWATER, FL 33755 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.544 | ANDREA TOMMASINI<br>11799 HARBOUR LIGHT DR<br>NORTH ROYALTON, OH 44133 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.545 | ANDREW KASSMAN<br>6501 NORTH PLACITA ALTA REPOSA<br>TUCSON, AZ 85750 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.546 | ANDREW SICONOLFI<br>43 BURGHER AVENUE<br>STATEN ISLAND, NY 10304 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.547 | ANDREW SICONOLFI<br>43 BURGHER AVENUE<br>STATEN ISLAND, NY 10304 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.548 | ANDRZEJ HASIEC<br>54527 HIBISCUS DR<br>MACOMB, MI 48042 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.549 | ANESE MCKNIGHT, ET AL.<br>CARY R. ROSENTHAL, 14297 ROSENTHAL & ASSOCIATES P.C. SPEC. REP. 55 W. WACKER, STE 900<br>CHICAGO, IL 60601 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| 3.550 | ANGELA SNELLING<br>200 GRANDVIEW DR<br>LOUISBURG, NC 27549 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.551 | ANGELINA RAEL, ET AL.<br>PATRICK R. BRITO, ESQ.<br>1850 OLD PECOS TRAIL, SUITE G<br>SANTA FE, NM 87505 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |

**1492**

Reverse Mortgage Solutions, Inc.                                    Case Number:        19-10422

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:**     **List All Creditors with NONPRIORITY Unsecured Claims**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Litigation** | | | | | | | |
| **3.552** ANN MARIE WALKER PO BOX 6031040 DANN LAW FIRM CO CLEVELAND, OH 44103 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.553** ANNETHA L. YOUNG ATTN: JOHN G. HELSTOWSKI J. GANNON HELSTOWSKI LAW FIRM 13601 PRESTON ROAD, SUITE E920 DALLAS, TX 75240 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.554** ANNIE REED 22 ALMA ROAD JASPER, AL 35501 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.555** ANTHONY TURNER 2715 N BEACON HILL CT WICHITA, KS 67220 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.556** ANTOLIN BUSTILLOS 7126 WOODFERN DR HOUSTON, TX 77040 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.557** ASHLEY EUBANKS 54 BACKSTROM ROAD RICHTON, MS 39476 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.558** AUDREY STYLES 145 LITTLE ACRES MARION, NC 28752 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.559** AUNDREA HATHAWAY 240 ALAN CIR SALISBURY, NC 28147 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.560** BADARA NDIAYE 6310 S ROSEBURY AVE #1 ST LOUIS, MO 63105 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.561** BALINDA JACOBS 1521 MANDEVILLE STREET CHARLENE PATTERSON NEW ORLEANS, LA 70117 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.562** BALLESTEROS, MARIA NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |

**1493**

**Reverse Mortgage Solutions, Inc.**  **Case Number:**  **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:**   **List All Creditors with NONPRIORITY Unsecured Claims**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|

### Litigation

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **3.563** BANK OF AMERICA, N.A JEFFREY M LIGGIO LIGGIO BENRUBI, P.A. THE BARRISTERS BLDG STE 3B 1615 FORUM PL WEST PALM BEACH, FL 33401 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.564** BELINDA FIELDS 4307 DARIO ROAD UPPER MARLBORO, MD 20772 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.565** BENNIE L MERSIER, ET AL. BRUCE H LEVITT LEVITT & SLAFKES, P.C. 515 VALLEY STREET, SUITE 140 MAPLEWOOD, NJ 7040 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.566** BESSIE FOWLER/ METROPOLITAN DEVELOPERS 67 S MEADOWCLIFF DR LITTLE ROCK, AR 72209 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.567** BETH WILLIAMS 30628 DETROIT RD 231 HERMAN LAW WESTLAKE, OH 44145 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.568** BETRICIA YARBOI 9 VAUGHN WAY BURLINGTON, NJ 08016 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.569** BETTIE FORDHAM-WILLIAMS 705 PARROTT AVENUE KINSTON, NC 28501 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.570** BETTY ATWOOD ZACHARY T. BARRON PO BOX 369 CLAREMORE, OK 74018 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.571** BILLY MANN 3295 DEVILLA TRACE ATLANTA, GA 30349-4058 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.572** BOBBY BELL 1236 HWY 15 N LONOKE, AR 72086 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |

**1494**

Reverse Mortgage Solutions, Inc.                                    Case Number:        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
| --- | --- |

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
| --- | --- | --- | --- | --- | --- | --- | --- |

### Litigation

| | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 3.573 | BOBBY HARRIS<br>4440 GREENMOUNT BOND RD<br>LONDON, KY 40741 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.574 | BONITA STREETER<br>28838 HWY 17 N<br>LEXINGTON, MS 39095 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.575 | BONNIE HAWTHORNE THOMPSON<br>350 EAGLE RIDGE ROAD<br>MACON, GA 31216 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.576 | BONNIE J. TILLMAN, AN INDIVIDUAL, DARLA J. TILLMAN-SAMUELSON<br>ATTN: BRITTA E. WARREN<br>BLACK HELTERLINE LLP<br>806 SW BROADWAY; STE. 1900<br>PORTLAND, OR 97205 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| 3.577 | BONNIE J. TILLMAN, ET AL.<br>BRITTA E. WARREN<br>BLACK HELTERLINE LLP<br>806 SW BROADWAY STE. 1900<br>PORTLAND, OR 97205 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| 3.578 | BONNIE SMITH/RHONDA WHITE<br>132 OXBOW WAY<br>DALTON, GA 30721 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.579 | BRADLEY ERROL<br>183 REYNOIR ST<br>BILOXI, MS 39530 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.580 | BRANDON OESTERN<br>2290 HILLVIEW DR<br>MARION, IA 52302 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.581 | BRIAN GIBBONS<br>917 MAIN STREET<br>DALTON, MA 01226 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.582 | BRIAN JONES<br>5 SPEARHEAD TRL<br>SHAMONG, NJ 08088 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |

Reverse Mortgage Solutions, Inc.                                    Case Number:        19-10422

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:**      **List All Creditors with NONPRIORITY Unsecured Claims**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Litigation** | | | | | | | |
| **3.583** BRIAN MILLER/ANNA MILLER<br>90 IRONWORKS HILL RD<br>BROOKFIELD, CT 06804 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.584** BRUCE ADAMS<br>1140 SINGINGWOOD CT APT 1<br>WALNUT CREEK, CA 94595 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.585** CARL BARATTA<br>P.O. BOX 123<br>MANASQUAN, NJ 08736 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.586** CARLA LAZELLE<br>236 EAST KENTUCKY STREET<br>FAIRFIELD, CA 94533 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.587** CARLA LAZELLE<br>236 EAST KENTUCKY STREET<br>FAIRFIELD, CA 94533 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.588** CARLA YVETTE BROWN, ET AL.<br>ROBERT E. RAY<br>REHMAN A. BHALESHA<br>1177 WEST LOOP SOUTH, STE 1180<br>HOUSTON, TX 77027 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.589** CARLOS JUAREZ<br>4718 WEST BELLE PLAINE AVENUE<br>CHICAGO, IL 60641 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.590** CARLOS SALGUERO<br>4750 W 105TH DR<br>WESTMINSTER, CO 80031 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.591** CARLTON KELLEY<br>1847 PETITE LANE<br>LITHONIA, GA 30058 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.592** CAROL CROCKER<br>305 NE 59TH ST<br>OAK ISLAND, NC 28465 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.593** CAROL DELONEY<br>1049 86TH AVE W<br>DULUTH, MN 55808 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |

**1496**

Reverse Mortgage Solutions, Inc.                                        Case Number:          19-10422

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:     List All Creditors with NONPRIORITY Unsecured Claims**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Litigation** | | | | | | | |
| **3.594** CAROL M WARNER<br>NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.595** CAROLYN GREENSTEIN, ET AL.<br>ELIYAHU KAPLOUN , ESQ.<br>KAPLOUN LAW, P.C.<br>445 E. 80TH ST., SUITE 12D<br>NEW YORK, NY 10075 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.596** CAROLYN HUNTER<br>MOUNTAIN STATE JUSTICE 325<br>WILLEY ST<br>MORGANTOWN, WV 26505 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.597** CAROLYN MASON<br>NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.598** CARRIE FELLOWS<br>182 BALD HILL RD A-5<br>NEW GLOUCESTER, ME 04260 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.599** CATHERINE CARNLEY<br>557 BROWN RD<br>MC DAVID, FL 32568 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.600** CECIL NYEIN<br>22924 HARTLAND ST<br>WEST HILLS, CA 91307 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.601** CELIA A HOPKEN<br>ATTN: THE PETTIT LAW FIRM<br>JULIE PETTIT; JANE CHERRY;<br>DAVID B. URTEAGA<br>3710 RAWLINS, SUITE 1050<br>DALLAS, TX 75219 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.602** CHAD TRIMMER<br>207 EAST UNION SREET<br>WHITEHALL, PA 18052 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.603** CHARLENE CRAIG<br>PO BOX 505<br>CHAPTICO, MD 20621 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |

**1497**

**Reverse Mortgage Solutions, Inc.**                                    **Case Number:**      **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:**      **List All Creditors with NONPRIORITY Unsecured Claims**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Litigation** | | | | | | | |
| **3.604** CHARLES J. PATERNOSTRO CHARLES J. PATERNOSTRO, ATTORNEY AT LAW STATE BAR #15569000, 1485 ELM RIDGE RD. ATTORNEY PRO-SE DENISON, TX 75020 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.605** CHARLES JASMER 30601 PINE ST LEBANON, OR 97355 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.606** CHARLES TAYLOR 21 SUNRISE AVENUE LEXINGTON, NC 27292 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.607** CHARLES WEATHERS, ET AL. GABRIEL BORGES CHICAGO VOLUNTEER LEGAL SERVICES 33 N. DEARBORN ST., SUITE 400 CHICAGO, IL 60602 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.608** CHERYL STOUT 165 MONTANA DR ST CHARLES, MO 63304 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.609** CHICAGO TITLE COMPANY LLC 10 S LASALLE STREET SUITE 3100 CHICAGO, IL 60603 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.610** CHRISSY SNOW 400 CAMBRIAN RIDGE TRAIL PELHAM, AL 35124 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.611** CHRISTINA VANCE 500 E LEXINGTON ST MARYLAND LEGAL AID BALTIMORE, MD 21202 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.612** CHRISTINA VANCE (SEIBERT)/WILLIAM STEINWEDEL 500 E LEXINGTON ST MARYLAND LEGAL AID BALTIMORE, MD 21202 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.613** CHRISTINE BRIGGS 129 E FORTUNA AVE ATWATER, CA 95301 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |

**1498**

Reverse Mortgage Solutions, Inc.                                    Case Number:        19-10422

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
|---------|------------------------------------------------------|

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|

**Litigation**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **3.614** | CHRISTOPHER BOSCO<br>15 LEROY STREET<br>PLEASANTVILLE, NY 10570 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.615** | CHRISTOPHER GINDORFF<br>8753 DEER PATH<br>EDEN PRAIRIE, MN 55344 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.616** | CINDY DAVIS<br>8218 GOODMAN STREE<br>OVERLAND PARK, KS 66204 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.617** | CLAUDIA BROWN<br>23 9TH AVENUE<br>HUNTINGTON STATION, NY 11746 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.618** | COLIN BLEASDELL, ET AL.<br>WILLIAM J. RUSSO, WJ RUSSO &<br>ASSOCS., PC<br>ATTYS FOR DEF. KAREN<br>BLEASDELL ET AL.<br>600 THIRD AVENUE, 15TH FLOOR<br>NEW YORK, NY 10016 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.619** | COLIN JOHNSTON<br>200 EMERSON ST<br>HOUSTON, TX 77006 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.620** | COLORADO INVESTMENT TRUST<br>LLC<br>MICHAEL E. LINDSAY<br>SNELL & WILMER LLP<br>1200 17TH STREET, SUITE 1900<br>DENVER, CO 80202 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.621** | COLORADO INVESTMENT TRUST<br>LLC<br>ATTN: MICHAEL E. LINDSAY<br>SNELL & WILMER LLP<br>1200 17TH STREET, SUITE 1900<br>DENVER, CO | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.622** | COMPLETE PROP RSTRTN AND<br>WINTERIZING LLC<br>DAVID G. OMER<br>FELTON BANKS, PLLC<br>7406 CHAPEL HILL ROAD, SUITE<br>H<br>RALEIGH, NC 27607 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |

**1499**

**Reverse Mortgage Solutions, Inc.**                                                  **Case Number:**        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:**     **List All Creditors with NONPRIORITY Unsecured Claims**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Litigation** | | | | | | | |
| **3.623** CONSTANCE M. POWER;, ET AL. SHANNON C. MCKINLEY, ESQ. CHRISTOPHER THOMPSON, ESQ. 33 DAVISON LANE EAST WEST ISLIP, NY 11795 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.624** CORA JACKSON 5005 GEORGI LN  183 HOUSTON, TX 77092 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.625** COREY MCCORMICK 2500 LODGE POLE SHOW LOW, AZ 85901 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.626** CORITZA ORTEZ 180 MASTIC BOULEVARD MASTIC, NY 11950 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.627** CRYSTAL ROBERTS 4839 E CORONADO RD PHOENIX, AZ 85008 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.628** CYNTHIA ERICKSON NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.629** CYNTHIA THOMPSON, ET AL. ELIZABETH LEMOINE MAKLER, LEMOINE & GOLDBERG, PC 515 NW SALTZMAN ROAD, STE 811 PORTLAND, OR 97229 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.630** CYNTHIA UNDERWOOD/ PARKWOOD ESTATES RR 1 BOX 170 B MILLERVILLE, MO 63766 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.631** DALE JONES PO BOX 6031040 DANN LAW CLEVELAND, OH 44103 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.632** DALERIE TURNER 8199 WYNFIELD DRIVE JONESBORO, GA 30238 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |

**1500**

Reverse Mortgage Solutions, Inc.                                    Case Number:        19-10422

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
|---|---|

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|

**Litigation**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **3.633** DALLAS CARSON<br>6564 SHADY SIDE ROAD<br>SHADY SIDE, MD 20764 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.634** DANA SHAHRAKI<br>5102 WINDSHIRE<br>MISSOURI CITY, TX 77459 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.635** DANIEL MARTINEZ/NATASHA MARTINEZ<br>1443 SE 26TH AVE<br>HOMESTEAD, FL 33035 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.636** DANIEL SADLER<br>4221 N COLORADO AVE<br>KANSAS CITY, MO 64117 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.637** DANNY DUPREE<br>PO BOX 801024<br>ACWORTH, GA 30101 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.638** DANNY WILLIAMS, ET AL.<br>VERNON C. GOINS II<br>GOINS & ASSOCIATES<br>1970 BROADWAY, SUITE 260<br>OAKLAND, CA 94612 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.639** DARRYL MACDONNEL<br>739 N KRISTEN<br>MESA, AZ 85213 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.640** DAVID FAR<br>7950 CAPISTRANO AVE<br>LOS ANGELES, CA 91304 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.641** DAVID JOSEPH MORALES<br>4013 TULAROSA AVE.<br>EL PASO, TX 79903 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.642** DAVID MALTBY<br>200 BAYWOOD BLVD<br>BRICK, NJ 08723 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.643** DAVID MALTBY<br>200 BAYWOOD BLVD<br>BRICK, NJ 08723 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |

