**1:21-cv-10038 (LAK)**

---

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

---

*In re DITECH HOLDING CORPORATION, et al.,
Debtors.*[1]

---

FINANCE OF AMERICA REVERSE LLC,

*Appellant,*

—against—

THE PLAN ADMINISTRATOR, ON BEHALF OF THE WIND DOWN ESTATES,

*Appellee.*

---

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

*IN RE: DITECH HOLDING CORPORATION, ET AL.*, CHAPTER 11 CASE NO. 19-10412
(JLG) (BANKR. S.D.N.Y.) (JOINTLY ADMINISTERED)

---

[1] On September 26, 2019, the Court confirmed the *Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors* (Case No. 19-10412, ECF No. 1404) (the "**Plan**") [A-585], which created the Wind Down Estates. The Wind Down Estates, along with the last four digits of their federal tax identification number, as applicable, are Ditech Holding Corporation (0486); DF Insurance Agency LLC (6918); Ditech Financial LLC (5868); Green Tree Credit LLC (5864); Green Tree Credit Solutions LLC (1565); Green Tree Insurance Agency of Nevada, Inc. (7331); Green Tree Investment Holdings III LLC (1008); Green Tree Servicing Corp. (3552); Marix Servicing LLC (6101); Walter Management Holding Company LLC (9818); and Walter Reverse Acquisition LLC (8837). The Wind Down Estates' principal offices are located at 2600 South Shore Blvd., Suite 300, League City, TX 77573.

---

## RESPONSE BRIEF OF APPELLEE

---

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Richard W. Slack
Sunny Singh
Natasha S. Hwangpo

*Attorneys for the Plan Administrator on Behalf of the Wind Down Estates - Appellee*

---

**RULE 8012 CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 8012 of the Federal Rules of Bankruptcy Procedure, Appellee states:

Mortgage Winddown LLC, as Plan Administrator, currently holds 100% of Ditech Holding

Corporation's equity interests pursuant to a single share issued under the Plan on the Effective

Date to hold in trust as custodian for the benefit of the former holders of Ditech Holding

Corporation's common stock and preferred stock.  *See* Plan § 4.9(b)(i).

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

JURISDICTIONAL STATEMENT ........................................................................4

COUNTERSTATEMENT OF THE ISSUES ON APPEAL ...................................5

STANDARD OF REVIEW ....................................................................................5

STATEMENT OF THE CASE................................................................................6

      A.     Background .............................................................................6

      B.     Procedural History.................................................................8

      C.     The Bankruptcy Court's Denial of Administrative Expense
            Status of the Claim ................................................................8

      D.     The Appeal ...........................................................................10

SUMMARY OF THE ARGUMENT .....................................................................11

ARGUMENT ........................................................................................................13

I.      The Bankruptcy Court Properly Denied Appellant's Classification of
       the Claim as an Administrative Expense Consistent with 30 Years of
       Second Circuit Authority....................................................................13

      A.     Claims Based on Postpetition Conduct Arising From
            Prepetition Contracts Give Rise to Prepetition Contract Claims,
            not Administrative Expense Claims, as Long as those Claims
            are Fairly Contemplated ........................................................13

      B.     FoA's Characterization of the Bankruptcy Court's Decision as a
            "New Rule" is Contrary to More Than 30 Years of Second
            Circuit Law...........................................................................16

      C.     FoA Already Received Legally Sufficient Compensation In
            Exchange for the Benefit Conferred on RMS in the Postpetition
            Period...................................................................................18

II.     The Bankruptcy Court Properly Found that the Extensions Were Not
      Postpetition Agreements....................................................................21

      A.     New York Courts Consider the Intent of the Parties in
            Determining Whether a Modification Forms a New Postpetition
            Agreement ............................................................................21

B.      Application of the Bush Factors Demonstrates That the Parties Intended the Extensions to be Modifications, Not New Postpetition Agreements ........................................................22

C.      FoA's Arguments to the Contrary Rely on Inapplicable Non-Bankruptcy Cases ..................................................................23

III.    To the Extent the Court Believes the Alternative Arguments Need to be Addressed, They Should be Remanded to the Bankruptcy Court in the First Instance...........................................................................26

A.      The Bankruptcy Court is the Proper Forum to Address the Alternative Arguments ........................................................26

B.      In the Alternative, the Alternative Arguments Should be Decided in Appellee's Favor.................................................27

1.      If the Extensions are Postpetition Agreements, the Extensions are Not Valid Because They Were Not Approved by the Bankruptcy Court ..............................27

2.      Any Entitlement to Administrative Expense Priority is Limited to the Concrete, Discernible Benefit FoA Conferred upon RMS in the Postpetition Period, Which FoA Has Already Received .......................................................................29

CONCLUSION ........................................................................................32

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*Beneke Co. v. Econ. Lodging Sys., Inc. (In re Econ. Lodging Sys., Inc.)*, 234 B.R. 691 (B.A.P. 6th Cir. 1999) ..................................................................................16

*Buena Vista Home Ent., Inc. v. Wachovia Bank, N.A. (In re Musicland Holding Corp.)*, 374 B.R. 113 (S.D.N.Y. 2007), *aff'd,* 386 B.R. 428 (S.D.N.Y. 2008, *aff'd,* 318 F. App'x 36 (2d Cir. 2009) ................................................................22

*Cappelli v. State Farm Mut. Auto. Ins. Co.*, 259 A.D.2d 581 (2d Dep't. 1999)......24

*Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co.,* 773 F.3d 110 (2d Cir. 2014)........................................................................................................22

*Delta Air Lines, Inc. v. Bombardier, Inc.*, Case No. 20-cv-3025-GHW, 2021 WL 1163702 (S.D.N.Y. Mar. 25, 2021) ............................................................ 24, 26

*Empire State Bldg. Co. v. New York Skyline, Inc. (In re New York Skyline, Inc.)*, 432 B.R. 66 (Bankr. S.D.N.Y. 2010) ................................................................22

*Flake v. Alper Holdings USA, Inc. (In re Alper Holdings USA, Inc.)*, 398 B.R. 736 (S.D.N.Y.) 2008 ................................................................................................5

*Flaxer v. Gifford (In re Lehr Constr. Corp.)*, 551 B.R. 732 (S.D.N.Y. 2016), *aff'd,* 666 F. App'x 66 (2d Cir. 2016)..........................................................................5

*Flushing Sav. Bank v. Teitelbaum (In re Lockwood Enters., Inc.)*, 70 B.R. 306 (S.D.N.Y. 1987)................................................................................................27

*Greek Orthodox Archdiocese of N. & S. Am. v. Abrams*, 162 Misc. 2d 850 (Sup. Ct. Kings Cnty. 1994)..............................................................................................26

*Hain v. Bush Indus., Inc. (In re Bush Indus., Inc.)*, No. 05-CV-119S, 2006 WL 8455682 (W.D.N.Y. Mar. 29, 2006) .................................................................9, 23

*In re Ames Dep't Stores, Inc.*, 306 B.R. 43 (Bankr. S.D.N.Y. 2004)......................20

*In re Bradlees Stores, Inc.*, No. 02 CIV. 0896 (WHP), 2003 WL 76990 (S.D.N.Y. Jan. 9, 2003), *aff'd*, 78 F. App'x 166 (2d Cir. 2003)...................................... 15, 18

*In re Crystal Apparel, Inc.*, 220 B.R. 816 (Bankr. S.D.N.Y. 1998) ................ 28, 29

*In re Ditech Holding Corp.*, No. 19-10412 (JLG), 2020 WL 7052883 (Bankr. S.D.N.Y. Nov. 30, 2020) ....................................................................................15

*In re DJK Residential LLC*, 416 B.R. 100 (Bankr. S.D.N.Y. 2009) ........................5

*In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 482 (Bankr. S.D.N.Y. 1991) .................................................................................................. 13, 19, 20, 30

*In re Enron Corp.*, 279 B.R. 79 (Bankr. S.D.N.Y. 2002)................................ passim

*In re Enron Corp.*, No. 01-16034 (AJG), 2003 WL 1562202 (Bankr. S.D.N.Y. Mar. 21, 2003) ....................................................................................................29

*In re Fairfield Sentry Ltd.*, No. 10 CIV. 7340, 2010 WL 4910119, (S.D.N.Y. Nov. 22, 2010)................................................................................................... 12, 27

*In re Karfakis*, 162 B.R. 719 (Bankr. E.D. Pa. 1993)...............................................22

*In re Klein Sleep Prod., Inc.*, 78 F.3d 18 (2d Cir. 1996) .........................................31

*In re Lavigne*, 114 F.3d 379 (2d Cir. 1997)...............................................................13

*In re Mammoth Mart, Inc.,* 536 F.2d 950 (1st Cir. 1976)................................. 19, 20

*In re Mazzeo*, 131 F.3d 295 (2d Cir. 1997)...............................................................14