**1501**

Reverse Mortgage Solutions, Inc.                                              Case Number:        19-10422

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:**   List All Creditors with NONPRIORITY Unsecured Claims

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Litigation** | | | | | | | |
| 3.644  DAVID MATTILA (DEBRA) 539 K ST WASHOUGAL, WA 98671 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.645  DAVID MUENZ 6137 VICTORY DR AVE MARIA, FL 34142 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.646  DAVID ROLLO 240 CARLYLE PARK DRIVE NE ATLANTA , GA 30307 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.647  DAVID STEFKO 5695 KY HIGHWAY 49 LIBERTY, KY 42539 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.648  DAVID YATES PO BOX 740 MADISON COUNTY CORRECTIONAL LONDON, OH 43140 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.649  DAWN DEGEORGE 68 PRINCESS ST STATEN ISLAND, NY 10303 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.650  DAWN MATERA 337 S STAR AVE PANAMA CITY, FL 32404 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.651  DEAN HEDGLEN 2415 AURELIUS RD APT 38 HOLT, MI 48842 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.652  DEBORAH SHINGLETON 1906 COLUMBIANA LISBON ROAD COLUMBIANA, OH 44408 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.653  DENISA DOUTHIT 6563 STONEGATE DR GUILFORD, IN 47022 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.654  DENNIS GOODSON (CARL DAVIS) 2520 BRENTWOOD PL. CHARLOTTE, NC 28208 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |

**1502**

**Reverse Mortgage Solutions, Inc.**                                      **Case Number:**        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
|---|---|

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|

**Litigation**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **3.655** DENNIS TAN<br>319 NIAGARA AVE<br>SAN FRANCISCO, CA 94112 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.656** DENNIS WATSON<br>4 ARROW PL<br>RANDOLPH, NJ 07869 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.657** DIANE E. CORMIER<br>ATTN: JOSEPH D. MACOM<br>LAW OFFICES OF JOSEPH D.<br>MACOM<br>8000 IH-10 WEST, SUITE 600;<br>FORUM BUILDING<br>SAN ANTONIO, TX 78230 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.658** DIANE GIBSON, ET AL.<br>TIMOTHY M. DOLAN, ATTORNEY<br>AT LAW<br>P. O. BOX 455<br>GARIBALDI, OR 97118 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.659** DIANE WILLIS-TURNER<br>16115 JAST DRIVE<br>CYPRESS, TX 77429 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.660** DIANNA M. STROH, ET AL.<br>BRIAN T. AHRENDT<br>SWORD & AHRENDT LAW<br>OFFICE, P.C.<br>PO BOX 283<br>HOT SPRINGS, SD 57747 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.661** DOLORES CAMPOS<br>6304 MORELLA AVE<br>NORTH HOLLYWOOD, CA 91606 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.662** DOLORES CUDAK<br>46 REDWOOD DR<br>HIGHLAND MILLS, NY 10930 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.663** DOLORES CUDAK<br>46 REDWOOD DR<br>HIGHLAND MILLS, NY 10930 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.664** DOMINIC FORMISANO<br>315 SOUTH DUNTON AVENUE<br>EAST PATCHOGUE, NY 11772 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |

**1503**

**Reverse Mortgage Solutions, Inc.**                              **Case Number:**        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:** **List All Creditors with NONPRIORITY Unsecured Claims**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Litigation** | | | | | | | |
| **3.665** DON BOTKIN<br>NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ✔ | Complaint | ☐ | UNDETERMINED |
| **3.666** DONALD JONES<br>NOT AVAILABLE | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ✔ | Litigation | ☐ | UNDETERMINED |
| **3.667** DONALD LASCOLA<br>41 N UMBERLAND DR<br>TOMS RIVER, NJ 08757 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ✔ | Complaint | ☐ | UNDETERMINED |
| **3.668** DONALD MASCARDO<br>2335 FLATBOAD STREET<br>STOCKTON, CA 95206 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ✔ | Complaint | ☐ | UNDETERMINED |
| **3.669** DONALD OATTS<br>8079 BOWLINE DRIVE<br>INDIANAPOLIS, IN 46236 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ✔ | Complaint | ☐ | UNDETERMINED |
| **3.670** DONNA SCHANKS<br>16438 EDGEWOOD DR<br>PLAINFIELD, IL 60586 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ✔ | Complaint | ☐ | UNDETERMINED |
| **3.671** DONNA SMITH<br>JANE DOWNEY MOORE TAYLOR<br>PO BOX 5709<br>WEST COLUMBIA, SC 29171 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ✔ | Complaint | ☐ | UNDETERMINED |
| **3.672** DORIS HUTTULA<br>3325 BARRINGTON DR<br>WEST LINN, OR 97068 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ✔ | Complaint | ☐ | UNDETERMINED |
| **3.673** DOROTEA SALDANA<br>21 THORNHILL OAKS DRIVE<br>HOUSTON, TX 77015 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ✔ | Complaint | ☐ | UNDETERMINED |
| **3.674** DOROTHY WILSON<br>370 CR 7719<br>DEVINE, TX 78016 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ✔ | Complaint | ☐ | UNDETERMINED |
| **3.675** DOYLE BEARD<br>7949 APPOMATTOX LANE<br>BOISE, ID 83714-6007 | UNKNOWN<br>ACCOUNT NO.: NOT AVAILABLE | ✔ | ✔ | ✔ | Complaint | ☐ | UNDETERMINED |

**1504**

**Reverse Mortgage Solutions, Inc.**                                    Case Number:    **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
|---|---|

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Litigation** | | | | | | | |
| **3.676** DUBON, ESLY<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.677** EARLEAN DANZY; ET AL.<br>ATTN: DANIEL P. LINDSEY, ESQ.<br>120 SOUTH LASALLE STREET,<br>SUITE 900<br>CHICAGO, IL 60603 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.678** EBER ZACETA<br>6200 SAVOY SUITE 1150 THE<br>LANE LAW FIRM<br>HOUSTON, TX 77036 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.679** EDWINA JENKINS<br>KATHRYN LISS<br>LAF<br>120 SOUTH LASALLE STREET,<br>SUITE 900<br>CHICAGO, IL 60603 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.680** ELI EISENBACH<br>603 TWIN OAKS DRIVE<br>LAKEWOOD , NJ 08701 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.681** ELIE NASSAR<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.682** ELIXE TABERTUS<br>22306 135TH AVE<br>LAURELTON, NY 11413 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.683** ELIZABETH DILEO<br>PO BOX 1012<br>OCEAN GATE, NJ 08740 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.684** ELIZABETH DILEO<br>PO BOX 1012<br>OCEAN GATE, NJ 08740 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.685** ELIZABETH DILEO<br>PO BOX 1012<br>OCEAN GATE, NJ 08740 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |

**1505**

**Reverse Mortgage Solutions, Inc.**                                    **Case Number:**        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
|---|---|

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Litigation** | | | | | | | |
| 3.686 ELIZABETH HERRERA 1103 SOUTH DOGWOOD TERRACE INVERNESS, FL 34450 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.687 ELIZABETH ZANOSKAR 151 STATE ROUTE 303 STREETSBORO, OH 44241 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.688 ELOUISE HAWKINS ARKANSAS FAIR HOUSING COMMISSION 101 E. CAPITOL AVE. SUITE 212 HESTER CRISWELL, JD, CHIEF INVESTIGATOR LITTLE ROCK, AR 72201 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| 3.689 EMMA CARAWAY P.O. BOX 304 THOMASVILLE, NC 27360 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.690 EQUEEL BHATTI 731 WESTERN AVE ALBANY, NY 12203 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.691 ERIC BIGELOW/ALISHA BIGELOW 3777 OAK ST BARNUM, MN 55707 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.692 ERIC RICHTER 10898 N 106TH LN LARGO, FL 33773 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.693 ERIC STEINHAUER, ET AL. ERIC STEINHAUER LAW OFFICE OF ERIC STEINHAUER 1919 ADDISON STREET, SUITE 105 BERKELEY, CA 94794 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| 3.694 ERICA JOHNSON 320 COUNTRY MDWS NICHOLLS, GA 31554 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.695 ERICKA BOIVIN 950 N BLUE JAY LN FAYETTEVILLE, AR 72704 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |

**1506**

Reverse Mortgage Solutions, Inc.                                    Case Number:        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
| --- | --- |

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
| --- | --- | --- | --- | --- | --- | --- | --- |
| **Litigation** | | | | | | | |
| **3.696**  ERIICA MALLARD<br>151 STEWART STREET<br>ANNISTON, AL 36206 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.697**  ESTATE OF DONALD KEITH THUM, DECEASED<br>NICHOLAS KRITIKOS<br>HOFFMAN & FORDE<br>3033 FIFTH AVENUE. SUITE 225<br>SAN DIEGO, CA 92103 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.698**  ESTATE OF KENNETH SPERLING, ET AL.<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.699**  ESTATE OF PEDRO RAMIREZ GARCIA, ET AL.<br>JONATHAN S MILDER<br>THE LAW OFFICE OF JONATHAN S MILDER<br>301 EAST COOK STREET, SUITE A<br>SANTA MARIA, CA 93454 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.700**  ESTATE OF RONALD L TOBIAS<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.701**  ESTATE OF RUTH F. GRIFFIN, ET AL.<br>REBECCA L. BLACK, ESQUIRE<br>PA 309127 LUTZ & PAWK;<br>MORGAN CENT. BLDG<br>101 E DIAMOND ST STE 102<br>BUTLER, PA 16001 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.702**  ESTHER MARTINEZ<br>2771 SOUTH 2580 WEST<br>WEST VALLEY, UT 84119 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.703**  ESTRADA, ANGELA<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.704**  EUGENE HERRINGTON<br>1249 CALEDONIA ST<br>PORTAGE, WI 53901 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |

**1507**

**Reverse Mortgage Solutions, Inc.**                                    **Case Number:**        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| **Part 2:** | **List All Creditors with NONPRIORITY Unsecured Claims** |
| --- | --- |

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
| --- | --- | --- | --- | --- | --- | --- | --- |
| **Litigation** | | | | | | | |
| **3.705** EVANGELITA (LUIS) SOTO 8104 GRANADA BLVD ORLANDO, FL 32836 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.706** EVELYN LEWIS 228 KA-OLA DR JEFFERSON, NC 28640 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.707** FERDINAND T. MOORE, ANDREA LIU BOB GILL WITH SAUL EWING 1919 PENNSYLVANIA AVE., NW, SUITE 550 WASHINGTON, DC 20006-3434 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.708** FINANCE OF AMERICA REVERSE, ET AL. 8023 EAST 63RD PLACE SUITE 700 TULSA, OK 74133 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.709** FU LUO 13711 SLATE CREEK LANE HOUSTON, TX 77077 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.710** GAIL ELLAND/GERI HESS 2519 WOOD ST LA CROSS, WI 54603 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.711** GARY JARRELL BRANDON S. STEELE, ESQ. 3049 ROBERT C. BYRD DRIVE, STE 100 BECKLEY, WV 25801 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.712** GARY P. BROTHERS/ PNC 290 VICKEY LN BOAZ, AL 35956 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.713** GENA RICHARDS 7314 SOMMERS ROAD PHILADELPHIA, PA 19138 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.714** GENEVIEVE HAY 13646 CHAPMAN CORNERS ROAD RED CREEK, NY 13143 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |

**1508**

**Reverse Mortgage Solutions, Inc.**                                    **Case Number:**      **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
|---------|------------------------------------------------------|

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|

### Litigation

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 3.715 | GEORGE KANARIS<br>9 BYRSONMA COURT WEST<br>HOMOSASSA, FL 34446 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| 3.716 | GEORGE MARTIN<br>1491 HIGHWAY 50 SPACE 51<br>DELTA, CO 81416 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| 3.717 | GEORGE OHRBERG<br>1332 CATILINE PL<br>BATON ROUGE, LA 70816 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| 3.718 | GEORGIA UNDERWRITING<br>ASSOCIATION<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Litigation | ☐ | UNDETERMINED |
| 3.719 | GLORIA BROWN<br>COMMUNITY LEGAL SERVICES,<br>INC.<br>BY: KERRY E. SMITH, ESQUIRE<br>ATTORNEY ID NO. 94473 1424<br>CHESTNUT ST<br>PHILADELPHIA, PA 19102 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Litigation | ☐ | UNDETERMINED |
| 3.720 | GOLDEN OPPORTUNITY, LLC<br>PATRICIA GOLDEN, PRO SE<br>570 MILLER RD<br>SOUTH WINDSOR, CT 06074 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Litigation | ☐ | UNDETERMINED |
| 3.721 | GRACEVILLE BINGO, ET AL.<br>CHARLES M WYNN LAW<br>OFFICES, PA<br>CHARLES M WYNN<br>P. O. BOX 146<br>MARIANNA, FL 32447 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Litigation | ☐ | UNDETERMINED |
| 3.722 | GRANT BROWN<br>1335 YELLOW SPRINGS<br>FAIRFIELD<br>FAIRBORN, OH 45324 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| 3.723 | GREG FRISBEY<br>MO | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| 3.724 | GREG HOGAN<br>P.O. BOX 1795<br>KETCHUM, ID 83340 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |

**1509**

Reverse Mortgage Solutions, Inc.                                    Case Number:        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
| --- | --- |

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
| --- | --- | --- | --- | --- | --- | --- | --- |
| **Litigation** | | | | | | | |
| **3.725** GREGORY STILLER 715 CARACARA CT KISSIMMEE, FL 34759 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.726** GUADALUPE M PAREDES JUAN J GARCIA, JR. 260 W. CANTON RD. LAREDO, TX 78041 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.727** GWENDOLYN THOMAS 1218 JASON DR DENHAM SPRINGS, LA 70726 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.728** HAROLD BAILEY 109 DARBY ST CAMPOBELLO, SC 29322 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.729** HARRIET (DOROTHY) WILSON 221 LUBERTHA RD RIDGELAND, MS 39157 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.730** HARRIET (DOROTHY) WILSON 221 LUBERTHA RD RIDGELAND, MS 39157 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.731** HEATHER OESTERN 2290 HILLVIEW DR MARION, IA 52302 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.732** HEATHER PETTY 7828 LION ST RANCHO CUCAMONGA, CA 91730 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.733** HEBER & SILVIA ARRIAGA 3334 OLD PLANK RD PARK CITY, IL 60085 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.734** HECTOR QUINONES 2640 REUTER ST FRANKLIN PARK, IL 60131 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.735** HURLEY SMITH 2847 FORBES RD GASTONIA, NC 28506 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |

**1510**

Reverse Mortgage Solutions, Inc.                                    Case Number:        19-10422