*In re Mesa Air Group, Inc.*, No. 10-10018 (MG) (Bankr. S.D.N.Y. Sep. 24, 2010) ............................................................................................................................29

*In re S.E. Nichols Inc.*, 120 B.R. 745 (Bankr. S.D.N.Y. 1990) ...............................22

*In re Texaco Inc.*, 254 B.R. 536 (Bankr. S.D.N.Y. 2000) .......................................18

*In re United States ex rel Harrison v. Estate of Deutscher*, 115 B.R. 592 (M.D. Tenn. 1990)...........................................................................................................29

*Karpen v. Ali*, 46 Misc. 3d 1228(A) (Sup. Ct. Kings Cnty. 2015) .........................26

*New York State Elec. & Gas Corp. v. Pub. Serv. Comm'n of State of New York*, 245 A.D. 131 (3d Dep't 1935), *aff'd,* 274 N.Y. 591(1937)........................................26

*Official Comm. of Unsecured Creditors of Veristar, Inc. v. Am. Tower Corp.,* No. 05 Civ. 6268 (RPP), 2005 WL 3455775 (S.D.N.Y. Dec. 15, 2005)...................27

*Ogle v. Fid. & Deposit Co. of Maryland*, 586 F.3d 143 (2d Cir. 2009).......... passim

*Olin Corp. v. Riverwood Int'l Corp. (In re Manville Forest Prods. Corp.)*, 209 F.3d 125 (2d Cir. 2000) ....................................................................... 16, 17

*Otte v. United States*, 419 U.S. 43 (1974).................................................20

*Pearl-Phil GMT (Far E.) Ltd. v. Caldor Corp.*, 266 B.R. 575 (S.D.N.Y. 2001) 1, 15

*Rescap Liquidating Tr. v. PHH Mortg. Corp. (In re Residential Cap., LLC)*, 558 B.R. 77 (S.D.N.Y. 2016) .................................................... 15, 16, 17, 19

*SP Special Opportunities, LLC V. Lightsquared Inc. (In re LightSquared, Inc.)*, 539 B.R. 232 (S.D.N.Y. 2015) ....................................................................27

*Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98 (2d Cir. 1986) ......................................................................... 1, 19, 20, 30

*U.S. Bank Nat'l Ass'n v. S. Side House, LLC*, No. 11-CV-4135 (ARR), 2012 WL 273119 (E.D.N.Y. Jan. 30, 2012) ......................................................................14

*United States v. LTV Corp. (In re Chateaugay Corp.)*, 944 F.2d 997 (2d Cir. 1991) ......................................................................... 3, 14, 17

*United Trucking*, 851 F.2d 159 (6th Cir. 1988) ......................................................20

*Winter v. Ajax Auto Serv. Co.*, 81 N.Y.S.2d 17 (Sup. Ct. N.Y. Cnty. 1948)...........22

*Wongco v. Federated Dep't Stores, Inc. (In re R.H. Macy & Co.)*, 67 F. App'x 30 (2d Cir. 2003) ....................................................................... 15, 20

**Statutes**

11 U.S.C. § 363 .................................................................................................28

11 U.S.C. § 503 ............................................................................................ 19, 30

28 U.S.C. § 1334(a) ............................................................................................4

28 U.S.C. § 157(a) ..............................................................................................4

## PRELIMINARY STATEMENT

This appeal is straight-forward.  It does not implicate fundamental issues of bankruptcy law or fairness as appellant Finance of America Reverse LLC (the "**Appellant**" or "**FoA**") suggests.  Rather, Appellant is a disappointed creditor of a chapter 11 debtor looking to claw its way out from decades of well-settled bankruptcy law that does not permit a contract counterparty to convert its prepetition claims that must share in recoveries with other prepetition creditors into administrative expense claims that must be paid one-hundred percent (100%).  Although FoA suggests that the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") created and applied "new" law, that is just plain wrong.  Rather, the Bankruptcy Court properly applied long-standing principles first set forth in *Pearl-Phil GMT (Far E.) Ltd. v. Caldor Corp.*, 266 B.R. 575, 582 (S.D.N.Y. 2001) that "a post-petition breach of a pre-petition contract gives rise only to a pre-petition claim."  The Second Circuit has since affirmed this holding on numerous occasions and district courts have applied this principle consistently thereafter.  The Bankruptcy Court correctly applied this long-standing authority to reject Appellant's contentions that it is entitled to full payment of approximately $14 million arising from alleged postpetition breaches of prepetition contracts against Reverse Mortgage Solutions, Inc., a chapter 11 debtor (the "**Debtor**" or "**RMS**").

The Second Circuit has held that administrative expense claims against the estate are to be narrowly construed.  *See Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 100 (2d Cir. 1986) ("Because the presumption in bankruptcy cases is that the debtor's limited resources will be equally distributed among his creditors, statutory priorities are narrowly construed."); *In re Enron Corp.*, 279 B.R. 79, 85 (Bankr. S.D.N.Y. 2002) ("[I]n light of the bankruptcy goal of providing equal distribution of a debtor's assets to all creditors, priorities are

narrowly construed.").  This is because bankruptcy is a zero sum game—a dollar into the pocket of one stakeholder is a dollar out of the pocket of another.  A central objective of the chapter 11 process is to allocate the limited assets of the debtor equitably among its creditors.

Accordingly, parties who deal with a chapter 11 debtor postpetition are not entitled to enforce the terms of their agreements against the debtor through alleged breach claims.  In other words, an alleged breach, even if it occurs postpetition, does not convert a prepetition contract into a postpetition contract.  Instead, any claim for administrative expenses are limited to the benefit conferred upon the debtor postpetition, not the alleged loss incurred by the claimant.  *See Enron*, 279 B.R. at 85 ("The focus on allowance of a priority is to prevent unjust enrichment of the estate, ***not to compensate the creditor for its loss***.") (emphasis added).

Appellant was a party to subservicing agreements with RMS, a Debtor in the below chapter 11 cases.[2]  RMS serviced mortgages owned by Appellant and remitted hundreds of millions of dollars of mortgage payments collected by RMS from FoA's borrowers during the postpetition period, less RMS's servicing fee of five percent (5%).  Appellant now contends that, in addition to the significant mortgage payments it has received from RMS during the postpetition period, it is also entitled to full payment of another approximately $14 million to satisfy alleged breach of contract claims against RMS.  But under well-settled Second Circuit law, those breach claims are prepetition claims that must share in pro-rated recovery with other prepetition creditors.

---

[2]  Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Plan, the *Order Confirming Third Amended Joint Chapter 11 Plan of Ditech Holding Corporation and Its Affiliated Debtors* (Case No. 19-10412, ECF No. 1404), or the *Order Approving (I) Claims Objection Procedures and (II) Claim Hearing Procedures* (the "**Claims Procedures Order**") (Case No. 19-10412, ECF No. 1632), as applicable.  *See* [A-474], [A-670].

Appellant makes two arguments to support its claim. First, Appellant alleges that this Court should overturn the Bankruptcy Court (and disregard Second Circuit law) because it is unfair and allegedly contrary to public policy to not permit it to leapfrog other prepetition claimants and collect one-hundred percent (100%) of its prepetition claims against the Debtor. The Bankruptcy Court properly considered and dismissed Appellant's first argument. Specifically, the Bankruptcy Court correctly applied long-standing Second Circuit law. The Second Circuit has adopted a "fair contemplation test" which provides that postpetition claims arising under a prepetition contract that are within the fair contemplation of the parties at the time of execution of the contract are prepetition claims, not administrative expense claims. *See United States v. LTV Corp. (In re Chateaugay Corp.)*, 944 F.2d 997, 1004 (2d Cir. 1991). The Bankruptcy Court then found that the parties contemplated breach claims arising from the alleged servicing errors at the time of execution as the contracts provide for numerous mechanisms, including indemnification, to address such claims. *See Memorandum Decision and Order Sustaining the Fifty-Second Omnibus Objection to Proofs of Claim (Misclassified Claims) with Respect to Claims of Liberty Home Equity Solutions, Inc. and Finance of America Reverse LLC* (Case No. 19-10412, ECF No. 3741) (the "**Bankruptcy Court Decision**") at [A-24]. Therefore, Appellant's alleged breach claim is a prepetition claim.

Second, Appellant alleges that simple one-page extensions of prepetition contracts that were executed postpetition by Appellant and the Debtor were really "new" contracts that give rise to administrative expense liability. The Bankruptcy Court rejected this allegation based on a simple review of the Extensions (as defined herein). Among other reasons, the Bankruptcy Court rejected Appellant's argument because the Extensions spoke of only "extending" the original agreements on the same terms and conditions as stated in the original contracts and even

said that they were being entered into so the parties could negotiate new agreements.  *See* Bankruptcy Court Decision at [A-19].