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
|---|---|

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C U D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|
| **Litigation** | | | | | |
| 3.736 INGUS NARUNS (BORROWER) ARCHER, BYINGTON, GLENNON & LEVINE, LLP JOHN H BYINGTO, III, ESQ. 1 HUNTINGTON QUAD. STE 4C10 P.O BOX 9064 MELVILLE, NY 11747-9064 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☑ | Litigation | ☐ | UNDETERMINED |
| 3.737 IRENE CASTILLO 1603 TULIPAN AVE MISSION, TX 78572 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☑ | Complaint | ☐ | UNDETERMINED |
| 3.738 ISAAC STEPHEN 657 LOCHERN TER BEL AIR, MD 21015 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☑ | Complaint | ☐ | UNDETERMINED |
| 3.739 JACK JACKSON 24363 LOIS LN SOUTHFIELD, MI 48075 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☑ | Complaint | ☐ | UNDETERMINED |
| 3.740 JACK O'NEILL RAMEY, ET AL. JANE DEARWESTER [SB#27782] FERIKES & BLEYNAT, PLLC 48 PATTON AVE., SUITE 300 ASHEVILLE, NC 28801 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☑ | Litigation | ☐ | UNDETERMINED |
| 3.741 JACOB LEARN 11345 LEXI LN BEAUMONT, CA 92223 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☑ | Complaint | ☐ | UNDETERMINED |
| 3.742 JACQUELINE MCDERMOTT 430 PECK ROAD SPENCERPORT, NY 14559 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☑ | Complaint | ☐ | UNDETERMINED |
| 3.743 JADELYNN AKAU 1301 RED GABLE LN UNIT 102 LAS VEGAS, NV 89144 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☑ | Complaint | ☐ | UNDETERMINED |
| 3.744 JAIME QUIROS 40027 NOTTING HILL ROAD MURRIETA, CA 92563 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☑ | Complaint | ☐ | UNDETERMINED |
| 3.745 JAMES COGGIN 4280 FREEMAN AVE HAMILTON, OH 45015 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☑ | Complaint | ☐ | UNDETERMINED |
| 3.746 JAMES DODD 16352 W 81ST ST S SAPULPA, OK 74066 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☑ | Complaint | ☐ | UNDETERMINED |

Reverse Mortgage Solutions, Inc.                                  Case Number:        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| **Part 2:** | **List All Creditors with NONPRIORITY Unsecured Claims** |

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **_Litigation_** | | | | | | | |
| **3.747** JAMES FRANZ 4445 WEST AVENIDA DEL SOL GLENDALE, AZ 85310 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.748** JAMES JONES NOT AVAILABLE | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.749** JAMES KELLEY 1804 SCARLETT BLVD LYNN HAVEN, FL 32444 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.750** JAMES KORNEGAY 4854 W POTOMAC CHICAGO, IL 60651 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.751** JAMES M. JONES, AS SUCCESSOR IN INTEREST MOHAMMAD MAAZ JT LEGAL GROUP, APC 801 N. BRAND BLVD. STE. 1130 GLENDALE, CA 91203 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.752** JAMES O'NEAL 50 GREEN MEADOW DR WINTER HAVEN, FL 33884 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.753** JAMES RAMBERT, ET AL. NOT AVAILABLE | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.754** JAMES S PORTER NOT AVAILABLE | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.755** JAMES WHITMORE MICHAEL BERNDT 371 ROBINSON RD CHATSWORTH, GA 30705 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.756** JANE E. BYFIELD-HALL, ET AL. JOHN J O'NEIL, JR. FRANCIS O'NEIL LLC 255 MAIN STREET HARTFORD, CT 06106 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.757** JANELLE HUMPHREY 10948 VIA BANCO SAN DIEGO, CA 92126 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |

**1512**

Reverse Mortgage Solutions, Inc.                                    Case Number:        19-10422

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
|---------|------------------------------------------------------|

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C U D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|
| **Litigation** | | | | | |
| **3.758** JAY SHAPIRO<br>2904 MESILLA NE<br>ALBUQUERQUE, NM 87110 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☑ | Complaint | ☐ | UNDETERMINED |
| **3.759** JEFFREY LEDBETTER<br>2751 BUFORD HWY SUITE 600<br>BERRY AND ASSOCIATES<br>ATLANTA, GA 30324 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☑ | Complaint | ☐ | UNDETERMINED |
| **3.760** JENETTA POLK O'NEAL<br>4913 SOUTH WABASH AVENUE<br>CHICAGO, IL 60615 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☑ | Complaint | ☐ | UNDETERMINED |
| **3.761** JENNIFER CLOTHIER<br>24317 88TH ST<br>SALEM, WI 53168 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☑ | Complaint | ☐ | UNDETERMINED |
| **3.762** JENNIFER JORDAN<br>8621 MADISON DR<br>NORTH RICHLAND HILLS, TX 76182 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☑ | Complaint | ☐ | UNDETERMINED |
| **3.763** JENNIFER PARK<br>3217 S 4840 W<br>W VALLY CITY, UT 84120 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☑ | Complaint | ☐ | UNDETERMINED |
| **3.764** JENNIFER WATSON<br>8 HUDSON RD E<br>IRVINGTON, NY 10533 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☑ | Complaint | ☐ | UNDETERMINED |
| **3.765** JENNIFER WILFORD<br>3420 PICKNEY BLUFF<br>FORT MILL, SC 29715 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☑ | Complaint | ☐ | UNDETERMINED |
| **3.766** JERRY AXE<br>PO BOX 253<br>RED LION, PA 17356 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☑ | Complaint | ☐ | UNDETERMINED |
| **3.767** JERRY HOLZER<br>P.O. BOX 801<br>SPRINGTOWN, TX 76082 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☑ | Complaint | ☐ | UNDETERMINED |
| **3.768** JESSE BOWMAN<br>4821 HEREFORD FARM RD<br>EVANS, GA 30809 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☑ | Complaint | ☐ | UNDETERMINED |

**1513**

Reverse Mortgage Solutions, Inc.                                    Case Number:        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:**     **List All Creditors with NONPRIORITY Unsecured Claims**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Litigation** | | | | | | | |
| **3.769** JF CONSTRUCTION, INC. EDWARD W.HARDIG ANDERSON, AGOSTINO & KELLER, P.C. 131 S. TAYLOR ST. SOUTH BEND, IN 46601-1521 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Litigation | ☐ | UNDETERMINED |
| **3.770** JILL MCGOWAN (DEBORAH TURNER) 20 SANDY LN LOWELL, MA 01854 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| **3.771** JIMMY (GLORIA)HOLMES 84 PEAR DR SILER CITY, NC 27344 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| **3.772** JO ANN GALLO/SHARON MCCUDDEN 129 BRUNSWICK AVENUE BLOOMSBURY, NJ 08804 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| **3.773** JOANNE ABENS, ET AL. ERICK B DEOBLER WHITE MARSH ANDERSON MARTIN VICKERS DOEBLER & GOODE; 511 E ETNA RD. OTTAWA, IL 61350 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Litigation | ☐ | UNDETERMINED |
| **3.774** JOHN CASH SMITH GEORGE B. BARRON ATTORNEY AT LAW 108 7TH STREET ORANGE, TX 77630 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Litigation | ☐ | UNDETERMINED |
| **3.775** JOHN DEPETRIS 2180 WHITE OAK DR EAST STROUDSBURG, PA 18301 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| **3.776** JOHN DOYLE 6204 MONTEREY DR KLAMATH FALLS, OR 97603 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| **3.777** JOHN EBANKS P.O. BOX 3118 EAST HAMPTON, NY 11937-0396 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| **3.778** JOHN HUNTER 3541 FOXWOOD PL SANTA ROSA, CA 95405 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |

**1514**

Reverse Mortgage Solutions, Inc.                                           Case Number:        19-10422

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
| --- | --- |

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
| --- | --- | --- | --- | --- | --- | --- | --- |

### Litigation

| | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 3.779 | JOHN TRUAX<br>2732 BOUDWIN AVENUE<br>BOOTHWYN, PA 19061 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.780 | JOHN WATSON (VIVIAN HIGGINS)<br>3400 N SYLVIA VISTA LN<br>WILLCOX, AZ 85643 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.781 | JOHNNIE ROWE<br>CHARLESTON, MO 63834 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.782 | JOLENE AMES, ET AL.<br>STEPHEN S TALT, ESQUIRE<br>2596 MISSION, SUITE 310<br>SAN MARINO, CA 91108 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| 3.783 | JON DOGAR MARINESCO<br>5858 ROUTE 209<br>KERHONKSON, NY 12446 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.784 | JONAH ANDERSON<br>232 MARGUERITE AVE<br>SYRACUSE, NY 13207 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.785 | JONATHAN KRATZ<br>574 YODER RD<br>HARLEYSVILLE, PA 19438 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.786 | JONATHAN OLSON<br>3 HEATHER LANE<br>NORTH GRANBY, CT 06060 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.787 | JORGE GALAZ/CYNTHIA GALAZ<br>1387 E COPPER VISTA DR<br>TUCSON, AZ 85706 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.788 | JOSE M. CRUZ, JR.<br>DAVID M MEDEARIS<br>SULLINS JOHNSTON ROHRBACH<br>& MAGERS<br>3200 SOUTHWEST FREEWAY,<br>SUITE 2200<br>HOUSTON, TX 77027 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| 3.789 | JOSEPH BERGAN<br>3803 CRESSON ST<br>PHILADELPHIA, PA 19127 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |

**1515**

Reverse Mortgage Solutions, Inc.                                    Case Number:        19-10422

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:     List All Creditors with NONPRIORITY Unsecured Claims**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Litigation** | | | | | | | |
| 3.790 JOSEPH DE LA ROSA, JR. NELSON W. GOODELL, ESQ. THE GOODELL LAW FIRM 5 THIRD STREET, SUITE 1100 SAN FRANCISCO, CA 94103 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Litigation | ☐ | UNDETERMINED |
| 3.791 JOSEPH THOMAS 18746 ROGERLAND DRIVE SPRING HILL, FL 34610 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| 3.792 JOSHUA QUINTERO 191 DARLEY DR VALLEJO, CA 94591 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| 3.793 JOYCE WILCOX 10108 KINGS HYW SITE 107 MYRTLE BEACH, SC 29572 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| 3.794 JUAN RODRIGUEZ-MOJICA, ET AL. HECTOR FIGUEROA VINCENTY BUFETE DEL PUEBLO P.S.C. EDIFICIO NORFE 201 AVE. 65 DE INFANTERIA 714 RIO PIEDRAS, PR 00924 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Litigation | ☐ | UNDETERMINED |
| 3.795 JUDITH CHAFFEE 19208C AVENUE OF THE OAKS NEWHALL, CA 91321 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| 3.796 JUDY CONTRERAS 1445 SW 122ND AVENUE MIAMI, FL 33184 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| 3.797 JUDY FELICIANO 5405 SUNSEEKER BOULEVARD GREENACRES, FL 33463 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| 3.798 JUDY SPEARS 2017 SEALY AVENUE GALVESTON, TX 77550 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| 3.799 JULIA HENNESSEY 65 MARSHALL DR EGG HARBOR TOWNSHIP, NJ 08234 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |

**1516**

Reverse Mortgage Solutions, Inc.                                    Case Number:        19-10422

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
|---------|-------------------------------------------------------|

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Litigation** | | | | | | | |
| **3.800** JULIA HENNESSEY 65 MARSHALL DR EGG HARBOR TOWNSHIP, NJ 08234 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.801** JULIE BOHLING 37766 132ND ST ABERDEEN, SD 57401 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.802** JUSTIN STRONG, ET AL. KELLY R. O'BRIEN; MEASURE, SAMPSEL, SULLIVAN & O'BRIEN, P.C. 24 FIRST AVENUE EAST, STE C P.O. BOX 918 KALISPELL, MT 59903-0918 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.803** KANE HARPER 4027 RIVER MIST CT LITHONIA, GA 30038 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.804** KAREN MINOR 3167 CREIGHTON LANDING RD FLEMING ISLE, FL 32003 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.805** KAREN MINOR 3167 CREIGHTON LANDING RD FLEMING ISLE, FL 32003 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.806** KATHERINE BURKE, ET AL. J. SAMUEL TENEBAUM BLUHM LEGAL CLINIC, #15245 NWU LAW 375 EAST CHICAGO AVENUE CHICAGO, IL 60611 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.807** KATHERINE PATRY 2401 N LILAC WAY ELLENSBURG, WA 98926 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.808** KATHERINE PATRY 2401 N LILAC WAY ELLENSBURG, WA 98926 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.809** KELLY HICKS/ WELLS FARGO BANK NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |

Reverse Mortgage Solutions, Inc.                                     Case Number:        19-10422

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:**      **List All Creditors with NONPRIORITY Unsecured Claims**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Litigation** | | | | | | | |
| **3.810** KELLY MAYES<br>PO BOX 1544<br>SANDY, OR 97055 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.811** KEN GATES (VALERIE)<br>PO BOX 1897<br>TEHACHAPI, CA 93581 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.812** KEN HONECK<br>3300 NE MOHAWK LANE<br>KANSAS CITY, MO 64116-2820 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.813** KENNETH PEPIN<br>2283 SOUTH 300 WEST<br>ALBION, IN 46701 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.814** KENNETH SPERLING, ET AL.<br>JOSEPH F BUFOGLE, ESQ.<br>BUFOGLE &ASSOC.<br>2405 E SKELLY DR.<br>TULSA, OK 74105 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.815** KENT BARTLEY<br>2373 WILLOWVIEW DRIVE<br>GRAHAM, NC 27253 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.816** KEVIN & JENNIFER ANDRADE<br>720 OLIVE DRIVE SUITE D<br>DAVIS, CA 95616 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.817** KEVIN NEUMANN<br>11443 W HANKS<br>BOISE, ID 83709 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.818** KIM LYNN<br>1184 WINDING MEADOWS ROAD<br>ROCKLEDGE, FL 32955 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.819** KIMBERLY KILLIAN (LEWIS)<br>404 7TH STREET EAST<br>SCOTT CITY, MO 63780 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.820** KIMIE MIYAMOTO<br>ATTN: CHARLES A. HIGGS, ESQ.<br>LAW OFFICE OF CHARLES A. HIGGS<br>115 E. 23RD STREET, 3RD FL<br>NEW YORK, NY 10010 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |

**1518**

**Reverse Mortgage Solutions, Inc.**                                  **Case Number:**        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| **Part 2:** | **List All Creditors with NONPRIORITY Unsecured Claims** |
|---|---|

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|

### Litigation

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 3.821 | KMC LANDSCAPING SERVICES INC. AND SERVICE IN PROCESS | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| 3.822 | KORI DEBOLT 1841 MISTY RIDGE BOULEVARD BYRON CENER, MI 49315 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.823 | KRISTOPHER BURCKHARD 7319 E LINDNER AVE MESA, AZ 85209 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.824 | KYLE ODOM 10818 CREEKTREE DR HOUSTON, TX 77070 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.825 | LARRY KALPAKOFF 8215 N GARDEN AVE FRESNO, CA 93720 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.826 | LARRY SMITH/JOAN SMITH 333 SAM HEAD RD WEST MONROE, LA 71292 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.827 | LAURINA LEATO 3411 SHOAFF PARK RIVER DR FORT WAYNE, IN 46835 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.828 | LEANNE WELSH 325 LAKE FOREST DR LA VERGNE, TN 37086 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.829 | LEE KAARUP/DARRELL KAARUP 738 NORTH KACHINA DRIVE WICKENBURG, AZ 85390-2119 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.830 | LEILA NAGHIBI 1727 F ST NE WASHINGTON, DC 20002 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.831 | LEO DESMARAIS 518 CENTRAL ST JEREMY LAPOINTE ESQ WINCHENDON, MA 01475 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |

Reverse Mortgage Solutions, Inc.                                         Case Number:        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| **Part 2:** | List All Creditors with NONPRIORITY Unsecured Claims |

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Litigation** | | | | | | | |
| **3.832** LESA FOREHAND (RUCKMAN) 811 FLIGHT AVE PANAMA CITY, FL 32404 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.833** LESA FOREHAND (RUCKMAN) 811 FLIGHT AVE PANAMA CITY, FL 32404 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.834** LINCOLN HALSTEAD 14 DAVIS AVENUE PISCATAWAY, NJ 08854 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.835** LINCOLN HALSTEAD 14 DAVIS AVENUE PISCATAWAY, NJ 08854 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.836** LINDA LEWIS 245 PINE AVENUE EGG HARBOR TOWNSHIP, NJ 08234 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.837** LINDA LEWIS 245 PINE AVENUE EGG HARBOR TOWNSHIP, NJ 08234 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.838** LINDA ROZEMA 481 E MT VERNON DR PLANTATION, FL 33325 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.839** LINDA STYLES 24632 SADABA MISSION VIEJO, CA 92692 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.840** LISE DEHART 7 CLARK ST BELMONT, NH 03220 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.841** LLOYD DEEM 737 SPRINGWATER ROAD KOKOMO, IN 46902 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.842** LOIS MARIE FARBER 3 MAIN STREET, SUITE 2406 NYACK, NY 10960 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |

**1520**

Reverse Mortgage Solutions, Inc.                                    Case Number:        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:**    **List All Creditors with NONPRIORITY Unsecured Claims**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Litigation** | | | | | | | |
| **3.843** LORENA MADDEN<br>PO BOX 10406<br>CEDAR RAPIDS, IA 52410 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.844** LORI MONDELLO<br>11926 HANCOCK DRIVE<br>BRADENTON, FL 34211 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.845** LUCY BUFKIN<br>P.O. BOX 154<br>LOUISVILLE, MS 39339 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.846** LYNDA ALILA<br>24643 FOREST HIKER CT<br>KATY, TX 77493 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.847** LYNDA BROWN<br>12950 WEST GOLF DRIVE<br>MIAMI, FL 33167 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.848** LYNN FISHER-COTE (COTE)<br>344 EXCHANGE ST<br>MILLIS, MA 02054 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.849** MAGALENE ROBBINS<br>152 PEACE LN<br>CLAYTON, NC 27528 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.850** MAGGIE KOCHUTIN<br>LAW OFFICES OF ALASKA<br>LEGAL SERVICES CORPORATION<br>1016 W. 6TH AVE., STE. 200<br>ANCHORAGE, AK 99501 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.851** MARCELA E MELGAREJO<br>DANIEL C. DURAND, III<br>ATTORNEY FOR PLAINTIFF TX<br>BAR # 06287570<br>522 S EDMONDS LN, STE 101<br>LEWISVILLE, TX 75067 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.852** MARCIA ALLEN/ WIDNER<br>GENERAL PARTNERSHIP<br>2512 BERRYWOOD DR<br>RANCHO CORDOVA, CA 95670 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |

**1521**

Reverse Mortgage Solutions, Inc.                                    Case Number:        19-10422

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
|---------|------------------------------------------------------|

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Litigation** | | | | | | | |
| **3.853** MARGARET LOUISE LARMAN RACHEL ERB JONES SWVA LEGAL AID SOCIETY, INC. 227 WEST CHERRY STREET MARION, VA 24354 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Litigation | ☐ | UNDETERMINED |
| **3.854** MARGARET REDUS 2793 SOUTH WEBSTER STREET DENVER, CO 80227 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| **3.855** MARGARET REDUS 2793 SOUTH WEBSTER STREET DENVER, CO 80227 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| **3.856** MARICA FISHER 211 ORIOLE RD LUMBERTON, NC 28360 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| **3.857** MARIO LOZANO 90 FAY DRIVE LYTLE, TX 78052 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| **3.858** MARIO LOZANO 90 FAY DR LYTLE, TX 78052 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| **3.859** MARK BAETA/JEANNE BAETA LOS GATOS, CA 95031 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| **3.860** MARKAND SHUKLA 8322 POLISHED STONE CIRCLE HOUSTON, TX 77095 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| **3.861** MARTA LOPEZ-KENNEY 302 WILLOWBROOK DR PIKEVILLE, NC 27863 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| **3.862** MARTINEZ, MARYORET NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Litigation | ☐ | UNDETERMINED |
| **3.863** MARY ANN NEWMAN DANIELLE LORDI PETERKIN & ASSOCIATES 222 NW IRVING AVE. BEND, OR 97703 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Litigation | ☐ | UNDETERMINED |

**1522**

Reverse Mortgage Solutions, Inc.                                    Case Number:          19-10422

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:**    **List All Creditors with NONPRIORITY Unsecured Claims**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Litigation** | | | | | | | |
| **3.864** MARY BRILL<br>1027 CEDAR ST<br>PUEBLO, CO 81004 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.865** MARY ELARDI<br>32 MANOR LN<br>COPIAGUE, NY 11726 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.866** MARY LOU NAVA, ET AL.<br>RICHARD A.ROMAN<br>1018 BROWN STREET.<br>STATE BAR NO.: 007 89595<br>EL PASO, TX 79902 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.867** MARY PALADINO<br>4256 FIELD OAK RD<br>MILLINGTON, TN 38053 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.868** MARY PATTON<br>6494 SOUTH COUNTY ROAD 250 EAST<br>PAOLI, IN 47454-9597 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.869** MARY WHITEHORSE<br>845 E DRYSTONE AVE<br>SANDY, UT 84094 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.870** MEGAN TOWER HUMPHREY<br>10210 NW ENGLEMAN STREET<br>PORTLAND, OR 97229 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.871** MERRILYN MACK, ET AL.<br>BRADLEY H BAINS STATE BAR # 01553980<br>MATTHEW J COOLBAUGH STATE BAR # 24100160<br>P. BOX 2776 COTTON BLEDSOE TIGHE &DAWSON<br>MIDLAND, TX 79702 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.872** MICHAEL & KATHERINE MOELLER<br>41406 120TH AVE CT E<br>EATONVILLE, WA 98328 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.873** MICHAEL AZEVEDO<br>3239 BOLLA CT<br>PLEASANTON, CA 94566 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |

**Reverse Mortgage Solutions, Inc.**                    **Case Number:**    **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
|---|---|

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Litigation** | | | | | | | |
| 3.874  MICHAEL BAZZI<br>7429 OAKMAN BLVD<br>DEARBORN, MI 48126 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.875  MICHAEL BAZZI<br>7429 OAKMAN BLVD<br>DEARBORN, MI 48126 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.876  MICHAEL COHEN<br>1430 MORIAH TRACE<br>AUBURN, GA 30011 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.877  MICHAEL DWAYNE DYKES<br>ATTN: STEPHEN M. STAFFORD<br>ATTORNEY AT LAW, L. L. C.<br>POST OFFICE BOX 720<br>WALKER, LA 70785 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| 3.878  MICHAEL FEARSON, ET AL.<br>CHRISTINE RUBINSTEIN<br>445 BROADHOLLOW ROAD,<br>SUITE CL-10<br>MELVILLE, NY 11747 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| 3.879  MICHAEL SASSANO (RALPH REDA)<br>333 MAMARONECK AVE 383<br>RALPH REDA<br>WHITE PLAINS, NY 10605 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.880  MICHAEL TODD/RITA TODD<br>4004 PARADISE RD  #3M<br>SWAMPSCOTT, MA 01907 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.881  MICHELE LUCAS<br>435 N 35TH AVE UNIT 529<br>GREELEY, CO 80631 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.882  MICHELLE CHENG<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.883  MIGUEL RIVAS<br>561 WEST 9TH STREET<br>HAZLETON, PA 18201 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.884  MIKALAH RENNELS<br>702 SHORT ST<br>ROSSVILLE, GA 30741 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |

**1524**

Reverse Mortgage Solutions, Inc.                                    Case Number:        19-10422

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
|---|---|

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|

### Litigation

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **3.885** MIKE D. CALVERY, ET AL. TOMMY D. CADLE, ESQUIRE CADLE ET FLOYD, P.A. 101 SOUTH MAIN STREET BOONEVILLE, MS 38829 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Litigation | ☐ | UNDETERMINED |
| **3.886** MILAGROS A. GRANT QUEENS LEGAL SEVICES STACY WOODS, ESQ. 89-00 SUTPHIN BLVD., FIFTH FLOOR JAMAICA, NY 11435 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Litigation | ☐ | UNDETERMINED |
| **3.887** MILDRED JACKSON 4105 OLD IRON CT APT 403 HOPEWELL, VA 23860 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| **3.888** MIMI MOODY 204 HANBURY AVE PORTSMOUTH, VA 23702 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| **3.889** MINDY WRIGHT 107 KING STREET SE VALDESE, NC 28690 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| **3.890** MINNIE SMITH DOLLY CARAPALLO CARABALLO & MANDELL, PLLC 261 MADISON AVENUE, 26TH FLOOR NEW YORK, NY 10016 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Litigation | ☐ | UNDETERMINED |
| **3.891** MIRANDA LAZARO 8738 NW 147TH LN HIALEAH, FL 33018 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| **3.892** MURIEL SWEARENGEN/LEGENDS NORTH OF BROAD 6644 GREEN MEADOWS LN MORROW, GA 30260 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| **3.893** MYRON SHARP/PALMETTO CONTRACTING SERVICES 21524 ALLENDALE RD WILDER, ID 83676 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| **3.894** NANCY KRUPAR 214 MAGYAR ST WELLINGTON, OH 44090 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |

**1525**

**Reverse Mortgage Solutions, Inc.**                                          **Case Number:**      **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| **Part 2:** | **List All Creditors with NONPRIORITY Unsecured Claims** |
| --- | --- |

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
| --- | --- | --- | --- | --- | --- | --- | --- |

### Litigation

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
| --- | --- | --- | --- | --- | --- | --- | --- |
| **3.895** NAT'L MGMT AND PRESERVATION SVCS, LLC VICTOR A. DEUTCH, ESQ. DEUTCH & ASSOCIATES LLC KISLAK BLDG 1000 US HWY 9 N, STE 204 WOODBRIDGE, NJ 07095 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.896** NAT'L MGMT AND PRESERVATION SVCS, LLC VICTOR A. DEUTCH, ESQ. DEUTCH & ASSOCIATES, LLC 1000 U.S. HIGHWAY 9 NORTH, STE 204 WOODBRIDGE, NJ 7095 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.897** NEIL DEFRIESSE 326 HOMESTEAD AVE WATERBURY, CT 06705 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.898** NEIL DEFRIESSE 326 HOMESTEAD AVENUE WATERBURY, CT 06705 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.899** NIGEL SAUNDERS 433 E 49 ST BROOKLYN, NY 11203 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.900** ODELL BLACKMON 20 S NORMAL ST YPSILANTI, MI 48197 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.901** OLD ALABAMA, LLC, ET AL. GINO E MASSAFRA 1000 GALLERIA PARKWAY, N.W., SUITE 1000 ATLANTA, GA 30339 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.902** OLD REPUBLIC NATIONAL LIFE INS. CO. CLARK L. CORNWELL, III 842 EAST 27TH STREET PATERSON, NJ 07513 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.903** ONETA CASPER & WILLIAM CASPER CRAIGE JENKINS LIIPFERT WALKER 110 OAKWOOD DR STE 300 WINSTON SALEM, NC 27103 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |

**1526**

Reverse Mortgage Solutions, Inc.                                    Case Number:        19-10422

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
|---------|------------------------------------------------------|

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Litigation** | | | | | | | |
| **3.904** ORLANDO ALVARADO BLOQUE 196 #26 CALLE 529 VILLA CAROLINA CAROLINA, PR 00985 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| **3.905** OSCAR LUEBBERT 1821 COUNRYVIEW DRIVE BURNSVILLE, MN 55337 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| **3.906** PAM WELTY 935 COUNTY RD 1300 EAST FAIRFIELD, IL 62837 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| **3.907** PAMELA (JEFFREY) CURREY 3304 N 81ST ST EN MILWAUKEE, WI 53222 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| **3.908** PAMELA DAVIS 7190 BUCKINGHAM AVENUE ALLEN PARK, MI 48101 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| **3.909** PAMELA H. HODGES JONATHAN R. ZIPRICK ZIPROCK & CRAMER, LLP 1233 BROOKSIDE AVE., STE A REDLAND, CA 92373-4402 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Litigation | ☐ | UNDETERMINED |
| **3.910** PAMELA OLSON 4347 N LA OSA WAY TUCSON, AZ 85705 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| **3.911** PATRICIA RECUPERO 37 ELMWAY STREET PROVIDENCE, RI 02906 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| **3.912** PATRICIA SPEIGHTS 5192 DEER LN MARIANNA, FL 32446 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| **3.913** PATRICIA WILSON, ET AL. BARBARA RICHARDSON, ESQ. 120 S. LASALLE STREET, STE 900 CHICAGO, IL 60602 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Litigation | ☐ | UNDETERMINED |
| **3.914** PATRICK KENNEDY 17320 RAINTREE RD LUTZ, FL 33558 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |

**1527**

**Reverse Mortgage Solutions, Inc.**                                    Case Number:        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| **Part 2:** | **List All Creditors with NONPRIORITY Unsecured Claims** |
|---|---|

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|

### Litigation

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 3.915 PATRYCJA KONAN<br>P.O. BOX 744<br>CLINTON, MA 01510 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| 3.916 PAUL CORAGGIO<br>15 HALSEY PL<br>SPOTSWOOD, NJ 08884 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| 3.917 PAUL COYNE JR<br>7335 SE SHERMAN ST<br>PORTLAND, OR 97215 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| 3.918 PAUL FLACKE<br>1243 E MILLS DR<br>MILFORD, OH 45150 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| 3.919 PAUL GUZMAN-SANCHEZ, AS SUCCESSOR<br>HARPREET SINGH<br>JT LEGAL GROUP, APC<br>801 N. ERAND ELVD. STE. 1130<br>GLENDALE, CA 91203 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Litigation | ☐ | UNDETERMINED |
| 3.920 PAULA K. GOLDWYN, ET AL.<br>PAULA K GOLDWYN, PRO SE<br>601 N. JULIETTE AVE.<br>MANHATTEN, KS 66502 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Litigation | ☐ | UNDETERMINED |
| 3.921 PAULA THOMPSON<br>P.O. BOX 12<br>CENTREVILLE, MS 39631 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| 3.922 PENNY BLEDSOE<br>103 LARIAT CIRCLE<br>WIMBERLEY, TX 78676 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| 3.923 PERRY TURNER, ET AL.<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Litigation | ☐ | UNDETERMINED |
| 3.924 PETER CUMMINGS<br>1923 HARBOR ISLAND D<br>FLEMING ISLAND, FL 32003 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| 3.925 PETER MENARD<br>681 TROUT LAKE RD<br>BOLTON LANDING, NY 12814 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |

**1528**

**Reverse Mortgage Solutions, Inc.**                                                    **Case Number:**        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
|---------|------------------------------------------------------|

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Litigation** | | | | | | | |
| 3.926   PETER PAPJES 787 FAIRWOOD LANE CLEARWATER, FL 33759 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| 3.927   PETER WINKLER 265 4TH AVENUE WEST BABYLON, NY 11704 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| 3.928   PHAN NGUYEN BUI & NHAN, P.L.L.C. 3921 OCEE HOUSTON, TX 77063 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Litigation | ☐ | UNDETERMINED |
| 3.929   PHILIP DUES/ELIZABETH DUES 8824 GATEWOOD RD FAYETTEVILLE, WV 25840 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| 3.930   PHILIP MULLIN PO BOX 3962 HOLIDAY, FL 34692 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| 3.931   PHRONSLEE STEWARD/GRETCHEN LEFFERSON 3514 ISLAND TRAIL DR WILLIAMSBURG, OH 45176 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| 3.932   PHYLLIS ANDRES-SMITH P.O. BOX 204 HARRISBURG, IL 62946 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| 3.933   PIERRE FONTILUS 1260 NE 214TH ST MIAMI, FL 33179 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| 3.934   PIOQUINTO MALDONADO JR NOT AVAILABLE | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Complaint | ☐ | UNDETERMINED |
| 3.935   PNC BANK, NATIONAL ASSOCIATION WILLIAM G. ASIMAKIS, JR. CLARK HILL PLC 500 WOODWARD AVENUE, SUITE 3500 DETROIT, MI 48226 | UNKNOWN  ACCOUNT NO.: NOT AVAILABLE | ✓ | ✓ | ✓ | Litigation | ☐ | UNDETERMINED |

**1529**

Reverse Mortgage Solutions, Inc.                                    Case Number:        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
| --- | --- |

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
| --- | --- | --- | --- | --- | --- | --- | --- |
| **Litigation** | | | | | | | |
| **3.936** PRO DEMOLITION INC. AND MICHAEL DOMAN NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.937** PU PRESERVATION/RENOVATION, LLC, ET AL. ELIO C. MORGAN LAW OFFICE OF ELIO CC MORGAN 1000 LAFAYETTE BOULEVARD, 11`X` FLOOR BRIDGEPORT, CT 06604 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.938** RAYMOND BLACK 1727 PARKHILL DR DAYTON, OH 45406 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.939** REBECCA EVANS-THOMPSON PO BOX 544 SANTEE, SC 29142 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.940** REBECCA FREDERICK 11196 SHANDON DR GREENWEL SPGS, LA 70739 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.941** RENAE ALLEN 13415 GERALD STREE GIBRALTAR, MI 48173 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.942** RENEE HURT MICHAEL DAVIDOV DAVIDOV LAW GROUP, PC 1981 MARCUS AVENUE, SUITE 231 NEW HYDE PARK, NY 11042 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.943** RICHARD BOERIGTER 967 53RD ST PULLMAN, MI 49450 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.944** RICHARD DEDRICK 603 MARK DR VERONA, WI 53593 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.945** RICHARD GORGO 49 WAGNER LANE COATESVILLE, PA 19320 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |

Reverse Mortgage Solutions, Inc.                                    Case Number:        19-10422

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:**      List All Creditors with NONPRIORITY Unsecured Claims

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Litigation** | | | | | | | |
| **3.946** RICHARD MARTIN<br>56 WILLIAMS STREET LAW<br>OFFICE KEVIN G MCINTYRE<br>NORTH EASTON, MA 02356 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.947** RICHARD ST. PIERRE<br>115 BRENTWOOD ROAD<br>EXETER, NH 03833 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.948** RICHARD ST. PIERRE<br>115 BRENTWOOD RD<br>EXETER, NH 03833 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.949** ROBERT ELLIOTT<br>10530 SOUTH STATE STREET<br>CHICAGO, IL 60629 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.950** ROBERT FENG<br>122 MOHAVE TERRACE<br>FREMONT, CA 94539 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.951** ROBERT HODGES<br>24 CAMELLIA DRIVE<br>COVINGTON, LA 70433 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.952** ROBERT JACKSON<br>147 LAKE MERIAL SHORES DR<br>PANAMA CITY, FL 32409 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.953** ROBERT KICKLIGHTER<br>9302 ODYSSEY LAKE CIRCLE<br>BRUNSWICK, GA 31525 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.954** ROBERT KRAFT<br>30 LINCOLN STREET<br>NEW ROCHELLE, NY 10801-4311 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.955** ROBERT POAGE<br>1716 EAST EDGECOMB STREET<br>COVINA, CA 91724 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.956** ROBERT PUGH III<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |

**1531**

**Reverse Mortgage Solutions, Inc.**                                    **Case Number:**      **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:**     **List All Creditors with NONPRIORITY Unsecured Claims**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Litigation** | | | | | | | |
| **3.957** ROBERT REYNOLDS<br>1826 MARTINIQUE DR<br>LAKE HAVASU CITY, AZ 86406 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.958** ROBERT UNSER<br>ALYSSON SNOW (BAR NO. 225185)<br>KATHLEEN BOX (RLSA BAR NO. 802675)<br>LASSD, INC. 110 SOUTH EUCLID AVENUE<br>SAN DIEGO, CA 92114 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.959** ROBERT WALTERS, PLTF.<br>KELLEY AUSTIN<br>EARL CARL INST. FOR LEGAL & SOC. POLICY<br>3100 CLEBURNE STREET<br>HOUSTON, TX 77004 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.960** ROBERTA SMITH<br>123 SMITH MITCHELL RD<br>HATTIESBURG, MS 39401 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.961** ROBIN JASPER<br>501 2ND STREET<br>WEST DES MOINES, IA 50265 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.962** ROGELIO TIJERINA, JR.<br>LAW OFFICES OF<br>RICHARD J. W. NUNEZ, L.L.P.C.<br>144 E. PRICE ROAD<br>BROWNSVILLE, TX 78521 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.963** RON JONES/BRUCE JONES<br>2020 TOMMY LEE COOK ROAD<br>PALMETTO, GA 30268 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.964** ROSALYN (OMOYELE) LOWDEN<br>101 N BRAND BLVD PH1920<br>GLENDALE, CA 91203 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.965** ROSEMARY FARLEY<br>10233 WEST NATIONAL ROAD<br>NEW CARLISLE, OH 45344 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.966** ROY DIXON<br>2001 PALM BEACH LKS BLVD 410<br>C/O K DRAKE OZMENT<br>WEST PALM BEACH, FL 33409 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |

**1532**

Reverse Mortgage Solutions, Inc.                                    Case Number:        19-10422

## Schedule E/F: Creditors Who Have Unsecured Claims

| **Part 2:** | **List All Creditors with NONPRIORITY Unsecured Claims** |
|---|---|

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Litigation** | | | | | | | |
| **3.967** RUBY COOK<br>1500 PINEHURST DRIVE #408<br>OPELIKA, AL 36601 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.968** RYAN GARCIA<br>650 NORTHHILL CIRCLE<br>NEW BRAUNFELS, TX 78130 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.969** SALLIE WHITE/RITA WHITE<br>P.O. BOX 676<br>TERRY , MS 39170-0676 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.970** SAMMY LEON CURRY<br>KATHY M. MULCAHY<br>LEGAL AID OF NORTH WEST TEXAS<br>500 CHESTNUT, STE 901, BOX 3<br>ABILENE, TX 79602 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.971** SARAH ANNA CRAGO, ET AL.<br>GEORGE F. MAY<br>HAROLD "HAP" MAY, P.C.<br>1500 SOUTH DAIRY ASHFORD RD.<br>HOUSTON, TX 77077 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.972** SEREATHA HOFLER<br>1529 DANTON DRIVE<br>ELBERTON, GA 30635-4667 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.973** SERVICE MASTER CLEAN<br>PROFESSIONAL RESTORATION<br>AND RECOVERY SERVICES<br>ATTN: EDWARD S. ZIZMOR, ESQ.<br>881 GERARD AVENUE, SUITE 200<br>BRONX, NY 10452 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.974** SHAH SIDDIQUI<br>5504 DARK FOREST DR<br>MC KINNEY, TX 75070 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.975** SHANA SUTTON<br>1864 GREENBRIAR BRANCH DR<br>MAIDENS, VA 23102 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.976** SHANNON F. FOSTER<br>MINTZ LAW FIRM, PLLC<br>RUDOLPH I. MINTZ, III<br>KINSTON, NC 28501 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |

**1533**

**Reverse Mortgage Solutions, Inc.**                                    **Case Number:**          **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:**     **List All Creditors with NONPRIORITY Unsecured Claims**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Litigation** | | | | | | | |
| **3.977** SHARON D. ROBERTSON MELVIN J. CALDWELL, JR. CALD WELL & WHITEHEAD, P.A. 109 CAMDEN STREET P.O. BOX 4520 SALISBURY, MD 21803-4520 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.978** SHARON DENNIS PO BOX 854 TURNER, OR 97392 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.979** SHARON OCEAN-CARTER 124 PERLMUTTER COURT CLAYTON, NC 27520-6192 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.980** SHAWN EATON 12402 NEON AVE BLOOMFIELD, IA 52537 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.981** SHAWN LIEBER 8086 JONSON DR REYNOLDSBURG, OH 43068 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.982** SHELBY GARRETT 1627 R ST SE WASHINGTON, DC 20020 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.983** SHELBY WHITE 301 N MAIN STE 1600 KLENDA AUSTERMAN LLC WICHITA, KS 67202 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.984** SHIRLEY A HARRIS, ET AL. A. EDWARD FAWWAL, ESQ. 312 NORTH 18TH STREET BESSEMER, AL 35020 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.985** SORAYA JUARBE-DIAZ 18972 DUQUESNE DRIVE TAMPA, FL 33647 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.986** SPENCER ENGLAND 7914 OAK RIDGE HIGHWAY KNOXVILLE, TN 37931 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.987** SREERAM PREMKUMAR 6316 40TH AVE N CRYSTAL, MN 55427 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |

**1534**

**Reverse Mortgage Solutions, Inc.**                                          **Case Number:**          **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
|---|---|

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Litigation** | | | | | | | |
| **3.988** STEPHANIE BURNS/JOHN DUGGAN<br>29852 NORTH 121ST<br>PEORIA, AZ 85304 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.989** STEPHANIE QUARTO<br>4 JAMAICA AVE<br>TOMS RIVER, NJ 08753 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.990** STEVE CARACAPPA<br>7713 SETTER TRACE LANE<br>CHARLOTTE, NC 28216 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.991** STEVEN HONEYWELL<br>PO BOX 548<br>PARK CITY, UT 84060 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.992** STEVEN LAMB/PAULA LAMB<br>5520 TOWER ROAD<br>SANTA FE, TX 77510 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.993** STEVEN LOUPE<br>11403 SHARPCREST ST<br>HOUSTON, TX 77072 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.994** STEVEN MILLER<br>212 PARADISE LN<br>KEYSER, WV 26726 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.995** STUART DIAMOND<br>3675 NORTH COUNTRY CLUB<br>DRIVE #18083<br>MIAMI, FL 33180-1708 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.996** SUDHA THAKRAL<br>3021 35TH STREET<br>OAK BROOKE, IL 60523 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.997** SUSAN DEWITZ/ROBERT DEWITZ<br>1705 UHI PLACE<br>HONOLULU, HI 96821 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.998** SUSANNE VAAGE<br>6371 CHURCH STREET<br>LOS ANGELES, CA 90042 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |

**Reverse Mortgage Solutions, Inc.**                                    **Case Number:**    **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:**    **List All Creditors with NONPRIORITY Unsecured Claims**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Litigation** | | | | | | | |
| **3.999** TAHMINA REHMAN<br>45 EXCHANGE BLVD SUITE 929<br>HASHMI LAW FIRM<br>ROCHESTER, NY 14614 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.1000** TAMMIE HEDRICK<br>1358 RIVER RD<br>WALTON, WV 25286 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.1001** TANYA GRANGER<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.1002** TEKLE GEBRE<br>PO BOX 28885<br>SEATTLE, WA 98118 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.1003** TERESA LAVIS<br>GARY M. SMITH<br>MOUNTAIN STATE JUSTICE, INC.<br>1031 QUARRIER STREET, SUITE 200<br>CHARLESTON, WV 23501 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.1004** TERESA OCHOA<br>PO BOX 50487<br>FORT MYERS, FL 33994 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.1005** TERRY BRUSHETT<br>PO BOX 205<br>SHASTA, CA 96087 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.1006** THAKAR BASATI<br>130 S JEFFERSON ST STE 350<br>SHIMANOVSKY & MOSCARDINI LLP<br>CHICAGO, IL 60661 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.1007** THERESA NICHOLS<br>7366 ATLEE ROAD<br>WARRENTON, VA 20187 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.1008** THERESSA WINGARD<br>6352 WOODSTOCK DR<br>JACKSON, MS 39206 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.1009** THOMAS & BERNICE STARLING<br>13673 JOAN DALE RD<br>JACKSONVILLE, FL 32220 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |

**1536**

Reverse Mortgage Solutions, Inc.                                    Case Number:        19-10422

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:**    List All Creditors with NONPRIORITY Unsecured Claims

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C U D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|
| **<u>Litigation</u>** | | | | | |
| **3.1010** THOMAS MARION<br>6350 HARDIN RD<br>BENSALEM, PA 19020 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☑ | Complaint | ☐ | UNDETERMINED |
| **3.1011** THOMAS MILO<br>PO BOX 2118<br>ALLBRIGHTS, PA 18210 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☑ | Complaint | ☐ | UNDETERMINED |
| **3.1012** TINA LARSON<br>7100 EMERALD ST<br>CHOWCHILLA, CA 93610 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☑ | Complaint | ☐ | UNDETERMINED |
| **3.1013** TODD & ROXANNE MOSTER<br>15721 MORRISON ST<br>ENCINO, CA 91436 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☑ | Complaint | ☐ | UNDETERMINED |
| **3.1014** TONIA SANTOS (HANSON)<br>142 DRESEHER TRATT RD<br>OROVRLE, CA 95966 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☑ | Complaint | ☐ | UNDETERMINED |
| **3.1015** TONIA SANTOS (HANSON)<br>142 DRESEHER TRATT RD<br>OROVRLE, CA 95966 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☑ | Complaint | ☐ | UNDETERMINED |
| **3.1016** TONYA LEVINE & TROY SMITH<br>5601 TOWNSHIP RD 55<br>BELLEFONTAINE, OH 43311 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☑ | Complaint | ☐ | UNDETERMINED |
| **3.1017** TONYA LEVINE/ MICHAEL BATTON (TP)<br>5601 TOWNSHIP RD 55<br>BELLEFONTAINE, OH 43311 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☑ | Complaint | ☐ | UNDETERMINED |
| **3.1018** TONYA MUHAMMAD<br>501 W BROADWAY STE 800<br>SAN DIEGO, CA 92101 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☑ | Complaint | ☐ | UNDETERMINED |
| **3.1019** TONYA WILLIAMS/FREDERICK WILLIAMS<br>3681 CLAREDON DRIVE<br>LEXINGTON, KY 40517 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☑ | Complaint | ☐ | UNDETERMINED |
| **3.1020** TOYA WEAVER<br>PO BOX 330716<br>MIAMI, FL 33233 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ ☑ ☑ | Complaint | ☐ | UNDETERMINED |