Nothing about the Bankruptcy Court Decision is unique or unfair.  The Bankruptcy Court simply applied well-established Second Circuit law in rejecting Appellant's demand for treatment of its litigation claim as an administrative expense claim.  Appellant has been paid hundreds of millions of dollars for collections that the Debtor made and transferred to Appellant during the postpetition period.  Accordingly, Appellant has been satisfied for the reasonable value of any benefit it conferred on the Debtor's estate.  It now demands that the Debtor also compensate it for the alleged loss it incurred as a result of alleged breaches of prepetition contracts, in clear violation of established Second Circuit precedent.  The Bankruptcy Court correctly refused to treat Appellant's asserted breach claim as an administrative expense.

The Bankruptcy Court's decision should be affirmed.

## JURISDICTIONAL STATEMENT

The Bankruptcy Court had jurisdiction over the proceedings below under 28 U.S.C. §§ 1334(a), 157(a), and the Amended Standing Order of Referral of Cases to Bankruptcy Judges of the United States District Court for the Southern District of New York, dated January 31, 2012 (Preska, C.J.).  This Court has jurisdiction under 28 U.S.C. § 158(a)(1) over this appeal from a final order granting the Appellee's *Fifty-Second Omnibus Objection to Proofs of Claim (Misclassified Claims)* (Case No. 19-10412, ECF No. 2186) (the "**Omnibus Objection**") as to the Claim filed by Appellant against RMS.  [A-710].

The Bankruptcy Court Decision was entered on October 21, 2021.  [A-1]. The Appellant filed a *Notice of Appeal* (Case No. 19-10412, ECF No. 3754) on November 3, 2021.  [A-1147].

4

## COUNTERSTATEMENT OF THE ISSUES ON APPEAL

1)      Did the Bankruptcy Court err in applying established Second Circuit law to find that FoA's contract-based claims arose at the time the contract was executed because those claims were fairly contemplated by the prepetition subservicing agreements and are therefore prepetition claims?

2)      Did the Bankruptcy Court err in finding that the plain unambiguous language of the Extensions demonstrate that they are not new postpetition agreements?

## STANDARD OF REVIEW

On appeal, the district court reviews the Bankruptcy Court's findings of fact for clear error and conclusions of law *de novo*.  *Flaxer v. Gifford (In re Lehr Constr. Corp.)*, 551 B.R. 732, 736 (S.D.N.Y. 2016), *aff'd*, 666 F. App'x 66 (2d Cir. 2016).  In determining "whether a party has met their burden in connection with a proof of claim, bankruptcy courts have looked to the pleading requirements set forth in the Federal Rules of Civil Procedure."  *In re DJK Residential LLC*, 416 B.R. 100, 106 (Bankr. S.D.N.Y. 2009).  Where a proof of claim attaches or incorporates by reference documents, the Court may consider those documents in deciding whether the claimant has plausibly asserted a claim.  *See, e.g.*, *Flake v. Alper Holdings USA, Inc. (In re Alper Holdings USA, Inc.)*, 398 B.R. 736, 748 (S.D.N.Y. 2008) ("The documents attached to the proofs of claim should be treated, for purposes of a motion to disallow claims, like documents that are attached to or relied upon in a complaint are treated on a Rule 12(b)(6) motion to dismiss") (citation omitted).

## STATEMENT OF THE CASE

### A.    Background

FoA is a reverse mortgage lender.   RMS was a mortgage servicing company that primarily focuses on servicing and subservicing reverse mortgage loans.  A reverse mortgage is a loan that allows homeowners to borrow money against the equity value of their homes.  FoA and RMS were parties to the three (3) agreements at issue here pursuant to which RMS subserviced certain reverse mortgage loans for FoA.   More specifically, RMS collected FoA's mortgage payments and remitted such payments to FoA in exchange for subservicing fees and other consideration.   The three agreements are:

- *Reverse Mortgage Subservicing Agreement*, dated as of December 12, 2017, by and between RMS and FoA (as extended from time to time, the "**Dec 2017 Agreement**");

- *Reverse Mortgage Subservicing Agreement*, dated as of October 4, 2018, by and between RMS and FoA (as extended from time to time, the "**Oct 2018 Agreement**")[3]; and

- *Reverse Mortgage Subservicing Agreement*, dated March 18, 2011, by and between RMS and FoA (f/k/a Urban Financial Group, Inc.) (the "**March 2011 Agreement**" and together with the Dec 2017 Agreement and Oct 2018 Agreement, the "**Original Agreements**").

The March 2011 Agreement's original term, inclusive of automatic renewals, expired on March 19, 2018.  Opening Brief (defined below) at 6.  FoA and RMS subsequently extended the March 2011 Agreement pursuant to seven (7) extension agreements that were executed before RMS filed for bankruptcy.  *Id*.  The last extension that was executed by the parties before RMS

---

[3]  As noted by the Appellant, the Dec 2017 Agreement and Oct 2018 Agreement were extended past the Petition Date pursuant to FoA's monthly renewal option under the agreements.  FoA exercised its option to extend through February 2019 and September 2019 respectively.  For the avoidance of doubt, the legal issues related to whether the Extensions are postpetition agreements are only applicable the March 2011 Agreement.

filed for bankruptcy was entered into on January 30, 2019 and extended the term of the Original Agreements through March 31, 2019.  *Id.*

On February 11, 2019 (the "**Petition Date**"), RMS, along with its Debtor affiliates, commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

After the Petition Date, RMS and FoA entered into four (4) extensions to the March 2011 Agreement (the "**Extensions**" and together with the Original Agreements, the "**Agreements**"). The Extensions extended the expiration date of the March 2011 Agreement without changing any other terms and conditions.  The final Extension expired on September 30, 2019, which was the date the Debtors' Plan became effective and binding against all creditors and parties in interest (the "**Effective Date**").  Under the Plan, RMS and its business was sold to an unaffiliated third party.  The buyer did not take assignment of the Agreements.  The Debtor did not assume the Agreements.  Accordingly, the Agreements were all rejected under the Bankruptcy Code.

On November 11, 2019, FoA filed proof of claim number 60182 (the "**Claim**" or "**Proof of Claim**"), seeking allowance of an administrative expense priority claim in the amount of $375,832.07 plus other amounts to be determined.  FoA subsequently revised the Claim to $14 million plus other amounts to be determined.   In the Proof of Claim, FoA alleged damages resulting from RMS's alleged subservicing errors and other material breaches of the Agreements during the period between the Petition Date and the Effective Date.  Each of the three Original Agreements contain terms that expressly contemplate the possibility that RMS might breach such agreements, including by making errors in its subservicing of reverse mortgages.  *See e.g.*, Proof of Claim at [A-1192] ("indemnifying FoA for all losses, including without limitation attorneys'

fees, resulting from . . . RMS' failure to perform any of its duties under the Subservicing Agreements in any material respect.").

## B.     Procedural History

On April 17, 2020, the Plan Administrator filed the Omnibus Objection, objecting to, among others, the Claim on the basis that it was improperly classified as an administrative expense claim.  On May 8, 2020, Appellee filed a response (the "**Response**").  On December 11, 2020, the Plan Administrator filed its reply (the "**Reply**").

Under the procedures established by the Bankruptcy Court's Claims Procedures Order, the Bankruptcy Court conducted a Sufficiency Hearing, defined as "a non-evidentiary hearing to address the whether the Contested Claim has failed to state a claim against the Debtors which can be allowed and should be dismissed pursuant to Bankruptcy Rule 7012."  Claims Procedures Order at [A-674].  The Claims Procedures Order dictates that the legal standard of review at a Sufficiency Hearing will be the equivalent to the standard applied upon a motion to dismiss for failure to state a claim upon which relief can be granted.  *Id.*  A Sufficiency Hearing on the Claim was held before Judge James L. Garrity on January 28, 2021, at which the Appellant appeared.

## C.     The Bankruptcy Court's Denial of Administrative Expense Status of the Claim

On October 21, 2021, the Bankruptcy Court entered the Bankruptcy Court Decision granting the Omnibus Objection.  First, the Bankruptcy Court analyzed whether the Extensions were postpetition agreements giving rise to administrative expense liability (as alleged by Appellant) or merely a modification of the March 2011 Agreement that continued the prepetition contract and therefore only gave rise to prepetition claims.  The Bankruptcy Court found the Agreements were prepetition agreements.  In reaching this conclusion, the Bankruptcy Court

8

looked at the factors set out in *Hain v. Bush Indus., Inc. (In re Bush Indus., Inc.)*, No. 05-CV-119S, 2006 WL 8455682 (W.D.N.Y. Mar. 29, 2006).  In *Bush*, the District Court for the Western District of New York held, in the bankruptcy claim context, that an agreement that (1) restates contract provisions with no substantive changes; (2) involves the same relationship among the same parties; (3) contains clauses that state the parties' desire to amend and restate prior agreements; and (4) merely adjusts the term of the agreement or the compensation, does not constitute a new contract (the "**Bush Factors**").  *Id*. at *5.  Furthermore, where the underlying agreement permits amendment, supplementation, or modification in whole or in part, subsequent agreements will be considered modifications rather than new agreements.  *See id*.