**1537**

**Reverse Mortgage Solutions, Inc.**                                    **Case Number:**        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
|---|---|

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Litigation** | | | | | | | |
| **3.1021** TRACY WHITE<br>101 WEST MONSON AVENUE<br>DOVER, NJ 07801 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.1022** TRAVIS SMITH/CLEMIS FRANKS<br>P.O. BOX 402<br>LAFAYETTE , AL 36862 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.1023** TRICIA HARMON<br>1145 PINK GOSS RD<br>WOODSTOCK, GA 30188 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.1024** TROY ALLEN<br>123 HOLIDAY DR<br>HAMPSTEAD, NC 28443 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.1025** TROY JEFFERSON<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.1026** TYLER FORBES<br>14063 OAK CHAPEL AVE<br>GRAND HAVEN, MI 49417 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.1027** TYLER SAWYER<br>130 RAYMONS CREEK RD<br>SHILOH, NC 27974 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.1028** VALERIE DITTMAN<br>4113 FAIRVIEW VIS PT 307<br>ORLANDO, FL 32804 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.1029** VERONICA ELIE/WILLIAM CHAPPEL<br>PO BOX 1305<br>JONESBORO, GA 30237 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.1030** VICKI DOTY<br>25 NORTH PORTAGE ST<br>STEPHEN P ZANGHI ESQ<br>WESTFIELD, NY 14787 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.1031** VINCENT MILLIGAN<br>215 APOLLO DR<br>BETHLEHEM, PA 18017 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |

**1538**

**Reverse Mortgage Solutions, Inc.**                                    **Case Number:**        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
|---|---|

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|

**Litigation**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| 3.1032 WALTER GANTT<br>2724 LEE BESS ROAD<br>CHERRYVILLE, NC 28201 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.1033 WEBSTER PELL AND LIANA PELL<br>EDWARD T. BRADING<br>208 SUNSET DRIVE, SUITE 409<br>JOHNSON CITY, TN 37604 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| 3.1034 WILLENE DAVIS<br>1329 COUNTY ROAD 3141 EAST<br>CLEVELAND, TX 77327 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.1035 WILLIAM ALLEN COPP<br>NOT AVAILABLE | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| 3.1036 WILLIAM BACHO/KATHARINE BACHO<br>2857 POLAND VILLAGE BOULEVARD<br>YOUNGSTOWN, OH 44514-2466 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.1037 WILLIAM BIRDYSHAW AND CAROL BIRDYSHAW<br>BRIAN MCCLOUD<br>201 BEACON PARKWAY WEST, SUITE 400<br>BIRMINGHAM, AL 35209 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| 3.1038 WILLIAM BIRDYSHAW AND CAROL BIRDYSHAW<br>KRISTEN S. CROSS, ESQ.<br>2320 HIGHAND AVE S STE 175<br>BIRMINGHAM, AL 35205 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| 3.1039 WILLIAM CAPLEY<br>4904 SANDCASTLE CIR<br>SAINT AUGUSTINE, FL 32084 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.1040 WILLIAM LYNCH<br>100 NORTH 2ND AVENUE<br>HARTFORD, AL 36344 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| 3.1041 WILLIAM TALBOT/CAROL TALBOT<br>58 CRANBERRY MEADOW ROAD<br>SPENCER, MA 01562-3000 | UNKNOWN<br><br>ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |

**Reverse Mortgage Solutions, Inc.**                                    Case Number:        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 2:**    **List All Creditors with NONPRIORITY Unsecured Claims**

| Creditor's Name, Mailing Address Including Zip Code | Date Claim Was Incurred And Account Number | C | U | D | Basis For Claim | Offset | Amount of Claim |
|---|---|---|---|---|---|---|---|
| **Litigation** | | | | | | | |
| **3.1042** WILMA MCKINNON SCHUYLER ELLIOTT 2024 BEAVER RUIN ROAD NORCROSS, GA 30071 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.1043** WILSON ANDRADE 10 POST OFFICE SQUARE STE 800 CULIK LAW BOSTON, MA 02109 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.1044** WINNIE FAYE WEST ALMA GONZALEZ 1711 AVE. J LUBBOCK, TX 79401 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.1045** YOLANDA PRUITT 1271 LAWRENCE BETHAL NEWTON, MS 39345 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |
| **3.1046** YOUNG, LATEASA NOT AVAILABLE | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Litigation | ☐ | UNDETERMINED |
| **3.1047** ZOFIA CHOCZYNSKI 5000 CARRIAGEWAY DR APT 211 ROLLING MEADOWS, IL 60008 | UNKNOWN ACCOUNT NO.: NOT AVAILABLE | ☑ | ☑ | ☑ | Complaint | ☐ | UNDETERMINED |

**Litigation Total:**                0

**1540**

**Reverse Mortgage Solutions, Inc.**                                    Case Number:        **19-10422**

## Schedule E/F: Creditors Who Have Unsecured Claims

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
|---------|------------------------------------------------------|

**Total: All Creditors with NONPRIORITY Unsecured Claims**          **$89,504,952**

**1541**

| Reverse Mortgage Solutions, Inc. | Case Number: | 19-10422 |
|---|---|---|

## Schedule E/F: Creditors Who Have Unsecured Claims

**Part 4:**   Total Amounts of the Priority and Nonpriority Unsecured Claims

5.    Add the amounts of priority and nonpriority unsecured claims.

**Total of claim amounts**

| | | |
|---|---|---|
| 5a.   **Total claims from Part 1** | 5a. | $0 |
| 5b.   **Total claims from Part 2** | 5b.   **+** | $89,504,952 |
| 5c.   **Total of Parts 1 and 2** | 5c. | $89,504,952 |

Lines 5a + 5b = 5c.

**1542**

**Reverse Mortgage Solutions, Inc.**                                  Case Number:        **19-10422**

## Schedule G: Executory Contracts and Unexpired Leases

1.    **Does the debtor have any executory contracts or unexpired leases?**

☐ No. Check this box and file this form with the court with the debtor's other schedules. There is nothing else to report on this form.

☑ Yes. Fill in all of the information below even if the contracts or leases are listed on Schedule A/B: Assets - Real and Personal Property (Official Form 206A/B).

2.    **List all contracts and unexpired leases**

| Nature of the Debtor's Interest | Expiration Date | Contract ID | Co-Debtor | Name | Address |
|---|---|---|---|---|---|
| **General Agreements** | | | | | |
| 2. 1   GENERAL AGREEMENT DATED 2/1/2017 | | ERN-79 | ☐ | AMERICAN BANKERS INSURANCE COMPANY OF FLORIDA | ATTN GLOBAL SPECIALTY, PRESIDENT 11222 QUAIL ROOST DR MIAMI, FL 33157 |
| 2. 2   MSA DATED 2/4/2019 | | ERN-74 | ☐ | AMERICAN BANKERS INSURANCE COMPANY OF FLORIDA | ATTN GLOBAL SPECIALTY, PRESIDENT 11222 QUAIL ROOST DR MIAMI, FL 33157 |
| 2. 3   MSA DATED 11/13/2017 | | ERN-221 | ☐ | BLOOMBERG FINANCE LP | 731 LEXINGTON AVENUE NEW YORK, NY 10022 |
| 2. 4   LICENSE AGREEMENT DATED 10/27/2014 | | ERN-583930 | ☐ | BROADBANDONE, INC. | ATTN: GENERAL COUNSEL 3500 NW BOCA RATON BLVD BOCA RATON, FL 33431 |
| 2. 5   MAINTENANCE RENEWAL DATED 2/4/2019 | | ERN-247 | ☐ | CAMEO SOLUTIONS, INC | D/B/A CAMEO GLOBAL ATTN JOY FORBECK, SERVICES RENEWAL MGR 9078 UNION CENTRE, UNIT 200 WEST CHESTER, OH 45069 |
| 2. 6   MSA DATED 2/6/2015 | | ERN-584023 | ☐ | CHARLES A. BROWN AND ASSOCIATES PLLC D/B/A DOCSOLUTION, INC. | ATTN: LORI A. LOWE 2316 SOUTHMORE PASADENA, TX 77502 |
| 2. 7   PROFESSIONAL SERVICES AGREEMENT FOR RMS O365 MIGRATION DATED 2/4/2019. | | ERN-420 | ☐ | CONQUEST TECHNOLOGY SERVICES CORPORATION | NOT AVAILABLE |

**1543**

**Reverse Mortgage Solutions, Inc.**                                    **Case Number:**        **19-10422**

## Schedule G: Executory Contracts and Unexpired Leases

| Nature of the Debtor's Interest | Expiration Date | Contract ID | Co-Debtor | Name | Address |
|---|---|---|---|---|---|
| 2. 8 MSA DATED 2/4/2019 | | ERN-445 | ☐ | CORELOGIC FLOOD SERVICES LLC | ATTN VICKI CHENAULT 11902 BURNET RD AUSTINE, TX 78752 |
| 2. 9 MSA DATED 7/17/2015 | | ERN-584145 | ☐ | CORELOGIC FLOOD SERVICES, LLC | ATTN: VICKI CHENAULT 11902 BURNET ROAD AUSTIN, TX 78758 |
| 2. 10 MSA DATED 11/14/2017 | | ERN-523 | ☐ | DATA FOUNDRY, INC. | 1044 LIBERTY PARK DRIVE AUSTIN, TX 78746-6943 |
| 2. 11 MSA DATED 5/17/2017 | | ERN-584222 | ☐ | DGG RE INVESTMENTS LLC DBA GUARDIAN ASSET MANAGEMENT | ATTN: DAN LEADER 2021 HARTEL STREET LEVITTOWN, PA 19057 |
| 2. 12 MSA DATED 10/31/2014 | | ERN-584255 | ☐ | DOCSOLUTIONS, INC. (BY BROWN & ASSOCIATES) | ATTN: GENERAL COUNSEL 10592A FUQUA SUITE 426 HOUSTON, TX 77089 |
| 2. 13 MSA DATED 10/28/2014 | | ERN-585200 | ☐ | FIRST AMERICAN CORPORATION, THE | ATTN: SPECIAL COUNSEL 1 FIRST AMERICAN WAY SANTA ANA, CA 92707 |
| 2. 14 MSA DATED 6/1/2016 | | ERN-584413 | ☐ | GREGG & VALBY, LLP | ATTN: SCOTT R. VALBY 1700 WEST LOOP SOUTH SUITE 200 HOUSTON, TX 77027 |
| 2. 15 MSA DATED 11/25/2014 | | ERN-584496 | ☐ | INNOVATIVE TAX SOLUTIONS, LLC | ATTN: NIEL SHANK, PRESIDENT 1402 KLOWA DRIVE ARLINGTON, TX 76012 |
| 2. 16 MSA DATED 3/29/2017 | | ERN-584512 | ☐ | INTERKLEEN, INC. | ATTN: GENERAL COUNSEL 1599 SW 30TH AVENUE SUITE 04 BOYNTON BEACH, FL 33426 |
| 2. 17 MSA DATED 2/4/2019 | | ERN-912 | ☐ | LEBERTA, LLC | ATTN JOHN WALSH, CEO 1123 PARK VIEW DRIVE COVINA, CA 91748 |

**1544**

Reverse Mortgage Solutions, Inc.                                    Case Number:        19-10422

## Schedule G: Executory Contracts and Unexpired Leases

| Nature of the Debtor's Interest | Expiration Date | Contract ID | Co-Debtor | Name | Address |
|---|---|---|---|---|---|
| 2. 18  MSA DATED 1/1/2019 | | ERN-914 | ☐ | LERETA LLC | ATTN CEO<br>123 PARK VIEW DR<br>COVINA, CA 91748 |
| 2. 19  MSA DATED 4/12/2016 | | ERN-584660 | ☐ | LRES CORPORATION | ATTN: GENERAL COUNSEL<br>765 THE CITY DRIVE SOUTH<br>SUITE 300<br>ORANGE , CA 92868 |
| 2. 20  MSA DATED 3/27/2017 | | ERN-584674 | ☐ | MANNA DISTRIBUTORS, INC. | ATTN: GENERAL COUNSEL<br>8707 WESTPARK DRIVE<br>HOUSTON, TX 77063 |
| 2. 21  MSA DATED 6/1/2016 | | ERN-584717 | ☐ | NATIONAL CREDITORS CONNECTION, INC. | ATTN: ALLEN JAY LOEB - VICE PRESIDENT<br>14 ORCHARD ROAD<br>LAKE FOREST , CA 92630 |
| 2. 22  MSA DATED 9/29/2017 | | ERN-1035 | ☐ | NATIONAL FIELD REPRESENTATIVES, INC. | 136 MAPLE AVENUE<br>CLAREMONT, NH 3743 |
| 2. 23  MSA DATED 10/9/2014 | | ERN-584762 | ☐ | NEWCOURSE COMMUNICATIONS, INC. | ATTN: JAMES L. CONDE,<br>PRESIDENT & CEO<br>5010 LINBAR DRIVE<br>SUITE 100<br>NASHVILLE, TN 37211 |
| 2. 24  MSA DATED 11/7/2014 | | ERN-584823 | ☐ | PAETEC COMMUNICATIONS, INC. | ATTN: GENERAL COUNSEL<br>ONE PAETEC PLAZA<br>600 WILLOWBROOK OFFICE PARK<br>FAIRPORT, NY 14450 |
| 2. 25  MSA DATED 10/10/2014 | | ERN-584845 | ☐ | PENSION BENEFIT INFORMATION, INC. | ATTN: GENERAL COUNSEL<br>711 GRAND AVE<br>SUITE 210<br>SAN RAFAEL, CA 94901 |
| 2. 26  EQUIPMENT USE AGREEMENT DATED 10/30/2013 FOR MACHINE LOCATED AT 14405 WALTERS ROAD, HOUSTON, TX. | | ERN-1157 | ☐ | PITNEY BOWES GLOBAL FINANCIAL SERIVCES LLC | NOT AVAILABLE |

**1545**

**Reverse Mortgage Solutions, Inc.**                                                            **Case Number:**        **19-10422**