Applying the Bush Factors, the Bankruptcy Court held that the Extensions do not constitute postpetition agreements.  Specifically, the Bankruptcy Court found it significant that the "[Extensions] speak only of extending the [March 2011 Agreement] on the same terms and conditions as stated in the [March 2011 Agreement]… Moreover, the parties tacitly acknowledge that the [Extensions] are not new agreements among the parties because they agreed to extend the termination dates of the agreements to allow the parties further time to negotiate and execute a new [subservicing agreement]."  Bankruptcy Court Decision at [A-19] (internal quotations omitted).  In addition, the Bankruptcy Court reasoned, "the [Extensions] fail to address, at all, the rights and obligations under the subservicing relationship that constitute breach, notification of breach, indemnity, dispute resolution, or the treatment of claims arising under the agreement." [A-20].  Consequently, like the agreement at issue in *Bush*, the Bankruptcy Court held that the Extensions merely "(i) restate the provisions of the [March 2011 Agreement] with no substantive changes, (ii) involve the same relationship among the same parties, and (iii) state the parties' intention to extend terms of the subject [March 2011 Agreement]."  *Id*.

The Bankruptcy Court then considered whether the Claim was entitled to administrative expense priority.  FoA argued, as it does on appeal, that the Claim was entitled to administrative expense priority because a "debtor's post-petition obligations under a prepetition contract that has not yet been assumed or rejected will give rise to administrative expense claims where the debtor-in-possession continues to perform under such contract and receive the benefits thereunder."   Bankruptcy Court Decision at [A-21].   The Bankruptcy Court applied long-standing Second Circuit precedent and rejected FoA's argument, holding that "[w]here parties contemplate the possibility of future breach in their contracts, such breaches are treated as contingent prepetition claims rather than post-petition claims."  *Id*. at [A-23].   Because the Original Agreements "contemplate the possibility of servicing errors and establish procedures for dealing with errors," the Bankruptcy Court held, "[t]he risk of subservicing errors in the postpetition period was within the fair contemplation of the parties, and the fact that the Debtors received compensation for their services does not transform the claims into administrative expense claims."  *Id*. at [A-24].

Accordingly, the Bankruptcy Court denied administrative expense treatment of the Claim, stating that the Claim is "at most, [a] contingent prepetition general unsecured [claim]." *Id*. at [A-26].

**D.     The Appeal[4]**

On November 3, 2021, Appellant filed a *Notice of Appeal* (ECF No. 3754).   On December 6, 2021, Appellant filed *Finance of America Reverse LLC's Statement of Issues*

---

[4]  RMS had entered into similar subservicing agreements and extensions with Liberty Home Equity Solutions, Inc. ("**LHES**") as it did with FoA.  LHES's claim was also reclassified as a General Unsecured Claim in the Bankruptcy Court Decision.  LHES filed and then dropped its appeal of the Bankruptcy Court Decision.

*Presented on Appeal and Designation of Record on Appeal* (ECF No. 3).  On December 16, 2021, Appellee filed *Plan Administrator-Appellee's Counter-Designation of Additional Items to be Included in the Record on Appeal* (ECF No. 4).  On January 18, 2022, Appellant filed their opening brief (ECF No. 7) (the "**Opening Brief**").

## SUMMARY OF THE ARGUMENT

The Bankruptcy Court properly denied Appellant's classification of the Claim as an administrative expense claim.  Appellant's assertion that the Bankruptcy Court has created a "new rule" is plainly false.  The Bankruptcy Court relied on more than thirty (30) years of Second Circuit jurisprudence in rejecting Appellant's request that its claims for a postpetition breach of a prepetition contract be treated as a postpetition administrative expense obligation.  Second Circuit courts have been clear that claims arising postpetition based on prepetition contracts are contingent prepetition claims, as long as the contingency is within the "actual or presumed contemplation of the parties at the time the original relationship between the parties was created."  *Ogle v. Fid. & Deposit Co. of Maryland*, 586 F.3d 143, 144, 146 (2d Cir. 2009).  As the Bankruptcy Court found, the Claim arises from alleged subservicing errors arising under the Original Agreements, which explicitly contemplate potential breaches in several provisions.  Consequently, the Claim is a contingent prepetition claim.

In addition, the Bankruptcy Court properly found that the Extensions were not postpetition agreements.  The most important factor courts look to when interpreting a contract is the intent of the parties.  The plain language of the Extensions demonstrates that FoA and RMS did not intend to enter into new postpetition contracts.  *See* Extensions at [A-895].

Appellee made two alternative arguments (the "**Alternative Arguments**") in the Reply that the Bankruptcy Court declined to address:

- If the Extensions constitute new, postpetition agreements, they were void because the Bankruptcy Court did not authorize the Debtor to enter into and perform under such agreements (the "**Ordinary Course Argument**"); and

- To the extent Appellant is entitled to any administrative expense claim, the amount should be capped at the amount of postpetition fees RMS collected under the Agreements (the "**Cap Argument**").

There is sufficient basis to affirm the Bankruptcy Court Decision without regard to the Alternative Arguments.  However, to the extent this Court finds that Alternative Arguments should be considered, they should be remanded to the Bankruptcy Court in the first instance. The decision to remand is in the Court's discretion.  This Court has cited judicial efficiency and bankruptcy law expertise as reasons why a bankruptcy court is a more appropriate forum to decide bankruptcy issues in the first instance.  *See In re Fairfield Sentry Ltd.*, No. 10 CIV. 7340, 2010 WL 4910119, at *2 (S.D.N.Y. Nov. 22, 2010) ("[T]he bankruptcy court is familiar with these proceedings and the underlying factual context, and, moreover, it can employ its specialty expertise to this question.  Thus, judicial efficiency would be served and the uniform administration of the bankruptcy laws improved by allowing the bankruptcy judge to decide this issue in the first instance.").  The same reasoning applies here.

To the extent this Court considers the Ordinary Course Argument, the Extensions are invalid because entering into new, postpetition subservicing agreements is outside the ordinary course of business and thus would have required prior Bankruptcy Court approval under section 363(b) of the Bankruptcy Code.  Because the Bankruptcy Court did not authorize these "new" contracts, they are void ab initio.  *See In re Lavigne*, 114 F.3d 379, 389 (2d Cir. 1997) ("We hold

that Lavigne's cancellation of the policy was beyond the ordinary course of his business and invalid without notice.").

To the extent this Court considers the Cap Argument, administrative expense priority is limited to the reasonable value of the benefit conferred on the estate.  The purpose of this limitation is to "prevent[] unjust enrichment of the debtor's estate, rather than the compensation of the creditor for the loss to him."  *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 482, 490 (Bankr. S.D.N.Y. 1991).  Here, FoA is asserting approximately $14 million as an administrative expense, which is approximately $10 million above what RMS collected in postpetition fees, *i.e.*, the maximum amount of the benefit conferred on the estate by FoA.  *See* Bankruptcy Court Order at [A-2].  Allowing FoA to recoup more than the postpetition fees RMS collected would result in a windfall to FoA at the expense of the estates' other creditors.

## ARGUMENT

## I.    The Bankruptcy Court Properly Denied Appellant's Classification of the Claim as an Administrative Expense Consistent with 30 Years of Second Circuit Authority

### A.    Claims Based on Postpetition Conduct Arising From Prepetition Contracts Give Rise to Prepetition Contract Claims, not Administrative Expense Claims, as Long as those Claims are Fairly Contemplated

Section 101(5) of the Bankruptcy Code defines "Claim" to include any "right to payment, whether or not such right is reduced to judgement, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."  Courts consistently hold that the definition of "Claim" is to be interpreted broadly.  *See In re Mazzeo*, 131 F.3d 295, 302 (2d Cir. 1997) (holding that "[w]e agree that the term "claim" is sufficiently broad to encompass any possible right to payment").  The Second Circuit in *Ogle* held that a "contingent claim under the [Bankruptcy] Code refers to obligations that will become due upon the happening of a future event that was within the actual or presumed contemplation of the

parties at the time the original relationship between the parties was created."  586 F.3d at 144 (citations and internal quotation marks  omitted).

Federal bankruptcy law governs when a claim arises.  *U.S. Bank Nat'l Ass'n v. S. Side House, LLC*, No. 11-CV-4135 (ARR), 2012 WL 273119, at *3, *6 (E.D.N.Y. Jan. 30, 2012) ("The time at which a claim arises—i.e. whether the claim arises pre- or postpetition—is determined as a matter of federal bankruptcy law.").  Second Circuit bankruptcy jurisprudence is clear that claims based on prepetition contracts are contingent prepetition claims—even if the alleged breaches of those contracts occur postpetition.  Beginning at least as early as 1991, the Second Circuit held in *Chateaugay*:

> that "[i]n the context of contract claims, the [Bankruptcy] Code's inclusion of 'unmatured' and 'contingent' claims is usually said to refer to obligations that will become due upon the happening of a future event that was 'within the actual or presumed contemplation of the parties at the time the original relationship between the parties was created.'"  944 F.2d at 1004.