## Schedule G: Executory Contracts and Unexpired Leases

| Nature of the Debtor's Interest | Expiration Date | Contract ID | Co-Debtor | Name | Address |
|---|---|---|---|---|---|
| 2. 27 | EQUIPMENT USE AGREEMENT DATED 10/30/2013 FOR MACHINE LOCATED AT 5222 CYRPRESS CREEK PARKWAY, HOUSTON, TX. | | ERN-1158 | ☐ | PITNEY BOWES GLOBAL FINANCIAL SERIVCES LLC | NOT AVAILABLE |
| 2. 28 | MSA DATED 6/21/2017 | | ERN-584876 | ☐ | PRIME LEGAL STAFF CORPORATION | ATTN: PRESIDENT 1700 BAYBERRY COURT SUITE 301 RICHMOND, VA 23226 |
| 2. 29 | MSA DATED 7/20/2015 | | ERN-584908 | ☐ | R2 UNIFIED TECHNOLOGIES, LLC | ATTN: CRISTINA TAYLOR 980 N. FEDERAL HIGHWAY SUITE 410 BOCA RATON, FL 33432 |
| 2. 30 | MSA DATED 10/9/2009 | | ERN-584952 | ☐ | RES.NET CORPORATION | C/O U.S. REAL ESTATE SERVICES, INC. ATTN: BILL COLBY, VP 25520 COMMERCENTRE DRIVE, 2ND FLOOR LAKE FOREST, CA 92630 |
| 2. 31 | MSA DATED 10/9/2009 | | ERN-584956 | ☐ | RES.NET CORPORATION | ATTN: GENERAL COUNSEL 25520 COMMERCENTRE DRIVE SUITE 150 LAKE FOREST, CA 92630 |
| 2. 32 | MSA DATED 6/11/2015 | | ERN-585086 | ☐ | SOUTHWEST BUSINESS CORPORATION | ATTN: GENERAL COUNSEL 9311 SAN PEDRO AVE SUITE 600 SAN ANTONIO, TX 78216 |
| 2. 33 | MSA DATED 9/30/2014 | | ERN-585085 | ☐ | SOUTHWEST BUSINESS CORPORATION | ATTN: BILL PEGEL 9311 SAN PEDRO SUITE 600 SAN ANTONIO, TX 78216 |
| 2. 34 | LICENSE AGREEMENT DATED 8/18/2017 | | ERN-585143 | ☐ | TATA AMERICA INTERNATIONAL CORPORATION | ATTN: LEGAL DEPARTMENT 101 PARK AVENUE FLOOR 26 NEW YORK, NY 10178 |

**1546**

**Reverse Mortgage Solutions, Inc.**                                                    **Case Number:**        **19-10422**

## Schedule G: Executory Contracts and Unexpired Leases

| Nature of the Debtor's Interest | Expiration Date | Contract ID | Co-Debtor | Name | Address |
|---|---|---|---|---|---|
| 2. 35 MAINTENANCE RENEWAL DATED 8/18/2017 | | ERN-585142 | ☐ | TATA AMERICA INTERNATIONAL CORPORATION | ATTN: LEGAL DEPARTMENT 101 PARK AVENUE FLOOR 26 NEW YORK, NY 10178 |
| 2. 36 MSA DATED 41968 | | ERN-1225 | ☐ | UNIFIED TAX RESOURCES LLC | ATTN SPECIAL COUNSEL 16000 BARKERS POINT LANE SUITE 201 HOUSTON, TX 77079 |
| 2. 37 MSA DATED 10/11/2018 | | ERN-1573 | ☐ | UNITED PARCEL SERVICE INC | ATTN KIMBERLY WYLIE, ISR 5315 SUMMIT PKWY SAN ANTONIO, TX 78228 |
| 2. 38 MSA DATED 11/8/2018 | | ERN-1574 | ☐ | UNITED STATES POSTAL SERVICE, THE | ATTN DENNIS NICOSKI, SVP SALES & CUSTOMER RELATIONS 475 L'ENFANT PLAZA SW WASHINGTON, DC 20260 |
| 2. 39 MSA DATED 9/6/2015 | | ERN-585272 | ☐ | VELOCIFY, INC. | ATTN: PRESIDENT AND CHIEF EXECUTIVE OFFICER 222 N. SEPULVEDA BLVD. SUITE 1800 EL SEGUNDO, CA 90245 |
| 2. 40 MSA DATED 8/14/2015 | | ERN-585277 | ☐ | VENDOR CONNECT, LLC | ATTN: STEVE MELMET 1920 MAIN STREET SUITE 760 IRVINE, CA 92614 |
| 2. 41 MSA DATED 12/24/2018 | | ERN-1086 | ☐ | VOICE PRINT INTERNATIONAL INC | 160 CAMINO RUIZ CAMARILLO, CA 93012 |

**1547**

Reverse Mortgage Solutions, Inc.                                        Case Number:        19-10422

## Schedule G: Executory Contracts and Unexpired Leases

| Nature of the Debtor's Interest | Expiration Date | Contract ID | Co-Debtor | Name | Address |
|---|---|---|---|---|---|
| **Attorney Agreements** | | | | | |
| 2. 42 ATTORNEY AGREEMENT DATED 4/23/2018 | | AA-10146 | ☐ | ALBA LAW GROUP, THE | 1350 MCCORMICK ROAD EP III SUITE 200 HUNT VALLEY, MD 21031 |
| 2. 43 ATTORNEY AGREEMENT DATED 1/4/2017 | | AA-10117 | ☐ | ALDRIDGE PITE, LLP | 3575 PIEDMONT ROAD N.E. SUITE 500 ATLANTA, GA 30305 |
| 2. 44 ATTORNEY AGREEMENT DATED 1/23/2017 | | AA-10118 | ☐ | BELL CARRINGTON | 508 HAMPTON STREET COLUMBIA, SC 29201 |
| 2. 45 ATTORNEY AGREEMENT DATED 5/25/2017 | | AA-10119 | ☐ | BROCK & SCOTT, PLLC | 1315 WESTBROOK PLAZA DRIVE SUITE 100 WINSTON-SALEM, NC 27103 |
| 2. 46 ATTORNEY AGREEMENT DATED 12/15/2016 | | AA-10120 | ☐ | BWW LAW GROUP | 6003 EXECUTIVE BLVD. SUITE 101 ROCKVILLE, MD 20852 |
| 2. 47 ATTORNEY AGREEMENT DATED 3/1/2017 | | AA-10121 | ☐ | CHOICE LEGAL GROUP, P.A. | 1901 WEST CYPRESS CREED ROAD SUITE 201 FT. LAUDERDALE, FL 33309 |
| 2. 48 ATTORNEY AGREEMENT DATED 12/23/2016 | | AA-10122 | ☐ | CODILIS AND ASSOCIATES - IL | 15W030 NORTH FRONTAGE ROAD BURR RIDGE, IL 60527 |
| 2. 49 ATTORNEY AGREEMENT DATED 10/7/2016 | | AA-10123 | ☐ | CODILIS, MOODY & CIRCELLI, P.C. | 650 NORTH SAM HOUSTON PKWY EAST SUITE 450 HOUSTON, TX 77060 |
| 2. 50 ATTORNEY AGREEMENT DATED 7/2/2018 | | AA-10124 | ☐ | GALLOWAY, JOHNSON, TOMKINS, BURR & SMITH APLC | 1301 MCKINNEY STREET SUITE 1400 HOUSTON, TX 77010 |
| 2. 51 ATTORNEY AGREEMENT DATED 9/26/2016 | | AA-10125 | ☐ | GLS LEGAL SERVICES | 1216 LUCHETTI STREET SAN JUAN, PR 00907 |

**1548**

Reverse Mortgage Solutions, Inc.                                                          Case Number:        19-10422

## Schedule G: Executory Contracts and Unexpired Leases

| Nature of the Debtor's Interest | Expiration Date | Contract ID | Co-Debtor | Name | Address |
|---|---|---|---|---|---|
| 2. 52 | ATTORNEY AGREEMENT DATED 9/23/2016 | | AA-10126 | ☐ | GROSS POLOWY | 1775 WEHRLE DRIVE SUITE 100 WILLIAMSVILLE, NY 14221 |
| 2. 53 | ATTORNEY AGREEMENT DATED 3/1/2017 | | AA-10127 | ☐ | HALLIDAY & WATKINS | 376 EAST 400 SOUTH SUITE 300 SALT LAKE CITY, UT 84111 |
| 2. 54 | ATTORNEY AGREEMENT DATED 7/31/2017 | | AA-10128 | ☐ | HERSCHEL C. ADCOCK | 13541 TIGERBEND ROAD BATON ROUGE, LA 70817 |
| 2. 55 | ATTORNEY AGREEMENT DATED 12/20/2016 | | AA-10129 | ☐ | JACKSON & MCPHERSON, LLC | 1010 COMMON STREET SUITE 1800 NEW ORLEANS, LA 70112 |
| 2. 56 | ATTORNEY AGREEMENT DATED 9/15/2016 | | AA-10130 | ☐ | KML LAW GROUP, P.C. | 701 MARKET STREET SUITE 500 PHILADELPHIA, PA 19106 |
| 2. 57 | ATTORNEY AGREEMENT DATED 6/28/2017 | | AA-10131 | ☐ | MACKIE WOLF ZIENTZ & MANN PC | 14160 N. DALLAS PARKWAY SUITE 900 DALLAS, TX 75254 |
| 2. 58 | ATTORNEY AGREEMENT DATED 1/27/2017 | | AA-10132 | ☐ | MALCOLM & CISNEROS, A LAW CORPORATION | 2112 BUSINESS CENTER DRIVE IRVINE, CA 92612 |
| 2. 59 | ATTORNEY AGREEMENT DATED 12/19/2016 | | AA-10133 | ☐ | MANLEY DEAS & KOCHALSKI LLC | 1555 LAKE SHORE DRIVE COLUMBUS, OH 43204 |
| 2. 60 | ATTORNEY AGREEMENT DATED 2/3/2017 | | AA-10134 | ☐ | MARTIN, LEIGH, LAWS & FRITZLEN, P.C. | 1044 MAIN STREET SUITE 900 KANSAS CITY, MO 64105 |
| 2. 61 | ATTORNEY AGREEMENT DATED 2/15/2017 | | AA-10135 | ☐ | MCCALLA RAYMER PIERCE LIEBERT, LLC | 1544 OLD ALABAMA ROAD ROSWELL, GA 30076 |
| 2. 62 | ATTORNEY AGREEMENT DATED 9/11/2017 | | AA-10136 | ☐ | MCCARTHY & HOLTHUS, LLP | 1770 4TH AVENUE SAN DIEGO, CA 92101 |

**1549**

**Reverse Mortgage Solutions, Inc.**                                          **Case Number:**          **19-10422**

## Schedule G: Executory Contracts and Unexpired Leases

| Nature of the Debtor's Interest | Expiration Date | Contract ID | Co-Debtor | Name | Address |
|---|---|---|---|---|---|
| 2. 63   ATTORNEY AGREEMENT DATED 6/4/2018 | | AA-10147 | ☐ | MORTGAGE LAW FIRM, THE | 27455 TIERRA ALTA WAY SUITE B TEMECULA, CA 92590 |
| 2. 64   POWER OF ATTORNEY DATED 12/15/2015 | | ERN-584828 | ☐ | PARTRIDGE SNOW & HAHN LLP | ATTN: PATRICIA ANTONELLI, ESQ., JAMES H. HAHN, ESQ., DAVID J. PELLEGRINO, ESQ., DAVID M. GILDEN, ESQ. 40 WESTMINSTER STREET SUITE 1100 PROVIDENCE, RI 02903 |
| 2. 65   ATTORNEY AGREEMENT DATED 1/12/2017 | | AA-10137 | ☐ | RAS BORISKIN | 900 MERCHANTS CONCOURSE SUITE 106 WESTBURY, NY 11590 |
| 2. 66   ATTORNEY AGREEMENT DATED 1/12/2017 | | AA-10138 | ☐ | RAS CITRON | 130 CLINTON ROAD SUITE 202 FAIRFIELD, NJ 07004 |
| 2. 67   ATTORNEY AGREEMENT DATED 2/12/2017 | | AA-10139 | ☐ | RAS CRANE | 10700 ABBOTT'S BRIDGE ROAD SUITE 170 DULUTH, GA 30097 |
| 2. 68   ATTORNEY AGREEMENT DATED 4/25/2017 | | AA-10140 | ☐ | REISENFELD & ASSOCIATES LPA, LLC | 3962 RED BANK ROAD CINCINNATI, OH 45227 |
| 2. 69   ATTORNEY AGREEMENT DATED 1/12/2017 | | AA-10141 | ☐ | ROBERTSON, ANSCHUTZ & SCHNEID, P.L. | 6409 CONGRESS AVENUE SUITE 100 BOCA RATON, FL 33487 |
| 2. 70   ATTORNEY AGREEMENT DATED 5/25/2017 | | AA-10142 | ☐ | ROGERS TOWNSEND & THOMAS PC | 100 EXECUTIVE CENTER DRIVE SUITE 210 COLUMBIA, SC 29210 |
| 2. 71   ATTORNEY AGREEMENT DATED 9/15/2016 | | AA-10143 | ☐ | RUBIN LUBLIN, LLC | 3145 AVALON RIDGE PLACE SUITE 100 PEACHTREE CORNERS, GA 30071 |
| 2. 72   ATTORNEY AGREEMENT DATED 9/14/2017 | | AA-10144 | ☐ | SIROTE & PERMUTT, P.C. | 2311 HIGHLAND AVENUE SOUTH BIRMINGHAM, AL 35205 |

**1550**

**Reverse Mortgage Solutions, Inc.**                                                      **Case Number:**          **19-10422**

## Schedule G: Executory Contracts and Unexpired Leases

| Nature of the Debtor's Interest | Expiration Date | Contract ID | Co-Debtor | Name | Address |
|---|---|---|---|---|---|
| 2. 73 ATTORNEY AGREEMENT DATED 8/16/2017 | | AA-10145 | ☐ | SOUTHLAW PC | 13160 FOSTER SUITE 100 OVERLAND PARK, KS 66213 |
| 2. 74 ATTORNEY AGREEMENT DATED 10/6/2016 | | AA-10148 | ☐ | TIFFANY & BOSCO, PA | 2525 EAST CAMELBACK ROAD SUITE 300 PHOENIX, AZ 85016 |
| 2. 75 ATTORNEY AGREEMENT DATED 6/4/2018 | | AA-10149 | ☐ | TMLF HAWAII LLC | 1001 BISHOP STREET SUITE 1000 HONOLULU, HI 96813 |
| 2. 76 ATTORNEY AGREEMENT DATED 8/9/2017 | | AA-10150 | ☐ | TROMBERG LAW GROUP, P.A. | 1515 S. FEDERAL HIGHWAY SUITE 100 BOCA RATON, FL 33432 |
| 2. 77 ATTORNEY AGREEMENT DATED 1/31/2017 | | AA-10151 | ☐ | TROTT LAW, P.C. | 31440 NORTHEASTERN HWY SUITE 200 FARMINGTON HILLS, MI 48334 |
| 2. 78 ATTORNEY AGREEMENT DATED 6/5/2018 | | AA-10152 | ☐ | USSET, WEINGARDEN & LIEBO PLLP | 4500 PARK GLEN ROAD SUITE 300 MINNEAPOLIS, MN 55416 |
| 2. 79 ATTORNEY AGREEMENT DATED 8/24/2017 | | AA-10153 | ☐ | WILSON & ASSOCIATES, PLLC | 1521 MERRILL DRIVE SUITE D-200 LITTLE ROCK, AR 72211 |
| 2. 80 ATTORNEY AGREEMENT DATED 6/15/2017 | | AA-10154 | ☐ | WRIGHT FINLAY & ZAK | 4665 MACARTHUR COURT SUITE 200 NEWPORT BEACH, CA 92660 |