Since then, courts in the Second Circuit have uniformly held that contract-based bankruptcy claims arise at the time the contract is executed.  *See Pearl-Phil GMT*, 266 B.R. at 582 ("For example, courts consistently hold that a postpetition breach of a pre-petition contract gives rise only to a prepetition claim."); s*ee also Ogle*, 586 F.3d at 147 ("[A]n unsecured claim for postpetition fees, authorized by a valid pre-petition contract," is a contingent claim "deemed to have arisen pre-petition."); *In re Bradlees Stores, Inc.*, No. 02 CIV. 0896 (WHP), 2003 WL 76990, at *3 (S.D.N.Y. Jan. 9, 2003), *aff'd*, 78 F. App'x 166 (2d Cir. 2003) ("[T]he Second Circuit recognizes that contract-based bankruptcy claims are deemed to arise at the time the contract is executed, and therefore a postpetition breach of a pre-petition contract gives rise solely to a pre-petition claim")*; Rescap Liquidating Tr. v. PHH Mortg. Corp. (In re Residential Cap., LLC)*, 558 B.R. 77, 86 (S.D.N.Y. 2016) ("The appellees' claims for attorney's fees accrued

14

at the time the Contracts were executed even though they remained contingent until the Trust allegedly breach the Contracts"); *Wongco v. Federated Dep't Stores, Inc. (In re R.H. Macy & Co.)*, 67 F. App'x 30, 32 (2d Cir. 2003) ("[O]bligations that will become due upon the happening of a future event that was within the actual or presumed contemplation of the parties at the time the original relationship between the parties was created."); *In re Ditech Holding Corp.*, No. 19-10412 (JLG), 2020 WL 7052883, at *6 (Bankr. S.D.N.Y. Nov. 30, 2020) ("Contract claims arise upon execution of an agreement…It is settled that prepetition contract based claims for attorney's fees are deemed to arise upon execution of the contract.").

In determining whether a breach of contract claim is a contingent prepetition claim, Second Circuit courts review whether a breach was within the "actual or presumed contemplation of the parties at the time the original relationship between the parties was created." *Ogle*, 586 F.3d at 146 (quotation marks omitted) (the "**Fair Contemplation Test**").  In other words, where parties contemplate the possibility of a future breach in their prepetition contracts, as RMS and FoA did here, such postpetition breaches are treated as contingent prepetition claims.  *See, e.g.*, *Residential Cap.* ("**ResCap**"), 558 B.R. at 85-87; *Olin Corp. v. Riverwood Int'l Corp. (In re Manville Forest Prods. Corp.)*, 209 F.3d 125, 129 (2d Cir. 2000) (claims for indemnity arose pre-petition where "the terms of the indemnification agreements were so broad as to encompass all types of future liability"); *see also supra* pp. 3.

The Bankruptcy Court correctly applied this long-standing authority.  The Fair Contemplation Test is a bedrock bankruptcy principle absent which every prepetition contract that continues postpetition—which occurs in the vast majority of cases—would convert into a postpetition contract allowing prepetition creditors to leapfrog other unsecured creditors.  Merely providing postpetition services under a prepetition contract does not give rise to an

administrative expense claim.  *See, e.g.*, *Beneke Co. v. Econ. Lodging Sys., Inc. (In re Econ. Lodging Sys., Inc.)*, 234 B.R. 691 (B.A.P. 6th Cir. 1999).

The breaches asserted in the Claim arise from alleged subservicing errors under the Agreements.  The Bankruptcy Court found that these types of claims were expressly contemplated by the plain terms of the Agreements.  *See* Bankruptcy Court Decision at [A-24] ("The [Original Agreements] contemplate the possibility of servicing errors and establish procedures for dealing with errors, including through indemnity provisions.").  As the Bankruptcy Court found, there are several provisions in the Original Agreements that contemplate breaches of their terms, including indemnification provisions.  *See id.* at [A-24].

These terms are not materially different from, for example, the prepetition agreement in *ResCap* that included covenants not to sue, notice and opportunity to cure provisions, forum selection clauses, and/or prevailing party provisions.  In *ResCap*, a breach of any of the above provisions entitled the claimant to attorney's fees.  In holding that the attorneys' fees were within the fair contemplation of the parties and therefore prepetition, the *ResCap* court held that "[t]he appellees' claims for attorney's fees accrued at the time the Contracts were executed even though they remained contingent until the Trust allegedly breached the Contracts."  *ResCap*, 558 B.R. at 86.

## B.    FoA's Characterization of the Bankruptcy Court's Decision as a "New Rule" is Contrary to More Than 30 Years of Second Circuit Law

FoA audaciously and incorrectly characterizes the Bankruptcy Court's ruling as creating a "new rule."  Opening Brief 2.  On the contrary, the Fair Contemplation Test has been well-settled law for more than 30 years in the Second Circuit.  The Second Circuit adopted a formulation of the Fair Contemplation Test in 1991 in *Chateaugay*, 944 F.2d 997.  In 2000, the Second Circuit expressly applied this law to contracts.  In *Manville*, the Court held that because a

16

claim for environmental liability indemnification arose at the time the parties executed the contract containing the indemnification provision even if the indemnification obligation was triggered postpetition, the indemnification claim was a contingent, prepetition claim.  209 F.3d at 128.  In the 21 years since *Manville* was decided, the Second Circuit has explicitly reaffirmed *Manville* numerous times.  *See, e.g.*, *supra* pp. 16-17.  Consequently, the Bankruptcy Court's ruling is hardly a "new rule"—it explicitly follows more than 30 years of Second Circuit law.

Furthermore, FoA cannot and does not allege that the breaches asserted in the Claim were not contemplated in the Original Agreements.  Instead, FoA attempts to create a distinction where none exists: between RMS's prepetition conduct—which FoA alleges is governed by the Fair Contemplation Test, and RMS's postpetition conduct—which FoA alleges is not governed by the Fair Contemplation Test.  Opening Brief 19.

FoA misstates the law.  The Fair Contemplation Test was specifically designed to address postpetition actions and whether postpetition actions give rise to a prepetition claim.  In *Ogle*, Fidelity & Deposit Company of Maryland ("**Fidelity**") entered into several surety bond agreements with Agway, Inc. ("**Agway**") which required Agway to indemnify Fidelity for attorneys' fees that it might incur to enforce the agreements against Agway.  586 F.3d at 145.  After Agway filed for bankruptcy, Fidelity made payments to Agway's creditors, unsuccessfully demanded indemnity under the agreements, and incurred attorneys' fees in litigation to collect from Agway.  *Id*.  The court held that "an unsecured claim for post-petition fees, authorized by a valid pre-petition contract, is… deemed to have arisen pre-petition."  *Id*. at 147.

FoA relies heavily upon *In re Texaco Inc.*, 254 B.R. 536 (Bankr. S.D.N.Y. 2000), to support its contention that a post-petition breach of a prepetition contract gives rise to an administrative claim.  *See* Opening Brief at 19, 22-23.  In *Texaco*, the debtor sought to bar

breach of contract claims that arose nearly a decade *after* confirmation of its chapter 11 plan under a contract that passed through the bankruptcy. *Texaco*, 254 B.R. at 557-59. The situation here is not *Texaco*. *Texaco* addressed claims arising after confirmation of the Plan when the debtor continued to receive benefits under the agreements at issue for ten (10) years following emergence. Here, the issue is whether FoA is entitled to an administrative expense claim for alleged breaches that occurred during the postpetition period before confirmation of the Debor's Plan. This fact pattern has been clearly decided by the Second Circuit.

Moreover, subsequent Second Circuit authority makes clear that FoA is not entitled to an administrative expense claim. For example, in *Bradlees Stores*, which was decided two years after *Texaco* and affirmed by the Second Circuit, the court held that "the Second Circuit recognizes that contract-based bankruptcy claims are deemed to arise at the time the contract is executed, and therefore a postpetition breach of a pre-petition contract gives rise solely to a pre-petition claim." 2003 WL 76990, at *3. This holding was then affirmed by the Second Circuit directly in *Ogle*. *See* 586 F.3d at 144 ("an unsecured claim for postpetition fees, authorized by a valid pre-petition contract," is a contingent claim "deemed to have arisen pre-petition."); *see also ResCap*, 558 B.R. at 84–85 ("The appellees' Counterclaims are 'contingent claims' that accrued pre-petition upon the execution of each respective Contract."); *supra* pp. 16-17.