**1551**

Reverse Mortgage Solutions, Inc.                                    Case Number:        19-10422

## Schedule G: Executory Contracts and Unexpired Leases

| Nature of the Debtor's Interest | Expiration Date | Contract ID | Co-Debtor | Name | Address |
|---|---|---|---|---|---|

### Customer Contracts

| | | | | | |
|---|---|---|---|---|---|
| 2. 81 | SUBSERVICING AGREEMENT | | CC-20001 | ☐ | ADVANTIS FEDERAL CREDIT UNION | NOT AVAILABLE |
| 2. 82 | SUBSERVICING AGREEMENT | | CC-20002 | ☐ | AMERICAN NATIONAL BANK | NOT AVAILABLE |
| 2. 83 | SUBSERVICING AGREEMENT | | CC-20003 | ☐ | BANK OF AMERICA, NATIONAL ASSOCIATION | NOT AVAILABLE |
| 2. 84 | INVESTOR AGREEMENT | | CC-20004 | ☐ | BOA MERRILL LYNCH | NOT AVAILABLE |
| 2. 85 | SUBSERVICING AGREEMENT | | CC-20005 | ☐ | CASCADE FUNDING ALTERNATIVE HOLDINGS, LLC | NOT AVAILABLE |
| 2. 86 | SUBSERVICING AGREEMENT | | CC-20008 | ☐ | CASCADE FUNDING MORTGAGE TRUST 2018-RM2 | NOT AVAILABLE |
| 2. 87 | SUBSERVICING AGREEMENT | | CC-20006 | ☐ | CASCADE FUNDING RM1 ACQUISITIONS GRANTOR TRUST | NOT AVAILABLE |
| 2. 88 | SUBSERVICING AGREEMENT | | CC-20007 | ☐ | CASCADE FUNDING RM1 ALTERNATIVE HOLDINGS, LLC | NOT AVAILABLE |
| 2. 89 | SUBSERVICING AGREEMENT | | CC-20009 | ☐ | CASCADE FUNDING RM3 ACQUISITIONS GRANTOR TRUST | NOT AVAILABLE |
| 2. 90 | SUBSERVICING AGREEMENT | | CC-20010 | ☐ | CASCADE FUNDING RM4 ACQUISITIONS GRANTOR TRUST | NOT AVAILABLE |
| 2. 91 | SUBSERVICING AGREEMENT | | CC-20011 | ☐ | CHETCO FEDERAL CREDIT UNION (RECEIVERSHIP) | NOT AVAILABLE |
| 2. 92 | SUBSERVICING AGREEMENT | | CC-20012 | ☐ | CITIZENS FIRST WHOLESALE MORTGAGE COMPANY | NOT AVAILABLE |
| 2. 93 | SUBSERVICING AGREEMENT | | CC-20013 | ☐ | CREDIGY (TRM/BLUE PLAINS) | NOT AVAILABLE |
| 2. 94 | SUBSERVICING AGREEMENT | | CC-20014 | ☐ | ENT FEDERAL CREDIT UNION | NOT AVAILABLE |

**1552**

Reverse Mortgage Solutions, Inc.                                                                    Case Number:        19-10422

## Schedule G: Executory Contracts and Unexpired Leases

| Nature of the Debtor's Interest | Expiration Date | Contract ID | Co-Debtor | Name | Address |
|---|---|---|---|---|---|
| 2. 95 | INVESTOR AGREEMENT | | CC-20015 | ☐ | FANNIE MAE | NOT AVAILABLE |
| 2. 96 | SUBSERVICING AGREEMENT | | CC-20016 | ☐ | FDIC | NOT AVAILABLE |
| 2. 97 | SUBSERVICING AGREEMENT | | CC-20017 | ☐ | FINANCE OF AMERICA REVERSE | NOT AVAILABLE |
| 2. 98 | SUBSERVICING AGREEMENT | | CC-20018 | ☐ | FINANCE OF AMERICA REVERSE | NOT AVAILABLE |
| 2. 99 | SUBSERVICING AGREEMENT | | CC-20019 | ☐ | GTE FEDERAL CREDIT UNION | NOT AVAILABLE |
| 2. 100 | SUBSERVICING AGREEMENT | | CC-20020 | ☐ | LIBERTY HOME EQUITY SOLUTIONS INC | NOT AVAILABLE |
| 2. 101 | SUBSERVICING AGREEMENT | | CC-20022 | ☐ | MID-HUDSON VALLEY FEDERAL CREDIT UNION | NOT AVAILABLE |
| 2. 102 | INVESTOR AGREEMENT | | CC-20023 | ☐ | MIDLAND NATIONAL LIFE & PDI | NOT AVAILABLE |
| 2. 103 | SUBSERVICING AGREEMENT | | CC-20024 | ☐ | MONEYHOUSE | NOT AVAILABLE |
| 2. 104 | INVESTOR AGREEMENT | | CC-20021 | ☐ | MORTGAGE EQUITY CONVERSION ASSET TRUST 2010-1 | NOT AVAILABLE |
| 2. 105 | SUBSERVICING AGREEMENT | | CC-20025 | ☐ | NEXBANK | NOT AVAILABLE |
| 2. 106 | SUBSERVICING AGREEMENT | | CC-20026 | ☐ | ONE REVERSE MORTGAGE | NOT AVAILABLE |
| 2. 107 | SUBSERVICING AGREEMENT | | CC-20027 | ☐ | REVERSE MORTGAGE FUNDING | NOT AVAILABLE |
| 2. 108 | SUBSERVICING AGREEMENT | | CC-20028 | ☐ | REVERSE MORTGAGE LOAN TRUST 2008-01 | NOT AVAILABLE |
| 2. 109 | INVESTOR AGREEMENT | | CC-20029 | ☐ | REVERSE MORTGAGE SOLUTIONS 2018-09 | NOT AVAILABLE |
| 2. 110 | SUBSERVICING AGREEMENT | | CC-20030 | ☐ | RML TRUST 2013-1 | NOT AVAILABLE |

**1553**

**Reverse Mortgage Solutions, Inc.**                                                    **Case Number:**        **19-10422**

## Schedule G: Executory Contracts and Unexpired Leases

| Nature of the Debtor's Interest | Expiration Date | Contract ID | Co-Debtor | Name | Address |
|---|---|---|---|---|---|
| 2. 111 | SUBSERVICING AGREEMENT | | CC-20031 | ☐ | RML TRUST 2013-2 | NOT AVAILABLE |
| 2. 112 | SUBSERVICING AGREEMENT | | CC-20032 | ☐ | SEATTLE BANK | NOT AVAILABLE |
| 2. 113 | SUBSERVICING AGREEMENT | | CC-20033 | ☐ | SEATTLE BANK (TX) | NOT AVAILABLE |
| 2. 114 | SUBSERVICING AGREEMENT | | CC-20034 | ☐ | SUNCOAST CREDIT UNION | NOT AVAILABLE |
| 2. 115 | SUBSERVICING AGREEMENT | | CC-20035 | ☐ | TEACHERS FEDERAL CREDIT UNION | NOT AVAILABLE |
| 2. 116 | SUBSERVICING AGREEMENT | | CC-20036 | ☐ | VISIONS FEDERAL CREDIT UNION | NOT AVAILABLE |

**1554**

**Reverse Mortgage Solutions, Inc.**  **Case Number:**  **19-10422**

## Schedule G: Executory Contracts and Unexpired Leases

| Nature of the Debtor's Interest | Expiration Date | Contract ID | Co-Debtor | Name | Address |
|---|---|---|---|---|---|
| **Real Estate Leases** | | | | | |
| 2. 117   REAL ESTATE LEASE | | RE-1008 | ☐ | BOXER F2, LP | 720 N POST OAK RD, SUITE 500 HOUSTON, TX 77024 |
| 2. 118   REAL ESTATE LEASE | | RE-1010 | ☐ | CENTREGARDENCITY,LLC | C/O JOHN C. BILLS PROPERTIES, LLC 3920 RCA BLVD, SUITE 2002 PALM BEACH GARDENS, FL 33410 |

**1555**

**Reverse Mortgage Solutions, Inc.**                                    Case Number:        **19-10422**

## Schedule G: Executory Contracts and Unexpired Leases

**TOTAL NUMBER OF CONTRACTS:  118**

**1556**

# In re: Ditech Holding Corporation, et al.,
# Schedule H: Codebtors

## Second Amended and Restated Credit Agreement

| Role | Debtor |
|---|---|
| Borrower | Ditech Holding Corporation |
| Guarantor | DF Insurance Agency LLC |
| Guarantor | Ditech Financial LLC |
| Guarantor | Green Tree Credit LLC |
| Guarantor | Green Tree Credit Solutions LLC |
| Guarantor | Green Tree Insurance Agency of Nevada, Inc. |
| Guarantor | Green Tree Investment Holdings III LLC |
| Guarantor | Green Tree Servicing Corp. |
| Guarantor | Marix Servicing LLC |
| Guarantor | Mortgage Asset Systems, LLC |
| Guarantor | REO Management Solutions, LLC |
| Guarantor | Reverse Mortgage Solutions, Inc. |
| Guarantor | Walter Management Holding Company LLC |
| Guarantor | Walter Reverse Acquisition LLC |

## Ditech Master Repurchase Agreement

| Role | Debtor |
|---|---|
| Borrower | Ditech Financial LLC |
| Guarantor | Ditech Holding Corporation |

## RMS Master Repurchase Agreement

| Role | Debtor |
|---|---|
| Borrower | Reverse Mortgage Solutions, Inc. |
| Guarantor | Ditech Holding Corporation |

## RMS Second Amended and Restated Master Repurchase Agreement

| Role | Debtor |
|---|---|
| Borrower | Reverse Mortgage Solutions, Inc. |
| Guarantor | Ditech Holding Corporation |

**1557**

# In re: Ditech Holding Corporation, et al.,
# Schedule H: Codebtors

## Second Lien Notes Indenture

| Role | Debtor |
|---|---|
| Borrower | Ditech Holding Corporation |
| Guarantor | DF Insurance Agency LLC |
| Guarantor | Ditech Financial LLC |
| Guarantor | Green Tree Credit LLC |
| Guarantor | Green Tree Credit Solutions LLC |
| Guarantor | Green Tree Insurance Agency of Nevada, Inc. |
| Guarantor | Green Tree Investment Holdings III LLC |
| Guarantor | Green Tree Servicing Corp. |
| Guarantor | Marix Servicing LLC |
| Guarantor | Mortgage Asset Systems, LLC |
| Guarantor | REO Management Solutions, LLC |
| Guarantor | Reverse Mortgage Solutions, Inc. |
| Guarantor | Walter Management Holding Company LLC |
| Guarantor | Walter Reverse Acquisition LLC |

## GSE Servicer Advance Facility

| Role | Debtor |
|---|---|
| Borrower | Ditech Financial LLC |
| Guarantor | Ditech Holding Corporation |

## PLS Servicer Advance Facility

| Role | Debtor |
|---|---|
| Borrower | Ditech Financial LLC |
| Guarantor | Ditech Holding Corporation |

**Reverse Mortgage Solutions, Inc.**                                   Case Number:            **19-10422**

## Schedule H: Codebtors

1.  **Does the debtor have any codebtors?**

    ☐ No. Check this box and submit this form to the court with the debtor's other schedules. Nothing else needs to be reported on this form.

    ☑ Yes

2.  **In Column 1, list as codebtors all of the people or entities who are also liable for any debts listed by the debtor in the schedules of creditors, Schedules D-G.**

    Include all guarantors and co-obligors. In Column 2, identify the creditor to whom the debt is owed and each schedule on which the creditor is listed. If the codebtor is liable on a debt to more than one creditor, list each creditor separately in Column 2.

| Column 1 | Column 2 | Applicable Schedules | | |
|---|---|---|---|---|
| **Codebtor Name and Mailing Address** | **Creditor Name** | **D** | **E/F** | **G** |
| 2.1      SEE ATTACHED CHART | | ☐ | ☐ | ☐ |

**1559**

| Fill in this information to identify the case: | |
|---|---|
| Debtor Name: | Reverse Mortgage Solutions, Inc. |
| United States Bankruptcy Court for the: | Southern District of New York |
| Case Number (if known): | 19-10422 |

☐ Check if this is an
amended filing

## Official Form 206Sum

## Summary of Assets and Liabilities for Non-Individuals

**12/15**

---

| Part 1: | Summary of Assets |
|---|---|

1. **Schedule A/B: Assets–Real and Personal Property** (Official Form 206A/B)

   1a. **Real property:**

      Copy line 88 from Schedule A/B ........................................................................................    $3,142,560

   1b. **Total personal property:**

      Copy line 91A from Schedule A/B ........................................................................................    $1,116,900,365

                           +

   1c. **Total of all property:**

      Copy line 92 from Schedule A/B ........................................................................................    $1,120,042,925

---

| Part 2: | Summary of Liabilities |
|---|---|

2. **Schedule D: Creditors Who Have Claims Secured by Property** (Official Form 206D)

   Copy the total dollar amount listed in Column A, Amount of claim, from line 3 of Schedule D .............................    $1,970,993,111

3. **Schedule E/F: Creditors Who Have Unsecured Claims** (Official Form 206E/F)

   3a. **Total claim amounts of priority unsecured claims:**

      Copy the total claims from Part 1 from line 6a of Schedule E/F ...........................................    $0

   3b. **Total amount of claims of nonpriority amount of unsecured claims:**

      Copy the total of the amount of claims from Part 2 from line 6b of Schedule E/F ......................................    $89,504,952

                           +

4. **Total liabilities**

   Lines 2 + 3a + 3b ........................................................................................    $2,060,498,064

**1560**

**Fill in this information to identify the case and this filing:**

Debtor Name: _Reverse Mortgage Solutions, Inc._

United States Bankruptcy Court for the: _Southern District of New York_

Case Number (if known): _19-10422_

## Official Form 202

## Declaration Under Penalty of Perjury for Non-Individual Debtors

12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.

Warning -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

### Declaration and Signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

[X] Schedule A/B: Assets-Real and Personal Property (Official Form 206A/B)

[X] Schedule D: Creditors Who Have Claims Secured by Property (Official Form 206D)

[X] Schedule E/F: Creditors Who Have Unsecured Claims (Official Form 206E/F)

[X] Schedule G: Executory Contracts and Unexpired Leases (Official Form 206G)

[X] Schedule H: Codebtors (Official Form (206H)

[X] Summary of Assets and Liabilities for Non-Individuals (Official Form 206Sum)

[ ] Amended Schedule _____

[ ] Other document that requires a declaration _____

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:    _March 27, 2019_          Signature:    _/s/ Gerald Lombardo_

                                          _Gerald Lombardo, Authorized Officer_
                                          **Name and Title**

**1561**