The Bankruptcy Court correctly reclassified the Claim as a General Unsecured Claim.

### C.  FoA Already Received Legally Sufficient Compensation In Exchange for the Benefit Conferred on RMS in the Postpetition Period

FoA incorrectly characterizes the Bankruptcy Court's holding as "every breach of a pre-petition contract [gives] rise only to pre-petition claims." FoA completely ignores the fact that the Fair Contemplation Test (and the Benefit to the Estate Test (as defined herein)) already act as safeguards against FoA's alleged abuses. Section 503 of the Bankruptcy Code affords

administrative expense priority only to claims that are "actual, necessary costs and expenses of preserving the estate".   11 U.S.C. § 503(b)(1)(A).   The purpose of the statute is to provide counterparties with the incentive to continue honoring their contractual obligations to the debtor so the debtor can continue to rehabilitate the business for the benefit of its creditors.   *See Amalgamated*, 789 F.2d at 101 ("Congress granted priority to administrative expenses in order to facilitate the efforts of the trustee or debtor in possession to rehabilitate the business for the benefit of all the estate's creditors.") (citing *In re Mammoth Mart, Inc.,* 536 F.2d 950, 953 (1st Cir. 1976)).

Consequently, it is not surprising that courts within the Second Circuit have long construed the "actual" and "necessary" component of the statute narrowly.  *See, e.g.*, *Drexel*, 134 B.R. at 488 ("Strict construction of the terms 'actual' and 'necessary,' serves to keep administrative expenses at a minimum so as to preserve the estate for the benefit of all its creditors." (quoting *Otte v. United States*, 419 U.S. 43, 53 (1974)); *In re Ames Dep't Stores, Inc.*, 306 B.R. 43, 54 (Bankr. S.D.N.Y. 2004) ("[G]rants of administrative expense priority cut against the general goal in bankruptcy law to distribute limited debtor assets equally among similarly situated creditors, and thus [] statutory priorities, such as those resulting from administrative expense treatment, are narrowly construed.").  In fact, administrative expense priority "should only be granted under extraordinary circumstances, to wit, when the parties seeking priority have sustained their burden of demonstrating that their services are actual and necessary to preserve the estate." *Drexel*, 134 B.R. at 489.

In *Amalgamated*, the Second Circuit laid out the test more clearly: "an expense is administrative only if [(1)] it arises out of a transaction between the creditor and bankrupt's trustee or debtor in possession… and [(2)] only to the extent that the consideration supporting the

claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business" (the "**Benefit to the Estate Test**").   789 F.2d at 101 (internal quotations omitted) (quoting *In re Mammoth Mart*, 536 F.2d 950 at 954).   In order to qualify as an administrative expense, there "must be a concrete, discernible benefit . . . because a speculative benefit or the mere potential for benefit is not enough to warrant an administrative claim priority."   *Enron*, 279 B.R. at 706.   Furthermore, the purpose of the Benefit to the Estate Test is to "prevent[] unjust enrichment of the debtor's estate, ***rather than the compensation of the creditor for the loss to him***."   *Drexel*, 134 B.R. at 490 (emphasis added) (citing *United Trucking*, 851 F.2d 159, 162 (6th Cir. 1988)); *see also Enron*, 279 B.R. at 85 (same); *R.H. Macy*, 170 B.R. 69, 78 (same).

The Benefit to the Estate Test applies where there is a postpetition transaction for an exchange of goods or services for which the creditor does not receive proper consideration.   For example, in *Enron*, the debtor was party to a series of prepetition energy contracts under which the debtor was accorded the right to use claimant's pipelines to transport and supply natural gas. 279 B.R. at 83.   Claimant filed an administrative expense claim for the debtor's right to use the pipeline during the postpetition period without regard to whether the debtor actually used the pipelines.   *See id*. at 84.   The Court strictly construed the "benefit" prong of the Benefit to the Estate Test, holding that the claimant was only entitled to administrative expense priority for the two postpetition days the debtor actually used the pipeline capacity, focusing on "prevent[ing] unjust enrichment", not to "compensate the creditor for its loss."   *Id*. at 85, 91.

Consequently, under the Fair Contemplation Test, claimants are not entitled to administrative expense priority for an alleged breach if the alleged breach was fairly contemplated by the prepetition agreement.   Under the Benefit to the Estate Test, claimants may

be entitled to administrative expense priority if they conferred a concrete, discernible benefit to the debtor in the operation of its business pursuant to a postpetition transaction, but not for a loss incurred by such creditor.  In this instance, because, as the Bankruptcy Court correctly found, the breaches here were fairly contemplated, FoA is not entitled to administrative expense priority under the Fair Contemplation Test.  Furthermore, the only benefit FoA could have possibly conferred to RMS was the approximately $4 million in postpetition subservicing fees RMS collected under the Agreements.  In exchange, FoA received hundreds of millions of dollars in mortgage payments, and therefore, any administrative expense claim FoA may have been entitled to under the Benefit to the Estate Test was already received by FoA, and any additional claims would be an unfair windfall to FoA in contravention of the settled law.

## II.     The Bankruptcy Court Properly Found that the Extensions Were Not Postpetition Agreements

### A.     New York Courts Consider the Intent of the Parties in Determining Whether a Modification Forms a New Postpetition Agreement

Contract interpretation is a matter of state law and, accordingly, bankruptcy courts will rely on applicable state law in construing a contract's terms.  *See In re Karfakis*, 162 B.R. 719, 725 (Bankr. E.D. Pa. 1993).  Because the governing law of the Original Agreements are the laws of the State of New York, New York law controls the interpretation of the Agreements.  The primary objective with respect to contract interpretation is to "give effect to the parties' intent as revealed in the language that they used."  *Buena Vista Home Ent., Inc. v. Wachovia Bank, N.A. (In re Musicland Holding Corp.),* 374 B.R. 113 (S.D.N.Y. 2007), *aff'd,* 386 B.R. 428 (S.D.N.Y. 2008, *aff'd,* 318 F. App'x 36 (2d Cir. 2009).  The words and phrases in a contract should be given their "plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions.  *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co.,* 773

F.3d 110, 114 (2d Cir. 2014).  New York courts have consistently held that substance, rather than form, controls in determining whether a modification is a separate agreement or part of the same, underlying agreement.  *In re S.E. Nichols Inc.*, 120 B.R. 745, 748 (Bankr. S.D.N.Y. 1990) ("In determining whether a new agreement constitutes a new lease or the modification of an existing lease, substance, rather than form, controls.") (citing *Winter v. Ajax Auto Serv. Co.*, 81 N.Y.S.2d 17, 18 (Sup. Ct. N.Y. Cnty. 1948)); *Empire State Bldg. Co. v. New York Skyline, Inc. (In re New York Skyline, Inc.)*, 432 B.R. 66, 78 (Bankr. S.D.N.Y. 2010) (same).

### B.   Application of the Bush Factors Demonstrates That the Parties Intended the Extensions to be Modifications, Not New Postpetition Agreements

As the Bankruptcy Court correctly found, it is clear from the plain language of the Extensions and the circumstances surrounding the negotiations that it was the intent of the parties to enter into a modification of an existing prepetition contract rather than a new, postpetition agreement.  *See* Bankruptcy Court Decision at [A-19] ("The plain, unambiguous language of the [Extensions] is clear that they are not 'new' post-petition agreements . . . .").  The Extensions were intended to be a temporary measure.  According to the Extensions, "[e]ach of RMS and [FoA] have entered into this Extension Agreement solely to temporarily extend the term of the [March 2011] Agreement" and "to allow the parties further time to negotiate and execute an Amended and Restated Reverse Mortgage Subservicing Agreement."  *See* Extensions at [A-895 n.17].

Furthermore, as laid out extensively in the Bankruptcy Court Decision, the Bush Factors are satisfied here.  In *Bush*, the modification versus separate contract issue arose because only one party had signed the modification.  There was a provision in the underlying agreement that allowed for unilateral modifications, and one of the parties tried to nullify the modification on the basis that it was a separate contract and therefore needed to be signed by both parties to be

valid.  The Court rejected this argument, stating that the modification is not a separate agreement because it (1) involves the same relationship among the same parties; (2) stated an intention of the parties' desire to amend and restate the original agreement; (3) altered the underlying agreement; and (4) restated all remaining provisions with no substantive changes.  *Bush*, 2006 WL 8455682, at *5.

Similarly here, as the Bankruptcy Court found, "[T]he [Extensions] merely (i) restate the provisions of the [March 2011 Agreement] with no substantive changes, (ii) involve the same relationship among the same parties, and (iii) state the parties' intention to extend terms of the [March 2011 Agreement].  Accordingly, [these Extensions] do not constitute new contracts." *See* Bankruptcy Court Decision at [A-20].  Based on the foregoing, the Bankruptcy Court properly concluded that it was the intent of the parties for the Extensions to be modifications of the prepetition March 2011 Agreement.

### C. FoA's Arguments to the Contrary Rely on Inapplicable Non-Bankruptcy Cases

The primary argument made by FoA is that a modification automatically constitutes a "new" agreement under New York law and then *ipse dixit* asserts that this "new" agreement is a postpetition agreement if the modification occurred postpetition.  FoA's contention that a "modification is a *type of new contract*" under New York Law misunderstands the core bankruptcy issue, *i.e.*, whether the modified contract constitutes a prepetition or postpetition contract.  While FoA cites to a number of cases, not one case concerned whether an agreement is considered prepetition or postpetition under bankruptcy law; in fact, none of FoA's cited cases are bankruptcy cases, and not a single bankruptcy court determining whether a contract is a prepetition or postpetition agreement has cited to FoA's laundry list of "new agreement" cases.

23

FoA cites *Cappelli v. State Farm Mut. Auto. Ins. Co.*, 259 A.D.2d 581 (2d Dep't. 1999) and *Delta Air Lines, Inc. v. Bombardier, Inc.*, Case No. 20-cv-3025-GHW, 2021 WL 1163702 (S.D.N.Y. Mar. 25, 2021), to support the notion that the Extensions are "new" agreements. Opening Brief 24.   *Cappelli* is a short case holding that an insurance policy amendment clarifying the definition of the term "each occurrence" in the policy was not a "renewal" as defined by a statute governing insurance policies, and therefore, the statute does not apply.   In so holding, the court made the statement that the "modification of a contract results in the creation of a new contract between the parties which *pro tanto* supplants the affected provisions of the original agreement while leaving the balance of the agreement intact."   *Cappelli*, 259 A.D.2d at 582.   The *Cappelli* court did not address whether a contract was a prepetition or postpetition contract nor the standard a court should use in making that determination for purposes of bankruptcy law.   Instead, the *Cappelli* court merely held that a modification needs to be read in conjunction with the underlying agreement to give effect to the full meaning of the contract.

In *Delta Air Lines*, Bombardier, Inc. and Delta Airlines, Inc. entered into a purchase agreement under which Delta purchased a fleet of jets from Bombardier.   2021 WL 1163702, at *1.   Bombardier subsequently assigned the agreement to an affiliate of Bombardier, C-Series Aircraft Limited Partnership ("**CSLP**"), which was then sold to Airbus.   *Id*. at *5-6.   Pursuant to this change in control, CSLP and Delta modified the agreement to change all references of Bombardier to CSLP.   *Id*.   An issue arose when Bombardier refused to accept certain credits Delta received under the modified purchase agreement, under which Delta previously was to receive certain credits for purchasing jets that it could apply towards "the purchase price of goods and/or services (excluding aircraft) purchased directly from *Bombardier*."   *Id*. at *8 (emphasis added).   After the amendment, "Bombardier" was changed to "Seller", defined as

CSLP.  *Id*.   The *Delta* court sided with Bombardier, holding that the amendment "clearly changed the terms of each of the relevant provisions of the [purchase agreement] . . . .  Seller is [CSLP].  As amended, the letter agreements unambiguously permit the application of the credits to buy goods and services from CSLP, not Bombardier."  *Id*. at *12.  In so holding, the court analyzed the purchase agreement using traditional methods of contract interpretation to ascertain the intent of the parties.  *See id*. at 10 ("When interpreting a contract, our primary objective is to give effect to the intent of the parties as revealed by the language of their agreement.") (internal quotations omitted).  Similar to *Cappelli*, the *Delta* court did not address whether a contract was a prepetition or postpetition contract nor the standard a court should use in making that determination for purposes of bankruptcy law.  Instead, the *Delta* court focused on the intent of the parties and the fact that the modification changed the underlying terms of the agreement.  *See Delta,* 2021 WL 1163702*,* at *11 ("The modifying agreement should be construed in connection with the original contract in order to ascertain the entire intent of the parties.").[5]

---

[5] The other cases FoA cite to similarly do not address whether a contract was a prepetition or postpetition contract nor the standard a court should use in making that determination for purposes of bankruptcy law. At their core, these cases simply look at the contract and determine that a modification was significant and therefore constituted a new contract for a non-bankruptcy purpose.  *See, e.g.*, *New York State Elec. & Gas Corp. v. Pub. Serv. Comm'n of State of New York*, 245 A.D. 131, 135 (3d Dep't 1935), *aff'd,* 274 N.Y. 591(1937) (holding that the Public Service Commission's order barring a utility company from entering into "amendments for extension of any existing servicing contract" with entities it had improper business relations was not an improper prohibition of "making" a new contract with an affiliate); *Karpen v. Ali*, 46 Misc. 3d 1228(A) (Sup. Ct. Kings Cnty. 2015) (holding that plaintiff's payment of an additional down payment pursuant to a modified contract constituted ratification of the modification); *Greek Orthodox Archdiocese of N. & S. Am. v. Abrams*, 162 Misc. 2d 850, 856 (Sup. Ct. Kings Cnty. 1994) (holding that Religious Corporations Law § 12, which requires prior court approval when a religious corporation "sell[s], mortgage[s], or lease[s] for a term exceeding five years any of its real property," applies when a Greek Orthodox Church modifies the sales price of the church).

FoA's cases do not even attempt to address the key issue here: whether a contract was a prepetition or postpetition contract.  Nor do these cases apply the Bush Factors, as the Bankruptcy Court properly did here.  *See* Bankruptcy Court Decision at [A-20].  As outlined extensively in section B above, it was the clear intent of the parties that, as evidenced by the plain language, the Extensions were not new, postpetition agreements.

## III.    To the Extent the Court Believes the Alternative Arguments Need to be Addressed, They Should be Remanded to the Bankruptcy Court in the First Instance

### A.    The Bankruptcy Court is the Proper Forum to Address the Alternative Arguments

The Plan Administrator agrees with the Bankruptcy Court that "the Court need not . . . address those [Alternative Arguments]."  Bankruptcy Court Decision at [A-26].  There is sufficient basis to affirm the Bankruptcy Court Decision solely on the Fair Contemplation Test and the Bush Factors.  However, to the extent this Court finds the Alternative Arguments need to be considered, they should be remanded to the Bankruptcy Court in the first instance.  *See Flushing Sav. Bank v. Teitelbaum (In re Lockwood Enters., Inc.)*, 70 B.R. 306, 307 (S.D.N.Y. 1987) ("On an appeal the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy court's judgment, order, or decree or remand with instructions for further proceedings.").

While remand is in the Court's discretion, this Court has cited judicial efficiency and bankruptcy law expertise as reasons why a bankruptcy court is a more appropriate forum to decide bankruptcy issues in the first instance.  *See Fairfield Sentry*, 2010 WL 4910119, at *2 ("[T]he bankruptcy court is familiar with these proceedings and the underlying factual context, and, moreover, it can employ its specialty expertise to this question.  Thus, judicial efficiency would be served and the uniform administration of the bankruptcy laws improved by allowing

the bankruptcy judge to decide this issue in the first instance.") (citing *Official Comm. of Unsecured Creditors of Veristar, Inc. v. Am. Tower Corp.,* No. 05 Civ. 6268 (RPP), 2005 WL 3455775, at *2 & n.2 (S.D.N.Y. Dec. 15, 2005)).   In addition, this Court has remanded bankruptcy appeals back to the Bankruptcy Court in the past.  *See SP Special Opportunities, LLC V. Lightsquared Inc. (In re LightSquared, Inc.)*, 539 B.R. 232, 245–46 (S.D.N.Y. 2015) ("Under the circumstances, the Court believes that the better course is to vacate [the injunction] and remand to the Bankruptcy Court in the first instance to reconsider the injunction in light of that Court's greater familiarity with the history of this matter and its understanding of the precise ends to which [the injunction] was directed.").

The Bankruptcy Court is intimately familiar with RMS's bankruptcy proceedings and business.  The Alternative Arguments, *i.e.,* whether the Extensions are outside the ordinary course of business transactions and whether any entitlement to administrative expense priority should be capped at an amount equal to the actual benefit RMS received during the postpetition period (*i.e.*, the subservicing fees) fundamentally deal with bankruptcy law concepts. Accordingly, to the extent this Court finds the Alternative Arguments should be considered, they should be remanded to the Bankruptcy Court in the first instance.

**B.**  **In the Alternative, the Alternative Arguments Should be Decided in Appellee's Favor**

*1.*  *If the Extensions are Postpetition Agreements, the Extensions are Not Valid Because They Were Not Approved by the Bankruptcy Court*

Under Section 363 of the Bankruptcy Code, actions by the debtor-in-possession outside the ordinary course of business by the debtor-in-possession require Bankruptcy Court approval, while actions within the ordinary course of business do not.  11 U.S.C. § 363.  In order to hold that a transaction is within the ordinary course, courts must find that the transaction satisfies two

27

tests:  (1) the "horizontal" test examines whether the transaction is ordinary for the debtor's business and other like businesses; and (2) the "vertical" test examines the reasonable expectations of interested parties as to what transactions the debtor is likely to enter in the course of its business. *In re Crystal Apparel, Inc.*, 220 B.R. 816, 831 (Bankr. S.D.N.Y. 1998).

The Extensions do not satisfy the "vertical" test.  The vertical test reviews the transaction "from the perspective of creditors, asking whether the transaction is one that creditors would reasonably expect the debtor or trustee to enter into." *In re Mesa Air Group, Inc.*, No. 10-10018 (MG), at *5 (Bankr. S.D.N.Y. Sep. 24, 2010).  Under this test, "the size, nature and type of business, and the size and nature of the transactions in question are relevant to determining whether the transactions are ordinary." *In re Enron Corp.*, No. 01-16034 (AJG), 2003 WL 1562202, at *17 (Bankr. S.D.N.Y. Mar. 21, 2003) (quoting *In re United States ex rel Harrison v. Estate of Deutscher*, 115 B.R. 592, 598 (M.D. Tenn. 1990)).  Transactions that are "not a daily occurrence for any given corporation… even if it is generally accepted corporations do enter in to these types of agreements regularly," are required to be approved by the Bankruptcy Court. *Crystal Apparel*, 220 B.R. at 832.

Here, the Extensions were monetarily significant.  RMS was paid approximately $4 million in subservicing fees in the approximately seven (7) months between the Petition Date and the Effective Date of the Plan, and, per FoA's assertion, allegedly incurred approximately $14 million in liabilities to FoA.  Furthermore, even if RMS is in the business subservicing, entering into a comprehensive subservicing contract is not a "daily occurrence."  In general, subservicing contracts takes months of extensive negotiations to reach a final form.

FoA cites to a 363(c) order entered by the Bankruptcy Court allowing the Debtors to continue "Servicing Obligations" in the ordinary course of business to support its position that

the Extensions are ordinary course transactions.   However, FoA's reliance on such order is misplaced and misleading.   The definition of Servicing Obligations in the Debtors' 363(c) motion only includes loans RMS is "obligated" to service.   [A-1295-96].   RMS was not "obligated" to extend the March 2011 Agreement and its obligations thereunder.   The 363(c) order was intended to allow RMS to continue its subservicing obligations, not incur new obligations under new subservicing agreements.

Based on the foregoing reasons, the Extensions were outside of the ordinary course and required prior Bankruptcy Court approval.   Because RMS never obtained such approval, to the extent the Extensions are deemed to be postpetition agreements, the Extensions are invalid.

### 2. Any Entitlement to Administrative Expense Priority is Limited to the Concrete, Discernible Benefit FoA Conferred upon RMS in the Postpetition Period, Which FoA Has Already Received

As detailed above, section 503 of the Bankruptcy Code provides that "actual, necessary costs and expenses of preserving the estate" may be afforded administrative priority.   11 U.S.C. § 503(b)(1)(A).   Priorities under the Bankruptcy Code is narrowly construed and are only granted if the Benefit to the Estate Test is satisfied.   *See, e.g.*, *Drexel*, 134 B.R. at 488; *Amalgamated*, 789 F.2d at 101; *supra* pp. 22-23.   As made clear by the *Enron* court, the purpose of the Benefit to the Estate Test is to prevent unjust enrichment to the debtor, *not* to "compensate the creditor for its loss."   *Enron*, 279 B.R. at 85.   Here, FoA is astonishingly asserting approximately $14 million as an administrative expense claim for its *losses*, approximately $10 million more than what RMS received in postpetition subservicing fees.   FoA asserts in a conclusory fashion that "RMS clearly benefited" because "RMS would not have been able to earn revenues otherwise."   Opening Brief 33.   However, FoA does not and cannot explain how such unsubstantiated benefit amounts to $14 million or how there was unjust enrichment in favor

of RMS.  Allowing FoA to recoup more than the postpetition fees RMS received would result in "compensat[ing] [FoA] for its loss," which is clearly not the intent and purpose of administrative expense priority under the Bankruptcy Code.[6]

FoA relies on *In re Klein Sleep Prod., Inc.* to support the notion that "whether a contract is 'beneficial', such that any claims arising thereunder will be afforded administrative expense priority, is determined at the time the estate incurs the obligation giving rise to the expense."  78 F.3d 18, 22 (2d Cir. 1996).  This reliance is misplaced.  *Klein Sleep* involved an assumed contract that was rejected 18 months later by a newly-appointed bankruptcy trustee.  *Id.* at 20.  In holding that the claimant landlord was entitled to administrative expense priority for future rent under the assumed-then-rejected contract, the Court relied on the premise that "if a lease is ***assumed*** in Chapter 11 proceedings, the liabilities flowing from the rejection of that lease will ever after be regarded as a Chapter 11 administrative expense."  *Id*. at 23 (emphasis added).  In analyzing the benefit prong of the Benefit to the Estate Test, the court held that "the bankruptcy court's earlier decision to let Klein Sleep assume the unexpired lease—a decision that was not appealed—precluded a subsequent finding that assuming the lease did not benefit *Klein Sleep*."  *Id*. at 25 (emphasis added).  Because *Klein Sleep* involved an assumed contract, its holding has no relevance here.

As mentioned in Section I above, the Benefit to the Estate Test and Fair Contemplation Test are in place to protect claimants against abuses by the debtor-in-possession.  Consequently, the Bankruptcy Court's ruling is not that "every breach of a prepetition contract [gives] rise only

---

[6] FoA asserts, in a footnote, that there are exceptions to the "benefit" requirement where, notwithstanding no direct benefit to the estate, certain claims are afforded administrative expense priority where the debtor's operation cause injury.  *See* Opening Brief 33, n. 34. However, all of the cases FoA cites for this proposition relate to statutory fines and penalties or torts, not contractual breaches, and are inapplicable here.

30

to prepetition claims" as FoA wrongfully asserts.   Opening Brief 17.   The correct characterization of the law and the Bankruptcy Court Order is that: (1) contractual breaches that are fairly contemplated by a prepetition agreement give rise to contingent prepetition claims (*i.e.* the Fair Contemplation Test); and (2) to the extent there is a postpetition transaction that provides a concrete, discernible benefit to the debtor-in-possession in the operation of its business, in exchange, the claimant is entitled to an administrative expense claim for the concrete amount the debtor-in-possession benefited from the postpetition transaction, not for the loss incurred by the counterparty (*i.e.* the Benefit to the Estate Test).   *See supra* pp. 24-25.

Under the Agreements, RMS, at most, benefitted from the approximately $4 million in postpetition fees paid by FoA.   FoA benefitted from the subservicing obligations performed by RMS, which resulted in FoA receiving hundreds of millions of dollars of mortgage payments. This relationship was the bargained-for exchange, and despite what FoA would have this Court believe, FoA fully reaped the benefits of the services that RMS provided.

*[Remainder of page intentionally left blank]*

31

## **CONCLUSION**

For the foregoing reasons the Bankruptcy Court's Order should be affirmed and the appeal should be denied with prejudice.

Dated:          February 17, 2022
                    New York, New York

                                         Respectfully submitted,

                                         */s/ Sunny Singh*
                                         WEIL, GOTSHAL & MANGES LLP
                                         767 Fifth Avenue
                                         New York, New York  10153
                                         Telephone:  (212) 310-8000
                                         Facsimile:  (212) 310-8007
                                         Ray C. Schrock, P.C.
                                         Richard W. Slack
                                         Sunny Singh
                                         Natasha S. Hwangpo

                                         Email:     Ray.Schrock@weil.com
                                                             Richard.Slack@weil.com
                                                             Sunny.Singh@weil.com
                                                             Natasha.Hwangpo@weil.com

                                         *Attorneys for Plan Administrator, on behalf of the Wind Down Estates, Appellee*

32

## CERTIFICATE OF COMPLIANCE

Based on the word counting device used on my computer, I hereby certify that:

1.      This brief is in compliance with the word limit requirement contained in Fed. R. Bankr. P. 8015(a)(7)(B)(i) and Local Civil Rule 7.1(c) because it contains less than 13,000 words (excluding the sections of the brief exempted by Fed. R. Bankr. P. 8015(g)).

2.      This brief is in compliance with the page limitation contained in the Court's Individual Rules of Practice, dated April 18, 2020, because it does not exceed 35 pages in length, double-spaced, which is the page limitation applicable to memoranda of law on motions.[7]

*/s/ Sunny Singh*
Sunny Singh

*Attorney for Plan Administrator, Appellee*

---

[7] Pursuant to the *Order Granting Letter Motion for Leave to File Excess Pages* (ECF No. 8), this opposition brief has been prepared using 12-point type Times New Roman typestyle.